# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

        Plaintiff,

  v.

U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, THE UNITED STATES OF AMERICA, and, in their official capacities, PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, and TULSI GABBARD,

        Defendants.

Civil Action No. 1:25-cv-00716

**EMERGENCY HEARING RESPECT-FULLY REQUESTED**

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF PERKINS COIE'S MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES .................................................................................. iiii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

    A.    Perkins Coie's History of Advocating for Its Clients ............................... 4

    B.    The Executive Order and Accompanying "Fact Sheet" ........................... 5

    C.    The Order Is Already Inflicting Irreparable Harm................................... 7

    D.    The Executive Order Is Politically Motivated Retribution ...................... 9

LEGAL STANDARD AND REVIEWABLITY ...................................................... 10

ARGUMENT ........................................................................................................ 12

I.    PERKINS COIE IS LIKELY TO SUCCEED ON THE MERITS................................. 12

    A.    The Executive Order Exceeds the President's Constitutional Authority and Violates the Separation of Powers ........................................................ 12

        1.    No Statutory or Constitutional Authority Supports the Order ................. 13

        2.    The Executive Order Improperly Usurps Judicial Power ......................... 15

    B.    The Executive Order Violates the First Amendment ............................... 19

        1.    The Executive Order Retaliates in Violation of the First Amendment ................................................................................................ 20

        2.    The Executive Order Constitutes Viewpoint Discrimination ................... 22

    C.    The Executive Order Violates Perkins Coie's Right to Due Process ................... 24

        1.    The Order Deprives Perkins Coie of Liberty and Property Interests......... 25

        2.    The Executive Order Was Issued Without Notice or A Hearing.............. 29

        3.    The Executive Order Is Impermissibly Vague........................................... 30

    D.    The Executive Order Violates Sixth Amendment and Due Process Rights to Counsel ................................................................................... 31

        1.    Perkins Coie Has Standing To Challenge These Violations..................... 32

2.      The Executive Order Violates Bedrock Sixth Amendment Rights ...........32

3.      The Executive Order Also Violates the Due Process Right to Counsel ..................................................................................................34

E.      The Executive Order Violates Equal Protection ......................................................35

II.     A TRO IS NEEDED TO STOP IRREPARABLE HARM...............................................36

A.      Perkins Coie Is Suffering Irreparable Economic Harm .........................................37

B.      The Executive Order Has Impaired Perkins Coie's Constitutional Rights...........39

C.      Perkins Coie Is Suffering Ongoing and Irreparable Reputational Harm. .............42

III.    THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR A TRO .................43

CONCLUSION.............................................................................................................................45

## TABLE OF AUTHORITIES

Page

### CASES

*112 Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489 (1982)...........................30

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)........................................................11

*Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 435415 (D.D.C. Feb. 7, 2025).............................43

*Arnaud v. Odom*, 870 F.2d 304 (5th Cir. 1989)...........................................................28

*Bailey v. Fed. Bureau of Prisons*, 2024 WL 3219207 (D.D.C. June 28, 2024)...........................39

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972)............................................25

*Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018)...................................43

*Biden v. Nebraska*, 600 U.S. 482 (2023) ...................................................................18

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ...............................................24, 29

*Bolling v. Sharpe*, 347 U.S. 497 (1954)....................................................................35

*Bond v. United States*, 564 U.S. 211 (2011) ..............................................................13

*Bond v. United States*, 572 U.S. 844 (2014) ..............................................................16

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).....................................................4

*Bowsher v. Synar*, 478 U.S. 714 (1986)...................................................................19

*Broudy v. Mather*, 460 F.3d 106 (D.C. Cir. 2006).........................................................28

*Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016).........................................................35

*Buckley v. Valeo*, 424 U.S. 1 (1976).......................................................................35

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)........................................28

*\*Campbell v. District of Columbia*, 894 F.3d 281 (D.C. Cir. 2018)..............................25, 26, 27

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) .......................................32

*CASA, Inc. v. Trump*, 2025 WL 408636 (D. Md. Feb. 5, 2025) ...............................11, 13

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)............................................................16

*\*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) .........................................................14

Page

Cases—continued:

*Cigar Ass'n of Am. v. U.S. FDA*, 317 F. Supp. 3d 555 (D.D.C. 2018)....................................39, 40

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985).............................................36

*City of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018)....................................................12

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) ........................................................................11

*\*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866) ................................................................19

*D.A.M. v. Barr*, 474 F. Supp. 3d 45 (D.D.C. 2020)......................................................................11

*Davis v. District of Columbia*, 158 F.3d 1342 (D.C. Cir. 1998).................................................39, 40

*Doctors for Am. v. Off. of Pers. Mgmt.*, 2025 WL 452707 (D.D.C. Feb. 11, 2025)...............11, 37

*Doe 1 v. Trump*, 275 F. Supp. 3d 167 (D.D.C. 2017),
    *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) ............................41

*Doe v. District of Columbia*, 697 F.2d 1115 (D.C. Cir. 1983) ....................................................34

*Doe v. DOJ*, 753 F.2d 1092 (D.C. Cir. 1985) .............................................................................26

*Doe v. McHenry*, 1:25-cv-00286 (D.D.C. Feb. 18, 2025), Dkt. 44 ............................................11

*Doe v. Trump*, 2025 WL 485070 (D. Mass. Feb. 13, 2025) .......................................................13

*Elrod v. Burns*, 427 U.S. 347 (1976) .....................................................................................39, 40

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) .................................................................36

*\*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)..................................................25, 29

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020).........................32

*Franks v. Rubitschun*, 312 F. App'x 764 (6th Cir. 2009) ...........................................................35

*Fuentes v. Shevin*, 407 U.S. 67 (1972).....................................................................................29

*\*Gen. Elec. v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010).............................................................26

*Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022) ...............................................14

*Gideon v. Wainwright*, 372 U.S. 335 (1963) .............................................................................31

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017)....................................................16

Page

Cases—continued:

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ....................................39, 40

*Goss v. Lopez*, 419 U.S. 565 (1975) .........................................................27

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ...............................16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ....................................31

*Greene v. McElroy*, 360 U.S. 474 (1959) ..................................................28

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .................................................30

*Harris v. Bessent*, 2025 WL 521027 (D.D.C. Feb. 18, 2025)...................11, 37

*\*Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016) .........................20

*Honeywell, Inc. v. Consumer Prod. Safety Comm'n*, 582 F. Supp. 1072 (D.D.C. 1984).............42

*Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022)................................20

*Hughes v. City of New York*, 680 F. App'x 8 (2d Cir. 2017).........................20

*Humanitarian Law Project v. U.S. Dep't of Treasury*,
    463 F. Supp. 2d 1049 (C.D. Cal. 2006) ................................................31

*In re Primus*, 436 U.S. 412 (1978)............................................................24

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Auto Glass
    Emps. Credit Union*, 72 F.3d 1243 (6th Cir. 1996) ...............................28

*\*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951).....................17, 20, 30

*Jones v. Trump*, 1:25-cv-00401 (D.D.C. Feb. 24, 2025), Dkt. 28 ................11

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020)..................................39, 40

*\*Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994).........................26

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) .......................................13

*Kohn v. State Bar*, 87 F.4th 1021 (9th Cir. 2024) (en banc)........................16

*Korte v. Off. of Pers. Mgmt.*, 797 F.2d 967 (Fed. Cir. 1986)........................18

*\*Lafler v. Cooper*, 566 U.S. 156 (2012) ....................................................33

v

Page

Cases—continued:

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) ............................24

*\*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................42, 44

*\*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) ...................................................23, 41, 45

*Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291 (M.D. Ala. 2012) ..............................20

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ................................................................25

*\*Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174 (D.D.C. 2021) ........................37, 38

*Mann v. Wash. Metro. Area Transit Auth.*, 185 F. Supp. 3d 189 (D.D.C. 2016) ........................37

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)...................................................................16

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................................................25

*McCrea v. District of Columbia*, 2021 WL 1216522 (D.D.C. Mar. 31, 2021)............................35

*Mead v. Indep. Ass'n*, 684 F.3d 226 (1st Cir. 2012) ................................................................25

*\*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ..............................13

*Myers v. United States*, 272 U.S. 52 (1926)..............................................................................15

*NAACP v. Button*, 371 U.S. 415 (1963)....................................................................................28

*Nalco Co. v. EPA*, 786 F. Supp. 2d 177 (D.D.C. 2011)..............................................................38

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
    2025 WL 573764 (D. Md. Feb. 21, 2025) ....................................................................21, 22

*Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852 (D.D.C. Feb. 3, 2025)...........................42

*\*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001)..........27, 30

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003)................................................11

*\*Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024).................................................................22, 34

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) ............................................................................13

*News Am. Pub., Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988).....................................................35

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ...................................................................................20

Page

Cases—continued:

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977)...................................................18

*Oparaugo v. Watts*, 884 A.2d 63 (D.C. 2005) ...........................................................17

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ................................................................33

*Patriot, Inc. v. HUD*, 963 F. Supp. 1 (D.D.C. 1997) ...................................................43

*Paul v. Davis*, 424 U.S. 693 (1976)........................................................................27

*Penson v. Ohio*, 488 U.S. 75 (1988) ......................................................................44

*Perry v. Sindermann*, 408 U.S. 593 (1972).............................................................21

*PFLAG, Inc. v. Trump*, 2025 WL 685124 (D. Md. Mar. 4, 2025)...................................13

*Powell v. Alabama*, 287 U.S. 45 (1932) ..................................................................34

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .....................................................22, 23

*Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419 (D.D.C. 2018) ......................42

*Romer v. Evans*, 517 U.S. 620 (1996)....................................................................36

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)...................22, 24

*Saline Parents v. Garland*, 88 F.4th 298 (D.C. Cir. 2023) ......................................11, 12

*SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28 (1st Cir. 2008)......................36

*Schware v. Bd. of Bar Exam.*, 353 U.S. 232 (1957) ...................................................25

*SEC v. Jarkesy*, 603 U.S. 109 (2024)......................................................................16

*Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984) ...........................21

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)...........................................................14

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ......................................................30

*Shilling v. Trump*, No. 2:25-cv-00241 (W.D. Wash. Feb. 6, 2025)..................................7

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012)................................40

*Sioux Tribe of Indians v. United States*, 316 U.S. 317 (1942)......................................13

Page

Cases—continued:

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................................................22

*Stein v. Bd. of N.Y.C. Bureau of Pupil Transp.*, 792 F.2d 13 (2d Cir. 1986)................28

*Stevens v. Holder*, 950 F. Supp. 2d 1282 (N.D. Ga. 2013)..........................................36

*Strickland v. Washington*, 466 U.S. 668 (1984) ...........................................................31

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................11

*\*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013)......................................35, 36

*Tex. All. for Retired Ams. v. Hughs*, No. 20-40643 (5th Cir.) ......................17, 20, 23, 24

*TikTok, Inc. v. Trump*, 490 F. Supp. 3d 73 (D.D.C. 2020) ............................................38

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .......................................................32

*Trentadue v. Integrity Comm.*, 501 F.3d 1215 (10th Cir. 2007)....................................28

*Trump v. Clinton*, 626 F. Supp. 3d 1264 (S.D. Fla. 2022)................................18, 23, 44

*\*Trump v. Hawaii*, 585 U.S. 667 (2018)........................................................................14

*Trump v. New York*, 592 U.S. 125 (2020)......................................................................12

*\*Trump v. United States*, 603 U.S. 593 (2024).............................................................15

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333 (D.D.C. 2020).............20

*U.S. Dep't of Agric. v. Moreno,* 413 U.S. 528 (1973) .................................................36

*U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715 (1990)................................................21, 32

*United States ex rel. Carey v. Rundle*, 409 F.2d 1210 (3d Cir. 1969) ..........................34

*United States v. Bear*, 769 F.3d 1221 (10th Cir. 2014) ...............................................16

*United States v. Brown*, 381 U.S. 437 (1965)...............................................................18

*\*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)................................33, 41, 45

*United States v. Laura*, 607 F.2d 52 (3rd Cir. 1979) ..............................................33, 34

*United States v. Midwest Oil Co.*, 236 U.S. 459 (1915) ..............................................15

Page

Cases—continued:

*United States v. Sussmann*, No. 1:21-cr-582 (D.D.C.) ...................................................17

*\*United States v. Williams*, 553 U.S. 285 (2008) .........................................................30

*\*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000)...................................................35

*Vote Forward v. DeJoy*, 490 F. Supp. 3d 110 (D.D.C. 2020) .......................................40

*Wheat v. United States*, 486 U.S. 153 (1988) ...............................................................31

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008)...........................................43

*\*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ....................36, 37

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ..................................................27, 28

*Wounded Knee Legal Def./Offense Comm. v. Fed. Bureau of Investigation*,
    507 F.2d 1281 (8th Cir. 1974) ................................................................................32, 33

*\*Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144 (D.D.C. Mar. 12, 2021).........................42, 43

*\*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ...............................12, 13, 14, 15

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015)..............................................14

## CONSTITUTION, REGULATION, AND RULES

U.S. Constitution

    amend. I.............................................................................................................. passim

    amend. V ......................................................................................24, 28, 29, 40, 41

    amend. VI............................................................................................................. passim

    art. I...........................................................................................................................18

    art. II....................................................................................................................12, 14

Declaration of Independence ...........................................................................................12

D.C. Rules of Professional Conduct

    Rule 1.2 .........................................................................................................................45

    Rule 1.3 ......................................................................................................................9, 44

    Rule 5.6 ....................................................................................................................41, 45

    Rule 6.2 .........................................................................................................................45


Executive Order No. 14230 (2025) ................................................................... passim

## OTHER AUTHORITIES

*Bill of Attainder*, Black's Law Dictionary (12th ed. 2024) ...........................................18

D.C. Ethics Op. 124 .....................................................................................................41

## INTRODUCTION

The President's March 6, 2025 Executive Order—titled "Addressing Risks from Perkins Coie LLP"—is an unconstitutional assault on Perkins Coie, its lawyers, its employees, its clients, the legal profession, and the rule of law. Perkins Coie lawyers are among the nation's best. They practice at the highest levels of the profession in federal and state courts across the country, before more than 90 federal agencies, and in varied transactional settings. They serve their communities as Sunday school teachers, Scout leaders, youth sports coaches, military reservists, and board members of civic organizations. Presidents from both political parties, including President Trump, have appointed Perkins Coie lawyers to serve as federal judges. Perkins Coie's staff have called the Firm one of the "Best Companies to Work For" for over 20 years. Perkins Coie lawyers devote countless hours to providing free legal services to those who cannot afford to pay. In 2024 alone, Perkins Coie lawyers worked over 89,000 hours on pro bono matters valued at nearly $70 million.

Lawyers protect and promote our cherished freedoms, including the rights to free speech and to petition the government, and safeguard the rule of law that underpins our democratic system. Critical to this role is lawyers' time-honored duty to advocate zealously for their clients, no matter how controversial. Zealous advocacy serves as a bulwark against government abuses that erode the rule of law. In keeping with the highest tradition of the legal profession, Perkins Coie has zealously advocated for its clients in matters large and small since the Firm's founding more than a century ago. The President's Executive Order attacks Perkins Coie and its clients for that advocacy. The Firm already has suffered significant harm, and that harm is increasing every day.

The Order defames Perkins Coie's 1,200 lawyers as "dishonest" and "dangerous" without basis. And it seeks to punish Perkins Coie based on a tiny sliver of the Firm's work: The Order criticizes the representations by *former* Perkins Coie lawyers *almost a decade ago* of clients that the President perceives as his political enemies, as well as the Firm's present representation of

clients in litigation that challenges his Administration's policies.  The retaliatory punishment the Order imposes is unprecedented.  It purports to restrict access to federal buildings for *every one* of the 2,500 lawyers and employees of the Firm.  It instructs federal agencies to refuse to meet with Perkins Coie lawyers and staff or even engage with them.  It instructs federal agencies to terminate contracts held by firm clients, for the express goal of causing clients to sever their relationships with their trusted Perkins Coie lawyers.  The Order is not just an attempt to constrain or weaken Perkins Coie; its objective is to destroy the Firm.  Unless restrained, the Order realistically might succeed in that objective within days based on the weight of the federal pressure being deployed against the Firm's clients.

The Order is unconstitutional from top to bottom.  While styled an Executive Order, the Order is not really *executive* at all.  It purports instead to adjudicate whether a handful of former Perkins Coie lawyers committed misconduct (as defined by the President) years ago, and then to punish the entire Firm with terminal sanctions for those lawyers' supposed transgressions.  It makes these adjudicative "findings" without notice to Perkins Coie and without an opportunity to be heard and to contest the Order's false claims.  If Congress had enacted legislation mirroring the Executive Order, it would be an unconstitutional bill of attainder.  The Constitution likewise bars the President from punishing his political opponents' law firms with a sweep of the pen.

The Order does not even try to disguise its retaliatory purpose.  The President promised during the campaign to retaliate against his political opponents, including the attorneys who represented them ("WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law…. *Please beware that this legal exposure extends to Lawyers*….").  The Order makes good on that threat.  The President confirmed as much at the signing ceremony, when he stated that Perkins Coie had engaged in weaponization "against a political opponent" (i.e., himself)

and tried to justify the Order by touting the chilling effect it will have on lawyers' representations of their clients ("it should never be allowed to happen again").

Although the Executive Order is expressly political, its consequences are not. The Order already has produced several harmful effects for Perkins Coie and its clients. Government officials already have invoked the Order to refuse to meet with Perkins Coie attorneys—including on matters having nothing to do with presidential politics or government contracting. Agencies already have asked Perkins Coie clients to disclose whether they have a relationship with the Firm. Some clients already have chosen to move work elsewhere. And other clients have expressed grave concern about the consequences of continuing to retain Perkins Coie if this illegal Order is not enjoined. Without an immediate restraining order, significant additional client relationships likely will be lost within days. The Order thus poses an imminent, ongoing threat to the Firm's survival.

Although the entire Executive Order is invalid, this Court should temporarily restrain at least Sections 1, 3, and 5. The constitutional violations are plain.

*First*, the Order exceeds the President's constitutional and statutory authority and thus violates the separation of powers. The President has no valid authority to adjudicate and punish alleged misconduct by a law firm in its general representation of clients.

*Second,* the Order blatantly violates the First Amendment by retaliating against the Firm and its attorneys for associating with clients and advocating positions the President disfavors and by discriminating against the Firm and its attorneys on the basis of viewpoint.

*Third*, the Order deprives Perkins Coie and its attorneys of their liberty and property interests without any semblance of due process of law.

*Fourth*, the Order unlawfully interferes with the ability of Perkins Coie and its attorneys to represent their clients in violation of the Sixth Amendment and Due Process Clause.

*Fifth*, the Order deprives Perkins Coie and its attorneys of equal protection of the law by singling out and targeting the law firm based on raw animus.

In short, the Executive Order seeks to punish a law firm for its zealous and successful representations of the President's political opponents by bullying clients into taking their business elsewhere and ultimately forcing the entire Firm into collapse.  It presages the next step, which is to intimidate other law firms from representing clients who would challenge Administration policies.  No President, regardless of party, is authorized to exercise such power. The Court should grant a temporary order restraining implementation of at least Sections 1, 3, and 5 of the Order.

## BACKGROUND

### A.    Perkins Coie's History of Advocating for Its Clients

Perkins Coie is one of the largest full-service law firms in the United States.  It employs more than 1,200 lawyers in offices around the world, and another approximately 1,200 business professionals.  Burman Decl. ¶ 7.  Perkins Coie's attorneys include military veterans, former prosecutors, and public servants.  *Id*. ¶¶ 4, 7.  They serve on hundreds of boards of civic organizations, ranging from art museums and food kitchens to major universities and local schools.  *Id*. ¶ 7.  Its lawyers hold political views across the spectrum.  Many attorneys joined the Firm after government service in both Democratic and Republican administrations, or after serving as judges or law clerks to judges appointed by both Democratic and Republican presidents.  *Id*. ¶ 8.  Reflecting this bipartisan ethos, four Perkins Coie partners have recently been appointed as federal judges: two by President Trump and two by President Biden.  *Id*.

Perkins Coie is dedicated to serving its clients, communities, and employees.  Over its 113-year history, its lawyers have represented clients in every state, in federal and state courts across the nation (including the Supreme Court), and in tribunals worldwide.  *Id*. ¶ 5.  The Firm and its lawyers are regularly recognized for excellence.  *Id*. ¶ 6.  Perkins Coie has a longstanding, firmwide

commitment to pro bono service. *Id.* ¶ 9. Its lawyers have provided nearly one and a half million hours of pro bono service to countless clients, including the League of Women Voters and other non-partisan organizations, and including indigent criminal defendants in the federal courts. *Id.*

As a full-service law firm that represents clients in all sectors of the economy, Perkins Coie routinely interacts with the federal government and its employees on behalf of the Firm's clients in innumerable ways. *Id.* ¶ 11. The Firm has nearly 1,000 active matters that require its lawyers to interact with more than 90 federal agencies. *Id.* ¶¶ 11, 19. Many of its clients are government contractors who have hired Perkins Coie for legal services having nothing to do with those government contracts. *Id.* ¶ 14; *see also infra* pp.7-9, 33-34, 38, 41-42.

### B.    The Executive Order and Accompanying "Fact Sheet"

On March 6, 2025, the President issued Executive Order No. 14230 titled "Addressing Risks From Perkins Coie LLP." Ex. 1 (hereinafter "Executive Order" or "EO").[1] Section 1 declares that Perkins Coie has engaged in "dishonest and dangerous activity" "for decades." *Id.* § 1. As purported examples of such "dishonest and dangerous activity," the Order cites the Firm's representation of the President's opponent in the 2016 election, Hillary Clinton, and its retention of an investigative firm, Fusion GPS, as part of that representation. *Id.* As a further example of alleged "dishonest and dangerous activity," the Order asserts that the Firm has worked with "activist donors" to "judicially overturn popular, necessary, and democratically enacted election laws." *Id.*

The Executive Order's assertions that Perkins Coie's employees present active "risk[s]" are preposterous. The Order fails to mention that the lawyer who led the representation of the 2016 Clinton presidential campaign is no longer employed by Perkins Coie and has not been for

---

[1] Exhibits are attached to the Declaration of Christopher N. Manning, filed herewith.

years.  Burman Decl. ¶ 12.  Nor does the Order mention that, in the litigation matters it decries, the Firm's clients prevailed against all but one of dozens of challenges brought by the Trump campaign seeking to overturn the 2020 election results, or that the Firm's clients also prevailed in a significant number of voting rights cases, including cases where its clients were successful in defending existing laws.  *Id.* ¶ 21.  The Order also omits that, before President Trump's reelection, a federal court in Florida dismissed with prejudice his personal lawsuit against Perkins Coie alleging that the Firm had conspired with the Clinton campaign and others to weave a false narrative about Mr. Trump's colluding with Russia to interfere with the 2016 election.  *Id.* ¶ 22.

Section 1 asserts that one court sanctioned Perkins Coie attorneys for a "lack of candor." EO § 1.  The Order does not mention that the incident occurred in 2021; that the total sanction was $8,700; that the three sanctioned attorneys are no longer partners or employees of the Firm; that what the court determined to be a lack of candor was a failure to notify the court that a motion to supplement the record was "nearly identical" to an earlier motion filed when the attorneys had sought an emergency stay; and that, upon reconsideration, the court explained that a violation of the local rules, without any need to find bad faith, supported the sanctions.  Burman Decl. ¶ 37(c).

With the Executive Order, the White House issued a so-called "Fact Sheet."  Ex. 2.  The Fact Sheet attempts to justify the Order by falsely stating that the Firm "pushed debunked claims of secret Trump-Russia communications via Alfa Bank" which resulted in former Perkins Coie attorney Michael Sussmann's being "indicted for lying to the FBI."  *Id.* at 2.  The Fact Sheet does not mention that a jury in this Court acquitted Mr. Sussmann after just two hours of deliberation or that Mr. Sussmann left Perkins Coie in 2021.  Burman Decl. ¶ 37(a).

The Fact Sheet states that Perkins Coie "has filed lawsuits against the Trump Administration, including one designed to reduce military readiness."  Fact Sheet at 2.  That appears to refer

to a pending lawsuit by servicemembers, represented by Perkins Coie, challenging the Executive

Order banning transgender personnel from military service.  Burman Decl. ¶ 37(g); *see Shilling v.*

*Trump*, Case No. 2:25-cv-00241 (W.D. Wash., filed Feb. 6, 2025).

### C.     The Order Is Already Inflicting Irreparable Harm

The Executive Order does more than disparage Perkins Coie.  It also punishes the Firm

with nothing less than existential sanctions.  As relevant to this Motion, Section 3 directs govern-

ment agencies to "require Government contractors to disclose any business they do with Perkins

Coie and whether that business is related to the subject of the Government contract."  EO § 3.  The

section further directs agencies to "take appropriate steps to terminate any contract, to the maxi-

mum extent permitted by applicable law, … for which Perkins Coie has been hired to perform any

service"; to "otherwise align their agency funding decisions" with the Administration's goals, es-

pecially those in the Executive Order itself; and to submit an "assessment of contracts with Perkins

Coie or with entities that do business with Perkins Coie" and "any actions taken with respect to

those contracts." *Id.*  The accompanying Fact Sheet makes clear that contracts with Perkins Coie's

clients will, in fact, be terminated: "[T]he Federal Government will prohibit funding contractors

that use Perkins Coie LLP," and will do so "[t]o ensure taxpayer dollars no longer go to contractors

whose earnings subsidize partisan lawsuits against the United States."  Fact Sheet at 1.

Many of the Firm's largest clients (for instance, all of the top 15 largest clients, represent-

ing more than $343 million in 2024 revenue), or their affiliates, have or compete for government

contracts, and the Firm represents many of those clients in legal matters completely unrelated to

government contracting.  Burman Decl. ¶¶ 14, 28.  Each of Perkins Coie's nine major practice

groups includes a substantial percentage of clients that do business with the government.  *Id.* ¶ 12.

For some, the fact that the Firm gives them legal advice is not public.  *Id.* ¶ 28.  Accordingly, if

implemented, the Order will require these clients to divulge to the government confidential

information regarding their consultation with counsel, after which the Administration has been instructed to terminate their government contracts. *Id.*

Section 5 directs the heads of "all agencies" to limit the access of Firm attorneys and employees to federal buildings when access would be "inconsistent with the interests of the United States" and to limit government employees "from engaging with Perkins Coie employees." EO § 5. It directs agency officials to "refrain from hiring employees of Perkins Coie" absent a waiver certifying that "such hire will not threaten the national security of the United States." *Id.*

Government officers already have begun implementing Section 5. The day the Order was released, the Criminal Division of the Department of Justice cited the Order as necessitating postponement of a meeting that was to include a Perkins Coie attorney representing a criminal defendant. Burman Decl. ¶ 26. The Criminal Division was unable to advise whether that meeting would ever be rescheduled, threatening that client's ability to achieve a swift resolution of the matter. *Id.* The next day, an official at a federal agency informed a Firm client that Perkins Coie lawyers should not attend a meeting at that agency to discuss their legal matter. *Id.* ¶ 25.

The Order's branding of Perkins Coie as *persona non grata* has caused reputational and financial harm that, if allowed to stand, jeopardizes the very existence of the Firm. In the days immediately after the Order was issued, multiple clients terminated engagements with Perkins Coie as a result of the Order, citing their need to be represented by lawyers with whom federal agencies will engage. Burman Decl. ¶ 29(a)-(h). These immediate and irreparable injuries will continue to grow by the day given the nature of Perkins Coie's ongoing legal work and client roster. A critical mass of key clients sit on a precipice: continued refusals by federal officials to meet with Perkins Coie lawyers, or refusals to permit Firm lawyers to access federal agencies and buildings, would devastate both the Firm as a whole and its zealous pursuit of its clients' interests.

Burman Decl. ¶ 30.  The consequences could be catastrophic: if enough of the firm's largest clients leave to protect their government contracts, then the firm could suffer an existential financial crisis.

By punishing a law firm for its advocacy on behalf of clients whom the President disfavors, the Executive Order is designed to have a chilling effect extending far beyond Perkins Coie.  Distinguished experts on the legal profession and on lawyers' professional responsibilities—three of whose declarations are included with this filing—agree that the Order presents a clear and present danger to the administration of justice in the United States.  As those experts explain, "[t]he quality of justice in the United States depends in large measure on lawyers' diligent advocacy of their clients' respective positions," especially for people "whose cause is controversial or the subject of popular disapproval."  Hirshon Decl. ¶¶ 6-7 (quoting D.C. R. Prof'l C. r. 1.3, Comment [2]).  That is why the Rules of Professional Conduct underscore "the importance of affording legal assistance to unpopular clients."  Green Decl. at 4.  Yet "[r]easonable lawyers will understand the Executive Order to mean not only that lawyers may suffer government retribution for representing clients in matters of which the President disapproves for personal or political reasons, but also that they may be punished for representing clients who challenge the legality of government policies."  Hirshon Decl. ¶ 10; *see also* Green Decl. at 5 (opining that the Order "will discourage not only Perkins Coie but also other law firms from representing future clients and pursuing future actions, and particularly actions against the Government and other advocacy that the President might disfavor").  Moreover, the Order deters clients from exercising their Constitutional right to select the counsel of their choosing, and would even deter law school graduates from choosing employment at law firms that represent clients the President dislikes.  Hirshon Decl. ¶¶ 12-13.

### D.    The Executive Order Is Politically Motivated Retribution

Observers immediately understood that the Executive Order and Fact Sheet are retaliation for Perkins Coie's representation of the President's opponents in the 2016 and 2020 elections and

of clients who have successfully challenged the President and his allies in court.  The Associated Press wrote that "the actions appear designed not only to settle scores from years past but also to deter both government officials and private sector workers from participating in new inquiries into his conduct."  Ex. 3.  *The New York Times* recognized the Order as an "escalation of efforts to punish groups the President sees as aiding his enemies."  Ex. 4.

The Order immediately had its intended chilling effect.  The *Wall Street Journal* reported that law firms are "fearful of taking on a president who hasn't shied away from punishing his enemies," citing "private conversations" with "partners at … leading law firms" who have declined to act "in part because of retaliation fears."  Ex. 5.; *see also id*. ("Advocacy groups … say it has been more difficult to recruit larger firms to help with cases against Trump …."); *id*. (quoting NAACP Legal Defense Fund employee: "Law firms are not as vocal and as zealous").

The press and the public rightly recognized the Order as retaliatory because the President repeatedly promised during his 2024 campaign to retaliate against his perceived political opponents and the lawyers who represented them.  In a June 2024 interview, for example, the President said, "Look, when this election is over, based on what they've done, I would have every right to go after them …."  Ex. 6.  In September 2024, Mr. Trump warned on Truth Social that "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law.  … Please beware that this legal exposure extends to Lawyers …."  Ex. 7.  Since issuing the Order, the President has reiterated his intention to punish firms that represent his perceived political enemies, stating: "We have a lot of law firms that we are going to be going after."  Ex. 5.

## LEGAL STANDARD AND REVIEWABLITY

For the reasons discussed below, Perkins Coie is entitled to a temporary restraining order enjoining implementation of at least Sections 1, 3, and 5 of the Executive Order.  "An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive

relief." *Harris v. Bessent*, 2025 WL 521027, at *2 (D.D.C. Feb. 18, 2025).  To obtain such relief, a plaintiff must show "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (cleaned up).  Where "the movant seeks to enjoin the government, the final two TRO factors … merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020).

There is "no question" that a district court "may review the constitutionality of [an] Executive Order and grant injunctive relief." *CASA, Inc. v. Trump*, 2025 WL 408636, at *1, *4 (D. Md. Feb. 5, 2025).  Indeed, this Court recently has enjoined implementation of Executive Orders that exceed the President's statutory or constitutional authority.  *See, e.g.*, *Doctors for Am. v. Off. of Pers. Mgmt.*, 2025 WL 452707, at *10 (D.D.C. Feb. 11, 2025) (granting TRO to prevent agencies from removing or modifying health-related websites pursuant to executive order); *Jones v. Trump*, 1:25-cv-00401, Dkt. 28 (D.D.C. Feb. 24, 2025) (granting TRO to prevent implementation of executive order regarding transgender inmates "as to the plaintiff"); *see also Doe v. McHenry*, 1:25-cv-00286, Dkt. 44 (D.D.C. Feb. 18, 2025) (granting preliminary injunction of same order).

The Executive Order is immediately reviewable.  As discussed above, the Order already is being implemented, and the Firm already is feeling its "effects" in a "concrete way." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003).  The issues raised in this motion are thus "fit[] … for judicial decision" now. *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (permitting review where plaintiff's conduct was "arguably proscribed" by law); *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (First Amendment rights "are particularly apt to be found ripe for immediate protection").  Moreover, "the hardship" to Perkins Coie of "withholding court consideration" until

some later date would be immense.  *Saline Parents*, 88 F.4th at 306.  This case is not "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all," *Trump v. New York*, 592 U.S. 125, 131 (2020) (cleaned up)—the harm is unfolding in real time.

The Order's boilerplate language that it should be implemented "consistent with applicable law" is no barrier to review.  As other courts have explained, such savings clauses in an executive order "cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language" that violates the Constitution.  *City of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (challenge to executive order justiciable).  Here, the Order "unambiguously commands action" that is plainly unconstitutional and already being implemented to Perkins Coie's detriment.  *Id.* at 1240.  Permitting an order that distorts the law and exceeds the President's authority based on a "consistent with applicable law" carveout would create an "intellectual cul-de-sac" and render "judicial review… a meaningless exercise."  *Id.*

## ARGUMENT

## I.    PERKINS COIE IS LIKELY TO SUCCEED ON THE MERITS

### A.    The Executive Order Exceeds the President's Constitutional Authority and Violates the Separation of Powers

Perkins Coie will succeed on its claim that Sections 1, 3 and 5 of the Executive Order exceed the President's constitutional authority and violate the separation of powers.  The President has no freestanding authority to regulate private parties, find facts, or impose punishments.  Because the Founders feared "unlimited executive power" and the "abuses and usurpations" of the King of England, they divided and limited governmental authority.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 641 (1952) (Jackson, J., concurring); Decl. of Indep. para. 2 (U.S. 1776).  The President's "executive Power" is paired with his obligation to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, §§ 1, 3.  In other words, his actions must be authorized

by the Constitution or by statute. *Youngstown*, 343 U.S. at 585. The President, moreover, cannot exercise his authority in a way that infringes on the authority of the other two branches. *Id.* at 587. Doing so would upend the separation of powers, which "protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

The Order—which sanctions a law firm in retaliation for representing clients whom the President views as political opponents—(1) is divorced from any statutory or constitutional source of executive power, and (2) invades the judiciary's constitutional authority.

### 1.    No Statutory or Constitutional Authority Supports the Order

*First*, it is "black letter law" that the President's power to issue an executive order "'must stem either from an act of Congress or from the Constitution itself.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999) (quoting *Youngstown*, 343 U.S. at 585). Courts have not hesitated to hold that an executive order with "no express constitutional or statutory authorization" lacks legal effect. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942). For example, in *Mille Lacs Band*, the Supreme Court held that an executive order was "ineffective to terminate" tribal rights because the President had "no statutory or constitutional authority" to issue a key provision of the order. 526 U.S. at 193-95. Likewise, district courts have enjoined executive orders for their lack of *any* statutory or constitutional authority.[2] Indeed, even when Presidents have cited statutes, courts have struck down orders that went beyond those statutes' explicit authority.[3] In contrast, when courts have upheld executive orders, they have found

---

[2] *See, e.g.*, *Doe v. Trump*, 2025 WL 485070, at *1, *16-17 (D. Mass. Feb. 13, 2025) (executive order on birthright citizenship); *CASA, Inc.*, 2025 WL 408636, at *4 (same); *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *24 (D. Md. Mar. 4, 2025) (executive order conditioning federal funding for medical institutions on denying gender-affirming care).

[3] *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1, 7-9 (9th Cir. 2024) (statute did not authorize executive order and implementing rule to raise the minimum wage for federal contractors); *Kentucky v.*

13

an explicit constitutional or statutory basis for the President's authority.  For example, the Supreme Court upheld President Trump's "travel ban" because the Immigration and Nationality Act established "grounds on which an alien abroad may be inadmissible to the United States" and "delegated to the President authority to suspend or restrict the entry of aliens in certain circumstances." *Trump v. Hawaii*, 585 U.S. 667, 683 (2018).

Here, the President does not identify any statutory basis for making the findings in Section 1 or imposing the punishments in Sections 3 and 5.  Nor could he: no statute authorizes the President or his executive officers to sanction a law firm for its general representation of clients.  The President thus is exacting retribution against a law firm for representing his political opponents without even an indication of statutory authority.  Put differently, "[t]he President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it [improperly] directs that a *presidential policy* be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588 (emphasis added).  In short, there is no "nexus between the" President's action "and some delegation of the requisite legislative authority by Congress." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1979).

Lacking any statutory basis, the Order could survive only if supported by some inherent executive power.  None applies here.  Again, the design and effect of the Order is to sanction an entire law firm because of the alleged conduct of some of its lawyers in representing the President's political adversaries years ago.  That is not an enumerated Article II power, nor is it a foreign-affairs power of the type that inheres in the nature of "executive Power." *See, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32 (2015).

---

*Biden*, 23 F.4th 585, 589, 606 (6th Cir. 2022) (statute did not support vaccine mandate for federal contractors); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1298 (11th Cir. 2022) (same).

Neither is it consistent with "executive practice, long pursued to the knowledge of the Congress and never before questioned," that helps define the limits of presidential power. *See Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring); *accord United States v. Midwest Oil Co.*, 236 U.S. 459, 473-74 (1915).

Instead, as discussed below, the power to sanction lawyers for professional misconduct rests with the judicial branch. As Prof. Green of Fordham Law School explains, the "Order is inconsistent with, and interferes with, settled understandings of the separation of powers and, in particular, judicial regulation of the legal profession." Green Decl. at 1. The Order's "form of *regulation by presidential whim … threatens to undermine the judicial regulation* that requires lawyers to represent clients zealously and not to subordinate clients' interests to lawyers' own self-interest." *Id.* at 6 (emphasis added). Indeed, the Executive Branch could not fairly discipline lawyers who represent clients in opposition to prosecutors, executive officials, and agencies. *Id.* at 3. Although the Executive plays a role in effectuating the judiciary's judgments, the President cannot render and execute his *own* judgments, just as he cannot unilaterally make and enforce his own laws. *Youngstown*, 343 U.S. at 587. In no sense is punishing lawyers for their representation of clients among the President's "core constitutional powers" or even within the "outer perimeter" of those powers. *Trump v. United States*, 603 U.S. 593, 614, 642 (2024).

### 2.    The Executive Order Improperly Usurps Judicial Power

In addition to lacking any statutory or constitutional basis, the Executive Order tramples the separation of powers by asserting fundamentally judicial authority. "If there is a principle in our Constitution … more sacred than another, it is that which separates the legislative, executive and judicial powers." *Myers v. United States*, 272 U.S. 52, 116 (1926) (cleaned up). The power to sanction attorneys for their conduct in representing clients always has belonged to the judiciary. The President's order transparently usurps that authority, without any of the procedural protections

accompanying the judicial process.

The power to sanction lawyers for their professional conduct has always been held by judges.  Federal and state courts have residual, inherent powers to regulate the practice of law.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  In federal court, "[t]hat authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process."  *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (cleaned up).  State courts (and state bars under delegated authority) also determine whether lawyers have complied with their professional obligations.  *See, e.g.*, *Kohn v. State Bar*, 87 F.4th 1021, 1050-51 (9th Cir. 2024) (en banc).  Legislatures too can regulate the practice of law by enacting rules of conduct, but the authority to impose sanctions for violating those rules rests with the judiciary.  Just as a legislature cannot intrude upon the judicial power, *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), the President cannot arrogate to himself powers traditionally exercised by other branches.  Nor may the President assume powers traditionally held by states.  *Cf. Bond v. United States*, 572 U.S. 844, 857 (2014) (federal statutes presumed not to intrude upon traditional areas of state authority).

More broadly, the Order unlawfully exercises judicial power by making factual findings that the Firm engaged in purported misconduct and then punishing the Firm based on those findings.  In cases involving private rights of liberty, property, and contract, the Judiciary—not the Executive—makes those determinations.  *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54-56 (1989); *see also United States v. Bear*, 769 F.3d 1221, 1230 (10th Cir. 2014); *cf. SEC v. Jarkesy*, 603 U.S. 109, 140 (2024) (the Constitution prohibits the "concentrat[ion of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch").  In Section 1 of the Order, however, the President makes various (false or misleading) findings about the Firm's representation of the President's 2016 opponent and other clients, as well as its advocacy and hiring practices.  And in

Sections 3 and 5, the President purports to penalize that conduct by, among other things, forcing the Firm's clients to disclose their attorney-client relationships with the Firm, stripping those clients of their government contracts, limiting the Firm's access to government buildings and ability to interact with government personnel to practice law, and presumptively barring Firm employees from government employment.

The Executive Order does all this in a way that the judiciary could not—by pronouncing judgment without any notice, opportunity to be heard, or neutral evaluation of the evidence. In *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 126 (1951), the Supreme Court condemned the notion that the Attorney General could lawfully designate groups as "subversive" "without notice, … without opportunity to meet the undisclosed evidence[,] … and without opportunity" to object. *Id.* at 161 (Frankfurter, J., concurring). Yet that is precisely what the Executive Order does. The President's order is thus a stunning combination of (1) an adjudication of facts to support a restriction of private rights and (2) no process whatsoever.[4] The Executive finds the facts he deems impermissible and pronounces them, full stop.

The Executive Order's invasion of the judicial function is clear from the fact that the federal courts already have adjudicated the President's grievances referenced in the Order. For example, the Fifth Circuit (after a hearing) already ruled upon the alleged "lack of candor" referenced in the Executive Order. *See Tex. All. for Retired Ams. v. Hughs*, No. 20-40643 (5th Cir.). A federal court already heard (and a jury acquitted) former Perkins Coie partner Michael Sussmann for allegedly lying to the FBI. *See United States v. Sussmann*, No. 1:21-cr-582 (D.D.C.). And a federal court already dismissed a civil suit brought by Mr. Trump in his personal capacity against the Firm and

---

[4] Worse still, the Order seeks to punish the Firm for its (successful) courtroom advocacy in election-related matters, advocacy which was protected at common law by "absolute privilege." *Oparaugo v. Watts*, 884 A.2d 63, 79 (D.C. 2005).

others.  *See, e.g.*, *Trump v. Clinton*, 626 F. Supp. 3d 1264 (S.D. Fla. 2022) (appeal pending).  Apparently dissatisfied with these court rulings and with the due process enshrined in the Constitution, the President takes matters into his own hands.  The Constitution forbids this.

Indeed, the President's purported "Executive Order" amounts to the equivalent of a bill of attainder.  Under Article I, Congress may not enact "bills of attainder," acts by which Parliament "named" a particular individual "considered disloyal to the … State" and unilaterally imposed a "wide array of punishments," including "the punitive confiscation of property."  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473-74 (1977); *see also* U.S. Const. art. I, § 9.  The prohibition on such acts was "an important ingredient of the doctrine of 'separation of powers,' one of the organizing principles of our system of government[,] … [and] an important 'bulwark against tyranny.'"  *Nixon*, 433 U.S. at 469-71 (quoting *United States v. Brown*, 381 U.S. 437, 442-43 (1965)).  In essence, that prohibition prevents Congress from usurping the judiciary's power to impose punishments that deprive individuals of private rights.

The Executive Order shares the essential features of a bill of attainder: it is a "special" act "prescribing punishment, without a trial, for a specific person or group."  *Bill of Attainder*, Black's Law Dictionary (12th ed. 2024).  To be sure, the Bill of Attainder Clause, by its terms, does not apply to the Executive Branch.  *See Korte v. Off. of Pers. Mgmt.*, 797 F.2d 967, 972 (Fed. Cir. 1986).  But the fact that the Executive Order is indistinguishable from a bill of attainder underscores its unconstitutionality.  Just as Congress may not usurp the judicial role by passing legislation depriving individuals of private rights, neither may the President do so through executive fiat.  *See Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 144 (Black, J., concurring).  Indeed, the President has significantly *less* authority to announce new measures as compared to Congress's power to enact legislation.  *See Biden v. Nebraska*, 600 U.S. 482, 503 (2023).  Yet the President

has taken it upon himself to "pronounce[] upon the guilt of [Perkins Coie] … in accordance [solely] with [the President's] own notions." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866). Presidents have no such power in a system where "separating and dividing the powers of government … was to diffuse power the better to secure liberty." *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (cleaned up).

To be clear, these flaws in the Executive Order are not about which person or party controls the White House.  Regardless of who fills the office of President, this Court has an obligation to preserve the separation of powers and the individual liberty it was designed to protect.  Because Sections 1, 3, and 5 of the Executive Order have no basis in any statute or the Constitution itself, this Court should enter a TRO enjoining their implementation.

### B.     The Executive Order Violates the First Amendment

Perkins Coie also will succeed in demonstrating that the Executive Order violates the First Amendment by (1) retaliating against the Firm and its clients for their actual and perceived exercise of speech and associational rights and (2) discriminating against the Firm on the basis of viewpoint.

As is well known, the President filed more than 60 lawsuits challenging the results of the 2020 election.  Perkins Coie successfully defended many of those lawsuits—prevailing in all but one.  In response, the President publicly and repeatedly stated his intention, if re-elected, to retaliate against those who opposed his election claims, including the lawyers who represented those persons.  He made that threat early and often during the 2024 campaign, for example telling his nearly four million Truth Social followers, "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law. … [T]his legal exposure extends to Lawyers."  Ex. 7. The Order fulfills that repeated threat.

The Order openly targets the Firm, branding it as a "partisan actor" and charging it with "a pattern" of "egregious activity," such as bringing "partisan lawsuits," associating with "activist

donors," and seeking "to judicially overturn popular, necessary, and democratically enacted election laws." And it punishes Perkins Coie and its clients for these perceived transgressions by ordering agencies to, among other things, (i) deny *all* Firm employees access to federal buildings and engagement with federal employees and (ii) terminate government contracts with *any* firm clients. Such clear retaliation against the Firm and its clients violates the First Amendment.

### 1. The Executive Order Retaliates in Violation of the First Amendment

The First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)) (cleaned up). That principle applies just as strongly when the government's "retaliatory response" is based not upon a person's own speech, but the speech of "a person in a close relationship with the plaintiff, and the government retaliated against the plaintiff for [its] perceived association with the other person and that person's speech." *Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1302 (M.D. Ala. 2012) (collecting cases); *see also Hughes v. City of New York*, 680 F. App'x 8, 10 (2d Cir. 2017) (summary order) (retaliating based on "'perceived' association" violates First Amendment); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020) (retaliating "on the basis of perceived viewpoint" violates First Amendment); *see generally Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016).

The Executive Order retaliates against the Firm and its clients for the Firm's own speech, for association with clients and their speech, and for the clients' speech. The Order does not stop at simply criticizing Perkins Coie for its allegedly "partisan" speech and associational activity in the public square; it imposes draconian punishments. Such reprisal clearly violates the First Amendment. Like the compilation and publication of enemies lists in the McCarthy era, the Order "smacks of a most evil type of censorship" and "cannot be reconciled with the First Amendment."

*Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 143-44 (Black, J., concurring).  Where, as here, retaliation against a disfavored viewpoint is the motive, that ends the inquiry.  *See Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *15 (D. Md. Feb. 21, 2025)*.

The Order's retaliatory motive is reflected in its stunning breadth.  *First*, the sanctions apply to every one of the more than 2,400 lawyers and employees of Perkins Coie—both now and going forward—even though the lawyers who led the alleged "partisan" speech and activity have not worked at the Firm for years.  The President therefore does not justify the Order based on a desire to address "[r]isks" associated with particular persons responsible for particular conduct; instead, the Order collectively punishes Perkins Coie employees for the Firm's past association with lawyers who have left the Firm.  *Second*, the sanctions apply even though the speech and activity occurred years ago, almost a decade ago in the case of the 2016 campaign, and more than four years ago in the case of challenges to the 2020 election results.  *Third*, the sanctions apply to persons who are not lawyers.  Section 5 directs agency officials to "refrain from hiring employees of Perkins Coie" to the extent permitted by law—a provision that applies to secretaries, IT specialists, docketing clerks, and every one of the Firm's other approximately 1,200 non-lawyer personnel.  And Section 3 threatens severe sanctions for another category of non-lawyers—clients of the Firm.  *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955-58 (1984) ("when there is a danger of chilling free speech," aligned third parties with injuries have standing to raise challenges); *see also U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990) (applying to lawyers).  As the Fact Sheet states bluntly, "To ensure taxpayer dollars no longer go to contractors whose earnings subsidize *partisan lawsuits* against the United States, *the Federal Government will prohibit funding contractors that use Perkins Coie LLP*."  Fact Sheet ¶ 1.

### 2.     The Executive Order Constitutes Viewpoint Discrimination

Even if the Executive Order did not reek of retaliatory motive, it still would violate the First Amendment because it discriminates against Perkins Coie for its expressive and associative activities and those of its clients.  The Order complains of the clients the Firm has taken (including Hillary Clinton); the consultants it has retained (including Fusion GPS); the persons who have funded allegedly "partisan" lawsuits (including "activist donors [such as] George Soros"); and the legal positions the Firm has advocated (including the alleged "judicial[] overturn[ing] of popular, necessary, and democratically enacted election laws").  The Fact Sheet decries that "Perkins Coie LLP *has filed lawsuits against the Trump Administration*," and, more specifically, that it filed a lawsuit "designed to reduce military readiness," Fact Sheet ¶ 2—a misdescription of a case brought by Firm clients challenging an Executive Order that would discharge transgender military personnel.  In doing so, the Order and Fact Sheet attribute to the Firm the speech and views of its clients, consultants, and associates, and then punish the Firm and other clients for those viewpoints.

Such speaker- and viewpoint-based sanctions constitute a "blatant and egregious form of content discrimination" subject to strict scrutiny.  *Reed v. Town of Gilbert*, 576 U.S. 155, 168-71 (2015) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  Where government regulation is viewpoint discriminatory, that "is 'all but dispositive' in a First Amendment challenge." *Nat'l Ass'n of Diversity Officers*, 2025 WL 573764, at *15 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011)).  It is dispositive because "viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024).  That principle dooms the Order because, as the Supreme Court underscored in *Vullo*, "the First Amendment prohibits government officials *from relying on 'the threat of invoking legal sanctions and other means of coercion … to achieve the suppression'* of disfavored speech." *Id*. at 176 (emphasis added).

Viewpoint discrimination is particularly egregious when it involves political speech, particularly speech about the rules that govern democratic elections, or when speech involves the presentation to the courts of reasonable legal arguments. As the Supreme Court explained in *Legal Services Corp. v. Velazquez*, which concerned regulations purporting to prevent Legal Services lawyers from challenging welfare laws, attempts to "draw lines around" those arguments that the government "finds unacceptable but which by their nature are within the province of the courts to consider" violate the First Amendment. 531 U.S. 533, 546, 548-49 (2001). That the Order targets a law firm for its clients' legitimate use of the courts makes it all the more obviously unconstitutional: The President simply does not like the results of judicial decisions won by the Firm's clients with the Firm's assistance.

Strict scrutiny requires the government to prove that the Order "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (cleaned up). The government cannot come close to meeting that demanding test for the simple reason that purportedly "partisan" speech and litigation by a handful of attorneys who no longer work for Perkins Coie cannot justify punishing the entire firm, including all its non-lawyer employees, and its many clients that have government contracts. Nor can the government show a compelling interest when the legal authority for sanctioning alleged professional misconduct resides with the judicial branch, not the executive. *Supra* pp.15-16.[5] To the extent the President disagrees with the legal positions advanced by Perkins Coie, he has already sought redress in the proper forum—the courts—and lost. *Trump*, 626 F. Supp. 3d 1264 (appeal pending).

For the same reasons, the Order is not narrowly tailored: it lacks any "precision of

---

[5] The former Perkins Coie lawyers whom the Order refers to as displaying a "lack of candor before the court," EO § 1, already have been sanctioned in the courts, *Tex. All. for Retired Ams. v. Hughs*, No. 20-40643 (5th Cir. Jun. 30, 2021), Dkt. No. 127-1.

regulation," a fatal defect when "political expression or association is at issue." *In re Primus*, 436 U.S. 412, 434 (1978). The Order, for example, threatens the termination of *all* government contracts held by *any* clients of Perkins Coie, where the only rationale for this far-reaching and drastic punishment is that government payments to contractors may "subsidize partisan lawsuits." Fact Sheet ¶ 1. And there is no narrow tailoring in Section 5, which calls for "limiting Government employees … from engaging with Perkins Coie employees." Even if there were a legitimate basis for limiting engagement with those lawyers who "filed lawsuits against the Trump Administration," Fact Sheet ¶ 2, (there is not), there would be no lawful basis, for example, for limiting the access of the Firm's patent lawyers to the Patent & Trademark Office in the more than 1,000 active matters, Berman Decl. ¶ 15, or limiting the access of any firm lawyer to a federal courthouse or adjudicative agency.[6] When the government provides a forum, it "ordinarily may not exclude speech or speakers from the forum on the basis of viewpoint," regardless of the type of forum. *E.g.*, *Rosenberger*, 515 U.S. at 829; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393-94 (1993). For all these reasons, the Order violates the First Amendment.

### C.    The Executive Order Violates Perkins Coie's Right to Due Process

Perkins Coie also will prevail on its due process claim. The Due Process Clause guarantees that "no person shall … be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The clause "is implicated" whenever the government imposes "civil penalties." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996) (emphasis omitted). Executive Branch "findings of wrongdoing" that carry legal consequences and "could have an adverse impact on [an entity's] reputation" qualify as "sanctions" that trigger the "essential … protection[ ]" of

---

[6] Barring access to a federal courthouse would be particularly egregious, both because doing so would violate the separation and powers and because the First Amendment right to petition the government for redress of grievances guarantees access to the courts. *See, e.g.*, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

"fair notice." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 254, 256 (2012).

At its core, due process mandates that a person facing a government sanction receive both "notice of the case against him" and an "opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 348 (1976) (cleaned up).  Courts apply a "familiar two-part inquiry:" (1) whether the plaintiff faces a deprivation of a protected property or liberty interest, and, if so, (2) whether that plaintiff has received the process that is due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).  Under that test, the Firm will succeed on its due process claim.

### 1.    The Order Deprives Perkins Coie of Liberty and Property Interests

Protected "liberty" interests include "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, … and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (cleaned up).  Here, the Order (a) deprives the Firm and its attorneys of the right to follow their chosen profession, (b) harms the Firm's reputation, (c) vitiates the Firm's right to petition the government; and (d) interferes with its constitutionally protected property interests.

a.    The Constitution safeguards the right to "follow a chosen profession free from unreasonable governmental interference."  *Campbell v. District of Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018) (cleaned up); *see Schware v. Bd. of Bar Exam.*, 353 U.S. 232, 238-39 (1957) (government "cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the [due process clause]").  That interest is implicated when government "direct[ly] and unambiguous[ly]" interferes with a private party's professional relationships.  *Mead v. Indep. Ass'n*, 684 F.3d 226, 232 (1st Cir. 2012).  The Order does just that.  It requires all federal contractors to disclose "any business they do with Perkins Coie" and then

orders agency officials to review those contracts and "take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law." EO § 3.  Or, as the Fact Sheet states, "the Federal Government will prohibit funding contractors that use [the Firm]." Fact Sheet at 1. The stated aim and obvious effect of Section 3 is to force the Firm's many government-contractor clients to end their relationships with the Firm.  Hirshon Decl. ¶ 12.  This pressure on current clients to disassociate from the Firm, and on potential clients to avoid associating with the Firm altogether, plainly interferes with the Firm's liberty interest.  Burman Decl. ¶¶ 28-32.

The Executive Order also limits the Firm's and its employees' liberty to pursue their chosen profession by impairing its ability to provide legal services.  That liberty interest is implicated whenever (1) the government "formally or automatically exclude[s an entity] from some category of work," or (2) where the government's action has "the broad effect of largely precluding [the entity] from pursuing [its] chosen career." *Campbell*, 894 F.3d at 289 (cleaned up); *see Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994).

The Firm satisfies both standards.  As the D.C. Circuit routinely holds, the government formally excludes private parties from future work by depriving them of the "right to be considered for government contracts in common with all other persons." *Gen. Elec. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010) (quoting *Doe v. DOJ*, 753 F.2d 1092, 1108-09 (D.C. Cir. 1985)); *see Kartseva*, 37 F.3d at 1528.  Here, the Order explicitly directs agencies to "terminate" any contract "for which Perkins Coie has been hired to perform any service." EO § 3(b)(i).

In addition, the obvious purpose and effect is to prevent the Firm's lawyers from doing the work necessary to provide effective legal representation to clients.  Section 5(a) purports to deny the Firm "access [to] Federal Government buildings," such as offices of administrative agencies, and prevents it from "engaging with" "Governmental employees" such as prosecutors, civil

enforcement staff, investigators, and court staff.  EO § 5(a).  Read literally, the Executive Order would even prevent the Firm's lawyers from attending hearings, arguing motions and appeals, trying cases, appearing before administrative agencies, engaging with regulators, negotiating with prosecutors, and resolving cases—in other words, from effectively representing clients in matters involving the federal government or federal issues.  While the Order cannot constitutionally bar the courthouse door to Perkins Coie lawyers, its sweeping prohibitions at minimum "seriously affect" Perkins Coie's ability to pursue its chosen profession.  *See Campbell*, 894 F.3d at 289; Burman Decl. ¶¶ 11-20, 25-33.

      b.      The Order and Fact Sheet also deprive the Firm of its liberty interest in its reputation.  "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."  *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).  To establish a cognizable reputational interest, Perkins Coie need only demonstrate that the government "issues a stigmatizing posting (or designation)" that "deprive[s Perkins Coie] of a right previously held under state law."  *Nat'l Counsel of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) (quoting *Paul v. Davis*, 424 U.S. 693, 708 (1976)).  Thus, the D.C. Circuit has held that plaintiffs' liberty interests were implicated when they were designated as "foreign terrorist organizations" and when that designation deprived them of their rights to, *inter alia*, hold bank accounts.  *Id.* at 205; *Constantineau*, 400 U.S. at 434, 437 (stigmatizing statements combined with deprivation of right to buy alcohol); *Goss v. Lopez*, 419 U.S. 565, 574-75 (school suspension).

      The Order and Fact Sheet besmirch the Firm's reputation directly and repeatedly.  The Order describes Perkins Coie as "dishonest and dangerous" and levels numerous unfounded allegations, including that it "manufactured a false 'dossier' designed to steal an election," engaged in

a "pattern" of "egregious activity," "undermin[ed] democratic elections" and "integrity of [the] courts, and honest law enforcement," "racially discriminates against its own attorneys and staff," "maintain[s] … discriminatory practices," and "engage[s] in blatant race-based and sex-based discrimination." EO § 1. The Fact Sheet adds that the Administration "will not tolerate [the Firm's] unethical and discriminatory actions." Fact Sheet at 1. The Order also indirectly tarnishes the Firm's reputation by suggesting that it cannot be trusted to enter federal buildings or talk to government employees. Those same restrictions deny the Firm rights to which it otherwise would be entitled, and which every citizen enjoys. EO §§ 3, 5. This change in status infringes a cognizable liberty interest. *See, e.g.*, *Constantineau*, 400 U.S. at 437; Burman Decl. ¶¶ 24-37.

c.      The Order independently deprives the Firm of its "liberty interest in [its] First Amendment right to petition the government." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236-37 (10th Cir. 2007); *Arnaud v. Odom*, 870 F.2d 304, 311 (5th Cir. 1989); *see NAACP v. Button*, 371 U.S. 415, 429 (1963). This protected right to petition "extends to all departments of the Government," including courts. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Broudy v. Mather*, 460 F.3d 106, 117 & n.6 (D.C. Cir. 2006). The Order facially deprives that right by purporting to restrict access to courthouses, a clear constitutional violation.

d.      Finally, the Order injures the Firm's valuable interests in its contractual relationships with its clients. "The Supreme Court has recognized that property interests protected by the Fifth Amendment may be created by virtue of purely private contractual agreements." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Auto Glass Emps. Credit Union*, 72 F.3d 1243, 1250 (6th Cir. 1996) (citing, *e.g.*, *Greene v. McElroy*, 360 U.S. 474, 492 (1959)); *see also Stein v. Bd. of N.Y.C. Bureau of Pupil Transp.*, 792 F.2d 13, 17 (2d Cir. 1986). As explained above, the Order represents an unprecedented effort to undermine the Firm's client

relationships.  This is an equally significant deprivation of liberty.

### 2.    The Executive Order Was Issued Without Notice or A Hearing

"[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required," *Fox Television*, 567 U.S. at 253, as well as notice of "the severity of the penalty that [the government] may impose," *Gore*, 517 U.S. at 574.  "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Fox Television*, 567 U.S. at 253.  And to be "constitutionally sufficient," notice should be provided "*prior to* [a person's] being sanctioned." *Id.* at 257 (emphasis added).

The Firm was not given prior notice that its conduct would trigger executive sanctions, and the Order does not identify any law that the Firm allegedly violated.  The Firm only learned of the Order's existence when the President issued it on March 6.  Perkins Coie never received a chance to challenge the imposition of sanctions before the Order took effect.  As a result, the Firm was deprived of "an opportunity to speak up in [its] own defense." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  It could not rebut the government's defamatory assertions (such as the claims that the Firm "manufactured" false evidence or "engages in blatant discrimination") or explain why, even if any of those false allegations were true, the punishment was inappropriate and disproportionate.

The Order's perfunctory references to "risk" and "national security" do not absolve the government of its due process obligations.  Courts have routinely found that, even when national security interests are genuinely implicated (not the case here) at least *some* notice and process is required before the government may impair a protected liberty interest or brand an individual or entity with a stigmatizing label.[7]  Perkins Coie received no process at all. *See* Burman Decl. ¶ 24.

---

[7] *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a

Any claim to deference based on national security considerations, moreover, cannot ignore the significant interests that weigh against the punishments meted out by the Order. Where the government's penalties "threaten[] to inhibit the exercise of constitutionally protected rights[,] ... a more stringent vagueness [and fair-notice] test should apply." *112 Vill. of Hoffman Est. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 498-99 (1982). Because core "first amendment guarantee[s]" are implicated, the decision to punish Perkins Coie cannot be made "arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). As explained above, the Order was issued based on a patently impermissible desire to punish Perkins Coie for its association with clients the President perceives as political opponents or personal enemies, and whose positions he attributes to the Firm. That improper and arbitrary motive further underscores the likelihood of success on the merits.

### 3.  The Executive Order Is Impermissibly Vague

The Order's intentional vagueness creates an independent due process problem. A federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted). The Order suffers from both defects. It leaves key provisions undefined. For example, the "Personnel" provision is so broad that Perkins Coie and its clients do not know the full set of circumstances under which the Firm will be barred from "engaging with" government employees. Similarly, the Order's repeated references to the "interests of the United States" and the "goals and priorities" of the Administration leave Defendants free to pick and choose how

---

neutral decision-maker."); *Joint Anti-Fascist*, 341 U.S. at 165-74 (Frankfurter, J., concurring) (due process requires notice and hearing for an organization slated to be designated as "Communist"); *National Council of Resistance of Iran*, 251 F.3d at 201, 208-09 (designating an entity a "foreign terrorist organization" without adequate notice or hearing violated due process).

they will enforce the Order. The Order thus "impermissibly delegates basic policy matters to [Defendants] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *see also Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006) (executive order that "lends itself to subjective interpretation" was unconstitutional).

### D. The Executive Order Violates Sixth Amendment and Due Process Rights to Counsel

Perkins Coie also will succeed in its Sixth Amendment and due process right-to-counsel claims. "In all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel." U.S. Const. amend. VI. That includes both "the right to the effective assistance of counsel," *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quotation omitted), and the "right to choose one's own counsel," *Wheat v. United States*, 486 U.S. 153, 159 (1988). The same principle extends to civil cases, where clients have due process liberty and property interests in their contractual relationships, including with counsel. *Supra* p.28. As discussed below, lawyers have standing to challenge the government's invasion of their attorney-client relationships and thus to protect their clients' right to counsel. Perkins Coie represents individuals and entities being investigated and prosecuted by the government, and hundreds of clients in other matters involving the government. The Order's interference with those clients' right to counsel cannot stand.

But the Order is not only an assault on the Firm and its clients. It is a reckless assault on the criminal justice system and the rule of law. The constitutional right to counsel is "fundamental" because criminal defense lawyers are essential "to assure fair trials before impartial tribunals in which every defendant stands equal before the law." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). Without criminal defense counsel, "justice will not still be done." *Id.* at 343 (cleaned up). The Firm's right-to-counsel claims are substantial.

### 1.    Perkins Coie Has Standing To Challenge These Violations

There is no question that the Firm has constitutional standing to challenge the Executive Order's infringement of its clients' right to counsel. Defendants' violations have caused, and will continue to cause, "concrete injury in fact" to the Firm's livelihood and its constitutional obligation to provide effective counsel to those who choose it; restraining and striking the Order would redress those harms. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

In addition, lawyers have prudential, third-party standing to challenge violations of their clients' Sixth Amendment or due process rights to counsel that interfere with the lawyers' practice. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989); *Triplett*, 494 U.S. at 720. In particular, because an attorney's duty to provide effective counsel "may not be fettered by harassment of government officials," a lawyer has "standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel." *Wounded Knee Legal Def./Offense Comm. v. Fed. Bureau of Investigation*, 507 F.2d 1281, 1284 (8th Cir. 1974); *accord Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020). Because the Firm represents criminal defendants and others in dealings with the government, it has standing to challenge the Order's attempted interference with its clients' rights to counsel.

### 2.    The Executive Order Violates Bedrock Sixth Amendment Rights

The Executive Order will violate criminal defendants' Sixth Amendment rights to effective counsel and to counsel of their choice. That already has begun.

*First*, by attempting to "interfere[] with [Perkins Coie's] professional obligation[s]" to its criminal defense clients, the Order infringes upon those defendants' rights to *effective* counsel. *Wounded Knee*, 507 F.2d at 1284. The Order directs "[t]he heads of all agencies"—including the Department of Justice—to "limit[] Government employees acting in their official capacity from

engaging with Perkins Coie employees" and "limit[] official access from Federal Government buildings to employees of Perkins Coie." EO § 5(a). The Order threatens to prevent Perkins Coie attorneys from performing the vast array of legal tasks that require interacting with government employees or visiting government buildings, ranging from conferring on discovery and procedural matters to negotiating plea agreements to attending meetings and hearings. "[T]he right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012); *see also Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (plea negotiations are "a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel"). Plea agreements, in particular, routinely require substantive, intensive, and extended negotiations. Yet the Order threatens to block the Firm's attorneys from engaging in such discussions, infringing their clients' Sixth Amendment rights and the Firm's ability to effectively and zealously represent those clients. Green Decl. at 6. This is not hypothetical; government employees have already canceled meetings, citing the Order. Burman Decl. ¶¶ 25-26.

*Second*, the Order infringes "[t]he right to select counsel of one's choice," which "has been regarded as the root meaning of the constitutional guarantee" of the right to counsel. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006). "[T]he most important decision a defendant makes in shaping his defense is his selection of an attorney." *United States v. Laura*, 607 F.2d 52, 56 (3rd Cir. 1979). The upshot of the Order, however, is to obstruct that selection: the government defamed Perkins Coie as "dishonest and dangerous," EO § 1, singled out the Firm with unique restrictions on its practice, EO §§ 3, 5, and is forcing the Firm's many government contractor clients to disclose their relationship with the Firm and face termination of contracts, EO § 3(a)-(b). It is irrelevant that the government is not expressly barring clients from hiring the Firm; the Order

33

intends to achieve that goal indirectly, and "a government official cannot do indirectly what [h]e is barred from doing directly." *Vullo*, 602 U.S. at 190. "[I]f a defendant chooses a particular counsel, the sixth amendment prevents [the government] from taking any 'arbitrary action prohibiting the effective use of (a particular) counsel.'" *Laura*, 607 F.2d at 57 (quoting *United States ex rel. Carey v. Rundle*, 409 F.2d 1210, 1215 (3d Cir. 1969)). In addition, interfering with counsel's effectiveness can itself violate choice of counsel: a lawyer who could not effectively represent a client because of limitations on his practice would be forced by the Rules of Professional Conduct to withdraw. Simon Decl. ¶ 36. By seeking to interfere with the Firm's effectiveness, the Order compromises criminal defendants' choice of Perkins Coie to defend them.

### 3.    The Executive Order Also Violates the Due Process Right to Counsel

The Order's effects reach beyond the Sixth Amendment. Clients also have due process interests in their attorney-client relationships. Clients enjoy "the right to the aid of counsel when desired and provided by the party asserting the right." *Powell v. Alabama*, 287 U.S. 45, 68 (1932); *accord Doe v. District of Columbia*, 697 F.2d 1115, 1119 (D.C. Cir. 1983) ("[E]very litigant has a powerful interest in being able to retain and consult freely with an attorney."); *see also* Simon Decl. ¶ 22. "[A]rbitrarily" interfering with and chilling those attorney-client relationships "would be a denial … of due process in the constitutional sense." *Powell*, 287 U.S. at 69. The Order does just that. And, as with the Firm's due-process interests discussed above, the Executive Order failed to provide adequate process before interfering with those rights to counsel. *Supra* pp.29-30.

### E.    The Executive Order Violates Equal Protection

Perkins Coie also will succeed on its equal protection claim.[8]  Equal protection bars the government not only from discriminating against entire classes, but also from disfavoring individuals without a constitutionally legitimate basis.  Such "class-of-one"[9] claims require showing that the plaintiff has (1) "been intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also McCrea v. District of Columbia*, 2021 WL 1216522, at *8 (D.D.C. Mar. 31, 2021).  When the differential treatment burdens a plaintiff's First Amendment activity, a test "appreciably more stringent than 'minimum rationality'" applies.  *See News Am. Pub., Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988).  "The classic class-of-one claim is illustrated when a public official, with no conceivable basis for his action other than spite or some other improper motive … comes down hard" on a citizen.  *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (cleaned up); *see Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016) ("[C]lass-of-one claims are designed to prevent government actors from singling out a person for arbitrary abuse.").

Both prongs of the class-of-one test are readily met.  *First*, the Order intentionally targets Perkins Coie with extraordinary sanctions not levied on similarly situated firms or lawyers.  The intentional and targeted nature of the sanctions is clear.  *Supra* pp.16-22.  So is the differential treatment.  Because "improper motive is usually covert," class-of-one claims ordinarily require

---

[8] The Fifth Amendment's Due Process Clause contains an equal protection component applicable to the federal government.  *Bolling v. Sharpe*, 347 U.S. 497, 498 (1954).  The "[e]qual protection analysis … is the same."  *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

[9] Despite the "class-of-one" moniker, "there is no requirement that the challenged government action single out one solitary person."  *Franks v. Rubitschun*, 312 F. App'x 764, 765 n.2 (6th Cir. 2009).  "[T]he number of individuals" being targeted "is immaterial."  *Olech*, 528 U.S. at 564 n.*.  The key to the claim is that the differential treatment is not based on "[m]embership in a protected class" but rather arbitrary mistreatment or animus.  *Franks*, 312 F. App'x at 765-66.

showing that "similarly situated individuals … received more favorable treatment." *Swanson*, 719 F.3d at 784. That is easy enough: No other firm has been subjected to the same sanctions as Perkins Coie. Moreover, unlike in run-of-the-mill class-of-one claims, the "improper motive" is plain on the face of the Executive Order and the Administration's related public statements. *Supra* pp.9-10, 16-24. Where, as here, "animus is readily obvious," strictly applying the comparator requirement is unnecessary to establish an equal protection violation. *Swanson*, 719 F.3d at 784; *see SBT Holdings v. Town of Westminster*, 547 F.3d 28, 35 & n.4 (1st Cir. 2008) (same); *Stevens v. Holder*, 950 F. Supp. 2d 1282, 1289-91 (N.D. Ga. 2013) (plaintiff pleaded class-of-one claim based on her "exclusion" from government meetings for reasons "she suspects … were false").

*Second*, the government cannot justify its conduct under even rational basis review, much less heightened scrutiny. The government must put forward a "plausible reason" for its differential treatment, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993), which cannot be "so attenuated" from its conduct "as to render [it] arbitrary or irrational," *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985) (citing, *inter alia, U.S. Dep't of Agric. v. Moreno,* 413 U.S. 528, 535 (1973)). A "bare … desire to harm a politically unpopular group" is "not [a] legitimate state interest[]." *Id.* at 447 (quoting *Moreno*, 413 U.S. at 534); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996) (where a governmental act is "so discontinuous with the reasons offered" that it "seems inexplicable by anything but animus," it "lacks a rational relationship to legitimate state interests"). Here, the evidence already shows that the Order is not rationally related to any legitimate interest but instead is intended and functions as retribution. *Supra* pp.9-10, 16-24.

## II.    A TRO IS NEEDED TO STOP IRREPARABLE HARM

For a TRO, irreparable harm must be "'both certain and great,' 'actual ... not theoretical,' and 'of such imminence that there is a clear and present need for equitable relief.'" *Drs. for Am. v. Off. of Pers. Mgmt.*, 2025 WL 452707, at *8 (D.D.C. Feb. 11, 2025) (quoting *Wis. Gas Co. v.*

*Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  This is a "high standard," *id.*, but amply met in the context of this Order, which is imposing extraordinary and escalating—potentially fatal, if unaddressed—injury on Perkins Coie.  Constitutional rights already have been violated, agencies already have refused to engage with the Firm, clients already have terminated representations, employees already have considered whether to leave the Firm, potential employees already have questioned whether to work there, and much more.  Burman Decl. ¶¶ 24-34.

The threat to Perkins Coie is truly existential—which is the Order's objective.  If no TRO is granted, the Firm may not be solvent long enough for the Court to hear this case on the merits.  If that happens, the fact that the Order is patently unconstitutional will make no difference.

### A.    Perkins Coie Is Suffering Irreparable Economic Harm

In days, the Executive Order has already subjected the Firm to multiple millions of dollars in unrecoverable losses.  Burman Decl. ¶ 29.  While economic loss is not always irreparable, *Harris v. Bessent*, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025) (granting TRO), economic injuries justify emergency equitable relief where "legal remedies after the fact [are] inadequate to restore the party seeking a stay to the status quo ante." *Mann v. Wash. Metro. Area Transit Auth.*, 185 F. Supp. 3d 189, 195 (D.D.C. 2016).  Courts have articulated two scenarios in which economic losses are irreparable.  *First*, even "[r]ecoverable monetary loss may constitute irreparable harm … where the loss threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674. *Second*, where damages are unrecoverable (for example, due to sovereign immunity), "significant" economic loss may constitute irreparable harm.  *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (issuing injunction).

*First*, absent relief, Perkins Coie can "reasonably fear a tsunami of adverse consequences that would threaten its ability to continue to effectively operate," including the departure of clients, partners, and practice groups.  Hirshon Decl. ¶ 14.  Of the Firm's nine practice groups, all "intersect

37

with the federal government in some way and include clients with business before the federal government." Burman Decl. ¶ 12. The "vast bulk of [Perkins Coie's] clients have matters" that demand the Firm interact with federal agencies. *Id.* ¶ 13. Lost business will not be replaced, as many current and prospective clients have matters related to the federal government. *See Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011) (irreparable harm from "loss of long-standing clients that may be unwilling, or unable, to do business with [plaintiff] hereafter if no injunction is issued" (cleaned up)). If the Order is not restrained, the Firm may not recover.

The Order also imposes irreparable harm by hindering the Firm's ability "to recruit and retain employees to build—or even maintain—its business." *TikTok, Inc. v. Trump*, 490 F. Supp. 3d 73, 84 (D.D.C. 2020) (issuing injunction); *see also Luokung*, 538 F. Supp. 3d at 193 (same). The Order's hiring restrictions (EO § 5) will "impair Perkins Coie's hiring of lawyer and non-lawyer professionals because of the risk that joining a law firm disfavored by the President would destroy any possible future in federal government service (e.g., as a federal prosecutor)." Hirshon Decl. ¶ 13. Perkins Coie is already experiencing those harms. Burman Decl. ¶¶ 24-34. This harm, too, threatens the Firm's ability to survive this unprecedented attack if not addressed.

*Second*, Perkins Coie's mounting losses are "irreparable *per se*" because sovereign immunity limits the Firm to nonmonetary equitable relief. *See Nalco*, 786 F. Supp. 2d at 188 (citation omitted); *Luokung*, 538 F. Supp. 3d at 192. Perkins Coie is grateful for the expressions of support from and its continued relationships with many clients. Nonetheless, in response to the Order, certain clients who are government contractors or are involved in government-related litigation already have terminated their attorney-client relationships. Burman Decl. ¶ 29. This has caused losses of anticipated revenue in the millions of dollars within days. *Id.* Other large clients who have tens of millions of dollars of extensive business with the Firm, making a termination of the

relationship more challenging, have expressed uncertainty about the future prospects of their relationship with Perkins Coie, and have requested daily updates regarding the Order's implementation. *Id.* The Department of Justice has already postponed one meeting with Perkins Coie lawyers, citing the Executive Order, and another agency has done the same. *Id.* ¶¶ 25-26. More than a thousand active matters in the federal courts, and thousands more before federal agencies, are at risk. *Id.* ¶ 27. Absent relief, the Firm will incur mushrooming losses, all unrecoverable.

### B.    The Executive Order Has Impaired Perkins Coie's Constitutional Rights

"[T]here is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (cleaned up). "[A] prospective violation of a constitutional right constitutes irreparable injury for … purposes" of such relief. *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (omission in original) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). Multiple such invasions and violations have already occurred, and many more are imminent.

*First Amendment.* "The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." *Cigar Ass'n of Am. v. U.S. FDA*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018) (cleaned up) (granting injunction) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Such a showing can be based on "First Amendment freedoms [that] are actually lost," or that "imminently will be." *Bailey v. Fed. Bureau of Prisons*, 2024 WL 3219207, at *9 (D.D.C. June 28, 2024) (granting injunction). The Order attacks Perkins Coie for allegedly "partisan" speech and activity, and sets out specific retaliatory consequences. In retaliating against Perkins Coie for its First Amendment activity, the Order threatens to halt the Firm's, its clients', and others' protected petitioning activity and other speech; to restrict unconstitutionally its protected conduct; and to infringe on its right to associate with the clients it chooses. *Supra* pp.19-24.

These First Amendment violations are "certain, because [they] ha[ve] already occurred,

and [are] ongoing." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012); *see also Cigar Ass'n of Am.*, 317 F. Supp. 3d at 562 (a showing of irreparable harm is sufficient where an order "'threaten[s] or in fact ... impair[s]' ... First Amendment interests 'at the time relief is sought.'" (second omission added) (quoting *Elrod*, 427 U.S. at 373)).   At the time of this filing, Perkins Coie's protected activity is actively being hampered by the Order; a growing number of government agencies have flatly refused to interact with Perkins Coie lawyers.   Burman Decl. ¶¶ 25-27.   Clients have distanced themselves from their association with the Firm.   *Id.* ¶¶ 28-30. The Order thus "chill[s] the rights of clients to petition government for redress of grievances and to peaceably assemble, as guaranteed by the First Amendment."   Simon Decl. ¶ 41.

 *Fifth Amendment*.   "[A] violation of Fifth Amendment due process rights" also suffices for a finding of irreparable harm.   *Karem*, 960 F.3d at 668; *see also Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 121, 129-30 (D.D.C. 2020) (enjoining threatened impairment of voting rights).   The Order violates Perkins Coie's due process rights because it "finds wrongdoing and imposes punishment without prior notice, an opportunity to be heard, a fair and impartial factfinder, or any other semblance of fair process."   Green Decl. at 4.   It interferes with Perkins Coie's professional liberty interests, its liberty interests in its reputation, and its protected property interests in its contractual relationships.   *Supra* pp.24-31.   The harm inflicted by the Order is ongoing, and "do[es] not … require proof of any injury other than the threatened constitutional deprivation itself."   *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Davis*, 158 F.3d at 1346).   As long as the Order remains in place, these irreparable harms will continue.

 The Order's differential treatment of Perkins Coie also constitutes an equal protection violation.   *Supra* pp.35-36.   The Order imposes unique punitive sanctions on the Firm to which no other similarly situated law firm or lawyer has been subjected—a "class of one."   *Id.*   For the

reasons above, the Firm has already been harmed by these "violations of [its] rights to equal protection of the laws under the Fifth Amendment," which "are irreparable." *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 216 (D.D.C. 2017), *vacated sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019) (vacated on other grounds).  Relief is necessary to curb further harm.

*Sixth Amendment*.  "The right to select counsel of one's choice" is "the root meaning of the [Sixth Amendment's] constitutional guarantee." *Gonzalez-Lopez*, 548 U.S. at 147-48.  The Order drastically limits the ability of Perkins Coie lawyers to represent their many clients, including "barring [them] from federal buildings," Hirshon Decl. ¶ 12, "bar[ing] federal employees from 'engaging' with" them, *id.*, and requiring all federal contractor clients to "disclose any business they do with" the Firm, which will subject them to a "review" solely because of that attorney-client relationship, EO § 3.  In so doing, the Order "distort[s] the legal system" and infringes on "the freedom of [the Firm's] clients to choose a lawyer," which is protected by the Constitution.  Green Decl. at 5 (quoting *Velazquez*, 531 U.S. at 544; D.C. Rules of Prof. Conduct, Rule 5.6, cmt. [1]). "[A]s a practical matter," the Order "deprive[s] clients of their right to be represented by their chosen lawyers."  Hirshon Decl. ¶ 12; *see also* Simon Decl. ¶¶ 32-35, 40.  Perkins Coie has standing to assert this harm as well.  *Supra* p.32.

Many Perkins Coie clients, including the largest, have government contracts.  Burnam Decl. ¶ 28.  In fact, a significant part of each practice group's clients do business with the federal government.  *Id.* ¶ 18.  And many Perkins Coie representations are not public, whether or not related to government contracting.  *Id.* ¶ 28; *see also* D.C. Ethics Op. 124 ("the fact of the firm's representation … is a client 'confidence' or 'secret' subject to … protection[]" if client requests nondisclosure or if disclosure would embarrass or harm client).  The Order requires clients to disclose confidential information about their consultations with counsel, putting them at risk of

termination of their contracts.  EO § 3(a).  "The disclosure of confidential information is, by its very nature, irreparable because such information, once disclosed, loses its confidential nature." *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018) (cleaned up).

### C.    Perkins Coie Is Suffering Ongoing and Irreparable Reputational Harm.

"Because injury to reputation or goodwill is not easily measurable in monetary terms it is typically viewed as irreparable."  *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (cleaned up).  The reputational injury here is no exception.  The Order has damaged Perkins Coie's "corporate goodwill and reputation and its competitive position," and that harm is growing.  *Honeywell, Inc. v. Consumer Prod. Safety Comm'n*, 582 F. Supp. 1072, 1078 (D.D.C. 1984) (issuing injunction).  Not only does the Order disparage the Firm as "dishonest" and "dangerous," EO § 1, it threatens severe restrictions on the Firm's ability to do work central to its mission.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (reversing denial of injunction; "obstacles" that "unquestionably make it more difficult for [movant] to accomplish [its] primary mission" establish irreparable harm); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (same) (issuing TRO).  There is a growing public perception that Perkins Coie may be restricted from representing clients in government-facing matters, or even entering federal courthouses.[10]  As discussed above, multiple large and longstanding clients, including clients who are government contractors, clients with ongoing litigation, and clients with matters that require engagement with federal agencies, have already taken their business elsewhere, citing doubts about the Firm's ability to continue to represent them in light of the Order.  Burnam Decl. ¶ 29.  Others have informed Perkins Coie that they are considering other counsel, have withdrawn consent for the Firm to disclose their relationship, or otherwise have

---

[10] *See, e.g.*, Exs. 5, 8, and 9 (articles discussing the impact of the Executive Order).

expressed uncertainty about their continued relationship with the Firm.  *Id.*

The (false) suggestion that a law firm is so untrustworthy that it cannot be permitted to represent clients in interactions with the federal government, in federal agencies, and in federal courtrooms poses concrete, here-and-now harm to the Firm's reputation.  This Court has found far less reputational damage to be irreparable.[11]  Emergency relief that preserves Perkins Coie's ability to advocate on behalf of its clients is necessary to limit the reputational damage.

## III.    THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR A TRO

Where a movant "seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge."  *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025) (citation omitted).  Courts weigh "the competing claims of injury and … consider the effect on each party [and the public] of the granting or withholding of the requested relief."  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).

Here, the balance of the equities and the public interest overwhelmingly favor a TRO.  The injury to Perkins Coie has been immediate and severe.  The Firm not only has suffered immense reputational harm by being falsely branded as "dishonest and dangerous," such that its personnel should not be permitted on federal property or to engage with federal employees, but has already lost clients and risks losing more.  *Supra* pp.7-9, 37-39.  In contrast, any purported injury to the United States is non-existent.  For example, the Order complains that former Perkins Coie lawyers represented the President's political opponent in 2016 and hired an investigative firm that produced a "dossier" about him.  But those are *personal* grievances from nine years ago.  The President

---

[11] *See, e.g.*, *Xiaomi*, 2021 WL 950144, at *1, 9 ("almost unquestionable" that plaintiff's designation as "Communist Chinese military company" "damaged its reputation[]"); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) ("termination for default … left a black mark on [plaintiff's] reputation, irreparable absent an injunction"); *Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997) (agency letter that characterized plaintiff as "'enticing' senior citizens into meetings, and 'pressuring' them" into financial decisions was irreparable reputational harm).

already asserted the same allegations in a lawsuit filed in his personal capacity, which was dismissed. *See Trump*, 626 F. Supp. 3d 1264 (appeal pending).

The Order also complains that the Firm represented clients in suits to challenge election laws. But representing clients who petition the courts in election-related lawsuits does not inflict cognizable injury on the United States where, as here, the lawsuits were meritorious or non-frivolous. To the extent the Order notes former Perkins Coie lawyers' alleged "lack of candor" in a single court case, that is a matter the judicial branch already addressed. The injury to Perkins Coie from the Order greatly outweighs any purported injury to the United States from its being enjoined.

More broadly, there is no public interest in executive agencies implementing an illegal executive order, like the present one. *See League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). But there is a "substantial public interest" in having governmental agencies "abide" by the law. *Id.* (citation omitted).

Unless enjoined, the Order will undermine the strong public interest in lawyers' zealously representing clients without fear of government retribution. Under the Rules of Professional Conduct, "[t]he duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law." *E.g.*, D.C. Rules Pro. Conduct r. 1.3 cmt. [1]. A lawyer is required to "take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor." *Id.* "[V]igorous representation" is of "paramount importance" to "our adversarial system of justice." *Penson v. Ohio*, 488 U.S. 75, 84 (1988). "This system is premised on the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question." *Id.* (cleaned up).

As explained in the attached expert declarations, the threat of presidential sanctions will chill lawyers from representing clients whom the President views as political opponents, or from

advocating legal positions that the President dislikes.  Hirshon Decl. ¶ 3; Green Decl. at 4-5; Simon Decl. ¶ 6.  "[T]he Executive Orders will have the effect of forcing lawyers to choose between performing their assigned role in our democracy or pleasing the President, all to the detriment of clients and the fair administration of justice."  Hirshon Decl. ¶ 17.  Indeed, the Order already is having this chilling effect, as reported by the press.  *Supra* pp.8-10, 37-28.

This chill will make it immensely harder for clients who are unpopular with the current administration to find legal representation, undermining the basic public policy favoring "the freedom of clients to choose a lawyer," D.C. Rules Pro. Conduct r. 5.6, cmt. [1], and the Sixth Amendment right to counsel of choice in criminal cases, *Gonzalez-Lopez*, 548 U.S. at 144.  The Rules of Professional Conduct provide that lawyers have a responsibility to "accept[] a fair share of unpopular matters or … unpopular clients."  D.C. Rules Pro. Conduct r. 6.2, cmt. [1].  As the Rules of Professional Conduct provide, "[l]egal representation should not be denied to people … whose cause is controversial or the subject of popular disapproval."  *Id.* at r. 1.2, cmt. [3].  Yet the Order threatens to punish lawyers for fulfilling this critical responsibility.

Finally, by chilling zealous representation, the Order will impair the functioning of the judiciary itself.  "An informed, independent judiciary presumes an informed, independent bar," *Velazquez*, 531 U.S. at 545—not a bar under threat of political retribution from the President.  If this Order stands, nothing will prevent the next President from meting out punishment to lawyers who represent his or her opponents.  The public interest—and indeed the very functioning of our legal system—demand entry of a TRO.

## CONCLUSION

Perkins Coie respectfully requests that the Court hold a hearing as soon as possible, grant the motion for a temporary restraining order, and enter the attached proposed order.

Dated: March 11, 2025                        Respectfully submitted,

                                             **WILLIAMS & CONNOLLY LLP**

                          By:      */s/ Dane H. Butswinkas*
                                   Dane H. Butswinkas (D.C. Bar #425056)

F. Lane Heard III (D.C. Bar #291724)              Amy M. Saharia (D.C. Bar #981644)
Christopher N. Manning (D.C. Bar #464069)         Matthew B. Nicholson (D.C. Bar #1013418)
Ryan T. Scarborough (D.C. Bar #466956)            Carol J. Pruski (D.C. Bar #1006941)*
Malachi B. Jones (D.C. Bar #455555)               Charles L. McCloud (D.C. Bar #1012047)*
Charles Davant IV (D.C. Bar #484305)              Krystal C. Durham (D.C. Bar # 987768)
David S. Kurtzer-Ellenbogen (D.C. Bar #489559)    Eden Schiffmann (D.C. Bar #1035019)
Jesse T. Smallwood (D.C. Bar #495961)

                                                  680 Maine Avenue, SW
                                                  Washington, DC  20024
                                                  (202) 434-5000

                                                  *Counsel for Plaintiff Perkins Coie LLP*

                                                  *\* DDC bar application pending*