## Declaration of Prof. Bruce A. Green
*Perkins Coie LLP v. U.S. Department of Justice, et al.*
U.S. District Court for the District of Columbia

I am the Stein Chair of Law at Fordham Law School, where I direct the Stein Center for Law and Ethics. Counsel for Perkins Coie LLP ("Perkins Coie" or "the law firm") has retained me to provide an objective expert opinion regarding President Trump's March 6, 2025 "Executive Order—Addressing Risks from Perkins Coie LLP," (the "Executive Order") and the accompanying Fact Sheet explaining the Executive Order (the "Fact Sheet"), and to opine on whether the Executive Order is consistent with the regulation of the legal profession.

The Executive Order states that measures are to be taken against Perkins Coie, its personnel, and its clients because of conduct by Perkins Coie lawyers in representing clients in litigation and extrajudicial advocacy disfavored by the President. The Executive Order explicitly cites as justification the law firm's representation of parties in judicial proceedings challenging "election laws, including those requiring voter identification." The Fact Sheet adds that "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness." This apparently refers to a lawsuit in which the law firm represents organizations in an action involving the rights of certain military personnel.

The Executive Order subjects Perkins Coie to various disabilities. Among other things, the order directs executive agencies not to retain Perkins Coie and to "provide guidance limiting official access from Federal Government buildings to Perkins Coie lawyers" (presumably including federal courthouses). Additionally, the Executive Order requires federal agencies to determine which federal contractors have sought the advice of or representation by Perkins Coie, so that federal agencies can assess whether to cease doing business with the law firm's clients. The Fact Sheet states that the Executive Order is designed in part "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States."

Evidently, the Executive Order is to be the first of many. After it was issued, President Trump publicly stated, "We have a lot of law firms that we're going to be going after." Therefore, besides having a punitively harsh effect on Perkins Coie if implemented, the Executive Order will discourage other law firms from doing what Perkins Coie did: representing clients and causes of which the current presidential administration disapproves.

For the reasons discussed below, my opinion is that the Executive Order is inconsistent with, and interferes with, settled understandings of the separation of powers and, in particular, judicial regulation of the legal profession.

### Qualifications

My qualifications to provide expert opinions on questions of lawyers' professional conduct in this case are set forth more fully in my curriculum vitae, which is available on the Fordham Law School website: https://www.fordham.edu/school-of-law/faculty/directory/full-time/bruce-green/.

1

I have been a law professor at Fordham University since 1987. I served as a law clerk to both Justice Thurgood Marshall of the Supreme Court of the United States and Judge James L. Oakes of the United States Court of Appeals for the Second Circuit. I was also an Assistant United States Attorney for the Southern District of New York, eventually serving as Deputy Chief and then Chief of the Criminal Division's appeals unit.

At Fordham, I have regularly taught courses on lawyers' professional responsibility. I currently teach courses on both Professional Responsibility and Ethics in Criminal Advocacy. Additionally, I co-author a casebook on professional responsibility for contemporary legal practice. *See* Jefferson, Pearce, Green, et al., *Professional Responsibility: A Contemporary Approach* (5th ed. 2023).

I have organized or co-organized numerous conferences and other programs for legal academics and practitioners on issues of lawyers' professional responsibility, and I speak frequently at Continuing Legal Education programs and academic programs on this subject.

I have written extensively on the subject of lawyers' professional conduct in both academic and professional publications. A list of my writings is included on my CV.

I have engaged extensively in professional work relating to lawyers' professional conduct, much of it involving the drafting, interpretation, or enforcement of professional conduct rules. On the national level, I currently chair both the American Bar Association Standing Committee on Ethics and Professional Responsibility and the Multistate Professional Responsibility Examination drafting committee. I previously chaired the ethics committees of both the American Bar Association Litigation Section and the American Bar Association Criminal Justice Section as well as the Section on Professional Responsibility of the Association of American Law Schools. Further, I am a past chair of the New York City Bar's Committee on Professional Ethics; I am a past chair and current member of the New York State Bar Association's Committee on Professional Ethics; I am a current member of the New York State Bar Association's Committee on Standards of Attorney Conduct; and I am a member of the New York County Lawyers Association's Committee on Professional Ethics. I served for six years on the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Department.

I occasionally testify as an expert witness, give advice, draft amicus briefs, and render other professional services on issues of lawyers' professional conduct. When serving as an expert witness in this case and others, I render opinions in my individual capacity and do not speak on behalf of any of the entities with which I am, or have been, associated. The compensation I receive in this matter is not dependent upon the conclusions I have reached in, or on the outcome of, this matter.

**Discussion**

*1. The regulation of the legal profession is principally the responsibility of the judiciary, and courts afford lawyers a fair process before punishing lawyers for misconduct.*

In the United States, courts have principal responsibility for regulating lawyers. State courts determine the standards for admission to practice law and oversee the licensing processes, and federal courts largely piggyback on the state licensing processes. State courts adopt rules of professional conduct to regulate the lawyers whom they license, and federal courts largely adopt the state-court rules of professional conduct. State courts also adopt and oversee disciplinary processes in which the professional conduct rules are enforced, and some federal courts also implement disciplinary processes for lawyers admitted to practice before them. In their disciplinary processes, courts may disbar, suspend or otherwise sanction lawyers who violate the courts' professional conduct rules. Lawyers who represent parties in court proceedings are also subject to regulation by the judges before whom they appear. Courts may adopt applicable rules and standards of conduct regulating lawyers in addition to those incorporated in professional conduct rules. Judges may enforce applicable rules and standards by sanctioning lawyers who engage in misconduct in proceedings over which the judges preside.

Courts afford lawyers a fair process before punishing them for alleged misconduct under established professional rules and standards. Formal disciplinary processes afford lawyers an opportunity to dispute allegations of misconduct in a proceeding before a fair and impartial adjudicator. Likewise, before judges may sanction lawyers for litigation misconduct, the judges must afford lawyers notice and an opportunity to be heard and must make a fair and impartial determination that misconduct occurred.

In contrast to the judiciary's role, the executive branch has had an exceedingly limited role in regulating private lawyers. Executive agencies may adopt and enforce standards of conduct for lawyers appearing before those agencies in agency proceedings, but the executive branch has no general regulatory authority over lawyers. In particular, the federal executive branch has no authority to regulate lawyers' conduct in litigation generally, or in litigation against the Government in particular. Regulating lawyers traditionally has been understood to be constitutionally entrusted to the states under the Tenth Amendment. *See Leis v. Flynt*, 439 U.S. 438, 441 (1979) ("Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions. The States prescribe the qualifications for admission to practice and the standards of professional conduct. They also are responsible for the discipline of lawyers."); *see also New York State Bar Ass'n v. FTC*, 276 F. Supp. 2d 110, 128-29 (D. D.C. 2003), *aff'd*, 430 F.3d 457 (D.C. Cir. 2005). "[A] federal court has the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Outside the regulation of lawyers in federal agency proceedings, the federal executive branch has little regulatory authority over the bar not only because regulating the bar is principally a state function and a judicial function but because lawyers routinely and properly represent private clients against the Government and against executive officials and agencies. The executive branch could not to be expected to regulate fairly the very lawyers against whom it litigates.

3

The Executive Order is inconsistent with these principles in several respects. First, the Executive Order punishes a law firm and its lawyers (and their clients) for conduct that is defined as improper and adjudicated as improper by an executive branch official, not a federal or state court or a disciplinary authority under a court's jurisdiction. Second, the alleged impropriety is not based on a preexisting legal standard (or even on a standard articulated clearly after-the-fact in the Executive Order). Third, the Executive Order finds wrongdoing and imposes punishment without prior notice, an opportunity to be heard, a fair and impartial factfinder, or any other semblance of fair process.

 2. *Judicial regulation encourages lawyers to represent disfavored parties in judicial proceedings.*

In the U.S., courts are established on the understanding that legal disputes should be resolved in court, not by combat in the streets or other disruptive or dangerous means. This is especially true with regard to challenges to the laws. Courts exist to resolve legal disputes about the laws. They are the ultimate arbiters of the meaning, application and constitutionality of statutes and regulations. Legal actions that, in the words of the Fact Sheet, "threaten our elections, military strength, and national security" (presumably because courts could apply the U.S. Constitution to overturn the laws in question or limit their reach), are among the sorts of legal actions that are entrusted to the courts to adjudicate.

When parties go to court to resolve legal disputes – including challenges to the constitutionality, meaning, or application of laws – courts recognize that it is in the public interest for the parties to be represented by counsel. The common law governing attorney-client privilege reflects that recognition. The privilege protects the confidentiality of lawyer-client communications in part to encourage parties to retain counsel to assist in legal disputes. Judicial rules regulating lawyers likewise recognize the importance of protecting lawyer-client relationships from interference and the importance of those relationships to the proper functioning of the legal system. *See, e.g.*, D.C. Rules of Professional Conduct ("D.C. Rules"), Rule 4.2; *see also id.*, Rule 4.4(a) & cmt. [1] (stating that the rule forbids "unwarranted intrusions into privileged relationships, such as the client-lawyer relationship").[1]

Judicial regulation of the legal profession recognizes, in particular, the importance of affording legal assistance to unpopular clients. Although U.S. trial lawyers, unlike their English counterparts, may decline clients who seek to retain them, our legal profession has a "historical commitment to the principle that all persons in our society should be able to obtain necessary legal services." DC. Rules, Rule 6.1, cmt. [1]. This commitment is incorporated in professional conduct rules encouraging lawyers to undertake pro bono work and requiring lawyers to accept court appointments. *Id.* These rules reflect the importance of lawyers' availability to unpopular clients. *See id.*, Rule 6.2, cmt. [1] ("All lawyers have a responsibility to assist in providing pro bono public service"); *see also id.* Rule 6.1 ("An individual lawyer fulfills this responsibility by accepting a fair share of unpopular matters or indigent or unpopular clients. A lawyer may also be subject to appointment by a court to serve unpopular clients . . .."). It would be fair to say, in fact, that our country was founded on this principle: Future president John Adams's defense of

---

[1] The D.C. Rules are cited throughout this Report by way of example. The rules of most or all other U.S. jurisdictions are substantively similar in relevant respects.

the British soldiers involved in the Boston Massacre, by his later account, "procured [him] Anxiety, and Obloquy enough," but was one of the best Pieces of Service [he] ever rendered [his] Country," because, by providing a zealous legal defense to despised defendants, the colonists demonstrated their commitment to fair process and the rule of law.

Professional conduct rules underscore the importance of affording legal representation to unpopular clients by recognizing that "[a] lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities." D.C. Rules, Rule 1.2(b). This provision presupposes that: (1) lawyers are fully capable of pursuing clients' lawful objectives even if the lawyers (or others) disapprove of the clients or their causes; (2) clients' views therefore should not be attributed to their lawyers; and (3) parties with disfavored views should have access to legal representation.

The Executive Order interferes with this foundational principle embedded in the judicial regulation of the legal profession. Restricting lawyers' availability to clients, or lawyers' ability to bring legitimate claims and defenses on clients' behalf, based on whether the executive branch approves of the client or cause, would, in the words of the Supreme Court, "distort[] the legal system by altering the traditional role of the attorneys" in our democracy. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001).

Likewise, unjustified restrictions should not be imposed on "the freedom of clients to choose a lawyer." D.C. Rules of Professional Conduct, Rule 5.6, cmt. [1]. Indeed, in criminal cases, clients' right to counsel of choice is protected by the Sixth Amendment right to counsel. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) ("[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him."). It would be prejudicial to the administration of justice for the Government to restrict clients' choice of counsel by refusing to negotiate with a disfavored lawyer, and a Government lawyer who did so would be subject to discipline. *See Matter of Rook*, 556 P.2d 1351 (Ore. 1976).

Of course, lawyers are restricted from (and can be disciplined for) making factually or legally frivolous arguments on behalf of clients in adjudicative proceedings. *See, e.g.*, D.C. Rules, Rule 3.1. But any restriction on creative or novel legal arguments is extremely limited: Professional conduct rules specifically allow lawyers to make "a good-faith argument for an extension, modification or reversal of existing law." *Id.* And, as described above, it is the role of the judicial system, not the executive branch, to adjudicate any violations of these rules of professional conduct. In the actions cited in the Executive Order, no court found Perkins Coie's legal arguments to be frivolous, and the Executive Order does not suggest they were. On the contrary, characterizing the actions as "dangerous" implies that they might prevail.

In sum, judicial regulation recognizes that the public interest benefits from the participation of skilled advocates on both sides of an action as well as from lawyers' role in providing legal advice and in assisting clients with other legal matters. The Executive Order is at odds with this regulation. It will discourage not only Perkins Coie but also other law firms from representing future clients and pursuing future actions, and particularly actions against the Government and other advocacy that the President might disfavor. Punishing the law firm for its representation of disfavored clients or causes is at odds with the traditions of the U.S. legal system and with courts' contemporary regulation of lawyers.

3. *Lawyers must argue their clients' legal positions zealously within the bounds of the law.*

Professional conduct rules recognize that a lawyer must "represent a client zealously and diligently within the bounds of the law," D.C. Rules, Rule 1.3(a), and that this includes a duty to "seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules." *Id.*, Rule 1.3(b)(1). In criminal cases, zealous representation is an aspect of the Sixth Amendment right to effective assistance of counsel. *See, e.g., Strickland v. Washington*, 466 U.S. 668 685 (1984) ("The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."). Further, "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Id.* at 686.

The Executive Order will interfere with this fundamental obligation of lawyers because it will chill Perkins Coie and other law firms from representing clients zealously and diligently, for fear of being branded pariahs by the federal government. Even if President Trump does not regard all representations adverse to the Government, and all other representations adverse to his friends and family, as "dangerous" and therefore punishable per se, the Executive Order demonstrates that he may be offended by particular litigation arguments, strategies or tactics, including those permitted by the rules and required as a matter of zealous advocacy. As a result of the Executive Order, law firms will be governed in their legal representations not only by professional conduct rules adopted and enforced by the courts, but by a fear of angering the President. Law firms seeking to avoid a similar Executive Order will have an incentive to eschew "reasonably available means" to advance their clients' lawful objectives that the President may find objectionable.

This form of regulation by presidential whim, therefore, threatens to undermine the judicial regulation that requires lawyers to represent clients' zealously and not to subordinate clients' interests to lawyers' own self-interest. A law firm that fails to pursue a client's lawful objectives zealously and diligently out of concern for losing other clients' business would be prioritizing its own business interests in violation of conflict-of-interest rules. *See id.*, Rule 1.7(b)(4) ("A lawyer shall not represent a client with respect to a matter if . . . the lawyer's professional judgment on behalf of the client will be or reasonably may be affected by . . . the lawyer's own financial, business, property, or personal interests."); *id.*, Rule 1.7, cmt. [11] ("The lawyer's own interests should not be permitted to have an adverse effect on representation of a client."). Yet that appears to be the very outcome the Executive Order would impose. Whenever matters might come to the President's attention, the Executive Order creates a conflict between the client's lawful interests and the lawyers' self-interest in avoiding offense to the President lest the federal government take measures to destroy their law practices.

I declare under penalty of perjury that the foregoing accurately reflects my opinions.

Executed on Monday, March 10, 2025:   _____
                                      Bruce A. Green