UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| PERKINS COIE LLP,<br><br>        Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF<br>JUSTICE, ET AL.,<br><br>        Defendants. | DECLARATION OF<br>PROFESSOR ROY D. SIMON, JR. |

### DECLARATION OF PROFESSOR ROY D. SIMON, JR.

Roy D. Simon, Jr., who is a Distinguished Professor of Legal Ethics Emeritus at Hofstra University's Maurice A. Deane School of Law, a legal ethics advisor to lawyers, and an attorney in good standing admitted to practice law in the State of New York, hereby declares the following under the penalties of perjury pursuant to 28 U.S.C. § 1746.

#### Introduction

1. Williams & Connolly, in its capacity as counsel for Plaintiff Perkins Coie LLP ("Perkins Coie"), has retained me to provide an objective expert opinion regarding the consequences that President Trump's March 6, 2025 Executive Order concerning Perkins Coie (the "Executive Order") will have on lawyers, law firms, clients, potential clients, tribunals, and the public in light of fundamental principles underlying the system of justice in the United States.

#### Factual Background

2. The Executive Order is on White House letterhead and is entitled "Addressing Risks from Perkins Coie LLP." It begins by asserting that "dishonest and dangerous activity of the law firm Perkins Coie … has affected this country for decades." The Executive Order then commands the

**Declaration of Prof. Roy D. Simon, Jr.**                                                    2

Attorney General and various other government agencies and officials to (among other things) (i) "immediately take steps ... to suspend any active security clearances held by individuals at Perkins Coie" pending further review, (ii) "expeditiously cease" providing "Sensitive Compartmented Information Facilities" to Perkins Coie, (iii) "provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie," and (iv) impose various other restrictions on Perkins Coie and its lawyers and employees. (The Executive Order also contains a section headed "Racial Discrimination," but I do not express any opinions regarding that section or its consequences.)

3. President Trump said when he signed the Executive Order that he plans to issue approximately fifteen similar Executive Orders in the future regarding other law firms, and since then he has said during an interview on national television that he will be "going after" other law firms. Whether or not he issues those other orders, his threat and his expressed intent to do so is on the public record and is widely known.

Brief Summary of My Opinions

4. In this section I briefly summarize my professional opinions regarding the fundamental principles underlying the system of justice and the consequences that the Executive Order will have with respect to those fundamental principles.

5. *Fundamental principles of our system of justice.* In my professional opinion, the following principles are fundamental to the system of justice in the United States:

   a. The people of the United States have the right to freedom of speech, which includes the right to express political views – directly or through lawyers – and the right to support or oppose political candidates, political parties, the President, members of any branch of government, and issues of public concern.

   b. The people have the right to petition the government for a redress of grievances.

**Declaration of Prof. Roy D. Simon, Jr.**                                                                3

      c. No person may be deprived of life, liberty, or property, without due process of law.

      d. In all criminal prosecutions, the accused shall have the right to effective assistance of counsel for his defense.

      e. In all legal matters, civil and criminal, clients who can afford counsel have the right to choose their counsel.

      f. In criminal cases, clients who cannot afford counsel generally have the right to have counsel appointed for them at government expense.

      g. Lawyers and law firms have a duty to make legal counsel available to all persons who need counsel.[1]

      h. Lawyers should represent clients zealously within the bounds of the law.

      i. Lawyers should exercise independent professional judgment on behalf of clients.

      j. Lawyers should exercise their professional judgment solely for the benefit of each of their clients, free of compromising or conflicting interests, influences and loyalties.

      k. No person is above the law.

6. *Consequences of the Executive Order.* In my professional opinion, if the Executive Order is permitted to stand, it will have the consequences set out below, all of which will undermine and threaten the fundamental principles of our system of justice:

      a. Law firms will be less likely to agree to represent clients that the President or his allies and supporters view with disfavor or clients that are unpopular with the President's base.

---

[1] In this declaration I use the terms "lawyers" and "law firms" (and their singular forms) interchangeably. My opinions regarding law firms also apply to individual lawyers, and vice versa.

**Declaration of Prof. Roy D. Simon, Jr.** 4

b. Law firms will be less likely to make legal arguments challenging a President's actions, policies, or orders (or the actions, policies, or orders of others in the Executive Branch).

c. Law firms will hesitate to make arguments inconsistent with the announced or anticipated positions of the President or of allies or supporters of the President outside of government.

d. Clients (especially clients not aligned with the President) are likely to have a narrower choice of counsel and to have greater difficulty finding counsel.

e. Clients will be less likely to bring legal challenges to actions taken by the President or by his personal or political allies, supporters, and friends inside and outside of government.

## My Qualifications as an Expert

7. My qualifications as an expert in the field of legal ethics and professional responsibility are set forth in my curriculum vitae, which is attached as Exhibit A to this Declaration. I briefly summarize my qualifications as an expert below.

8. I am the sole author of ROY D. SIMON, SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED (Thomson Reuters, 24th ed. 2024), a two-thousand page treatise that analyzes and annotates the New York Rules of Professional Conduct phrase by phrase.

9. I serve or have served on multiple bar committees governing professional standards for New York lawyers. For example: (i) since 2014 I have been the Chair or Co-Chair of the New York State Bar Association Committee on Standards of Attorney Conduct ("COSAC"), which drafts or evaluates proposed amendments to the New York Rules of Professional Conduct and other rules governing lawyers; (ii) I served as Chair of the New York State Bar Association Committee on Professional Ethics from 2008 to 2011 and have been a member of that committee since 1995; and

**<u>Declaration of Prof. Roy D. Simon, Jr.</u>**                                        5

(iii) I have served three separate three-year terms on the New York City Bar Committee on Professional Ethics.

10. I was a full-time law professor for twenty-eight years (from 1983 until 2011), first at Washington University in St. Louis (where I received tenure) and later (beginning in 1992) at Hofstra University. In 2003 I was appointed as the Howard Lichtenstein Distinguished Professor of Legal Ethics at Hofstra University School of Law. I remained in that position until 2011. I am now a Distinguished Professor of Legal Ethics Emeritus.

11. I am an active member in good standing of the New York Bar. In my law practice, I frequently advise lawyers in New York and elsewhere regarding issues of professional conduct, including conflicts of interest, legal malpractice, fiduciary duties, and related issues. I also sometimes serve as an expert consultant or expert witness regarding professional conduct.

12. I received my Bachelor of Arts degree cum laude in 1973 from Williams College and received my J.D. in 1977 from New York University School of Law, where I served as Editor-in-Chief of the New York University Law Review. I then clerked for the Hon. Robert R. Merhige, Jr. in the United States District Court for the Eastern District of Virginia and practiced law for five years in Chicago before becoming a full-time law professor.

13. I am being compensated at my current hourly rate for the time that I spend in connection with this matter. My compensation does not depend in any way on the content of my opinions or on the outcome of any aspect of the matter.

<u>Analysis and Opinions</u>

14. In this section I articulate and explain in more detail the fundamental principles of our system of justice, and I explain in more depth my opinions and analysis regarding the consequences of the Executive Order.

**Declaration of Prof. Roy D. Simon, Jr.**                                                                  6

   A. <u>Fundamental principles of the United States system of justice</u>

15. The principles set forth below are fundamental to the system of justice in the United States. These fundamental principles are intertwined with each other, so the erosion of any one principle may lead to the erosion of other principles.

16. *<u>Freedom of expression and the right to assemble peaceably.</u>* The First Amendment to the United States Constitution guarantees the right of the people (including corporations and other entities) to freedom of expression (*i.e.,* free speech) and the right to peaceably assemble. Lawyers are often sought out by people who desire to exercise their First Amendment right to express their views or to peaceably assemble. For example:

    a. People seeking to organize public protests often need the guidance of lawyers to understand the legal limits of lawful protest (such as restrictions on time, place, and manner, and the necessity for obtaining permits), and people need lawyers to advise them regarding what conduct is permitted if the government prohibits a protest or arrests protesters.

    b. Individuals and entities who object to proposed or actual laws or regulations often need lawyers to help them (i) understand the language of those laws or regulations, (ii) determine the appropriate (or required) timing and recipients of any objections, (iii) phrase objections in a logical and legally supported manner, and (iv) determine rights of appeal if the government rejects an objection.

17. *<u>Petitioning for redress of grievances.</u>* The First Amendment to the United States Constitution also guarantees the right of the people to petition the government for a redress of grievances. Avenues of redress include (among other things) (i) public protests, (ii) communications to the President, (iii) communications to legislative representatives, Executive Branch officers and

**<u>Declaration of Prof. Roy D. Simon, Jr.</u>** 7

employees, and administrative agency officials and employees, and (iv) legal action in courts and administrative agencies.

18. As with freedom of expression, people (*i.e.,* clients) who wish to petition the government for redress of grievances often need lawyers to help them articulate their grievances, suggest alternatives to actual or proposed laws or regulations, direct objections to appropriate government officials in a timely fashion, follow up on these grievances by advocating with the government in person or through written or oral communications, and appeal adverse decisions.

19. <u>*Due process of law*</u>. The Fifth Amendment to the United States Constitution provides that no person may be deprived of life, liberty, or property, without due process of law. Our legal system is complex, consisting not only of substantive law (including federal, state, local, and municipal laws and regulations, common law, and recognized customs and practices) but also consisting of detailed procedural options and requirements (codified in sources such as the federal Administrative Procedure Act, the Federal Rules of Civil Procedure, local court rules, rules of individual judges, administrative agency regulations, and state, local, and municipal analogs of these procedures).

20. The term "due process" refers primarily to procedural options and requirements. Most of these procedures are unfamiliar to nonlawyers, so most people need the guidance of lawyers to avail themselves of their procedural rights and to ensure that they are accorded due process of law under those procedures.

21. <u>*Effective assistance of counsel*</u>. The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall have the right to assistance of counsel for his defense. For more than fifty years, the United States Supreme Court has recognized that the

**Declaration of Prof. Roy D. Simon, Jr.** 8

Sixth Amendment right to assistance of counsel is the right to the "effective" assistance of counsel. Specifically:

    a. A long line of United States Supreme Court cases, including the famous decision in *Gideon v. Wainwright*, 372 U. S. 335 (1963), has recognized that the Sixth Amendment right to counsel exists, and is needed, to protect the fundamental right to a fair trial.

    b. The right to assistance of counsel in criminal prosecutions recognizes that in most cases, the substantive laws and the procedures and techniques for mounting an effective defense are beyond the knowledge and skill of most nonlawyers.

22. *Choice of counsel*. Courts at all levels, both state and federal, have long recognized that in all legal matters, whether civil or criminal, clients who can afford counsel have the right to choose their counsel. The right to counsel of choice is a vital right because, as Sir Francis Bacon observed nearly two centuries ago: "The greatest trust between [people] is the trust of giving counsel." Clients hire attorneys to exercise professional judgment on their behalf, and the fiduciary duty of giving counsel is imbued with ultimate trust and confidence. Thus, courts accord great weight to a client's choice of counsel when that right is challenged (such as via a motion to disqualify or a motion to deny *pro hac vice* admission to a client's chosen lawyer).

23. *Appointed counsel*. In criminal cases, clients who cannot afford counsel generally have the right to have counsel appointed for them at government expense. That is the holding of *Gideon v. Wainwright*, 372 U. S. 335 (1963), which recognizes the importance of the Sixth Amendment right to effective assistance of counsel, for reasons I have already stated above.

24. *Representing clients who cannot afford counsel*. The legal profession has long recognized that lawyers have a duty to make legal counsel available to all persons who need counsel. This means not only providing pro bono (*i.e.,* no-cost or low-cost) legal services to those who cannot afford to pay

8

**Declaration of Prof. Roy D. Simon, Jr.**  9

legal fees at market rates, but also the duty to represent paying clients who are unpopular or controversial, and the duty to educate the public about legal problems and possible avenues of redress.

25. Rule 6.1 of the District of Columbia Rules of Professional Conduct (the "Rules")[2] addresses pro bono legal services by providing as follows:

> *Rule 6.1.     Pro Bono Publico Service*
>
> *A lawyer should participate in serving those persons, or groups of persons, who are unable to pay all or a portion of reasonable attorney's fees or who are otherwise unable to obtain counsel.* A lawyer may discharge this responsibility by providing professional services at no fee, or at a substantially reduced fee, to persons and groups who are unable to afford or obtain counsel, or by active participation in the work of organizations that provide legal services to them. When personal representation is not feasible, a lawyer may discharge this responsibility by providing financial support for organizations that provide legal representation to those unable to obtain counsel. [Emphasis added.]

26. <u>*Representing unpopular or controversial clients*</u>.   Rule 1.2 provides: "(b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities." The purpose of this rule is to avoid discouraging lawyers from representing clients with minority or unpopular views. If a lawyer's representation of a client constituted an endorsement of the client's views or activities, then many clients who oppose the government or who are at odds with powerful corporations or individuals would have difficulty securing counsel, which would impede their right to get legal advice or petition the government for redress of grievances, or hamper their right to effective assistance of counsel in criminal cases. The official Comment explaining Rule 1.2(b) is headed "Independence From Client's Views or Activities" and states, in pertinent part, as follows:

> [3] Legal representation should not be denied to people … whose cause is controversial or the subject of popular disapproval. By the same token, representing a client does not constitute approval of the client's views or activities.

---

[2] Although I cite only the District of Columbia Rules of Professional Conduct, all fifty states and many federal courts have adopted versions of the Rules of Professional Conduct that have many provisions in common with the D.C. Rules.

**Declaration of Prof. Roy D. Simon, Jr.** 10

27. *Zealous representation.* Lawyers should represent clients zealously within the bounds of the law. Thus, lawyers have discretion to take any legal position in litigation as long as the legal position is not frivolous. This concept is captured in Rule 3.1, which provides as follows:

> *Rule 3.1: Meritorious Claims and Contentions*
>
> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good-faith argument for an extension, modification, or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or for the respondent in a proceeding that could result in involuntary institutionalization, shall, if the client elects to go to trial or to a contested fact-finding hearing, nevertheless so defend the proceeding as to require that the government carry its burden of proof.

28. Nothing in Rule 3.1 prohibits a lawyer from agreeing to represent an unpopular client or a client whose views are unpopular or contrary to the views of the government, or prohibits a lawyer from asserting facts or advancing legal arguments as long as there is "a basis in law and fact for doing so that is not frivolous." The official Comment to Rule 3.1 explains the lawyer's duty of zealous advocacy by saying (in pertinent part): "[1] The advocate has *a duty to use legal procedure for the fullest benefit of the client's cause*, but also a duty not to abuse legal procedure. ..." (Emphasis added.) Rule 3.1 thus reinforces Rule 1.2(b) by ensuring that a lawyer has freedom not only to represent unpopular or controversial clients but also to represent those clients zealously within the bounds of the law.

29. If lawyers violate Rule 3.1 by advancing positions or arguments for which there is no basis in law and fact for doing so that is not frivolous, courts may penalize the offending lawyers by invoking inherent judicial authority and authority under procedural rules (such as Rule 11 of the Federal Rules of Civil Procedure, which governs sanctions). In addition, courts and other lawyers have the right (and sometimes the duty) to refer errant lawyers to disciplinary authorities.

30. *Independent professional judgment.* Lawyers are required to exercise independent professional judgment on behalf of clients. A lawyer should exercise professional judgment solely

**Declaration of Prof. Roy D. Simon, Jr.** 11

for the benefit of the client, free of compromising or conflicting interests influences and loyalties. This duty is captured most prominently in Rule 1.7, which provides, in pertinent part, as follows:

> *Rule 1.7: Conflict of Interest: General Rule*
>
> ... (b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:
>
> \* \* \* \* \*
>
> (4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or *the lawyer's own financial, business, property, or personal interests.* [Emphasis added.]

### B. Consequences of the President's Executive Order

31. In my professional opinion, the Executive Order, if permitted to stand, will have numerous consequences that will threaten or undermine the fundamental principles of our system of justice. I now turn to those consequences.

32. Law firms will be less likely (and in some instances totally unwilling) to agree to represent clients who are unpopular with or critical of the President or his allies and supporters. This consequence will remove many law firms from the list of available choices for clients seeking legal advice about Executive Branch actions or clients seeking to redress grievances in courts, in government agencies, or in public forums. This is a major concern because the Plaintiff here, Perkins Coie, has demonstrated a willingness, over many years, to represent clients who are challenging the legality of government actions and policies.

33. The concern is even more acute because the President said at the signing ceremony for the Executive Order that approximately fifteen similar executive orders concerning law firms are in the works, and he said on a recent Fox News show that "We have a lot of law firms that we're going to be going after." Joe DePaolo, *"'We Have a Lot of Law Firms We're Going After': Trump Declares Plan to Target Law Firms He Considers 'Very, Very Dishonest'"* (Fox News, March 9, 2025)

11

**<u>Declaration of Prof. Roy D. Simon, Jr.</u>** 12

(reporting on President Trump's appearance on Fox's Sunday Morning Futures, anchored by Maria Bartiromo). This will be understood by the profession as a threat to remove from the marketplace the law firms with the most experience, expertise, size, and financial resources to defend clients against government overreach or to represent clients challenging government actions that may be illegal or that may be taken without the due process of law guaranteed by the Fifth Amendment to the United States Constitution.

34. As a corollary consequence, clients (especially clients opposing the Executive Branch) are likely to have a diminished range of options for choice of counsel and are likely to have more difficulty finding counsel. Given the deep trust between lawyer and client that is the bedrock of a successful attorney-client relationship, using executive orders to penalize and restrict law firms that have the courage to oppose the President will remove from the legal marketplace many law firms that clients have come to trust in the past and that clients otherwise would seek out in the future.

35. If the President can unilaterally issue an executive order penalizing a law firm on grounds that the law firm is advancing positions that the President or his allies oppose (or on grounds that the law firm has taken such positions in the past), then the professional judgment of a lawyer in that firm "will be or reasonably may be adversely affected by … the lawyer's own financial, business, property, or personal interests," implicating Rule 1.7(b)(4) (quoted earlier). For example, a lawyer representing a client against the Executive Branch may justifiably fear loss of reputation, loss of government contracts, loss of access to government buildings, or loss of access to important evidence if the lawyer advances legal positions antithetical to the President's positions.

36. Clients and potential clients will be deprived of their choice of counsel if the Executive Order's restrictions on Perkins Coie (such as denying Perkins Coie lawyers access to Sensitive Compartmented Information Facilities or denying Perkins Coie lawyers the right to enter federal courthouses or other federal buildings) interfere with Perkins Coie's ability to represent a client

**<u>Declaration of Prof. Roy D. Simon, Jr.</u>** 13

competently, and therefore permit or require Perkins Coie to request a tribunal's permission to withdraw from a pending matter. (Rule 1.16(c) of the D.C. Rules of Professional Conduct provides that a lawyer "must comply with applicable law requiring notice to or permission of a tribunal when terminating a representation.") If a request by Perkins Coie to withdraw is granted, that will deprive Perkins Coie's clients of their chosen counsel in that matter.

37. Law firms will have an incentive not to make legal arguments challenging the President's actions, policies, or orders, and law firms will have an incentive not to make arguments inconsistent with the announced or anticipated positions of the President or his allies and supporters outside of government (*i.e.,* the President's allies and supporters in the private sector). Law firms will be wary of incurring swift and serious penalties if the firm's lawyers challenge actions by the President, or by any arm or agent of government appointed by or aligned with the President, or by any private actor that the President favors.

38. The Executive Order will seriously undermine Rule 3.1, which permits law firms to assert any fact or legal position that is not frivolous. If the President has power to penalize lawyers for taking positions that are *not* frivolous but that the President dislikes, then lawyers will be discouraged or prevented from fulfilling their duty to use legal procedure for the fullest benefit of a client's cause, as Rule 3.1 demands.

38. If the President has unilateral power to penalize lawyers via an executive order for representing certain clients or taking certain non-frivolous positions that disagree with the President's positions, then the President's unilateral power would almost inevitably negate or severely diminish a lawyer's right and duty to advance non-frivolous factual position and to make non-frivolous legal arguments. That is so because lawyers on opposite sides of a dispute by definition disagree with at least some of an opposing lawyer's factual and legal positions. (Absent disagreement, there would be

**<u>Declaration of Prof. Roy D. Simon, Jr.</u>**                                                                14

no case or controversy, and thus no federal court jurisdiction under Article III of the United States Constitution.)

    39. No person is above the law. Yet if the President of the United States has power with the mere stroke of a pen to penalize, vilify, and impede lawyers whose clients are opposing the President or the President's allies or supporters (or lawyers whose clients have opposed the President in the past, or who may oppose the President in the future), then upholding the Executive Order at issue here would effectively place the President above the law. Allowing the Executive Order to stand would give the President unilateral power to hamper and even to override the carefully balanced and well-established principles and purposes of the Rules of Professional Conduct, the Federal Rules of Civil Procedure, and other rules, regulations, and judicial powers fundamental to our system of justice.

    40. Clients will be less likely to bring meritorious legal challenges to (or to mount meritorious defenses against) actions taken by the President or by his personal or political allies, supporters, or friends. If clients know or believe that the President has the power to prohibit lawyers at a given law firm to enter government buildings, or to impose other penalties on a law firm (which the President has attempted to do in the Executive Order at issue here), then clients and potential clients will likely fear that they themselves (the clients and potential clients) will be targeted by the President – and will thus suffer negative practical, reputational, and financial consequences – if they dare to challenge or resist actions by the President or by his allies and supporters in and out of government.

    41. In sum, in my professional opinion, the Executive Order will in all likelihood (i) chill the rights of clients to petition government for redress of grievances and to peaceably assemble, as guaranteed by the First Amendment, (ii) deprive many clients of due process of law under the Fifth Amendment, and (iii) deprive many clients of the right to effective assistance of counsel under the Sixth Amendment. Moreover, if these sacrosanct rights under Bill of Rights are eroded, then other

**Declaration of Prof. Roy D. Simon, Jr.** 15

basic rights guaranteed by the First Amendment will also be in jeopardy, because the right to freedom of expression and the right to assistance of counsel are an essential foundation for exercising rights under other provisions of the Constitution.

## Conclusion

42. In my professional opinion, the Executive Order directed at Perkins Coie and its lawyers, if allowed to stand, will undermine fundamental principles of the system of justice in the United States, and will thus undermine revered and fundamental rights under the United States Constitution.

                                           Respectfully submitted,

                                           Roy D. Simon, Jr.

March 10, 2025
New York City, New York

Updated February 19, 2025

# Roy D. Simon
## Legal Ethics Advisor to Lawyers
## Distinguished Professor of Legal Ethics Emeritus
## 205 West End Avenue – Suite 8N
## New York, NY 10023

E-mail: roy.simon@hofstra.edu                                            Mobile: (607) 342-0840

## Education

1977        J.D., NEW YORK UNIVERSITY SCHOOL OF LAW, New York, N.Y.

   Editor-in-Chief, *New York University Law Review*, 1976-1977.
   Winner of John Norton Pomeroy Prize, 1975 (awarded to the top 15 students in the first year class).

1973        B.A., WILLIAMS COLLEGE, Williamstown, Massachusetts.
   English Major.
   Graduated Cum Laude and Phi Beta Kappa.

## Publications

### A. Books and Book Chapters.

SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED (Thomson Reuters, 24th ed. 2024). This 2,000-page treatise annotates and explains every phrase in the New York Rules of Professional Conduct and annotates other sources regulating New York lawyers. In 2015, the N.Y. State Bar Association Committee on Professional Ethics presented me with the Sanford D. Levy Memorial Award for "contributions to the field of legal ethics," including this book.

REGULATION OF LAWYERS: STATUTES AND STANDARDS (Wolters Kluwer, 30th ed. 2019) (co-authored with Professor Stephen Gillers and Dean Andrew Perlman). This book compiles and annotates the ABA Model Rules of Professional Conduct and various statutes, court rules, and other sources governing lawyers.

LAWYERS AND THE LEGAL PROFESSION: CASES AND MATERIALS (LexisNexis, 4th ed. 2009) (co-authored by Professors Carol Needham and Burnele Powell). This is a textbook for law students taking professional responsibility. I am the lead co-author of the Third and Fourth Editions. (I took over authorship after the first two editions.)

*Attorney Fees and Conflicts of Interest*, a chapter in a six-volume set entitled ENVIRONMENTAL LAW PRACTICE GUIDE (Matthew Bender 1992).

*Rule 68 in Civil Rights Litigation*, a chapter in 3 J. Lobel & B. Wolvovitz, eds., CIVIL RIGHTS LITIGATION AND ATTORNEY FEES ANNUAL HANDBOOK (Clark Boardman 1987).

B.  **Selected Articles in Law Reviews and Other Periodicals.**

*Fee Sharing Between Lawyers and Public Interest Groups*, 98 Yale L. J. 1069 (1989).

*The New Meaning of Rule 68:* Marek v. Chesny *and Beyond*, 14 N.Y.U. Rev. of Law & Social Change 475 (1986) (lead article in symposium on attorneys' fees).

*The Riddle of Rule 68*, 54 Geo. Wash. L. Rev. 1 (1985) (selected by AALS Section on Civil Procedure as one of fifteen "particularly noteworthy" articles on civil procedure for 1986).

*Rule 68 at the Crossroads: The Relationship Between Offers of Judgment and Statutory Attorneys' Fees*, 53 U. Cin. L. Rev. 889   (1984) (cited by Justice Brennan, dissenting, in *Marek v. Chesny*, 473 U.S. 1, 34 n.50 (1985)).

*Developments in the Regulation of Lawyers*, a column that I wrote once or twice a year from 1991 to 2019 in the Newsletter of the AALS Section on Professional Responsibility (distributed to law professors who teach professional responsibility).

## Academic Employment

1992-2011    HOFSTRA UNIVERSITY SCHOOL OF LAW, Hempstead, New York. Professor of Law (1992-2003); Howard Lichtenstein Distinguished Professor of Legal Ethics (2003-2011); Distinguished Professor of Legal Ethics Emeritus (beginning September 1, 2011).

*Courses taught at Hofstra:* (1) Lawyers' Ethics (1992-2009); (2) Civil Procedure (1997-2006); (3) Antitrust (2001-2004); (4) Insurance Law (1999, 2000, & 2003); (5) Contracts (2006-2010); (6) Disabilities Law Clinic (1992-1997); and (7) Law & Economics (2007-2009).

1983-1992    WASHINGTON UNIVERSITY SCHOOL OF LAW, St. Louis, Missouri. Assistant Professor, 1983-1986; promoted to Associate Professor on July 1, 1986; promoted to Professor, with tenure, on July 1, 1989.

*Courses taught at Washington University*:  (1) Legal Profession (1985-1992); (2) Pretrial Litigation (1983-1991); (3) Agency and Partnership (1992); (4) Trial Practice (1990-1991); (5) Complex Litigation (1990-1991); and (6) Clinical Courses at the United States Attorney's Office (Civil and Criminal Divisions), Legal Services of Eastern Missouri, and the Special Public Defender's Office (1983-1991).

## Legal Employment

1976         Summer Associate, DAVIS POLK & WARDWELL, New York, New York. (Received but declined permanent offer.)

1977-78      Law Clerk, HON. ROBERT R. MERHIGE, JR., United States District Court for the Eastern District of Virginia, Richmond, Virginia.

1978-82      Associate, JENNER & BLOCK, Chicago, Illinois.

2

**Professional Activities**

*New York State Bar Association' Committee on Standards of Attorney Conduct ("COSAC")*: Chair or Co-Chair (2014-Present), Vice-Chair (2003-2014), Chief Reporter (since 2003), and Member (since 2000). This Committee drafted proposed New York Rules of Professional Conduct from 2003 to 2008. COSAC continues to monitor and propose amendments to the New York Rules of Professional Conduct, and it comments on other existing and proposed rules, standards, and guidelines affecting lawyers.

*New York State Bar Association Committee on Professional Ethics:* Member (1995-present) and Chair (2008-2011). This Committee responds to ethics inquiries from attorneys regarding the New York Rules of Professional Conduct, and the Committee comments on proposals affecting regulation of lawyers.

*New York City Bar Committee on Professional Ethics*: Member for three separate three-year terms – 2002-2005, 2012-2015, and 2019-2022.

*Nassau County Bar Professional Ethics Committee:* Member (1993-2012) and Chair (1996-1998).

*New York City Bar Presidential Task Force on Artificial Intelligence and Digital Technologies – Subcommittee on Generative Artificial Intelligence and the Law:* Member beginning 2024.

*New York State Bar Association Task Force on Artificial Intelligence:* Inaugural Member, 2023-2024.

*Association of the Bar of the City of New York Committee on Professional Responsibility:* Member 2005-2008.

*New York City Bar Task Force on the Role of the Lawyer in Corporate Governance*: Member 2005-2006 (from inception of Task Force to completion).

*New York City Bar Ethics 2000 Committee:* Member 2000-2002. This seven-member special committee, appointed by the President of the Association, spent two years reviewing and commenting on the work of the American Bar Association's Ethics 2000 Commission, which recommended amendments to the ABA Model Rules of Professional Conduct.

*New York City Bar Committee on Professional Discipline*: Member 1995-1998 (three-year term). Chair of Subcommittee on Ethics Rules in Federal Courts.

*AALS Section of Professional Responsibility*: Chair (1993) and Executive Committee Member (1990-1994).

Admitted to practice law and in good standing in New York since 1992.