```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

    *  *  *  *  *  *  *  *  *  *  *  *  *  *
PERKINS COIE LLP,               )
               Plaintiff,       )  Civil Action
vs.                             )  No. 25-716
                                )
U.S. DEPARTMENT OF JUSTICE,     )  March 12, 2025
et al.,                         )  2:03 p.m.
               Defendants.      )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

                     **TRANSCRIPT OF HEARING**
            **BEFORE THE HONORABLE BERYL A. HOWELL,**
            **UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>:

FOR THE PLAINTIFFS:
                        DANE BUTSWINKAS
                        RYAN SCARBOROUGH
                        CHRIS MANNING
                        LUKE MCCLOUD
                        CAROL PRUSKI
                        MATT NICHOLSON
                        Williams & Connolly
                        680 Main Avenue SW
                        Washington, D.C.  20024
                        (202) 434-5110
                        dbutswinkas@wc.com


FOR THE DEFENSE:
                        CHAD MIZELLE
                        RICHARD LAWSON
                        TERRY HENRY
                        DOUGLAS C. DREIER
                        U.S. Attorney's Office
                        for the District of Columbia
                        601 D Street NW
                        Washington, D.C.  20053



Court Reporter:     Elizabeth Davila, RPR, FCRR
                    Official Court Reporter

            Proceedings reported by machine shorthand.
        Transcript produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Your Honor, this is Civil

3      Action 25-716, Perkins Coie LLP v. United States Department

4      of Justice, et al.

5              Would the parties please come forward to the

6      lectern and identify yourselves for the record this

7      afternoon.  We will start with plaintiff's counsel first.

8              MR. BUTSWINKAS:  Good afternoon, Your Honor.

9      I am Dane Butswinkas from Williams & Connolly on behalf of

10     Perkins Coie.

11             THE COURT:  Okay.  Good afternoon.

12             Let me just make sure that I have got --

13     Butswinkas?

14             MR. BUTSWINKAS:  Yes, Your Honor.

15             THE COURT:  Okay.  Did I say that correctly?

16             MR. BUTSWINKAS:  We must be related.

17             THE COURT:  All right.  Welcome to everybody else

18     at your table.  Did you want to introduce everybody just for

19     the record?

20             MR. BUTSWINKAS:  Yes.  Ryan Scarborough.

21             THE COURT:  You have to use the mic.

22             MR. BUTSWINKAS:  Ryan Scarborough, Chris Manning,

23     Luke McCloud, Carol Pruski, and Matt Nicholson.  Thank you.

24             THE COURT:  All right.  Welcome.

25             And for the government?

1          MR. MIZELLE:  Hey, good afternoon, Your Honor.

2   Chad Mizelle on behalf of the United States.  And I am

3   joined at counsel's table by Richard Lawson, Terry Henry,

4   and Doug Dreier.

5          THE COURT:  All right.  And are you all from DOJ

6   or from the U.S. Attorney's Office, or what?

7          MR. MIZELLE:  We're all from Main Justice.

8          THE COURT:  From Main Justice, okay.

9          MR. MIZELLE:  Yes, ma'am.

10          THE COURT:  Federal programs?

11          MR. MIZELLE:  Actually, I think -- I'm sorry.

12   Doug is with the U.S. Attorney's Office.

13          THE COURT:  Doug Dreier?

14          MR. MIZELLE:  Yes, Your Honor.

15          THE COURT:  Okay.  I thought you were the person

16   who was just going to be coming, but you brought a whole

17   crowd with you, Mr. Dreier.

18          MR. MIZELLE:  We're just trying to keep up, Your

19   Honor.

20          THE COURT:  There is no room in the gallery.

21   Thankfully, you have got seats up front.

22          Okay.  You can be seated.

23          Good afternoon, everyone.

24          We're here today for a hearing on Plaintiff

25   Perkins Coie LLP's motion for a temporary restraining order.

1    This was filed yesterday afternoon.  It challenges Executive

2    Order 14230, which is -- it's already been docketed at 90

3    *Federal Register* 11781.  This was issued by President Trump

4    a week ago, on March 6, 2025.  The executive order is titled

5    "Addressing Risks From Perkins Coie LLP."

6         I have provided the public access line.  If there

7    are people listening, either here in the courthouse or on

8    the public access line who might not be lawyers and,

9    therefore, not really familiar with Perkins Coie, which is

10   the name in the title of the executive order, Perkins Coie

11   is the name of a very well-respected and prominent law firm;

12   it has about 1200 lawyers, 2500 nonlawyers, and 21 separate

13   offices around the world, which I have learned in more

14   detail from the motion papers.

15        As the plaintiff in this lawsuit, Perkins Coie is

16   seeking a temporary injunction to stop three of the five

17   parts of the executive order bearing its name in the title.

18        So with that, I will turn to the plaintiffs, since

19   it's the plaintiff's motion.

20        MR. BUTSWINKAS:  Thank you, Your Honor.

21        Again, Dane Butswinkas on behalf of Perkins Coie.

22        If I may start, Your Honor, by introducing the

23   representatives of my client who are here.  And they are

24   Shannon Bloodworth, who is a representative of the executive

25   committee of the law firm.

 1              THE COURT:  Okay.

 2              MR. BUTSWINKAS:  Bill Malley, who is the managing

 3      partner of the law firm.

 4              THE COURT:  Okay.

 5              MR. BUTSWINKAS:  And Bates Larson, who is the

 6      general counsel of the law firm.

 7              THE COURT:  All right.  Welcome.

 8              MR. BUTSWINKAS:  We appreciate you giving us this

 9      opportunity so expediently on the docket.  We know the Court

10      is busy.

11              May it please the Court.

12              This executive order takes a wrecking ball to the

13      rule of law, to the principles that promote democracy; and

14      for purposes of this proceeding, to the law firm Perkins

15      Coie.  Its effects have been immediate, substantial,

16      irreparable; and, if not halted, life-threatening for the

17      law firm.

18              THE COURT:  So let me just pause you right there.

19      I will give you time to say everything you want.  I have the

20      luxury of being a district court judge, so I sit by myself.

21      I don't have impatient colleagues sitting on a panel with

22      me, so I can take as much time as I want.

23              I appreciate that the complaint is a challenge to

24      the whole executive order.  You are only seeking a TRO as to

25      Sections 1, 3, and 5.  So you are leaving out Section 2

1    having to do with the lifting of security clearances, and

2    Section 5, which actually applies to all large law firms,

3    whatever that means --

4          MR. BUTSWINKAS:  Section 4.

5          THE COURT:  Section 4, yes -- sorry -- that

6    applies to all large law firms.

7          So why are you holding back on Sections 2 and 4?

8          MR. BUTSWINKAS:  The reason is that we picked the

9    sections where the harm was most immediate and the infirmity

10    most clear and the remedy most clear.

11          The other provisions in our -- if you set a

12    preliminary injunction hearing, we believe we will be able

13    to demonstrate that they are constitutionally invalid as

14    well.

15          THE COURT:  Okay.  Well, we'll get to that at the

16    end because I am going to -- you know, not to keep you on

17    the edges of your seats; but I am going to ask you-all to

18    confer so that we can determine whether we need to go

19    forward with a preliminary injunction hearing or just move

20    to an expedited summary judgment.

21          MR. BUTSWINKAS:  That's what we would prefer, Your

22    Honor.

23          THE COURT:  All right.  Good.  So we'll get to

24    that at the end.

25          MR. BUTSWINKAS:  Yes.

```
 1              THE COURT:  Okay.  Well, that was interesting
 2    because there's been a lot of press about the security
 3    clearance business because another law firm, Covington, is
 4    also -- you know, had security clearance issues pursuant to
 5    an executive order.  So I didn't know why you were holding
 6    off on looking at that particular section.
 7              What I would like to do is go through the
 8    executive order section by section, just to make sure I
 9    haven't missed anything that I should understand from your
10    briefing papers, which hit my desk after 4 o'clock
11    yesterday.  So this has been my first opportunity to read
12    the actual Executive Order 14230.
13              Section 1 describes the purpose of the order.  It
14    has a number of derogatory accusations against the law firm,
15    all in service of showing, quote:  Good cause to conclude
16    that they -- meaning the law firm -- neither have access to
17    our nation's secrets nor be deemed responsible stewards of
18    any federal funds.
19              Now, I appreciate from your papers and the
20    declaration submitted by Mr. Burman -- Burman?
21              MR. BUTSWINKAS:  Yes.
22              THE COURT:  Yes.
23              -- from the firm that all of those accusations are
24    vigorously disputed.
25              But for purposes of the TRO, what precisely are
```

1    the government actions you are seeking to have enjoined in

2    Section 1?  Because I don't see -- unlike the other two

3    sections that you are seeking a TRO on, I don't see in

4    Section 1 that the government is being told to do something

5    there.

6              MR. BUTSWINKAS:  The gravamen of Section 1, we

7    believe, are, in essence, factual findings of the

8    administration, which we believe have been a judicial

9    function.  And so we would ask you to invalidate their

10    authority which guide, in theory, agencies and departments

11    in the other paragraphs of what to do if they deliberate

12    about something.

13              For example, several of the other provisions say

14    you have to deliberate about the interests of the

15    United States and whether engaging with this law firm is

16    within those interests.  And it's somewhat of a circular

17    process because paragraph 1, the purpose, essentially makes

18    findings against the law firm that working with them would

19    not be in the interest of the United States.

20              So one answer to your earlier question, Your

21    Honor, is that even Section 2 and Section 4, which we will

22    get to at some point in the process, are driven by

23    Section 1, which we submit to the Court are a series of

24    factual findings.  And you are absolutely correct, not only

25    do we dispute them, the court proceedings about them dispute

1    them.

2              THE COURT:  So are you seeking, for example, a

3    declaration as part of the TRO that Section 1 are findings

4    that are wrong or improper?

5              I mean, I can't decide whether they're wrong, I

6    think, at this stage, but -- just the likelihood of success

7    that you will establish that they're wrong.

8              But as I look at your proposed order as to --

9    precisely, what do you want me to do about that Section 1?

10   You, basically, clump Section 1 with the other two

11   sections -- you know, to disregard it when issuing guidance,

12   prevent enforcement or implementation.

13             So I am a little puzzled --

14             MR. BUTSWINKAS:  Yes.

15             THE COURT:  -- about what the injunctive relief is

16   you are seeking on that.

17             MR. BUTSWINKAS:  On Section 1, we would ask for an

18   instruction to departments, agency, and the administration

19   that they are not to use Section 1's findings as a direction

20   for any interactions with Perkins Coie.

21             THE COURT:  Okay.  That's clearer than what I

22   could see in the proposed order.  Okay.

23             All right.  So then let's turn to Section 3 of the

24   executive order.  That's the one that, by my count, directs

25   four specific federal government actions against Perkins

```
1    Coie:  One, that government contracting agencies require

2    government contractors to disclose any business they do with

3    Perkins Coie and whether that business is related to the

4    subject of the government contract; two, the heads of all

5    federal agencies must review all contracts with Perkins Coie

6    or with entities that disclose doing business with Perkins

7    Coie; three, that heads of all federal agencies must take

8    appropriate steps to terminate any contract with Perkins

9    Coie and for contracts where Perkins Coie has been hired to

10   perform any service; and then, all federal agencies -- the

11   last one -- have to submit to OMB, within 30 days, an

12   assessment of contracts with Perkins Coie or with entities

13   that do business with Perkins Coie and any actions taken

14   with respect to those contracts in accordance with this

15   order.

16          And so for that last step, do you view that as

17   some kind of enforcement mechanism that agencies are

18   actually going through and terminating all the contracts

19   either directly with Perkins Coie or with clients of Perkins

20   Coie?

21          MR. BUTSWINKAS:  Yes.

22          THE COURT:  Or how do you interpret that?

23          MR. BUTSWINKAS:  Pardon me, Your Honor?

24          THE COURT:  Or how do you interpret that?

25          MR. BUTSWINKAS:  That's how I interpret it.
```

1          And I interpret, actually, (b)(2), the assessment

2     of contracts with the language that says:  Figure out

3     whether these relationships are in the interest of the

4     citizens of the United States and consistent with the goals

5     and priorities of my administration; that's why this process

6     is -- from a due process and a number of other

7     constitutional standpoints, circular.

8          Because paragraph 1, the purpose, outlines the

9     findings for the agencies and department who are being

10    directed by the administration.  And so it's not much of a

11    process.

12         THE COURT:  And just to make absolutely clear on

13    the record, Perkins Coie had no prior notice of this

14    executive order being issued until it was issued?

15         MR. BUTSWINKAS:  That is correct.

16         THE COURT:  Okay.  And no consultation before it

17    was issued?

18         MR. BUTSWINKAS:  No consultation, no notice, no

19    opportunity to be heard of any kind.  No due process at all.

20         THE COURT:  Okay.  So then plaintiff does contend

21    that directing all federal agencies to review and terminate

22    government contracts where the contractor has used the

23    services of Perkins Coie, deprives plaintiff of the right to

24    practice its profession.

25         So let me just dig into that a little bit because,

1    certainly, Section 3 may drive government contractor clients

2    away from using Perkins Coie, but the order does not disbar

3    the plaintiff, it doesn't seek disbarment or direct agencies

4    to seek disbarment of any Perkins Coie lawyers; it doesn't

5    prohibit Perkins Coie from practicing law at all.

6         So the harm here is simply that -- is what, then,

7    in terms of the plaintiff's practice of law and ability to

8    practice law?

9         MR. BUTSWINKAS:  Well, it's -- the harm arises

10   from having a separate set of procedures that apply only to

11   one law firm; and it is truly the existence of the

12   procedures as much as the potential prospective application

13   of those procedures that is causing the present harm because

14   clients who are government contractors cannot hire a law

15   firm with this executive order in place because they will be

16   in the situation that -- and we are finding this, as you

17   know from our papers already; and we have agencies reaching

18   out to contractors to ask them about their relationships

19   with Perkins Coie, consistent with this instruction in the

20   executive order.

21        A large portion of the practice of Perkins Coie is

22   with federal agencies, federal courts, and in defense

23   contracting.  Every one of the top 15 clients at the law

24   firm has government contracts; and I think that accounts for

25   approximately 25 percent of the revenue of the law firm.

1              THE COURT:  So one of the things that the

2     plaintiff is contending is that Section 3, because of these

3     extra burdens and procedures -- special procedures that

4     would apply to Perkins Coie -- deprives plaintiff of a due

5     process property right to its contractual relationships.

6              So why should interference with a government

7     contract be considered a due process violation?

8              MR. BUTSWINKAS:  Because the courts have

9     consistently said that a contractual relationship is

10    protected by the property interest under the Due Process

11    Clause.

12             THE COURT:  And the contract that's being

13    interfered with is actually Perkins Coie's clients largely.

14             MR. BUTSWINKAS:  Correct.

15             THE COURT:  Perkins Coie's clients contract with

16    the government as opposed to -- although, perhaps, Perkins

17    Coie has some direct contracts with the government, which

18    would also be terminated under this section.  But this is a

19    little -- one step removed, in terms of the due process

20    interference claimed.

21             MR. BUTSWINKAS:  So --

22             THE COURT:  It's not Perkins Coie's own contract

23    with the government that would be terminated, it's sort of

24    an aftereffect.

25             MR. BUTSWINKAS:  That is a correct statement of

 1    the facts.  But, respectfully, the contract that's relevant

 2    here for due process violations is a contract between

 3    Perkins Coie and its clients because given these procedures

 4    that have been announced there has been and there will be

 5    enormous risk that these contractors will sever or not enter

 6    into these contractual relation -- retainer agreements with

 7    Perkins Coie; and that is the due process harm.

 8            You raise a good point and maybe another argument,

 9    and I would have to think about standing on that issue.  But

10    the --

11            THE COURT:  Right.  And that's where I was going

12    because the order doesn't require the private parties to end

13    the relationships with Perkins Coie.  It, basically, is just

14    telling agencies to end the relationship with the clients.

15    And then what the clients do with this risk to their

16    government contracts is different.  And is there third -- so

17    there is a third party in between the order and Perkins

18    Coie.

19            I wonder if there can be a due process violation

20    of private entities that, on their own, decide they would

21    simply rather have another law firm represent them in order

22    to keep their government contracting business, whether that

23    can be a due process violation because of the causation.

24            MR. BUTSWINKAS:  With respect to the contract --

25    with respect to the contracting party, they have a right to

1   counsel of their choice.  And so that is actually -- it may

2   also --

3          THE COURT:  So you are moving from a due process

4   claim to the Sixth Amendment right to counsel --

5          MR. BUTSWINKAS:  I'm saying it's a Sixth Amendment

6   matter, yes.  That issue is -- the standing is solid on

7   that, to assert the claim on behalf of the interference with

8   right to counsel, interference with counsel of choice, and

9   interference with effective counsel, all of which are

10  implicated here.  Because one of the difficulties as -- one

11  of the expert submissions that we submitted is that -- even

12  unfettered, there are so many qualifications under the Rules

13  of Professional Responsibility that the lawyers will have to

14  give to their clients, that sophisticated lawyers know that

15  will not be a relationship.

16         And so while it doesn't -- while the executive

17  order itself -- and I might push back a little bit on the

18  Court.  While the executive order doesn't on its face

19  actually terminate the contract, it is directing the

20  agencies to do that.  And it is that procedure that applies

21  only to this law firm; that different procedure that singles

22  them out, that has due process implications; Sixth Amendment

23  implications; and frankly, equal protection implications in

24  the -- under the class-of-one doctrine.

25         THE COURT:  Well, let's turn to the Sixth

1      Amendment right-to-counsel issues that you have raised.

2              I mean, when people choose a lawyer, they have got

3      a lot of considerations, from cost, attention, personal

4      chemistry, skill, et cetera.  While Section 3 does set up

5      special conditions for Perkins Coie, by contrast to any

6      other firm, as I understand it, or firms with -- clients

7      with government business, does this really cause an

8      infringement on the client's right to choice of counsel

9      since it's just now one other consideration like cost,

10     skill, location for potential clients to consider?

11             MR. BUTSWINKAS:  Yes.  It's a great question; and,

12     I guess, the heart of Section 3, which essentially says to

13     these contractors:  If you want to have government

14     contracts, you cannot use this law firm.

15             That's the most quintessential abrogation of the

16     contract that is protected by the Due Process Clause and

17     interferes with the contractor's right to counsel of its

18     choice, and effective counsel.  Because if you couple it

19     with Section 5, which I know we are not to yet, and you

20     can't have exchanges with government officials and you can't

21     go into government buildings, it's inconceivable how you

22     could comply with the disciplinary rules effectively and

23     counsel your clients.

24             So while it sets up these forward-looking

25     procedures, it's the existence of the restrictions right now

1    that is incredibly damaging and threatening and has already

2    caused harm to the relationship between Perkins Coie and its

3    clients.  And it has lost clients each day since the order

4    was implemented, as we note in our papers.

5              THE COURT:  Let me just go back to touch on one

6    point I meant to cover with due process and lack of notice.

7              I know this executive order sort of stands on its

8    own, it's not part of any sort of statutory construct or

9    administrative set of rules, meaning that:  If somebody

10   wants to rebut parts of this or challenge parts of it, the

11   only option is to come to court.  You can't just go back to

12   the agency or appeal it or something, like you can with

13   other types of government lists of designated people, like

14   for OFAC lists, or something like that, right?

15             So why doesn't -- my question to you is -- to

16   explain, why doesn't this executive order on its own

17   constitute notice to Perkins Coie, Perkins Coie's clients

18   that contracts may be terminated or that plaintiff's

19   attorneys may be barred from working with federal agencies?

20   And why under the Due Process Clause wouldn't that notice,

21   just by virtue of the executive order, be enough?

22             MR. BUTSWINKAS:  Well, I think that it,

23   technically, would provide prospective notice to the things

24   that haven't happened.  But it does not provide any kind of

25   notice with respect to the factual findings in Section 1,

1    and it doesn't provide any notice at all about the

2    restrictions that are placed only on this law firm because

3    they only learned about them contemporaneous with the

4    release of the executive order.  And --

5              THE COURT:  So this is not the kind of notice

6    that's contemplated by the Due Process Clause?

7              MR. BUTSWINKAS:  Certainly.  And it's certainly --

8    given the idea that you learn about the restriction when it

9    comes out is not sufficient notice to give you the types of

10   things that come with due process, like an opportunity to be

11   heard, an opportunity to dispute the factual findings, an

12   opportunity to say that there is no rational basis or

13   compelling state interest in any of the procedures that are

14   laid out.

15             I think it's especially a difficult problem here

16   given my point that these agencies are already told what the

17   outcome of their analysis is, because they have been told in

18   Section 1 that working with Perkins Coie is not consistent

19   with the national interest and not consistent with the

20   administration and policies of this administration.

21             THE COURT:  So what you are saying is that to the

22   extent that the words -- two words "national security" are

23   thrown around in different parts of Sections 1, 3, and 5, in

24   terms of the guidance, that those two words are then

25   accompanied by -- or, you know, a finding that it would be a

1   threat to national security or inconsistent with the U.S.

2   interests.  And so even if there is zero national security

3   risk, the outcome of the guidance, the outcome of the

4   decisions that heads of agencies are required to make under

5   this executive order is predetermined because of Section 1.

6           MR. BUTSWINKAS:  Right.  Which says that the

7   purpose is, as you reviewed earlier, among other things, to

8   have a finding of serious violations of the public trust.  I

9   mean, it is exactly what these agencies and departments are

10  told to measure, and all they have to do is look back at

11  Section 1 to find out the answer.

12          THE COURT:  Okay.  So I think I understood from

13  your papers that that was going to be your interpretation of

14  this phrase -- the tag line, along with "national security"

15  consistent with U.S. interests; but that's one of the things

16  I am going to want to explore with the government.

17          Like, what does that mean?

18          MR. BUTSWINKAS:  And may I add one more point,

19  Your Honor, about that?

20          THE COURT:  Of course.

21          MR. BUTSWINKAS:  And that is this, "national

22  security" appears to be sprinkled into the executive order

23  for exactly the purpose that you are asking.  But it seems

24  crystal clear, as I will talk about in a minute, that it's a

25  pretext for a retaliatory executive order against this law

1    firm for viewpoints, association, and speech.

2            And the reason why I say that is because of the

3    things that the President announced before, during the

4    executive order, and afterwards.  He didn't say:  I have

5    this executive order to protect national security.

6            He said:  I am going to take care of these

7    dishonest and dangerous law firms who represent Hillary

8    Clinton, who litigate election laws, who associate

9    themselves with people unpopular with the President.  And

10   those constitute serious violations of the public trust.

11           And interestingly -- and I think tellingly -- if

12   you look at Section 1, which purports to be the purpose of

13   this provision, the words "national security" appear one

14   time, and it's in connection with funding laws.  It's not

15   about a threat to national security.

16           So if you want to know the answer to whether it's

17   a pretext, it's not a circumstantial case from which you

18   have to make some inference.  You wake up in the morning and

19   there is snow, so you conclude it snowed last night.

20           This is, you got to watch the entire snowstorm

21   because you got to hear what the President said before the

22   executive order, about what he promised to do, which was

23   retaliate against the Perkins Coie law firm; number two, you

24   had to hear what he said in the executive order; and in the

25   fact sheet, which said he is going to retaliate against

1    Perkins Coie, and afterwards.

2         So the first point I would make is the "national

3    security" words are a pretext.  And you probably only have

4    to look to the purpose to see -- it doesn't say anywhere in

5    there:  Gee, we need to impose restrictions on this law firm

6    because if we don't that will threaten national security.

7         THE COURT:  Okay.  Let's turn to Section 5, which

8    requires more actions by federal agencies; by my count I

9    have got three that I have teased out of that Section 5.

10   One action is that the heads of all federal agencies must

11   provide guidance limiting official access from federal

12   government buildings to employees of Perkins Coie when such

13   access would threaten the national security or otherwise be

14   inconsistent with the interests of the United States.  That

15   phrase we were just talking about.

16        Two, again:  Heads of all federal agencies have to

17   provide guidance limiting government employees acting in

18   their official capacity from engaging with Perkins Coie

19   employees to ensure consistency with national security and

20   other interests of the United States.

21        And then, not just all heads of federal agencies,

22   but all agency officials across all federal agencies, of

23   which there are -- I mean, hundreds.

24        MR. BUTSWINKAS:  Your Honor, we mentioned over

25   90 --

```
 1                THE COURT:  90.

 2                MR. BUTSWINKAS:  -- in Mr. Burman's declaration.

 3                THE COURT:  Okay.  Yes.  So that's a lot of

 4      people -- a lot of agency officials are required not to

 5      hire -- not to hire employees of Perkins Coie absent a

 6      waiver from the head of the agency made in consultation with

 7      the director of Office of Personnel Management that such a

 8      hire will not threaten the national security of the

 9      United States.

10                So any employee from Perkins Coie, as I read that,

11      because it's not limited to lawyers.  That means --

12                MR. BUTSWINKAS:  That is correct.

13                THE COURT:  -- people in the mail office, legal

14      assistants, IT people -- all of those people working at --

15      those 2500 nonlawyer employees at Perkins Coie can't get a

16      federal job without going through a special, more burdensome

17      process with a waiver.

18                Is that how you read it?

19                MR. BUTSWINKAS:  That's right.  Yes, that's

20      exactly how I read it.

21                And it's even a little worse than that, right?

22      The rule is they can't work there unless they get this

23      exception that requires the head of an agency and the head

24      of the OMB.  That's inconceivably overbroad.

25                And you are absolutely right, it applies to the
```

1    people in the mail room, the IT director, and secretaries.

2              THE COURT:  All right.  Have you seen any

3    guidance -- I have read from your papers and Mr. Burman's

4    declaration that you are feeling real-word consequences with

5    canceled meetings by Criminal Division, Department of

6    Justice prosecutors already -- where they have canceled

7    meetings with no rescheduled meetings to follow up.

8              But have you seen any guidance whatsoever yet that

9    implements Section 5 or any of the other sections?

10             MR. BUTSWINKAS:  We have seen nothing that would

11   in any way limit it or give any guidance to any agency head

12   or departmental authority on what this means, other than

13   what you have just described.

14             THE COURT:  All right.  I am not sure exactly what

15   the government is going to say when they stand up.  But if

16   they stand up and say:  This section doesn't actually bar

17   all the employees from Perkins Coie from entering any

18   federal building in all cases because we don't have guidance

19   yet.  So maybe this is all premature.  And the guidance has

20   to be consistent with the law, so maybe there is no real

21   problem here.

22             What is your response to that, if they make that

23   argument?

24             MR. BUTSWINKAS:  My first response is the point I

25   already made, the language at the end of 5(a).  So it says,

1    as you read:  Heads of all agency shall provide guidance

2    limiting official access from federal government buildings

3    to employees of Perkins -- and as you know, that's a lot of

4    buildings.  It includes the post office; it includes the

5    V.A. hospital, a lot of veterans work at Perkins Coie; it

6    includes this building.

7         And then it says:  When such access would threaten

8    the national security -- which is sprinkled in there, so you

9    asked the questions that you are asking.  So it's a clever

10   pretext language.  But then it says:  Or otherwise be

11   inconsistent with the interests of the United States, which

12   is explained in the fact sheet that's attached and the

13   purpose in Section 1.  They are hand in glove with one

14   another.

15        And so we have had people canceling meetings, as

16   you have said.  The difficulty is that under the

17   professional rules -- the Rules of Professional

18   Responsibility, you have to advise your client on these

19   potential limitations of your practice.  And the limitation

20   may be that:  I can't go in the courthouse.  I can't go in

21   any of the 90 agencies that they have work in front of.

22        You know, we listed out in Mr. Burman's

23   declaration, as you know, all of the thousands and thousands

24   of matters that this law firm has in front of over

25   90 agencies.  And imagine Mr. Burman, who has been at

1    Perkins Coie for 45 years, has to sit down and write under

2    oath that this is a threat to my law firm.  That is damage

3    that's happening now.

4            THE COURT:  I just want to make sure because we,

5    in the judiciary -- we're the third branch.  We are not the

6    executive branch.  We are not subject to this guidance.  But

7    our landlord, and all of the federal courthouses around the

8    country is GSA --

9            MR. BUTSWINKAS:  GSA.

10           THE COURT:  -- General Services Administration.

11   And the people who do the security at our front doors, all

12   across the country in federal courthouses, are DOJ-component

13   employees from the U.S. Marshals Service or court security

14   officers.  So they are all executive branch employees.

15           MR. BUTSWINKAS:  And they are in charge --

16           THE COURT:  So I want to make sure you had no

17   trouble getting into this building today.  Did you?

18           MR. BUTSWINKAS:  We did not.

19           THE COURT:  Okay.

20           MR. BUTSWINKAS:  But they are -- your point is a

21   really good one.  They are in charge of access to

22   courthouses.  The word "NA" [sic] is access.

23           So, I mean, I hardly have to explain the colossal

24   damage that that rule -- that restriction imposed on one law

25   firm, and no other, is for their ability to practice their

1    profession.

2          THE COURT:  Let's just talk about the harms, which

3    you have provided in -- Mr. Burman's declaration provided

4    great detail about that.

5          But, generally, monetary harms don't qualify as

6    "irreparable," but you have brought them up here.  So could

7    you explain why the monetary harms qualify as "irreparable"

8    here, which is what you would need to show to rely -- if you

9    are relying only on the monetary harms to obtain the

10   extraordinary relief of a temporary injunction?

11         MR. BUTSWINKAS:  There are two reasons.  One is

12   that when the economic damages are not compensable under the

13   law -- and we can't recover those from the administration

14   because of immunity, and that turns the analysis onto

15   whether an injunction is needed.  So that's number one.

16         Number two, in this Circuit the standard is high

17   when measuring economic and potential economic damages, but

18   that's important.  It's existing economic damages and the

19   damages that will be incurred if the TRO is not entered.

20         You and I are from an era where we know law firms

21   can collapse pretty quickly.  And here, they have -- by way

22   of example, they have over a thousand active matters in

23   federal courts.  They have clients who are indicted and

24   federal targets.  They have 69 matters before federal

25   agencies in their government contracts group.  They have 555

1    clients in 5,415 pending patent applications before the

2    USPTO; 20 clients in 56 post-grant proceedings before PTAP;

3    7 clients and 11 proceedings before the ITC; 66 matters in

4    TTAB; 1,960 trademark matters before the Patent and

5    Trademark Office; 145 copyright matters before the Copyright

6    Office; 340 lawyers engaging with the FDIC, the Comptroller

7    of Currency, the Federal Board, the Department of Commerce,

8    the ITC, labor matters; 22 USCIS matters; and an extensive

9    practice before the SEC, the Department of Agriculture, the

10   FDA, the Department of Transportation, the DOJ, Homeland

11   Security, and the State Department.  They have a white

12   collar and investigations group that has 29 lawyers that

13   regularly engage with the FBI, the U.S. Attorney's Office,

14   and the SEC.

15          And as I mentioned earlier, the top 15 clients in

16   the law firm all have contracts with the government.

17          It is an immense, already-existing problem that is

18   like a tsunami waiting to hit the firm.  It truly is

19   life-threatening.  I am not here to exaggerate about it.  It

20   is a -- it will spell the end of the law firm.  And under

21   those circumstances, where the enterprise is truly at

22   economic risk, independent of whether it's compensable or

23   not, that satisfies the standard for TRO.

24          THE COURT:  All right.  You will have an

25   opportunity to come back after I hear from the government.

1          We haven't heard from the government because, on

2     TROs, we have to do this very expeditiously.  And if I had

3     given the government time to respond and, then, you time to

4     reply, we would have been meeting on Friday.  I understood

5     from the papers, you needed more expedition than that, which

6     is why we are meeting today.  I really do want to hear from

7     the government now.

8          MR. BUTSWINKAS:  Thank you, Your Honor.

9          MR. MIZELLE:  Thank you, Your Honor.

10         May it please the Court.  Chad Mizelle on behalf

11    of the United States.

12         Your Honor, if I could pick up right where you

13    left off.  I believe this case, the issues are complex.  The

14    issues related to harms, even in the declaration, are

15    complex.  I think the harm is a lot more speculative and

16    undetermined than my, you know, good friend --

17         THE COURT:  If this is such a complex matter, are

18    you agreeing to entry of a TRO to maintain the status quo

19    until I can get much more complete, fulsome briefing from

20    both sides?  Because that would be great.

21         MR. MIZELLE:  It might -- my argument to you --

22         THE COURT:  It will be my lucky day.

23         MR. MIZELLE:  Yeah.  My argument to you, Your

24    Honor, is that we should have already been given that

25    opportunity.  I do, you know, respectfully request before

1    any injunction is issued that the United States be afforded

2    the opportunity to file a proper response to the TRO to

3    contest some of the allegations, the factual statements, the

4    errors in law, all of those issues.

5             If the Court is not inclined to do that --

6             THE COURT:  That is the purpose of a TRO,

7    Mr. Mizelle -- let's not play games -- to maintain the

8    status quo on a temporary basis until the Court can get more

9    fulsome briefing.

10            So that is not happening.

11            MR. MIZELLE:  Well, I am prepared to --

12            THE COURT:  But we will proceed, and you can just

13   respond to my questions to the extent that you can.

14            MR. MIZELLE:  Yes, Your Honor.

15            THE COURT:  I am just going to do the same thing

16   with you that I did with plaintiff's counsel, just to go

17   through this section by section to make sure I am

18   understanding it all.

19            Section 1 of this executive order -- the whole

20   executive order struck me as different from almost any other

21   executive order I have seen.  Usually, executive orders

22   start, in the first paragraph, with sometimes a very lengthy

23   paragraph saying:  This executive order is being issued

24   under this statute and that statute and this code of federal

25   regulations and that code of federal regulations.

1      This one just starts with "Purpose."  And it just

2  cites the Constitution and the laws of the United States

3  without any specific other citation.

4      You would agree, it's a little bit different from

5  most executive orders?

6      MR. MIZELLE:  You know, I don't know if I would

7  agree with that, having had the privilege of working in the

8  White House Counsel's Office before, seeing a lot of

9  executive orders.  I would say that the form is actually

10  fairly consistent with what I am used to seeing.

11      But I would also add, Your Honor, that with

12  respect to the specific action that's being taken here, this

13  is clear Article II executive authority.

14      The President of the United States is authorized

15  under the Constitution to find that there are certain

16  individuals or certain companies that are not trustworthy

17  with the nation's secrets; that is something that the

18  President is afforded to do under the Constitution.  I don't

19  believe that it is something that Congress could even

20  impinge even if it wanted to, citing the law of the

21  United States.

22      And I think that the only constitutional authority

23  that we really need is the vesting laws.  So it really is --

24      THE COURT:  So you are relying on the whole

25  "national security" phrase that's scattered throughout the

1    executive order as the source -- the constitutional source

2    for his authority to issue this order?

3              MR. MIZELLE:  For the specific provisions that are

4    being challenged today, which is, namely, Sections 1, 3, and

5    5, yes, Your Honor.  That we believe -- and I am happy to

6    walk through, in more detail, the specific statements in

7    Section 1 and why those are a sufficient basis for the

8    President to direct the action that he is doing here.

9              But absolutely.  I mean, even starting from the

10   very first sort of substantive sentence here relating to

11   hiring Fusion GPS, which then maintained --

12             THE COURT:  Right.  He cites the Perkins Coie work

13   with the 2016 campaign of Hillary Clinton; its work with

14   activist donors and litigation over certain election laws,

15   including those requiring voter identification, which is

16   referring to Perkins Coie's fairly extensive work in

17   protecting voting rights that is perceived in this purpose

18   as not protecting voting rights but being counter to

19   protecting voting rights.  So it depends on how you are

20   looking at it.  That's a clear perspective issue.

21             MR. MIZELLE:  Your Honor, if I --

22             THE COURT:  Its work against candidates for

23   office, what he calls in the purpose, "work for election

24   change."

25             I think -- how is this not all viewpoint-related

1    purposes for this order?

2          MR. MIZELLE:  It's a great question, Your Honor,

3    and I would love to address all of those.

4          So in the very first, again, sentence relating to

5    hiring Fusion GPS, which -- they manufactured a false

6    dossier, that is something that the very statement goes to

7    the heart of national security.  At the heart of the dossier

8    were allegations that President Trump's campaign improperly

9    colluded with Russia; those were proven to be false,

10   factually incorrect.  Special Counsel Durham went through

11   and found that every aspect of the dossier -- not a single

12   aspect of it was verifiable --

13         THE COURT:  I have also read the Mueller report.

14   So I wouldn't say that -- I am not going to get into a

15   debate with you about it.  I think that there are very big

16   differences of view about whether -- you cannot be saying

17   that there was nobody involved in the 2016 Trump campaign

18   that had any connection with any Russian; you can't say

19   that.

20         MR. MIZELLE:  Your Honor, I believe --

21         THE COURT:  So let's not get into debate about

22   that.

23         I think what you are establishing is only

24   confirming that there might be a viewpoint perspective

25   difference here.

1          MR. MIZELLE:  I disagree with that, Your Honor.  I

2     would say that, fundamentally, the President -- it's not

3     whether a view is debatable; that is not the relevant

4     question here.

5          The relevant question is:  Is there sufficient

6     basis based on the conduct -- not the speech -- but the

7     conduct of individuals to find that they are not trustworthy

8     with our nation's secrets?  That is the key question.  And

9     it's perfectly based on the facts, as alluded to here, and

10     certainly as they have played out in history --

11          THE COURT:  Okay.  So let's take at face value

12     your perspective and the perspective that's reflected in

13     the --

14          MR. MIZELLE:  The President's perspective.

15          THE COURT:  The President's perspective, yes.  You

16     are right.  Thank you for that clarification.

17          You are competent counsel, and you are

18     representing your client vigorously -- as you must -- and I

19     appreciate that.  Truly, I do.

20          MR. MIZELLE:  Thank you, Your Honor.  Thank you.

21          THE COURT:  The President's perspective here, if

22     we want to dig down a little bit more, is that Perkins Coie,

23     at a certain time, did this thing with Fusion GPS.  Those

24     people who are involved in that are long gone from Perkins

25     Coie.

1          So how is that helping this executive order's

2     overall purpose in, basically, taking fairly punitive

3     measures against this law firm for acts that happened about

4     a decade ago with people who no longer even work there

5     when -- when sections of this executive order apply not only

6     to the lawyers but the 2500 nonlawyers at the firm?

7          MR. MIZELLE:  Yes, Your Honor.

8          I would direct your attention to a D.C. Circuit

9     case from last year, *Lee v. Garland*.  In that case, the

10    court rejected a Fifth Amendment due process claim, which

11    plaintiffs are bringing here; a First Amendment challenge,

12    which they're bringing here; an equal protection challenge,

13    which I don't believe they're bringing here -- but all

14    related to the revocation of a security clearance on the

15    grounds that this individual was not somebody who could be

16    trusted with the nation's secrets.  There the court said

17    that those are all unreviewable here.  And so we would say

18    that not only is that binding precedent --

19         THE COURT:  That is, perhaps, part of the reason

20    Section 2 is not being challenged here.  That involves the

21    security clearances.

22         MR. MIZELLE:  That's right.

23         But I actually think that -- thinking about this

24    from that provision and the national security, everything

25    flows.  And I know we are going to get to Section 3 and

1    Section 5 -- and I am very much looking forward to doing

2    that -- though, I don't want to leave Section 1 just yet.

3         Because everything is flowing from the

4    President's -- it is fundamentally the President's

5    prerogative, not reviewable by courts, according to *Lee* --

6    according to the D.C. Circuit in *Lee*, not reviewable by

7    courts, whether somebody is trustworthy with the nation's

8    secret.

9         The President has made that finding here.  And

10    everything else in the executive order that is being

11    challenged, Sections 3 and Sections 5, fundamentally flow

12    from that determination.

13         THE COURT:  Well, when I look at the First

14    Amendment claim in the complaint, and under First Amendment

15    analysis, I have to look at how is the government going to

16    satisfy strict scrutiny here by showing a compelling

17    straight interest and also narrow tailoring when -- even if

18    they had a compelling -- assume, for purposes of argument,

19    that's a compelling state interest about national security

20    because of something that happened a decade ago with people

21    who no longer work at Perkins Coie -- how is applying

22    punitive measures to everybody who works for Perkins Coie,

23    putting aside even right now its own -- the law firm's

24    clients, but Perkins Coie itself -- narrowly tailored to

25    show that any infringement on their First Amendment

1    associational rights, petition of government rights, and

2    then their other free speech rights -- how is that narrowly

3    tailored at all?

4            MR. MIZELLE:  Your Honor, I think this actually

5    goes to one of the --

6            THE COURT:  For them not to show not likelihood of

7    success on the merits on those claims.

8            MR. MIZELLE:  Right.  I think this actually goes

9    to one of the foundational defects in plaintiff's case,

10   which is no negative action has been taken against them.

11           This case fundamentally is not ripe because what

12   they're complaining about is a series of boogymen, it's a

13   series of ghosts.  Which -- you know, we can sit here all

14   day and talk about hypos:  What if we can't get on a plane?

15   What if we can't get into a courthouse?  I know that

16   everybody was --

17           THE COURT:  Post office.

18           MR. MIZELLE:  A post office, right?

19           THE COURT:  AUSA won't let us on the plane.

20           MR. MIZELLE:  None of that has happened.

21           THE COURT:  They won't talk to us, they won't look

22   at our paperwork.

23           MR. MIZELLE:  Sure.  Sure.  Right?  It's easy to

24   come up with a thousand hypos, like, what-ifs.  Right?  None

25   of those what-ifs have happened, and that's fundamentally

1    why this is not ripe.

2              THE COURT:  Let me ask you, what is the status of

3    the guidance among the 100 or so or more federal agencies --

4    I have never counted them up.  Have you seen any guidance

5    yourself?

6              MR. MIZELLE:  I have not seen any guidance, Your

7    Honor.

8              THE COURT:  All right.  Are you aware of whether

9    any guidance has been issued?

10             MR. MIZELLE:  I am not aware of any guidance

11   having been issued.  I know, certainly, at the Department of

12   Justice that leadership is working on guidance; I don't have

13   an exact timeline for that.  I know that they are, in light

14   of this case and others, working on it expeditiously; but I

15   can't commit to a timeline.

16             But I have not seen any guidance, Your Honor.

17             THE COURT:  Okay.

18             MR. MIZELLE:  But I do -- again, you know, you

19   asked a question to plaintiff's counsel relating to -- I

20   believe it's more on the due process question, but it was

21   about:  Can't you go back to the agency?

22             And we would say:  That's fundamentally correct.

23   Right?

24             When guidance is issued, when actions are taken,

25   when contracts may or may not be canceled, that is the time

1     that there has actually been a concrete harm,

2     nonspeculative, that the plaintiffs can come in and say:

3     Okay.  Now we have something to complain about.

4              This Court may be the right venue.  It might be

5     the Court of Federal Claims, depending on the specific

6     action that we're taking, but that is the type of concrete

7     actions.  So we're not -- you know, the government --

8     listen, we are happy to carry a big burden.  We're happy to,

9     you know, fight a long way.  But, really, we are being put

10    up with a bunch of what-ifs and boogymen and ghosts that we

11    are having to fight about.  None of those ghosts are real.

12    The boogymen are not real.

13             And so the hard part here is that, like, I am

14    trying to back down --

15             THE COURT:  You have read the declaration about

16    DOJ Criminal Division, at least one prosecutor, declining to

17    meet with the Perkins Coie lawyers in a criminal matter

18    because of the executive order and fear of probably being

19    fired should they meet with Perkins Coie attorneys in

20    violation of whatever -- however this is interpreted by

21    leadership of the Department of Justice.

22             MR. MIZELLE:  Yes, I have.

23             THE COURT:  You have read about the problems that

24    they're having getting federal officials to meet with them

25    in their different -- on their different matters and

1     different agencies.  So do you think this is still just a

2     boogyman and not having real-world effects now?

3                    MR. MIZELLE:  100 percent.  And I can explain why.

4                    First off, it's paragraph 26, I believe, of the

5     Burman Declaration that discusses an incident in the fraud

6     section of the Criminal Division.

7                    And while I have no reason to doubt the veracity

8     of Mr. Burman's declaration here, I have no ability to test

9     it because, unfortunately, for us, Mr. Burman -- unless it's

10    been included somewhere that I have just missed, I don't

11    have an email, I don't know who this attorney is.  And I can

12    say that the action of a single attorney in a department of

13    over 120,000 individuals does not represent the view of the

14    Department of Justice.

15                   Actually, it's only the Attorney General or her

16    delegated -- those to whom she has delegated authority who

17    can take that kind of action.

18                   And so the fact that they can point to a single

19    instance -- I would say no, that is actually not sufficient.

20    This is a bit of a boogyman here.  There could have been a

21    lot of reasons for this, the attorney could have been

22    mistaken.  If that attorney had talked to their supervisor,

23    their supervisor may have said:  No, no, no.  Don't take

24    this action.

25                   So again, without context, without being able to

1    probe, it's not actually clear what exactly happened here.

2          And if I could continue just on the declaration

3    for a little bit, because I think this actually relates to

4    the other question.

5          Really, I take paragraph 30 as really focusing on

6    the harm here to the firm.  And I understand, you know, my

7    friend on the other side's statement, you know:  This is

8    threatening the very existence of a law firm.

9          But if we look even at the second or third

10   sentence here, there is a lot of speculation.

11         If the order were to cause current clients to

12   terminate their agreements and if it were to frighten away

13   new clients, it could put the firm's solvency and existence

14   at risk.  Right away we have an inference built upon an

15   inference that might lead to the firm's solvency being an

16   issue.  But we have no evidence of that.  You know, just

17   simply claiming that 15 clients represents a quarter of the

18   revenue --

19         THE COURT:  And so why don't we just look at

20   paragraph 29 that goes on for one and a half pages listing

21   all of the clients that have raised concerns or left the

22   firm already, which are some of the real-world consequences

23   of what Perkins Coie's clients are facing while awaiting the

24   guidance and experiencing in the Perkins Coie clients' own

25   interactions with government officials.

```
1                    So I am looking at not just paragraph 30 --

2              MR. MIZELLE:  Sure.

3              THE COURT:  -- as to monetary harm, but also some

4      of the other paragraphs that are a little bit more extensive

5      about how this isn't just an if, if, if situation.

6              MR. MIZELLE:  Right.  Absolutely, Your Honor.  I

7      was going to go back to that, but I am glad you also raised

8      that because I see, in paragraph 29, two major issues.

9                    First, I see a traceability issue; second, I see a

10     redressability issue.  I am going to have to talk about both

11     of those.

12                   With respect to traceability, clients make

13     decisions for lots of reasons.  In fact, numerous clients

14     make decisions -- and, you know, I have been in a law firm,

15     I have seen this firsthand.  I have also worked at

16     businesses and seen this on the other side, how you decide

17     to pick lawyers.  You pick them for a variety of reasons.

18                   What we have is an independent actor, and they're

19     claiming:  Hey, we're not going to work with Perkins Coie

20     because of this order.  Right?

21                   We haven't been able to test that.  We are not

22     sure the, you know, actual causation here.

23             THE COURT:  Well, I mean, I did ask that question

24     about the causation, redressability, and so on.

25             MR. MIZELLE:  Yes.
```

1          THE COURT:  And one of the things that I see in

2     the declaration is the communications that have been ongoing

3     directly with Perkins Coie's current clients, with them

4     raising questions about potentially having to leave if this

5     executive order situation persists --

6          MR. MIZELLE:  But to me, Your Honor, that is

7     actually the crux of the defect --

8          THE COURT:  -- meaning that it's not just lots of

9     other factors.  They already had the client; they have had

10    the client for a long time, some of them.

11         MR. MIZELLE:  Right.

12         THE COURT:  And because of this, the clients are

13    looking -- are considering whether they have to move

14    elsewhere.

15         MR. MIZELLE:  But again, having at least been on

16    the other side of it, I can tell you from personal

17    experience, there are certain law firms with reputations of

18    having -- let's call them political connections to various

19    administrations.  And so there are certain law firms,

20    depending on who the President is and who is staffing the

21    administration, who you might choose to hire because it's

22    perceived that they have more relationships with that

23    particular administration or another administration.

24         So it's not clear, one, that it's actually

25    stemming from the order as opposed to that; and that is

1    perfectly lawful, and that happens every single day.

2            And then I also think because that is true, we

3    have a redressability problem.  So fundamentally, even if

4    Section 3 and Section 5 get enjoined here, there is no sort

5    of clear -- because I think causation is not clear -- there

6    is no clear evidence that these law firms are going to -- or

7    sorry, these clients are going to say:  You know what, we're

8    going to stay with Perkins Coie.

9            As opposed to saying:  You know what, clearly, the

10   President, at least personally, does not trust you with the

11   nation's secrets.  And so regardless of how Section 2 plays

12   out, this is not really the law firm we want to use if we're

13   trying to get additional business from the federal

14   government.

15           THE COURT:  I want to turn to one other issue that

16   sort of crosses across Sections 1, 3, and 5; and that is a

17   bill of attainder.

18           The plaintiff indicates that the bill of attainder

19   prohibition in Article I, Sections 9 and 10 apply only to

20   Congress and not to the President.

21           Does the government agree with that?

22           MR. MIZELLE:  First off, we would argue that this

23   is not a bill of attainder.  But second off, I mean, I would

24   agree that they --

25           THE COURT:  Well, would you agree that some

1    provisions in this executive order, 14230, are punitive to

2    Perkins Coie?

3            MR. MIZELLE:  Punitive in the sense of -- I don't

4    think I would use the word "punitive."  I would say have an

5    impact and have caused an injury, certainly, to Perkins

6    Coie.

7            THE COURT:  Cause an injury.  Okay.  But just

8    because they cause an injury to Perkins Coie, in your mind,

9    doesn't make them punitive in the meaning of the term "bill

10   of attainder"?

11           MR. MIZELLE:  Right.  When I think bill of

12   attainder, you know, I typically think that you have a

13   legislator who has essentially convicted somebody of a

14   crime.  Without the benefit of counsel, without the benefit

15   of a trial, without the benefit of a jury, they have

16   convicted this person of a crime.  One, nobody has been

17   convicted of a crime.

18           THE COURT:  I don't think a bill of attainder

19   basically has to say:  You are going to go to jail -- you,

20   John Doe.

21           I think a bill of attainder could be:  You, John

22   Doe, in our view, are a bad person for various reasons; and

23   therefore, we are going to penalize you monetarily or in

24   some other way.

25           So I think since we don't have bills of attainder

1  because they are barred under our Constitution -- I mean,

2  the definition of a bill of attainder is, basically, it's a

3  punitive measure taken against an individual without due

4  process by the legislative branch.

5          When an executive order is being issued as if it

6  were a law --

7          MR. MIZELLE:  Right.

8          THE COURT:  -- I am not as quick as the plaintiffs

9  were to say a bill of attainder bar --

10          MR. MIZELLE:  Right.

11          THE COURT:  -- doesn't apply to the executive

12  branch.  But I just was curious whether the government

13  agreed with the plaintiff or thinks it's a more open

14  question.

15          MR. MIZELLE:  I mean, I would say, just as a pure

16  constitutional matter, that the bill of attainder

17  restriction is only on Article I and not on Article II, and

18  so it doesn't apply to the President.

19          THE COURT:  Yes.  But I think, at the time of our

20  founding, they didn't think of Presidents issuing as many

21  executive orders as they do today -- thought of issuing laws

22  like this.

23          MR. MIZELLE:  I disagree.  They certainly thought

24  of Presidents taking action to protect the national security

25  interests of the United States.  And if that meant excluding

1    individuals who are no long trustworthy with the nation's

2    secrets -- that is a bedrock principle of our republic.  I

3    mean, that has existed for a very, very long time.

4                THE COURT:  So can I just explore this a little

5    bit with you, I mean, because this is the second time you

6    have said this, Mr. Mizelle.

7                I would admit to you, it sends little chills down

8    my spine when you say that:  If the President, in his view,

9    takes the position that an individual or an organization or

10    a company is operating in a way that is not in the nation's

11    interests, he can issue an executive order like this and

12    take steps to bar that individual, that entity, that company

13    from doing any business with the government, terminate

14    whatever contracts they have got, bar them from federal

15    buildings -- I mean, that's a pretty extraordinary power for

16    the President to exercise.

17                I am only familiar with OFAC lists, where there is

18    a whole administrative process where people are designated

19    on the lists and there are lots of appeal rights; there are

20    lots of -- there is a lot of due process that's associated

21    with -- whether you are a U.S. citizen or even a foreigner,

22    to challenge being put on a -- designated as a person on

23    that list.

24                Here, the President is basically adopting an

25    OFAC-designation kind of power for Americans as he sees fit.

1    So why shouldn't we be chilled by that?

2              MR. MIZELLE:  I think to adopt any other reading

3    of this -- and to adopt, I think, something -- respectfully,

4    Your Honor, to adopt a ruling that you just articulated

5    would fundamentally upend Article II power as we know it.

6    It would prevent the President from taking all necessary

7    action to suspend security clearances when such action is

8    deemed necessary.  It would prevent the President from --

9              THE COURT:  We are not talking about Section 2

10   here.

11             MR. MIZELLE:  But your reasoning would certainly

12   apply to security clearances, I don't know why it wouldn't.

13   It would prevent the President from issuing sanctions under

14   IEEPA.  It would prevent the President from taking actions,

15   as it's been recognized since 1940 by the U.S. Supreme

16   Court:  The government enjoys the unrestricted power to

17   produce its own supplies, to determine those with whom it

18   will deal, and affix the terms and conditions upon it will

19   need to make those purchases --

20             THE COURT:  So your view is:  Don't be chilled,

21   Judge, we should just trust the President to draw the right

22   lines, and yes, he has that power.

23             That's the government's position here?

24             MR. MIZELLE:  It is 100 percent our position that

25   government -- that the President has that power, and that it

1    is the right and prerogative of the President as the sole

2    individual vested with Article II authority to exercise that

3    prerogative.  Right?

4         It might be a situation where the Court deems it

5    imprudent or unwise.  I am not going to sort of -- you know,

6    sort of bicker with the Court about, you know, your own sort

7    of personal views on it.  But what I will say and vigorously

8    defend is that the President has every right to make that

9    action.  And in taking that action against -- in making a

10   finding that there is a national security risk with respect

11   to a group of individuals, he is allowed to effectuate that.

12        THE COURT:  And so we have Williams & Connolly, a

13   very brave law firm, to take this on.

14        MR. MIZELLE:  Yes, ma'am.  We have hired several

15   of their people to DOJ, so I am familiar with them.

16        THE COURT:  They are very brave to take on the

17   Perkins Coie matter.  And they could be next, with an

18   executive order, because they're representing Perkins

19   Coie -- the President would have that power -- to issue the

20   next executive order that wouldn't be called "Addressing

21   Risk From Perkins Coie LLP," it could be "Addressing Risks

22   From Williams & Connolly" -- LLP LLC, I am not sure -- but

23   that would be within the President's power should he get

24   annoyed by Williams & Connolly's defense of Perkins Coie,

25   which the President believes, as stated in the Section 1

1  purpose of the executive order is a dishonest and dangerous

2  law firm?

3             MR. MIZELLE:  I think that if the President issued

4  a --

5             THE COURT:  Yes or no, the President would have

6  that power?

7             MR. MIZELLE:  If he made a finding that there was

8  a national security risk with a particular law firm, then

9  yes --

10            THE COURT:  Or not in the interest of the

11 United States, in his view.

12            MR. MIZELLE:  I think that this is actually really

13 tied --

14            THE COURT:  Because that's the finding -- that's

15 the finding that he has made here.

16            MR. MIZELLE:  I think this is really tied to

17 national security.  And, again, I think that there is a lot

18 of bases going back to, again, the very first example about

19 Fusion GPS; false information related to Russia; and

20 national security issues, certainly.  I think that it's

21 really tied to that.

22            THE COURT:  I know the President has just -- you

23 know, based on reading these papers, he was upset about that

24 in 2016; he was so upset about this still he filed a lawsuit

25 against Perkins Coie and others in the Southern District of

1   Florida that was dismissed in rapid order.  He keeps

2   bringing it up.  It's like he doesn't want any of us to

3   forget Fusion GPS.  He doesn't want any of us to forget

4   that -- any of this.  He really has a bee in his bonnet

5   about it.

6           So now we have this executive order.  And I

7   already have enormous respect for Williams & Connolly and an

8   enormous respect for them taking this case, when not every

9   law firm in this city or this country would given the

10   substance of this executive order.

11          If I am hearing you correctly, it is your view

12   that another executive order is totally possible and within

13   the President's power to have "Addressing Risks From

14   Williams & Connolly" if the President got angry enough to

15   view this in Williams & Connolly's vigorous representation

16   of Perkins Coie as dishonest and dangerous?

17          MR. MIZELLE:  Your Honor, I would just --

18          THE COURT:  Your answer is yes?

19          MR. MIZELLE:  If the President --

20          THE COURT:  Within the President's power?

21          MR. MIZELLE:  The President has the sole authority

22   to determine if a person poses a national security risk such

23   that certain actions need to be taken, including revocation

24   of security clearances, including walling them off from

25   certain sensitive government buildings that could endanger

1    the national security interest of the United States.  100

2    percent, that is the President's prerogative under the

3    Constitution of the United States.

4            THE COURT:  Okay.

5            MR. MIZELLE:  And I believe -- I would say, going

6    further, that that's a prerogative that, under *Lee v.*

7    *Garland*, this Circuit has said cannot be challenged, at

8    least under a sort of back-door, Fifth Amendment, First

9    Amendment, equal protection-type case, which is exactly what

10   plaintiffs are seeking to do here.

11           THE COURT:  All right.  So let's just look for --

12   move on to Section 3, which you have already told me you

13   haven't seen any guidance yet, but DOJ is working hard on

14   expeditiously issuing guidance about how to, I guess, take

15   steps to terminate contracts, and so on; and Section 5,

16   which also requires guidance to be issued on limiting access

17   to federal government buildings.

18           Is that guidance from each agency, if you know,

19   going to be implemented in a way that, you know, Perkins

20   Coie is going to know which buildings they can go into or is

21   it going to be implemented with enforcement at the door of

22   every federal building or is that too premature to know?

23           MR. MIZELLE:  I believe it's too premature.  I

24   haven't seen any guidance, Your Honor, on that.  I very much

25   doubt it would be a situation where people are, you know,

1    arrested at the door, but --

2              THE COURT:  But it's possible?

3              MR. MIZELLE:  Well, I mean, again, if we're living

4    in a hypo world, sure; I guess anything, as plaintiffs would

5    point out, is theoretically possible.

6              Likely to happen?  I don't think so.

7              Speculative?  Absolutely.

8              Any harm there, under a sort of series of

9    potential hypos, would be necessarily speculative.  I mean,

10   we don't know what is going to happen.

11             I think the fact that neither of us sitting here,

12   and plaintiff's counsel can't --

13             THE COURT:  So let me just ask you because --

14   like, Section 5(a), for example, requires the guidance on

15   limiting Perkins Coie employees -- all of them -- 1200

16   lawyers, plus 2500 nonlawyers -- limiting all of their

17   access to federal government buildings.  That guidance has

18   to address when such access would threaten national security

19   or otherwise be inconsistent with the interests of the

20   United States.

21             So that "inconsistent with the interests of the

22   United States" is far broader than threatening the national

23   security.  And one could say, you know, who needs national

24   security if you can just look to whether it's inconsistent

25   with the interests of the United States?

1          So how do you think "inconsistent with the

2     interests of the United States" should be interpreted?

3          MR. MIZELLE:  To be honest, Your Honor, I am not

4     sure.  And I would -- I am not a head of an agency, so I

5     would not want to speculate as to how the President's

6     cabinet is planning to implement this.

7          But what I would say is the very fact that we're

8     having this conversation --

9          THE COURT:  Well, it's not just the head of the

10    cabinets, it's all federal agencies.  And there are, like,

11    over 90 of them.

12         MR. MIZELLE:  Yes.  Yes, Your Honor.  I mean, you

13    are right.

14         THE COURT:  Some of them, I don't even know what

15    the acronym stands for.

16         MR. MIZELLE:  Right.

17         THE COURT:  So is it possible, then, that the head

18    of every one of these 90-plus agencies could have their own

19    particular view about what's "inconsistent with the

20    interests of the United States" means?

21         And so the people who work at Perkins Coie could

22    have one set of guidance -- a different set of guidance at

23    each different agency.

24         MR. MIZELLE:  Which is not that inconsistent with

25    how access to a lot of these agencies already work, going

1    through various security.  The security of the Department of

2    Justice is very different than security at the Department of

3    Education, for example, right?

4             THE COURT:  But that applies to everybody coming

5    in, not one particular firm and employees of a firm, right?

6             MR. MIZELLE:  That is true.

7             But again, this is an instance where:  Once

8    guidance is issued, if there is an issue with that, if they

9    believe that it's objectionable in some way, I would say

10   that is the proper time to bring a lawsuit and say:  There

11   is now specific issues with guidance issues by this specific

12   agency head.

13            THE COURT:  Let me ask you this.  I know that DOJ,

14   based on your representation, is working hard to implement

15   guidance for this executive order.

16            MR. MIZELLE:  Yes, Your Honor.

17            THE COURT:  Has this order been circulated to the

18   employees at the Department of Justice?

19            MR. MIZELLE:  I am not sure whether the executive

20   order has.  It's not something we would typically just send

21   around to everybody.

22            THE COURT:  Okay.  How about at the U.S.

23   Attorney's Office; do you know?

24            MR. MIZELLE:  I am not sure, Your Honor.

25            THE COURT:  Mr. Dreier, has it been sent to

```
 1    everybody at the U.S. Attorney's Office?

 2              MR. DREIER:  I don't believe it has.

 3              THE COURT:  Okay.

 4              Would you agree that if the guidance that is

 5    issued, with the full spirit of the purposes of the

 6    executive order, tells Department of Justice people with

 7    whom you are most familiar or U.S. Attorney's Office people

 8    here in D.C.:  Don't meet or engage -- to use the word from

 9    the executive order -- with anybody from Perkins Coie --

10    that that would put quite the damper on Perkins Coie

11    attorneys' ability to represent clients?

12              MR. MIZELLE:  I don't read it, first off --

13              THE COURT:  When the Department of Justice is on

14    one side of the view or the other?

15              MR. MIZELLE:  Sure.  Yeah.  First, I don't read it

16    as going, necessarily, as far as you suggested, to not even

17    talk to or speak with individuals.

18              And I would also remind -- you know, respectfully

19    remind the Court that during COVID nobody was entering

20    federal buildings; nobody was meeting; all access and all

21    communications were handled via letter, email, phone

22    calls --

23              THE COURT:  Well, you tell me, Mr. Mizelle.

24              The specific words are:  Heads of all agencies

25    shall provide guidance limiting government employees acting
```

 1    in their official capacity from engaging with Perkins Coie

 2    employees.

 3             So "engaging" is not -- they could have said:

 4    Don't meet in person.

 5             That would say -- he can have a Zoom call.

 6             MR. MIZELLE:  Sure.

 7             THE COURT:  But this is broader than that.  It

 8    says "engaging."

 9             So do you think "engaging" just means hiring or

10    entering into a contract with Perkins Coie?  Or do you think

11    "engaging" means, in the context of this overall executive

12    order, something broader than that, and it means more akin

13    to interacting with them?

14             MR. MIZELLE:  I would say, first off, it says:

15    Engaging to ensure consistency with the national security

16    and other interests of the United States.

17             So I believe it all has to be read together.  It's

18    not just "engaging," full stop, right there.  There is a

19    qualifier there that the agency should consider when

20    directing it.

21             Now, how each head of the agency --

22             THE COURT:  But limiting -- limiting those

23    engagements.  It uses the word "limiting."

24             MR. MIZELLE:  Limiting those engagements to the

25    extent to ensure consistency with the national security,

1    yes, Your Honor.

2            THE COURT:  And other interests of the United

3    States.

4            MR. MIZELLE:  That's exactly right.

5            THE COURT:  So you read that in total; and

6    plaintiff certainly reads that to say:  Government officials

7    are not willing to take meetings with us -- that's happened

8    already.  And we're afraid the guidance is going to also say

9    that because that's how it reads.

10            How do you read it?

11            MR. MIZELLE:  Me personally, Your Honor, I think

12    my reading of it is somewhat irrelevant.

13            THE COURT:  Well, you are representing the

14    government here.  So... right?

15            MR. MIZELLE:  And I read it as giving agencies

16    discretion and to determine what level of engagement would

17    be appropriate in light of the interests in national

18    security of the United States.

19            So it's not even clear that it's --

20            THE COURT:  In a situation where a Perkins Coie

21    lawyer is representing a criminal defendant --

22            MR. MIZELLE:  Sure.

23            THE COURT:  -- say, or a potential target --

24            MR. MIZELLE:  Right.

25            THE COURT:  -- in a criminal investigation, and

1     they want to have a negotiation about what charges or what

2     disposition, or no charges --

3                 MR. MIZELLE:  Right.

4                 THE COURT:  -- or deferred prosecution --

5                 MR. MIZELLE:  Right.

6                 THE COURT:  -- all of the things that go on in

7     those incredibly important plea negotiations, or

8     negotiations between government counsel and defense counsel.

9     Would that be engagement that would be consistent with the

10    national security or other interests of the United States?

11                MR. MIZELLE:  I am not sure it would.  And in the

12    same way as the Court alluded to right at the very

13    beginning, if you were to order a meet-and-confer, I would

14    not go over to, you know, my counterpart and say:  Listen, I

15    can't talk to you, have a nice day; and openly defy the

16    Court's order there.  That is not how I read this, nor do I

17    think that that would be required.

18                And the very fact -- and I really would like to

19    hammer this point home.  The very fact that we don't know --

20    plaintiffs have put forward a world, and it looks a certain

21    way.  And I have put forward a world, and it looks a very

22    different way.  And the fact that you are even trying to

23    decide which world is accurate just shows how speculative

24    the harm is.  That is not the role of a court to determine.

25                THE COURT:  And isn't the speculativeness of this

1    harm and how far it will go and the risk that the next

2    executive order is going to be saying not "Addressing Risks

3    From Perkins Coie" but "Addressing Risks From Williams &

4    Connolly"? -- isn't that enough of a concern about

5    associational risks, rights of association, rights of being

6    able to practice law and accept clients that you want, and

7    for clients to be able to choose the lawyers they want for

8    us not to have to wait on the guidance?

9            MR. MIZELLE:  Regardless of whether a matter --

10   you might feel that there is a certain harm being done --

11   fundamentally, this is something going to the Article III

12   jurisdiction of the Court.  Right?

13           If there is a speculative harm here, which is

14   exactly what they're pointing to, we may not be able to go

15   to airports; we may not be able to go to the post office.

16   If an order is entered by a postal master saying:  Perkins

17   Coie's employees may not enter the post office, then --

18           THE COURT:  We're going to have to use FedEx.

19           MR. MIZELLE:  Right.  Or someone else, right?

20   UPS, right?  But that would be now a challenge that is ripe

21   for this Court to adjudicate.  At this point, the fact that

22   we're all speculating and guessing just shows that it's not

23   ripe for adjudication by this Court.

24           THE COURT:  Thank you, Mr. Mizelle.

25           MR. MIZELLE:  If I may, Your Honor, there's just a

1    couple more points that you brought up that I would like to

2    address.

3              THE COURT:  Sure.  Go ahead.

4              MR. MIZELLE:  Your Honor, you mentioned the First

5    Amendment and, certainly, viewpoint discrimination.  I

6    believe there it's more of a nuanced approach when we talk

7    about national security.

8              And so whenever I say, you know, First Amendment

9    rights, you think it's typically someone's First Amendment

10   rights.  There's a lot of things that people -- a lot of

11   speech that people are allowed to engage in that we might

12   even find abhorrent but, nonetheless, it's protected by the

13   First Amendment.  People can be pro-terrorist, pro-ISIS

14   terrorist.  They can engage -- they could even call for the

15   overthrow of the federal government.  However, those are

16   activities that would be categorically disqualifying for

17   national security experiences.

18             THE COURT:  Perhaps unless you are a green card

19   holder at Colombia University.

20             MR. MIZELLE:  Perhaps, Your Honor.  Right?  If

21   that individual is calling for the violent overthrow of the

22   United States --

23             THE COURT:  I don't think he was doing that --

24             MR. MIZELLE:  That is something while --

25             THE COURT:  -- based on what my reading is.

1          MR. MIZELLE:  Yeah.  There is a lot of facts in

2     that case that are, you know, tricky and not all public.

3          But with respect to viewpoint discrimination, it

4     is fundamentally the prerogative of the federal government

5     to find -- in fact, when I got my own security clearance,

6     one of the key questions was:  Have you ever advocated for

7     the overthrow of the United States?

8          If I had answered that question yes, the

9     government would be well within its rights to say:  You know

10    what, we are not going to trust you, Mr. Mizelle, with a

11    security clearance.  And so this notion that any speech

12    whatsoever --

13          THE COURT:  You are not -- you are not even

14    suggesting that anybody at Perkins Coie did that to justify

15    this executive order, are you?

16          MR. MIZELLE:  What I am suggesting -- no, Your

17    Honor.

18          THE COURT:  To be clear, you are not; are you?

19          MR. MIZELLE:  No, Your Honor.

20          But what I am suggesting is that throwing around

21    terms like "viewpoint discrimination" and "strict scrutiny,"

22    when you look at it in the national security context, it

23    fundamentally needs to be viewed differently.  And that

24    fundamental difference is, the government is allowed to

25    discriminate on the basis of viewpoint.  We are not required

1    to trust our nation's secrets to somebody who advocates for

2    the overthrow of the federal government or for someone who

3    is engaged in other sort of dangerous actions that are

4    contrary to the national security of the United States.

5         And that is fundamentally, I think, what is at

6    heart here because we're not talking about, you know,

7    generic principles of First Amendment law.  What we're

8    talking about is a finding by the President of the United

9    States which is eminently defensible, both in law and fact,

10   that Perkins Coie poses a national security risk to the

11   United States.  And he is directing all of those to whom --

12   he is directing everybody who reports to him, all of the

13   heads of the agencies, to take actions in light of that,

14   right?

15        And so that does mean a security clearance review,

16   which is not under challenge today; but also means taking

17   actions with respect to federal buildings and personnel that

18   need to be consistent with our nation's most treasured, most

19   private secrets.  And I believe that's exactly what the

20   President did here, Your Honor.

21             THE COURT:  Thank you.

22             MR. MIZELLE:  Thank you, Your Honor.

23             THE COURT:  Yes.  Mr. Butswinkas.

24             MR. BUTSWINKAS:  Thank you, Your Honor.

25             I appreciate the time the Court has devoted to

1   this, and I will try to be as brief as possible; but there

2   are a few things that I just am compelled to respond to.

3          That is a different Constitution from the one I am

4   familiar with.

5          The words "if the President in his view" jump out

6   of the courtroom.  That's not the way the Constitution

7   works.

8          The President can issue executive orders from a

9   delegated act of Congress or from inherent authority in the

10  vesting clause of the Constitution.

11         THE COURT:  And he has a very broad view of the

12  vesting clause of the Constitution.

13         MR. BUTSWINKAS:  Indeed.  But it's not one

14  consistent with the law.  And --

15         THE COURT:  Well, the Supreme Court might have to

16  decide that.

17         MR. BUTSWINKAS:  This case -- *Youngstown Sheet &*

18  *Tube Company*, which I know you are familiar with because you

19  have cited it, where Justice Jackson, the concurring

20  opinion, is kind of the cornerstone of this analysis.  And

21  when she --

22         THE COURT:  We see in some ways -- I mean, I just

23  issued an opinion on the unitary President theory, I didn't

24  know it was actually going to come up again in this case --

25         MR. BUTSWINKAS:  When the government --

```
 1              THE COURT:  But there you go.

 2              MR. BUTSWINKAS:  I'm sorry.

 3              When the government says:  "The President in his

 4     view," this passage from Justice Jackson jumps off the page:

 5     The essence of our free Government is "leave to live by no

 6     man's leave, underneath the law," -- to be governed by those

 7     impersonal forces which we call law.  Our government is

 8     fashioned to fulfill this concept so far as humanly

 9     possible.  The Executive, except for recommendation and

10     veto, has no legislative power.  The executive action we

11     have here originates in the individual will of the President

12     and represents an exercise of authority without law.

13              That's exactly what we have here.  And that

14     concurring opinion, as you know, has been the foundation of

15     executive order analysis for, now, 75 years.

16              I want to touch upon the case that they cite to

17     Your Honor showing that this is inherent authority from the

18     vesting clause.  And by the way, I am not one here to argue

19     that the vesting clause is any model of clarity; but the

20     cases have court meaning into it that would not allow an

21     executive order that targets a law firm to retaliate because

22     of lawsuits they have been involved in.

23              You mentioned the bill of attainder.  And I have

24     always thought that was curious, too, because the law does

25     say the bill of attainder applies to Congress, not to the
```

1    President --

2              THE COURT:  Well, it's in Article I.

3              MR. BUTSWINKAS:  Yes.

4              THE COURT:  But it doesn't say only Congress.

5              MR. BUTSWINKAS:  Well, that's right.  And I don't

6    know --

7              THE COURT:  So, I mean, I don't --

8              MR. BUTSWINKAS:  I think, Judge, that's right.

9              THE COURT:  I think you can't have a law that is a

10   bill of attainder, period, short stop.  That is in the

11   Constitution -- two sections they thought it was so

12   important, the founders.  I don't think they thought about

13   things like executive orders.

14             I know the government has a different view, thinks

15   that it's perfectly common.  But executive orders that sort

16   of stand in for law, I think, could be subject to a bill of

17   attainder constitutional bar.

18             MR. BUTSWINKAS:  We had open and robust debate

19   about how to characterize the bill of attainder, but I will

20   say this, we agreed on one thing:  Whether you call it "bill

21   of attainder" or not, the same principles apply to the

22   executive.  Those aren't my words, those are Justice Black

23   in *Joint Anti-Fascist Refugee Comm v. McGrath* -- the

24   McCarthy cases which, by the way, not as bad as this

25   executive order.

1          Here is what Justice Black said:  Moreover,

2     officially prepared and proclaimed governmental blacklists

3     possess almost every quality of bills of attainder, the use

4     of which was, from the beginning, forbidden to both national

5     and state governments.  It is true that the classic bill of

6     attainder was a condemnation by the legislature following

7     investigation by that body while, in the present case, the

8     Attorney General performed the official task.

9          Justice Black goes on:  But I cannot believe that

10     the authors of the Constitution who outlawed the bill of

11     attainder inadvertently endowed the executive with power to

12     engage in the same tyrannical practices that had made the

13     bill such an odious institution.

14          Your point is exactly right, and that's what

15     happened here.

16          I want to touch upon the First Amendment.  It is

17     virtually indisputable that this executive order is a

18     retaliation for many First Amendment rights:  Association,

19     petition, speech -- and you only have to read the order or

20     read the statements we submitted from the President before,

21     during, and after.  And the language of the order jumps out.

22     It says:  Partisans -- partisans, activists, election

23     lawsuits -- it's all quintessential viewpoint

24     discrimination.

25          And I want to make that point clear because when

1    you get to -- like, in the McCarthy situation, putting

2    together an enemies list which is targeting viewpoints, the

3    cases are clear.  And Justice Black said that smacks of the

4    most evil type of censorship in our society; it cannot be

5    reconciled with the First Amendment.

6          And the retaliation for a favored viewpoint -- and

7    this is, I think, critical to our First Amendment

8    analysis -- if that is the motive, as is confessed in

9    Section 1 of the executive order, that ends the inquiry.

10   It's over.  You don't have to worry about compelling state

11   interests, rational -- you don't have to do anything

12   because, first of all, you couldn't pass those tests because

13   you have already established that the actual motive was not

14   some legitimate interest but one that is in violation of the

15   First Amendment.  And that's the *Perry* case that we cite

16   from the Supreme Court in 1972, and the *National Association*

17   *of Diversity Officers v. Trump* in 2025.  A unanimous Supreme

18   Court echoed the same principle in *National Rifle*

19   *Association v. Vullo*, when Justice Sotomayor -- as I said,

20   writing for the whole Court:  At the heart of the First

21   Amendment free speech clause is the recognition that

22   viewpoint discrimination is uniquely harmful to a free and

23   democratic society.  The First Amendment prohibits

24   government officials from relying on the threat of invoking

25   legal sanctions and other means of coercion to achieve the

1    suppression of disfavored speech.

2            I wanted to talk about, briefly -- and I will try

3    not to take up too much more time, boogymen, ghosts, and

4    causation.  One legal concept, one not so much.  Same point.

5            We listed out exactly what has happened.  Despite

6    the claim of speculative causation, they all happened on

7    March 6, March 7, March 8, March 9, March 10, March 11th.

8    And I don't know what that fallacy is *post hoc ergo propter*

9    *hoc* -- whatever it is.  All of these people said:  We love

10   you as our lawyers.  We want you as our lawyers, but we

11   can't.

12           The Justice Department person from the Criminal

13   Division said:  Can't meet with you.

14           Only, I think, yesterday agencies started to

15   contact contractors and ask them to tell us:  Do we have a

16   relationship with Perkins Coie?

17           They are required by March 20th to give an answer

18   to that.

19           These are not ghosts, these are real things that

20   are threatening the vitality of that law firm.

21           Clients terminating their relationships because

22   administrations change, so maybe they are trying to cozy up

23   to a new administration.  The clients we mentioned were

24   35-year clients; that's a lot of different administrations.

25   20-year clients; that's a lot of different administrations.

1          That argument does not hold water here.

2          The other thing I will say is there has been a big

3     debate about economic harm.  And I think the economic harm

4     is massive.  First of all, since it's noncompensable, it

5     doesn't have to be massive.  But second of all, it is a

6     massive threat to the law firm.

7          But also, the government didn't talk about the

8     other irreparable constitutional harms.  Those are *per se*

9     irreparable injury if we prove to you that there is a

10    violation of First Amendment rights, petition, association,

11    speech; Fifth Amendment rights, due process; Sixth Amendment

12    rights, the right to counsel, if you agree on the standing

13    point we talked about; and equal protection about a group

14    being singled out like no other group.  That one we only

15    spent a page on in our 45 pages, and it is a slam dunk on

16    the law.

17         There is also irreparable reputational harm by all

18    of the aspersions that are cast in Section 1, and in the

19    fact sheet.  And all of those are injuries that establish,

20    as we point out in our papers, irreparable on many, many

21    different levels.

22         I think the government admitted to you that this

23    was punitive.  That makes a big difference, too, because in

24    the separation of powers analysis, one thing you will look

25    at -- we submitted to you -- that what they have done is

1    just a mulligan from the things that happened in the

2    judicial system.

3            Sussmann was indicted and acquitted.  President

4    Trump, as a private citizen, sued the law firm; and he lost.

5            The punitive portion, courts mete out punishment,

6    not the Presidents; and courts adjudicate, not Presidents.

7            THE COURT:  I know.  This is the first claim in

8    your complaint, the ultra vires claim.

9            MR. BUTSWINKAS:  So I guess I will conclude by

10   saying that we believe that we meet the criteria for a TRO,

11   and we don't come here lightly to ask.

12           I will tell you that this is the first time I have

13   ever advised a client in 36 years to seek a TRO because it's

14   a tough thing to get.  You have to have emergent

15   circumstances.  Those are present here in spades.

16           It's not political.  It's not a Republican or

17   Democratic issue.  It's not a liberal or conservative issue.

18           Not supporting a -- not being able to associate

19   yourself with an unpopular client or an unpopular viewpoint

20   cannot be the way we do business in Washington.

21           When John Adams represented British soldiers after

22   the Boston Massacre, that was a watershed event for our

23   legal profession.  It's one that not only encourages us but

24   requires us to represent the people who are unpopular in

25   viewpoint or otherwise; and every single code of

1     professional responsibility compels us to do that.  The

2     President is punishing this law firm for exactly that.

3            My father and mother are buried in Arlington

4     National Cemetery.  My dad spent almost a quarter of a

5     century in the Navy.  He didn't agree with the opinions of

6     anyone, but he would fight to the death for your right to

7     say them.  This executive order eviscerates that concept;

8     and if left unchecked, we will be in a country we barely

9     recognize.

10            Thank you, Your Honor.

11            THE COURT:  Thank you.

12            All right.  I see why, Mr. Butswinkas, you are

13    such a popular attorney and so well respected.  I am going

14    to follow on your eloquent words by issuing my ruling.

15            Plaintiff Perkins Coie LLP, moves for a temporary

16    restraining order to enjoin enforcement of Sections 1, 3,

17    and 5 of President Trump's Executive Order dated March 6,

18    2025, Numbered 14230, titled "Addressing Risks For Perkins

19    Coie LLP."

20            An application for a TRO is analyzed using the

21    same factors that apply to a request for a preliminary

22    injunction; see *Gordon v. Holder*, 632 F.3d 722, jump cite

23    723, D.C. Circuit 2011.

24            The purpose of a TRO is not to decide which side

25    wins the case; that will come later in the case when the

1    parties and this Court have more time to consider all facets

2    of the law and how the law appropriately applies to the

3    facts.

4            The purpose of a TRO is to preserve the status quo

5    while the Court considers the merits of the case and gets in

6    all of that necessary briefing.  See *National Council of*

7    *Nonprofits v. OMB*, Civil Action No. 25-239, 2025 WL 314433

8    at *2, D.D.C. January 28, 2025; citing *MGU v. Nielsen*, 316

9    F.Supp.3d 518, jump cite 520, D.D.C. 2018, which involves a

10   TRO; and *Chaplaincy of Full Gospel Churches v. England,* 454

11   F.3d 290, jump cite 297, D.C. Circuit from 2006, involving a

12   preliminary injunction.

13           For all of you who are listening, sorry I have to

14   give all of these citations.  The administration has --

15   while TROs are normally not appealable, the administration

16   has taken appeals from TROs.  I want to make sure my record

17   is full and complete in case this is appealed, and the

18   Circuit has the benefit of all of my citations.

19           So the status quo is the last uncontested status

20   which preceded the pending controversy.  See *Huisha-Huisha*

21   *v. Mayorkas*, 27 F.4th 718, jump cite 733, D.C. Circuit 2022;

22   citing *District 50 United Mine Workers of America v.*

23   *International Union, United Mine Workers of America,* 412

24   F.2d 165, 168 -- jump cite 168, D.C. Circuit 1969.

25           For a TRO to be granted, the plaintiff must show

1     that:  One, the plaintiff is likely to succeed on the merits

2     of its claims; two, the plaintiff is likely to suffer

3     irreparable harm without the TRO; three, the balance of the

4     equities favors issuance of the TRO; and four, the issuance

5     of the TRO is in the public interest.  See *Ramirez v.*

6     *Collier, 595 U.S.* 411, jump cite 421, from 2022; quoting

7     *Winter v. NRDC,* 555 U.S. 7, jump cite 20, from 2008.

8             When the government is the opposing party, the

9     final two factors, namely, the balance of the equities and

10    the public interests, merge into one.  See *Karem v. Trump,*

11    960 F.3d 656, jump cite 668, D.C. Circuit from 2020.

12            Here, the plaintiff has met its burden to satisfy

13    all of these factors and, therefore, is entitled to a

14    temporary restraining order enjoining enforcement of

15    Sections 1, 3, and 5 of Executive Order 14230.

16            To be clear, I have not been asked and, therefore,

17    have not considered for purposes of today's TRO hearing the

18    other two sections of Executive Order 14230.

19            I am going to start with the first factor, the

20    likelihood that plaintiff will succeed on the merits.  This

21    factor is one of the most important, and absent the showing

22    of likelihood of success on the merits, the injunctive

23    relief should be denied.  See, for example, *Greater New*

24    *Orleans Action Center v. U.S. Department of Housing and*

25    *Urban Development,* 639 F.3d 1078, jump cite 1088,

1    D.C. Circuit 2011, stating:  When a plaintiff has not shown

2    the likelihood of success on the merits, there is no need to

3    consider the remaining factors.  See also, *Kiyemba v. Obama*,

4    561 F.3d 509, jump cite 513, D.C. Circuit 2009; and *Hanson*

5    *v. District of Columbia*, 120 F.4th 223, jump cite 242,

6    D.C. Circuit 2024, with the same holdings.

7         Plaintiffs have shown that Plaintiff Perkins Coie

8    is likely to succeed on the merits on at least three of its

9    constitutional claims against the executive order, each of

10   which are sufficient to satisfy the first factor of the

11   standard for issuance of a TRO.

12        Given the time constraints under which the Court

13   is considering the nine claims plaintiff asserts in the

14   complaint filed only yesterday afternoon, this focus on only

15   three of the claims does not mean that the other claims have

16   any less or even more likelihood of success, but only that

17   deeper review of all the claims must await further briefing

18   by the parties and consideration by the Court.

19        I am going to start with the plaintiff's First

20   Amendment claims before turning to plaintiff's due process

21   and Sixth Amendment claims.

22        Plaintiff has shown a likelihood of success on the

23   merits of its First Amendment claim on two fronts:  One,

24   that Executive Order 14230 unlawfully retaliates against

25   plaintiff for protected speech; and two, that the executive

1    order constitutes unlawful viewpoint discrimination.

2         As a general matter, the First Amendment prohibits

3    government officials from subjecting individuals to

4    retaliatory actions after the fact for having engaged in

5    protected speech.  See *Houston Community College System v.*

6    *Wilson*, 595 U.S. 468, jump cite 472, from 2022.  This

7    prohibition extends to retaliatory actions based on

8    perceived viewpoint.  See *Turner v. U.S. Agency for Global*

9    *Media*, 502 F.Supp.3d 333, jump cite 381, D.D.C. from 2020;

10   and *Heffernan v. City of Paterson*, 578 U.S. 266, jump cite

11   270 through 273, from 2016.

12        The retaliatory nature of Executive Order 14230 is

13   clear from its face.

14        In Section 1, the executive order cites as one

15   basis for the order that Perkins Coie worked with activist

16   donors, including George Soros, to judicially overturn

17   popular necessary and democratically enacted election laws,

18   including those requiring voter identification, along with

19   Perkins Coie's work for Hillary Clinton in the 2016

20   election.

21        The executive order goes on, in Section 3, to

22   allude, in slightly more general terms, to Perkins Coie's

23   work for Hillary Clinton and election litigation as the

24   explicit basis for the punitive nature of the steps that

25   federal agency heads and officials are ordered to take

1    against Perkins Coie and its clients under that section.

2         Executive Order 14230 was accompanied by a fact

3    sheet to explain the order.  Both were issued the same day.

4         The fact sheet is even more explicit about the

5    retaliatory animus for issuance of the order.  This fact

6    sheet cites, "Partisan lawsuits" filed by Perkins Coie as

7    the justification for the federal contracting restrictions

8    in Section 3 of the order and cites:  "Lawsuits against the

9    Trump Administration" in effort to, "protect the nation from

10   partisan actors, as another justification for issuing the

11   executive order."

12        This language makes clear the executive order is a

13   means of retaliating against Perkins Coie for representing

14   individual clients who are the President's political

15   opponents whom the President does not like; for representing

16   clients in litigation seeking results the President does not

17   like; and representing clients in litigation challenging

18   some of the President's actions, which he also does not

19   like.

20        The firm's political work on behalf of a political

21   opponent of the President and to protect voting rights in

22   the 2020 presidential election and the viewpoint or

23   perceived viewpoint of the law firm's clients and even

24   former or current partners and employees of the firm all

25   fall squarely within the protections of the First Amendment.

1          Regardless of whether the President dislikes the

2     firm's clients, dislikes the litigation positions the law

3     firm takes and vigorous representation of those clients, or

4     dislikes the results Perkins Coie achieves for its clients,

5     issuing an executive order targeting the firm based on the

6     President's dislike of these political positions of the

7     firm's clients or the firm's litigation positions is

8     retaliatory and runs head-on into the wall of First

9     Amendment protections.

10          As the Supreme Court has previously articulated in

11    a case involving the firing of a government employee based

12    on his perceived viewpoint, quote:  The discharge of one

13    tells the others that they engage in protected activity at

14    their peril.  *Heffernan v. City of Paterson*, 578 U.S. 266,

15    jump cite 273, from 2016.

16          That chilling of speech, the Supreme Court has

17    said, causes constitutional harm because:  When an employer

18    announces a policy of demoting those who, say, help a

19    particular candidate in a mayoral race, all employees

20    fearful of demotion may refrain from providing any such

21    help.  See *Heffernan* at 274.

22          That is exactly what the executive order at issue

23    in the instant case does, by punishing Perkins Coie for

24    accepting work from political candidates and from clients

25    who want or need to challenge government actions, oftentimes

 1    on a pro bono basis, this order, quote:  Tells others that

 2    they engage in this kind of protected activity at their

 3    peril.

 4            Exactly the concern expressed in *Heffernan*.

 5            The order here tells other law firms and lawyers

 6    that they engage in political work for certain candidates

 7    and for clients with causes unpopular with the political

 8    powers at their own peril with the costs likely to include

 9    their livelihoods.  This kind of clear retaliation chills

10    First Amendment-protected activity, both for those

11    retaliated against and others watching on the sidelines.

12    And I am sure that many of the legal profession are watching

13    in horror at what Perkins Coie is going through here.

14            Plaintiff has clearly shown it is likely to

15    succeed on the merits of its claim in Count 7 of the

16    complaint, and the executive order unlawfully retaliates on

17    the basis of First Amendment-protected activity.

18            Plaintiff has also shown it is likely to succeed

19    on the merits of its claim in Count 5 of the complaint that

20    the executive order constitutes unlawful viewpoint

21    discrimination.  When the government targets particular

22    views taken by speakers on a subject, the violation of the

23    First Amendment is all the more blatant.  See *Rosenberger v.*

24    *Rector & Visitors of the University of Virginia*, 515 U.S.

25    819, jump cite 829, from 1995.  Viewpoint discrimination is

1    thus, an egregious form of content discrimination.

2          The government must abstain from regulating speech

3    when the specific motivating ideology or the opinion or

4    perspective of the speaker is the rationale for the

5    restriction.  See *Rosenberger.*

6          The Supreme Court has spoken clearly that, quote:

7    The state may not burden the speech of others in order to

8    tilt public debate in a preferred direction.  See *Sorrell v.*

9    *IMS Health, Inc.*, 564 U.S. 552, jump cite 578, from 2011.

10   That is why, as the Supreme Court reaffirmed just last year,

11   quote:  Government officials cannot attempt to coerce

12   private parties in order to punish or suppress views that

13   the government disfavors.  See *National Rifle Association v.*

14   *Vullo*, 602 U.S. 175, jump cite 180, from 2024.

15         In this case, the plain language of Executive

16   Order 14230 confirms that this is exactly what government

17   officials are attempting to do; coerce plaintiff with

18   punitive actions against all federal agencies to punish and

19   suppress views that the government, or at least the current

20   administration, disfavors.

21         As already noted, the plain text of the executive

22   order states that the executive order is being issued due to

23   Perkins Coie work with the 2016 campaign of Hillary Clinton;

24   its work with activist donors and litigation over certain

25   election laws, including those requiring voter

1    identification; its work against candidates for office; and

2    its work for election changes as justification for the

3    order.

4        The fact sheet issued by the White House to

5    explain the order is even more explicit, citing Perkins Coie

6    partisan lawsuits against the United States, representation

7    of Hillary Clinton, filing of lawsuits against the Trump

8    Administration, and perceived status as a partisan actor as

9    rationale for the executive order.

10        All of this language makes perfectly clear that

11    Perkins Coie and its employees were targeted for the firm

12    accepting clients with perceived viewpoints that are

13    unpopular with those in current political power.  This

14    targeting is a clear violation of long-established Supreme

15    Court precedent that government actors may not punish or

16    suppress views that the government disfavors.  See *Vullo*;

17    also, see *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, jump

18    cite 67, 1963, finding that the threat of invoking legal

19    sanctions and other means of coercion, persuasion, and

20    intimidation in order to achieve suppression of First

21    Amendment-protected activity warranted injunctive relief.

22        Nor is the government likely to be able to prove

23    that the executive order is narrowly tailored to achieve a

24    compelling state interest.  First, the order is not narrowly

25    tailored but sweeps breathtakingly broadly.

1          As plaintiff notes at page 23 of its memorandum,

2     the order punishes the entire law firm, all its lawyers and

3     supporting personnel, from the firm's mail room, IT staff,

4     and docketing clerks, with the reputational taint and harm

5     by being described as dishonest and dangerous in Section 1

6     of the order; but also in Section 5, every person working at

7     Perkins Coie faces the embarrassment and risk of being

8     barred from federal buildings and barred from meeting with

9     government employees acting in their official capacity.

10    They face extra hurdles if they should seek a job at the

11    federal government, even if they aspire to public service,

12    even if they want to help the President in achieving his

13    political agenda.

14          This order directs all federal officials to

15    refrain from hiring employees of Perkins Coie unless the

16    official goes through a lot of extra hoops to get a waiver

17    from the head of the agency and that the director of office

18    of personnel management approves that the hire will not

19    threaten the national security of the United States.

20          The order goes even further to punish every client

21    of the firm that holds any government contract with a

22    reporting requirement about any business the client does

23    with Plaintiff Perkins Coie and the threat of termination of

24    the government contract.

25          Then you get to Section 5 of the order, which

1    requires limiting official access from federal government

2    buildings to employees of Perkins Coie and limiting the

3    government employees acting in their official capacity from

4    engaging with Perkins Coie employees.

5           In short, the scope of the order sweeps widely to

6    hurt everyone working at Perkins Coie and every client at

7    the firm with a government contract.  The firm and other

8    clients with other matters that may have -- require

9    engagement with a government official.

10          The firm is already suffering adverse impacts of

11   the order.  The Burman Declaration describes two instances

12   where the government officials refused to meet with Perkins

13   Coie employees on issues related to pending cases; totally

14   unrelated to any of those cited by the executive order.

15          Also, while the order mentions the words "national

16   security," this simply cannot mask the fact laid out in the

17   opening -- in the order and its accompanying fact sheet that

18   this order is intended to punish Perkins Coie for its work

19   on behalf of its clients.  And this is viewpoint

20   discrimination, plain and simple.

21          The government has no compelling interest in

22   punishing a President's political opponents or preventing

23   certain viewpoints of being heard in the public forum or in

24   the courts, as the Supreme Court's viewpoint discrimination

25   makes clear.  For all of these reasons, plaintiff has shown

1    it is likely to succeed on the merits of its First Amendment

2    claims of retaliation based on First Amendment-protected

3    activities and impermissible viewpoint discrimination.

4         Plaintiff has also shown that the law firm is

5    likely to succeed on the merits on its due process claims in

6    Counts 2 and 3.

7         The inquiry for a due process violation is:  One,

8    whether plaintiff was deprived of a protected interest; and

9    two, what process was due.  See *Logan v. Zimmerman Brush*

10   *Company,* 455 U.S. 422, jump cite 428, from 1982.

11        Plaintiff has identified multiple protected

12   interests that are infringed by the executive order.

13        First, there is the constitutionally protected

14   right of the firm and its attorneys to follow their chosen

15   profession.  See *Campbell v. District of Columbia,* 894 F.3d

16   281, jump cite 288, D.C. Circuit from 2018.  One may be

17   foreclosed from their profession in two ways:  Either via a

18   formal exclusion from some category of work or via some act

19   that has the, quote:  Broad effect of largely precluding the

20   plaintiff from pursuing a chosen career.  See *O'Donnell v.*

21   *Barry,* 148 F.3d 1126, jump cite 1141, D.C. Circuit from

22   1998.

23        Executive Order 14230 places an enormous burden on

24   the law firm's ability to practice law as it has in the past

25   and as it is entitled to do.  This order directs that

1    guidance be developed to restrict plaintiff's attorneys from

2    entering federal buildings and from interacting or

3    engaging -- to use the words used in the order -- with

4    federal employees, preventing employees from practicing law

5    before agency adjudicators, meeting with federal regulators,

6    negotiating with federal prosecutors, and so forth.

7         For a deprivation of the ability to pursue one's

8    profession to be constitutionally cognizable, it may not

9    absolutely bar its practice; rather, seriously affecting, if

10   not destroying plaintiff's ability or substantially reducing

11   the value of its human capital is enough.  See *Campbell v.*

12   *District of Columbia*, a D.C. Circuit case from 2018.

13        Plaintiff's anticipated and real harm that it has

14   already suffered clearly meets that standard.  Plaintiff has

15   a robust practice in specialization of working with federal

16   agencies and federal contractors as well as litigating

17   against such entities.  That practice can no longer operate

18   as it has until issuance of this executive order.

19        The ability of plaintiff to pursue other kinds of

20   legal work, transactional work between private parties, for

21   instance, does not make up for this loss of huge portions of

22   plaintiff's practice and the sole purpose of the work of

23   many of plaintiff's attorneys.  Moreover, plaintiff's

24   attorneys will find it hard to do any kind of legal work

25   going forward, assuming they could avoid interactions or

1    engagement with the federal government entirely in their

2    work, given the harm to their reputations, as I will discuss

3    next, and clients' fear of reprisal from this

4    administration, which has put a target on Perkins Coie.

5            Plaintiff also has a constitutional right to its

6    good name, reputation, honor, and integrity.  See *Wisconsin*

7    *v. Constantineau*, 400 U.S. 433, jump cite 437, from 1971,

8    holding that it is unconstitutional to attach to someone a

9    badge of infamy without due process.

10           The order describes plaintiff as a threat to

11   national security and the interests of the country, accusing

12   the firm of acting unethically, dishonestly, and

13   discriminatorily, based solely on the President's say-so

14   with clear adverse effects on the firm's reputation.

15           Plaintiff is further deprived of its liberty

16   interests in the First Amendment right to petition the

17   government.  See *Trentadue v. Integrity Commission,* 501 F.3d

18   1215, jump cite 1237, Tenth Circuit 2007, noting a First

19   Amendment right to petition the government.

20           While the First Amendment bars any law abridging

21   the freedom of speech or of the press, the very last clause

22   of the First Amendment also protects the right to petition

23   the government for a redress of grievances.  Plaintiff is

24   unable to seek recourse via federal agents on behalf of its

25   clients because the order restricts the firm's ability to

1    enter federal property and engage with federal officials.

2         Finally, EO 14230 deprives plaintiff of its

3    property interest in the form of contractual relationships

4    with the firm's clients.  As an initial matter, Section

5    3(b)(i) of the order instructs agencies to terminate

6    contracts directly with plaintiff.  In addition, property

7    interests can derive from the private contractual agreements

8    that the plaintiff has with its clients.  See *International*

9    *Union United Auto, Aerospace & Agriculture Implement Workers*

10   *of America v. Auto Glass Empires Credit Union*, 72 F.3d,

11   1243, jump cite 1250, Sixth Circuit 1996; and *Brock v.*

12   *Roadway Express,* 481 U.S. 252, jump cite 260, describing a

13   property interest in a collective bargaining agreement.

14        The order deprives plaintiff of these private

15   relationships as well by requiring disclosure, review, and

16   termination of government contracts with clients of Perkins

17   Coie.  This, obviously, impairs the firm's ability to work

18   with and across from the federal government and even enter

19   federal buildings.

20        As to the second prong for finding a due process

21   violation, this Court need not determine precisely what

22   process was due plaintiff before issuance of Executive Order

23   14230 because no process was given.

24        As the Supreme Court has explained, the

25   fundamental requirement of due process is the opportunity to

1    be heard at a meaningful time and in a meaningful manner.

2    See *Mathews v. Eldridge,* 424 U.S. 319, jump cite 333, 1976;

3    quoting *Armstrong v. Manzo*, 380 U.S. 545, jump cite 552,

4    from 1965.  See also *Joint Anti-Fascist Refugee Committee v.*

5    *McGrath*, 341 U.S. 123, jump cite 160, 1951, with Justice

6    Frankfurter concurring and condemning the designation by the

7    U.S. Attorney General of certain organizations as communist

8    without notice, without opportunity to meet the evidence or

9    suspicion on which designation may have been based, and

10   without opportunity to establish affirmatively that the aims

11   and acts of the organization are innocent and, instead, on

12   the mere say-so of the Attorney General, and describing it

13   as:  So devoid of fundamental fairness as to offend the due

14   process clause of the Fifth Amendment.

15           Plaintiff apparently only learned of the order

16   when it took effect, so plaintiff had no opportunity to be

17   heard prior to the deprivation of its rights.  Even where

18   national security interests are legitimately involved,

19   plaintiffs generally have a right to some due process.  See

20   *Ralls Corp v. Committee on Foreign Investment in U.S.*, 758

21   F.3d 296, jump cite 318, D.C. Circuit from 2014, finding a

22   due process violation where a foreign-owned corporation was

23   subject to an order from the Committee on Foreign Investment

24   in the United States, sometimes called CFIUS, preventing a

25   merger without an opportunity to rebut the findings.

1          Plaintiff was clearly deprived of due process when

2     it was not even given the most basic protection of advance

3     notice and opportunity to challenge the decision reflected

4     in Executive Order 14230.

5          Plaintiff has demonstrated an additional separate

6     due process problem.  The order is so vague that government

7     officials in different agencies may apply all of the

8     different provisions where, specifically, Section 3 and

9     Section 5, to Perkins Coie, its employees, and its clients

10     in ways that are inconsistent and overbroad; so the firm,

11     its employees, and its clients will have little idea what to

12     expect in any professional encounter with any government

13     official.  An enactment is void for vagueness if its

14     prohibitions are not clearly defined.  See *Grayned v. City

15     of Rockford,* 408 U.S. 104, jump cite 108, 1972.

16          Plaintiff explains, for example, that the

17     "Personnel" in Section 5 provision is so broad that Perkins

18     Coie and its clients do not know the full set of

19     circumstances under which the firm will be barred from

20     engaging with government employees.

21          The government concedes that we don't know exactly

22     what that means even or what "engaging" means, and what the

23     impact of that is going to be.  Section 5 of the order

24     refers to limiting official access from federal government

25     buildings to employees of Perkins Coie when such access

1    would threaten the national security of or otherwise be

2    inconsistent with the interests of the United States.  What

3    exactly that means is far from clear, as our discussion here

4    of today has evinced.

5          At a minimum, even where an agency finds zero

6    national security threat, Perkins Coie employees can still

7    be barred from federal government buildings if an agency

8    head finds that to be in the U.S. interests, whatever that

9    may mean.

10          In short, Executive Order 14230 is like a bill of

11    attainder, a punishment for a singled-out entity deemed to

12    be disloyal, without any formal investigation, trial, or

13    even informal process.  This may be amusing in *Alice in*

14    *Wonderland*, where the Queen of Hearts yells "Off with their

15    heads," at annoying subjects, and when the Queen of Hearts

16    wants to impose a sentence before a verdict; but this cannot

17    be the reality we are living under.

18          Our Constitution bars bills of attainder by either

19    the federal government or the states.  See Article I,

20    Sections 9 and 10.  And the Fifth Amendment's due process

21    clause does not permit such arbitrary assaults on

22    constitutional rights.

23          Finally, plaintiff has shown it is likely to

24    succeed on its Sixth Amendment right to counsel claim in

25    Count 8.  The Sixth Amendment right to counsel protects a

1    criminal defendant's right to the effective assistance of

2    counsel.  See *Strickland v. Washington,* 466 U.S. 668, jump

3    cite 686, from 1984.  And a defendant's right to choose

4    one's own counsel subject to some restrictions -- see *Wheat*

5    *v. U.S.,* 486 U.S. 153, jump cite 159, from 1988.

6            Executive Order 14230 likely impermissibly

7    threatens both of those counsel rights.

8            As an initial matter, Perkins Coie has standing to

9    challenge the violations of the Sixth Amendment right to

10   counsel on behalf of the firm's clients and criminal matters

11   in this case.  When an entity seeks standing to advance the

12   constitutional rights of others, the Court asks two

13   questions:  First, has the litigant suffered some

14   injury-in-fact adequate to satisfy Article III's

15   case-or-controversy requirement; and second, do prudential

16   considerations -- which the Supreme Court has identified in

17   its prior cases -- point to permitting litigants to advance

18   the claim.  See *Caplin & Drysdale, Chartered v. U.S.,* 491

19   U.S. 617, 624 n.3, from 1989; citing *Singleton v. Wulff*, 428

20   U.S. 106, jump cite 112, from 1976.

21           Here, plaintiff has clearly alleged that the law

22   firm has suffered and will continue to suffer concrete,

23   cognizable injuries-in-fact from the executive order, such

24   as lost fees and reputational harm.  See the Burman

25   Declaration, paragraphs 25, 29, 30, and 33.

1          Prudential considerations also weigh in favor of

2     allowing plaintiff to challenge alleged Sixth Amendment

3     violations on behalf of its clients.  The Supreme Court has

4     outlined several factors to consider here, including:  One,

5     the relationship of the litigant to the person whose rights

6     are being asserted; two, the ability of the person to

7     advance his own rights; and three, the impact of the

8     litigation on third-party interests.  See *Caplin & Drysdale*.

9          Both the first and third prudential considerations

10    clearly weigh in favor of standing for Perkins Coie here to

11    protect the Sixth Amendment rights of its clients since the

12    attorney-client relationship is one of special consequence

13    and since it has credibly alleged that the Executive Order

14    14230 may materially impair the ability of third persons

15    represented by Perkins Coie to exercise their constitutional

16    rights.

17         Turning first to the Sixth Amendment right to

18    effective counsel, the instruction in Section 5(a) of the

19    executive order for all agencies, quote:  To limit

20    government employees acting in their official capacity from

21    engaging with Perkins Coie employees, threatens to undermine

22    plaintiff's ability to provide effective assistance of

23    counsel to its clients in criminal cases.

24         As the Supreme Court has recognized, negotiations

25    between a criminal defendant's counsel and the government

1    are critical to the operation of the criminal justice

2    system.  See *Missouri v. Frye*, 566 U.S. 134, jump cite 143,

3    from 2012; and *Lafler v. Cooper*, 566 U.S. 156, jump cite

4    170, also from 2012.

5         Here, the plain language of the executive order

6    threatens Perkins Coie's ability to engage in such

7    negotiations because it limits government employees acting

8    in their official capacity from engaging with Perkins Coie

9    employees, and further limits Perkins Coie employees from

10   accessing federal government buildings.  This has already

11   led to a DOJ Criminal Division attorney canceling a meeting

12   with Perkins Coie attorneys in an ongoing case, with no

13   clarity as to whether that meeting will ever be rescheduled.

14   See Burman Declaration, paragraph 26.

15        Given the centrality of plea bargaining and other

16   related and required communications between criminal defense

17   lawyers and the government to the operation of the criminal

18   justice system -- see *Frye*, 566 U.S. at 143 -- preventing

19   lawyers representing criminal defendants from meeting with

20   or working with or engaging with government lawyers likely

21   threatens their ability to provide effective assistance of

22   counsel to their clients, implicating their clients' Sixth

23   Amendment rights.

24        This threat also necessarily implicates the right

25   of a defendant who does not require appointed counsel to

1    choose who will represent him.  See *U.S. v. Gonzalez-Lopez*,

2    548 U.S. 140, jump cite 144, 2006.  This is called the right

3    to counsel of choice.

4         Executive Order 14230 singles out Perkins Coie and

5    prevents the firm's attorneys from performing duties central

6    to the representation of criminal defendants and, as a

7    consequence, those firm's clients who engage at the firm in

8    criminal matters are likely to lose their ability to choose

9    Perkins Coie as their counsel of choice, either because

10   doing so would prevent them from receiving effective

11   assistance of counsel because of the government's actions

12   or, as pointed out in one of the plaintiff's declarations,

13   because legal ethics rules would require Perkins Coie

14   attorneys to withdraw from representations where they could

15   not provide effective counsel due to the restrictions

16   imposed by the executive order.  See declaration of

17   Professor Roy Simon from Hofstra Law School.

18        Although plaintiff acknowledges that Executive

19   Order 14230 does not expressly bar clients from hiring the

20   firm, the order clearly intends to prevent clients from

21   hiring the firm, both by impugning the firm's reputation and

22   integrity and by preventing it from doing the work needed

23   and necessary to represent its clients effectively.

24        The right to select counsel of one's choice is the

25   root meaning of the constitutional guarantee to counsel in

1    the Sixth Amendment.  See *Gonzalez-Lopez* at 147.  The

2    government may not interfere with this right directly, and a

3    government official cannot do indirectly what she is barred

4    from doing directly.  See *Vullo,* from 2024.

5            Here, that principle demonstrates that plaintiff

6    is likely to succeed on the merits of its Sixth Amendment

7    claims.

8            I am now going to turn to the second factor for a

9    TRO, irreparable harm.

10           Plaintiff has shown it is likely to suffer

11   irreparable harm without the issuance of a TRO.  To obtain a

12   TRO, the movant must establish that the alleged injury is

13   certain and great, actual and not theoretical, beyond

14   remediation, and of such imminence that there is clear and

15   present need for equitable relief.  See *Mexican Specialty*

16   *Resins, Inc. v. EPA*, 787 F.3d 544, jump cite 555,

17   D.C. Circuit 2015.

18           Here, plaintiff has made a clear showing that it

19   will likely suffer irreparable harm on multiple fronts in

20   the absence of emergency injunctive relief.  *Singh v.*

21   *Berger*, 56 F.4th 88, jump cite 95, D.C. Circuit 2022.

22           As already discussed, plaintiff has shown a

23   likelihood of success on the merits that Executive Order

24   14230 likely violates plaintiff's First, Fifth, and Sixth

25   Amendment rights, and those are the only claims examined for

1    purposes of this expeditious TRO hearing.

2           Violations of plaintiff's constitutional rights in

3    and of themselves leads to irreparable harm.

4           As to the First Amendment, the Supreme Court has

5    stated that the loss of First Amendment freedoms for even

6    minimal periods of time unquestionably constitutes

7    irreparable injury.  See *Roman Catholic Diocese of Brooklyn*

8    *v. Cuomo*, 592 U.S. 14, jump cite 19, 2020; see also *Cigar*

9    *Association of America v. U.S. Food and Drug Administration,*

10   317 F.Supp.3d 555, jump cite 562, D.D.C. from 2018; and

11   *Elrod v. Burns*, 427 U.S. 347, jump cite 373, from 1976,

12   stating that the loss of First Amendment freedoms for even

13   minimal periods of time constitute irreparable injury.

14          Here, plaintiff has done more than merely allege

15   harm and has showed irreparable harm that has flowed from

16   violations of its First Amendment rights.  For example, as

17   of the time of this hearing, and supported by declarations,

18   the order has resulted in a growing number of government

19   agencies refusing to interact with plaintiff's lawyers, and

20   clients have distanced themselves from association with

21   Perkins Coie.

22          Compounding this harm, the order casts a chilling

23   harm of a blizzard -- of blizzard proportions across the

24   entire legal profession.  If not enjoined or restrained, the

25   executive order will be understood by lawyers and law firms

1   as an extreme dangerous and unprecedented effort to

2   intimidate them and prevent them from representing clients

3   whom the President does not wish to have access to legal

4   counsel or to the courts or whose advocacy the President

5   wishes to punish.

6          I am quoting from the declaration of Robert

7   Hirshon, the former President of the American Bar

8   Association and the former professor for practice and

9   special counsel on developments in the legal profession at

10  the University of Michigan Law School.

11         Indeed, the executive order is already chilling

12  lawyers' advocacy on behalf of clients as law firms are now

13  fearful of taking on a President who hasn't shied away from

14  punishing his enemies.  See the Hirshon Declaration at

15  paragraph 9.

16         The executive order consequently, if permitted to

17  remain in effect, will -- as Mr. Hirshon states, will force

18  lawyers to choose between performing their assigned role in

19  our democracy or pleasing the President, all to the

20  detriment of clients and the fair administration of justice.

21         Thus, the First Amendment violations are certain,

22  as they have already occurred and are ongoing.  See *Simms v.*

23  *District of Columbia*, 872 F.Supp.2d 90, jump cite 105,

24  D.D.C. from 2012.

25         All of this irreparably harms the plaintiff's

1    activity of petitioning the government, First Amendment

2    right to speech, and the right to associate.

3         As to the Fifth Amendment due process rights, a

4    violation of Fifth Amendment due process rights suffices for

5    a finding of irreparable harm.  See *Karem v. Trump*, a D.C.

6    Circuit case from 2020, stating:  A violation of Fifth

7    Amendment due process rights supports injunctive relief.

8         As already discussed, the executive order

9    interferes with plaintiff's liberty interests and property

10   interests, and does so without prior notice and opportunity

11   to be heard, a fair and impartial factfinder, or any other

12   semblance of fair process.

13        Numerous clients have already withdrawn work from

14   the plaintiff in light of the order, and the order has

15   chilled plaintiff's attorneys, who must now reconsider how

16   they approach certain matters that require them to appear in

17   federal buildings, and it threatens their right to practice

18   their profession.

19        At this juncture, plaintiff has shown irreparable

20   harm based on the order's violation of plaintiff's Fifth

21   Amendment due process rights.

22        As to the Sixth Amendment, the order, which bars

23   plaintiff and its lawyers from federal buildings and bars

24   federal employees from engaging with them, and requires all

25   federal contractor clients to disclose any business they do

1    at the firm has resulted in irreparable harm.  A significant

2    portion of plaintiff's clients have matters that require its

3    lawyers to interact with federal agencies.  See the Burman

4    Declaration at paragraph 13.

5          For example, plaintiff represents a number of

6    clients with a number of patent applications pending before

7    the U.S. Patent and Trademark Office, the firm's white

8    collar and investigation practice almost exclusively relies

9    on interacting and engaging with the federal government and

10   has civil and criminal matters requiring its lawyers to

11   interact with or appear before government officials in at

12   least 90 different federal agencies.

13         The government employees have already canceled

14   meetings where the individual or entity is represented by

15   the plaintiff.  Clients of Perkins Coie have cited the order

16   and its accompanying uncertainty as reasons to terminate

17   their relationship with Perkins Coie.

18         At this juncture, plaintiff has been irreparably

19   harmed because, as a practical matter, the order deprives

20   clients of their right to be represented by their chosen

21   lawyers.  Furthermore, many of plaintiff's representations

22   are not public, whether or not related to government

23   contracting.  And despite the confidentiality that generally

24   cloaks attorney-client communications, the order requires

25   clients to disclose the fact that they are consulting with

1    Perkins Coie.  Once such disclosure occurs, it is, by its

2    very nature, irreparable.  See *Robert Half International,*

3    *Inc. v. Billingham,* 315 F.Supp.3d 419, jump cite 433, D.D.C.

4    2018.

5         While ordinary -- with respect to the monetary

6    harms, while ordinary economic injuries are usually

7    insufficient, financial harm can constitute irreparable harm

8    where the loss threatens the very existence of the movant's

9    business.  See *Wisconsin Gas Company v. FERC*, 758 F.2d 669,

10   at 674, D.C. Circuit from 1985.

11        Executive Order 14230 poses a risk of such

12   irreparable harm to Perkins Coie.

13        First, all of plaintiff's practice groups interact

14   with the federal government in some way.  See Burman

15   Declaration at paragraph 12.  And because the vast bulk of

16   the firm's practice requires plaintiff's lawyers to engage

17   with the federal government, the order poses an existential

18   risk to plaintiff's solvency, as it would be unable to

19   perform its duties and generate income for the firm under

20   the terms of this executive order and, notwithstanding, that

21   guidance hasn't been issued yet.  The direction is clear in

22   both the purpose of this and the other framing terms of what

23   the guidance is supposed to look like.

24        Certain clients who are government contractors or

25   involved in government-related litigation already have

1    terminated their attorney-client relationships with

2    plaintiff.  This has caused losses of anticipated revenue in

3    the millions of dollars within days.  All of which is

4    unrecoverable because sovereign immunity limits the firm to

5    nonmonetary equitable relief.  See *Xiaomi Corp v.*

6    *Department of Defense*, 2021 WL 950144, D.D.C. from March 12,

7    2021; explaining that:  When plaintiff's alleged damages are

8    unrecoverable, such as here, due to sovereign immunity

9    enjoined by defendants, courts have recognized that

10   unrecoverable economic loss can, indeed, constitute

11   irreparable harm.

12         At this juncture, plaintiff has established

13   irreparable financial harm stemming from the order.  But

14   because injury to reputation or goodwill is not easily

15   measurable in monetary terms, it is also typically viewed as

16   irreparable.  See *Xiaomi Corp v. Department of Defense*

17   at *9.  Here, if the executive order brands the plaintiff as

18   dishonest and dangerous, and threatens severe restrictions

19   on the firm's ability to do work, which has already resulted

20   in large and long-standing clients to take their business

21   elsewhere.

22         Accordingly, the order has damaged plaintiff's

23   corporate goodwill and reputation and its competitive

24   position, which is sufficient to find irreparable harm.  See

25   *Honeywell, Inc. v. Consumer Product Safety Commission*, 582

1      F.Supp. 1072, jump cite 1078, D.D.C. from 1984.

2             The final factor combines an analysis of whether

3      the balance of the equities and the public interest favor

4      issuance of a TRO.  Here, they do.

5             As already addressed, the injuries to plaintiff

6      have been and will continue to be severe.  Plaintiff's

7      clients have also suffered significant injuries to their

8      rights to counsel, as previously analyzed.  The government,

9      meanwhile, would suffer no cognizable injuries from the

10     issuance of a TRO.

11            To the extent Executive Order 14230 is based on

12     the actions of two former Perkins Coie partners during the

13     2016 presidential election, neither individual works for the

14     firm anymore, and neither has for many years.  Furthermore,

15     this ground is a personal grievance that President Trump has

16     already attempted to pursue in a personal lawsuit that was

17     dismissed in its entirety by a court in the Southern

18     District of New York.  See *Trump v. Clinton*, 626 F.Supp.3d,

19     1264, Southern District of Florida from 2022.

20            To the extent this executive order appears to be

21     an instance of President Trump using taxpayer dollars and

22     government resources with four attorneys from the Department

23     of Justice and the D.C. U.S. Attorney's Office sitting at

24     counsel table to pursue what is a wholly personal vendetta,

25     advancing such political payback is not something in which

1    the government has a cognizable interest.  Moreover, the

2    other concerns mentioned by the government in the executive

3    order also would suffer no harm by a TRO.

4            The isolated Fifth Circuit ethics issue involving

5    three Perkins Coie attorneys alluded to in Section 1 of the

6    order was adjudicated and already resolved by a court.  This

7    is old news.  Nor can the claims about Perkins Coie hiring

8    practices be tied to any significant governmental interest,

9    even if they were able to be substantiated.

10           Finally, the public interest also favors the

11   issuance of a TRO.  While Sections 1, 3, and 5 of the

12   executive order subjects only Perkins Coie to punitive

13   federal government actions, its potential adverse impact

14   cannot be understated.  Without issuance of a TRO, lawyers

15   around the country may be in fear of retribution for

16   litigating against or advancing cases for clients with

17   viewpoints disfavored by the Trump Administration.  Such a

18   circumstance threatens the very foundations of our legal

19   system, which operates on a basis that an informed,

20   independent judiciary presumes an informed, independent bar.

21   See *Legal Services Corp v. Velazquez*, 531 U.S. 533, jump

22   cite 545, from 2001.

23           Our justice system is based on the fundamental

24   belief that justice works best when all parties have zealous

25   advocates, when all sides have vigorous representation and

1    can present for the Court to hear powerful statements on

2    both sides of the question.  See *Penson v. Ohio*, 488 U.S.

3    75, jump cite 84, 1988.

4         That fundamental promise extends to all parties,

5    even those with unpopular ideas or beliefs or those with

6    causes disliked by President Trump.  That promise, however,

7    cannot be fulfilled when lawyers' livelihoods are threatened

8    with retribution for representing clients and interests

9    deemed unpopular by those wielding political power.

10        The chilling effect of this executive order,

11   14230, threatens to significantly undermine the integrity of

12   our entire legal system and the ability of all people and

13   groups to access justice in the American judicial system.

14   The public interest, therefore, demands that a TRO be issued

15   to protect the integrity of the judicial system and the

16   lawyers who practice under professional obligations to

17   represent their clients zealously within the bounds of the

18   law.

19        The President is certainly entitled to his own

20   beliefs, entitled to his preferred causes, and he is

21   entitled to hold tight to his own dislikes.

22        The Constitution protects all of us, however, from

23   the exercise of his targeted power based on those dislikes,

24   to bring the force of the federal government down on the

25   lawyers representing his political opponents and challengers

1    to his political actions, as he has done here.

2    　　　　The Court will, therefore, issue a TRO enjoining

3    the President's subordinates from enforcing unlawful

4    sections of 1, 3, and 5 of the executive order.

5    　　　　I am going to post a TRO order shortly.

6    　　　　As to the next steps, if the parties will confer,

7    I can order you to do so, and then you will have no problem

8    under the executive order.  Confer, submit jointly by -- I

9    would say 4 p.m. tomorrow, unless you need more time -- you

10    will let me know -- a proposal on scheduling.

11    　　　　As I opened with plaintiff's counsel, we could go

12    to a preliminary injunction hearing, but unless you see a

13    reason not to, I don't know why we just can't have a

14    schedule for expedited summary judgment briefing.  And then

15    I don't need to see you-all again once I have issued that

16    judgment until it goes up and the case is remanded.  But

17    anyway, it's just cleaner with an expedited summary

18    judgment, if I can encourage you-all to work on that.

19    　　　　So I will wait to hear from you tomorrow, and then

20    I will enter a scheduling order.  I like to let parties

21    control their own destinies.  If you-all can reach an

22    agreement on that, that will be the scheduling order I

23    enter.

24    　　　　Yes.

25    　　　　MR. BUTSWINKAS:  Thank you, Judge.  I had one

1    question about the order.

2            One concern that we have, obviously, is some of

3    these agencies have reached out to contractors to require

4    them to report by March 20th.  We just want to make sure

5    that the order goes to all of the agencies, and any actions

6    that have been taken pursuant to those sections of the

7    executive order -- they're told to rescind them.

8            THE COURT:  Okay.  This is what I am going to ask

9    you to do -- you have a whole team, much larger than mine.

10   Why don't you submit to me any changes you want to make with

11   respect to Section 1 from your proposed order, as we

12   discussed at the beginning of this hearing, and other

13   suggestions that you have that I can consider before I issue

14   the order.  If you do that in the next hour and a half --

15           MR. BUTSWINKAS:  Yes.

16           THE COURT:  -- I will wait for that, not much

17   longer than that.

18           MR. BUTSWINKAS:  Okay.  Thank you.

19           THE COURT:  Thank you.

20           Anything else from the government?

21           MR. MIZELLE:  Yes, Your Honor, if I may.

22           I would just ask that counsel share that with us

23   too, just to have the opportunity to talk about it --

24           MR. BUTSWINKAS:  Of course.

25           MR. MIZELLE:  -- and present at least an argument

1    to the extent that what they would propose is an expansion

2    of even what they have already offered up to the Court, just

3    so that we have an opportunity to do that.

4          MR. BUTSWINKAS:  Of course we will, Your Honor.

5          THE COURT:  Okay.  Well, depending on how long

6    that conferral process takes -- I was planning on issuing

7    the order today, but I can wait until tomorrow if the

8    conferral goes a little longer.  You should get papers in

9    today.

10         MR. BUTSWINKAS:  Yes, Your Honor.  We'll provide

11   it to them in the next half hour.

12         THE COURT:  Well, let me see if I can cut through

13   this a little bit.  You have seen the proposed order?

14         MR. MIZELLE:  I have, Your Honor.

15         THE COURT:  And based on that proposed order,

16   other than what plaintiff's counsel just suggested, about

17   making sure that the order was circulated to all federal

18   agencies who may have received the executive order, what --

19   I think it is within the scope of what has been determined

20   here, it's limited to Sections 1, 3, and 5, which pretty

21   much covers --

22         MR. MIZELLE:  Your Honor, I would take issue

23   with -- so I am looking at the proposed order now.

24         The plaintiff chose who to sue, who to make a

25   defendant in this case, so to the extent that the order is

1    directed towards "defendants," that is okay.  To the extent

2    that they want to expand it beyond defendants in this case,

3    I think that's wholly inappropriate, wholly improper.  They

4    would need to fundamentally amend their complaint.

5         MR. BUTSWINKAS:  May I respond briefly, Your

6    Honor?

7         THE COURT:  Well, one of the defendants is the

8    United States America.

9         MR. BUTSWINKAS:  You took my response.

10        THE COURT:  Well, I got that.  So you-all can

11   confer.  It would have been easy for me to just deal with

12   that in, like, two seconds once I got the submission from

13   the government; but I have dealt with that now.

14        MR. BUTSWINKAS:  Your Honor, if I may.  I don't

15   want to keep you.

16        There are only two things we would like to add to

17   the order, and I could tell you what they are right now.

18        Order that defendants are directed to immediately

19   instruct all agencies of the federal government to

20   immediately cease all communications or directions to any

21   contractor or other person or entity instructing or asking

22   them to disclose a relationship with Perkins Coie LLP or any

23   person associated with the firm.

24        THE COURT:  Okay.  I am going to ask you to repeat

25   that very slowly because I am not going to try and keep up

```
 1    with you.
 2              MR.  BUTSWINKAS:  Okay.
 3              THE COURT:  My court reporter is looking at me,
 4    which is her signal to me that you need to go more slowly;
 5    and my law clerk is not as fast as she is.
 6              MR. BUTSWINKAS:  Here it is.
 7              Order that defendants are directed to immediately
 8    instruct all agencies of the federal government to
 9    immediately cease all communications or directions to any
10    contractor or other person or entity instructing or asking
11    them to disclose a relationship with Perkins Coie LLP or any
12    person associated with the firm.  That's number one.
13              THE COURT:  Do you want to have time to think
14    about that, or do you have a view on that now?
15              MR. MIZELLE:  Just these two new paragraphs?
16              MR. BUTSWINKAS:  Yes.
17              MR. MIZELLE:  Your Honor, if I could just get two
18    minutes to read these and confer with my --
19              THE COURT:  Go ahead.
20              MR. BUTSWINKAS:  Your Honor, if I may approach, I
21    can give you an order that includes that.  Thank you.
22              The new paragraphs are paragraphs 2 and 3, on page
23    2.  I hope that's right.
24              (Whereupon, the proceeding pauses while government
25    counsel confer.)
```

1          THE COURT:  Yes, Mr. Mizelle.

2          MR. MIZELLE:  Thank you for your indulgence, Your

3     Honor.

4          So there are two new paragraphs.  With respect to

5     the second one:  Defendants are directed to immediately

6     instruct all agencies of the federal government to

7     immediately communicate to every recipient of a request for

8     such disclosure, the request is immediately rescinded until

9     further order of the Court.

10          That one we have no objection to.

11          The first one, Your Honor, instructs the

12     defendants to immediately instruct all agencies of the

13     federal government to immediately cease all communications

14     or directions to any contractor or other person or entity

15     instructing them to disclose a relationship with Perkins

16     Coie or any other person associated with their firm.

17          That, Your Honor, is untied to anything related to

18     the executive order, at least in terms of, like, directly

19     tying it to.  So there could be other legitimate bases that

20     the government would have for asking these types of

21     questions.  So we would ask that --

22          THE COURT:  Okay.  What would you suggest?

23          MR. MIZELLE:  I actually think that it's already

24     covered by the immediately preceding paragraph that says:

25     The defendants are directed to immediately issue guidance to

1    their officers, staff, employees, and contractors to

2    disregard Sections 1, 3, and 5 of the executive order and

3    carry on their ordinary business absent such sections of the

4    executive order.

5              I believe that the paragraph that we are flagging

6    as objectionable is completely redundant --

7              THE COURT:  Why don't we just -- I don't think it

8    is.  Why don't we just add the -- ask them to disclose a

9    relationship pursuant to Executive Order --

10             MR. MIZELLE:  I think that would solve our

11   concern, Your Honor.

12             THE COURT:  -- 40230.

13             MR. MIZELLE:  I think that would solve our

14   concern.  Thank you.

15             THE COURT:  Any objection to that?

16             MR. BUTSWINKAS:  No, Your Honor.

17             THE COURT:  All right.

18             MR. MIZELLE:  Thank you, Your Honor.

19             THE COURT:  All right.  I think we have our order

20   then, and I will look forward to getting your proposed

21   schedule tomorrow.

22             Thank you.

23             (Whereupon, the proceeding concludes, 4:34 p.m.)

24

25

## **CERTIFICATE**

I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 13th day of March, 2025.

/s/ Elizabeth Davila, RPR, FCRR
Official Court Reporter

## /

**/s** [1] - 111:14

## 1

**1** [37] - 5:25, 7:13, 8:2, 8:4, 8:6, 8:17, 8:23, 9:3, 9:9, 9:10, 9:17, 11:8, 17:25, 18:18, 18:23, 19:5, 19:11, 20:12, 24:13, 29:19, 31:4, 31:7, 35:2, 43:16, 48:25, 67:9, 69:18, 71:16, 73:15, 75:14, 81:5, 102:5, 102:11, 104:4, 105:11, 106:20, 110:2
**1's** [1] - 9:19
**1,960** [1] - 27:4
**10** [3] - 43:19, 68:7, 89:20
**100** [4] - 37:3, 39:3, 47:24, 51:1
**104** [1] - 88:15
**105** [1] - 96:23
**106** [1] - 90:20
**1072** [1] - 101:1
**1078** [2] - 73:25, 101:1
**108** [1] - 88:15
**1088** [1] - 73:25
**11** [1] - 27:3
**112** [1] - 90:20
**1126** [1] - 83:21
**1141** [1] - 83:21
**11781** [1] - 4:3
**11th** [1] - 68:7
**12** [3] - 1:5, 99:15, 100:6
**120** [1] - 74:5
**120,000** [1] - 39:13
**1200** [2] - 4:12, 52:15
**1215** [1] - 85:18
**123** [1] - 87:5
**1237** [1] - 85:18
**1243** [1] - 86:11
**1250** [1] - 86:11
**1264** [1] - 101:19
**13** [1] - 98:4
**134** [1] - 92:2
**13th** [1] - 111:13
**14** [1] - 95:8
**140** [1] - 93:2
**14230** [23] - 4:2, 7:12, 44:1, 71:18, 73:15, 73:18, 74:24, 75:12, 76:2, 79:16, 83:23, 86:2, 86:23, 88:4, 89:10, 90:6, 91:14,

93:4, 93:19, 94:24, 99:11, 101:11, 103:11
**143** [2] - 92:2, 92:18
**144** [1] - 93:2
**145** [1] - 27:5
**147** [1] - 94:1
**148** [1] - 83:21
**15** [3] - 12:23, 27:15, 40:17
**153** [1] - 90:5
**156** [1] - 92:3
**159** [1] - 90:5
**160** [1] - 87:5
**165** [1] - 72:24
**168** [2] - 72:24
**170** [1] - 92:4
**175** [1] - 79:14
**180** [1] - 79:14
**19** [1] - 95:8
**1940** [1] - 47:15
**1951** [1] - 87:5
**1963** [1] - 80:18
**1965** [1] - 87:4
**1969** [1] - 72:24
**1971** [1] - 85:7
**1972** [2] - 67:16, 88:15
**1976** [3] - 87:2, 90:20, 95:11
**1982** [1] - 83:10
**1984** [2] - 90:3, 101:1
**1985** [1] - 99:10
**1988** [2] - 90:5, 103:3
**1989** [1] - 90:19
**1995** [1] - 78:25
**1996** [1] - 86:11
**1998** [1] - 83:22

## 2

**2** [10] - 5:25, 6:7, 8:21, 34:20, 43:11, 47:9, 72:8, 83:6, 108:22, 108:23
**20** [2] - 27:2, 73:7
**20-year** [1] - 68:25
**2001** [1] - 102:22
**20024** [1] - 1:15
**20053** [1] - 1:21
**2006** [2] - 72:11, 93:2
**2007** [1] - 85:18
**2008** [1] - 73:7
**2009** [1] - 74:4
**2011** [3] - 71:23, 74:1, 79:9
**2012** [3] - 92:3, 92:4, 96:24
**2014** [1] - 87:21
**2015** [1] - 94:17

**2016** [8] - 31:13, 32:17, 49:24, 75:11, 75:19, 77:15, 79:23, 101:13
**2018** [5] - 72:9, 83:16, 84:12, 95:10, 99:4
**202** [1] - 1:15
**2020** [5] - 73:11, 75:9, 76:22, 95:8, 97:6
**2021** [2] - 100:6, 100:7
**2022** [5] - 72:21, 73:6, 75:6, 94:21, 101:19
**2024** [3] - 74:6, 79:14, 94:4
**2025** [7] - 1:5, 4:4, 67:17, 71:18, 72:7, 72:8, 111:13
**20th** [2] - 68:17, 105:4
**21** [1] - 4:12
**22** [1] - 27:8
**223** [1] - 74:5
**23** [1] - 81:1
**242** [1] - 74:5
**25** [2] - 12:25, 90:25
**25-239** [1] - 72:7
**25-716** [2] - 1:4, 2:3
**2500** [4] - 4:12, 22:15, 34:6, 52:16
**252** [1] - 86:12
**26** [2] - 39:4, 92:14
**260** [1] - 86:12
**266** [2] - 75:10, 77:14
**27** [1] - 72:21
**270** [1] - 75:11
**273** [2] - 75:11, 77:15
**274** [1] - 77:2
**28** [1] - 72:8
**281** [1] - 83:16
**288** [1] - 83:16
**29** [4] - 27:12, 40:20, 41:8, 90:25
**290** [1] - 72:11
**296** [1] - 87:21
**297** [1] - 72:11
**2:03** [1] - 1:5

## 3

**3** [24] - 5:25, 9:23, 12:1, 13:2, 16:4, 16:12, 18:23, 31:4, 34:25, 35:11, 43:4, 43:16, 51:12, 71:16, 73:15, 75:21, 76:8, 83:6, 88:8, 102:11, 104:4, 106:20, 108:22, 110:2
**3(b)(i** [1] - 86:5
**30** [4] - 10:11, 40:5, 41:1, 90:25

**314433** [1] - 72:7
**315** [1] - 99:3
**316** [1] - 72:8
**317** [1] - 95:10
**318** [1] - 87:21
**319** [1] - 87:2
**33** [1] - 90:25
**333** [2] - 75:9, 87:2
**340** [1] - 27:6
**341** [1] - 87:5
**347** [1] - 95:11
**35-year** [1] - 68:24
**36** [1] - 70:13
**372** [1] - 80:17
**373** [1] - 95:11
**380** [1] - 87:3
**381** [1] - 75:9

## 4

**4** [6] - 6:4, 6:5, 6:7, 7:10, 8:21, 104:9
**400** [1] - 85:7
**40230** [1] - 110:12
**408** [1] - 88:15
**411** [1] - 73:6
**412** [1] - 72:23
**419** [1] - 99:3
**421** [1] - 73:6
**422** [1] - 83:10
**424** [1] - 87:2
**427** [1] - 95:11
**428** [2] - 83:10, 90:19
**433** [2] - 85:7, 99:3
**434-5110** [1] - 1:15
**437** [1] - 85:7
**45** [2] - 25:1, 69:15
**454** [1] - 72:10
**455** [1] - 83:10
**466** [1] - 90:2
**468** [1] - 75:6
**472** [1] - 75:6
**481** [1] - 86:12
**486** [1] - 90:5
**488** [1] - 103:2
**491** [1] - 90:18
**4:34** [1] - 110:23

## 5

**5** [25] - 5:25, 6:2, 16:19, 18:23, 21:7, 21:9, 23:9, 31:5, 35:1, 35:11, 43:4, 43:16, 51:15, 71:17, 73:15, 78:19, 81:6, 81:25, 88:9, 88:17, 88:23, 102:11, 104:4, 106:20, 110:2
**5(a** [2] - 52:14, 91:18

**5(a)** [1] - 23:25
**5,415** [1] - 27:1
**50** [1] - 72:22
**501** [1] - 85:17
**502** [1] - 75:9
**509** [1] - 74:4
**513** [1] - 74:4
**515** [1] - 78:24
**518** [1] - 72:9
**520** [1] - 72:9
**531** [1] - 102:21
**533** [1] - 102:21
**544** [1] - 94:16
**545** [2] - 87:3, 102:22
**548** [1] - 93:2
**552** [2] - 79:9, 87:3
**555** [4] - 26:25, 73:7, 94:16, 95:10
**56** [2] - 27:2, 94:21
**561** [1] - 74:4
**562** [1] - 95:10
**564** [1] - 79:9
**566** [2] - 92:2, 92:3, 92:18
**578** [3] - 75:10, 77:14, 79:9
**58** [1] - 80:17
**582** [1] - 100:25
**592** [1] - 95:8
**595** [2] - 73:6, 75:6

## 6

**6** [3] - 4:4, 68:7, 71:17
**601** [1] - 1:20
**602** [1] - 79:14
**617** [1] - 90:19
**624** [1] - 90:19
**626** [1] - 101:18
**632** [1] - 71:22
**639** [1] - 73:25
**656** [1] - 73:11
**66** [1] - 27:3
**668** [2] - 73:11, 90:2
**669** [1] - 99:9
**67** [1] - 80:18
**674** [1] - 99:10
**680** [1] - 1:14
**686** [1] - 90:3
**69** [1] - 26:24

## 7

**7** [4] - 27:3, 68:7, 73:7, 78:15
**718** [1] - 72:21
**72** [1] - 86:10
**722** [1] - 71:22
**723** [1] - 71:23

2

**733** [1] - 72:21
**75** [2] - 64:15, 103:3
**758** [2] - 87:20, 99:9
**787** [1] - 94:16

## 8

**8** [2] - 68:7, 89:25
**819** [1] - 78:25
**829** [1] - 78:25
**84** [1] - 103:3
**872** [1] - 96:23
**88** [1] - 94:21
**894** [1] - 83:15

## 9

**9** [5] - 43:19, 68:7, 89:20, 96:15, 100:17
**90** [8] - 4:2, 21:25, 22:1, 24:21, 24:25, 53:11, 96:23, 98:12
**90-plus** [1] - 53:18
**95** [1] - 94:21
**950144** [1] - 100:6
**960** [1] - 73:11

## A

**abhorrent** [1] - 60:12
**ability** [19] - 12:7, 25:25, 39:8, 55:11, 83:24, 84:7, 84:10, 84:19, 85:25, 86:17, 91:6, 91:14, 91:22, 92:6, 92:21, 93:8, 100:19, 103:12, 111:7
**able** [10] - 6:12, 39:25, 41:21, 59:6, 59:7, 59:14, 59:15, 70:18, 80:22, 102:9
**abridging** [1] - 85:20
**abrogation** [1] - 16:15
**absence** [1] - 94:20
**absent** [3] - 22:5, 73:21, 110:3
**absolutely** [7] - 8:24, 11:12, 22:25, 31:9, 41:6, 52:7, 84:9
**abstain** [1] - 79:2
**accept** [1] - 59:6
**accepting** [2] - 77:24, 80:12
**access** [19] - 4:6, 4:8, 7:16, 21:11, 21:13, 24:2, 24:7, 25:21, 25:22, 51:16, 52:17, 52:18, 53:25, 55:20, 82:1, 88:24, 88:25,

96:3, 103:13
**accessing** [1] - 92:10
**accompanied** [2] - 18:25, 76:2
**accompanying** [2] - 82:17, 98:16
**accordance** [1] - 10:14
**according** [2] - 35:5, 35:6
**accordingly** [1] - 100:22
**accounts** [1] - 12:24
**accurate** [2] - 58:23, 111:4
**accusations** [2] - 7:14, 7:23
**accusing** [1] - 85:11
**achieve** [3] - 67:25, 80:20, 80:23
**achieves** [1] - 77:4
**achieving** [1] - 81:12
**acknowledges** [1] - 93:18
**acquitted** [1] - 70:3
**acronym** [1] - 53:15
**act** [2] - 63:9, 83:18
**acting** [7] - 21:17, 55:25, 81:9, 82:3, 85:12, 91:20, 92:7
**Action** [4] - 1:3, 2:3, 72:7, 73:24
**action** [14] - 21:10, 30:12, 31:8, 36:10, 38:6, 39:12, 39:17, 39:24, 45:24, 47:7, 48:9, 64:10
**actions** [21] - 8:1, 9:25, 10:13, 21:8, 37:24, 38:7, 47:14, 50:23, 62:3, 62:13, 62:17, 75:4, 75:7, 76:18, 77:25, 79:18, 93:11, 101:12, 102:13, 104:1, 105:5
**active** [1] - 26:22
**activist** [3] - 31:14, 75:15, 79:24
**activists** [1] - 66:22
**activities** [2] - 60:16, 83:3
**activity** [6] - 77:13, 78:2, 78:10, 78:17, 80:21, 97:1
**actor** [2] - 41:18, 80:8
**actors** [2] - 76:10, 80:15
**acts** [2] - 34:3, 87:11
**actual** [4] - 7:12, 41:22, 67:13, 94:13

**Adams** [1] - 70:21
**add** [4] - 19:18, 30:11, 107:16, 110:8
**addition** [1] - 86:6
**additional** [2] - 43:13, 88:5
**address** [3] - 32:3, 52:18, 60:2
**addressed** [1] - 101:5
**Addressing** [7] - 4:5, 48:20, 48:21, 50:13, 59:2, 59:3, 71:18
**adequate** [1] - 90:14
**adjudicate** [2] - 59:21, 70:6
**adjudicated** [1] - 102:6
**adjudication** [1] - 59:23
**adjudicators** [1] - 84:5
**administration** [16] - 8:8, 9:18, 11:5, 11:10, 18:20, 26:13, 42:21, 42:23, 68:23, 72:14, 72:15, 79:20, 85:4, 96:20
**Administration** [5] - 25:10, 76:9, 80:8, 95:9, 102:17
**administrations** [4] - 42:19, 68:22, 68:24, 68:25
**administrative** [2] - 17:9, 46:18
**admit** [1] - 46:7
**admitted** [1] - 69:22
**adopt** [3] - 47:2, 47:3, 47:4
**adopting** [1] - 46:24
**advance** [4] - 88:2, 90:11, 90:17, 91:7
**advancing** [2] - 101:25, 102:16
**adverse** [3] - 82:10, 85:14, 102:13
**advise** [1] - 24:18
**advised** [1] - 70:13
**advocacy** [2] - 96:4, 96:12
**advocated** [1] - 61:6
**advocates** [2] - 62:1, 102:25
**Aerospace** [1] - 86:9
**affecting** [1] - 84:9
**affirmatively** [1] - 87:10
**affix** [1] - 47:18
**afforded** [2] - 29:1, 30:18
**afraid** [1] - 57:8

**aftereffect** [1] - 13:24
**afternoon** [7] - 2:7, 2:8, 2:11, 3:1, 3:23, 4:1, 74:14
**afterwards** [2] - 20:4, 21:1
**agencies** [49] - 8:10, 10:1, 10:5, 10:7, 10:10, 10:17, 11:9, 11:21, 12:3, 12:17, 12:22, 14:14, 15:20, 17:19, 18:16, 19:4, 19:9, 21:8, 21:10, 21:16, 21:21, 21:22, 24:21, 24:25, 26:25, 37:3, 39:1, 53:10, 53:18, 53:25, 55:24, 57:15, 62:13, 68:14, 79:18, 84:16, 86:5, 88:7, 91:19, 95:19, 98:3, 98:12, 105:3, 105:5, 106:18, 107:19, 108:8, 109:6, 109:12
**Agency** [1] - 75:8
**agency** [20] - 9:18, 17:12, 21:22, 22:4, 22:6, 22:23, 23:11, 24:1, 37:21, 51:18, 53:4, 53:23, 54:12, 56:19, 56:21, 75:25, 81:17, 84:5, 89:5, 89:7
**agenda** [1] - 81:13
**agents** [1] - 85:24
**ago** [3] - 4:4, 34:4, 35:20
**agree** [8] - 30:4, 30:7, 43:21, 43:24, 43:25, 55:4, 69:12, 71:5
**agreed** [2] - 45:13, 65:20
**agreeing** [1] - 28:18
**agreement** [2] - 86:13, 104:22
**agreements** [3] - 14:6, 40:12, 86:7
**Agriculture** [2] - 27:9, 86:9
**ahead** [2] - 60:3, 108:19
**aided** [1] - 1:25
**aims** [1] - 87:10
**airports** [1] - 59:15
**akin** [1] - 56:12
**al** [2] - 1:5, 2:4
**Alice** [1] - 89:13
**allegations** [2] - 29:3, 32:8
**allege** [1] - 95:14

**alleged** [5] - 90:21, 91:2, 91:13, 94:12, 100:7
**allow** [1] - 64:20
**allowed** [3] - 48:11, 60:11, 61:24
**allowing** [1] - 91:2
**allude** [1] - 75:22
**alluded** [3] - 33:9, 58:12, 102:5
**almost** [4] - 29:20, 66:3, 71:4, 98:8
**already-existing** [1] - 27:17
**amend** [1] - 107:4
**Amendment** [64] - 15:4, 15:5, 15:22, 16:1, 34:10, 34:11, 35:14, 35:25, 51:8, 51:9, 60:5, 60:8, 60:9, 60:13, 62:7, 66:16, 66:18, 67:5, 67:7, 67:15, 67:21, 67:23, 69:10, 69:11, 74:20, 74:21, 74:23, 75:2, 76:25, 77:9, 78:10, 78:17, 78:23, 80:21, 83:1, 83:2, 85:16, 85:19, 85:20, 85:22, 87:14, 89:24, 89:25, 90:9, 91:2, 91:11, 91:17, 92:23, 94:1, 94:6, 94:25, 95:4, 95:5, 95:12, 95:16, 96:21, 97:1, 97:3, 97:4, 97:7, 97:21, 97:22
**Amendment's** [1] - 89:20
**Amendment-protected** [4] - 78:10, 78:17, 80:21, 83:2
**America** [5] - 72:22, 72:23, 86:10, 95:9, 107:8
**American** [2] - 96:7, 103:13
**Americans** [1] - 46:25
**amusing** [1] - 89:13
**analysis** [8] - 18:17, 26:14, 35:15, 63:20, 64:15, 67:8, 69:24, 101:2
**analyzed** [2] - 71:20, 101:8
**angry** [1] - 50:14
**animus** [1] - 76:5
**announced** [2] - 14:4, 20:3

**announces** [1] - 77:18
**annoyed** [1] - 48:24
**annoying** [1] - 89:15
**answer** [5] - 8:20, 19:11, 20:16, 50:18, 68:17
**answered** [1] - 61:8
**Anti** [2] - 65:23, 87:4
**Anti-Fascist** [2] - 65:23, 87:4
**anticipated** [2] - 84:13, 100:2
**anyway** [1] - 104:17
**appeal** [2] - 17:12, 46:19
**appealable** [1] - 72:15
**appealed** [1] - 72:17
**appeals** [1] - 72:16
**appear** [3] - 20:13, 97:16, 98:11
**APPEARANCES** [1] - 1:9
**application** [2] - 12:12, 71:20
**applications** [2] - 27:1, 98:6
**applies** [7] - 6:2, 6:6, 15:20, 22:25, 54:4, 64:25, 72:2
**apply** [10] - 12:10, 13:4, 34:5, 43:19, 45:11, 45:18, 47:12, 65:21, 71:21, 88:7
**applying** [1] - 35:21
**appointed** [1] - 92:25
**appreciate** [5] - 8, 5:23, 7:19, 33:19, 62:25
**approach** [3] - 60:6, 97:16, 108:20
**appropriate** [2] - 10:8, 57:17
**appropriately** [1] - 72:2
**approves** [1] - 81:18
**arbitrary** [1] - 89:21
**argue** [2] - 43:22, 64:18
**argument** [7] - 14:8, 23:23, 28:21, 28:23, 35:18, 69:1, 105:25
**arises** [1] - 12:9
**Arlington** [1] - 71:3
**Armstrong** [1] - 87:3
**arrested** [1] - 52:1
**Article** [10] - 30:13, 43:19, 45:17, 47:5, 48:2, 59:11, 65:2, 89:19, 90:14
**articulated** [2] - 47:4,

77:10
**aside** [1] - 35:23
**aspect** [2] - 32:11, 32:12
**aspersions** [1] - 69:18
**aspire** [1] - 81:11
**assaults** [1] - 89:21
**assert** [1] - 15:7
**asserted** [1] - 91:6
**asserts** [1] - 74:13
**assessment** [2] - 10:12, 11:1
**assigned** [1] - 96:18
**assistance** [4] - 90:1, 91:22, 92:21, 93:11
**assistants** [1] - 22:14
**associate** [3] - 20:8, 70:18, 97:2
**associated** [4] - 46:20, 107:23, 108:12, 109:16
**Association** [5] - 67:16, 67:19, 79:13, 95:9, 96:8
**association** [5] - 20:1, 59:5, 66:18, 69:10, 95:20
**associational** [2] - 36:1, 59:5
**assume** [1] - 35:18
**assuming** [1] - 84:25
**attach** [1] - 85:8
**attached** [1] - 24:12
**attainder** [22] - 43:17, 43:18, 43:23, 44:10, 44:12, 44:18, 44:21, 44:25, 45:2, 45:9, 45:16, 64:23, 64:25, 65:10, 65:17, 65:19, 65:21, 66:3, 66:6, 66:11, 89:11, 89:18
**attempt** [1] - 79:11
**attempted** [1] - 101:16
**attempting** [1] - 79:17
**attention** [2] - 16:3, 34:8
**attorney** [9] - 39:11, 39:12, 39:21, 39:22, 71:13, 91:12, 92:11, 98:24, 100:1
**Attorney** [4] - 39:15, 66:8, 87:7, 87:12
**Attorney's** [8] - 1:19, 3:6, 3:12, 27:13, 54:23, 55:1, 55:7, 101:23
**attorney-client** [3] - 91:12, 98:24, 100:1
**attorneys** [2] - 17:19, 38:19, 83:14, 84:1,

84:23, 84:24, 92:12, 93:5, 93:14, 97:15, 101:22, 102:5
**attorneys'** [1] - 55:11
**AUSA** [1] - 36:19
**authority** [11] - 21:10, 23:12, 30:13, 30:22, 31:2, 39:16, 48:2, 50:21, 63:9, 64:12, 64:17
**authorization** [1] - 111:10
**authorized** [1] - 30:14
**authors** [1] - 66:10
**Auto** [2] - 86:9, 86:10
**Avenue** [1] - 1:14
**avoid** [1] - 84:25
**await** [1] - 74:17
**awaiting** [1] - 40:23
**aware** [2] - 37:8, 37:10

# B

**b)(2** [1] - 11:1
**back-door** [1] - 51:8
**bad** [2] - 44:22, 65:24
**badge** [1] - 85:9
**balance** [3] - 73:3, 73:9, 101:3
**ball** [1] - 5:12
**Bantam** [1] - 80:17
**bar** [8] - 23:16, 45:9, 46:12, 46:14, 65:17, 84:9, 93:19, 102:20
**Bar** [1] - 96:7
**barely** [1] - 71:8
**bargaining** [2] - 86:13, 92:15
**barred** [7] - 17:19, 45:1, 81:8, 88:19, 89:7, 94:3
**Barry** [1] - 83:21
**bars** [4] - 85:20, 89:18, 97:22, 97:23
**based** [16] - 33:6, 33:9, 49:23, 54:14, 60:25, 75:7, 77:5, 77:11, 83:2, 85:13, 87:9, 97:20, 101:11, 102:23, 103:23, 106:15
**bases** [2] - 49:18, 109:19
**basic** [1] - 88:2
**basis** [10] - 18:12, 29:8, 31:7, 33:6, 61:25, 75:15, 75:24, 78:1, 78:17, 102:19
**Bates** [1] - 5:5
**bearing** [1] - 4:17

**bedrock** [1] - 46:2
**bee** [1] - 50:4
**BEFORE** [1] - 1:8
**beginning** [3] - 58:13, 66:4, 105:12
**behalf** [11] - 2:9, 3:2, 4:21, 15:7, 28:10, 76:20, 82:19, 85:24, 90:10, 91:3, 96:12
**belief** [1] - 102:24
**beliefs** [2] - 103:5, 103:20
**believes** [1] - 48:25
**below** [1] - 111:11
**benefit** [4] - 44:14, 44:15, 72:18
**Berger** [1] - 94:21
**BERYL** [1] - 1:8
**best** [2] - 102:24, 111:6
**between** [8] - 14:2, 14:17, 17:2, 58:8, 84:20, 91:25, 92:16, 96:18
**beyond** [2] - 94:13, 107:2
**bicker** [1] - 48:6
**big** [4] - 32:15, 38:8, 69:2, 69:23
**bill** [20] - 43:17, 43:18, 43:23, 44:9, 44:11, 44:18, 44:21, 45:2, 45:9, 45:16, 64:23, 64:25, 65:10, 65:16, 65:19, 65:20, 66:5, 66:10, 66:13, 89:10
**Bill** [1] - 5:2
**billingham** [1] - 99:3
**bills** [3] - 44:25, 66:3, 89:18
**binding** [1] - 34:18
**bit** [9] - 11:25, 15:17, 30:4, 33:22, 39:20, 40:3, 41:4, 46:5, 106:13
**Black** [4] - 65:22, 66:1, 66:9, 67:3
**blacklists** [1] - 66:2
**blatant** [1] - 78:23
**blizzard** [2] - 95:23
**Bloodworth** [1] - 4:24
**Board** [1] - 27:7
**body** [1] - 66:7
**bonnet** [1] - 50:4
**bono** [1] - 78:1
**boogyman** [2] - 39:2, 39:20
**boogymen** [4] - 36:12, 38:10, 38:12, 68:3
**Books** [1] - 80:17

**Boston** [1] - 70:22
**bounds** [1] - 103:17
**branch** [5] - 25:5, 25:6, 25:14, 45:4, 45:12
**brands** [1] - 100:17
**brave** [2] - 48:13, 48:16
**breathtakingly** [1] - 80:25
**brief** [1] - 63:1
**briefing** [6] - 7:10, 28:19, 29:9, 72:6, 74:17, 104:14
**briefly** [2] - 68:2, 107:5
**bring** [2] - 54:10, 103:24
**bringing** [4] - 34:11, 34:12, 34:13, 50:2
**British** [1] - 70:21
**broad** [3] - 63:11, 83:19, 88:17
**broader** [3] - 52:22, 56:7, 56:12
**broadly** [1] - 80:25
**Brock** [1] - 86:11
**Brooklyn** [1] - 95:7
**brought** [3] - 3:16, 26:6, 60:1
**Brush** [1] - 83:9
**building** [4] - 23:18, 24:6, 25:17, 51:22
**buildings** [20] - 16:21, 21:12, 24:2, 24:4, 46:15, 50:25, 51:17, 51:20, 52:17, 55:20, 62:17, 81:8, 82:2, 84:2, 86:19, 88:25, 89:7, 92:10, 97:17, 97:23
**built** [1] - 40:14
**bulk** [1] - 99:15
**bunch** [1] - 38:10
**burden** [4] - 38:8, 73:12, 79:7, 83:23
**burdens** [1] - 13:3
**burdensome** [1] - 22:16
**buried** [1] - 71:3
**burman** [2] - 7:20, 24:25
**Burman** [8] - 7:20, 39:5, 39:9, 82:11, 90:24, 92:14, 98:3, 99:14
**burman's** [5] - 22:2, 23:3, 24:22, 26:3, 39:8
**Burns** [1] - 95:11

**business** [15] - 7:3, 10:2, 10:3, 10:6, 10:13, 14:22, 16:7, 43:13, 46:13, 70:20, 81:22, 97:25, 99:9, 100:20, 110:3
**businesses** [1] - 41:16
**busy** [1] - 5:10
**Butswinkas** [5] - 2:9, 2:13, 4:21, 62:23, 71:12
**BUTSWINKAS** [72] - 1:11, 2:8, 2:14, 2:16, 2:20, 2:22, 4:20, 5:2, 5:5, 5:8, 6:4, 6:8, 6:21, 6:25, 7:21, 8:6, 9:14, 9:17, 10:21, 10:23, 10:25, 11:15, 11:18, 12:9, 13:8, 13:14, 13:21, 13:25, 14:24, 15:5, 16:11, 17:22, 18:7, 19:6, 19:18, 19:21, 21:24, 22:2, 22:12, 22:19, 23:10, 23:24, 25:9, 25:15, 25:18, 25:20, 26:11, 28:8, 62:24, 63:13, 63:17, 63:25, 64:2, 65:3, 65:5, 65:8, 65:18, 70:9, 104:25, 105:15, 105:18, 105:24, 106:4, 106:10, 107:5, 107:9, 107:14, 108:2, 108:6, 108:16, 108:20, 110:16

**C**

**cabinet** [1] - 53:6
**cabinets** [1] - 53:10
**campaign** [4] - 31:13, 32:8, 32:17, 79:23
**Campbell** [2] - 83:15, 84:11
**canceled** [4] - 23:5, 23:6, 37:25, 98:13
**canceling** [2] - 24:15, 92:11
**candidate** [1] - 77:19
**candidates** [4] - 31:22, 77:24, 78:6, 80:1
**cannot** [13] - 12:14, 16:14, 32:16, 51:7, 66:9, 67:4, 70:20, 79:11, 82:16, 89:16, 94:3, 102:14, 103:7

**capacity** [6] - 21:18, 56:1, 81:9, 82:3, 91:20, 92:8
**capital** [1] - 84:11
**Caplin** [2] - 90:18, 91:8
**card** [1] - 60:18
**care** [1] - 20:6
**career** [1] - 83:20
**CAROL** [1] - 1:13
**Carol** [1] - 2:23
**carry** [2] - 38:8, 110:3
**case** [30] - 20:17, 28:13, 34:9, 36:9, 36:11, 37:14, 50:8, 51:9, 61:2, 63:17, 63:24, 64:16, 66:7, 67:15, 71:25, 72:5, 72:17, 77:11, 77:23, 79:15, 84:12, 90:11, 90:15, 92:12, 97:6, 104:16, 106:25, 107:2
**case-or-controversy** [1] - 90:15
**cases** [8] - 23:18, 64:20, 65:24, 67:3, 82:13, 90:17, 91:23, 102:16
**cast** [1] - 69:18
**casts** [1] - 95:22
**categorically** [1] - 60:16
**category** [1] - 83:18
**Catholic** [1] - 95:7
**causation** [6] - 14:23, 41:22, 41:24, 43:5, 68:4, 68:6
**caused** [3] - 17:2, 44:5, 100:2
**causes** [4] - 77:17, 78:7, 103:6, 103:20
**causing** [1] - 12:13
**cease** [3] - 107:20, 108:9, 109:13
**Cemetery** [1] - 71:4
**censorship** [1] - 67:4
**Center** [1] - 73:24
**central** [1] - 93:5
**centrality** [1] - 92:15
**century** [1] - 71:5
**certain** [18] - 30:15, 30:16, 31:14, 33:23, 42:17, 42:19, 50:23, 50:25, 58:20, 59:10, 78:6, 79:24, 82:23, 87:7, 94:13, 96:21, 97:16, 99:24
**certainly** [12] - 12:1, 18:7, 33:10, 37:11,

44:5, 45:23, 47:11, 49:20, 57:6, 60:5, 103:19
**CERTIFICATE** [1] - 111:1
**certificate** [1] - 111:8
**certify** [1] - 111:3
**cetera** [1] - 16:4
**CFIUS** [1] - 87:24
**Chad** [2] - 3:2, 28:10
**CHAD** [1] - 1:17
**challenge** [11] - 5:23, 17:10, 34:11, 34:12, 46:22, 59:20, 62:16, 77:25, 88:3, 90:9, 91:2
**challenged** [4] - 31:4, 34:20, 35:11, 51:7
**challengers** [1] - 103:25
**challenges** [1] - 4:1
**challenging** [1] - 76:17
**change** [2] - 31:24, 68:22
**changes** [2] - 80:2, 105:10
**Chaplaincy** [1] - 72:10
**characterize** [1] - 65:19
**charge** [2] - 25:15, 25:21
**charges** [2] - 58:1, 58:2
**Chartered** [1] - 90:18
**chemistry** [1] - 16:4
**chilled** [3] - 47:1, 47:20, 97:15
**chilling** [4] - 77:16, 95:22, 96:11, 103:10
**chills** [2] - 46:7, 78:9
**choice** [7] - 15:1, 15:8, 16:8, 16:18, 93:3, 93:9, 93:24
**choose** [7] - 16:2, 42:21, 59:7, 90:3, 93:1, 93:8, 96:18
**chose** [1] - 106:24
**chosen** [3] - 83:14, 83:20, 98:20
**CHRIS** [1] - 1:12
**Chris** [1] - 2:22
**Churches** [1] - 72:10
**Cigar** [1] - 95:8
**Circuit** [24] - 26:16, 34:8, 35:6, 51:7, 71:23, 72:11, 72:18, 72:21, 72:24, 73:11, 74:1, 74:4, 74:6, 83:16, 83:21, 84:12,

85:18, 86:11, 87:21, 94:17, 94:21, 97:6, 99:10, 102:4
**circular** [2] - 8:16, 11:7
**circulated** [2] - 54:17, 106:17
**circumstance** [1] - 102:18
**circumstances** [3] - 27:21, 70:15, 88:19
**circumstantial** [1] - 20:17
**citation** [1] - 30:3
**citations** [2] - 72:14, 72:18
**cite** [49] - 64:16, 67:15, 71:22, 72:9, 72:11, 72:21, 72:24, 73:6, 73:7, 73:11, 73:25, 74:4, 74:5, 75:6, 75:9, 75:10, 77:15, 78:25, 79:9, 79:14, 80:18, 83:10, 83:16, 83:21, 85:7, 85:18, 86:11, 86:12, 87:2, 87:3, 87:5, 87:21, 88:15, 90:3, 90:5, 90:20, 92:2, 92:3, 93:2, 94:16, 94:21, 95:8, 95:10, 95:11, 96:23, 99:3, 101:1, 102:22, 105:4
**cited** [3] - 63:19, 82:14, 98:15
**cites** [5] - 30:2, 31:12, 75:14, 76:6, 76:8
**citing** [5] - 30:20, 72:8, 72:22, 80:5, 90:19
**citizen** [2] - 46:21, 70:4
**citizens** [1] - 11:4
**city** [2] - 50:9, 77:14
**City** [2] - 75:10, 88:14
**Civil** [3] - 1:3, 2:2, 72:7
**civil** [1] - 98:10
**claim** [12] - 15:4, 15:7, 34:10, 35:14, 68:6, 70:7, 70:8, 74:23, 78:15, 78:19, 89:24, 90:18
**claimed** [1] - 13:20
**claiming** [2] - 40:17, 41:19
**claims** [14] - 36:7, 73:2, 74:9, 74:13, 74:15, 74:17, 74:20, 74:21, 83:2, 83:5,

94:7, 94:25, 102:7
**Claims** [1] - 38:5
**clarification** [1] - 33:16
**clarity** [2] - 64:19, 92:13
**class** [1] - 15:24
**class-of-one** [1] - 15:24
**classic** [1] - 66:5
**clause** [8] - 63:10, 63:12, 64:18, 64:19, 67:21, 85:21, 87:14, 89:21
**Clause** [4] - 13:11, 16:16, 17:20, 18:6
**cleaner** [1] - 104:17
**clear** [27] - 6:10, 11:12, 19:24, 30:13, 31:20, 40:1, 42:24, 43:5, 43:6, 57:19, 61:18, 66:25, 67:3, 73:16, 75:13, 76:12, 78:9, 80:10, 80:14, 82:25, 85:14, 89:3, 94:14, 94:18, 99:21
**clearance** [6] - 7:3, 7:4, 34:14, 61:5, 61:11, 62:15
**clearances** [5] - 6:1, 34:21, 47:7, 47:12, 50:24
**clearer** [1] - 9:21
**clearly** [9] - 43:9, 78:14, 79:6, 84:14, 88:1, 88:14, 90:21, 91:10, 93:20
**clerk** [1] - 108:5
**clerks** [1] - 81:4
**clever** [1] - 24:9
**client** [13] - 4:23, 24:18, 33:18, 42:9, 42:10, 70:13, 70:19, 81:20, 81:22, 82:6, 91:12, 98:24, 100:1
**client's** [1] - 16:8
**clients** [86] - 10:19, 12:1, 12:14, 12:23, 13:13, 13:15, 14:3, 14:14, 14:15, 15:14, 16:6, 16:10, 16:23, 17:3, 17:17, 26:23, 27:1, 27:2, 27:3, 27:15, 35:24, 40:11, 40:13, 40:17, 40:21, 40:23, 41:12, 41:13, 42:3, 42:12, 43:7, 55:11, 59:6, 59:7, 68:21, 68:23, 68:24, 68:25, 76:1, 76:14,

5

76:16, 76:17, 76:23,
77:2, 77:3, 77:4,
77:7, 77:24, 78:7,
80:12, 82:8, 82:19,
85:25, 86:4, 86:8,
86:16, 88:9, 88:11,
88:18, 90:10, 91:3,
91:11, 91:23, 92:22,
93:7, 93:19, 93:20,
93:23, 95:20, 96:2,
96:12, 96:20, 97:13,
97:25, 98:2, 98:6,
98:15, 98:20, 98:25,
99:24, 100:20,
101:7, 102:16,
103:8, 103:17
**clients'** [3] - 40:24,
85:3, 92:22
**Clinton** [7] - 20:8,
31:13, 75:19, 75:23,
79:23, 80:7, 101:18
**cloaks** [1] - 98:24
**clump** [1] - 9:10
**code** [3] - 29:24,
29:25, 70:25
**coerce** [2] - 79:11,
79:17
**coercion** [2] - 67:25,
80:19
**cognizable** [4] - 84:8,
90:23, 101:9, 102:1
**Coie** [128] - 2:3, 2:10,
3:25, 4:5, 4:9, 4:10,
4:15, 4:21, 5:15,
9:20, 10:1, 10:3,
10:5, 10:7, 10:9,
10:12, 10:13, 10:19,
10:20, 11:13, 11:23,
12:2, 12:4, 12:5,
12:19, 12:21, 13:4,
13:17, 14:3, 14:7,
14:13, 14:18, 16:5,
17:2, 17:17, 18:18,
20:23, 21:1, 21:12,
21:18, 22:5, 22:10,
22:15, 23:17, 24:5,
25:1, 31:12, 33:22,
33:25, 35:21, 35:22,
35:24, 38:17, 38:19,
40:24, 41:19, 43:8,
44:2, 44:6, 44:8,
48:17, 48:19, 48:21,
48:24, 49:25, 50:16,
51:20, 52:15, 53:21,
55:9, 55:10, 56:1,
56:10, 57:20, 59:3,
61:14, 62:10, 68:16,
71:15, 71:19, 74:7,
75:15, 76:1, 76:6,
76:13, 77:4, 77:23,

78:13, 79:23, 80:5,
80:11, 81:7, 81:15,
81:23, 82:2, 82:4,
82:6, 82:13, 82:18,
85:4, 86:17, 88:9,
88:18, 88:25, 89:6,
90:8, 91:10, 91:15,
91:21, 92:8, 92:9,
92:12, 93:4, 93:9,
93:13, 95:21, 98:15,
98:17, 99:1, 99:12,
101:12, 102:5,
102:7, 102:12,
107:22, 108:11,
109:16
**COIE** [1] - 1:3
**Coie's** [11] - 13:13,
13:15, 13:22, 17:17,
31:16, 40:23, 42:3,
59:17, 75:19, 75:22,
92:6
**collapse** [1] - 26:21
**collar** [2] - 27:12, 98:8
**colleagues** [1] - 5:21
**collective** [1] - 86:13
**College** [1] - 75:5
**Collier** [1] - 73:6
**colluded** [1] - 32:9
**Colombia** [1] - 60:19
**colossal** [1] - 25:23
**COLUMBIA** [1] - 1:1
**Columbia** [5] - 1:20,
74:5, 83:15, 84:12,
96:23
**combines** [1] - 101:2
**coming** [2] - 3:16,
54:4
**Comm** [1] - 65:23
**Commerce** [1] - 27:7
**Commission** [2] -
85:17, 100:25
**commit** [1] - 37:15
**committee** [2] - 4:25,
87:20
**Committee** [2] - 87:4,
87:23
**common** [1] - 65:15
**communicate** [1] -
109:7
**communications** [7] -
42:2, 55:21, 92:16,
98:24, 107:20,
108:9, 109:13
**communist** [1] - 87:7
**Community** [1] - 75:5
**companies** [1] - 30:16
**company** [2] - 46:10,
46:12
**Company** [3] - 63:18,
83:10, 99:9

**compelled** [1] - 63:2
**compelling** [7] -
18:13, 35:16, 35:18,
35:19, 67:10, 80:24,
82:21
**compels** [1] - 71:1
**compensable** [2] -
26:12, 27:22
**competent** [1] - 33:17
**competitive** [1] -
100:23
**complain** [1] - 38:3
**complaining** [1] -
36:12
**complaint** [7] - 5:23,
35:14, 70:8, 74:14,
78:16, 78:19, 107:4
**complete** [3] - 28:19,
72:17, 111:6
**completely** [1] - 110:6
**complex** [3] - 28:13,
28:15, 28:17
**comply** [1] - 16:22
**component** [1] - 25:12
**compounding** [1] -
95:22
**Comptroller** [1] - 27:6
**computer** [1] - 1:25
**computer-aided** [1] -
1:25
**concedes** [1] - 88:21
**concept** [3] - 64:8,
68:4, 71:7
**concern** [5] - 59:4,
78:4, 105:2, 110:11,
110:14
**concerns** [2] - 40:21,
102:2
**conclude** [3] - 7:15,
20:19, 70:9
**concludes** [1] -
110:23
**concrete** [3] - 38:1,
38:6, 90:22
**concurring** [3] -
63:19, 64:14, 87:6
**condemnation** [1] -
66:6
**condemning** [1] - 87:6
**conditions** [2] - 16:5,
47:18
**conduct** [2] - 33:6,
33:7
**confer** [7] - 6:18,
58:13, 104:6, 104:8,
107:11, 108:18,
108:25
**conferral** [2] - 106:6,
106:8
**confessed** [1] - 67:8

**confidentiality** [1] -
98:23
**confirming** [1] - 32:24
**confirms** [1] - 79:16
**Congress** [5] - 30:19,
43:20, 63:9, 64:25,
65:4
**connection** [2] -
20:14, 32:18
**connections** [1] -
42:18
**Connolly** [7] - 1:14,
2:9, 48:12, 48:22,
50:7, 50:14, 59:4
**Connolly's** [2] - 48:24,
50:15
**consequence** [2] -
91:12, 93:7
**consequences** [2] -
23:4, 40:22
**consequently** [1] -
96:16
**conservative** [1] -
70:17
**consider** [6] - 16:10,
56:19, 72:1, 74:3,
91:4, 105:13
**consideration** [2] -
16:9, 74:18
**considerations** [4] -
16:3, 90:16, 91:1,
91:9
**considered** [3] - 13:7,
73:17, 111:8
**considering** [2] -
42:13, 74:13
**considers** [1] - 72:5
**consistency** [3] -
21:19, 56:15, 56:25
**consistent** [10] - 11:4,
12:19, 18:18, 18:19,
19:15, 23:20, 30:10,
58:9, 62:18, 63:14
**consistently** [1] - 13:9
**Constantineau** [1] -
85:7
**constitute** [5] - 17:17,
20:10, 95:13, 99:7,
100:10
**constitutes** [4] - 75:1,
78:20, 95:6, 111:4
**Constitution** [13] -
30:2, 30:15, 30:18,
45:1, 51:3, 63:3,
63:6, 63:10, 63:12,
65:11, 66:10, 89:18,
103:22
**constitutional** [14] -
11:7, 30:22, 31:1,
45:16, 65:17, 69:8,

74:9, 77:17, 85:5,
89:22, 90:12, 91:15,
93:25, 95:2
**constitutionally** [3] -
6:13, 83:13, 84:8
**constraints** [1] - 74:12
**construct** [1] - 17:8
**consultation** [3] -
11:16, 11:18, 22:6
**consulting** [1] - 98:25
**Consumer** [1] -
100:25
**contact** [1] - 68:15
**contemplated** [1] -
18:6
**contemporaneous** [1]
- 18:3
**contend** [1] - 11:20
**contending** [1] - 13:2
**content** [1] - 79:1
**contest** [1] - 29:3
**context** [3] - 39:25,
56:11, 61:22
**continue** [3] - 40:2,
90:22, 101:6
**contract** [15] - 10:4,
10:8, 13:7, 13:12,
13:15, 13:22, 14:1,
14:2, 14:24, 15:19,
16:16, 56:10, 81:21,
81:24, 82:7
**contracting** [6] - 10:1,
12:23, 14:22, 14:25,
76:7, 98:23
**contractor** [6] - 11:22,
12:1, 97:25, 107:21,
108:10, 109:14
**contractor's** [1] -
16:17
**contractors** [10] -
10:2, 12:14, 12:18,
14:5, 16:13, 68:15,
84:16, 99:24, 105:3,
110:1
**contracts** [19] - 10:5,
10:9, 10:12, 10:14,
10:18, 11:2, 11:22,
12:24, 13:17, 14:16,
16:14, 17:18, 26:25,
27:16, 37:25, 46:14,
51:15, 86:6, 86:16
**contractual** [5] - 13:5,
13:9, 14:6, 86:3,
86:7
**contrary** [1] - 62:4
**contrast** [1] - 16:5
**control** [1] - 104:21
**controversy** [2] -
72:20, 90:15
**conversation** [1] -

53:8
**convicted** [3] - 44:13, 44:16, 44:17
**Cooper** [1] - 92:3
**copyright** [1] - 27:5
**Copyright** [1] - 27:5
**cornerstone** [1] - 63:20
**Corp** [4] - 87:20, 100:5, 100:16, 102:21
**corporate** [1] - 100:23
**corporation** [1] - 87:22
**correct** [6] - 8:24, 11:15, 13:14, 13:25, 22:12, 37:22
**correctly** [2] - 2:15, 50:11
**cost** [2] - 16:3, 16:9
**costs** [1] - 78:8
**Council** [1] - 72:6
**counsel** [45] - 2:7, 5:6, 15:1, 15:4, 15:8, 15:9, 16:1, 16:8, 16:17, 16:18, 16:23, 29:16, 33:17, 37:19, 44:14, 52:12, 58:8, 69:12, 89:24, 89:25, 90:2, 90:4, 90:7, 90:10, 91:18, 91:23, 91:25, 92:22, 92:25, 93:3, 93:9, 93:11, 93:15, 93:24, 93:25, 96:4, 96:9, 101:8, 101:24, 104:11, 105:22, 106:16, 108:25
**Counsel** [1] - 32:10
**Counsel's** [1] - 30:8
**counsel's** [1] - 3:3
**Count** [3] - 78:15, 78:19, 89:25
**count** [2] - 9:24, 21:8
**counted** [1] - 37:4
**counter** [1] - 31:18
**counterpart** [1] - 58:14
**country** [6] - 25:8, 25:12, 50:9, 71:8, 85:11, 102:15
**Counts** [1] - 83:6
**couple** [2] - 16:18, 60:1
**course** [3] - 19:20, 105:24, 106:4
**COURT** [167] - 1:1, 1:8, 2:11, 2:15, 2:17, 2:21, 2:24, 3:5, 3:8, 3:10, 3:13, 3:15,

3:20, 5:1, 5:4, 5:7, 5:18, 6:5, 6:15, 6:23, 7:1, 7:22, 9:2, 9:15, 9:21, 10:22, 10:24, 11:12, 11:16, 11:20, 13:12, 13:13, 13:15, 13:22, 14:11, 15:3, 15:25, 17:5, 18:5, 18:21, 19:12, 19:20, 21:7, 22:1, 22:3, 22:13, 23:2, 23:14, 25:4, 25:10, 25:16, 25:19, 26:2, 27:24, 28:17, 28:22, 29:6, 29:12, 29:15, 30:24, 31:12, 31:22, 32:13, 32:21, 33:11, 33:15, 33:21, 34:19, 35:13, 36:6, 36:17, 36:19, 36:21, 37:2, 37:8, 37:17, 38:15, 38:23, 40:19, 41:3, 41:23, 42:1, 42:8, 42:12, 43:15, 43:25, 44:7, 44:18, 45:8, 45:11, 45:19, 46:4, 47:9, 47:20, 48:12, 48:16, 49:5, 49:10, 49:14, 49:22, 50:18, 50:20, 51:4, 51:11, 52:2, 52:13, 53:9, 53:14, 53:17, 54:4, 54:13, 54:17, 54:22, 54:25, 55:3, 55:13, 55:23, 56:7, 56:22, 57:2, 57:5, 57:13, 57:20, 57:23, 57:25, 58:4, 58:6, 58:25, 59:18, 59:24, 60:3, 60:18, 60:23, 60:25, 61:13, 61:18, 62:21, 62:23, 63:11, 63:15, 63:22, 64:1, 65:2, 65:4, 65:7, 65:9, 70:7, 71:11, 105:8, 105:16, 105:19, 106:5, 106:12, 106:15, 107:7, 107:10, 107:24, 108:3, 108:13, 108:19, 109:1, 109:22, 110:7, 110:12, 110:15, 110:17, 110:19
**court** [11] - 5:20, 8:25, 17:11, 25:13, 34:10, 34:16, 58:24, 64:20, 101:17, 102:6, 108:3
**Court** [45] - 1:23, 1:23, 5:9, 5:11, 8:23, 15:18, 28:10, 29:5,

29:8, 38:4, 38:5, 47:16, 48:4, 48:6, 55:19, 58:12, 59:12, 59:21, 59:23, 62:25, 63:15, 67:16, 67:18, 67:20, 72:1, 72:5, 74:12, 74:18, 77:10, 77:16, 79:6, 79:10, 80:15, 86:21, 86:24, 90:12, 90:16, 91:3, 91:24, 95:4, 103:1, 104:2, 106:2, 109:9, 111:14
**Court's** [2] - 58:16, 82:24
**courthouse** [3] - 4:7, 4:20, 36:15
**courthouses** [3] - 25:7, 25:12, 25:22
**courtroom** [1] - 63:6
**COURTROOM** [1] - 2:2
**courts** [10] - 12:22, 13:8, 26:23, 35:5, 35:7, 70:5, 70:6, 82:24, 96:4, 100:9
**cover** [1] - 17:6
**covered** [1] - 109:24
**covers** [1] - 106:21
**COVID** [1] - 55:19
**Covington** [1] - 7:3
**cozy** [1] - 68:22
**credibly** [1] - 91:13
**Credit** [1] - 86:10
**crime** [3] - 44:14, 44:16, 44:17
**Criminal** [5] - 23:5, 38:16, 39:6, 68:12, 92:11
**criminal** [14] - 38:17, 57:21, 57:25, 90:1, 90:10, 91:23, 91:25, 92:1, 92:16, 92:17, 92:19, 93:6, 93:8, 98:10
**criteria** [1] - 70:10
**critical** [2] - 67:7, 92:1
**crosses** [1] - 43:16
**crowd** [1] - 3:17
**crux** [1] - 42:7
**crystal** [1] - 19:24
**Cuomo** [1] - 95:8
**curious** [2] - 45:12, 64:24
**Currency** [1] - 27:7
**current** [5] - 40:11, 42:3, 76:24, 79:19, 80:13
**cut** [1] - 106:12

**D**

**D.C** [23] - 1:6, 1:15, 1:21, 34:8, 35:6, 55:8, 71:23, 72:11, 72:21, 72:24, 73:11, 74:1, 74:4, 74:6, 83:16, 83:21, 84:12, 87:21, 94:17, 94:21, 97:5, 99:10, 101:23
**D.D.C** [8] - 72:8, 72:9, 75:9, 95:10, 96:24, 99:3, 100:6, 101:1
**dad** [1] - 71:4
**damage** [2] - 25:2, 25:24
**damaged** [1] - 100:22
**damages** [5] - 26:12, 26:17, 26:18, 26:19, 100:7
**damaging** [1] - 17:1
**damper** [1] - 55:10
**Dane** [2] - 2:9, 4:21
**DANE** [1] - 1:11
**dangerous** [7] - 20:7, 49:1, 50:16, 62:3, 81:5, 96:1, 100:18
**dated** [1] - 71:17
**Dated** [1] - 111:13
**Davila** [2] - 1:23, 111:14
**DAVILA** [1] - 111:3
**days** [2] - 10:11, 100:3
**dbutswinkas@wc.**
**com** [1] - 1:16
**deal** [2] - 47:18, 107:11
**dealt** [1] - 107:13
**death** [1] - 71:6
**debatable** [1] - 33:3
**debate** [5] - 32:15, 32:21, 65:18, 69:3, 79:8
**decade** [2] - 34:4, 35:20
**decide** [6] - 9:5, 14:20, 41:16, 58:23, 63:16, 71:24
**decision** [1] - 88:3
**decisions** [3] - 19:4, 41:13, 41:14
**declaration** [13] - 7:20, 9:3, 22:2, 23:4, 24:23, 26:3, 28:14, 38:15, 39:8, 40:2, 42:2, 93:16, 96:6
**Declaration** [7] - 39:5, 82:11, 90:25, 92:14, 96:14, 98:4, 99:15
**declarations** [2] -

93:12, 95:17
**declining** [1] - 38:16
**deemed** [4] - 7:17, 47:8, 89:11, 103:9
**deems** [1] - 48:4
**deeper** [1] - 74:17
**defect** [1] - 42:7
**defects** [1] - 36:9
**defend** [1] - 48:8
**defendant** [3] - 57:21, 92:25, 106:25
**defendant's** [3] - 90:1, 90:3, 91:25
**defendants** [11] - 92:19, 93:6, 100:9, 107:1, 107:2, 107:7, 107:18, 108:7, 109:5, 109:12, 109:25
**Defendants** [1] - 1:6
**defense** [4] - 12:22, 48:24, 58:8, 92:16
**DEFENSE** [1] - 1:17
**Defense** [2] - 100:6, 100:16
**defensible** [1] - 62:9
**deferred** [1] - 58:4
**defined** [1] - 88:14
**definition** [1] - 45:2
**defy** [1] - 58:15
**delegated** [3] - 39:16, 63:9
**deliberate** [2] - 8:11, 8:14
**demands** [1] - 103:14
**democracy** [2] - 5:13, 96:19
**Democratic** [1] - 70:17
**democratic** [1] - 67:23
**democratically** [1] - 75:17
**demonstrate** [1] - 6:13
**demonstrated** [1] - 88:5
**demonstrates** [1] - 94:5
**demoting** [1] - 77:18
**demotion** [1] - 77:20
**denied** [1] - 73:23
**department** [2] - 11:9, 39:12
**Department** [19] - 2:3, 23:5, 27:7, 27:9, 27:10, 27:11, 37:11, 38:21, 39:14, 54:1, 54:2, 54:18, 55:6, 55:13, 68:12, 73:24, 100:6, 100:16, 101:22
**DEPARTMENT** [1] -

1:5
**departmental** [1] - 23:12
**departments** [3] - 8:10, 9:18, 19:9
**deprivation** [2] - 84:7, 87:17
**deprived** [3] - 83:8, 85:15, 88:1
**deprives** [5] - 11:23, 13:4, 86:2, 86:14, 98:19
**DEPUTY** [1] - 2:2
**derive** [1] - 86:7
**derogatory** [1] - 7:14
**described** [2] - 23:13, 81:5
**describes** [2] - 7:13, 82:11, 85:10
**describing** [2] - 86:12, 87:12
**designated** [3] - 17:13, 46:18, 46:22
**designation** [3] - 46:25, 87:6, 87:9
**desk** [1] - 7:10
**despite** [2] - 68:5, 98:23
**destinies** [1] - 104:21
**destroying** [1] - 84:10
**detail** [3] - 4:14, 26:4, 31:6
**determination** [1] - 35:12
**determine** [6] - 6:18, 47:17, 50:22, 57:16, 58:24, 86:21
**determined** [1] - 106:19
**detriment** [1] - 96:20
**developed** [1] - 84:1
**Development** [1] - 73:25
**developments** [1] - 96:9
**devoid** [1] - 87:13
**devoted** [1] - 62:25
**difference** [3] - 32:25, 61:24, 69:23
**differences** [1] - 32:16
**different** [20] - 14:16, 15:21, 18:23, 29:20, 30:4, 38:25, 39:1, 53:22, 53:23, 54:2, 58:22, 63:3, 65:14, 68:24, 68:25, 69:21, 88:7, 88:8, 98:12
**differently** [1] - 61:23
**difficult** [1] - 18:15
**difficulties** [1] - 15:10

**difficulty** [1] - 24:16
**dig** [2] - 11:25, 33:22
**Diocese** [1] - 95:7
**direct** [4] - 12:3, 13:17, 31:8, 34:8
**directed** [6] - 11:10, 107:1, 107:18, 108:7, 109:5, 109:25
**directing** [5] - 11:21, 15:19, 56:20, 62:11, 62:12
**direction** [3] - 9:19, 79:8, 99:21
**directions** [3] - 107:20, 108:9, 109:14
**directly** [6] - 10:19, 42:3, 86:6, 94:2, 94:4, 109:18
**director** [3] - 22:7, 23:1, 81:17
**directs** [3] - 9:24, 109:8, 109:21
**disagree** [2] - 33:1, 45:23
**disassembled** [1] - 111:9
**disbar** [1] - 12:2
**disbarment** [2] - 12:3, 12:4
**discharge** [1] - 77:12
**disciplinary** [1] - 16:22
**disclose** [8] - 10:2, 10:6, 97:25, 98:25, 107:22, 108:11, 109:15, 110:8
**disclosure** [3] - 86:15, 99:1, 109:8
**discretion** [1] - 57:16
**discriminate** [1] - 61:25
**discrimination** [12] - 60:5, 61:3, 61:21, 66:24, 67:22, 75:1, 78:21, 78:25, 79:1, 82:20, 82:24, 83:3
**discriminatorily** [1] - 85:13
**discuss** [1] - 85:2
**discussed** [3] - 94:22, 97:8, 105:12
**discusses** [1] - 39:5
**discussion** [1] - 89:3
**disfavored** [2] - 68:1, 102:17
**disfavors** [3] - 79:13, 79:20, 80:16
**dishonest** [5] - 20:7, 49:1, 50:16, 81:5,

100:18
**dishonestly** [1] - 85:12
**dislike** [1] - 77:6
**disliked** [1] - 103:6
**dislikes** [5] - 77:1, 77:2, 77:4, 103:21, 103:23
**disloyal** [1] - 89:12
**dismissed** [2] - 50:1, 101:17
**disposition** [1] - 58:2
**dispute** [3] - 8:25, 18:11
**disputed** [1] - 7:24
**disqualifying** [1] - 60:16
**disregard** [2] - 9:11, 110:2
**distanced** [1] - 95:20
**DISTRICT** [3] - 1:1, 1:1, 1:8
**district** [1] - 5:20
**District** [9] - 1:20, 49:25, 72:22, 74:5, 83:15, 84:12, 96:23, 101:18, 101:19
**Diversity** [1] - 67:17
**Division** [5] - 23:5, 38:16, 39:6, 68:13, 92:11
**docket** [1] - 5:9
**docketed** [1] - 4:2
**docketing** [1] - 81:4
**doctrine** [1] - 15:24
**Doe** [2] - 44:20, 44:22
**DOJ** [8] - 3:5, 25:12, 27:10, 38:16, 48:15, 51:13, 54:13, 92:11
**DOJ-component** [1] - 25:12
**dollars** [2] - 100:3, 101:21
**done** [4] - 59:10, 69:25, 95:14, 104:1
**donors** [3] - 31:14, 75:16, 79:24
**door** [3] - 51:8, 51:21, 52:1
**doors** [1] - 25:11
**dossier** [3] - 32:6, 32:7, 32:11
**doubt** [2] - 39:7, 51:25
**Doug** [3] - 3:4, 3:12, 3:13
**DOUGLAS** [1] - 1:19
**down** [5] - 25:1, 33:22, 38:14, 46:7, 103:24
**draw** [1] - 47:21
**Dreier** [4] - 3:4, 3:13,

3:17, 54:25
**DREIER** [2] - 1:19, 55:2
**drive** [1] - 12:1
**driven** [1] - 8:22
**Drug** [1] - 95:9
**Drysdale** [2] - 90:18, 91:8
**due** [39] - 11:6, 11:19, 13:4, 13:7, 13:19, 14:2, 14:7, 14:19, 14:23, 15:3, 15:22, 17:6, 18:10, 34:10, 37:20, 45:3, 46:20, 69:11, 74:20, 79:22, 83:5, 83:7, 83:9, 85:9, 86:20, 86:22, 86:25, 87:13, 87:19, 87:22, 88:1, 88:6, 89:20, 93:15, 97:3, 97:4, 97:7, 97:21, 100:8
**Due** [4] - 13:10, 16:16, 17:20, 18:6
**dunk** [1] - 69:15
**Durham** [1] - 32:10
**during** [4] - 20:3, 55:19, 66:21, 101:12
**duties** [2] - 93:5, 99:19

**E**

**easily** [1] - 100:14
**easy** [2] - 36:23, 107:11
**echoed** [1] - 67:18
**economic** [9] - 26:12, 26:17, 26:18, 27:22, 69:3, 99:6, 100:10
**edges** [1] - 6:17
**Education** [1] - 54:3
**effect** [4] - 83:19, 87:16, 96:17, 103:10
**effective** [8] - 15:9, 16:18, 90:1, 91:18, 91:22, 92:21, 93:10, 93:15
**effectively** [2] - 16:22, 93:23
**effects** [3] - 5:15, 39:2, 85:14
**effectuate** [1] - 48:11
**effort** [2] - 76:9, 96:1
**egregious** [1] - 79:1
**either** [5] - 4:7, 10:19, 83:17, 89:18, 93:9
**Eldridge** [1] - 87:2
**election** [12] - 20:8, 31:14, 31:23, 66:22,

75:17, 75:20, 75:23, 76:22, 79:25, 80:2, 101:13
**Elizabeth** [2] - 1:23, 111:14
**ELIZABETH** [1] - 111:3
**eloquent** [1] - 71:14
**Elrod** [1] - 95:11
**elsewhere** [2] - 42:14, 100:21
**email** [2] - 39:11, 55:21
**embarrassment** [1] - 81:7
**emergency** [1] - 94:20
**emergent** [1] - 70:14
**eminently** [1] - 62:9
**Empires** [1] - 86:10
**employee** [2] - 22:10, 77:11
**employees** [39] - 21:12, 21:17, 21:19, 22:5, 22:15, 23:17, 24:3, 25:13, 25:14, 52:15, 54:5, 54:18, 55:25, 56:2, 59:17, 76:24, 77:19, 80:11, 81:9, 81:15, 82:2, 82:3, 82:4, 82:13, 84:4, 88:9, 88:11, 88:20, 88:25, 89:6, 91:20, 91:21, 92:7, 92:9, 97:24, 98:13, 110:1
**employer** [1] - 77:17
**enacted** [1] - 75:17
**enactment** [1] - 88:13
**encounter** [1] - 88:12
**encourage** [1] - 104:18
**encourages** [1] - 70:23
**end** [6] - 6:16, 6:24, 14:12, 14:14, 23:25, 27:20
**endanger** [1] - 50:25
**endowed** [1] - 66:11
**ends** [1] - 67:9
**enemies** [2] - 67:2, 96:14
**enforcement** [5] - 9:12, 10:17, 51:21, 71:16, 73:14
**enforcing** [1] - 104:3
**engage** [12] - 27:13, 55:8, 60:11, 60:14, 66:12, 77:13, 78:2, 78:6, 86:1, 92:6, 93:7, 99:16

**engaged** [2] - 62:3, 75:4
**engagement** [4] - 57:16, 58:9, 82:9, 85:1
**engagements** [2] - 56:23, 56:24
**engaging** [19] - 8:15, 21:18, 27:6, 56:1, 56:3, 56:8, 56:9, 56:11, 56:15, 56:18, 82:4, 84:3, 88:20, 88:22, 91:21, 92:8, 92:20, 97:24, 98:9
**England** [1] - 72:10
**enjoin** [1] - 71:16
**enjoined** [4] - 8:1, 43:4, 95:24, 100:9
**enjoining** [2] - 73:14, 104:2
**enjoys** [1] - 47:16
**enormous** [4] - 14:5, 50:7, 50:8, 83:23
**ensure** [3] - 21:19, 56:15, 56:25
**enter** [6] - 14:5, 59:17, 86:1, 86:18, 104:20, 104:23
**entered** [2] - 26:19, 59:16
**entering** [4] - 23:17, 55:19, 56:10, 84:2
**enterprise** [1] - 27:21
**entire** [4] - 20:20, 81:2, 95:24, 103:12
**entirely** [1] - 85:1
**entirety** [1] - 101:17
**entities** [4] - 10:6, 10:12, 14:20, 84:17
**entitled** [5] - 73:13, 83:25, 103:19, 103:20, 103:21
**entity** [7] - 46:12, 89:11, 90:11, 98:14, 107:21, 108:10, 109:14
**entry** [1] - 28:18
**EO** [1] - 86:2
**EPA** [1] - 94:16
**equal** [4] - 15:23, 34:12, 51:9, 69:13
**equitable** [2] - 94:15, 100:5
**equities** [3] - 73:4, 73:9, 101:3
**era** [1] - 26:20
**ergo** [1] - 68:8
**errors** [1] - 29:4
**especially** [1] - 18:15
**essence** [2] - 8:7, 64:5

**essentially** [3] - 8:17, 16:12, 44:13
**establish** [4] - 9:7, 69:19, 87:10, 94:12
**established** [3] - 67:13, 80:14, 100:12
**establishing** [1] - 32:23
**et** [3] - 1:5, 2:4, 16:4
**ethics** [2] - 93:13, 102:4
**event** [1] - 70:22
**evidence** [3] - 40:16, 43:6, 87:8
**evil** [1] - 67:4
**evinced** [1] - 89:4
**eviscerates** [1] - 71:7
**exact** [1] - 37:13
**exactly** [18] - 19:9, 19:23, 22:20, 23:14, 40:1, 51:9, 57:4, 59:14, 62:19, 64:13, 66:14, 68:5, 71:2, 77:22, 78:4, 79:16, 88:21, 89:3
**exaggerate** [1] - 27:19
**examined** [1] - 94:25
**example** [10] - 8:13, 9:2, 26:22, 49:18, 52:14, 54:3, 73:23, 88:16, 95:16, 98:5
**except** [1] - 64:9
**exception** [1] - 22:23
**exchanges** [1] - 16:20
**excluding** [1] - 45:25
**exclusion** [1] - 83:18
**exclusively** [1] - 98:8
**Executive** [22] - 4:1, 7:12, 64:9, 71:17, 73:15, 73:18, 74:24, 75:12, 76:2, 79:15, 83:23, 86:22, 88:4, 89:10, 90:6, 91:13, 93:4, 93:18, 94:23, 99:11, 101:11, 110:9
**executive** [109] - 4:4, 4:10, 4:17, 4:24, 5:12, 5:24, 7:5, 7:8, 9:24, 11:14, 12:15, 12:20, 15:16, 15:18, 17:7, 17:16, 17:21, 18:4, 19:5, 19:22, 19:25, 20:4, 20:5, 20:22, 20:24, 25:6, 25:14, 29:19, 29:20, 29:21, 29:23, 30:5, 30:9, 30:13, 31:1, 34:1, 34:5, 35:10, 38:18, 42:5, 44:1, 45:5, 45:11, 45:21,

46:11, 48:18, 48:20, 49:1, 50:6, 50:10, 50:12, 54:15, 54:19, 55:6, 55:9, 56:11, 59:2, 61:15, 63:8, 64:10, 64:15, 64:21, 65:13, 65:15, 65:22, 65:25, 66:11, 66:17, 67:9, 71:7, 74:9, 74:25, 75:14, 75:21, 76:11, 76:12, 77:5, 77:22, 78:16, 78:20, 79:21, 79:22, 80:9, 80:23, 82:14, 83:12, 84:18, 90:23, 91:19, 92:5, 93:16, 95:25, 96:11, 96:16, 97:8, 99:20, 100:17, 101:20, 102:2, 102:12, 103:10, 104:4, 104:8, 105:7, 106:18, 109:18, 110:2, 110:4
**exercise** [5] - 46:16, 48:2, 64:12, 91:15, 103:23
**existed** [1] - 46:3
**existence** [5] - 12:11, 16:25, 40:8, 40:13, 99:8
**existential** [1] - 99:17
**existing** [2] - 26:18, 27:17
**expand** [1] - 107:2
**expansion** [1] - 106:1
**expect** [1] - 88:12
**expediently** [1] - 5:9
**expedited** [3] - 6:20, 104:14, 104:17
**expedition** [1] - 28:5
**expeditious** [1] - 95:1
**expeditiously** [3] - 28:2, 37:14, 51:14
**experience** [1] - 42:17
**experiences** [1] - 60:17
**experiencing** [1] - 40:24
**expert** [1] - 15:11
**explain** [6] - 17:16, 25:23, 26:7, 39:3, 76:3, 80:5
**explained** [2] - 24:12, 86:24
**explaining** [1] - 100:7
**explains** [1] - 88:16
**explicit** [3] - 75:24, 76:4, 80:5
**explore** [2] - 19:16, 46:4

**Express** [1] - 86:12
**expressed** [1] - 78:4
**expressly** [1] - 93:19
**extends** [2] - 75:7, 103:4
**extensive** [3] - 27:8, 31:16, 41:4
**extent** [8] - 18:22, 29:13, 56:25, 101:11, 101:20, 106:1, 106:25, 107:1
**extra** [3] - 13:3, 81:10, 81:16
**extraordinary** [2] - 26:10, 46:15
**extreme** [1] - 96:1

# F

**F.2d** [2] - 72:24, 99:9
**F.3d** [11] - 71:22, 72:11, 73:11, 73:25, 74:4, 83:15, 83:21, 85:17, 86:10, 87:21, 94:16
**F.4th** [3] - 72:21, 74:5, 94:21
**F.Supp** [1] - 101:1
**F.Supp.2d** [1] - 96:23
**F.Supp.3d** [5] - 72:9, 75:9, 95:10, 99:3, 101:18
**face** [4] - 15:18, 33:11, 75:13, 81:10
**faces** [1] - 81:7
**facets** [1] - 72:1
**facing** [1] - 40:23
**fact** [23] - 20:25, 24:12, 39:18, 41:13, 52:11, 53:7, 58:18, 58:19, 58:22, 59:21, 61:5, 62:9, 69:19, 75:4, 76:2, 76:4, 76:5, 80:4, 82:16, 82:17, 90:14, 90:23, 98:25
**factfinder** [1] - 97:11
**factor** [5] - 73:19, 73:21, 74:10, 94:8, 101:2
**factors** [6] - 42:9, 71:21, 73:9, 73:13, 74:3, 91:4
**facts** [4] - 14:1, 33:9, 61:1, 72:3
**factual** [5] - 8:7, 8:24, 17:25, 18:11, 29:3
**factually** [1] - 32:10
**fair** [3] - 96:20, 97:11, 97:12

**fairly** [3] - 30:10, 31:16, 34:2
**fairness** [1] - 87:13
**fall** [1] - 76:25
**fallacy** [1] - 68:8
**false** [3] - 32:5, 32:9, 49:19
**familiar** [4] - 4:9, 46:17, 48:15, 55:7, 63:4, 63:18
**far** [5] - 52:22, 55:16, 59:1, 64:8, 89:3
**Fascist** [2] - 65:23, 87:4
**fashioned** [1] - 64:8
**fast** [1] - 108:5
**father** [1] - 71:3
**favor** [3] - 91:1, 91:10, 101:3
**favored** [1] - 67:6
**favors** [2] - 73:4, 102:10
**FBI** [1] - 27:13
**FCRR** [3] - 1:23, 111:3, 111:14
**FDA** [1] - 27:10
**FDIC** [1] - 27:6
**fear** [3] - 38:18, 85:3, 102:15
**fearful** [2] - 77:20, 96:13
**federal** [78] - 3:10, 7:18, 9:25, 10:5, 10:7, 10:10, 11:21, 12:22, 17:19, 21:8, 21:10, 21:11, 21:16, 21:21, 21:22, 22:16, 23:18, 24:2, 25:7, 25:12, 26:23, 26:24, 29:24, 29:25, 37:3, 38:24, 43:13, 46:14, 51:17, 51:22, 52:17, 53:10, 55:20, 60:15, 61:4, 62:2, 62:17, 75:25, 76:7, 79:18, 81:8, 81:11, 81:14, 82:1, 84:2, 84:4, 84:5, 84:6, 84:15, 84:16, 85:1, 85:24, 86:1, 86:18, 86:19, 88:24, 89:7, 89:19, 92:10, 97:17, 97:23, 97:24, 97:25, 98:3, 98:9, 98:12, 99:14, 99:17, 102:13, 103:24, 106:17, 107:19, 108:8, 109:6, 109:13
**Federal** [4] - 4:3, 27:7, 38:5

9

**FedEx** [1] - 59:18
**fees** [1] - 90:24
**FERC** [1] - 99:9
**few** [1] - 63:2
**Fifth** [11] - 34:10, 51:8, 69:11, 87:14, 89:20, 94:24, 97:3, 97:4, 97:6, 97:20, 102:4
**fight** [3] - 38:9, 38:11, 71:6
**figure** [1] - 11:2
**file** [1] - 29:2
**filed** [4] - 4:1, 49:24, 74:14, 76:6
**filing** [1] - 80:7
**final** [2] - 73:9, 101:2
**finally** [3] - 86:2, 89:23, 102:10
**financial** [2] - 99:7, 100:13
**findings** [9] - 8:7, 8:18, 8:24, 9:3, 9:19, 11:9, 17:25, 18:11, 87:25
**fired** [1] - 38:19
**firing** [1] - 77:11
**firm** [73] - 4:11, 4:25, 5:3, 5:6, 5:14, 5:17, 7:3, 7:14, 7:16, 7:23, 8:15, 8:18, 12:11, 12:15, 12:24, 12:25, 14:21, 15:21, 16:6, 16:14, 18:2, 20:1, 20:23, 21:5, 24:24, 25:2, 25:25, 27:16, 27:18, 27:20, 34:3, 34:6, 40:6, 40:8, 40:22, 41:14, 43:12, 48:13, 49:2, 49:8, 50:9, 54:5, 64:21, 68:20, 69:6, 70:4, 71:2, 76:24, 77:3, 77:5, 80:11, 81:2, 81:21, 82:7, 82:10, 83:4, 83:14, 85:12, 88:10, 88:19, 90:22, 93:7, 93:20, 93:21, 98:1, 99:19, 100:4, 101:14, 107:23, 108:12, 109:16
**firm's** [21] - 35:23, 40:13, 40:15, 76:20, 76:23, 77:2, 77:7, 81:3, 83:24, 85:14, 85:25, 86:4, 86:17, 90:10, 93:5, 93:7, 93:21, 98:7, 99:16, 100:19
**firms** [11] - 6:2, 6:6, 16:6, 20:7, 26:20,

42:17, 42:19, 43:6, 78:5, 95:25, 96:12
**First** [40] - 34:11, 35:13, 35:14, 35:25, 51:8, 60:4, 60:8, 60:9, 60:13, 62:7, 66:16, 66:18, 67:5, 67:7, 67:15, 67:20, 67:23, 69:10, 74:19, 74:23, 75:2, 76:25, 77:8, 78:10, 78:17, 78:23, 80:20, 83:1, 83:2, 85:16, 85:18, 85:20, 85:22, 94:24, 95:4, 95:5, 95:12, 95:16, 96:21, 97:1
**first** [27] - 2:7, 7:11, 21:2, 23:24, 29:22, 31:10, 32:4, 39:4, 41:9, 43:22, 49:18, 55:12, 55:15, 56:14, 67:12, 69:4, 70:7, 70:12, 73:19, 74:10, 80:24, 83:13, 90:13, 91:9, 91:17, 99:13, 109:11
**firsthand** [1] - 41:15
**fit** [1] - 46:25
**five** [1] - 4:16
**flagging** [1] - 110:5
**Florida** [2] - 50:1, 101:19
**flow** [1] - 35:11
**flowed** [1] - 95:15
**flowing** [1] - 35:3
**flows** [1] - 34:25
**focus** [1] - 74:14
**focusing** [1] - 40:5
**follow** [3] - 23:7, 71:14, 83:14
**following** [1] - 66:6
**Food** [1] - 95:9
**FOR** [3] - 1:1, 1:10, 1:17
**forbidden** [1] - 66:4
**force** [2] - 96:17, 103:24
**forces** [1] - 64:7
**foreclosed** [1] - 83:17
**foregoing** [1] - 111:4
**Foreign** [2] - 87:20, 87:23
**foreign** [1] - 87:22
**foreign-owned** [1] - 87:22
**foreigner** [1] - 46:21
**forget** [2] - 50:3
**form** [3] - 30:9, 79:1, 86:3
**formal** [2] - 83:18,

89:12
**former** [4] - 76:24, 96:7, 96:8, 101:12
**forth** [1] - 84:6
**forum** [1] - 82:23
**forward** [8] - 2:5, 6:19, 16:24, 35:1, 58:20, 58:21, 84:25, 110:20
**forward-looking** [1] - 16:24
**foundation** [1] - 64:14
**foundational** [1] - 36:9
**foundations** [1] - 102:18
**founders** [1] - 65:12
**founding** [1] - 45:20
**four** [3] - 9:25, 73:4, 101:22
**framing** [1] - 99:22
**Frankfurter** [1] - 87:6
**frankly** [1] - 15:23
**fraud** [1] - 39:5
**free** [4] - 36:2, 64:5, 67:21, 67:22
**freedom** [1] - 85:21
**freedoms** [2] - 95:5, 95:12
**Friday** [1] - 28:4
**friend** [2] - 28:16, 40:7
**frighten** [1] - 40:12
**front** [4] - 3:21, 24:21, 24:24, 25:11
**fronts** [2] - 74:23, 94:19
**Frye** [2] - 92:2, 92:18
**fulfill** [1] - 64:8
**fulfilled** [1] - 103:7
**Full** [1] - 72:10
**full** [5] - 55:5, 56:18, 72:17, 88:18, 111:5
**fulsome** [2] - 28:19, 29:9
**function** [1] - 8:9
**fundamental** [5] - 61:24, 86:25, 87:13, 102:23, 103:4
**fundamentally** [13] - 33:2, 35:4, 35:11, 36:11, 36:25, 37:22, 43:3, 47:5, 59:11, 61:4, 61:23, 62:5, 107:4
**funding** [1] - 20:14
**funds** [1] - 7:18
**furthermore** [2] - 98:21, 101:14
**Fusion** [5] - 31:11, 32:5, 33:23, 49:19, 50:3

**G**

**gallery** [1] - 3:20
**games** [1] - 29:7
**Garland** [2] - 34:9, 51:7
**Gas** [1] - 99:9
**gee** [1] - 21:5
**general** [3] - 5:6, 75:2, 75:22
**General** [5] - 25:10, 39:15, 66:8, 87:7, 87:12
**generally** [3] - 26:5, 87:19, 98:23
**generate** [1] - 99:19
**generic** [1] - 62:7
**George** [1] - 75:16
**ghosts** [5] - 36:13, 38:10, 38:11, 68:3, 68:19
**given** [11] - 14:3, 18:8, 18:16, 28:3, 28:24, 50:9, 74:12, 85:2, 86:23, 88:2, 92:15
**glad** [1] - 41:7
**Glass** [1] - 86:10
**Global** [1] - 75:8
**glove** [1] - 24:13
**goals** [1] - 11:4
**Gonzalez** [2] - 93:1, 94:1
**Gonzalez-Lopez** [2] - 93:1, 94:1
**goodwill** [2] - 100:14, 100:23
**Gordon** [1] - 71:22
**Gospel** [1] - 72:10
**governed** [1] - 64:6
**Government** [1] - 64:5
**government** [130] - 2:25, 8:1, 8:4, 9:25, 10:1, 10:2, 10:4, 11:22, 12:1, 12:14, 12:24, 13:6, 13:16, 13:17, 13:23, 14:16, 14:22, 16:7, 16:13, 16:20, 16:21, 17:13, 19:16, 21:12, 21:17, 23:15, 24:2, 26:25, 27:16, 27:25, 28:1, 28:3, 28:7, 35:15, 36:1, 38:7, 40:25, 43:14, 43:21, 45:12, 46:13, 47:16, 47:25, 50:25, 51:17, 52:17, 55:25, 57:6, 57:14, 58:8, 60:15, 61:4, 61:9, 61:24, 62:2, 63:25, 64:3, 64:7,

65:14, 67:24, 69:7, 69:22, 73:8, 75:3, 77:11, 77:25, 78:21, 79:2, 79:11, 79:13, 79:16, 79:19, 80:15, 80:16, 80:22, 81:9, 81:11, 81:21, 81:24, 82:1, 82:3, 82:7, 82:9, 82:12, 82:21, 85:1, 85:17, 85:19, 85:23, 86:16, 86:18, 88:6, 88:12, 88:20, 88:21, 88:24, 89:7, 89:19, 91:20, 91:25, 92:7, 92:10, 92:17, 92:20, 94:2, 94:3, 95:18, 97:1, 98:9, 98:11, 98:13, 98:22, 99:14, 99:17, 99:24, 99:25, 101:8, 101:22, 102:1, 102:2, 102:13, 103:24, 105:20, 107:13, 107:19, 108:8, 108:24, 109:6, 109:13, 109:20
**government's** [2] - 47:23, 93:11
**government-related** [1] - 99:25
**governmental** [2] - 66:2, 102:8
**governments** [1] - 66:5
**GPS** [5] - 31:11, 32:5, 33:23, 49:19, 50:3
**grant** [1] - 27:2
**granted** [1] - 72:25
**gravamen** [1] - 8:6
**Grayned** [1] - 88:14
**great** [5] - 16:11, 26:4, 28:20, 32:2, 94:13
**Greater** [1] - 73:23
**green** [1] - 60:18
**grievance** [1] - 101:15
**grievances** [1] - 85:23
**ground** [1] - 101:15
**grounds** [1] - 34:15
**group** [5] - 26:25, 27:12, 48:11, 69:13, 69:14
**groups** [2] - 99:13, 103:13
**growing** [1] - 95:18
**GSA** [2] - 25:8, 25:9
**guarantee** [1] - 93:25
**guess** [4] - 16:12, 51:14, 52:4, 70:9
**guessing** [1] - 59:22

**guidance** [41] - 9:11, 18:24, 19:3, 21:11, 21:17, 23:3, 23:8, 23:11, 23:18, 23:19, 24:1, 25:6, 37:3, 37:4, 37:6, 37:9, 37:10, 37:12, 37:16, 37:24, 40:24, 51:13, 51:14, 51:16, 51:18, 51:24, 52:14, 52:17, 53:22, 54:8, 54:11, 54:15, 55:4, 55:25, 57:8, 59:8, 84:1, 99:21, 99:23, 109:25
**guide** [1] - 8:10

## H

**half** [3] - 40:20, 105:14, 106:11
**Half** [1] - 99:2
**halted** [1] - 5:16
**hammer** [1] - 58:19
**hand** [1] - 24:13
**handled** [1] - 55:21
**Hanson** [1] - 74:4
**happy** [3] - 31:5, 38:8
**hard** [4] - 38:13, 51:13, 54:14, 84:24
**hardly** [1] - 25:23
**harm** [42] - 6:9, 12:6, 12:9, 12:13, 14:7, 17:2, 28:15, 38:1, 40:6, 41:3, 52:8, 58:24, 59:1, 59:10, 59:13, 69:3, 69:17, 73:3, 77:17, 81:4, 84:13, 85:2, 90:24, 94:9, 94:11, 94:19, 95:3, 95:15, 95:22, 95:23, 97:5, 97:20, 98:1, 99:7, 99:12, 100:11, 100:13, 100:24, 102:3
**harmed** [1] - 98:19
**harmful** [1] - 67:22
**harms** [8] - 26:2, 26:5, 26:7, 26:9, 28:14, 69:8, 96:25, 99:6
**head** [12] - 22:6, 22:23, 23:11, 53:4, 53:9, 53:17, 54:12, 56:21, 77:8, 81:17, 89:8
**head-on** [1] - 77:8
**heads** [11] - 10:4, 10:7, 19:4, 21:10, 21:16, 21:21, 24:1, 55:24, 62:13, 75:25, 89:15

**Health** [1] - 79:9
**hear** [6] - 20:21, 20:24, 27:25, 28:6, 103:1, 104:19
**heard** [7] - 11:19, 18:11, 28:1, 82:23, 87:1, 87:17, 97:11
**HEARING** [1] - 1:7
**hearing** [9] - 3:24, 6:12, 6:19, 50:11, 73:17, 95:1, 95:17, 104:12, 105:12
**heart** [5] - 16:12, 32:7, 62:6, 67:20
**Hearts** [2] - 89:14, 89:15
**Heffernan** [4] - 75:10, 77:14, 77:21, 78:4
**help** [3] - 77:18, 77:21, 81:12
**helping** [1] - 34:1
**Henry** [1] - 3:3
**HENRY** [1] - 1:18
**hereby** [1] - 111:3
**high** [1] - 26:16
**Hillary** [6] - 20:7, 31:13, 75:19, 75:23, 79:23, 80:7
**hire** [6] - 12:14, 22:5, 22:8, 42:21, 81:18
**hired** [2] - 10:9, 48:14
**hiring** [7] - 31:11, 32:5, 56:9, 81:15, 93:19, 93:21, 102:7
**Hirshon** [3] - 96:7, 96:14, 96:17
**history** [1] - 33:10
**hit** [2] - 7:10, 27:18
**hoc** [2] - 68:8, 68:9
**Hofstra** [1] - 93:17
**hold** [2] - 69:1, 103:21
**Holder** [1] - 71:22
**holder** [1] - 60:19
**holding** [3] - 6:7, 7:5, 85:8
**holdings** [1] - 74:6
**holds** [1] - 81:21
**home** [1] - 58:19
**Homeland** [1] - 27:10
**honest** [1] - 53:3
**Honeywell** [1] - 100:25
**honor** [1] - 85:6
**Honor** [65] - 2:2, 2:8, 2:14, 3:1, 3:14, 3:19, 4:20, 4:22, 6:22, 8:21, 10:23, 19:19, 21:24, 28:8, 28:9, 28:12, 28:24, 29:14, 30:11, 31:5, 31:21,

32:2, 32:20, 33:1, 33:20, 34:7, 36:4, 37:7, 37:16, 41:6, 42:6, 47:4, 50:17, 51:24, 53:3, 53:12, 54:16, 54:24, 57:1, 57:11, 59:25, 60:4, 60:20, 61:17, 61:19, 62:20, 62:22, 62:24, 64:17, 71:10, 105:21, 106:4, 106:10, 106:14, 106:22, 107:6, 107:14, 108:17, 108:20, 109:3, 109:11, 109:17, 110:11, 110:16, 110:18
**HONORABLE** [1] - 1:8
**hoops** [1] - 81:16
**hope** [1] - 108:23
**horror** [1] - 78:13
**hospital** [1] - 24:5
**hour** [2] - 105:14, 106:11
**House** [2] - 30:8, 80:4
**Housing** [1] - 73:24
**Houston** [1] - 75:5
**HOWELL** [1] - 1:8
**huge** [1] - 84:21
**Huisha** [2] - 72:20
**Huisha-Huisha** [1] - 72:20
**human** [1] - 84:11
**humanly** [1] - 64:8
**hundreds** [1] - 21:23
**hurdles** [1] - 81:10
**hurt** [1] - 82:6
**hypo** [1] - 52:4
**hypos** [3] - 36:14, 36:24, 52:9

## I

**idea** [2] - 18:8, 88:11
**ideas** [1] - 103:5
**identification** [3] - 31:15, 75:18, 80:1
**identified** [2] - 83:11, 90:16
**identify** [1] - 2:6
**ideology** [1] - 79:3
**IEEPA** [1] - 47:14
**ifs** [3] - 36:24, 36:25, 38:10
**II** [4] - 30:13, 45:17, 47:5, 48:2
**III** [1] - 59:11
**III's** [1] - 90:14
**imagine** [1] - 24:25

**immediate** [2] - 5:15, 6:9
**immediately** [11] - 107:18, 107:20, 108:7, 108:9, 109:5, 109:7, 109:8, 109:12, 109:13, 109:24, 109:25
**immense** [1] - 27:17
**imminence** [1] - 94:14
**immunity** [3] - 26:14, 100:4, 100:8
**impact** [4] - 44:5, 88:23, 91:7, 102:13
**impacts** [1] - 82:10
**impair** [1] - 91:14
**impairs** [1] - 86:17
**impartial** [1] - 97:11
**impatient** [1] - 5:21
**impermissible** [1] - 83:3
**impermissibly** [1] - 90:6
**impersonal** [1] - 64:7
**impinge** [1] - 30:20
**implement** [2] - 53:6, 54:14
**Implement** [1] - 86:9
**implementation** [1] - 9:12
**implemented** [3] - 17:4, 51:19, 51:21
**implements** [1] - 23:9
**implicated** [1] - 15:10
**implicates** [1] - 92:24
**implicating** [1] - 92:22
**implications** [3] - 15:22, 15:23
**important** [4] - 26:18, 58:7, 65:12, 73:21
**impose** [2] - 21:5, 89:16
**imposed** [2] - 25:24, 93:16
**improper** [2] - 9:4, 107:3
**improperly** [1] - 32:8
**imprudent** [1] - 48:5
**impugning** [1] - 93:21
**IMS** [1] - 79:9
**inadvertently** [1] - 66:11
**inappropriate** [1] - 107:3
**Inc** [5] - 79:9, 80:17, 94:16, 99:3, 100:25
**incident** [1] - 39:5
**inclined** [1] - 29:5
**include** [1] - 78:8
**included** [1] - 39:10

**includes** [4] - 24:4, 24:6, 108:21
**including** [7] - 31:15, 50:23, 50:24, 75:16, 75:18, 79:25, 91:4
**income** [1] - 99:19
**inconceivable** [1] - 16:21
**inconceivably** [1] - 22:24
**inconsistent** [11] - 19:1, 21:14, 24:11, 52:19, 52:21, 52:24, 53:1, 53:19, 53:24, 88:10, 89:2
**incorrect** [1] - 32:10
**incredibly** [2] - 17:1, 58:7
**incurred** [1] - 26:19
**indeed** [3] - 63:13, 96:11, 100:10
**independent** [4] - 27:22, 41:18, 102:20
**indicates** [1] - 43:18
**indicted** [2] - 26:23, 70:3
**indirectly** [1] - 94:3
**indisputable** [1] - 66:17
**individual** [10] - 34:15, 45:3, 46:9, 46:12, 48:2, 60:21, 64:11, 76:14, 98:14, 101:13
**individuals** [7] - 30:16, 33:7, 39:13, 46:1, 48:11, 55:17, 75:3
**indulgence** [1] - 109:2
**infamy** [1] - 85:9
**inference** [3] - 20:18, 40:14, 40:15
**infirmity** [1] - 6:9
**informal** [1] - 89:13
**information** [1] - 49:19
**informed** [2] - 102:19, 102:20
**infringed** [1] - 83:12
**infringement** [2] - 16:8, 35:25
**inherent** [2] - 63:9, 64:17
**initial** [2] - 86:4, 90:8
**injunction** [9] - 4:16, 6:12, 6:19, 26:10, 26:15, 29:1, 71:22, 72:12, 104:12
**injunctive** [5] - 9:15, 73:22, 80:21, 94:20, 97:7

**injuries** [6] - 69:19, 90:23, 99:6, 101:5, 101:7, 101:9
**injuries-in-fact** [1] - 90:23
**injury** [9] - 44:5, 44:7, 44:8, 69:9, 90:14, 94:12, 95:7, 95:13, 100:14
**injury-in-fact** [1] - 90:14
**innocent** [1] - 87:11
**inquiry** [2] - 67:9, 83:7
**instance** [4] - 39:19, 54:7, 84:21, 101:21
**instances** [1] - 82:11
**instant** [1] - 77:23
**instead** [1] - 87:9
**institution** [1] - 66:13
**instruct** [4] - 107:19, 108:8, 109:6, 109:12
**instructing** [3] - 107:21, 108:10, 109:15
**instruction** [3] - 9:18, 12:19, 91:18
**instructs** [2] - 86:5, 109:11
**insufficient** [1] - 99:7
**integrity** [4] - 85:6, 93:22, 103:11, 103:15
**Integrity** [1] - 85:17
**intended** [1] - 82:18
**intends** [1] - 93:20
**interact** [4] - 95:19, 98:3, 98:11, 99:13
**interacting** [3] - 56:13, 84:2, 98:9
**interactions** [3] - 9:20, 40:25, 84:25
**interest** [21] - 8:19, 11:3, 13:10, 18:13, 18:19, 35:17, 35:19, 49:10, 51:1, 67:14, 73:5, 80:24, 82:21, 83:8, 86:3, 86:13, 101:3, 102:1, 102:8, 102:10, 103:14
**interesting** [1] - 7:1
**interestingly** [1] - 20:11
**interests** [31] - 8:14, 8:16, 19:2, 19:15, 21:14, 21:20, 24:11, 45:25, 46:11, 52:19, 52:21, 52:25, 53:2, 53:20, 56:16, 57:2, 57:17, 58:10, 67:11, 73:10, 83:12, 85:11,

85:16, 86:7, 87:18, 89:2, 89:8, 91:8, 97:9, 97:10, 103:8
**interfere** [1] - 94:2
**interfered** [1] - 13:13
**interference** [5] - 13:6, 13:20, 15:7, 15:8, 15:9
**interferes** [2] - 16:17, 97:9
**International** [3] - 72:23, 86:8, 99:2
**interpret** [4] - 10:22, 10:24, 10:25, 11:1
**interpretation** [1] - 19:13
**interpreted** [2] - 38:20, 53:2
**intimidate** [1] - 96:2
**intimidation** [1] - 80:20
**introduce** [1] - 2:18
**introducing** [1] - 4:22
**invalid** [1] - 6:13
**invalidate** [1] - 8:9
**investigation** [4] - 57:25, 66:7, 89:12, 98:8
**investigations** [1] - 27:12
**Investment** [2] - 87:20, 87:23
**invoking** [2] - 67:24, 80:18
**involved** [5] - 32:17, 33:24, 64:22, 87:18, 99:25
**involves** [2] - 34:20, 72:9
**involving** [3] - 72:11, 77:11, 102:4
**irrelevant** [1] - 57:12
**irreparable** [5] - 5:16, 26:6, 26:7, 69:8, 69:9, 69:17, 69:20, 73:3, 94:9, 94:11, 94:19, 95:3, 95:7, 95:13, 95:15, 97:5, 97:19, 98:1, 99:2, 99:7, 99:12, 100:11, 100:13, 100:16, 100:24
**irreparably** [2] - 96:25, 98:18
**ISIS** [1] - 60:13
**isolated** [1] - 102:4
**issuance** [11] - 73:4, 74:11, 76:5, 84:18, 86:22, 94:11, 101:4, 101:10, 102:11,

102:14
**issue** [20] - 14:9, 15:6, 31:2, 31:20, 40:16, 41:9, 41:10, 43:15, 46:11, 48:19, 54:8, 63:8, 70:17, 77:22, 102:4, 104:2, 105:13, 106:22, 109:25
**issued** [21] - 4:3, 11:14, 11:17, 29:1, 29:23, 37:9, 37:11, 37:24, 45:5, 49:3, 51:16, 54:8, 55:5, 63:23, 76:3, 79:22, 80:4, 99:21, 103:14, 104:15
**issues** [10] - 7:4, 16:1, 28:13, 28:14, 29:4, 41:8, 49:20, 54:11, 82:13
**issuing** [9] - 9:11, 45:20, 45:21, 47:13, 51:14, 71:14, 76:10, 77:5, 106:6
**IT** [3] - 22:14, 23:1, 81:3
**ITC** [2] - 27:3, 27:8
**itself** [2] - 15:17, 35:24

## J

**Jackson** [2] - 63:19, 64:4
**jail** [1] - 44:19
**January** [1] - 72:8
**job** [2] - 22:16, 81:10
**John** [3] - 44:20, 44:21, 70:21
**joined** [1] - 3:3
**Joint** [2] - 65:23, 87:4
**jointly** [1] - 104:8
**judge** [1] - 5:20
**JUDGE** [1] - 1:8
**Judge** [3] - 47:21, 65:8, 104:25
**judgment** [4] - 6:20, 104:14, 104:16, 104:18
**judicial** [4] - 8:8, 70:2, 103:13, 103:15
**judicially** [1] - 75:16
**judiciary** [2] - 25:5, 102:20
**jump** [48] - 63:5, 71:22, 72:9, 72:11, 72:21, 72:24, 73:6, 73:7, 73:11, 73:25, 74:4, 74:5, 75:6, 75:9, 75:10, 77:15,

78:25, 79:9, 79:14, 80:17, 83:10, 83:16, 83:21, 85:7, 85:18, 86:11, 86:12, 87:2, 87:3, 87:5, 87:21, 88:15, 90:2, 90:5, 90:20, 92:2, 92:3, 93:2, 94:16, 94:21, 95:8, 95:10, 95:11, 96:23, 99:3, 101:1, 102:21, 103:3
**jumps** [2] - 64:4, 66:21
**juncture** [1] - 97:19, 98:18, 100:12
**jurisdiction** [1] - 59:12
**jury** [1] - 44:15
**Justice** [21] - 2:4, 3:7, 3:8, 23:6, 37:12, 38:21, 39:14, 54:2, 54:18, 55:6, 55:13, 63:19, 64:4, 65:22, 66:1, 66:9, 67:3, 67:19, 68:12, 87:5, 101:23
**justice** [6] - 92:1, 92:18, 96:20, 102:23, 102:24, 103:13
**JUSTICE** [1] - 1:5
**justification** [3] - 76:7, 76:10, 80:2
**justify** [1] - 61:14

## K

**Karem** [2] - 73:10, 97:5
**keep** [5] - 3:18, 6:16, 14:22, 107:15, 107:25
**keeps** [1] - 50:1
**key** [2] - 33:8, 61:6
**kind** [10] - 10:17, 11:19, 17:24, 18:5, 39:17, 46:25, 63:20, 78:2, 78:9, 84:24
**kinds** [1] - 84:19
**Kiyemba** [1] - 74:3

## L

**labor** [1] - 27:8
**lack** [1] - 17:6
**Lafler** [1] - 92:3
**laid** [2] - 18:14, 82:16
**landlord** [1] - 25:7
**language** [8] - 11:2, 23:25, 24:10, 66:21, 76:12, 79:15, 80:10,

92:5
**large** [4] - 6:2, 6:6, 12:21, 100:20
**largely** [2] - 13:13, 83:19
**larger** [1] - 105:9
**Larson** [1] - 5:5
**last** [7] - 10:11, 10:16, 20:19, 34:9, 72:19, 79:10, 85:21
**Law** [2] - 93:17, 96:10
**law** [84] - 4:11, 4:25, 5:3, 5:6, 5:13, 5:14, 5:17, 6:2, 6:6, 7:3, 7:14, 7:16, 8:15, 8:18, 12:5, 12:7, 12:8, 12:11, 12:14, 12:23, 12:25, 14:21, 15:21, 16:14, 18:2, 19:25, 20:7, 20:23, 21:5, 23:20, 24:24, 25:2, 25:24, 26:13, 26:20, 27:16, 27:20, 29:4, 30:20, 34:3, 35:23, 40:8, 41:14, 42:17, 42:19, 43:6, 43:12, 45:6, 48:13, 49:2, 49:8, 50:9, 59:6, 62:7, 62:9, 63:14, 64:6, 64:7, 64:12, 64:21, 64:24, 65:9, 65:16, 68:20, 69:6, 69:16, 70:4, 71:2, 72:2, 76:23, 77:2, 78:5, 81:2, 83:4, 83:24, 84:4, 85:20, 90:21, 95:25, 96:12, 103:18, 108:5
**lawful** [1] - 43:1
**laws** [8] - 20:8, 20:14, 30:2, 30:23, 31:14, 45:21, 75:17, 79:25
**Lawson** [1] - 3:3
**LAWSON** [1] - 1:18
**lawsuit** [4] - 4:15, 49:24, 54:10, 101:16
**lawsuits** [6] - 64:22, 66:23, 76:6, 76:8, 80:6, 80:7
**lawyer** [2] - 16:2, 57:21
**lawyers** [31] - 4:8, 4:12, 12:4, 15:13, 15:14, 22:11, 27:6, 27:12, 34:6, 38:17, 41:17, 52:16, 59:7, 68:10, 78:5, 81:2, 92:17, 92:19, 92:20, 95:19, 95:25, 96:18, 97:23, 98:3, 98:10,

98:21, 99:16, 102:14, 103:16, 103:25
**lawyers'** [2] - 96:12, 103:7
**lead** [1] - 40:15
**leadership** [2] - 37:12, 38:21
**leads** [1] - 95:3
**learn** [1] - 18:8
**learned** [3] - 4:13, 18:3, 87:15
**least** [9] - 38:16, 42:15, 43:10, 51:8, 74:8, 79:19, 98:12, 105:25, 109:18
**leave** [4] - 35:2, 42:4, 64:5, 64:6
**leaving** [1] - 5:25
**lectern** [1] - 2:6
**led** [1] - 92:11
**Lee** [4] - 34:9, 35:5, 35:6, 51:6
**left** [3] - 28:13, 40:21, 71:8
**Legal** [1] - 102:21
**legal** [14] - 22:13, 67:25, 68:4, 70:23, 78:12, 80:18, 84:20, 84:24, 93:13, 95:24, 96:3, 96:9, 102:18, 103:12
**legislative** [2] - 45:4, 64:10
**legislator** [1] - 44:13
**legislature** [1] - 66:6
**legitimate** [2] - 67:14, 109:19
**legitimately** [1] - 87:18
**lengthy** [1] - 29:22
**less** [1] - 74:16
**letter** [1] - 55:21
**level** [1] - 57:16
**levels** [1] - 69:21
**liberal** [1] - 70:17
**liberty** [2] - 85:15, 97:9
**life** [2] - 5:16, 27:19
**life-threatening** [2] - 5:16, 27:19
**lifting** [1] - 6:1
**light** [4] - 37:13, 57:17, 62:13, 97:14
**lightly** [1] - 70:11
**likelihood** [8] - 9:6, 36:6, 73:20, 73:22, 74:2, 74:16, 74:22, 94:23
**likely** [18] - 52:6, 73:1,

73:2, 74:8, 78:8, 78:14, 78:18, 80:22, 83:1, 83:5, 89:23, 90:6, 92:20, 93:8, 94:6, 94:10, 94:19, 94:24
**limit** [2] - 23:11, 91:19
**limitation** [1] - 24:19
**limitations** [1] - 24:19
**limited** [2] - 22:11, 106:20
**limiting** [14] - 21:11, 21:17, 24:2, 51:16, 52:15, 52:16, 55:25, 56:22, 56:23, 56:24, 82:1, 82:2, 88:24
**limits** [3] - 92:7, 92:9, 100:4
**line** [3] - 4:6, 4:8, 19:14
**lines** [1] - 47:22
**list** [2] - 46:23, 67:2
**listed** [2] - 24:22, 68:5
**listen** [2] - 38:8, 58:14
**listening** [2] - 4:7, 72:13
**listing** [1] - 40:20
**lists** [4] - 17:13, 17:14, 46:17, 46:19
**litigant** [2] - 90:13, 91:5
**litigants** [1] - 90:17
**litigate** [1] - 20:8
**litigating** [2] - 84:16, 102:16
**litigation** [9] - 31:14, 75:23, 76:16, 76:17, 77:2, 77:7, 79:24, 91:8, 99:25
**live** [1] - 64:5
**livelihoods** [2] - 78:9, 103:7
**living** [2] - 52:3, 89:17
**LLC** [1] - 48:22
**LLP** [9] - 1:3, 2:3, 4:5, 48:21, 48:22, 71:15, 71:19, 107:22, 108:11
**LLP's** [1] - 3:25
**location** [1] - 16:10
**Logan** [1] - 83:9
**long-established** [1] - 80:14
**long-standing** [1] - 100:20
**look** [15] - 9:8, 19:10, 20:12, 21:4, 35:13, 35:15, 36:21, 40:9, 40:19, 51:11, 52:24, 61:22, 69:24, 99:23,

110:20
**looking** [8] - 7:6, 16:24, 31:20, 35:1, 41:1, 42:13, 106:23, 108:3
**looks** [2] - 58:20, 58:21
**Lopez** [2] - 93:1, 94:1
**lose** [1] - 93:8
**loss** [5] - 84:21, 95:5, 95:12, 99:8, 100:10
**losses** [1] - 100:2
**lost** [3] - 17:3, 70:4, 90:24
**love** [2] - 32:3, 68:9
**lucky** [1] - 28:22
**Luke** [1] - 2:23
**LUKE** [1] - 1:12
**luxury** [1] - 5:20

## M

**ma'am** [2] - 3:9, 48:14
**machine** [1] - 1:24
**mail** [3] - 22:13, 23:1, 81:3
**Main** [3] - 1:14, 3:7, 3:8
**maintain** [2] - 28:18, 29:7
**maintained** [1] - 31:11
**major** [1] - 41:8
**Malley** [1] - 5:2
**man's** [1] - 64:6
**management** [1] - 81:18
**Management** [1] - 22:7
**managing** [1] - 5:2
**manner** [2] - 87:1, 111:10
**MANNING** [1] - 1:12
**Manning** [1] - 2:22
**manufactured** [1] - 32:5
**Manzo** [1] - 87:3
**March** [13] - 1:5, 4:4, 68:7, 68:17, 71:17, 100:6, 105:4, 111:13
**Marshals** [1] - 25:13
**mask** [1] - 82:16
**Massacre** [3] - 69:4, 69:5, 69:6
**master** [1] - 59:16
**materially** [1] - 91:14
**Mathews** [1] - 87:2
**MATT** [1] - 1:13
**Matt** [1] - 2:23
**matter** [10] - 15:6,

28:17, 38:17, 45:16, 48:17, 59:9, 75:2, 86:4, 90:8, 98:19
**matters** [15] - 24:24, 26:22, 26:24, 27:3, 27:4, 27:5, 27:8, 38:25, 82:8, 90:10, 93:8, 97:16, 98:2, 98:10
**mayoral** [1] - 77:19
**Mayorkas** [1] - 72:21
**McCarthy** [2] - 65:24, 67:1
**McCloud** [1] - 2:23
**MCCLOUD** [1] - 1:12
**McGrath** [2] - 65:23, 87:5
**mean** [22] - 9:5, 16:2, 19:9, 19:17, 21:23, 25:23, 31:9, 41:23, 43:23, 45:1, 45:15, 46:3, 46:5, 46:15, 52:3, 52:9, 53:12, 62:15, 63:22, 65:7, 74:15, 89:9
**meaning** [6] - 7:16, 17:9, 42:8, 44:9, 64:20, 93:25
**meaningful** [2] - 87:1
**means** [14] - 6:3, 22:11, 23:12, 53:20, 56:9, 56:11, 56:12, 62:16, 67:25, 76:13, 80:19, 88:22, 89:3
**meant** [2] - 17:6, 45:25
**meanwhile** [1] - 101:9
**measurable** [1] - 100:15
**measure** [2] - 19:10, 45:3
**measures** [2] - 34:3, 35:22
**measuring** [1] - 26:17
**mechanism** [1] - 10:17
**Media** [1] - 75:9
**meet** [10] - 38:17, 38:19, 38:24, 55:8, 56:4, 58:13, 68:13, 70:10, 82:12, 87:8
**meet-and-confer** [1] - 58:13
**meeting** [8] - 28:4, 28:6, 55:20, 81:8, 84:5, 92:11, 92:13, 92:19
**meetings** [6] - 23:5, 23:7, 24:15, 57:7, 98:14

**meets** [1] - 84:14
**memorandum** [1] - 81:1
**mentioned** [6] - 21:24, 27:15, 60:4, 64:23, 68:23, 102:2
**mentions** [1] - 82:15
**mere** [1] - 87:12
**merely** [1] - 95:14
**merge** [1] - 73:10
**merger** [1] - 87:25
**merits** [14] - 36:7, 72:5, 73:1, 73:20, 73:22, 74:2, 74:8, 74:23, 78:15, 78:19, 83:1, 83:5, 94:6, 94:23
**met** [1] - 73:12
**mete** [1] - 70:5
**Mexican** [1] - 94:15
**MGU** [1] - 72:8
**mic** [1] - 2:21
**Michigan** [1] - 96:10
**might** [11] - 4:8, 15:17, 28:21, 32:24, 38:4, 40:15, 42:21, 48:4, 59:10, 60:11, 63:15
**millions** [1] - 100:3
**mind** [1] - 44:8
**mine** [1] - 105:9
**Mine** [2] - 72:22, 72:23
**minimal** [2] - 95:6, 95:13
**minimum** [1] - 89:5
**minute** [1] - 19:24
**minutes** [1] - 108:18
**missed** [2] - 7:9, 39:10
**Missouri** [1] - 92:2
**mistaken** [1] - 39:22
**MIZELLE** [101] - 1:17, 3:1, 3:7, 3:9, 3:11, 3:14, 3:18, 28:9, 28:21, 28:23, 29:11, 29:14, 30:6, 31:3, 31:21, 32:2, 32:20, 33:1, 33:14, 33:20, 34:7, 34:22, 36:4, 36:8, 36:18, 36:20, 36:23, 37:6, 37:10, 37:18, 38:22, 39:3, 41:2, 41:6, 41:25, 42:6, 42:11, 42:15, 43:22, 44:3, 44:11, 45:7, 45:10, 45:15, 45:23, 47:2, 47:11, 47:24, 48:14, 49:3, 49:7, 49:12, 49:16, 50:17, 50:19, 50:21, 51:5, 51:23, 52:3, 53:3, 53:12, 53:16,

53:24, 54:6, 54:16, 54:19, 54:24, 55:12, 55:15, 56:6, 56:14, 56:24, 57:4, 57:11, 57:15, 57:22, 57:24, 58:3, 58:5, 58:11, 59:9, 59:19, 59:25, 60:4, 60:20, 60:24, 61:1, 61:16, 61:19, 62:22, 105:21, 105:25, 106:14, 106:22, 108:15, 108:17, 109:2, 109:23, 110:10, 110:13, 110:18

**Mizelle** [8] - 3:2, 28:10, 29:7, 46:6, 55:23, 59:24, 61:10, 109:1

**model** [1] - 64:19
**monetarily** [1] - 44:23
**monetary** [6] - 26:5, 26:7, 26:9, 41:3, 99:5, 100:15
**moreover** [3] - 66:1, 84:23, 102:1
**morning** [1] - 20:18
**most** [11] - 6:9, 6:10, 16:15, 30:5, 55:7, 62:18, 67:4, 73:21, 88:2
**mother** [1] - 71:3
**motion** [3] - 3:25, 4:14, 4:19
**motivating** [1] - 79:3
**motive** [2] - 67:8, 67:13
**movant** [1] - 94:12
**movant's** [1] - 99:8
**move** [3] - 6:19, 42:13, 51:12
**moves** [1] - 71:15
**moving** [1] - 15:3
**MR** [172] - 2:8, 2:14, 2:16, 2:20, 2:22, 3:1, 3:7, 3:9, 3:11, 3:14, 3:18, 4:20, 5:2, 5:5, 5:8, 6:4, 6:8, 6:21, 6:25, 7:21, 8:6, 9:14, 9:17, 10:21, 10:23, 10:25, 11:15, 11:18, 12:9, 13:8, 13:14, 13:21, 13:25, 14:24, 15:5, 16:11, 17:22, 18:7, 19:6, 19:18, 19:21, 21:24, 22:2, 22:12, 22:19, 23:10, 23:24, 25:9, 25:15, 25:18, 25:20, 26:11, 28:8, 28:9, 28:21,

28:23, 29:11, 29:14, 30:6, 31:3, 31:21, 32:2, 32:20, 33:1, 33:14, 33:20, 34:7, 34:22, 36:4, 36:8, 36:18, 36:20, 36:23, 37:6, 37:10, 37:18, 38:22, 39:3, 41:2, 41:6, 41:25, 42:6, 42:11, 42:15, 43:22, 44:3, 44:11, 45:7, 45:10, 45:15, 45:23, 47:2, 47:11, 47:24, 48:14, 49:3, 49:7, 49:12, 49:16, 50:17, 50:19, 50:21, 51:5, 51:23, 52:3, 53:3, 53:12, 53:16, 53:24, 54:6, 54:16, 54:19, 54:24, 55:2, 55:12, 55:15, 56:6, 56:14, 56:24, 57:4, 57:11, 57:15, 57:22, 57:24, 58:3, 58:5, 58:11, 59:9, 59:19, 59:25, 60:4, 60:20, 60:24, 61:1, 61:16, 61:19, 62:22, 62:24, 63:13, 63:17, 63:25, 64:2, 65:3, 65:5, 65:8, 65:18, 70:9, 104:25, 105:15, 105:18, 105:21, 105:24, 105:25, 106:4, 106:10, 106:14, 106:22, 107:5, 107:9, 107:14, 108:2, 108:6, 108:15, 108:16, 108:17, 108:20, 109:2, 109:23, 110:10, 110:13, 110:16, 110:18

**Mueller** [1] - 32:13
**mulligan** [1] - 70:1
**multiple** [2] - 83:11, 94:19
**must** [10] - 2:16, 10:5, 10:7, 21:10, 33:18, 72:25, 74:17, 79:2, 94:12, 97:15

## N

**n.3** [1] - 90:19
**NA** [1] - 25:22
**name** [4] - 4:10, 4:11, 4:17, 85:6
**namely** [2] - 31:4, 73:9
**narrow** [1] - 35:17

**narrowly** [4] - 35:24, 36:2, 80:23, 80:24
**nation** [1] - 76:9
**nation's** [10] - 7:17, 30:17, 33:8, 34:16, 35:7, 43:11, 46:1, 46:10, 62:1, 62:18
**national** [45] - 18:19, 18:22, 19:1, 19:2, 19:14, 19:21, 20:5, 20:13, 20:15, 21:2, 21:6, 21:13, 21:19, 22:8, 24:8, 30:25, 32:7, 34:24, 35:19, 45:24, 48:10, 49:8, 49:17, 49:20, 50:22, 51:1, 52:18, 52:22, 52:23, 56:15, 56:25, 57:17, 58:10, 60:7, 60:17, 61:22, 62:4, 62:10, 66:4, 81:19, 82:15, 85:11, 87:18, 89:1, 89:6
**National** [5] - 67:16, 67:18, 71:4, 72:6, 79:13
**nature** [3] - 75:12, 75:24, 99:2
**Navy** [1] - 71:5
**necessarily** [3] - 52:9, 55:16, 92:24
**necessary** [5] - 47:6, 47:8, 72:6, 75:17, 93:23
**need** [15] - 6:18, 21:5, 26:8, 30:23, 47:19, 50:23, 62:18, 74:2, 77:25, 86:21, 94:15, 104:9, 104:15, 107:4, 108:4
**needed** [3] - 26:15, 28:5, 93:22
**needs** [2] - 52:23, 61:23
**negative** [1] - 36:10
**negotiating** [1] - 84:6
**negotiation** [1] - 58:1
**negotiations** [4] - 58:7, 58:8, 91:24, 92:7
**never** [1] - 37:4
**New** [2] - 73:23, 101:18
**new** [5] - 40:13, 68:23, 108:15, 108:22, 109:4
**news** [1] - 102:7
**next** [7] - 48:17, 48:20, 59:1, 85:3, 104:6, 105:14, 106:11

**nice** [1] - 58:15
**NICHOLSON** [1] - 1:13
**Nicholson** [1] - 2:23
**Nielsen** [1] - 72:8
**night** [1] - 20:19
**nine** [1] - 74:13
**nobody** [4] - 32:17, 44:16, 55:19, 55:20
**noncompensable** [1] - 69:4
**none** [3] - 36:20, 36:24, 38:11
**nonetheless** [1] - 60:12
**nonlawyer** [1] - 22:15
**nonlawyers** [3] - 4:12, 34:6, 52:16
**nonmonetary** [1] - 100:5
**Nonprofits** [1] - 72:7
**nonspeculative** [1] - 38:2
**normally** [1] - 72:15
**note** [1] - 17:4
**noted** [1] - 79:21
**notes** [2] - 81:1, 111:5
**nothing** [1] - 23:10
**notice** [13] - 11:13, 11:18, 17:6, 17:17, 17:20, 17:23, 17:25, 18:1, 18:5, 18:9, 87:8, 88:3, 97:10
**noting** [1] - 85:18
**notion** [1] - 61:11
**notwithstanding** [1] - 99:20
**NRDC** [1] - 73:7
**nuanced** [1] - 60:6
**null** [1] - 111:8
**number** [9] - 7:14, 11:6, 20:23, 26:15, 26:16, 95:18, 98:5, 98:6, 108:12
**Numbered** [1] - 71:18
**numerous** [2] - 41:13, 97:13
**NW** [1] - 1:20

## O

**o'clock** [1] - 7:10
**O'Donnell** [1] - 83:20
**oath** [1] - 25:2
**Obama** [1] - 74:3
**objection** [2] - 109:10, 110:15
**objectionable** [2] - 54:9, 110:6
**obligations** [1] -

103:16
**obtain** [2] - 26:9, 94:11
**obviously** [2] - 86:17, 105:2
**occurred** [1] - 96:22
**occurs** [1] - 99:1
**odious** [1] - 66:13
**OF** [3] - 1:1, 1:5, 1:7
**OFAC** [3] - 17:14, 46:17, 46:25
**OFAC-designation** [1] - 46:25
**offend** [1] - 87:13
**offered** [1] - 106:2
**office** [9] - 22:13, 24:4, 31:23, 36:17, 36:18, 59:15, 59:17, 80:1, 81:17
**Office** [13] - 1:19, 3:6, 3:12, 22:7, 27:5, 27:6, 27:13, 30:8, 54:23, 55:1, 55:7, 98:7, 101:23
**Officers** [1] - 67:17
**officers** [2] - 25:14, 110:1
**offices** [1] - 4:13
**Official** [1] - 1:23
**official** [16] - 21:11, 21:18, 24:2, 56:1, 66:8, 81:9, 81:16, 82:1, 82:3, 82:9, 88:13, 88:24, 91:20, 92:8, 94:3, 111:14
**officially** [1] - 66:2
**officials** [16] - 16:20, 21:22, 22:4, 38:24, 40:25, 57:6, 67:24, 75:3, 75:25, 79:11, 79:17, 81:14, 82:12, 86:1, 88:7, 98:11
**oftentimes** [1] - 77:25
**Ohio** [1] - 103:2
**old** [1] - 102:7
**OMB** [3] - 10:11, 22:24, 72:7
**once** [4] - 54:7, 99:1, 104:15, 107:12
**one** [65] - 8:20, 9:24, 10:1, 10:11, 12:11, 12:23, 13:1, 13:19, 15:10, 15:24, 16:9, 17:5, 19:15, 19:18, 20:13, 21:10, 24:13, 25:21, 25:24, 26:11, 26:15, 30:1, 36:5, 36:9, 38:16, 40:20, 42:1, 42:24, 43:15, 44:16, 52:23, 53:18,

53:22, 54:5, 55:14, 61:6, 63:3, 63:13, 64:18, 65:20, 67:14, 68:4, 69:14, 69:24, 70:23, 73:1, 73:10, 73:21, 74:23, 75:14, 77:12, 83:7, 83:16, 91:4, 91:12, 93:12, 104:25, 105:2, 107:7, 108:12, 109:5, 109:10, 109:11
**one's** [3] - 84:7, 90:4, 93:24
**ongoing** [3] - 42:2, 92:12, 96:22
**open** [2] - 45:13, 65:18
**opened** [1] - 104:11
**opening** [1] - 82:17
**openly** [1] - 58:15
**operate** [1] - 84:17
**operates** [1] - 102:19
**operating** [1] - 46:10
**operation** [2] - 92:1, 92:17
**opinion** [4] - 63:20, 63:23, 64:14, 79:3
**opinions** [1] - 71:5
**opponent** [1] - 76:21
**opponents** [2] - 76:15, 82:22, 103:25
**opportunity** [18] - 5:9, 7:11, 11:19, 18:10, 18:11, 18:12, 27:25, 28:25, 29:2, 86:25, 87:8, 87:10, 87:16, 87:25, 88:3, 97:10, 105:23, 106:3
**opposed** [3] - 13:16, 42:25, 43:9
**opposing** [1] - 73:8
**option** [1] - 17:11
**order** [182] - 3:25, 4:4, 4:10, 4:17, 5:12, 5:24, 7:5, 7:8, 7:13, 9:8, 9:22, 9:24, 10:15, 11:14, 12:2, 12:15, 12:20, 14:12, 14:17, 14:21, 15:17, 15:18, 17:3, 17:7, 17:16, 17:21, 18:4, 19:5, 19:22, 19:25, 20:4, 20:5, 20:22, 20:24, 29:19, 29:20, 29:21, 29:23, 31:1, 31:2, 32:1, 34:5, 35:10, 38:18, 40:11, 41:20, 42:5, 42:25, 44:1, 45:5, 46:11,

48:18, 48:20, 49:1, 50:1, 50:6, 50:10, 50:12, 54:15, 54:17, 54:20, 55:6, 55:9, 56:12, 58:13, 58:16, 59:2, 59:16, 61:15, 64:15, 64:21, 65:25, 66:17, 66:19, 66:21, 67:9, 71:7, 71:16, 73:14, 74:9, 75:1, 75:14, 75:15, 75:21, 76:3, 76:5, 76:8, 76:11, 76:12, 77:5, 77:22, 78:1, 78:5, 78:16, 78:20, 79:7, 79:12, 79:22, 80:3, 80:5, 80:9, 80:20, 80:23, 80:24, 81:2, 81:6, 81:14, 81:20, 81:25, 82:5, 82:11, 82:14, 82:15, 82:17, 82:18, 83:12, 83:25, 84:3, 84:18, 85:10, 85:25, 86:5, 86:14, 87:15, 87:23, 88:6, 88:23, 90:23, 91:19, 92:5, 93:16, 93:20, 95:18, 95:22, 95:25, 96:11, 96:16, 97:8, 97:14, 97:22, 98:15, 98:19, 98:24, 99:17, 99:20, 100:13, 100:17, 100:22, 101:20, 102:3, 102:6, 102:12, 103:10, 104:4, 104:5, 104:7, 104:8, 104:20, 104:22, 105:1, 105:5, 105:7, 105:11, 105:14, 106:7, 106:13, 106:15, 106:17, 106:18, 106:23, 106:25, 107:17, 107:18, 108:7, 108:21, 109:9, 109:18, 110:2, 110:4, 110:19
**Order** [21] - 4:2, 7:12, 71:17, 73:15, 73:18, 74:24, 75:12, 76:2, 79:16, 83:23, 86:22, 88:4, 89:10, 90:6, 91:13, 93:4, 93:19, 94:23, 99:11, 101:11, 110:9
**order's** [2] - 34:1, 97:20
**ordered** [1] - 75:25
**orders** [7] - 29:21, 30:5, 30:9, 45:21,

63:8, 65:13, 65:15
**ordinary** [3] - 99:5, 99:6, 110:3
**organization** [2] - 46:9, 87:11
**organizations** [1] - 87:7
**originates** [1] - 64:11
**Orleans** [1] - 73:24
**otherwise** [5] - 21:13, 24:10, 52:19, 70:25, 89:1
**outcome** [3] - 18:17, 19:3
**outlawed** [1] - 66:10
**outlined** [1] - 91:4
**outlines** [1] - 11:8
**overall** [2] - 34:2, 56:11
**overbroad** [2] - 22:24, 88:10
**overthrow** [4] - 60:15, 60:21, 61:7, 62:2
**overturn** [1] - 75:16
**own** [16] - 13:22, 14:20, 17:8, 17:16, 35:23, 40:24, 47:17, 48:6, 53:18, 61:5, 78:8, 90:4, 91:7, 103:19, 103:21, 104:21
**owned** [1] - 87:22

## P

**p.m** [3] - 1:5, 104:9, 110:23
**page** [4] - 64:4, 69:15, 81:1, 108:22
**pages** [2] - 40:20, 69:15
**panel** [1] - 5:21
**papers** [11] - 4:14, 7:10, 7:19, 12:17, 17:4, 19:13, 23:3, 28:5, 49:23, 69:20, 106:8
**paperwork** [1] - 36:22
**paragraph** [15] - 8:17, 11:8, 29:22, 29:23, 39:4, 40:5, 40:20, 41:1, 41:8, 92:14, 96:15, 98:4, 99:15, 109:24, 110:5
**paragraphs** [7] - 8:11, 41:4, 90:25, 108:15, 108:22, 109:4
**pardon** [1] - 10:23
**part** [4] - 9:3, 17:8, 34:19, 38:13

**particular** [7] - 7:6, 42:23, 49:8, 53:19, 54:5, 77:19, 78:21
**parties** [10] - 2:5, 14:12, 72:1, 74:18, 79:12, 84:20, 102:24, 103:4, 104:6, 104:20
**Partisan** [1] - 76:6
**partisan** [3] - 76:10, 80:6, 80:8
**partisans** [2] - 66:22
**partner** [1] - 5:3
**partners** [2] - 76:24, 101:12
**parts** [4] - 4:17, 17:10, 18:23
**party** [5] - 14:17, 14:25, 73:8, 91:8, 111:10
**pass** [1] - 67:12
**passage** [1] - 64:4
**past** [1] - 83:24
**patent** [2] - 27:1, 98:6
**Patent** [2] - 27:4, 98:7
**Paterson** [2] - 75:10, 77:14
**pause** [1] - 5:18
**pauses** [1] - 108:24
**payback** [1] - 101:25
**penalize** [1] - 44:23
**pending** [4] - 27:1, 72:20, 82:13, 98:6
**Penson** [1] - 103:2
**people** [26] - 4:7, 16:2, 17:13, 20:9, 22:4, 22:13, 22:14, 23:1, 24:15, 25:11, 33:24, 34:4, 35:20, 46:18, 48:15, 51:25, 53:21, 55:6, 55:7, 60:10, 60:11, 60:13, 68:9, 70:24, 103:12
**per** [1] - 69:8
**perceived** [7] - 31:17, 42:22, 75:8, 76:23, 77:12, 80:8, 80:12
**percent** [4] - 12:25, 39:3, 47:24, 51:2
**perfectly** [4] - 33:9, 43:1, 65:15, 80:10
**perform** [2] - 10:10, 99:19
**performed** [1] - 66:8
**performing** [2] - 93:5, 96:18
**perhaps** [4] - 13:16, 34:19, 60:18, 60:20
**peril** [3] - 77:14, 78:3, 78:8

**period** [1] - 65:10
**periods** [2] - 95:6, 95:13
**PERKINS** [1] - 1:3
**Perkins** [140] - 2:3, 2:10, 3:25, 4:5, 4:9, 4:10, 4:15, 4:21, 5:14, 9:20, 9:25, 10:3, 10:5, 10:6, 10:8, 10:9, 10:12, 10:13, 10:19, 11:13, 11:23, 12:2, 12:4, 12:5, 12:19, 12:21, 13:4, 13:13, 13:15, 13:16, 13:22, 14:3, 14:7, 14:13, 14:17, 16:5, 17:2, 17:17, 18:18, 20:23, 21:1, 21:12, 21:18, 22:5, 22:10, 22:15, 23:17, 24:3, 24:5, 25:1, 31:12, 31:16, 33:22, 33:24, 35:21, 35:22, 35:24, 38:17, 38:19, 40:23, 40:24, 41:19, 42:3, 43:8, 44:2, 44:5, 44:8, 48:17, 48:18, 48:21, 48:24, 49:25, 50:16, 51:19, 52:15, 53:21, 55:9, 55:10, 56:1, 56:10, 57:20, 59:3, 59:16, 61:14, 62:10, 68:16, 71:15, 71:18, 74:7, 75:15, 75:19, 75:22, 76:1, 76:6, 76:13, 77:4, 77:23, 78:13, 79:23, 80:5, 80:11, 81:7, 81:15, 81:23, 82:2, 82:4, 82:6, 82:12, 82:18, 85:4, 86:16, 88:9, 88:17, 88:25, 89:6, 90:8, 91:10, 91:15, 91:21, 92:6, 92:8, 92:9, 92:12, 93:4, 93:9, 93:13, 95:21, 98:15, 98:17, 99:1, 99:12, 101:12, 102:5, 102:7, 102:12, 107:22, 108:11, 109:15
**permit** [1] - 89:21
**permitted** [1] - 96:16
**permitting** [1] - 90:17
**Perry** [1] - 67:15
**persists** [1] - 42:5
**person** [16] - 3:15, 44:16, 44:22, 46:22, 50:22, 56:4, 68:12,

81:6, 91:5, 91:6, 107:21, 107:23, 108:10, 108:12, 109:14, 109:16
**personal** [6] - 16:3, 42:16, 48:7, 101:15, 101:16, 101:24
**personally** [2] - 43:10, 57:11
**personnel** [3] - 62:17, 81:3, 81:18
**Personnel** [2] - 22:7, 88:17
**persons** [1] - 91:14
**perspective** [8] - 31:20, 32:24, 33:12, 33:14, 33:15, 33:21, 79:4
**persuasion** [1] - 80:19
**petition** [6] - 36:1, 66:19, 69:10, 85:16, 85:19, 85:22
**petitioning** [1] - 97:1
**phone** [1] - 55:21
**photocopied** [1] - 111:9
**phrase** [3] - 19:14, 21:15, 30:25
**pick** [3] - 28:12, 41:17
**picked** [1] - 6:8
**place** [1] - 12:15
**placed** [1] - 18:2
**places** [1] - 83:23
**plain** [4] - 79:15, 79:21, 82:20, 92:5
**plaintiff** [64] - 4:15, 11:20, 11:23, 12:3, 13:2, 13:4, 43:18, 45:13, 57:6, 71:15, 72:25, 73:1, 73:2, 73:12, 73:20, 74:1, 74:13, 74:22, 74:25, 78:14, 78:18, 79:17, 81:1, 82:25, 83:4, 83:8, 83:11, 83:20, 84:14, 84:19, 85:5, 85:10, 85:15, 85:23, 86:2, 86:6, 86:8, 86:14, 86:22, 87:15, 87:16, 88:1, 88:5, 88:16, 89:23, 90:21, 91:2, 93:18, 94:5, 94:10, 94:18, 94:22, 95:14, 97:14, 97:19, 97:23, 98:5, 98:15, 98:18, 100:2, 100:12, 100:17, 101:5, 106:24
**Plaintiff** [4] - 1:3, 3:24, 74:7, 81:23

**plaintiff's** [35] - 2:7, 4:19, 12:7, 17:18, 29:16, 36:9, 37:19, 52:12, 74:19, 74:20, 84:1, 84:10, 84:13, 84:22, 84:23, 91:22, 93:12, 94:24, 95:2, 95:19, 96:25, 97:9, 97:15, 97:20, 98:2, 98:21, 99:13, 99:16, 99:18, 100:7, 100:22, 101:6, 104:11, 106:16
**plaintiffs** [9] - 4:18, 34:11, 38:2, 45:8, 51:10, 52:4, 58:20, 74:7, 87:19
**PLAINTIFFS** [1] - 1:10
**plane** [2] - 36:14, 36:19
**planning** [2] - 53:6, 106:6
**play** [1] - 29:7
**played** [1] - 33:10
**plays** [1] - 43:11
**plea** [2] - 58:7, 92:15
**pleading** [1] - 96:19
**plus** [1] - 52:16
**point** [18] - 8:22, 14:8, 17:6, 18:16, 19:18, 21:2, 23:24, 25:20, 39:18, 52:5, 58:19, 59:21, 66:14, 66:25, 68:4, 69:13, 69:20, 90:17
**pointed** [1] - 93:12
**pointing** [1] - 59:14
**points** [1] - 60:1
**policies** [1] - 18:20
**policy** [1] - 77:18
**political** [16] - 42:18, 70:16, 76:14, 76:20, 77:6, 77:24, 78:6, 78:7, 80:13, 81:13, 82:22, 101:25, 103:9, 103:25, 104:1
**popular** [2] - 71:13, 75:17
**portion** [3] - 12:21, 70:5, 98:2
**portions** [1] - 84:21
**poses** [4] - 50:22, 62:10, 99:11, 99:17
**position** [4] - 46:9, 47:23, 47:24, 100:24
**positions** [3] - 77:2, 77:6, 77:7
**possess** [1] - 66:3
**possible** [6] - 50:12, 52:2, 52:5, 53:17,

63:1, 64:9
**post** [8] - 24:4, 27:2, 36:17, 36:18, 59:15, 59:17, 68:8, 104:5
**post-grant** [1] - 27:2
**postal** [1] - 59:16
**potential** [7] - 12:12, 16:10, 24:19, 26:17, 52:9, 57:23, 102:13
**potentially** [1] - 42:4
**power** [16] - 46:15, 46:25, 47:5, 47:16, 47:22, 47:25, 48:19, 48:23, 49:6, 50:13, 50:20, 64:10, 66:11, 80:13, 103:9, 103:23
**powerful** [1] - 103:1
**powers** [2] - 69:24, 78:8
**practical** [1] - 98:19
**practice** [19] - 11:24, 12:7, 12:8, 12:21, 24:19, 25:25, 27:9, 59:6, 83:24, 84:9, 84:15, 84:17, 84:22, 96:8, 97:17, 98:8, 99:13, 99:16, 103:16
**practices** [2] - 66:12, 102:8
**practicing** [2] - 12:5, 84:4
**preceded** [1] - 72:20
**precedent** [2] - 34:18, 80:15
**preceding** [1] - 109:24
**precisely** [3] - 7:25, 9:9, 86:21
**precluding** [1] - 84:9
**predetermined** [1] - 19:5
**prefer** [1] - 6:21
**preferred** [2] - 79:8, 103:20
**preliminary** [5] - 6:12, 6:19, 71:21, 72:12, 104:12
**premature** [3] - 23:19, 51:22, 51:23
**prepared** [2] - 29:11, 66:2
**prerogative** [6] - 35:5, 48:1, 48:3, 51:2, 51:6, 61:4
**present** [6] - 12:13, 66:7, 70:15, 94:15, 103:1, 105:25
**preserve** [1] - 72:4
**President** [59] - 4:3, 20:3, 20:9, 20:21, 30:14, 30:18, 31:8,

32:8, 33:2, 35:9, 42:20, 43:10, 43:20, 45:18, 46:8, 46:16, 46:24, 47:6, 47:8, 47:13, 47:14, 47:21, 47:25, 48:1, 48:8, 48:19, 48:25, 49:3, 49:5, 49:22, 50:14, 50:19, 50:21, 62:8, 62:20, 63:5, 63:8, 63:23, 64:3, 64:11, 65:1, 66:20, 70:3, 71:2, 71:17, 76:15, 76:16, 76:21, 77:1, 81:12, 96:3, 96:4, 96:7, 96:13, 96:19, 101:15, 101:21, 103:6, 103:19
**President's** [16] - 33:14, 33:15, 33:21, 35:4, 48:23, 50:13, 50:20, 51:2, 53:5, 76:14, 76:18, 77:6, 82:22, 85:13, 104:3
**presidential** [2] - 76:22, 101:13
**Presidents** [4] - 45:20, 45:24, 70:6
**press** [2] - 7:2, 85:21
**presumes** [1] - 102:20
**pretext** [4] - 19:25, 20:17, 21:3, 24:10
**pretty** [3] - 26:21, 46:15, 106:20
**prevent** [8] - 9:12, 47:6, 47:8, 47:13, 47:14, 93:10, 93:20, 96:2
**preventing** [5] - 82:22, 84:4, 87:24, 92:18, 93:22
**prevents** [1] - 93:5
**previously** [2] - 77:10, 101:8
**principle** [3] - 46:2, 67:18, 94:5
**principles** [3] - 5:13, 62:7, 65:21
**priorities** [1] - 11:5
**private** [4] - 14:12, 14:20, 62:19, 70:4, 79:12, 84:20, 86:7, 86:14
**privilege** [1] - 30:7
**pro** [3] - 60:13, 78:1
**pro-ISIS** [1] - 60:13
**pro-terrorist** [1] - 60:13
**probe** [1] - 40:1
**problem** [6] - 18:15,

23:21, 27:17, 43:3, 88:6, 104:7
**problems** [1] - 38:23
**procedure** [2] - 15:20, 15:21
**procedures** [8] - 12:10, 12:12, 12:13, 13:3, 14:3, 16:25, 18:13
**proceed** [1] - 29:12
**proceeding** [3] - 5:14, 108:24, 110:23
**proceedings** [4] - 8:25, 27:2, 27:3, 111:6
**Proceedings** [1] - 1:24
**Process** [4] - 13:10, 16:16, 17:20, 18:6
**process** [46] - 8:17, 8:22, 11:5, 11:6, 11:11, 11:19, 13:5, 13:7, 13:19, 14:2, 14:7, 14:19, 14:23, 15:3, 15:22, 17:6, 18:10, 22:17, 34:10, 37:20, 45:4, 46:18, 46:20, 69:11, 74:20, 83:5, 83:7, 83:9, 85:9, 86:20, 86:22, 86:23, 86:25, 87:14, 87:19, 87:22, 88:1, 88:6, 89:13, 89:20, 97:3, 97:4, 97:7, 97:12, 97:21, 106:6
**proclaimed** [1] - 66:2
**produce** [1] - 47:17
**produced** [1] - 1:25
**Product** [1] - 100:25
**profession** [10] - 11:24, 26:1, 70:23, 78:12, 83:15, 83:17, 84:8, 95:24, 96:9, 97:18
**professional** [4] - 24:17, 71:1, 88:12, 103:16
**Professional** [2] - 15:13, 24:17
**Professor** [1] - 93:17
**professor** [1] - 96:8
**programs** [1] - 3:10
**prohibit** [1] - 12:5
**prohibition** [2] - 43:19, 75:7
**prohibitions** [1] - 88:14
**prohibits** [2] - 67:23, 75:2
**prominent** [1] - 4:11

16

**promise** [2] - 103:4, 103:6
**promised** [1] - 20:22
**promote** [1] - 5:13
**prong** [1] - 86:20
**proper** [2] - 29:2, 54:10
**property** [7] - 13:5, 13:10, 86:1, 86:3, 86:6, 86:13, 97:9
**proportions** [1] - 95:23
**proposal** [1] - 104:10
**propose** [1] - 106:1
**proposed** [7] - 9:8, 9:22, 105:11, 106:13, 106:15, 106:23, 110:20
**propter** [1] - 68:8
**prosecution** [1] - 58:4
**prosecutor** [1] - 38:16
**prosecutors** [2] - 23:6, 84:6
**prospective** [2] - 12:12, 17:23
**protect** [6] - 20:5, 45:24, 76:9, 76:21, 91:11, 103:15
**protected** [14] - 13:10, 16:16, 60:12, 74:25, 75:5, 77:13, 78:2, 78:10, 78:17, 80:21, 83:2, 83:8, 83:11, 83:13
**protecting** [3] - 31:17, 31:18, 31:19
**protection** [5] - 15:23, 34:12, 51:9, 69:13, 88:2
**protection-type** [1] - 51:9
**protections** [2] - 76:25, 77:9
**protects** [3] - 85:22, 89:25, 103:22
**prove** [2] - 69:9, 80:22
**proven** [1] - 32:9
**provide** [11] - 17:23, 17:24, 18:1, 21:11, 21:17, 24:1, 55:25, 91:22, 92:21, 93:15, 106:10
**provided** [3] - 4:6, 26:3
**providing** [1] - 77:20
**provision** [3] - 20:13, 34:24, 88:17
**provisions** [5] - 6:11, 8:13, 31:3, 44:1, 88:8

**prudential** [3] - 90:15, 91:1, 91:9
**PRUSKI** [1] - 1:13
**Pruski** [1] - 2:23
**PTAP** [1] - 27:2
**public** [14] - 4:6, 4:8, 19:8, 20:10, 61:2, 73:5, 73:10, 79:8, 81:11, 82:23, 98:22, 101:3, 102:10, 103:14
**punish** [6] - 79:12, 79:18, 80:15, 81:20, 82:18, 96:5
**punishes** [1] - 81:2
**punishing** [4] - 71:2, 77:23, 82:22, 96:14
**punishment** [2] - 70:5, 89:11
**punitive** [12] - 34:2, 35:22, 44:1, 44:3, 44:4, 44:9, 45:3, 69:23, 70:5, 75:24, 79:18, 102:12
**purchases** [1] - 47:19
**pure** [1] - 45:15
**purports** [1] - 20:12
**purpose** [7] - 7:13, 8:17, 11:8, 19:7, 19:23, 20:12, 21:4, 24:13, 29:6, 31:17, 31:23, 34:2, 49:1, 71:24, 72:4, 84:22, 99:22
**Purpose** [1] - 30:1
**purposes** [7] - 5:14, 7:25, 32:1, 35:18, 55:5, 73:17, 95:1
**pursuant** [3] - 7:4, 105:6, 110:9
**pursue** [4] - 84:7, 84:19, 101:16, 101:24
**pursuing** [1] - 83:20
**push** [1] - 15:17
**put** [7] - 38:9, 40:13, 46:22, 55:10, 58:20, 58:21, 85:4
**putting** [2] - 35:23, 67:1
**puzzled** [1] - 9:13

**Q**

**qualifications** [1] - 15:12
**qualifier** [1] - 56:19
**qualify** [2] - 26:5, 26:7
**quality** [1] - 66:3
**quarter** [2] - 40:17,

71:4
**Queen** [2] - 89:14, 89:15
**questions** [6] - 24:9, 29:13, 42:4, 61:6, 90:13, 109:21
**quick** [1] - 45:8
**quickly** [1] - 26:21
**quintessential** [2] - 16:15, 66:23
**quite** [1] - 55:10
**quo** [4] - 28:18, 29:8, 72:4, 72:19
**quote** [7] - 7:15, 77:12, 78:1, 79:6, 79:11, 83:19, 91:19
**quoting** [3] - 73:6, 87:3, 96:6

**R**

**race** [1] - 77:19
**raise** [1] - 14:8
**raised** [3] - 16:1, 40:21, 41:7
**raising** [1] - 42:4
**Ralls** [1] - 87:20
**Ramirez** [1] - 73:5
**rapid** [1] - 50:1
**rather** [2] - 14:21, 84:9
**rational** [2] - 18:12, 67:11
**rationale** [2] - 79:4, 80:9
**reach** [1] - 104:21
**reached** [1] - 105:3
**reaching** [1] - 12:17
**read** [19] - 7:11, 22:10, 22:18, 22:20, 23:3, 24:1, 32:13, 38:15, 38:23, 55:12, 55:15, 56:17, 57:5, 57:10, 57:15, 58:16, 66:19, 66:20, 108:18
**reading** [4] - 47:2, 49:23, 57:12, 60:25
**reads** [2] - 57:6, 57:9
**reaffirmed** [1] - 79:10
**real** [8] - 23:4, 23:20, 38:11, 38:12, 39:2, 40:22, 68:19, 84:13
**real-word** [1] - 23:4
**real-world** [2] - 39:2, 40:22
**reality** [1] - 89:17
**really** [15] - 4:9, 16:7, 25:21, 28:6, 30:23, 38:9, 40:5, 43:12, 49:12, 49:16, 49:21, 50:4, 58:18

**reason** [5] - 6:8, 20:2, 34:19, 39:7, 104:13
**reasoning** [1] - 47:11
**reasons** [7] - 26:11, 39:21, 41:13, 41:17, 44:22, 82:25, 98:16
**rebut** [2] - 17:10, 87:25
**received** [1] - 106:18
**receiving** [1] - 93:10
**recipient** [1] - 109:7
**recognition** [1] - 67:21
**recognize** [1] - 71:9
**recognized** [3] - 47:15, 91:24, 100:9
**recommendation** [1] - 64:9
**reconciled** [1] - 67:5
**reconsider** [1] - 97:15
**record** [4] - 2:6, 2:19, 11:13, 72:16
**recourse** [1] - 85:24
**recover** [1] - 26:13
**Rector** [1] - 78:24
**redress** [1] - 85:23
**redressability** [3] - 41:10, 41:24, 43:3
**reducing** [1] - 84:10
**redundant** [1] - 110:6
**referring** [1] - 31:16
**refers** [1] - 88:24
**reflected** [2] - 33:12, 88:3
**refrain** [2] - 77:20, 81:15
**Refugee** [2] - 65:23, 87:4
**refused** [1] - 82:12
**refusing** [1] - 95:19
**regardless** [3] - 43:11, 59:9, 77:1
**Register** [1] - 4:3
**regularly** [1] - 27:13
**regulating** [1] - 79:2
**regulations** [2] - 29:25
**regulators** [1] - 84:5
**rejected** [1] - 34:10
**related** [11] - 2:16, 10:3, 28:14, 31:25, 34:14, 49:19, 82:13, 92:16, 98:22, 99:25, 109:17
**relates** [1] - 40:3
**relating** [3] - 31:10, 32:4, 37:19
**relation** [1] - 14:6
**relationship** [12] - 13:9, 14:14, 15:15, 17:2, 68:16, 91:5,

91:12, 98:17, 107:22, 108:11, 109:15, 110:9
**relationships** [9] - 11:3, 12:18, 13:5, 14:13, 42:22, 68:21, 86:3, 86:15, 100:1
**release** [1] - 18:4
**relevant** [3] - 14:1, 33:3, 33:5
**relief** [8] - 9:15, 26:10, 73:23, 80:21, 94:15, 94:20, 97:7, 100:5
**relies** [1] - 98:8
**rely** [1] - 26:8
**relying** [3] - 26:9, 30:24, 67:24
**remain** [1] - 96:17
**remaining** [1] - 74:3
**remanded** [1] - 104:16
**remediation** [1] - 94:14
**remedy** [1] - 6:10
**remind** [2] - 55:18, 55:19
**removed** [1] - 13:19
**repeat** [1] - 107:24
**reply** [1] - 28:4
**report** [2] - 32:13, 105:4
**reported** [1] - 1:24
**reporter** [1] - 108:3
**Reporter** [3] - 1:23, 1:23, 111:14
**reporting** [1] - 81:22
**reports** [1] - 62:12
**represent** [8] - 14:21, 20:7, 39:13, 55:11, 70:24, 93:1, 93:23, 103:17
**representation** [6] - 50:15, 54:14, 77:3, 80:6, 93:6, 102:25
**representations** [2] - 93:14, 98:21
**representative** [1] - 4:24
**representatives** [1] - 4:23
**represented** [4] - 70:21, 91:15, 98:14, 98:20
**representing** [11] - 33:18, 48:18, 57:13, 57:21, 76:13, 76:15, 76:17, 92:19, 96:2, 103:8, 103:25
**represents** [3] - 40:17, 64:12, 98:5
**reprisal** [1] - 85:3

**republic** [1] - 46:2
**Republican** [1] - 70:16
**reputation** [5] - 85:6, 85:14, 93:21, 100:14, 100:23
**reputational** [3] - 69:17, 81:4, 90:24
**reputations** [2] - 42:17, 85:2
**request** [4] - 28:25, 71:21, 109:7, 109:8
**require** [8] - 10:1, 14:12, 82:8, 92:25, 93:13, 97:16, 98:2, 105:3
**required** [6] - 19:4, 22:4, 58:17, 61:25, 68:17, 92:16
**requirement** [3] - 81:22, 86:25, 90:15
**requires** [9] - 21:8, 22:23, 51:16, 52:14, 70:24, 82:1, 97:24, 98:24, 99:16
**requiring** [5] - 31:15, 75:18, 79:25, 86:15, 98:10
**rescheduled** [2] - 23:7, 92:13
**rescind** [1] - 105:7
**rescinded** [1] - 109:8
**Resins** [1] - 94:16
**resolved** [1] - 102:6
**resources** [1] - 101:22
**respect** [14] - 10:14, 14:24, 14:25, 17:25, 30:12, 41:12, 48:10, 50:7, 50:8, 61:3, 62:17, 99:5, 105:11, 109:4
**respected** [2] - 4:11, 71:13
**respectfully** [4] - 14:1, 28:25, 47:3, 55:18
**respond** [4] - 28:3, 29:13, 63:2, 107:5
**response** [4] - 23:22, 23:24, 29:2, 107:9
**Responsibility** [2] - 15:13, 24:18
**responsibility** [1] - 71:1
**responsible** [1] - 7:17
**restrained** [1] - 95:24
**restraining** [3] - 3:25, 71:16, 73:14
**restrict** [1] - 84:1
**restriction** [4] - 18:8, 25:24, 45:17, 79:5
**restrictions** [7] -

16:25, 18:2, 21:5, 76:7, 90:4, 93:15, 100:18
**restricts** [1] - 85:25
**resulted** [3] - 95:18, 98:1, 100:19
**results** [2] - 76:16, 77:4
**retainer** [1] - 14:6
**retaliate** [3] - 20:23, 20:25, 64:21
**retaliated** [1] - 78:11
**retaliates** [2] - 74:24, 78:16
**retaliating** [1] - 76:13
**retaliation** [4] - 66:18, 67:6, 78:9, 83:2
**retaliatory** [6] - 19:25, 75:4, 75:7, 75:12, 76:5, 77:8
**retribution** [2] - 102:15, 103:8
**revenue** [3] - 12:25, 40:18, 100:2
**review** [5] - 10:5, 11:21, 62:15, 74:17, 86:15
**reviewable** [2] - 35:5, 35:6
**reviewed** [1] - 19:7
**revocation** [2] - 34:14, 50:23
**Richard** [1] - 3:3
**RICHARD** [1] - 1:18
**Rifle** [2] - 67:18, 79:13
**right-to-counsel** [1] - 16:1
**rights** [34] - 31:17, 31:18, 31:19, 36:1, 36:2, 46:19, 59:5, 60:9, 60:10, 61:9, 66:18, 69:10, 69:11, 69:12, 76:21, 87:17, 89:22, 90:7, 90:12, 91:5, 91:7, 91:11, 91:16, 92:23, 94:25, 95:2, 95:16, 97:3, 97:4, 97:7, 97:21, 101:8
**ripe** [4] - 36:11, 37:1, 59:20, 59:23
**risk** [13] - 14:5, 14:15, 19:3, 27:22, 40:14, 48:10, 49:8, 50:22, 59:1, 62:10, 81:7, 99:11, 99:18
**Risk** [1] - 48:21
**Risks** [6] - 4:5, 48:21, 50:13, 59:2, 59:3, 71:18

**risks** [1] - 59:5
**Roadway** [1] - 86:12
**Robert** [2] - 96:6, 99:2
**robust** [2] - 65:18, 84:15
**Rockford** [1] - 88:15
**role** [2] - 58:24, 96:18
**Roman** [1] - 95:7
**room** [3] - 3:20, 23:1, 81:3
**root** [1] - 93:25
**Rosenberger** [2] - 78:23, 79:5
**Roy** [1] - 93:17
**RPR** [3] - 1:23, 111:3, 111:14
**rule** [3] - 5:13, 22:22, 25:24
**Rules** [2] - 15:12, 24:17
**rules** [4] - 16:22, 17:9, 24:17, 93:13
**ruling** [2] - 47:4, 71:14
**runs** [1] - 77:8
**Russia** [2] - 32:9, 49:19
**Russian** [1] - 32:18
**RYAN** [1] - 1:11
**Ryan** [2] - 2:20, 2:22

**S**

**Safety** [1] - 100:25
**sanctions** [3] - 47:13, 67:25, 80:19
**satisfies** [1] - 27:23
**satisfy** [4] - 35:16, 73:12, 74:10, 90:14
**say-so** [2] - 85:13, 87:12
**Scarborough** [2] - 2:20, 2:22
**SCARBOROUGH** [1] - 1:11
**scattered** [1] - 30:25
**schedule** [2] - 104:14, 110:21
**scheduling** [3] - 104:10, 104:20, 104:22
**School** [2] - 93:17, 96:10
**scope** [2] - 82:5, 106:19
**scrutiny** [2] - 35:16, 61:21
**se** [1] - 69:8
**seated** [1] - 3:22
**seats** [2] - 3:21, 6:17
**SEC** [2] - 27:9, 27:14

**second** [9] - 40:9, 41:9, 43:23, 46:5, 69:5, 86:20, 90:15, 94:8, 109:5
**seconds** [1] - 107:12
**secret** [1] - 35:8
**secretaries** [1] - 23:1
**secrets** [8] - 7:17, 30:17, 33:8, 34:16, 43:11, 46:2, 62:1, 62:19
**Section** [59] - 5:25, 6:2, 6:5, 7:13, 8:2, 8:4, 8:6, 8:21, 8:23, 9:3, 9:9, 9:10, 9:17, 9:19, 9:23, 12:1, 13:2, 16:4, 16:12, 16:19, 17:25, 18:18, 19:5, 19:11, 20:12, 21:7, 21:9, 23:9, 24:13, 31:7, 34:20, 34:25, 35:1, 35:2, 43:4, 43:11, 47:9, 48:25, 51:12, 51:15, 52:14, 67:9, 69:18, 75:14, 75:21, 76:8, 81:5, 81:6, 81:25, 86:4, 88:8, 88:9, 88:17, 88:23, 91:18, 102:5, 105:11
**section** [11] - 6:4, 7:6, 7:8, 13:18, 23:16, 29:17, 29:19, 39:6, 76:1
**Sections** [14] - 5:25, 6:7, 18:23, 31:4, 35:11, 43:16, 43:19, 71:16, 73:15, 89:20, 102:11, 106:20, 110:2
**sections** [10] - 6:9, 8:3, 9:11, 23:9, 34:5, 65:11, 73:18, 104:4, 105:6, 110:3
**Security** [1] - 27:11
**security** [59] - 6:1, 7:2, 7:4, 18:22, 19:1, 19:2, 19:14, 19:22, 20:5, 20:13, 20:15, 21:3, 21:6, 21:13, 21:19, 22:8, 24:8, 25:11, 25:13, 30:25, 32:7, 34:14, 34:21, 34:24, 35:19, 45:24, 47:7, 47:12, 48:10, 49:8, 49:17, 49:20, 50:22, 50:24, 51:1, 52:18, 52:23, 52:24, 54:1, 54:2, 56:15, 56:25, 57:18, 58:10,

60:7, 60:17, 61:5, 61:11, 61:22, 62:4, 62:10, 62:15, 81:19, 82:16, 85:11, 87:18, 89:1, 89:6
**see** [69] - 8:2, 8:3, 9:22, 21:4, 41:8, 41:9, 42:1, 63:22, 71:12, 71:22, 72:6, 72:20, 73:5, 73:10, 73:23, 74:3, 75:5, 75:8, 77:21, 78:23, 79:5, 79:8, 79:13, 80:16, 80:17, 83:9, 83:15, 83:20, 84:11, 85:6, 85:17, 86:8, 87:2, 87:4, 87:19, 88:14, 89:19, 90:2, 90:4, 90:18, 90:24, 91:8, 92:2, 92:14, 92:18, 93:1, 93:16, 94:1, 94:4, 94:15, 95:7, 95:8, 96:14, 96:22, 97:5, 98:3, 99:2, 99:9, 99:14, 100:5, 100:16, 100:24, 101:18, 102:21, 103:2, 104:12, 104:15, 106:12
**seeing** [2] - 30:8, 30:10
**seek** [5] - 12:3, 12:4, 70:13, 81:10, 85:24
**seeking** [8] - 4:16, 5:24, 8:1, 8:3, 9:2, 9:16, 51:10, 76:16
**seeks** [1] - 90:11
**sees** [1] - 46:25
**select** [1] - 93:24
**semblance** [1] - 97:12
**send** [1] - 54:20
**sends** [1] - 46:7
**SENIOR** [1] - 1:8
**sense** [1] - 44:3
**sensitive** [1] - 50:25
**sent** [1] - 54:25
**sentence** [4] - 31:10, 32:4, 40:10, 89:16
**separate** [3] - 4:12, 12:10, 88:5
**separation** [1] - 69:24
**series** [4] - 8:23, 36:12, 36:13, 52:8
**serious** [2] - 19:8, 20:10
**seriously** [1] - 84:9
**Service** [1] - 25:13
**service** [3] - 7:15, 10:10, 81:11

**Services** [2] - 25:10, 102:21
**services** [1] - 11:23
**set** [7] - 6:11, 12:10, 16:4, 17:9, 53:22, 88:18
**sets** [1] - 16:24
**sever** [1] - 14:5
**several** [3] - 8:13, 48:14, 91:4
**severe** [2] - 100:18, 101:6
**shall** [3] - 24:1, 55:25, 111:8
**Shannon** [1] - 4:24
**share** [1] - 105:22
**sheet** [8] - 20:25, 24:12, 69:19, 76:3, 76:4, 76:6, 80:4, 82:17
**Sheet** [1] - 63:17
**shied** [1] - 96:13
**short** [3] - 65:10, 82:5, 89:10
**shorthand** [1] - 1:24
**shortly** [1] - 104:5
**show** [4] - 26:8, 35:25, 36:6, 72:25
**showed** [1] - 95:15
**showing** [5] - 7:15, 35:16, 64:17, 73:21, 94:18
**shown** [11] - 74:1, 74:7, 74:22, 78:14, 78:18, 82:25, 83:4, 89:23, 94:10, 94:22, 97:19
**shows** [2] - 58:23, 59:22
**sic** [1] - 25:22
**side** [4] - 41:16, 42:16, 55:14, 71:24
**side's** [1] - 40:7
**sidelines** [1] - 78:11
**sides** [3] - 28:20, 102:25, 103:2
**signal** [1] - 108:4
**signatory** [1] - 111:10
**significant** [3] - 98:1, 101:7, 102:8
**significantly** [1] - 103:11
**Simms** [1] - 96:22
**Simon** [1] - 93:17
**simple** [1] - 82:20
**simply** [4] - 12:6, 14:21, 40:17, 82:16
**Singh** [1] - 94:20
**single** [5] - 32:11, 39:12, 39:18, 43:1,

70:25
**singled** [2] - 69:14, 89:11
**singled-out** [1] - 89:11
**singles** [2] - 15:21, 93:4
**Singleton** [1] - 90:19
**sit** [3] - 5:20, 25:1, 36:13
**sitting** [3] - 5:21, 52:11, 101:23
**situation** [7] - 12:16, 41:5, 42:5, 48:4, 51:25, 57:20, 67:1
**Sixth** [18] - 15:4, 15:5, 15:22, 15:25, 69:11, 74:21, 86:11, 89:24, 89:25, 90:9, 91:2, 91:11, 91:17, 92:22, 94:1, 94:6, 94:24, 97:22
**skill** [2] - 16:4, 16:10
**slam** [1] - 69:15
**slightly** [1] - 75:22
**slowly** [2] - 107:25, 108:4
**smacks** [1] - 67:3
**snow** [1] - 20:19
**snowed** [1] - 20:19
**snowstorm** [1] - 20:20
**so..** [1] - 57:14
**society** [2] - 67:4, 67:23
**soldiers** [1] - 70:21
**sole** [3] - 48:1, 50:21, 84:22
**solely** [1] - 85:13
**solid** [1] - 15:6
**solve** [2] - 110:10, 110:13
**solvency** [3] - 40:13, 40:15, 99:18
**someone** [3] - 59:19, 62:2, 85:8
**sometimes** [2] - 29:22, 87:24
**somewhat** [2] - 8:16, 57:12
**somewhere** [1] - 39:10
**sophisticated** [1] - 15:14
**Soros** [1] - 75:16
**Sorrell** [1] - 79:8
**sorry** [5] - 3:11, 6:5, 43:7, 64:2, 72:13
**sort** [13] - 13:23, 17:7, 17:8, 31:10, 43:4, 43:16, 48:5, 48:6, 51:8, 52:8, 62:3,

65:15
**Sotomayor** [1] - 67:19
**source** [2] - 31:1
**Southern** [3] - 49:25, 101:17, 101:19
**sovereign** [2] - 100:4, 100:8
**spades** [1] - 70:15
**speaker** [1] - 79:4
**speakers** [1] - 78:22
**special** [5] - 13:3, 16:5, 22:16, 91:12, 96:9
**Special** [1] - 32:10
**specialization** [1] - 84:15
**Specialty** [1] - 94:15
**specific** [10] - 9:25, 30:3, 30:12, 31:3, 31:6, 38:5, 54:11, 55:24, 79:3
**specifically** [1] - 88:8
**speculate** [1] - 53:5
**speculating** [1] - 59:22
**speculation** [1] - 40:10
**speculative** [6] - 28:15, 52:7, 52:9, 58:23, 59:13, 68:6
**speculativeness** [1] - 58:25
**speech** [16] - 20:1, 33:6, 36:2, 60:11, 61:11, 66:19, 67:21, 68:1, 69:11, 74:25, 75:5, 77:16, 79:2, 79:7, 85:21, 97:2
**spell** [1] - 27:20
**spent** [2] - 69:15, 71:4
**spine** [1] - 46:8
**spirit** [1] - 55:5
**spoken** [1] - 79:6
**sprinkled** [2] - 19:22, 24:8
**squarely** [1] - 76:25
**staff** [2] - 81:3, 110:1
**staffing** [1] - 42:20
**stage** [1] - 9:6
**stand** [3] - 23:15, 23:16, 65:16
**standard** [4] - 26:16, 27:23, 74:11, 84:14
**standing** [7] - 14:9, 15:6, 69:12, 90:8, 90:11, 91:10, 100:20
**standpoints** [1] - 11:7
**stands** [2] - 17:7, 53:15
**start** [5] - 2:7, 4:22,

29:22, 73:19, 74:19
**started** [1] - 68:14
**starting** [1] - 31:9
**starts** [1] - 30:1
**state** [6] - 18:13, 35:19, 66:5, 67:10, 79:7, 80:24
**State** [1] - 27:11
**statement** [3] - 13:25, 32:6, 40:7
**statements** [4] - 29:3, 31:6, 66:20, 103:1
**States** [37] - 2:3, 3:2, 8:15, 8:19, 11:4, 21:14, 21:20, 22:9, 24:11, 28:11, 29:1, 30:2, 30:14, 30:21, 45:25, 49:11, 51:1, 51:3, 52:20, 52:22, 52:25, 53:2, 53:20, 56:16, 57:3, 57:18, 58:10, 60:22, 61:7, 62:4, 62:9, 62:11, 80:6, 81:19, 87:24, 89:2, 107:8
**states** [3] - 79:22, 89:19, 96:17
**STATES** [2] - 1:1, 1:8
**stating** [3] - 74:1, 95:12, 97:6
**status** [7] - 28:18, 29:8, 37:2, 72:4, 72:19, 80:8
**statute** [2] - 29:24
**statutory** [1] - 17:8
**stay** [1] - 43:8
**stemming** [2] - 42:25, 100:13
**stenographic** [1] - 111:5
**step** [2] - 10:16, 13:19
**steps** [5] - 10:8, 46:12, 51:15, 75:24, 104:6
**stewards** [1] - 7:17
**still** [3] - 39:1, 49:24, 89:6
**stop** [3] - 4:16, 56:18, 65:10
**straight** [1] - 35:17
**Street** [1] - 1:20
**Strickland** [1] - 90:2
**strict** [2] - 35:16, 61:21
**struck** [1] - 29:20
**subject** [6] - 10:4, 25:6, 65:16, 78:22, 87:23, 90:4
**subjecting** [1] - 75:3
**subjects** [2] - 89:15, 102:12

**submission** [1] - 107:12
**submissions** [1] - 15:11
**submit** [4] - 8:23, 10:11, 104:8, 105:10
**submitted** [4] - 7:20, 15:11, 66:20, 69:25
**subordinates** [1] - 104:3
**substance** [1] - 50:10
**substantial** [1] - 5:15
**substantially** [1] - 84:10
**substantiated** [1] - 102:9
**substantive** [1] - 31:10
**succeed** [9] - 73:1, 73:20, 74:8, 78:15, 78:18, 83:1, 83:5, 89:24, 94:6
**success** [7] - 9:6, 36:7, 73:22, 74:2, 74:16, 74:22, 94:23
**sue** [1] - 106:24
**sued** [1] - 70:4
**suffer** [6] - 73:2, 90:22, 94:10, 94:19, 101:9, 102:3
**suffered** [4] - 84:14, 90:13, 90:22, 101:7
**suffering** [1] - 82:10
**suffices** [1] - 97:4
**sufficient** [6] - 18:9, 31:7, 33:5, 39:19, 74:10, 100:24
**suggest** [1] - 109:22
**suggested** [2] - 55:16, 106:16
**suggesting** [3] - 61:14, 61:16, 61:20
**suggestions** [1] - 105:13
**Sullivan** [1] - 80:17
**summary** [3] - 6:20, 104:14, 104:17
**supervisor** [2] - 39:22, 39:23
**supplies** [1] - 47:17
**supported** [1] - 95:17
**supporting** [2] - 70:18, 81:3
**supports** [1] - 97:7
**supposed** [1] - 99:23
**suppress** [3] - 79:12, 79:19, 80:16
**suppression** [2] - 68:1, 80:20
**Supreme** [15] - 47:15,

63:15, 67:16, 67:17, 77:10, 77:16, 79:6, 79:10, 80:14, 82:24, 86:24, 90:16, 91:3, 91:24, 95:4
**suspend** [1] - 47:7
**suspicion** [1] - 87:9
**Sussmann** [1] - 70:3
**SW** [1] - 1:14
**sweeps** [2] - 80:25, 82:5
**System** [1] - 75:5
**system** [8] - 70:2, 92:2, 92:18, 102:19, 102:23, 103:12, 103:13, 103:15

## T

**table** [3] - 2:18, 3:3, 101:24
**tag** [1] - 19:14
**tailored** [4] - 35:24, 36:3, 80:23, 80:25
**tailoring** [1] - 35:17
**taint** [1] - 81:4
**target** [2] - 57:23, 85:4
**targeted** [2] - 80:11, 103:23
**targeting** [3] - 67:2, 77:5, 80:14
**targets** [3] - 26:24, 64:21, 78:21
**task** [1] - 66:8
**taxpayer** [1] - 101:21
**team** [1] - 105:9
**teased** [1] - 21:9
**technically** [1] - 17:23
**tellingly** [1] - 20:11
**temporary** [6] - 3:25, 4:16, 26:10, 29:8, 71:15, 73:14
**Tenth** [1] - 85:18
**term** [1] - 44:9
**terminate** [8] - 10:8, 11:21, 15:19, 40:12, 46:13, 51:15, 86:5, 98:16
**terminated** [4] - 13:18, 13:23, 17:18, 100:1
**terminating** [2] - 10:18, 68:21
**termination** [2] - 81:23, 86:16
**terms** [10] - 12:7, 13:19, 18:24, 47:18, 61:21, 75:22, 99:20, 99:22, 100:15, 109:18
**terrorist** [1] - 60:13,

60:14
**TERRY** [1] - 1:18
**Terry** [1] - 3:3
**test** [2] - 39:8, 41:21
**tests** [1] - 67:12
**text** [1] - 79:21
**thankfully** [1] - 3:21
**THE** [170] - 1:1, 1:8, 1:10, 1:17, 2:2, 2:11, 2:15, 2:17, 2:21, 2:24, 3:5, 3:8, 3:10, 3:13, 3:15, 3:20, 5:1, 5:4, 5:7, 5:18, 6:5, 6:15, 6:23, 7:1, 7:22, 9:2, 9:15, 9:21, 10:22, 10:24, 11:12, 11:16, 11:20, 13:1, 13:12, 13:15, 13:22, 14:11, 15:3, 15:25, 17:5, 18:5, 18:21, 19:12, 19:20, 21:7, 22:1, 22:3, 22:13, 23:2, 23:14, 25:4, 25:10, 25:16, 25:19, 26:2, 27:24, 28:17, 28:22, 29:6, 29:12, 29:15, 30:24, 31:12, 31:22, 32:13, 32:21, 33:11, 33:15, 33:21, 34:19, 35:13, 36:6, 36:17, 36:19, 36:21, 37:2, 37:8, 37:17, 38:15, 38:23, 40:19, 41:3, 41:23, 42:1, 42:8, 42:12, 43:15, 43:25, 44:7, 44:18, 45:8, 45:11, 45:19, 46:4, 47:9, 47:20, 48:12, 48:16, 49:5, 49:10, 49:14, 49:22, 50:18, 50:20, 51:4, 51:11, 52:2, 52:13, 53:9, 53:14, 53:17, 54:4, 54:13, 54:17, 54:22, 54:25, 55:3, 55:13, 55:23, 56:7, 56:22, 57:2, 57:5, 57:13, 57:20, 57:23, 57:25, 58:4, 58:6, 58:25, 59:18, 59:24, 60:3, 60:18, 60:23, 60:25, 61:13, 61:18, 62:21, 62:23, 63:11, 63:15, 63:22, 64:1, 65:2, 65:4, 65:7, 65:9, 70:7, 71:11, 105:8, 105:16, 105:19, 106:5, 106:12, 106:15, 107:7, 107:10,

107:24, 108:3, 108:13, 108:19, 109:1, 109:22, 110:7, 110:12, 110:15, 110:17, 110:19
**themselves** [3] - 20:9, 95:3, 95:20
**theoretical** [1] - 94:13
**theoretically** [1] - 52:5
**theory** [2] - 8:10, 63:23
**therefore** [6] - 4:9, 44:23, 73:13, 73:16, 103:14, 104:2
**thinking** [1] - 34:23
**thinks** [2] - 45:13, 65:14
**third** [7] - 14:16, 14:17, 25:5, 40:9, 91:8, 91:9, 91:14
**third-party** [1] - 91:8
**thousand** [2] - 26:22, 36:24
**thousands** [1] - 24:23
**threat** [10] - 19:1, 20:15, 25:2, 67:24, 69:6, 80:18, 81:23, 85:10, 89:6, 92:24
**threaten** [7] - 21:6, 21:13, 22:8, 24:7, 52:18, 81:19, 89:1
**threatened** [1] - 103:7
**threatening** [6] - 5:16, 17:1, 27:19, 40:8, 52:22, 68:20
**threatens** [9] - 90:7, 91:21, 92:6, 92:21, 97:17, 99:8, 100:18, 102:18, 103:11
**three** [8] - 4:16, 10:7, 21:9, 73:3, 74:8, 74:15, 91:7, 102:5
**throughout** [1] - 30:25
**throwing** [1] - 61:20
**thrown** [1] - 18:23
**tied** [4] - 49:13, 49:16, 49:21, 102:8
**tight** [1] - 103:21
**tilt** [1] - 79:8
**timeline** [2] - 37:13, 37:15
**title** [2] - 4:10, 4:17
**titled** [2] - 4:4, 71:18
**today** [9] - 3:24, 25:17, 28:6, 31:4, 45:21, 62:16, 89:4, 106:7, 106:9
**today's** [1] - 73:17
**together** [2] - 56:17,

67:2
**tomorrow** [4] - 104:9, 104:19, 106:7, 110:21
**took** [2] - 87:16, 107:9
**top** [2] - 12:23, 27:15
**total** [1] - 57:5
**totally** [2] - 50:12, 82:13
**touch** [3] - 17:5, 64:16, 66:16
**tough** [1] - 70:14
**towards** [1] - 107:1
**traceability** [2] - 41:9, 41:12
**trademark** [1] - 27:4
**Trademark** [2] - 27:5, 98:7
**transactional** [1] - 84:20
**TRANSCRIPT** [1] - 1:7
**Transcript** [1] - 1:25
**transcript** [3] - 111:5, 111:6, 111:9
**transcription** [1] - 1:25
**Transportation** [1] - 27:10
**treasured** [1] - 62:18
**Trentadue** [1] - 85:17
**trial** [2] - 44:15, 89:12
**tricky** [1] - 61:2
**TRO** [33] - 5:24, 7:25, 8:3, 9:3, 26:19, 27:23, 28:18, 29:2, 29:6, 70:10, 70:13, 71:20, 71:24, 72:4, 72:10, 72:25, 73:3, 73:4, 73:5, 73:17, 74:11, 94:9, 94:11, 94:12, 95:1, 101:4, 101:10, 102:3, 102:11, 102:14, 103:14, 104:2, 104:5
**TROs** [3] - 28:2, 72:15, 72:16
**trouble** [1] - 25:17
**true** [5] - 43:2, 54:6, 66:5, 111:4, 111:5
**truly** [4] - 12:11, 27:18, 27:21, 33:19
**trump** [1] - 97:5
**Trump** [12] - 4:3, 32:17, 67:17, 70:4, 73:10, 76:9, 80:7, 101:15, 101:18, 101:21, 102:17, 103:6
**Trump's** [2] - 32:8, 71:17

**trust** [6] - 19:8, 20:10, 43:10, 47:21, 61:10, 62:1
**trusted** [1] - 34:16
**trustworthy** [4] - 30:16, 33:7, 35:7, 46:1
**try** [3] - 63:1, 68:2, 107:25
**trying** [5] - 3:18, 38:14, 43:13, 58:22, 68:22
**tsunami** [1] - 27:18
**TTAB** [1] - 27:4
**Tube** [1] - 63:18
**turn** [6] - 4:18, 9:23, 15:25, 21:7, 43:15, 94:8
**Turner** [1] - 75:8
**turning** [2] - 74:20, 91:17
**turns** [1] - 26:14
**two** [27] - 8:2, 9:10, 10:4, 18:22, 18:24, 20:23, 21:16, 26:11, 26:16, 41:8, 65:11, 73:2, 73:9, 73:18, 74:23, 74:25, 82:11, 83:9, 83:17, 90:12, 91:6, 101:12, 107:12, 107:16, 108:15, 108:17, 109:4
**tying** [1] - 109:19
**type** [3] - 38:6, 51:9, 67:4
**types** [3] - 17:13, 18:9, 109:20
**typically** [4] - 44:12, 54:20, 60:9, 100:15
**tyrannical** [1] - 66:12

## U

**U.S** [51] - 1:5, 3:6, 3:12, 19:1, 19:15, 25:13, 27:13, 46:21, 47:15, 54:22, 55:1, 55:7, 73:6, 73:7, 73:24, 75:6, 75:8, 75:10, 77:14, 78:24, 79:9, 79:14, 80:17, 83:10, 85:7, 86:12, 87:2, 87:3, 87:5, 87:7, 87:20, 88:15, 89:8, 90:2, 90:5, 90:18, 90:19, 90:20, 92:2, 92:3, 92:18, 93:1, 93:2, 95:8, 95:9, 95:11, 98:7,

101:23, 102:21, 103:2
**u.S** [1] - 1:19
**ultra** [1] - 70:8
**unable** [2] - 85:24, 99:18
**unanimous** [1] - 67:17
**uncertainty** [1] - 98:16
**unchecked** [1] - 71:8
**unconstitutional** [1] - 85:8
**uncontested** [1] - 72:19
**under** [28] - 13:10, 13:18, 15:12, 15:24, 17:20, 19:4, 24:16, 25:1, 26:12, 27:20, 29:24, 30:15, 30:18, 35:14, 45:1, 47:13, 51:2, 51:6, 51:8, 52:8, 62:16, 74:12, 76:1, 88:19, 89:17, 99:19, 103:16, 104:8
**undermine** [2] - 91:21, 103:11
**underneath** [1] - 64:6
**understated** [1] - 102:14
**understood** [3] - 19:12, 28:4, 95:25
**undetermined** [1] - 28:16
**unethically** [1] - 85:12
**unfettered** [1] - 15:12
**unfortunately** [1] - 39:9
**Union** [3] - 72:23, 86:9, 86:10
**uniquely** [1] - 67:22
**unitary** [1] - 63:23
**United** [40] - 2:3, 3:2, 8:15, 8:19, 11:4, 21:14, 21:20, 22:9, 24:11, 28:11, 29:1, 30:2, 30:14, 30:21, 45:25, 49:11, 51:1, 51:3, 52:20, 52:22, 52:25, 53:2, 53:20, 56:16, 57:2, 57:18, 58:10, 60:22, 61:7, 62:4, 62:8, 62:11, 72:22, 72:23, 80:6, 81:19, 86:9, 87:24, 89:2, 107:8
**UNITED** [2] - 1:1, 1:8
**University** [3] - 60:19, 78:24, 96:10
**unlawful** [3] - 75:1, 78:20, 104:3
**unlawfully** [2] - 74:24,

78:16
**unless** [6] - 22:22, 39:9, 60:18, 81:15, 104:9, 104:12
**unlike** [1] - 8:2
**unpopular** [8] - 20:9, 70:19, 70:24, 78:7, 80:13, 103:5, 103:9
**unprecedented** [1] - 96:1
**unquestionably** [1] - 95:6
**unrecoverable** [3] - 100:4, 100:8, 100:10
**unrelated** [1] - 82:14
**unrestricted** [1] - 47:16
**unreviewable** [1] - 34:17
**untied** [1] - 109:17
**unwise** [1] - 48:5
**up** [22] - 3:18, 3:21, 16:4, 16:24, 20:18, 23:7, 23:15, 23:16, 26:6, 28:12, 36:24, 37:4, 38:10, 50:2, 60:1, 63:24, 68:3, 68:22, 84:21, 104:16, 106:2, 107:25
**upend** [1] - 47:5
**UPS** [1] - 59:20
**upset** [2] - 49:23, 49:24
**Urban** [1] - 73:25
**USCIS** [1] - 27:8
**uses** [1] - 56:23
**USPTO** [1] - 27:2

**V**

**V.A** [1] - 24:5
**vague** [1] - 88:6
**vagueness** [1] - 88:13
**value** [2] - 33:11, 84:11
**variety** [1] - 41:17
**various** [3] - 42:18, 44:22, 54:1
**vast** [1] - 99:15
**Velazquez** [1] - 102:21
**vendetta** [1] - 101:24
**venue** [1] - 38:4
**veracity** [1] - 39:7
**verdict** [1] - 89:16
**verifiable** [1] - 32:12
**vested** [1] - 48:2
**vesting** [5] - 30:23, 63:10, 63:12, 64:18, 64:19

**veterans** [1] - 24:5
**veto** [1] - 64:10
**via** [4] - 55:21, 83:17, 83:18, 85:24
**view** [17] - 10:16, 32:16, 33:3, 39:13, 44:22, 46:8, 47:20, 49:11, 50:11, 50:15, 53:19, 55:14, 63:5, 63:11, 64:4, 65:14, 108:14
**viewed** [2] - 61:23, 100:15
**viewpoint** [21] - 31:25, 32:24, 60:5, 61:3, 61:21, 61:25, 66:23, 67:6, 67:22, 70:19, 70:25, 75:1, 75:8, 76:22, 76:23, 77:12, 78:20, 78:25, 82:19, 82:24, 83:3
**viewpoint-related** [1] - 31:25
**viewpoints** [5] - 20:1, 67:2, 80:12, 82:23, 102:17
**views** [5] - 48:7, 78:22, 79:12, 79:19, 80:16
**vigorous** [3] - 50:15, 77:3, 102:25
**vigorously** [3] - 7:24, 33:18, 48:7
**violates** [1] - 94:24
**violation** [14] - 13:7, 14:19, 14:23, 38:20, 67:14, 69:10, 78:22, 80:14, 83:7, 86:21, 87:22, 97:4, 97:6, 97:20
**violations** [8] - 14:2, 19:8, 20:10, 90:9, 91:3, 95:2, 95:16, 96:21
**violent** [1] - 60:21
**vires** [1] - 70:8
**Virginia** [1] - 78:24
**virtually** [1] - 66:17
**virtue** [1] - 17:21
**Visitors** [1] - 78:24
**vitality** [1] - 68:20
**void** [2] - 88:13, 111:8
**voter** [3] - 31:15, 75:18, 79:25
**voting** [4] - 31:17, 31:18, 31:19, 76:21
**vs** [1] - 1:4
**Vullo** [2] - 67:19, 79:14, 80:16, 94:4

**W**

**wait** [4] - 59:8, 104:19, 105:16, 106:7
**waiting** [1] - 27:18
**waiver** [2] - 22:6, 22:17, 81:16
**wake** [1] - 20:18
**walk** [1] - 31:6
**wall** [1] - 77:8
**walling** [1] - 50:24
**wants** [2] - 17:10, 89:16
**warranted** [1] - 80:21
**Washington** [4] - 1:6, 1:15, 70:20, 90:2
**washington** [1] - 1:21
**watch** [1] - 20:20
**watching** [2] - 78:11, 78:12
**water** [1] - 69:1
**watershed** [1] - 70:22
**ways** [3] - 63:22, 83:17, 88:10
**week** [1] - 4:4
**weigh** [2] - 91:1, 91:10
**welcome** [3] - 2:17, 2:24, 5:7
**well-respected** [1] - 4:11
**what-ifs** [3] - 36:24, 36:25, 38:10
**whatsoever** [2] - 23:8, 61:12
**Wheat** [1] - 90:4
**White** [2] - 30:8, 80:4
**white** [2] - 27:11, 98:7
**whole** [7] - 3:16, 5:24, 29:19, 30:24, 46:18, 67:20, 105:9
**wholly** [3] - 101:24, 107:3
**widely** [1] - 82:5
**wielding** [1] - 103:9
**Williams** [9] - 1:14, 2:9, 48:12, 48:22, 48:24, 50:7, 50:14, 50:15, 59:3
**willing** [1] - 57:7
**Wilson** [1] - 75:6
**wins** [1] - 71:25
**Winter** [1] - 73:7
**Wisconsin** [2] - 85:6, 99:9
**wish** [1] - 96:3
**wishes** [1] - 96:5
**withdraw** [1] - 93:14
**withdrawn** [1] - 97:13
**WL** [2] - 72:7, 100:6

**W**

**wonder** [1] - 14:19
**Wonderland** [1] - 89:14
**word** [5] - 23:4, 25:22, 44:4, 55:8, 56:23
**words** [11] - 18:22, 18:24, 20:13, 21:3, 55:24, 63:5, 65:22, 71:14, 82:15, 84:3
**Workers** [3] - 72:22, 72:23, 86:9
**works** [4] - 35:22, 63:7, 101:13, 102:24
**world** [7] - 4:13, 39:2, 40:22, 52:4, 58:20, 58:21, 58:23
**worry** [1] - 67:10
**worse** [1] - 22:21
**wrecking** [1] - 5:12
**write** [1] - 25:1
**writing** [1] - 67:20
**Wulff** [1] - 90:19

**X**

**Xiaomi** [2] - 100:5, 100:16

**Y**

**year** [2] - 34:9, 79:10
**years** [4] - 25:1, 64:15, 70:13, 101:14
**yells** [1] - 89:14
**yesterday** [4] - 4:1, 7:11, 68:14, 74:14
**York** [1] - 101:18
**you-all** [5] - 6:17, 104:15, 104:18, 104:21, 107:10
**Youngstown** [1] - 63:17
**yourself** [2] - 37:5, 70:19
**yourselves** [1] - 2:6

**Z**

**zealous** [1] - 102:24
**zealously** [1] - 103:17
**zero** [2] - 19:2, 89:5
**Zimmerman** [1] - 83:9
**Zoom** [1] - 56:5