## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

　　　　　　　Plaintiff,

　　　　v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

　　　　　　　Defendants.

Civil Action No. 25-716 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION AND ORDER</u>

Though this adage is commonplace, and the tactic overused, it is called to mind by defendants' pending motion to disqualify this Court: "When you can't attack the message, attack the messenger." Defendants filed this motion less than two weeks after this Court issued a temporary restraining order barring defendants from enforcing against plaintiff Perkins Coie LLP three of the five sections of Executive Order 14230 ("EO 14230"), issued by President Donald J. Trump on March 6, 2025, 90 Fed. Reg. 11781 (Mar. 11, 2025), targeting the law firm with punitive measures due to the law firm's representation of clients whom the President dislikes or who sought relief through litigation that the President opposes. When the U.S. Department of Justice engages in this rhetorical strategy of *ad hominem* attack, the stakes become much larger than only the reputation of the targeted federal judge. This strategy is designed to impugn the integrity of the federal judicial system and blame any loss on the decision-maker rather than fallacies in the substantive legal arguments presented.

The opportunity presented by the defendants' motion, which invokes 28 U.S.C. § 455(a) to disqualify this Court, is welcomed to set the record straight, because facts matter. To begin, this Court agrees wholeheartedly with defendants that "[f]air proceedings free from any suggestion of impartiality are essential to the integrity of our country's judiciary." Defendants' Mot. to

Disqualify Judge Beryl Howell ("Defs.' Mot.") at 1, ECF No. 34.  No judicial ruling exists in a vacuum but rests on the facts presented in "Cases" or "Controversies" necessary for the exercise of a federal court's jurisdiction, U.S. Const. art. III, § 2, and every litigating party deserves a fair and impartial hearing to determine both what the material facts are and how the law best applies to those facts.  That fundamental promise, however, does not entitle *any* party—not even those with the power and prestige of the President of the United States or a federal agency—to demand adherence to their own version of the facts and preferred legal outcome.  "Factfinding," after all, "is the basic responsibility of district courts," *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982) (citation omitted, alteration accepted), and "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

This reminder about the role of the federal courts seems necessary given the opening line in defendants' pending motion, expressing "the need to curtail ongoing improper encroachments of President Trump's Executive Power playing out around the country."  Defs.' Mot. at 1.  This line, which sounds like a talking point from a member of Congress rather than a legal brief from the United States Department of Justice, has no citation to any legal authority for the simple reason that the notion expressed reflects a grave misapprehension of our constitutional order.  Adjudicating whether an Executive Branch exercise of power is legal, or not, is actually the job of the federal courts, and not of the President or the Department of Justice, though vigorous and rigorous defense of executive actions is both expected and helpful to the courts in resolving legal issues.  Defendants then proceed, in the second line of their pending motion, to describe as "meritless" every lawsuit challenging the President's "agenda that the American people elected him to carry out."  *Id*.  This blanket denigration of the merits of all the lawsuits filed across the

country certainly reflects palpable frustration with court rulings issued to pause, temper, or reverse Trump Administration actions, but this is a testament to the fact that this country has an independent judiciary that adheres to an impartial adjudication process, without being swayed merely because the federal government appears on one side of a case and the President wishes a particular result.

While obviously not able to speak to the merits of all the cases "around the country" provoking defendants' frustration, a quick survey of the cases over which this Court is presiding challenging the current Administration's actions show that, contrary to the defendants' posturing, the outcomes have followed the facts and the law. When the facts and applicable law appear likely to favor the actions taken by the current administration, for example, this Court has ruled in the government's favor. *See, e.g.*, Min. Order, *U.S. Inst. of Peace v. Jackson*, No. 25-cv-804-BAH (D.D.C. Mar. 19, 2025) (denying motion for a temporary restraining order filed by plaintiffs in a case against President Trump and ten other Executive Branch defendants for terminating ten board members and the acting president of the U.S. Institute of Peace). In another case, even the government conceded that binding Supreme Court precedent required the legal result reached by this Court if the facts were found to be sufficiently similar to that precedent, which the Court found they were. *See Wilcox v. Trump*, -- F. Supp. 3d --, 2025 WL 720914, at *10 (D.D.C. Mar. 6, 2025); *id.* at *1 ("*Humphrey's Executor* remains binding on this Court, as defendants rightly acknowledge." (citing Defs.' Opp'n at 8 n.2)); Defs.' Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. at 8 n.2, *Wilcox v. Trump*, No. 25-cv-334, ECF No. 23 (D.D.C.) (filed Feb. 21, 2025) ("[T]he government acknowledges that whatever little remains of *Humphrey's Executor* is binding on this Court until overturned by the Supreme Court."). Thus, in the latter case, the action

taken by the President was declared null and void, since the facts and applicable law entitled the plaintiff to a favorable judgment. The neutral administration of justice required no less.

The D.C. Circuit has warned that consideration of a motion for disqualification "is never taken lightly," since "[i]n the wrong hands, a disqualification motion is a procedural weapon" that, "[i]f supported only by rumor, speculation, or innuendo," might be used, among other nefarious purposes, as "a means to tarnish the reputation of a federal judge," *United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) (en banc) (per curiam), or to "reduce[] the judicial process to little more than a skirmish in a partisan battle," *In re Flynn*, 973 F.3d 74, 85 (D.C. Cir. 2020) (en banc) (per curiam) (Griffith, J., concurring). This larger concern about the overall damage to the rule of law and the federal judicial system from the feckless impugning of the decision-making process of individual federal judges has prompted Chief Justice John G. Roberts, Jr., to criticize "regrettabl[e] . . . attempts" by "[p]ublic officials . . . to intimidate judges," including by "suggesting political bias in the judge's adverse rulings without a credible basis for such allegations." John G. Roberts, Jr., 2024 Year End Rep. on the Fed. Judiciary 7 (Dec. 31, 2024), https://perma.cc/QU5A-r9YB.

Here, defendants rely only on "speculation[ and] innuendo" in seeking to get another Judge assigned to preside over this case. The clear absence of any legitimate basis for disqualification requires denial of the pending motion. *See, e.g., United States v. Haldeman*, 559 F.2d 31, 139 n.360 (D.C. Cir. 1976) ("[I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. . . . Nothing in [§455] should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial."); *Garrett v. Ohio State*

*Univ.*, 60 F.4th 359, 371 (6th Cir. 2023) (warning of the "significant toll" "exact[ed]" on the judiciary by "needless recusals," including "facilitat[ing] judge-shopping" (quoting *In re U.S.*, 572 F.3d 301, 308 (7th Cir. 2009))).

## I.    LEGAL STANDARD

A judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or "[w]here he has a personal bias or prejudice concerning a party," *id.* § (b)(1).  This statute sets a high bar under which "recusal must be limited to truly extraordinary cases."  *Cobell v. Kempthorne*, 455 F.3d 317, 332 (D.C. Cir. 2006); *see also, e.g.*, *United States v. Pollard*, 959 F.2d 1011, 1023 (D.C. Cir. 1992) ("[D]isqualification of a judge is not lightly granted," since "that relief" is "extraordinary.").  As a result, the party moving for disqualification carries a "heavy burden" of proof to succeed.  *Cobell*, 455 F.3d at 332.  A court's "judicial rulings alone almost never" satisfy this standard.  *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)); *see also SEC v. Loving Spirit Found. Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004) ("[R]ulings resting on record evidence 'almost never constitute a valid basis for a bias or partiality motion.'" (quoting *Liteky*, 510 U.S. at 555)).  Instead, as the Supreme Court has explained, adverse rulings are "[a]lmost invariably . . . proper grounds for appeal, not for recusal."  *Liteky*, 510 U.S. at 555.  Moreover, judicial recusal is required "'if a reasonable person, *knowing all the circumstances*, would expect that the judge would have actual knowledge' of his interest or bias in the case."  *Sao Paulo State of Federative Republic of Braz. v. Am. Tobacco Co.*, 535 U.S. 229, 232-33 (2002) (emphasis in original) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861 (1988)); *see also Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Statement of Chief Justice Rehnquist on decision not to recuse) (noting that, under § 455(a), the "inquiry is an objective one,

made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances"); *United States v. Hite*, 769 F.3d 1154, 1172 (D.C. Cir. 2014) (reiterating that rulings alone are almost never a basis for recusal).

Similarly, when a motion for disqualification relies on other grounds, recusal is improper unless the moving party can show that the judge has "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Liteky*, 510 U.S. at 556; *id.* at 558 (Kennedy, J., concurring in judgment) ("[U]nder [28 U.S.C.] § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute."). This standard is not satisfied merely because a judge "has expressed an opinion" on a legal issue "while on the bench," something the Supreme Court has long recognized is "common," and, in fact, "encourage[d]," by various codes governing judicial conduct. *Republican Party of Minn. v. White*, 536 U.S. 765, 779 (2002).

## II.    DISCUSSION

Defendants base their disqualification motion on the claim that this Court has demonstrated "[s]ystematic" "disdain for President Trump," Defs.' Mot. at 3, in three referenced prior rulings, *see id.* at 1, 4-5, and in "comments in this proceeding, other judicial proceedings, and in the public," *id.* at 6.[1]  Although defendants' motion is rife with innuendo, none of the claims put forward come close to meeting the standard for disqualification.

---

[1]    Defendants' requested relief is not just to have this case reassigned but, more specifically, "transferred to another district court judge who was neither involved with [the] Mueller Report nor the investigation of Special Counsel John Durham ("Durham Investigation") and who has not demonstrated a pattern of hostility towards Defendants." Defs.' Mot. at 2; *see also id.* at 7 (asking for reassignment "before a judge free from any appearance of hostility toward this Administration and is otherwise unconnected with any matter related to the Mueller Report or Durham Investigation"). Though this odd request might leave available for any reassignment those judges who handled matters related to investigations by Special Counsels Jack Smith and Robert Hur, by defendants' measure of purported bias, recusal would apply to most of the judges on this Court. Other judges have overseen grand jury matters involving the President, tried cases brought by the Mueller and Durham Special Counsel Offices, granted

### A. Defendants' Reliance On This Court's Three Prior Rulings

Despite the law being clear that prior rulings "[a]lmost invariably" do not provide a basis for disqualification, *Liteky*, 510 U.S. at 555, defendants point to three prior decisions of this Court as suggesting bias. *See* Defs.' Mot. at 4-5. Notably, defendants "offer[] no evidence" of actual bias but instead "merely *infer[]* bias from unfavorable judicial rulings." *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 848 (D.C. Cir. 1995) (emphasis in original). These prior rulings are addressed in reverse chronological order.

### 1. Dismissal of Cases Charging Defendants with Criminal Conduct at the U.S. Capitol on January 6, 2021

Defendants claim that this Court's dismissal of pending charges against defendants charged with criminal conduct at the U.S. Capitol on January 6, 2021, showed "hostility toward President Trump" through "disdain for his supporters," Defs.' Mot. at 4 (citing only *United States v. Jovanovic*, No. 25-cr-15 (BAH), 2025 WL 266551, at *2 (D.D.C. Jan. 22, 2025)).[2] These

---

dismissal without prejudice in January 6 prosecutions, and granted temporary restraining orders against the Trump administration. The regularity of these judicial decisions only highlights how unfounded the government's request is for recusal.

[2] The *Jovanovic* decision relied upon by defendants was only one of many issued by this Court to resolve the government's motions to dismiss, with prejudice, ongoing criminal cases against defendants for offense conduct during the January 6, 2021, attack at the U.S. Capitol. In a number of these cases, the defendants were charged with felonies for assaulting and/or physically resisting law enforcement officers, which charges were supported by the defendants' own admissions, photographic and video evidence, and extensive law enforcement investigations. For instance, in *Jovanovic*, the government alleged, based on photographic and video evidence, that the defendant assaulted law enforcement officers in a "prolonged scuffle" where he "rushed a line of police officers," and grabbed an officer's baton to drag that officer into a "mob" of rioters. 2025 WL 266551, at *1. In *United States v. DeCarlo*, No. 21-cr-73 (BAH), 2025 WL 266308, at *1 (D.D.C. Jan. 22, 2025), the two defendants, one of whom was a former senior leader of the Proud Boys, "by their own admission, engaged in criminal assault against law enforcement officers . . ., as well as property damage and theft" while at the Capitol. In *United States v. Amos*, -- F. Supp. 3d --, 2025 WL 275639, at *1 (D.D.C. Jan. 23, 2025), the defendant faced criminal charges for, among other conduct, attempting to break past a police line outside the Capitol, charging law enforcement officers while wielding a flagpole, and assaulting law enforcement officers by deploying pepper spray against them. In *United States v. Mangia*, No. 23-cr-288-2 (BAH), 2025 WL 266493, at *1 (D.D.C. Jan. 22, 2025), evidence showed, and the co-defendant in the case admitted, that the defendant physically assaulted law enforcement officers, breached the Capitol two separate times, and entered the Speaker of the House's personal office and the Senate floor. In *United States v. Dahlquist*, No. 24-cr-443 (BAH), 2025 WL 270608, at *1 (D.D.C. Jan. 22, 2025), the defendant was charged with nine counts, including the direct assault of two law enforcement officers, based on photographic and video evidence of defendant spraying officers with a chemical agent and throwing a four-by-four piece of lumber at officers responding to the scene. In *United States v. Gonzalez*, No. 24-cr-462 (BAH), 2025 WL 275605, at *1

defendants were not identified, investigated, and prosecuted for their political beliefs or support for President Trump but because they engaged in offense conduct during the January 6, 2021, attack on the U.S. Capitol that allegedly violated federal criminal laws. The offense conduct of these dismissed defendants, similarly to the many pardoned defendants, who already had been convicted of offense conduct at the Capitol attack, ran the gamut of breaching police lines, illegally entering restricted grounds, and assaulting and impeding police officers. Their conduct—not their beliefs and not their political views—was the reason for their criminal charges.

Defendants further accuse this Court of "grandstand[ing]," *id.*, because the decisions in each such dismissed case explained the legal and factual reasons for dismissing the cases "without prejudice," rather than simply granting the request of the U.S. Attorney's Office for the District of Columbia for dismissal "with prejudice," *see, e.g.*, *Jovanovic*, 2025 WL 266551, at *2-3. As a matter of law, the requested dismissals of charges in these cases were predicated on a criminal procedural rule requiring the exercise of judicial discretion, albeit narrow, and thus an explanation for the decision reached, in the form of a written decision, is appropriate and even warranted. *See* FED. R. CRIM. P. 48(a) ("The government may, *with leave of court*, dismiss an indictment, information, or complaint." (emphasis supplied)).

The crux of defendants' critique appears to be the fact that, in explaining the decision to dismiss the pending criminal cases without prejudice, this Court did not adopt in full the President's reasons for his issuance of the pardons to convicted defendants and his direction to the D.C. U.S. Attorney's Office to seek dismissal of the pending cases arising from the January 6,

---

(D.D.C. Jan. 23, 2025), the defendant was charged with felonies for directly assaulting two law enforcement officers and destroying government property, resulting in damages of more than $1,000. In *United States v. Williams*, No. 21-cr-377 (BAH), 2025 WL 266565, at *1 (D.D.C. Jan. 22, 2025), the defendant faced charges for, in his own words, "storm[ing] the stairs of the Capitol, push[ing] the cops back, . . . and hit[ting] everybody." (alterations in original) (citation, internal quotation marks omitted). In *United States v. Giusini*, No. 24-cr-318 (BAH), 2025 WL 275683, at *1 (D.D.C. Jan. 23, 2025), the defendant admitted to using physical force to help resist the police line attempting to clear and secure the Capitol building.

2021, attack on the U.S. Capitol.  *See* Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025). As defendants highlight, this Court, in "[d]irectly rejecting the president's determination" justifying the "dismissal of pending indictments," instead "curtly stated that no 'national injustice' occurred here."  Defs. Mot. at 4 (quoting *Jovanovic*, 2025 WL 266551, at *2).  In essence, defendants are affronted that the President's version of the facts was not simply adopted as reality by this Court.

Whatever reasons the President gives for the exercise of his pardon power are unreviewable by the courts.  *See, e.g.*, *United States v. Klein*, 80 U.S. 128, 147 (1871) ("To the executive alone is intrusted the power of pardon; and it is granted without limit."); *The Laura*, 114 U.S. 411, 413 (1885) (recognizing that the President has "the general, unqualified grant of power to pardon offenses against the United States"); *United States v. Flynn*, 507 F. Supp. 3d 116, 135-37 (D.D.C. 2020) (collecting and reviewing cases on the scope of the President's pardon power).  While the President may want a judicial imprimatur to bolster his reasons for a pardon, no court is required to grant this wish, though courts should explain the reasons for any judicial decision.  That is the responsibility this Court fulfilled.  *See, e.g.*, *Jovanovic*, 2025 WL 266551, at *1-3 (reviewing the factual allegations supporting criminal charges against defendant and noting that "the government's cursory motion provides *no* factual basis for dismissal," acknowledging that "the government's view of the public interest" does not clearly fall within the types of reasons found to warrant denial of a government Rule 48(a) motion to dismiss charges, but finding that "[n]othing about the government's reasoning for dismissal warrants entry of dismissal with prejudice" (emphasis in original)).[3]

---

[3]    Contrary to the reason given by the President for pardoning defendants charged with criminal conduct at the U.S. Capitol on January 6, 2021—*i.e.*, asserting that these defendants were the subjects of a "national injustice," Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025)—the same careful review of the facts and law relevant to each individual case this Court applied to the government's dismissal motions was also given to January 6

Moreover, the specific statements by this Court in these decisions granting the government's motion to dismissing pending charges against January 6 defendants that are objected to by defendants—*i.e.*, "[n]o 'national injustice' occurred here," *id.* at *2 (quoting Proclamation No. 10887), and that statements to the contrary represented a "revisionist myth," *id.*—provide no basis for finding "recusable . . . bias or prejudice," since these statements were "properly and necessarily acquired in the course of the proceedings," *Liteky*, 510 U.S. at 551, against the specific dismissed defendant and "scores" of other January 6 cases, through review of "extensive videotapes and photographs, admissions by defendants in the course of plea hearings and in testimony at trials, and the testimony of law enforcement officers and congressional staff present at the Capitol" on January 6, 2021, *Jovanovic*, 2025 WL 266551, at *2.  Since these comments properly "reflect[] what [the Court] learned . . . during the proceedings," *Microsoft Corp.*, 253 F.3d at 115, they provide no basis for disqualification.

Decisions from the D.C. Circuit finding that recusal was not warranted in cases involving far more critical comments made about criminal defendants reinforce this determination, *see, e.g.*, *Haldeman*, 559 F.2d at 131-32, 131 n.293 (holding, in a case involving Watergate defendants, that recusal was not warranted despite comments from a previous case "express[ing] a belief that criminal liability extended beyond the seven persons there charged" and "suggest[ing] persons whom the prosecutors might consider calling before the grand jury investigating 'Watergate'"); *In re Flynn*, 973 F.3d at 83 (finding no recusal warranted where the district judge told the defendant,

<hr />

defendants' motions filed during the pendency of their cases, resulting in some rulings by this Court favoring the positions asserted vigorously by their defense counsel, often over the strenuous objection of the government.  *See, e.g.*, *United States v. DeCarlo*, No. 21-cr-73 (BAH), 2024 WL 4650993 (D.D.C. Nov. 1, 2024); *United States v. Lyons*, No. 21-cr-79 (BAH), 2024 WL 3898550 (D.D.C. Aug. 22, 2024) (granting release pending resolution of a motion to vacate January 6 defendant's convictions, despite defendant's failure to appeal, over the government's objection); *United States v. Bledsoe*, No. 21-cr-204 (BAH), 2024 WL 341159 (D.D.C. Jan. 30, 2024) (granting release pending appeal to January 6 defendant over the government's objection); *United States v. Roche*, No. 22-cr-86 (BAH), 2024 WL 1328459 (D.D.C. Mar. 28, 2024) (same).

"[a]rguably, you sold your country out. . . . I'm not hiding my disgust, my disdain for this criminal offense."), as do similar decisions from other circuits, *see, e.g.*, *United States v. Allen*, 587 F.3d 246, 252 (5th Cir. 2009) (per curiam) (finding no recusal required for a criminal contempt trial where the district judge previously stated the defendants were "now in criminal contempt as far as [he was] concerned" (alteration in original)); *United States v. Young*, 45 F.3d 1405, 1414-15 (10th Cir. 1995) (finding no recusal required where a district judge had previously opined it was "obvious" that a defendant was "going to get convicted").

### 2.    Two Rulings in Grand Jury Related Matters

Defendants also rely on two decisions issued in grand jury matters, claiming that this Court "utilized the judicial power against President Trump himself." Defs.' Mem. at 4 (citing *In re Sealed Case*, 77 F.4th 815, 822 n.2 (D.C. Cir. 2023)); *id.* at 5 (citing decision on crime-fraud exception to attorney-client privilege as applied to "President Trump's personal attorney").[4]  As an initial matter, to the extent that defendants' characterization of "utiliz[ing] the judicial power" means deciding cases brought before the Court by determining the facts and applying the relevant legal principles, this phrase merely describes the job of a judge. For that reason, the Supreme Court's caution that "judicial rulings alone" are "[a]lmost invariably[] . . . proper grounds for appeal, *not for recusal*," *Liteky*, 510 U.S. at 555 (emphasis supplied), bears repeating, particularly where, as here, appeals were unsuccessfully pursued in both referenced cases, and President Trump ultimately voluntarily dismissed the appeal in one of those matters.

The first grand jury related decision defendants cite as an example of purported bias involved enforcement of a search warrant issued to the company formerly known as Twitter. *In*

---

[4]    Pursuant to D.D.C. Local Civil Rule 40.7, this Court was tasked, during her service as Chief Judge of the Court from March 2016 until March 2023, with resolving legal issues arising from grand jury investigations taking place in this district court, including such investigations conducted generally by the U.S. Department of Justice, the D.C. U.S. Attorney's Office and by special counsels Robert Mueller, John Durham, Jack Smith, and Robert Hur.

*re Sealed Case*, 77 F.4th at 821. While the company "ultimately complied with the warrant,"
compliance only occurred "three days after a court-ordered deadline," with which the company
had agreed it could and would comply, resulting in a finding of civil contempt and the imposition
of a previously-noticed sanction for the delay. *Id.*; *see also* Mem. Op., *In the Matter of the Search
of: Information That is Stored at Premises Controlled by Twitter Inc.*, No. 23-sc-31 (BAH) (D.D.C.
Mar. 3, 2023) [hereinafter *Twitter Contempt Decision*], Ex. 1 to Notice of Filing of Redacted Mem.
Op., *In the Matter of the Search of: Information That is Stored at Premises Controlled by Twitter
Inc.*, No. 23-sc-31, ECF No. 32 (D.D.C.) (filed Mar. 3, 2023) (filing a redacted version of the
Court's Mem. Op. as an attachment to the notice). On appeal, this Court's decision was
unanimously "affirm[ed] . . . in all respects" by the D.C. Circuit. *Id.*[5] To the extent defendants
allege bias due to the suggestion that a flight risk may have existed were the investigation publicly
revealed, they refer only to standard statutory language included in an order and omit that the D.C.
Circuit specifically found that the "ultimate analysis" in this Court's decision "did not rely on risk
of flight." *Id.* at 822 n.2.

Defendants also note this Court's questioning of Twitter's counsel in a February 7, 2023,
hearing on Twitter's failure to comply with the search warrant, Defs.' Mot. at 5, though how this
is supposed to show purported bias is not entirely clear. In context, defendants' cherry-picked
quotations were part of close questioning by the Court about the legal justifications put forward
by Twitter for its highly unusual positions to challenge the search warrant based on theoretical
claims of privilege on behalf of a third-party user of the account at issue and the non-disclosure
order based on First Amendment grounds. These were challenges Twitter had apparently never

---

[5]    Twitter's petition to the D.C. Circuit for rehearing en banc was denied, No. 23-5044, 2024 WL 158766
(D.C. Cir. Jan. 16, 2024), as was the company's petition to the Supreme Court for certiorari, 145 S. Ct. 159 (2024).

before brought in a case involving a covert search warrant, *see Twitter Contempt Decision* at 1, and in testing whether the privilege and First Amendment grounds were merely masking more obvious business interests to lure then-former President Trump back to using the Twitter platform, the Court posed pointed questions about this business interest to Twitter's counsel.  Defendants mischaracterize this line of questions as "editorializing," Defs.' Mot. at 5, but actually this line of questioning was effective in clarifying the issue since, in response, Twitter's counsel conceded that the company "had no standing to assert any privilege by any of its users, including the Target Account's User" and "had no confirmation that the Target Account's User wanted or would seize on any opportunity to assert any privilege if such opportunity were provided," *Twitter Contempt Decision* at 10 (citing Feb. 7, 2023, Hr'g Tr. at 66:3-4, 54:11-25).

The second grand jury related decision cited as an example of purported bias by defendants involved grand jury subpoenas for testimony from two personal attorneys for President Trump, "as part of an investigation into whether the former president orchestrated a scheme unlawfully to retain and hide from the government documents bearing classification markings."  Mem. Op. at 1, *In re Grand Jury Subpoena*, No. 23-gj-10 (BAH) (D.D.C. Mar. 17, 2023) [hereinafter *Crime Fraud Decision*], Ex. 12 to President Trump's Mot. to Dismiss the Indictment Based on Prosecutorial Misconduct & Due Process Violations ("Trump MTD"), *United States v. Trump*, No. 9:23-cr-80101-AMC, ECF No. 561 (S.D. Fla.) (filed May 21, 2024) (filing the Court's Mem. Op. as an attachment to this motion).  In their strained effort to find some purported bias in this decision, defendants conveniently ignore several notable points.  First, the government's motion to enforce these subpoenas and compel testimony was granted only in part and denied in part based on an extensive review of the facts and applicable legal principles, explained in an 85-page opinion.  *See generally Crime Fraud Decision*.  For example, the government's request to compel the production

of documents from both attorneys was partially denied, *id*. at 74-79, and the government's request to compel testimony on enumerated topics from one of the attorneys was also partially denied, *id*. at 78-79.

Second, as a grand jury matter, this decision could have remained under seal, literally forever, but for the fact that President Trump himself asked for the decision to be unsealed for his use in support of his motion to dismiss the criminal indictment pending against him in the Southern District of Florida. Trump MTD at 20 (citing *Crime Fraud Decision* at 47 n.13). Specifically, he relied on a portion of this Court's *Crime Fraud Decision* agreeing with his position presented to the Florida court that certain aspects of the prosecutor's questioning before the grand jury were improper. *Id*.

Finally, defendants do not take issue here with any of the substantive factual or legal findings in the *Crime Fraud Decision*, *see* Defs.' Mot. at 5, claiming only that the decision suffered from a "readily apparent lack of venue in this District," *id*. at 1. In fact, President Trump initially pursued, and lost on appeal, an effort to stay this Court's decision, Alan Feuer, Ben Protess & Maggie Haberman, *Appeals Court Orders Trump Lawyer to Hand Over Records in Documents Inquiry*, N.Y. Times (Mar. 22, 2023), https://www.nytimes.com/2023/03/22/us/politics/trump-lawyer-classified-documents-investigation.html, before later voluntarily dismissing his appeal, *see* Order, *In re Sealed Case*, No. 23-3035 (D.C. Cir. May 1, 2023); Order, *In re Sealed Case*, No. 23-3036 (D.C. Cir. Oct. 4, 2023).

Defendants make a somewhat oblique complaint that this Court, in supervising the grand jury investigation into then-former President's retention of documents with classified markings, should have been aware that venue to conduct that investigation in Washington, D.C. was somehow improper, Defs.' Mot. at 1, 5, when, to the contrary, the documents at issue had been

removed from this district and were being requested by the National Archives located in this district to be returned to this district as records belonging to the American people, not to the former President personally.  Notably, a venue challenge was never raised in the hotly litigated motion to compel the testimony of the two personal attorneys—not by the attorneys themselves nor by then-former President Trump—for good reasons.  While the grand jury is obtaining and reviewing relevant evidence to assess whether probable cause exists to find that a crime was committed and by whom, determining where venue for a criminal charge properly lies may not become clear until the investigation has sufficiently progressed to assess who is involved in the criminal conduct, where relevant conduct occurred, and the precise charges to be brought.  To be sure, by the time the grand jury returns an indictment, "the government must show that 'venue is proper with respect to each count charged.'"  *United States v. Slatten*, 865 F.3d 767, 788 (D.C. Cir. 2017) (quoting *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991)).  Here, the *Crime Fraud Decision* was issued several months before any indictment was filed in the Southern District of Florida arising from this aspect of the grand jury's work.

In sum, mere disagreements with the prior legal rulings of this Court do not "constitute a valid basis" for disqualification.  *Liteky*, 510 U.S. at 555.

## B.  November 2023 Speech

Defendants also point to a single line in a speech delivered by this Court in November 2023, upon acceptance of an award from the Women's White Collar Defense Association ("WWCDA"), Defs.' Mot. at 3, a non-partisan, non-profit organization that promotes diversity in white-collar and other defense and compliance legal work, *see Membership and Mission*, Women's White Collar Defense Ass'n, https://www.wwcda.org/who-we-are/mission-goals-and-membership-criteria (last visited Mar. 25, 2025).  The apolitical, nonpartisan theme of the remarks

defendants cite for purported bias was the importance of facts in the legal profession, the body politic, and American democracy. *See 2023 WWCDA Awards Gala Full Video* ("WWCDA Video") at 1:45:11–1:53:15 (Nov. 30, 2023), YouTube, https://www.youtube.com/watch?v=sNDnJWh1gzE. To support these points, the speech drew on examples from history, including an anecdote about President Abraham Lincoln, *see id.* at 1:47:25–1:48:10, and quoted from a recent bestselling book by a Boston College professor of American history warning about one of the keys to the rise of authoritarianism being the dismissal of facts and reliance on "big lies," *see id.* at 1:48:28–1:49:40. In further emphasis of this point, a single line of the speech reflected on then-recent experiences at the sentencings of individuals involved in the attack on the U.S. Capitol on January 6, 2021, stating that judges on this Court "regularly see the impact of 'big lies' at the sentencing of hundreds, hundreds of individuals who have been convicted for offense conduct on January 6, 2021, when they disrupted the certification of the 2020 presidential election at the U.S. Capitol." *Id.* at 1:49:41–1:50:04. This remark drew on observations of, and comments made by, defendants and their counsel about the motivations for many defendants to engage in this criminal conduct as stemming from their belief in a stolen election, despite the lack of any evidence showing any outcome dispositive election fraud in the 2020 presidential election.

Importantly, and contrary to defendants' assertions, *see* Defs.' Mot. at 3, this speech never mentioned President Trump or took any political positions, nor named any of the media outlets, pundits or politicians cited by January 6 defendants and their counsel in court proceedings as the source for their mistaken belief in a stolen 2020 presidential election. *See generally* WWCDA Video at 1:45:11–1:53:15. To the extent defendants suggest otherwise and even point an accusatory finger at President Trump as the person who must have been the source, that is their

finger and not that of this Court. Their motion twists and mischaracterizes the words actually spoken, seemingly adopting the partisan framing by a Republican member of Congress who filed the ethics complaint referenced by defendants against this Court. Defs.' Mot. at 3-4; *see also* April Rubin, *Stefanik Urges Ethics Investigation into Judge Linked to Trump, Jan. 6 Cases*, Axios (Dec. 15, 2023), https://www.axios.com/2023/12/15/stefanik-complaint-ethics-judge-trump.[6] This same Republican member of Congress has filed a series of ethics complaints against other judges who issued rulings perceived to be adverse to President Trump. *See, e.g.*, Jose Pagliery, *New York Tosses Stefanik's Trump Court Complaint in Bank Fraud Civil Suit*, The Daily Beast (June 3, 2024, 8:01 PM), https://www.thedailybeast.com/new-york-tosses-rep-stefaniks-trump-court-complaint-in-bank-fraud-civil-suit/ (reporting that an ethics complaint filed by the same Republican member of Congress against a New York state court judge overseeing a civil trial against President Trump was dismissed as "having . . . no basis on the facts presented to commence an investigation"); Sophia Cai, *Scoop: Stefanik Files Ethics Complaint Against Judge Merchan*, Axios (May 21, 2024), https://www.axios.com/2024/05/21/stefanik-ethics-complaint-judge-merchan-trump. Two independent legal ethics experts characterized the ethics complaint filed against this Court as failing to "rais[e] any viable ethics issues." Peter A. Joy & Kevin C. McMunigal, *Ethics Complaint Against Judge Howell*, Crim. Just. Magazine (Summer 2024), https://www.americanbar.org/groups/criminal_justice/resources/magazine/2024-summer/ethics-complaint-against-judge-howell/.

---

[6]  Other obvious sources for misinformation about a "stolen" 2020 presidential election were certainly available. Indeed, the ethics complaint from the Republican House member was dated the same day a jury in a civil lawsuit presided over by this Court returned a verdict of $148,169,000.00, in compensatory and punitive damages for defamation and intentional infliction of emotional distress in favor of two Georgia election workers against Rudolph W. Giuliani for his false public statements that the plaintiffs had engaged in election fraud when doing their job of counting ballots for the 2020 presidential election. *See* Verdict Form, *Freeman v. Giuliani*, No. 21-cv-3354-BAH, ECF No. 135 (D.D.C. Dec. 15, 2023).

The Supreme Court has long recognized that judges are "not only permit[ted] but encourage[d]" to "state their views on disputed legal issues outside the context of adjudication," including "in classes that they conduct, and in books and speeches." *Republican Party of Minn.*, 536 U.S. at 779. It is "common" for judges to later "confront[] a legal issue on which [they have] expressed an opinion while on the bench," including "in . . . speeches." *Id.* This reality does not undermine a judge's impartiality. In the words of the D.C. Circuit, disqualification "would be extraordinary" for remarks that "reflected what [a judge] learned, or what [the judge] thought [s]he learned, during . . . proceedings" in a case. *Microsoft Corp.*, 253 F.3d at 115. "[C]andid reflections" about a "judge's assessment of a defendant's conduct" offered "on the basis of facts presented during the proceedings . . . simply do not establish bias or prejudice." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 751 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991)).

"Candid reflections" are exactly what the remarks at issue here offered, drawing on knowledge and experience from observing and presiding over many cases and trials arising out of the attack on the Capitol on January 6, 2021, and becoming intimately familiar with the facts of that day. *See, e.g.*, *United States v. Warnagiris*, No. 21-cr-382 (PLF), 2025 WL 341990, at *5 (D.D.C. Jan. 30, 2025) (explaining the extensive investigations of the facts of January 6 cases and voluminous evidence presented in each case to support the prosecutions). These cases were used to emphasize the importance of a generally applicable legal theme about the critical importance of accurate fact-finding to the legal process and to the broader health of our democracy. As explained in the speech, a focus on "authentic, reliable, and tested facts" *promotes* confidence that all parties will receive fair processes and just outcomes in federal district courts and federal courts more

broadly.  WWCDA Video at 1:50:04–1:51:05.  Put simply, the nonpartisan discussion of the importance of facts provides no basis for disqualification in this case.

### C.  The Instant Case

Finally, as is clearly laid out in the "Purpose" section of EO 14230, "issues of the Durham investigation, the Fusion GPS report, and the Mueller Report are central to the EO."  Defs.' Mot. at 6; *see also* EO 14230, § 1, 90 Fed. Reg. at 11781.  Defendants take issue with what they call the Court's "concerning and dismissive approach to the entire Durham Investigation" and "[t]he entire Fusion GPS fiasco."  Defs.' Mot. at 6.  While styling this as an accusation about purported bias in the Court's "[c]onduct," *id.*, at its core, this objection appears to be that the Court has not given sufficient deference to how President Trump views these and other events as "dishonest and dangerous activity of the law firm," EO 14230, § 1, 90 Fed. Reg. at 11781, and "actions that threaten our elections, military strength, and national security," *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.  While the President and his administration are promoting an expansive view of presidential authority and claimed that any decisions purportedly made in the name of national security are judicially nonreviewable, *see, e.g.*, Tr. of Mar. 12, 2025, Temporary Restraining Order Hr'g ("TRO Hr'g Tr.") at 30:6–35:12, ECF No. 22; *see also id.* at 45:23–48:11 (defense counsel explaining defendants' position that "the President has that power, and that it is the right and prerogative of the President as the sole individual vested with Article II authority to exercise that prerogative"), that legally debatable claim is at the heart of the challenge in this case, *see, e.g.*, *id.* at 18:7–21:6 (plaintiff's counsel articulating position that the President's conduct violated fundamental constitutional rights and that the use of "the 'national security' words are a

pretext"); *id.* at 62:24–64:22 (plaintiff's counsel further articulating plaintiff's position that the President's actions exceeded his constitutional authority).  The mere fact that the Court, in an emergency hearing on a temporary restraining order held less than 24 hours after the filing of the motion, did not immediately adopt defendants' legal arguments about the level of deference owed to the President, even when a national security justification is asserted, does not mean bias exists when foundational constitutional principles and norms are also at stake.

Moreover, defendants' motion mischaracterizes the discussion of Fusion GPS and the Mueller investigation.  While noting possible "big differences of view" on these topics, the Court took "at face value" "[t]he President's perspective" on the issue and used this viewpoint to evaluate the likely legality of EO 14230.  TRO Hr'g Tr. at 32:15–33:16; *see also id.* at 33:21–43:14 (questioning defendants' counsel about aspects of the legality of the order).  The Court recognized that President Trump is "certainly entitled to his own beliefs, entitled to his preferred causes, and he is entitled to hold tight to his own dislikes." *Id.* at 103:19-21.  As a legal matter, however, the Court found at this stage that "[t]he Constitution protects all [Americans] . . . from the exercise of [the President's] targeted power based on those dislikes, to bring the force of the federal government down on the lawyers representing his political opponents and challengers to his political actions, as he has done here." *Id.* at 103:22–104:1.

As this case continues, pursuant to the briefing schedule jointly proposed by the parties, Joint Status Report ¶ 3, ECF No. 25, and adopted by the Court, Order, ECF No. 26, the parties will have the opportunity to present relevant evidence and legal arguments, which will receive full, fair, and impartial consideration, as does every case before this Court.  To the extent the parties disagree with the final judgment entered, the normal judicial process of appeal applies.  *See* FED.

R. App. P. 4.  Defendants' disagreements, no matter how strong, with this Court's preliminary legal determinations simply provide no basis for disqualification.  *Liteky*, 510 U.S. at 555.

## III.    CONCLUSION AND ORDER

For the reasons addressed above, defendants' motion to disqualify this Court pursuant to 28 U.S.C. § 455, ECF No. 34, which relies only on speculation, innuendo, and basic legal disagreements that provide no basis for disqualification of a judge, must be denied.  Therefore, it is hereby—

**ORDERED** that defendants' Motion to Disqualify Judge Beryl Howell, ECF No. 34, is **DENIED.**

**SO ORDERED.**

Date:  March 26, 2025

_____
**BERYL A. HOWELL**
United States District Judge