**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PERKINS COIE LLP, <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, THE UNITED STATES OF AMERICA, and, in their official capacities, PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, and TULSI GABBARD, <br><br> *Defendants*. | Civil Action No. 1:25-cv-00716 (BAH) <br><br> Judge Beryl A. Howell |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

    A.    The Undisputed Facts Show that the Executive Order Is Retaliatory ....................3

    B.    The Order Threatens Irreparable Harm and Is Enjoined by This Court ................8

SUMMARY JUDGMENT STANDARD .......................................................................9

ARGUMENT ..................................................................................................................10

I.    PERKINS COIE IS ENTITLED TO SUMMARY JUDGMENT ON ITS
    CLAIMS .................................................................................................................10

    A.    The Executive Order Violates the First Amendment.............................................10

        1.    The Executive Order Retaliates in Violation of the First
            Amendment ................................................................................................10

        2.    The Executive Order Constitutes Viewpoint Discrimination ...................18

        3.    The Executive Order Burdens Protected Speech and Associations...........20

    B.    The Executive Order Violates Perkins Coie's Right to Due Process of Law........21

        1.    The Order Deprives Perkins Coie of Liberty and Property Interests.........21

        2.    The Executive Order Was Issued without Notice or a Hearing.................24

        3.    The Executive Order Is Akin to a Bill of Attainder.................................26

        4.    The Executive Order Is Impermissibly Vague..........................................27

    C.    The Executive Order Violates the Constitutional Rights to Counsel ...................27

        1.    Perkins Coie Has Standing to Challenge these Violations .......................28

        2.    The Executive Order Violates Bedrock Sixth Amendment Rights ..........29

        3.    The Executive Order Also Violates the Due Process Right to
            Counsel.....................................................................................................30

    D.    The Executive Order Exceeds the President's Constitutional Authority and
    Violates the Separation of Powers ........................................................................31

E.  The Executive Order Violates Equal Protection .....................................................37

II.  PERKINS COIE IS ENTITLED TO A PERMANENT INJUNCTION ..........................38

A.  Absent an Injunction, Perkins Coie Will Suffer Further Irreparable Harm ...........39

B.  Perkins Coie Has No Adequate Remedy at Law ....................................................42

C.  The Equities and Public Interest Strongly Favor a Permanent Injunction.............43

CONCLUSION......................................................................................................................45

# TABLE OF AUTHORITIES

Page

## CASES

*Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865 (D.C. Cir. 1984) ........................................31

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
   898 F. Supp. 2d 73 (D.D.C. 2012) ..................................................................................41

*\*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)...................................................20, 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................9

*Arnaud v. Odom*, 870 F.2d 304 (5th Cir. 1989)............................................................................24

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462 (D.C. Cir. 2009) ...........9

*Atl. Richfield Co. v. Dep't of Energy*, 1983 WL 1111 (D.D.C. Jan. 7, 1983)................................42

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)....................................................................10

*Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996).................................................................17

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) .....................................................................24

*Bond v. United States*, 564 U.S. 211 (2011) ................................................................................31

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024)..............................................................42

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011)..................................................................11

*Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016) ........................................................................37

*Buckley v. Valeo*, 424 U.S. 1 (1976) .............................................................................................37

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020).....................................................................41

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).....................................11, 24

*\*Campbell v. District of Columbia*, 894 F.3d 281 (D.C. Cir. 2018)................................21, 22, 23

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) .............................28, 29, 30

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).......................................................................34, 35

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985)............................................38

*Cohen v. Hurley*, 366 U.S. 117 (1961) ..........................................................................................1

Page

Cases—continued:

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220 (D.C. Cir. 2005)....................................30

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ...........................................................................10

*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866) ................................................................26

*DL v. District of Columbia*, 860 F.3d 713 (D.C. Cir. 2017) ......................................................39

*\*Denius v. Dunlop*, 209 F.3d 944 (7th Cir. 2000) ....................................................................20

*Doe v. Cheney*, 885 F.2d 898 (D.C. Cir. 1989)........................................................................23

*Doe v. DOJ*, 753 F.2d 1092 (D.C. Cir. 1985) .........................................................................22

*Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993) .......................................................................15

*Doe v. Mattis*, 928 F.3d 1 (D.C. Cir. 2019) ............................................................................39

*eBay Inc. v. MercExchange*, 547 U.S. 388 (2006).....................................................................39

*EEOC v. Shell Oil Co.*, 466 U.S. 54 (1984).........................................................................6, 18

*\*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009).................................................................10, 11

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ................................................................38

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).....................................................23, 24

*Franks v. Rubitschun*, 312 F. App'x 764 (6th Cir. 2009) ..........................................................37

*GE Co. v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010) .................................................................22

*Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312 (8th Cir. 2009)....................................42

*Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022) ..................................32

*Gill v. DOJ*, 875 F.3d 677 (D.C. Cir. 2017) ..........................................................................15

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017)....................................................35

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) .............................................................34

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)...................................................................27

*Greene v. McElroy*, 360 U.S. 474 (1959) ...............................................................................24

Page

Cases—continued:

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ........................................................25, 33, 34

*Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024)..................................30

*Hartman v. Moore*, 547 U.S. 250 (2006).......................................................................10

\*Heffernan v. City of Paterson*, 578 U.S. 266 (2016).....................................................10

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) .........................................................9

*Hughes v. City of New York*, 680 F. App'x 8 (2d Cir. 2017)..........................................10

*Humanitarian L. Project v. U.S. Dep't of Treasury*,
    463 F. Supp. 2d 1049 (C.D. Cal. 2006) .....................................................................27

*In re Halkin*, 598 F.2d 176 (D.C. Cir. 1979) ................................................................11

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Loc. 737 v. Auto Glass Emps. Credit Union*, 72 F.3d 1243 (6th Cir. 1996)...............................24

*J.G.G. v. Trump,* 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ....................................16

\*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951) .....................25, 26, 33, 36

\*Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994) .....................................22, 23

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022),
    *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023) .......................................................32

*Kohn v. State Bar*, 87 F.4th 1021 (9th Cir. 2023) .........................................................35

*Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012)............................................18

*Lafler v. Cooper*, 566 U.S. 156 (2012) .........................................................................29

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)....................44

*Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024)............................................................15

\*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001)...........................10, 19, 36, 45

*Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291 (M.D. Ala. 2012)..............10

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) .................................................21

Page

Cases—continued:

*Loving v. IRS*, 917 F. Supp. 2d 67 (D.D.C. 2013), *aff'd*, 742 F.3d 1013 (D.C. Cir. 2014) ..........43

*Luis v. United States*, 578 U.S. 5 (2016)...................................................30

*Martin v. Lauer*, 686 F.2d 24 (D.C. Cir. 1982)..............................................20

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................24

*McVeigh v. Cohen*, 983 F. Supp. 215 (D.D.C. 1998) ......................................42

*Mead v. Indep. Ass'n*, 684 F.3d 226 (1st Cir. 2012) ......................................22

*Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024) ...........................18

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) .....................39

*Mills v. Alabama*, 384 U.S. 214 (1966) ...................................................19

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)................................40

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ...........................31, 32

*Missouri v. Frye*, 566 U.S. 134 (2012)...................................................29

*Myers v. United States*, 272 U.S. 52 (1926)................................................34

*NAACP v. Button*, 371 U.S. 415 (1963)...................................................24

*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) ...23, 24, 25

*Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286 (D.C. Cir. 1993)...........................15, 34

*Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024)...........................................1, 10, 19, 30

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) ...............................................32

*News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988) ...............................37, 38

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977)........................................26

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................43

*Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir. 1984) ..........................................33

*Penson v. Ohio*, 488 U.S. 75 (1988) ....................................................28, 44

Page

Cases—continued:

*PFLAG, Inc. v. Trump*, 2025 WL 685124 (D. Md. Mar. 4, 2025)................................32

*Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211 (1995)......................................36

*Potashnick v. Port City Const. Co.*, 609 F.2d 1101 (5th Cir. 1980) .................31

*\*Powell v. Alabama*, 287 U.S. 45 (1932) ..........................................28, 30

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296 (D.C. Cir. 2014) .........25

*Ramirez v. U.S. Customs & Border Prot.*, 477 F. Supp. 2d 150 (D.D.C. 2007).........40

*Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012) ..................................15

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .....................................19

*Regan v. Wald*, 468 U.S. 222 (1984) .............................................34

*Romer v. Evans*, 517 U.S. 620 (1996)............................................38

*\*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)............18, 19

*Rutan v. Republican Party*, 497 U.S. 62 (1990) ...................................17

*Ryan v. Ill. Dep't of Child & Fam. Servs.*, 185 F.3d 751 (7th Cir. 1999)...............25

*Sanders v. District of Columbia*, 85 F. Supp. 3d 523 (D.D.C. 2015) ..................18

*SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28 (1st Cir. 2008)...............38

*Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232 (1957) ...............................22

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)................................11

*\*SEC v. Jarkesy*, 603 U.S. 109 (2024)............................................34

*\*Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947 (1984).......................16

*Shelton v. Tucker*, 364 U.S. 479 (1960)..........................................20

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ..................................25

*Sioux Tribe of Indians v. United States*, 316 U.S. 317 (1942)........................32

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ......................................28

Page

Cases—continued:

*Stidham v. Tex. Comm'n on Priv. Sec.*, 418 F.3d 486 (5th Cir. 2005)..........................................23

*Strickland v. Washington*, 466 U.S. 668 (1984) ...............................................................28

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013).......................................................37, 38

*TD Bank N.A. v. Hill*, 928 F.3d 259 (3d Cir. 2019) ...........................................................42

*Tex. All. for Retired Ams. v. Hughs*, No. 20-40643 (5th Cir.) .................................................35

*Trentadue v. Integrity Comm.*, 501 F.3d 1215 (10th Cir. 2007)................................................24

*Trump v. Clinton*, 653 F. Supp. 3d 1198 (S.D. Fla. 2023)......................................................36

*\*Trump v. United States*, 603 U.S. 593 (2024)..............................................................32, 33

*Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ..................................10

*U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715 (1990)..........................................................16, 28

*United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973)................................................38

*\*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006).....................................................29, 45

*United States v. Robel*, 389 U.S. 258 (1967) ...............................................................20

*United States v. Sussmann*, No. 1:21-cr-582 (D.D.C.) ......................................................36

*United States v. U.S. Dist. Ct.*, 407 U.S. 297 (1972) .......................................................34

*United States v. Williams*, 553 U.S. 285 (2008) ...........................................................27

*Vill. of Hoffman Ests. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489 (1982) ...............................25

*\*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam) ........................................37

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)..................................................20

*Warth v. Seldin*, 422 U.S. 490 (1975) .....................................................................29

*Webster v. Doe*, 486 U.S. 592 (1988) ......................................................................15

*Wheat v. United States*, 486 U.S. 153 (1988) ..............................................................28

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
   2025 WL 946979 (D.D.C. Mar. 28, 2025)...............................................................11

Page

Cases—continued:

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ....................................................43

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) (per curiam) ...........................39

*\*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) .......................................................23

*Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281 (8th Cir. 1974) ....................29

*\*Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144 (D.D.C. Mar. 12, 2021) ..........................40, 42

*\*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ....................................31, 32, 33

*\*Ziglar v. Abbasi*, 582 U.S. 120 (2017) .........................................................................33

*Zivotofsky v. Clinton*, 566 U.S. 189 (2012) .................................................................16

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Constitution
    amend. I ........................................................................................................ passim
    amend. IV .....................................................................................................34
    amend. V .....................................................................................26, 28, 37, 41
    amend. VI ...................................................................................................... passim
    amend. XIV ..................................................................................................37
    art. I .............................................................................................................26
    art. II ............................................................................................................31
    art. III ..........................................................................................................34

40 U.S.C. § 121 ...............................................................................................32

42 U.S.C.
    § 2000e-5 ..................................................................................................6, 18
    § 2000e-8 ......................................................................................................18

90 Federal Register
    11781-82 .........................................................................................................3
    13039-40 ......................................................................................................6, 7
    13685-86 .........................................................................................................7
    13997-99 .........................................................................................................7

Fed. R. Civ. P. 56 .............................................................................................9

Page

Constitution, Statutes, Regulations, and Rules—continued:

D.C. Rules of Professional Conduct
    r. 1.3 ........................................................................................................44
    r. 5.6 ........................................................................................................44
    r. 6.2 ........................................................................................................45

## OTHER AUTHORITIES

*Black's Law Dictionary* (12th ed. 2024) ....................................................26

The Federalist No. 70 (Hamilton) (C. Rossiter ed., 1961) ...........................33

St. George Tucker, Blackstone's Commentaries (1803) ...............................34

## INTRODUCTION

The Executive Order, titled "Addressing Risks from Perkins Coie LLP," is an unconstitutional assault on Perkins Coie, its lawyers, its employees, its clients, and the rule of law.

Ours is a "free and democratic society." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024). The Framers intended that the people may speak out against the government, associate with unpopular causes, and petition the government without fear that the government will retaliate or discriminate against them. They insisted that the government extend due process of law before depriving any person of life, liberty, or property. They expressly protected every person's right to a lawyer in criminal proceedings. And to prevent the abuses of the British monarchy, they divided power among three co-equal branches.

Lawyers are instrumental in safeguarding these foundational principles. Just as John Adams defended British soldiers after the Boston Massacre, lawyers today have a professional responsibility to defend unpopular clients and the rule of law. To protect the rights of all Americans, lawyers must be free to do their jobs without fear of government retribution. Otherwise, lawyers would "become nothing more than parrots of the views of whatever group wields government power at the moment." *Cohen v. Hurley*, 366 U.S. 117, 138 (1961) (Black, J., dissenting).

The Order, like similar ones directed at other large law firms, takes a wrecking ball to these principles. It deems the Firm "dishonest and dangerous" for representing the President's perceived opponents and advocating positions on their behalf. For these purported sins, the Order imposes draconian sanctions aimed at destroying the Firm. Among other things, it restricts access to federal buildings and services, blocks engagement with federal personnel, and presumptively bars federal employment for *every one* of the Firm's 2,500 lawyers and employees. And it directs agencies to terminate government contracts with Firm clients, coercing these clients to cut ties with the Firm.

Although Perkins Coie did not bring this suit lightly, it was compelled to do so to preserve

1

its ability to continue representing the best interests of its clients. The Constitution does not permit our elected leaders, from any party, to punish lawyers by fiat for representing clients who oppose their political agendas. It would set a grave precedent for our Republic if the Order were allowed to stand.

Every section of the Order violates the Constitution. This Court already has found that the Firm is likely to succeed on at least its First Amendment, Due Process, and Sixth Amendment claims challenging Sections 1, 3, and 5. The Court should now grant summary judgment on all of the Firm's claims, declare the Order invalid, and permanently enjoin the Order in full.

First, every section retaliates and discriminates against the Firm for First Amendment-protected speech, association, and petitioning. It is beyond dispute that the Order punishes the Firm because of its protected activities, not for any "national security" reasons. Both the Order and the accompanying Fact Sheet say so *on their face*.

Second, the Order imposes sanctions on the Firm without even a pretense of due process, calling to mind the bills of attainder that the Framers twice repudiated in our Constitution.

Third, by restricting the Firm's ability to interact with government officials, use government services, and enter government buildings, the Order interferes with the rights to counsel.

Fourth, the Order is not a valid exercise of the President's Article II powers and unlawfully intrudes on the Judicial Branch's prerogatives. No statute or constitutional provision authorizes the President to unilaterally sanction a law firm for representing his perceived opponents.

Fifth, the Order violates equal protection by punishing the Firm without rational basis.

Finally, while this Court's TRO stemmed the irreparable harms flowing from the Order, a permanent injunction is necessary to prevent those harms from resuming and intensifying. Such

2

relief also is necessary to protect the compelling public interest in allowing lawyers to zealously represent their clients, no matter how unpopular with the current Administration they may be.

## BACKGROUND

Perkins Coie sets forth the facts in detail in its attached Statement of Facts ("SOF") and briefly summarizes some of the key facts below.

### A.    The Undisputed Facts Show that the Executive Order Is Retaliatory

On March 6, 2025, President Trump issued Executive Order 14230, titled "Addressing Risks from Perkins Coie LLP." 90 Fed. Reg. 11781-82 (Mar. 6, 2025) ("Executive Order," "Order," or "EO"). The Order targets plaintiff Perkins Coie LLP (or "the Firm"), a 113-year-old law firm that employs nearly 2,500 personnel in offices around the world. SOF ¶¶ 1-3, 10.

The Order is retaliatory on its face. Section 1 of the Order declares that its "Purpose" is to address the supposedly "dishonest and dangerous activity" of the Firm. The activity in question? Representing the President's political opponents, championing election litigation with which he disagrees, and supporting values of diversity and inclusion that the President opposes.

These motivations are stated plainly in the Order itself. The "Purpose" section discusses the Firm "representing failed Presidential candidate Hillary Clinton" in 2016 and "hir[ing] Fusion GPS, which then manufactured a false 'dossier'" of opposition research about then-candidate Trump. EO § 1. The "Purpose" section then criticizes the Firm for working "with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification." *Id.* That is a reference to lawsuits—most of which were *successful*—challenging election laws as unconstitutional or defending existing laws. SOF ¶¶ 77-79. Finally, the "Purpose" section falsely claims the Firm "discriminates against its own attorneys and staff," criticizing the Firm's actual or imagined "diversity, equity, and inclusion" policies and accusing it of using "deceiving language" to describe its diversity

policies. EO § 1. Based on these criticisms, the Order concludes that the Firm should "neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds." *Id.*

The White House simultaneously issued a "Fact Sheet" further explaining the Order. Ex. 28 ("Fact Sheet").[1] The Order's retaliatory purpose is just as plain in that document. The Fact Sheet claims that the Fusion GPS dossier was "designed to steal an election" from the President. It labels the Firm a "partisan actor[]" and states it is targeting the Firm's clients to undermine the Firm's "partisan lawsuits." *Id.* And it justifies punishing the Firm because of "lawsuits against the Trump Administration," specifically a *pro bono* suit in which the Firm represents servicemembers challenging the Administration's policy excluding transgender military personnel. SOF ¶¶ 84-86. The court in that case found the suit likely to succeed and enjoined the policy. *Id.* ¶ 86.

After explaining its "Purpose," the Order imposes draconian and collective sanctions for the perceived wrongs set out in Section 1:

- Section 2 directs agencies "immediately" to "suspend *any* active security clearances" held by Firm personnel, pending a review, and directs agencies to stop providing the Firm with "*all* Government goods, property, material, and services."[2]

- Section 3 requires federal contractors "to disclose *any* business they do with Perkins Coie" and its subject matter, and directs agencies to "terminate *any* contract" for "which Perkins Coie has been hired to perform any service." Section 3 also requires agencies to "assess[]" any contract "with entities *that do business with* Perkins Coie" in light of the "priorities of [the] Administration." EO § 3. The Fact Sheet clarifies that Section 3's purpose is to "*prohibit funding contractors that use Perkins Coie LLP*" to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize *partisan lawsuits*."

- Section 4 directs the EEOC Chair to review and the Attorney General to investigate employment practices of "large law firms." EO § 4. The Fact Sheet expressly identifies "Perkins Coie" among the targeted firms.

- Section 5 directs agencies to "limi[t]" Firm employees from "access[ing]" "Government buildings" and "limit" federal employees from "engaging" with Firm employees to ensure

---

[1] Exhibits are attached to the Declaration of Chris Manning, filed contemporaneously herewith.

[2] All emphases are added and internal citations are omitted, unless otherwise noted.

consistency with "national security" and the "interests of the United States."  Section 5 also bars agencies "from hiring employees of Perkins Coie," absent a waiver.

The President's public statements before, during, and after he signed the Order confirm what is evident from the Order's face:  The Order retaliates against the Firm for representing his political opponents and advocating legal positions he dislikes.  During his first term, the President repeatedly criticized the Firm and two of its *former* partners, Marc Elias and Michael Sussmann, for involvement with the allegedly "discredited and Fake Dossier."  SOF ¶ 101.  After the 2018 midterm elections, he accused Elias of being "shady," "finding votes," and committing "FRAUD." *Id.* ¶¶ 103-4.  And in 2019, President Trump claimed that an FBI investigation of him was instigated by "big Crooked Hillary law firm, [and] her lawyer Michael Sussmann."  *Id.* ¶ 105.

In 2021, Perkins Coie parted ways with Sussman, Elias, and about 50 attorneys and staff from the Firm's political law group (the Firm's smallest group, accounting for only 0.5% of revenue).  *Id.* ¶¶70-76.  Nonetheless, President Trump remained preoccupied with the Firm.  In 2022, he filed a lawsuit in his personal capacity, accusing the Firm of "spearheading" a plot and "maliciously conspir[ing] to weave a false narrative" about him.  *Id.* ¶ 80.  He further accused the Firm and other defendants of "falsifying evidence, deceiving law enforcement, and exploiting access to highly-sensitive data sources."  *Id.*  The suit was dismissed.  *Id.* ¶ 81

Throughout 2022 and into 2023, he continued to post on social media about the Firm and its then-former partners.  *Id.* ¶¶108-11.  For example, after Sussman was acquitted of charges relating to the 2016 election, President Trump asserted that the legal system was "CORRUPT."  *Id.* ¶ 108.  And in a 2023 speech, he assured his supporters, "*I am your retribution.*"  *Id.* ¶ 112.

The President continued to make similar posts in 2024.  *Id.* ¶¶ 114-18.  For example, he threatened that "WHEN I WIN, those people that CHEATED will be prosecuted .… Please beware [sic] that this legal exposure extends to Lawyers .…"  *Id.* ¶ 118.

The President's complaints about the Firm's work and the alleged "lawfare" against him culminated in issuance of the Executive Order. *Id.* ¶ 124. During the signing ceremony, the President's staff secretary said the Order would "hold those who have engaged in lawfare accountable." *Id.* The President responded, "What they've done is … it's just terrible. It's weaponization … against a political opponent and it should never be allowed to happen again." *Id.* ¶ 125. In an interview recorded on March 6, 2025, he explained that the Order was part of "*going after*" law firms. *Id.* ¶ 138.

Indeed, the Order was only the beginning of the President's campaign of retribution. On March 17, 2025, the Acting Chair of the EEOC began implementing Section 4 of the Order by sending nearly identical letters to Perkins Coie and 19 other firms, requesting extensive information about the firms' employment practices "[b]ased on their public statements." *Id.* ¶ 140. The Acting Chair launched these Title VII investigations without any actual charge against any of the targeted firms, in direct violation of the law. *EEOC v. Shell Oil Co.*, 466 U.S. 54, 64 (1984); 42 U.S.C. § 2000e-5(b). She simultaneously issued a press release and publicly posted the demand letters, naming the firms she accused of discrimination. SOF ¶¶ 141-43.

The President has continued his retaliation against law firms with additional threats and orders. On March 14, 2025, the President spoke at the Department of Justice. *Id.* ¶ 229. In that speech, he referred to lawyers who have opposed his candidacies—including a former employee of Perkins Coie—as "thugs," "scum," and "radicals." *Id.* He then boasted about his actions against "the crooked law firms that aided" the "partisan persecutions" against him. *Id.*

Later that day, he issued an executive order targeting Paul Weiss because a former partner of that firm left to work for the Manhattan District Attorney's Office on an investigation of then-private-citizen Trump. 90 Fed. Reg. 13039-40 (Mar. 14, 2025). The order also criticized Paul

Weiss's *pro bono* cases and its diversity-related employment practices.  *Id.*  And the order levied the same devastating sanctions on Paul Weiss that the President levied against Perkins Coie.  *Id.*

On March 20, 2025, the President posted on Truth Social, claiming he had entered an agreement with Paul Weiss following an in-person meeting where the firm's chairman "acknowledged the wrongdoing" of the firm's former partner.  SOF ¶ 249.  According to the President, the firm agreed to (i) affirm certain principles such as not using the justice system "to achieve political ends," (ii) not to "pursue any DEI policies" and to engage "mutually agreed" experts to audit the firm's employment practices, and (iii) to dedicate "$40 million in pro bono legal services" to "support the Administration's initiatives."  *Id*.  The President then issued a new executive order, titled "Addressing Remedial Action by Paul Weiss," in which he revoked his prior order because of the firm's "remarkable change of course."  90 Fed. Reg. 13685-86 (Mar. 21, 2025).

The President then issued a memorandum, directing the Attorney General and Secretary of Homeland Security to, *inter alia*, seek sanctions against firms that engage in "frivolous, unreasonable, and vexatious litigation against the United States."  SOF ¶¶ 231-32.  The President also issued another executive order, this time targeting Jenner & Block in retaliation for hiring a prosecutor associated with the Mueller investigation, engaging in *pro bono* work he dislikes, and "refus[ing] to accept the biological reality of sex."  90 Fed. Reg. 13997-99 (Mar. 25, 2025).  Two days later, the President issued an order against WilmerHale in retaliation for employing (or formerly employing) Robert Mueller and other Mueller investigation prosecutors and for advocacy on affirmative action, immigration, and election law.  Ex. 54.

In public remarks, the President suggested other firms were approaching him for deals:

> You see what we're doing with the colleges, and they're all bending and saying, "Sir, thank you very much.  We appreciate it." … Nobody can believe it, including law firms that have been so horrible,

> law firms that nobody would believe this, just saying "Where do I
> sign?  Where do I sign?"

SOF ¶ 234.  The next day, the President announced he had entered a deal with another firm, Skad-

den, which the President's allies had criticized for representing a plaintiff in a *pro bono* suit against

a filmmaker who claimed widespread fraud in the 2020 election.  *Id.* ¶ 262.  To avoid an executive

order, Skadden agreed, *inter alia*, to commit at least $100 million in *pro bono* services to causes

the President supports, to change its *pro bono* policy, and to pay at least five "Skadden Fellows"

per year to work on projects approved by the President.  *Id.* ¶ 263.  A few days later, yet another

law firm, Willkie Farr, entered a similar deal with the President.  *Id.* ¶ 264.

### B.    The Order Threatens Irreparable Harm and Is Enjoined by This Court

Perkins Coie received no notice or opportunity to be heard before the Order issued.  *Id.*

¶ 134.  Immediately thereafter, agencies began implementing it.  *Id.* ¶ 135.  On March 7, 2024, an

Office of Management and Budget memorandum directed all agencies to review contracts with

Perkins Coie and to cease providing any goods, material, and services to the Firm.  *Id.* ¶ 137.

The Order, until temporarily enjoined, threatened the Firm and its clients with irreparable

harm.  Many of the Firm's largest clients (including its 15 largest) or their affiliates have contracts

or subcontracts with the federal government.  *Id.* ¶ 147.  For many clients, their association with

the Firm is not public.  *Id.* ¶ 148.  Yet the Order would require them to divulge their relationships

with the Firm, after which agencies have been instructed to terminate their contracts.  *Id.* ¶ 149;

EO § 3; Fact Sheet.  Consequently, after the Order (and before the TRO), several clients ended or

communicated that they were considering ending their relationship with Perkins Coie.  SOF

¶¶ 150-59.

Agencies also began implementing the Order's restrictions on "engaging" with Perkins

Coie.  An attorney in DOJ's Criminal Division cited the Order to postpone a meeting with a Firm

lawyer representing a criminal defendant. *Id.* ¶ 162. And an official of a federal agency informed a Perkins Coie client that the Firm's lawyers should not attend a meeting. *Id.* ¶ 152. That client hired another firm to represent it before the federal government. *Id.*

To halt the threat to its existence, the Firm filed this suit on March 11, 2025. Although it challenged the entire Order, the Firm sought a TRO only as to Sections 1, 3, and 5 because those sections threatened the most immediate, irreparable harm on the Firm and its clients.

On March 12, 2025, this Court temporarily restrained enforcement of Sections 1, 3, and 5. TRO Tr. 71:15-104:4 (Mar. 12, 2025). In so doing, the Court held the Firm was likely to succeed on "at least three" of its claims, namely, that the Order (i) violates the First Amendment by retaliating for expression and discriminating based on viewpoint; (ii) deprives the Firm of due process; and (iii) violates the Sixth Amendment rights of the Firm's clients. *Id.* at 74:7-94:7.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that determines a claim or a defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" only if "the evidence" is such that a reasonable factfinder could "return a verdict for the non-moving party." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A party opposing summary judgment may not create a genuine dispute of fact merely by presenting affidavits that offer conclusory allegations. *Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009).

## ARGUMENT

## I.    PERKINS COIE IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS

### A.    The Executive Order Violates the First Amendment

The Court already has found that Perkins Coie is likely to prevail on its First Amendment claims as to Sections 1, 3, and 5, because the Order retaliates against the Firm and its clients for expression and discriminates based on perceived viewpoints.  TRO Tr. 74:7-83:3.  The undisputed facts now warrant summary judgment as to the entire Order, including Sections 2 and 4.

### 1.    The Executive Order Retaliates in Violation of the First Amendment

Time and again, the Supreme Court has declared that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out," *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)), and from "relying on 'the threat of invoking legal sanctions … to achieve the suppression' of disfavored speech," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).  These principles prohibit retaliation not only for the plaintiff's own speech, but also for the plaintiff's "*perceived* association with [another] person and that person's speech."  *Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1302 (M.D. Ala. 2012); *see Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 381 (D.D.C. 2020) ("perceived viewpoint"); *Hughes v. City of New York*, 680 F. App'x 8, 10 (2d Cir. 2017) ("'perceived' association"); *see generally Heffernan v. City of Paterson*, 578 U.S. 266, 272-73 (2016).

Because litigation can serve political and social purposes, "state action designed to retaliate against and chill an attorney's advocacy … strikes at the heart of the First Amendment."  *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) (cleaned up).  "[A]dvocacy by [an] attorney to the courts" is protected "speech and expression."  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2001).  And interference with attorney advocacy "implicates the client's, as well as the

10

attorney's, First Amendment interests." *Eng*, 552 F.3d at 1069. Those interests include not only freedom of speech, but also the right to petition the government, including by commencing a legal action in a court or federal agency. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Accordingly, Perkins Coie lawyers "retain their First Amendment rights even as participants in the judicial process" and may not constitutionally be punished for having taken, and continuing to take, legal positions the President does not like. *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979), *overruled in part on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 & n.18, 37 (1984).

There is no genuine dispute that the Order retaliates against the Firm and its clients for their protected First Amendment activities. That retaliatory purpose is plain on the face of the Order, plain on the face of the Fact Sheet, and plain in the President's own words.

***The Order***. As this Court recognized, the "retaliatory nature of [the Order] is clear from its face." TRO Tr. 75:12-13; *accord Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) (same as to Wilmer order); Ex. 55 (Jenner TRO Tr. 48:1-5 (Mar. 28, 2025)) (same as to Jenner order). Section 1 ("Purpose") admits its retaliatory intent. Why does the Order target Perkins Coie? Because the Firm "represent[ed] failed Presidential candidate Hillary Clinton"; purportedly "worked with activist donors" to bring suits to "judicially overturn … election laws"; and promotes diversity and inclusion through allegedly "deceiving language." EO § 1. The Order's text alone "makes clear [that] the [Order] is a means of retaliating against Perkins Coie for representing individual clients who are the President's political opponents whom the President does not like" and "for representing clients in litigation seeking results the President does not like." TRO Tr. 76:12-17. These activities "fall squarely within the First Amendment. *Id.* at 76:24-25.

The government cannot "mask" the Order's retaliatory intent by invoking "national security." *Id.* at 82:15-16. At the hearing, the government asserted that Section 1's reference to the hiring of Fusion GPS goes to the "heart of national security" because that investigatory firm "manufactured a false dossier" alleging the President's "campaign improperly colluded with Russia." *Id.* at 32:4-9. But Section 1 nowhere purports to find that the Firm's involvement with that nearly decade-old dossier threatens national security. Section 1 faults the Firm for "representing" the President's 2016 opponent and associating with "activist donors." EO § 1. Having stated his "Purpose" out loud, the President cannot invent a "national security" justification after the fact.

Moreover, the Order's extraordinary overbreadth is indisputable evidence of retaliatory intent and shows that any "national security" rationale is pretext. If the Order genuinely were concerned with "national security," then the Order would have been directed at the attorneys involved in hiring Fusion GPS. But those attorneys left the Firm years ago. SOF ¶ 75. The Order instead sanctions *all* of the Firm's nearly 2,500 personnel—none of whom had any involvement with the dossier. The Order thus punishes the entire Firm for its past association with attorneys who represented the President's opponent. Such guilt-by-association is the epitome of retaliation.

***The Fact Sheet***. As the Court recognized, the Fact Sheet is "even more explicit" about the Order's "retaliatory animus." TRO Tr. 76:4-6. What abuses is the Order meant to stop? "[P]artisan lawsuits against the United States" that are "subsidize[d]" by fees the Firm earns from government contractor clients. Fact Sheet. What "unethical" conduct won't the President tolerate and will the Order end? *Id.* "[L]awsuits against the Trump Administration, including one designed to reduce military readiness," referring to a *pro bono* case challenging the Administration's policy

excluding transgender personnel from the military. *Id.*[3] And how will the Order deliver "account-ability"? *Id.* By protecting the nation from "partisan actors" like Perkins Coie, which represented the President's 2016 opponent and which defended against his challenges to the 2020 election results (rejected by more than 60 judges). *Id.*; SOF ¶¶ 75, 77-79.

**Public Statements**. Whether it was promising to "go[] after" his political enemies or warn-ing that "this legal exposure extends to Lawyers" who "CHEATED" in election litigation, SOF ¶¶ 118, 138, the President's threats of retaliation were open, notorious, and repeated. *Supra* pp.3-8; SOF ¶¶ 100-18. The Order simply follows through on his threats. When signing the Order, the President said the Firm had engaged in "weaponization "against a political opponent" (himself) and "it should never be allowed to happen again." SOF ¶ 125. Days later, he announced, he was "going after" many firms, a sentiment he repeated in a speech at the Department of Justice. *Id.* ¶¶ 138, 229. In addition to a memorandum threatening sanctions, he now has issued three more orders targeting firms because their *former* members investigated or prosecuted him and the firms currently represent *pro bono* clients who challenge Administration policies. *Supra* pp.6-8.

Because Section 1 is retaliatory, its findings against the Firm violate the First Amendment. That retaliatory intent extends to and invalidates each of the Order's remaining sections as well:

**Section 2(a)**. This section directs agencies "immediately" to "suspend active security clearances held by individuals at Perkins Coie," pending review. The government has argued that Section 2(a) is unreviewable because it is "the President's prerogative" to decide whether someone can be "trust[ed] with the nation's secrets" and the President "has made that *finding* here." TRO Tr. 35:3-9. That argument is off-the-mark in three ways. *First*, Section 2 does not, in fact, invoke

---

[3] Contrary to the Fact Sheet's suggestion, the Firm's *pro bono* work is overwhelmingly non-parti-san. SOF ¶¶ 15, 57-69.

"national security" as a justification. It orders agencies immediately to suspend clearances—apparently based on Section 1's findings about the Firm's representation of Ms. Clinton, its alleged association with "activist donors" and election-law litigation, and its employment practices. EO §§ 1, 2. Section 2 then orders "review of whether such clearances are consistent with *the national interest*." EO § 2(a). The "national interest" is far broader than "national security," as the Court noted. TRO Tr. 52:21-25. How broad? Even the government is "not sure." *Id.* at 53:3-4.

*Second*, even if Section 2(a) invoked "national security," that invocation would be pretextual. Section 2(a) does not reach the former Firm attorneys associated with the Fusion GPS dossier; it sanctions *current* personnel with no such involvement. Section 2(a) also is oddly timed. If the 2016 dossier did not cause the President to revoke the clearances of Firm lawyers during his first term, "it is impossible to understand how that nearly decade-old activity could now serve as a 'national security' justification for the immediate suspension of security clearances." Leonard Rpt. ¶ 50. The Paul Weiss, Jenner, and WilmerHale executive orders also show that "national security" is a pretext. Those orders contain nearly identical Section 2s, but those sections similarly do not invoke "national security." SOF ¶¶ 248, 255, 261. Moreover, the President withdrew the Paul Weiss Order when that firm agreed to provide *pro bono* services that he supports, *id.* ¶ 249, which shows that "[t]here cannot reasonably have been a national security emergency that justified the immediate suspension of security clearances," Leonard Rpt. ¶ 53.

*Third*, a First Amendment retaliation claim for suspending security clearances on a *categorical* basis is fully justiciable. The government has argued the President has unreviewable discretion to make clearance decisions about *individuals*. TRO Tr. 33:7, 35:3-8, 46:1, 50:21-23, 62:1-4. But the "finding" made by the President is not about any individual Firm lawyer; not one is even named in the Order or Fact Sheet. The "finding" is a categorical one as to the Firm's

personnel as a group, whoever they may be, on a guilt-by-association basis. *See* Leonard Rpt. ¶ 46 (explaining "a blanket suspension of all security clearances at a law firm of 1,200+ lawyers and 1,200+ business professionals is unprecedented" and "inconsistent with existing authority").

"It is simply not the case that all security-clearance decisions are immune from judicial review." *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993). To be sure, challenges to the "substantive basis" of an individual security clearance revocation generally are nonjusticiable. *Lee v. Garland*, 120 F.4th 880, 894 (D.C. Cir. 2024). But the D.C. Circuit has made clear that courts may review "the constitutionality of the methods" for making security-clearance decisions. *Greenberg*, 983 F.2d at 290. This includes reviewing whether information provided in the revocation process is "knowingly false." *Rattigan v. Holder*, 689 F.3d 764, 770 (D.C. Cir. 2012). It also includes reviewing whether a general policy concerning security clearances is constitutional, because such review does not involve second-guessing the substance of any individualized decision. *See Webster v. Doe*, 486 U.S. 592, 602-03 (1988) (distinguishing between decisions based on an individual's "homosexuality" and those based on a "policy" or "practice[]" against "*all* homosexuals"); *Doe v. Gates*, 981 F.2d 1316, 1322 (D.C. Cir. 1993) (assuming CIA "blanket policy against homosexuals" would be unconstitutional); *Gill v. DOJ*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) ("If [plaintiff] could show that the government has a policy or practice of treating Muslims or naturalized citizens differently, his equal protection claims ... would not be barred.").

Under the government's contrary view, the President could suspend or revoke clearances for all women, all Chinese-Americans, or all Harvard alumni with no judicial review. While it may be "unmanageable" for courts to question the Executive's "predictive judgment" about whether particular "*individuals* are likely to divulge sensitive information," *Lee*, 120 F.4th at 893,

courts are perfectly capable of reviewing whether a general policy comports with the Constitution. That question "sound[s] in familiar principles of constitutional interpretation" and can be answered through ordinary judicial tools of "textual, structural, and historical" analysis. *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012); *accord J.G.G. v. Trump,* 2025 WL 914682, at *6 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) ("Questions of interpretation and constitutionality—the heartland of the judicial ken—are subject to judicial review."). That is especially true where, as here, the President has put the reasons for his policy in full view. Section 2(a) is reviewable because it *categorically*—and *openly*—retaliates against the Firm for First Amendment activities.

  ***Sections 2(b) & 5***. The massive overbreadth of both sections betrays their retaliatory purpose. Section 2(b) prevents *everyone* in the Firm—secretaries, IT professionals, and docketing clerks, as well as lawyers—from accessing not only "Sensitive Compartmented Information Facilities," but also "*all* Government goods, property, material, and services."[4] Section 5 limits *all* Firm personnel from "access[ing]" federal buildings, "engaging" with federal employees, or (absent a waiver) obtaining federal employment. The sheer breadth of those restrictions underscores that the Order is not rationally tied to any legitimate goal.

  ***Section 3***. This section, too, is so overbroad as to be plainly retaliatory. It retaliates against not only the Firm, but also its *clients*.[5] Specifically, it directs agencies to "terminate any contract" for "which Perkins Coie has been hired to perform any service" and, more broadly, to "assess[]" any "contracts with entities" (including Firm clients) that "do business with Perkins Coie." EO

---

[4] Section 2(b)'s reference to a SCIF is pretext, because the Firm has never had one. SOF ¶ 99.

[5] Perkins Coie has standing to assert the First Amendment rights of its clients in this context. *See Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 955-58 (1984) ("[W]hen there is a danger of chilling free speech," aligned third parties with injuries have standing to raise challenges); *see also U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720-21 (1990) (applying to lawyers).

§ 3(b).  The Fact Sheet makes no bones that any assessment has a preordained conclusion:  It states that "[t]he Federal Government *will prohibit funding contractors that use Perkins Coie LLP*" to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize *partisan lawsuits*." Fact Sheet.  Again, the Order does not address particular lawyers, clients or contracts.  It punishes all the Firm's government-contractor clients because the Firm's supposed "partisan actors" have filed "partisan lawsuits" against "the Trump Administration."  *Id.*  This approach has nothing to do with protecting national secrets or ending discrimination and everything to do with "going after" the Firm for representing the President's perceived enemies.

After the Firm filed its TRO papers, a White House spokesperson said, "It is absurd that a billion-dollar law firm is suing to retain its access to government perks and handouts."  SOF ¶ 228. Tellingly, he made no mention of national security.  *Id.*  In any event, it is no answer for the government to say that the Firm and its clients are not entitled to security clearances, government contracts, or government jobs.  Even if a person has "no entitlement" to a benefit, the government may not revoke that benefit "on a basis that infringes his constitutionally protected freedom of speech."  *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (cleaned up).  Nor does the First Amendment permit the government to turn discretionary decisions into a vehicle for political patronage, *Rutan v. Republican Party*, 497 U.S. 62, 72 (1990), whether by denying benefits to enemies or bestowing them upon friends.

**Section 4**.  The government cannot defend Section 4—a directive to the Chair of the EEOC and the Attorney General to investigate employment practices of "leading" and "large" law firms—as non-retaliatory or as a mere investigation.  It is blatantly retaliatory for speech promoting diversity and inclusion.  Although Section 4 does not name the Firm, that Section would not be in the Order if the Firm were not a target.  Indeed, the Fact Sheet makes clear that "Perkins Coie

LLP" would be among the targeted firms. And it soon was. On March 17, 2025, the Chair sent nearly identical letters to 20 firms, including Perkins Coie, requesting information about the firms' employment practices "[b]ased on their public statements." SOF ¶ 140. Instead of filing a charge against these firms, which would have required the EEOC to keep the proceedings confidential, 42 U.S.C. § 2000e-5(b), the Chair issued public letters and a press release naming the firms and insinuating that they engage in unlawful discrimination. SOF ¶¶ 141-43.

That decision not to file a charge and instead go public before investigation is a dead give-away about the Order's retaliatory purpose. The law is clear that the EEOC may initiate a Title VII investigation only *after* a valid charge has been filed. *EEOC v. Shell Oil Co.*, 466 U.S. 54, 64 (1984).[6] Here, no charge has been filed. *See Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012) (inferring retaliatory intent where, *inter alia*, officers "did not wait for the warrants or other official approval before" arresting plaintiffs). Nor is this investigation merely a "series of boogymen" or "ghosts." TRO Tr. 36:12-13. Initiating an investigation as retaliation for speech is itself a violation of the First Amendment. *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 8, 27-29 (D.D.C. 2024); *Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 535-37 (D.D.C. 2015). Retaliatory animus pervades the Order and warrants summary judgment on Counts V and VII.

### 2. The Executive Order Constitutes Viewpoint Discrimination

Independently, the Order also is unconstitutional because the undisputed facts show it discriminates against the Firm for its perceived viewpoints and those of its clients. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

---

[6] The EEOC's "investigative authority is tied to charges filed with the Commission; unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction, the EEOC is entitled to access only evidence 'relevant to the charge under investigation.'" *Shell Oil*, 466 U.S. at 64 (quoting 42 U.S.C. § 2000e-8(a)).

Discrimination based on "[v]iewpoint" is an "egregious form of content discrimination," *id.* at 829, and "uniquely harmful to a free and democratic society," *Vullo*, 602 U.S. at 187. Such discrimination is particularly egregious when it involves core political speech, such as that about candidates or voting rights. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966) (First Amendment protects discussion of "government affairs" including "candidates" and "political processes").

Viewpoint discrimination also is especially problematic if used to prevent lawyers from presenting reasonable arguments in court. The government may not "draw lines" to "exclude from litigation those arguments" that it "finds unacceptable but which … are within the province of the courts to consider." *Velazquez*, 531 U.S. at 546.

The Order tramples these principles. On its face, the Order sanctions the Firm for its perceived viewpoints regarding (i) the 2016 election, (ii) the constitutionality of certain election laws, and (iii) the values of diversity and inclusion. EO §§ 1-5. The Fact Sheet adds that the Order discriminates against the Firm for filing "lawsuits *against the Trump Administration*." These statements could not be clearer: The Order discriminates against the Firm and its clients for their perceived views, including for advancing positions that challenge the Administration's policies.

Because the Order is rife with viewpoint discrimination, it is unconstitutional unless the government demonstrates it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). The government cannot come close. As this Court held, "[t]he government has no compelling interest in punishing a President's political opponents or preventing certain viewpoints [from] being heard in the public forum or in the courts." TRO Tr. 82:21-25. And even if the government had such an interest, the Order is far from narrowly tailored. As discussed above, the Order is wildly overbroad and discriminates against Firm personnel and clients, regardless of whether they share or have advanced the

viewpoints the President seeks to punish.  In particular, the Order attributes the political views and legal positions of certain clients to the Firm and its personnel (Section 1) and, in turn, attributes the Firm's perceived viewpoints to its government-contractor clients (Section 3).  Such guilt-by-association is the antithesis of narrow tailoring.  *Cf. United States v. Robel*, 389 U.S. 258, 264-66 (1967) (barring employment based on "guilt by association alone" violated First Amendment).

This Order and the others like it are designed to chill lawyers from representing the President's perceived opponents and to silence them from expressing positions he dislikes.  The orders strike at the very heart of our Constitution.  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics…." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  In keeping with that principle, the Court should grant summary judgment on Counts V and VII.

### 3.    The Executive Order Burdens Protected Speech and Associations

Section 3 also violates the First Amendment rights of the Firm, and its clients, *see supra* n.5, by compelling disclosure of attorney-client relationships.  The facts again are undisputed.

The First Amendment's implied right of association prevents the government from "punish[ing]" citizens for associating with others for "political, social, economic, educational, religious, and cultural ends." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021).  "The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Denius v. Dunlop*, 209 F.3d 944, 953 (7th Cir. 2000); *see also Martin v. Lauer*, 686 F.2d 24, 33 (D.C. Cir. 1982) (clients' First Amendment right to speak to their attorney "implicate[s] [their] fundamental right of access to the courts" and is "deserving of rigorous protection").  Government action that compels disclosure of private associations creates "heavy" "pressure" to "avoid any ties which might displease those who control [one's] professional destiny." *Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960).  For a compelled-disclosure requirement

to satisfy the First Amendment, there must be "a substantial relation between the disclosure re-quirement and a sufficiently important governmental interest," and the requirement must be "narrowly tailored to the interest."  *Ams. for Prosperity Found.*, 594 U.S. at 611.

Section 3 unconstitutionally burdens the speech and association rights of the Firm and its clients.  The section compels disclosure of "sensitive information," *id.* at 618, regarding govern-ment contractors' often confidential associations with Perkins Coie, SOF ¶¶ 34, 149.  The Order and Fact Sheet identify the government's supposed interest as "prevent[ing] the transfer of tax-payer dollars to Federal contractors whose earnings subsidize, among other things," Perkins Coie's election-related litigation. EO § 3(a); Fact Sheet.  But that interest in stifling perceived speech and association with which the President disagrees is not even legitimate, much less "sufficiently im-portant."  Nor is the Order—which compels disclosure of "any business" that any contractor does with Perkins Coie—narrowly tailored to that supposed interest. EO § 3(a).  The Court should grant summary judgment on Count VI.

### B.    The Executive Order Violates Perkins Coie's Right to Due Process of Law

Perkins Coie is entitled to summary judgment on its due process claims (Counts II and III).  Such claims are assessed under a two-part test:  "One, whether [the] plaintiff was deprived of a protected interest; and two, what process was due." TRO Tr. 83:7-10 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)).  That test is satisfied here.

### 1.    The Order Deprives Perkins Coie of Liberty and Property Interests

As the Court previously found, the Order (a) deprives the Firm and its attorneys of the right to follow their chosen profession, (b) harms the Firm's reputation, (c) vitiates the Firm's right to petition the government; and (d) interferes with its property interests. TRO Tr. 83:11-86:19.

a. The Constitution safeguards the right to "follow a chosen profession free from unrea-sonable governmental interference." *Campbell v. District of Columbia*, 894 F.3d 281, 288 (D.C.

Cir. 2018); *see Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238-39 (1957). That liberty interest is implicated when government action either (1) "formally or automatically excludes" an individual from work or (2) has "the broad effect of largely" doing so. *Campbell*, 894 F.3d at 289; *see Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994).

The Firm satisfies both independent tests. As to the first, the government formally excludes parties from future work when it deprives them of the "right to be considered for government contracts in common with all other persons." *GE Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010) (quoting *Doe v. DOJ*, 753 F.2d 1092, 1109 (D.C. Cir. 1985)); *see Kartseva*, 37 F.3d at 1528. Here, the Order goes even further by directing agencies to "terminate" any contract "for which Perkins Coie has been hired to perform any service." EO § 3(b)(i).

The Order also precludes the Firm's lawyers from pursuing their chosen career by seriously interfering with their ability to represent clients. For example, Section 5(a) denies Firm lawyers "access [to] Federal Government buildings" and prevents them from "engaging with" "Government employees." EO § 5(a). Read literally, the Order would prevent Firm lawyers from attending court proceedings, appearing before federal agencies, or engaging with regulators and prosecutors—in other words, from effectively representing clients in any matter involving federal courts or the federal government. In addition, Section 2 not only immediately "suspend[s]" any security clearances held by Firm personnel, but also blocks the Firm from accessing "all Government goods, property, material, and services." EO § 2(b). The latter would prohibit Firm lawyers from, among other things, using the postal service, accessing the SEC's EDGAR filing system, or using pay.gov. On top of all this, Section 3 forces the Firm's government-contractor clients to choose between keeping their government contracts and keeping their Perkins Coie lawyers, EO § 3, interfering with the Firm's professional relationships, *Mead v. Indep. Ass'n*, 684 F.3d 226, 232 (1st

Cir. 2012); *Stidham v. Tex. Comm'n on Priv. Sec.*, 418 F.3d 486, 491-92 (5th Cir. 2005).  These provisions "seriously affect[]" the Firm and its lawyers' ability to pursue their chosen profession. *See Campbell*, 894 F.3d at 289; *Kartseva*, 37 F.3d at 1528; SOF ¶¶ 24-69, 89-99, 147-72.

b.  The Order also deprives the Firm of its liberty interest in its reputation.  "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."  *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54, 256 (2012) (due process implicated where Executive Branch makes "findings of wrongdoing" that "could have an adverse impact on [an entity's] reputation").  To establish a cognizable reputational interest, the Firm must show that the Order (1) "issue[d] a stigmatizing posting (or designation)" that (2) "deprived [Perkins Coie] of a right previously held under state law."  *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) (cleaned up).

Both elements are met.  *First*, the Order repeatedly attacks the Firm's reputation.  It describes the Firm as "dishonest and dangerous" and levels numerous unfounded allegations, including that the Firm "manufactured a false 'dossier'"; "undermin[ed] democratic elections, the integrity of our courts, and honest law enforcement"; and engaged in "discrimination."  EO § 1.

*Second*, the Order denies the Firm various rights by excluding the Firm or its lawyers from federal buildings, federal contracts, federal services, and federal employment; restricting engagement with federal employees; and suspending security clearances.  EO §§ 2, 3, 5.  These disabilities, standing alone, deprive the Firm of significant liberty interests.  And when combined with this reputational harm, they all the more clearly infringe the Firm's liberty.  *See, e.g.*, *Constantineau*, 400 U.S. at 437; *Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989); SOF ¶¶ 185-93.

c.  For the same reasons, the Order deprives the Firm of its "liberty interest" in its "right to

petition the government." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236-37 (10th Cir. 2007); *see Arnaud v. Odom*, 870 F.2d 304, 311 (5th Cir. 1989); *NAACP v. Button*, 371 U.S. 415, 429 (1963). This "right to petition extends to all departments of the Government," including courts and agencies from which the Firm is barred. *Cal. Motor Transp. Co.*, 404 U.S. at 510.

d. Finally, the Order injures the Firm's protected interests in its "private contractual" relationships with clients. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Loc. 737 v. Auto Glass Emps. Credit Union*, 72 F.3d 1243, 1250 (6th Cir. 1996) (citing, *e.g.*, *Greene v. McElroy*, 360 U.S. 474, 492 (1959)). The Order attempts to force the Firm's clients, particularly those with government contracts, to cut ties with the Firm. Indeed, prior to the TRO, certain clients terminated their relationships with the Firm, and others indicated they might do so. SOF ¶¶ 150-61. This interference with the Firm's contracts is a significant deprivation.

### 2. The Executive Order Was Issued without Notice or a Hearing

As the Court explained, there is no need to "determine precisely what process was due [the Firm] before issuance of [the Order] because no process was given." TRO Tr. 86:20-23. At a minimum, due process requires that "a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (cleaned up). Due process also requires that the law provide "fair notice of conduct that is forbidden," *Fox Television*, 567 U.S. at 253, as well as notice of "the severity of the penalty that [the government] may impose," *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).

The Firm received none of these protections. The Order nowhere identifies what law the Firm supposedly violated to warrant Section 1's findings of wrongdoing, much less what law warrants the sanctions imposed on the Firm. And the Firm never was given "notice that the designation" in Section 1 was "impending." *Nat'l Council of Resistance of Iran*, 251 F.3d at 208. The Firm thus had no opportunity to challenge the Order's findings or its sanctions.

The Order's perfunctory references to "national security" do not exempt the government from its due process obligations. "Even where national security interests are legitimately involved, plaintiffs generally have a right to some due process." TRO Tr. 87:17-21 (citing *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014)).[7] Indeed, the need for due process is particularly critical where, as here, core "first amendment guarantee[s]" are at stake. *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977); *accord Vill. of Hoffman Ests. v. Flipside, Hoffman Est., Inc.*, 455 U.S. 489, 498-99 (1982) ("If … the law interferes with the right of free speech or of association, a more stringent vagueness [and fair-notice] test should apply.").

That the Order directs agency heads to conduct further review before imposing additional punishment likewise does not solve the due process problem. Given the findings contained in Section 1 of the Order, the result of the "review" process is foreordained. For example, with respect to the security clearance review in Section 2(a), there is no realistic possibility that agencies accountable to the President will determine that they should not strip security clearances from individuals the President has already deemed too untrustworthy to enter federal buildings. Similarly, the EEOC review contemplated by Section 4 is predetermined by the President's finding that "Perkins Coie racially discriminates." EO § 1. Thus, even if the Firm had the opportunity to plead its case, the process "would be a sham" because the "decision has already been made." *Cf. Ryan v. Ill. Dep't of Child & Fam. Servs.*, 185 F.3d 751, 762 (7th Cir. 1999); Leonard Rpt. ¶¶ 54-56.

---

[7] *See also, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality opinion) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 165-74 (1951) (Frankfurter, J., concurring) (due process requires notice and hearing for an organization to be designated as "Communist"); *Nat'l Council of Resistance of Iran*, 251 F.3d at 201, 208-09 (designating an entity a "foreign terrorist organization" without notice or hearing violated due process).

In short, the Order mirrors the enemies lists of the McCarthy era: It was made "without notice," "without opportunity to meet the undisclosed evidence …, and without opportunity to establish affirmatively that the aims and acts of the organization are innocent." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 161 (1951) (Frankfurter, J., concurring).

### 3.    The Executive Order Is Akin to a Bill of Attainder

As this Court recognized, the Order is so devoid of due process that it amounts to a "bill of attainder." TRO Tr. 89:10-11. The Constitution twice prohibits such bills, *i.e.*, acts by which the legislature "named" a particular individual "disloyal" and unilaterally imposed a "wide array of punishments." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473-74 (1977); *see* U.S. Const. art. I, §§ 9, 10. Those punishments were not limited to criminal convictions, as the government contends. TRO Tr. 44:11-17. They included civil penalties, like "punitive[ly] confiscat[ing] … property" or "barring … individuals from Government employment." *Nixon*, 433 U.S. at 474-75.

The Order shares the essential features of a bill of attainder: It is a "special" act "prescribing punishment, without a trial, for a specific person or group." *Bill of Attainder*, *Black's Law Dictionary* (12th ed. 2024). To be sure, the Bill of Attainder Clauses appear in Article I, rather than Article II. As this Court recognized, however, the clauses reflect a basic principle of due process that applies to the Executive through the Fifth Amendment. TRO Tr. 89:10-22. There is no reason to "believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 144 (Black, J., concurring). Yet here, the President has taken it upon himself to "pronounce[] upon the guilt of [Perkins Coie] … in accordance [solely] with [the President's] own n[o]tions." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866). The Constitution plainly forbids this.

### 4.    The Executive Order Is Impermissibly Vague

As this Court recognized, the Order's vagueness creates "an additional separate due process problem." TRO Tr. 88:5-6. A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The Order suffers from both defects. To begin, the Order fails to give fair notice of what is prohibited because critical provisions are undefined. For example, Section 5(a)'s reference to "Personnel" is "so broad that Perkins Coie and its clients do not know the full set of circumstances under which the firm will be barred from engaging with government employees." TRO Tr. 88:16-20. Indeed, the government conceded that it does not know what "Personnel" means, what "engaging" means, or what Section 5's impact will be. *Id.* at 88:21-23. Similarly, Sections 1 and 4 never explain what "diversity, equity, and inclusion" policies are problematic, or what "other categories" of persons the Firm is accused of improperly discriminating against.

The Order's references to "interests of the United States" and the Administration's "goals and priorities" also are "far from clear." TRO Tr. 89:3. That ambiguity "impermissibly delegates basic policy matters to [agency heads] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application," exacerbating any chilling effect. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *see Humanitarian L. Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006) (executive order permitting "subjective interpretation" was unconstitutional). "Even where an agency finds zero national security threat, Perkins Coie employees can still be barred from federal government buildings if an agency head finds that to be in the U.S. interests, whatever that may mean." TRO Tr. 89:5-9.

### C.    The Executive Order Violates the Constitutional Rights to Counsel

Perkins Coie also is entitled to summary judgment on its claims in Counts VIII and IX that

the Order violates its clients' constitutional rights to counsel.  In criminal prosecutions, the Sixth

Amendment guarantees the Firm's clients "the right to the effective assistance of counsel," *Strick-

land v. Washington*, 466 U.S. 668, 686 (1984) (quotation omitted), and the "right to choose [their]

own counsel," *Wheat v. United States*, 486 U.S. 153, 159 (1988).  The same principles extend to

civil cases through the Fifth Amendment.  *Powell v. Alabama*, 287 U.S. 45, 68 (1932).

      This Court previously recognized that "the Order likely impermissibly threatens" the coun-

sel rights of criminal defendants.  TRO Tr. 90:6-7.  The Court should now hold that the Order

violates those rights, as well as the counsel rights of civil litigants.  Indeed, the Order is an unam-

biguous assault on our entire "adversarial system of justice," which has long recognized "vigorous

representation" to be of "paramount importance."  *Penson v. Ohio*, 488 U.S. 75, 84 (1988).

### 1.      Perkins Coie Has Standing to Challenge these Violations

      An attorney may vindicate his clients' constitutional injuries if he possesses constitutional

and third-party standing.  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3

(1989).  As this Court held, the Firm has both.  TRO Tr. 90:8-20.  The Firm has constitutional

standing because the Order (prior to the TRO) paralyzed the Firm's ongoing representations and

imperiled its continued existence.  *Id.* at 99:5-100:13; SOF ¶¶ 146-72.  Those concrete injuries

would be redressed by enjoining the Order.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

      The Firm likewise satisfies the prudential considerations for third-party standing.  Courts

examine "three factors:  The relationship of the litigant to the person whose rights are being as-

serted; the ability of the person to advance his own rights; and the impact of the litigation on third-

party interests."  *Caplin*, 491 U.S. at 624 n.3.  As to the first factor, Perkins Coie's attorney-client

relationship is sufficient to confer third-party standing.  *Triplett*, 494 U.S. at 720; *Caplin*, 491 U.S.

at 624 n.3.  As to the second, the Firm's clients' ability to protect their interests will be eviscerated

if their lawyers of choice are barred from entering federal courthouses, agency buildings, or

prisons.  As to the third, an adverse outcome in this litigation will "materially impair the ability of" the Firm's clients to protect a wide range of legal rights.  *Caplin*, 491 U.S. at 624 n.3.

Third-party standing also is appropriate "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights."  *Warth v. Seldin*, 422 U.S. 490, 510 (1975).  Enforcing the Order would undermine the counsel rights of the Firm's clients.  *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974) (lawyer had standing to challenge "interfere[nce] with his professional obligation to his client").

### 2.    The Executive Order Violates Bedrock Sixth Amendment Rights

The Order already has violated criminal defendants' Sixth Amendment rights to effective counsel and to counsel of their choice.  It will continue to do so unless permanently enjoined.

Start with the guarantee of effective counsel.  The Sixth Amendment imposes upon defense counsel "responsibilities in the plea bargain process" to practice "[t]he art of negotiation" and "horse trading."  *Missouri v. Frye*, 566 U.S. 134, 143-45 (2012) (cleaned up); *accord Lafler v. Cooper*, 566 U.S. 156, 170 (2012).  The Order interferes with that obligation.  It compels "[t]he heads of all agencies"—including the Department of Justice—to "limit[]" government employees from "engaging" with Firm employees and to "limit[]" their access to "Government buildings." EO § 5(a).  Unless permitted to "engag[e] with" government officials and "access" government buildings, *id.*, Firm attorneys cannot negotiate with prosecutors, resolve discovery disputes, accompany clients to meetings, or proceed past Executive Branch officers guarding the courthouse doors.  *See* TRO Tr. 25:10-14; Green Rpt. ¶¶ 20, 23.  Those restrictions deny the right to "have counsel present at all 'critical' stages of the criminal proceedings."  *Frye*, 566 U.S. at 140.

The Order also is at war with the Sixth Amendment "right to select counsel of one's choice."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006).  The Order not only prevents Perkins Coie attorneys from entering federal buildings or engaging with federal

employees; it also cuts the Firm off from "all Government goods, property, material, and services." EO § 2(b). In addition, the Order compels clients with government contracts to report, and then sever, their attorney-client relationship with the Firm lest they lose those contracts. *Id.* § 3(a)-(b). The Order thus directly "undermine[s]" a defendant's "right to be represented by an otherwise qualified [Perkins Coie] attorney whom that defendant can afford to hire." *Luis v. United States*, 578 U.S. 5, 12, 19-20 (2016) (quoting *Caplin*, 491 U.S. at 624).[8]

It is irrelevant that it remains nominally lawful to hire the Firm. Constitutional rights "protect those closely related acts necessary to their exercise." *Id.* at 26 (Thomas, J., concurring). The ability to engage with the government "is necessary to make meaningful" a client's right to choose the Firm. *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024). The professional rules underscore this point: If the Order's restrictions interfere with a Firm lawyer's ability to represent a client, the rules would permit or even require the lawyer to request a tribunal's permission to withdraw. Simon Rpt. ¶ 48. "[A] government official cannot do indirectly what []he is barred from doing directly," *Vullo*, 602 U.S. at 190, and the Order may not leverage government access to "nullify the right to counsel of choice," *Luis*, 578 U.S. at 27 (Thomas, J., concurring).

### 3.  The Executive Order Also Violates the Due Process Right to Counsel

The Order violates the right to counsel beyond the criminal context. Civil clients also are guaranteed "the right to the aid of counsel when desired and provided by the party asserting the right." *Powell*, 287 U.S. at 68; *see* Simon Rpt. ¶¶ 15(e), 32. The Supreme Court has recognized that "arbitrarily" interfering with that right constitutes "denial … of due process." *Powell*, 287 U.S. at 69. The government may not, for instance, require civil litigants to obtain its permission

---

[8] Indeed, before the President rescinded the Paul Weiss order, a criminal-defendant client obtained substitute counsel, forcing Paul Weiss to withdraw. *United States v. Coburn*, No. 2:19-cr-00120-MEF (D.N.J. Mar. 19, 2025), Dkt. 1012. The Court may take judicial notice of those proceedings. *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

before choosing counsel. *See Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 867, 872-73 (D.C. Cir. 1984). The government also may not prohibit a civil litigant from consulting his attorney during breaks in court proceedings. *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1118-19 (5th Cir. 1980). Plainly, the Executive may not leverage the federal government's weight (including by threatening clients' federal contracts) to dissuade a client from retaining a law firm.

### D. The Executive Order Exceeds the President's Constitutional Authority and Violates the Separation of Powers

Perkins Coie also is entitled to summary judgment on its claim in Count 1 that several key provisions of the Order (namely, Sections 1, 2(b), 3, and 5) exceed the President's executive authority and violate the separation of powers. Because the Founders feared the "unlimited executive power" exercised by the King of England, they divided and limited authority between three branches. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 641 (1952) (Jackson, J., concurring). In the President, they vested the "executive Power" and the obligation to "take Care that the laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. The President may not, however, exercise his limited authority in ways that infringe upon the authority of the other branches. *Youngstown*, 343 U.S. at 587. This separation of powers "protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

The Executive Order flouts these basic principles. In the Order, the President summarily punishes Perkins Coie for representing clients whom he views as political opponents and for advocating positions he dislikes. Such an order—which effectively functions as a bill of attainder—is wholly bereft of constitutional or statutory authority and invades the province of the Judiciary.

### 1. No Statutory or Constitutional Authority Supports the Order

It is "black letter law" that the President's power to issue an executive order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of*

*Chippewa Indians*, 526 U.S. 172, 188-89 (1999) (quoting *Youngstown*, 343 U.S. at 585). "If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." *Trump v. United States*, 603 U.S. 593, 608 (2024) (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring)). Courts thus have held that executive orders lacking statutory or constitutional authority are invalid.[9]

Here, Sections 1, 2(b), 3, and 5 of the Order have no support in any statute. The Order cites no statutory basis for these sections, other than a generic reference to the "laws of the United States." EO (preamble). When asked at the hearing to identify a statutory basis, the government offered none, retreating to the President's asserted authority under Article II. TRO Tr. 30:6-23.

That response was unsurprising, as no statute authorizes the President to punish a firm for its general representation of clients. For example, the President's authority to issue directives governing procurement, contracting, and property stems from the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 121. But nothing in that statute purports to authorize the Order's retributive measures. Indeed, courts have held that that act does not even authorize measures far more plausibly related to procurement.[10] In short, the Order "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a *presidential policy* be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588.

Nor is there any constitutional authority for the foregoing sections. There is no executive

---

[9] *See, e.g.*, *Mille Lacs Band*, 526 U.S. at 193-95 (executive order "was ineffective to terminate [tribal] rights" because it had "no statutory or constitutional authority"); *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942) (executive orders lacked "constitutional or statutory authorization" to convey land to tribe); *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *24 (D. Md. Mar. 4, 2025) (order regarding gender-affirming care lacked constitutional or statutory basis).

[10] *Nebraska v. Su*, 121 F.4th 1, 7-9 (9th Cir. 2024) (order and associated rule raising minimum wage for federal contractors); *Kentucky v. Biden*, 23 F.4th 585, 589, 606 (6th Cir. 2022) (statute did not authorize vaccine mandate for federal contractors), *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023); *Georgia v. President of the United States*, 46 F.4th 1283, 1298 (11th Cir. 2022) (same).

practice "long pursued" and "never before questioned" of Presidents punishing firms for repre-
senting their adversaries. *Youngstown*, 343 U.S. at 610 (Frankfurter, J. concurring). Indeed, such
a power is not within even the "outer perimeter" of Article II. *Trump*, 603 U.S. at 614, 642.

The government nonetheless sought to justify the Order on the theory that Article II's vest-
ing clause grants the President "sole authority" to determine that "a person poses a national security
risk such that certain actions need to be taken." TRO Tr. 50:21-23. The government further con-
tends that such Presidential decisions "cannot be challenged" in court. *Id.* at 51:5-10.

Setting aside that any supposed "national security" concern is a sham, *supra* pp.10-16,
there is no merit to either of the government's extraordinary contentions. While the Framers en-
visioned an "energetic Executive," *see* The Federalist No. 70, at 423 (Hamilton) (C. Rossiter ed.,
1961), they certainly did not create one with unilateral power to punish any citizen he deems a
"national security risk." As Justice Black wrote, our Constitution "wisely withheld authority for
resort to executive investigations, condemnations and blacklists as a substitute for imposition of
legal types of penalties by courts following trial and conviction in accordance with procedural
safeguards of the Bill of Rights." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 144-45 (Black,
J., concurring).

Nor is there any merit to the government's claim that the President may evade review by
invoking "national security." The term "national security" is not a "talisman" that permits the
Executive to exercise unreviewable powers. *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017). "[E]ven
with respect to matters of national security," there are "limitations" on the Executive's constitu-
tional authority. *Id.*; *accord Ozonoff v. Berzak*, 744 F.2d 224, 233 (1st Cir. 1984) (Breyer, J.).
And where "individual liberties are at stake," the Constitution "most assuredly envisions a role for
all three branches." *Hamdi*, 542 U.S. at 536 (plurality op.). The Judiciary may "properly

scrutinize" the "manner" in which the Executive acts. *Greenberg*, 983 F.2d at 290. For example, national-security concerns do not greenlight the Executive to circumvent the Fourth Amendment, *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 316-17 (1972), deny passports based on political beliefs, *Regan v. Wald*, 468 U.S. 222, 242 (1984), or detain American citizens without due process, *Hamdi*, 542 U.S. at 530-31 (plurality op.). Even "a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens." *Id.* at 536.

Thus, even if national security concerns were at stake here (they are not), the President could not assume the mantle of judge and jury to punish the law firm. The Constitution forbids such a "concentrat[ion]" of "the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024).

### 2. The Executive Order Improperly Usurps Judicial Power

In addition to lacking any constitutional or statutory basis, the Order invades the Judiciary's authority. "If there is a principle in our Constitution … more sacred than another, it is that which separates the legislative, executive and judicial powers." *Myers v. United States*, 272 U.S. 52, 116 (1926). Yet the Order usurps judicial authority by finding facts and imposing punishments and does so without any of the procedural protections accompanying the judicial process.

Article III vests federal "judicial Power" in the federal courts. U.S. Const. art. III, § 1. As one early treatise explained, the Judiciary is "that department of the government to whom the protection of the rights of the individual is by the constitution especially confided." 1 St. George Tucker, Blackstone's Commentaries, App. 357 (1803). Thus, in cases involving private rights, only the Judiciary may enter judgments depriving individuals of those rights. *See Jarkesy*, 603 U.S. at 127-28; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54-55 (1989).

The Judiciary also has inherent authority to discipline lawyers for misconduct in their general representation of clients. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). In federal court,

"[t]hat authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Chambers*, 501 U.S. at 44-45). Similarly, state courts (and state bars under delegated authority) may discipline lawyers who breach their professional obligations. *See, e.g.*, *Kohn v. State Bar*, 87 F.4th 1021, 1032, 1035 (9th Cir. 2023). This inherent power resides with the Judiciary, rather than the Executive, for good reason. "[L]awyers routinely and properly represent private clients against the Government and against executive officials and agencies." Green Rpt. ¶ 34. "The executive branch could not be expected to regulate fairly the very lawyers against whom it litigates." *Id.*

The Order usurps the Judiciary's power over private rights, as well as its inherent authority to discipline lawyers for alleged professional misconduct. In Section 1, the Order purports to make various (false or misleading) findings about the Firm's representation of Hillary Clinton and other clients. The Order then relies on those findings to punish the Firm. Among other things, the Order deprives the Firm of government services; threatens the Firm's clients with cancellation of their government contracts unless they cut ties with the Firm; limits the Firm's access to government buildings and ability to engage with government personnel; and presumptively bars Firm employees from government employment. EO §§ 2(b), 3, 5. By punishing the Firm for its general representation of clients, the President "interferes with[] settled understandings of the separation of powers and, in particular, judicial regulation of the legal profession." Green Rpt. ¶ 24.

The Order's invasion of the judicial function is particularly clear given that federal courts already have adjudicated many of the President's grievances referenced in the Order. For example, the Fifth Circuit (after a hearing) already ruled upon the alleged "lack of candor" referenced in Section 1. *See Tex. All. for Retired Ams. v. Hughs*, No. 20-40643 (5th Cir.). A federal court already tried (and a jury acquitted) former Perkins Coie partner Michael Sussmann for allegedly

lying to the FBI.  *See United States v. Sussmann*, No. 1:21-cr-582 (D.D.C.).  And a federal court already dismissed a civil suit brought by Mr. Trump in his personal capacity against the Firm and others (and also sanctioned Mr. Trump and his lawyers).  *Trump v. Clinton*, 653 F. Supp. 3d 1198, 1207-08 (S.D. Fla. 2023) (appeal pending).  Apparently dissatisfied with those rulings, the President resorts to seizing judicial power.  But just as Congress may not reopen the Judiciary's final judgments, *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 219 (1995), the President may not accomplish the same result by arrogating judicial power to himself.

The Order not only asserts judicial power; it does so in a way the Judiciary could not—by pronouncing judgment without any notice, opportunity to be heard, or neutral evaluation of the evidence.  The Executive is no more empowered than the Judiciary to punish groups "without notice" and "without opportunity to meet the undisclosed evidence."  *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 161 (Frankfurter, J., concurring).  Yet the Order does precisely that.  Indeed, as discussed above, the Order functions as an unconstitutional bill of attainder.  *Supra* p.26.

Finally, the Order interferes with "the proper exercise of the judicial power."  *Velazquez*, 531 U.S. at 545.  Courts "depend" on attorneys to "present all the reasonable and well-grounded arguments necessary for proper resolution of the case."  *Id.*  The separation of powers forbids another branch from excluding "from litigation those arguments and theories [it] finds unacceptable but which by their very nature are within the province of the courts to consider."  *Id.* at 546.

The Order contravenes those "separation-of-powers principles."  *Id.*  It punishes the Firm not only for representing the President's opponents, but also for "fil[ing] lawsuits against the Trump Administration."  Fact Sheet.  If allowed to stand, the Order will chill lawyers from bringing similar challenges.  The Order thus will undermine the "informed, independent bar" on which an "informed, independent judiciary" depends.  *Velazquez*, 531 U.S. at 545.

### E.    The Executive Order Violates Equal Protection

Perkins Coie also is entitled to summary judgment on its Equal Protection claim in Count IV.  "Nowhere are the protections of the Equal Protection Clause more critical than when [the government] singles out one or a few for uniquely disfavored treatment." *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 813 (D.C. Cir. 1988).[11]  These "class-of-one" claims require showing that (1) the plaintiff has "been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).[12]  "The classic class-of-one claim is illustrated when a public official, with no conceivable basis for his action other than spite or some other improper motive comes down hard" on a private citizen. *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (cleaned up); *see Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016).  This case perfectly fits that description.

1. The intentional, targeted nature of the sanctions is clear and indisputable. *Supra* pp.3-8, 10-18.  So is the differential treatment.  The Order's "Purpose" is to punish Perkins Coie, and only Perkins Coie. *Supra* pp.3-5, 11-18.  To be sure, in the typical "class-of-one" claim, where "improper motive is usually covert," courts compare the plaintiff to similarly situated individuals to "infer animus." *Swanson*, 719 F.3d at 784.  But where "animus is readily obvious," the plaintiff does not need to show disparate treatment in a "near exact, one-to-one comparison" to another

---

[11] The Fifth Amendment's Due Process Clause contains an equal protection right applicable to the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  The "[e]qual protection analysis … is the same" as for the Fourteenth Amendment. *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

[12] Despite the "class-of-one" moniker, "the number of individuals" targeted "is immaterial." *Olech*, 528 U.S. at 564 n.*; *see also Franks v. Rubitschun*, 312 F. App'x 764, 765 n.2 (6th Cir. 2009) (same).  The key is that differential treatment is not based on "[m]embership in a protected class" but on arbitrary mistreatment or animus. *Franks*, 312 F. App'x at 765-66.  Thus, the President targeting other firms, *see, e.g.*, Paul Weiss EO, does not defeat a class-of-one claim.

individual. *Id.*; *see also SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 35 & n.4 (1st Cir. 2008). Needless to say, this is the extraordinary case. The Order "strikes at [Perkins Coie] with the precision of a laser beam," so the only remaining question is whether the Order corresponds with any "legitimate public purpose." *See News Am. Publ'g*, 844 F.2d at 814.

2. The Order does not serve any legitimate public purpose. The government cannot justify the Order under even rational basis review, much less heightened scrutiny. *See News Am. Publ'g*, 844 F.2d at 802, 814 (where differential treatment burdens First Amendment activity, a standard "appreciably more stringent than 'minimum rationality'" applies). At a minimum, the government must put forward a "plausible reason[]" for its differential treatment, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993), which cannot be "so attenuated" from its conduct "as to render [it] arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985) (citing, *inter alia*, *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973)). "[A] bare desire to harm a politically unpopular group" is "not [a] legitimate state interest[]." *City of Cleburne*, 473 U.S. at 447; *see also Romer v. Evans*, 517 U.S. 620, 632 (1996).

The undisputed evidence shows that the Order is nothing more than political payback. *Supra* pp.10-18. The Order targets *everyone* in a 2,500-person firm based on nearly decade-old allegations related to the representation of the President's political opponent by lawyers who left the Firm years ago. SOF ¶ 75. The Order also seeks to punish the Firm for representing clients in *successful* lawsuits involving election laws. *Id.* ¶¶ 77-79. And without any evidence whatsoever of any current or former national-security threat from Perkins Coie, the Order limits the Firm's interactions with federal employees and access to federal buildings. The extraordinary overbreadth of the sanctions proves that any national security or national interest argument is obvious pretext.

## II.    PERKINS COIE IS ENTITLED TO A PERMANENT INJUNCTION

The Court should permanently enjoin implementation of the entire Order. To obtain a

permanent injunction, a plaintiff must show:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law … are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. Mer-cExchange*, 547 U.S. 388, 391 (2006).  The Firm readily satisfies those elements.

### A.    Absent an Injunction, Perkins Coie Will Suffer Further Irreparable Harm

This Court found at the TRO stage that the Order causes irreparable harm to the Firm that is "certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is clear and present need for equitable relief."  TRO Tr. 94:13-15 (citing *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)).  The Court should reach the same con-clusion now, especially since the irreparable-harm standard is the same for a permanent injunction as for a preliminary injunction or TRO.  *See Doe v. Mattis*, 928 F.3d 1, 7 (D.C. Cir. 2019).

While the Order was in effect, it subjected the Firm to concrete economic, constitutional, and reputational harms.  TRO Tr. 94:9-101:1.  Although the TRO stemmed those consequences, a permanent injunction is necessary to prevent them from resuming and intensifying.  SOF ¶ 160. The Court should "not hesitate in awarding necessary relief."  *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quotation omitted).

***Economic harm.***  Without a permanent injunction, Perkins Coie will suffer catastrophic and unrecoverable economic harm that "threatens the very existence of [its] business," rendering that harm irreparable.  TRO Tr. 99:8-9; *see Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (even compensable damages may be irreparable when loss "threatens the very existence of the movant's business").  As discussed, the Order brands the Firm *persona non grata* before the federal government and threatens its government-contracting clients with termination of their contracts unless they sever ties with the Firm.  Consequently, prior to the TRO, certain

clients terminated their relationship with the Firm, and others will likely do so if the Order goes back into effect. SOF ¶¶ 150-60. The continued termination of such relationships would threaten the Firm's very existence. *See* TRO Tr. 99:8. These harms are not only existential, but also "un-recoverable" because "sovereign immunity limits the Firm to nonmonetary equitable relief." TRO Tr. 100:4; *see Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021).

**Constitutional harm.** "Violations of [a] plaintiff's constitutional rights in and of them-selves lead[] to irreparable harm." TRO Tr. 95:2-3; *see Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). The Order violates Perkins Coie's constitutional rights in multiple respects and therefore irreparably harms the Firm.

1. *First Amendment violations.* "As the Supreme Court has said on many occasions, any violation of one's First Amendment rights constitutes irreparable harm." *Ramirez v. U.S. Customs & Border Prot.*, 477 F. Supp. 2d 150, 159 (D.D.C. 2007). Perkins Coie already has shown that the Order's First Amendment violations have caused irreparable harm, including that "government agencies [have] refus[ed] to interact with [the Firm's] lawyers, and clients have distanced them-selves from association with [the Firm]." TRO Tr. 95:18-21. The Order also had an immediate "chilling effect" on Perkins Coie attorneys who were forced to "reconsider how they approach certain matters that require them to appear in federal buildings." SOF ¶ 176. The Court's TRO as to Sections 1, 3, and 5 of the Order blunted these snowballing consequences. Permanent relief is necessary to ensure those harms do not resume.

Sections 2 and 4 of the Order also violate the Firm's First Amendment rights. Section 2, which immediately suspends security clearance for any Firm personnel pending a review of whether those clearances "are consistent with the national interest," EO § 2, retaliates against the Firm for protected First Amendment speech and association. Similarly, Section 4 punishes Perkins

Coie's speech through EEOC's unlawful and retaliatory "investigation." *Supra* pp.17-18; *see Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 84 (D.D.C. 2012) (sufficient showing of irreparable harm where plaintiffs demonstrated their First Amendment rights were threatened or being impaired at the time relief was sought).

2. *Fifth Amendment violations.*  As this Court found, the Order violates the Fifth Amendment by interfering with Perkins Coie's "liberty interests and property interests" without due process.  TRO Tr. 97:8-12.  The Order also violates the equal protection component of the Fifth Amendment by singling out the Firm for differential treatment. *Supra* p.37-38.  These violations of Perkins Coie's Fifth Amendment rights are not limited to Sections 1, 3, and 5.  The Firm also has a right to due process, and a right not to be singled out, in connection with security clearances held by its personnel and in connection with its diversity and inclusion activities.  Because Perkins Coie has shown "success on [its] Fifth Amendment claims" it has "also established irreparable harm." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 217-18 (D.D.C. 2020).

3. *Sixth Amendment violations.*  The Order also violates the Sixth Amendment rights of the Firm's clients "to be represented by their chosen lawyers." TRO Tr. 98:20-21; *see also* Hirshon Rpt. ¶ 12 ("The Executive Order also will deter clients from exercising their Constitutional right to select the counsel of their choosing.").  It also infringes on those clients' right to *effective* counsel by preventing Perkins Coie attorneys from performing the vast array of legal tasks that require interacting with government employees or visiting government buildings. *Supra* p.22-23.  Injunctive relief is warranted to prevent further irreparable harm.

**Reputational harm.**  Finally, a permanent injunction is necessary to avoid further irreparable harm to Perkins Coie's reputation. "[T]he executive order brands [Perkins Coie] as dishonest and dangerous, and threatens severe restrictions on the firm's ability to do work." TRO Tr. 100:17-

19. During the brief period before the TRO, the Order "already resulted in large and long-standing clients … tak[ing] their business elsewhere." *Id.* at 100:19-21; *see* SOF ¶ 160. The Order thus already has demonstrated its capacity to "damage[] [Perkins Coie's] corporate goodwill and reputation and its competitive position." TRO Tr. 100:22-24. Such reputational damage "is sufficient to find irreparable harm," *id.*, because "injury to reputation or goodwill is not easily measurable in monetary terms," *Xiaomi*, 2021 WL 950144, at *9 (quotation omitted).

Section 1 of the Executive Order also makes the baseless accusation that Perkins Coie "racially discriminates against its own attorneys and staff, and against applicants." EO § 1. An attack of this sort from the President brands Perkins Coie, whose reputation hinges on its ability to draw top talent, SOF ¶ 192, with an indelible "stigma." *See McVeigh v. Cohen*, 983 F. Supp. 215, 221 (D.D.C. 1998). Given that the Order already has proven its ability to inflict reputational damage, a permanent injunction is necessary to prevent further harm.

### B.     Perkins Coie Has No Adequate Remedy at Law

Perkins Coie also has no adequate remedy at law. The concepts of irreparable harm and lack of an adequate remedy at law "typically constitute two sides of the same inquiry, for the availability of adequate monetary damages belies a claim of irreparable injury." *TD Bank N.A. v. Hill*, 928 F.3d 259, 282 (3d Cir. 2019) (cleaned up). Thus, a finding of irreparable harm "demonstrat[es] the inadequacy of a legal remedy." *Atl. Richfield Co. v. Dep't of Energy*, 1983 WL 1111, at *8 (D.D.C. Jan. 7, 1983); *accord Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) ("An irreparable harm is one for which there is no adequate remedy at law.") (cleaned up); *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009) (same).

Perkins Coie has no remedy at law for the irreparable harms it has suffered and will suffer. As to its constitutional injuries, there is no remedy short of a permanent injunction that could ensure the Firm's and its clients' right to speak, assure the Firm due process and equal protection,

and protect its clients' right to counsel. Additionally, the Court already has found that the economic harms associated with the Order are both existential and nonrecoverable due to sovereign immunity. TRO Tr. 99:5-100:11. "No remedy at law would adequately compensate that injury." *Loving v. IRS*, 917 F. Supp. 2d 67, 81 (D.D.C. 2013), *aff'd*, 742 F.3d 1013 (D.C. Cir. 2014).

### C.    The Equities and Public Interest Strongly Favor a Permanent Injunction

When the government is the opposing party, the balance of equities and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts weigh "the competing claims of injury" and "consider the effect on each party [and the public] of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

At the TRO stage, the Court found that these factors favored temporary injunctive relief, and the same considerations support a permanent injunction. First, the injuries to Perkins Coie's business, reputation, and constitutional rights "have been and will continue to be severe," and the Firm's clients also have "suffered significant injuries to their rights to counsel." TRO Tr. 101:5-8. In contrast, the government "would suffer no cognizable injury" from an injunction. *Id.* at 101:8-9. To the extent the Order is based on the actions of two former Perkins Coie partners during the 2016 election, "neither individual works for the firm anymore, and neither has for many years." *Id.* at 101:11-14. Further, "this ground is a personal grievance that President Trump has already attempted to pursue in a personal lawsuit that was dismissed in its entirety." *Id.* at 101:14-17.

The other concerns mentioned by the Order also do not weigh against a permanent injunction. *Id.* at 102:2-3. For example, the Order complains that the Firm represented clients in suits to challenge election laws. EO § 1. But representing clients who petition the courts in election-related lawsuits does not inflict cognizable injury on the United States where, as here, the lawsuits were meritorious or non-frivolous. Insofar as the Order complains that certain former Perkins Coie lawyers displayed a "lack of candor" in a single court case, that is a matter that already was

"adjudicated" and "resolved" by the Fifth Circuit.  TRO Tr. 102:6.

The "public interest also favors the issuance" of an injunction.  *Id.* at 102:10-111.  There is no public interest in having agencies implement a blatantly illegal order, like the present one.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").  But there is a "substantial public interest" in having governmental agencies "abide" by the law.  *Id.*

In addition, the Executive Order undermines the strong public interest in lawyers zealously representing their clients without fear of retribution.  Under the professional rules, "[t]he duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law."  *E.g.*, D.C. Rules Pro. Conduct r. 1.3 cmt. [1].  Such "vigorous representation" is of "paramount importance" to "our adversarial system of justice."  *Penson*, 488 U.S. at 84.  "This system is premised on the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question."  *Id.* (cleaned up).

The threat of presidential sanctions, however, will chill "lawyers around the country from litigating against or advancing cases for clients with viewpoints disfavored by the Trump Administration."  TRO Tr. 102:14-17; *accord* Hirshon Rpt. ¶ 83; Green Rpt. ¶ 48; Simon Rpt. ¶ 16.  Indeed, as this Court found, the Order "already" is having a chilling effect of "blizzard proportions across the entire legal profession."  TRO Tr. 95:23-24, 96:11.

This chill will make it immensely harder for clients who are unpopular with the Administration to find counsel, undermining "the freedom of clients to choose a lawyer," D.C. Rules Pro. Conduct r. 5.6, cmt. [1], and the Sixth Amendment right to counsel of choice in criminal cases, *Gonzalez-Lopez*, 548 U.S. at 144.  The professional rules recognize lawyers have a responsibility to "accept[] a fair share of unpopular matters" or "unpopular clients."  D.C. Rules Pro. Conduct r.

6.2, cmt. [1]. Yet the Order "force[s] lawyers to choose between performing their assigned role in our democracy or pleasing the President." TRO Tr. 96:17-19 (quoting Hirshon TRO Decl.).

Finally, the Order "threatens to significantly undermine the integrity of our entire legal system." *Id.* at 103:10-12. "An informed, independent judiciary presumes an informed, independent bar," *Velazquez*, 531 U.S. at 545, not a bar under threat of retribution from the President. If the Order stands, nothing will prevent the President from punishing even more firms and cowing them into submission, as he already has succeeded in doing. *Supra* pp.7-8. The public interest—and the very functioning of our democracy—demand a permanent injunction. TRO Tr.103:18.

## CONCLUSION

Perkins Coie respectfully requests that the Court grant summary judgment in its favor on all of its claims and enter the proposed order for declaratory and permanent injunctive relief.

Dated:  April 2, 2025                    Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

By:     */s/ Dane H. Butswinkas*
         Dane H. Butswinkas (D.C. Bar #425056)

F. Lane Heard III (D.C. Bar #291724)                Amy M. Saharia (D.C. Bar #981644)
Christopher N. Manning (D.C. Bar #464069)        Matthew B. Nicholson (D.C. Bar #1013418)
Ryan T. Scarborough (D.C. Bar #466956)            Carol J. Pruski (D.C. Bar #1006941)*
Malachi B. Jones (D.C. Bar #455555)                Charles L. McCloud (D.C. Bar #1012047)*
Charles Davant IV (D.C. Bar #484305)              Krystal C. Durham (D.C. Bar # 987768)
David S. Kurtzer-Ellenbogen (D.C. Bar #489559)  Eden Schiffmann (D.C. Bar #1035019)
Jesse T. Smallwood (D.C. Bar #495961)

                                                                  680 Maine Avenue, SW
                                                                  Washington, DC  20024
                                                                  (202) 434-5000
                                                                  *Counsel for Plaintiff Perkins Coie LLP*

                                                                  * DDC bar application pending