# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

                *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

                *Defendants*.

Case No. 1:25-cv-00716 (BAH)

Judge Beryl A. Howell

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Civil Rule 7(h), Plaintiff Perkins Coie LLP submits the following Statement of Material Facts as to Which There Is No Genuine Dispute in support of its Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief.

## I.    Perkins Coie LLP Is an Established, Reputable Law Firm

### A.    Perkins Coie has Represented Clients for More than 100 Years

1.    Perkins Coie is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Perkins Coie LLP.  Burman Decl. ¶ 1.

2.    Perkins Coie was founded in 1912 in Seattle by a retiring U.S. District Judge and U.S. Attorney.  Burman Decl. ¶ 4.

3.    Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific Northwest, has opened offices throughout the United States and in Asia and in Europe, and has more than 1,200 lawyers.  Burman Decl. ¶ 4.

4.    The firm's lawyers are members of national, state, and local bar associations around the country.  Among other esteemed professional organizations, its lawyers are members of the American Bar Association, state bar associations for nearly every state in the country, and local

bar associations in such cities and counties as Chicago, King County, Los Angeles County, Maricopa County, New York City, San Francisco, and Washington, D.C.  Burman Decl. ¶ 6.

5.      The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations.  Burman Decl. ¶ 5.

6.      Perkins Coie alumni have been and are presently serving as state and federal court judges, judicial law clerks, prosecutors, public defenders, and high-ranking government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies.  Burman Decl. ¶ 5.

7.      Perkins Coie and its lawyers have represented clients in most, if not every, state, in federal and state courts across the nation, and in tribunals throughout the world (including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law.  Burman Decl. ¶ 6.

8.      Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade.  The firm and its lawyers are regularly recognized for excellence in the legal community by *Best Lawyers*®, *Chambers USA*, and other respected organizations, including national and local bar associations.  Burman Decl. ¶ 7.

9.      Perkins Coie has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive years, and its individual offices are often named to similar local lists. Burman Decl. ¶ 12.

10.      Perkins Coie has approximately 2,500 lawyers and business professionals.  Of those, nearly half are attorneys—including equity partners, non-equity partners, and associates,

among others—and half are business professionals—including paralegals, patent agents, legal assistants, and other professionals.  Burman Decl. ¶ 8.

11.     Perkins Coie's personnel include former members of the armed forces and current reservists in the U.S. military.  Many of the firm's partners and business professionals also serve as Sunday school teachers, Scouts leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations.  Burman Decl. ¶ 8.

12.     Perkins Coie's attorneys are drawn from all sides of the political spectrum, and most of its attorneys are not politically active.  Burman Decl. ¶ 9.

13.     Many Perkins Coie attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or judicial law clerks to judges appointed by both Democratic and Republican presidents.  Burman Decl. ¶ 9.

14.     In the past six years, four current or former Perkins Coie lawyers have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023.  One former partner ran for Congress as a Republican, won, and returned to the firm for a time after he lost re-election. Another former partner was elected Washington Attorney General as a Republican.  Burman Decl. ¶ 9.

15.     The firm has a longstanding, firmwide commitment to pro bono service.  Since 1989, the firm has provided approximately 1.45 million hours of pro bono service by attorneys, paralegals, and other business professionals to numerous clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing, education, food, benefits, and economic justice.  Perkins Coie's pro bono

service also extends to representing indigent criminal defendants before federal courts by court appointment and clients on death row in states with limited pro bono resources.  Burman Decl. ¶ 10.

16.    In 2024, Perkins Coie lawyers, paralegals, and other business professionals spent over 89,000 hours, valued at nearly $70 million, in pro bono service.  Burman Decl. ¶ 10.

17.    Perkins Coie has received numerous awards from a wide range of organizations for its pro bono representation, including state and local bar associations, the U.S. Patent and Trademark Office 2023 Patent Pro Bono Achievement Certificate, the U.S. District Court for the District of Arizona 2022 Outstanding Pro Bono Attorney of the Year Award (awarded in 2023), and the 2023 Veteran Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance.  Burman Decl. ¶ 11.

**B.    Perkins Coie Is Committed to Advancing Diversity and Inclusion Within the Firm and the Legal Industry**

18.    In addition to its representation of clients in this area, Perkins Coie has a longstanding and demonstrable commitment to fostering diversity and inclusion (D&I) within the firm, the legal profession and its community.  This commitment is reflected on the Perkins Coie website, which states:

- "We are intentional and consistent in our efforts to increase the diversity of our workforce and to advance the values of diversity and inclusion in the legal profession.  Diversity and inclusion are key to our culture, our values, and our business strategy.  They are fundamental to the way we connect with and serve our clients.";

- "Perkins Coie is committed to advancing diversity and inclusion both within the firm and throughout our collective communities.  We will continue to support and participate in efforts to make the legal profession more diverse and inclusive."

Burman Decl. ¶ 13; Ex. 1, p. 2 (Perkins Coie Website).

19.     Like the federal government, Perkins Coie formally recognizes Martin Luther King Jr. Day and Juneteenth as firmwide holidays, reinforcing the firm's commitment to racial equity through institutionalized reflection, education, and service.  The firm encourages attorneys and staff to engage in volunteer activities on these days, supporting local community organizations dedicated to advancing racial justice.  Burman Decl. ¶ 14.

20.     Perkins Coie observes many heritage months, including several that have been recognized by Congress, by conducting programming aimed at fostering awareness and appreciation of diverse cultural narratives.  These include, but are not limited to, Black History Month, Asian American and Pacific Islander Heritage Month, Women's History Month, Pride Month, and Hispanic Heritage Month.  These initiatives are complemented by firm-wide speakers, panel discussions, and presentations open to all Perkins Coie personnel designed to encourage meaningful dialogue on diversity-related topics.  These programs benefit all the firm's personnel and the firm believes that they make for a more cohesive and effective working environment. Burman Decl. ¶ 14.

21.     Perkins Coie's hiring and promotion decisions are merit-based: all candidates are evaluated based on qualifications, competencies, personality, and demonstrated excellence.  The firm's hiring committee and interviewers undergo training on best practices for inclusive hiring, mitigating implicit biases, and fostering fair opportunities.  Burman Decl. ¶ 15.  Perkins Coie does not have "percentage quotas" as part of its hiring practices.  Burman Decl. ¶ 15.

22.    Perkins Coie has a Diversity & Inclusion Fellowship program that is expressly open to all first-year law students.  Burman Decl. ¶ 16; Ex. 2, p. 3 (Perkins Coie Website).

23.    Following litigation initiated by the American Alliance for Equal Rights in 2023, the firm explicitly affirmed the inclusive nature of the fellowship to ensure continued adherence to principles of fairness and legal compliance.  After the firm's confirmation that the law student fellowships were open to all, the American Alliance for Equal Rights voluntarily dismissed its lawsuit.  Burman Decl. ¶ 17.

**C.    Many of Perkins Coie's Practices Require Interaction with the Federal Government**

24.    As a full-service law firm that represents clients across all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government on behalf of their clients.  Those interactions are crucial to their ability to practice their profession.  Burman Decl. ¶ 19.

25.    Most of the firm's litigation practice occurs in federal court on behalf of its clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings. Burman Decl. ¶ 19.

26.    The firm has nearly one thousand cases currently pending before federal district, bankruptcy, and appellate courts, including the Supreme Court of the United States.  Burman Decl. ¶ 19.

27.    Perkins Coie attorneys have upcoming appearances scheduled before agencies and in courtrooms, including an argument before the Supreme Court.  Burman Decl. ¶ 19.

28.    Perkins Coie represents clients who have been criminally charged or are the targets of pending federal criminal investigations.  Over the past five years, the firm has represented more than 80 individuals and companies who have been criminally investigated, charged, or prosecuted

by federal authorities at the Department of Justice.  This list does not include the firm's work in federal criminal-adjacent areas, such as clemency petitions or other post-conviction relief beyond direct appeals, such as pardons or compassionate release.  Burman Decl. ¶¶ 20.

29.     The firm has nine practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government.  Burman Decl. ¶ 21.

30.     The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys. Burman Decl. ¶ 21.

31.     The smallest practice group by headcount is Political Law, which includes 8 attorneys, plus 19 attorneys who are members of other practice groups and also affiliated with the practice.  Burman Decl. ¶ 21.

32.     In the course of their representations, Perkins Coie lawyers frequently meet with federal officials from many federal agencies.  Burman Decl. ¶ 22.

33.     The significant majority of the firm's clients have matters that require Perkins Coie lawyers to interact with federal agencies.  Burman Decl. ¶ 22.

34.     A significant number of Perkins Coie clients are, or have affiliates who are, government contractors and subcontractors—including 100% of its top 15 clients by revenue. Burman Decl. ¶ 23.  The firm is frequently sought out by leading technology and communications companies who are innovating in areas as varied as artificial intelligence, telecommunications, and the Internet of Things.  Burman Decl. ¶ 6.

35.     Perkins Coie is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, and thus cannot disclose client engagements without authorization.

No client has authorized Perkins Coie to disclose its engagement of the firm in connection with this litigation.  Burman Decl. ¶ 18.

36.    The firm's Government Contracts group handles clients' bid protests and disputes surrounding contract claims, including transactional work and litigation.  Perkins Coie represents some of these clients in connection with government contract matters.  Burman Decl. ¶ 24.

37.    The approximately nine attorneys in the Government Contracts group currently are handling approximately 70 government contracting matters involving various federal agencies. Burman Decl. ¶ 24.

38.    Many other firm clients that have government contracts have engaged Perkins Coie to represent them in matters unrelated to their government contracts.  Burman Decl. ¶ 24.

39.    Perkins Coie's Intellectual Property group and its clients also depend heavily on access to the federal government.  The approximately 236 attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board.  Burman Decl. ¶ 25.

40.    Perkins Coie is currently representing clients in approximately 5,415 pending patent applications before the USPTO.  Burman Decl. ¶ 25.

41.    Perkins Coie is also representing clients in approximately 56 active post-grant proceedings (i.e., administrative trial proceedings) before the Patent Trial and Appeal Board (PTAB), and approximately 11 active proceedings before the International Trade Commission (ITC).  Burman Decl. ¶ 25.

42.    Perkins Coie is also representing clients in trademark and copyright matters before agencies, including approximately 66 matters before the Trademark Trial and Appeal Board

(TTAB), approximately 1,960 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office. Burman Decl. ¶ 25.

43. Many of Perkins Coie's patent and trademark clients have contracts with the federal government. Burman Decl. ¶ 25.

44. Perkins Coie has approximately 340 attorneys in its Business group. Burman Decl. ¶ 26.

45. The Business group includes subgroups directed to financial regulation, which requires them to engage with federal financial regulatory agencies and instrumentalities (such as the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency); international trade, which involves interaction with and practice before the Department of Commerce and the International Trade Commission; and tax, which involves interaction with the Internal Revenue Service. Burman Decl. ¶ 26.

46. The international trade group also has approximately 17 pending matters before the Department of Labor and approximately 22 pending matters before U.S. Citizenship and Immigration Services. Burman Decl. ¶ 26.

47. The group's corporate and securities practice regularly represents clients before and in connection with the Securities and Exchange Commission (SEC), including No Action Request Letters, Securities Act registration statements subject to SEC review, and Exchange Act filings. Burman Decl. ¶ 26.

48. The Business group also represents clients before or in connection with the Department of Agriculture, the Food and Drug Administration, Department of Transportation, Department of Labor, Department of Justice, Department of Homeland Security, and Department of State. Burman Decl. ¶ 26.

49.     Perkins Coie's White Collar & Investigations practice (a subgroup of the Commercial Litigation group) includes approximately 29 attorneys and is almost exclusively reliant on interacting with the federal government. Burman Decl. ¶ 27.  The White Collar & Investigations practice involves representing clients in investigations and after indictments in numerous proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation (FBI), U.S. Attorney's Offices, and SEC, among others.  Burman Decl. ¶ 27.

50.     There are many other practice groups and subgroups at Perkins Coie that interact, by necessity, with the federal government on behalf of their clients.  These groups include, but are not limited to, Commercial Litigation (with subgroups including Appeals, Issues & Strategy; Construction; and Antitrust); Environment, Energy & Resources; Labor & Employment; Private Client Services; Product Liability; and Real Estate & Land Use.  Burman Decl. ¶ 28.

51.     Much of Perkins Coie's work on behalf of its clients requires access to federal government buildings, which house both courthouses and agencies.  Burman Decl. ¶ 28.

52.     Every practice group at the firm has work on behalf of its clients that requires access to federal government buildings.  Burman Decl. ¶ 28.

53.      Certain of the firm's practice areas, such as White Collar & Investigations, are almost exclusively reliant on interacting with the federal government.  Burman Decl. ¶ 28.

54.     Each of Perkins Coie's nine major practice groups relies on clients who have done business with the federal government.  Burman Decl. ¶ 28.

55.     Clients who have done business with the federal government or their corporate affiliates account for a significant fraction of revenue in each practice group, as evidenced by the top 15 clients in each practice group (84% of revenue from top 15 clients in Business from those

that have or whose corporate affiliates have government contracts; 90% for Commercial Litigation; 88% for Intellectual Property; 51% for Environment, Energy & Resources; 75% for Labor & Employment; 44% for Political Law; 51% for Private Client Services; 94% for Product Liability; 32% for Real Estate & Land Use). Burman Decl. ¶ 28.

56.    Perkins Coie has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, instrumentalities, or other bodies which require them either to interact with or appear before federal government officials:

- Administration for Strategic Preparedness and Response
- Advisory Council on Historic Preservation
- Biomedical Advanced Research and Development Authority
- Bonneville Power Administration
- Bureau of the Census
- Bureau of Economic Analysis
- Bureau of Indian Affairs
- Bureau of Industry and Security
- Bureau of Land Management
- Bureau of Ocean Energy Management
- Bureau of Reclamation
- Bureau of Safety and Environmental Enforcement
- CHIPS Program Office
- Committee on Foreign Investment in the United States
- Commodity Futures Trading Commission
- Consumer Financial Protection Bureau
- Defense Contract Audit Agency
- Defense Contract Management Agency
- Defense Logistics Agency
- Department of Agriculture
- Department of the Army
- Department of Commerce
- Department of Defense
- Department of Energy (including Oak Ridge National Laboratory)
- Department of Health & Human Services
- Department of Homeland Security
- Department of the Interior
- Department of Justice (including Antitrust, CCIPS, Civil, Fraud)
- Department of Labor
- Department of State
- Department of Transportation

- Department of Toxic Substance Controls
- Department of the Treasury
- Department of Veterans Affairs
- Directorate of Defense Trade Controls
- Drug Enforcement Administration
- Environmental Protection Agency
- Equal Employment Opportunity Commission
- Executive Office of the President (including CEQ, OMB, and OSTP)
- Fannie Mae and Freddie Mac
- Federal Aviation Administration
- Federal Bureau of Investigation
- Federal Bureau of Prisons
- Federal Communications Commission
- Federal Deposit Insurance Corporation
- Food & Drug Administration
- Federal Election Commission
- Federal Emergency Management Agency
- Federal Energy Regulatory Commission
- Federal Highway Administration
- Federal Permitting Improvement Steering Council
- Federal Transit Administration
- Financial Crimes Enforcement Network
- Financial Industry Regulatory Affairs
- Government Accountability Office
- Grid Deployments Office
- Housing and Urban Development
- Internal Revenue Service
- International Trade Administration
- Loan Programs Office
- National Institutes of Health
- National Labor Relations Board
- National Marine Fisheries Service
- National Oceanic and Atmospheric Administration
- National Park Service
- National Renewable Energy Lab
- Office of Clean Energy Demonstrations
- Office of Federal Contract Compliance Programs
- Office of Foreign Assets Control
- Office of the Comptroller of the Currency
- Office of the U.S. Trade Representative
- Pacific States Marine Fisheries Commission
- Patent Trial & Appeal Board
- Rural Utilities Service
- Securities & Exchange Commission

- Small Business Administration
- Trademark Trial & Appeal Board
- U.S. Army Corps of Engineers
- U.S. Attorney's Offices
- U.S. Copyright Office
- U.S. Citizenship and Immigration Services
- U.S. Customs and Border Protection
- U.S. Fish & Wildlife Service
- U.S. Forest Service
- U.S. Immigration and Customs Enforcement
- U.S. International Trade Commission
- U.S. Patent & Trademark Office
- U.S. Postal Inspection Service
- U.S. Secret Service

Burman Decl. ¶ 29.

57.     Perkins Coie's pro bono work is frequently before federal agencies or involves interacting with federal government officials.  Burman Decl. ¶ 30.

58.     Perkins Coie attorneys represent individual veterans pro bono in obtaining benefits before the Department of Veterans Affairs and the Department of Defense.  Perkins Coie has approximately 41 open pro bono matters for individual veterans, the majority of which relate to seeking higher levels of benefits for veterans in connection with their service to this country, such as application for combat-related special compensation (before the Combat-Related Special Compensation Board); discharge upgrade petitions; and appeals to the U.S. Court of Appeals for Veterans Claims.  Burman Decl. ¶ 30.

59.     In the past five years, Perkins Coie has handled 90 matters for individual servicemembers related to veterans' rights.  Burman Decl. ¶ 30.

60.     Perkins Coie received the 2023 Veterans Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance (OMVLA).  That award recognizes the law firm that provided the greatest contribution to OMVLA in any given year. Burman Decl. ¶ 30.

61.    The National Veterans Legal Services Program (NVLSP) also selected a Perkins Coie attorney to receive the 2020 NVLSP Lawyers Serving Warriors Excellence Award.  Burman Decl. ¶ 30.

62.    The entire veterans-rights practice requires access to federal officials and buildings. Burman Decl. ¶ 30.

63.    Perkins Coie attorneys also represent disaster victims on a pro bono basis in FEMA applications and appeals.  Burman Decl. ¶ 30.

64.    Perkins Coie attorneys represent pro bono clients in social-security matters, including Social Security Income (SSI) and Social Security Disability Insurance (SSDI) cases. Burman Decl. ¶ 30.

65.    Perkins Coie represents several nonprofits pro bono for a range of matters, including obtaining federal tax exemptions, formation, and counseling.  Burman Decl. ¶ 30.

66.    Perkins Coie represents pro bono low-income inventors with patent applications before the USPTO, and assists organizations and small businesses in registering trademarks. Burman Decl. ¶ 30.

67.    Perkins Coie attorneys also provide pro bono representation to religious organizations.  Burman Decl. ¶ 30.

68.    Much of Perkins Coie's pro bono work is not political.  Only about 20% of the pro bono matters, and 35% of the pro bono time spent over the past year, were attributable to cases that might be viewed as "political" – i.e., cases involving transgender service members, homelessness, immigration, reproductive rights, the First or Second Amendments, elections, discrimination, or right to die.  By contrast, 80% of Perkins Coie's pro bono matters, and nearly two-thirds of its pro bono hours over the past year, were devoted to non-political matters such as

veterans, domestic abuse, Criminal Justice Act appointments to represent indigent defendants, Social Security disability payments, patents and trademarks, business and non-profit tax counseling.  Burman Decl. ¶ 31.

69.     Examples of the type of pro bono work that might be considered "political" include: (1) a challenge to a state law that prevented pregnant individuals from using midwives that employ traditional healing practices for prenatal, maternal, and infant care; (2) assisting a faith-based "crisis" pregnancy resources center in a lease dispute; and (3) assisting a deported veteran—who had lived in the United States as a lawful permanent resident since the age of five—in returning to the United States through humanitarian parole.  Burman Decl. ¶ 32.

**D.      Some Former Perkins Coie Lawyers Represented Clients Aligned with the Democratic Party**

70.     Perkins Coie's Political Law Group has historically been much smaller than the firm's other practice groups.  Burman Decl. ¶ 21.

71.     In 2021, the Political Law Group shrank further when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group.  Burman Decl. ¶ 21.

72.     The Elias Law Group describes itself as "a mission-driven firm committed to helping Democrats win, citizens vote, and progressives make change."  Marc Elias and other former Perkins Coie lawyers founded the firm to "focus[] on representing the Democratic Party, Democratic campaigns, nonprofit organizations, and individuals committed to securing a progressive future."  Manning Decl. ¶ 2, Ex. 1.

73.     Today, Perkins Coie's Political Law Group includes 8 attorneys (and 19 other attorneys who are members of other practice groups and also affiliated with the practice).  Burman Decl. ¶ 21.

74.     The Political Law Group accounts for about 0.5% of the firm's revenue.    It historically has handled a mix of paying and some pro bono cases, and is often called on to advise clients (typically corporations and business organizations) on political finance issues.    Burman Decl. ¶ 21.

75.     In 2016, Marc Elias and others at Perkins Coie represented Hillary Clinton in connection with her presidential campaign, including the engagement of Fusion GPS.    Burman Decl. ¶ 60.    No attorney employed by Perkins Coie during the last three years was involved with the engagement of Fusion GPS.    Burman Decl. ¶ 60.

76.     On May 31, 2022, a former Perkins Coie attorney who was not in the Political Law group, Michael Sussmann, was acquitted of lying to the FBI about links between the Trump organization and Russia.    Manning Decl. ¶ 61, Ex. 60; *United States v. Sussmann*, 21-CR-582 (CRC), ECF No. 156 (May 31, 2022) (Judgment of Acquittal).    Mr. Sussmann, who had considerable experience as a cybersecurity lawyer, had been engaged by the Clinton campaign after its emails were hacked.    Mr. Sussmann left Perkins Coie in 2021.    Burman Decl. ¶¶ 60-61.

77.     In 2020, Perkins Coie represented a number of clients opposing then-candidate Trump's challenges to the results of the 2020 Presidential Election.    Perkins Coie's clients prevailed in all but one of the challenges brought by the Trump campaign.    The case where Perkins Coie's client did not prevail involved a challenge to the deadline—November 9 versus November 12—to confirm the identities of first-time voters who voted by mail in Pennsylvania.    Burman Decl. ¶ 33.

78.     In 2020, the firm's clients also prevailed in a significant number of voting rights cases, including cases where its clients were successful in defending existing laws against various legal challenges.    Burman Decl. ¶ 33.

16

79.     Perkins Coie has represented both party-affiliated and non-partisan clients in litigation over election laws.  None of Perkins Coie's election-related litigation was frivolous.  More than half of the litigation was successful after both sides had full due process.  And much of the litigation was defending state election procedures and actions taken by state officials.  Burman Decl. ¶ 61.

### E.     President Trump's 2022 Lawsuit Against Perkins Coie, Hillary Clinton, Michael Sussmann, and Others

80.     On March 24, 2022, Donald Trump sued 31 individuals and entities, including Perkins Coie, Hillary Clinton, the Democratic National Committee, Fusion GPS, and former Perkins Coie partners Michael Sussmann and Marc Elias in the U.S. District Court for the Southern District of Florida alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia, including by "falsifying evidence, deceiving law enforcement, and exploiting access to highly-sensitive data sources."  The complaint also alleged that "Perkins Coie was tasked with spearheading the scheme to find—or fabricate—proof of a sinister link between Donald J. Trump and Russia."  Mr. Trump asserted civil RICO claims against certain defendants, including Perkins Coie, for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits. *Trump v. Clinton et al.,* 2:22-cv-14102, Dkt. 1, (S.D. Fla. 2022).

81.     On September 8, 2022, the court dismissed the lawsuit with prejudice.  *Trump v. Clinton et al.,* 626 F. Supp. 3d 1264 (S.D. Fla. 2022).  The court decision stated "[w]hatever the utilities of [the Amended Complaint] as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit."  *Id.* at 1264.

82.     Some of those defendants, but not Perkins Coie, sought sanctions.  The court sanctioned Mr. Trump, and his attorneys Alina Habba and Habba Madaio & Associates,

$937,989.39 for, among other things, bringing a frivolous case "in order to dishonestly advance a political narrative."  *See Trump v. Clinton et al.,* 2:22-cv-14102, Dkt. 302 (S.D. Fla.).  The court stated that the case was part of "[a] continuing pattern of misuse of the courts by Mr. Trump and his lawyers" which "undermines the rule of law, portrays judges as partisans, and diverts resources from those who have suffered actual legal harm."  *Id.*

83.     In 2021, three former Perkins Coie attorneys were sanctioned, collectively, $8,700 in connection with a single duplicative motion to supplement the record in a Fifth Circuit appeal in a voting-rights case.  None of the three sanctioned attorneys remains at Perkins Coie.  *See Tex. All. for Retired Ams. v. Hughs*, No. 20-40643, Dkt. No. 127-1 (5th Cir. Jun. 30, 2021).

F.     **Perkins Coie's Current Litigation Against the Trump Administration**

84.     On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League challenging Executive Order 14185 entitled "Restoring America's Fighting Force," which purports to address risks posed by transgender military servicemembers.  *Shilling v. Trump*, No. 2:25-cv-241, Dkt. 1 (W.D. Wash.).

85.     Perkins Coie represents the plaintiffs in *Shilling* on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights Campaign.  On February 19, 2025, Perkins Coie, on behalf of its clients, filed a motion for a preliminary injunction asking the court to bar implementation of the executive order until it could adjudicate the case.  *Shilling*, No. 2:25-cv-241, Dkt. No. 23 (W.D. Wash.).

18

86.     Perkins Coie's clients in *Shilling* argue that the Order violates their First Amendment, due process, and equal protection rights.  The court entered a preliminary injunction on March 27, 2025.  *Shilling*, No. 2:25-cv-241, Dkt. No. 103 (W.D. Wash.).

87.     On January 28, 2025, a group of plaintiffs filed an earlier parallel lawsuit challenging Executive Order 14185.  *Talbott v. Trump*, No. 25-cv-240, Dkt. 1 (D.D.C.).  Perkins Coie does not represent those individuals and is not otherwise involved in that litigation.  Burman Decl. ¶ 35.

88.     On March 18, 2025, the court granted the *Talbott* plaintiffs' motion for a preliminary injunction, holding that Executive Order 14185 violated the *Talbott* plaintiffs' equal protection rights.  *Talbott v. Trump*, No. 25-cv-240, Dkt. 89 (D.D.C.).

### G.     Perkins Coie Personnel Maintain Security Clearances for Matters Unrelated to the Executive Order

89.     At the time Executive Order 14230 was issued, *see infra* ¶ 123, approximately twenty-four Perkins Coie lawyers and business professionals held security clearances.  These individuals include a dozen persons with former military or other public service backgrounds, granted access to sensitive information by virtue of their commitment to public service.  These individuals also include and overlap with persons whose access to sensitive information has been granted in the context of their fulfilling their obligations as lawyers to represent their clients.  Burman Decl. ¶ 36.

90.     Of the twenty-four security clearance holders, twenty-one received clearance from the Department of Defense and the other three received clearance from the Department of Justice and Federal Bureau of Investigation.  Burman Decl. ¶ 37.

91.     One partner received a security clearance on February 12, 2025, after President Trump's inauguration and approximately three weeks before the Executive Order issued.  The

"Adjudication History" in the Defense Information System for Security (DISS) for the partner reflected "**Top Secret adjudication completed** with a **determination of Favorable by DoD CAS on 2025/02/12**." (emphasis in original.)  All of the factual conclusions recited in Section 1 of the Executive Order occurred before that partner received a security clearance.  Burman Decl. ¶ 39.

92.     None of the security clearance holders is a primary member of the Political Law Group.  Burman Decl. ¶ 41.

93.     Ten of the security clearance holders were hired at Perkins Coie after the 2016 election.  Burman Decl. ¶ 40.

94.     Nineteen of the security clearance holders had no involvement in any of the matters referenced in the Order or the Fact Sheet.  Of the five that did, the security clearances they held were unrelated to their work on those matters.  Burman Decl. ¶ 41.

95.     No security clearance holder had any involvement in the Fusion GPS matter.  Burman Decl. ¶ 41.

96.     No security clearance holder has any involvement with the *Shilling* matter.  Burman Decl. ¶ 41.

97.     Nine of the security clearance holders received their clearance prior to being hired by Perkins Coie.  Burman Decl. ¶ 38.  Two of those individuals hold clearances in connection with their duties as military reservists, and wholly unrelated to their work at Perkins Coie.  Burman Decl. ¶ 38.

98.     Four of the twenty-four individuals with security clearances are non-attorneys.  Burman Decl. ¶ 38.

99.     Perkins Coie previously (but does not now) maintained a secure area with a low classification level, namely a secure working environment, but that secure area was closed prior

to the issuance of the Order. Perkins Coie has never maintained a Sensitive Compartmented Information Facility (SCIF). Burman Decl. ¶ 42.

## II.    For Almost a Decade, President Trump Has Routinely Attacked and Vowed to Retaliate Against Perkins Coie and Lawyers Previously Associated with the Firm (Marc Elias and Michael Sussmann)

100.    Since the 2016 Presidential Election, President Trump has made numerous statements directed at Perkins Coie and its lawyers, particularly former partners Marc Elias and Michael Sussmann. Manning Decl. ¶¶ 3-23, Exs. 2-22. Both as a candidate and as President, Mr. Trump has threatened retribution against them. Manning Decl. ¶¶ 3-23, Exs. 2-22. Some non-exhaustive examples include the following:

101.    On October 19, 2017, then-President Trump posted on "X," formerly Twitter: "Workers of firm involved with the discredited and Fake Dossier take the 5th. Who paid for it, Russia, the FBI or the Dems (or all)?" Manning Decl. ¶ 3, Ex. 2.

102.    On August 6, 2018, then-President Trump posted on X: "Collusion with Russia was very real. Hillary Clinton and her team 100% colluded with the Russians, and so did Adam Schiff who is on tape trying to collude with what he thought was Russians to obtain compromising material on DJT. We also know that Hillary Clinton paid through....a law firm, eventually Kremlin connected sources, to gather info on Donald Trump. Collusion is very real with Russia, but only with Hillary and the Democrats, and we should demand a full investigation." Dan Bongino on @foxandfriends Looking forward to the new IG Report!" Manning Decl. ¶ 4, Ex. 3.

103.    On November 9, 2018, then-President Trump took questions from reporters on the South Lawn, which the White House later posted under "Remarks by President Trump Before Marine One Departure." When asked by a reporter about whether there was any evidence of voter fraud in Broward County, Florida, then-President Trump stated, "[a]ll of a sudden, they're finding

votes? . . . And you have this guy, Elias, who represented Hillary Clinton and a lot of shady things."
Manning Decl. ¶ 5, Ex. 4.

104.    On November 9, 2018, then-President Trump posted on X: "As soon as Democrats
sent their best Election stealing lawyer, Marc Elias, to Broward County they miraculously started
finding Democrat votes.  Don't worry, Florida – I am sending much better lawyers to expose the
FRAUD!"  Manning Decl. ¶ 6, Ex. 5.  Then-President Trump posted the same on Facebook.
Manning Decl. ¶ 7, Ex. 6.

105.    On January 22, 2019, then-President Trump posted on X: "Former FBI top lawyer
James Baker just admitted involvement in FISA Warrant and further admitted there were
IRREGULARITIES in the way the Russia probe was handled.  They relied heavily on the
unverified Trump 'Dossier' paid for by the DNC & Clinton Campaign, & funded through a…"
"…big Crooked Hillary law firm, represented by her lawyer Michael Sussmann (do you believe
this?) who worked Baker hard & gave him Oppo Research for 'a Russia probe.' This meeting, now
exposed, is the subject of Senate inquiries and much more.  An Unconstitutional Hoax.
@FoxNews."  Manning Decl. ¶ 8, Ex. 7.

106.    This paragraph is intentionally omitted.

107.    On December 5, 2021, then-former President Trump claimed the following in an
interview with Fox News's Mark Levin:

> LEVIN: Let's talk a little bit more about this Russia collusion issue. Durham has indicted
> this guy, Michael Sussman who lied to the F.B.I., brought them fake information. He was
> working with Perkins Coie. That law firm used to have a guy by the name of Mark Elias.
> They went all through the states from 2016 to 2020 trying to change the rules and so
> forth, all kinds of dark money behind them from billionaires –
>
> TRUMP: And got fired from Perkins Coie.
>
> LEVIN: Well, he certainly left.

TRUMP: Because it's hot.

LEVIN: It's hot. Hillary Clinton was behind most of it.

TRUMP: Yes.

LEVIN: What do you want to say to Hillary Clinton?

TRUMP: Well, I think it's disgraceful. I think that I always knew it was a hoax and I tell the story. During the campaign, people would come up to me -- different people, young people, old people, people that were working on my campaign. So, what do you know about Russia? I said nothing. What do you know about Russia? Nothing. Two months later, what do you know about -- sir, do you know anything about Russia? After about five times, I'd said, what the hell is going on with Russia? They've created a false -- it was a totally fabricated story. They made it up in either her kitchen or a law office. She spent millions of dollars. Crooked Hillary did this -- millions and millions of dollars, gave it to Steele, who is a nut job and he did the whole F.B.I.

Manning Decl. ¶ 10, Ex. 9

108.    On May 31, 2022, the day Michael Sussmann was acquitted of lying to the FBI about links between the Trump organization and Russia, the then-former President Trump posted on Truth Social: "Our Legal System is CORRUPT, our Judges (and Justices!) are highly partisan, compromised or just plain scared, our Borders are OPEN, our Elections are Rigged, Inflation is RAMPANT, gas prices and food costs are 'through the roof,' our Military 'Leadership' is Woke, our Country is going to HELL, and Michael Sussmann is not guilty.  How's everything else doing? Enjoy your day!!!"  Manning Decl. ¶ 11, Ex. 10.

109.    On November 15, 2022, then-former President Trump announced his candidacy for the 2024 Presidential Election.  Manning Decl. ¶ 12, Ex. 13.

110.    On December 11, 2022, then-candidate Trump posted a link on Truth Social to a Breitbart article entitled "Elon Musk Calls out Sussmann, Perkins Coie for 'Attempt to Corrupt a Presidential Election.'"  Manning Decl. ¶ 13, Ex. 12.

111.    On May 16, 2023, then-candidate Trump posted on Truth Social his interview with Dan Bongino, in which he included Marc Elias in a list of "bad people" and stated that their actions "really effected 2020 more than it effected 2016."  Manning Decl. ¶ 14, Ex. 13.

112.    During the 2023 Conservative Political Action Conference, then-candidate Trump stated "I am your warrior.  I am your justice.  And for those who have been wronged and betrayed: I am your retribution."  Manning Decl. ¶ 15, Ex. 14.

113.    On June 21, 2023, then-candidate Trump reposted on Truth Social an infographic associating Perkins Coie with "collusion" with Russia in relation to Fusion GPS and the Steele Dossier.   Manning Decl. ¶ 16, Ex. 15.

114.    On March 31, 2024, then-candidate Trump posted on Truth Social an article from Vigilant News entitled "Marc Elias Is Scared…And He Should Be[:] The lawfare being used to try to stop President Trump is failing."  Manning Decl. ¶ 17, Ex. 16.

115.    On April 23, 2024, then-candidate Trump posted on Truth Social:  "I am being accused of Election Interference in a trial being presided over by a Corrupt D.A. and a ridiculously Conflicted Judge, representing people who Rigged and stole the 2020 Presidential Election, and paid millions of dollars for the Fake and Fully Discredited Russia Dossier…..And they're after me because a bookkeeper marked down 'Legal Expense' in a Ledger when describing Legal Fees paid to a lawyer.  What else would you call it?  The Biden Thugs call it Falsifying Business Records. THIS FAKE CASE SHOULD BE DROPPED, IMMEDIATELY!"  Manning Decl. ¶ 18, Ex. 17.

116.    On May 5, 2024, then-candidate Trump posted on Truth Social:  "Andrew McCarthy: 'HILLARY CLINTON, RECIDIVIST ELECTION-THEFT CONSPIRATOR . . . book[ed] as legal fees what might euphemistically be called 'research'—was the blueprint for the 2016 Hillary Clinton campaign, in cahoots with the Democratic National Committee. They paid

their law firm, Perkins Coie, which retained the research firm Fusion GPS and its contractor,

former British spy Christopher Steele, to generate the farcical Steele dossier that was shared with

the FBI, the State Department, and the media to smear Trump as a clandestine agent of the

Kremlin…"  Manning Decl. ¶ 19, Ex. 18.

117.    On August 29, 2024, Monica Crowley, a former Trump administration official and

media figure, hosted then-candidate Trump on her podcast and asked whether he believed the July

13, 2024 assassination attempt near Butler, Pennsylvania at one of President Trump's campaign

events was an "inside job."  In response, President Trump acknowledged that the circumstances

were "strange," and questioned whether Marc Elias was involved in paying for the lawyer hired to

represent the family of the individual who attempted to carry out the assassination—Matthew

Crooks.  Manning Decl. ¶ 20, Ex. 19.

118.    On September 7, 2024, then-candidate Trump posted the following on Truth Social:

> CEASE & DESIST: I, together with many Attorneys and Legal
> Scholars, am watching the Sanctity of the 2024 Presidential Election
> very closely because I know, better than most, the rampant Cheating
> and Skullduggery that has taken place by the Democrats in the 2020
> Presidential Election.  It was a Disgrace to our Nation!  Therefore,
> the 2024 Election, where Votes have just started being cast, will be
> under the closest professional scrutiny and, WHEN I WIN, those
> people that CHEATED will be prosecuted to the fullest extent of the
> Law, which will include long term prison sentences so that this
> Depravity of Justice does not happen again.  We cannot let our
> Country further devolve into a Third World Nation, AND WE
> WON'T!  Please beware that this legal exposure extends to
> Lawyers, Political Operatives, Donors, Illegal Voters, & Corrupt
> Election Officials.  Those involved in unscrupulous behavior will be
> sought out, caught, and prosecuted at levels, unfortunately, never
> seen before in our Country.

Manning Decl. ¶ 21, Ex. 20.  He posted substantially the same post on Truth Social ten days later

on September 17, 2024 and again on October 25, 2024. Manning Decl. ¶¶ 22-23, Exs. 21-22.

**III.     President Trump Also Has Targeted Efforts Supporting Diversity & Inclusion**

119.    The President and his Administration have demonstrated their opposition to viewpoints supporting Diversity & Inclusion efforts, often characterizing such policies as illegal, radical, immoral, woke, or politically motivated.

120.    The President has signed multiple Executive Orders targeting such viewpoints.  For example, an Executive Order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" focused specifically on targeted "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," and described such programs as "public waste and shameful discrimination."  Manning Decl. ¶ 24, Ex. 23, Executive Order 14151 (Jan. 20, 2025).

121.    A White House Fact Sheet called "Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI," states DEI's "foundational rhetoric and ideas foster intergroup hostility and authoritarianism" and "creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict."  Manning Decl. ¶ 25, Ex. 24, White House Fact Sheet (Jan. 22, 2025).

122.    On March 4, 2025, During President Trump's Joint Address to Congress, he stated "We've ended the tyranny of so-called diversity, equity, and inclusion policies all across the entire federal government and, indeed, the private sector and our military.  [] And our country will be woke no longer."  He also claimed "[W]e're getting wokeness out of our schools and out of our military, and it's already out, and it's out of our society.  We don't want it.  Wokeness is trouble.

Wokeness is bad.  It's gone.  It's gone."  Manning Decl. ¶ 27, Ex. 26.

## IV.    President Trump Issues Executive Order 14230 to Make Good on His Promise of Retribution against Perkins Coie

123.    On March 6, 2025, less than two months after taking office, President Trump issued Executive Order 14230, entitled "Addressing Risks from Perkins Coie LLP" ("the Order"), and an accompanying document titled "Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP."  Manning Decl. ¶¶ 28-29, Exs. 27-28; Burman Decl. ¶ 24.

124.    President Trump signed the Order in the Oval Office during a filmed signing ceremony.  At the beginning of the signing ceremony, President Trump's staff secretary handed him the Order, saying, "Sir, your administration has made it a priority both to end lawfare and the weaponization of government and also to hold those who have engaged in lawfare accountable. Uh, one of those, uh one of the law firms that uh has been involved in that is called Perkins Coie. That's also a law firm uh that has engaged in unlawful DEI practices.  This Executive Order will security clearances…"  President Trump interrupted his staff secretary saying, "And I've watched it take place."  President Trump's staff secretary continued, "This executive order will suspend security clearances and access to certain federal resources for that law firm, and also launch a holistic review of unlawful DEI practices at some of the Nation's largest law firms."  Manning Decl. ¶ 30, Ex. 29.

125.    After his staff secretary finished, President Trump said, "This is an absolute honor to sign.  What they've done is… it's just terrible.  It's weaponization, uh you could say weaponization against a political opponent and it should never be allowed to happen again."  At that point, President Trump began signing the Order. Manning Decl. ¶ 30, Ex. 29.

126.    Each section of the Order retaliates against Perkins Coie, consistent with President

Trump's prior statements.

127.    Section 1 of the Order is titled "Purpose."  Section 1 of the Executive Order purports to make a series of factual findings, including:

    a.    "The dishonest and dangerous activity of the law firm Perkins Coie LLP ("Perkins Coie") has affected this country for decades."

    b.    "Notably, in 2016 while representing failed Presidential candidate Hillary Clinton, Perkins Coie hired Fusion GPS, which then manufactured a false "dossier" designed to steal an election."

    c.    "This egregious activity is part of a pattern.  Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification. In one such case, a court was forced to sanction Perkins Coie attorneys for an unethical lack of candor before the court."

    d.    "In addition to undermining democratic elections, the integrity of our courts, and honest law enforcement, Perkins Coie racially discriminates against its own attorneys and staff, and against applicants.  Perkins Coie publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights laws.  It proudly excluded applicants on the basis of race for its fellowships, and it maintained these discriminatory practices until applicants harmed by them finally sued to enforce change."

    e.    "Those who engage in blatant race-based and sex-based discrimination, including quotas, but purposefully hide the nature of such discrimination through deceiving language, have engaged in a serious violation of the public trust.  Their disrespect

for the bedrock principle of equality represents good cause to conclude that they

neither have access to our Nation's secrets nor be deemed responsible stewards of

any Federal funds."

Manning Decl. ¶ 28, Ex. 27.

128.    Section 2 of the Executive Order is titled "Security Clearance Review."  Section

2(a) directs "The Attorney General, the Director of National Intelligence, and all other relevant

heads of executive departments and agencies" to "immediately take steps consistent with

applicable law to suspend any active security clearances held by individuals at Perkins Coie,

pending a review of whether such clearances are consistent with the national interest."  Section

2(b) directs "[t]he Office of Management and Budget" to "identify all Government goods,

property, material, and services, including Sensitive Compartmented Information Facilities,

provided for the benefit of Perkins Coie," and "[t]he heads of all agencies providing such material

or services shall, to the extent permitted by law, expeditiously cease such provision."  Manning

Decl. ¶ 28, Ex. 27.

129.    Section 3 of the Executive Order is titled "Contracting."  Section 3 includes

provisions that mandate federal agencies to require government contractors to disclose any

relationship they have with Perkins Coie, and to terminate government contracts for clients as to

which Perkins Coie has been hired to perform any service, even if unrelated to the particular matter

for which the client engaged Perkins Coie.  Manning Decl. ¶¶ 28, 32, Exs. 27, 31.

130.    Section 4 of the Executive Order is titled "Racial Discrimination."  Executive Order

14230.  Section 4 contains a directive to the Acting Chair of the Equal Employment Opportunity

Commission (EEOC) and the Attorney General to investigate the hiring and promotion practices

of "leading" and "large" law firms, including Perkins Coie.  Manning Decl. ¶ 28, Ex. 27.

131.    Section 5 of the Order is titled "Personnel."  Section 5 broadly restricts access to federal buildings, limits engagement with federal personnel, and presumptively bars all Firm employees from federal employment.  Manning Decl. ¶ 28, Ex. 27.

132.    The Order's accompanying Fact Sheet states that "President Trump's Administration will not tolerate Perkins Coie LLP's unethical and discriminatory actions that threaten our elections, military strength, and national security."  Manning Decl. ¶ 29, Ex. 28.

133.    The Fact Sheet purports to make a series of factual findings, including:

  a.    "In 2016, Perkins Coie LLP hired Fusion GPS to manufacture a false 'dossier' designed to steal an election while representing failed presidential candidate Hillary Clinton."

  b.    "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussman indicted for lying to the FBI about this scheme."

  c.    "Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter identification."

  d.    "Perkins Coie has been accused of racially discriminating against its own attorneys, staff, and applicants."

  e.    "Perkins Coie has publicly announced Perkins Coe LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump."

  f.    "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness."

Manning Decl. ¶ 29, Ex. 28.

134.    Perkins Coie was given no notice of, nor an opportunity to respond to, the Order or Fact Sheet or to explain their impact on the firm before they were issued.  Burman Decl. ¶ 34.

135.    Immediately following the issuance of the Order, federal agencies began to implement the Order's directives.

136.    After President Trump signed the Order, a senior administration official told The Washington Post that the "President doesn't believe they should have the privileges afforded to companies of their stature to work and operate with the federal government, since they have made it very clear that are vehemently against the president of the United States, and their work proves that."  The Washington Post stated that the senior official spoke "on the condition of anonymity to talk frankly about the sensitive decision-making behind the order."  Manning Decl. ¶ 31, Ex. 30.

137.    On March 7, 2025, Russell Vought, Director of the Office of Management and Budget, sent a memorandum to the heads of all executive branch departments and agencies that directed:

> Agencies must review all Government contracts and subcontracts with Perkins and Coie LLP, as well as provision to Perkins and Coie LLP of goods, property, material, and services, including any Sensitive Compartmented Information Facilities.  Agencies shall complete the review, perform all duties required by the . . . Executive Order, and report back to the Office of Management of [sic] Budget . . . no later than April 5, 2025, which should include contract type, scope, period of performance, and value, along with any action taken.

Manning Decl. ¶ 32, Ex. 31.

138.    On March 9, 2025, during an interview with Fox News Channel's Maria Bartiromo that was given on March 6, 2025, Ms. Bartiromo noted that President Trump signed executive orders regarding law firms, and that one of the law firms was Perkins Coie.  Ms. Bartiromo stated, regarding Perkins Coie, that "that was the law firm that had the Steele dossier."  President Trump

responded, "Yeah. They had the Steele dossier; they had a lot of other things, and we have a lot

of law firms that we're going to be going after because they were very dishonest people. They

were very, very dishonest. I could go point after point after point… and were so bad for our

country, and we have a lot of law firms that we're going after." Manning Decl. ¶¶ 33-34, Ex. 32-

33.

139.    On March 10, 2025, Stephen Miller, President Trump's deputy chief of staff for

policy, appeared on Fox News and described the Executive Order "as part of President Trump's

plan to shut down weaponized law enforcement. Perkins Coie, as has been well documented and

established, was at the center of the Russian collusion hoax that was a multi-year war on American

democracy—a giant PSYOP attempted on the American people that formed the justification for

the incarceration, harassment, and spying on of countless American citizens, and of course the

attempt to infiltrate President Trump's campaign and ultimately to try to launch a coup to throw

him out of office." Manning Decl. ¶ 34, Ex. 33.

140.    On March 17, 2025, following the directives in Section 4 of the Order, Acting Chair

Andrea Lucas of the Equal Employment Opportunity Commission (EEOC) sent nearly identical

letters to Perkins Coie and 19 other law firms requesting extensive information about each firm's

employment practices "[b]ased on [their] public statements." Manning Decl. ¶ 35, Ex. 34.

Nothing about Perkins Coie's commitment to Diversity & Inclusion was considered illegal before

President Trump's inauguration.

141.    The investigative letters are publicly available on the Equal Employment

Opportunity Commission's website. Manning, Decl. ¶ 36, Ex. 35.

142.    The 11-page letter to Perkins Coie contained 37 "initial" requests for information, including four requests which seek ten years of information about Perkins Coie's hiring practices. Manning Decl. ¶ 35, Ex. 34.

143.    At the same time, Acting Chair Lucas issued a press release identifying Perkins Coie by name and stating, "The EEOC is prepared to root out discrimination anywhere it may rear its head, including in our nation's elite law firms.  No one is above the law—and certainly not the private bar."  Manning, Decl. ¶ 36, Ex. 35.

144.    The EEOC may only initiate a Title VII investigation after a valid charge has been filed.  Yet the investigative letters do not cite any such charges, and no such charge has been filed.  *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 64 (1984); *see also* Manning, Decl. ¶ 35, Ex. 34.

## V.    Executive Order 14230 Punishes and Irreparably Harms Perkins Coie

145.    Since the issuance of the Order and Fact Sheet, Perkins Coie has incurred irreparable economic, constitutional, and reputational harms as a result of each Section of the Order.

### A.    Perkins Coie Has Suffered and Will Suffer Irreparable Economic Harm

#### 1.    The Firm Has Lost Clients as a Result of the Order and Will Lose Clients Without a Permanent Injunction

146.    Perkins Coie is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, but can report general facts and facts known to the government. Burman Decl. ¶ 25.

147.    Many of Perkins Coie's largest clients (for instance, the top 15 clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue) or their affiliates have contracts or subcontracts with the federal government, or compete

for such contracts, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters.  Burman Decl. ¶ 47.

148.    For many of the firm's clients, the fact that the firm gives them legal advice is not public information.  Burman Decl. ¶ 47.

149.    Enforcement of the Order would require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts due solely to their engagement with Perkins Coie.  Burman Decl. ¶ 47.

150.    In the less than four business days between the issuance of the Order and the Court's entry of a temporary restraining order, multiple clients terminated their legal engagements with Perkins Coie or began reviewing their relationship with the firm, their government contracts, and other government interactions to determine if the relationship could continue.  Burman Decl. ¶ 48.

151.    On March 6, 2025, within hours of the Order's release, a seven-year client with seven open matters ended Perkins Coie's representation of that client in any litigation before the relevant federal agency.  Burman Decl. ¶ 48.

152.    The day after the Executive Order, an official of a federal agency refused to allow the client's Perkins Coie lawyers to attend a scheduled meeting with an office in that agency to discuss a pending matter.  The client had engaged Perkins Coie to defend that client in that enforcement action, and Perkins Coie performed substantial work on the matter, totaling over $1 million in fees, and interacted with the agency on this matter in the interim.  The client hired another law firm to represent it before the federal government and in related litigation.  Burman Decl. ¶ 44.

153.    A major government contractor that has been a firm client for over 35 years reassigned two matters to other law firms on March 7.  Burman Decl. ¶ 48.

154.    A government contractor that was a firm client since 2018 withdrew all work from Perkins Coie as of March 7.  Burman Decl. ¶ 48.

155.    After the Order was issued, a coalition of four clients whose matters required engagement with various federal agencies—including the DEA, DOJ, and HHS—withdrew all coalition work from Perkins Coie.  Burman Decl. ¶ 48.

156.    On March 7, 2025, a major government contractor that was a firm client since 2021 with fifteen open matters started reconsidering its engagements with Perkins Coie.  Burman Decl. ¶ 48.

157.    On March 7, 2025, another client abruptly started considering other firms to represent it in connection with a DOJ investigation.  Burman Decl. ¶ 48.

158.    Many clients began requesting frequent updates relating to the Order to assess whether Perkins Coie can continue to represent them.  Burman Decl. ¶ 48.

159.    On March 11, 2025, a longtime client of the firm that had increased its work five-fold over the past three years and had 30 open matters started to reconsider whether to terminate every engagement with Perkins Coie.  Burman Decl. ¶ 48.

160.    The abrupt loss of so many longstanding and significant clients across a variety of business types and practice disciplines in a one-week period is exceptional and abnormal.  The common denominator is that each client terminated or began reconsidering its engagements in the immediate aftermath of the Order's issuance.  While the TRO stemmed some of those consequences, a permanent injunction is necessary to prevent them from resuming and intensifying.  Burman Decl. ¶ 49.

161.    Since March 6, 2025, Perkins Coie has lost significant revenue due to the loss of clients who terminated their engagements after the Order was issued.  Perkins Coie also lost out on new work from clients who were considering engaging the firm, but chose not to move forward with Perkins Coie after issuance of the Executive Order.  Burman Decl. ¶ 50.

### 2.    The Order Affects Perkins Coie's Ability to Practice Law on Behalf of its Clients

162.    On March 6, 2025, the day the Order was issued, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice cancelled a previously set meeting relating to another Perkins Coie client, pending further guidance on whether that meeting could even occur in light of the Order.  Burman Decl. ¶ 45.  Because the Order may be interpreted to ban Perkins Coie's access to federal courthouses, the firm incurred additional costs in securing additional backup personnel to attend impending hearings before it was enjoined.  Burman Decl. ¶ 46.

163.    Perkins Coie attorneys have numerous upcoming appearances before federal courts and agencies that will be affected by the Order, were the injunction to be lifted.  Burman Decl. ¶ 46.

164.    Perkins Coie has nearly one thousand active matters before federal courts, and has thousands of matters before agencies that require access to federal government buildings and officials.  Burman Decl. ¶ 46.

165.    Continued refusals by federal officials to meet with Perkins Coie lawyers, or to permit Perkins Coie lawyers to access federal agencies and buildings, would be devastating to both Perkins Coie's legal practice and its clients' interests.  Burman Decl. ¶ 46.

166.    The firm would not be able to operate without interacting with federal agencies or entering federal buildings on behalf of its clients.  Burman Decl. ¶ 46.

### 3. The Order Affects Perkins Coie's Business Relationships and Hiring Practices

167.   The Order threatens Perkins Coie attorneys' right to practice their chosen profession, which frequently requires them to appear in federal court or before federal agencies in criminal, civil, or administrative matters.  Burman Decl. ¶ 52.

168.   The Order has also impacted Perkins Coie's recruiting and retention of its personnel.  Since the issuance of the Order, the firm has had business professional candidates who have been extended offers question the economic health of the firm and ask if there will be layoffs. Burman Decl. ¶ 53.

169.   The Order also interferes with Perkins Coie's diversity and inclusion programs, including its ability to offer fellowships to potential new hires.  Burman Decl. ¶ 58.

170.   The Order increases the potential that Perkins Coie lawyers will leave the Firm for other opportunities in order to preserve their relationships with clients that have government contracts.  Burman Decl. ¶ 54.

171.   The Order interferes with Perkins Coie's employer–employee relationships because the restrictions include Perkins Coie employees.  Burman Decl. ¶ 55.

172.   The Firm's ability to grow its business hinges on its ability to draw and retain top talent.  Burman Decl. ¶ 53.

### B. Perkins Coie Has Suffered and Will Suffer Irreparable Constitutional Harm from the Order

173.   The Order exceeds the President's constitutional authority and violates the separation of powers.

174.   The Order violates Perkins Coie's and its clients' constitutional rights under the First, Fifth, and Sixth Amendments.

175.   The Order's purpose is retaliatory.  *See supra* ¶¶ 100-144.

37

176.    The Order has also caused an immediate chilling effect.  Immediately after the Order's enactment, some government agencies refused to interact with Perkins Coie and some clients disengaged from the firm altogether.  *See supra* ¶¶ 145-166.  Perkins Coie attorneys have been forced to reconsider how they approach certain matters that require them to appear in federal buildings or interact with federal officials.  Burman Decl. ¶ 51.

177.    The firm currently faces considerable uncertainty regarding which aspects of its D&I activities and advocacy will result in adverse consequences, including injunctive relief, but the message appears to be to get rid of everything.  This risk and uncertainty given the vagueness of the Executive Order and the need to protect the firm from extralegal pressure has resulted in pausing or pulling back on certain programs and some statements in support of D&I and the implementation of D&I initiatives even where likely lawful and consistent with EEOC guidance at the time those actions were taken.  Burman Decl. ¶¶ 56, 58.

178.    Perkins Coie is reassessing statements and references to its D&I advocacy on its website.  In an abundance of caution, all press releases and stories touting the firm's prior advocacy more than six months old were removed from the firm's website (but have been preserved).  Burman Decl. ¶ 57.

179.    Perkins Coie has postponed a showing of a movie regarding Lilly Ledbetter, sex discrimination and the Fair Pay Act.  Burman Decl. ¶ 58.

180.    Perkins Coie has reassessed and is reassessing statements and references to its D&I advocacy in various advertisements and program brochures, including considering removal of the following:

        a.   The phrase "Diversity is Excellence" in an advertisement;

38

     b.    The statement that Perkins Coie is "proud to support" an organization's "commitment to inclusivity and empowerment of diverse communities," in a program brochure for an event the firm is sponsoring.

     c.    The phrase "Investing in diversity and inclusion is smart business and helps drive our pursuit of excellence," in a program brochure.

Burman Decl. ¶ 57.

181.    The firm is considering whether and how it can or should respond to questions from clients and prospective clients regarding the demographics of the firm or its lawyers.  Burman Decl. ¶ 58.

182.    Although the firm decided to proceed with the event, the Perkins Coie Women's Forum was concerned that an internal event for first-time attendees to the firm's partner planning conference could be targeted as impermissible, even though it was open to all conference attendees, because a resource group was hosting the event.  Burman Decl. ¶ 58.

183.    Firm personnel were unsure whether they can have a reference to "DE&I" in their email signature block.  Burman Decl. ¶ 58.

184.    The EEOC letter and accompanying press release have further chilled Perkins Coie's exercise of its First Amendment right to advocate for D&I at the firm, in the legal profession and in the community.  Burman Decl. ¶ 58.

**C.    Perkins Coie Has Suffered and Will Suffer Irreparable Reputational Harms from the Order**

185.    The Order has branded Perkins Coie as "dishonest and dangerous," which irreparably threatens Perkins Coie's reputation, and thus, its ability to do its work.  Burman Decl. ¶ 59.

186.     The Order and the Fact Sheet have harmed Perkins Coie's reputation in the market for clients, lawyers, and staff through its false and disparaging characterizations of the firm and its attorneys.  Burman Decl. ¶ 59.

187.     The Order likewise defames Perkins Coie by falsely stating Perkins Coie worked to "steal an election," "undermining democratic elections, the integrity of our courts, and honest law enforcement."  Burman Decl. ¶ 60.

188.     Similarly, the Order defames Perkins Coie by falsely stating Perkins Coie "racially discriminates against its own attorneys and staff, and against applicants," including through "percentage quotas" and "proudly exclud[ing] applicants on the basis of race."  Burman Decl. ¶ 60.

189.     The Order also defames Perkins Coie by falsely stating Perkins Coie has "earnings" that "subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust."  Burman Decl. ¶ 60.

190.     The Fact Sheet disparages Perkins Coie by falsely stating "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme."  A jury unanimously acquitted Mr. Sussmann on May 31, 2022.  Manning Decl. ¶ 61, Ex. 60.

191.     These false and disparaging statements have stigmatized Perkins Coie.  Burman Decl. ¶ 59.

192.     Perkins Coie's reputation hinges on its ability to draw and retain top talent.  Burman Decl. ¶ 53.

193.     Perkins Coie's reputation also is critically affected by its ability to draw and retain clients.  Burman Decl. ¶ 59.

**D.      Punishing Perkins Coie for Its Advocacy Irreparably Harms the Administration of Justice**

194.      Several reputable experts—Robert Hirshon, Bruce Green, and Roy Simon—submitted reports in this case opining on the Executive Order's legal infirmities, including its constitutional flaws and its interference with lawyers discharging their ethical obligations under applicable rules of professional conduct.  Numerous bar groups, law schools, law firms, and lawyers have also spoken out against the Executive Order.

195.      Professor Hirshon opined that the Order presents a clear and present danger to the administration of justice in the United States.  Hirshon Rpt. ¶¶ 8-21; Simon Rpt. ¶ 16.

196.      Professor Hirshon also opined that the quality of justice in the United States depends in large measure on lawyers' diligent advocacy of their clients' respective positions, especially for people whose cause is controversial or the subject of popular disapproval.  Hirshon Rpt. ¶¶ 14-15 (quoting D.C. R. Prof'l C. r. 1.3, Comment [2]).

197.      Professor Green opined that the Rules of Professional Conduct underscore "the importance of affording legal assistance to unpopular clients."  Green Rpt. ¶ 42.

198.      Professors Green and Hirshon opined that reasonable lawyers will understand the Executive Order to mean not only that lawyers may suffer government retribution for representing clients in matters of which the President disapproves for personal or political reasons, but also that they may be punished for representing clients who challenge the legality of government policies.  Hirshon Rpt. ¶ 17; *see also* Green Rpt. ¶ 48 (opining that the Order "will discourage not only Perkins Coie but also other law firms from representing future clients and pursuing future actions, and particularly actions against the Government and other advocacy that the President might disfavor").

199.    They also opined that the threat of presidential sanctions will chill lawyers from representing clients whom the President views as political opponents, or from advocating legal positions that the President dislikes.  Hirshon Rpt. ¶¶ 15-18 ; Green Rpt. ¶¶ 51-52; *see also* Simon Rpt. ¶¶ 43-55.

200.    Professor Hirshon opined "the Executive Orders will have the effect of forcing lawyers to choose between performing their assigned role in our democracy or pleasing the President, all to the detriment of clients and the fair administration of justice."  Hirshon Rpt. ¶ 24.

201.    Professor Green opined that the Order also deters clients from exercising their Constitutional right to select the counsel of their choosing.  Green Rpt. ¶ 45.

202.    Professor Green opined that the Order threatens to block the firm's attorneys from engaging in such discussions, infringing their clients' Sixth Amendment rights and the Firm's ability to effectively and zealously represent those clients.  Green Rpt. ¶¶ 49-53.

203.    Professor Hirshon opined that the Order drastically limits the ability of Perkins Coie lawyers to represent their many clients, including "barring [them] from federal buildings." Hirshon Rpt. ¶ 19.

204.    Professor Simon opined that interfering with counsel's effectiveness can itself violate choice of counsel: a lawyer who could not effectively represent a client because of limitations on his practice could be forced by the Rules of Professional Conduct to withdraw. Simon Rpt. ¶ 48.

205.    Professors Hirshon and Simon concluded that "as a practical matter," the Order "deprive[s] clients of their right to be represented by their chosen lawyers."  Hirshon Rpt. ¶ 19; *see also* Simon Rpt. ¶ 48.

206.    Professor Simon explained that the Order thus "chill[s] the rights of clients to petition government for redress of grievances and to peaceably assemble, as guaranteed by the First Amendment."  Simon Rpt. ¶ 55.

207.    Professor Green also opined that the Order "distort[s] the legal system" and infringes on "the freedom of [the Firm's] clients to choose a lawyer," which is protected by the Constitution.  Green Rpt. ¶¶ 44-45 (quoting *Velazquez*, 531 U.S. at 544; D.C. Rules of Prof. Conduct, Rule 5.6, cmt. [1]).

208.    Professor Hirshon opined that the Order's hiring restrictions will "impair Perkins Coie's hiring of lawyer and non-lawyer professionals because of the risk that joining a law firm disfavored by the President would destroy any possible future in federal government service (e.g., as a federal prosecutor or SEC lawyer)."  Hirshon Rpt. ¶ 20.

209.    Professor Hirshon further opined that the Order would deter law school graduates from choosing employment at law firms that represent clients the President dislikes.  Hirshon Rpt. ¶ 20.

210.    Professor Green opined that the Order is also inconsistent with, and interferes with, settled understandings of the separation of powers and, in particular, judicial regulation of the legal profession.  Green Rpt. ¶ 54.

211.    Professor Green also opined that the Order's "form of regulation by presidential whim … threatens to undermine the judicial regulation that requires lawyers to represent clients zealously and not to subordinate clients' interests to lawyers' own self-interest."  Green Rpt. ¶ 53.

212.    Professor Green opined that the Executive Branch could not "be expected to regulate fairly the very lawyers against whom it litigates."  Green Rpt. ¶ 34.

213.    Professor Green also opined that the Order "finds wrongdoing and imposes punishment without prior notice, an opportunity to be heard, a fair and impartial factfinder, or any other semblance of fair process."  Green Rpt. ¶ 38.

214.    Professor Hirshon opined that under Executive Order 14230, Perkins Coie can "reasonably fear a tsunami of adverse consequences that would threaten its ability to continue to effectively operate," including the departure of clients, partners, and practice groups.  Hirshon Rpt. ¶ 21.

## VI.    The Order Is Inconsistent With Governing Security Clearance Policy, Is Facially Unrelated to National Security, and Has No Bona Fide Relationship to National Security

215.    A reputable expert—J. William Leonard, who served in various senior positions with responsibility for security clearances and classification of national security information—submitted a pro bono report in this case opining on governmental policy and guidance related to security clearances.

216.    Mr. Leonard opined that the Order's blanket approach is inconsistent with governing policy requiring "fair and equitable treatment" of security clearance holders, and violates bedrock principles of the security-clearance review process, because it provides no individualized assessment of personal conduct in the suspension of clearances.    Leonard Rpt. ¶¶ 44-47.

217.    Mr. Leonard explained that the individualized review of security clearances "is one of the fundamental hallmarks of the security-clearance review process; Person A is never held accountable for the conduct of Person B, let alone are Persons 1 through 2,500 held accountable for the conduct of formerly-associated Person 2,501."  Leonard Rpt. ¶ 44.

218.    Mr. Leonard further opined that the Order is unprecedented in that it relies on facially stale information and conduct unrelated to national security as the justification for a directive to immediately suspend security clearances.  Leonard Rpt. ¶¶ 48-53.

219.    Mr. Leonard noted that Section 2 of the Order never uses the term "national security interest," but rather mentions "national interest," which is "markedly broader than the 'national security interest' that serves as the touchstone of a security-clearance review."  Leonard Rpt. ¶ 49.

220.    Mr. Leonard further noted that most of the claimed factual findings purporting to justify the Order's directive to immediately suspend security clearances are facially unrelated to national security (such as participation in election-related litigation), and the only reference that might be considered remotely related to "national security" (a reference to Perkins Coie's retention of Fusion GPS in 2016) was public knowledge between 2017 and 2021, throughout the duration of President Trump's first administration, and therefore cannot be an emergency necessitating an immediate suspension of security clearances now, in 2025.  Leonard Rpt. ¶ 50.

221.    Mr. Leonard further noted that after a similar Executive Order was published directing the immediate suspensions of security clearances for all personnel at another firm, that Executive Order was promptly rescinded on the basis of a commitment by that firm to provide pro bono services and undertake certain other conduct unrelated to national security, demonstrating that there cannot have been a national security emergency justifying the immediate suspension of security clearances that could have been remedied by that firm's promise to provide pro bono services.  Leonard Rpt. ¶ 53.

222.    Mr. Leonard further noted that as a Perkins Coie attorney was issued a security clearance only a few weeks before the Perkins Coie Executive Order was published in March 2025, there cannot have been any national security emergency grounded in stale facts such as Perkins

Coie's 2016 engagement of Fusion GPS that could be a bona fide justification for the immediate suspension of a security clearance granted without controversy and in accordance with ordinary procedures only weeks earlier.  Leonard Rpt. ¶ 52.

223.    Mr. Leonard also opined that the Order amounts to preordained revocation of security clearances held by the firm's employees without the required due process protections associated with such revocation, such that the Order "functionally plays the role of judge, jury, and executioner."  Leonard Rpt. ¶¶ 54-56.

224.    Mr. Leonard explained that although the Order directs a review to follow the immediate suspension of security clearances held by all Perkins Coie employees, the express findings of Section 1 of the Order functionally predetermine the outcome of any such review, precluding a good-faith and impartial investigation.  Leonard Rpt. ¶ 55.

## VII.    Perkins Coie Challenges the Order as the White House Continues Its Retaliation Against the Firm

225.    Because of the irreparable harm caused by the Order, Perkins Coie moved for a Temporary Restraining Order on March 11, 2025.  P*erkins Coie LLP v. U.S. Department of Justice et al*., 1:25-cv-00716-BAH, Dkt. 2 (D.D.C.).

226.    The Court granted Perkins Coie's motion on March 12, 2025.  *Perkins Coie LLP v. U.S. Department of Justice et al*., 1:25-cv-00716-BAH, Dkt. 21 (D.D.C)

227.    On March 12, 2025, White House Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller linked to a post on X announcing this Court's Order awarding Perkins Coie a temporary restraining order and denounced the Court's Order as "Lawless judicial tyranny.  Judges have no authority to force the executive branch to provide classified secrets to Democrat activist law firms."  Manning Decl. ¶ 37, Ex. 36.

228.    On March 13, 2025, after this Court granted Perkins Coie's motion for a temporary

restraining order, the White House made a statement to Fox News stating that "[t]he Trump Administration is working efficiently to eliminate waste, fraud and abuse in the federal government."  The White House spokesperson, Harrison Fields, continued, "It is absurd that a billion-dollar law firm is suing to retain its access to government perks and handouts."  The White House did not mention national security in its statement.  Manning Decl. ¶ 38, Ex. 37.

229.    On March 14, 2025, President Trump delivered a speech in the Great Hall of the Department of Justice.  In that approximately hour-long speech, President Trump stated that "a corrupt group of hacks and radicals within the ranks of the American government [who] obliterated the trust and goodwill built up over generations.  They weaponized the vast powers of our intelligence and law enforcement agencies to try and thwart the will of the American people."  Among those individuals, President Trump singled out "radicals like Marc Elias, Mark Pomerantz" and "scum" "like Andrew Weissmann and Jack Smith."  President Trump stated, "We revoked the clearances of deranged Jack Smith, Alvin Bragg, Letitia James, and the crooked law firms that aided their partisan persecutions."  He also stated "these are people that nobody's ever seen anything like it.  So many others, but these are people that are bad people, really bad people.  They tried to turn America into a corrupt, communist and Third World country.  But in the end, the thugs failed and the truth won.  Freedom won.  Justice won.  Democracy won.  And above all, the American people won.  There could be no more heinous betrayal of American values than to use the law to terrorize the innocent and reward the wicked."  Manning Decl. ¶ 39, Ex. 38.

230.    On March 20, 2025, Defendant Department of Justice and Defendant Attorney General Pamela Bondi issued a memorandum to all agencies subject to the Order.  It directed all agencies to comply with the Court's temporary restraining order on Executive Order 14230, and stated "The Executive Branch's position is that Executive Order 14230 is permissible, and that the

Court's order was erroneous.  The government reserves the right to take all necessary and legal actions in response to the 'dishonest and dangerous' conduct of Perkins Coie LLP, as set forth in Executive Order 14230."  *Perkins Coie LLP v. U.S. Department of Justice et al.*, 1:25-cv-00716-BAH, Dkt. 032-01 (D.D.C.).

231.    On March 22, 2025, President Trump issued a Presidential Memoranda addressed to the Attorney General and the Secretary of Homeland Security entitled, "Preventing Abuses of the Legal System and the Federal Court."  The subject of the memo was "Preventing Abuses of the Legal System and the Federal Court."  Manning Decl. ¶ 40, Ex. 39.

232.    Among other things, the Presidential Memoranda recited, "Recent examples of grossly unethical [lawyer] misconduct are far too common.  For instance, in 2016, Marc Elias, founder and chair of Elias Law Group LLP, was deeply involved in the creation of a false 'dossier' by a foreign national designed to provide a fraudulent basis for Federal law enforcement to investigate a Presidential candidate in order to alter the outcome of the Presidential election.  Elias also intentionally sought to conceal the role of his client — failed Presidential candidate Hillary Clinton — in the dossier."  The President directed the Attorney General and Secretary of Homeland Security to "seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United States," and to reassess "security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services."  Manning Decl. ¶ 40, Ex. 39.

233.    On March 25, 2025, counsel for the government in this case, the Attorney General's Chief of Staff, Chad Mizelle, criticized former federal judge J. Michael Luttig, who had publicly criticized the Perkins Coie Executive Order, stating "Mike Luttig is the Perkins Coie of judges."

Manning Decl. ¶ 41, Ex. 40.

234.    On March 26, 2025, at an event commemorating Women's History Month, President Trump stated "You see what we're doing with the colleges, and they're all bending and saying, 'Sir, thank you very much.  We appreciate it.' … Nobody can believe it, including law firms that have been so horrible, law firms that, nobody would believe this, just saying, 'Where do I sign? Where do I sign?' … And there's more coming, but we really are in the 'Golden age of America.'"  Manning Decl. ¶ 42, Ex. 41.

## VIII.   The Retaliatory Intent of Executive Order 14230 Is Demonstrated by Similar Executive Orders Targeting Law Firms Associated with President Trump's Legal Adversaries

235.    President Trump's attacks on law firms and lawyers are not limited to Perkins Coie. In October 2024, NPR counted "100 threats to investigate, prosecute, imprison or otherwise punish [the President's] perceived opponents."  Manning Decl. ¶ 43, Ex. 42.

236.    The White House has focused on six other law firms in addition to Perkins Coie, out of the significant number of firms that have engaged in election litigation, have ties to investigations of former-President Trump, or that have diversity and inclusion programs.

### A.    Covington & Burling LLP

237.    President Trump and his Administration have taken action against Covington & Burling LLP for some Covington attorneys' affiliation with Special Prosecutor Jack Smith, who prosecuted President Trump in two separate cases for his "efforts to unlawfully retain power after losing the 2020 election and his unlawful retention of classified documents after leaving office." Manning Decl. ¶ 44, Ex. 43.

238.    For example, on June 30, 2023, then-candidate Trump posted on Truth Social: "The Crooked Election Interference 'Thugs' from the DOJ, headed by the worst Thug of them all, Deranged Jack Smith, are now admitting that the Mar-a-Lago Security Tapes were NOT

DELETED. That's not what they were illegally leaking to the press. These guys should be prosecuted for MISCONDUCT. Also, whatever happened to Crooked Joe's Documents? Where are the ones he sent and stored in Chinatown? Is Deranged Jack going to Indict him for this and, at the same time, receiving BRIBES FROM CHINA?"  Manning Decl. ¶ 45, Ex. 44.

239.    After President Trump was reelected, both cases were dismissed due to the Department of Justice's longstanding position "that the Constitution forbids the federal indictment and prosecution of a sitting President."  Manning Decl. ¶ 44, Ex. 43.

240.    On February 25, 2025, the White House issued a memorandum to the Secretaries of State and Defense, the Attorney General, the Director of National Intelligence, and other agency heads, directing them to suspend any active security clearances held by "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel."  Manning Decl. ¶ 46, Ex. 45.

241.    That memorandum also directed the same persons "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law …."  Manning Decl. ¶ 46, Ex. 45.

242.    During his March 14, 2025 speech at the Justice Department, President Trump bragged that his "administration stripped the security clearances of the disgraced intelligence agents who lied about Hunter Biden's laptop from hell. We revoked the clearances of deranged Jack Smith, Alvin Bragg, Letitia James, and the crooked law firms that aided their partisan persecutions, and I went through it. These are state and city courts and the corruption is unbelievable."  Manning Decl. ¶ 39, Ex. 38.

**B.     Paul, Weiss, Rifkind Wharton & Garrison LLP**

243.    The President also issued an executive order regarding Paul, Weiss, Rifkind Wharton & Garrison LLP for Mark Pomerantz's, a former partner, political speech.  Manning Decl. ¶ 50, Ex. 49.

244.    Mark Pomerantz investigated President Trump as a special prosecutor in the Manhattan District Attorney's Office who believed that President Trump had committed fraud. Manning Decl. ¶ 50, Ex. 49.

245.    On January 26, 2023, referring to Paul Weiss lawyer Mike Pomerantz, then-candidate Trump posted on Truth Social:  "So Crooked HILLARY Clinton's lawyer, from the biggest of all Democrat law firms, and which is headed up by Chuck Schumer's brother, is put into the Manhattan District Attorneys Office in order to dredge up bull…. to PROSECUTE 'TRUMP." A TOTALLY CORRUPT WEAPONIZATION OF LAW ENFORCEMENT BY THE DEMOCRATS, RUN DIRECTLY BY THE DEPARTMENT OF INJUSTICE (D.C.), WHO HAVE IMPLANTED THEIR OWN PEOPLE INTO THAT OFFICE.  In the meantime, record breaking murders and violent crime are not even being looked at!"  Manning Decl. ¶ 47, Ex. 46.

246.    On February 9, 2023, then-candidate Trump posted on Truth Social:  "This Crazy Pomerantz guy, Hillary Clinton's lawyer, who left his Democrat only Law Firm to join (get this!) the Manhattan D.A.'s Office in order to prosecute 'Trump,' while at the same time writing a book about his exploits, including everything that happened in a secret Grand Jury.  This guy is deranged and should be charged approximately.  Nothing like this has ever happened before.  As prosecutor he actually wrote a book in the midst of an ongoing case.  It's stone cold prosecutorial misconduct!"  Manning Decl. ¶ 48, Ex. 47.

247.    On April 23, 2024, then-candidate Trump posted on Truth Social:  "Every single Legal Scholar and Expert said that Soros backed prosecutor, Alvin Bragg, has 'no case.' This list

includes Jonathan Turley, Gregg Jarrett, Byron York, Andrew McCarthy, Mark Levin, Alan Dershowitz, Mike Davis, David Rivkin, Kristin Shapiro, Brad Smith, Andrew Cherkasky, and many more. SO WHY WON'T THEY DROP THIS CASE? Alvin Bragg never wanted to bring it – thought it was a joke. Was furious at lawyer MARK POMERANTZ (will he be prosecuted?) for what he did!" Manning Decl. ¶ 49, Ex. 48.

248. On March 14, 2025, two days after the Court granted Perkins Coie's Motion for a Temporary Restraining Order, President Trump issued an Executive Order titled "Addressing Risks from Paul[,] Weiss" (the "Paul, Weiss Executive Order"). Manning Decl. ¶ 50, Ex. 49. Other than Section 1, which was customized to Paul, Weiss, the other sections of the Paul, Weiss Executive Order largely mirrored the Perkins Coie Executive Order. *Compare* Manning Decl. ¶ 28, Ex. 27 *with* Manning Decl. ¶ 50, Ex. 49.

249. On March 20, 2024, President Trump posted on Truth Social that he had entered into an agreement with Paul, Weiss "following a meeting with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice." According to President Trump, Paul, Weiss agreed (i) affirm certain principles such as not using the justice system "to achieve political ends," (ii) not to "pursue any DEI policies" and to engage "mutually agreed" experts to audit the firm's employment practices, and (iii) to dedicate "$40 million in pro bono legal services" to "support the Administration's initiatives." Manning Decl. ¶ 62, Ex. 61.

250. The President later withdrew the Paul, Weiss Executive Order following the settlement. Manning Decl. ¶ 51, Ex. 50.

251.    On March 21, 2025, in response to a reporter's questions about the President's decision to revoke the Executive Order he issued regarding Paul, Weiss, President Trump responded, "Well, the law firms all want to make deals.  You mean the law firms that we're going after, that went after me for four years ruthlessly, violently, illegally?  Are those the law firms you're talking about?"  He continued that those firms are "not babies.  They're very sophisticated people.  Those law firms did bad things.  Bad things.  They went after me for years."  Manning Decl. ¶ 52, Ex. 51.

### C.    Jenner & Block LLP

252.    The President also issued an executive order regarding Jenner and Block LLP for its former partner Andrew Weissmann's political speech.  Manning Decl. ¶ 53, Ex. 52.

253.    Weissmann was a prosecutor working with Robert Mueller in what the Executive Order refers to as an "entirely unjustified investigation." Manning Decl. ¶ 53, Ex. 52.

254.    On March 25, 2025, President Trump issued an Executive Order titled "Addressing Risks from Jenner & Block LLP."  While signing the Order, President Trump stated that Andrew Weissmann was a "bad man."  Manning Decl. ¶ 64, Ex. 63.

255.    Other than Section 1, which was customized to Jenner & Block, the other sections of the Executive Order mirror the Perkins Coie Executive Order.  *Compare* Manning Decl. ¶ 28, Ex. 27, *with* Manning Decl. ¶ 53, Ex. 52.

### D.    Wilmer Cutler Pickering Hale and Dorr LLP

256.    The President also targeted Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) for the political speech of former partner Robert Mueller, current partner, Aaron Zebley, and James Quarles, who is retired.  Manning Decl. ¶ 55, Ex. 54.

257.    On September 6, 2023, then-candidate Trump tweeted "They spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, the Fake Dossier Hoax, FISA

Fraud, Election Fraud, the "No Collusion" Mueller Hoax, and so much more. I was innocent on all counts. If I am elected, they will be brought to JUSTICE, something that Republicans have always been afraid to do."  Manning Decl. ¶ 54, Ex. 53.

258.    On March 27, 2025, President Trump issued an Executive Order titled "Addressing Risks from WilmerHale."  Manning Decl. ¶ 55, Ex. 54.

259.    The Order states "WilmerHale rewarded Robert Mueller and his colleagues — Aaron Zebley, Mueller's 'top aide' and 'closest associate,' and James Quarles — by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history."  Manning Decl. ¶ 55, Ex. 54.

260.    The Order states "Mueller's 'investigation' upended the lives of public servants in my Administration who were summoned before 'prosecutors' with the effect of interfering in their ability to fulfill the mandates of my first term agenda."  Manning Decl. ¶ 55, Ex. 54.

261.    Other than Section 1, which was customized to WilmerHale, the other sections of the Executive Order mirror the Perkins Coie Executive Order.  *Compare* Manning Decl. ¶ 28, Ex. 27 *with* Manning Decl. ¶ 55, Ex. 54.

### E.    Skadden, Arps, Slate, Meagher & Flom LLP

262.    On March 23, 2025, conservative filmmaker Dinesh D'Souza posted on X that Skadden, Arps, Slate, Meagher & Flom LLP was engaged in "systematic lawfare" and had an "army of 17 attorneys working pro bono" against him in connection with his film "2000 Mules," which alleges widespread voter fraud in the 2020 election.  Elon Musk re-published D'Souza's post, stating "Skadden, this needs to stop now."  Manning Decl. ¶ 63, Ex. 62.

263.    Five days later, on March 28, 2025, Skadden preemptively entered into an agreement with  the Trump Administration where it agreed to provide $100 million dollars in pro bono legal services to causes that "the President and Skadden both support;" agreed to commit at

least five Skadden Fellows to projects including "Assisting Veterans; ensuring fairness in our Justice System; combatting Antisemitism" and that Skadden Fellows will include people who "represent . . . conservative ideals;" agreed to "not engage in illegal DEI discrimination and preferences," and agreed to "not deny representation to clients, such as members of politically disenfranchised groups, who have not historically received legal representation from major National Law Firms."  Manning Decl. ¶ 65, Ex. 64.

### F.    Willkie Farr & Gallagher LLP

264.    On April 1, 2025, after "proactively reach[ing] out to President Trump," Willkie Farr & Gallagher LLP (Willkie) entered into an agreement with the Trump Administration in which it agreed to provide "a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support" and that "pro bono activities represent the full political spectrum, including Conservative ideals;" agreed to "not engage in illegal DEI discrimination and preferences," that Willkie would give "consideration to Job Candidates irrespective of their political beliefs, including Candidates who have served in the Trump Administration, and any other Republican or Democrat Administration," and that Willkie "will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms," and to avoid action against it by the Trump Administration.  Manning Decl. ¶ 60, Ex. 59.

Dated:  April 2, 2025                          Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

By:    */s/ Dane H. Butswinkas*
      Dane H. Butswinkas (D.C. Bar #425056)

F. Lane Heard III (D.C. Bar #291724)          Amy M. Saharia (D.C. Bar #981644)
Christopher N. Manning (D.C. Bar #464069)      Matthew B. Nicholson (D.C. Bar #1013418)
Ryan T. Scarborough (D.C. Bar #466956)         Carol J. Pruski (D.C. Bar #1006941)*
Malachi B. Jones (D.C. Bar #455555)            Charles L. McCloud (D.C. Bar #1012047)*
Charles Davant IV (D.C. Bar #484305)           Krystal C. Durham (D.C. Bar # 987768)
David S. Kurtzer-Ellenbogen (D.C. Bar #489559) Eden Schiffmann (D.C. Bar #1035019)
Jesse T. Smallwood (D.C. Bar #495961)

                                               680 Maine Avenue, SW
                                               Washington, DC  20024
                                               (202) 434-5000

                                               *Counsel for Plaintiff Perkins Coie LLP*

                                               * *DDC bar application pending*