## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

        *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

        *Defendants*.

Case No. 1:25-cv-00716

## DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE, IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DECLARATORY AND PERMANENT INJUNCTIVE RELIEF

1.      I am a partner in the law firm of Williams & Connolly LLP and a member of the Bar of this Court. I am one of the counsel of record in the above-captioned action representing the Plaintiff, Perkins Coie LLP. I submit this declaration in support of Plaintiff's Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the webpage https://www.elias.law/about, which upon information and belief is a website owned by Elias Law Group.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of an October 19, 2017 post on "X" by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of two August 6, 2018 posts on "X" by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of a document titled

"Remarks by President Trump Before Marine One Departure," posted to the White House website on November 9, 2018.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of a November 9, 2018 post on "X" by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of a November 9, 2018 post on Facebook by user Donald J. Trump, which upon information and belief is an account owned by President Donald J. Trump.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of two January 22, 2019 posts on "X" by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

9.      [*Paragraph 9 and* **Exhibit 8** *are intentionally omitted.*]

10.     Attached hereto as **Exhibit 9** is a true and correct copy of a transcript of a December 5, 2021 interview of Donald J. Trump by Mark Levin on Fox News Network.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of a May 31, 2022 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of a November 15, 2022 video of Donald J. Trump speaking at the Conservative Political Action Conference.  The video is available here: https://www.c-span.org/video/?c5041282/i-tonight-announcing-candidacy-president-united-states.[1]

---

[1] Pursuant to Local Civil Rule 5.4(e)(1), digital file copies of the video and audio exhibits to this Declaration are being maintained by plaintiff's counsel and will be provided to the Court and defendants' counsel.

13.    Attached hereto as **Exhibit 12** is a true and correct copy of a December 11, 2022 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

14.    Attached hereto as **Exhibit 13** is a true and correct copy of a May 16, 2023 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.    The posted audio is available here: http://truthsocial.com/@realDonaldTrump/posts/110381617248464734.

15.    Attached hereto as **Exhibit 14** is a true and correct copy of a video of a March 4, 2023 speech Donald J. Trump gave at the Conservative Political Action Conference, posted on c-span.org.  The video is available here: https://www.c-span.org/program/campaign-2024/former-president-trump-speaks-at-cpac/624800.

16.    Attached hereto as **Exhibit 15** is a true and correct copy of a June 21, 2023 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

17.    Attached hereto as **Exhibit 16** is a true and correct copy of a March 31, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

18.    Attached hereto as **Exhibit 17** is a true and correct copy of an April 23, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

19.    Attached hereto as **Exhibit 18** is a true and correct copy of a May 5, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

20.     Attached hereto as **Exhibit 19** is a true and correct copy of an August 29, 2024 interview of Donald J. Trump by Monica Crowley.  An audio version of the interview is available here:  https://play.cdnstream1.com/s/bahakel/the-monica-crowley-podca-3102d5/a-newsmaking-talk-with-p-8574db.

21.     Attached hereto as **Exhibit 20** is a true and correct copy of a September 7, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

22.     Attached hereto as **Exhibit 21** is a true and correct copy of a September 17, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

23.     Attached hereto as **Exhibit 22** is a true and correct copy of an October 25, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

24.     Attached hereto as **Exhibit 23** is a true and correct copy of Executive Order Number 14151 issued by President Donald J. Trump on January 20, 2025 and titled "Ending Radical and Wasteful Government DEI Programs and Preferencing."

25.     Attached hereto as **Exhibit 24** is a true and correct copy of a White House Fact Sheet titled "Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI," posted to the White House website on January 22, 2025.

26.     *[Paragraph 26 and **Exhibit 25** are intentionally omitted.]*

27.     Attached hereto as **Exhibit 26** is a true and correct copy of a document titled "Remarks by President Trump in Joint Address to Congress," posted to the White House website on March 6, 2025.

28.     Attached hereto as **Exhibit 27** is a true and correct copy of Executive Order Number 14230 issued by President Donald J. Trump on March 6, 2025 and titled "Addressing Risks from Perkins Coie LLP."

29.     Attached hereto as **Exhibit 28** is a true and correct copy of a White House Fact Sheet titled "Fact Sheet:  President Donald J. Trump Addresses Risks from Perkins Coie LLP," posted to the White House website on March 6, 2025.

30.     Attached hereto as **Exhibit 29** is a true and correct copy of a video titled "President Trump Signs Executive Orders," posted on c-span.org on March 6, 2025.  The video is available here:     https://www.c-span.org/program/white-house-event/president-trump-signs-executive-orders/656830.

31.     Attached hereto as **Exhibit 30** is a true and correct copy of a March 6, 2025 Washington Post article by Perry Stein and Michael Birnbaum titled *Trump expands retribution campaign against law firms that aided his foes*.

32.     Attached hereto as **Exhibit 31** is a true and correct copy of an Office of Management and Budget Memorandum titled "Implementation of the Executive Order on 'Addressing Risks from Perkins Coie LLP.'"

33.     Attached hereto as **Exhibit 32** is a true and correct copy of a video of a March 6, 2025 interview of President Trump by Maria Bartiromo.  The full interview, with some breaks, aired    on    March    9,    2025.    The    video    is    available    here: https://www.foxnews.com/video/6369823374112.

34.     Attached hereto as **Exhibit 33** is a true and correct copy of a March 10, 2025 interview of Stephen Miller, White House Deputy Chief of Staff, on Fox News.  The video of the interview is available here:  https://www.youtube.com/watch?app=desktop&v=zA_7x3F5Gag.

35.    Attached hereto as **Exhibit 34** is a true and correct copy of a compendium of letters from Andrea R. Lucas, Acting Chair of the U.S. Equal Employment Opportunity Commission, to twenty law firms regarding their compliance with Title VII of the Civil Rights Act of 1964.

36.    Attached hereto as **Exhibit 35** is a true and correct copy of a Press Release by the U.S. Equal Employment Opportunity Commission posted on the website https://www.eeoc.gov/newsroom/eeoc-acting-chair-andrea-lucas-sends-letters-20-law-firms-requesting-information-about-dei, which upon information and belief is operated by the U.S. Equal Employment Opportunity Commission.

37.    Attached hereto as **Exhibit 36** is a true and correct copy of a March 12, 2025 post on "X" by user @StephenM, which upon information and belief is an account owned by Stephen Miller, White House Deputy Chief of Staff.

38.    Attached hereto as **Exhibit 37** is a true and correct copy of a March 13, 2025 Foxnews.com article by Diana Stancy, titled *'Absurd': White House blasts law firm that helped fuel Russia hoax after challenging Trump order.*

39.    Attached hereto as **Exhibit 38** is a true and correct copy of a video of a March 14, 2025 speech by President Trump.    The video of the speech is available here: https://www.youtube.com/watch?v=6i41Av4eYO8.

40.    Attached hereto as **Exhibit 39** is a true and correct copy of a March 22, 2025 Presidential Memorandum addressed to the Attorney General and the Secretary of Homeland Security entitled, "Preventing Abuses of the Legal System and the Federal Court."

41.    Attached hereto as **Exhibit 40** is a true and correct copy of a March 25, 2025 post on "X" by user @ChadMizelle47, which upon information and belief is an account owned by Chad Mizelle, one of the attorneys representing defendants in this action.

42.     Attached hereto as **Exhibit 41** is a true and correct copy of a video of President Trump speaking at a Women's History Month Event, posted by the White House to its official YouTube channel on March 26, 2025.     The video is available here: https://www.youtube.com/watch?v=37yfOP8cVPQ.

43.     Attached hereto as **Exhibit 42** is a true and correct copy of an October 22, 2024 NPR story, titled *Trump has made more than 100 threats to prosecute or punish perceived enemies.*

44.     Attached hereto as **Exhibit 43** is a true and correct copy of a January 7, 2025 letter from Special Counsel Jack Smith to Merrick Garland, then-Attorney General of the United States, titled *Final Report of the Special Counsel Under 28 C.F.R. § 600.8*, attaching a document titled *Final Report on the Special Counsel's Investigations and Prosecutions* dated January 7, 2025.

45.     Attached hereto as **Exhibit 44** is a true and correct copy of a June 30, 2023 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

46.     Attached hereto as **Exhibit 45** is a true and correct copy of a Presidential Memoranda addressed to the Secretary of Defense, Attorney General, the Secretary of Energy, the Director of the Office of Management and Budget, the Director of National Intelligence, The Director of the Central Intelligence Agency, and the Director of the Office of Personnel Management entitled, "Suspension of Security Clearances and Evaluation of Government Contracts," posted to the White House website on February 25, 2025.

47.     Attached hereto as **Exhibit 46** is a true and correct copy of a January 26, 2023 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

48.     Attached hereto as **Exhibit 47** is a true and correct copy of a February 9, 2023 post

on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

49.      Attached hereto as **Exhibit 48** is a true and correct copy of an April 23, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

50.      Attached hereto as **Exhibit 49** is a true and correct copy of Executive Order Number 14237 issued by President Donald J. Trump on March 14, 2025 and titled "Addressing Risks from Paul Weiss."

51.      Attached hereto as **Exhibit 50** is a true and correct copy of an Executive Order issued by President Donald J. Trump titled "Addressing Remedial Action by Paul Weiss," posted to the White House website on March 21, 2025.

52.      Attached hereto as **Exhibit 51** is a true and correct copy of a video of President Trump answering questions from reporters in the oval office, posted to KGET.com on March 21, 2025.   The video is available here:   https://www.kget.com/video/trump-suggests-law-firms-%e2%80%98want-to-make-deals%e2%80%99-after-rescinding-paul-weiss-order/10560109/.

53.      Attached hereto as **Exhibit 52** is a true and correct copy of Executive Order 14246 issued by President Donald J. Trump on March 25, 2025 and titled "Addressing Risks from Jenner & Block."

54.      Attached hereto as **Exhibit 53** is a true and correct copy of a September 6, 2023 post on "X" by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

55.      Attached hereto as **Exhibit 54** is a true and correct copy of an Executive Order issued by President Donald J. Trump and titled "Addressing Risks from WilmerHale," posted to

the White House website on March 27, 2025.

56.     Attached hereto as **Exhibit 55** is a true and correct copy of a transcript of a March 28, 2025 hearing before the Honorable John D. Bates in *Jenner & Block LLP v. U.S. Dep't of Justice, et al.*, Case No. 1:25-cv-00916-JDB (D.D.C.).

57.     Attached hereto as **Exhibit 56** is a true and correct copy of a transcript of a March 28, 2025 hearing before the Honorable Richard J. Leon in *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President, et al.*, Case No. 1:25-cv-00917-RJL (D.D.C.).

58.     Attached hereto as **Exhibit 57** is a true and correct copy of a White House Fact Sheet titled "Fact Sheet:  President Donald J. Trump Addresses Risks from WilmerHale," posted to the White House website on March 27, 2025.

59.     Attached hereto as **Exhibit 58** is a true and correct copy of a White House Fact Sheet titled "Fact Sheet:  President Donald J. Trump Addresses Risks from Jenner & Block," posted to the White House website on March 25, 2025.

60.     Attached hereto as **Exhibit 59** is a true and correct copy of an April 1, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

61.     Attached hereto as **Exhibit 60** is a true and correct copy of the judgment of acquittal signed by the Honorable Christopher R. Cooper in *United States of America v. Michael A. Sussmann*, Case No. 1:21-cr-00582-CRC (D.D.C.).

62.     Attached hereto as **Exhibit 61** is a true and correct copy of a March 20, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

63.     Attached hereto as **Exhibit 62** is a true and correct copy of a March 23, 2025 post

on "X" by user @elonmusk, which upon information and belief is an account owned by Elon Musk.

64.    Attached hereto as **Exhibit 63** is a true and correct copy of a March 25, 2025 video of Donald J. Trump signing an Executive Order titled "Addressing Risks from Jenner & Block LLP," which was posted on March 26, 2025.  The video is available here:  https://youtu.be/7LsV-l0xWh4?si=7W5wjK2r_BxDnv7e.

65.    Attached hereto as **Exhibit 64** is a true and correct copy of a March 28, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump.

                        *        *        *

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 2d day of April, 2025.

_____
Christopher N. Manning, Esq.

10

# EXHIBIT 1



# Elias Law Group is a mission-driven firm committed to helping Democrats win, citizens vote, and progressives make change.

Founded by Marc Elias in 2021, Elias Law Group is the nation's largest law firm focused on representing the Democratic Party, Democratic campaigns, nonprofit organizations, and individuals committed to securing a progressive future.

As voting rights and democratic institutions have come under attack, Elias Law Group has become the nation's go-to law firm to fight back against voter suppression and election subversion. By protecting voting rights in state and federal court, our attorneys have helped millions of Americans register to vote, cast their ballot, and have that ballot counted.

Elias Law Group attorneys have collectively represented hundreds of Democratic campaigns, organizations, and PACs—including every national Democratic Party organization, House and Senate leadership, governors, senators, and members of Congress, and over a dozen presidential campaigns.

The firm focuses on political law and cutting-edge, pro-democracy litigation. Elias Law Group has earned national recognition for its aggressive litigation to protect voting rights and advocate for fair maps during the redistricting process. Its attorneys also provide tax and regulatory counsel to leading nonprofits that promote progressive change.

Driven by a firm-wide commitment to diversity and inclusion, more than half of all attorneys and partners at Elias Law Group are women, and more than one third of all attorneys are black, indigenous, and people of color.

Elias Law Group is headquartered in Washington, D.C., with an office in Seattle, WA.

**Elias Law Group "[boasts] a deep bench of experienced practitioners able to advise on complex election law matters. The firm offers particular prowess in voting rights and redistricting litigation and is well placed to assist Democratic campaigns and institutions, as well as nonprofit organizations." - Chambers USA**

# EXHIBIT 2

 **Donald J. Trump** ✓
@realDonaldTrump



Workers of firm involved with the discredited and Fake Dossier take the 5th. Who paid for it, Russia, the FBI or the Dems (or all)?

7:56 AM · Oct 19, 2017

# EXHIBIT 3

 **Donald J. Trump** ✔
@realDonaldTrump

    ...

"Collusion with Russia was very real. Hillary Clinton and her team 100% colluded with the Russians, and so did Adam Schiff who is on tape trying to collude with what he thought was Russians to obtain compromising material on DJT. We also know that Hillary Clinton paid through....

10:13 AM · Aug 6, 2018

 **Donald J. Trump** 
@realDonaldTrump

….a law firm, eventually Kremlin connected sources, to gather info on Donald Trump. Collusion is very real with Russia, but only with Hillary and the Democrats, and we should demand a full investigation." Dan Bongino on @foxandfriends  Looking forward to the new IG Report!

10:25 AM · Aug 6, 2018

# EXHIBIT 4

Case 1:25-cv-00716-BAH   Document 39-4   Filed 04/02/25   Page 20 of 734

The Wayback Machine - https://web.archive.org/web/20181115151047/https://www.whitehouse.gov/briefing…



**REMARKS**

# Remarks by President Trump Before Marine One Departure

Issued on: **November 9, 2018**



South Lawn

9:05 A.M. EST

THE PRESIDENT: So we're heading off to Europe. It should be a very beautiful period of time — the 100th anniversary of the ending of World War I. We have many countries; the leadership of many countries will be there, especially since they heard the United States will be there. And we look forward to that. It'll be a great, really, commemorative service. I think it's going to be something very special. I've seen what they have planned, and I think it's going to be something very, very special.

I just signed the proclamation on asylum. Very important. People can come in, but they have to come in through the ports of entry. And that, to me, is a very important thing. Again, I reiterate we needs Democrats' votes. They have to pass new immigration laws, because they're flooding our country. We're not letting them in, but they're trying to flood our country. We need the wall; we're building the wall. But we need it all built at one time, and quickly. It's very important.

We need Democrat support on new immigration laws to bring us up to date. The laws are obsolete and they're incompetent. They are the worst laws any country has anywhere in the world. And it's only because we don't have the Democrats' votes. So we need Democrat vote so we can change immigration, and we'll have no trouble whatsoever at the border. We want people to come into our country, but they have to come into our country legally. They have to come into our country legally.

We want people to come in through the merit system so that they can work for all of these great companies that I have coming into our country. We have many car companies coming in. We have many tech companies coming in. We have literally hundreds of companies moving back into the United States. We need people. We need to have — you see the unemployment numbers are at record lows. We need people in our country, but they have to come in legally, and they have to have merit. They have to come in through a system of merit. We have everything worked out. We need some votes from the Democrats, or we need support from the Democrats, and hopefully they see what's going on.

And the reason this is happening is we've created such a successful country, economically, that everybody is flooding into our country, or they want to. But we're stopping them at the border. And that's why we have our great military there.

Q    Mr. President, what do you say to all the criticism of Matt Whitaker and the calls for him to recuse himself, given what he said about the Russian (inaudible)?

THE PRESIDENT:  Well, Matt Whitaker — I don't know Matt Whitaker. Matt Whitaker worked for Jeff Sessions, and he was always extremely highly thought of, and he still is. But I didn't know Matt Whitaker. He worked for Attorney General Sessions. He was very, very highly thought of, and still is highly thought of. But this only comes up because anybody that works for me, they do a number on them.

But Matt Whitaker is a very smart man. He is a very respected man in the law enforcement community. Very respected; at the top of the line. And actually, the choice was greeted with raves, initially, and it still is in some circles. You know, it's a shame that

no matter who I put in, they go after them. It's very sad, I have to say. But he's Acting. I think he'll do a very good job. And we'll see what happens.

But I will say this: Matt Whitaker is a very highly respected man, and you didn't have any problems with Matt Whitaker when he worked for Jeff Sessions. He's respected by law enforcement. He's a very strong law enforcement personality and person.

Q Mr. President, did you talk with Matt Whitaker at all about the Mueller probe before you appointed him?

THE PRESIDENT: I didn't speak to Matt Whitaker about it. I don't know Matt Whitaker. Matt Whitaker has a great reputation, and that's what I wanted. I also wanted to do something which, frankly, I could have brought somebody very easily from the outside. I didn't want to do that. When Sessions left, what I did, very simply, is take a man who worked for Sessions. Again, he worked for Jeff Sessions. He's a highly respected man, especially by law enforcement. And I think he's going to do a great job. He's there in an acting position. He's a — probably, from what I hear — a very strong person, a very strong personality. And I think that's what they need.

Q Is Kellyanne's husband's wrong?

THE PRESIDENT: Who?

Q Kellyanne's husband wrote that the appointment was unconstitutional.

THE PRESIDENT: You mean Mr. Kellyanne Conway?

Q He wrote that you're unconstitutionally appointing him. He is wrong?

THE PRESIDENT: He's just trying to get publicity for himself. Why don't you do this: Why don't you ask Kellyanne that question, all right? She might know him better than me. I really don't know the guy.

Q Given Matt Whitaker's public comments, (inaudible) —

THE PRESIDENT: Well, when you make a comment —

Q (Inaudible.)

THE PRESIDENT: First of all — let me speak, please. First of all, when you make comments, I see everybody on television — all these lawyers, all these law enforcement people making comment after comment. They never ask to get recused. They make comment. The fact that you go on Fox or CNN or MSNBC or anybody, and you make a comment, you'd have nobody left to choose. You would have absolutely nobody left.

I see different people, at different times, going on shows. Am I supposed to say, "Oh, now he's never qualified to serve in government?" So, all the time I'm watching many different people go on many different shows, saying many different things. That doesn't mean they're unqualified.

Now, in all fairness to Matt Whitaker, who, again, I didn't know — okay? — other than through reputation. His reputation is excellent. But in all fairness to him, he did some shows; so did many of the people that you're talking about. So did everybody that — you're talking about a permanent position. I think everybody looking at a permanent position, in any department, has done many shows. Does that mean we can't hire anybody? We have to hire somebody that's in a shell? I don't think so.

Q Do you foresee a federal role in the Florida recount?

THE PRESIDENT: Say it again. You have to speak up.

Q I'm trying to. Do you foresee a federal role in the Florida recount, which you tweeted about last night?

THE PRESIDENT: Well, it could be. Because if you look at Broward — and Palm Beach, to a lesser extent — if you look at Broward County, they have had a horrible history. And if

you look at the person — in this case, a woman — involved, she has had a horrible history. And all of a sudden, they're finding votes out of nowhere.

And Rick Scott, who won by — you know, it was close, but he won by a comfortable margin — every couple of hours it goes down a little bit. And then you see the people, and they were involved with that fraud of the fake dossier, the phony dossier. And I guess I hear they were somehow involved or worked with the GPS Fusion people, who have committed — I mean, if you look at what they've done, you look at the dishonesty —

Look, look, there's — bad things have gone on in Broward County. Really bad things. She's been to court. She's had a lot of problems. She's lost. I say this: He easily won, but every hour it seems to be going down. I think that people have to look at it very, very cautiously.

Q You're finishing up the written answers —

THE PRESIDENT: What?

Q You're doing the written questions to Robert Mueller. Have you ruled out a sit-down, an in-person sit-down with Robert Mueller?

THE PRESIDENT: I haven't ruled out anything. I haven't even thought about it. I'm thinking about the world. Right now, I'm thinking about the world. I'm not thinking about sit-downs or not sit-downs. There was no collusion. It's a whole hoax. This was a thing set up by the Democrats, just like they set up other things — when you look at what's going on Florida; when you look at what's going on in lots of different locations.

The Russian investigation is a hoax. It's a phony hoax. I didn't speak to Russians. The fact is, I was a much better candidate than Hillary Clinton. I worked much harder. I went to the right places. She went to the wrong places, because she didn't know what the hell she was doing. I did a great job; I was a great candidate. She was a bad candidate.

I went to Wisconsin. I went more to Michigan. I went to Pennsylvania. She didn't do a good job. This has nothing to do with Russians; it's a Russian hoax.

Q    What do you say to Michelle Obama who says she will never forgive you for your birther comments in the past?

THE PRESIDENT: Oh, Michelle Obama said that? I haven't seen it. I guess she wrote a book. She got paid a lot of money to write a book. And they always insist that you come up with controversial.

Well, I'll give you a little controversy back: I'll never forgive him for what he did to our United States military by not funding it properly. It was depleted. Everything was old and tired. And I came in, and I had to fix it. And I'm in the process of spending tremendous amounts of money. So I'll never forgive him for what he did to our military. I'll never forgive him for what he did in many other ways, which I'll talk to you about in the future.

But what he did — because she talked about safety — what he did to our military made this country very unsafe for you and you and you.

Q    (Inaudible) and did you meet Chris Christie here, yesterday?

THE PRESIDENT: Well, we're looking at other people. I did not see Chris Christie yesterday. I heard he was in the White House. He's a friend of mine. He's a good man. When he got out of the presidential race, as you know, the next day he supported me. He has good taste. So he proved one thing: He has good taste. But when he got out, he immediately supported me. I like Chris Christie, but I have not talked to him about it. He was in the White House yesterday, but I did not see him.

Q    Mr. President, how long are you going to leave Jim Acosta in the penalty box?

THE PRESIDENT: I think Jim Acosta is a very unprofessional man. He does this with everybody. He gets paid to do that. You know, he gets paid to burst in. He's a very

unprofessional guy. Whether it was me or Ronald Reagan or anybody else, he would have done the same thing.

Look, I don't think he's a smart person, but he's got a loud voice. And —

Q Is it permanent?

THE PRESIDENT: Wait, wait. David, do you mind if I answer the question?

Q Sure. Of course.

THE PRESIDENT: And as far as I'm concerned, I haven't made that decision. But it could be others also. When you're in the White House — this is a very sacred place to me. This is a very special place. You have to treat the White House with respect. You have to treat the presidency with respect. If you've ever seen him dealing with Sarah Huckabee Sanders, it's a disgrace. And he does it for, you know, the reason.

The same thing with April Ryan. I watched her get up. I mean, you talk about somebody that's a loser. She doesn't know what the hell she's doing. She gets publicity, and then she gets a pay raise or she gets a contract with, I think, CNN. But she's very nasty, and she shouldn't be. She shouldn't be.

You've got to treat the White House and the Office of the Presidency with respect.

I see her nodding very positively, so I'll ask her — you know.

Q (Inaudible.)

THE PRESIDENT: You have to speak up, though. You have a helicopter raging back —

For all the people that don't know why, my hearing is great, but you have a helicopter that's raging back there.

Q I'll help her out.

THE PRESIDENT: In fact, do you remember Ronald Reagan? He'd always, "What? What? I can't hear you." I never — I always thought he was hard of hearing; he wasn't. That's the problem.

Q She wants to know what's going to happen when you meet with Putin.

THE PRESIDENT: Well, I'll meet with Putin at the G20. I don't know that we're seeing each other in Paris, but there may be a lunch for the leaders. I don't know. So I would say, nothing. We have a good relationship. Having a good relationship with Russia and China, and every other country, is a good thing, not a bad thing.

But we have a good — we have a very good relationship.

Q Are you going to fire Ryan Zinke?

THE PRESIDENT: No. I'm going to look into any complaints. David, if there are any complaints, I'll look into it.

Q Your thoughts about the judge's decision to delay the XL Pipeline?

THE PRESIDENT: Well, it was a political decision made by a judge. I think it's a disgrace. It's 48,000 jobs. I approved it; it's ready to start. And they went — and I guess they'll end up going to the Ninth Circuit, as usual. We're slowly putting new judges in the Ninth Circuit. Everything goes to the Ninth Circuit. Everything.

Now, DACA, that was actually good news yesterday, because you never win in the Ninth Circuit if you're on this half of the equation. When I say "half," it could be half or more. But you never win; you rarely win in the Ninth Circuit. The good news is, by rejecting DACA in the Ninth Circuit yesterday, finally we've been waiting for that. We get to the Supreme Court, and we want to be in the Supreme Court on DACA.

President Obama said he had no right to sign it. He had no right, but it was upheld in the Ninth Circuit, as usual. If you take President Obama's statement, he knew that he couldn't sign it. So this whole thing, it's a terrible thing what's happening with the courts. The DACA will now hopefully go to the Supreme Court, where we'll be given a fair decision.

Q U.N. Ambassador. Have you made a decision?

THE PRESIDENT: We'll be making a decision. I have so many people who want it. We are looking at Heather. We're looking at numerous people. We have plenty of time. Nikki is staying until the end of the year. We're working with Nikki, also. We have some very good people that want that job.

I'll make the decision over the next few weeks, but by the end of the year.

Q On the Attorney General, what's your timeline to make a decision? And who are the frontrunners?

THE PRESIDENT: Well, I have some very, very good people. But, I mean, there's no rush. You know, it has to go through a Senate process, which takes a long time. But we'll pick somebody that's great. We're going to pick somebody that's very good. And again, I think it's very — Matt Whitaker is a highly respected man, but I didn't know Matt Whitaker. But he's a highly respected man.

Q Mr. President, you said the Senate process. Matt Whitaker has not gone through a Senate process.

THE PRESIDENT: Yeah, but neither has Mueller.

Q (Inaudible.)

THE PRESIDENT: Excuse me. You talk about the Senate process. Mueller is doing a report. He hasn't gone through the Senate process. You're saying Whitaker hasn't, but

Whitaker has. Wait a minute. Because he was a really distinguished U.S. attorney in Iowa, and he was approved by everybody. Because to be U.S. attorney, that's top of the line. He was a highly respected.

In fact, I'll tell you, the Ambassador to China, as you know, Terry Branstad — who used to the be the governor of Iowa — he told me that what a great choice that is; that he is one of the most respected people in all of Iowa. And that was coming from Terry Branstad, who was the governor.

Look, Mueller — a big complaint people have — Mueller was not Senate confirmed. So he's doing a report. He wasn't Senate confirmed. Whitaker was Senate confirmed. Now, he doesn't need this, but he was Senate confirmed at the highest level, when he was the U.S. attorney from Iowa. But Mueller was not Senate confirmed. Why didn't they get him Senate confirmed? He should have been Senate confirmed. No — but because of all the conflicts, they didn't want to bring him before the Senate because he's very conflicted. So because of those conflicts, they didn't want to bring him before the Senate.

But don't tell me about Whitaker. Don't tell me about Whitaker, because Mueller was not Senate confirmed, and Whitaker was, actually.

Q Mr. President, the Democrats keep picking up more seats in the House, now more than 31 seats. Can you still describe (inaudible)?

THE PRESIDENT: It doesn't — whether they get a couple of more House seats, it doesn't matter. It doesn't matter. But you notice the votes never go the other way? They hire lawyers, and the votes don't ever seem to go the Republican way — although I hear —

Q Do you have evidence of fraud?

THE PRESIDENT: Well, I don't know, you tell me. It's always the Democrats. It's always GPS Fusion. It's always crooked stuff.

Q But there's no evidence that you have, is there?

THE PRESIDENT: Look — look at what happened. How many FBI are gone? How many Justice Department people are gone? That I found out — that I found out. There's a lot of bad stuff going on in this country, and we're finding out, and I'm getting to the bottom of it. And I've done a hell of a job. How many people have been fired from the FBI? You got Comey, you got McCabe, you got Strzok, you have Lisa Page, you have Baker. You have a whole list of people. There's a lot of crooked stuff going on.

But it is interesting; it always seems to go the way of the Democrats. Now, in Arizona, all of a sudden, out of the wilderness, they find a lot of votes. And she's — the other candidate is just winning by a hair. What's going on in a Florida is a disgrace. Go down and see what happened over the last period of time — 10 years. Take a look at Broward. Take a look at the total dishonesty of what happened with respect to Broward County. Broward County — just (inaudible) — Broward County/election. There's a lot of dishonesty.

Q Why did your Press Secretary share a doctored video of the incident in the East Room? Of the (inaudible).

THE PRESIDENT: The taped video of Acosta?

Q Yes, sir.

THE PRESIDENT: What are you talking about? All that was —

Q The video is manipulated.

THE PRESIDENT: Nobody manipulated it. Give me a break. See, that's just dishonest reporting. All that is, is a close-up. See, that's just — that is just dishonest reporting. I watched that; I heard that last night. They made it close up. They showed it up close up.

And he was not nice to that young woman. I don't hold him for that because it wasn't overly, you know, horrible. But it was — but all that was — when you say "doctored,"

you're a dishonest guy. Because it wasn't doctored. They gave a close-up view. That's not doctoring.

Q Mr. President, are you thinking about more Supreme Court justices since Justice Ginsburg in the hospital?

THE PRESIDENT: No, I wish her well. She said something very inappropriate during the campaign, but she apologized for it. I wouldn't say she's exactly on my side, but I wish her well. I hope she gets better. And I hope she serves on the Supreme Court for many, many years.

Q (Inaudible) another mass shooting, this time in California.

THE PRESIDENT: Terrible. Terrible.

Q What are we going to do about (inaudible)?

THE PRESIDENT: He's a very sick — well, it's a mental health problem. He is a very sick puppy. He was a very, very sick guy. Not too many people knew about it. But now that they're looking, they're starting to see he had a lot of problems, a lot of trouble. And we're very much into that. As you know, I funded a lot of money toward mental health for that reason. And we're continuing to do it, and we continue to look at the laws. We want to make sure — look, it is a problem. It's a disastrous problem. It makes you sick to look at it. But he was a very, very mentally ill person.

Q (Inaudible.)

THE PRESIDENT: Say it?

Q Do firearms play any part of this mental health conversation?

THE PRESIDENT: Well, he was a war veteran. He was a Marine; he was in the war. He served time. He saw some pretty bad things. And a lot of people say he had the PTSD.

And that's a tough deal. We're spending — as you know, I've given tremendous funding to the vets for the PTSD and for general health for PTSD. It's a big problem.

People come back. That's why it's a horrible thing. They come back, and they're never the same.

Q Are you prepared to fly that flag at half-mast a lot more?

THE PRESIDENT: Well, I don't like abusing any privilege, but when I see something that we should do, I always do that. Yeah, I always do that. I believe you should. When somebody — when it's a worthy situation, I do believe it.

Q Do you expect Matt Whitaker to be involved in the Russia probe? Do you want him to —

THE PRESIDENT: It's up to him.

Q Do you want him to rein in Robert Mueller?

THE PRESIDENT: What a stupid question that is. What a stupid question. But I watch you a lot. You ask a lot of stupid questions.

Q (Inaudible) sign an executive order on birthright citizenship this week. Why did that not happen?

THE PRESIDENT: We're working. Well, because other things have come up, and we will be signing it soon.

Q Was it a political stunt?

THE PRESIDENT: No, no, no. Oh, we're signing it. We're doing it. And it'll probably work its way up to the Supreme Court. Birthright citizenship probably works its way up to the Supreme Court. It will be signed. We wanted a perfect document. And because of the

election and all of the delays in the election, and whatever is going on in Broward County — remember the word, "Broward County."

Q Is there any evidence of fraud in Broward County?

THE PRESIDENT: Wait. Well, you take a look at the past. Take a look at the past.

Q Right now is there any?

THE PRESIDENT: And all of a sudden, they're finding votes? You mean after the election, they're finding votes? And then you look at her past, where she's already been convicted, and now they're finding votes. And you have this guy, Elias, who represented Hillary Clinton and a lot of very shady things. I think what you ought to do is get smart.

Good luck, folks. I'll see you in Europe.

END

9:28 A.M. EST

# EXHIBIT 5

 **Donald J. Trump** ☑
@realDonaldTrump

  ···

As soon as Democrats sent their best Election stealing lawyer, Marc Elias, to Broward County they miraculously started finding Democrat votes. Don't worry, Florida – I am sending much better lawyers to expose the FRAUD!

11:52 AM · Nov 9, 2018

# EXHIBIT 6

 **Donald J. Trump** ✓
November 9, 2018 · 🌐

As soon as Democrats sent their best Election stealing lawyer, Marc Elias, to Broward County they miraculously started finding Democrat votes. Don't worry, Florida - I am sending much better lawyers to expose the FRAUD!

 126K                                                    16.9K comments   18K shares

👍 Like                                    💬 Comment

# EXHIBIT 7

 **Donald J. Trump** ✅
@realDonaldTrump

    ...

Former FBI top lawyer James Baker just admitted involvement in FISA Warrant and further admitted there were IRREGULARITIES in the way the Russia probe was handled. They relied heavily on the unverified Trump "Dossier" paid for by the DNC & Clinton Campaign, & funded through a...

10:53 AM · Jan 22, 2019

 **Donald J. Trump** ✅
@realDonaldTrump

   ⋯

...big Crooked Hillary law firm, represented by her lawyer Michael Sussmann (do you believe this?) who worked Baker hard & gave him Oppo Research for "a Russia probe." This meeting, now exposed, is the subject of Senate inquiries and much more. An Unconstitutional Hoax. @FoxNews

11:06 AM · Jan 22, 2019

# Exhibit 8
# Intentionally Omitted

# EXHIBIT 9

### *Donald Trump Talks About His Life And His Legacy*

Fox News Network LIFE, LIBERTY, LEVIN 8:00 PM EST

December 5, 2021 Sunday

Copyright 2021 Fox News Network LLC All Rights Reserved

**Section:** NEWS; Domestic

**Length:** 6383 words

**Byline:** Mark Levin

**Guests:** Donald Trump

## Body

MARK LEVIN, FOX NEWS HOST: Hello, America. I'm Mark Levin. This is LIFE, LIBERTY & LEVIN. Part two of my interview with President Trump.

Now, there's interviews with the President, and there's interviews with the President. This format, the long-form format is the best because we can have the President speak for himself rather than interrupting him and rushing around and so forth. So this is Part two.

But before we get to Part two, which will be shortly, I want to mention a few things.

We have got to reject the media narrative in this country. If you listen to the media in this country, you're going to get all screwed up. You're not going to get the facts, you're not going to get any history, even recent history. It is a propaganda operation and we should all know this by now.

There are a handful of real journalists in this country, a handful of news platforms in this country, and that's it. One of the things they want to do is ensure that Donald Trump, if he chooses to run for President again in the Republican primary and so forth, that you will oppose him. It is the same media that tried to turn the 2016 election into a fraudulent election.

Talk about them talking about fraudulent elections.

I want to remind you that all Donald Trump wanted to do is to improve this country, unlike Barack Obama, he loved this country and he loved the citizens of this country. He didn't view them as racist. He didn't want to fundamentally transform America. He wanted to make America great again after Barack Obama and his ilk on the hard left.

They tried to impeach him twice. These will go down in history as two of the most outrageous acts by a Democratic Congress. They used Russia collusion against him, which was clear to us, but it is not clear to everybody, which was a criminal enterprise launched by Hillary Clinton, the F.B.I., the Intel Agencies, the Obama White House, in my view, Obama and Biden as well, certain law firms and other individuals to try and take out a duly elected President.

There is no commission to investigate that, of course.

We have Twitter and Facebook and the corporate media, a cabal of pro- Democrat, pro-American Marxist entities that oppose free speech, and have shut down the President of the United States, if not worse.

You had disloyal saboteurs around this President. He came to Washington. He had never served in Washington or in government before, and so he needed to select people who had some experience at the bureaucratic level. Many

Donald Trump Talks About His Life And His Legacy

of them turned on him. They leaked to the press, they stabbed him in the back. Some of them are trying to enrich themselves with books and so forth.

This is a complete lack of character, and it is so disgusting to me, somebody who worked eight years in the Reagan administration, and would never have thought of doing anything like this.

A phony whistleblower -- they go after his tax returns. The Emoluments Clause, another phony charge. Two and a half to three years of a criminal special prosecutor -- what an outrage -- unleashed against a President of the United States.

They called them everything -- Hitler, Stalin, Mussolini, a racist, an anti-Semite, a dictator, a man who loves his country. Absolutely outrageous. And now, we have the Nancy Pelosi January 6th Stalinist Politburo trying to ensure that Donald Trump will never run again.

But we have to reject this narrative, and starting this evening, right here, I'm putting a marker down. Enough is enough, here and now.

The comparison is what Trump has done versus what Biden is doing, and reject the rest of the corrupt media analysis, because it is all propaganda.

Let's look at COVID-19. Operation Warp Speed: Three vaccines in less than a year, therapeutics in less than a year, stopped travel with China, built hospitals, ventilators, masks, et cetera. Under constant attack from media, Democrats, congressional Democrats every step of the way. This was the equivalent of the Modern Manhattan Project for domestic war against the pandemic. We have never seen anything like this before in American history. That's what it was. That's what it is, despite what they say.

What do we have from Biden? Nothing. No new vaccines. No new therapeutics. More people have died in 2021 under Biden than died in 2020 under Trump. According to Biden, that means he shouldn't be President of the United States. Where is the little charts on the television screens? They don't exist anymore -- and he has three vaccines and therapeutics that were developed under Trump.

What do we get from Biden? People are fired. People are attacked. People are wearing the scarlet letter because they are unvaccinated. They don't even take into account natural immunity, which is a scientific fact, which is even stronger than the vaccine. They have mandates, they have threats, they have firings. They have punishment. That's what we get from the autocratic Biden administration.

What else? Let's look at the border. Southern border, more secure than it has been in generations. Five hundred miles of wall built under Trump despite lawsuits from Democrats trying to stop him and slow him down with support from the media and RINOs who are weak on the border. The number of illegal alien entrants were slashed to record lows.

He had diplomatic breakthroughs with Mexico. Nobody thought he could do it. So you had remain-in-Mexico. You want to come into the United States, you're a refugee. You stay in Mexico until we figure this out.

Huge drop in the flow of deadly drugs. Now, we have a spike like we've never seen before. Drop in sex trafficking. Now, we have a spike. Criminal immigrants coming into this country, MS-13, and so forth, hundreds of thousands of unknown illegal immigrants. That is outrageous under Joe Biden.

And what has he done? A complete open border, that's what he's done. They talk about COVID. We have COVID infected aliens, people with other disease coming from the poorest parts of the world into this country and they don't seem to care. They are secretly released into parts of the country, particularly in Florida because they hate DeSantis -- without telling anybody.

I have to move fast. Time is limited.

Donald Trump Talks About His Life And His Legacy

Look at the economy. Under Trump, record low inflation, record low gas prices, energy independence. We were exporting oil. Fracking, ANWR, Federal leases, pipelines -- all moving the American economic engine.

Record employment before COVID. Blacks, Hispanics, Asians, women -- everyone -- even with COVID, the economy was recovering strongly. I would call this Trump's morning in America. People were hopeful again, businesses were opening again, manufacturing was opening again. What do we have under Biden? Massive inflation, massive spending.

What else? Push for more massive taxation and massive regulation. Energy independence is dead. Now, we're begging our enemies, Russia. We're begging OPEC for oil. They say no.

What else? Skyrocketing gas and home oil prices. Supply chain disaster. We've never had that before. Shortages of basics in food markets, for toys for Christmas. Huge price increases when they are available.

What else? He wants to massively expand the Federal government under this Build Back Better, or whatever the hell they call it. The welfare state. They want to expand new entitlements, redistribution of wealth, subsidies for non-work. That's not America. That's not what we believe in.

Foreign policy. Oh my God, under Trump. Iran was in a box. Iran's economy was imploding. They're our enemy. He eliminated the Iran deal, which was a giveaway.

China was boxed in with tariffs. Trump built up our military, our Navy. They were boxed in.

Russia, the pipeline was cut off. NATO was strengthened. NATO was strengthened. He was sending offensive weapons to Ukraine.

The Middle East. Peace breaking out everywhere. Unimaginable.

Israel, we had the Gulf Arab States, the Abraham Accords -- multiple peace deals, never imagined before.

Trust but verify. Again, this was, I think, one of Trumps beliefs. Use of economic superiority, use of military superiority. He created the Space Force to confront China, which has satellite killing satellites in the sky. He said enough of that.

He rebuilt the U.S. Army and he was getting us out of Afghanistan with integrity, with honor. He would never have left hundreds of American citizens over there, our allies over there, or equipment over there, or given them that Bagram Base. Never ever, ever.

And what do we have with Biden? The Afghanistan disaster, still hundreds of citizens over there that nobody seems to want to talk about. Worst ever. Worst ever military defeat at least in modern times. That provokes our enemies and it has.

Iran is moving at warp speed so to speak to build nuclear weapons. General McKenzie, Biden's General has said they're going to have them within a month or so. What then ladies and gentlemen? And their economy is moving up again because they are selling 500 million barrels of oil to China.

Iran, China, and now Russia, an alliance that did not exist. China is threatening to destroy Taiwan the way it destroyed Hong Kong with multiple endless military interventions into Taiwan airspace. Russia has 100,000 troops on the Ukrainian border today. And I already spoke about Iran. Israel is being undermined, its defenses are being undermined because the Biden administration has told them, you are not to attack Iran.

Well, how are they going to defend themselves?

Military. Biden uses it for social experimentation, critical race theory, vax mandates. They want women in the draft. And ladies and gentlemen, they're destroying the number one military on the face of the Earth. He doesn't even want to increase their budget.

Donald Trump Talks About His Life And His Legacy

Executive orders, the attacks on the independence of the courts, the attacks on separation of power, the filibuster rule, the attacks on our voting system. The corrupt Biden Department of Justice threatening parents at School Board meetings, using the power of the Department of Justice to destroy women's sports, and I could say more and more.

But I can't, because I want to get to Part two of my interview with the President of the United States. But compare the records. There is no comparison.

There is an effort by the media, the RINO, and the never Trumpers to distract you because they don't want Donald Trump to be President again and many of you do. Here's part two.

(BEGIN VIDEOTAPE)

LEVIN: Biden, you say he will go down as the worst President in history. I look at what he has done or the people around him have done. Do you think the election a few weeks ago was a reaction to him as well as all these crazy Marxist ideologies?

Critical race theory. You sign an executive order banning it from the Federal government. Biden is forcing our military members to learn it, and to --

DONALD TRUMP, FORMER PRESIDENT OF THE UNITED STATES: That's right.

LEVIN: And to digest it. Biden is in bed with the teachers unions that promote the same thing. Of course, they didn't like you all that much, you pushed for school choice.

You also pushed for liberty and entrepreneurship in the Black community and minority communities. More than Biden or Obama have ever done. You got an increase vote in the black community, you got an increase vote in the Hispanic community, too.

TRUMP: And criminal justice reform.

LEVIN: Criminal justice reform.

Can you think of anything Biden has done that has united the country? That has actually helped minorities that is positive in any way?

TRUMP: So if you look, President Obama was very divisive. But people were more quiet about it. They didn't want to insult him, but he was very divisive. But the Biden administration is far worse. In fact, I noticed the other day where Obama said, this is very dangerous, all of these. You know what they've done, it's too much for him.

It may be too much for Bernie Sanders, but I doubt it, okay. But when they look at his top, economic people who are looking at this inflation and they are seeing these bills that are being passed to trillions and trillions of dollars, where it's like, throwing money out the window.

He sees the cost of energy, and they see the cost of it. They see what's happening, and they are saying, you can't do this. You can't do it. These are Obama people telling Biden people you can't do this. But they push forward anyway.

Let's see what happens. We have a -- we had an election. I was very helpful. In fact, the new Governor of Virginia called up early in the morning after the election to thank me. We were very helpful -- look, the MAGA people and people that support Trump came out in force, far greater than anybody thought possible.

You know, you're an expert. You see what's going on. Your wife is a brilliant lawyer, she knows what's going on.

It's terrible. We have to get back to borders. We have to get back to free enterprise and we need a press that's fair and equal, and we don't have it.

Donald Trump Talks About His Life And His Legacy

What's happened with Big Tech is a disgrace. I mean, it's just an absolute disgrace. So we have things to do, but it's going to happen.

I believe we have the people on our side, I think we really do. I think we have a large majority. Who wouldn't want voter ID as an example? Who wouldn't want a strong military? A border? Who wants to have millions of people flowing into our country?

How many people -- I mean, think, if you did a sample of a thousand people, typical good American people that love our country. They are they -- can't believe what they're witnessing at the border, and some of the people are really bad. These are stone cold killers that other countries don't want, and they're sending them in from their prisons.

Prisons are being emptied out in other countries. This is not a majority. Sanctuary cities. This is not a majority. This stuff is really, really bad, and I think you're going to see a big, big victory for Republicans in the midterms. I think it's going to be very hard for them to come back that fast.

They're using prosecutors all over the place to hurt people, to hurt Republicans. I will say that, Bill Barr certainly didn't do that. He certainly didn't. But they are using their prosecutors to hurt people and hurt them very badly. They're going after people, everybody.

I've been under investigation from the day I came down the escalator, think of it. I come down the escalator to do a good job. And by the way, I knew that running would be a very expensive thing. I didn't know it'd be this expense. But that's okay. I'm very happy about what happened.

I saw Bloomberg spend $2 billion. He never got past the first question. The first question, he was gone. He would have been very good if he didn't do the debate, but he spent $2 billion.

This country has tremendous potential -- tremendous. But we're giving it away, and there will be a point -- there will be a point where the country can't come back, and we can never allow that point to be reached.

So I think things are going to happen very big in the midterm elections, and I think in 2024, it's going to be a great result.

LEVIN: The number of photos in the book, again the name of the book is, "Our Journey Together." People can get it for Hanukkah, for Christmas. It's a fantastic book.

TRUMP: And we even have a picture of Mark.

LEVIN: Of me and my beautiful wife.

TRUMP: Much more importantly.

LEVIN: Thank you, yes. You can go to 45books.com, 45books.com.

You have a couple of photographs in here, you and Netanyahu, you in Israel. You're the only President to ever visit the Western Wall -- ever. And you have our kippah on and you're there with Ivanka and others and so forth.

You did so much for the State of Israel. In fact, you did so much for peace in the Middle East, the Abraham Accords. Nobody could believe, one after another after another, and you were choking Iran economically. Iran was about to collapse.

Now, look at what's happening today. Iran is selling 500,000 barrels of oil to China every day. Iran is sprinting toward nuclear weapons. Biden is begging them to come to the table and they won't.

Israel is on defense. They are threatening Israel. They vote against Israel in the United Nations.

These Arab countries that made these deals with Israel, and they've kept these deals with Israel. We haven't added a single another country and you were close to adding Saudi Arabia and so many others.

Donald Trump Talks About His Life And His Legacy

TRUMP: I would have had -- they were lined up. They were lined up.

Had we not had a rigged election, we would have had peace in the Middle East. They were lined up. We were just waiting after the election. We were going to sign them one after another. It was happening.

Look, we had UAE, he is a leader. He is a great leader, and it is a leading country over there and respected. But I will tell you this, Israel is in big trouble. Israel is in trouble.

LEVIN: Taiwan and Israel.

TRUMP: Nobody talked about Taiwan when I was President, and he understood that. I had a very good relationship until COVID because after COVID, my relationship -- I didn't, you know, I just -- there's only so much you can take.

China has been ripping us off for years. I put tariffs on. We took in hundreds of billions of dollars, all of that I still go. But when COVID came in, and came in, obviously from China. I mean, China tried to blame Italy and Europe, initially, if you remember. People don't remember these things, but it very much hurt my relationship with President Xi, because maybe --

I mean, who wouldn't? I mean, who can speak to somebody you're losing -- the world is dying around you. The whole world, not just the United States, I mean, places have been hit much harder, relatively much harder. So when you look at it, when you look at what we've done, what we've accomplished, despite all of these things that have happened, it's incredible.

Had COVID not happened, we would have had the greatest four years of economic success in the history of the world. COVID hit us that third -- at the end of the third year, and we did a great job, and then really handed him a very beautiful palette. We handed it to him.

And every day, they are destroying that palette. And we have a big problem. We're going to have a big problem if it continues.

I will say this. Israel was safe with me. Iran would have made a deal with me. They were being hurt very badly by the sanctions. Now, most of those sanctions have been taken off, and you're right, China was buying very little. I said, don't do it. Don't do it. Now, they're buying more than 500,000 barrels a day. Can you believe this?

But you didn't hear about Taiwan. You know, when I was President, you didn't hear bombers are flying all over Taiwan. They will do something with Taiwan probably after the Olympics, because they don't respect the Biden administration.

I watched them the other day sitting, it was President Xi who is at the top of his game. There is nobody in Hollywood that could play his role. I know him very well. I had a great relationship with him.

But I told him early on, don't ever do anything with Taiwan. Don't ever do it. He understood that. Strong guy, tough guy. He understood it. But nobody talked about Taiwan during -- they talked about someday in the future. I mean, this is imminent when you take a look.

But I watched Biden sitting with Xi, and it didn't look like Biden really knew what was going on. And he made a very terrible mistake. You know, the mistake I'm talking about. That was a terrible mistake.

I don't even like saying it. But what he said now, what he said was so bad, but he was sitting with Xi and you have somebody that's at the top of his game and you have somebody else that was never really at the top of the game of the game, and certainly is not at the top of his game and our country is in trouble.

JON SCOTT, FOX NEWS CHANNEL ANCHOR: Welcome to "FOX News Live." I'm Jon Scott.

Donald Trump Talks About His Life And His Legacy

New restrictions for foreign travelers wishing to enter the U.S. kick in tomorrow. The new rules require international visitors to show proof that they have tested negative for COVID. They are being enforced as the omicron variant spreads to a third of our country.

But now health officials are saying omicron might not be as dangerous as the delta strain. Infectious disease expert Dr. Anthony Fauci says the Biden administration might rethink its travel restrictions for some South African nation.

Americans tonight remembering Bob Dole who served his nation as a World War II hero and Republican senator from Kansas. He was also a three-time presidential candidate. Dole revealed last February he was battling lung cancer. He died at the age of 98.

I'm Jon Scott, now back to LIFE, LIBERTY & LEVIN.

LEVIN: Let's talk a little bit more about this Russia collusion issue. Durham has indicted this guy, Michael Sussman who lied to the F.B.I., brought them fake information. He was working with Perkins Coie. That law firm used to have a guy by the name of Mark Elias. They went all through the states from 2016 to 2020 trying to change the rules and so forth, all kinds of dark money behind them from billionaires --

TRUMP: And got fired from Perkins Coie.

LEVIN: Well, he certainly left.

TRUMP: Because it's hot.

LEVIN: It's hot. Hillary Clinton was behind most of it.

TRUMP: Yes.

LEVIN: What do you want to say to Hillary Clinton?

TRUMP: Well, I think it's disgraceful. I think that I always knew it was a hoax and I tell the story. During the campaign, people would come up to me -- different people, young people, old people, people that were working on my campaign. So, what do you know about Russia? I said nothing. What do you know about Russia? Nothing.

Two months later, what do you know about -- sir, do you know anything about Russia? After about five times, I'd said, what the hell is going on with Russia?

They've created a false -- it was a totally fabricated story. They made it up in either her kitchen or a law office. She spent millions of dollars. Crooked Hillary did this -- millions and millions of dollars, gave it to Steele, who is a nut job and he did the whole F.B.I.

And John McCain, not my favorite person, I knew him well. I knew him well. He sent a copy to the F.B.I. Great Republican, he was, right?

Let's take down the Republican President. He sent a copy of a fake report to the F.B.I. If you did a movie.

LEVIN: Nobody will believe it.

TRUMP: Nobody will believe it. Okay, nobody would believe it. And a lot of people say to me, how you survived is one of the most incredible things. Don't forget, I fired Comey. Had I not fired Comey, you might not be talking to me right now about a beautiful book of four years at the White House and we'll see about the future. The future is going to be very interesting.

But I fired Comey, that whole group, and now that group is coming back again. I mean, it's not believable. It shouldn't be allowed to happen. It shouldn't be allowed to happen.

Donald Trump Talks About His Life And His Legacy

LEVIN: You have some beautiful photographs in the book. The book is called "Our Journey Together" and you can get it at 45books.com, 45books.com -- with Rush Limbaugh.

TRUMP: Yes.

LEVIN: He was an early supporter of yours.

TRUMP: Right. I didn't know him. I never met him. He supported me right after the --

LEVIN: Highly thought of you.

TRUMP: Yes.

LEVIN: And there is a similarity and a sense of both of you. You really are individual human beings who do what you think is right. You're free spirits. You don't play the game with the social communities or the media or anything else, and I think -- Rush was one of my best friends -- saw that in you, and that is what attracted him to you.

He said, "This guy is different. He speaks out. He fights he is not hiding. He takes the media on." Because, you know, they used to come after him and so forth, but what do you make of that?

TRUMP: So Rush was interesting. Obviously, I knew he was, you know, like the biggest of all time on radio, talk radio and all of that. And by the way, you're doing really well, too.

LEVIN: Thank you, sir.

TRUMP: You and the Great Sean Hannity are doing great.

LEVIN: He is.

TRUMP: But Rush was -- even Sean would say, irreplaceable. He was an amazing guy, but I didn't know him. I never met him. And I came down and I made a speech. It was quickly written, I didn't have speech writers or anything, perhaps the day before, I didn't even know if I was running.

And I came down, I talked about the wall, I talked about the horrible things. I talked about the rape and all of the things that were going on with this tremendous migration, which by the way, is a tiny fraction of what it is now. I had it brought to the lowest number in our country's history.

And now, it's the highest number after just a few months. It's the highest number, the worst number in our country's history.

But I talked about immigration. I talked about the wall. I talked about a strong military. I talked about all these different things, right? And I heard that somebody came into my office at that time in Trump Tower. They had said, we understand, sir, that Rush Limbaugh is a big fan of yours. I said, well, that's really nice. I don't know him, but that's really nice.

And then I'd hear more and more and more, and then eventually I got to speak to him on the phone quickly, and then we met, and we fell in love, okay. We had a great relationship.

I mean, he was great. His wife is a great person and he was amazing. He could talk for three hours without phone calls.

You know, it's easy to do with phone calls. What do you think of this is? What do you think of that? He would just sit there and talk. He didn't actually like taking phone calls, you know that.

LEVIN: Right.

Donald Trump Talks About His Life And His Legacy

TRUMP: He took very few phone calls. When you made a call, it was very rare, very interesting, because I think it's much easier to do the call. Even if you hustle calls, to me, that's like easy. You know, your wrap up the three hours or the two hours.

He would sit there for hours and just talk, and people were spellbound. I mean, it was incredible. I said, who does this? Who could do this? And he really became a tremendous fan.

So he got sick and I have the honor of giving out the Presidential Medal of Freedom. That's the highest award you can get outside of the Congressional Medal of Honor. This is civilian, that's for the military.

And we've given them to great people -- great people. And I said, you know what I'm going to do? Make it in the State of the Union, it was coming up. Rush was very sick, and yet, he wasn't missing a day. He'd go to a hospital in Boston and come back, and he'd do his show and he was going through -- he had a real tough -- he had a tough one in terms of the various cancers.

He had one, that I guess they would say no chance, but he felt there was a great chance, all right. That's the way he was, optimistic about everything about this country. He loved the country as much as anybody I've ever known.

But he got sick, very sick. And I said to Melania, the First Lady, who is very popular, by the way. Every time I do, "We love our First Lady, we love our First Lady." I said to Melania, I said, you know, he is a great guy. He has had an incredible career. People love him because he loves our country. We're going to give him the award, and I think I'm going to do something that's never been done. I'm going to give it to him during my State of the Union, and it was wild.

Because I did it, and you know, you have just about 50/50, right? And the side on the right happened to be in this case, it's the right, but it was the Democrats sitting on the right, and they were like this, except for one or two people.

I must tell you, Joe Manchin had a beautiful smile on his face. He even lightly applauded -- and a couple of others too, because they understood the greatness of what Rush had done.

But for the most part, it was just stark cold. And the left, which in this case was the Republicans, you never saw people go crazy like that. For five minutes, they were screaming and chanting, and Rush, you know, as you know, he's told you, he considered it the greatest honor of his life.

But it was such an honor for me to have done it, and it wasn't even that controversial. It was very interesting. I thought I was going to be killed on that one, like getting out of the Paris Accord where I wasn't, and doing other things where I wasn't because the people of this country know.

But I thought with that, I'd be hit hard, and I wasn't because people understood. He was a great man. He loved the country, and I was really honored to have his support.

And he wasn't with like anybody else. He knew a lot of the senators that were running, he knew everybody that was running. But he just saw my first opening remarks -- speech -- I guess, you could call it a speech, it was just remarks about what's wrong with the country and what could be right, and he loved it.

And from day one, he was a fan.

So he was just a terrific guy, and we miss Rush.

LEVIN: And what you did was very classy, because I can tell you afterward, he called me about it. We spoke about it. He couldn't believe it.

TRUMP: Yes.

LEVIN: And it was the thrill of his life.

Donald Trump Talks About His Life And His Legacy

LEVIN: The number of photos in this book with you and your wife, First Lady, Melania, you have a very tight relationship with your wife.

When my wife and I sit with you and your wife from time to time, you commiserate, you talk to each other. You agree or disagree in a very respectful way. Tell us about the relationship.

TRUMP: So, she is a very solid person. She is -- you're not allowed to say this anymore, so I won't say it -- that she is a beautiful person. She's very beautiful. But today that doesn't matter. We are not allowed to talk about that.

LEVIN: But it matters to a lot of us.

TRUMP: So, I won't do that. Okay, I will not talk about beauty. But she is, she is a beautiful person inside and out -- but a beautiful person.

And she comes from a country that doesn't have too many problems. They don't know about crime, they don't know about the kind of problems we have. You know, it's a very solid -- they are a solid people.

You look at that part of the world where they clean their sidewalks every Saturday morning, they scrub this sidewalks. Everything is clean. You know, they have difficulties, I guess like, everybody has difficulties but she's just -- she comes from a very good background, and it is amazing, but that background made her like this country, love this country even more.

She was very honored to be First Lady. First Ladies of other countries, the wives of Prime Ministers, the wives of Presidents like France, Macron, the wife, she's a wonderful woman. They all gravitated to Melania. They loved Melania.

The press was so irrelevant to her. No matter what you -- she'd do the most beautiful Christmas ornaments and trees and they were white, they were so beautiful on the press would say, oh, they shouldn't be white, they should be green. Then should have them green and they said, they shouldn't be green, they should be white. It didn't matter.

She has a lot of confidence. It didn't matter to her too much. She just wanted to do the right thing.

But she loves helping people, and she helped a lot of people while she was at the White House.

LEVIN: She speaks a lot of languages, too, right?

TRUMP: A lot of languages.

LEVIN: Incredibly intelligent.

TRUMP: Very smart. Very smart. Got a good heart. But she's also very strong, and she knows right from wrong.

LEVIN: And your kids, they went through a lot, too.

TRUMP: Yes.

LEVIN: I mean --

TRUMP: They went through a tremendous --

LEVIN: It used to be, keep your hands off the kids.

TRUMP: Yes.

LEVIN: But Don Jr. especially, Ivanka was mocked even though she was very, very successful. What was it like when your kids would come under attack or they were dragged in front of depositions and so forth and you knew they were lying about this Russia collusion and so forth?

Donald Trump Talks About His Life And His Legacy

TRUMP: Well, it's like I said with Don, they make up a story, and then they go after these people. I mean, they go after people, not only my kids, they were going after other people violently about Russia, and they had nothing to do with Russia. It was so sick, but they did it. They went after my kids.

You know, my kids -- Ivanka had a very successful company, and we knew that it would cost us. You know, every other President, they leave, they make a lot of money. They make it during their presidency. And Obama goes with Netflix and all of that.

I mean, nobody looks at that, made millions of dollars from a book. He had more money for a book than anybody ever even came close to. So, why do you pay so much money for a book? There is so much stuff that goes on.

I knew that I would substantially hurt my wealth. It didn't matter, because I'm very wealthy. But I knew that to do it right, I could have made -- I am telling you, I could have made deals with everybody. I could have made deals in Saudi Arabia, I could have made deals with everybody. They all wanted me to make deals. I said, don't do it. Don't make deals.

I could have -- I could have made -- I could have quadrupled my fortune. I could have made it 20 times bigger, 10 times bigger. I didn't want to do it. I knew that doing this would be very expensive because I didn't want to do the kind of things that many other people would do.

When you look at so many other -- look at the things that happened with Biden over the years, and look at what the son is doing. Great artists don't get anywhere near what he gets for a painting. It's such a scam.

If I said about prosecutors what he said about the prosecutor in Ukraine, about the $2 billion not going to Ukraine unless the prosecutors -- I would be excoriated. It would be over. You talk about quid pro quo, that was quid pro quo.

LEVIN: You don't want to Hunter Biden getting in trouble.

TRUMP: I don't want to see that, no.

LEVIN: But they wanted Don, Jr. to get in trouble.

TRUMP: Yes, they did.

LEVIN: And Eric and Ivanka and people close to you, secretaries and other people had to spend a fortune on lawyers and everything. That's the difference, I would argue between them and us.

They play to destroy.

TRUMP: Yes. Yes, they do.

LEVIN: We play to win.

TRUMP: It's wrong what they do. It's vicious and it's wrong, but they do.

Hunter Biden, if he were on the other side, well, it wouldn't happen because he would have been gone long before he took the money from China, long before he got paid $3.5 million from the mayor of Moscow's wife.

We have a double standard. It's much harder for Republicans. Frankly, I tell people, it's a lot easier to be a Democrat because they're protected. They have been there for a long time. You know, it's interesting, I came to Washington, I was only there for 17 times, I think 17 times, it was reported, but not a lot. It wasn't my playground for the most part.

I never stayed overnight. All of a sudden I'm riding down Pennsylvania Avenue in a beautiful -- in The Beast, right? The world's most expensive car in this -- and I look at the First Lady, and I say, "Do you believe it? I am President and you're the First Lady." We're riding, we have hundreds of motorcycles and we have everything.

Donald Trump Talks About His Life And His Legacy

But the fact is, we weren't a part of that establishment. These people have been put in office for 25 to 30 years. The Bushes, in many cases. Clinton, Obama -- so we get there, don't know -- now, I know sort of everybody. I know every -- I know, The Good, the Bad, and the Ugly.

But they've been there for a long time. You know, they call it the Deep State. And we'll have another discussion on the words Deep State. But they've been there for a long time. They've been in the Justice Department. They've been in the F.B.I. They've been in C.I.A.

So you're coming into a hornet's nest. I was going to say before, if I didn't fire Comey, they were looking to take down the President of the United States. If I didn't fire him, and some people said, he made a mistake when he fired Comey. And now those same people said it was the most incredible instinctual moves that they've ever seen, because I wouldn't -- I might be here with you, perhaps we'll be talking about something else.

But I don't think I could have survived if I didn't fire him, because it was like a hornet's nest. When I fired him, they all went crazy against each other.

LEVIN: And they didn't like him before you fired him. They wanted him removed because they thought he set up Hillary, and then you fire him and then all of a sudden they flip.

TRUMP: Well, there's two F.B.I.'s

LEVIN: Yes.

TRUMP: There's the people atop, the Comey and the McCabe, and all of these people, the two lovers, right? The two lovers. It's just so -- but the two lovers used the public servers. They used the F.B.I. servers for their message back and forth. Wasn't that lovely? So other people, I can imagine who they were didn't find out.

And a big moment was when they said that's the insurance policy. In other words, the insurance policy, remember, she's going to win 100 million to one. But in case she doesn't, we have an insurance policy, and they were doing the insurance policy.

And now, that's being found out through Durham and others. We've found out. We've had great patriots -- Jim Jordan and Devin Nunes and many -- so many people. We've had great, great support.

And you know why I had great support on the impeachment? When I watched Cuomo, he didn't want to be impeached -- and then he left. He didn't have support, and I had tremendous support from the Republican Party and then outside of a few people.

LEVIN: And the people -- and the people.

TRUMP: I had great support from the people --

LEVIN: And they did not like what was taking place.

TRUMP: Yes.

LEVIN: Welcome back, America. You know, there's not many people who could do a 70-minute interview straight through, Part one and Part two, like President Trump did, certainly not Joe Biden, but very few politicians.

I want to strongly encourage you to get a copy of this fantastic book. It's a wonderful coffee table book, "Our Journey Together." A perfect Christmas gift. Go to 45books.com to order -- four-five books.com, 45books.com.

Again, it is a terrific book. You're going to enjoy it very, very much.

Also, if you go to Amazon right now, you can get "American Marxism." And for this book, it's right here. It's 50 percent off, 50 percent off. So, it's $14.00.

Donald Trump Talks About His Life And His Legacy

And if you're on Amazon Prime, if you're one of those members, you'll get another $1.25 off, $12.75. Perfect Christmas gift.

But again, "Our Journey Together," President Trump, 45books.com, 45books.com.

See you next time on LIFE, LIBERTY & LEVIN.

**Load-Date:** December 6, 2021

---

**End of Document**

# EXHIBIT 10



← **Truth Details**
7844 replies

**Donald J. Trump** ✓
@realDonaldTrump

Our Legal System is CORRUPT, our Judges (and Justices!) are highly partisan, compromised or just plain scared, our Borders are OPEN, our Elections are Rigged, Inflation is RAMPANT, gas prices and food costs are "through the roof," our Military "Leadership" is Woke, and our Country is going to HELL, and Michael Sussmann is not guilty. How's everything else doing? Enjoy your day!!!

**31.6k** ReTruths   **61.4k** Likes                          May 31, 2022, 1:05 PM

# EXHIBIT 11

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,
IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Exhibit 11</u>

Donald Trump announces he's running for president in 2024

The posted video is available here:

[https://www.c-span.org/video/?c5041282/i-tonight-announcing-candidacy-president-united-states](https://www.c-span.org/video/?c5041282/i-tonight-announcing-candidacy-president-united-states)

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit is being maintained by plaintiff's counsel and will be provided to the Court and defendants' counsel.*

# EXHIBIT 12

 **Donald J. Trump** ✓
@realDonaldTrump

breitbart.com/politics/2022/12...



𝒸 www.breitbart.com

Elon Musk Calls out Sussmann, Perkins
Coie for 'Attempt to Corrupt a
Presidential Election'

Sussmann, then at Perkins Coie LLP,
played a role in selling the "Russia
collusion" hoax to the FBI, falsely linking
Trump to Russia.

**4.34k** ReTruths  **14.1k** Likes                Dec 11, 2022, 4:38 PM

# EXHIBIT 13

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,
IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Exhibit 13</u>

May 16, 2023 post on Truth Social by user @realDonaldTrump, which upon
information and belief is an account owned by President Donald J. Trump

The posted audio is available here:
http://truthsocial.com/@realDonaldTrump/posts/110381617248464734

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit
is being maintained by plaintiff's counsel and will be provided to the
Court and defendants' counsel.*

# EXHIBIT 14

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,
IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Exhibit 14</u>

March 4, 2023 speech Donald J. Trump gave at the Conservative
Political Action Conference

The video is available here:
[https://www.c-span.org/program/campaign-2024/former-president-trump-speaks-at-cpac/624800](https://www.c-span.org/program/campaign-2024/former-president-trump-speaks-at-cpac/624800)

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit
is being maintained by plaintiff's counsel and will be provided to the
Court and defendants' counsel.*

# EXHIBIT 15

**TRUTH.**

← **Truth Details**
453 replies



**Donald J. Trump** ✅
@realDonaldTrump

@JudiciaryGOP

Found your collusion, @RepAdamSchiff.

#Durham



**5.29k** ReTruths   **14.8k** Likes       Jun 21, 2023, 7:16 PM

◯ Reply      ⇄ ReTruth      ♡ Like      ◻      ⬆      •••

# EXHIBIT 16



**Donald J. Trump** ✓
@realDonaldTrump

vigilantnews.com/post/marc-eli...

⌀ vigilantnews.com
Marc Elias Is Scared...And He Should Be
The lawfare being used to try to stop President Trump is failing.

**2.73k** ReTruths  **11.4k** Likes                    Mar 31, 2024, 11:57 AM

# EXHIBIT 17



← **Truth Details**
2559 replies



**Donald J. Trump** ✓
@realDonaldTrump

I am being accused of Election Interference in a trial being presided over by a Corrupt D.A. and a ridiculously Conflicted Judge, representing people who Rigged and Stole the 2020 Presidential Election, and paid millions of dollars for the Fake and Fully Discredited Russia Dossier.....And they're after me because a bookkeeper marked down "Legal Expense" in a Ledger when describing Legal Fees paid to a lawyer. What else would you call it? The Biden Thugs call it Falsifying Business Records. THIS FAKE CASE SHOULD BE DROPPED, IMMEDIATELY!

**6.69k** ReTruths   **22.3k** Likes            Apr 23, 2024, 5:42 PM

# EXHIBIT 18

 **Donald J. Trump** ✅
@realDonaldTrump

Andrew McCarthy: "HILLARY CLINTON, RECIDIVIST ELECTION-THEFT CONSPIRATOR...Regarding 1992, the Clinton campaign used a law firm as the intermediary for tens of thousands of dollars in payments to a private investigator (Jack Palladino) whose task was to obtain the silence of women who claimed to have had affairs with Bill Clinton...it turns out that this 1992 tactic — booking as legal fees what might euphemistically be called 'research' — was the blueprint for the 2016 Hillary Clinton campaign, in cahoots with the Democratic National Committee. They paid their law firm, Perkins Coie, which retained the research firm Fusion GPS and its contractor, former British spy Christopher Steele, to generate the farcical Steele dossier that was shared with the FBI, the State Department, and the media to smear Trump as a clandestine agent of the Kremlin...

**2.2k** ReTruths  **7.68k** Likes                          May 05, 2024, 3:01 PM

# EXHIBIT 19

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,
IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Exhibit 19</u>

August 29, 2024 interview of President Trump by Monica Crowley

An audio version of the interview is available here:
https://play.cdnstream1.com/s/bahakel/the-monica-crowley-podca-3102d5/a-newsmaking-talk-with-p-8574db

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit is being maintained by plaintiff's counsel and will be provided to the Court and defendants' counsel.*

# EXHIBIT 20

 **Donald J. Trump** ✓
@realDonaldTrump

CEASE & DESIST: I, together with many Attorneys and Legal
Scholars, am watching the Sanctity of the 2024 Presidential
Election very closely because I know, better than most, the
rampant Cheating and Skullduggery that has taken place by the
Democrats in the 2020 Presidential Election. It was a Disgrace to
our Nation! Therefore, the 2024 Election, where Votes have just
started being cast, will be under the closest professional scrutiny
and, WHEN I WIN, those people that CHEATED will be prosecuted
to the fullest extent of the Law, which will include long term prison
sentences so that this Depravity of Justice does not happen again.
We cannot let our Country further devolve into a Third World
Nation, AND WE WON'T! Please beware that this legal exposure
extends to Lawyers, Political Operatives, Donors, Illegal Voters, &
Corrupt Election Officials. Those involved in unscrupulous behavior
will be sought out, caught, and prosecuted at levels, unfortunately,
never seen before in our Country.

**17.6k** ReTruths  **46.9k** Likes                    Sep 07, 2024, 7:01 PM

◯ Reply        ⮂ ReTruth        ♡ Like         🔖        ↥        • • •

# EXHIBIT 21

**TRUTH.**

← **Truth Details**
2875 replies



**Donald J. Trump** ✔
@realDonaldTrump

CEASE & DESIST: I, together with many Attorneys and Legal Scholars, am watching the Sanctity of the 2024 Presidential Election very closely because I know, better than most, the rampant Cheating and Skullduggery that has taken place by the Democrats in the 2020 Presidential Election. It was a Disgrace to our Nation! Therefore, the 2024 Election, where Votes have just started being cast, will be under the closest professional scrutiny and, WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law, which will include long term prison sentences so that this Depravity of Justice does not happen again. We cannot let our Country further devolve into a Third World Nation, AND WE WON'T! Please beware that this legal exposure extends to Lawyers, Political Operatives, Donors, Illegal Voters, & Corrupt Election Officials. Those involved in unscrupulous behavior will be sought out, caught, and prosecuted at levels, unfortunately, never seen before in our Country.

**8.36k** ReTruths   **22.6k** Likes                                   Sep 17, 2024, 11:56 AM

# EXHIBIT 22

**TRUTH.**

← **Truth Details**
2314 replies                                                    ⋯

 **Donald J. Trump** ✓
@realDonaldTrump

CEASE & DESIST: I, together with many Attorneys and Legal Scholars, am watching the Sanctity of the 2024 Presidential Election very closely because I know, better than most, the rampant Cheating and Skullduggery that has taken place by the Democrats in the 2020 Presidential Election. It was a Disgrace to our Nation! Therefore, the 2024 Election, where Votes have just started being cast, will be under the closest professional scrutiny and, WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law, which will include long term prison sentences so that this Depravity of Justice does not happen again. We cannot let our Country further devolve into a Third World Nation, AND WE WON'T! Please beware that this legal exposure extends to Lawyers, Political Operatives, Donors, Illegal Voters, & Corrupt Election Officials. Those involved in unscrupulous behavior will be sought out, caught, and prosecuted at levels, unfortunately, never seen before in our Country.

**8.17k** ReTruths   **20.2k** Likes                    Oct 25, 2024, 1:32 PM

🗨    ⇄    ♡    🔖    ⬆

# EXHIBIT 23


## Presidential Documents

Executive Order 14151 of January 20, 2025

## Ending Radical and Wasteful Government DEI Programs and Preferencing

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose and Policy.* The Biden Administration forced illegal and immoral discrimination programs, going by the name "diversity, equity, and inclusion" (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military. This was a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."

Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted "Equity Action Plans" to detail the ways that they have furthered DEIs infiltration of the Federal Government. The public release of these plans demonstrated immense public waste and shameful discrimination. That ends today. Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great.

**Sec. 2**. *Implementation.* (a) The Director of the Office of Management and Budget (OMB), assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), shall coordinate the termination of all discriminatory programs, including illegal DEI and "diversity, equity, inclusion, and accessibility" (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear. To carry out this directive, the Director of OPM, with the assistance of the Attorney General as requested, shall review and revise, as appropriate, all existing Federal employment practices, union contracts, and training policies or programs to comply with this order. Federal employment practices, including Federal employee performance reviews, shall reward individual initiative, skills, performance, and hard work and shall not under any circumstances consider DEI or DEIA factors, goals, policies, mandates, or requirements.

(b) Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:

(i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

(ii) provide the Director of the OMB with a list of all:

(A) agency or department DEI, DEIA, or "environmental justice" positions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether these positions, committees, programs, services, activities, budgets, and expenditures have been misleadingly relabeled in an attempt to preserve their pre-November 4, 2024 function;

(B) Federal contractors who have provided DEI training or DEI training materials to agency or department employees; and

(C) Federal grantees who received Federal funding to provide or advance DEI, DEIA, or ''environmental justice'' programs, services, or activities since January 20, 2021.

(iii) direct the deputy agency or department head to:

(A) assess the operational impact (e.g., the number of new DEI hires) and cost of the prior administration's DEI, DEIA, and ''environmental justice'' programs and policies; and

(B) recommend actions, such as Congressional notifications under 28 U.S.C. 530D, to align agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including set-asides), grants, consent orders, and litigating positions with the policy of equal dignity and respect identified in section 1 of this order. The agency or department head and the Director of OMB shall jointly ensure that the deputy agency or department head has the authority and resources needed to carry out this directive.

(c) To inform and advise the President, so that he may formulate appropriate and effective civil-rights policies for the Executive Branch, the Assistant to the President for Domestic Policy shall convene a monthly meeting attended by the Director of OMB, the Director of OPM, and each deputy agency or department head to:

(i) hear reports on the prevalence and the economic and social costs of DEI, DEIA, and ''environmental justice'' in agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including set-asides), grants, consent orders, and litigating positions;

(ii) discuss any barriers to measures to comply with this order; and

(iii) monitor and track agency and department progress and identify potential areas for additional Presidential or legislative action to advance the policy of equal dignity and respect.

**Sec. 3**. *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**Federal Register** / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents **8341**

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01953
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

# EXHIBIT 24



The White House

January 22, 2025

**PROTECTING CIVIL RIGHTS AND EXPANDING INDIVIDUAL OPPORTUNITY**: Today, President Donald J. Trump signed an historic Executive Order that protects the civil rights of all Americans and expands individual opportunity by terminating radical DEI preferencing in federal contracting and directing federal agencies to relentlessly combat private sector discrimination. It enforces long-standing federal statutes and faithfully advances the Constitution's promise of colorblind equality before the law. This comprehensive order is the most important federal civil rights measure in decades:

- It terminates "diversity, equity, and inclusion" (DEI) discrimination in the federal workforce, and in federal contracting and spending.
  - Federal hiring, promotions, and performance reviews will reward individual initiative, skills, performance, and hard work and not, under any circumstances, DEI-related factors, goals, policies, mandates, or requirements.

- The order requires OMB to streamline the federal contracting process to enhance speed and efficiency, reduce costs, and require Federal contractors and subcontractors to comply with our civil rights laws.
  - It revokes Executive Order 11246 contracting criteria mandating affirmative action
  - It bars the Office of Federal Contract Compliance Programs from pushing contractors to balance their workforce based on race, sex, gender identity, sexual preference, or religion.

- It requires simple and unmistakable affirmation that contractors will not engage in illegal discrimination, including illegal DEI.

- It directs all departments and agencies to take strong action to end private sector DEI discrimination, including civil compliance investigations.

- It mandates the Attorney General and the Secretary of Education issue joint guidance regarding the measures and practices required to comply with the Supreme Court's decision in *Students for Fair Admissions v. Harvard*.

**RESTORING THE VALUES OF INDIVIDUAL DIGNITY, HARD WORK, AND EXCELLENCE**: Individual dignity, hard work, and excellence are fundamental to American greatness. This Executive Order reaffirms these values by ending the Biden-Harris Administration's anti-constitutional and deeply demeaning "equity" mandates, terminating DEI, and protecting civil rights:

- Reversing the progress made in the decades since the Civil Rights Act of 1964 toward a colorblind and competence-based workplace, radical DEI has dangerously tainted many of our critical businesses and influential institutions, including the federal government.

- In the private sector, many corporations and universities use DEI as an excuse for biased and unlawful employment practices and illegal admissions preferences, ignoring the fact that DEI's foundational rhetoric and ideas foster intergroup hostility and authoritarianism.
  - Billions of dollars are spent annually on DEI, but rather than reducing bias and promoting inclusion, DEI creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict.

**PRESIDENT TRUMP PROMISED AND DELIVERED**: President Trump promised to terminate DEI in the federal government, protect equal opportunity, and force schools to end discriminatory admissions policies, and he delivered. Every man and woman should have the opportunity to go as far as their hard work, individual initiative, and competence can take them. In America, excellence, grit, and determination is our strength.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

    

WH.GOV

Copyright

Privacy

Style Guide

# Exhibit 25
# Intentionally Omitted

# EXHIBIT 26

Case 1:25-cv-00716-BAH   Document 39-4   Filed 04/03/25   Page 94 of 734



U.S. Capitol

Washington, D.C.

9:19 P.M. EST

(March 4, 2025)

THE PRESIDENT:  Thank you.  (Applause.)  Thank you very much.  Thank you very much.  It's a great honor.  Thank you very much.

Speaker Johnson, Vice President Vance, the first lady of the United States — (applause) — members of the United States Congress, thank you very much.

And to my fellow citizens, America is back.  (Applause.)

AUDIENCE:  USA!  USA!  USA!

THE PRESIDENT:  Six weeks ago, I stood beneath the dome of this Capitol and proclaimed the dawn of the golden age of America.  From that moment on, it has been nothing but swift and unrelenting action to usher in the greatest and most successful era in the history of our country.

We have accomplished more in 43 days than most administrations accomplished in four years or eight years, and we are just getting started.  (Applause.)  Thank you.

I return to this chamber tonight to report that America's momentum is back, our spirit is back, our pride is back, our confidence is back, and the American dream is surging bigger and better than ever before.  (Applause.)  The American dream is unstoppable, and our country is on the verge of a comeback, the likes of which the world has never witnessed and perhaps will never witness again.  There's never been anything like it.  (Applause.)

The presidential election of November 5th was a mandate like has not been seen in many decades.  We won all seven swing states, giving us an electoral college victory of 312 votes.  (Applause.)  We won the popular vote —

REPRESENTATIVE GREEN:  (Inaudible.)

THE PRESIDENT:  — by big numbers and won counties in our country —

AUDIENCE:  Booo —

AUDIENCE:  USA!  USA!  USA!

REPRESENTATIVE GREEN:  You are — you have no right to cut Medicaid.

AUDIENCE:  USA!  USA!  USA!

THE PRESIDENT:  — and won counties in our country 2,700 to 525 on a map that reads almost completely red for Republican.  (Applause.)

Now, for the first time in modern history, more Americans believe that our country is headed in the right direction than the wrong direction.  In fact, it's an astonishing record: 27-point swing, the most ever.  (Applause.)

Likewise, small-business optimism saw its single largest one-month gain ever recorded.

SPEAKER JOHNSON:  Mr. President —

THE PRESIDENT:  A 41-point jump.

(Speaker Johnson strikes the gavel.)

SPEAKER JOHNSON:  Members are directed to uphold and maintain decorum in the House and to cease any further disruptions.  That's your warning.

REPRESENTATIVE GREEN:  He has no mandate to cut Medicaid.

SPEAKER JOHNSON:  Members are engaging in willful and continuing breach of decorum, and the chair is prepared to direct the sergeant at arms to restore order to the joint session.  (Applause.)

Mr. Green, take your seat.  Take your seat, sir.

REPRESENTATIVE GREEN:  He has no mandate to cut Medicaid.

SPEAKER JOHNSON:  Take your seat.

(Cross-talk.)

Finding that members continue to engage in willful and concerted disruption of proper decorum, the chair now directs the sergeant at arms to restore order.

(Applause.)  Remove this gentleman from the chamber.  (Applause.)

REPRESENTATIVE GREEN:  Shame on all of you.

(Members of the audience sing "Na Na Hey Hey Kiss Him Goodbye.")

(Cross-talk.)

You have no mandate.

SPEAKER JOHNSON:  Members are directed to uphold and maintain decorum in the House.

Mr. President, you can continue.

THE PRESIDENT:  Thank you.

Over the past six weeks, I have signed nearly 100 executive orders and taken more than 400 executive actions — a record — to restore common sense, safety, optimism, and wealth all across our wonderful land.  The people elected me to do the job, and I'm doing it.  (Applause.)

In fact, it has been stated by many that the first month of our presidency — it's our presidency — (applause) — is the most successful in the history of our nation by many.  (Applause.)  And what makes it even more impressive is that — do you know who number two is?  George Washington.  How about that?  (Laughter and applause.)  How about that?  I don't know about that list, but we'll take it.

Within hours of taking the oath of office, I declared a national emergency on our southern border — (applause) — and I deployed the U.S. military and Border Patrol to repel the invasion of our country.  And what a job they've done.

As a result, illegal border crossings last month were, by far, the lowest ever recorded.  Ever.  (Applause.)  They heard my words, and they chose not to come.  Much easier that way.

In comparison, under Joe Biden, the worst president in American history — (applause) — there were hundreds of thousands of illegal crossings a month, and virtually all of them, including murderers, drug dealers, gang members, and people from mental institutions and insane asylums, were released into our country.  Who would want to do that?

This is my fifth such speech to Congress, and, once again, I look at the Democrats in front of me, and I realize there is absolutely nothing I can say to make them happy or to make them stand or smile or applaud.  Nothing I can do.  I could find a cure to the most devastating disease — a disease that would wipe out entire nations, or announce the answers to the greatest economy in history or the stoppage of crime to the lowest levels ever recorded, and these people sitting right here will not clap, will not stand, and certainly will not cheer for these astronomical achievements.  They won't do it no matter what.

Five times I've been up here.  It's very sad, and it just shouldn't be this way.  (Applause.)

So, Democrats sitting before me, for just this one night, why not join us in celebrating so many incredible wins for America?  For the good of our nation, let's work together and let's truly make America great again.  (Applause.)

Every day, my administration is fighting to deliver the change America needs, to bring a future that America deserves, and we're doing it.  This is a time for big dreams and bold action.

Upon taking office, I imposed an immediate freeze on all federal hiring, a freeze on all new federal regulations, and a freeze on all foreign aid.  (Applause.)  I terminated the ridiculous Green New Scam.  I withdrew from the unfair Paris Climate Accord, which was costing us trillions of dollars that other countries were not paying.  (Applause.)  I withdrew from the corrupt World Health Organization.  (Applause.)  And I also withdrew from the anti-American U.N. Human Rights Council.  (Applause.)

We ended all of Biden's environmental restrictions that were making our country far less safe and totally unaffordable.  And importantly, we ended the last administration's insane electric vehicle mandate, saving our autoworkers and companies from economic destruction.  (Applause.)

To unshackle our economy, I have directed that for every 1 new regulation, 10 old regulations must be eliminated, just like I did in my very successful first term.  (Applause.)  And in that first term, we set records on ending unnecessary rules and regulations like no other president had done before.

We ordered all federal workers to return to the office.  They will either show up for work in person or be removed from their job.  (Applause.)

And we have ended weaponized government, where, as an example, a sitting president is allowed to viciously prosecute his political opponent, like me. How did that work out? (Laughter.) Not too good. (Applause.) Not too good.

And I have stopped all government censorship and brought back free speech in America. It's back. (Applause.)

And two days ago, I signed an order making English the official language of the United States of America. (Applause.)

I renamed the Gulf of Mexico the Gulf of America. (Applause.)

And, likewise, I renamed — for a great president, William McKinley — Mount McKinley again. (Applause.) Beautiful Alaska. We love Alaska.

We've ended the tyranny of so-called diversity, equity, and inclusion policies all across the entire federal government and, indeed, the private sector and our military. (Applause.) And our country will be woke no longer. (Applause.)

We believe that whether you are a doctor, an accountant, a lawyer, or an air traffic controller, you should be hired and promoted based on skill and competence, not race or gender. Very important. (Applause.) You should be hired based on merit. And the Supreme Court, in a brave and very powerful decision, has allowed us to do so.

Thank you. Thank you very much. Thank you. (Applause.)

We have removed the poison of critical race theory from our public schools. And I signed an order making it the official policy of the United States government that there are only two genders: male and female. (Applause.)

I also signed an executive order to ban men from playing in women's sports. (Applause.)

Three years ago, Payton McNabb was an all-star high school athlete — one of the best — preparing for a future in college sports. But when her girls' volleyball match was invaded by a male, he smashed the ball so hard in Payton's face, causing traumatic brain injury, partially paralyzing her right side, and ending her athletic career. It was a shot like she's never seen before. She's never seen anything like it. Payton is here tonight in the gallery. And, Payton, from now on, schools will kick the men off the girls' team or they will lose all federal funding. (Applause.)

And if you really want to see numbers, just take a look at what happened in the woman's boxing, weightlifting, track and field, swimming, or cycling, where a male recently finished a long-distance race five hours and 14 minutes ahead of a woman for a new record by five hours.  Broke the record by five hours.

It's demeaning for women, and it's very bad for our country.  We're not going to put up with it any longer.  (Applause.)

What I have just described is only a small fraction of the commonsense revolution that is now, because of us, sweeping the entire world.  Common sense has become a common theme, and we will never go back.  Never.  Never going to let that happen.  (Applause.)

Among my very highest priorities is to rescue our economy and get dramatic and immediate relief to working families.  As you know, we inherited from the last administration an economic catastrophe and an inflation nightmare.  Their policies drove up energy prices, pushed up grocery costs, and drove the necessities of life out of reach for millions and millions of Americans.  They've never had anything like it.  We suffered the worst inflation in 48 years but perhaps even in the history of our country. They're not sure.  As president, I'm fighting every day to reverse this damage and make America affordable again.  (Applause.)

Joe Biden especially let the price of eggs get out of control.

AUDIENCE:  Booo —

THE PRESIDENT:  The egg price is out of control, and we're working hard to get it back down.

Secretary, do a good job on that.  You inherited a total mess from the previous administration.  Do a good job.  (Applause.)

A major focus of our fight to defeat inflation is rapidly reducing the cost of energy.  The previous administration cut the number of new oil and gas leases by 95 percent, slowed pipeline construction to a halt, and closed more than 100 power plants.  We are opening up many of those power plants right now.  (Applause.)

And, frankly, we have never seen anything like it.  That's why, on my first day in office, I declared a national energy emergency.  (Applause.)  As you've heard me say many times, we have more liquid gold under our feet than any nation on Earth and by far.

And now I've fully authorized the most talented team ever assembled to go and get it. It's called drill, baby, drill. (Applause.)

My administration is also working on a gigantic natural gas pipeline in Alaska — among the largest in the world — where Japan, South Korea, and other nations want to be our partner with investments of trillions of dollars each. There's never been anything like that one. It will be truly spectacular. It's all set to go. The permitting is gotten.

And later this week, I will also take historic action to dramatically expand production of critical minerals and rare earths here in the USA. (Applause.)

To further combat inflation, we will not only be reducing the cost of energy, but we'll be ending the flagrant waste of taxpayer dollars. (Applause.) And to that end, I have created the brand-new Department of Government Efficiency – DOGE. (Applause.) Perhaps you've heard of it — perhaps — which is headed by Elon Musk, who is in the gallery tonight. (Applause.)

Thank you, Elon. He's working very hard. He didn't need this. (Laughs.) He didn't need this. Thank you very much. We appreciate it. Everybody here, even this side, appreciates it, I believe. (Applause.) They just don't want to admit that.

Just listen to some of the appalling waste we have already identified.

$22 billion from HHS to provide free housing and cars for illegal aliens.

$45 million for diversity, equity, and inclusion scholarships in Burma.

$40 million to improve the social and economic inclusion of sedentary migrants. Nobody knows what that is. (Laughter.)

$8 million to promote LGBTQI+ in the African nation of Lesotho, which nobody has ever heard of. (Laughter.)

$60 million for Indigenous peoples and Afro-Colombian empowerment in Central America. $60 million.

$8 million for making mice transgender. (Laughter.) This is real.

$32 million for a left-wing propaganda operation in Moldova.

$10 million for male circumcision in Mozambique.

$20 million for the Arab "Sesame Street" in the Middle East. It's a program. $20 million for a program.

$1.9 billion to recently created decarbonization of homes committee, headed up — and we know she's involved — just at the last moment, the money was passed over — by a woman named Stacey Abrams. Have you ever heard of her?

AUDIENCE: Booo —

THE PRESIDENT: A $3.5 million consulting contract for lavish fish monitoring.

$1.5 million for voter confidence in Liberia.

$14 million for social cohesion in Mali.

$59 million for illegal alien hotel rooms in New York City.

AUDIENCE: Booo —

THE PRESIDENT: He's a real estate developer. He's done very well.

$250,000 to increase vegan local climate action innovation in Zambia.

$42 million for social and behavior change in Uganda.

$14 million for improving public procurement in Serbia.

$47 million for improving learning outcomes in Asia. Asia is doing very well with learning. (Laughter.) Don't know what we're doing. We should use it ourselves. And $101 million for DEI contracts at the Department of Education, the most ever paid. Nothing even like it.

Under the Trump administration, all of these scams — and there are far worse, but I didn't think it was appropriate to talk about them. They're so bad. Many more have been found out and exposed and swiftly terminated by a group of very intelligent, mostly young people, headed up by Elon. And we appreciate it. We've found hundreds of billions of dollars of fraud. (Applause.)

And we've taken back the money and reduced our debt to fight inflation and other things. Taken back a lot of that money. We got it just in time.

AUDIENCE MEMBERS: (Inaudible.)

THE PRESIDENT: This is just the beginning. The Government Accountability Office, a federal government office, has estimated annual fraud of over $500 billion in our nation, and we are working very hard to stop it. We're going to.

We're also identifying shocking levels of incompetence and probable fraud in the Social Security program for our seniors and that our seniors and people that we love rely on. Believe it or not, government databases list 4.7 million Social Security members from people aged 100 to 109 years old.

THE PRESIDENT:  It lists 3.6 million people from ages 110 to 119.  I don't know any of them.  I know some people that are rather elderly, but not quite that elderly.  (Laughter.)

3.47 million people from ages 120 to 129.

3.9 million people from ages 130 to 139.

3.5 million people from ages 140 to 149.

And money is being paid to many of them, and we're searching right now.

In fact, Pam, good luck.  Good luck.  You're going to find it.

But a lot of money is paid out to people because it just keeps getting paid and paid, and nobody does — and it really hurts Social Security and hurts our country.

1.3 million people from ages 150 to 159.  And over 130,000 people, according to the Social Security databases, are age over 160 years old.

We have a healthier country than I thought, Bobby.  (Laughter and applause.)

Including, to finish, 1,039 people between the ages of 220 and 229; one person between the age of 240 and 249; and one person is listed at 360 years of age.

AUDIENCE MEMBER: Joe Biden!  (Laughter.)

THE PRESIDENT: More than 100 years older than our country.

But we're going to find out where that money is going, and it's not going to be pretty.  By slashing all of the fraud, waste, and theft we can find, we will defeat inflation, bring down mortgage rates, lower car payments and grocery prices, protect our seniors, and put more money in the pockets of American families.  (Applause.)

And today, interest rates took a beautiful drop — big, beautiful drop.  It's about time.  And in the near future, I want to do what has not been done in 24 years: balance the federal budget.  We're going to balance it.  (Applause.)

With that goal in mind, we have developed in great detail what we are calling the gold card, which goes on sale very, very soon.

For $5 million, we will allow the most successful, job-creating people from all over the world to buy a path to U.S. citizenship.  It's like the green card but better and more sophisticated.  (Laughter.)  And these people will have to pay tax in our country.  They won't have to pay tax from where they came.  The money that they've made, you wouldn't want to do that, but they have to pay tax, create jobs.

They'll also be taking people out of colleges and paying for them so that we can keep them in our country, instead of having them being forced out.  Number one at the top school, as an example, being forced out and not being allowed to stay and create tremendous numbers of jobs and great success for a company out there.

So, while we take out the criminals, killers, traffickers, and child predators who were allowed to enter our country under the open border policy of these people — the Democrats, the Biden administration — the open border, insane policies that you've allowed to destroy our country — we will now bring in brilliant, hardworking, job-creating people.  They're going to pay a lot of money, and we're going to reduce our debt with that money.  (Applause.)

Americans have given us a mandate for bold and profound change.  For nearly 100 years, the federal bureaucracy has grown until it has crushed our freedoms, ballooned our deficits, and held back America's potential in every possible way.  The nation founded by pioneers and risk-takers now drowns under millions and millions of pages of regulations and debt.

Approvals that should take 10 days to get instead take 10 years, 15 years, and even 20 years before you're rejected.  Meanwhile, we have hundreds of thousands of federal workers who have not been showing up to work.

My administration will reclaim power from this unaccountable bureaucracy, and we will restore true democracy to America again. (Applause.)  Any federal bureaucrat who resists this change will be removed from office immediately — (applause) — because we are draining the swamp.  It's very simple.  And the days of rule by unelected bureaucrats are over.  (Applause.)

And the next phase of our plan to deliver the greatest economy in history is for this Congress to pass tax cuts for everybody.  They're in there.  They're waiting for you to vote.  (Applause.)

And I'm sure that the people on my right — I don't mean the Republican right, but my right right here — I'm sure you're going to vote for those tax cuts, because, otherwise, I don't believe the people will ever vote you into office.  So, I'm doing you a big favor by telling you that.  (Applause.)

But I know this group is going to be voting for the taxes.  (Applause.)

3/31/25, 5:09 PM
Case 1:25-cv-00716-BAH   Document 39-4   Filed 04/02/25   Page 104 of 734
Remarks by President Trump in Joint Address to Congress – The White House

Thank you. It's a very, very big part of our plan. We had tremendous success in our first term with it. A very big part of our plan. We're seeking permanent income tax cuts all across the board.

And to get urgently needed relief to Americans hit especially hard by inflation, I'm calling for no tax on tips, no tax on overtime, and no tax on Social Security benefits for our great seniors. (Applause.)

(Addressing Speaker Johnson.) Good luck.

And I also want to make interest payments on car loans tax deductible but only if the car is made in America. (Applause.)

And, by the way, we're going to have growth in the auto industry like nobody has ever seen. Plants are opening up all over the place. Deals are being made. Never seen. That's a combination of the election win and tariffs.

It's a beautiful word, isn't it?

That, along with our other policies, will allow our auto industry to absolutely boom. It's going to boom. Spoke to the majors today — all three — the top people, and they're so excited. In fact, already, numerous car companies have announced that they will be building massive automobile plants in America, with Honda just announcing a new plant in Indiana, one of the largest anywhere in the world. (Applause.)

And this has taken place since our great victory on November 5th, a date which will hopefully go down as one of the most important in the history of our country. (Applause.)

In addition, as part of our tax cuts, we want to cut taxes on domestic production and all manufacturing. And just as we did before, we will provide 100 percent expensing. It will be retroactive to January 20th, 2025, and it was one of the main reasons why our tax cuts were so successful in our first term, giving us the most successful economy in the history of our country. First term — we had a great first term. (Applause.)

If you don't make your product in America, however, under the Trump administration, you will pay a tariff and, in some cases, a rather large one. Other countries have used tariffs against us for decades, and now it's our turn to start using them against those other countries.

On average, the European Union, China, Brazil, India, Mexico, and Canada — have you heard of them? — and countless other nations charge us tremendously higher tariffs than we charge them.  It's very unfair.  India charges us auto tariffs higher than 100 percent.  China's average tariff on our products is twice what we charge them.  And South Korea's average tariff is four times higher.  Think of that: four times higher.  And we give so much help militarily and in so many other ways to South Korea, but that's what happens.

This is happening by friend and foe.  This system is not fair to the United States and never was.  And so, on April 2nd — I wanted to make it April 1st, but I didn't want to be accused of April Fool's Day.  (Laughter.)  Just one day, which cost us a lot of money.  (Laughter.)  But we're going to do it in April. I'm a very superstitious person. April 2nd, reciprocal tariffs kick in.  And whatever they tariff us — other countries — we will tariff them.  That's reciprocal, back and forth.  (Applause.)  Whatever they tax us, we will tax them.

If they do non-monetary tariffs to keep us out of their market, then we will do non-monetary barriers to keep them out of our market.  There's a lot of that too.  They don't even allow us in their market.

We will take in trillions and trillions of dollars and create jobs like we have never seen before.  I did it with China, and I did it with others.  And the Biden administration couldn't do anything about it because it was so much money.  They couldn't do anything about it.

We have been ripped off for decades by nearly every country on Earth, and we will not let that happen any longer.  (Applause.)

Much has been said over the last three months about Mexico and Canada, but we have very large deficits with both of them.  But even more importantly, they have allowed fentanyl to come into our country at levels never seen before, killing hundreds of thousands of our citizens and many very young, beautiful people — destroying families.  Nobody has ever seen anything like it.

They are, in effect, receiving subsidies of hundreds of billions of dollars.  We pay subsidies to Canada and to Mexico of hundreds of billions of dollars.  And the United States will not be doing that any longer.  We're not going to do it any longer.  (Applause.)

Thanks to our America First policies we're putting into place, we have had $1.7 trillion of new investment in America in just the past few weeks. (Applause.) The combination of the election and our economic policies — the people of SoftBank, one of the most brilliant anywhere in the world, announced a $200 billion investment. OpenAI and Oracle — Larry Ellison — announced $500 billion investment, which they wouldn't have done if Kamala had won. (Applause.)

Apple announced $500 billion investment. Tim Cook called me. He said, "I cannot spend it fast enough." It's going to be much higher than that, I believe. They'll be building their plants here, instead of in China.

And just yesterday, Taiwan Semiconductor — the biggest in the world, most powerful in the world, has a tremendous amount — 97 percent of the market, announced a $165 billion investment to build the most powerful chips on Earth right here in the USA. (Applause.)

And we're not giving them any money. Your CHIPS Act is a horrible, horrible thing. We give hundreds of billions of dollars, and it doesn't mean a thing. They take our money, and they don't spend it. All that meant to them — we're giving them no money. All that was important to them was they didn't want to pay the tariffs, so they came and they're building. And many other companies are coming.

We don't have to give them money. We just want to protect our businesses and our people. And they will come because they won't have to pay tariffs if they build in America. And so, it's very amazing.

You should get rid of the CHIP Act. And whatever is left over, Mr. Speaker, you should use it to reduce debt or any other reason you want to. (Applause.)

Our new trade policy will also be great for the American farmer — I love the farmer — (applause) — who will now be selling into our home market, the USA, because nobody is going to be able to compete with you. Because those goods that come in from other countries and companies, they're really, really in a bad position in so many different ways. They're uninspected. They may be very dirty and disgusting, and they come in and they pour in, and they hurt our American farmers.

The tariffs will go on agricultural product coming into America. And our farmers, starting on April 2nd — it may be a little bit of an adjustment period. We had that before, when I made the deal with China. Fifty billion dollars of purchases, and I said,

"Just bear with me," and they did.  They did.  Probably have to bear with me again, and this will be even better.

That was great.  The problem with it was that Biden didn't enforce it.  He didn't enforce it.  Fifty billion dollars of purchases, and we were doing great, but Biden did not enforce it.  And it hurt our farmers, but our farmers are going to have a field day right now.

So, to our farmers, have a lot of fun.  I love you too.  I love you too.  (Applause.)  It's all going to happen.

And I have also imposed a 25 percent tariff on foreign aluminum, copper, lumber, and steel, because if we don't have, as an example, steel and lots of other things, we don't have a military and, frankly, we just won't have a country very long.

Here today is a proud American steelworker, fantastic person from Decatur, Alabama.  Jeff Denard has been working at the same steel plant for 27 years in a job that has allowed him to serve as the captain of his local volunteer fire department; raise seven children with his beautiful wife, Nicole; and over the years, provide a loving home for more than 40 foster children.  So great, Jeff.  (Applause.)

Thank you, Jeff.  Thank you, Jeff.  (Applause.)

Stories like Jeff's remind us that tariffs are not just about protecting American jobs.  They're about protecting the soul of our country.  Tariffs are about making America rich again and making America great again.  And it's happening, and it will happen rather quickly.

There will be a little disturbance, but we're okay with that.  It won't be much.

AUDIENCE MEMBER:  No, we're not!

THE PRESIDENT:  No, you're not.  Oh.  (Laughter.)

And look — and look where Biden took us.  Very low.  The lowest we've ever been.  Jeff, I want to thank you very much.

And I also want to recognize another person who has devoted herself to foster care community.  She worked so hard on it.  A very loving person.  Our magnificent first lady of the United States.  (Applause.)

Melania's work has yielded incredible results, helping prepare our nation's future leaders as they enter the workforce.

Our first lady is joined by two impressive young women — very impressive: Haley Ferguson, who benefited from the first lady's Fostering the Future initiative and is poised to complete her education and become a teacher, and Elliston Berry, who became a victim of an illicit deepfake image produced by a peer.  With Elliston's help, the Senate just passed the Take It Down Act —

This is so important.  Thank you very much, John.  John Thune, thank you. (Applause.)  Stand up, John.  Thank you, John.  (Applause.)  Thank you all very much.  Thank you.

And thank you to John Thune and the Senate.  A great job.

— to criminalize the publication of such images online.  This terrible, terrible thing. And once it passes the House, I look forward to signing that bill into law.  Thank you. And I'm going to use that bill for myself too, if you don't mind — (laughter) — because nobody gets treated worse than I do online.  Nobody.  (Laughter.)

That's great.  Thank you very much to the Senate.  Thank you.

But if we truly care about protecting America's children, no step is more crucial than securing America's borders.  Over the past four years, 21 million people poured into the United States.  Many of them were murderers, human traffickers, gang members, and other criminals from the streets of dangerous cities all throughout the world. Because of Joe Biden's insane and very dangerous open border policies, they are now strongly embedded in our country, but we are getting them out and getting them out fast.  (Applause.)

And I want to thank Tom Homan.  And, Kristi, I want to thank you.  And Paul of Border Patrol, I want to thank you.  What a job they've all done.  Everybody.  Border Patrol, ICE.  Law enforcement, in general, is incredible.  We have to take care of our law enforcement.  (Applause.)  We have to.

Last year, a brilliant 22-year-old nursing student named Laken Riley — the best in her class, admired by everybody — went out for a jog on the campus of the University of Georgia.  That morning, Laken was viciously attacked, assaulted, beaten, brutalized, and horrifically murdered.  Laken was stolen from us by a savage illegal alien gang member who was arrested while trespassing across Biden's open southern border and then set loose into the United States under the heartless policies of that failed administration.  It was indeed a failed administration.

He had then been arrested and released in a Democrat-run sanctuary city — a disaster — before ending the life of this beautiful young angel.

With us this evening are Laken's beloved mother, Allyson, and her sister, Lauren. (Applause.)

Last year, I told Laken's grieving parents that we would ensure their daughter would not have died in vain. That's why the very first bill I signed into law as your 47th president mandates the detention of all dangerous criminal aliens who threaten public safety. It's a very strong, powerful act. (Applause.) It's called the Laken Riley Act. (Applause.)

So, Allyson and Lauren, America will never, ever forget our beautiful Laken Hope Riley. (Applause.)

Thank you very much.

Since taking office, my administration has launched the most sweeping border and immigration crackdown in American history, and we quickly achieved the lowest numbers of illegal border crossers ever recorded. Thank you. (Applause.)

The media and our friends in the Democrat Party kept saying we needed new legislation. "We must have legislation to secure the border." But it turned out that all we really needed was a new president. (Applause.)

AUDIENCE: Trump! Trump! Trump!

THE PRESIDENT: Thank you.

Joe Biden didn't just open our borders. He flew illegal aliens over them to overwhelm our schools, hospitals, and communities throughout the country. Entire towns, like Aurora, Colorado, and Springfield, Ohio, buckled under the weight of the migrant occupation and corruption like nobody has ever seen before. Beautiful towns destroyed.

Now, just as I promised in my Inaugural Address, we are achieving the great liberation of America. (Applause.)

But there still is much work to be done.

Here tonight is a woman I have gotten to know: Alexis Nungaray from Houston. Wonderful woman. Last June, Alexis's 12-year-old daughter, her precious Jocelyn, walked to a nearby convenience store. She was kidnapped, tied up, assaulted for two hours under a bridge, and horrifically murdered. Arrested and charged with this

heinous crime are two illegal alien monsters from Venezuela, released into America by the last administration through their ridiculous open border.

The death of this beautiful 12-year-old girl and the agony of her mother and family touched our entire nation greatly.

Alexis, I promised that we would always remember your daughter — your magnificent daughter.  And earlier tonight, I signed an order keeping my word to you.

One thing I have learned about Jocelyn is that she loved animals so much.  She loved nature.  Across Galveston Bay from where Jocelyn lived in Houston, you will find a magnificent national wildlife refuge. A pristine, peaceful, 34,000-acre sanctuary for all of God's creatures on the edge of the Gulf of America.

Alexis, moments ago, I formally renamed that refuge in loving memory of your beautiful daughter, Jocelyn.

So, Mr. Vice President, if you would, may I have the order?  (Applause.)

(The president holds up the executive order.)

Thank you very much.

All three savages charged with Jocelyn and Laken's murders were members of the Venezuelan prison gang — the toughest gang, they say, in the world — known as Tren de Aragua.  Two weeks ago, I officially designated this gang, along with MS-13 and the bloodthirsty Mexican drug cartels, as foreign terrorist organizations.  (Applause.)

They are now officially in the same category as ISIS, and that's not good for them. Countless thousands of these terrorists were welcomed into the U.S. by the Biden administration, but now every last one will be rounded up and forcibly removed from our country, or, if they're too dangerous, put in jails, standing trial in this country, because we don't want them to come back ever.

With us this evening is a warrior on the front lines of that battle, Border Patrol agent Roberto Ortiz.  Great guy.  (Applause.)

In January, Roberto and another agent were patrolling by the Rio Grande, near an area known as Cartel Island — doesn't sound too nice to me — when heavily armed gunmen started shooting at them.  Roberto saw that his partner was totally exposed, in great danger, and he leapt into action, returning fire and providing crucial seconds for his fellow agent to seek safety, and just barely.  I have some of the prints of that event, and it was not good.

Agent Ortiz, we salute you for your great courage and for your line of fire that you took and for the bravery that you showed.  We honor you, and we will always honor you.  Thank you, Roberto, very much.  (Applause.)  Thank you, Roberto.

And I actually got to know him on my many calls to the border.  He's a great, great gentleman.

The territory to the immediate south of our border is now dominated entirely by criminal cartels that murder, rape, torture, and exercise total control — they have total control over a whole nation — posing a grave threat to our national security.  The cartels are waging war in America, and it's time for America to wage war on the cartels, which we are doing.  (Applause.)

Five nights ago, Mexican authorities, because of our tariff policies being imposed on them — think of this — handed over to us 29 of the biggest cartel leaders in their country.  That has never happened before.  They want to make us happy.  (Applause.)  First time ever.

But we need Mexico and Canada to do much more than they've done, and they have to stop the fentanyl and drugs pouring into the USA.  They're going to stop it.

I have sent Congress a detailed funding request laying out exactly how we will eliminate these threats to protect our homeland and complete the largest deportation operation in American history, larger even than current record holder, President Dwight D. Eisenhower, a moderate man but someone who believed very strongly in borders.  Americans expect Congress to send me this funding without delay so I can sign it into law.

So, Mr. Speaker, John Thune, both of you, I hope you're going to be able to do that.  Mr. Speaker, thank you.  Mr. Leader, thank you.  Thank you very much.  And let's get it to me.  I'll sign it so fast, you won't even believe it.  (Applause.)

And as we reclaim our sovereignty, we must also bring back law and order to our cities and towns.  (Applause.)  In recent years, our justice system has been turned upside down by radical-left lunatics.  Many jurisdictions virtually ceased enforcing the law against dangerous repeat offenders while weaponizing law enforcement against political opponents like me.

My administration has acted swiftly and decisively to restore fair, equal, and impartial justice under the constitutional rule of law, starting at the FBI and the DOJ.

Pam, good luck.  Kash, wherever you may be, good luck.  (Applause.)  Good luck.  Pam Bondi, good luck.  So important.  Going to do a great job.  (Applause.)

Kash, thank you.  Thank you, Kash.  (Applause.)

They have already started very strong.  They're going to do a fantastic job.  You're going to be very proud of them.

We're also, once again, giving our police officers the support, protection, and respect they so dearly deserve.  They have to get it.  They have such a hard, dangerous job, but we're going to make it less dangerous.  The problem is the bad guys don't respect the law, but they're starting to respect it, and they soon will respect it.

(Cross-talk.)

This also includes our great fire departments throughout the country.  Our firemen and women are unbelievable people, and I will never forget them.  And besides that, they voted for me in record numbers, so I have no choice.  (Applause.)

One year ago this month, 31-year-old New York police officer Jonathan Diller — unbelievably wonderful person and a great officer — was gunned down at a traffic stop on Long Island.  I went to his funeral.  The vicious criminal charged with his murder had 21 prior arrests, and they were rough arrests too.  He was a real bad one.  The thug in the seat next to him had 14 prior arrests and went by the name of "Killer."  He was Killer.  He killed other people.  They say a lot of them.

I attended Officer Diller's service, and when I met his wife and one-year-old son, Ryan, it was very inspirational, actually.  His widow's name is Stephanie, and she is here tonight.  Stephanie, thank you very much, Stephanie.  Thank you very much.  (Applause.)

Stephanie, we're going to make sure that Ryan knows his dad was a true hero — New York's Finest.  And we're going to get these cold-blooded killers and repeat offenders off our streets, and we're going to do it fast.  Got to stop it.

They get out with 28 arrests.  They push people into subway trains.  They hit people over the back of the head with baseball bats.  We got to get them out of here.

I've already signed an executive order requiring a mandatory death penalty for anyone who murders a police officer.  And, tonight, I'm asking Congress to pass that policy into permanent law.  (Applause.)

3/31/25, 5:09 PM
Case 1:25-cv-00716-BAH   Document 39-4   Filed 04/02/25   Page 113 of 734
Remarks by President Trump in Joint Address to Congress – The White House

I'm also asking for a new crime bill, getting tough on repeat offenders while enhancing protections for America's police officers so they can do their jobs without fear of their lives being totally destroyed.  They don't want to be killed.  We're not going to let them be killed.

Joining us in the gallery tonight is a young man who truly loves our police.  His name is D.J. Daniel.  He is 13 years old, and he has always dreamed of becoming a police officer.  (Applause.)

But in 2018, D.J. was diagnosed with brain cancer.  The doctors gave him five months at most to live.  That was more than six years ago.  (Applause.)

Since that time, D.J. and his dad have been on a quest to make his dream come true, and D.J. has been sworn in as an honorary law enforcement officer, actually, a number of times.  Pec- — the police love him.  The police departments love him.

And tonight, D.J., we're going to do you the biggest honor of them all.  I am asking our new Secret Service director, Sean Curran, to officially make you an agent of the United States Secret Service.  (Applause.)

(Director Curran presents Mr. Daniel with a Secret Service Agent credential.)

AUDIENCE:  D.J.!  D.J.!  D.J.!

THE PRESIDENT:  Thank you, D.J.

D.J.'s doctors believe his cancer likely came from a chemical he was exposed to when he was younger.  Since 1975, rates of child cancer have increased by more than 40 percent.  Reversing this trend is one of the top priorities for our new presidential commission to make America healthy again, chaired by our new secretary of Health and Human Services, Robert F. Kennedy, Jr.  (Applause.)

AUDIENCE MEMBER:  MAHA, baby!

THE PRESIDENT:  With the name "Kennedy," you would have thought everybody over here would have been cheering.  (Laughter.)  How quickly they forget.

Our goal is to get toxins out of our environment, poisons out of our food supply, and keep our children healthy and strong.

As an example, not long ago — you can't even believe these numbers — 1 in 10,000 children had autism. 1 in 10,000.  And now it's 1 in 36.  There's something wrong.  One in 36.  Think of that.

So, we're going to find out what it is, and there's nobody better than Bobby and all of the people that are working with you — you have the best — to figure out what is going on.

Okay, Bobby?  Good luck.  It's a very important job.  Thank you.  (Applause.)  Thank you.  Thank you.

My administration is also working to protect our children from toxic ideologies in our schools.

A few years ago, January Littlejohn and her husband discovered that their daughter's school had secretly socially transitioned their 13-year-old little girl.  Teachers and administrators conspired to deceive January and her husband, while encouraging her daughter to use a new name and pronouns — "they/them" pronouns, actually — all without telling January, who is here tonight and is now a courageous advocate against this form of child abuse.  January, thank you.  Thank you.  Thank you very much.  (Applause.)  Thank you.  Thank you.

Stories like this are why, shortly after taking office, I signed an executive order banning public schools from indoctrinating our children with transgender ideology.  (Applause.)

I also signed an order to cut off all taxpayer funding to any institution that engages in the sexual mutilation of our youth.  (Applause.)  And now I want Congress to pass a bill permanently banning and criminalizing sex changes on children and forever ending the lie that any child is trapped in the wrong body.  This is a big lie.  (Applause.)  And our message to every child in America is that you are perfect exactly the way God made you.  (Applause.)

Because we're getting wokeness out of our schools and out of our military, and it's already out, and it's out of our society.  We don't want it.  Wokeness is trouble.  Wokeness is bad.  It's gone.  It's gone.  And we feel so much better for it, don't we?  Don't we feel better?  (Applause.)

Our service members won't be activists and ideologues.  They will be fighters and warriors.  They will fight for our country.

And, Pete, congratulations. Secretary of Defense, congratulations. (Applause.)

And he's not big into the woke movement, I can tell you. (Laughter.) I know him well.

I am pleased to report that, in January, the U.S. Army had its single best recruiting month in 15 years and that all armed services are having among the best recruiting results ever in the history of our services. (Applause.) What a difference.

And you know it was just a few months ago where the results were exactly the opposite. We couldn't recruit anywhere. We couldn't recruit. Now we're having the best results, just about, that we've ever had. What a tremendous turnaround. It's really a beautiful thing to see. People love our country again. It's very simple. They love our country, and they love being in our military again. So, it's a great thing. And thank you very much. Great job. Thank you. (Applause.)

We're joined tonight by a young man, Jason Hartley, who knows the weight of that call of duty. Jason's father, grandfather, and great-grandfather all wore the uniform.

Jason tragically lost his dad, who was also a Los Angeles County sheriff's deputy, when he was just a boy, and now he wants to carry on the family legacy of service. Jason is a senior in high school, a six-letter varsity athlete — a really good athlete, they say — a brilliant student, with a 4.46 — that's good — GPA. (Laughter.) And his greatest dream is to attend the U.S. Military Academy at West Point. (Applause.)

And, Jason, that's a very big deal getting in. That's a hard one to get into. But I'm pleased to inform you that your application has been accepted. You will soon be joining the Corps of Cadets. (Applause.)

Thank you. Jason, you're going to be on the Long Gray Line, Jason.

As commander in chief, my focus is on building the most powerful military of the future.  As a first step, I'm asking Congress to fund a state-of-the-art Golden Dome missile defense shield to protect our homeland, all made in the USA.  (Applause.)

And Ronald Reagan wanted to do it long ago, but the technology just wasn't there, not even close.  But now we have the technology.  It's incredible, actually.  And other places, they have it: Israel has it.  Other places have it.  And the United States should have it too.  Right, Tim?  Right?  (Applause.)  They should have it too.  So, I want to thank you.

But it's a very important.  This is a very dangerous world.  We should have it.  We want to be protected.  And we're going to protect our citizens like never before.

To boost our defense industrial base, we are also going to resurrect the American shipbuilding industry, including commercial shipbuilding and military shipbuilding.  (Applause.)

And for that purpose, I am announcing tonight that we will create a new Office of Shipbuilding in the White House and offer special tax incentives to bring this industry home to America, where it belongs.

We used to make so many ships.  We don't make them anymore very much, but we're going to make them very fast, very soon.  It will have a huge impact.

To further enhance our national security, my administration will be reclaiming the Panama Canal, and we've already started doing it.  (Applause.)

Just today, a large American company announced they are buying both ports around the Panama Canal and lots of other things having to do with the Panama Canal and a couple of other canals.

The Panama Canal was built by Americans for Americans, not for others, but others

could use it.  But it was built at tremendous cost of American blood and treasure.  Thirty-eight thousand workers died building the Panama Canal.  They died of malaria.  They died of snake bites and mosquitoes.  Not a nice place to work.  They paid them very highly to go there, knowing there was a 25 percent chance that they would die.  The most expensive project, also, that was ever built in our country's history, if you bring it up to modern-day costs.

It was given away by the Carter administration for $1, but that agreement has been violated very severely.  We didn't give it to China.  We gave it to Panama, and we're taking it back.  (Applause.)

And we have Marco Rubio in charge.  Good luck, Marco.  (Laughter and applause.)  Now we know who to blame if anything goes wrong.  (Laughter.)
No, Marco has been amazing, and he's going to do a great job.  Think of it.  He got a hundred votes.  (Applause.)  You know, he was approved with, actually, 99, but the 100th was this gentleman, and I feel very certain — so, let's assume he got 100 votes.  And I'm either very, very happy about that or I'm very concerned about it.  (Laughter.)

But he's already proven — I mean, he's a great gentleman.  He's respected by everybody.  And we appreciate you voting for Marco.  He's going to do a fantastic job.  Thank you.  (Applause.)  Thank you.  He's doing a great job.  Great job.

And I also have a message tonight for the incredible people of Greenland.  (Laughter.)  We strongly support your right to determine your own future, and, if you choose, we welcome you into the United States of America.

We need Greenland for national security and even international security, and we're working with everybody involved to try and get it.  But we need it, really, for international world security.  And I think we're going to get it.  One way or the other, we're going to get it.

We will keep you safe.  We will make you rich.  And together, we will take Greenland to heights like you have never thought possible before.

It's a very small population but very, very large piece of land and very, very important for military security.

America is once again standing strong against the forces of radical Islamic terrorism.

Three and a half years ago, ISIS terrorists killed 13 American service members and countless others in the Abbey Gate bombing during the disastrous and incompetent withdrawal from Afghanistan — not that they were withdrawing; it was the way they withdrew.  Perhaps the most embarrassing moment in the history of our country.

Tonight, I am pleased to announce that we have just apprehended the top terrorist responsible for that atrocity, and he is right now on his way here to face the swift sword of American justice.  (Applause.)

And I want to thank, especially, the government of Pakistan for helping arrest this monster.

This was a very momentous day for those 13 families, who I actually got to know very well, most of them, whose children were murdered, and the many people that were so badly — over 42 people — so badly injured on that fateful day in Afghanistan.  What a horrible day.  Such incompetence was shown that when Putin saw what happened, I guess he said, "Wow, maybe this is my chance."  That's how bad it was.  Should have never happened.  Grossly incompetent people.

I spoke to many of the parents and loved ones, and they're all in our hearts tonight.  Just spoke to them on the phone.  We had a big call.  Every one of them called, and everybody was on the line, and they did nothing but cry with happiness.  They were very happy — as happy as you can be under those circumstances.  Their child,

brother, sister, son, daughter was killed for no reason whatsoever.

In the Middle East, we're bringing back our hostages from Gaza. In my first term, we achieved one of the most groundbreaking peace agreements in generations: the Abraham Accords. (Applause.)
And now we're going to build on that foundation to create a more peaceful and prosperous future for the entire region. A lot of things are happening in the Middle East. People haven't been talking about that so much lately with everything going on with Ukraine and Russia, but a lot of things are happening in the Middle East. It's a rough neighborhood, actually.

I'm also working tirelessly to end the savage conflict in Ukraine. Millions of Ukrainians and Russians have been needlessly killed or wounded in this horrific and brutal conflict with no end in sight.

The United States has sent hundreds of billions of dollars to support Ukraine's defense with no security, with no anything. (Applause.)

Do you want to keep it going for another five years?

SENATOR WARREN: Yes!

THE PRESIDENT: Yeah. Yeah, you would say — Pocahontas says, "Yes." (Laughter.)

AUDIENCE MEMBERS: Booo —

THE PRESIDENT: Two thousand people are being killed every single week — more than that. They're Russian young people. They're Ukrainian young people. They're not Americans. But I want it to stop.

Meanwhile, Europe has sadly spent more money buying Russian oil and gas than they have spent on defending Ukraine, by far. Think of that. They've spent more

3/31/25, 5:09 PM
Case 1:25-cv-00716-BAH   Document 39-4   Filed 04/02/25   Page 120 of 734
Remarks by President Trump in Joint Address to Congress – The White House

buying Russian oil and gas than they have defending. And we've spent, perhaps, $350 billion. Like taking candy from a baby, that's what happened. And they've spent $100 billion. What a difference that is. And we have an ocean separating us, and they don't.

But we're getting along very well with them, and lots of good things are happening.

Biden has authorized more money in this fight than Europe has spent by billions and billions of dollars. It's hard to believe that they wouldn't have stopped it and said, at some point, "Come on. Let's equalize. You got to be equal to us." But that didn't happen.

Earlier today, I received an important letter from President Zelenskyy of Ukraine. The letter reads, "Ukraine is ready to come to the negotiating table as soon as possible to bring lasting peace closer." "Nobody wants peace more than the Ukrainians," he said. (Applause.) "My team and I stand ready to work under President Trump's strong leadership to get a peace that lasts. We do really value how much America has done to help Ukraine maintain its sovereignty and independence. Regarding the agreement on minerals and security, Ukraine is ready to sign it at any time that is convenient for you."

I appreciate that he sent this letter. Just got it a little while ago.

Simultaneously, we've had serious discussions with Russia and have received strong signals that they are ready for peace. Wouldn't that be beautiful? Wouldn't that be beautiful? (Applause.) Wouldn't that be beautiful?

It's time to stop this madness. It's time to halt the killing. It's time to end this senseless war. If you want to end wars, you have to talk to both sides.

Nearly four years ago, amid rising tensions, a history teacher named Marc Fogel was detained in Russia and sentenced to 14 years in a penal colony. Rough stuff.

The previous administration barely lifted a finger to help him.  They knew he was innocent, but they had no idea where to begin.  But last summer, I promised his 95-year-old mother, Malphine, that we would bring her boy safely back home.

After 22 days in office, I did just that, and they are here tonight.  (Applause.)

To Marc and his great mom, we are delighted to have you safe and sound and with us.

As fate would have it, Marc Fogel was born in a small, rural town — in Butler, Pennsylvania — have you heard of it? — where his mother has lived for the past 78 years.

I just happened to go there last July 13th for a rally. That was not pleasant. (Laughter.)  And that is where I met his beautiful mom, right before I walked onto that stage.  And I told her I would not forget what she said about her son.  And I never did, did I?  Never forgot.

Less than 10 minutes later, at that same rally, gunfire rang out, and a sick and deranged assassin unloaded eight bullets from his sniper's perch into a crowd of many thousands of people.

My life was saved by a fraction of an inch, but some were not so lucky.  Corey Comperatore was a firefighter, a veteran, a Christian, a husband, a devoted father, and, above all, a protector.

When the sound of gunshots pierced the air — it was a horrible sound — Corey knew instantly what it was and what to do.  He threw himself on top of his wife and daughters and shielded them from the bullets with his own body.

Corey was hit really hard.  You know the story from there.  He sacrificed his life to

save theirs.

Two others — very fine people — were also seriously hit.  But thankfully, with the help of two great country doctors, we thought they were gone, and they were saved.  So, those doctors had great talent.

We're joined by Corey's wife, Helen, who was his high school sweetheart, and their two beloved daughters, Allyson and Kaylee.  Thank you.  (Applause.)

To Helen, Allyson, and Kaylee, Corey is looking down on his three beautiful ladies right now, and he is cheering you on.  He loves you.  He is cheering you on.

Corey was taken from us much too soon, but his destiny was to leave us all with a shining example of the selfless devotion of a true American patriot.  It was love like Corey's that built our country, and it's love like Corey's that is going to make our country more majestic than ever before.

I believe that my life was saved that day in Butler for a very good reason.  I was saved by God to make America great again.  I believe that.  (Applause.)  Thank you.

Thank you.  Thank you very much.

From the patriots of Lexington and Concord to the heroes of Gettysburg and Normandy, from the warriors who crossed the Delaware to the trailblazers who climbed the Rockies, and from the legends who soared at Kitty Hawk to the astronauts who touched the Moon, Americans have always been the people who defied all odds, transcended all dangers, made the most extraordinary sacrifices, and did whatever it took to defend our children, our country, and our freedom.

And as we have seen in this chamber tonight, that same strength, faith, love, and spirit is still alive and thriving in the hearts of the American people.  Despite the best efforts of those who would try to censor us, silence us, break us, destroy us,

3/31/25, 5:09 PM
Case 1:25-cv-00716-BAH Document 39-4 Filed 04/02/25 Page 123 of 734
Remarks by President Trump in Joint Address to Congress – The White House

Americans are today a proud, free, sovereign, and independent nation that will always be free, and we will fight for it till death.

We will never let anything happen to our beloved country, because we are a country of doers, dreamers, fighters, and survivors.

Our ancestors crossed a vast ocean, strode into the unknown wilderness, and carved their fortunes from the rock and soil of a perilous and very dangerous frontier. They chased our destiny across a boundless continent. They built the railroads, laid the highways, and graced the world with American marvels, like the Empire State Building, the mighty Hoover Dam, and the towering Golden Gate Bridge.

They lit the world with electricity, broke free of the force of gravity, fired up the engines of American industry, vanquished the communists, fascists, and Marxists all over the world, and gave us countless modern wonders sculpted out of iron, glass, and steel.

We stand on the shoulders of these pioneers who won and built the modern age, these workers who poured their sweat into the skylines of our cities, these warriors who shed their blood on fields of battle and gave everything they had for our rights and for our freedom.

Now it is our time to take up the righteous cause of American liberty, and it is our turn to take America's destiny into our own hands and begin the most thrilling days in the history of our country.

This will be our greatest era.

With God's help, over the next four years, we are going to lead this nation even higher, and we are going to forge the freest, most advanced, most dynamic, and most dominant civilization ever to exist on the face of this Earth.

We are going to create the highest quality of life, build the safest and wealthiest and healthiest and most vital communities anywhere in the world.

We are going to conquer the vast frontiers of science, and we are going to lead humanity into space and plant the American flag on the planet Mars and even far beyond.  (Applause.)

And, through it all, we are going to rediscover the unstoppable power of the American spirit, and we are going to renew unlimited promise of the American dream.

Every single day, we will stand up and we will fight, fight, fight for the country our citizens believe in and for the country our people deserve.  (Applause.)  Thank you.  Thank you.

AUDIENCE MEMBERS:  Fight!  Fight!  Fight!

THE PRESIDENT:  My fellow Americans, get ready for an incredible future, because the golden age of America has only just begun.  It will be like nothing that has ever been seen before.

Thank you.  God bless you.  And God bless America.  (Applause.)

Thank you.  Thank you, everybody.  Thank you.  Thank you very much.  Thank you very much.  Thank you.
Thank you very much.  Appreciate it.
Thank you very much.

END            11:00 P.M. EST

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

  

WH.GOV



Copyright

Privacy

Style Guide

# EXHIBIT 27

Federal Register

Vol. 90, No. 46

Tuesday, March 11, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14230 of March 6, 2025

## Addressing Risks From Perkins Coie LLP

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The dishonest and dangerous activity of the law firm Perkins Coie LLP (''Perkins Coie'') has affected this country for decades. Notably, in 2016 while representing failed Presidential candidate Hillary Clinton, Perkins Coie hired Fusion GPS, which then manufactured a false ''dossier'' designed to steal an election. This egregious activity is part of a pattern. Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification. In one such case, a court was forced to sanction Perkins Coie attorneys for an unethical lack of candor before the court.

In addition to undermining democratic elections, the integrity of our courts, and honest law enforcement, Perkins Coie racially discriminates against its own attorneys and staff, and against applicants. Perkins Coie publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights laws. It proudly excluded applicants on the basis of race for its fellowships, and it maintained these discriminatory practices until applicants harmed by them finally sued to enforce change.

My Administration is committed to ending discrimination under ''diversity, equity, and inclusion'' policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant race-based and sex-based discrimination, including quotas, but purposefully hide the nature of such discrimination through deceiving language, have engaged in a serious violation of the public trust. Their disrespect for the bedrock principle of equality represents good cause to conclude that they neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

**Sec. 2.** *Security Clearance Review.* (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Perkins Coie. The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

**Sec. 3.** *Contracting.* (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract.

(b) The heads of all agencies shall review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Perkins Coie has been hired to perform any service;

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Perkins Coie or with entities that do business with Perkins Coie effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

**Sec. 4**. *Racial Discrimination.* (a) The Chair of the Equal Employment Opportunity Commission shall review the practices of representative, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis.

(b) The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered.

**Sec. 5**. *Personnel.* (a) The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 6, 2025.*

[FR Doc. 2025–03989
Filed 3–10–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT 28

Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP
The White HouseMarch 6, 2025

**STOPPING ABUSES THAT UNDERMINE THE NATION:** Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Perkins Coie LLP, pending a review of whether their access to sensitive information is consistent with the national interest.

- Security clearances held by Perkins Coie LLP employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
  - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to Perkins Coie LLP and restrict its employees' access to government buildings.
  - Federal Agencies will also refrain from hiring Perkins Coie LLP employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States, the Federal Government will prohibit funding contractors that use Perkins Coie LLP.
  - All Federal Government contracts with Perkins Coie LLP will undergo rigorous scrutiny, with agency heads directed to terminate engagements to the maximum extent permitted by law.

- The practices of Perkins Coie LLP will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

**ENSURING GOVERNMENT SERVES THE AMERICAN PEOPLE:** President Trump's Administration will not tolerate Perkins Coie LLP's unethical and discriminatory actions that threaten our elections, military strength, and national security.

- In 2016, Perkins Coie LLP hired Fusion GPS to manufacture a false "dossier" designed to steal an election while representing failed presidential candidate Hillary Clinton.

- Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme.

- Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter identification.
  - A court was forced to sanction Perkins Coie attorneys for unethical lack of candor before the court.

- Perkins Coie LLP has been accused of racially discriminating against its own attorneys, staff, and applicants.
  - Perkins Coie has publicly announced racial percentage quotas for hiring and promotions, violating civil rights laws, and excluded applicants from fellowships based on race until lawsuits forced change.

- Perkins Coie LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump.

- Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan actors who exploit their influence.

- President Trump is refocusing government operations to their core mission—serving the citizens of the United States.

- President Trump signed an Executive Order to end the weaponization of the Federal Government on his first day in office after promising to "end forever the weaponization of government and the abuse of law enforcement against political opponents."

- President Trump revoked security clearances held by dozens of intelligence officials who falsely claimed in a 2020 letter, during the height of the U.S. presidential election season, that Hunter Biden's laptop was tantamount to Russian disinformation.

# EXHIBIT 29

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,**
**IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Exhibit 29

President Trump Signs Executive Orders on March 6, 2025

The video is available here:

<u>https://www.c-span.org/program/white-house-event/president-trump-signs-executive-orders/656830</u>

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit is being maintained by plaintiff's counsel and will be provided to the Court and defendants' counsel.*

# EXHIBIT 30

*Democracy Dies in Darkness*

# Trump expands retribution campaign against law firms that aided his foes

Trump hit another major law firm that worked for his political rivals with an executive order seeking to limit its ability to work for the U.S. government.

Updated March 6, 2025

By Perry Stein and Michael Birnbaum

President Donald Trump on Thursday targeted another elite law firm that has represented clients he considers his political enemies, sending a forceful message that he is willing to punish firms who work for people or groups that oppose his administration's agenda.

In an Oval Office ceremony, the president signed an executive order hitting the large international law firm Perkins Coie with a sweeping directive that bans the federal government from hiring it, or from using contractors who work with it, except in limited circumstances. The order also bars Perkins Coie employees from entering federal buildings and suspends their security clearances.

The firm represented Hillary Clinton's campaign and the Democratic National Committee during the 2016 presidential race, and it also contracted with the research firm that produced the now-discredited opposition dossier that alleged extensive contacts between Trump and Russia.

The move could have a chilling effect on law firms' willingness to take on clients and cases that run counter to the Trump administration, challenging a fundamental tenet of the rule of law in the United States that everyone should have access to legal representation, experts said.

"This is an absolute honor to sign," Trump said from his Oval Office desk.

A spokesman for Perkins Coie said in a statement that the executive order is "patently unlawful, and we intend to challenge it."

A White House official said the move targeted Perkins Coie because of its track record on Trump.

"The president doesn't believe they should have the privileges afforded to companies of their stature to work and operate with the federal government, since they have made it very clear they are vehemently against the president of the United States, and their work proves that," a senior administration official said, speaking on the condition of anonymity to talk frankly about the sensitive decision-making behind the order.

"If this case was retribution or anti-Democrat, anti-liberal, then we would basically pull the security clearance clearances of every law firm on K Street, because they all hate the president," the official said. "This law firm in particular has shown a level of bias in which their coordination with the federal government was done so in an illegal fashion that was purposely intended on undermining the president of the United States and really locking him up."

Perkins Coie is the second law firm Trump has taken action against or decried as engaging "in the weaponization of the judicial process."

Last week, he ordered the suspension of security clearances of some attorneys at Covington & Burling, which has represented special counsel Jack Smith pro bono. Smith led the federal investigations of Trump for allegedly mishandling classified materials and trying to block the 2020 election results.

Trump's orders targeting the law firms called for limiting their access to federal resources and could have the effect of dissuading other private law firms from battling the Trump administration in court.

The American legal system relies on attorneys representing all sorts of clients, including violent criminals, and the president's appearing to punish firms for their choice of clients could do grave damage to that system, said Mark Zaid, a national security lawyer who often represents whistleblowers.

"By taking these actions against these major law firms, it is effectively sending a message to all the lawyers that you best not challenge this administration, or you, your lawyers and your clients will suffer," Zaid said. "It is the most un-American thing I've ever heard."

Other experts said the order was part of Trump's broader campaign against the legal system.

"He doesn't like judges who rule against him. He doesn't like prosecutors who prosecuted against him. He doesn't like lawyers who've undertaken measures against him," said Thomas Carothers, the director of the Democracy, Conflict, and Governance Program at the Carnegie Endowment for International Peace. "This is part of a broader questioning, and in many cases, an attack on the core institutions of the rule of law."

But Carothers said that he did not think Trump's order would bring the U.S. legal system to a halt.

"I don't think a peer law firm will think, 'Oh, we shouldn't bring this enforcement action against this government entity, because we can no longer challenge the U.S. government.' I think that would be overreading it."

Perkins Coie became embroiled in what Trump and his allies have repeatedly described as the "Russia hoax" when it contracted with a firm that conducted research about Trump's connections to Russia during the 2016 presidential campaign. That contract resulted in the now-famous Steele dossier, a document full of unverified allegations assembled by former British intelligence officer Christopher Steele.

But the two main attorneys involved in that work — Marc E. Elias and Michael Sussmann — are no longer employed by Perkins Coie. Both attorneys are named in a fact sheet explaining Trump's executive order.

Elias retained Fusion GPS, the Washington firm that ultimately produced the Steele dossier.

Years later, special counsel John Durham — who was assigned to look into possible wrongdoing among federal agents who investigated Trump's 2016 campaign — charged Sussmann with lying to a senior FBI official during that investigation.

Sussmann was accused of bringing allegations to the FBI of a secret computer communications channel between the Trump organization and Russia-based Alfa Bank. FBI agents investigated the data but concluded that there was nothing suspicious about it.

In 2022, a jury found Sussmann not guilty.

Perkins Coie is one of eight big law firms involved in lawsuits against Trump, according to an American Bar Association Journal article published last week that cited the law firm's representation of transgender service members who are challenging the administration's ban on joining the military.

Trump also signed a separate order that could make it harder for opponents to seek injunctions against his administration's actions by holding them accountable for legal costs if they lose. The Justice Department will ask judges to require plaintiffs who are seeking injunctions and restraining orders against the Trump administration to post a bond to cover court costs should they fail, raising the bar for legal challenges.

When presenting the Perkins Coie executive order to Trump to sign, White House staff secretary Will Scharf said the firm has engaged in "unlawful DEI practices," referring to diversity, equity and inclusion programs, and accused it of using racial quotas for hiring and promotions.

Scharf said the executive order calls for a "holistic review of unlawful DEI in some of the nation's largest law firms."

Although the Supreme Court has banned affirmative action in college admissions, and federal law prohibits workplace discrimination on the basis of race, sex and certain other criteria, no law bans diversity and equity efforts within private companies.

Scharf did not explain what the government's review would entail, which law firms would be examined and what criteria the federal government would use to determine whether a law firm engaged in wrongdoing.

The Trump administration's move to penalize law firms for their DEI practices when no court has said such programs are illegal "is extraordinary," said Walter Olson, a senior fellow at the Cato Institute, a libertarian think tank.

"There is no legal definition of excessive DEI. The law itself is so unsettled," Olson said. "The administration can take positions, but it's not as if the courts have taken a position and given them a green light and said, 'Yes, you are right.'"

**CORRECTION**

An earlier version of this article misspelled the last name of a former Perkins Coie attorney. He is Michael Sussmann. This article has been corrected.

**What readers are saying**

The comments overwhelmingly criticize the Trump administration's decision to target Perkins Coie, viewing it as an abuse of power and a threat to the rule of law. Many commenters express concern that this action represents authoritarian behavior, likening it to tactics used by... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 31



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

March 7, 2025

M-25-17

MEMORANDUM TO THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:      Russell T. Vought
              Director

SUBJECT:   Implementation of the Executive Order on "Addressing Risks From Perkins Coie
              LLP"

     In accordance with direction provided by the President in an Executive Order dated
March 6, 2025 entitled, "Addressing Risks From Perkins Coie LLP," I am issuing this
memorandum to all executive Departments and Agencies.

     Agencies must review all Government contracts and subcontracts with Perkins and Coie
LLP, as well as provision to Perkins and Coie LLP of goods, property, material, and services,
including any Sensitive Compartmented Information Facilities.  Agencies shall complete the
review, perform all duties required by the aforementioned Executive Order, and report back to
the Office of Management of Budget by emailing MBX.OMB.OFPPv2@omb.eop.gov no later
than April 5, 2025, which should include contract type, scope, period of performance, and value,
along with any action taken.

# EXHIBIT 32

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,
IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Exhibit 32</u>

March 9, 2025 interview of President Trump by Maria Bartiromo

The video is available here:
<u>https://www.foxnews.com/video/6369823374112</u>

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit is being maintained by plaintiff's counsel and will be provided to the Court and defendants' counsel.*

# EXHIBIT 33

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,
IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Exhibit 33</u>

March 10, 2025 interview of Stephen Miller, White House Deputy
Chief of Staff, on Fox News

The video is available here:
https://www.youtube.com/watch?app=desktop&v=zA_7x3F5Gag

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit
is being maintained by plaintiff's counsel and will be provided to the
Court and defendants' counsel.*

# EXHIBIT 34

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Perkins Coie LLP
c/o Dane H. Butswinkas
Williams & Connolly LLP
680 Maine Avenue, SW
Washington, DC  20024
dbutswinkas@wc.com

Re:    Review of Perkins Coie LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Butswinkas:

      Based on public statements and court filings[1] by Perkins Coie LLP ("Perkins Coie"), I am seeking information about the firm's employment practices.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2]  Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3]    Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4]  It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

      Perkins Coie publicly has touted its hiring practices, including its diversity fellowships, which have historically been limited to "students of color,"[5] as "help[ing] create and foster one of

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; public statements by Perkins Coie in court filings; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

[5] *See AAER v. Perkins Coie LLP*, Case No. 3:23-cv-01788 (N.D. Tex. 2023), Dkt. 1 at 1.

the strongest and most diverse talent pipelines in the legal profession"[6] and "designed to increase the representation of racially diverse lawyers at the firm."[7]  Merely five months ago, Perkins Coie announced it had "achieved Mansfield 7.0 Certification Plus status for another year from Diversity Lab, which measures how leading law firms have affirmatively considered women, lawyers of color, [and] LGBTQ+ lawyers . . . for recruitment, partnership promotions, and management positions, among other significant benchmarks."[8]

In addition, in 2020, Microsoft's Law Firm Diversity Program recognized Perkins Coie as its "top performing law firm" when it came to meeting Microsoft's diversity goals, demonstrating a five year plan that "achieved impressive progress . . . growing diverse attorney hours on Microsoft matters by 12.3 percentage points (from 56.7% to 69%);" a 10.3 point increase in overall diverse partner representation at the firm (from 33.6% to 43.9%);" and "great progress in diverse representation on its management committee, with over 64% of their committee members identifying as women, minorities, LGBTQ+ people, people with disabilities and veterans."[9]  In fact, since at least 2012, Perkins Coie has been a leader in a third-party diversity scorecard that scores law firms based on their "percentile ranking of the representation of underrepresented racial and ethnic groups, gender and LBGTQ+ per level and the overall disclosure of DEI data versus firms of a similar size."[10]

Further, Perkins Coie provides several "Resource Groups," divided on, among other bases, Title VII-protected bases, including race, color, religion, sex, and national origin.  For example, Perkins Coie's "South Asian/Middle Eastern (SAME) Lawyers Resource Group consists of attorneys with backgrounds from South Asian and Middle Eastern nations . . . ."[11]  The group "seeks to attract, welcome, retain, and promote attorneys that identify as South Asian or Middle Eastern" and provide those attorneys with other advancement opportunities.[12]  Similarly, the "Asian Pacific Islander Resource Group" seeks to "create business opportunities with clients . . . ."[13]

I am concerned that Perkins Coie's "diversity and inclusion" or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or

---

[6] *See id.*, Dkt. 29 at 7.

[7] *See id.*, Dkt. 29 at 30.

[8] Perkins Coie, "Perkins Coie Awarded Mansfield 7.0 Certification Plus in Diversity Leadership for a Consecutive Year," https://perma.cc/3UNE-39PG.

[9] Dev Stahlkopf, Microsoft's Law Firm Diversity Program 2020 Awards and the Next Evolution of the Program, Microsoft On the Issues, https://blogs.microsoft.com/on-the-issues/2020/09/30/microsoft-law-firm-diversity-program-2020-awards (last accessed Mar. 13, 2025).

[10] *See* MCCA Scorecard, 2022 Law Firm Diversity Survey Participants, https://mccascorecard.com (last visited Mar. 13, 2025).

[11] Perkins Coie, "Diversity & Inclusion," https://perma.cc/8S7C-6DQQ.

[12] *Id.*

[13] *Id.*

in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### *Internships, Fellowships, and Scholarships*

In public statements and court filings, Perkins Coie has acknowledged that it has had a 1L Diversity Fellowship Program since 1991 and a similar 2L Diversity Fellowship Program since 2021. Perkins Coie also admitted in court filings that, at least until 2023, those hiring programs had a "requirement that participants belong to a group historically underrepresented in the legal profession" and appears to concede that those programs previously limited participation by race and "asked or required [applicants] to identify their race when applying."[14] Perkins Coie also has asserted in court filings that it changed the criteria for its diversity fellowship programs in 2023.[15]

1.  Please describe the application and selection criteria used by Perkins Coie for its 1L Diversity Fellowship Program from: (a) 2015 to 2023; and (b) from 2023 to the present.

2.  Please describe the application and selection criteria used by Perkins Coie for its 2L Diversity Fellowship Program from: (a) 2021 to 2023; and (b) from 2023 to the present.

3.  Does Perkins Coie hire any 1L law students as summer associates other than participants in the firm's 1L Diversity Fellowship Program?

4.  At any point since 2015, did participation in either the 1L or 2L Diversity Fellowship Program provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.  In court filings, Perkins Coie admitted that it engaged in disparate treatment in compensation between summer associates who solely participated in the firm's regular summer associate program and summer associates who were admitted into the firm's 1L and 2L Diversity Fellowship Program. The firm admitted that in addition to a "paid summer associate position," in "recent years, Perkins Coie's 1L and 2L diversity fellows received an additional stipend, both at the end of the summer and if they returned after graduation for full-time employment at the firm."[16] Please provide documents and information regarding compensation for the firm's summer associate program as well as the two "additional stipends" received by all diversity fellows.

---

[14] *See AAER v. Perkins Coie LLP*, Case No. 3:23-cv-01788 (N.D. Tex. 2023), Dkt. 1 at 7, 9.

[15] *Id.*, Dkt. 1 at 9.

[16] *Id.*, Dkt. 1 at 10.

6.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L Diversity Fellowship Program:

a.  Name
b.  Sex
c.  Race
d.  Phone number
e.  Email address
f.  Law school
g.  Law school GPA (as of date of application)
h.  Selected for 1L Diversity Fellowship Program (Y/N)

*If selected*:
i.  Compensation for 1L Diversity Fellowship Program
j.  Received offer for 2L Diversity Fellowship Program (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in Diversity Fellowship Program (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a.  Name
b.  Sex
c.  Race
d.  Phone number
e.  Email address
f.  Law school
g.  Law school GPA (as of date of application)
h.  Selected for 2L Diversity Fellowship Program (Y/N)

*If selected*:
i.  Compensation for 2L Diversity Fellowship Program
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

**SEO Law Fellowship**

4

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[17] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are invited to apply" for the the SEO Law Fellowship.[18] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[19] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[20] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[21] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[22] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[23] If your firm had SEO Fellows placed at your firm at any point since 2019, please answer the following questions:

8. Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9. The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10. During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

---

[17] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

[18] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[19] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[20] *Id.*

[21] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[22] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[23] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

11.    Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.    Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Total compensation paid to SEO Fellow for internship at your firm
    h.  Applied for 1L summer associate program (Y/N)
    i.  Selected for 1L summer associate program (Y/N)
    j.  Applied for 2L summer associate program (Y/N)
    k.  Selected for 2L summer associate program (Y/N)
    l.  Applied for full-time associate attorney position (Y/N)
    m.  Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

    a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting

personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm is seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.    At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.    At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.    If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.    In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

a.   Name
b.   Sex
c.   Race
d.   Phone number
e.   Email address
f.   Law school
g.   Law school GPA (as of date of application)
h.   Hired (Y/N)

*If hired*:
i.   Date hired

j. Date discharged (indicating voluntary or involuntary)
k. Starting compensation
l. Compensation as of the date of response
m. Tuition repayment assistance
n. Title
o. Date of promotion
p. Office location

***Other Terms, Conditions, and Privileges of Employment***

23. At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

   a. The years on which your firm selected attorneys to participate in those training and leadership development programs;

   b. The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

   c. Information on all candidates that your firm considered selecting to receive access to these programs:

      i. Name
      ii. Sex
      iii. Race
      iv. Phone number
      v. Email address
      vi. Office location
      vii. Year that candidate was considered for LCLD program
      viii. Selected by your firm to participate in LCLD program (Y/N)
      ix. Job position at time of consideration for LCLD program
      x. Current job position
      xi. Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
      xii. Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24. Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.    Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

   a.    The client
   b.    The date of disclosure
   c.    The client's response
   d.    Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[24] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

---

[24]    *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

32.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

*Partnership Decisions*

33.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Office location
    g.   Member of firm affinity group (Y/N)
    h.   Name of affinity group(s) in which attorney participates
    i.   Previously participated in LCLD program (Y/N)
    j.   Previously was SEO Fellow (Y/N)
    k.   Previously participated in firm diversity internship or fellowship (Y/N)
    l.   Elevated to partner (Y/N)

    m.  Equity or non-equity partner (Equity / Non-Equity)

37.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Member of a firm affinity group (Y/N)
    h.  Name of affinity group(s) in which attorney participates / participated
    i.  Previously participated in LCLD program (Y/N)
    j.  Previously was SEO Fellow (Y/N)
    k.  Previously participated in a firm diversity internship or fellowship (Y/N)
    l.  Hired as lateral partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov.  If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Cooley LLP
c/o Rachel Proffitt, Chief Executive Officer
3175 Hanover Street
Palo Alto, CA 94304-1130
rproffitt@cooley.com

Re:    Review of Cooley LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Ms. Proffitt:

Based on public statements[1] by Cooley LLP (Cooley), I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

Cooley has publicly touted its hiring goals, including "targets for greater representation of women in the partnership, diversity among lawyers and diversity in business professionals' leadership."[5] According to your public website, Cooley's board of director approved a Diversity, Equity and Inclusion Action Plan ("DEI Action Plan") on August 18, 2020, and updated the DEI

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

[5] Cooley LLP, *DEI Snapshot 2024*, dei-snapshot-2024.pdf (last accessed Mar. 14, 2025).

Action Plan on September 30, 2021.[6] Your landing page on March 13, 2025 summarized the DEI Action Plan and outlined specific metrics such as "increase[ing] the percentage of ethnic, racial, and LGBTQ+ diversity among all lawyers to at least 32%" and "increase[ing] the percentage of ethnic, racial and LGBTQ+ diversity among all managers and directors to at least 37%" by January 1, 2026.[7] Also on that page, Cooley defined "diversity" as "ethnic/racial diversity and LGBTQ+," while celebrating its "progress" with the following graphic:[8]



However, as of March 14, 2025, Cooley's DEI Action Plan landing page is no longer available to the public. Cooley's sudden, overnight removal of its "board approved DEI plan" from its public facing landing page gives me pause.

The chair of Cooley's diversity committee is "extremely proud that we continue to make meaningful strides toward achieving our *ambitious* representation goals,"[9] goals that the Chicago Committee recognized with a 2024 Diversity Award for Commitment and Investment "based on the firm's racially/ethnically diverse associate hiring, partnership ranks, diversification of client teams, and inclusive succession planning."[10]

As reflected in the graphic above, in only approximately *two* years (from 2020 to April 2023), Cooley increased its percentage of "ethnic/racial diversity and LGBTQ+" "diversity among

---

[6] Cooley LLP, *Diversity, Equity and Inclusion Action Plan*, cooley.com/diversity/dei-action-plan (This page was available on your website on March 13, 2025, but was no longer available on March 14, 2025). Please preserve this and any other records relevant to this inquiry.

[7] *Id.*

[8] *Id.*

[9] Cooley LLP, "Cooley Welcomes New Chief Diversity Officer Kelly Batts," Press Release, Oct. 10, 2023, https://www.cooley.com/news/coverage/2023/2023-10-10-cooley-welcomes-new-chief-diversity-officer-kelly-batts (last accessed Mar. 14, 2025) (emphasis added).

[10] Chicago Committee on Minorities in Large Law Firms, 2024 Annual Report, https://chicagocommittee.org/wp-content/uploads/2024/10/Chicago-Committee-Annual-Report-2024.pdf (last accessed Mar. 14, 2025).

lawyers" by **nine** percentage points.[11]  That rapid increase resulted in "diversity" representation that is three percentage points above even the firm's own *six-year* goal for "diversity among lawyers."[12]  It is unclear how much more that representation percentage may have increased in the approximately two additional years since April 1, 2023, but it is reasonable to assume that this trend has continued, causing the firm to even further exceed its own "ambitious" 2026 goal.

Cooley directly (and likely significantly) financially benefited from the employment decisions the firm took that led to such a rapid increase in racial, ethnic, and LGBTQ+ representation in its lawyer ranks. In 2021 and 2022, Microsoft's Law Firm Diversity Program recognized Cooley as one of five law firms meeting Microsoft's diversity "goals," "earning the full program bonus"[13] of 3% of annual fees[14] in 2021 and meeting "goals of increasing diversity on the teams that work on Microsoft matters" in 2022.[15]

In addition, a few months ago, Cooley announced it had "achieved Mansfield Rule Certification status" which "measures whether law firms have affirmatively considered women, underrepresented racial and ethnic groups, LGBTQ+ lawyers and lawyers with disabilities for leadership and governance roles, equity partner promotions, formal client pitch opportunities and senior lateral positions."[16] Diversity Lab has named Cooley an "Inclusion Blueprint Champion," an honor Cooley achieved by showing "diversity representation based on average or above-average thresholds, year-over-year diversity representation progress," and "diversity tracking."[17]

In fact, since at least 2012, Cooley has been ranked by a third-party diversity scorecard that scores law firms based on their "percentile ranking of the representation of underrepresented racial and ethnic groups, gender and LBGTQ+ per level and the overall disclosure of DEI data versus

---

[11] Cooley LLP, "Diversity, Equity and Inclusion Action Plan, cooley.com/diversity/dei-action-plan"

[12] *Id.*

[13] Hossein Nowbar, Recognizing Partner Law Firms for Furthering Diversity in the Legal Profession, Microsoft On the Issues, https://blogs.microsoft.com/on-the-issues/2021/12/14/lfdp-law-firm-diversity-program-2021-results (last accessed Mar. 14, 2025).

[14] Microsoft, *Law Firm Diversity Program Overview and FAQ*, 4, https://aka.ms/LFDP_ProgramOverviewandFAQ (last accessed Mar. 14, 2025).

[15] Hossein Nowbar, Microsoft's Law Firm Diversity Program: Celebrating Top Performers in 2022, Microsoft On the Issues, https://blogs.microsoft.com/on-the-issues/2022/12/08/microsoft-law-firm-diversity-program-lfdp-2022/ (last accessed Mar. 14, 2025).

[16] Cooley LLP, "Cooley Achieves US, UK Mansfield Rule Certification Status," Press Release, Oct. 28, 2024, https://www.cooley.com/news/coverage/2024/2024-10-28-cooley-achieves-us-uk-mansfield-rule-certification-status (last accessed Mar. 14, 2025).

[17] Cooley LLP, "Diversity Lab Names Cooley an Inclusion Blueprint Champion," Press Release, Dec. 17, 2021, https://www.cooley.com/news/coverage/2021/2021-12-17-diversity-lab-names-cooley-an-inclusion-blueprint-champion (last accessed Mar. 14, 2025).

firms of a similar size."[18]  Last year, Cooley was ranked among the top three of all participating law firms.[19]

It appears likely that Cooley disparately provides access to certain privileges of employment (training and leadership development) based on its employees' race or other protected characteristics.  Cooley advertises that it is a member of the Leadership Council on Legal Diversity; that through its "membership in the program, we nominate a diverse set of lawyers for leadership development programs each year;" and that "Cooley is recognized as a key law firm partner by LCLD."[20] Cooley has provided "diverse" lawyers access to these unique leadership development program and training since 2013.[21]  Cooley does not indicate how it defines "diverse" for purposes of selecting lawyers for access to these unique LCLD programs, but it is reasonable to assume that Cooley consistently defines "diversity" as "ethnic/racial diversity and LGBTQ+," as it does in its DEI Action Plan.

In its press releases touting its lawyers' participation in LCLD programs following their nomination by Cooley, Cooley describes the LCLD "Pathfinders Program [as] connect[ing] high-potential, early-career lawyers of diverse backgrounds and perspectives from LCLD member organizations with foundational leadership skills and relationship-building resources during a seven-month professional development program."[22]  Cooley describes the LCLD "Fellows Program [as] prepar[ing] high-potential, mid-career lawyers of diverse backgrounds and perspectives at LCLD member organizations with professional and personal development opportunities, leadership training, relationship-building resources and access to LCLD members (including managing partners and general counsel)."[23]  Cooley's selection of a Cooley lawyer for the LCLD Pathfinders Program allows that lawyer to receive access to LCLD-provided "train[ing] . . . in critical career-development strategies including leadership and the building of professional networks," and indicates that that Cooley lawyer is "recognized as emerging leaders within their organization," that is, within Cooley.[24]  Cooley's selection of a Cooley lawyer for the LCLD Fellows Program is designed to "increase diversity at the [firm's] leadership levels" and places that lawyer "on a trajectory towards leadership positions" at Cooley.[25]

---

[18]  *See* MCCA Scorecard, 2022 Law Firm Diversity Survey Participants, https://mccascorecard.com (last visited Mar. 14, 2025).

[19] MCCA Scorecard, 2024 Law Firm Diversity Survey Rankings, https://mccascorecard.com (last visited Mar. 14, 2025).

[20]  Cooley LLP, Racial and Social Justice, https://www.cooley.com/diversity/racial-and-social-justice.

[21] Cooley LLP, Press Release, Cooley Lawyers Join Leadership Council on Legal Diversity's Fellows and Pathfinders Programs (Feb. 26, 2024), https://www.cooley.com/news/coverage/2024/2024-02-26-cooley-lawyers-join-leadership-council-on-legal-diversitys-fellows-and-pathfinders-programs.

[22] *Id.*

[23] *Id.*

[24] Cooley LLP, Press Release, "Cooley Lawyers Set to Join LCLD Fellows + Pathfinders Programs" (March 11, 2021), https://www.cooley.com/news/coverage/2021/2021-03-11-cooley-lawyers-set-to-join-lcld-fellows-pathfinders-programs.

[25]  *Id.*

Cooley also provides several "Affinity Groups," divided on, among other bases, Title VII-protected bases, including race, color, religion, sex, and national origin. For example, Cooley's "Black Business Professionals Affinity Group provides a safe space for engagement on various issues, including equity and inclusion, for members who self-identify as Black or of African descent."[26] Similarly, the "Latinx Affinity Group" "The group is dedicated to recruiting, mentoring, supporting and retaining Latinx and other diverse business professionals, law students and lawyers throughout their careers. Further, it serves an integral role in advocating for all Latinx employees . . . ."[27]

I am concerned that Cooley's "diversity, equity, and inclusion" or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### Internships, Fellowships, and Scholarships

Cooley has publicly acknowledged that it has a 1L Diversity Fellowship Program[28] and a 2L Diversity Fellowship Program.[29]

1.    Please describe the application and selection criteria used by Cooley for its 1L Diversity Fellowship Program from 2019 to the present.

2.    Please describe the application and selection criteria used by Cooley for its 2L Diversity Fellowship Program from 2019 to the present.

3.    Does Cooley hire any 1L law students as summer associates other than participants in the firm's 1L Diversity Fellowship Program?

4.    At any point since 2019, did participation in either the 1L or 2L Diversity Fellowship Program provide participants with an accelerated interview, consideration, or selection

---

[26] Cooley LLP, Black Business Professionals Affinity Group, https://www.cooley.com/diversity/black-business-professionals-affinity-group, [https://web.archive.org/web/20231001114916/https://www.cooley.com/diversity/black-business-professionals-affinity-group].

[27] Cooley LLP, Latinx Affinity Group, https://www.cooley.com/diversity/latinx-affinity-group, [https://web.archive.org/web/20231001121716/https://www.cooley.com/diversity/latinx-affinity-group].

[28] Cooley LLP, US 1L Diversity Fellowship (2025), https://www.cooley.com/careers/law-students/us-1l-diversity-fellowship.

[29] Cooley LLP, US 2L Diversity Fellowship (2025), https://www.cooley.com/careers/law-students/us-2l-diversity-fellowship.

process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.    On its website, Cooley admits that it engages in disparate treatment in compensation between summer associates who solely participate in the firm's regular summer associate program and summer associates who were "recipients" of the firm's "US Diversity Fellowship." The firm admits that US 1L Diversity Fellowship "recipients will receive a paid 1L summer associate position and an award of up to $50,000 to assist with law school tuition,"[30] and US 2L Diversity Fellowship "will receive a paid 2L summer associate position and an award of up to $40,000 to assist with law school tuition."[31] Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all "US Diversity Fellowship recipients."

6.    From 2019 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L Diversity Fellowship Program:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Selected for 1L Diversity Fellowship Program (Y/N)

    *If selected*:
    i.  Compensation for 1L Diversity Fellowship Program
    j.  Received offer for 2L Diversity Fellowship Program (Y/N)
    k.  Received offer for regular summer associate position (Y/N)
    l.  Received offer for full-time associate attorney position (Y/N)
    m.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
    n.  Amount of additional funds
    o.  Reason for receipt of additional funds
    p.  Office location

7.    From 2019 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

---

[30] Cooley LLP, US 1L Diversity Fellowship, https://www.cooley.com/careers/law-students/us-1l-diversity-fellowship; *see also* Cooley LLP, Racial and Social Justice, https://www.cooley.com/diversity/racial-and-social-justice.

[31] Cooley LLP, US 2L Diversity Fellowship (2025), https://www.cooley.com/careers/law-students/us-2l-diversity-fellowship.

   a. Name
   b. Sex
   c. Race
   d. Phone number
   e. Email address
   f. Law school
   g. Law school GPA (as of date of application)
   h. Selected for 2L Diversity Fellowship Program (Y/N)

*If selected*:
   i. Compensation for 2L Diversity Fellowship Program
   j. Received offer for regular summer associate position (Y/N)
   k. Received offer for full-time associate attorney position (Y/N)
   l. Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
   m. Amount of additional funds
   n. Reason for receipt of additional funds
   o. Office location

### SEO Law Fellowship

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[32] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are invited to apply" for the the SEO Law Fellowship.[33] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[34] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[35] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused

---

[32] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

[33] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[34] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[35] *Id.*

on, or restricted to, "students of color."[36] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[37] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[38]

SEO Law's website indicates that SEO Fellows were placed at four of Cooley LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

13.     Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm? Did those duties relate to your firm's work?

14.     Does your firm hire any 0L summer associates other than SEO Fellows?

15.     For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

        a.  Name
        b.  Sex
        c.  Race
        d.  Phone number
        e.  Email address
        f.  Office location

---

[36] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).
[37] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.
[38] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

g.  Total compensation paid to SEO Fellow for internship at your firm
h.  Applied for 1L summer associate program (Y/N)
i.  Selected for 1L summer associate program (Y/N)
j.  Applied for 2L summer associate program (Y/N)
k.  Selected for 2L summer associate program (Y/N)
l.  Applied for full-time associate attorney position (Y/N)
m.  Selected for full-time associate attorney position (Y/N)

16.  For each year since 2019 in which your firm had any summer associate programs:

a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.  At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.  At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.  At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.    At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.    If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.    In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Hired (Y/N)

    *If hired*:
    i.  Date hired
    j.  Date discharged (indicating voluntary or involuntary)
    k.  Starting compensation
    l.  Compensation as of the date of response
    m.  Tuition repayment assistance
    n.  Title
    o.  Date of promotion
    p.  Office location

### *Reduction in Force*

23.    In 2022, Cooley announced a Reduction in Force (RIF) for 150 employees ("2022 RIF"). Provide all documents and memorandum Cooley issued to its employees, shareholders, and partners regarding its decision to RIF employees or what criteria Cooley was considering when making its RIF decisions.

24.    Provide all documents upon which Cooley relied to make its determination on whom to RIF, including any internal memorandums, data, metrics, directives, and responsive reports from managers.

25. Provide a copy of the form severance agreement issued to employees as result of the 2022 RIF.

26. In a searchable spreadsheet, for each employee discharged pursuant the to the 2022 RIF, provide the following:

    a. Name
    b. Sex
    c. Race
    d. Date of Birth
    e. Phone number
    f. Email address
    g. Date hired
    h. Hours billed for each year 2019, 2020, 2021, and 2022
    i. Date hired
    j. Title
    k. Affinity group membership
    l. Practice group
    m. Office location

***Other Terms, Conditions, and Privileges of Employment***

27. Cooley touts that for the past 11 years, it has selected Cooley lawyers to receive access to the Leadership Council on Legal Diversity Pathfinders Program or Fellows Program. Provide the following information and all related documents:

    a. The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b. The definition of "diverse" lawyers that Cooley used when selecting candidates for the programs and written documentation of that definition;

    c. The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    d. Information on all candidates that your firm considered selecting to receive access to these programs:

        i. Name
        ii. Sex
        iii. Race
        iv. Phone number
        v. Email address
        vi. Office location
        vii. Year that candidate was considered for LCLD program
        viii. Selected by your firm to participate in LCLD program (Y/N)

     ix.    Job position at time of consideration for LCLD program
     x.    Current job position
     xi.    Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
     xii.    Whether individual currently holds a leadership position at your firm (Y/N)

### *Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests*

28.    Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters.  Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications.  Produce any related documents.

29.    Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a.    The client
    b.    The date of disclosure
    c.    The client's response
    d.    Whether the disclosure was client mandated/requested

30.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[39] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

### *Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics*

31.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

32.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer

---

[39] *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

33.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

35.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

36.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### *Partnership Decisions*

37.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

38.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

39.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

40.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.  Name
   b.  Sex
   c.  Race
   d.  Phone number
   e.  Email address
   f.  Office location
   g.  Member of firm affinity group (Y/N)
   h.  Name of affinity group(s) in which attorney participates
   i.  Previously participated in LCLD program (Y/N)
   j.  Previously was SEO Fellow (Y/N)
   k.  Previously participated in firm diversity internship or fellowship (Y/N)
   l.  Elevated to partner (Y/N)
   m.  Equity or non-equity partner (Equity / Non-Equity)

41.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

   a.  Name
   b.  Sex
   c.  Race
   d.  Phone number
   e.  Email address
   f.  Office location
   g.  Member of a firm affinity group (Y/N)
   h.  Name of affinity group(s) in which attorney participates / participated
   i.  Previously participated in LCLD program (Y/N)
   j.  Previously was SEO Fellow (Y/N)
   k.  Previously participated in a firm diversity internship or fellowship (Y/N)
   l.  Hired as lateral partner (Y/N)
   m.  Equity or non-equity partner (Equity / Non-Equity)

                                        ***

   Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov.  If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Reed Smith LLP
c/o Casey Ryan, Global Managing Partner
225 5th Ave., Ste 1200
Pittsburgh, PA 15222
cryan@reedsmith.com

Re:    Review of Reed Smith's Compliance with Title VII of the Civil Rights Act of 1964

Dear Ms. Ryan:

Based on public statements[1] by Reed Smith LLP ("Reed Smith"), I am seeking information about the firm's employment practices.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2]  Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3]  Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4]  It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

Reed Smith has publicly touted its commitment to diversity, equity, and inclusion in its annual reports, outlining the composition of this workforce and summer associates. In 2020, and in response to the George Floyd incident, Reed Smith created its "Race Equity Action Plan" ("REAP").[5]  According its REAP, Reed Smith outlined the following "goals" for the firm to meet by 2024:

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

[5] Reed Smith LLP, Annual Report 2021, *Diversity, Equity & Inclusion*, 6.

- Increase the number of Black lawyers across the firm by 50%;
- Improve Black lawyer and staff attrition rate to be consistent with the firmwide attrition rate by 2024;
- Increase the percentage of Black leadership by 30%; and
- Expand engagement with clients to uncover opportunities for Black lawyer development.[6]

Expanding on this initiative, Reed Smith created a series of YouTube videos, which have since been removed.[7] An initiative with overt specific racial "goals," coupled with the removal of related public facing documents, is concerning.

These concerns are amplified after reviewing Reed Smith's reported REAP progress from 2021. In just one quarter, Reed Smith increased its Black lawyers on its Global Leadership Team from 4.76% to 7.41% — a 55% increase in 3 months.[8] By the end of 2021, this figure grew to 8.64% — an 81% increase from 2020.

---

[6] *Id*.

[7] *See id*. ("View our REAP video series")
https://www.youtube.com/playlist?list=PLcdzLBBmHfIwWalzjIcrC5CwZS4vEBG5A    (The playlist does not exist).

[8] *Id*. at 7.



In 2024, 37.2% of Reed Smith's workforce was "diverse,"[9] compared to 35.4% in 2023.[10] Similarly, in 2024 Reed Smith also announced that 84% of its summer associates were women or "diverse,"[11] a remarkable 2% increase from 2023's 82%.[12] Currently, Reed Smith highlights that 74% of its new associates are "diverse."[13]

These astonishing "gains" are likely attributable in part to employer required scorecards for practice group leaders and managing office partners.  According to its 2021 Annual Report,

---

[9]   Reed  Smith  LLP,  ANNUAL  REPORT  2024,  *Diversity,  Equity  &  Inclusion*,  6, https://www.reedsmith.com/-/media/documents/2025/deiannualreport2024.pdf    (last    accessed Mar. 17, 2025).
[10]   Reed  Smith  LLP,  ANNUAL  REPORT  2023,  *Diversity,  Equity  &  Inclusion*,  3 https://interactive.reedsmith.com/articulate/65b3cd9aed827d739320613e?pwd=Z0QBSEbuE9H2 l5E1TyAQ5TLuktdO41X0-G7L5xT8Kb8  (last accessed March 16, 2025)
[11]  Reed Smith, ANNUAL REPORT 2024, p. 6
[12]  Reed Smith, ANNUAL REPORT 2023, p. 3
[13]  See, Reed Smith LLP, *Diversity, Equity & Inclusion*, https://www.reedsmith.com/en/diversity ("60 percent of the executive committee is diverse, 69% of our managing partners are diverse, and 74% of our new U.S. associates are diverse.")

Reed Smith's score cards "aim …. to incentivize and motivate [its] leaders to focus on the recruitment, retention, and promotion of diverse lawyers within their office/group."  Leaders are required "to create scorecards which measure diversity metrics for each group and office, including headcount by title, year to date attrition, year to date hires, and year to date promotions."[14]

Additionally, Reed Smith has initiated several DEI programs, including:

- "RISING": a facially race-restricted "program designed to support an inaugural cohort of 32 Black lawyers in accelerating progress toward their practice growth goals and prospective opportunities."  Specifically, "each participant is matched with a 'connector,' who is a senior firm lawyer, and a Senior Management Team sponsor…Connectors work proactively to put their connectees into the path of opportunity;"[15]

- STAARS: "Sustaining and Training African Americans at Reed Smith," a facially race-restricted program that focuses on the development of "African Americans throughout the firm."[16] Members are invited to attend career development conferences, retreats,[17] and training such as the "Associate Academy" which provides "coaching, community building, and training;"[18]

- DEI Leadership Development Program: a program that "provides training and opportunities to [its] partners, counsel and senior professional staff.  Of those who participated in the 2022/2023 program, 67% were eligible for promotion;"[19] and

- Various 1L and 2L Diversity Fellowship programs that historically required the candidate be "diverse:"[20]

    o **The Reed Smith / McKesson 1L Diversity Fellowship Program** provides "an award in the amount of $5,000 and a summer associate position ***to a diverse***, first-year law student;"

    o **The Reed Smith/Citizens Financial Group Diversity Fellowship Program** provides "an award in the amount of $5,000 and a summer associate position ***to a diverse***, first-year law student;"

---

[14] Reed Smith, ANNUAL REPORT 2021, p. 16

[15] Reed Smith, ANNUAL REPORT 2022, p. 17

[16] YouTube, Reed Smith, *Driving Progress Through Diversity & Inclusion, featuring STAARS Chair Regina Speed-Bost*, https://www.youtube.com/watch?v=oBk-c-TsLD0 (last visited March 16, 2025)

[17] Reed Smith, ANNUAL REPORT 2022, p. 67

[18] Reed Smith, ANNUAL REPORT 2023, p. 21

[19] Reed Smith, ANNUAL REPORT 2023, p. 7

[20] Reed Smith, *Diversity Fellowship Programs*, https://www.law.upenn.edu/live/files/11291-diversity-fellowship-document (last visited March 16, 2025); *see also* Reed Smith, ANNUAL REPORT 2022, p. 35; Reed Smith, ANNUAL REPORT 2021, pp. 29-30

- **The Philadelphia Diversity Law Group (PDLG) Fellows Program** (formerly known as the PDLG Summer 1L Program) "***offers diverse*** first year law students a route to summer employment at outstanding law firms and legal departments;"

- **The Reed Smith/BNY Mellon Diversity Fellowship Program** -- provides "an award in the amount of $5,000 and a summer associate position ***to a diverse***, second-year law student;"

- **Reed Smith 2L Managed Care Diversity Fellowship Program** – "provides an award in the amount of $5,000 and a summer associate position ***to a diverse***, second-year law student interested in pursuing a career in managed care litigation."

- **1L Leadership Council on Legal Diversity (LCLD)** – "The 1L LCLD Scholars program is designed to strengthen the legal pipeline by expanding the number of opportunities for ***diverse*** first-year law students. The program offers students the opportunity to work side by side with [Reed Smith] lawyers as part of our summer associate program." Notably, Reed Smith is a co-founder of LCLD.[21]

As a result of the totality its efforts, Reed Smith has proudly proclaimed numerous accolades:

- ***Mansfield Certified Plus*** 7.0 status – an award giving to firms "that have reached at least 30% diverse lawyer representation in a notable number of leadership roles and committees."[22]

- ***Leadership Council on Legal Diversity (LCLD)*** – a 2023 and 2024 top performer and compass award winner[23]

- Moved to #26 from #43 in ***The America's Lawyer 2023 Diversity Scorecard***[24]

- Recognized by ***Bloomberg Law's 2023 DEI Framework***[25]

I am concerned that Reed Smith's diversity, equity, and inclusion initiatives, including REAP, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

---

[21] Reed Smith, ANNUAL REPORT 2021, p. 30
[22] Reed Smith, ANNUAL REPORT 2024, p 11
[23] *Id.* at 12; see also Reed Smith, ANNUAL REPORT 2023, p. 5
[24] *Id.*
[25] *Id.*

*Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award." In public statements, Reed Smith has acknowledged that it has 1L Diversity Fellowship Programs and 2L Diversity Fellowship Programs, and that these programs offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar. Please answer the following questions regarding those programs.

1.    Please describe the application and selection criteria used by Reed Smith for each of its 1L Diversity Fellowship Program(s) from 2015 to the present. For each year, provide documentation reflecting the described criteria.

2.    Please describe the application and selection criteria used by Reed Smith for each of its 2L Diversity Fellowship Program(s) from 2015 to the present. For each year, provide documentation reflecting the described criteria.

3.    Does Reed Smith hire any 1L law students as summer associates other than participants in any of the firm's Diversity Fellowship Programs?

4.    At any point since 2015, did participation in either the 1L or 2L Diversity Fellowship Program(s) provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2015, did the firm provide participants in the 1L or 2L Diversity Fellowship Program(s) with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program? For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation. Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L Diversity Fellowship Program(s):

       a.  Name
       b.  Sex
       c.  Race
       d.  Phone number
       e.  Email address
       f.  Law school
       g.  Law school GPA (as of date of application)
       h.  Selected for 1L Diversity Fellowship Program (Y/N)

      i.    Name of 1L Diversity Fellowship Program

*If selected*:
      j.    Compensation for 1L Diversity Fellowship Program
      k.   Received offer for a 2L Diversity Fellowship Program (Y/N)
      l.    Received offer for regular summer associate position (Y/N)
      m.  Received offer for full-time associate attorney position (Y/N)
      n.   Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
      o.   Amount of additional funds
      p.   Reason for receipt of additional funds
      q.   Office location

7.     From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program(s):

      a.   Name
      b.   Sex
      c.   Race
      d.   Phone number
      e.   Email address
      f.    Law school
      g.   Law school GPA (as of date of application)
      h.   Selected for 2L Diversity Fellowship Program (Y/N)
      i.    Name of 2L Diversity Fellowship Program

*If selected*:
      j.    Compensation for 2L Diversity Fellowship Program
      k.   Received offer for regular summer associate position (Y/N)
      l.    Received offer for full-time associate attorney position (Y/N)
      m.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
      n.   Amount of additional funds
      o.   Reason for receipt of additional funds
      p.   Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[26] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that

---

[26] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

"[a]ll are invited to apply" for the the SEO Law Fellowship.[27] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[28] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[29] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[30] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[31] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[32] If your firm had SEO Fellows placed at your firm at any point since 2019, please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[27] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[28] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[29] *Id.*

[30] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[31] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[32] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm? Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Total compensation paid to SEO Fellow for internship at your firm
    h.  Applied for 1L summer associate program (Y/N)
    i.  Selected for 1L summer associate program (Y/N)
    j.  Applied for 2L summer associate program (Y/N)
    k.  Selected for 2L summer associate program (Y/N)
    l.  Applied for full-time associate attorney position (Y/N)
    m.  Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

    a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.     At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.     At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.     At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.     If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.     In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

        a.   Name
        b.   Sex
        c.   Race
        d.   Phone number
        e.   Email address
        f.   Law school
        g.   Law school GPA (as of date of application)
        h.   Hired (Y/N)

        *If hired*:
        i.   Date hired
        j.   Date discharged (indicating voluntary or involuntary)
        k.   Starting compensation
        l.   Compensation as of the date of response
        m.   Tuition repayment assistance
        n.   Title
        o.   Date of promotion

    p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.    At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c.  Information on all candidates that your firm considered selecting to receive access to these programs:

        i.    Name
        ii.    Sex
        iii.    Race
        iv.    Phone number
        v.    Email address
        vi.    Office location
        vii.    Year that candidate was considered for LCLD program
        viii.    Selected by your firm to participate in LCLD program (Y/N)
        ix.    Job position at time of consideration for LCLD program
        x.    Current job position
        xi.    Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii.    Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.    Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.    Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a.    The client
    b.    The date of disclosure

c.    The client's response
d.    Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[33] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

### *Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics*

27.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

28.    Provide all documentation related to the firm's "REAP" initiative, including how the firm's goals were decided upon, how each component of the plan would be effectuated, metrics to be measured each quarter, benchmarks since the initiative began, whether the firm has achieved any of the goals outlined, and any reports created related to REAP.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation, including all scorecards.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

32.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe

---

[33]    *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

the recruitment bonus policy and the amount of the bonuses, and provide all related documentation. Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

***Partnership Decisions***

33.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex? If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner? If so, describe in detail. If so, please describe the policy or practice in detail and provide all related documentation.

35.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm? If so, please describe the policy or practice in detail and provide all related documentation.

36.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Member of firm affinity group (Y/N)
   h.   Name of affinity group(s) in which attorney participates
   i.   Previously participated in LCLD program (Y/N)
   j.   Previously was SEO Fellow (Y/N)
   k.   Previously participated in firm diversity internship or fellowship (Y/N)
   l.   Elevated to partner (Y/N)
   m.   Equity or non-equity partner (Equity / Non-Equity)

37.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

   a.   Name
   b.   Sex
   c.   Race

    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Member of a firm affinity group (Y/N)
    h.  Name of affinity group(s) in which attorney participates / participated
    i.  Previously participated in LCLD program (Y/N)
    j.  Previously was SEO Fellow (Y/N)
    k.  Previously participated in a firm diversity internship or fellowship (Y/N)
    l.  Hired as lateral partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

A & O Shearman
c/o Doreen Lilienfeld
599 Lexington Avenue
New York, NY 10022
dlilienfeld@aoshearman.com

Re:    Review of A & O Shearman's Compliance with Title VII of the Civil Rights Act of 1964

Dear Ms. Lilienfeld:

      Based on public statements[1] by A & O Shearman, I am seeking information about the firm's employment practices.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2]  Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3]  Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4]  It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

      I am concerned that A & O Shearman's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII.  I believe you can be of assistance in helping to identify all relevant information I might

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### *Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If A & O Shearman (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by A & O Shearman for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by A & O Shearman for its 2L diversity internship from 2019 to the present.

3.    Does A & O Shearman hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

     a.  Name
     b.  Sex
     c.  Race
     d.  Phone number
     e.  Email address
     f.  Law school
     g.  Law school GPA (as of date of application)

    h.  Selected for 1L diversity internship (Y/N)

    *If selected*:
    i.  Compensation for 1L diversity internship
    j.  Received offer for 2L diversity internship (Y/N)
    k.  Received offer for regular summer associate position (Y/N)
    l.  Received offer for full-time associate attorney position (Y/N)
    m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
    n.  Amount of additional funds
    o.  Reason for receipt of additional funds
    p.  Office location

7.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Selected for 2L diversity internship (Y/N)

    *If selected*:
    i.  Compensation for 2L diversity internship
    j.  Received offer for regular summer associate position (Y/N)
    k.  Received offer for full-time associate attorney position (Y/N)
    l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
    m.  Amount of additional funds
    n.  Reason for receipt of additional funds
    o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at A & O Shearman's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.   Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.   Does your firm hire any 0L summer associates other than SEO Fellows?

15.   For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Office location
    g.   Total compensation paid to SEO Fellow for internship at your firm
    h.   Applied for 1L summer associate program (Y/N)
    i.   Selected for 1L summer associate program (Y/N)
    j.   Applied for 2L summer associate program (Y/N)
    k.   Selected for 2L summer associate program (Y/N)
    l.   Applied for full-time associate attorney position (Y/N)
    m.   Selected for full-time associate attorney position (Y/N)

16.   For each year since 2019 in which your firm had any summer associate programs:

    a.   What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.   How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.   How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.   How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.   How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.   At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.    At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.    At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.    If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.    In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Hired (Y/N)

    *If hired*:
    i.  Date hired
    j.  Date discharged (indicating voluntary or involuntary)
    k.  Starting compensation
    l.  Compensation as of the date of response
    m.  Tuition repayment assistance
    n.  Title

o. Date of promotion
p. Office location

***Other Terms, Conditions, and Privileges of Employment***

23. At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

   a. The years on which your firm selected attorneys to participate in those training and leadership development programs;

   b. The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

   c. Information on all candidates that your firm considered selecting to receive access to these programs:

      i. Name
      ii. Sex
      iii. Race
      iv. Phone number
      v. Email address
      vi. Office location
      vii. Year that candidate was considered for LCLD program
      viii. Selected by your firm to participate in LCLD program (Y/N)
      ix. Job position at time of consideration for LCLD program
      x. Current job position
      xi. Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
      xii. Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24. Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25. Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

   a. The client
   b. The date of disclosure

      c.    The client's response

      d.    Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]   *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### *Partnership Decisions*

33.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Office location
    g.   Member of firm affinity group (Y/N)
    h.   Name of affinity group(s) in which attorney participates
    i.   Previously participated in LCLD program (Y/N)
    j.   Previously was SEO Fellow (Y/N)
    k.   Previously participated in firm diversity internship or fellowship (Y/N)
    l.   Elevated to partner (Y/N)
    m.   Equity or non-equity partner (Equity / Non-Equity)

37.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

*** 

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Debevoise & Plimpton LLP
c/o Peter A. Furci
66 Hudson Boulevard
New York, NY 10001
pafurci@debevoise.com

Re:    Review of Debevoise & Plimpton LLP's Compliance with Title VII of the Civil Rights
Act of 1964

Dear Mr. Furci:

Based on public statements[1] by Debevoise & Plimpton LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Debevoise & Plimpton LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

*Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Debevoise & Plimpton LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by Debevoise & Plimpton LLP for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by Debevoise & Plimpton LLP for its 2L diversity internship from 2019 to the present.

3.    Does Debevoise & Plimpton LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Law school
    g.   Law school GPA (as of date of application)

h. Selected for 1L diversity internship (Y/N)

*If selected*:
i. Compensation for 1L diversity internship
j. Received offer for 2L diversity internship (Y/N)
k. Received offer for regular summer associate position (Y/N)
l. Received offer for full-time associate attorney position (Y/N)
m. Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n. Amount of additional funds
o. Reason for receipt of additional funds
p. Office location

7.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Law school
g. Law school GPA (as of date of application)
h. Selected for 2L diversity internship (Y/N)

*If selected*:
i. Compensation for 2L diversity internship
j. Received offer for regular summer associate position (Y/N)
k. Received offer for full-time associate attorney position (Y/N)
l. Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m. Amount of additional funds
n. Reason for receipt of additional funds
o. Office location

***SEO Law Fellowship***

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Debevoise & Plimpton LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship.  Did your firm pay the SEO Fellows?  If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work?  Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added).  "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.  Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.  Does your firm hire any 0L summer associates other than SEO Fellows?

15.  For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

   a.  Name
   b.  Sex
   c.  Race
   d.  Phone number
   e.  Email address
   f.  Office location
   g.  Total compensation paid to SEO Fellow for internship at your firm
   h.  Applied for 1L summer associate program (Y/N)
   i.  Selected for 1L summer associate program (Y/N)
   j.  Applied for 2L summer associate program (Y/N)
   k.  Selected for 2L summer associate program (Y/N)
   l.  Applied for full-time associate attorney position (Y/N)
   m.  Selected for full-time associate attorney position (Y/N)

16.  For each year since 2019 in which your firm had any summer associate programs:

   a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
   b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
   c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
   d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
   e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.  At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.     At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.     At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.     At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.     If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.     In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

        a.   Name
        b.   Sex
        c.   Race
        d.   Phone number
        e.   Email address
        f.   Law school
        g.   Law school GPA (as of date of application)
        h.   Hired (Y/N)

        *If hired*:
        i.   Date hired
        j.   Date discharged (indicating voluntary or involuntary)
        k.   Starting compensation
        l.   Compensation as of the date of response
        m.  Tuition repayment assistance
        n.   Title

o.  Date of promotion
p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.  At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

   a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

   b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

   c.  Information on all candidates that your firm considered selecting to receive access to these programs:

      i.    Name
      ii.   Sex
      iii.  Race
      iv.   Phone number
      v.    Email address
      vi.   Office location
      vii.  Year that candidate was considered for LCLD program
      viii. Selected by your firm to participate in LCLD program (Y/N)
      ix.   Job position at time of consideration for LCLD program
      x.    Current job position
      xi.   Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
      xii.  Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.  Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters.  Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications.  Produce any related documents.

25.  Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

   a.  The client
   b.  The date of disclosure

      c.      The client's response

      d.      Whether the disclosure was client mandated/requested

26.     Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.     At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.     At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.     At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.     At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.     Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12] *See, e.g.,* Microsoft Law Firm Diversity Program Overview and FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.     At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### Partnership Decisions

33.     At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.     At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.     At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.     For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Member of firm affinity group (Y/N)
    h.  Name of affinity group(s) in which attorney participates
    i.  Previously participated in LCLD program (Y/N)
    j.  Previously was SEO Fellow (Y/N)
    k.  Previously participated in firm diversity internship or fellowship (Y/N)
    l.  Elevated to partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

37.     For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Freshfields Bruckhaus Deringer LLP
c/o Sarah K. Solum
855 Main Street
Redwood City, CA
sarah.solum@freshfields.com

Re:    Review of Freshfields Bruckhaus Deringer LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Ms. Solum:

Based on public statements[1] by Freshfields Bruckhaus Deringer LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Freshfields Bruckhaus Deringer LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

all relevant information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

*Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Freshfields Bruckhaus Deringer LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by Freshfields Bruckhaus Deringer LLP for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by Freshfields Bruckhaus Deringer LLP for its 2L diversity internship from 2019 to the present.

3.    Does Freshfields Bruckhaus Deringer LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)

    h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.  Compensation for 1L diversity internship
j.  Received offer for 2L diversity internship (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Selected for 2L diversity internship (Y/N)

*If selected*:
i.  Compensation for 2L diversity internship
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Freshfields Bruckhaus Deringer LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Office location
    g.   Total compensation paid to SEO Fellow for internship at your firm
    h.   Applied for 1L summer associate program (Y/N)
    i.   Selected for 1L summer associate program (Y/N)
    j.   Applied for 2L summer associate program (Y/N)
    k.   Selected for 2L summer associate program (Y/N)
    l.   Applied for full-time associate attorney position (Y/N)
    m.   Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

    a.   What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.   How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.   How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.   How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.   How many of the incoming class of associate attorneys previously had been SEO Fellows?

### Other Hiring and Compensation Practices

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.     At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.     At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.     At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.     If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.     In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

        a.   Name
        b.   Sex
        c.   Race
        d.   Phone number
        e.   Email address
        f.   Law school
        g.   Law school GPA (as of date of application)
        h.   Hired (Y/N)

        *If hired*:
        i.   Date hired
        j.   Date discharged (indicating voluntary or involuntary)
        k.   Starting compensation
        l.   Compensation as of the date of response
        m.   Tuition repayment assistance
        n.   Title

o.  Date of promotion
p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.  At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c.  Information on all candidates that your firm considered selecting to receive access to these programs:

        i.  Name
        ii.  Sex
        iii.  Race
        iv.  Phone number
        v.  Email address
        vi.  Office location
        vii.  Year that candidate was considered for LCLD program
        viii.  Selected by your firm to participate in LCLD program (Y/N)
        ix.  Job position at time of consideration for LCLD program
        x.  Current job position
        xi.  Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii.  Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.  Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.  Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a.  The client
    b.  The date of disclosure

     c.     The client's response

     d.     Whether the disclosure was client mandated/requested

26.     Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.     At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.     At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.     At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.     At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.     Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]    *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### *Partnership Decisions*

33.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Office location
    g.   Member of firm affinity group (Y/N)
    h.   Name of affinity group(s) in which attorney participates
    i.   Previously participated in LCLD program (Y/N)
    j.   Previously was SEO Fellow (Y/N)
    k.   Previously participated in firm diversity internship or fellowship (Y/N)
    l.   Elevated to partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

37.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

Goodwin Procter LLP
c/o Mark T. Bettencourt
100 Northern Avenue, Boston, MA 02210
mbettencourt@goodwinlaw.com

Re:    Review of Goodwin Procter LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Bettencourt:

Based on public statements[1] by Goodwin Procter LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Goodwin Procter LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.


*Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Goodwin Procter LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1. Please describe the application and selection criteria used by Goodwin Procter LLP for its 1L diversity internship from 2019 to the present.

2. Please describe the application and selection criteria used by Goodwin Procter LLP for its 2L diversity internship from 2019 to the present.

3. Does Goodwin Procter LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4. At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5. At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6. From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

   a. Name
   b. Sex
   c. Race
   d. Phone number
   e. Email address
   f. Law school
   g. Law school GPA (as of date of application)

h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.  Compensation for 1L diversity internship
j.  Received offer for 2L diversity internship (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a.  Name
b.  Sex
c.  Race
d.  Phone number
e.  Email address
f.  Law school
g.  Law school GPA (as of date of application)
h.  Selected for 2L diversity internship (Y/N)

*If selected*:
i.  Compensation for 2L diversity internship
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Goodwin Procter LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Total compensation paid to SEO Fellow for internship at your firm
   h.   Applied for 1L summer associate program (Y/N)
   i.   Selected for 1L summer associate program (Y/N)
   j.   Applied for 2L summer associate program (Y/N)
   k.   Selected for 2L summer associate program (Y/N)
   l.   Applied for full-time associate attorney position (Y/N)
   m.   Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

   a.   What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
   b.   How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
   c.   How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
   d.   How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
   e.   How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.    At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.    At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.    If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.    In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

        a.   Name
        b.   Sex
        c.   Race
        d.   Phone number
        e.   Email address
        f.   Law school
        g.   Law school GPA (as of date of application)
        h.   Hired (Y/N)

        *If hired*:
        i.   Date hired
        j.   Date discharged (indicating voluntary or involuntary)
        k.   Starting compensation
        l.   Compensation as of the date of response
        m.  Tuition repayment assistance
        n.   Title

     o.   Date of promotion
     p.   Office location

***Other Terms, Conditions, and Privileges of Employment***

23.    At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a.   The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b.   The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c.   Information on all candidates that your firm considered selecting to receive access to these programs:

        i.     Name
        ii.    Sex
        iii.   Race
        iv.   Phone number
        v.     Email address
        vi.   Office location
        vii.  Year that candidate was considered for LCLD program
        viii. Selected by your firm to participate in LCLD program (Y/N)
        ix.   Job position at time of consideration for LCLD program
        x.     Current job position
        xi.   Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii.  Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.    Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.    Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a.    The client
    b.    The date of disclosure

      c.     The client's response

      d.     Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

### *Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics*

27.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]   *See, e.g.,* Microsoft Law Firm Diversity Program Overview and FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

*Partnership Decisions*

33.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Office location
    g.   Member of firm affinity group (Y/N)
    h.   Name of affinity group(s) in which attorney participates
    i.   Previously participated in LCLD program (Y/N)
    j.   Previously was SEO Fellow (Y/N)
    k.   Previously participated in firm diversity internship or fellowship (Y/N)
    l.   Elevated to partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

37.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov.  If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

Hogan Lovells LLP
c/o Miguel A. Zaldivar, Jr.
555 Thirteenth Street, NW, Washington, DC 20004
miguel.zaldivar@hoganlovells.com

Re:    Review of Hogan Lovells LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Zaldivar:

Based on public statements[1] by Hogan Lovells LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Hogan Lovells LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### Internships, Fellowships, and Scholarships

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Hogan Lovells LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by Hogan Lovells LLP for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by Hogan Lovells LLP for its 2L diversity internship from 2019 to the present.

3.    Does Hogan Lovells LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Law school
   g.   Law school GPA (as of date of application)

2

    h.   Selected for 1L diversity internship (Y/N)

    *If selected*:
    i.    Compensation for 1L diversity internship
    j.    Received offer for 2L diversity internship (Y/N)
    k.   Received offer for regular summer associate position (Y/N)
    l.    Received offer for full-time associate attorney position (Y/N)
    m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
    n.   Amount of additional funds
    o.   Reason for receipt of additional funds
    p.   Office location

7.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.    Law school
    g.   Law school GPA (as of date of application)
    h.   Selected for 2L diversity internship (Y/N)

    *If selected*:
    i.    Compensation for 2L diversity internship
    j.    Received offer for regular summer associate position (Y/N)
    k.   Received offer for full-time associate attorney position (Y/N)
    l.    Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
    m.  Amount of additional funds
    n.   Reason for receipt of additional funds
    o.   Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Hogan Lovells LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.   Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.   Does your firm hire any 0L summer associates other than SEO Fellows?

15.   For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Office location
    g.   Total compensation paid to SEO Fellow for internship at your firm
    h.   Applied for 1L summer associate program (Y/N)
    i.   Selected for 1L summer associate program (Y/N)
    j.   Applied for 2L summer associate program (Y/N)
    k.   Selected for 2L summer associate program (Y/N)
    l.   Applied for full-time associate attorney position (Y/N)
    m.   Selected for full-time associate attorney position (Y/N)

16.   For each year since 2019 in which your firm had any summer associate programs:

    a.   What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.   How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.   How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.   How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.   How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.   At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.    At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.    At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.    If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.    In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

a.   Name
b.   Sex
c.   Race
d.   Phone number
e.   Email address
f.   Law school
g.   Law school GPA (as of date of application)
h.   Hired (Y/N)

*If hired*:
i.   Date hired
j.   Date discharged (indicating voluntary or involuntary)
k.   Starting compensation
l.   Compensation as of the date of response
m.  Tuition repayment assistance
n.   Title

    o.  Date of promotion
    p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.    At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c.  Information on all candidates that your firm considered selecting to receive access to these programs:

        i.    Name
        ii.   Sex
        iii.  Race
        iv.  Phone number
        v.    Email address
        vi.  Office location
        vii.  Year that candidate was considered for LCLD program
        viii. Selected by your firm to participate in LCLD program (Y/N)
        ix.  Job position at time of consideration for LCLD program
        x.    Current job position
        xi.  Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii.  Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.    Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.    Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a.    The client
    b.    The date of disclosure

      c.      The client's response

      d.      Whether the disclosure was client mandated/requested

26.      Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

### *Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics*

27.      At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.      At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.      At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.      At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.      Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]   *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.   At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

***Partnership Decisions***

33.   At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.   At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.   At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.   For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Member of firm affinity group (Y/N)
   h.   Name of affinity group(s) in which attorney participates
   i.   Previously participated in LCLD program (Y/N)
   j.   Previously was SEO Fellow (Y/N)
   k.   Previously participated in firm diversity internship or fellowship (Y/N)
   l.   Elevated to partner (Y/N)
   m.   Equity or non-equity partner (Equity / Non-Equity)

37.   For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

Kirkland & Ellis LLP
c/o Jon A. Ballis
333 West Wolf Point Plaza, Chicago, IL 60654
jon.ballis@kirkland.com

Re:    Review of Kirkland & Ellis LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Ballis:

Based on public statements[1] by Kirkland & Ellis LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Kirkland & Ellis LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### *Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award." If Kirkland & Ellis LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.  Please describe the application and selection criteria used by Kirkland & Ellis LLP for its 1L diversity internship from 2019 to the present.

2.  Please describe the application and selection criteria used by Kirkland & Ellis LLP for its 2L diversity internship from 2019 to the present.

3.  Does Kirkland & Ellis LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.  At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.  At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program? For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation. Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)

h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.  Compensation for 1L diversity internship
j.  Received offer for 2L diversity internship (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a.  Name
b.  Sex
c.  Race
d.  Phone number
e.  Email address
f.  Law school
g.  Law school GPA (as of date of application)
h.  Selected for 2L diversity internship (Y/N)

*If selected*:
i.  Compensation for 2L diversity internship
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

### SEO Law Fellowship

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7]  And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10]  "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Kirkland & Ellis LLP's offices in Summer 2024. Please answer the following questions:

8.    Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.    The SEO Fellowship is a paid internship.  Did your firm pay the SEO Fellows?  If so, how much?

10.   During their placement at your firm for their summer internship, at what location did the interns work?  Did they work in your firms' office(s) or other firm premises?

11.   Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.   Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added).  "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

   a.  Name
   b.  Sex
   c.  Race
   d.  Phone number
   e.  Email address
   f.  Office location
   g.  Total compensation paid to SEO Fellow for internship at your firm
   h.  Applied for 1L summer associate program (Y/N)
   i.  Selected for 1L summer associate program (Y/N)
   j.  Applied for 2L summer associate program (Y/N)
   k.  Selected for 2L summer associate program (Y/N)
   l.  Applied for full-time associate attorney position (Y/N)
   m.  Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

   a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
   b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
   c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
   d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
   e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.　At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.　At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.　At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.　If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.　In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

a.　Name
b.　Sex
c.　Race
d.　Phone number
e.　Email address
f.　Law school
g.　Law school GPA (as of date of application)
h.　Hired (Y/N)

*If hired*:
i.　Date hired
j.　Date discharged (indicating voluntary or involuntary)
k.　Starting compensation
l.　Compensation as of the date of response
m.　Tuition repayment assistance
n.　Title

    o.  Date of promotion
    p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.    At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a.    The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b.    The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c.    Information on all candidates that your firm considered selecting to receive access to these programs:

        i.    Name
        ii.    Sex
        iii.    Race
        iv.    Phone number
        v.    Email address
        vi.    Office location
        vii.    Year that candidate was considered for LCLD program
        viii.    Selected by your firm to participate in LCLD program (Y/N)
        ix.    Job position at time of consideration for LCLD program
        x.    Current job position
        xi.    Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii.    Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.    Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.    Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a.    The client
    b.    The date of disclosure

    c.      The client's response

    d.      Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12] *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### *Partnership Decisions*

33.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Member of firm affinity group (Y/N)
   h.   Name of affinity group(s) in which attorney participates
   i.   Previously participated in LCLD program (Y/N)
   j.   Previously was SEO Fellow (Y/N)
   k.   Previously participated in firm diversity internship or fellowship (Y/N)
   l.   Elevated to partner (Y/N)
   m.   Equity or non-equity partner (Equity / Non-Equity)

37.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Latham & Watkins LLP
c/o Richard M. Trobman
1271 Avenue of the Americas, New York, NY 10020
richard.trobman@lw.com

Re:    Review of Latham & Watkins LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Trobman:

Based on public statements[1] by Latham & Watkins LLP, I am seeking information about the firm's employment practices.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2]  Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3]  Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4]  It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Latham & Watkins LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII.  I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### *Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award." If Latham & Watkins LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.  Please describe the application and selection criteria used by Latham & Watkins LLP for its 1L diversity internship from 2019 to the present.

2.  Please describe the application and selection criteria used by Latham & Watkins LLP for its 2L diversity internship from 2019 to the present.

3.  Does Latham & Watkins LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.  At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.  At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program? For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation. Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)

    h.  Selected for 1L diversity internship (Y/N)

    *If selected*:
    i.  Compensation for 1L diversity internship
    j.  Received offer for 2L diversity internship (Y/N)
    k.  Received offer for regular summer associate position (Y/N)
    l.  Received offer for full-time associate attorney position (Y/N)
    m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
    n.  Amount of additional funds
    o.  Reason for receipt of additional funds
    p.  Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Selected for 2L diversity internship (Y/N)

    *If selected*:
    i.  Compensation for 2L diversity internship
    j.  Received offer for regular summer associate position (Y/N)
    k.  Received offer for full-time associate attorney position (Y/N)
    l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
    m.  Amount of additional funds
    n.  Reason for receipt of additional funds
    o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Latham & Watkins LLP's offices in Summer 2024. Please answer the following questions:

8.    Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.    The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.    During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.    Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.    Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.
[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.
[8] *Id.*
[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).
[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.
[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.     Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.     Does your firm hire any 0L summer associates other than SEO Fellows?

15.     For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Total compensation paid to SEO Fellow for internship at your firm
    h.  Applied for 1L summer associate program (Y/N)
    i.  Selected for 1L summer associate program (Y/N)
    j.  Applied for 2L summer associate program (Y/N)
    k.  Selected for 2L summer associate program (Y/N)
    l.  Applied for full-time associate attorney position (Y/N)
    m.  Selected for full-time associate attorney position (Y/N)

16.     For each year since 2019 in which your firm had any summer associate programs:

    a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.     At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.  At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.  At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.  At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.  If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.  In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

   a.  Name
   b.  Sex
   c.  Race
   d.  Phone number
   e.  Email address
   f.  Law school
   g.  Law school GPA (as of date of application)
   h.  Hired (Y/N)

   *If hired*:
   i.  Date hired
   j.  Date discharged (indicating voluntary or involuntary)
   k.  Starting compensation
   l.  Compensation as of the date of response
   m. Tuition repayment assistance
   n.  Title

o.  Date of promotion
p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.  At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c.  Information on all candidates that your firm considered selecting to receive access to these programs:

        i.    Name
        ii.   Sex
        iii.  Race
        iv.   Phone number
        v.    Email address
        vi.   Office location
        vii.  Year that candidate was considered for LCLD program
        viii. Selected by your firm to participate in LCLD program (Y/N)
        ix.   Job position at time of consideration for LCLD program
        x.    Current job position
        xi.   Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii.  Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.  Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters.  Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications.  Produce any related documents.

25.  Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a.  The client
    b.  The date of disclosure

    c.     The client's response

    d.     Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]   *See, e.g.,* Microsoft Law Firm Diversity Program Overview and FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.   At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### Partnership Decisions

33.   At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.   At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.   At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.   For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Member of firm affinity group (Y/N)
   h.   Name of affinity group(s) in which attorney participates
   i.   Previously participated in LCLD program (Y/N)
   j.   Previously was SEO Fellow (Y/N)
   k.   Previously participated in firm diversity internship or fellowship (Y/N)
   l.   Elevated to partner (Y/N)
   m.   Equity or non-equity partner (Equity / Non-Equity)

37.   For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

*** 

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

McDermott Will & Emery
c/o Ira J. Coleman
444 West Lake Street, Chicago, IL 60606-0029
icoleman@mwe.com

Re:     Review of McDermott Will & Emery's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Coleman:

Based on public statements[1] by McDermott Will & Emery, I am seeking information about the firm's employment practices.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2]  Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3]  Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4]  It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that McDermott Will & Emery's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII.  I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### *Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award." If McDermott Will & Emery (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.  Please describe the application and selection criteria used by McDermott Will & Emery for its 1L diversity internship from 2019 to the present.

2.  Please describe the application and selection criteria used by McDermott Will & Emery for its 2L diversity internship from 2019 to the present.

3.  Does McDermott Will & Emery hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.  At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.  At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program? For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation. Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)

    h.  Selected for 1L diversity internship (Y/N)

    *If selected*:
    i.  Compensation for 1L diversity internship
    j.  Received offer for 2L diversity internship (Y/N)
    k.  Received offer for regular summer associate position (Y/N)
    l.  Received offer for full-time associate attorney position (Y/N)
    m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
    n.  Amount of additional funds
    o.  Reason for receipt of additional funds
    p.  Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Selected for 2L diversity internship (Y/N)

    *If selected*:
    i.  Compensation for 2L diversity internship
    j.  Received offer for regular summer associate position (Y/N)
    k.  Received offer for full-time associate attorney position (Y/N)
    l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
    m.  Amount of additional funds
    n.  Reason for receipt of additional funds
    o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at McDermott Will & Emery's offices in Summer 2024. Please answer the following questions:

8.     Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.     The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.    During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.    Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.    Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

     a.    Name
     b.    Sex
     c.    Race
     d.    Phone number
     e.    Email address
     f.    Office location
     g.    Total compensation paid to SEO Fellow for internship at your firm
     h.    Applied for 1L summer associate program (Y/N)
     i.    Selected for 1L summer associate program (Y/N)
     j.    Applied for 2L summer associate program (Y/N)
     k.    Selected for 2L summer associate program (Y/N)
     l.    Applied for full-time associate attorney position (Y/N)
     m.    Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

     a.    What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
     b.    How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
     c.    How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
     d.    How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
     e.    How many of the incoming class of associate attorneys previously had been SEO Fellows?

### *Other Hiring and Compensation Practices*

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.     At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.     At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.     At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.     If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.     In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

        a.  Name
        b.  Sex
        c.  Race
        d.  Phone number
        e.  Email address
        f.  Law school
        g.  Law school GPA (as of date of application)
        h.  Hired (Y/N)

        *If hired*:
        i.  Date hired
        j.  Date discharged (indicating voluntary or involuntary)
        k.  Starting compensation
        l.  Compensation as of the date of response
        m.  Tuition repayment assistance
        n.  Title

o.  Date of promotion
p.  Office location

### Other Terms, Conditions, and Privileges of Employment

23.  At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

   a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

   b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

   c.  Information on all candidates that your firm considered selecting to receive access to these programs:

       i.  Name
       ii.  Sex
       iii.  Race
       iv.  Phone number
       v.  Email address
       vi.  Office location
       vii.  Year that candidate was considered for LCLD program
       viii.  Selected by your firm to participate in LCLD program (Y/N)
       ix.  Job position at time of consideration for LCLD program
       x.  Current job position
       xi.  Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
       xii.  Whether individual currently holds a leadership position at your firm (Y/N)

### Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests

24.  Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.  Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

   a.  The client
   b.  The date of disclosure

      c.      The client's response

      d.      Whether the disclosure was client mandated/requested

26.      Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

### *Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics*

27.      At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.      At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.      At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.      At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.      Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12] *See, e.g.,* Microsoft Law Firm Diversity Program Overview and FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.   At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

***Partnership Decisions***

33.   At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.   At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.   At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.   For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Member of firm affinity group (Y/N)
   h.   Name of affinity group(s) in which attorney participates
   i.   Previously participated in LCLD program (Y/N)
   j.   Previously was SEO Fellow (Y/N)
   k.   Previously participated in firm diversity internship or fellowship (Y/N)
   l.   Elevated to partner (Y/N)
   m.   Equity or non-equity partner (Equity / Non-Equity)

37.   For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

9

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Milbank LLP
c/o Scott A. Edelman
55 Hudson Yards, New York, NY US 10001-2163
sedelman@milbank.com

Re:     Review of Milbank LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Edelman:

Based on public statements[1] by Milbank LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Milbank LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

***Internships, Fellowships, and Scholarships***

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Milbank LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by Milbank LLP for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by Milbank LLP for its 2L diversity internship from 2019 to the present.

3.    Does Milbank LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

     a.  Name
     b.  Sex
     c.  Race
     d.  Phone number
     e.  Email address
     f.  Law school
     g.  Law school GPA (as of date of application)
     h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.  Compensation for 1L diversity internship
j.  Received offer for 2L diversity internship (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a.  Name
b.  Sex
c.  Race
d.  Phone number
e.  Email address
f.  Law school
g.  Law school GPA (as of date of application)
h.  Selected for 2L diversity internship (Y/N)

*If selected*:
i.  Compensation for 2L diversity internship
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

### SEO Law Fellowship

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).
[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7]  And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10]  "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Milbank LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship.  Did your firm pay the SEO Fellows?  If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work?  Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

13.     Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

---

[7] *Id.* (emphasis added).  "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Total compensation paid to SEO Fellow for internship at your firm
   h.   Applied for 1L summer associate program (Y/N)
   i.   Selected for 1L summer associate program (Y/N)
   j.   Applied for 2L summer associate program (Y/N)
   k.   Selected for 2L summer associate program (Y/N)
   l.   Applied for full-time associate attorney position (Y/N)
   m.   Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

   a.   What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
   b.   How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
   c.   How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
   d.   How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
   e.   How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other

third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.     At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.     At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.     If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.     In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

a.   Name
b.   Sex
c.   Race
d.   Phone number
e.   Email address
f.   Law school
g.   Law school GPA (as of date of application)
h.   Hired (Y/N)

*If hired*:
i.   Date hired
j.   Date discharged (indicating voluntary or involuntary)
k.   Starting compensation
l.   Compensation as of the date of response
m.   Tuition repayment assistance
n.   Title
o.   Date of promotion
p.   Office location

*Other Terms, Conditions, and Privileges of Employment*

23. At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a. The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b. The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c. Information on all candidates that your firm considered selecting to receive access to these programs:

        i. Name
        ii. Sex
        iii. Race
        iv. Phone number
        v. Email address
        vi. Office location
        vii. Year that candidate was considered for LCLD program
        viii. Selected by your firm to participate in LCLD program (Y/N)
        ix. Job position at time of consideration for LCLD program
        x. Current job position
        xi. Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii. Whether individual currently holds a leadership position at your firm (Y/N)

*Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests*

24. Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25. Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a. The client
    b. The date of disclosure
    c. The client's response
    d. Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

32.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe

---

[12]    *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

the recruitment bonus policy and the amount of the bonuses, and provide all related documentation. Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### *Partnership Decisions*

33. At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex? If so, please describe the policy or practice in detail and provide all related documentation.

34. At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner? If so, describe in detail. If so, please describe the policy or practice in detail and provide all related documentation.

35. At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm? If so, please describe the policy or practice in detail and provide all related documentation.

36. For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

    a. Name
    b. Sex
    c. Race
    d. Phone number
    e. Email address
    f. Office location
    g. Member of firm affinity group (Y/N)
    h. Name of affinity group(s) in which attorney participates
    i. Previously participated in LCLD program (Y/N)
    j. Previously was SEO Fellow (Y/N)
    k. Previously participated in firm diversity internship or fellowship (Y/N)
    l. Elevated to partner (Y/N)
    m. Equity or non-equity partner (Equity / Non-Equity)

37. For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

    a. Name
    b. Sex
    c. Race

   d. Phone number
   e. Email address
   f. Office location
   g. Member of a firm affinity group (Y/N)
   h. Name of affinity group(s) in which attorney participates / participated
   i. Previously participated in LCLD program (Y/N)
   j. Previously was SEO Fellow (Y/N)
   k. Previously participated in a firm diversity internship or fellowship (Y/N)
   l. Hired as lateral partner (Y/N)
   m. Equity or non-equity partner (Equity / Non-Equity)

                                    ***

   Please submit your responses and any supporting documentation by **April 15, 2025**, to
lawfirmDEI@eeoc.gov.  If certain information is unavailable or requires additional time to
compile, please indicate this in your response and provide an estimated timeline for submission.

   Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

Morgan, Lewis & Bockius LLP
c/o Jami McKeon
2222 Market St., Philadelphia, PA 19103-3007
jami.mckeon@morganlewis.com

Re:    Review of Morgan, Lewis & Bockius LLP's Compliance with Title VII of the Civil
Rights Act of 1964

Dear Ms. McKeon:

     Based on public statements[1] by Morgan, Lewis & Bockius LLP, I am seeking information about the firm's employment practices.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2]  Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3]  Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4]  It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

     I am concerned that Morgan, Lewis & Bockius LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII.  I believe you can be of assistance in helping to identify

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

all relevant information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.


*Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Morgan, Lewis & Bockius LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by Morgan, Lewis & Bockius LLP for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by Morgan, Lewis & Bockius LLP for its 2L diversity internship from 2019 to the present.

3.    Does Morgan, Lewis & Bockius LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)

    h.   Selected for 1L diversity internship (Y/N)

    *If selected*:
    i.    Compensation for 1L diversity internship
    j.   Received offer for 2L diversity internship (Y/N)
    k.  Received offer for regular summer associate position (Y/N)
    l.   Received offer for full-time associate attorney position (Y/N)
    m. Received any additional funds related to, or following, participation in a diversity internship (Y/N)
    n.  Amount of additional funds
    o.  Reason for receipt of additional funds
    p.  Office location

7.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.   Law school
    g.  Law school GPA (as of date of application)
    h.  Selected for 2L diversity internship (Y/N)

    *If selected*:
    i.    Compensation for 2L diversity internship
    j.   Received offer for regular summer associate position (Y/N)
    k.  Received offer for full-time associate attorney position (Y/N)
    l.   Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
    m. Amount of additional funds
    n.  Reason for receipt of additional funds
    o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Morgan, Lewis & Bockius LLP's offices in Summer 2024. Please answer the following questions:

8.    Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.    The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.    During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.    Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.    Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13. Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm? Did those duties relate to your firm's work?

14. Does your firm hire any 0L summer associates other than SEO Fellows?

15. For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

   a. Name
   b. Sex
   c. Race
   d. Phone number
   e. Email address
   f. Office location
   g. Total compensation paid to SEO Fellow for internship at your firm
   h. Applied for 1L summer associate program (Y/N)
   i. Selected for 1L summer associate program (Y/N)
   j. Applied for 2L summer associate program (Y/N)
   k. Selected for 2L summer associate program (Y/N)
   l. Applied for full-time associate attorney position (Y/N)
   m. Selected for full-time associate attorney position (Y/N)

16. For each year since 2019 in which your firm had any summer associate programs:

   a. What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
   b. How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
   c. How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
   d. How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
   e. How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17. At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.    At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.    At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.    If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.    In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

a.   Name
b.   Sex
c.   Race
d.   Phone number
e.   Email address
f.   Law school
g.   Law school GPA (as of date of application)
h.   Hired (Y/N)

*If hired*:
i.   Date hired
j.   Date discharged (indicating voluntary or involuntary)
k.   Starting compensation
l.   Compensation as of the date of response
m.  Tuition repayment assistance
n.   Title

o. Date of promotion
p. Office location

*Other Terms, Conditions, and Privileges of Employment*

23. At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a. The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b. The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c. Information on all candidates that your firm considered selecting to receive access to these programs:

        i. Name
        ii. Sex
        iii. Race
        iv. Phone number
        v. Email address
        vi. Office location
        vii. Year that candidate was considered for LCLD program
        viii. Selected by your firm to participate in LCLD program (Y/N)
        ix. Job position at time of consideration for LCLD program
        x. Current job position
        xi. Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii. Whether individual currently holds a leadership position at your firm (Y/N)

*Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests*

24. Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25. Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a. The client
    b. The date of disclosure

c.  The client's response
d.  Whether the disclosure was client mandated/requested

26. Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27. At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28. At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29. At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30. At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31. Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12] *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.     At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

***Partnership Decisions***

33.     At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.     At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.     At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.     For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

  a.  Name
  b.  Sex
  c.  Race
  d.  Phone number
  e.  Email address
  f.  Office location
  g.  Member of firm affinity group (Y/N)
  h.  Name of affinity group(s) in which attorney participates
  i.  Previously participated in LCLD program (Y/N)
  j.  Previously was SEO Fellow (Y/N)
  k.  Previously participated in firm diversity internship or fellowship (Y/N)
  l.  Elevated to partner (Y/N)
  m.  Equity or non-equity partner (Equity / Non-Equity)

37.     For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

Office of the Chair
Andrea R. Lucas, Acting Chair

March 17, 2025

<u>**Via Electronic Mail**</u>

Morrison & Foerster LLP
c/o Eric T. McCrath
425 Market Street, San Francisco, CA 94105-2482
emccrath@mofo.com

Re:    Review of Morrison & Foerster LLP's Compliance with Title VII of the Civil Rights Act
of 1964

Dear Mr. McCrath:

Based on public statements[1] by Morrison & Foerster LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Morrison & Foerster LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### *Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Morrison & Foerster LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.      Please describe the application and selection criteria used by Morrison & Foerster LLP for its 1L diversity internship from 2019 to the present.

2.      Please describe the application and selection criteria used by Morrison & Foerster LLP for its 2L diversity internship from 2019 to the present.

3.      Does Morrison & Foerster LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.      At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.      At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.      From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

      a.   Name
      b.   Sex
      c.   Race
      d.   Phone number
      e.   Email address
      f.   Law school
      g.   Law school GPA (as of date of application)

h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.  Compensation for 1L diversity internship
j.  Received offer for 2L diversity internship (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a.  Name
b.  Sex
c.  Race
d.  Phone number
e.  Email address
f.  Law school
g.  Law school GPA (as of date of application)
h.  Selected for 2L diversity internship (Y/N)

*If selected*:
i.  Compensation for 2L diversity internship
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Morrison & Foerster LLP's offices in Summer 2024. Please answer the following questions:

8.    Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.    The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.   During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.   Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.   Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

4

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Total compensation paid to SEO Fellow for internship at your firm
   h.   Applied for 1L summer associate program (Y/N)
   i.   Selected for 1L summer associate program (Y/N)
   j.   Applied for 2L summer associate program (Y/N)
   k.   Selected for 2L summer associate program (Y/N)
   l.   Applied for full-time associate attorney position (Y/N)
   m.   Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

   a.   What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
   b.   How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
   c.   How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
   d.   How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
   e.   How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.   At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.   At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.   At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.   If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.   In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Law school
   g.   Law school GPA (as of date of application)
   h.   Hired (Y/N)

   *If hired*:
   i.   Date hired
   j.   Date discharged (indicating voluntary or involuntary)
   k.   Starting compensation
   l.   Compensation as of the date of response
   m.   Tuition repayment assistance
   n.   Title

o.  Date of promotion
p.  Office location

*Other Terms, Conditions, and Privileges of Employment*

23.  At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

c.  Information on all candidates that your firm considered selecting to receive access to these programs:

  i.     Name
  ii.    Sex
  iii.   Race
  iv.    Phone number
  v.     Email address
  vi.    Office location
  vii.   Year that candidate was considered for LCLD program
  viii.  Selected by your firm to participate in LCLD program (Y/N)
  ix.    Job position at time of consideration for LCLD program
  x.     Current job position
  xi.    Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
  xii.   Whether individual currently holds a leadership position at your firm (Y/N)

*Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests*

24.  Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.  Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

a.     The client
b.     The date of disclosure

    c.    The client's response

    d.    Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]  *See, e.g.,* Microsoft Law Firm Diversity Program Overview and FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.    At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### *Partnership Decisions*

33.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.  Name
   b.  Sex
   c.  Race
   d.  Phone number
   e.  Email address
   f.  Office location
   g.  Member of firm affinity group (Y/N)
   h.  Name of affinity group(s) in which attorney participates
   i.  Previously participated in LCLD program (Y/N)
   j.  Previously was SEO Fellow (Y/N)
   k.  Previously participated in firm diversity internship or fellowship (Y/N)
   l.  Elevated to partner (Y/N)
   m.  Equity or non-equity partner (Equity / Non-Equity)

37.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

*** 

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

Ropes & Gray LLP
c/o Julie H. Jones
800 Boylston Street, Boston, MA 02199-3600
Julie.Jones@ropesgray.com

Re:    Review of Ropes & Gray LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Ms. Jones:

Based on public statements[1] by Ropes & Gray LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Ropes & Gray LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### Internships, Fellowships, and Scholarships

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award." If Ropes & Gray LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.  Please describe the application and selection criteria used by Ropes & Gray LLP for its 1L diversity internship from 2019 to the present.

2.  Please describe the application and selection criteria used by Ropes & Gray LLP for its 2L diversity internship from 2019 to the present.

3.  Does Ropes & Gray LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.  At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.  At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program? For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation. Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)

h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.  Compensation for 1L diversity internship
j.  Received offer for 2L diversity internship (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a.  Name
b.  Sex
c.  Race
d.  Phone number
e.  Email address
f.  Law school
g.  Law school GPA (as of date of application)
h.  Selected for 2L diversity internship (Y/N)

*If selected*:
i.  Compensation for 2L diversity internship
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

***SEO Law Fellowship***

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Ropes & Gray LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Total compensation paid to SEO Fellow for internship at your firm
    h.  Applied for 1L summer associate program (Y/N)
    i.  Selected for 1L summer associate program (Y/N)
    j.  Applied for 2L summer associate program (Y/N)
    k.  Selected for 2L summer associate program (Y/N)
    l.  Applied for full-time associate attorney position (Y/N)
    m.  Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

    a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

### Other Hiring and Compensation Practices

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.     At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.     At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.     At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.     If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.     In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

        a.   Name
        b.   Sex
        c.   Race
        d.   Phone number
        e.   Email address
        f.   Law school
        g.   Law school GPA (as of date of application)
        h.   Hired (Y/N)

        *If hired*:
        i.   Date hired
        j.   Date discharged (indicating voluntary or involuntary)
        k.   Starting compensation
        l.   Compensation as of the date of response
        m.  Tuition repayment assistance
        n.   Title

o.  Date of promotion
p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.   At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

a.   The years on which your firm selected attorneys to participate in those training and leadership development programs;

b.   The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

c.   Information on all candidates that your firm considered selecting to receive access to these programs:

i.     Name
ii.    Sex
iii.   Race
iv.    Phone number
v.     Email address
vi.    Office location
vii.   Year that candidate was considered for LCLD program
viii.  Selected by your firm to participate in LCLD program (Y/N)
ix.    Job position at time of consideration for LCLD program
x.     Current job position
xi.    Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
xii.   Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.   Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters.  Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications.  Produce any related documents.

25.   Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

a.     The client
b.     The date of disclosure

  c.  The client's response

  d.  Whether the disclosure was client mandated/requested

26. Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27. At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28. At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29. At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30. At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31. Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12] *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.     At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### *Partnership Decisions*

33.     At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.     At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.     At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.     For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Member of firm affinity group (Y/N)
    h.  Name of affinity group(s) in which attorney participates
    i.  Previously participated in LCLD program (Y/N)
    j.  Previously was SEO Fellow (Y/N)
    k.  Previously participated in firm diversity internship or fellowship (Y/N)
    l.  Elevated to partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

37.     For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

*** 

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Sidley Austin LLP
c/o Michael J. Schmidtberger
One South Dearborn, Chicago, Illinois 60603
mschmidtberger@sidley.com

Re:    Review of Sidley Austin LLP's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Schmidtberger:

Based on public statements[1] by Sidley Austin LLP, I am seeking information about the firm's employment practices.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2]  Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3]  Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4]  It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Sidley Austin LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII.  I believe you can be of assistance in helping to identify all relevant information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

*Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award." If Sidley Austin LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.      Please describe the application and selection criteria used by Sidley Austin LLP for its 1L diversity internship from 2019 to the present.

2.      Please describe the application and selection criteria used by Sidley Austin LLP for its 2L diversity internship from 2019 to the present.

3.      Does Sidley Austin LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.      At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.      At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program? For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation. Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.      From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

        a.   Name
        b.   Sex
        c.   Race
        d.   Phone number
        e.   Email address
        f.   Law school
        g.   Law school GPA (as of date of application)
        h.   Selected for 1L diversity internship (Y/N)

2

*If selected*:
  i.   Compensation for 1L diversity internship
  j.   Received offer for 2L diversity internship (Y/N)
  k.   Received offer for regular summer associate position (Y/N)
  l.   Received offer for full-time associate attorney position (Y/N)
  m.   Received any additional funds related to, or following, participation in a diversity internship (Y/N)
  n.   Amount of additional funds
  o.   Reason for receipt of additional funds
  p.   Office location

7.  From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

  a.   Name
  b.   Sex
  c.   Race
  d.   Phone number
  e.   Email address
  f.   Law school
  g.   Law school GPA (as of date of application)
  h.   Selected for 2L diversity internship (Y/N)

*If selected*:
  i.   Compensation for 2L diversity internship
  j.   Received offer for regular summer associate position (Y/N)
  k.   Received offer for full-time associate attorney position (Y/N)
  l.   Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
  m.   Amount of additional funds
  n.   Reason for receipt of additional funds
  o.   Office location

***SEO Law Fellowship***

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).
[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Sidley Austin LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

13.     Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm? Did those duties relate to your firm's work?

---

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

14.     Does your firm hire any 0L summer associates other than SEO Fellows?

15.     For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

   a.  Name
   b.  Sex
   c.  Race
   d.  Phone number
   e.  Email address
   f.  Office location
   g.  Total compensation paid to SEO Fellow for internship at your firm
   h.  Applied for 1L summer associate program (Y/N)
   i.  Selected for 1L summer associate program (Y/N)
   j.  Applied for 2L summer associate program (Y/N)
   k.  Selected for 2L summer associate program (Y/N)
   l.  Applied for full-time associate attorney position (Y/N)
   m.  Selected for full-time associate attorney position (Y/N)

16.     For each year since 2019 in which your firm had any summer associate programs:

   a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
   b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
   c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
   d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
   e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.     At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.     At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other

third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.    At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.    At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.    If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.    In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

a.   Name
b.   Sex
c.   Race
d.   Phone number
e.   Email address
f.   Law school
g.   Law school GPA (as of date of application)
h.   Hired (Y/N)

*If hired*:
i.   Date hired
j.   Date discharged (indicating voluntary or involuntary)
k.   Starting compensation
l.   Compensation as of the date of response
m.   Tuition repayment assistance
n.   Title
o.   Date of promotion
p.   Office location

***Other Terms, Conditions, and Privileges of Employment***

23.    At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

   a.    The years on which your firm selected attorneys to participate in those training and leadership development programs;

   b.    The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

   c.    Information on all candidates that your firm considered selecting to receive access to these programs:

      i.     Name
      ii.    Sex
      iii.   Race
      iv.    Phone number
      v.     Email address
      vi.    Office location
      vii.   Year that candidate was considered for LCLD program
      viii.  Selected by your firm to participate in LCLD program (Y/N)
      ix.    Job position at time of consideration for LCLD program
      x.     Current job position
      xi.    Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
      xii.   Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.    Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters.  Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications.  Produce any related documents.

25.    Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

   a.    The client
   b.    The date of disclosure
   c.    The client's response
   d.    Whether the disclosure was client mandated/requested

26. Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27. At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28. At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29. At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30. At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31. Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

32. At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe

---

[12] *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

the recruitment bonus policy and the amount of the bonuses, and provide all related documentation. Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

*Partnership Decisions*

33. At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex? If so, please describe the policy or practice in detail and provide all related documentation.

34. At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner? If so, describe in detail. If so, please describe the policy or practice in detail and provide all related documentation.

35. At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm? If so, please describe the policy or practice in detail and provide all related documentation.

36. For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a. Name
   b. Sex
   c. Race
   d. Phone number
   e. Email address
   f. Office location
   g. Member of firm affinity group (Y/N)
   h. Name of affinity group(s) in which attorney participates
   i. Previously participated in LCLD program (Y/N)
   j. Previously was SEO Fellow (Y/N)
   k. Previously participated in firm diversity internship or fellowship (Y/N)
   l. Elevated to partner (Y/N)
   m. Equity or non-equity partner (Equity / Non-Equity)

37. For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

   a. Name
   b. Sex
   c. Race

    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Member of a firm affinity group (Y/N)
    h.  Name of affinity group(s) in which attorney participates / participated
    i.  Previously participated in LCLD program (Y/N)
    j.  Previously was SEO Fellow (Y/N)
    k.  Previously participated in a firm diversity internship or fellowship (Y/N)
    l.  Hired as lateral partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

10

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Simpson Thacher & Bartlett LLP
c/o Alden Millard
425 Lexington Avenue, New York, NY 10017
jmillard@stblaw.com

Re:    Review of Simpson Thacher & Bartlett LLP's Compliance with Title VII of the Civil
Rights Act of 1964

Dear Mr. Millard:

Based on public statements[1] by Simpson Thacher & Bartlett LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Simpson Thacher & Bartlett LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

all relevant information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### Internships, Fellowships, and Scholarships

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Simpson Thacher & Bartlett LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by Simpson Thacher & Bartlett LLP for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by Simpson Thacher & Bartlett LLP for its 2L diversity internship from 2019 to the present.

3.    Does Simpson Thacher & Bartlett LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

     a.  Name
     b.  Sex
     c.  Race
     d.  Phone number
     e.  Email address
     f.  Law school
     g.  Law school GPA (as of date of application)

    h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.  Compensation for 1L diversity internship
j.  Received offer for 2L diversity internship (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Selected for 2L diversity internship (Y/N)

*If selected*:
i.  Compensation for 2L diversity internship
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Simpson Thacher & Bartlett LLP's offices in Summer 2024. Please answer the following questions:

8.     Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.     The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.   Name
    b.   Sex
    c.   Race
    d.   Phone number
    e.   Email address
    f.   Office location
    g.   Total compensation paid to SEO Fellow for internship at your firm
    h.   Applied for 1L summer associate program (Y/N)
    i.   Selected for 1L summer associate program (Y/N)
    j.   Applied for 2L summer associate program (Y/N)
    k.   Selected for 2L summer associate program (Y/N)
    l.   Applied for full-time associate attorney position (Y/N)
    m.   Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

    a.   What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.   How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.   How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.   How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.   How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.   At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.   At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.   At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.   If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.   In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

      a.   Name
      b.   Sex
      c.   Race
      d.   Phone number
      e.   Email address
      f.   Law school
      g.   Law school GPA (as of date of application)
      h.   Hired (Y/N)

      *If hired*:
      i.   Date hired
      j.   Date discharged (indicating voluntary or involuntary)
      k.   Starting compensation
      l.   Compensation as of the date of response
      m.   Tuition repayment assistance
      n.   Title

o.  Date of promotion
p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.  At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

c.  Information on all candidates that your firm considered selecting to receive access to these programs:

i.  Name
ii.  Sex
iii.  Race
iv.  Phone number
v.  Email address
vi.  Office location
vii.  Year that candidate was considered for LCLD program
viii.  Selected by your firm to participate in LCLD program (Y/N)
ix.  Job position at time of consideration for LCLD program
x.  Current job position
xi.  Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
xii.  Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.  Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.  Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

a.  The client
b.  The date of disclosure

7

     c.      The client's response

     d.     Whether the disclosure was client mandated/requested

26.     Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.     At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.     At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.     At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.     At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.     Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]   *See, e.g.,* Microsoft Law Firm Diversity Program Overview and FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.  At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### Partnership Decisions

33.  At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.  At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.  At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.  For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Member of firm affinity group (Y/N)
    h.  Name of affinity group(s) in which attorney participates
    i.  Previously participated in LCLD program (Y/N)
    j.  Previously was SEO Fellow (Y/N)
    k.  Previously participated in firm diversity internship or fellowship (Y/N)
    l.  Elevated to partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

37.  For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

### U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Washington, D.C.

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**<u>Via Electronic Mail</u>**

Skadden, Arps, Slate, Meagher & Flom LLP
c/o Jeremy D. London
One Manhattan West, New York, NY 10001
jeremy.london@skadden.com

Re:    Review of Skadden, Arps, Slate, Meagher & Flom LLP's Compliance with Title VII of
the Civil Rights Act of 1964

Dear Mr. London:

Based on public statements[1] by Skadden, Arps, Slate, Meagher & Flom LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that Skadden, Arps, Slate, Meagher & Flom LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

all relevant information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.


*Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If Skadden, Arps, Slate, Meagher & Flom LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by Skadden, Arps, Slate, Meagher & Flom LLP for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by Skadden, Arps, Slate, Meagher & Flom LLP for its 2L diversity internship from 2019 to the present.

3.    Does Skadden, Arps, Slate, Meagher & Flom LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)

h. Selected for 1L diversity internship (Y/N)

*If selected*:
i. Compensation for 1L diversity internship
j. Received offer for 2L diversity internship (Y/N)
k. Received offer for regular summer associate position (Y/N)
l. Received offer for full-time associate attorney position (Y/N)
m. Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n. Amount of additional funds
o. Reason for receipt of additional funds
p. Office location

7. From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Law school
g. Law school GPA (as of date of application)
h. Selected for 2L diversity internship (Y/N)

*If selected*:
i. Compensation for 2L diversity internship
j. Received offer for regular summer associate position (Y/N)
k. Received offer for full-time associate attorney position (Y/N)
l. Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m. Amount of additional funds
n. Reason for receipt of additional funds
o. Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at Skadden, Arps, Slate, Meagher & Flom LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Total compensation paid to SEO Fellow for internship at your firm
    h.  Applied for 1L summer associate program (Y/N)
    i.  Selected for 1L summer associate program (Y/N)
    j.  Applied for 2L summer associate program (Y/N)
    k.  Selected for 2L summer associate program (Y/N)
    l.  Applied for full-time associate attorney position (Y/N)
    m.  Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

    a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.   At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.   At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.   At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.   If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.   In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Law school
   g.   Law school GPA (as of date of application)
   h.   Hired (Y/N)

   *If hired*:
   i.   Date hired
   j.   Date discharged (indicating voluntary or involuntary)
   k.   Starting compensation
   l.   Compensation as of the date of response
   m.  Tuition repayment assistance
   n.   Title

    o.  Date of promotion
    p.  Office location

***Other Terms, Conditions, and Privileges of Employment***

23.    At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

    a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

    b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

    c.  Information on all candidates that your firm considered selecting to receive access to these programs:

        i.    Name
        ii.   Sex
        iii.  Race
        iv.  Phone number
        v.   Email address
        vi.  Office location
        vii.  Year that candidate was considered for LCLD program
        viii. Selected by your firm to participate in LCLD program (Y/N)
        ix.  Job position at time of consideration for LCLD program
        x.   Current job position
        xi.  Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
        xii. Whether individual currently holds a leadership position at your firm (Y/N)

***Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests***

24.    Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters.  Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications.  Produce any related documents.

25.    Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

    a.    The client
    b.    The date of disclosure

c.     The client's response
d.     Whether the disclosure was client mandated/requested

26.    Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

### *Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics*

27.    At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.    At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.    At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.    At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.    Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]   *See, e.g.,* MICROSOFT LAW FIRM DIVERSITY PROGRAM OVERVIEW AND FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.　At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

***Partnership Decisions***

33.　At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.　At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.  If so, please describe the policy or practice in detail and provide all related documentation.

35.　At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.　For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

　　a.　Name
　　b.　Sex
　　c.　Race
　　d.　Phone number
　　e.　Email address
　　f.　Office location
　　g.　Member of firm affinity group (Y/N)
　　h.　Name of affinity group(s) in which attorney participates
　　i.　Previously participated in LCLD program (Y/N)
　　j.　Previously was SEO Fellow (Y/N)
　　k.　Previously participated in firm diversity internship or fellowship (Y/N)
　　l.　Elevated to partner (Y/N)
　　m.　Equity or non-equity partner (Equity / Non-Equity)

37.　For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

a. Name
b. Sex
c. Race
d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov.  If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

White & Case LLP
c/o Heather K. McDevitt
1221 Avenue of the Americas, New York, NY 10020-1095
hmcdevitt@whitecase.com

Re:    Review of White & Case LLP's Compliance with Title VII of the Civil Rights Act of
1964

Dear Ms. McDevitt:

Based on public statements[1] by White & Case LLP, I am seeking information about the firm's employment practices. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2] Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3] Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4] It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that White & Case LLP's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII. I believe you can be of assistance in helping to identify all relevant

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

information I might consider. As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

### Internships, Fellowships, and Scholarships

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award." If White & Case LLP (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by White & Case LLP for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by White & Case LLP for its 2L diversity internship from 2019 to the present.

3.    Does White & Case LLP hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions? If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program? For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation. Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

     a.   Name
     b.   Sex
     c.   Race
     d.   Phone number
     e.   Email address
     f.   Law school
     g.   Law school GPA (as of date of application)

    h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.  Compensation for 1L diversity internship
j.  Received offer for 2L diversity internship (Y/N)
k.  Received offer for regular summer associate position (Y/N)
l.  Received offer for full-time associate attorney position (Y/N)
m.  Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.  Amount of additional funds
o.  Reason for receipt of additional funds
p.  Office location

7.     From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Law school
    g.  Law school GPA (as of date of application)
    h.  Selected for 2L diversity internship (Y/N)

*If selected*:
i.  Compensation for 2L diversity internship
j.  Received offer for regular summer associate position (Y/N)
k.  Received offer for full-time associate attorney position (Y/N)
l.  Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.  Amount of additional funds
n.  Reason for receipt of additional funds
o.  Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).

invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at White & Case LLP's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

---

[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

13.    Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm?  Did those duties relate to your firm's work?

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

   a.  Name
   b.  Sex
   c.  Race
   d.  Phone number
   e.  Email address
   f.  Office location
   g.  Total compensation paid to SEO Fellow for internship at your firm
   h.  Applied for 1L summer associate program (Y/N)
   i.  Selected for 1L summer associate program (Y/N)
   j.  Applied for 2L summer associate program (Y/N)
   k.  Selected for 2L summer associate program (Y/N)
   l.  Applied for full-time associate attorney position (Y/N)
   m.  Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

   a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
   b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
   c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
   d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
   e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

***Other Hiring and Compensation Practices***

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

5

18.  At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.  At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.  At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.  If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.  In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

a.  Name
b.  Sex
c.  Race
d.  Phone number
e.  Email address
f.  Law school
g.  Law school GPA (as of date of application)
h.  Hired (Y/N)

*If hired*:
i.  Date hired
j.  Date discharged (indicating voluntary or involuntary)
k.  Starting compensation
l.  Compensation as of the date of response
m. Tuition repayment assistance
n.  Title

6

o.   Date of promotion
p.   Office location

### Other Terms, Conditions, and Privileges of Employment

23.   At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

   a.   The years on which your firm selected attorneys to participate in those training and leadership development programs;

   b.   The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

   c.   Information on all candidates that your firm considered selecting to receive access to these programs:

      i.     Name
      ii.    Sex
      iii.   Race
      iv.    Phone number
      v.     Email address
      vi.    Office location
      vii.   Year that candidate was considered for LCLD program
      viii.  Selected by your firm to participate in LCLD program (Y/N)
      ix.    Job position at time of consideration for LCLD program
      x.     Current job position
      xi.    Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
      xii.   Whether individual currently holds a leadership position at your firm (Y/N)

### Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests

24.   Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.   Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

   a.   The client
   b.   The date of disclosure

      c.      The client's response

      d.      Whether the disclosure was client mandated/requested

26.     Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

***Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics***

27.     At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.     At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.     At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.     At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.     Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

---

[12]  *See, e.g.,* Microsoft Law Firm Diversity Program Overview and FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

32.   At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

### *Partnership Decisions*

33.   At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.   At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.   If so, please describe the policy or practice in detail and provide all related documentation.

35.   At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.   For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Member of firm affinity group (Y/N)
   h.   Name of affinity group(s) in which attorney participates
   i.   Previously participated in LCLD program (Y/N)
   j.   Previously was SEO Fellow (Y/N)
   k.   Previously participated in firm diversity internship or fellowship (Y/N)
   l.   Elevated to partner (Y/N)
   m.   Equity or non-equity partner (Equity / Non-Equity)

37.   For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Member of a firm affinity group (Y/N)
    h.  Name of affinity group(s) in which attorney participates / participated
    i.  Previously participated in LCLD program (Y/N)
    j.  Previously was SEO Fellow (Y/N)
    k.  Previously participated in a firm diversity internship or fellowship (Y/N)
    l.  Hired as lateral partner (Y/N)
    m.  Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

10

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington, D.C.**

**Office of the Chair**
**Andrea R. Lucas, Acting Chair**

March 17, 2025

**Via Electronic Mail**

WilmerHale
c/o Anjan Sahni
7 World Trade Center, 250 Greenwich Street, New York, NY 10007
anjan.sahni@wilmerhale.com

Re:    Review of WilmerHale's Compliance with Title VII of the Civil Rights Act of 1964

Dear Mr. Sahni:

Based on public statements[1] by WilmerHale, I am seeking information about the firm's employment practices.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin.[2]  Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer, or other covered entity, taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.[3]  Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored.[4]  It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to private employers.

I am concerned that WilmerHale's "diversity, equity, and inclusion," "DEI," diversity, or other employment programs, policies, and practices may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based—in whole or in part—on race, sex, or other protected characteristics, in violation of Title VII.  I believe you can be of assistance in helping to identify all relevant information I might consider.  As an initial request, please provide responses to the questions outlined below. Please also preserve all relevant records.

---

[1] This letter is exclusively based on publicly available information regarding your firm, including but not limited to documents and information published on your firm's public website; public statements by your firm and its leadership; and news reporting.

[2] 42 U.S.C. § 2000e-2.

[3] 42 U.S.C. § 2000e-2(m).

[4] 42 U.S.C. § 2000e-2(a)(2).

*Internships, Fellowships, and Scholarships*

Many major law firms operate 1L and 2L diversity internship or diversity fellowship programs, or provide certain summer associates with additional funds characterized as a diversity "scholarship," "bonus," "stipend," or "award."  If WilmerHale (a) operated a diversity internship, diversity fellowship, or related diversity program (hereinafter "diversity internship") for law students to work as summer associates at the firm, and/or (b) offered some form of additional funds to summer associates characterized as a scholarship, bonus, stipend, award, or something similar, please answer the following questions.

1.    Please describe the application and selection criteria used by WilmerHale for its 1L diversity internship from 2019 to the present.

2.    Please describe the application and selection criteria used by WilmerHale for its 2L diversity internship from 2019 to the present.

3.    Does WilmerHale hire any 1L law students as summer associates other than participants in the firm's 1L diversity internship?

4.    At any point since 2019, did participation in either the 1L or 2L diversity internship provide participants with an accelerated interview, consideration, or selection process for the firm's regular summer associate program or full-time associate attorney positions?  If so, please describe the policy or practice in detail and provide all related documentation.

5.    At any point since 2019, did the firm provide participants in the 1L or 2L diversity internship with additional funds beyond the regular compensation for the diversity fellowship programs or the firm's regular summer associate program?  For example, a bonus, stipend, diversity "scholarship," or other additional monetary compensation.  Please provide documents and information regarding compensation for the firm's summer associate program as well as any additional funds received by all diversity fellows.

6.    From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 1L diversity internship:

     a.  Name
     b.  Sex
     c.  Race
     d.  Phone number
     e.  Email address
     f.  Law school
     g.  Law school GPA (as of date of application)
     h.  Selected for 1L diversity internship (Y/N)

*If selected*:
i.   Compensation for 1L diversity internship
j.   Received offer for 2L diversity internship (Y/N)
k.   Received offer for regular summer associate position (Y/N)
l.   Received offer for full-time associate attorney position (Y/N)
m.   Received any additional funds related to, or following, participation in a diversity internship (Y/N)
n.   Amount of additional funds
o.   Reason for receipt of additional funds
p.   Office location

7.   From 2015 to the present, in a searchable Excel spreadsheet, please provide the following respective sets of data for applicants to the 2L Diversity Fellowship Program:

a.   Name
b.   Sex
c.   Race
d.   Phone number
e.   Email address
f.   Law school
g.   Law school GPA (as of date of application)
h.   Selected for 2L diversity internship (Y/N)

*If selected*:
i.   Compensation for 2L diversity internship
j.   Received offer for regular summer associate position (Y/N)
k.   Received offer for full-time associate attorney position (Y/N)
l.   Received any additional funds related to, or following, participation in a Diversity Fellowship Program (Y/N)
m.   Amount of additional funds
n.   Reason for receipt of additional funds
o.   Office location

### *SEO Law Fellowship*

Dozens of major law firms partner with Sponsors for Educational Opportunity (SEO) Law's SEO Law Fellowship and employ SEO Fellows at their firms for a 0L summer associate program for incoming law students (students who have been admitted but have not yet started law school).[5] The SEO Law website for the SEO 2025 Law Fellowship Program currently claims that "[a]ll are invited to apply" for the the SEO Law Fellowship.[6] However, the website emphasizes "SEO Law *encourages* applicants from underserved backgrounds, broadly defined, including but not limited

---

[5] SEO Law, Partners, https://www.seo-usa.org/law/partners/ (listing partner law firms at which SEO Law Fellows were placed in Summer 2024).
[6] SEO Law, Apply to the SEO Law Fellowship, Frequently Asked Questions, https://www.seo-usa.org/law/our-program/apply-to-fellowship/.

to: race or ethnicity; gender identity or sexual orientation; immigration or veteran status; disability or first-generation status; socioeconomic background or experiences with the criminal justice/child welfare systems."[7] And, the website's main photo displays a picture of 20 law students, at least 14 of whom are black students, one of whom is an Asian student, and 8 of whom are women.[8] Moreover, certain law schools indicate that the SEO Law Fellowship effectively remains focused on, or restricted to, "students of color."[9] According to SEO Law, participants in this program receive an eight-week to ten-week "paid internship at a top law firm with a salary of up to $1,625 per week" and "[a]lmost all of our partner firms actively recruit and regularly hire former SEO Law Fellows for future summer associate positions and full-time associate positions."[10] "While the SEO Law Fellows' corporate law firm experiences may vary from firm to firm, Fellows can expect to work full-time during the 10-week internship alongside with other 1L and 2L summer associates."[11]

SEO Law's website indicates that SEO Fellows were placed at WilmerHale's offices in Summer 2024. Please answer the following questions:

8.      Since 2019, in what years have SEO Fellows been placed at your firm for an internship?

9.      The SEO Fellowship is a paid internship. Did your firm pay the SEO Fellows? If so, how much?

10.     During their placement at your firm for their summer internship, at what location did the interns work? Did they work in your firms' office(s) or other firm premises?

11.     Did the SEO Fellows placed at your firm use computers and other technology provided by your firm during the internship?

12.     Did your firm or its attorneys have the right to control when, where, and how the SEO Fellows performed their internship duties during their placement at your firm?

13.     Did your firm or its attorneys assign projects, tasks, and other work duties to the SEO Fellows during their placement at your firm? Did those duties relate to your firm's work?

---

[7] *Id.* (emphasis added). "Generally, employers should not express a racial preference in job advertisements. Employers can indicate that they are "equal opportunity employers."" EEOC, "Questions and Answers about Race and Color Discrimination in Employment," EEOC-NVTA-2006-1 (Apr. 2006), https://www.eeoc.gov/laws/guidance/questions-and-answers-about-race-and-color-discrimination-employment.

[8] *Id.*

[9] *See, e.g.*, Columbia University, Undergraduate Research & Fellowships, SEO Law Fellowship Program (webpage dated 2025), https://urf.columbia.edu/fellowship/seo-law-fellowship-program (listing application deadline of February 28, 2025 for Summer 2025 program).

[10] SEO Law, "Practice and Prep," https://www.seo-usa.org/law/our-program/practice-and-prep/.

[11] SEO Law, "Fast-Track Your Legal Career with the SEO Law Fellowship," https://www.seo-usa.org/law/our-program/fellowship/.

14.    Does your firm hire any 0L summer associates other than SEO Fellows?

15.    For each year in which SEO Fellows were placed at your firm, provide the following information about all SEO Fellows placed at your firm:

    a.  Name
    b.  Sex
    c.  Race
    d.  Phone number
    e.  Email address
    f.  Office location
    g.  Total compensation paid to SEO Fellow for internship at your firm
    h.  Applied for 1L summer associate program (Y/N)
    i.  Selected for 1L summer associate program (Y/N)
    j.  Applied for 2L summer associate program (Y/N)
    k.  Selected for 2L summer associate program (Y/N)
    l.  Applied for full-time associate attorney position (Y/N)
    m.  Selected for full-time associate attorney position (Y/N)

16.    For each year since 2019 in which your firm had any summer associate programs:

    a.  What was the total number of law students or pre-law students who were summer associates nationwide in the United States in any category of summer associate program operated by your firm?
    b.  How many of the 0L participants in your firm's summer associate programs were SEO Fellows?
    c.  How many of the 1L participants in your firm's summer associate programs previously had been SEO Fellows?
    d.  How many of the 2L participants in your firm's summer associate programs previously had been SEO Fellows?
    e.  How many of the incoming class of associate attorneys previously had been SEO Fellows?

### *Other Hiring and Compensation Practices*

17.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other third-party organization sourcing attorney candidates for the firm, that the firm was seeking black, Hispanic, or female candidates, "diverse" candidates, or candidates of another particular race(s), ethnicities, sex, or another protected characteristic? If so, please describe the policy or practice in detail and provide all related documentation.

18.    At any point since 2019, did any member of the firm indicate, orally or in writing, to any firm employee (including the firm's human resources personnel, attorney recruiting personnel, and attorneys), to any recruiter working with or for the firm, or to any other

third-party organization sourcing attorney candidates for the firm, that the firm was not seeking male or white candidates or candidates of any other particular race, ethnicity, sex, or another protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

19.   At any point since 2019, did the firm provide retention bonuses or other bonuses to black, Hispanic, or other "diverse" attorneys at the firm that were not provided to other similarly situated attorneys, or were a higher amount than bonuses provided to other similarly situated attorneys?  If so, please describe the policy or practice in detail and provide all related documentation.

20.   At any point since 2019, did the firm use GPA cutoffs or ranges for considering attorney applicants (including but not limited to applicants for the diversity fellowship programs, the regular summer associate program, and full-time associate attorney hiring)?  If so, please describe the policy or practice in detail and provide all related documentation.

21.   If the firm used GPA cutoffs or ranges, did these GPA cutoffs or ranges for similarly situated applicants (e.g., applicants from the same law school) differ based on an applicant's race, sex, or other protected characteristic?  If so, please describe the policy or practice in detail and provide all related documentation.

22.   In a searchable Excel spreadsheet, fully identify all law students or attorneys who applied to be hired by the firm (including as a regular summer associate, associate attorney, of counsel, or partner) since 2019.   A complete response to this answer will include the applicant's:

a.   Name
b.   Sex
c.   Race
d.   Phone number
e.   Email address
f.   Law school
g.   Law school GPA (as of date of application)
h.   Hired (Y/N)

*If hired*:
i.   Date hired
j.   Date discharged (indicating voluntary or involuntary)
k.   Starting compensation
l.   Compensation as of the date of response
m.  Tuition repayment assistance
n.   Title
o.   Date of promotion
p.   Office location

6

*Other Terms, Conditions, and Privileges of Employment*

23.  At any point since 2019, has your firm selected any of your lawyers for access to the Leadership Council on Legal Diversity "Pathfinders Program" or "Fellows Program"? If so, provide the following information and all related documents:

a.  The years on which your firm selected attorneys to participate in those training and leadership development programs;

b.  The process by which your firm selected attorneys to participate, including but not limited to the selection criteria your firm used;

c.  Information on all candidates that your firm considered selecting to receive access to these programs:

i.    Name
ii.   Sex
iii.  Race
iv.   Phone number
v.    Email address
vi.   Office location
vii.  Year that candidate was considered for LCLD program
viii. Selected by your firm to participate in LCLD program (Y/N)
ix.   Job position at time of consideration for LCLD program
x.    Current job position
xi.   Whether, at the time of consideration for LCLD program, candidate held a leadership position at your firm (Y/N)
xii.  Whether individual currently holds a leadership position at your firm (Y/N)

*Data Disclosures, Staffing Decisions, and Other Actions Taken in Response to Client Requests*

24.  Since 2019, fully identify all clients that have "diversity requirements," "diversity preferences," or any demographic-related requirements for matters, including but not limited to race or sex requirements for the employees staffed on their matters. Identify the clients, the respective clients' specific requirements, and all actions you have taken in response to those requirements, including compliance certifications. Produce any related documents.

25.  Since 2019, fully identify all times you provided the race or sex of your employees staffed on a matter to a client, including:

a.    The client
b.    The date of disclosure
c.    The client's response
d.    Whether the disclosure was client mandated/requested

26.   Since 2019, have any of your clients provided an incentive-based program that provides bonuses or other monetary incentives to your firm (for example, calculated as percentage of your firm's annual fees) for achieving or exceeding representation goals?[12] If so, please provide information regarding (a) if the firm achieved or exceeding those representation goals; (b) if so, the amount of money received for achieving or exceeding those representation goals; and (c) all actions taken to achieve or exceed any such representation goals.

### Other Policies and Processes Incentivizing Decisions Motivated by Protected Characteristics

27.   At any point since 2019, did your firm have an annual report or plan (whether shared internally or externally) related to the firm's goals, policies, processes, practices, programs, or any action related to DEI, diversity, demographic representation, or other related topics as it relates to the firm's own workforce?  For example, the type of reports, plans, or other documents encompassed by this request include, but are not limited to, documents framed as a diversity, equity, and inclusion (DEI) report; diversity, equity, and inclusion (DEI) action plan, etc.  If so, produce all copies of such reports, plans, or documents.

28.   At any point since 2019, did your firm set race, sex, or other demographic or "diversity" representation goals for any employees, including with respect to hiring of summer associates, associate attorneys, or lateral partner; elevation to partner or shareholder; associate attorney representation; partner representation; or retention of associates or partners?  If so, please describe the policy or practice in detail and provide all related documentation.

29.   At any point since 2019, did your firm tie a component of partner or associate performance reviews to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

30.   At any point since 2019, did your firm tie a component of partner or associate compensation to DEI or diversity efforts, including but not limited to race, sex, or other demographic or "diversity" representation goals? If so, please describe the policy or practice in detail and provide all related documentation.

31.   Any point since 2019, for any process for hiring, promotion, or selection for management or leadership roles, did your firm use any form of a diverse slate policy (requiring a certain number or percentage of candidates to be candidates of a particular race, ethnicity, sex, or other protected characteristic)?  If so, please describe the policy or practice in detail and provide all related documentation.

32.   At any point since 2019, has the firm provided recruitment bonuses to firm employees who refer an attorney candidate who subsequently is hired by the firm?  If so, please describe

---

[12]   *See, e.g.,* Microsoft Law Firm Diversity Program Overview and FAQ, https://aka.ms/LFDP_ProgramOverviewandFAQ, (last visited Mar. 13, 2025).

the recruitment bonus policy and the amount of the bonuses, and provide all related documentation.  Please indicate whether the availability or amount of any such bonuses varied depending on the race, sex, or any other protected characteristic of the referred candidate.

*Partnership Decisions*

33.    At any point since 2019, have any partnership decisions been made motivated—in whole or in part—by a candidates' race or sex?  If so, please describe the policy or practice in detail and provide all related documentation.

34.    At any point since 2019, did your firm include any DEI or diversity considerations in putting lawyers in your firm up for partner, or selecting any lawyers for partner?  If so, describe in detail.  If so, please describe the policy or practice in detail and provide all related documentation.

35.    At any point since 2019, did a lawyer's participation in a firm-sponsored or third-party affinity group (groups organized around a single race, ethnicity, sex, or other protected characteristics, or groups organized around multiple aspects of "diversity") play any role in (a) whether that lawyer was eligible for or considered for elevation to partnership at your firm; or (b) whether that lawyer was selected for elevation to partnership at your firm?  If so, please describe the policy or practice in detail and provide all related documentation.

36.    For each year since 2019, please provide the following data for lawyers in your firm who were considered for elevation for partner:

   a.   Name
   b.   Sex
   c.   Race
   d.   Phone number
   e.   Email address
   f.   Office location
   g.   Member of firm affinity group (Y/N)
   h.   Name of affinity group(s) in which attorney participates
   i.   Previously participated in LCLD program (Y/N)
   j.   Previously was SEO Fellow (Y/N)
   k.   Previously participated in firm diversity internship or fellowship (Y/N)
   l.   Elevated to partner (Y/N)
   m.   Equity or non-equity partner (Equity / Non-Equity)

37.    For each year since 2019, please provide the following data for lawyers in your firm who applied or were recruited as potential lateral partners:

   a.   Name
   b.   Sex
   c.   Race

d. Phone number
e. Email address
f. Office location
g. Member of a firm affinity group (Y/N)
h. Name of affinity group(s) in which attorney participates / participated
i. Previously participated in LCLD program (Y/N)
j. Previously was SEO Fellow (Y/N)
k. Previously participated in a firm diversity internship or fellowship (Y/N)
l. Hired as lateral partner (Y/N)
m. Equity or non-equity partner (Equity / Non-Equity)

***

Please submit your responses and any supporting documentation by **April 15, 2025**, to lawfirmDEI@eeoc.gov. If certain information is unavailable or requires additional time to compile, please indicate this in your response and provide an estimated timeline for submission.

Thank you in advance for your cooperation.

Sincerely,

Andrea R. Lucas
Acting Chair
U.S. Equal Employment Opportunity Commission

# EXHIBIT 35

 **U.S. Equal Employment Opportunity Commission**

**Press Release**
03-17-2025

# EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI–Related Employment Practices

WASHINGTON – Today, U.S. Equal Employment Opportunity Commission (EEOC) Acting Chair Andrea Lucas sent letters to 20 law firms requesting information about their diversity, equity and inclusion (DEI) related employment practices.

Based on publicly available information, the letters note concerns that some firms' employment practices, including those labeled or framed as DEI, may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based on race, sex, or other protected characteristics, in violation of **Title VII of the Civil Rights Act of 1964 (Title VII) (https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964)** .

"The EEOC is prepared to root out discrimination anywhere it may rear its head, including in our nation's elite law firms," Lucas said. "No one is above the law—and certainly not the private bar."

Title VII prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin. Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.

Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored. There is no "diversity" exception to these prohibitions. It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to businesses and other private sector employers.

The law firms that received letters from Acting Chair Lucas include:

1. A & O Shearman

2. Debevoise & Plimpton LLP

3. Cooley LLP

4. Freshfields Bruckhaus Deringer LLP

5. Goodwin Procter LLP

6. Hogan Lovells LLP

7. Kirkland & Ellis LLP

8. Latham & Watkins LLP

9. McDermott Will & Emery

10. Milbank LLP

11. Morgan, Lewis & Bockius LLP

12. Morrison & Foerster LLP

13. Perkins Coie

14. Reed Smith

15. Ropes & Gray LLP

16. Sidley Austin LLP

17. Simpson Thacher & Bartlett LLP

18. Skadden, Arps, Slate, Meagher & Flom LLP

19. White & Case LLP

20. WilmerHale

You can read the letters here: **https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf (https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf)**

The EEOC has established an email where whistleblowers can submit information to the EEOC about potentially unlawful DEI practices at law firms: lawfirmDEI@eeoc.gov. Whistleblowers should be aware that emailing allegations of unlawful discrimination, harassment, or retaliation to the lawfirmDEI@eeoc.gov email address, **does not constitute filing a charge of discrimination**. If you suspect you have experienced or witnessed DEI-related discrimination at a law firm, and you wish to file a charge of discrimination, contact the EEOC promptly because there are strict time limits for filing a charge—you can learn more about the process to file a charge at **https://www.eeoc.gov/filing-charge-discrimination (https://www.eeoc.gov/filing-charge-discrimination)** .

Information obtained from individuals who contact the EEOC is **confidential (https://www.eeoc.gov/confidentiality)** and will not be revealed to the employer until the individual files a charge of discrimination. Your employer may not fire, demote, harass, or otherwise retaliate against you for filing a charge or cooperating with the EEOC. The laws the EEOC enforces make it illegal for an employer to **retaliate (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues)** against someone who files a charge or someone who takes part in an EEOC process, investigation, or lawsuit.

The EEOC is the federal agency authorized to investigate and litigate against private companies and other private employers for violations of Title VII and other federal laws prohibiting employment discrimination. For public employers, the EEOC shares jurisdiction with the Department of Justice's Civil Rights Division; the EEOC is responsible for investigating public sector charges before referring them to DOJ for potential litigation. The EEOC also is responsible for coordinating the federal

government's employment antidiscrimination effort. More information about the EEOC is available at **www.eeoc.gov (http://www.eeoc.gov/)** . Stay connected with the latest EEOC news by subscribing to our **email updates (https://public.govdelivery.com/accounts/USEEOC/subscriber/new)** .

# EXHIBIT 36



# Post

**Stephen Miller** ✓
@StephenM

Lawless judicial tyranny. Judges have no authority to force the executive branch to provide classified secrets to Democrat activist law firms.

> **Nick Sortor** ✓ @nicksortor · Mar 12
> 🚨 #BREAKING: A federal judge has BLOCKED President Trump from revoking the security clearance of Perkins Coie, the law firm which helped develop the Russia Hoax
>
> WTF?...
>
> Show more

👥 **Readers added context**

Howell's restraining order prevents the Trump administration from barring Perkins Coie employees from accessing government buildings. However, it does not apply to the security clearance reviews called for in Trump's order, the judge noted.

democracydocket.com/news-alerts/tr…

Do you find this helpful?   **Rate it**

5:20 PM · Mar 12, 2025 · **791.2K** Views

💬 1.9K    🔁 6.3K    ♡ 20K    🔖 304    ⬆️

**Post your reply**    Reply

**Wall Street Apes** ✓ @WallStreetApes · Mar 12
The GOP has started the impeachment of exactly 0 activist judges. So they'll continue to do whatever they want

💬 98    🔁 760    ♡ 3.1K    📊 23K

**Nick Sortor** ✓ @nicksortor · Mar 12
We're no longer a Republic. We're a judicial autocracy.

💬 20    🔁 76    ♡ 562    📊 7.6K

**Aesthetica** ✓ @Anc_Aesthetics · Mar 12
Why are you following their orders?

💬 14    🔁 7    ♡ 308    📊 6.1K

**Marc Rudov** ✓ @MarcRudov · Mar 12

## Relevant people

**Stephen Miller** ✓    Follow
@StephenM
@WhiteHouse Deputy Chief of Staff for Policy and Homeland Security Advisor | 45 & 47

**Nick Sortor** ✓    Follow
@nicksortor
On-scene covering stories MSM won't. | Seen on @TuckerCarlson Tonight, Fox News, Newsmax, Timcast, etc. •
#EastPalestine #Maui #WNC

## Live on X

**Al Jazeera English** 🟡 is hosting
LIVE: AL JAZEERA ENGLISH    +191

## What's happening

**From the Desk of Anthony Pompliano**
LIVE

Trending in Canada
**Goodbye**
64K posts

Music · Trending
**Selena Gomez**
78.2K posts

Trending in Canada
**#MarkCarney2025**

Severance · Trending
**#severance**
113K posts

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2025 X Corp.

What can Trump do about this? He can't spend his entire presidency in appellate courts and at SCOTUS.

SOLUTION: Trump must ignore the lawfare judges and simultaneously get Mike Johnson to impeach them.

💬 23    🔁 59    ♡ 295    📊 12K

**J Kerner** ✓ @JKernerOT · Mar 12

all court orders attempting to block Trump are in complete violation of the Constitution and must be ignored by Trump and his administration.

The Constitution and Bill of Rights are the Supreme Law of the Land - not acts of Congress, presidents' executive orders or court

Show more

💬 7    🔁 44    ♡ 97    📊 1.7K

**Josiah Lippincott** ✓ @jlippincott_ · Mar 12

The President must assert executive prerogative against these courts

💬    🔁 5    ♡ 73    📊 1.3K

🇺🇸 **MAGA Michelle S** 🇺🇸 ✓ @MAGAMichelleS69 · Mar 12

When will something be done with these rogue judges?

💬 2    🔁 1    ♡ 26    📊 291

**Primrose** ✓ @Primrose771646 · Mar 14

💬 1    🔁 2    ♡ 5    📊 150

Messages 🔵

11. Stephen Miller drone: "Unless judicial tyranny judges have no authority (2/2) to the executive branch to provide classified secr...

# EXHIBIT 37





# 'Absurd': White House blasts law firm that helped fuel Russia hoax after challenging Trump order

By Diana Stancy

Published March 13, 2025

Fox News

The White House said a lawsuit filed by a law firm with ties to the FBI's Russia investigation during President Donald Trump's first term – known among conservatives as the "Russia collusion hoax" – is "absurd," after a federal judge blocked the Trump administration from cutting off the firm's access to federal resources Wednesday.

Perkins Coie, the firm that hired the company responsible for composing the so-called "Steele dossier" released in 2017 about Trump's alleged connections to Russia that was used to obtain a surveillance warrant against former Trump campaign advisor Carter Page, filed a motion in a federal court in Washington Tuesday requesting a temporary restraining order to block the Trump administration from rescinding its access to federal resources.

U.S. Judge Beryl Howell approved the request Wednesday afternoon.

"The Trump Administration is working efficiently to eliminate waste, fraud and abuse in the federal government," White House spokesman Harrison Fields said in a Wednesday evening statement to Fox News Digital. "It is absurd that a billion-dollar law firm is suing to retain its access to government perks and handouts."

Perkins Coie and Attorney General Pam Bondi's chief of staff, Chad Mizelle, appeared before U.S. Judge Beryl Howell Wednesday afternoon.

Attorney Dane Butswinkas, who is representing Perkins Coie, said roughly a quarter of the firm's revenue stems from clients with government contracts, and compared Trump's order to "a tsunami waiting to hit the firm."

Additionally, Howell said Wednesday that the order "sends little chills down my spine."

Trump signed an executive order March 6 suspending security clearances for Perkins Coie employees until a further review evaluating its access to sensitive information is complete to determine if it aligns with national interests.

The order also pulled access to sensitive information facilities for Perkins Coie employees and limits the company's access to government employees. The order also prevents the federal government from hiring Perkins Coie employees without specific authorization.

**JUDGE DISMISSES TRUMP'S LAWSUIT ALLEGING INFAMOUS DOSSIER AND ITS 'SCANDALOUS CLAIMS' DAMAGED HIS**

**REPUTATION**



President Donald Trump signs an executive order March 6 suspending security clearances for Perkins Coie employees until a further review. (Evelyn Hockstein/Reuters)

As a result, Perkins Coie's lawsuit claims that the Trump administration's executive order is an "affront to the Constitution and our adversarial system of justice" and that the order means the firm's ability to represent its clients is "under direct and imminent threat."

Likewise, the lawsuit asserts the order violated procedural due process because it failed to give Perkins Coie the opportunity to contest accusations included in the executive order.

"The order violates core constitutional protections, including the rights to free speech and due process, and undermines all clients' right to select counsel of their choice," a Perkins Coie spokesperson said in a Tuesday statement. "We were compelled to take this step to protect our firm and safeguard the interests of our clients."

Attorneys general from states including California, Arizona, Massachusetts and Rhode Island filed an amicus brief Wednesday voicing support for Perkins Coie "to underscore the bedrock rule of law principles and free speech imperatives at issue in this case."

"Through official action, the President has attempted to exclude certain lawyers and certain viewpoints from reaching a court of law at all," the coalition of attorneys general wrote in the brief. "It is a menacing message to attorneys nationwide: unless they advance positions or represent clients favorable to the current administration, their livelihood may be at risk and their patriotism will be called into question."

Perkins Coie represented Hillary Clinton's campaign and the Democratic National Committee in the 2016 election and former President Joe Biden after Trump challenged Biden's 2020 election win.

Marc Elias, the former chair of the firm's political law practice, hired opposition research firm Fusion GPS to conduct opposition research into presidential candidate Trump in April 2016 on behalf of Trump's opponent, Clinton, and the Democratic National Committee.

**CARTER PAGE FISA WARRANT LACKED PROBABLE CAUSE, DOJ ADMITS IN DECLASSIFIED ASSESSMENT**



Christopher Steele, a former British intelligence officer, crafted the dossier after Fusion GPS hired him. (Getty Images)

Fusion GPS then hired former British intelligence officer Christopher Steele, who authored the so-called "Steele dossier." The document, which BuzzFeed News published in 2017, included shocking and mostly unverified allegations, including details that Trump engaged in sex acts with Russian prostitutes.

**CLICK HERE TO GET THE FOX NEWS APP**

Trump, who repeatedly denied the allegations included in the dossier, filed a lawsuit in September 2023 against Orbis Business Intelligence, a company Steele co-founded, claiming that the dossier led to personal and reputational damage. A judge tossed the

case in February 2024.

Meanwhile, Trump said Thursday it was an "honor" to sign the executive order.

"What they've done, it's just terrible," Trump said. "It's weaponization. You could say weaponization against a political opponent, and it should never be allowed to happen again."

*Fox News' Breanne Deppisch contributed to this report.*

Diana Stancy is a politics reporter with Fox News Digital covering the White House.

Print   Close

**URL**

https://www.foxnews.com/politics/absurd-white-house-blasts-law-firm-helped-fuel-russia-hoax-after-challenging-trump-order

Home | Video | Politics | U.S. | Opinion | Entertainment | Tech | Science | Health | Travel | Lifestyle | World | Sports | Weather

Privacy | Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.Do Not Sell my Personal Information - New Terms of Use - FAQ

# EXHIBIT 38

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,
IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Exhibit 38</u>

March 14, 2025 speech by President Trump

The video is available here:
https://www.youtube.com/watch?v=6i41Av4eYO8

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit is being maintained by plaintiff's counsel and will be provided to the Court and defendants' counsel.*

# EXHIBIT 39



*The* WHITE HOUSE

⬉ **PRESIDENTIAL ACTIONS**

Preventing Abuses of the Legal System and the Federal Court

Presidential Memoranda

March 22, 2025

MEMORANDUM FOR THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT:    Preventing Abuses of the Legal System and the Federal Court

Lawyers and law firms that engage in actions that violate the laws of the United States or rules governing attorney conduct must be efficiently and effectively held accountable. Accountability is especially important when misconduct by lawyers and law firms threatens our national security, homeland security, public safety, or election integrity.

Recent examples of grossly unethical misconduct are far too common. For instance, in 2016, Marc Elias, founder and chair of Elias Law Group LLP, was deeply involved in the creation of a false "dossier" by a foreign national designed to provide a fraudulent basis for Federal law enforcement to investigate a Presidential candidate in order to alter the outcome of the Presidential election. Elias also intentionally sought to conceal the role of his client — failed Presidential candidate Hillary Clinton — in the dossier.

The immigration system — where rampant fraud and meritless claims have supplanted the constitutional and lawful bases upon which the President exercises core powers under Article II of the United States Constitution — is likewise replete with examples of

unscrupulous behavior by attorneys and law firms. For instance, the immigration bar, and powerful Big Law pro bono practices, frequently coach clients to conceal their past or lie about their circumstances when asserting their asylum claims, all in an attempt to circumvent immigration policies enacted to protect our national security and deceive the immigration authorities and courts into granting them undeserved relief. Gathering the necessary information to refute these fraudulent claims imposes an enormous burden on the Federal Government. And this fraud in turn undermines the integrity of our immigration laws and the legal profession more broadly — to say nothing of the undeniable, tragic consequences of the resulting mass illegal immigration, whether in terms of heinous crimes against innocent victims like Laken Riley, Jocelyn Nungaray, or Rachel Morin, or the enormous drain on taxpayer resources intended for Americans.

Federal Rule of Civil Procedure 11 prohibits attorneys from engaging in certain unethical conduct in Federal courts. Attorneys must not present legal filings "for improper purpose[s]," including "to harass, cause unnecessary delay, or needlessly increase the cost of litigation." FRCP 11(b)(1). Attorneys must ensure that legal arguments are "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FRCP 11(b)(2). And attorneys must ensure that their statements about facts are "reasonably based" on evidentiary support, or a belief that such evidence actually exists. FRCP 11(b)(3)–(b)(4). When these commands are violated, opposing parties are authorized to file a motion for sanctions. FRCP 11(c). The text of the rule specifically addresses and provides for sanctions for attorneys and their firms as well as for recalcitrant parties given the solemn obligation that attorneys have to respect the rule of law and uphold our Nation's legal system with integrity. Furthermore, Rule 3.1 of the Model Rules of Professional Conduct provides that, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."

Unfortunately, far too many attorneys and law firms have long ignored these requirements when litigating against the Federal Government or in pursuing baseless partisan attacks. To address these concerns, I hereby direct the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive

departments and agencies of the United States.

I further direct the Attorney General and the Secretary of Homeland Security to prioritize enforcement of their respective regulations governing attorney conduct and discipline. *See, e.g.*, 8 C.F.R. 292.1 *et seq.*; 8 C.F.R. 1003.101 *et seq.*; 8 C.F.R. 1292.19.

I further direct the Attorney General to take all appropriate action to refer for disciplinary action any attorney whose conduct in Federal court or before any component of the Federal Government appears to violate professional conduct rules, including rules governing meritorious claims and contentions, and particularly in cases that implicate national security, homeland security, public safety, or election integrity. In complying with this directive, the Attorney General shall consider the ethical duties that law partners have when supervising junior attorneys, including imputing the ethical misconduct of junior attorneys to partners or the law firm when appropriate.

I further direct that, when the Attorney General determines that conduct by an attorney or law firm in litigation against the Federal Government warrants seeking sanctions or other disciplinary action, the Attorney General shall, in consultation with any relevant senior executive official, recommend to the President, through the Assistant to the President for Domestic Policy, additional steps that may be taken, including reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services.

I further direct the Attorney General, in consultation with any relevant senior executive official, to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years. If the Attorney General identifies misconduct that may warrant additional action, such as filing frivolous litigation or engaging in fraudulent practices, the Attorney General is directed to recommend to the President, through the Assistant to the President for Domestic Policy, additional steps that may be taken, including reassessment of security clearances held by the attorney, termination of any contract for which the relevant attorney or law firm has been hired to perform services, or any other appropriate actions.

Law firms and individual attorneys have a great power, and obligation, to serve the rule of

law, justice, and order.  The Attorney General, alongside the Counsel to the President, shall report to the President periodically on improvements by firms to capture this hopeful vision.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

  

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 40



# EXHIBIT 41

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,**
**IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

<u>Exhibit 41</u>

President Trump speaking at a Women's History Month Event, posted by the
White House to its official YouTube channel on March 26, 2025

The posted video is available here:
https://www.youtube.com/watch?v=37yfOP8cVPQ

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit*
*is being maintained by plaintiff's counsel and will be provided to the*
*Court and defendants' counsel.*

# EXHIBIT 42



Start Listening
Play Your Playlist

MY PLAYLIST

 

DONATE

INVESTIGATIONS

# Trump has made more than 100 threats to prosecute or punish perceived enemies

OCTOBER 22, 2024 · 7:00 AM ET

HEARD ON ALL THINGS CONSIDERED

 Tom Dreisbach

**7-Minute Listen**                    PLAYLIST    TRANSCRIPT



Former President Donald Trump speaks to supporters during a campaign event at Saginaw Valley State University on Oct. 3 in Saginaw, Mich.

*Scott Olson/Getty Images*

With just two weeks remaining until the presidential election, former President Donald Trump has used his most recent appearances on podcast and cable interviews to escalate attacks on fellow Americans whom he calls "the enemy from within."

In one recent interview, Trump said that if "radical left lunatics" disrupt the election, "it should be very easily handled by — if necessary, by National Guard, or if really necessary, by the military."

That statement, on Fox News, was not the first time Trump has expressed support for using government force against domestic political rivals. Since 2022, when he began preparing for the presidential campaign, Trump has issued more than 100 threats to investigate, prosecute, imprison or otherwise punish his perceived opponents, NPR has found.

Sponsor Message

LEARN MORE

A review of Trump's rally speeches, press conferences, interviews and social media posts shows that the former president has repeatedly indicated that he would use federal law enforcement as part of a campaign to exact "retribution."

Vice President Kamala Harris "should be impeached and prosecuted," Trump said at a rally last month.

"I will appoint a real special prosecutor to go after the most corrupt president in the history of the United States of America, Joe Biden, and the entire Biden crime family," Trump said last year.

"ELIZABETH LYNNE CHENEY IS GUILTY OF TREASON," reads one post Trump reposted on his social media site, Truth Social, regarding the former Republican congresswoman. "RETRUTH IF YOU WANT TELEVISED MILITARY TRIBUNALS."

 **Donald J. Trump** ✓
@realDonaldTrump

She should go to Jail along with the rest of the Unselect Committee!

 **John Solomon** ✓
@jsolomonreports · Mar 11

Updated: Liz Cheney sat in interview with Secret Service driver who denied story Trump tried to commandeer presidential limo on Jan. 6 but did not include in final report.
justthenews.com/government/con...



🔗 justthenews.com

Democrats' Jan. 6 panel withheld crucial evidence, including denial from Trump driver: new report

For the first time, the report released information from the Secret Service driver who took Trump to his Jan. 6, 2021, speech on the Ellipse and back to the White House. The driver directly contradicted...

**1.76k** ReTruths  **5.74k** Likes                    Mar 17, 2024, 10:33 AM

Journalists who decline to identify the sources of leaked information would also face imprisonment, Trump said.

"If the reporter doesn't want to tell you, it's 'bye-bye,' the reporter goes to jail," Trump said in 2022. He appeared to suggest that the reporter could also face sexual assault while in custody.

Trump and his allies have either downplayed these threats, or said that these actions would be justified, in part, because of the four criminal prosecutions brought against Trump since he left office. In one of those cases, a New York jury found Trump guilty of 34 felony counts in connection with hush money he paid to keep an alleged affair with adult film actress Stormy Daniels secret. He is appealing that verdict.

When right-wing radio host Glenn Beck asked Trump if he would lock up his opponents in a second term, Trump responded, "The answer is you have no choice because they're doing it to us."

Legal experts said that there are few guardrails preventing Trump from pursuing his plans to prosecute opponents and noted that Trump pressured the Department of Justice to investigate rivals during his first term. In about a dozen cases, the Justice Department followed through and initiated investigations, according to one analysis.

If Trump follows through on his stated plans in a second term, these experts said, his actions could endanger Americans' civil liberties and cause a chilling effect on criticism of the president. The threats he's made have already led some of his targets to prepare for the worst by saving money and considering whether to leave the country if Trump wins the election.

"This is how autocrats cement their permanent grip on power," said Ian Bassin, the executive director of the nonprofit group Protect Democracy, which advocates for protections against authoritarianism.

Many of Trump's threats relate to his persistent false claims about election fraud and the lie that he won the 2020 election.

"START ARRESTING THE POLL WORKERS AND WATCH HOW FAST THEY TELL YOU WHO TOLD THEM TO CHEAT," reads a message Trump reposted on social media in 2023.

He has also repeatedly targeted the prosecutors, judges and even courtroom staff connected to the prosecutions against him for alleged election interference, improperly holding classified documents and business fraud.



New York Attorney General Letitia James and Judge Arthur Engoron "should be arrested and punished accordingly," Trump said at a rally in January. James successfully brought a civil fraud case against Trump, which Engoron presided over. Trump is appealing the judgment against him. He also reposted a message attacking a member of the Georgia grand jury that indicted him.

Attorney General Letitia James sits in the courtroom during the civil fraud trial of former President Donald Trump at the New York Supreme Court on Jan. 11 in New York City.

*Pool/Getty Images*



**Donald J. Trump** ✅
@realDonaldTrump

Judge Engoron should end the ridiculous Political Witch Hunt against me. I have TOTALLY WON THIS CASE, which should never have been brought. The only Fraud was committed by A.G. Letitia James in convincing the Judge that Mar-a-Lago was only worth $18,000,000 (in order to make my "numbers" look bad), when it is worth 50 to 100 times that amount. She campaigned on "getting Trump." She should be prosecuted!

**6.12k** ReTruths  **22.3k** Likes                    Nov 10, 2023, 10:42 AM

Among the other targets of Trump's threats are former President Barack Obama ("*RETRUTH IF YOU WANT PUBLIC MILITARY TRIBUNALS*"), members of the U.S. Capitol Police who defended the Capitol during the Jan. 6, 2021, riot ("*The cops should be charged and the protesters should be freed*"), members of the Jan. 6 Select Committee in Congress ("*They should be prosecuted for their lies and, quite frankly, TREASON!*"), Facebook founder Mark Zuckerberg ("*We are watching him closely, and if he does anything illegal this time he will spend the rest of his life in prison*"), people who criticize the Supreme Court ("*These people should be put in jail, the way they talk about our judges and our justices*") and protesters who burn the American flag ("*You should get a one-year jail sentence if you desecrate the American flag*").

In one instance, Trump suggested that Gen. Mark Milley, who served as chairman of the Joint Chiefs of Staff in his administration, could face execution for calling officials in China to try and defuse tensions in the chaotic aftermath of the Jan. 6 attack.

"This is an act so egregious that, in times gone by, the punishment would have been DEATH!" Trump wrote on Truth Social.

Milley, who retired in 2023, has since told journalist Bob Woodward that Trump is "fascist to the core" and "the most dangerous person to this country."



Donald J. Trump ✓
@realDonaldTrump

Mark Milley, who led perhaps the most embarrassing moment in American history with his grossly incompetent implementation of the withdrawal from Afghanistan, costing many lives, leaving behind hundreds of American citizens, and handing over BILLIONS of dollars of the finest military equipment ever made, will be leaving the military next week. This will be a time for all citizens of the USA to celebrate! This guy turned out to be a Woke train wreck who, if the Fake News reporting is correct, was actually dealing with China to give them a heads up on the thinking of the President of the United States. This is an act so egregious that, in times gone by, the punishment would have been DEATH! A war between China and the United States could have been the result of this treasonous act. To be continued!!!

**6.9k** ReTruths  **20.5k** Likes                              Sep 22, 2023, 7:59 PM

In addition to using the powers under criminal law, Trump has also promised to take greater control of agencies like the Federal Communications Commission,

which regulates broadcast television and radio, including NPR's network of member stations.

After his presidential debate against Harris on ABC News, Trump called for the FCC to revoke ABC's broadcast license, due to his perception of the moderators' bias. He also called for an investigation of CBS News for campaign finance violations after it aired an interview with Vice President Harris. He's previously floated pulling the license for NBC, as well, over criticisms of its news coverage.

"I absolutely think he will follow up on those threats," said Stephanie Grisham, who worked for Trump's 2016 presidential campaign and served as his White House press secretary. Grisham resigned in the aftermath of the Jan. 6, 2021, attack on the U.S. Capitol and has since become a vocal critic of her former boss.

"I just know that once he's in office with no guardrails, no reason to worry about reelection, and only the most fervent, loyal people surrounding him," Grisham said, "he will absolutely make sure his enemies pay for what he perceives to be their crimes."

John Bolton, who served as national security adviser in the Trump White House, said at an event earlier this year that he believed Trump would use the Department of Justice to enact a "retribution presidency."

In response to NPR's reporting, the Republican National Committee issued a statement.

"Kamala Harris is the threat to democracy," said RNC spokesperson Anna Kelly.
"She and Joe Biden weaponized our justice system in order to sway an election."

# Trump has made at least 109 threats since 2022

Click on the buttons below to filter by category of person targeted

| Show all | Current and former government officials | Democratic district attorneys |

| Election workers and administrators | Journalists and media organizations |

| Participants in Trump's court cases | Political opponents | Private citizens |

| Tech companies and executives | U.S. Capitol Police | Other |

---

**Target: Emily Kohrs**
*Participants in Trump's court cases*

"Thats literally a felony, will she be prosecuted?"

— *Feb. 22, 2023, Statement reposted by Trump on Truth Social (source)*

---

**Target: Politico journalists**
*Journalists and media organizations*

"The Supreme Court has just announced it is not able to find out, even with the help of our 'crack' FBI, who the leaker was on the R v Wade scandal. They'll never find out, & it's important that they do. So, go to the reporter & ask him/her who it was. If not given the answer, put whoever in jail until the answer is given. You might add the publisher and editor to the list. Stop playing games, this leaking cannot be allowed to happen. It won't take long before the name of this slime is revealed!"

— *Jan. 19, 2023, Trump post on Truth Social (source)*

---

**Target: Jamaal Bowman**
*Political opponents*

Trump posted "100% correct!" in response to a statement that Rep. Jamaal Bowman should be charged with a felony.

— *Oct. 26, 2023, Trump post on Truth Social (source)*

---

**Target: Jack Smith**
*Participants in Trump's court cases*

"Speaking of LEAKS, Special 'Prosecutor' Jack Smith (What did his name used to be?) leaked massive amounts of information to The Washington ComPost. This is illegal, and I assume this Radical Left

Lunatic, much to the chagrin of his Trump Hating wife and family, will be PROSECUTED? He is a totally biased Thug who should be let loose on the Biden Documents hidden in Chinatown, and the 1,850 BOXES secretly stored in Delaware, which Biden REFUSES to give up. Biden is guilty of Obstruction, I am not!"

— *April 3, 2023, Trump post on Truth Social (source)*

| Target: Michael Byrd |
| :---: |
| *U.S. Capitol Police* |

"THIS NEEDS TO BE POSTED DAILY UNTIL THAT SOB IS ARRESTED & STANDS TRIAL"

— *Jan. 13, 2023, Statement reposted by Trump on Truth Social (source)*

### Trump's claims of a "witch hunt"

Amid this flood of threats against his opponents, Trump has repeatedly accused the Biden administration of "weaponizing" the Justice Department and subjecting him to "political persecution" and a "witch hunt."

Judges presiding over Trump's criminal cases have rejected those arguments.

Biden did state publicly that subjects of the Jan. 6 Select Committee's investigation should face prosecution for defying subpoenas. He later said that comment was "inappropriate." But there's no evidence that Biden has directed the federal cases against Trump. Those cases are being led by special counsel Jack Smith.

During Biden's presidency, the Justice Department has also brought prosecutions against several high-profile Democrats, including former New Jersey Sen. Robert Menendez and New York Mayor Eric Adams, as well as the president's son, Hunter Biden.

Vice President Harris has generally avoided commenting on Trump's federal criminal cases. When supporters at recent campaign rallies started chanting "lock him up," she told the crowd, "We're gonna let the courts handle that."

### Could Trump actually order prosecutions of his enemies?

After the widespread abuses of presidential power by Richard Nixon, subsequent administrations generally sought to give the Department of Justice more independence from the White House, in part to insulate the agency from electoral politics.

But legal experts and former government officials said those rules and norms can be overturned or ignored.

"There are not really legal restrictions or even structural restrictions that would stop the president, if he were to appoint loyalists to be the lead prosecutors in all 93 jurisdictions around the country, from simply directing them to go and investigate his perceived opponents," said Bassin, who also served as associate White House counsel in the Obama administration. "If he appointed a loyal director of the FBI, he would be able to make life pretty miserable for the people he is targeting."

Trump has said he will appoint the "most ferocious legal warriors against crime and Communist corruption that this country has ever seen."

Trump's allies have also promised to weaken or even end the Justice Department's independence from the White House if he returns to office, which would give Trump and his political appointees greater ability to direct the federal prosecutions.

"The president has the authority under the Constitution to conduct law enforcement," Russ Vought, a former Trump administration official and a leader of the Heritage Foundation's Project 2025 blueprint, told NPR last year. Vought added that "I think you can absolutely trust Donald Trump" not to use the Justice Department for partisan purposes.

The Supreme Court also recently removed one potential guardrail preventing political prosecutions in its ruling on Trump's claim of presidential immunity.



**INVESTIGATIONS**

**Trump's Bedminster club hosted an alleged Nazi sympathizer who stormed the Capitol**



**INVESTIGATIONS**

**The Trump campaign embraces Jan. 6 rioters with money and pardon promises**

"One of the most remarkable lines in that Supreme Court opinion is that a sitting president could order their Justice Department to engage in a 'sham' investigation," said Ryan Goodman, a law professor at New York University. "So a president would not have to fear criminal accountability for ordering a sham investigation of their perceived enemies."

One final check against political prosecutions is the judicial branch. Judges can refuse to authorize search and arrest warrants. If an investigation leads to an actual prosecution, judges can also dismiss charges and juries can acquit defendants. But the process alone can do significant damage to a target's reputation and finances, regardless of the final outcome. And both Trump and running mate JD Vance have suggested they might ignore the judiciary's decisions.

Trump posted on Truth Social that "massive fraud" in the 2020 election justified "the termination of all rules, regulations, and articles, even those found in the Constitution." In a 2021 interview, Vance said Trump should ignore court rulings if they constrain the administration's ability to replace career officials with political loyalists.

"Much of this depends upon the character of the individual in the White House and the character of those surrounding them," said Goodman, "because there's so many levers of power that they can use."

## Trump's actions in his first term

Trump made the prosecution of Hillary Clinton, his Democratic rival in the 2016 election, a centerpiece of his first presidential campaign. "Lock her up" became a perennial call-and-response between Trump and his supporters at rallies.

And while the Justice Department under Trump did not ultimately charge Clinton, there's substantial evidence that his pressure on prosecutors did have an impact in some cases.

"President Trump treated the Department of Justice like his own personal law firm, and he put people in charge there who did his bidding," said Geoffrey Berman, who served as U.S. attorney for the Southern District of New York during the Trump administration, in a 2022 interview with WHYY's *Fresh Air*. "The Justice Department targeted political enemies of the president and assisted political allies of the president."

One of Trump's most frequent targets in his first term was Andrew McCabe, a longtime FBI official who became the bureau's acting director when Trump fired James Comey in 2017.



Andrew McCabe, then-acting director of the Federal Bureau of Investigation, speaks during a Senate Intelligence Committee hearing in Washington, D.C., on May 11, 2017.

While in office, Trump attempted to "purge" the FBI of people he perceived as disloyal, McCabe said in an interview.

Trump repeatedly attacked McCabe, because he was in the leadership of the FBI during the investigation into Russian interference with the 2016 election and because he perceived McCabe as a partisan enemy. McCabe considered himself a moderate Republican, but Trump seized on the

Andrew Harrer/Getty Images

fact that McCabe's wife had run unsuccessfully for the Virginia state Senate in 2015 as a Democrat.

Trump publicly pressured the department to fire McCabe before he would be eligible to receive retirement benefits, writing on Twitter, "FBI Deputy Director Andrew McCabe is racing the clock to retire with full benefits. 90 days to go?!!!"

"It was clear to me, he was basically saying, 'I'm going to do whatever I can to fire this guy before he can retire,'" McCabe said.

Department of Justice leaders demoted and then fired McCabe just hours before that deadline.

"Andrew McCabe FIRED, a great day for the hard working men and women of the FBI," Trump posted. "A great day for Democracy."

Internal investigators at the Justice Department said that McCabe "lacked candor" about his contacts with journalists — an allegation McCabe denies — and federal prosecutors opened a criminal investigation into McCabe that dragged on for nearly two years.

McCabe said he was with his wife and two children when the news of the criminal investigation leaked.

"It was just an incredibly sad moment and really scary for them, because it was the first time that I think they had ever considered that what had been political nonsense might actually cost me my liberty," McCabe said. "And it's also humiliating. It's embarrassing."

Federal Judge Reggie Walton, a George W. Bush appointee, questioned prosecutors over their handling of the case and Trump's apparent influence over it.

"I don't think people like the fact that you got somebody at the top basically trying to dictate whether somebody should be prosecuted," Walton said. "I just think it's a banana republic when we go down that road."

Prosecutors ultimately dropped the case without bringing charges.

McCabe sued the Department of Justice over his firing. After Trump left office, he received a settlement that restored his back pay, retirement benefits and rank.

McCabe was not the only target, according to an analysis co-written by Goodman. He found 11 other cases in which Trump pushed the Justice Department to investigate his rivals.

"There is an established track record of Trump having done this before," said Goodman of NYU. "It's not pure rhetoric."

In one instance described in the Mueller report and cited by Goodman, Trump urged then-Attorney General Jeff Sessions to prosecute Hillary Clinton. (Trump

also urged prosecution publicly on Twitter.) Federal prosecutors in Utah later opened an investigation into Clinton and the Clinton Foundation without bringing charges. Hillary Clinton remained one of Trump's most frequent targets even after he left office. Last year, he reposted a video with calls to "lock her up" for alleged treason.

The Jan. 6 Select Committee in Congress presented additional evidence of Trump putting pressure on prosecutors to say they found widespread fraud in the 2020 election, despite a lack of evidence.



**Donald J. Trump** ✔
@realDonaldTrump

Tucker Carlson a MUST WATCH tonight. Releasing more VIDEO which was "HIDDEN BY THE CROOKED J 6 UNSELECT COMMITTEE." They should be prosecuted for their lies and, quite frankly, TREASON!

**8.38k** ReTruths  **24.1k** Likes                    Mar 07, 2023, 9:21 AM

"What I'm just asking you to do is to say it was corrupt and leave the rest to me and the Republican congressmen," Trump told officials in his Justice Department, according to testimony obtained by the select committee.

"Trump was absolutely willing to use the Justice Department for his ends," former Republican Congressman Adam Kinzinger, a member of the select committee, told NPR.



A supporter holds up a sign as Trump speaks at a town hall at the Lancaster County Convention Center on Oct. 20 in Lancaster, Pa.
*Evan Vucci/AP*

### Preparing for the worst

Trump continues to threaten McCabe.

Steve Bannon, who served as Trump's chief strategist in the White House and remains a prominent supporter, said on his podcast that McCabe "should be worried" that Trump would go after him if he returns to the White House.

"You should be very worried," Bannon said. "But also understand this, brother, we have extradition treaties with virtually every country in the world. And you go ahead and run and

run as far as you want. We're going to come and get you." (Bannon is currently serving a four-month prison sentence for contempt of Congress and is due to be released at the end of October.)

Trump reposted Bannon's comments on Truth Social.

"It shows you, I think, and in serious terms, a persistent commitment to this idea of 'we are going on the revenge tour,'" McCabe said in response to those comments.

McCabe said he has had difficult conversations with his family about what Trump might do if he returns to the White House, and he knows other former officials who are also contemplating leaving the country.

"I don't intend to leave the country that I served for 21 years," McCabe said. "But this kind of pits you against your children and your spouses who just want you to be safe."

Grisham said she is also making preparations in case Trump returns to the White House — and saving up money.

Trump has not threatened her with jail time or prosecution, but did attack her in personal terms after she published a book critical of the administration.

"I'm definitely fearful for myself and for many of my friends who have spoken out, too," Grisham said. "It's a terrifying thought, because that is literally the most

powerful person in the world that knows you and wants only bad for you. It's truly a terrifying thought."

donald trump     2024 election     department of justice



## The news you need to start your day

Our journalists summarize the biggest stories in the Up First newsletter so you can stay informed, not overwhelmed.

| Email address | SUBSCRIBE |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy. NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR

# EXHIBIT 43



**U.S. Department of Justice**

**Jack Smith**
**Special Counsel**

---

January 7, 2025

<u>DELIVERY BY HAND</u>
The Honorable Merrick B. Garland
Attorney General of the United States
Robert F. Kennedy Department of Justice Building
950 Pennsylvania Avenue NW
Washington, D.C.  20530

      Re:    <u>Final Report of the Special Counsel Under 28 C.F.R. § 600.8</u>

Dear Mr. Attorney General:

      In the fall of 2022, former President Donald J. Trump was a subject of two separate criminal investigations by the Department of Justice.  The first was an investigation into whether any person violated the law in connection with efforts to interfere with the lawful transfer of power following the 2020 presidential election.  The second investigation focused on the possession of highly classified documents at Mr. Trump's Mar-a-Lago social club following his presidency.

      On November 15, 2022, Mr. Trump declared his candidacy to unseat President Joseph R. Biden, Jr., who had previously stated his intention to stand for reelection.  Mr. Trump's announcement created a highly unusual situation, in which the Department, an agency within the Executive Branch headed by President Biden, was conducting criminal investigations regarding his newly declared challenger.  Based on a longstanding recognition that "in certain extraordinary cases, it is in the public interest to appoint a special prosecutor to independently manage an investigation and prosecution," you, as the Attorney General, promptly did so here to "underscore[] the Department's commitment to both independence and accountability in particularly sensitive matters."  Attorney General Merrick B. Garland, Remarks on the Appointment of a Special Counsel, Washington, D.C. (Nov. 18, 2022).

      On the day that I was appointed, I pledged that I would exercise independent judgment, follow the best traditions of the Department of Justice, and conduct my work expeditiously and thoroughly to reach whatever outcome the facts and law dictated.  With the aid of an outstanding team, that is what I did.  Upon my appointment, I organized a staff of experienced career federal prosecutors, and together we conducted the investigations and subsequent prosecutions under our mandate, consistent with the Department's traditions of integrity and nonpartisanship that have guided all of us throughout our careers.

Attorney General Edward H. Levi, who assumed the Department's helm in the wake of Watergate, summed up those traditions best:

> [O]ne paramount concern must always guide our way. This is the keeping of the faith in the essential decency and even-handedness in the law, a faith which is the strength of the law and which must be continually renewed or else it is lost. In a society that too easily accepts the notion that everything can be manipulated, it is important to make clear that the administration of federal justice seeks to be impartial and fair . . . .

Address to the Los Angeles County Bar Association, Los Angeles, CA (Nov. 18, 1976). Attorney General Levi's remarks, shared 46 years to the day before my appointment, ring as true now as they did then.

I have been a career prosecutor in local, national, and international settings over the last three decades, working shoulder to shoulder with hundreds of prosecutors in that time. The prosecutors and staff of the Special Counsel's Office are, in my estimation, without peer in terms of accomplishment, capability, judgment, and work ethic. More importantly in my book, they are people of great decency and the highest personal integrity. The intense public scrutiny of our Office, threats to their safety, and relentless unfounded attacks on their character and integrity did not deter them from fulfilling their oaths and professional obligations. These are intensely good people who did hard things well. I will not forget the sacrifices they made and the personal resilience they and their families have shown over the last two years. Our country owes them a debt of gratitude for their unwavering service and dedication to the rule of law. Without pause they have upheld the Department's commitment to the impartial and independent pursuit of justice. For that, I am grateful—as I know you are as well.

Staffed by some of the most experienced prosecutors in the Department, my Office operated under the same Department policies and procedures that guide all federal prosecutors. The regulations under which I was appointed required that we do so, *see* 28 C.F.R. § 600.7(a), and our work benefited from those processes. The Department has long recognized that proceeding with "uniformity of policy . . . is necessary to the prestige of federal law." Robert H. Jackson, "The Federal Prosecutor" (April 1, 1940). As a result, throughout our work we regularly consulted the Justice Manual, the Department's publicly available guidebook on policies and procedures, and adhered to its requirements.

Our work rested upon the fundamental value of our democracy that we exist as "a government of laws, and not of men." John Adams, *Novanglus*, No. VII at 84 (Mar. 6, 1775). In making decisions as Special Counsel, I considered as a first principle whether our actions would contribute to upholding the rule of law, and acted accordingly. Our committed adherence to the rule of law is why we not only followed Department policies and procedures, but strictly observed legal requirements and dutifully respected the judicial decisions and precedents our prosecutions prompted. That is also why, in my decision-making, I heeded the imperative that "[n]o man in this country is so high that he is above the law," *United States v. Lee*, 106 U.S. 196, 220 (1882). Simply

2

put: the Department of Justice's guiding mandate, which my Office strove to uphold, is that power, politics, influence, status, wealth, fear, and favor should not impede justice under the law.

When I assumed responsibility for the matters you assigned to me, I came to the work with no preconceived notion of what the just outcome of the investigations would be. I was not yet familiar with all of the relevant facts and had not yet researched the relevant law. Depending upon what the investigations revealed, I was equally comfortable closing the investigations or moving forward with prosecutions in one or both of the matters, having done both in high profile matters throughout my career.

To make prosecutorial determinations, my Office gathered relevant evidence and examined whether that evidence established violations of federal criminal law. In doing so I was guided by the Principles of Federal Prosecution, a series of considerations designed to promote the fair and evenhanded application of the law. As set forth in my Report, after conducting thorough investigations, I found that, with respect to both Mr. Trump's unprecedented efforts to unlawfully retain power after losing the 2020 election and his unlawful retention of classified documents after leaving office, the Principles compelled prosecution. Indeed, Mr. Trump's cases represented ones "in which the offense [was] the most flagrant, the public harm the greatest, and the proof the most certain." Jackson, "The Federal Prosecutor."

As directed by the Principles, I made my decision in these cases without regard to Mr. Trump's "political association, activities, or beliefs," or the possible personal or professional consequences of a prosecution for me or any member of my Office. Justice Manual § 9-27.260. "[T]he likelihood of an acquittal due to unpopularity of some aspect of the prosecution or because of the overwhelming popularity of the defendant or his cause," or the converse, were not factors in my prosecutive decisions. *Id.* § 9-27.220 (Comment). My Office also adhered at all times to the Department's policy against interfering in elections. As a former Chief of the Department's Public Integrity Section, it was important to me, as it is to you, that we adhere to both the letter and spirit of this policy. I can assure you that neither I nor the prosecutors on my team would have tolerated or taken part in any action by our Office for partisan political purposes. Throughout my service as Special Counsel, seeking to influence the election one way or the other, or seeking to interfere in its outcome, played no role in our work. My Office had one north star: to follow the facts and law wherever they led. Nothing more and nothing less.

While I relied greatly on the counsel, judgment, and advice of our team, I want it to be clear that the ultimate decision to bring charges against Mr. Trump was mine. It is a decision I stand behind fully. To have done otherwise on the facts developed during our work would have been to shirk my duties as a prosecutor and a public servant. After nearly 30 years of public service, that is a choice I could not abide.

It is equally important for me to make clear that nobody within the Department of Justice ever sought to interfere with, or improperly influence, my prosecutorial decision making. The regulations under which I was appointed provided you with the authority to countermand my decisions, 28 C.F.R. § 600.7, but you did not do so. Nor did you, the Deputy Attorney General, or members of your staff ever attempt to improperly influence my decision as to whether to bring

charges against Mr. Trump.  And to all who know me well, the claim from Mr. Trump that my decisions as a prosecutor were influenced or directed by the Biden administration or other political actors is, in a word, laughable.

While we were not able to bring the cases we charged to trial, I believe the fact that our team stood up for the rule of law matters.  I believe the example our team set for others to fight for justice without regard for the personal costs matters.  The facts, as we uncovered them in our investigation and as set forth in my Report, matter.  Experienced prosecutors know that you cannot control outcomes, you can only do your job the right way for the right reasons.  I conclude our work confident that we have done so, and that we have met fully our obligations to the Department and to our country.

Accompanying this letter, I am providing you "a confidential report explaining the prosecution or declination decisions reached by the Special Counsel." 28 C.F.R. § 600.8.  The Report consists of two volumes: Volume One addresses the Election Case, and Volume Two addresses the Classified Documents Case.  I understand that you are considering whether all or part of my Report can be made public, consistent with applicable legal restrictions.  *See* 28 C.F.R. § 600.9(c).  Both volumes minimize the identification of witnesses and co-conspirators, consistent with accepted Department practice, and we have provided a redacted version of Volume Two that identifies certain information that remains under seal or is restricted from public disclosure by Federal Rule of Criminal Procedure 6(e).  Because Volume Two discusses the conduct of Mr. Trump's alleged co-conspirators in the Classified Documents Case, Waltine Nauta and Carlos De Oliveira, consistent with Department policy, Volume Two should not be publicly released while their case remains pending.

Though not required, prior to finalizing the Report, my Office provided an opportunity for counsel for Mr. Trump to review both volumes, and for counsel for his former co-defendants in the Classified Documents Case, Mr. Nauta and Mr. De Oliveira, to review Volume Two.  After their review, counsel for Mr. Trump wrote a letter to you, and we have provided a written response to you, both of which you will find as an Addendum to the Report.

With this Report, my service and the service of my staff is complete.  I thank you for the trust you placed in me and my team and for affording us the independence necessary to conduct our work.  Public service is a privilege, and we deeply appreciate the opportunity to serve our Nation in seeking to uphold the rule of law.

Sincerely yours,

JACK SMITH

FINAL REPORT ON THE SPECIAL COUNSEL'S
INVESTIGATIONS AND PROSECUTIONS

VOLUME ONE: THE ELECTION CASE

REPORT ON EFFORTS TO INTERFERE WITH THE LAWFUL TRANSFER
OF POWER FOLLOWING THE 2020 PRESIDENTIAL ELECTION OR
THE CERTIFICATION OF THE ELECTORAL COLLEGE VOTE
HELD ON JANUARY 6, 2021

Special Counsel Jack Smith
Submitted Pursuant to 28 C.F.R. § 600.8(c)

Washington, D.C.
January 7, 2025

## TABLE OF CONTENTS

VOLUME ONE: THE ELECTION CASE ................................................................. 1

I.      THE RESULTS OF THE INVESTIGATION ................................................. 2

     A.      Mr. Trump's Pressure on State Officials ................................. 8

     B.      Mr. Trump's Fraudulent Elector Plan ................................. 11

     C.      Mr. Trump's Misuse of Official Power Through the Justice Department ............ 16

     D.      Mr. Trump's Pressure on the Vice President ......................... 20

     E.      Mr. Trump's Supporters Attack the United States Capitol ................... 23

II.      THE LAW ............................................................................ 33

     A.      Conspiracy to Defraud the United States (18 U.S.C. § 371) ............... 34

     B.      Obstruction and Conspiracy to Obstruct (18 U.S.C. § 1512(k) and (c)(2)) .......... 45

     C.      Conspiracy Against Rights (18 U.S.C. § 241) ....................... 49

     D.      Defenses ................................................................. 53

     E.      Other Charges ......................................................... 61

     F.      Co-Conspirator Liability ............................................. 67

III.      THE PRINCIPLES OF FEDERAL PROSECUTION ....................... 68

     A.      Prosecuting Mr. Trump Served Multiple Substantial Federal Interests ............ 69

         1.      The substantial federal interest in protecting the integrity of the electoral process and the peaceful transfer of power was served by Mr. Trump's prosecution. ................................................. 69

         2.      The substantial federal interest in counting every citizen's vote was served by Mr. Trump's prosecution. ................................. 74

         3.      The substantial federal interest in protecting election officials and other government officials from violence was served by Mr. Trump's prosecution. ................................. 75

         4.      The substantial federal interest in the evenhanded administration of the law was served by Mr. Trump's prosecution. ................... 83

B.    Mr. Trump Was Not Subject to Effective Prosecution in Another Jurisdiction ................................................................................ 87

C.    There Was No Adequate Non-Criminal Alternative to Prosecution ..................... 88

D.    Mr. Trump's Conduct Had No Historical Analogue ............................... 90

IV.    INVESTIGATIVE PROCEDURE AND POLICY ........................................ 92

A.    The Investigative Process ........................................................ 92

B.    Investigative and Prosecutive Procedures in an Election Year ........................ 95

    1.    The Department's Election Year Sensitivities Policy ................ 96

    2.    Pre-Indictment Procedures ........................................... 99

    3.    Post-Indictment Procedures ......................................... 100

V.    INVESTIGATIVE CHALLENGES AND LITIGATION ISSUES ......................... 107

A.    Pre-Indictment Litigation with Third Parties ................................... 108

    1.    The Twitter/X Search Warrant ..................................... 108

    2.    Legislative Privilege Under the Speech or Debate Clause ..............110

B.    Threats and Harassment of Witnesses .........................................112

C.    Mr. Trump's Claims of Executive Privilege ....................................116

D.    Presidential Immunity ......................................................... 122

    1.    Prosecutorial Decisions During the Charging Stage ................. 123

    2.    Immunity Litigation ................................................ 126

    3.    Unresolved Issues Regarding Presidential Immunity ................ 132

VI.    CONCLUSION .................................................................... 136

APPENDIX: KEY FILINGS IN SIGNIFICANT LITIGATION ............................ 138

VOLUME ONE: THE ELECTION CASE

On November 18, 2022, the Attorney General appointed the Special Counsel to oversee an ongoing investigation into "whether any person or entity violated the law in connection with efforts to interfere with the lawful transfer of power following the 2020 presidential election or the certification of the Electoral College vote held on or about January 6, 2021." *See* Office of the Attorney General, Order No. 5559-2022, *Appointment of John L. Smith as Special Counsel* (Nov. 18, 2022). As a result of that investigation, on August 1, 2023, a federal grand jury in the District of Columbia charged Donald J. Trump with four felony offenses arising from his efforts to unlawfully retain power by using fraud and deceit to overturn the 2020 election results. After the Supreme Court held last summer that Mr. Trump was immune from prosecution for certain misuse of official power alleged in the indictment, a second grand jury found probable cause to return a superseding indictment charging the same offenses based on his non-immunized conduct. Mr. Trump was thereafter reelected as President of the United States, and as a result, on November 25, 2024, the Special Counsel moved to dismiss the case against Mr. Trump because of the Department of Justice's longstanding position that the Constitution forbids the federal indictment and prosecution of a sitting President.

This Volume focuses on the Election Case against Mr. Trump and, consistent with the applicable regulations, provides an explanation of the prosecution decisions reached by the Special Counsel. *See* 28 C.F.R. § 600.8(c). The first section of this Volume sets forth a summary of key facts gleaned from the investigation, a vast majority of which are already a matter of public record through the litigation that occurred before the district court. The second section discusses the statutes that Mr. Trump was charged with violating, applying the facts developed during the investigation to the law as the Special Counsel's Office (the Office) understood it. This section also addresses other charges that the Office considered but did not pursue, and the

1

defenses that the Office expected Mr. Trump to raise at trial. The third section explains why the

Special Counsel's decision to prosecute Mr. Trump was fully consistent with and indeed was

compelled by the Principles of Federal Prosecution. The fourth section describes the Office's

investigative procedures and policies. Finally, the fifth section of this Volume discusses a series

of investigative and prosecutive issues that the Office confronted in the Election Case.

I.      THE RESULTS OF THE INVESTIGATION [1]

In 2020, then-President Donald J. Trump ran for reelection against Joseph R. Biden, Jr.

Mr. Trump lost. [2] As alleged in the original and superseding indictments, substantial evidence

demonstrates that Mr. Trump then engaged in an unprecedented criminal effort to overturn the

legitimate results of the election in order to retain power. [3] Although he did so primarily in his

private capacity as a candidate, and with the assistance of multiple private co-conspirators, Mr.

Trump also attempted to use the power and authority of the United States Government in

furtherance of his scheme.

As set forth in the original and superseding indictments, when it became clear that Mr.

Trump had lost the election and that lawful means of challenging the election results had failed,

he resorted to a series of criminal efforts to retain power. This included attempts to induce state

---

[1] This section of the Report summarizes the evidence uncovered by the Office's investigation, and therefore includes conduct for which the Supreme Court later held Mr. Trump to be immune from prosecution, *see Trump v. United States*, 603 U.S. 593, 597 (2024). That conduct is not included in the superseding indictment that the Office obtained after the Supreme Court's decision, *see* ECF No. 226, nor is that conduct included in the discussion below regarding why the evidence warranted criminal charges under the Principles of Federal Prosecution. Unless otherwise noted, all ECF citations in this Volume of the Report are to the docket in *United States v. Trump*, No. 23-cr-257 (D.D.C.).

[2] SCO-00701211 at 7 (Federal Election Commission, Election Results for 2020 Federal Elections).

[3] An indictment is an allegation, not a verdict; a person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt. The Office was prepared to present the evidence of Mr. Trump's alleged crimes in a public adversarial trial and to accept any verdicts rendered by a jury of his peers. As explained below, the Office commenced prosecution of Mr. Trump in the Election Case under both the original and superseding indictments because it concluded that the admissible evidence would be sufficient to obtain and sustain a conviction. *See* Justice Manual § 9-27.220 and *infra* at Section III.

officials to ignore true vote counts; to manufacture fraudulent slates of presidential electors in seven states that he had lost; to force Justice Department officials and his own Vice President, Michael R. Pence, to act in contravention of their oaths and to instead advance Mr. Trump's personal interests; and, on January 6, 2021, to direct an angry mob to the United States Capitol to obstruct the congressional certification of the presidential election and then leverage rioters' violence to further delay it.[4]  In service of these efforts, Mr. Trump worked with other people to achieve a common plan: to overturn the election results and perpetuate himself in office.  These individuals included Co-Conspirator 1, a private attorney who was willing to spread knowingly false claims and pursue strategies that Mr. Trump's Campaign attorneys would not; Co-Conspirator 2, a private attorney who devised and attempted to implement a strategy to leverage the Vice President's ministerial role in the certification proceeding to obstruct the certification; Co-Conspirator 3, a private attorney whose unfounded claims of election fraud Mr. Trump privately acknowledged were "crazy," but which he embraced and publicly amplified nonetheless; Co-Conspirator 4, a Justice Department official who worked on civil matters and who, with Mr. Trump, attempted to use the Justice Department to open sham election crime investigations and influence state legislatures with knowingly false claims of election fraud; Co-Conspirator 5, a private attorney who assisted in devising and attempting to implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding; and Co-Conspirator 6, a private political consultant who helped implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding.[5]  The throughline of all of Mr. Trump's criminal efforts was deceit—knowingly false claims of election

---

[4] ECF No. 1 at ¶ 10; ECF No. 226 at ¶ 11; *see* ECF No. 252 at 3.

[5] ECF No. 1 at ¶ 8; ECF No. 226 at ¶ 9; *see* ECF No. 252 at 4.

fraud—and the evidence shows that Mr. Trump used these lies as a weapon to defeat a federal

government function foundational to the United States' democratic process.[6]

Mr. Trump's false claims included dozens of specific claims regarding certain states, such

as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast

ballots, or that voting machines had changed votes for Mr. Trump to votes against him.[7]  These

claims were demonstrably and, in many cases, obviously false.[8]  The Office investigated whether

Mr. Trump believed the claims he made.  Evidence from a variety of sources established that Mr.

Trump knew that there was no outcome-determinative fraud in the 2020 election, that many of

the specific claims he made were untrue, and that he had lost the election.  He knew this because

some of the highest-ranking officials in his own Administration, including the Vice President,

told him directly that there was no evidence to support his claims.[9]  Mr. Trump's private

---

[6] *See* ECF No. 1; ECF No. 226.  Mr. Trump's conduct with Co-Conspirator 4 was charged in the original indictment, ECF No. 1, but not in the superseding indictment, ECF No. 226, because the Supreme Court held in the interim that Mr. Trump's conduct regarding the Department of Justice was immunized.  *Trump*, 603 U.S. at 597.

[7] *See, e.g.*, ECF No. 252 at 10; SCO-02244118 at 11-12, 14-19 (Remarks by Mr. Trump at Save America Rally 01/06/2021); SCO-04949418 at 04:15:22-04:31:46 (Video of Save America Rally 01/06/2021); SCO-04976462 at 18:34-19:12 (Video of Speech at White House 12/02/2020); SCO-00455939 (Donald J. Trump Tweet 11/19/2020); SCO-04976283 at 01:00:43-01:14:24 (Video of Dalton, GA speech 01/04/2021); SCO-04976275 at 22:00-22:40 (Video of Valdosta, GA speech 12/05/2020); SCO-00455041 (Donald J. Trump Tweet 01/02/2021); SCO-00456153 (Donald J. Trump Tweet 11/12/2020); SCO-00456144 (Donald J. Trump Tweet 11/13/2020); SCO-00456102 (Donald J. Trump Tweet 11/14/2020); SCO-00456066 (Donald J. Trump Tweet 11/15/2020); SCO-00455969 (Donald J. Trump Tweet 11/18/2020); SCO-04976266 at 20:10-37:50 (Video of Thanksgiving Call to Troops 11/26/2020).

[8] *Compare* SCO-02244118 at 11, 19 (Remarks by Mr. Trump at Save America Rally 01/06/2021) (Mr. Trump asserting on January 6 that there were 205,000 more votes than voters in Pennsylvania) *with* SCO-00709557 at 156 (SJC Tr.) (stating that Mr. Trump was told on January 3 that the allegation that there were more votes than voters in Pennsylvania was untrue); *see also* SCO-04976459 at 02:06:23-02:07:00 (Video of Arizona State Hearing 11/30/2020) (Co-Conspirator 1 stating that there could have been "five million illegal aliens in Arizona," and "a few hundred thousand" of those who fraudulently voted, even though the state had a total population of approximately 7.4 million).

[9] *See, e.g.*, ECF No. 1 at ¶ 11; *see* ECF No. 252 at 10-14 & nn.29-53; SCO-00014655 at 37-44; SCO-00689680 (Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, ASSOCIATED PRESS, Dec. 1, 2020); SCO-00764172 at 21-25 (HSC Tr.); SCO-11506911 at 96-97, 116, 125 (Int. Tr.); SCO-04957448 at 28-31 (SJC Tr.); SCO-00775937 at 57-64 (HSC Tr.); SCO-04952679 (Tweet 11/17/2020); SCO-12929351 (Tweet 11/12/2020); SCO-

advisors, both within and outside of his Campaign, told him the same.[10] On November 13, his

own Campaign conceded its litigation in Arizona, a state pivotal to his reelection prospects.[11]

State officials and legislators whom Mr. Trump pressured to change vote tallies or stop

certifications of results rebuffed him and informed him that his fraud claims were wrong, both

privately and through public statements.[12] Mr. Trump also monitored legal developments

---

03036930 (Joint Statement on Election Security 11/12/2020); SCO-00003294 at 37, 39-43; SCO-00015002 at 22-24; SCO-12920242 at 1-7 (Int. Rep.); SCO-00006256 at 46-47, 59, 74-76.

[10] *See, e.g.*, ECF No. 252 at 9-14 & nn.29-53, 17-18 & n.69, 21 & n.95, 25; SCO-12920242 at 1-7 (Int. Rep.).

[11] *See* ECF No. 252 at 9 & n.24; *Donald J. Trump for President, Inc. v. Hobbs*, No. CV 2020-014248, Transcript of Proceedings (Maricopa County, Az. Super. Ct. Nov. 13, 2020); *Hobbs*, No. CV 2020-014248, Docket Code 042 (Maricopa County, Az. Super. Ct. Nov. 13, 2020).

[12] *See* ECF No. 252 at 14 & nn.52-53; *see also, e.g.*, SCO-00829361 at 17 (HSC Tr.) (state legislator told Mr. Trump that "he primarily lost Michigan because of two counties that are routinely Republican counties . . . and more specifically he underperformed with educated females"); SCO-11509450 at 25 (Int. Tr.) (state legislator told Mr. Trump that state officials had not seen evidence of widespread fraud); SCO-04953053 (Joint Statement 11/20/2020) (state legislators' statement that they are unaware of "any information that would change the outcome of the election in Michigan" and noting legislative review of the state's elections process); SCO-04952823 (Statement 12/04/2020) (state legislator citing U.S. Attorney General's statement that he had not seen outcome-determinative election fraud); SCO-06730226 (Letter to Maricopa County Voters 11/17/2020) (noting "no evidence of fraud or misconduct or malfunction" in the over two million ballots cast); SCO-00614161 at 1335 (Tweets 12/01/2020) (describing Arizona election security measures, including poll ID and hand-conducted signature review); SCO-04957281 (Georgia Secretary of State News Release 10/23/2020) (refuting that electronic ballot marking is particularly vulnerable to cyberattack); SCO-04957309 (Georgia Secretary of State News Release 11/05/2020) (noting ballot count progress and listing voting security measures); SCO-12876768 (Video of Georgia Secretary of State Press Conference 11/06/2020) (giving numbers of rejected ballots from unregistered and non-citizen voters, and partially counted ballots from out-of-precinct voters); SCO-12876769 (Video of Georgia Secretary of State Press Conference 11/09/2020) (refuting allegations about ballot counting at State Farm Arena, software malfunctions, more votes than voters, and ballot harvesting, among others); SCO-12876771 (Video of Georgia Secretary of State Press Conference 11/12/2020) (addressing decision to conduct risk-limiting audit, explaining under-voting in presidential race, refuting allegations that computers and software flipped votes); SCO-04957154 (Georgia Secretary of State News Release 11/18/2020) (explaining that 2020 election absentee ballot rejection rate was equivalent to that in the 2018 general election); SCO-04957157 (Georgia Secretary of State News Release 11/19/2020) (risk-limiting audit results confirmed machine ballot count results); SCO-04957179 (Georgia Secretary of State News Release 12/07/2020) (hand recount and formal recount requested by Mr. Trump's campaign confirmed original election results; Co-Conspirator 3's lawsuit dismissed); SCO-04976277 (Video of Georgia Secretary of State Press Conference 12/07/2020) (refuting allegations about vote-switching algorithms and "secret suitcases" of ballots at State Farm Arena and noting that in-person voting always requires identification); SCO-12896570 (Video of Georgia Secretary of State Press Conference 12/16/2020) (stating that hand vote count confirmed machine count, signature matching was performed, "there were no votes flipped," and full video of vote counting at State Farm Arena confirmed no wrongdoing); SCO-04957276 (Georgia Secretary of State News Release 12/29/2020) (recounts and signature audit confirmed original Georgia election results, and signature matching in Cobb County found no fraudulent ballots); SCO-04976281 (Video of Interview 01/02/2021) (election audit and full recount confirmed that Mr. Trump lost in

regarding the election and was on notice that state and federal courts rejected every post-election

lawsuit that Mr. Trump and his allies filed claiming outcome-determinative election fraud.[13]  Mr.

Trump and co-conspirators could not have believed the specific fraud claims that they were

---

Georgia election); SCO-12998394 (Tr. of Georgia Secretary of State Call 01/02/2021); SCO-04976282 (Video of Georgia Secretary of State Press Conference 01/04/2021) (among other issues, refuting specific allegations about: Dominion voting machines; State Farm Arena ballot counting; convicted felons voting—74 at most, not 2,506; underage voters—zero, not 66,248; unregistered voters—zero, not 2,423; voting past the registration deadline—zero, not 4,926); SCO-04955691 (Michigan Secretary of State web page 11/06/2020) (voting machine software did not malfunction, no ballots were backdated); SCO-12876350 (Michigan Secretary of State web page 12/08/2020) (noting that Antrim County reporting error was accidental human error and citing U.S. Attorney General, FBI, and CISA view that 2020 election was "the most secure election in our nation's history and, despite unprecedented scrutiny, there has been no evidence of widespread fraud identified whatsoever"); SCO-02243762 (Michigan Attorney General and Secretary of State News Release 12/14/2020) (affirming that the "general election in Michigan and across the country was the most secure in the nation's history"); SCO-04957382 (Michigan Secretary of State web page 12/17/2020) (hand audit confirmed Antrim County election results and showed Dominion machines accurately calculated results); SCO-12839140 (Michigan Secretary of State web page 12/18/2020) (stating that final numbers from "Antrim County hand-tallied audit yesterday continue to affirm the accuracy of the Nov. 3 general election certified results"); SCO-02963078 (Video of Statement by City Clerk in Rochester Hills, Michigan) (stating that "[t]here were no missing ballots" and "[t]he accusation that 2,000 ballots were found is categorically false"); SCO-04957413 (New Mexico Secretary of State News Release 12/14/2020) (announcing that New Mexico's electoral votes went to Mr. Biden and that the 2020 election was "the most secure in American history"); SCO-12876770 (Video of Interview of Philadelphia City Commissioner with CNN 11/11/2020) (stating that there were no dead voters and no provisional ballots cast by ineligible voters and confirming that "[w]e just had the most transparent and secure election in the history of Philadelphia"); SCO-12929345 (Tweet 11/27/2020) (Philadelphia City Commissioner responding to Mr. Trump's 11/27/2020 Tweet and confirming, "Not only is there no evidence of 'massive' voter fraud in Philadelphia, but there haven't been *any* documented instances in the many lawsuits filed in Pennsylvania"); SCO-04956023 (Pennsylvania Department of State Public Response Statement 12/29/2020) (refuting misinformation in letter from Republican lawmakers that state data was contradicted by county-level data and explaining the state's risk-limiting audit to ensure accurate vote counts); SCO-12837952 (Wisconsin Elections Commission web page 11/05/2020) (impossible to have more votes than voters, and no absentee ballots were found in the middle of the night); SCO-12848641 (Wisconsin Elections Commission web page 11/10/2020) (no credible evidence to undermine unofficial election results or support allegations of widespread election issues, only registered voters can request absentee ballots, and ballot signatures can never be added by poll workers); SCO-12838580 (Wisconsin Elections Commission web page 12/16/2020) (Dominion machines did not flip votes, 200,000 people did not illegally vote without identification, and absentee ballots were not issued without a ballot application); SCO-12845421 (Nevada Secretary of State Facts vs. Myths Release 12/18/2020) ("we have yet to see any evidence of wide-spread fraud"; "we have not been presented with evidence of non-citizens voting in the 2020 election").

[13] See, e.g., ECF No. 252 at 18, 36-37 & nn.181-183, 41 & nn.207-208, 44-45 & nn.227-230; SCO-00455873, SCO-12987569 (Donald J. Trump Tweet 11/21/2020) (about failed Pennsylvania lawsuit); SCO-00455356, SCO-12858834 (Donald J. Trump Tweet 12/12/2020) (about failed Supreme Court lawsuit); SCO-00455197, SCO-00455196, SCO-00455195, SCO-12987423, SCO-12987422, SCO-12987421 (Donald J. Trump Tweets 12/21/2020) (about failed Wisconsin lawsuit); SCO-00790949 at 170-171 (HSC Tr.) (Senior Advisor noting that, in Mr. Trump's presence, he challenged Co-Conspirator 3 about losing lawsuits across the country); SCO-00014205 at 7-8.

making because the numbers they touted—for instance, of dead voters in a particular state—
frequently vacillated wildly from day to day or were objectively impossible,[14] including, for
example, Co-Conspirator 3's claims about voting machines that Mr. Trump privately
acknowledged sounded "crazy"[15] before he publicly amplified them.[16]  Finally, at times, Mr.
Trump made comments implicitly acknowledging that he knew he had lost the election.  For
example, in a January 3, 2021 Oval Office meeting regarding a national security matter, Mr.
Trump stated in part, "[I]t's too late for us.  We're going to give that to the next guy," meaning
President-elect Biden.[17]

Mr. Trump aimed his deceit at the United States' process of collecting, counting, and
certifying votes, which flows from the Constitution and a federal law enacted in 1887 called the
Electoral Count Act (ECA).  The Constitution provides that the United States President is
selected through the votes of individuals called electors and that each state determines how to
appoint its electors.[18]  Through state laws, all fifty states and the District of Columbia have
chosen to select electors based on the popular vote.[19]  Therefore, after election day, pursuant to

---

[14] *See, e.g.*, ECF No. 252 at 15 & nn.55-59 (Arizona); *id.* at 21 & n.96, 30 & n.142, 122-123 & n.592 (Georgia).  For Arizona, *see, e.g.*, SCO-04976384 at 20:47 (Common Sense episode 89 11/25/2020) ("36,000"); SCO-04976459 at 02:06:23-02:07:00 (Video of Arizona State Hearing 11/30/2020) ("a few hundred thousand"); SCO-06628641 at 18:52-19:42 (War Room episode 608 12/24/2020) ("about 250,000"); SCO-06628646 at 35:19-35:45 (War Room episode 625 01/02/2021) ("32,000"); SCO-02244118 at 17 (Remarks by Mr. Trump at Save America Rally 01/06/2021) ("36,000").  Additional examples are discussed below. *See, e.g.*, *infra* at nn.155-158 (Georgia).

[15] *See* ECF No. 252 at 44 & n.224; SCO-11523477 at 94-103 (Int. Tr.).

[16] *See* ECF No. 252 at 44-45 & nn.227-229; SCO-00455825 (Donald J. Trump Retweet 11/24/2020); SCO-12858284 (Tweet 11/24/2020) (showing Donald J. Trump Retweet); SCO-00455769, SCO-12858342 (Donald J. Trump Retweet 11/26/2020); SCO-04949395 at 3 (Remarks by Mr. Trump on the Presidential Election 12/02/2020); SCO-02244118 at 18-19 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[17] *See* ECF No. 1 at ¶ 83.

[18] U.S. CONST. art. II, § 1.

[19] ECF No. 1 at ¶ 9; ECF No. 226 at ¶ 10; *see* ECF No. 252 at 4; *About the Electors*, NATIONAL ARCHIVES, https://www.archives.gov/electoral-college/electors; *see also Chiafalo v. Washington,* 591 U.S. 578, 581, 584-85 & n.1 (2020).

the ECA, each state formally determines—or "ascertains"—its electors based on the popular vote; the ascertained electors meet on a day determined by the ECA and cast their votes based on their state's popular vote; and the ascertained electors mail their electoral votes, along with a certification from the state executive that they are the state's legitimate electors, to the United States Congress to be counted and certified in an official proceeding.[20]  The Constitution and ECA provide that on the sixth of January following election day, the Congress meets for that certification proceeding, which is presided over by the Vice President as President of the Senate; the legitimate electors' votes are opened and counted; and the winner is certified.[21]  Until Mr. Trump obstructed it, this democratic process had operated in a peaceful and orderly manner for more than 130 years.

A.    Mr. Trump's Pressure on State Officials

One of Mr. Trump's efforts to change the results of the election involved targeting the electoral process at the state level through politically aligned state officials.  Mr. Trump contacted state legislators and executives, pressured them with false claims of election fraud in their states, and urged them to take action to ignore the vote counts and change the results.[22] Significantly, he made election claims only to state legislators and executives who shared his political affiliation and were his political supporters, and only in states that he had lost.[23]

---

[20] Electoral Count Act, 3 U.S.C. §§ 5-11.

[21] U.S. CONST. amend. XII; Electoral Count Act, 3 U.S.C. § 15.

[22] *See* ECF No. 252 at 16-35; *see, e.g.*, SCO-12733339 at 3-6, 13-15 (Int. Rep.); SCO-00767550 at 10-18 (HSC Tr.); SCO-12998394 (Tr. of Georgia Secretary of State Call 01/02/2021); SCO-00829361 at 8-11, 15-24 (HSC Tr.).

[23] *See* ECF No. 252 at 16; SCO-12733339 at 3-5 (Int. Rep.); SCO-02296394 at 6 (Presidential Daily Diary 11/09/2020); SCO-00829361 at 9-10 (HSC Tr.); SCO-00767550 at 9-12, 18 (HSC Tr.); SCO-02295943 at 3 (Presidential Daily Diary 11/22/2020); SCO-02301680 at 3 (Presidential Daily Diary 12/08/2020); SCO-11509251 at 38-39, 43 (Int. Tr.); SCO-12998394 (Tr. of Georgia Secretary of State Call 01/02/2021).

For instance, Mr. Trump and Co-Conspirator 1 called the Speaker of the Arizona House of Representatives on November 22 and used false fraud claims to try to convince the Speaker to call the state legislature into session and replace Arizona's legitimate electors with Mr. Trump's illegitimate ones.[24]  Co-Conspirator 1 tried to coerce the Arizona Speaker, including by telling him, "we're all kind of Republicans and we need to be working together."[25]  The Arizona Speaker refused to do what he was asked and requested that Co-Conspirator 1 provide evidence to support his fraud claims.[26]  Co-Conspirator 1 not only failed to ever provide such evidence, but he conceded to the Arizona Speaker at an in-person meeting a week later that "[w]e don't have the evidence, but we have lots of theories."[27]  Despite this lack of fraud evidence, Mr. Trump and others continued to pressure the Arizona Speaker to overturn the election results.[28]

Mr. Trump similarly leaned on other state officials—always those of the same political party.  On January 2, 2021, just days before the election results were to be certified, he called Georgia's Secretary of State and pressed him to "find 11,780 votes"—Mr. Biden's margin of victory in the state.[29]  When the Secretary of State refuted Mr. Trump's false fraud claims, Mr. Trump issued a threat, stating that because the Secretary of State knew "what they did and you're

---

[24] See ECF No. 252 at 19 & nn.77-79; SCO-02295943 at 3 (Presidential Daily Diary 11/22/2020); SCO-00767550 at 9-12, 18 (HSC Tr.).

[25] See ECF No. 252 at 19 & n.80; SCO-00767550 at 15-16 (HSC Tr.).

[26] See ECF No. 252 at 19 & n.81; SCO-00767550 at 10-12, 15-16 (HSC Tr.); SCO-00715584 (Arizona House Speaker News Release 12/04/2020) ("I and my fellow legislators swore an oath to support the U.S. Constitution and the constitution and laws of the state of Arizona.  It would violate that oath, the basic principles of republican government, and the rule of law if we attempted to nullify the people's vote based on unsupported theories of fraud.").

[27] See ECF No. 252 at 19 & nn.82, 84; SCO-00767550 at 12-13, 35-36 (HSC Tr.).

[28] See ECF No. 252 at 20-21 & nn.88-91; SCO-00455536, SCO-12987478 (Donald J. Trump Retweet 12/06/2020); SCO-00455538, SCO-12858634 (Donald J. Trump Tweet 12/06/2020); SCO-00767550 at 43-49 (HSC Tr.); SCO-11540788 at 51-53 (Int. Tr.).

[29] See ECF No. 252 at 29 & nn.134, 137; SCO-00825967 at 105-107, 123-124 (HSC Tr.); SCO-12998394 at 12 (Tr. of Georgia Secretary of State Call 01/02/2021).

not reporting it . . . that's a criminal offense. And you know, you can't let that happen. That's a big risk to you . . . ."[30] Mr. Trump also pressed state legislators in Michigan by inviting them to the White House on November 20, raising false claims of election fraud, and bringing Co-Conspirator 1 into the meeting by phone.[31] Michigan's Senate Majority Leader told Mr. Trump that he had lost the election not because of fraud, but because he had underperformed with educated females—an assessment that displeased Mr. Trump.[32]

Mr. Trump engaged in these efforts even though trusted state and party officials had told him from the outset that there was no evidence of fraud in the election. In Arizona, Mr. Trump called the Governor on November 9—a week after election day, and after both Fox News and the Associated Press had projected that Mr. Trump had lost the state.[33] Using a baseball metaphor, the Governor told Mr. Trump that "it was the ninth inning, two outs and he was several runs down."[34] During the call, Mr. Trump raised false claims of election fraud; the Governor asked Mr. Trump to send evidence of the alleged fraud, and Mr. Trump suggested he would do so.[35] He never did.[36] In Pennsylvania, just two days after the election, the Chairman of the state's Republican Party, who had represented Mr. Trump in previous election litigation, refuted Mr.

---

[30] *See* ECF No. 252 at 30 & n.144; SCO-12998394 at 12 (Tr. of Georgia Secretary of State Call 01/02/2021).

[31] *See* ECF No. 252 at 32 & nn.157-159; SCO-11532925 at 53-56 (Int. Tr.); SCO-00829361 at 15-24 (HSC Tr.).

[32] *See* ECF No. 252 at 32-33 & nn.160-161; SCO-00829361 at 16-18 (HSC Tr.).

[33] *See* ECF No. 252 at 17 & n.63; SCO-12733339 at 3-5 (Int. Rep.); SCO-02296394 at 6 (Presidential Daily Diary 11/09/2020); *see also Democrats flip Arizona as Biden, Kelly score key election wins*, FOX NEWS (Nov. 3, 2020), https://www.foxnews.com/video/6206934979001; Jonathan J. Cooper and Anita Snow, *Biden wins Arizona, flips longtime Republican stronghold*, APNEWS.COM (Nov. 4, 2020), https://apnews.com/article/election-2020-joe-biden-donald-trump-race-and-ethnicity-legislature-218ad4d596e87c6b1a223f19f817776e.

[34] *See* ECF No. 252 at 17 & n.66; SCO-12733339 at 14 (Int. Rep.).

[35] *See* ECF No. 252 at 17 & nn.67-68; SCO-12733339 at 4 (Int. Rep.).

[36] *See* ECF No. 252 at 17 & n.68; SCO-12733339 at 4 (Int. Rep.).

Trump's claim that it was suspicious that his early lead was slipping away.[37]   The Chairman explained that there were still roughly 1,750,000 mail-in ballots being counted, which were expected to weigh heavily in Mr. Biden's favor.[38]   In the course of conversations like these, state officials—better positioned than Mr. Trump to know the facts in their states—repeatedly told Mr. Trump that his fraud claims were unfounded and that there was no evidence of substantial election fraud in their states.   And apart from Georgia's Secretary of State, Mr. Trump never contacted other election officials to determine whether there was merit to any specific allegation of election fraud in their states—even though they would have been the best sources to confirm or refute such claims.

B.    Mr. Trump's Fraudulent Elector Plan

As December 14—the date the ECA required each state's electors to vote and send their certificates of vote to Congress—approached, Mr. Trump and co-conspirators launched another plan.   Under this plan, they would organize the people who would have served as Mr. Trump's electors, had he won the popular vote, in seven states that Mr. Trump had lost—Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin—and cause them to sign and send to Washington false certifications claiming to be the legitimate electors.[39] Ultimately, as explained below, Mr. Trump and co-conspirators used the fraudulent certificates to

---

[37] See ECF No. 252 at 37-38 & nn.187-190; SCO-00016926 at 10-11, 19-23; SCO-02300357 at 3-4 (Presidential Daily Diary 11/06/2020).

[38] See ECF No. 252 at 38 & n.190; SCO-00016926 at 21.

[39] See ECF No. 252 at 48, 56 & n.301; SCO-02341381 (Fraudulent "Arizona's Electoral Votes for President and Vice President"); SCO-02341386 (Fraudulent "Georgia's Electoral Votes for President and Vice President"); SCO-02341398 (Fraudulent "Michigan's Electoral Votes for President and Vice President"); SCO-02341415 (Fraudulent "Nevada's Electoral Votes for President and Vice President"); SCO-02341409 (Fraudulent "New Mexico's Electoral Votes for President and Vice President"); SCO-02341435 (Fraudulent "Pennsylvania's Electoral Votes for President and Vice President"); SCO-02341449 (Fraudulent "Wisconsin's Electoral Votes for President and Vice President").

try to obstruct the congressional certification proceeding. The fraudulent elector plan's arc is reflected in a series of memoranda drafted in late November and early December by Co-Conspirator 5, who initially portrayed it as a contingency to preserve the possibility that Mr. Trump's electors' votes would be counted on January 6 if he prevailed in ongoing election litigation.[40] But as described below, the plan quickly transformed into a corrupt strategy to obstruct the certification proceeding and overturn the valid election results.[41]

Mr. Trump set the fraudulent elector plan into motion in early December, ensured that it was carried out by co-conspirators and Campaign agents in the targeted states, and monitored its progress. On December 6, for instance, Mr. Trump and Co-Conspirator 2 called the Chairwoman of the Republican National Committee and told her that it was important for the RNC to help organize Mr. Trump's elector nominees in the targeted states.[42] During the call, Co-Conspirator 2 told a lie that the co-conspirators would use to induce the cooperation of many of the fraudulent electors: that Mr. Trump's electors' votes would be used only if ongoing litigation in their state proved successful for Mr. Trump.[43] From that point on, Mr. Trump communicated with Co-Conspirators 1 and 2 about the plan, and they in turn communicated with Co-Conspirators 5 and 6.[44] At Co-Conspirator 1's direction, Co-Conspirator 5 generated and

---

[40] See ECF No. 252 at 48-49 & nn.250-253; SCO-00310619 (Co-Conspirator 5 memo 11/18/2020); SCO-00310626 (Co-Conspirator 5 memo 12/06/2020); SCO-00039311 (Co-Conspirator 5 memo 12/09/2020).

[41] See ECF No. 252 at 48-49 & nn.250-253; SCO-00310626 (Co-Conspirator 5 memo 12/06/2020); SCO-00039311 (Co-Conspirator 5 memo 12/09/2020); SCO-00039408 (Email from Co-Conspirator 5 12/08/2020).

[42] See ECF No. 252 at 50 & nn.258-260; SCO-00009955 at 8-10; SCO-00806514 at 7-10 (HSC Tr.).

[43] See ECF No. 252 at 50 & nn.258-260; SCO-00009955 at 10; SCO-00806514 at 9-10 (HSC Tr.).

[44] See ECF No. 252 at 50-51 & nn.266-267, 64 & nn.344-345, 65 & n.353; SCO-00245354 (Email among Campaign staff 12/14/2020); SCO-11572270 (Email from Co-Conspirator 6 12/09/2020); SCO-04858082 (Text messages between Campaign staff and Senior Advisor 12/13/2020); SCO-03661463 (Email from Co-Conspirator 5 12/11/2020); SCO-00039102 (Email from Co-Conspirator 6 to Co-Conspirator 5 12/10/2020); SCO-00039461 (Email from Co-Conspirator 5 to Co-Conspirator 6 and others 12/11/2020); SCO-00309939 (Email from

sent directions to the Trump electors in each targeted state on how best to mimic the manner in which the state required valid electors to gather and vote,[45] and Campaign staff and agents helped carry out Co-Conspirator 5's plans.[46]

For the most part, the co-conspirators deceived Mr. Trump's elector nominees in the targeted states by falsely claiming that their electoral votes would be used only if ongoing litigation were resolved in Mr. Trump's favor.[47]    Indeed, the co-conspirators deliberately

---

Co-Conspirator 5 to Co-Conspirator 1 12/13/2020); SCO-02296764 (Presidential Daily Diary 12/23/2020); SCO-02296763 at 7 (Presidential Daily Diary, Flight Manifest 12/23/2020); SCO-11618747 at 115, 156-158, 166-169 (Text messages including Co-Conspirator 6); SCO-02301015 at 4 (Presidential Daily Diary 01/04/2021).

[45] *See* ECF No. 252 at 51-52 & n.274; SCO-00039311 (Co-Conspirator 5 memo 12/09/2020); SCO-03660671 (Email from Co-Conspirator 6 to Co-Conspirator 5 12/11/2020); SCO-03661463 (Email from Co-Conspirator 5 12/11/2020); SCO-00039412 (Email from Co-Conspirator 5 to others, including Co-Conspirator 1 and Co-Conspirator 6 12/10/2020); SCO-00310094 (Email from Co-Conspirator 5 to Co-Conspirator 1 12/10/2020); SCO-00039381 (Email from Co-Conspirator 5 12/10/2020); SCO-03660648 (Email from Co-Conspirator 5 12/10/2020); SCO-03660731 (Email from Co-Conspirator 5 12/10/2020); SCO-00039442 (Email from Co-Conspirator 5 12/10/2020); SCO-05396682 (Text message from Co-Conspirator 6 12/13/2020); SCO-05389962-SCO-05389971 (Text messages between Campaign staffer and Co-Conspirator 5 12/13/2020).

[46] *See* ECF No. 252 at 51 & n.268; SCO-00310140 (Email from Co-Conspirator 6 12/09/2020); SCO-03660557 (Email from Co-Conspirator 6 to others, including Co-Conspirator 1 and Co-Conspirator 5 12/10/2020); SCO-00039412 (Email from Co-Conspirator 5 to others, including Co-Conspirator 1 and Co-Conspirator 6 12/10/2020); SCO-05390131-SCO-05390136 (Text messages between Co-Conspirator 6, Co-Conspirator 5, and Campaign staffer 12/11/2020); SCO-00430180 (Text messages between Co-Conspirator 6 and Campaign staffer 12/11/2020); SCO-00309359 (Email to Co-Conspirator 1 and Co-Conspirator 6 12/14/2020); SCO-00405057 (Email among Campaign staff 12/15/2020); SCO-06452193 (Email among Campaign staff 12/12/2020); SCO-00312444 (Text messages among Co-Conspirator 1, Co-Conspirator 6, and others 12/12/2020); SCO-12185268 (Email from Co-Conspirator 6 to Co-Conspirator 1 and others 12/13/2020); SCO-03656456 (Email from Co-Conspirator 5 to Campaign staffer 01/05/2021); SCO-00039215 (Email to Co-Conspirator 5 01/05/2021); SCO-04022107 (Email to Co-Conspirator 5 01/05/2021); SCO-04022176 (Text messages from Co-Conspirator 5 01/05/2021); SCO-12804411 (Text messages from Co-Conspirator 5 01/06/2021); SCO-12804414 (Text messages between Co-Conspirator 5 and Campaign staffer 01/05/2021); SCO-03666178 (Email from Co-Conspirator 5 01/05/2021); SCO-00038522, SCO-00038523, SCO-00038527 (Email with attachments 01/07/2021).

[47] *See, e.g.*, ECF No. 252 at 53 & n.282; *see, e.g.*, SCO-12949797 at 82-83 (Int. Tr.); SCO-11547433 at 4, 6 (Int. Rep.); SCO-00009540 at 15-16; SCO-00017495 at 42-45; SCO-11551879 at 51-55 (Int. Tr.); SCO-00017100 at 53-55; SCO-11548772 at 75-85 (Int. Tr.); SCO-11568208 at 107-109; SCO-11514688 at 6-7 (Int. Tr.); SCO-12832045 at 75-78 (Int. Tr.); SCO-12808771 at 24-30, 40-41 (Int. Tr.); SCO-11523905 at 153-154 (Int. Tr.); SCO-12741405 (Email from Co-Conspirator 5 12/14/2020); *see also* SCO-00310647 (Email to Co-Conspirator 1, Co-Conspirator 5, Co-Conspirator 6, and others 12/11/2020).

withheld from the elector nominees information showing otherwise.[48]   This deception was crucial to the conspiracy, as many who participated as fraudulent electors would not have done so had they known the true extent of the co-conspirators' plans.[49]   Not all of Mr. Trump's elector nominees were persuaded, forcing the co-conspirators to recruit substitutes in some of the targeted states.[50]   For example, one Trump elector nominee in Pennsylvania recognized the plan as "illegal" and an attempt "to overthrow the Government," and he declined to participate.[51] Conversely, a select few of Mr. Trump's agents and elector nominees had insight into the

---

[48] See ECF No. 252 at 53 & n.282; SCO-03660393 (Email from Co-Conspirator 5 to Campaign staff 12/10/2020); SCO-03660734 (Co-Conspirator 5 streamlined memo 12/10/2020); SCO-11509937 at 257-260 (Int. Tr.).

[49] See, e.g., SCO-12949797 at 121 (Int. Tr.) (Trump Elector: "Nobody—nobody suggested, hey, you know what, let's just get this signed because we're gonna put pressure on . . . Pence on the 6th.  Cause if I had known that was the plan, I wouldn't have signed a contingent on it."); SCO-00017495 at 57-58; SCO-11551879 at 89-90 (Int. Tr.) ("Q: [W]ould you have agreed to this plan if you knew that the forms you were signing might be used to delay or prevent the certification of the election on January 6, [2021]?  Trump Elector: Nobody told me, and I don't remember anything, so no.  And I would not agree for—if somebody else use this . . . for some other reasons.  Q: And . . . did anyone ever inform you that the documents you were signing on December 14, 2020 might be used as a reason not to count Georgia's electoral votes during the certification of the election on January 6, 2021?  A: No, nobody told me.  Q: Would you have agreed to that?  Trump Elector: No."); SCO-00017100 at 54-55; SCO-11548772 at 79 (Int. Tr.) (Trump Elector: "[M]y expectation was that the electoral votes that were cast were, were in the event that President Trump won New Mexico . . . and not to be used for any other purpose."); SCO-11568208 at 108; SCO-12832045 at 75 (Int. Tr.) ("Q: [W]ould you have wanted to know, before you cast that vote, if somebody else intended to use your vote to delay the certification, regardless of the outcome of the certification?  Trump Elector: I never thought about that.  Q: Is that something that would've mattered to you when you were deciding whether or not to cast the vote if, if they were gonna use it that way?  Trump Elector: Yes, it would've mattered. . . .  Because that's unethical.  Q: Okay.  And would it have mattered to you if somebody was going to try to convince Vice President Pence that he could just pick between these things, regardless of litigation?  Would you have wanted to know that before you cast your vote?  Trump Elector: . . . I hadn't thought of something that high up, quite frankly.  But my vote was not cast to be used for anything that was unethical, illegal, immoral, or not justified."); SCO-12808771 at 29, 40 (Int. Tr.) (Q: "[The certificates] were only to be used in the case that . . . something actually changed the outcome of the election in New Mexico?  Trump Elector: That's correct.  Q: And that was important to you?  Trump Elector: Yes. . . .  Q: And were you surprised by [how the certificates were used on January 6th]?  Trump Elector: Extremely surprised.").

[50] See, e.g., SCO-00016926 at 61-69; SCO-11531008 at 9-10 (Int. Tr.); SCO-11524990 at 14 (Int. Tr.); SCO-00312444 (Text messages among Co-Conspirator 1, Co-Conspirator 6, and others 12/12/2020); see also SCO-02341386 at 6-9 (Fraudulent "Georgia's Electoral Votes for President and Vice President") (noting substitute "electors"); SCO-02341398 at 4-5 (Fraudulent "Michigan's Electoral Votes for President and Vice President") (same); SCO-02341435 at 4-10 (Fraudulent "Pennsylvania's Electoral Votes for President and Vice President") (same).

[51] SCO-11531008 at 10, 79 (Int. Tr.).

ultimate plan to use the fraudulent elector certificates to disrupt the congressional certification on January 6 and willingly assisted.[52]   On December 9, after a phone call with Co-Conspirator 5, one of the Campaign's agents wrote in an email that Co-Conspirator 5's plan for the electors to "send[] in 'fake' electoral votes to Pence" was "[k]ind of wild/creative."[53]   Two and a half hours later, he replied to his own email and, as cover, wrote that "'alternative' votes is probably a better term than 'fake' votes" and that he agreed with a suggestion "to keep [the plan] under wraps until Congress counts the vote on Jan. 6th."[54]   In each of the targeted states, Mr. Trump and his co-conspirators successfully organized enough elector nominees and substitutes to gather on December 14, cast fraudulent electoral votes on his behalf, and send them to Washington, D.C., for the congressional certification[55]—a fact that the RNC Chairwoman relayed to Mr. Trump on the evening of December 14.[56]

At the same time that Mr. Trump's elector nominees in the targeted states were preparing to gather and cast fraudulent votes, his co-conspirators were planning to use them to overturn the election results at the January 6 certification.   On December 13, Co-Conspirator 5 sent Co-Conspirator 1 a memorandum that envisioned a scenario in which the Vice President would use the fraudulent slates to claim that there were dueling slates of electors from the targeted

---

[52] See ECF No. 252 at 53 & n.283; SCO-12876963 at 03:15-05:09 (Audio of Interview 12/16/2020); SCO-11572270 (Email from Co-Conspirator 6 12/09/2020).

[53] SCO-11572270 at 2 (Email to Co-Conspirator 6 12/08/2020).

[54] Id. at 1.

[55] See ECF No. 252 at 56 & n.301; SCO-02341381 (Fraudulent "Arizona's Electoral Votes for President and Vice President"); SCO-02341386 (Fraudulent "Georgia's Electoral Votes for President and Vice President"); SCO-02341398 (Fraudulent "Michigan's Electoral Votes for President and Vice President"); SCO-02341415 (Fraudulent "Nevada's Electoral Votes for President and Vice President"); SCO-02341409 (Fraudulent "New Mexico's Electoral Votes for President and Vice President"); SCO-02341435 (Fraudulent "Pennsylvania's Electoral Votes for President and Vice President"); SCO-02341449 (Fraudulent "Wisconsin's Electoral Votes for President and Vice President"); SCO-00405057 (Email to Campaign staff 12/15/2020).

[56] See ECF No. 252 at 57-58 & nn.308-310; SCO-00009955 at 64-66; SCO-00806514 at 18 (HSC Tr.); SCO-02270392 (Emails between RNC Chairwoman and Trump Executive Assistant 12/14/2020).

states and negotiate a solution for Mr. Trump to seize power.[57]   And on December 16, Co-Conspirator 5 traveled to Washington with a group of private attorneys who had done work for Mr. Trump's Campaign in Wisconsin for a meet-and-greet with Mr. Trump in the Oval Office;[58] as the group left, Co-Conspirator 5 had a direct, private conversation with Mr. Trump.[59]

Days later, on December 19, Mr. Trump publicly posted a Tweet demonstrating his own focus on the certification proceeding and directing his supporters to gather in Washington, D.C., to oppose it.  At 1:42 a.m., he posted a copy of a report falsely alleging outcome-determinative election fraud and wrote, "Statistically impossible to have lost the 2020 Election.  Big protest in D.C. on January 6th.  Be there, will be wild!"[60]   That same day, Co-Conspirator 5 notified another attendee of the December 16 Oval Office meeting of Mr. Trump's Tweet, and he indicated that Mr. Trump had privately foreshadowed his plans for January 6, writing, "Wow. Based on 3 days ago, I think we have unique understanding of this."[61]

### C.   Mr. Trump's Misuse of Official Power Through the Justice Department

As his efforts to directly pressure state officials to discount legitimate votes failed and the fraudulent elector plan unfolded, Mr. Trump also tried another tack: he attempted to wield federal power to perpetuate his fraud claims and retain office.  Mr. Trump was frustrated with the Justice

---

[57] See ECF No. 252 at 58 & n.312; SCO-05390160 (Text message from Co-Conspirator 6 to Co-Conspirator 5 and Campaign staffer 12/12/2020); SCO-00309946 (Email from Co-Conspirator 5 to Co-Conspirator 1 12/13/2020).

[58] See ECF No. 252 at 58 & n.315; SCO-00039255 (Email to Co-Conspirator 5 and others 12/15/2020); SCO-02337874, SCO-02337893, SCO-02337993 (Photographs of Oval Office Meeting 12/16/2020); SCO-02297155 at 2 (Presidential Daily Diary 12/16/2020); SCO-02297163 at 12-13 (Presidential Daily Diary 12/16/2020); SCO-11510314 at 86-90 (Int. Tr.).

[59] See ECF No. 252 at 59 & n.317; SCO-11621981 at 48-52 (Int. Tr.).

[60] See ECF No. 252 at 60 & n.319, 136 & n.632; SCO-00455253, SCO-12987427 (Donald J. Trump Tweet 12/19/2020).

[61] See ECF No. 252 at 60 & n.320; SCO-12982941 at 2 (Text messages from Co-Conspirator 5 12/19/2020).

Department because its criminal investigations had identified no evidence of substantial fraud[62] and the Attorney General had publicly acknowledged this fact in an interview on December 1 by saying, among other things, "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."[63]    As a result, Mr. Trump considered appointing Co-Conspirator 4—a Justice Department attorney who worked on civil matters—to be the Acting Attorney General, because as described below, Co-Conspirator 4 was willing to use the Justice Department to spread Mr. Trump's lies and pressure targeted states to overturn election results.[64]

Throughout the post-election period, Justice Department officials reviewed Mr. Trump's claims of election fraud, found no support for any of them, and informed him of such.[65]   In one such discussion, when the Acting Attorney General advised Mr. Trump that the Justice Department could not just "snap its fingers" and change the election outcome,[66] Mr. Trump told the Acting Attorney General and Acting Deputy Attorney General that they should "just say that the election was corrupt and leave the rest to me and the Republican congressmen."[67]   In the same call, alluding to replacing Justice Department leadership if they did not do as he directed, Mr. Trump also said, "people tell me [Co-Conspirator 4] is great.  I should put him in."[68]  Mr. Trump knew about Co-Conspirator 4 because he had been introduced to Co-Conspirator 4 by a

---

[62] *See, e.g.*, ECF No. 252 at 158-159; SCO-04957448 at 139-140 (SJC Tr.); SCO-00775937 at 59-63, 106-108 (HSC Tr.); SCO-12263324 at 5-12 (Handwritten notes 12/27/2020); SCO-00764172 at 18-19 (HSC Tr.).

[63] *See* ECF No. 252 at 158-159 & n.705; SCO-00689680 at 2 (Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, ASSOCIATED PRESS, Dec. 1, 2020).

[64] SCO-00775937 at 62, 107 (HSC Tr.); SCO-04957448 at 46-51 (SJC Tr.); SCO-11522446 at 23-24 (Int. Rep.); SCO-11511407 at 177-183 (Int. Tr.); SCO-11542142 at 90-98 (Int. Tr.); SCO-11517380 at 96-99 (Int. Tr.).

[65] *See, e.g.*, SCO-00775937 at 47-58 (HSC Tr.); SCO-00764172 at 18-19 (HSC Tr.).

[66] SCO-00775937 at 58 (HSC Tr.); SCO-12263324 at 8 (Handwritten notes 12/27/2020).

[67] SCO-00775937 at 58 (HSC Tr.); SCO-12263324 at 9 (Handwritten notes 12/27/2020).

[68] SCO-12264603 at 88 (SJC Tr.); *see also* SCO-00775937 at 62 (HSC Tr.).

Member of Congress and had been secretly engaging with Co-Conspirator 4, who was communicating with Mr. Trump in contravention of policies designed to protect the independence of the Justice Department.[69]

On December 28, as his secret communications with Mr. Trump continued, Co-Conspirator 4 emailed the Acting Attorney General and Acting Deputy Attorney General a proposed letter that falsely claimed that the Justice Department had "identified significant concerns that may have impacted the outcome of the election in multiple States" and recommended that those state legislatures convene in special session to reconsider certification of their electoral votes.[70]  Co-Conspirator 4 proposed to "send it to the Governor, Speaker, and President pro temp of each relevant state to indicate that in light of time urgency and sworn evidence of election irregularities presented to courts and to legislative committees, the legislatures thereof should each assemble and make a decision about elector appointment in light of their deliberations."[71]  Within about an hour of receiving the draft letter, the Acting Deputy Attorney General pointedly rejected Co-Conspirator 4's proposal, writing, "I know of nothing that would support the statement, 'we have identified significant concerns that may have impacted the outcome of the election in multiple states.'"[72]  He also observed that the Justice Department had no role in states' administration of their own elections, writing, "I cannot imagine a scenario in which the Department would recommend that a State assemble its

---

[69] SCO-02270007 (Email from  Co-Conspirator 4 12/22/2020) (coordinating arrival); SCO-04957448 at 84-86 (SJC Tr.); SCO-12420899, SCO-12420900 (Email with attachment 11/11/2020) (memo regarding White House communications); SCO-00827266 at 54-58 (HSC Tr.); SCO-12941569 (Signal messages between Co-Conspirator 4 and Member of Congress 12/21/20); SCO-12947964 (Signal messages between Co-Conspirator 4 and Member of Congress 12/22/20); SCO-12947874, SCO-12947878 (Signal messages between Co-Conspirator 4 and Member of Congress, with attachment 12/21/20).

[70] SCO-12481890, SCO-12481891 (Email from Co-Conspirator 4, with attachment 12/28/2020).

[71] Id.

[72] SCO-12392895 (Email to Co-Conspirator 4 12/28/2020).

legislature to determine whether already-certified election results should somehow be overridden by legislative action."[73]

Nonetheless, Mr. Trump continued to circumvent Justice Department leadership and engage directly with Co-Conspirator 4. With Mr. Trump's intervention, Co-Conspirator 4 obtained a highly classified briefing on foreign interference in the 2020 election on January 2, 2021—a briefing that yielded nothing to support the conspirators' allegations, as demonstrated by contemporaneous electronic messages between Co-Conspirator 4 and the same Member of Congress who had introduced Co-Conspirator 4 to Mr. Trump.[74] Yet the following day, Mr. Trump attempted to install Co-Conspirator 4 as the Acting Attorney General. On January 3, after Mr. Trump offered the position to Co-Conspirator 4 and Co-Conspirator 4 informed Justice Department senior leadership that he was accepting it,[75] Mr. Trump, Co-Conspirator 4, and senior officials from the Justice Department and White House Counsel's Office gathered for a hastily scheduled meeting in the Oval Office.[76] Mr. Trump made clear that he wanted to appoint Co-Conspirator 4 because Co-Conspirator 4 would cause the Justice Department to send to the targeted states the false letter that the Acting Attorney General and the Acting Deputy Attorney General had rejected as inaccurate and improper.[77] Mr. Trump ultimately did not do so only because he was informed that if he did, mass resignations within the Justice Department and the

---

[73] *Id.*

[74] SCO-12946533 at 2 (Signal messages between Co-Conspirator 4 and Member of Congress 01/02/2021) ("Bottom line is there is nothing helpful to P.").

[75] SCO-04957448 at 157-159 (SJC Tr.).

[76] SCO-12264603 at 47-48 (SJC Tr.); SCO-04957448 at 46-48 (SJC Tr.); SCO-11522446 at 23-24 (Int. Rep.); SCO-11542142 at 95 (Int. Tr.).

[77] SCO-12264603 at 49, 152-153 (SJC Tr.); SCO-04957448 at 48-52 (SJC Tr.); SCO-11542142 at 97-100 (Int. Tr.).

White House would result in Co-Conspirator 4 "leading a graveyard."[78]  Near the end of the meeting, when Co-Conspirator 4 raised the idea of the Justice Department opining on the Vice President's role during the congressional certification, Mr. Trump told all those assembled that no one other than him should be talking to the Vice President.[79]

D.    Mr. Trump's Pressure on the Vice President

Mr. Trump wanted no one else speaking with Vice President Pence because he and co-conspirators were already implementing a secret plan to use Mr. Pence's ministerial role as President of the Senate to Mr. Trump's advantage.  Co-Conspirator 2, with assistance from Co-Conspirators 5 and 6, spearheaded the execution of a strategy—which Co-Conspirator 2 had recently conceded was not supported by the Constitution or federal law[80]—for Mr. Pence to decline to count the legitimate electoral certificates in the targeted states where Mr. Trump's electors had signed fraudulent ones.[81]  In the weeks before the certification, Mr. Trump began pressuring Mr. Pence to cooperate, both directly and by mobilizing Mr. Trump's supporters.

In repeated conversations, day after day, Mr. Trump pressed Mr. Pence to use his ministerial position as President of the Senate to change the election outcome, often by citing false claims of election fraud as justification; he even falsely told Mr. Pence that the "Justice Department [was] finding major infractions."[82]  When Mr. Pence repeatedly refused to act as Mr.

---

[78] SCO-00709557 at 159 (SJC Tr.); SCO-11542142 at 99 (Int. Tr.); *see also* SCO-00775937 at 125 (HSC Tr.).

[79] SCO-11517380 at 101-104 (Int. Tr.).

[80] *See* ECF No. 252 at 61 & n.324; SCO-01576281 at 2, SCO-01576283 at 2 (Email from Co-Conspirator 2, with attachment 10/16/2020); SCO-12986301.

[81] *See* ECF No. 252 at 65 & n.352; SCO-12184337, SCO-12184338 (Email and memo from Co-Conspirator 2 to Co-Conspirator 5 and Co-Conspirator 6 12/23/2020); SCO-12101300, SCO-12101301 (Email and memo from Co-Conspirator 2 to Co-Conspirator 6 01/03/2021).

[82] *See, e.g.*, ECF No. 1 at ¶ 90; *see* ECF No. 252 at 62-74; *see, e.g.*, SCO-00014655 at 157-182; SCO-00014442 at 29-43 (Pence, *So Help Me God* pp. 441-455); SCO-04982306 (Handwritten notes 12/25/2020); SCO-04982309

Trump wanted,[83] Mr. Trump told him that "hundreds of thousands" of people would "hate his guts" and think he was "stupid," and that Mr. Pence was "too honest."[84]   Surrounding these communications, Mr. Trump frequently took to Twitter to exhort supporters to travel to Washington for January 6, such as when he tweeted on January 1, "The BIG Protest Rally in Washington, D.C., will take place at 11.00 A.M. on January 6th.   Locational details to follow. StopTheSteal!"[85]

On January 4, two days before the certification proceeding, Mr. Trump arranged for Mr. Pence to meet with Co-Conspirator 2 in the Oval Office, in hopes that Co-Conspirator 2 could convince Mr. Pence to accede.[86]   During the meeting, Co-Conspirator 2 outlined two ways that he claimed Mr. Pence could affect the election outcome using his role in the certification: he could reject the legitimate electors outright—denying Mr. Biden an electoral majority and likely sending the selection of the President to the House of Representatives, where fellow Republicans controlled the majority of state delegations—or he could send the elector slates to targeted states' legislatures for them to choose which electoral votes should be counted—affording Republican-controlled legislatures the opportunity to reject Mr. Biden's electors and replace them with Mr. Trump's.[87]   In response to Mr. Pence's questioning, Co-Conspirator 2 admitted that both

(Handwritten notes 12/29/2020); SCO-04982313 (Handwritten notes 01/02/2021); SCO-04982315 (Handwritten notes 01/03/2021); SCO-04982330 (Handwritten notes 01/04/2021).

[83] See, e.g., ECF No. 252 at 62 & nn.332-333, 63 & n.338, 65 & nn.349-350, 71 & nn.394-395; SCO-00014655 at 157-182; SCO-00014442 at 29-43 (Pence, So Help Me God pp. 441-455); SCO-04982330 (Handwritten notes 01/04/2021); SCO-04982320 at 2 (Handwritten notes 01/06/2021) (noting "I don't have the authority").

[84] See ECF No. 252 at 63 & n.338; SCO-00014442 at 34 (Pence, So Help Me God p. 446).

[85] See, e.g., ECF No. 252 at 64 & n.340; SCO-00455068, SCO-12987393 (Donald J. Trump Tweet 01/01/2021); see also, e.g., SCO-00455147, SCO-12987408 (Donald J. Trump Tweet 12/26/2020).

[86] See ECF No. 252 at 64 & nn.344-345, 65 & n.353; SCO-11618747 at 156-158, 166-169 (Text messages from Co-Conspirator 6 01/02/2021-01/05/2021); SCO-02301015 at 4 (Presidential Daily Diary 01/04/2021).

[87] See ECF No. 252 at 66 & n.362; SCO-00007167 at 50-51; SCO-11527024 at 187-189 (Int. Tr.); SCO-00016118 at 73-74; SCO-00014442 at 38-39 (Pence, So Help Me God pp. 450-451).

proposals violated the ECA and were untested.[88]   When Mr. Pence turned to Mr. Trump and pointed out that even "[Mr. Trump's] lawyer," Co-Conspirator 2, did not think Mr. Pence had the authority to return electoral votes to the states, Mr. Trump responded that he "like[d] the other thing better," which Mr. Pence understood to mean Mr. Pence simply rejecting the electoral votes outright.[89]   In the end, Mr. Pence again stated that he did not believe he could do what he was being asked.[90]

That night, Mr. Trump used a speech in Dalton, Georgia, to focus the crowd on the idea that Mr. Pence could change the results of the election, saying, "I hope Mike Pence comes through for us, I have to tell you.  I hope that our great Vice President, our great Vice President comes through for us. . . .  Of course, if he doesn't come through, I won't like him quite as much."[91]   The next day, on January 5, when Mr. Trump again failed to make headway with Mr. Pence in a private conversation, Mr. Trump warned that he would have to publicly criticize Mr. Pence.[92]   Mr. Trump then (in response to a *New York Times* report on the conversation between Mr. Trump and Mr. Pence) issued a false statement claiming, "The Vice President and I are in total agreement that the Vice President has the power to act."[93]

---

[88] *See* ECF No. 252 at 67 & n.363; SCO-00014442 at 38-39 (Pence, *So Help Me God* pp. 450-451); SCO-00007167 at 52-53; SCO-00016118 at 75-76.

[89] *See* ECF No. 252 at 67 & n.364; SCO-00014442 at 39 (Pence, *So Help Me God* p. 451); SCO-00007167 at 51; SCO-00016118 at 74-78.

[90] *See* ECF No. 252 at 67 & n.366; SCO-00014442 at 39 (Pence, *So Help Me God* p. 451); SCO-00007167 at 55-56.

[91] *See* ECF No. 252 at 68 & n.371; SCO-02235176 at 3 (Remarks by Mr. Trump at Victory Rally in Dalton, GA 01/04/2021); SCO-04976283 at 10:56-11:15 (Video of Dalton, GA speech 01/04/2021).

[92] *See* ECF No. 252 at 71 & nn.392-396; SCO-00016118 at 107-110; SCO-00014655 at 189, 193-200; SCO-00014442 at 41-42 (Pence, *So Help Me God* pp. 453-454); SCO-04982319 (Handwritten notes 01/05/2021).

[93] *See* ECF No. 252 at 72 & n.404; SCO-00444946 (Donald J. Trump Campaign Statement 01/05/2021); SCO-00016118 at 134-136; SCO-11545613 at 152-153 (Int. Tr.); SCO-00829440 at 222-225 (HSC Tr.); SCO-00810832 at 172-177 (HSC Tr.).

E.    Mr. Trump's Supporters Attack the United States Capitol

Mr. Trump's efforts to remain in power converged and culminated on January 6, the day that Mr. Biden was to be certified President. That day, Mr. Trump was scheduled to speak at the Ellipse to the crowd of supporters he had summoned to Washington with false claims of election fraud.[94] At around 1:00 a.m. on the morning of January 6, Mr. Trump tweeted: "If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!"[95] Just before he left the White House to give his speech at the Ellipse, Mr. Trump phoned Mr. Pence one last time;[96] when Mr. Pence told Mr. Trump that he planned to issue a public statement making clear that he lacked the authority to do what Mr. Trump wanted, Mr. Trump expressed anger at him.[97] He then directed staffers to re-insert into his planned Ellipse speech some language that he had drafted earlier targeting Mr. Pence.[98]

---

[94] *See* ECF No. 252 at 136 & nn.631-632, 139-140 & nn.642-645; SCO-00454954, SCO-12987365 (Donald J. Trump Tweet 01/05/2021); SCO-00455147, SCO-12987408 (Donald J. Trump Tweet 12/26/2020); SCO-00455067, SCO-12987392 (Donald J. Trump Tweet 01/01/2021); SCO-00454979, SCO-12987370 (Donald J. Trump Tweet 01/04/2021).

[95] *See* ECF No. 252 at 72-73 & n.405, 137 & n.636; SCO-00454942, SCO-12987357 (Donald J. Trump Tweet 01/06/2021).

[96] *See* ECF No. 252 at 73 & n.410, 140 & n.646; SCO-00014442 at 47-48 (Pence, *So Help Me God* pp. 459-460); SCO-11532623 at 203 (Int. Tr.); SCO-11534332 at 211 (Int. Tr.).

[97] *See* ECF No. 252 at 73-74 & n.411, 140 & n.647; SCO-11522446 at 25 (Int. Rep.); SCO-00014655 at 206-207; SCO-00014442 at 47-48 (Pence, *So Help Me God* pp. 459-460); SCO-04982320 (Handwritten notes 01/06/2021).

[98] *See* ECF No. 252 at 74 & n.412, 140 & n.648; SCO-00013901 at 59-60; SCO-02241925 (Save America Rally Draft Speech 01/06/2021); SCO-00017298 at 135-139; SCO-00842413 at 163-165 (HSC Tr.); SCO-02343119 (Email among Speechwriting staff 01/06/2021); SCO-02343413 (Email from Speechwriter 01/06/2021); SCO-00006256 at 160; SCO-11522446 at 26 (Int. Rep.).

During his speech at the Ellipse,[99] Mr. Trump made one more attempt to retain power. In his remarks, Mr. Trump repeated many of the same lies he had been telling for months—regarding dead voters, non-citizen voters, and vote dumps—and he told newer ones: lies that targeted states wanted to change their electors and that Mr. Pence had the authority, and might be persuaded, to change the election results.[100] The lie regarding Mr. Pence was particularly deceptive because Mr. Trump knew what his supporters in the crowd did not: that Mr. Pence had just told him in no uncertain terms that he would not do what Mr. Trump was demanding.

Mr. Trump told the crowd—a crowd of his supporters that he had remarked to advisors the night before was "angry"[101]—that the election had been stolen and the country would no longer exist if this purported crime were not stopped; and that the discovery of "fraud" licensed them to "go by very different rules."[102] Although Mr. Trump at one point also told his supporters to "peacefully and patriotically make [their] voices heard,"[103] he used the word "fight" more than ten times in the speech before concluding by directing his supporters to march to the Capitol to give allied Members of Congress "the kind of pride and boldness they need to take back our

---

[99] Mr. Trump's speech at the Ellipse on January 6, 2021, was a Campaign event. The rally at which Mr. Trump spoke was planned and executed by private political supporters, and it was completely funded by a $2.1 million private donation. Mr. Trump promoted the event using the word "rally," a word connoting a private political effort, and Mr. Trump's White House staff recognized the event to be a private, unofficial exercise. Finally, the speech itself used campaign language and closely resembled Mr. Trump's other campaign speeches, including one he had given in Dalton, Georgia, for the Senate runoff election just two days earlier. *See* ECF No. 252 at 118-126 & nn.577-598.

[100] *See* ECF No. 252 at 75-76 & nn.423-428; SCO-02244118 at 3, 6, 11-12, 16-17 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[101] *See* ECF No. 1 at ¶ 98; SCO-00015613 at 155-156.

[102] *See* ECF No. 252 at 77 & nn.432-436; SCO-02244118 at 19-20 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[103] *See* SCO-02244118 at 6 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

country."[104]  He also told the angry crowd that "if you don't fight like hell, you're not going to

have a country anymore."[105]  Throughout the speech, Mr. Trump gave his supporters false hope

that through such action, they could cause Mr. Pence to overturn the election results, even

improvising new lines directed at Mr. Pence as the speech went on.[106]

At Mr. Trump's urging, thousands of his supporters marched from the Ellipse to the

Capitol building.[107]  There, Mr. Pence began the certification at around 1:00 p.m.[108]  Outside the

building, the crowd swelled and broke through barriers cordoning off the grounds.[109]  The crowd

that attacked the Capitol was filled with Mr. Trump's supporters, as made clear by their Trump

shirts, signs, and flags.[110]  As described in detail below, the crowd violently attacked the law

enforcement officers attempting to secure the building.[111]

---

[104] *See* ECF No. 252 at 77–78 & nn.432-443; SCO-02244118 at 5, 6, 9, 22 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[105] *See* ECF No. 252 at 77–78 & nn.432-443; SCO-02244118 at 22 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[106] *See* ECF No. 252 at 76 & nn.430-431; SCO-02244118 at 3 (Remarks by Mr. Trump at Save America Rally 01/06/2021); *compare* SCO-02244118 at 16 (Remarks by Mr. Trump at Save America Rally 01/06/2021) *with* SCO-00745151 at 12 (Save America Rally teleprompter speech 01/06/2021).

[107] *See* ECF No. 252 at 78 & n.444; *see also, e.g.*, SCO-11506080 at 01:09:30 (Video of Save America Rally 01/06/2021); SCO-12918852 (Video of March to Capitol 01/06/2021); SCO-12919559 at 01:30-02:52 (Video of March to Capitol 01/06/2021); SCO-06614619 at 21:13-22:07 (Video of Fox News Coverage 01/06/2021).

[108] *See* ECF No. 252 at 78 & n.445; SCO-12945127 at 20:47 (Video of House Floor 01/06/2021); SCO-03666330 at 2 (Congressional Record 01/06/2021).

[109] *See* ECF No. 252 at 78 & n.448; *see also, e.g.*, SCO-12876233 at 02:20-03:50 (Video of Capitol Riot 01/06/2021).

[110] *See* ECF No. 252 at 78–79 & n.450, 82 & n.477; SCO-12806961 at 56:56, SCO-12919902 at 38:59, SCO-00029113, SCO-12738292, SCO-12806977 at 04:30 (Videos of Capitol Riot 01/06/2021); *see also* SCO-11506096 at 61-63 (Int. Tr.).

[111] *See* ECF No. 252 at 82 & nn.475-477; *see also, e.g.*, SCO-12919902 at 38:48, SCO-12738292, SCO-12806977 at 04:30, SCO-12738332, SCO-12919680 at 54:30 (Videos of Capitol Riot 01/06/2021).



Photograph of the Capitol on January 6, 2021 (John Manchillo/AP)[112]



Photograph of the Capitol on January 6, 2021 (Ken Cedeno/UPI)[113]

---

[112] Perry Stein, Aaron C. Davis, Spencer S. Hsu, and Tom Jackman, *FBI did not have undercover agents at Jan. 6 riots, watchdog says*, WASH. POST (Dec. 12, 2024), https://www.washingtonpost.com/national-security/2024/12/12/fbi-jan-6-report/.

[113] Doug Cunningham, *Jan. 6 rioters face criminal penalties as sentences, convictions mount*, UNITED PRESS INTERNATIONAL, INC. (June 2, 2023), https://www.upi.com/Top_News/US/2023/06/02/Jan-6-rioters-sentences-convictions/1151685561006/.



Photograph of the Capitol on January 6, 2021 (Shannon Stapleton/Reuters)[114]



Photograph of the Capitol on January 6, 2021 (Lev Radin/Pacific
Press/LightRocket/Getty Images)[115]

---

[114]  *Harrowing scenes from the Jan 6 U.S. Capitol attack*, REUTERS (Oct. 13, 2022),
https://www.reuters.com/news/picture/harrowing-scenes-from-the-jan-6-us-capit-idUSRTSC60V8/.

[115] Aaron Blake, *More Republicans now call Jan. 6 a 'legitimate protest' than a 'riot,'* WASH. POST (July 7, 2022),
https://www.washingtonpost.com/politics/2022/07/07/many-republicans-no-longer-call-jan-6-an-insurrection-or-
even-riot/.



Photograph of the Capitol on January 6, 2021 (David Butow/Redux)[116]



Photograph of the Capitol on January 6, 2021 (Roberto Schmidt/AFP via Getty Images)[117]

---

[116] Statement from Leaders, Updated: 'Our Children Are Watching': Nonprofit and Foundation Leaders Respond to Capitol Hill Violence, THE CHRONICLE OF PHILANTHROPY (Jan. 7, 2021), https://www.philanthropy.com/article/how-nonprofit-and-foundation-leaders-are-responding-to-capitol-hill-violence.

[117] Eric Westervelt, *Off-Duty Police Officers Investigated, Charged With Participating In Capitol Riot*, NPR (Jan. 15, 2021), https://www.npr.org/2021/01/15/956896923/police-officers-across-nation-face-federal-charges-for-involvement-in-capitol-ri.

After his speech, Mr. Trump returned to the White House and, at around 1:30 p.m., settled in the dining room off of the Oval Office.[118]  There, he watched television news coverage of events at the Capitol and reviewed Twitter on his phone.[119]  When the angry crowd advanced on the Capitol building and breached it at around 2:13 p.m., forcing the Senate to recess,[120] several of Mr. Trump's advisors rushed to the dining room and told him that a riot had started at the Capitol and that rioters were in the building.[121]  Over the course of the afternoon, they forcefully urged Mr. Trump to issue calming messages to his supporters.[122]  Mr. Trump resisted, repeatedly remarking that the people at the Capitol were angry because the election had been stolen.[123]

Just before 2:24 p.m., the news channel playing on the television in the dining room where Mr. Trump was sitting aired an interview with an individual marching from the Ellipse to the Capitol, who expressed his anger at Mr. Pence and stated, "But I still believe President

---

[118] See ECF No. 252 at 79 & n.452; SCO-00783547 at 36-39 (HSC Tr.); SCO-00015613 at 180.

[119] See ECF No. 252 at 79 & nn.451-452; SCO-00783547 at 38-39 (HSC Tr.); SCO-11528445 at 52-53 (Int. Tr.); SCO-00015613 at 183-185; SCO-00006256 at 164, 168; SCO-11522446 at 26 (Int. Rep.); SCO-00481112 (Spreadsheet of Data from Mr. Trump's White House Phone).

[120] See ECF No. 252 at 79 & n.453; SCO-12881998 at 01:04-01:25 (Video of Senate Wing Door CCTV 01/06/2021); SCO-12945145 at 44:16-44:36 (Video of Senate Floor 01/06/2021).

[121] See ECF No. 252 at 141 & n.653; SCO-00006256 at 163-166; SCO-00015002 at 37-38; SCO-00686662 at 117-119 (HSC Tr.) (recalling entering the dining room with Mr. Trump and conveying "this was a situation now out of control" while they were "all fixated on the television set"); SCO-11532623 at 222-228, 235 (Int. Tr.) (recalling Mr. Trump being told about riot at Capitol); SCO-00003294 at 114.

[122] See, e.g., ECF No. 252 at 141-142 & nn.653, 663; SCO-00015613 at 194-201; SCO-00003294 at 115-116, 121-123, 131-132; SCO-11511407 at 227-228 (Int. Tr.); SCO-00006256 at 164-166, 174; SCO-11522446 at 26 (Int. Rep.) (recalling presenting Mr. Trump with draft language for a statement that was never published); SCO-00015002 at 38; SCO-11542142 at 134-135 (Int. Tr.) ("I thought that the President had to issue a strong statement, quickly, telling everybody to leave the Capitol, and condemning what was going on there."); SCO-11532623 at 240, 262-265 (Int. Tr.) (recalling a staffer entering the dining room and telling Mr. Trump to "call for calm" and asking Mr. Trump's daughter to "come in to help advocate with the President").

[123] See ECF No. 252 at 141 & n.654; SCO-00006256 at 164-166; SCO-00015613 at 189, 202-203; SCO-00011109 at 179-182; SCO-11534332 at 193-194 (Int. Tr.) (recalling Mr. Trump commenting to House Minority Leader that "a lot of these people are upset with the election . . . they felt like it was stolen from him" and that "maybe these people are more upset about the election results than you are").

Trump has something else left."[124]  Then, at 2:24 p.m., sitting alone, Mr. Trump issued a Tweet attacking Mr. Pence and fueling the riot: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify.  USA demands the truth!"[125]  One minute later, the United States Secret Service was forced to evacuate Mr. Pence to a secure location at the Capitol.[126]  When an advisor at the White House learned this, he rushed to the dining room and informed Mr. Trump, who replied "So what?"[127]

The rioters at the Capitol had been motivated and directed by Mr. Trump, and he continued to resist advisors' requests to direct them to leave.  Throughout the afternoon, crowds at the Capitol hunted for Mr. Pence and other lawmakers, with some chanting, "Hang Mike Pence!"[128]  At 2:38 p.m. and 3:30 p.m., Mr. Trump issued two Tweets falsely suggesting that events at the Capitol were "peaceful" and asking individuals there (whom he termed "WE") to remain that way: "Please support our Capitol Police and Law Enforcement.  They are truly on the side of our Country.  Stay Peaceful!" and, "I am asking for everyone at the U.S. Capitol to remain peaceful.  No violence!  Remember, WE are the Party of Law & Order—respect the Law

---

[124] *See* ECF No. 252 at 79-80 & nn.452, 460; SCO-06614619 at 21:45-22:42 (Video of Fox News Coverage 01/06/2021).

[125] *See* ECF No. 252 at 80 & n.462, 141 & nn.655, 657; SCO-00456476, SCO-12987690 (Donald J. Trump Tweet 01/06/2021); SCO-00015613 at 188-189, 196-198; SCO-00011109 at 160-161.

[126] *See* ECF No. 252 at 81 & n.465, 141 & n.658; SCO-00029459 (Video of Pence Evacuation 01/06/2021).

[127] *See* ECF No. 252 at 142 & n.662; SCO-00009250 at 214-220.

[128] *See* ECF No. 252 at 81 & n.466; SCO-12876211, SCO-12738313, SCO-12738317, SCO-12738306, SCO-12738312 at 00:59-01:40 (Videos of Capitol Riot 01/06/2021).

and our great men and women in Blue.  Thank you!"[129]  At 4:17 p.m., he tweeted a video message in which he for the first time asked his supporters to leave the Capitol—while at the same time falsely claiming that "[w]e had an election that was stolen from us . . . a landslide election," and embracing the people who had attacked the Capitol, telling them "we love you, you're very special."[130]  And at 6:01 p.m., he tweeted, "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long.  Go home with love & in peace.  Remember this day forever!"[131]

At around the same time as he issued his 6:01 p.m. Tweet, Mr. Trump tried to reach two United States Senators, and he also directed Co-Conspirator 1 to call Members of Congress and attempt to enlist them to further delay the certification.[132]  When Mr. Trump's White House Counsel called him at around 7:00 p.m. and asked him to withdraw any objections to the certification, Mr. Trump refused.[133]  Nonetheless, the certification resumed late in the evening of

---

[129] *See* ECF No. 252 at 142 & nn.664-665; SCO-00454933, SCO-04963517, SCO-00454932, SCO-04963518 (Donald J. Trump Tweets 01/06/2021).

[130] *See* ECF No. 252 at 143 & n.666; SCO-00456473 (Video of Rose Garden Speech 01/06/2021); SCO-12876968 (Draft Tr. of Rose Garden Speech 01/06/2021).

[131] *See* ECF No. 252 at 143 & n.667; SCO-00456472, SCO-12987689 (Donald J. Trump Tweet 01/06/2021).

[132] *See* ECF No. 226 at ¶ 97(c) and (d); ECF No. 252 at 83-84 & nn.485-492; SCO-12706940 at row 1383 (Spreadsheet of Executive Assistant's text messages); SCO-02131850 at 2392 (Toll Records 01/06/2021); SCO-00009250 at 234-235; SCO-11616952 (Email from Executive Assistant 01/06/2021); SCO-00404535 (Text Message from Co-Conspirator 6 01/06/2021); SCO-11520423 (Co-Conspirator 1 Toll Analysis 01/06/2021); SCO-02035182 at 5396-5397 (Co-Conspirator 1 Toll Records 01/06/2021); SCO-02054919 at 71 (Co-Conspirator 1 Toll Records 01/06/2021); SCO-04134777 (Voicemail from Co-Conspirator 1 01/06/2021) (telling Senator, "We need you, our Republican friends, to try to just slow it down so we can get these legislatures to get more information to you.  And I know they're reconvening at eight tonight but the only strategy we can follow is to object to numerous states and raise issues so that we get ourselves into tomorrow—ideally until the end of tomorrow."); SCO-06475675 (Voicemail from Co-Conspirator 1 01/06/2021) (asking Senator to "object to every state and kind of spread this out a little bit like a filibuster").

[133] *See* ECF No. 1 at ¶ 120; SCO-00003294 at 141-143; SCO-02301375 at 4 (Presidential Daily Diary 01/06/2021).

January 6 and, at 3:41 a.m. on January 7, Mr. Pence announced the certified results of the 2020 presidential election in favor of Mr. Biden. [134]

As he did in his 4:17 p.m. and 6:01 p.m. Tweets on January 6, Mr. Trump has provided additional evidence of his intent by continuing to support and ally himself with the people who attacked the Capitol. He has called them "patriots"[135] and "hostages,"[136] reminisced about January 6 as a "beautiful day,"[137] and championed the "January 6 Choir,"[138] a group of January 6 defendants who, because of their dangerousness, are detained at the District of Columbia jail. [139]

---

[134] *See* ECF No. 252 at 85 & n.495; SCO-04955950 at 19:14-20:34 (Video of Congress Joint Session 01/06/2021); SCO-03666330 at 41 (Congressional Record 01/06/2021).

[135] *See* ECF No. 252 at 83 & n.478; SCO-04976301 at 16:52-17:02 (Video of Waco Rally 03/25/2023); SCO-04976442 at 48:29-48:44 (Video of Mr. Trump at Faith and Freedom Coalition 06/17/2022); SCO-04976291 at 16:42-16:58 (Video of Trump Interview 02/01/2022).

[136] *See* ECF No. 252 at 83 & n.479; SCO-12982756 at 35:50-36:22 (Video of Greensboro Rally 03/02/2024).

[137] *See* ECF No. 252 at 83 & n.481; SCO-12851309 at 45:18-45:40 (Video of Trump Interview 08/23/2023); SCO-04958191 at 7 (CNN Town Hall Tr. 05/10/2023).

[138] *See* ECF No. 252 at 83 & nn.482-483; SCO-04976301 at 03:00-05:35 (Video of Waco Rally 03/25/2023); SCO-12982756 at 35:50-36:21 (Video of Greensboro Rally 03/02/2024).

[139] *See United States v. Nichols*, No. 21-mj-29, ECF No. 9 (E.D. Tex. Jan. 25, 2021) (ordering pretrial detention in prosecution of defendant who later became a member of the "January 6 choir"); *United States v. Nichols*, No. 21-cr-117, ECF No. 75 (D.D.C. Dec. 23, 2021) (denying defendant's motion for pretrial release); *id.*, ECF No. 307 at 27 n.10, 35-36 (D.D.C. Apr. 30, 2024) (government sentencing memorandum referencing defendant's involvement in "January 6 choir"); *see also United States v. Mink*, No. 21-mj-105, ECF No. 19 (W.D. Pa. Jan. 29, 2021) (in prosecution of defendant who later became a member of the "January 6 choir," ordering defendant's pretrial detention); *United States v. Mink*, No. 21-cr-25, ECF No. 45 (D.D.C. Dec. 13, 2021) (court order denying defendant's motion to revoke pretrial detention); *United States v. Sandlin*, No. 21-mj-110, ECF No. 8 (D. Nev. Feb. 3, 2021) (ordering pretrial detention in prosecution of defendant who later became a member of the "January 6 choir"); *United States v. Sandlin*, No. 21-cr-88, ECF No. 31 (D.D.C. Apr. 13, 2021) (denying defendant's motion for release on bond); *id.*, ECF Nos. 44, 44-1 (D.D.C. Aug. 31, 2021) (mandate return following denial of defendant's appeal of pretrial detention order); *United States v. Shively*, No. 21-cr-151, ECF No. 42 (D.D.C. May 9, 2022) (in prosecution of defendant who later became a member of the "January 6 choir," revoking conditions of release and ordering pretrial detention); *United States v. Khater*, No. 21-cr-222, ECF No. 25 (D.D.C. May 12, 2021) (in prosecution of defendant who later became a member of the "January 6 choir," denying defendant's motion for release from custody); *United States v. McGrew*, No. 21-cr-398, ECF No. 40 (D.D.C. Nov. 2, 2021) (order of detention pending trial in prosecution of defendant who later became a member of the "January 6 choir").

II.    THE LAW

Based on the above facts, and after analyzing the relevant criminal statutes, the Office sought, and a grand jury found probable cause for, an indictment of Mr. Trump on four federal charges: conspiring to obstruct the governmental function of selecting and certifying the President of the United States, in violation of 18 U.S.C. § 371; obstructing and attempting to obstruct the official proceeding on January 6, 2021, in violation of 18 U.S.C. § 1512(c)(2); conspiring to obstruct the official proceeding, in violation of 18 U.S.C. § 1512(k); and conspiring to violate the federal rights of citizens to vote and have their votes counted, in violation of 18 U.S.C. § 241.  Because of the unprecedented facts and the variety of legal issues that would be litigated in this case, the Office was aware that the case would involve litigation risks, as would any case of this scope and complexity.  However, after an exhaustive and detailed review of the law, the Office concluded that the charges were well supported and would survive any legal challenges absent a change in the law as it existed at the time of indictment.

As set forth in Section V.D below, after the original indictment was returned, the Supreme Court ruled in *Trump v. United States*, 603 U.S. 593 (2024), that Mr. Trump had absolute immunity for core presidential conduct, enjoyed a rebuttable presumption of immunity for other official presidential acts, and had no immunity for unofficial conduct.  *Id.* at 606, 609, 614-615.

The Supreme Court's decision required the Office to reanalyze the evidence it had collected.  The original indictment alleged that Mr. Trump, as the incumbent President, used all available tools and powers, both private and official, to overturn the legitimate results of the election despite notice, including from official advisors, that his fraud claims were false and he had lost the election.  Given the Supreme Court's ruling, the Office reevaluated the evidence and assessed whether Mr. Trump's non-immune conduct—either his private conduct as a candidate or official conduct for which the Office could rebut the presumption of immunity—violated federal

law. The Office concluded that it did. After doing so, the Office sought, and a new grand jury issued, a superseding indictment with identical charges but based only on conduct that was not immune because it was either unofficial or any presumptive immunity could be rebutted. This section reviews the federal laws violated by Mr. Trump's non-immunized conduct.

A.    Conspiracy to Defraud the United States (18 U.S.C. § 371)

The defraud clause of the general conspiracy statute makes it a crime "[i]f two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371. The defraud clause applies not just to schemes to cheat the government out of money or property, but also to schemes "to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924). Under longstanding, established precedent, the government must prove the following elements to establish a violation of the defraud clause: (1) the defendant "entered into an agreement, (2) to obstruct a lawful function of the government or an agency of the government, (3) by deceitful or dishonest means, and (4) at least one overt act was taken in furtherance of that conspiracy." *United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 46 (D.D.C. 2018) (citation and quotations omitted); *see also Hammerschmidt*, 265 U.S. at 188; *United States v. Dean*, 55 F.3d 640, 647 (D.C. Cir. 1995). The Office concluded that Mr. Trump's conduct satisfied each of these established elements of a defraud-clause offense.

The process of selecting and certifying the President, as described above and prescribed by the Constitution and federal law, is plainly a lawful function of the federal government. *Cf. Ray v. Blair*, 343 U.S. 214, 224 (1952) (noting that "[t]he presidential electors exercise a federal function"); *Burroughs v. United States*, 290 U.S. 534, 545 (1934) (stating that electors "exercise

federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States"); *United States v. Brock*, 94 F.4th 39, 51 (D.C. Cir. 2024) (noting the "unique congressional function of certifying electoral college votes"). Indeed, Mr. Trump never challenged the indictment on that basis, though he filed more than 100 pages in support of dismissal motions. As the court of appeals found in the context of the immunity litigation in this case, "[f]ormer President Trump's alleged efforts to remain in power despite losing the 2020 election were, if proven, an unprecedented assault on the structure of our government." *United States v. Trump*, 91 F.4th 1173, 1199 (D.C. Cir. 2024), *vacated and remanded on other grounds*, 603 U.S. 593 (2024). Mr. Trump also sought to obstruct the certification; his sole objective was to ensure that no one other than himself was certified as the President. Nor is there any doubt that Mr. Trump conspired with others to achieve his goal, and that at least one overt act was committed.

With three of the four elements of a Section 371 violation established, the Office anticipated that a central dispute at trial would be whether Mr. Trump pursued his obstructive purpose by "deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt*, 265 U.S. at 188. The Office concluded that the evidence established beyond a reasonable doubt that he did.

The core of Mr. Trump's obstructive scheme was a false narrative of outcome-determinative voter fraud, which he and his surrogates frequently repeated and widely disseminated over the course of two months. Crucially, not only was Mr. Trump's voter-fraud narrative objectively false—he knew that it was false. Mr. Trump's false claims were repeatedly debunked, often directly to him by the very people best positioned to ascertain their truth. Campaign personnel told Mr. Trump his claims were unfounded; so did state officials, a White

House official who engaged with Mr. Trump in his capacity as a candidate, and even his own running mate.[140]  For example, Mr. Trump's Campaign Manager informed him that a claim that had been circulating—that a substantial number of non-citizens had voted in Arizona—was false.[141]  State officials issued public statements dispelling Mr. Trump's claims of widespread election fraud.[142]  Georgia's Secretary of State refuted multiple false claims of election fraud directly to Mr. Trump, including the false allegation that 5,000 dead people had voted in Georgia.[143]  When Mr. Trump raised various fraud allegations with Michigan's Senate Majority Leader, he was told that he had lost because he had underperformed with educated females.[144]  Vice President Pence told Mr. Trump that he had seen no evidence of outcome-determinative fraud in the election.[145]  And, tellingly, a Senior Advisor reiterated to Mr. Trump that Co-Conspirator 1 would be unable to prove his false fraud allegations in court, to which Mr. Trump responded, "The details don't matter."[146]

Courts in which Mr. Trump brought numerous lawsuits all rebuffed his claims, which in some instances prompted him to issue public rebukes acknowledging those decisions.[147]  Still

---

[140] See ECF No. 252 at 11-12 & nn.34-40, 13-14 & nn.45-51, 17-18 & n.69, 24 & nn.112-113, 29-30 & nn.136-144, 32-33 & nn.159-160, 38 & nn.189-191, 39 & n.200, 46-47 & nn.241-244; see also SCO-00006256 at 46-50, 70-77; SCO-12920242 at 1-7 (Int. Rep.); SCO-00014655 at 38-44, 63-66, 91-96, 98-102; SCO-00016750 at 58-63; SCO-11509251 at 40-42 (Int. Tr.); SCO-12998394 at 4, 6-10 (Tr. of Georgia Secretary of State Call 01/02/2021); SCO-00829361 at 15-17 (HSC Tr.); SCO-00016926 at 20-22; SCO-00003548 at 171; SCO-00009955 at 109-112.

[141] See ECF No. 226 at ¶ 18; ECF No. 252 at 17-18 & n.69; SCO-00016750 at 58-63.

[142] See ECF No. 226 at ¶ 13; ECF No. 252 at 14 & nn.52-53; see also supra at n.12.

[143] See ECF No. 252 at 29-30 & nn.136-144; SCO-12998394 at 4, 6-10 (Tr. of Georgia Secretary of State Call 01/02/2021).

[144] See ECF No. 252 at 32-33 & nn.159-160; SCO-00829361 at 15-17 (HSC Tr.).

[145] See ECF No. 252 at 12 & n.40; SCO-00014655 at 38-44.

[146] See ECF No. 252 at 11-12 & nn.34-35; SCO-00006256 at 46-49; SCO-12920242 at 1, 4 (Int. Rep.).

[147] See ECF No. 252 at 36 & nn.181-182, 41 & nn.208-210, 44-45 & nn.225-230; see also, e.g., Law v. Whitmer, No. 20OC001631B, Order at 13-24, 28-34 (Nev. Dist. Ct. Dec. 4, 2020), https://electioncases.osu.edu/wp-content/uploads/2020/11/Law-v-Gloria-Order-Granting-Motion-to-Dismiss.pdf  [https://perma.cc/32U2-BTA6];

other federal and state officials—some appointed by Mr. Trump, and others who publicly supported and voted for him—publicly debunked allegations of outcome-determinative voter fraud.[148] Mr. Trump did not reach out to any of these officials to ask relevant questions about the election because he was not seeking honest answers. This was a pattern revealed throughout the investigation: Mr. Trump unquestioningly accepted at face value and amplified election fraud claims that benefited his quest to retain power. Conversely, he avoided consulting informed sources, such as state election officials, who possessed evidence that could debunk his claims. The Office concluded that this consistent pattern would constitute powerful proof at trial that Mr. Trump knew the claims he was making were false.

Mr. Trump's false claims were often divergent from one day to the next and otherwise internally inconsistent.[149] For example, in Arizona, the conspirators started with the allegation that 36,000 non-citizens voted in that state;[150] five days later, it was "beyond credulity that a few hundred thousand didn't vote";[151] three weeks later, "the bare minimum [was] 40 or 50,000. The reality is about 250,000";[152] days after that, the assertion was 32,000;[153] and ultimately, the

---

*Trump v. Biden*, 394 Wis. 2d 629, 633 (Wis. 2020); SCO-00455197, SCO-00455196, SCO-00455195, SCO-12987423, SCO-12987422, SCO-12987421 (Donald J. Trump Tweets 12/21/2020).

[148] *See* ECF No. 252 at 14 & nn.52-53, 20 & nn.86-87, 23 & n.106, 33 & n.165, 38 & n.192, 42 & n.212, 42-43 & n.216, 46 & nn.238-239; *see also supra* at n.12; SCO-04976277 (Video of Georgia Secretary of State Press Conference 12/07/2020); SCO-11509450 at 103-104 (Int. Tr.); SCO-03036930 (Joint Statement on Election Security 11/12/2020); SCO-04952679 (Tweet 11/17/2020); SCO-07167983 (Email from GOP Comms Alert circulating Associated Press article titled "Barr: No evidence of fraud that'd change election outcome" 12/01/2020).

[149] *See* ECF No. 252 at 15 & nn.55-59; SCO-04976384 at 20:46-21:05 (Common Sense episode 89 11/25/2020); SCO-04976459 at 02:06:23-02:07:00 (Video of Arizona State Hearing 11/30/2020); SCO-06628641 at 18:52-19:42 (War Room episode 608 12/24/2020); SCO-06628646 at 35:19-35:45 (War Room episode 625 01/02/2021).

[150] *See* ECF No. 252 at 15 & n.55; SCO-04976384 at 20:46-21:05 (Common Sense episode 89 11/25/2020).

[151] *See* ECF No. 252 at 15 & n.56; SCO-04976459 at 02:06:23-02:07:00 (Video of Arizona State Hearing 11/30/2020).

[152] *See* ECF No. 252 at 15 & n.57; SCO-06628641 at 18:52-19:42 (War Room episode 608 12/24/2020).

[153] *See* ECF No. 252 at 15 & n.58; SCO-06628646 at 35:19-35:45 (War Room episode 625 01/02/2021).

conspirators landed back where they started, at 36,000—a false figure that they never verified or corroborated. [154]  And in Georgia, the conspirators initially suggested that a large enough number of dead voters had cast ballots to overcome Mr. Trump's losing margin of about 12,000 voters;[155] one month later, the number was 10,315;[156] three days after that, the assertion was "close to 5,000 people";[157] and then two days later, the number bounced back to 10,315. [158]  Mr. Trump bears legal responsibility for each of these false claims because they were made by him and his co-conspirators in furtherance of the conspiracy that he led.  *See Salinas v. United States*, 522 U.S. 52, 63-64 (1997) ("The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other."); *see also* Fed. R. Evid. 801(d)(2)(E) (statement by an opposing party's "conspirator during and in furtherance of the conspiracy" is admissible against that party); *United States v. Brockenborrugh*, 575 F.3d 726, 735 (D.C. Cir. 2009); *United States v. Tarantino*, 846 F.2d 1384, 1411-1412 (D.C. Cir. 1988).

The Office developed further evidence of Mr. Trump's knowledge that his claims were untrue from witnesses who reported that he planned to use fraud claims before the election had even happened.  For instance, in advance of the election, advisors told Mr. Trump that the election would be close and that initial returns might be misleading, showing an early lead for Mr. Trump that would diminish as mail-in ballots were counted.  In response, Mr. Trump suggested that if that prediction were true—which it ultimately was—he would simply declare

---

[154] *See* ECF No. 252 at 15 & n.59; SCO-04976283 at 01:04:04-01:04:13 (Video of Dalton, GA speech 01/04/2021); SCO-02244118 at 17 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[155] *See* ECF No. 252 at 21 & n.96; SCO-04976323 at 22:43-23:51 (Video of Trump Interview 11/29/2020).

[156] SCO-04976407 at 03:29:00-03:29:34 (Video of Georgia Senate Judiciary Subcommittee Hearing 12/30/2020).

[157] *See* ECF No. 252 at 30 & n.142; SCO-12998394 at 3 (Tr. of Georgia Secretary of State Call 01/02/2021).

[158] *See* ECF No. 252 at 122-123 & n.592; SCO-04976283 at 53:25-53:59 (Video of Dalton, GA speech 01/04/2021).

victory before all ballots were counted and a winner was projected.[159]  He also made repeated

public statements in the lead-up to election day in which he sowed public doubt in the election

results, setting the stage for his later fraud claims.[160]  And Mr. Trump made his first statement

claiming fraud in the election only hours after polls closed—when no investigations had begun,

much less concluded.[161]

Mr. Trump's intent in spreading knowing falsehoods was further evidenced by statements

he made to those around him.  In private—in contrast with his public false claims—Mr. Trump

made admissions that reflected his understanding that he had lost.  In a private moment, Mr.

Trump confessed to his family members that "it doesn't matter if you won or lost the election.

You still have to fight like hell."[162]  When President-elect Biden appeared on television in

November, Mr. Trump said to a staffer, "can you believe I lost to this f'ing guy?"[163]  And when

his own Vice President declined to join the conspiracy, Mr. Trump berated him for being "too

honest."[164]

Because the evidence showed that Mr. Trump knew his claims were false, it amply

satisfied the mens rea standard for a Section 371 charge, which would be satisfied by evidence

that Mr. Trump either knew his fraud claims were false or that he acted with deliberate disregard

for their truth or falsity.  The concept of deliberate disregard—sometimes referred to as reckless

---

[159] *See* ECF No. 252 at 5 & nn.2-4; SCO-11621981 at 74-83, 92-93 (Int. Tr.); SCO-00016750 at 14-18, 27-30; SCO-00006819 at 9-12, 19-20; SCO-00003548 at 8-29; SCO-00016118 at 144-145.

[160] *See* ECF No. 252 at 6 & nn.5-10; SCO-00712149 at 37:20 (Video of Trump Interview on Fox News 07/19/2020); SCO-12998418 (Donald J. Trump Tweet 07/30/2020); SCO-12992141 at 57:33 (Video of Oshkosh, WI Rally 08/17/2020); SCO-12992142 at 22:08 (Video of Trump Speech 08/24/2020); SCO-12992143 at 03:11-03:28 (Video of Trump Statement 10/27/2020).

[161] *See* ECF No. 252 at 7-8 & n.16; SCO-04976258 (Video of White House Speech 11/04/2020).

[162] *See* ECF No. 252 at 14-15 & n.54; SCO-00009250 at 156; SCO-11529771 at 99-102 (Int. Tr.).

[163] SCO-11521307 at 88 (Int. Tr.).

[164] *See* ECF No. 252 at 63 & n.338; SCO-00014442 at 34 (Pence, *So Help Me God* p. 446).

disregard, or reckless or deliberate indifference—has deep roots in the law of fraud. *See U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750-752 (2023); 1 J. Story, *Commentaries on Equity Jurisprudence* § 193 (10th ed. 1870) ("Whether the party, thus misrepresenting a material fact, knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know or believe to be true is equally, in morals and law, as unjustifiable as the affirmation of what is known to be positively false."). That concept is reflected in case law and jury instructions for the District of Columbia, as well as precedent from every other circuit. *See, e.g.*, *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1121 (D.C. Cir. 2009); 1 Criminal Jury Instructions for the District of Columbia 5.200 (2024).[165]    Here, the evidence showed that Mr. Trump decided, even before the election, that he would allege outcome-determinative fraud, whether it occurred or not, if he were not declared the winner, and he adhered to that plan—repeating false claims that he knew to be untrue.

Although Mr. Trump's conduct fell comfortably within the established elements of a defraud-clause offense, the Office noted that the Supreme Court has in several recent decisions limited the reach of other federal fraud and obstruction statutes. *See, e.g.*, *Ciminelli v. United States*, 598 U.S. 306 (2023) (reversing conviction of construction contractor for wire fraud, 18 U.S.C. § 1343, for scheming with public official to tailor bid requirements for government contracts to favor himself because the government did not prove the defendant deprived the victim of a traditional property interest); *Kelly v. United States*, 590 U.S. 391 (2020) (reversing

---

[165] *See also, e.g.*, *United States v. Correia*, 55 F.4th 12, 26 (1st Cir. 2022); *Knickerbocker Merchandising Co. v. United States*, 13 F.2d 544, 546 (2d Cir. 1926); *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995); *United States v. Hester*, 880 F.2d 799, 803 (4th Cir. 1989); *United States v. Dillman*, 15 F.3d 384, 392-393 (5th Cir. 1994); *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013); *United States v. Schwartz*, 787 F.2d 257, 265 (7th Cir. 1986); *United States v. Marley*, 549 F.2d 561, 563-564 (8th Cir. 1977) ("It must also be noted that the courts have long recognized that scienter may be established where reckless disregard of truth or falsity is present."); *United States v. Dearing*, 504 F.3d 897, 903 (9th Cir. 2007); *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997); *United States v. Clay*, 832 F.3d 1259, 1311 (11th Cir. 2016).

convictions for wire fraud, 18 U.S.C. § 1343, and federal program fraud, 18 U.S.C. § 666, where defendants aimed to inflict political retribution on mayor by closing lanes of a bridge that served the mayor's city because the object of the scheme was not to obtain money or property); *Skilling v. United States*, 561 U.S. 358 (2010) (paring back honest-services fraud statute, 18 U.S.C. § 1346, to reach only core bribery and kickbacks and reversing conviction of executive who was convicted of making false statements to inflate his company's value but was not alleged to have taken bribes or kickbacks for his efforts); *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) (requiring showing of knowingly corrupt conduct under obstruction of justice statute, 18 U.S.C. § 1512(b)(2), and reversing conviction of accounting firm convicted of shredding documents in advance of an SEC investigatory demand based on failure of jury instructions to convey the requisite consciousness of wrongdoing).  Given these decisions restricting the reach of other fraud and corruption statutes, the Office considered whether the Supreme Court might also adopt a new construction of the defraud clause in Section 371, such as one that would for the first time limit it to money or property fraud.

The Office concluded, however, that the creation of such a new rule would not be supported in the law given that the well-established elements of a defraud-clause offense are firmly grounded in the statute's text, history, and longstanding judicial precedent.  For more than a hundred years, the Supreme Court has "stated repeatedly that the fraud covered by the statute reaches any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government" and that this branch of liability is distinct from money-or-property limitations in other areas of fraud law.  *Tanner v. United States*, 483 U.S. 107, 128 (1987) (citation and quotations omitted); *see Dennis v. United States*, 384 U.S. 855, 861 (1966) ("It has long been established that this statutory language is not confined to fraud as that term has

been defined in the common law.  It reaches any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government.") (citation and quotations omitted); *Glasser v. United States*, 315 U.S. 60, 66 (1942) (upholding prosecution of a federal prosecutor for conspiring to receive bribes to influence his official duties; no financial fraud against the United States alleged: "The indictment charges that the United States was defrauded by depriving it of its lawful governmental functions by dishonest means; it is settled that this is a 'defrauding' within the meaning of Section 37 of the Criminal Code," the predecessor to Section 371); *Hammerschmidt*, 265 U.S. at 188 ("To conspire to defraud the United States . . . also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.  It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention."); *Haas v. Henkel*, 216 U.S. 462, 479 (1910) ("[I]t is not essential that such a conspiracy shall contemplate a financial loss or that one shall result.  The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government.").

Against the backdrop of that Supreme Court precedent, Congress has reenacted—and indeed expanded the scope of—the defraud clause, reflecting congressional ratification of the Court's construction of it.  *See, e.g.*, *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-240 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.") (citation and quotations omitted).  In 1948, for instance, when Congress codified the general conspiracy

statute, 18 U.S.C. § 371, where the defraud clause currently resides, *see* Pub. L. No. 80-772, 62 Stat. 701, it was already "settled" that "defraud[ing]" the United States "by depriving it of its lawful governmental functions by dishonest means . . . is a 'defrauding' within the meaning of" the defraud clause, *Glasser*, 315 U.S. at 66, and at that time, Congress added the words "or any agency thereof" in the defraud clause after "United States." Pub. L. No. 80-772, 62 Stat. 701. The House Report from the Judiciary Committee accompanying the pertinent bill specifically stated that the amendment was designed "[t]o reflect the construction placed upon [the predecessor statute] by the courts." H.R. Rep. No. 80-304, at A28 (1947). And it has consistently been the Department's position in litigation that the defraud clause proscribes conspiracies to obstruct a lawful function of the federal government through deceit. *See, e.g.*, *Gas Pipe, Inc. v. United States*, No. 21-183, 2021 WL 5193105, Brief in Opp'n (U.S. Oct. 8, 2021) (stating petitioners' contention that defraud clause is limited to money and property schemes is "inconsistent with over a century of [Supreme Court] precedent"); *Flynn v. United States*, No. 20-1129, 2021 WL 7210413, Brief in Opp'n (U.S. May 19, 2021) (stating defraud clause is not unconstitutionally vague in part because of the Supreme Court's longstanding interpretation that interference or obstruction must be by deceit or dishonest means); *Coplan v. United States*, No. 12-1299, 2013 WL 3324197, Brief in Opp'n (U.S. July 1, 2013) (explaining that petitioner's claim that the decisions in mail- and wire-fraud cases like *McNally v. United States*, 483 U.S. 350 (1987), and *Skilling* undermine "longstanding, congressionally adopted construction of the defraud clause" is erroneous and misplaced, and "disregards important limitations inherent in the defraud clause," including the requirement that "a conspiracy under the defraud clause must be deceptive or deceitful").[166] Accordingly, the Office concluded that

---

[166] The Supreme Court denied certiorari in each of these cases. *See Gas Pipe, Inc. v. United States*, 142 S. Ct. 484

Mr. Trump's conduct fell within the scope of Section 371 given the statute's longstanding, congressionally ratified construction, and its historic use by the Justice Department.

The Office also recognized various limiting principles in the application of Section 371 that separate Mr. Trump's conduct from mere hardscrabble politics. A defraud-clause violation, as honed by years of judicial decisions, including repeated applications by the Supreme Court, requires not only an agreement among co-conspirators, but identification of a specific function of the federal government, the intent to obstruct that function through deceit, and an overt act. *See, e.g., United States v. Johnson*, 383 U.S. 169, 172, 184-185 (1966) (in exchange for undisclosed "campaign contributions" and "legal fees," congressman conspired to defeat the lawful functions of the Department of Justice by urging dismissal of pending indictments). First, a defraud clause conspiracy must be targeted at a lawful function of the United States or any agency thereof. *See, e.g., United States v. Haldeman*, 559 F.2d 31, 121 (D.C. Cir. 1976) ("The unlawful agreement to attempt to use the CIA to interfere with the investigation of the Watergate break-in was thus fairly charged in Count 1 of the indictment as one of the means by which the defendants intended to accomplish one of the principal objects of their conspiracy defrauding the United States of its right to have its officials and agencies transact their business honestly, impartially, and free from corruption or undue influence or obstruction."). In contrast, a conspiracy targeted at a private party or at a state or local government does not suffice, even if the entity receives federal funds or "serve[s] as an intermediary performing official functions on behalf of the Federal Government." *Tanner*, 483 U.S. at 130-131. Second, obstruction of the governmental function must be "a *purpose* or *object* of the conspiracy, and not merely a foreseeable consequence of the conspiratorial scheme." *United States v. Goldberg*, 105 F.3d 770, 773 (1st Cir. 1997) (emphasis

(2021); *Flynn v. United States*, 141 S. Ct. 2853 (2021); *Coplan v. United States*, 571 U.S. 819 (2013).

in original) (citing *Dennis*, 384 U.S. at 861).    Thus, for example, financial crimes do not "automatically become federal conspiracies to defraud the IRS," simply because the crime may have foreseeable tax implications.    *Id.*  And this requirement means that the conspiracy must be aimed at defeating and obstructing the government function, rather than simply participating in it.    Third, the defraud clause "is limited only to wrongs done 'by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt*, 265 U.S. at 188.    Fourth, the overt-act requirement provides another limitation, the function of which is "to manifest that the conspiracy is at work, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence."    *Yates v. United States*, 354 U.S. 298, 334 (1957) (citation and quotations omitted), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).  Finally, while a court in the District of Columbia has stated that materiality is not an element of a defraud-clause conspiracy, *see Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d at 50 n.5, the Office was prepared to prove the materiality of Mr. Trump's deceptive statements and to offer a materiality instruction as another limitation on the scope of Section 371.  Under that limitation, even conspirators who make knowingly false statements with an obstructive intent will not violate the defraud clause unless their statements are material.

All of these requirements for establishing a conspiracy to defraud under Section 371, taken collectively, ensure that common political conduct or political speech does not fall within the scope of the defraud clause.  The evidence collected during the investigation met these requirements as to Mr. Trump's conduct.

B.    <u>Obstruction and Conspiracy to Obstruct (18 U.S.C. § 1512(k) and (c)(2))</u>

The federal statute prohibiting obstruction of an official proceeding makes it a crime to "corruptly (1) alter[], destroy[], mutilate[], or conceal[] a record, document, or other object, or attempt[] to do so, with the intent to impair the object's integrity or availability for use in an

official proceeding; or (2) otherwise obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so."  18 U.S.C. § 1512(c).  A separate provision defines the term "official proceeding" to include a "proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).

In *Fischer v. United States*, 603 U.S. 480 (2024), decided during the pendency of Mr. Trump's immunity appeal, the Supreme Court clarified the scope of an obstruction offense under Section 1512(c)(2), holding that the statute applies only when a defendant impairs (or attempts to impair) "the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding."  *Id.* at 498.  In language that applies directly to the allegations in the superseding indictment, the Supreme Court explained that Section 1512(c)(2)'s criminal prohibition includes "creating false evidence."  *Id.* at 491.  Before seeking the original indictment—which, like the superseding indictment, alleged that one component of Mr. Trump's and his co-conspirators' obstruction involved replacing valid elector certificates from the contested states with false ones they had manufactured—the Office anticipated the possibility of such a result in *Fischer* and confirmed that the evidence would prove Mr. Trump's guilt beyond a reasonable doubt even under a narrow interpretation of Section 1512(c)(2).  *See* ECF No. 139 at 20-21.  In construing Section 1512(c)(2) to reach impairing or attempting to impair the integrity or availability of records, documents, or other objects through "creating false evidence," the Supreme Court cited *United States v. Reich*, 479 F.3d 179, 183, 185-187 (2d Cir. 2007) (Sotomayor, J.), in which a defendant was convicted under Section 1512(c)(2) after he forged a court order and sent it to an opposing party intending to cause that party to withdraw a mandamus petition then pending before an appellate court.  Just as the defendant in *Reich* violated Section 1512(c)(2) by "inject[ing] a false order into ongoing litigation to which he was a party," *id.* at 186, the evidence showed that the co-conspirators created fraudulent electoral

certificates that they intended to introduce into the congressional certification proceeding on January 6 to obstruct it. [167]

The Office was also prepared to prove that Mr. Trump willfully caused his supporters to obstruct and attempt to obstruct the proceeding by summoning them to Washington, D.C., and then directing them to march to the Capitol to cause the Vice President and legislators to reject the legitimate certificates and instead rely on the fraudulent electoral certificates. [168]  *See* 18 U.S.C. § 2(b) (making a defendant criminally liable for "willfully caus[ing] an act to be done which if directly performed by him or another would be" a federal offense); *United States v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999) (upholding a conviction for willfully causing a violation of 18 U.S.C. § 1001).  The Supreme Court's opinion in *Fischer* therefore did not undermine the viability of the Section 1512 counts.

Much of the evidence that supports the Section 371 conspiracy to defraud likewise proves that Mr. Trump and co-conspirators violated Section 1512(k) and Section 1512(c)(2).  To demonstrate a violation of Section 1512(c)(2) following *Fischer*, the government must prove (1) the defendant obstructed, influenced, or impeded an official proceeding, or attempted to do so, (2) in the course of doing so, the defendant committed or attempted to commit an act that

---

[167] *See* ECF No. 252 at 48-49 & nn.251-254, 51-52 & n.274, 56-57 & nn.302-307, 58 & n.312, 65 & n.352; SCO-02341381 (Fraudulent "Arizona's Electoral Votes for President and Vice President"); SCO-02341386 (Fraudulent "Georgia's Electoral Votes for President and Vice President"); SCO-02341398 (Fraudulent "Michigan's Electoral Votes for President and Vice President"); SCO-02341415 (Fraudulent "Nevada's Electoral Votes for President and Vice President"); SCO-02341409 (Fraudulent "New Mexico's Electoral Votes for President and Vice President"); SCO-02341435 (Fraudulent "Pennsylvania's Electoral Votes for President and Vice President"); SCO-02341449 (Fraudulent "Wisconsin's Electoral Votes for President and Vice President"); SCO-00310626 (Co-Conspirator 5 memo 12/06/2020); SCO-00039408 (Email from Co-Conspirator 5 12/08/2020); SCO-00309946 (Email from Co-Conspirator 5 to Co-Conspirator 1 12/13/2020); SCO-12184337, SCO-12184338 (Email from Co-Conspirator 2 to Co-Conspirator 5 and Co-Conspirator 6, with attachment 12/23/2020) (memo); SCO-12101300, SCO-12101301 (Email from Co-Conspirator 2 to Co-Conspirator 6, with attachment 01/03/2021) (memo).

[168] *See* ECF No. 252 at 72-73 & nn.405-407, 74 & nn.411-414, 75 & n.422, 76-78 & nn.428-444, 80 & n.462; *see also, e.g.*, SCO-00455253, SCO-12987427 (Donald J. Trump Tweet 12/19/2020); SCO-00455068, SCO-12987393 (Donald J. Trump Tweet 01/01/2021); SCO-02244118 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

impaired the integrity or rendered unavailable records, documents, objects, or other things for use in the official proceeding, (3) the defendant intended to impair the integrity of or render unavailable such records, documents, objects, or other things for use in the official proceeding, and (4) the defendant acted corruptly. *See United States v. Baez*, No. 21-cr-507, ECF No. 106 at 8 (D.D.C. Sept. 23, 2024) (describing elements required to establish a violation of Section 1512(c)(2) following *Fischer*).

Mr. Trump's conduct establishes each of these elements beyond a reasonable doubt. The congressional certification proceeding was an official proceeding for purposes of Section 1512, as every district court judge in the District of Columbia to have considered this question has concluded, *see United States v. Bingert*, 605 F. Supp. 3d 111, 120 (D.D.C. 2022), and as the D.C. Circuit has agreed, *see Fischer*, 64 F.4th at 342-343 (D.C. Cir. 2023), *vacated and remanded on other grounds*, 603 U.S. 480 (2024). The evidence described above supporting the Section 371 charge also establishes Mr. Trump's knowingly obstructive conduct. And as described above, Mr. Trump willfully caused others to attempt to obstruct the certification proceeding on January 6.

Finally, the Government was prepared to prove Mr. Trump's corrupt intent—under any definition—beyond a reasonable doubt. To act "corruptly" means (1) acting dishonestly, (2) intending the use of unlawful means, (3) violating a legal duty or causing or seeking to cause someone else to violate a legal duty, or (4) seeking an unlawful or improper benefit or advantage. Acting corruptly also means acting with consciousness of wrongdoing. *See United States v. Robertson*, 86 F.4th 355, 368-369 (D.C. Cir. 2023); *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996); *Arthur Andersen LLP*, 544 U.S. at 706-707 (2005). Mr. Trump and co-conspirators used deceptive and dishonest means; he intended the use of independently

48

criminal means to obstruct the congressional certification proceeding; he and co-conspirators plainly sought to cause state and federal officials to violate a legal duty; and Mr. Trump acted "with an intent to procure an unlawful benefit either for oneself or for some other person." *Fischer*, 64 F.4th at 352 (Walker, J., concurring) (citation and quotations omitted). Most basically, Mr. Trump sought "unlawfully [to] secure a professional advantage—the presidency," *id.* at 356 n.5—to which he was not lawfully entitled.

C.      Conspiracy Against Rights (18 U.S.C. § 241)

Section 241 makes it unlawful for two or more persons to "conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." A violation of Section 241 requires proof of three elements: (1) Mr. Trump entered into a conspiracy, (2) to willfully injure, oppress, threaten, or intimidate a person in the United States, (3) in the exercise or enjoyment of a right secured by the Constitution or federal law. 18 U.S.C. § 241; *see, e.g.*, *United States v. Epley*, 52 F.3d 571, 575-576 (6th Cir. 1995).

Mr. Trump's conduct meets each element.[169] The right to vote for President—based on the determination by state legislatures to appoint electors based on their constituents' votes—is "fundamental." *Bush v. Gore*, 531 U.S. 98, 104 (2000); *cf. Burdick v. Takushi*, 504 U.S. 428, 441 (1992) ("the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system"); *United States v. Robinson*, 813 F.3d 251, 255-256 (6th Cir. 2016) (Section 241 "prohibits interference with a voter's right to cast

---

[169] The Office further set forth its position on the applicability of Section 241 in response to Mr. Trump's motion to dismiss the charge in the district court. *See* ECF No. 139 at 22-25.

a ballot for his or her preferred candidate . . . and prohibits interference with the right of voters to have their votes free from dilution by unlawfully procured votes."). It is a right rooted in the principles of accountability to and consent by the governed, which has distinguished this nation from its founding. As the Supreme Court has recognized, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *see also Yick Wo v. Hopkins*, 118 U.S. 357, 370 (1886) (voting is "regarded as a fundamental political right, because [it is] preservative of all rights"); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.").

Mr. Trump acknowledged that voting in a presidential election is a fundamental right under the Constitution. *See* ECF No. 163 at 23 (arguing that "urging States or Congress to use their power to select or to count electors does not affect the 'fundamental' right to vote because it does not arbitrarily 'value one person's vote over that of another,' *Bush*, 531 U.S. at 104-105, or restrict the exercise of that right; rather, it encourages the States and Congress to exercise their constitutional prerogatives a certain way"). Indeed, given that all states have made the popular vote an integral means of appointing electors, the right to vote in a presidential election is among the most precious federal rights protected by the Constitution. *Cf. United States v. Classic*, 313 U.S. 299, 314 (1941) (when a state makes a primary election "an integral part of the procedure for the popular choice of a Congressman," it becomes "a right established and guaranteed by the Constitution"); *see also Trump v. Anderson*, 601 U.S. 100, 115-116 (2024) (per curiam) (noting

the "uniquely important national interest" in "a Presidential election" because "the President . . . represents all the voters in the Nation") (citation, quotations, and emphasis omitted).

This history of the Section 241 offense with which Mr. Trump was charged, along with courts' universal and longstanding recognition of the voting rights protected by that statute, confirm that protecting the right to vote is critical to the existence of the right. Section 241's predecessor statute was passed as part of the Enforcement Act of 1870, a Reconstruction-era law to address the "continued denial of rights" to Black citizens, "sometimes accompanied by violent assaults." *United States v. Price*, 383 U.S. 787, 801-802 (1966). That Act sought to combat widespread anti-Reconstruction violence, which included acts of terror aimed at disenfranchising Black voters. The same year as the Act's passage, Congress established the U.S. Department of Justice, and the Department zealously pursued its mission to enforce voting rights in the Reconstruction Era. Through the application and interpretation of Section 241 and its predecessor statute, courts have repeatedly underscored the importance of the right to vote. Courts have held that the right encompasses the ability to cast a vote, *Ex parte Yarbrough (The Ku-Klux Cases)*, 110 U.S. 651, 657-658 (1884) (protecting right of an emancipated person to vote), and to have that vote counted, *United States v. Mosley*, 238 U.S. 383, 386 (1915) ("We regard it as equally unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box."). They have further confirmed that one's vote cannot lawfully be denied, destroyed, or diluted. *See, e.g., Classic*, 313 U.S. at 321-322 (holding that Section 241's predecessor statute applied to conspiracies to prevent the official counting of ballots in a primary election); *United States v. Saylor*, 322 U.S. 385 (1944) (Section 241 applies to prohibit conspiracies to dilute legitimate votes by stuffing the ballot box); *United States v. Pleva*, 66 F.2d 529, 530 (2d Cir. 1933) (board of elections inspectors charged with

falsely tabulating ballots to favor certain candidates; convictions reversed on separate jury grounds); *United States v. Skurla*, 126 F. Supp. 713, 715 (W.D. Pa. 1954) (defendants charged for casting and causing to be cast false and forged ballots, causing an incorrect vote tally, and using unqualified individuals to impersonate lawful voters); *United States v. Townsley*, 843 F.2d 1070, 1073-1075 (8th Cir. 1988) (scheme to discard certain absentee ballots).

Mr. Trump and co-conspirators sought to deprive—that is, injure or oppress—citizens of their constitutional right to have their presidential election votes counted. The words "injure or oppress" in Section 241 are not used in any technical sense, but cover a variety of conduct intended to prevent, harm, inhibit, hinder, frustrate, obstruct, or interfere with the free exercise and enjoyment of a right. *See United States v. Handy*, No. 22-cr-96, 2023 WL 6199084, at *3 (D.D.C. Sept. 22, 2023); *United States v. Mackey*, 652 F. Supp. 3d 309, 336-337 (E.D.N.Y. 2023). Although they were not in a backroom altering the vote tallies in a local election, or stuffing falsified ballots into the ballot boxes, as alleged in prior cases charged under this statute, Mr. Trump and co-conspirators nonetheless sought the same result: to effectively cast aside legitimate votes in a manner that would have deprived citizens of their right to vote and have their votes counted. As Co-Conspirator 1 admitted, their primary objective was to "just flat out change the vote, deduct that number of votes from the – declare those votes, 300,000 votes in Philadelphia, illegal, unlawful. Reduce the number by 300,000."[170] Mr. Trump attempted to carry out this objective in multiple ways. He urged state officials to disregard the legitimate majority of votes for Mr. Biden and pressured and threatened Georgia's Secretary of State to "find" more than 11,000 votes to dilute Mr. Biden's vote count in the state.[171] And he urged Mr.

---

[170] SCO-06628582 at 13:07-13:22 (War Room episode 491 11/11/2020).

[171] *See* ECF No. 252 at 29 & n.137; SCO-12998394 at 12 (Tr. of Georgia Secretary of State Call 01/02/2021).

Pence to discard the legitimate electoral certificates that reflected millions of citizens' votes in the targeted states.[172] The evidence collected showed that Mr. Trump targeted this voting right with precision: he centered his false claims of election fraud on select states, or cities and counties within those states, with large numbers of voters who had not chosen to reelect him.

D.    Defenses

Before presenting the original indictment to the grand jury, the Office considered Mr. Trump's potential defenses to these charges, including a good faith defense, an advice of counsel defense, and constitutional defenses. The Office concluded that each of the defenses was legally or factually flawed and thus would not prevail.

First, it was expected that Mr. Trump would argue that he acted in good faith when he sought to stop the transfer of presidential power because he genuinely believed that outcome-determinative fraud had undermined the election's integrity and caused him to lose. As set forth above in Section II.A, the Office developed strong proof that Mr. Trump knew that his election fraud claims were false. For example, Mr. Trump made persistent claims of a large number of dead voters in Georgia—including in his speech at the Ellipse on January 6—even though his Senior Campaign Advisor and Georgia's Secretary of State had told him that the claims were untrue.[173] He spread lies—including in his Ellipse speech—of sinister, fraudulent "vote dumps" in Michigan, even after Michigan's Senate Majority Leader told him that nothing suspicious had occurred.[174] And Mr. Trump repeatedly made provably false allegations about fraud in

---

[172] *See* ECF No. 252 at 66-67 & nn.361-365, 71 & nn.392-399; SCO-00014655 at 198-200.

[173] *See* ECF No. 252 at 21 & n.95, 30 & n.142; SCO-02244118 at 16 (Remarks by Mr. Trump at Save America Rally 01/06/2021); SCO-00011882 at 33-37; SCO-12998394 at 6 (Tr. of Georgia Secretary of State Call 01/02/2021).

[174] *See* ECF No. 252 at 32-33 & n.160; SCO-02244118 at 18 (Remarks by Mr. Trump at Save America Rally 01/06/2021); SCO-11545470 at 62-64 (Int. Tr.); SCO-00829361 at 16-17 (HSC Tr.).

Pennsylvania, despite having been told by the Chairman of the state Republican Party that the vote count was occurring as expected.[175]

Even if Mr. Trump maintained that he sincerely believed he won the election (a conclusion unsupported by the evidence collected in the investigation), it would not provide a defense to the Section 371 charge. A defendant may not use deceit to obstruct a government function even if he believes the function itself to be unconstitutional because "a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit." *Dennis*, 384 U.S. at 867. "One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." *Id.* There are "appropriate and inappropriate ways to challenge" perceived illegalities. *Id.* Just as the president of a company may be guilty of fraud for using knowingly false statements of fact to defraud investors even if he subjectively believes that his company will eventually succeed, *see, e.g.*, *United States v. Arif*, 897 F.3d 1, 9-10 & n.9 (1st Cir. 2018); *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013); *United States v. Chavis*, 461 F.3d 1201, 1209 (10th Cir. 2006), Mr. Trump could be convicted of using deceit to obstruct the government function by which the results of the presidential election are collected, counted, and certified, even if he established that he subjectively believed that he had reason to do so because of his claims that the election was "rigged."

It bears emphasis that Mr. Trump's knowing deceit was pervasive throughout the charged conspiracies. This was not a case in which Mr. Trump merely misstated a fact or two in a handful of isolated instances. On a repeated basis, he and co-conspirators used specific and

---

[175] *See* ECF No. 252 at 37-38 & nn.187-190; SCO-02244118 at 11-12 (Remarks by Mr. Trump at Save America Rally 01/06/2021); SCO-00016926 at 20-24.

knowingly false claims of election fraud in his calls and meetings with state officials, in an effort
to induce them to overturn the results of the election in their states;[176] to his own Vice President,
to induce Mr. Pence to violate his duty during the congressional certification proceeding;[177] and
on January 6, as a call to action to the angry crowd he had gathered at the Ellipse and sent to the
Capitol to disrupt the certification proceeding.[178]   Mr. Trump and co-conspirators used other
forms of deceit as well—including when they falsely represented that the fraudulent electoral
votes would be used only if Mr. Trump prevailed in pending contests in their states,[179] and when
they caused the fraudulent electors to falsely swear that they were duly certified and send those
false certifications to Congress.[180]  Regardless of any claim that Mr. Trump subjectively believed
the outcome of the election was unfair or "rigged," the Office concluded that these knowingly
deceitful statements and acts would overcome any good faith defense.

The Office also expected that Mr. Trump might claim that his consultation with
attorneys—several of whom were co-conspirators—should negate a finding that he acted with a

---

[176] *See* ECF No. 252 at 17 & nn.67-68, 18 & n.72, 29-30 & nn.139-144, 32 & n.159; SCO-12733339 at 4 (Int. Rep.); SCO-00767550 at 10-11 (HSC Tr.); SCO-11509251 at 41-42 (Int. Tr.); SCO-12998394 at 1-3 (Tr. of Georgia Secretary of State Call 01/02/2021); SCO-00829361 at 16-17 (HSC Tr.).

[177] *See* ECF No. 252 at 67 & n.365; SCO-00014655 at 155-158, 170-171; SCO-04982309 (Handwritten notes 12/29/2020); SCO-04982330 at 1 (Handwritten notes 01/04/2021).

[178] *See* ECF No. 252 at 75-76 & nn.423-428; SCO-02244118 at 6, 12-22 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[179] *See* ECF No. 252 at 50 & n.260, 53 & n.282; SCO-00009955 at 8-11; SCO-12949797 at 82-83 (Int. Tr.); SCO-00016926 at 48-50; SCO-00009540 at 15-19.

[180] *See* ECF No. 252 at 56 & n.301; SCO-02341381 (Fraudulent "Arizona's Electoral Votes for President and Vice President"); SCO-02341386 (Fraudulent "Georgia's Electoral Votes for President and Vice President"); SCO-02341398 (Fraudulent "Michigan's Electoral Votes for President and Vice President"); SCO-02341415 (Fraudulent "Nevada's Electoral Votes for President and Vice President"); SCO-02341409 (Fraudulent "New Mexico's Electoral Votes for President and Vice President"); SCO-02341435 (Fraudulent "Pennsylvania's Electoral Votes for President and Vice President"); SCO-02341449 (Fraudulent "Wisconsin's Electoral Votes for President and Vice President").  Even in Pennsylvania and New Mexico, where the fraudulent certificates contained future contingent language, the cover memoranda and envelopes sent to Congress represented that the documents were the state's "Electoral Votes for President and Vice President."

criminal state of mind. In pretrial litigation, the Court granted the Government's motion that Mr. Trump should be required to declare whether he intended to employ such a defense and, if he did, to produce the discovery required by the attendant waiver of Mr. Trump's attorney-client privilege. ECF No. 147. A defendant's claim that he relied in good faith on his attorney's advice is "not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but functions instead as "evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.'" *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989)). Under D.C. Circuit law, an advice-of-counsel defense consists of two elements: the defendant (1) "'relied in good faith on the counsel's advice that his course of conduct was legal'" and (2) "'made full disclosure of all material facts to his attorney before receiving the advice at issue.'" *United States v. Gray-Burriss*, 920 F.3d 61, 66 (D.C. Cir. 2019) (quoting *United States v. DeFries*, 129 F.3d 1293, 1308 (D.C. Cir. 1997)).

The Office concluded that if Mr. Trump chose to raise such a defense, it would fail because an advice-of-counsel defense is not available "where counsel acts as an accomplice to the crime." *United States v. West*, 392 F.3d 450, 457 (D.C. Cir. 2004) (Roberts, J.). The evidence showed that the central attorneys on whom Mr. Trump may have relied for such a defense, such as Co-Conspirator 1 or Co-Conspirator 2, were "partner[s] in a venture," with the result that any advice-of-counsel defense necessarily would fail. *Id.* (citing *United States v. Carr*, 740 F.2d 339, 347 (5th Cir. 1984)); *cf. United States v. Cintolo*, 818 F.2d 980, 990 (1st Cir. 1987) ("A criminal lawyer has no license to act as a lawyer-criminal."). Co-Conspirator 1 assisted Mr. Trump in using knowingly false claims of election fraud in furtherance of the

charged conspiracies. At press conferences,[181] at hearings before legislatures in the targeted states,[182] and directly with officials in the targeted states,[183] Co-Conspirator 1 made a wide range of specific (though ever-changing) false claims of election fraud. Co-Conspirator 1 continued to do so after his lies were publicly or directly debunked.[184] Co-Conspirator 1's involvement spanned from his insistence that Mr. Trump declare victory on election night[185] to the voicemails[186] that Co-Conspirator 1 left for Senators on the night of January 6, using false claims of election fraud to ask that the legislators further delay the certification. Co-Conspirator 2 was instrumental in Mr. Trump's efforts to organize his electors to cast fraudulent votes and send them to the Vice President, and then to pressure the Vice President to use the fraudulent electoral certificates to overturn the election results. Throughout his involvement in Mr. Trump's conspiracies, Co-Conspirator 2 conceded privately to other attorneys (both private attorneys and those responsible for advising Mr. Trump and the Vice President) that his plans violated federal law and would not withstand scrutiny in court.[187]

---

[181] *See* ECF No. 252 at 43 & nn.217-218; *see, e.g.*, SCO-04976260 (Video of Four Seasons Total Landscaping Press Conference 11/07/2020); SCO-04976264 (Video of RNC Press Conference 11/19/2020).

[182] *See* ECF No. 252 at 19-20 & nn.83-85, 21 & n.97, 25 & nn.119-120, 39 & nn.195-197; SCO-04976265 at 15:52-30:00 (Video of Pennsylvania Hotel Hearing 11/25/2020); SCO-04976459 at 02:06:23-02:07:00 (Video of Arizona State Hearing 11/30/2020); SCO-04976326 at 25:00-31:05 (Video of Michigan House Committee Meeting 12/02/2020); SCO-04976332 at 01:04:50-01:10:25 (Video of Georgia Senate Judiciary Subcommittee Hearing 12/03/2020).

[183] *See* ECF No. 252 at 19 & nn.77-82, 33 & nn.163-164, 34 & nn.168-169; SCO-11545470 at 53 (Int. Tr.); SCO-00829361 at 20-22 (HSC Tr.); SCO-00312350 (Text messages from Co-Conspirator 1 12/07/2020); SCO-05390337-05390346 (Text messages 12/08/2020); SCO-11508370 at 62-64 (Int. Tr.).

[184] *See* ECF No. 252 at 14 & n.53, 23 & nn.105-106; *see also, e.g.*, SCO-04976279 at 01:36:58-02:01:58 (Video of Georgia House Committee Hearing 12/10/2020); SCO-04952956 (Tweet 12/04/2020); SCO-04976277 at 08:44-09:10 (Video of Georgia Secretary of State Press Conference 12/07/2020); *supra* at n.12.

[185] *See* ECF No. 252 at 7 & n.15; SCO-00003548 at 61-62; SCO-00016750 at 31-35.

[186] *See* ECF No. 252 at 84 & nn.488-492; SCO-04134777 (Voicemail from Co-Conspirator 1 01/06/2021); SCO-06475675 (Voicemail from Co-Conspirator 1 01/06/2021).

[187] *See* ECF No. 252 at 61 & nn.324-326, 63 & n.336, 66 & n.356, 69 & n.384; SCO-00007167 at 66; SCO-02248764 at 3 (Email from Co-Conspirator 2 01/06/21); SCO-12245492 (Email from Co-Conspirator 2

Furthermore, Mr. Trump could not have succeeded in showing that he relied in good faith on legal advice from these attorneys. The evidence showed that Mr. Trump was not looking to Co-Conspirator 1 or Co-Conspirator 2 for legal advice; instead, Mr. Trump was the head of a conspiracy who sought legal cover from his co-conspirators. As Co-Conspirator 1 acted repeatedly in furtherance of the conspiracies, multiple advisors to Mr. Trump warned him that Co-Conspirator 1 would not successfully challenge the election results and was not acting in Mr. Trump's best interest; Mr. Trump ignored them all because he was not relying on Co-Conspirator 1 as an attorney.[188] Similarly, Co-Conspirator 2's willingness to advocate for actions that he knew and even privately conceded were unlawful demonstrates that both he and Mr. Trump understood his role was not that of an attorney offering legal advice on which Mr. Trump was acting.[189] For instance, in a lawsuit in Georgia, Co-Conspirator 2 filed a false certification by Mr. Trump after having written to other attorneys in an email that both he and Mr. Trump knew some of the allegations incorporated in the filing were inaccurate.[190] And Co-Conspirator 2's decision to advocate to the Vice President's counsel and chief of staff on January 5, 2021, that the Vice President should unlawfully reject legitimate electoral certificates—an act that Co-Conspirator 2 had previously recognized was not supported by the Constitution or federal

---

12/29/2020); SCO-00039087 (Text messages among Co-Conspirator 2, Co-Conspirator 5, and Co-Conspirator 6 12/28/2020).

[188] *See* ECF No. 252 at 11-12 & nn.32-35; SCO-12920242 at 1, 4, 7 (Int. Rep.); SCO-00006256 at 44-52; SCO-12945195 (Email 11/28/2020); SCO-00764172 at 26-27 (HSC Tr.); SCO-11532925 at 70-71 (Int. Tr.); SCO-00014655 at 68-73.

[189] *See* ECF No. 252 at 61 & nn.324-326, 63 & n.336, 66-67 & nn.356-364, 69-70 nn.382-385; *see, e.g.,* SCO-12245107 at 1-2 (Draft Letter from Co-Conspirator 2); SCO-00280481 at 2 (Memo from Co-Conspirator 2 to Co-Conspirator 6 12/23/2020); SCO-00006256 at 130-135; SCO-00007167 at 50-53, 60-63; SCO-00016118 at 72-80; SCO-00014442 at 38-39 (Pence, *So Help Me God* pp. 450-451); SCO-04982330 (Handwritten notes 01/04/2021); *Trump v. Kemp*, No. 20-cv-5310, ECF No. 21 at 27-29 (N.D. Ga. Jan. 5, 2021) (Transcript of Motions Hearing); SCO-04976350 at 56:53-57:36, 01:05:59-01:07:02, 01:19:12-1:27:28 (Video of HSC Testimony); SCO-04094748 (Handwritten notes 01/05/2021); SCO-00794788 at 108-115 (HSC Tr.).

[190] *See* ECF No. 252 at 27 & nn.127-130; *Kemp*, No. 20-cv-5310, ECF No. 1 at 33-34 (N.D. Ga. Dec. 31, 2020) (Complaint); SCO-00006256 at 205-206; SCO-00282435 at 1 (Email from Co-Conspirator 2 12/31/2020).

law[191]—was a sharp reversal from his position just one day earlier and happened only because Mr. Trump had made clear that it was his preferred strategy.[192]   The Office was otherwise confident that it would be able to demonstrate that with respect to all attorneys, Mr. Trump could not meet the elements of the defense, such as the requirement that he make full disclosure to any attorneys of all relevant facts and then rely faithfully on their advice. *See Gray-Burriss*, 920 F.3d at 66.

Finally, the Office anticipated that Mr. Trump would claim that his conduct was protected by the First Amendment.  As the district court recognized, "the First Amendment 'embodies our profound national commitment to the free exchange of ideas," and it bars the government from "'restrict[ing] expression because of its message, its ideas, its subject matter, or its content.'" ECF No. 171 at 31 (quoting *Ashcroft v. Am. Civ. Liberties Union*, 535 U.S. 564, 573 (2002), and *United States v. Stevens*, 559 U.S. 460, 468 (2010)).  At the same time, "it is well established that the First Amendment does not protect speech that is used as an instrument of a crime."  *Id.* "'Many long established' criminal laws permissibly 'criminalize speech that is intended to induce or commence illegal activities,' *United States v. Williams*, 553 U.S. 285, 298 (2008), such as fraud, bribery, perjury, extortion, threats, incitement, solicitation, and blackmail, *see, e.g.*, *Stevens*, 559 U.S. at 468–469 (fraud); *Williams*, 553 U.S. at 298 (incitement, solicitation); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 356 (2010) (bribery); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 244 (4th Cir. 1997) (extortion, threats, blackmail, perjury)."  ECF No. 171 at 31-32 (ellipsis omitted).  "Prosecutions for conspiring, directing, and aiding and abetting do not run afoul of the Constitution when those offenses are 'carried out through

---

[191] *See* ECF No. 252 at 61 & nn.324-326; SCO-12245107 at 1-2 (Draft Letter from Co-Conspirator 2).

[192] *See* ECF No. 252 at 66-67 & nn.361-364, 69 & nn.382-384; SCO-00007167 at 51, 60-61; SCO-04976350 at 01:19:12-01:21:30 (Video of HSC Testimony); SCO-04094748 (Handwritten notes 01/05/2021).

speech.'" *Id.* at 32 (quoting *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655-656 (D.C. Cir. 1994), and citing *Williams*, 553 U.S. at 298).

Consistent with that precedent, the original and superseding indictments recognized that Mr. Trump "had a right, like every American, to speak publicly about the [2020 presidential] election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won." ECF No. 1 at ¶ 3; ECF No. 226 at ¶ 3. They charged Mr. Trump, however, with using knowingly false statements to defeat a government function, injure the right to vote, and obstruct an official proceeding. That is, he made "dozens of specific claims that there had been substantial fraud in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast ballots, or that voting machines had changed votes for the Defendant to votes for Biden." ECF No. 1 at ¶ 11; ECF No. 226 at ¶ 12. Those were factual claims that were verifiably false, and Mr. Trump knew that they were false. *See id.* Mr. Trump then used those lies as the instruments of his four criminal offenses. Because he used those knowingly false statements regarding specific facts to commit the crimes charged in the superseding indictment, they were not protected by the First Amendment. *See Stevens*, 559 U.S. at 468-469 (including "fraud" in the list of "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem") (citation and quotations omitted); *United States v. Nordean*, 579 F. Supp. 3d 28, 53-54 (D.D.C. 2021) ("[B]y focusing on 'corrupt' actions, [Section 1512(c)(2)] does not even reach free speech."); *see also United States v. Alvarez*, 567 U.S. 709, 719-721 (2012) (plurality opinion) (explaining that while "falsity alone may not suffice to bring the speech outside the First Amendment," the First Amendment permits criminal laws that proscribe

knowing or reckless falsehoods in connection with some "other legally cognizable harm," including "protect[ing] the integrity of Government processes").

In pretrial motions, Mr. Trump moved to dismiss the original indictment based on the First Amendment. *See* ECF No. 113 at 4-18. The Office filed an opposition brief, ECF No. 139 at 29-34, and the district court denied the motion, finding that the indictment "properly alleges Defendant's statements were made in furtherance of a criminal scheme," ECF No. 171 at 33. As the court explained, Mr. Trump was "not being prosecuted for his 'view' on a political dispute; he [was] being prosecuted for acts constituting criminal conspiracy and obstruction of the electoral process," *id.* at 34, and the fact that his "alleged criminal conduct involved speech does not render the Indictment unconstitutional," *id.* at 32. Because he was "not being prosecuted simply for making false statements, but rather for knowingly making false statements in furtherance of a criminal conspiracy and obstructing the electoral process," there was "no danger of a slippery slope in which inadvertent false statements alone are alleged to be the basis for criminal prosecution." *Id.* at 36 (citation omitted); *see generally id.* at 32-37 (rejecting other First Amendment claims).

E.    Other Charges

The Office considered, but ultimately opted against, bringing other charges. One potential charge was 18 U.S.C. § 2383, sometimes referred to as the Insurrection Act, which provides that "[w]hoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined under this title or imprisoned not more than ten years, or both; and shall be incapable of holding any office under the United States." 18 U.S.C. § 2383. Section 2383 originated during the Civil War, as part of the Second Confiscation Act of 1862. *See* Act of July 17, 1862, ch. 195, § 2, Pub. L. No. 37-160, 12 Stat. 589, 590.

Cases interpreting Section 2383 are scarce and arose in contexts that provided little guidance regarding its potential application in this case. *See, e.g.*, *United States v. Greathouse*, 26 F. Cas. 18, 23 (C.C.N.D. Cal. 1863) (construing the original version of the act to encompass treason, consisting of arming a vessel to commit hostilities against United States vessels, in the context of the rebellion by the confederate states); *United States v. Cathcart*, 25 F. Cas. 344, 345 (C.C.S.D. Ohio 1864) (rejecting legal argument that treason against the United States was legally impossible in the context of the rebellion by the confederate states); *In re Grand Jury*, 62 F. 834, 837-838 (S.D. Cal. 1894) (grand jury charge describing offense in the context of a labor dispute involving interference with transportation of the mail); *In re Charge to Grand Jury*, 62 F. 828, 829-830 (N.D. Ill. 1894) (grand jury charged that "[i]nsurrection is a rising against civil or political authority" and requires "such a number of persons as would constitute a general uprising in that particular locality" in the context of offense of obstructing the mails). It does not appear that any defendant has been charged with violating the statute in more than 100 years.

To establish a violation of Section 2383, the Office would first have had to prove that the violence at the Capitol on January 6, 2021, constituted an "insurrection against the authority of the United States or the laws thereof," and then prove that Mr. Trump "incite[d]" or "assist[ed]" the insurrection, or "g[ave] aid or comfort thereto." 18 U.S.C. § 2383.

Courts have found or described the attack on the Capitol as an insurrection. In *Anderson v. Griswold*, 543 P.3d 283, 329 (Colo. 2023), *rev'd on other grounds sub nom. Trump v. Anderson*, 601 U.S. 100 (2024) (per curiam), the Colorado Supreme Court found that Mr. Trump engaged in an insurrection as that term is used in Section Three of the Fourteenth Amendment. Federal courts in the District of Columbia have also used the term "insurrection" to describe the attack on the Capitol, but did so in cases where there was no criminal charge under Section 2383.

*See, e.g.*, *United States v. Chwiesiuk*, No. 21-cr-536, 2023 WL 3002493, at *3 (D.D.C. Apr. 19, 2023) ("As this Court and other courts in the United States District Court for the District of Columbia have stated previously, what occurred on January 6, 2021 was in fact an insurrection and involved insurrectionists and, therefore, the terms to which Defendants object are accurate descriptors."); *United States v. Carpenter*, No. 21-cr-305, 2023 WL 1860978, at *4 (D.D.C. Feb. 9, 2023) ("What occurred on January 6 was in fact a riot and an insurrection, and it did in fact involve a mob."); *see also United States v. Munchel*, 991 F.3d 1273, 1279, 1281 (D.C. Cir. 2021) (using the term "insurrection" in a case that did not involve Section 2383). These cases, however, did not require the courts to resolve the issue of how to define insurrection for purposes of Section 2383, or apply that definition to the conduct of a criminal defendant in the context of January 6.

The Office recognized why courts described the attack on the Capitol as an "insurrection," but it was also aware of the litigation risk that would be presented by employing this long-dormant statute. As to the first element under Section 2383—proving an "insurrection against the authority of the United States or the laws thereof"—the cases the Office reviewed provided no guidance on what proof would be required to establish an insurrection, or to distinguish an insurrection from a riot. Generally speaking, an "[i]nsurrection is a rising against civil or political authority[]—the open and active opposition of a number of persons to the execution of law in a city or state." *In re Charge to Grand Jury*, 62 F. at 830; *see also Insurrection*, MERRIAM-WEBSTER 649 (11th ed. 2020) ("an act or instance of revolting against civil authority or an established government"); *Insurrection*, AMERICAN HERITAGE DICTIONARY 909 (4th ed. 2000) ("The act or an instance of open revolt against civil authority or a constituted government."); *Insurrection*, 7 THE OXFORD ENGLISH DICTIONARY 1060 (2nd ed. 1989) ("The

action of rising in arms or open resistance against established authority or governmental restraint[.]").  Some sources distinguish an "insurrection" from a "'rout, riot, [or] offense connected with mob violence by the fact that in insurrection there is an organized and armed uprising against authority or operations of government, while crimes growing out of mob violence, however serious they may be and however numerous the participants, are simply unlawful acts in disturbance of the peace which do not threaten the stability of the government or the existence of political society.'"  BLACK'S LAW DICTIONARY (12th ed. 2024) (quoting 77 C.J.S. *Riot; Insurrection* § 29, at 579 (1994)); *see also Anderson*, 543 P.3d at 329-336 (noting Mr. Trump's argument that "an insurrection is more than a riot but less than a rebellion" and agreeing that "an insurrection falls along a spectrum of related conduct").

In case law interpreting "insurrection" in another context, one court has observed that an insurrection typically involves overthrowing a sitting government, rather than maintaining power, which could pose another challenge to proving beyond a reasonable doubt that Mr. Trump's conduct on January 6 qualified as an insurrection given that he was the sitting President at that time.  *Cf. CITGO Petroleum Corp. v. Starstone Ins. SE*, No. 21-cv-389, 2023 WL 2525651, at *13 (S.D.N.Y. Mar. 15, 2023) ("[I]n every case over the course of over sixty years to find the existence of an insurrection within the meaning of an insurance policy, the insurrection has occurred against—not by—the established, effective and de facto government.") (citation and quotations omitted); *Pan Am World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1017 (2d Cir. 1974) ("The district court held that the word insurrection means (1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers.") (citation and quotations omitted); *accord, e.g.*, *Home Ins. Co. of New York v. Davila*, 212 F.2d 731, 738 (1st Cir. 1954) (noting that if Puerto

64

Rican extremists had a "maximum objective" to "overthrow of the insular government" on the island, that group's uprising would constitute insurrection); *Hartford Fire Ins. Co. v. W. Union Co.*, 630 F. Supp. 3d 431, 435-437 (S.D.N.Y. 2022) (a Russian-backed separatist group's attack on a plane in service of overthrowing the current government in eastern Ukraine was an insurrectionary act); *Younis Bros. & Co., Inc. v. CIGNA Worldwide Ins. Co.*, 91 F.3d 13, 14-15 (3d Cir. 1996) (applying *Davila* in finding that, where individuals outside of the Liberian government "led their respective armies in a violent uprising" "against the Liberian government," damage to properties fell within an insurance contract's insurrection clause). The Office did not find any case in which a criminal defendant was charged with insurrection for acting within the government to maintain power, as opposed to overthrowing it or thwarting it from the outside. Applying Section 2383 in this way would have been a first, which further weighed against charging it, given the other available charges, even if there were reasonable arguments that it might apply.

As to the second element under Section 2383, there does not appear to have ever been a prosecution under the statute for inciting, assisting, or giving aid or comfort to rebellion or insurrection. The few relevant cases that exist appear to be based on a defendant directly engaging in rebellion or insurrection, but the Office's proof did not include evidence that Mr. Trump directly engaged in insurrection himself. Thus, however strong the proof that he incited or gave aid and comfort to those who attacked the Capitol, application of those theories of liability would also have been a first. *See* Alexander Tsesis, *Incitement to Insurrection and the First Amendment*, 57 WAKE FOREST L. REV. 971, 973 & n.6 (2022) ("The likelihood of conviction under the federal incitement to insurrection statute, 18 U.S.C. § 2383 . . . is fraught with uncertainty because no federal court has interpreted it.").

The Office determined that there were reasonable arguments to be made that Mr. Trump's Ellipse Speech incited the violence at the Capitol on January 6 and could satisfy the Supreme Court's standard for "incitement" under *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (holding that the First Amendment does not protect advocacy "directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action"), particularly when the speech is viewed in the context of Mr. Trump's lengthy and deceitful voter-fraud narrative that came before it.  For example, the evidence established that the violence was foreseeable to Mr. Trump, that he caused it, that it was beneficial to his plan to interfere with the certification, and that when it occurred, he made a conscious choice not to stop it and instead to leverage it for more delay.   But the Office did not develop direct evidence—such as an explicit admission or communication with co-conspirators—of Mr. Trump's subjective intent to cause the full scope of the violence that occurred on January 6.   Therefore, in light of the other powerful charges available, and because the Office recognized that the *Brandenburg* standard is a rigorous one, *see, e.g.*, *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 902, 927-929 (1982) (speech delivered in "passionate atmosphere" that referenced "possibility that necks would be broken" and violators of boycott would be "disciplined" did not satisfy *Brandenburg* standard); *Brandenburg*, 395 U.S. at 446-447 (reversing conviction where Ku Klux Klan leader threatened "revengeance" for "suppression" of the white race), it concluded that pursuing an incitement to insurrection charge was unnecessary.

By comparison, the statutes that the Office did charge had been interpreted and analyzed in various contexts over many years.  The Office had a solid basis for using Sections 371, 1512, and 241 to address the conduct presented in this case, and it concluded that introducing relatively untested legal theories surrounding Section 2383 would create unwarranted litigation risk.

Importantly, the charges the Office brought fully addressed Mr. Trump's criminal conduct, and pursuing a charge under Section 2383 would not have added to or otherwise strengthened the Office's evidentiary presentation at trial. For all of these reasons, the Office elected not to pursue charges under Section 2383.[193]

F.    Co-Conspirator Liability

As described in the factual recitation above, Mr. Trump was charged with participating in crimes with at least six co-conspirators, and the Office's investigation uncovered evidence that some individuals shared criminal culpability with Mr. Trump. Following the original indictment on August 1, 2023, the Office continued to investigate whether any other participant in the conspiracies should be charged with crimes. In addition, the Office referred to a United States Attorney's Office for further investigation evidence that an investigative subject may have committed unrelated crimes.

Before the Department concluded that this case must be dismissed, the Office had made a preliminary determination that the admissible evidence could justify seeking charges against certain co-conspirators. The Office had also begun to evaluate how to proceed, including whether any potential charged case should be joined with Mr. Trump's or brought separately.

---

[193] The Office also considered, but decided not to pursue, charges under certain other federal criminal statutes, including 18 U.S.C. § 2101 (the Anti-Riot Act) and 18 U.S.C. § 372 (Conspiracy to Impede or Injure an Officer of the United States). The Office was aware that courts have struck down and limited various prongs of the Anti-Riot Act, *see United States v. Rundo*, 990 F.3d 709, 716-717 (9th Cir. 2021) (per curiam); *United States v. Miselis*, 972 F.3d 518, 535-539 (4th Cir. 2020). And as to Section 372, the Office had strong evidence that Mr. Trump and his co-conspirators agreed to use deceit to defeat the government function of collecting, counting, and certifying the results of the election, to obstruct the certification, and to injure the right of citizens to vote and have their votes counted. Further, as explained above, the Office also had strong evidence that the violence that occurred on January 6 was foreseeable to Mr. Trump, that he caused it, and that he and his co-conspirators leveraged it to carry out their conspiracies. But because the investigation did not develop proof beyond a reasonable doubt that the conspirators specifically agreed to threaten force or intimidation against federal officers, the Office did not pursue a charge under Section 372. After considering the facts, the law, and the Principles of Federal Prosecution, the Office concluded that the charges ultimately pursued would fully address Mr. Trump's criminal conduct, allow the Office to present the full scope of that conduct to a jury, and avoid unnecessary litigation. As a result, the Office decided not to seek any of these other potential charges.

Because the Office reached no final conclusions and did not seek indictments against anyone other than Mr. Trump—the head of the criminal conspiracies and their intended beneficiary—this Report does not elaborate further on the investigation and preliminary assessment of uncharged individuals. This Report should not be read to allege that any particular person other than Mr. Trump committed a crime, nor should it be read to exonerate any particular person.

III.    THE PRINCIPLES OF FEDERAL PROSECUTION

As set forth above, the Office concluded that Mr. Trump's conduct violated several federal criminal statutes and that the admissible evidence would be sufficient to obtain and sustain a conviction. Therefore, under the longstanding Principles of Federal Prosecution, the Office considered whether: (1) the prosecution would serve a substantial federal interest; (2) Mr. Trump was subject to effective prosecution in another jurisdiction; or (3) there existed an adequate non-criminal alternative to prosecution. U.S. Department of Justice, Justice Manual § 9-27.220. As described below, multiple substantial federal interests were served by Mr. Trump's prosecution, he was not subject to effective prosecution in another jurisdiction, and there was no adequate non-criminal alternative to prosecution. The Supreme Court's decision on presidential immunity, handed down after the initial decision to prosecute and analyzed below in Section V.D.2 did not alter the Office's view that the Principles of Federal Prosecution compelled prosecuting Mr. Trump; although that decision prevented use of certain evidence uncovered regarding Mr. Trump's misuse of presidential power, he also engaged in non-immune criminal conduct that is set forth in the superseding indictment. Accordingly, this section discusses only evidence that was not immunized—either because it involved Mr. Trump's private conduct or because the Office would have rebutted any presumption of immunity.

A.     Prosecuting Mr. Trump Served Multiple Substantial Federal Interests

Mr. Trump's prosecution served multiple federal interests, including the federal interest in the integrity of the United States' process for collecting, counting, and certifying presidential elections, and in a peaceful and orderly transition of presidential power; the federal interest in ensuring that every citizen's vote is counted; the federal interest in protecting public officials and government workers from violence; and the federal interest in the fair and even-handed enforcement of the law.  All of these federal interests, which are rooted in the law, the Constitution, and our basic democratic values, are substantial and command protection from Mr. Trump's criminal design to subvert them.

          1.     The substantial federal interest in protecting the integrity of the electoral process and the peaceful transfer of power was served by Mr. Trump's prosecution.

As set forth above, the investigation revealed that Mr. Trump and others conspired to use false claims of election fraud to attempt to disrupt the United States' electoral process and obstruct the congressional certification of the 2020 presidential election results.  Prosecution for that conduct thus vindicated abiding federal interests in protecting the electoral process and the previously unbroken tradition—before Mr. Trump's charged conduct—of a peaceful transition of presidential power from one administration to the next.  These federal interests are fundamental to our system of government, favoring no particular administration or political party.  Indeed, electoral processes like selecting the president are "necessarily structured to maintain the integrity of the democratic system." *Burdick*, 504 U.S. at 441.  "Preserving the integrity of the electoral process" and "preventing corruption . . . are interests of the highest importance." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 788-789 (1978).

The Office was cognizant of Mr. Trump's free speech rights during the investigation and would not have brought a prosecution if the evidence indicated he had engaged in mere political exaggeration or rough-and-tumble politics.  *See supra* at Section II.D (First Amendment defense discussion); Robert Jackson, *The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys* (April 1, 1940) ("In the enforcement of laws that protect our national integrity and existence, we should prosecute any and every *act* of violation, but only overt acts, not the expression of opinion, or activities such as the holding of meetings, petitioning of congress, or dissemination of news or opinions.") (emphasis in original).  As set forth in the original and superseding indictments, Mr. Trump had "a right, like every American, to speak publicly about the election and even to claim, falsely, that there had been outcome-determinative fraud in the election and that he had won."  ECF No. 1 at ¶ 3; ECF No. 226 at ¶ 3.  He also had lawful recourse to challenge the election results, including through lawsuits, recounts, and audits.  In fact, Mr. Trump and his allies vigorously pursued these methods of contesting the election results, but they were unsuccessful.

After election day, Mr. Trump or his Campaign were plaintiffs or intervenors in at least sixteen lawsuits seeking to change the outcome of the election,[194] and Mr. Trump's supporters

---

[194] *In re Enforcement of Election Laws and Securing Ballots Cast or Received after 7:00 p.m. on Nov. 3, 2020*, No. SPCV20-00982 (Chatham County, Ga. Super. Ct.); *Donald J. Trump for President Inc. v. Boockvar*, No. 602-md-2020 (Pa. Commw. Ct.); *Aguilera v. Fontes*, No. 20-cv-14083 (Maricopa County, Az. Super. Ct.); *Donald J. Trump for President Inc. v. Benson*, No. 20-000225-MZ (Mich. Ct. Cl.); *Donald J. Trump for President Inc. v. Philadelphia County Bd. of Elections*, No. 20-cv-5533 (E.D. Pa.); *Donald J. Trump for President Inc. v. Montgomery County Bd. of Elections*, No. 2020-18680 (Montgomery County, Pa. Ct. Com. Pls.); *Donald J. Trump for President Inc. v. Hobbs*, No. 2020-cv-014248 (Maricopa County Ariz. Super. Ct.); *Donald J. Trump for President Inc. v. Boockvar*, No. 20-cv-02078 (M.D. Pa.); *Donald J. Trump for President Inc. v. Benson*, No. 20-cv-1083 (W.D. Mich.); *Trump v. Evers*, No. 2020-AP-1971 (Wis. Sup. Ct.); *Trump v. Wisconsin Election Commission*, No. 20-cv-1785 (E.D. Wis.); *Trump v. Biden*, No. 2020-cv-7092, No. 2020-cv-2514 (Cir. Ct. Wis.); *Donald J. Trump for President Inc. v. Raffensperger*, No. 2020-cv-343255 (Fulton County, Ga. Super. Ct.); *Texas v. Pennsylvania*, 141 S. Ct. 1230 (2020); *Donald J. Trump for President Inc. v. Toulouse-Oliver*, No. 20-cv-01289-MV (D.N.M.); *Kemp*, No. 20-cv-5310 (N.D. Ga.).

filed dozens of other such lawsuits,[195] but all of these failed to change the outcome in any state. Mr. Trump pursued recounts in only two states—a statewide machine recount in Georgia and a recount in Wisconsin's Milwaukee and Dane Counties—and both served only to confirm the previously reported result (in Wisconsin, the recount increased Mr. Trump's margin of loss).[196] Following public requests, Secretaries of State in Georgia and Michigan ordered additional audits and recounts—in Georgia, a statewide hand recount and an audit in Cobb County, and in Michigan, a statewide audit and a hand recount in Antrim County, where Mr. Trump seized on claims of a clerk's temporary clerical error—but all merely confirmed previously reported results.[197]

The conduct of Mr. Trump and co-conspirators, however, went well beyond speaking their minds or contesting the election results though our legal system.   Instead, Mr. Trump targeted a key federal government function—the process by which the United States collects, counts, and certifies the results of the presidential election—and sought to obstruct or defeat it through fraud and deceit.  He did so using knowingly false claims of election fraud to attempt to induce state officials to reject citizens' votes and instead appoint Mr. Trump's electors; when he deceived his electors and caused them to falsify electoral certificates and submit them to Congress; when he attempted to enlist Mr. Pence with false claims of election fraud and pressure;

---

[195] *See, e.g., Costantino v. City of Detroit*, No. 20-14780 (Wayne County, Mich. Cir. Ct.); *Republican Party of Arizona v. Fontes*, No. 2020-cv-014553 (Maricopa County, Az. Super. Ct.); *Law v. Whitmer*, 20 OC 0016318B (First Jud. Ct. Carson City, Nev.); *Ward v. Jackson*, No. 2020-cv-015285 (Maricopa County, Az. Super. Ct.); *Pearson v. Kemp*, No. 18-cv-04809 (N.D. Ga.); *King v. Whitmer*, No. 20-cv-13134 (E.D. Mich.).

[196] *See* ECF No. 252 at 28 & n.131, 33-34 & n.167, 41 & n.207; SCO-12847178 (Georgia Secretary of State News Release 12/29/2020); SCO-03656876 (Wisconsin Order for Recount 11/19/2020); SCO-06613715 (Wisconsin Statement of Canvass 11/30/2020); *Trump v. Biden*, 394 Wis.2d 629, 633 (Wis. 2020).

[197] *See* ECF No. 252 at 12 & n.39, 28 & n.131, 46 & nn.241-243; SCO-04976281 at 03:22-04:16 (Video of Interview 01/02/2021); SCO-12847178 (Georgia Secretary of State News Release 12/29/2020); SCO-04957382 (Michigan Secretary of State News Release 12/17/2020); SCO-04952782 at 33 (Michigan Bureau of Elections, Audits of the November 3, 2020 General Election 04/21/2021).

and when he used, and attempted to leverage, an angry crowd of his supporters—fueled by Mr. Trump's lies—to stop the certification proceeding.

Mr. Trump did this in contravention of the Framers' intent to prevent a sitting President from perpetuating himself in power. "In free Governments," Benjamin Franklin explained, "the rulers are the servants, and the people their superiors & sovereigns." 2 *The Records of the Federal Convention of 1787*, at 120 (Max Farrand ed., 1911). Although the Framers recognized "the necessity of an energetic Executive," they justified and checked his power by ensuring that he always retained "a due dependence on the people." THE FEDERALIST NO. 70 (A. Hamilton); *see Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 223-224 (2020). As the Supreme Court noted in *Trump*, "[t]he President . . . plays no direct role in the process [of appointing electors], nor does he have authority to control the state officials who do. And the Framers, wary of 'cabal, intrigue and corruption,' specifically excluded from service as electors 'all those who from situation might be suspected of too great devotion to the president in office.'" 603 U.S. at 627-628 (quoting THE FEDERALIST NO. 68, at 459 (A. Hamilton) (J. Cooke ed., 1961)). Accordingly, Article II of the U.S. Constitution provides that "no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector." U.S. CONST. art. II, § 1, cl. 2. The considerable federal interest in protecting the integrity of the United States' electoral process weighed in favor of proceeding with Mr. Trump's prosecution.

So too did the federal interest in defending from future harm the United States' exceptional tradition of peaceful transitions of presidential power. That tradition was initiated by George Washington when he announced in his September 1796 Farewell Address that he would decline to seek a third term, followed by John Adams when he relinquished the power of the

presidency to his political rival Thomas Jefferson after the election of 1800, and continued by every sitting President until 2020—even through the turbulent Civil War and Reconstruction eras. And Congress and the courts have also recognized the federal interest in orderly presidential transitions. *See, e.g.*, Presidential Transition Act of 1963, Pub. L. 88-277, 78 Stat. 153, 153-154, § 2 (legislation "to promote the orderly transfer of the executive power" because "[a]ny disruption occasioned by the transfer of the executive power could produce results detrimental to the safety and well-being of the United States and its people"); *Trump v. Thompson*, 20 F.4th 10, 16-17 (D.C. Cir. 2021) (recognizing Congress's "unique legislative need" for documents "directly relevant to the . . . inquiry into an attack on the Legislative Branch and its constitutional role in the peaceful transfer of power"); *United States v. Tarrio*, 605 F. Supp. 3d 73, 78 (D.D.C. 2022) (when assessing "very serious" nature and circumstances of a January 6-related offense, court observed that "[t]hey involve, among other things, an alleged conspiracy to obstruct the certification of the Electoral College vote and thus to interfere with the peaceful transfer of power, one of our Nation's crown jewels").

In his first inaugural address, President Ronald Reagan remarked on the country's tradition of a peaceful transition of presidential power:

> To a few of us here today this is a solemn and most momentous occasion, and yet in the history of our nation it is a commonplace occurrence. The orderly transfer of authority as called for in the Constitution routinely takes place, as it has for almost two centuries, and few of us stop to think how unique we really are. In the eyes of many in the world, this every-4-year ceremony we accept as normal is nothing less than a miracle.

Inaugural Address (1981). In connection with preserving that tradition, Vice Presidents have presided over the certification of their own election losses. In 1961, then-Vice President Richard M. Nixon fulfilled his role as President of the Senate at the January 6 certification proceeding,

announcing that John F. Kennedy had won the presidency. In so announcing his own defeat, Nixon stated,

> This is the first time in 100 years that a candidate for the Presidency announced the result of an election in which he was defeated and announced the victory of his opponent. I do not think we could have a more striking and eloquent example of the stability of our constitutional system and of the proud tradition of the American people of developing, respecting, and honoring institutions of self-government.

107 CONG. REC. 291 (Jan. 6, 1961). And in 2001, after a hard-fought legal dispute over the 2000 presidential election, Vice President Albert Gore Jr. similarly presided over the certification of his opponent, George W. Bush, as President-elect. *See* 147 CONG. REC. 101 (Jan. 6, 2001). Protecting the well-established American tradition of a peaceful transfer of power weighed in favor of prosecution.

> 2.    The substantial federal interest in counting every citizen's vote was served by Mr. Trump's prosecution.

Few federal interests are stronger in our representative democracy than that of protecting every eligible citizen's right to vote and to have that vote counted. The evidence establishes that in contravention of that right, Mr. Trump urged state officials to disregard the legitimate majority of votes for Mr. Biden and instead appoint Mr. Trump's electors; pressured and threatened Georgia's Secretary of State to "find" more than 11,000 votes to dilute the legitimate vote count and allow Mr. Trump to be declared the winner of the state; and urged Mr. Pence to discard the legitimate electoral certificates that reflected millions of citizens' votes in the targeted states.[198] An additional factor meriting Mr. Trump's prosecution therefore was the need to vindicate and protect the voting rights of these and all future voters.

---

[198] *See* ECF No. 252 at 19 & nn.77-82, 29 & n.137, 65 & n.349, 67 & n.364, 71 & nn.392-398, 73-74 & nn.410-411; *supra* at Section I; *see also, e.g.,* SCO-02295943 at 3 (Presidential Daily Diary 11/22/2020); SCO-00767550 at 9-12 (HSC Tr.); SCO-12998394 at 12 (Tr. of Georgia Secretary of State Call 01/02/2021).

The strength of the federal interest in protecting the right to vote is plain from the history of suffrage in America, as chronicled in the Constitution—which has been amended not fewer than five times to extend and protect the franchise for all adult citizens regardless of race, sex, age, and education, *see* U.S. CONST. amend. XIV, § 2 (providing that if a state failed to ensure all eligible citizens the right to vote, the state's proportional representation would be reduced); amend. XV, § 1 ("The right . . . to vote shall not be denied or abridged . . . on account of race, color, or previous condition of servitude."); amend. XIX (same "on account of sex"); amend. XXIV, § 1 (same "by reason of failure to pay any poll tax or other tax"); amend. XXVI, § 1 (same for citizens "who are eighteen years of age or older . . . on account of age")—and a consistent line of court decisions maintaining that suffrage "can neither be denied outright, nor destroyed by alteration of ballots," *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (citations omitted). The strength of the federal interest is further reflected by the history of the Section 241 offense with which Mr. Trump was charged, and, as set forth in Section II.C above, by courts' universal and longstanding recognition of the right protected by that statute. In attempting to disenfranchise voters who did not choose to reelect him, Trump targeted a bedrock fundamental right that the government has a strong interest in protecting.

      3.    <u>The substantial federal interest in protecting election officials and other government officials from violence was served by Mr. Trump's prosecution.</u>

Another federal interest that merited Mr. Trump's prosecution was addressing his resort, throughout the charged criminal conspiracies, to threats and encouragement of violence against his perceived opponents. Consistently, when elected officials refused to take improper actions that Mr. Trump urged, like discarding legitimate votes or appointing fraudulent electors, Mr. Trump attacked them publicly on Twitter, a social media application on which he had more than

80 million followers.[199]  Inevitably, threats and intimidation to these officials followed.[200]  For

instance, after Mr. Trump targeted a Philadelphia City Commissioner in a Tweet criticizing the

Commissioner for stating that there was no evidence of widespread election fraud in

Philadelphia,[201] threats against the Commissioner grew more targeted, more detailed, and more

graphic.[202]  These threats extended to include highly personal information like the names and

ages of the Commissioner's family members, as well as photos or the address of his home.[203]

Fulton County, Georgia, election officials similarly reported receiving threats—including death

threats—following Mr. Trump's false public accusations against Fulton County election

workers.[204]

Mr. Trump also targeted private citizens who served as election workers.  He took

particular aim at a mother and daughter who worked at Atlanta's State Farm Arena counting

ballots on election day; he and his co-conspirators spread pernicious false claims that these

election workers had committed misconduct.[205]  Although the lies were promptly and publicly

---

[199] See ECF No. 252 at 18 & nn.73-76, 20 & n.88, 26-27 & nn.123-126, 28 & n.132, 31 & n.146, 40 & n.206; see, e.g., SCO-00456209, SCO-00715415 (Donald J. Trump Tweet 11/11/2020); SCO-00455691, SCO-12858431 (Donald J. Trump Retweet 11/30/2020); SCO-00455690, SCO-12987528 (Donald J. Trump Tweet 11/30/2020); SCO-00455536, SCO-12858636 (Donald J. Trump Retweet 12/06/2020).

[200] See ECF No. 252 at 21 & nn.92-93, 38 & nn.192-194; SCO-11545129 at 86-88 (Int. Tr.); SCO-00767550 at 52-54 (HSC Tr.).

[201] See ECF No. 252 at 38 & n.193; SCO-12876770 at 02:20-04:13 (Video of Interview with CNN 11/11/2020); SCO-00456209, SCO-12987659 (Donald J. Trump Tweet 11/11/2020).

[202] See ECF No. 252 at 38 & n.194; SCO-11545129 at 87 (Int. Tr.); SCO-04976349 at 02:03:17-02:04:10 (Video of HSC Hearing).

[203] See ECF No. 252 at 38 & n.194; SCO-11545129 at 87 (Int. Tr.); SCO-04976349 at 02:03:17-02:04:10 (Video of HSC Hearing).

[204] SCO-11507432 at 46-50, 57-62 (Int. Tr.); SCO-11528118 at 54-62 (Int. Tr.).

[205] See ECF No. 252 at 25-26 & nn.119-122; SCO-04976332 at 33:30-01:04:37 (Video of Georgia Senate Judiciary Subcommittee Hearing 12/03/2020); SCO-00455601, SCO-12987506 (Donald J. Trump Tweet 12/03/2020); SCO-04976279 at 01:36:58-02:01:58 (Video of Georgia House Committee Hearing 12/10/2020).

debunked,[206] Mr. Trump continued to repeat them,[207] and the election workers were subjected to vile threats. As one of the women explained, "when someone as powerful as the President of the United States eggs on a mob, that mob will come. They came for us with their cruelty, their threats, their racism, and their hats. They haven't stopped even today."[208] Mr. Trump persisted in publicly spreading false and harmful social media posts about the same election workers into 2023.[209] In 2024, Co-Conspirator 1 conceded in a defamation lawsuit filed by the election workers that his statements about them were "defamatory per se" and "false," and a jury awarded them damages of more than $145 million.[210]

Mr. Trump took aim at Mr. Pence when Mr. Pence repeatedly informed Mr. Trump that he could not in good conscience do as Mr. Trump asked. On January 6, this included Mr. Trump's retributive targeting of Mr. Pence during his Ellipse speech and the 2:24 p.m. Tweet attacking Mr. Pence that Mr. Trump issued even though he knew that the riot was ongoing at the Capitol. Taken together, these actions resulted in rioters at the Capitol on January 6 singling out Mr. Pence for their ire and chanting, "Where is Pence? Bring Him Out!"[211] and, "Hang Mike Pence!"[212]

---

[206] SCO-04952956 (Tweet 12/04/2020); SCO-04976277 at 08:44-09:10 (Video of Georgia Secretary of State Press Conference 12/07/2020).

[207] See ECF No. 252 at 26 & n.122; SCO-12998394 at 2 (Tr. of Georgia Secretary of State Call 01/02/2021).

[208] See ECF No. 252 at 25-26 & n.121; SCO-00783640 at 8 (HSC Tr.).

[209] See ECF No. 252 at 26 & n.122; SCO-04963742 (Donald J. Trump Truth Social Post 01/02/2023); SCO-04963743 (Donald J. Trump Truth Social Post 01/03/2023).

[210] Freeman v. Giuliani, No. 21-cv-3354, ECF No. 90 at 1-2 (D.D.C. Aug. 8, 2023) (Def. Stipulation), ECF No. 142 (D.D.C. Dec. 18, 2023) (Final Judgment).

[211] See ECF No. 1 at ¶ 113; see ECF No. 252 at 81 & n.467; SCO-12738318 (Video of Capitol Riot 01/06/2021).

[212] See ECF No. 1 at ¶ 113; see ECF No. 252 at 81 & n.466; SCO-12876211 (Video of Capitol Riot 01/06/2021).

In addition to prompting these threats against the targets of Mr. Trump's criticisms, Mr. Trump's words inspired his supporters to commit acts of physical violence. On January 6, Mr. Trump used his Ellipse speech to direct his supporters to "go[] to the Capitol" and "fight like hell."[213] He explicitly licensed them, not long after Co-Conspirator 1 had exhorted the crowd to engage in "trial by combat,"[214] to operate under "very different rules"[215] because fraud was allegedly involved. And he told them they were "not going to let it happen,"[216] urging them to stop the election certification proceeding that was about to begin.

The people who took Mr. Trump at his word formed a massive crowd that broke onto restricted Capitol grounds and into the building, violently attacking law enforcement officers protecting the Capitol and those inside. Officers have described being assaulted by rioters wielding bear spray, metal bats and flag poles, and other improvised weapons.[217] A Metropolitan Police Department (MPD) commander recounted that the scene was "a non-stop barrage of just strikes, with weapons and things being thrown, and pepper spray, and you name it. Everything being hurled at these [officers]. You could hear them yelling. You could hear them, screams and moans, and everything else."[218] Multiple officers stated that they feared for their lives when among the rioters that day. One MPD officer put that fear at "a hundred percent" from the moment he entered the crowd, and he explained that he thought he might die: "You know, you're

---

[213] *See* ECF No. 252 at 77 & nn.437, 440; SCO-02244118 at 22 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[214] SCO-04949418 at 02:22:07 (Video of Save America Rally 01/06/2021).

[215] SCO-02244118 at 20 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[216] *Id.* at 2.

[217] *See* ECF No. 252 at 82 & nn.475-476; SCO-11506096 at 125-126 (Int. Tr.); SCO-11506269 at 38-39 (Int. Tr.); SCO-12808448 at 127-128 (Int. Tr.); SCO-11520948 at 95-97 (Int. Tr.); SCO-12997436 at 64 (*United States v. Irwin & Richter*, No. 21-cr-589, Trial Day 1 Tr. 01/22/2024).

[218] SCO-11529214 at 98 (Int. Tr.).

getting pushed, kicked, you know, people are throwing metal bats at you and all that stuff. I was like, yeah, this is fucking it."[219]   A U.S. Capitol Police officer similarly recalled thinking, "I think I might die today."[220]   And in one instance, an MPD officer recounted that rioters dragged him into the crowd, where they beat and tased him while yelling things like, "I got one!" and, "Kill him with his gun!"[221]

The January 6 rioters assaulted at least 140 law enforcement officers that day, and at least 123 defendants have been charged with using a deadly or dangerous weapon or causing serious bodily injury to law enforcement.[222]   This violence took a lasting toll.   In addition to the significant physical injuries inflicted that day,[223] officers suffered "unseen injuries," including depression and other forms of psychological trauma.[224]

---

[219] *See* ECF No. 252 at 82 & nn.475-476; SCO-11506096 at 126 (Int. Tr.).

[220] SCO-12807683 at 106-107 (Int. Tr.).

[221] SCO-12919375 at 01:12:28-01:13:50 (Video of Interview from HBO's *Four Hours at the Capitol*, 10/20/2021).

[222] Press Release, U.S. Attorney's Office for the District of Columbia, Three Years Since the Jan. 6 Attack on the Capitol (Jan. 5, 2024), https://www.justice.gov/usao-dc/36-months-jan-6-attack-capitol-0.

[223] SCO-11506096 at 96-99, 134-135 (Int. Tr.) (MPD officer recounting knee injury and concussion from defending against rioters on January 6); SCO-12875808 at 228-230 (*United States v. McCaughey*, No. 21-cr-40, Trial Day 1 Tr. 08/29/2022) (MPD sergeant describing being "bruised, abrased," and "covered in chemical munitions" from January 6); *id.* at 229 (50 percent of sergeant's 30-person platoon injured); SCO-12997205 at 101 (*United States v. Sparks*, No. 21-cr-87, Trial Tr. 02/29/2024) (Capitol Police officer describing concern on January 6 for fellow officers he saw "still irritated from the tear gas, people still coughing, people limping, battered, bruised, bloody," and learning that a fellow officer "had passed away"); SCO-12997436 at 63-64 (*United States v. Irwin & Richter*, No. 21-cr-589, Trial Day 1 Tr. 01/22/2024) (Capitol Police Deputy Chief listing officers' injuries from rioters, including a "serious concussion" and a "near-career-ending leg injury"); SCO-12807683 at 124-125 (Int. Tr.) (Capitol Police officer describing jaw injury and concussion from rioter assault); *id.* at 135 (Capitol Police officer detailing lingering effects of Capitol siege injuries, including persistent migraines, fainting, and imbalance).

[224] SCO-12876218 at 08:53-09:45 (Video of Impact Statement) (MPD officer recounting that "there [were] a lot of unseen injuries," that MPD "has put a lot of effort and resources into getting these officers the help that they need for some of these emotional injuries," and that the events of January 6 had "definitely taken a toll on a lot of the officers over there that day"); SCO-11529214 at 116 (Int. Tr.) (MPD officer stating there were "some people that went through, like, you know, some depression and, like, really some soul-searching"); SCO-12807683 at 16 (Int. Tr.) (Capitol Police officer describing "survivor's guilt" and engaging in officer peer support program); *id.* at 143 (describing officer reactions to January 6, including "shell-shock" and inability to move on from that day); SCO-12919375 at 01:28:00-01:28:20 (Video of MPD Officer's Interview from HBO's *Four Hours at the Capitol*, 10/20/2021) (MPD officer describing that he had a mild heart attack and traumatic brain injury from rioter assaults

Officers at the Capitol understood that if the rioters reached the lawmakers and other staff inside the building violence would have been done to them as well.[225] Only through the heroism of the law enforcement officers who defended the Capitol were lawmakers and their staff protected from harm.[226] Many Members of Congress feared for their lives. Once the rioters breached the Capitol building, "elected representatives, congressional staff, and members of the press hid in terror from the mob" in barricaded offices or unmarked rooms as rioters roamed the hallways. *United States v. Chrestman*, 525 F. Supp. 3d 14, 19 (D.D.C. 2021).[227] For instance, in detailing his efforts to evacuate a U.S. Senator and her staff from an unmarked hiding spot, one

---

on January 6, but what he "most struggle[s] with is, you know, kind of, some of the emotional after-effects, or psychological trauma" of that day).

[225] SCO-11506096 at 107-108 (Int. Tr.) (MPD officer describing effort to keep rioters from entering the Capitol because, for staff inside, that would mean "possible death. People are getting killed, maimed," and adding that while officers "have gear on" and weapons, "someone who just showed up this morning to go to work, who was like a clerk or something, walked in their office . . . they're not ready for that, you know? And if one of these [rioters] get their hands on them, it's over with."); SCO-11529214 at 78-80 (Int. Tr.) (MPD officer describing seeing rioters "trying to beat [officers] up with such ferocity," and wondering, "What are they going to do to somebody else that's in here, that's maybe a staff or a congressman or somebody with the press? How are—what are they going to do to them? You know, like, we can take the beating. And I don't know if these other people can take the beating, too."); SCO-11544684 at 7 (Int. Rep.) (Capitol Police officer recalling that the rioters turned on Vice President Pence and being concerned for Pence's safety inside the Capitol if rioters breached the police line); *see also* SCO-12738295 (Video of Capitol Riot 01/06/2021) (rioters inside the Capitol yelling, "Where are the fucking traitors? Drag 'em out by their fucking hair!" and "Who's first?"); SCO-12738313 (Video of Capitol Riot 01/06/2021) (rioter yelling, "Bring Mitch out! Bring Pelosi out! Bring Schumer out!"); SCO-12738317 (Video of Capitol Riot 01/06/2021) (rioters chanting, "Pence is a traitor!" and, "Traitor Pence! Traitor Pence!"); SCO-12738306 (Video of Capitol Riot 01/06/2021) (rioter yelling, "We're coming for you, Nancy!"); SCO-12738312 at 00:59-01:40 (Video of Capitol Riot 01/06/2021) (rioter inside the Capitol yelling, "Nancy Pelosi! Where you at, Nancy?" and, "Nancy! Where are you, Nancy? We're looking for you!").

[226] *See* 167 CONG. RECORD S5686 (daily ed. Aug. 3, 2021) (statement of Sen. Klobuchar) ("The insurrection at the Capitol was more than an assault on democracy. . . . [I]t was also an actual life-or-death situation for the many brave law enforcement officers who show up here to do their work every day."); *id. at* S5687 (statement of Sen. Blunt) ("I am incredibly grateful for the heroic actions we saw that day [January 6] from the Capitol Police, from the Metropolitan Police, who . . . were here within 10 or 12 minutes of being called."); 167 CONG. RECORD H2790 (June 15, 2021) (statement of Rep. McHenry) ("[T]he brave men and women who stood and faced danger on January 6 deserve to be recognized for their actions. Without their courageous work and their dedication, many of us here today could have been seriously injured or worse.").

[227] *See also* SCO-12919375 at 29:44-30:52, 41:45-43:15 (Video of Interview from HBO's *Four Hours at the Capitol*, 10/20/2021) (Congressional staffer describing hiding under a table from rioters who had breached the Capitol building, hearing rioters banging on the door to the room in which she was barricaded, and fearing she would die that day).

U.S. Capitol Police officer described the Senator as "afraid for her life," "shaking," and "very, very—she was scared."[228] He added that the Senator later relayed to him that what the rioters did on January 6 had "scared and frightened everybody" and had "put a lot of people's lives in danger."[229]

The violence of January 6 was foreseeable to Mr. Trump, who had remarked just the evening before that his supporters were "angry"[230] and who—to cheers of, "Invade the Capitol building!" and, "Take the Capitol!"[231]—had told those supporters during his Ellipse speech to "show strength" and to "be strong."[232] When he told them "we're not going to let it happen," the crowd chanted, "Fight for Trump!"[233] And when he warned his gathered supporters that "if you don't fight like hell, you're not going to have a country anymore,"[234] the crowd marched to the Capitol in response. Indeed, officials and advisors close to Mr. Trump recognized and voiced their concerns over this high potential for election-related violence. On January 4, a Senior Advisor explicitly warned Co-Conspirator 2 that if Mr. Pence unilaterally rejected legitimate electoral votes, it would cause "riots in the streets."[235] Co-Conspirator 2 replied that there had previously been points in the nation's history where violence was necessary to protect the

---

[228] SCO-11520948 at 150-152 (Int. Tr.).

[229] Id. at 151.

[230] See ECF No. 1 at ¶ 98; SCO-00015613 at 155-156.

[231] See ECF No. 252 at 77-78 & n.443; SCO-12876144 at 00:28-00:43 (Rallygoer video 01/06/2021).

[232] See ECF No. 252 at 77-78 & n.442; SCO-02244118 at 6 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[233] See ECF No. 252 at 77 & nn.438-439; SCO-02244118 at 2 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[234] SCO-02244118 at 22 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[235] See ECF No. 252 at 66 & n.356; SCO-00006256 at 130-133; SCO-11522446 at 6 (Int. Rep.); SCO-00790949 at 26 (HSC Tr.).

republic.[236]   On January 5, after Mr. Trump told Mr. Pence that he would have to publicly criticize him, Mr. Pence's Chief of Staff was sufficiently concerned for Mr. Pence's safety that he alerted the head of the Vice President's protective detail.[237]   And a Counsel to the Vice President issued a prescient warning to Co-Conspirator 2 the same day, when he warned that the conspirators' plan would result in a "disastrous situation" where the election might "have to be decided in the streets."[238]   Indeed, as the riot at the Capitol unfolded on January 6, the Vice President's Counsel chided Co-Conspirator 2 that "whipping large numbers of people into a frenzy over something with no chance of ever attaining legal force through actual process of law, has led us to where we are."[239]

There is unquestionably a public interest in ensuring that elected officials and election workers can carry out their duties without fear of threats and retaliation.  *See, e.g.*, Memorandum from Lisa Monaco, Deputy Attorney General, *Guidance Regarding Threats Against Election Workers* (June 25, 2021) ("The right to vote is the cornerstone of our democracy, the right from which all other rights ultimately flow.  For this vital right to be effective, election officials must be permitted to do their jobs free from improper partisan influence, physical threats, or any other conduct designed to intimidate.").  Accordingly, the need to promote this federal interest weighed in favor of proceeding against Mr. Trump.

---

[236] *See* SCO-00006256 at 133; SCO-11522446 at 6 (Int. Rep.); SCO-00790949 at 26 (HSC Tr.).

[237] SCO-11545613 at 165-171 (Int. Tr.).

[238] *See* ECF No. 252 at 69-70 & n.385; SCO-04976350 at 01:26:01-01:26:32 (Video of HSC Testimony).

[239] SCO-00256421 at 2 (Email to Co-Conspirator 2 01/06/2021).

4.    The substantial federal interest in the evenhanded administration of the
law was served by Mr. Trump's prosecution.

There is a substantial federal interest in ensuring the evenhanded administration of the

law with respect to accountability for the events of January 6, 2021, and the Office determined

that interest would not be satisfied absent Mr. Trump's prosecution for his role. Multiple district

court judges have recognized Mr. Trump's role in the events of January 6. *See United States v.*

*Lolos*, No. 21-cr-242, ECF No. 37 at 55-56 (D.D.C. Nov. 19, 2021) (Transcript of Sentencing)

(Court stating that Jan. 6 defendant was "called to Washington, D.C. by an election official; he

was prompted to walk to the Capitol by an elected official" and telling defendant, "I think you

were a pawn, you were a pawn in a game that was played and directed by people who should

have known better"); *United States v. Peterson*, No. 21-cr-309, ECF No. 32 at 23 (D.D.C. Dec. 1,

2021) (Transcript of Sentencing) (Court stating that "incendiary" statements at the Ellipse rally

"absolutely, quite clearly and deliberately, stoked the flames of fear and discontent and explicitly

encouraged those at the rally to go to the Capitol and fight for one reason and one reason only, to

make sure the certification did not happen"); *United States v. Barnard*, No. 21-cr-235, ECF No.

53 at 28 (D.D.C. Feb. 24, 2022) (Transcript of Sentencing) ("The events of January 6th involved

a rather unprecedented confluence of events spurred by then President Trump and a number of

his prominent allies who bear much responsibility for what occurred on that date."). To date,

more than 1,500 people have been criminally charged for their roles in the January 6 attack on

the United States Capitol. With that in mind, Mr. Trump's relative culpability weighed heavily in

favor of charging him, as the individual most responsible for what occurred at the Capitol on

January 6. *See* Justice Manual § 9-27.230.4 (requiring prosecutors to assess the "degree of the

person's culpability in connection with the offense, both in the abstract and in comparison with

any others involved in the offense").

Rioters have cited Mr. Trump as the reason they traveled to Washington, D.C., and went to the Capitol that day. In the weeks before January 6, Mr. Trump issued several Tweets calling his supporters to Washington, D.C., for his rally at the Ellipse, and they answered the call. In the days after Mr. Trump's December 19 Tweet promising that the rally would be "wild," for instance, Kelly Meggs—a member of the Oath Keepers group who was later convicted of seditious conspiracy among other charges—messaged associates that "[i]t's going to be wild. [Trump] wants us to make it wild. That's what he's saying." *United States v. Rhodes*, No. 22-cr-15, ECF No. 815 at 61 (D.D.C. Feb. 21, 2024) (Motion Hearing Tr.). Meggs added, "He called us all to the Capitol, . . . and he wants us to make it wild." *Id.* at 61-62. Rioter David Kuntz—a member of the Three Percenters militia group who would later plead guilty to charges related to breaching the Capitol building—planned travel to Washington, D.C., on January 6 in direct response to the December 19 Tweet. *United States v. Wilson*, No. 23-cr-427, ECF No. 47 at 6-7 (D.D.C. Apr. 17, 2024) (Superseding Indictment). Kuntz later shared Trump's December 27 Tweet, which told supporters, "See you in Washington DC, on January 6th. Don't miss it. Information to follow!" Kuntz commented, "He is asking us to be there," and, "Good he does need us im [sic] going armed period." *Id.* at 11; *see also Wilson*, No. 23-cr-427, ECF No. 95 at 8 (D.D.C. Dec. 2, 2024) (Statement of Offense).

In his Ellipse speech, Mr. Trump explicitly directed his supporters to march on the Capitol. At one point, in reply to a line in his speech that "[w]e will not let them silence your voices; we're not going to let it happen," a portion of the rally crowd chanted, "Fight for Trump! Fight for Trump!"[240] When he repeatedly exhorted his supporters to "walk down"[241] to the U.S.

---

[240] *See* ECF No. 252 at 77 & nn.438-439; SCO-02244118 at 2 (Remarks by Mr. Trump at Save America Rally 01/06/2021); SCO-00747921 at 03:18-03:47 (Rallygoer video 01/06/2021).

Capitol to help prevent Congress's planned certification, they listened.    Law enforcement

witnesses at and near the Capitol on January 6 describe large crowds descending upon Capitol

grounds from the direction of the Ellipse rally.[242]  And video and photographic evidence shows

that hundreds of individuals in attendance at the Ellipse rally were later participants in the

Capitol siege and in some cases were among the most violent of the rioters.[243]

During the siege, Mr. Trump's supporters continued to heed his words.  Video evidence

from that afternoon shows rioters, in real time, crediting Mr. Trump for their presence and

conduct at the Capitol.  For example, as the crowd sought to push past officers protecting the

Capitol's East Front, one rioter shouted: "We were invited here!   We were invited by the

President of the United States!"[244]   Inside, another rioter yelled at officers to "stand down.

You're outnumbered.  There's a fucking million of us out there.  And we're listening to Trump—

---

[241] *See* ECF No. 252 at 77 & n.440; SCO-02244118 at 6, 22 (Remarks by Mr. Trump at Save America Rally 01/06/2021).

[242] SCO-11506096 at 59-62 (Int. Tr.); SCO-11520948 at 71-74 (Int. Tr.).

[243] *See, e.g.*, SCO-12919600 at 27:22-27:26 (Video of Rioter 1 at the Save America Rally 01/06/2021); SCO-12919284 at 03:17-03:18 (Video of Rioter 1 at the Save America Rally 01/06/2021); SCO-12807276 at 03:08-03:14 (Video of Rioter 1 on Capitol Grounds 01/06/2021); SCO-12919212 at 03:17-03:21 (Video of Rioter 1 on Capitol Grounds 01/06/2021); SCO-12919384 at 08:20-08:34 (Video of Rioter 2 in the Capitol Rotunda 01/06/2021); SCO-12919401 at 04:06-04:14 (Video of Rioter 2 walking down Pennsylvania Avenue from the Save America Rally 01/06/2021); SCO-12918732 at 04:29-04:31 (Photograph of Rioter 2 in the Capitol Rotunda 01/06/2021); SCO-12918900 at 00:01-00:07 (Video of Rioter 2 inside the Capitol 01/06/2021); SCO-12919421 at 00:00-00:02 (Video of Rioter 3 in the crowd at the Save America Rally 01/06/2021); SCO-12807145 (Photograph of Rioter 3 on Capitol Grounds 01/06/2021); SCO-12919066 at 02:07-02:10 (Video of Rioter 3 at the Save America Rally 01/06/2021); SCO-12919977 at 23:06-23:10 (Video of Rioter 4 at the Save America Rally 01/06/2021); SCO-12918777 (Photograph of Rioter 4 on Capitol Grounds 01/06/2021); SCO-12807279 at 01:09:28-01:09:55, 01:10:05-01:10:37, 01:10:40-01:11:09 (Video of Rioter 4 on Capitol Grounds 01/06/2021); SCO-12919375 at 01:13:17-01:13:22 (Video of Rioter 4 on Capitol Grounds from HBO's *Four Hours at the Capitol* 01/06/2021); SCO-12916307 at 24:16-25:50 (Video of Rioter 4 inside Capitol Tunnel 01/06/2021); SCO-12918918 at 00:11-00:12 (Video of Rioter 5 at the Save America Rally 01/06/2021); SCO-12919079 (Photograph of Rioter 5 on Capitol Grounds 01/06/2021); SCO-12919419 at 00:33-00:38 (Video of Rioter 5 on Capitol Grounds); SCO-12738292 at 00:24-00:32 (Video of Rioter 5 at the Capitol); SCO-12733719 at 35:17-35:22 (Video of Rioter 5 at the Capitol); SCO-12807327 at 00:00-00:01 (Video of Rioter 6 at the Save America Rally 01/06/2021); SCO-12807375 at 00:49-00:51 (Photograph of Rioter 6 at the Capitol 01/06/2021); SCO-12916338 at 03:00:21-03:00:55 (Video of Rioter 6 at the Capitol 01/06/2021).

[244] SCO-12738326 at 00:03-00:18 (Video of Capitol Riot 01/06/2021).

your boss."[245]  *United States v. Harris*, No. 21-cr-189, ECF No. 84 at 5 (D.D.C. Oct. 20, 2023).

That rioter was later convicted of obstruction and of assaulting an officer, among other

violations.  *Id.* at 11.  As the day wore on, rioters continued to obey Mr. Trump's commands.  At

4:25 p.m.—just eight minutes after Mr. Trump's video Tweet telling supporters that they were

"very special" but should "go home now"—rioter Edward Vallejo, a member of the Oath

Keepers, posted to a group Signal chat that "our commander in chief has just ordered us to go

home."  *Rhodes*, ECF No. 822 at 55 (Sentencing Hearing Tr.).  Another rioter, Jacob Chansley,

played that video Tweet to a crowd at the Capitol and announced that "Donald Trump has asked

everybody to go home."[246]  Chansley left the Capitol at that point—having earlier breached the

Senate chamber, taken a seat at the dais, and declared Vice President Pence to be "a fucking

traitor."  *United States v. Chansley*, No. 21-cr-3, ECF No. 81 at 10-11 (D.D.C. Nov. 9, 2021)

(Gov't Sentencing Memorandum).[247]

After January 6, when rioters began to face accountability for their unlawful acts at the

Capitol, many pointed to Mr. Trump in an attempt to excuse or mitigate their conduct.  For

example, following his arrest on charges stemming from the Capitol siege, rioter Alex Harkrider

sought release from pretrial detention by arguing that "[l]ike thousands of others [at the Capitol],

Mr. Harkrider was responding to the entreaties of the then Commander-in-Chief, former

President Donald Trump."  *United States v. Harkrider*, No. 21-cr-117, ECF No. 16 at 14 (D.D.C.

Apr. 1, 2021) (Def.'s Motion to Revoke Order of Detention); *see also, e.g., United States v.*

---

[245] SCO-12876131 at 02:26-02:33 (Video of Capitol Riot 01/06/2021).

[246] SCO-12918754 at 24:47-27:22 (Video of Capitol Riot 01/06/2021); *id.* at 28:00-28:08 (rioter announcing that he was "going to do as Donald Trump has asked and [he was] going to go home"); SCO-12919861 at 01:55:29-01:55:45 (Video of Capitol Riot 01/06/2021); *id.* at 01:57:20-01:57:34 (rioter announcing that "Donald Trump asked everybody to go home.  So what are we gonna do?  We're going to obey our President; we're gonna do as he asked; and we're gonna go home."); SCO-12876155 (Video outside Capitol 01/06/2021).

[247] *See also* SCO-12916465 (Video of Senate Chamber 01/06/2021).

*Hale-Cusanelli*, No. 21-cr-37, ECF No. 13 at 17 (D.D.C. Mar. 2, 2021) (Def.'s Motion for Modification of Bond) (requesting pretrial release in part because defendant "was responding to the entreaties of the then commander in chief, President Trump"); *Chansley*, No. 21-cr-3, ECF No. 12 at 10 (D.D.C. Feb. 23, 2021) (Motion of Def. for Pretrial Release) (arguing that Chansley was "incited" by Mr. Trump and noting his unsuccessful request for a presidential pardon).  In closing argument at trial on seditious conspiracy and other charges related to January 6, defense counsel unsuccessfully asked the jury to acquit Proud Boys leader Enrique Tarrio because, in part, "[i]t was [Mr. Trump's] anger that caused what occurred on January 6th" and "[i]t was not Enrique Tarrio." *United States v. Nordean et al.*, No. 21-cr-175, Trial Tr. at 19991 (D.D.C. Apr. 25, 2023).  And, at sentencing in January 6 cases, many rioter defendants—whether expressing remorse or not—have sought leniency by blaming Mr. Trump both for their presence at the Capitol and their underlying belief "that the [2020 presidential] election was fraudulent and that they must take action to stop the transition of the presidency."  *United States v. Palmer*, No. 21-cr-328, ECF No. 31 at 8 (D.D.C. Dec. 13, 2021) (Sentencing Memorandum and Motion for Downward Variance); *see also, e.g.*, *United States v. McCaughey*, 21-cr-40, ECF No. 528 at 2 (D.D.C. Feb. 17, 2023) (Def. David Mehaffie's Sentencing Statement); *United States v. Gruppo*, No. 21-cr-391, ECF No. 28-2 at 2 (D.D.C. Oct. 19, 2021) (Def.'s Letter) (citing language of Ellipse rally speech and stating, "I trusted the President and that was a big mistake").

B.    <u>Mr. Trump Was Not Subject to Effective Prosecution in Another Jurisdiction</u>

The next consideration, under the Principles of Federal Prosecution, is whether Mr. Trump was subject to effective prosecution in another jurisdiction.  The Office concluded that a prosecution carried out by a single local authority could not effectively hold him accountable for his efforts targeting the only election for national office.  Although Mr. Trump was theoretically subject to state criminal charges for his conduct, based on the scope and magnitude of Mr.

Trump's alleged crimes, no local prosecution could effectively hold Mr. Trump accountable for his attempts to overturn the valid results of the election, obstruct the congressional certification, and disenfranchise millions of voters. Indeed, all citizens, not just the citizens in the seven contested states that he targeted with his criminal plan, suffered the impact of Mr. Trump's crimes, warranting a federal prosecution accounting for all his conduct and the federal interests it implicated.

In addition, when the Office was making its charging decision in the summer of 2023, no other jurisdiction had initiated charges against Mr. Trump or co-conspirators. After the grand jury returned the original indictment against Mr. Trump in this case, however, he subsequently was also charged with a racketeering conspiracy in Georgia, *Georgia v. Trump*, 23sc188947, Indictment (Fulton County, Ga. Super. Ct. Aug. 14, 2023) (19-defendant case pending since August 2023 in Fulton County Superior Court). Although the forty-count indictment in Fulton County encompasses some of the same core conduct for which Mr. Trump was charged federally in the District of Columbia, its focus is on a conspiracy to commit fraud—that is, to change the outcome of the election—including through false statements to Georgia state legislators and other high-ranking state officials. *See id.* at 16-17. It does not fully address Mr. Trump's alleged criminal conduct in furtherance of a conspiracy to obstruct the January 6 certification proceeding or a conspiracy against voters' rights. As described above, there are strong federal interests in protecting the integrity of the certification proceeding and the right to vote and have one's vote counted.

## C.    There Was No Adequate Non-Criminal Alternative to Prosecution

Given the strong federal interests in holding Mr. Trump accountable described above, the Office could not identify any adequate non-criminal alternative to prosecution. To be sure, because he was President at the time of his alleged offenses, Mr. Trump was subject to

impeachment and was in fact impeached (though he was not convicted). Impeachment, however, was never intended to be a substitute for criminal prosecution. "[T]he Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses—the impeachment trial and a separate criminal trial." *Nixon v. United States*, 506 U.S. 224, 234 (1993). The Impeachment Judgment Clause itself expressly contemplates separate proceedings, stating that the punishment for impeachment and conviction "shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7.

Not only are impeachment and prosecution separate and distinct proceedings, they apply different standards and pursue different objectives. When Congress decides whether a President should be impeached and convicted, that process does not depend on rigorously adjudicating facts and applying law, or on finding a criminal violation. Instead, the impeachment process is, by design, an inherently political remedy for the dangers to governance posed by an office holder who has committed "Treason, Bribery, or other high Crimes and Misdemeanors." U.S. CONST. art. II, § 4. Congress may decide not to impeach or convict for reasons that have little or no connection to the nature of the evidence of the officer's culpable conduct. For example, the political alignment of Congress may prevent impeachment and conviction, without regard to the officer's conduct. Indeed, prior to 2020, no Senator had ever voted to convict an impeached President of the same political party. And in cases like this one, where the President has left office by the time an impeachment trial occurs, Senators may question their authority to convict

regardless of the egregiousness of the conduct at issue. *See, e.g.*, 167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) (statement of Sen. McConnell).

During Mr. Trump's impeachment trial, his counsel insisted that the outcome of the proceeding would have no bearing on any future criminal prosecution, stating, "Clearly, a former civil officer who is not impeached is subject to" criminal prosecution.  167 Cong. Rec. S607 (daily ed. Feb. 9, 2021); *see id.* at S601 (noting that if a President "committed a criminal offense" then "[a]fter he is out of office, you go and arrest him," adding, "[t]he Department of Justice does know what to do with such people").  Senators who voted to acquit Mr. Trump expressed a similar view.  *See, e.g.*, 167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) (statement of Sen. McConnell) (stating that Mr. Trump "is still liable for everything he did while he was in office, as an ordinary citizen," and noting that "[w]e have a criminal justice system in this country").  Thus, even if Mr. Trump had been convicted by the Senate, political accountability, in the form of impeachment, would not have been an adequate alternative for criminal accountability, especially considering the scope of Mr. Trump's offenses and the substantial federal interests they targeted.

D.     Mr. Trump's Conduct Had No Historical Analogue

During pretrial litigation, Mr. Trump contended that his conduct was materially indistinguishable from that of other actors throughout American history—including past Presidents and Vice Presidents—who had either claimed that an election was tainted by fraud or presided over a certification proceeding at the joint session where electoral votes were in dispute. Mr. Trump further argued that because those actors had not been prosecuted for their purportedly similar conduct, it would be unconstitutional to prosecute him for his conduct, because doing so would either violate his right to fair notice, *see* ECF No. 113 at 25-31; ECF No. 114 at 28-31, or result in selective or vindictive prosecution, *see* ECF No. 116 at 6-8.  That is, even accepting that

Mr. Trump engaged in the conduct alleged in the indictment, and that such conduct violated the charged statutes, he maintained that prosecution was improper because it conflicted with historical practice.

The historical episodes that Mr. Trump invoked—arising from elections in 1800, 1824, 1876, 1960, 2000, 2004, and 2016—did not involve similar conduct and did not supply a valid reason to decline to bring charges here. In litigation, the Office addressed each historical episode he cited and explained why none was meaningfully similar to the charged conduct. *See* ECF No. 139 at 40-47; ECF No. 141 at 6-9. Taken together, those episodes showed that "[t]here have been times, as in 1800, 1876, and 1960, when genuine questions have arisen over which slate of electors from a particular state has been duly appointed"; "[t]here have also been times, as in 1824, when the failure of any candidate to obtain a majority of electoral votes has thrown the election to the House of Representatives"; and "there have been times, as in 2000, 2004, and 2016, when those dissatisfied with the results have sought to raise objections to the electoral vote count, resulting in either the objections being overruled or, in one case, a brief adjournment designed as an Ohio-focused protest vote without 'the hope or even the hint of overturning the victory of the President.'" ECF No. 139 at 46-47 (quoting 151 CONG. REC. 199 (Jan. 6, 2005)). But none of the historical episodes at issue involved "any attempt by any person to use fraud and deceit to obstruct or defeat the governmental function that would result in the certification of the lawful winner of a presidential election." *Id.* at 40-47; *see* ECF No. 141 at 6-9.

The district court found that there were no historical analogues to Mr. Trump's alleged criminal conduct. When Mr. Trump filed a motion to dismiss the indictment on a claim that he was being selectively prosecuted because of a historical "track record of similar, unprosecuted, efforts" to challenge elections, *see* ECF No. 116 at 6, the district court rejected it, explaining that

Mr. Trump was "not being prosecuted for publicly contesting the results of the election; he is being prosecuted for knowingly making false statements in furtherance of a criminal conspiracy and for obstruction of election certification proceedings." ECF No. 198 at 5-7. Likewise, in its opinion denying Mr. Trump's immunity motion, the district court found that "none of the contested elections" Mr. Trump "invokes is analogous to this case," as none involved "any allegation that any official engaged in criminal conduct to obstruct the electoral process." ECF No. 171 at 47.

IV.    INVESTIGATIVE PROCEDURE AND POLICY

Upon appointing the Special Counsel, the Attorney General explained that the appointment "underscores the Department's commitment to both independence and accountability in particularly sensitive matters. It also allows prosecutors and agents to continue their work expeditiously, and to make decisions indisputably guided only by the facts and the law." *See* Press Release, Office of Public Affairs, Department of Justice, Appointment of a Special Counsel (Nov. 18, 2022), https://www.justice.gov/opa/pr/appointment-special-counsel-0. The Attorney General also noted that, "[a]lthough the Special Counsel will not be subject to the day-to-day supervision of any official of the Department, he must comply with the regulations, procedures, and policies of the Department." *Id.* The Office conducted its work accordingly.

A.    The Investigative Process[248]

Employing traditional investigative tools, including voluntary interviews, grand jury subpoenas, and search warrants—and subject to the same legal requirements binding on all federal prosecutors—the Office, spanning the period predating the Special Counsel's

---

[248] The Appendix to this Report lists public information about key documents from significant litigation undertaken in the course of the investigation and prosecution.

appointment to the completion of its work, developed a thorough record of independently verified facts on which it based its prosecutive decisions in the Election Case. The investigative record comprised voluntary witness interviews and grand jury testimony from numerous individuals,[249] as well as voluminous records such as emails, text messages, encrypted messages, memoranda, and other documents. These records were obtained through both voluntary productions by dozens of witnesses and through compulsory process and court orders, including grand jury subpoenas directed to witnesses and entities, court orders for non-content information (such as sender, recipient, date, and time) from electronic communications accounts, and search warrants to obtain evidence from physical sources and/or locations, electronic devices, and email and iCloud accounts.[250] The Office also obtained records from other components of the Department of Justice, including the U.S. Attorney's Office for the District of Columbia, and other federal agencies, including the National Archives, Department of Homeland Security, Department of Defense, and Office of the Director of National Intelligence.[251] Further, the

---

[249] This record, including the period predating the Special Counsel's appointment, encompasses voluntary interviews of more than 250 individuals and grand jury testimony from more than 55 witnesses.

[250] Search warrants for electronic devices and accounts, as well as applications to obtain records of electronic communications, must be approved by a federal magistrate or district judge and are held to well-established standards of proof. To obtain a search warrant, for instance, the government must establish that there is probable cause to believe that the location, device, or account to be searched contains evidence of a crime. *See* U.S. CONST. amend. IV (search warrants require "probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"). Other court orders—for instance, those that give the government access to the non-content information described above regarding electronic communications—require a showing that there are reasonable grounds to believe that the information sought is relevant and material to an ongoing criminal investigation. *See* 18 U.S.C. § 2703(d).

[251] The Office's investigation included consideration of the report issued on December 22, 2022, by the U.S. House of Representatives' Select Committee to Investigate the January 6th Attack on the United States Capitol, as well as certain materials received from the Committee. Those materials comprised a small part of the Office's investigative record, and any facts on which the Office relied to make a prosecution decision were developed or verified through independent interviews and other investigative steps. During the prosecution of the Election Case, Mr. Trump alleged that the Select Committee and Special Counsel's Office were one and the same and sought additional discovery about the Select Committee's work. The district court rejected the claim. *See* ECF No. 263 at 47 (concluding that Mr. Trump has "not supplied an adequate basis to consider the January 6 Select Committee part of the prosecution team"). Regardless, the Office provided or otherwise made available to Mr. Trump in discovery all

Office collected more than one terabyte of data from publicly available sources such as social media postings and websites. All discoverable material was provided or made available to Mr. Trump in discovery during the prosecution of the Election Case.

Throughout its work, the Office complied with "the rules, regulations, procedures, practices and policies of the Department of Justice," 28 C.F.R. § 600.7(a), including consulting the Justice Manual, the Department's publicly available guidebook on policies and procedures, and consulting or obtaining requisite approvals from other Department components. For example, as required under the Justice Manual, the Office obtained approvals from the Criminal Division's Office of Enforcement Operations, which provides legal guidance on the use of sensitive law enforcement tools, such as certain subpoenas and search warrants involving attorneys. And as discussed more below, the Office consulted the Criminal Division's Public Integrity Section (PIN), which oversees the investigation and prosecution of federal crimes affecting government integrity, pursuant to Justice Manual requirements pertaining to the service of subpoenas and other process on Members of Congress, the use of election fraud charges, and the Department's Election Year Sensitivities Policy, a longstanding Department policy regarding the conduct of sensitive investigations during an election year.

Even when not required, in accordance with the best traditions of the Department, the Office actively sought advice and guidance from subject matter experts throughout the Department. For example, the Office requested assistance from the Civil Division and Office of Information Policy (OIP) on civil litigation for public access to investigative and prosecutive materials. And the Office conferred with the Office of the Solicitor General (OSG), which is

---

materials received from the Select Committee. *See* ECF No. 263 at 47 ("the Government states that it has already produced all the records it received from the Committee").

responsible for supervising and conducting government litigation in the United States Supreme Court, the Office of Legal Counsel (OLC), which provides binding legal advice to the Executive Branch, and the Criminal Division's Appellate Section, which conducts and oversees the Department's criminal appellate litigation, on complex statutory, constitutional, and other legal issues—including regarding charging decisions in the original and superseding indictments, *see supra* at Section II, Mr. Trump's challenge to the district court's order on extrajudicial statements, *see infra* at Section V.B, Mr. Trump's executive privilege claims, *see infra* at Section V.C, and Mr. Trump's immunity challenge to the indictment, *see infra* at Section V.D.

B.    Investigative and Prosecutive Procedures in an Election Year

Mr. Trump's announcement of his candidacy for President while two federal criminal investigations were ongoing presented an unprecedented challenge for the Department of Justice and the courts. Given the timing and circumstances of the Special Counsel's appointment and the Office's work, it was unavoidable that the regular processes of the criminal law and the judicial system would run parallel to the election campaign. Mr. Trump's position was that when the judicial process conflicted with his election campaign, the courts should always yield; as discussed below, the courts did not agree. Under these unique circumstances, the Department's actions would be criticized by one constituency or another, regardless of which path the investigations took. Accordingly, the Office leaned on established Department policy, practice, and wisdom, and focused on doing its job promptly and thoroughly.

From the outset and throughout its work, the Office recognized the weighty issues presented by the matters under its mandate and operated on the principle that the best interests of the Department and the nation required prompt investigation and decision-making. The Office's exceptional working pace ensured that its investigative work could be completed, charging decisions could be made, and any necessary indictments could be returned by the summer of

2023, long before the election. The Office had no interest in affecting the presidential election, and it complied fully with the letter and spirit of the Department's policy regarding election year sensitivities. It did so through fundamentally sound practices: moving its investigations swiftly, making charging decisions and returning indictments well before the election, litigating its cases on the timetables set by the courts, and consulting with PIN.

        1.    The Department's Election Year Sensitivities Policy

The staff of the Office was deeply familiar with and committed to the Department's election year sensitivities policy, as it included fraud and public corruption prosecutors with many years of experience working in and leading PIN. The Special Counsel himself and one of his Counselors had served as Chief of PIN, two of the attorneys had been deputy chiefs in PIN, and two other attorneys in the Office had been trial attorneys in PIN. Collectively, prosecutors in the Office had many years of experience providing training, advice, and guidance to prosecutors and law enforcement agents throughout the Department on how to comply with the Department's election-related policies. In fact, the Counselor in the Office who had previously served as Chief of PIN was one of the drafters of the first election year sensitivities memorandum issued to Department attorneys.

The Department's policy regarding elections has two overlapping components. The first is focused on the prosecutor's purpose: it prohibits prosecutors from taking any action or timing any action for the purpose of affecting an election. Justice Manual § 9-27.260 and § 9-85.500. That flat prohibition applies to all actions by prosecutors and at all times during an investigation or prosecution. The second and overlapping component focuses on safeguarding the Department's reputation for fairness and nonpartisanship, requiring that prosecutors take

particular care in an election year and consult with PIN when an action is "likely to raise an issue or the perception of an issue." Justice Manual § 9-85.500.[252]

These policies are well-established within the Department. In 2008, in the wake of allegations and investigations concerning politicization in the Department,[253] and recognizing that there was uncertainty regarding the terms of the Department's policies and practices in election years, the Criminal Division and PIN evaluated the feasibility of establishing a specific and definitive set of rules regarding the duty to avoid interference with elections in the run-up to an election. While prosecutors had long been advised to exercise particular care in politically sensitive cases in the two or three months immediately prior to an election, the Department had never had a formal 60-day or 90-day rule that governed such situations.[254] As part of its evaluation in 2008, the Department considered whether to codify a particular rule, but ultimately concluded that the best course was, instead, to provide guidance in the form of an Attorney General Memorandum addressing the need for particular care to protect the Department's reputation for impartiality in an election year, and setting forth in writing the core principle that prosecutors and agents may not act for a political purpose.

---

[252] The Department's election-related policies were first developed in the context of investigations involving ballot fraud, where PIN's Election Crimes Branch has for decades maintained a written non-interference policy that applies only in the context of ballot fraud investigations. *See Federal Prosecution of Election Offenses* (8th ed. 2017) at 84-85. That policy, which precludes certain investigative actions in a ballot fraud investigation until after the election to which the investigation relates is completed and certified, was codified in the Justice Manual in August 2022. *See* Justice Manual § 9-85.300. Because the 2020 presidential election had been completed and certified before our investigation began, the ballot fraud policy had no application to the Office's work.

[253] *See* Joint Report of the Department of Justice, Office of Professional Responsibility and Office of the Inspector General, *An Investigation of Allegations of Politicized Hiring by Monica Goodling and Other Staff in the Office of the Attorney General* (July 28, 2008), https://oig.justice.gov/sites/default/files/legacy/special/s0807/final.pdf.

[254] The background regarding the election year sensitivities policy and the so-called "60-day rule" was reviewed by the Department of Justice Office of the Inspector General in its June 2018 report, *A Review of Various Actions by the Federal Bureau of Investigation and the Department of Justice in Advance of the 2016 Election*, at 16-18, https://oig.justice.gov/sites/default/files/reports/18-04.pdf.

On March 5, 2008, Attorney General Michael Mukasey issued the first Election Year Sensitivities Memorandum setting forth this guidance.  In relevant part, the Attorney General Memorandum stated:

> Department of Justice employees are entrusted with the authority to enforce the laws of the United States and with the responsibility to do so in a neutral and impartial manner.  This is particularly important in an election year.  Now that the election season is upon us, I want to remind you of the Department's existing policies with respect to political activities.
>
> …
>
> The Department of Justice has a strong interest in the prosecution of election fraud and other election-related crimes, such as those involving federal and state campaign finance laws, federal patronage laws, and corruption of the election process.  As Department employees, however, we must be particularly sensitive to safeguarding the Department's reputation for fairness, neutrality and nonpartisanship.
>
> Simply put, politics must play no role in the decisions of federal investigators or prosecutors regarding any investigations or criminal charges.  Law enforcement officers and prosecutors may never select the timing of investigative steps or criminal charges for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party.  Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution.
>
> If you are faced with a question regarding the timing of charges or overt investigative steps near the time of a primary or general election, please contact the Public Integrity Section of the Criminal Division for further guidance.

Memorandum from Michael Mukasey, Attorney General, *Election Year Sensitivities* (Mar. 5, 2008).

Since 2008, Attorneys General have issued memoranda containing substantially the same guidance to prosecutors and agents in each election year.[255]  In August 2022, just three months

---

[255] *See* Memorandum from William Barr, Attorney General, *Election Year Sensitivities* (May 15, 2020) (adding language to the Election Year Sensitivities memorandum to make clear that the policy applied not only to investigative and charging actions, but also to public statements by prosecutors and law enforcement agents).

before the Attorney General appointed the Special Counsel, the Department codified its election

year policies in the Justice Manual:

> Federal prosecutors and agents may never select the timing of any action,
> including investigative steps, criminal charges, or statements, for the purpose of
> affecting any election, or for the purpose of giving an advantage or disadvantage
> to any candidate or political party.  Such a purpose is inconsistent with the
> Department's mission and with the Principles of Federal Prosecution.  *See*
> § 9-27.260.  Any action likely to raise an issue or the perception of an issue under
> this provision requires consultation with the Public Integrity Section, and such
> action shall not be taken if the Public Integrity Section advises that further
> consultation is required with the Deputy Attorney General or Attorney General.

Justice Manual § 9-85.500; *see also id.* § 9-27.260 (adding the election year sensitivities policy

to the Principles of Federal Prosecution).

Implementation of the election year sensitivities policy can raise challenging questions.

Taking action may be viewed as hurting a candidate, while refraining from action may be viewed

as helping that candidate.  This challenging landscape counsels in favor of structuring and timing

investigations in a manner that enables prosecutors and agents to avoid these issues as much as

possible and do what they do best: focus on the needs of the case.  Consistent with that, PIN

often counsels prosecutors to move their investigations along promptly and avoid unnecessary

delay that could needlessly place them in the position of deciding whether to take overt action or

bring charges in the period immediately before an election.  Because of the Office's deep

familiarity and experience with these policies, it focused on completing both of its investigations

promptly and making timely charging decisions, long before the election.

2.    Pre-Indictment Procedures

During the investigation and prosecution of this case, the Office consulted regularly with

PIN.  For example, because the Election Case involved election fraud charges under 18 U.S.C.

§§ 241 and 371, the Office consulted with PIN and its Election Crimes Branch prior to returning

the Election Case indictment in the District of Columbia, as required by Justice Manual § 9-85.210 (Violations of Campaign Financing Laws, Federal Patronage Laws, and Corruption of Elections—Consultation Requirement). In addition, the Office consulted with PIN regarding investigative steps that involved gathering evidence connected to congressional staff, pursuant to Justice Manual § 9-85.110 (Investigations Involving Members of Congress). As discussed below in Section V.A.2, the Office also consulted PIN regarding issues that arose in litigation involving the Speech or Debate Clause, U.S. CONST. art. I, § 6, cl. 1, a unique constitutional protection that provides a form of immunity to legislative acts by Member of Congress and their staff. *See, e.g., In re Press Application for Access to Judicial Records Ancillary to Certain Grand Jury Proc. Concerning Former Vice President Mike Pence*, No. 23-mc-35, ECF No. 11-5 at 19 (D.D.C. June 9, 2023) (publicly released Mar. 27, 2023, Memorandum Opinion) (application of Speech or Debate privilege to Vice President when acting as President of the Senate); *In re Sealed Case*, 80 F.4th 355 (D.C. Cir. 2023) (application of Speech or Debate privilege to search of congressman's cell phone). However, because the Office proceeded expeditiously with its investigations and charging decisions, no election year sensitivities consultation with PIN was required prior to returning the original indictment in either the Classified Documents Case in June of 2023 or the Election Case in August of 2023.

3.    Post-Indictment Procedures

The two components of the Department's election year sensitivities policy play out differently in the context of post-indictment litigation. First, the bedrock principle that prosecutors may not take any action for the purpose of affecting an election or providing an advantage or disadvantage to any candidate or party applies fully during post-indictment litigation. On this score, the Office did not take a single action at any time for any such purpose;

rather, the Office's mission was at all times to uphold the law and carefully follow the requirements of the criminal justice process.

Unlike the purpose-focused component of Department policy, the component that focuses on the Department's reputation for impartiality stands on a different footing with respect to pre-indictment and post-indictment activity. This component of the policy applies fully to the timing of actions by prosecutors prior to indictment—bringing charges, taking overt investigative steps, and making public statements. Justice Manual § 9-85.500. For such actions, prosecutors must take election year sensitivities into account, and they are required to consult with PIN. *Id.* However, once the case is charged, this component of the policy does not limit the ability to litigate according to the schedule set down by the court and does not require consultation with PIN for such litigation. Whether it is during an election year or any other time, the duty of prosecutors after indictment is to litigate their cases fully and zealously, consistent with the Constitution, United States Code, Federal Rules of Criminal Procedure, rules of professional responsibility, and dictates of the calendar set forth by the court. *See CNN This Morning, Garland Comments on Trump Case*, CNN.COM - TRANSCRIPTS (Jan. 19, 2024), https://transcripts.cnn.com/show/ctmo/date/2024-01-19/segment/02 [https://perma.cc/HD2R-6U8Y] (the "[p]rosecutor has urged speedy trials, with which I agree. And it's now in the hands of the judicial system, not in our hands."). Once a case is charged, no policy of the Department limits the ability of prosecutors to litigate effectively on the schedule set by the court, and that is what the Office did.

Consistent with the Department's policy, after indictment, the Office litigated the Election Case according to the schedules set down by the district court, the D.C. Circuit, and the

Supreme Court.[256]  Given the gravity of the issues presented by the charges, the Office sought to move the case forward expeditiously for two central reasons unrelated to the election.  First, the Speedy Trial Act mandates expeditious resolution of criminal cases, and it does so not only for the benefit of the accused, but in the best interest of the public.  *See Zedner v. United States*, 547 U.S. 489, 501 (2006) ("[T]he [Speedy Trial] Act was designed with the public interest firmly in mind."); *Strunk v. United States*, 412 U.S. 434, 439 n.2 (1973) ("The public interest in a broad sense, as well as the constitutional guarantee, commands prompt disposition of criminal charges."); *Cobbledick v. United States*, 309 U.S. 323, 325 (1940) ("[E]ncouragement of delay is fatal to the vindication of the criminal law.").  Second, those fundamental interests were heightened in this case, which raised matters of utmost gravity, urgency, and national concern, charging the former President with conspiring to thwart the peaceful transfer of power through lies that undermined the democratic process and ultimately fueled a violent attack on the United States Capitol.  These criminal charges warranted prompt and fair disposition, and that is what the Office sought to achieve.

Both during the investigation and after the case was charged, however, Mr. Trump sought to delay the proceedings, taking the position that when the judicial process conflicted with his election campaign, the courts should always yield.  *See, e.g.*, ECF No. 30 at 11 (proposing April

---

[256] The Office did the same in the Classified Documents Case in the Southern District of Florida, litigating the case according to the calendar set by the court.  Trial had been set for May 20, 2024, but in late February, the court ordered the parties to submit proposals for a new schedule and held a conference to discuss them, including proposals for new trial dates.  *See United States v. Trump*, No. 23-cr-80101, ECF No. 338 (S.D. Fla. Feb. 27, 2024); *Trump*, No. 23-cr-80101, ECF No. 369 (S.D. Fla. Mar. 1, 2024).  Before responding to the court, the Office confirmed with PIN its own understanding that the election year sensitivities policy did not apply to post-indictment litigation or require an election year sensitivities consultation before requesting a new trial date.  The Office then proposed a trial date of July 8, 2024, while Mr. Trump proposed August 12, 2024.  But the court never set a new trial date.  *See id.*, ECF Nos. 356 & 357 (S.D. Fla. Feb. 29, 2024).  PIN later advised the Office that prosecutors who request a trial date closer in time to an election than the July date that the Office proposed could be required to consult with PIN.  In any event, the Office consulted regularly with PIN, and PIN agrees that the Office complied fully with the election year sensitivities policy in both of its cases.

2026 trial date, emphasizing that "[n]o major party presidential candidate has ever been charged while in the middle of a campaign"); ECF No. 103 at 20 (Mr. Trump's counsel arguing, "The easiest solution to all of this is an obvious one. . . . and that is to adjourn the case after the presidential election. That's the solution."); ECF No. 242 at 7-8 (asking court to reconsider scheduling order, emphasizing that "President Trump is the leading candidate in the Presidential election, which is just weeks away").

The courts did not agree. They consistently rejected Mr. Trump's efforts to delay or stop the proceedings. The courts' words and actions throughout the litigation reflected their fundamental commitment to the operation of the judicial process, notwithstanding the election campaign. *See, e.g.*, ECF No. 38 at 53 ("the public has a right to a prompt and efficient resolution of this matter"); ECF No. 29 at 41 ("the fact that the defendant is engaged in a political campaign is not going to allow him any greater or lesser latitude than any defendant in a criminal case"); *id.* at 15 ("And so what the defendant is currently doing—you know, the fact that he's running a political campaign currently has to yield to the orderly administration of justice."); *id.* at 19 ("I cannot, and I will not, factor into my decisions the effect it's going to have on a political campaign for either side."); *United States v. Trump*, 88 F.4th 990, 1018 (D.C. Cir. 2023) ("Delaying the trial date until after the election, as Mr. Trump proposes, would be counterproductive, create perverse incentives, and unreasonably burden the judicial process."); *id.* at 1016 ("But there is another fundamental constitutional interest at stake here. The existence of a political campaign or political speech does not alter the court's historical commitment or obligation to ensure the fair administration of justice in criminal cases. A trial participant's engagement in political speech cannot degrade or diminish that essential judicial function."); *Trump*, No. 23-3228, Per Curiam Order (D.C. Cir. Dec. 13, 2023) (expediting briefing and oral

argument); *Trump*, No. 23-3228, Judgment (D.C. Cir. Feb. 6, 2024) (accelerating the schedule for Mr. Trump to seek any further review).

The Office also sought to move the Election Case forward expeditiously in the Supreme Court based upon the public interest in a prompt resolution of the case and the precedent set by the Watergate Special Prosecutor in *United States v. Nixon*, 418 U.S. 683 (1974) (*Nixon*), where the Court "granted both the United States' petition for certiorari before judgment (No. 73-1766), and also the President's cross-petition for certiorari before judgment (No. 73-1834), because of the public importance of the issues presented and the need for their prompt resolution . . . ." *Id.* at 686-687 (citations omitted). The Office filed a petition for certiorari before judgment, which would have moved the Election Case directly to the Supreme Court from the district court, and argued that the Court should follow the *Nixon* model. The Supreme Court did not grant the Office's petition for certiorari before judgment. However, like the D.C. Circuit, the Supreme Court ultimately expedited its consideration of the case, further confirming the Office's emphasis on the strong public interest in a prompt resolution.[257]

Following the Supreme Court's immunity decision, the Office again proceeded in a manner that was fully consistent with the letter and spirit of the Department's election year

---

[257] After the D.C. Circuit issued its opinion affirming the district court, Mr. Trump filed a motion in the Supreme Court to stay the Circuit's issuance of its mandate until he could file, and the Supreme Court could resolve, a petition for certiorari that he intended to file in the Supreme Court. *See Trump v. United States*, No. 23A745, Application for a Stay of the D.C. Circuit's Mandate Pending the Filing of a Petition for Writ of Certiorari (U.S. Feb. 12, 2024). In response to that motion, the Office again pointed to the significant public interest in a prompt resolution of the case, and argued that the Supreme Court should either deny the stay or, as an alternative manner of moving the case promptly, treat Mr. Trump's motion as a petition for certiorari, grant the petition, and set the case for expedited briefing and argument. *See Trump*, No. 23A745, Resp. in Opp'n to Application for a Stay of the Mandate of the United States Court of Appeals for the D.C. Circuit (U.S. Feb. 14, 2024). The Supreme Court adopted the Office's alternative proposal and set an argument and briefing schedule to complete the litigation in the October Term, which ended on July 1, 2024. *See Trump*, No. 23-939, Order Granting Petition (U.S. Feb. 28, 2024). Briefing was completed by April 15, 2024, the Supreme Court held oral argument on April 25, 2024, and the Supreme Court issued its immunity opinion remanding for further proceedings on July 1, 2024. *See Trump*, 603 U.S. at 642.

sensitivities policy: litigating the case according to the schedule established by the district court, taking action based upon the law and the best interests of the case, and consulting with PIN. Upon receiving the decision, the Office immediately began a multi-faceted process to determine the best way forward, including (1) a thorough evaluation of the opinion itself; (2) an exhaustive and detailed review of the evidence and the allegations in the original indictment to determine whether there was sufficient non-immune evidence to support the charges in light of the opinion; (3) once the Office determined that there was sufficient non-immunized evidence, an evaluation of whether to litigate the case based on the existing grand jury record and indictment or instead, seek a superseding indictment that would be presented to a grand jury that had not heard any immunized evidence; and (4) given the timing, evaluate whether all of the necessary steps could be undertaken consistent with the election year sensitivities policy.  The Office determined that that there was sufficient non-immunized evidence to support the charges and that the best course of action for the case was to obtain a superseding indictment that implemented the Supreme Court's holding in *Trump*, and present that new indictment to a grand jury that had not heard evidence of immunized conduct.  *See* ECF No. 228 (Notice of Superseding Indictment).  Before doing so, the Office consulted with PIN for two purposes: (1) to obtain PIN's concurrence regarding the proposed election fraud charges under 18 U.S.C. §§ 241 and 371, as required by Justice Manual § 9-85.300; and (2) given the timing of the superseding indictment, to consult with PIN regarding election year sensitivities, pursuant to Justice Manual § 9-85.500 and the Attorney General's Election Year Sensitivities Memorandum.  PIN concurred with the return of the superseding indictment, which was returned by the grand jury on August 27, 2024.

Following the superseding indictment, and consistent with the district court's instructions, on August 30, 2024, the parties submitted their positions regarding the schedule for

pretrial proceedings.  ECF No. 229.  The Office proposed that it file an opening brief regarding immunity in which it would provide detailed information without which the court could not undertake the factbound analysis that was required by the Supreme Court's remand.  The Office argued that its filing would include the information that the defense would need to address and that the district court would need to make its immunity determinations—regarding both the allegations in the superseding indictment and the evidence that the Office would introduce at trial—in a manner that would avoid the prospect of multiple interlocutory appeals.  *Id.* at 2-3.  Were the defense to file first on remand, it would leave a large gap in the analysis that the district court was required to undertake because only the Office could identify all of the evidence upon which the charges were based and upon which it would rely at trial.  *See* ECF No. 232 at 12-15 (Transcript of Hearing).  The Office did not propose a particular date for filing its immunity brief or a schedule for conducting the immunity litigation.  It left those matters to the court's discretion.  Mr. Trump proposed that the immunity litigation should not begin until December 2024.

The district court issued an order setting a new schedule for pretrial litigation and directing the Office to file its opening immunity brief on September 26, 2024.  *See* ECF No. 233. Prior to filing its immunity brief, the Office again confirmed with PIN that the election year sensitivities policy did not apply to conducting such post-indictment litigation according to the court's schedule and that the Justice Manual did not require consultation with PIN regarding such litigation.  And after the Office filed its immunity brief and Mr. Trump attempted to delay its public disclosure, the district court again rejected his attempt to conflate the election and the criminal justice process:

> In addition to the assertions discussed above, Defendant's opposition brief repeatedly accuses the Government of bad-faith partisan bias.  *See* Def.'s Opp'n

at 2, 5-6. These accusations, for which Defendant provides no support, continue a pattern of defense filings focusing on political rhetoric rather than addressing the legal issues at hand. *See* Oversized Brief Order at 2-3 (identifying two recent instances of this pattern). Not only is that focus unresponsive and unhelpful to the court, but it is also unbefitting of experienced defense counsel and undermining of the judicial proceedings in this case.

ECF No. 251 at 7.[258]

Throughout its work, the Office was focused entirely on its mandate to uphold the law, and nothing more. The career prosecutors in the Office conducted its investigation and prosecution in a manner that complied fully with the Department's policies regarding election year sensitivities.

## V.    INVESTIGATIVE CHALLENGES AND LITIGATION ISSUES

In a corruption or conspiracy investigation, it is not unusual for a subject or target of the investigation to continue to wield significant influence over, or command strong loyalty from, potential witnesses, often complicating the ability of prosecutors to obtain evidence. That dynamic was amplified in this case given Mr. Trump's political and financial status, and the prospect of his future election to the presidency. As described below, one company resisted a lawful court order issued during the Office's investigation, and important witnesses made the choice to assert privileges against providing evidence based on their own official positions in the government. In addition, after his indictment, Mr. Trump used his considerable social media presence to make extrajudicial comments—sometimes of a threatening nature—about the case, and the Office was forced to pursue litigation to preserve the integrity of the proceeding and

---

[258] On October 17, 2024, Mr. Trump filed a motion, ECF No. 264, to delay public disclosure of the Office's appendix to its immunity brief until after Mr. Trump had filed his own appendix on November 14, nine days after the 2024 presidential election, such that both appendices would be released publicly simultaneously. Because Mr. Trump filed his motion before obtaining the Office's position, the Office emailed the district court's chambers, copying defense counsel, to inform the court that the Office did not object to that procedure.

prevent witness intimidation. Mr. Trump also was able to raise claims of executive privilege and presidential immunity. This section discusses each of those challenges and how the Office addressed them.

      A.    <u>Pre-Indictment Litigation with Third Parties</u>

          1.    <u>The Twitter/X Search Warrant</u>

Mr. Trump's public statements—and specifically, his posts on the social media application Twitter—constituted important potential evidence of his criminal conduct and intent. Accordingly, on January 17, 2023, the Office applied for, and the district court authorized, a search warrant requiring Twitter to provide certain information regarding Mr. Trump's Twitter account. *In re Twitter Search Warrant*, No. 23-sc-31, ECF No. 32 at 1-2 & n.1, 5 (D.D.C. Mar. 3, 2023) (Twitter Decision). At the same time, as is common in non-public criminal investigations to prevent individuals under investigation from destroying evidence or otherwise hampering the process, the Office asked the district court to issue a non-disclosure order (NDO), which would direct Twitter that it could not inform Mr. Trump that the Office was seeking information regarding his account. *Id.* at 6. The district court granted the request and issued the NDO. *Id.*

The search warrant required Twitter's compliance within ten days of its issuance, but the day before that deadline, its Senior Director of Legal informed the Office that "it would not comply with the Warrant by the next day." *Id.* at 7-9. Shortly thereafter, Twitter's Senior Director of Legal further informed the Office that it would not comply with the warrant "without changes to the NDO" permitting Twitter to notify Mr. Trump of the warrant. *Id.* at 9. Twitter claimed that the NDO impinged on its First Amendment interests in communicating with the former President, which, according to Twitter, were heightened because the warrant purportedly could implicate issues of executive privilege though it conceded that it had no standing to raise

any privilege issues. *Id.* at 24. The district court later described Twitter's actions as "extraordinary" and noted that its resistance to the NDO appeared to be a first in the company's history. *Id.* at 1 ("For what appears to be the first time in their nearly seventeen-year existence as a company . . . [Twitter] seeks to vacate or modify an order, issued under the Stored Communications Act . . . commanding that the company not disclose the existence of a search warrant for a user's Twitter account, and further seeks to condition any compliance by the company with that search warrant on the user (or user's representatives) first being notified about the warrant and given an opportunity to stop or otherwise intervene in execution of the warrant.").

The Office promptly moved in district court to have Twitter show cause why it should not be held in contempt of court, asking the district court to impose a penalty that doubled with each day of non-compliance, starting at $50,000. *Id.* at 9, 12. In rejecting Twitter's basis for refusing to comply with the warrant, the district court emphasized that the search warrant and NDO had been "issued by this Court after being apprised of extensive reasons sufficient to establish probable cause for issuance of the warrant and to meet the statutory requirements for an NDO, to which reasons Twitter is neither privy nor entitled to be privy." *Id.* at 2. The district court rejected Twitter's contentions, finding that there existed compelling government interests to maintain the NDO to preserve the integrity of the investigation, *id.* at 17-26, and that as a practical matter, "[i]f accepted, Twitter's argument would invite repeated litigation by Twitter and other [electronic communication services] providers to challenge NDOs in order to alert users to [Stored Communications Act] orders, particularly for high profile, highly placed users, such as current or former government officials, with whom the providers might want to curry

favor, with concomitant and inevitable delays in execution of [Stored Communications Act] orders and resultant frustration in expeditiously conducting criminal investigations," *id.* at 11.

The district court ultimately held that the NDO lawfully prohibited Twitter from notifying Mr. Trump about the warrant and fined Twitter $350,000 for failing to comply with the court-ordered search warrant in a timely fashion, finding that Twitter failed to show good faith and substantial compliance in response to the warrant. *Id.* at 30-34. The sanction and NDO were both upheld by the D.C. Circuit, and the Supreme Court declined to review the case. *In re Sealed Case*, 77 F.4th 815, 830 (D.C. Cir. 2023), *cert. denied sub nom. X Corp. v. United States*, 2024 WL 4426628 (U.S. Oct. 7, 2024) (upholding NDO where the order was narrowly tailored and "the district court specifically found reason to believe that disclosure of the warrant would jeopardize the criminal investigation"); *id.* at 836 (holding that the "sanction ultimately imposed was not unreasonable, given Twitter's $40-billion valuation and the court's goal of coercing Twitter's compliance").

### 2.     Legislative Privilege Under the Speech or Debate Clause

The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. CONST. art. I, § 6, cl. 1. The Clause affords members of Congress a number of distinct protections, including a testimonial privilege that guarantees that a member "may not be made to answer" questions about his or her legislative acts. *Gravel v. United States*, 408 U.S. 606, 616 (1972). During the investigation, former Vice President Pence (in his capacity as President of the Senate) invoked his privilege under the Speech or Debate Clause. Through litigation over the scope and applicability of the claimed privilege, the Office obtained important evidence.

After the grand jury subpoenaed Mr. Pence to testify about Mr. Trump's alleged efforts to overturn the results of the 2020 election, Mr. Pence moved to quash the subpoena, invoking the

Speech or Debate Clause. *In re Press Application*, No. 23-mc-35, ECF No. 11-1 at 1 (D.D.C. June 9, 2023). Mr. Pence argued that the Vice President should receive the protections of the Speech or Debate Clause when acting in his constitutional capacity as President of the Senate, as he did while presiding over the joint session of Congress on January 6, 2021. *Id.* at 2. According to Mr. Pence, the Speech or Debate Clause therefore foreclosed questioning before the grand jury about his legislative acts relating to the joint session. *Id.* at 2-3.

The Chief Judge of the United States District Court for the District of Columbia, who presides over grand jury matters in that district, denied "in large part" Mr. Pence's motion to quash. *Id.*, ECF No. 11-5 at 19. The court held "that, while the Clause does apply to the Vice President, it does not cover the vast majority of what the Special Counsel seeks to ask him about." *Id.* at 1. The court determined that although the Speech or Debate Clause foreclosed questioning about Mr. Pence's legislative acts, much of the conduct the Office sought to question Mr. Pence about did not qualify as legislative acts under the Speech or Debate Clause, including, for example, Mr. Trump's "conversations exhorting Pence to reject electors on January 6th." *Id.* at 16. The court concluded that the Speech or Debate Clause precluded government questioning in two subject areas: (1) Mr. Pence's drafting and recitation of the statement he made on the floor of the Senate on January 6; and (2) internal advice from Mr. Pence's staff about the scope of his authority on January 6. *Id.* at 18-19. Neither the Office nor Mr. Pence appealed the district court's ruling.[259]

---

[259] The Government also litigated Speech or Debate Clause issues against a Member of Congress. In August 2022, before the Special Counsel was appointed, based on judicial findings of probable cause that evidence of crimes would be found on the personal cell phone of Representative Scott Perry, the Government obtained warrants to seize and search the cell phone of Representative Perry. *See In re Sealed Case*, 80 F.4th at 360. Because of *United States v. Rayburn House Office Bldg.*, 497 F.3d 654 (D.C. Cir. 2007), a case in which the D.C. Circuit held that the Speech or Debate Clause required the government to allow a Member of Congress to review and assert claims of privilege over materials seized from his office before it could access and review the materials, the Government gave

B.    Threats and Harassment of Witnesses

A significant challenge that the Office faced after Mr. Trump's indictment was his ability and willingness to use his influence and following on social media to target witnesses, courts, and Department employees, which required the Office to engage in time-consuming litigation to protect witnesses from threats and harassment.

Mr. Trump's resort to intimidation and harassment during the investigation was not new, as demonstrated by his actions during the charged conspiracies. A fundamental component of Mr. Trump's conduct underlying the charges in the Election Case was his pattern of using social media—at the time, Twitter—to publicly attack and seek to influence state and federal officials, judges, and election workers who refused to support false claims that the election had been stolen or who otherwise resisted complicity in Mr. Trump's scheme. After Mr. Trump publicly assailed these individuals, threats and harassment from his followers inevitably followed. *See* ECF No. 57 at 3 (one witness identifying Mr. Trump's Tweets about him as the cause of specific and graphic threats about his family, and a public official providing testimony that after Mr. Trump's Tweets, he required additional police protection). In the context of the attack on the Capitol on January 6, Mr. Trump acknowledged that his supporters "listen to [him] like no one else."[260]

---

Representative Perry a copy of the contents of his phone so that he had an opportunity to claim the Speech or Debate privilege over the materials before the Government accessed them. *Id.* After Representative Perry did so, and after litigation in both the district court and the D.C. Circuit, *see generally id.*; *see also In re Sealed Case*, No. 23-3001, Doc. 2031508 (D.C. Cir. Dec. 14, 2023), and *In re Scott Perry Cell Phone Search Warrant*, No. 22-sc-2144, Memorandum Opinion at 1 (D.D.C. Dec. 19, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/22-sc-2144%20-%20Opinion.pdf [https://perma.cc/5PPD-JH68], the Government obtained records—including encrypted messages between Representative Perry and Co-Conspirator 4—that it intended to use at trial prior to the Supreme Court's decision on presidential immunity. *See, e.g.*, SCO-12946533 (Signal messages between Co-Conspirator 4 and Perry 01/02/2021). Irrespective of that decision, the records would have been admissible in a trial of Mr. Trump's co-conspirators.

[260] SCO-04958191 at 7 (CNN Town Hall Tr. 05/10/2023); SCO-04976309 at 13:28-14:35 (CNN Town Hall Video 05/10/2023).

The same pattern transpired after Mr. Trump's indictment in the Election Case. As the D.C. Circuit later found, Mr. Trump "repeatedly attacked those involved in th[e] case through threatening public statements, as well as messaging daggered at likely witnesses and their testimony," *Trump*, 88 F.4th at 1010. Those attacks had "real-time, real-world consequences," exposing "those on the receiving end" to "a torrent of threats and intimidation" and turning their lives "upside down." *Id.* at 1011-1012. The day after his arraignment, for example, Mr. Trump posted on the social media application Truth Social, "IF YOU GO AFTER ME, I'M COMING AFTER YOU!" *Id.* at 998. The next day, "one of his supporters called the district court judge's chambers and said: 'Hey you stupid slave n[****]r[.] * * * If Trump doesn't get elected in 2024, we are coming to kill you, so tread lightly b[***]h. * * * You will be targeted personally, publicly, your family, all of it.'" *Id.*[261] Mr. Trump also "took aim at potential witnesses named in the indictment," *id.* at 998-999, and "lashed out at government officials closely involved in the criminal proceeding," as well as members of their families, *id.* at 1010-1011.

To protect the integrity of the proceedings, on September 5, 2023, the Office filed a motion seeking an order pursuant to the district court's rules restricting certain out-of-court statements by either party. *See* ECF No. 57; D.D.C. LCrR 57.7(c). The district court heard argument and granted the Office's motion, finding that Mr. Trump's public attacks "pose a significant and immediate risk that (1) witnesses will be intimidated or otherwise unduly influenced by the prospect of being themselves targeted for harassment or threats; and (2) attorneys, public servants, and other court staff will themselves become targets for threats and harassment." ECF No. 105 at 2. Because no "alternative means" could adequately address these

---

[261] *See also United States v. Shry*, 23-cr-413 (S.D. Tex.) (threats made against the district court judge presiding over the Election Case).

"grave threats to the integrity of these proceedings," the court prohibited the parties and their counsel from making public statements that "target (1) the Special Counsel prosecuting this case or his staff; (2) defense counsel or their staff; (3) any of this court's staff or other supporting personnel; or (4) any reasonably foreseeable witness or the substance of their testimony." *Id.* at 3. The court emphasized, however, that Mr. Trump remained free to make "statements criticizing the government generally, including the current administration or the Department of Justice; statements asserting that [he] is innocent of the charges against him, or that his prosecution is politically motivated; or statements criticizing the campaign platforms or policies of [his] current political rivals." *Id.* at 3.

Mr. Trump appealed, and the D.C. Circuit affirmed in large part, finding that Mr. Trump's attacks on witnesses in this case posed "a significant and imminent threat to individuals' willingness to participate fully and candidly in the process, to the content of their testimony and evidence, and to the trial's essential truth-finding function," with "the undertow generated by such statements" likely to "influence other witnesses" and deter those "not yet publicly identified" out of "fear that, if they come forward, they may well be the next target." *Trump*, 88 F.4th at 1012-1013. Likewise, "certain speech about counsel and staff working on the case poses a significant and imminent risk of impeding the adjudication of th[e] case," since "[m]essages designed to generate alarm and dread, and to trigger extraordinary safety precautions, will necessarily hinder the trial process and slow the administration of justice." *Id.* at 1014.

The court of appeals explained that the district court's order "involve[d] the confluence of two paramount constitutional interests: the freedom of speech guaranteed by the First Amendment and the federal courts' vital Article III duty to ensure the fair and orderly administration of justice in criminal cases." *Id.* at 996. Balancing these interests, the court

explained, required consideration of three related questions: "(1) whether the Order is justified by a sufficiently serious risk of prejudice to an ongoing judicial proceeding; (2) whether less restrictive alternatives would adequately address that risk; and (3) whether the Order is narrowly tailored, including whether the Order effectively addresses the potential prejudice." *Id.* at 1007. Because "the record amply support[ed]" the district court's finding that, "'when [Mr. Trump] has publicly attacked individuals including on matters related to this case, those individuals are consequently threatened and harassed,'" *id.* at 1012 (quoting ECF No. 105 at 2), and because "[n]o less-speech-restrictive alternative could viably protect against the imminent threat to the participation of witnesses, trial participants, and staff in this criminal matter, or the full, fair, and unobstructed receipt of relevant evidence," *id.* at 1017, the court affirmed the decision to "impose[] some limitation on trial participants' speech," *id.* at 1016.  Indeed, "[g]iven the record in this case, the [district] court had a duty to act proactively to prevent the creation of an atmosphere of fear or intimidation aimed at preventing trial participants and staff from performing their functions within the trial process." *Id.* at 1014.  The court of appeals therefore affirmed the district court's order to the extent that it prohibited parties and their counsel from making "public statements about known or reasonably foreseeable witnesses concerning their potential participation in the investigation or in this criminal proceeding," or "public statements about—(1) counsel in the case other than the Special Counsel, (2) members of the court's staff and counsel's staffs, or (3) the family members of any counsel or staff member—if those statements are made with the intent to materially interfere with, or to cause others to materially interfere with, counsel's or staff's work in this criminal case, or with the knowledge that such interference is highly likely to result." *Id.* at 1027-1028.  To ensure that going forward the order

was as narrowly tailored as possible, the court vacated the district court order "to the extent it cover[ed] speech beyond those specified categories." *Id.* at 1028.

### C.    Mr. Trump's Claims of Executive Privilege

A time-consuming investigative challenge that the Office faced was Mr. Trump's broad invocation of executive privilege to try to prevent witnesses from providing evidence on a wide variety of topics. Mr. Trump asserted a form of executive privilege known as the presidential-communications privilege—a special privilege belonging to Presidents that the Supreme Court has found derives from the Constitution's design of the Executive Branch and separation of powers, *see Nixon v. GSA*, 433 U.S. 425, 446-447 (1977) (*GSA*); *Nixon*, 418 U.S. at 708—with respect to fourteen Executive Branch officials. Mr. Trump's repeated assertion of the presidential-communications privilege as a basis to withhold evidence required extensive pre-indictment litigation that delayed the Office's receipt of important testimony and other evidence, including testimony from senior White House staff and Executive Branch officials about topics such as Mr. Trump's knowledge that he had lost the election and the pressure campaign Mr. Trump waged against the Vice President to convince him to reject legitimate elector slates at the January 6 certification proceeding.

The courts uniformly rejected Mr. Trump's privilege assertions seeking to deny the grand jury from hearing evidence from Executive Branch employees, *see* Media Access ECF No. 32-2 (No. 22-gj-25, Memorandum Opinion, Sept. 28, 2022);[262] Media Access ECF No. 32-6 (Memorandum Opinion, Nov. 19, 2022); Media Access ECF No. 32-11 (No. 22-gj-39, Memorandum Opinion, Dec. 9, 2022); Media Access ECF No. 32-15 (No. 23-gj-12,

---

[262] "Media Access ECF" refers to previously sealed documents that were made public in redacted form in *In re Application of the New York Times*, 22-mc-100 (D.D.C.), litigation brought by the media for access to materials from the executive-privilege litigation.

Memorandum Opinion, Mar. 15, 2023); Media Access ECF No. 32-17 (No. 23-gj-13, Memorandum Opinion, Mar. 25, 2023), finding that the evidence was "directly relevant, important, and essential" to the Office's investigation, as well as unavailable elsewhere, *e.g.*, Media Access ECF No. 32-15 at 33, 45.   In each instance, the courts determined that the "importance and unavailability" of that "vital" evidence "outweigh[ed]" the qualified privilege for presidential communications and ordered that it be produced promptly to the grand jury. Media Access ECF No. 32-2 at 30.  And when Mr. Trump tried to delay the investigation even further by seeking to stay orders denying his executive privilege claims pending appeal, district and appellate courts rejected all of them.   In so doing, one court held that Mr. Trump was engaging in an "obvious" effort to delay the investigation and impede the grand jury from carrying out its constitutional responsibilities, Media Access ECF No. 32-4 at 6-8 (No. 22-gj-25, Memorandum Opinion, Oct. 6, 2022), and separately observed that staying proceedings risked indefinite delay, *see* Media Access ECF No. 32-8 at 9 (No. 22-gj-33, Memorandum Opinion, Dec. 18, 2022) ("The Court thus declines to further pause the grand jury's constitutionally protected work, particularly in the absence of any reassurance that the former president's delay tactics will cease.").  Another court concluded that Mr. Trump's claim that the impact of delay on the investigation would be "nominal" was a "vast understatement," noting instead that it "would be . . . serious and deleterious" and would "harm[] the public interest."  Media Access ECF No. 32-16 at 34 (No. 23-gj-12, Hearing Transcript, Apr. 3, 2023).

The presidential-communications privilege covers evidence "that reflect[s] presidential decisionmaking and deliberations and that the President believes should remain confidential."  *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).   The law on the presidential-communications privilege derives from the Supreme Court's decision in *Nixon*.  There, the Court

recognized a "presumptive privilege for Presidential communications," which it described as "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." 418 U.S. at 708. But the Court held that the privilege is qualified, not absolute, *id.* at 706-707, emphasizing "our historic commitment to the rule of law," which is "nowhere more profoundly manifest than in our view that the twofold aim of criminal justice is that guilt shall not escape or innocence suffer," *id.* at 708-709 (citation, quotations, and alterations omitted). Specifically, the Court "weigh[ed] the importance of the general privilege of confidentiality of Presidential communications in performance of the President's responsibilities against the inroads of such a privilege on the fair administration of criminal justice," *id.* at 711-712, and it concluded that "[t]he generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial," *id.* at 713. The D.C. Circuit has applied the same general standard to grand jury subpoenas. *See In re Sealed Case*, 121 F.3d at 756.

Most of the executive privilege litigation in this case took place in five sealed proceedings between August 2022 and March 2023 concerning the testimony of fourteen witnesses in total. *See* Media Access ECF No. 32 (notice attaching district court orders and memorandum opinions). In August 2022, before the Special Counsel was appointed, the Government began to seek evidence from two former Executive Branch employees of Mr. Trump's, including by issuing subpoenas for testimony before the grand jury. *See* Media Access ECF No. 32-2. Although the Government believed it unlikely that the information that it sought from these witnesses was subject to the presidential-communications privilege because it did not concern presidential decision-making, in an abundance of caution given the unprecedented

118

circumstance of investigating the former President, the Government made certain notifications to determine whether executive privilege would be a contested issue.

Specifically, with the district court's permission, the Government notified Mr. Trump and the incumbent President about the subpoenas to ascertain whether either would assert executive privilege and identified certain potential topics of investigative inquiry.[263]    The Government chose to notify both the sitting and former Presidents even though it was unsettled under *GSA* whether a former President's view about potential harm to Executive Branch confidentiality interests could supersede the sitting President's.    *See GSA*, 433 U.S. at 449.    The incumbent President responded through the White House Counsel's Office that he did not intend to assert executive privilege.[264]    Mr. Trump instructed the two witnesses that they should not provide testimony about any privileged communications, and he specifically identified the presidential-communications privilege. *See* Media Access ECF No. 32-2 at 9-10.[265]

After the witnesses withheld testimony pursuant to Mr. Trump's instruction, the Government filed a motion to compel with the Chief Judge of the United States District Court for the District of Columbia.    Given that the investigation focused largely on Mr. Trump's activities as a candidate seeking office, not his official activities as President, the Government believed that it was likely that many if not all the communications at issue were not subject to the presidential-communications privilege because they were not made in the process of arriving at

---

[263] *See, e.g.*, SCO-11533730 (Letter to Trump Attorney) (identifying topics covering, among other things, potential fraud or irregularities regarding the 2020 presidential election, the January 6 rally at the Ellipse, the congressional certification on January 6, and co-conspirators).

[264] *See* SCO-00007123 at 2 (Letter from the White House Counsel's Office to U.S. Attorney for the District of Columbia 06/27/2022).    Throughout its existence, the Office conducted its work in full compliance with the Department's Policy on Communications with the White House. *See, e.g.*, Memorandum from Merrick Garland, Attorney General, *Department of Justice Communications with the White House* (July 21, 2021).

[265] *See* SCO-12921102, SCO-11545866 at 2 (Letters from Trump Attorney to Witness Counsel).

presidential decisions. *See* Media Access ECF No. 32-2 at 17. As the Supreme Court has explained, the presidential-communications privilege "is limited to communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *GSA*, 433 U.S. at 449 (citation, quotations, and alterations omitted). But the Government's position was that the district court did not have to decide whether the communications at issue were subject to the privilege and instead could assume that the communications were privileged and find that the Government had overcome any privilege that would apply to presidential communications because it had made the showing of need for the evidence required under *Nixon*. Under D.C. Circuit precedent, to make the required showing of need, the Government had to establish that the testimony withheld by the witnesses likely contained important evidence that was not available to the grand jury with due diligence elsewhere. *In re Sealed Case*, 121 F.3d at 754.

After briefing and argument, the district court granted the Government's motion to compel. *See* Media Access ECF No. 32-1 (Order, Sept. 28, 2022). The court found that the witnesses possessed "unique and inimitable evidence," Media Access ECF No. 32-2 at 28-29, that was "important and relevant to the grand jury's investigation," Media Access ECF No. 32-1 at 2. The court concluded that the witnesses possessed "vital evidence for the grand jury, the importance and unavailability of which outweigh the presidential-communications privilege in this case." *Id.* at 30. The district court subsequently denied a motion by Mr. Trump for a stay pending appeal. Media Access ECF No. 32-4 at 6-8 (No. 22-gj-25, Memorandum Opinion, Oct. 6, 2022); *see* Media Access ECF No. 32-3 (No. 22-gj-25, Order, Oct. 6, 2022). The court of appeals also denied a stay pending appeal and later dismissed the appeal as moot. *See* Docket, *In re Sealed Case*, No. 22-3073 (D.C. Cir. 2023).

In the following months, the Government filed two more motions to compel testimony from three additional witnesses. *See* Media Access No. 32-6 (No. 22-gj-33, Memorandum Opinion, Nov. 19, 2022); Media Access No. 32-11 (No. 22-gj-39, Memorandum Opinion, Dec. 9, 2022). The district court granted the motions, making findings with respect to each witness that the Government had made a showing of need to overcome the qualified privilege for presidential communications. *See* Media Access ECF Nos. 32-5, 32-6 (No. 22-gj-33, Order and Memorandum Opinion, Nov. 19, 2022); Media Access ECF Nos. 32-10, 32-11 (No. 22-gj-39, Order and Memorandum Opinion, Dec. 9, 2022). The district court also denied stays pending appeals. *See* Media Access ECF Nos. 32-7, 32-8 (No. 22-gj-33, Order and Memorandum Opinion, Dec. 18, 2022); Media Access ECF Nos. 32-12, 32-13 (No. 22-gj-29, Order and Memorandum Opinion, Jan. 10, 2023).

After the appointment of the Special Counsel, it became clear—given the scope of the grand jury's investigation and the need to obtain evidence from a number of former Executive Branch officials—that seeking to compel testimony from one or two witnesses at a time would be inefficient and would unduly delay the investigation. The Office therefore decided to consolidate the proceedings to the extent possible and filed two additional motions to compel that covered the remaining eight Executive Branch officials who had communicated through their attorneys that they would withhold testimony from the grand jury based on executive privilege. The district court granted the motions, making findings with respect to each individual witness that, as noted above, they "possess[ed] vital evidence for the grand jury, the importance and unavailability of which outweigh[ed] the presidential communications privilege." Media Access ECF No. 32-15 at 45; Media Access ECF No. 32-17 (No. 23-gj-13, Memorandum Opinion, Mar. 25, 2023). The district court also denied stays pending appeals. *See* Media

Access ECF No. 32-16; Media Access ECF No. 32-18 (23-gj-13, Transcript of Hearing, Apr. 10, 2023). Subsequently, the court of appeals denied stays pending appeals in both cases, dismissed one of the appeals as moot, and granted Mr. Trump's motion to voluntarily dismiss the other appeal. *See* Docket, *In re Sealed Case*, No. 23-3043 (D.C. Cir. 2023); Docket, *In re Sealed Case*, No. 23-3049 (D.C. Cir. 2023).

D.    Presidential Immunity

Before this case, no court had ever found that Presidents are immune from criminal responsibility for their official acts, and no text in the Constitution explicitly confers such criminal immunity on the President. As set forth below, prior criminal investigations by the Department of Justice, whether conducted through special prosecutors, independent counsels, or special counsels, had examined whether Presidents had violated federal criminal law through use of their official powers, and none of those investigations had regarded former Presidents as immune from criminal liability for their official acts. The Office proceeded from the same premise.

Soon after the original indictment issued in the Election Case, Mr. Trump raised a claim of immunity in a motion to dismiss the indictment. The district court denied the immunity motion, and the court of appeals affirmed. The Supreme Court, however, vacated the court of appeals' judgment based on its conclusion that Presidents have absolute immunity for core official conduct that Congress lacks power to regulate; at least presumptive immunity for other official presidential acts; and no immunity for unofficial conduct. The Court then applied that test to hold that certain conduct alleged in the indictment was immune, while remanding for application of its legal framework to the remaining allegations. *Trump*, 603 U.S. at 593. The Office responded by obtaining a superseding indictment to comply with the Court's decision and

by seeking district court rulings that the charged conduct and expected evidence at trial was not shielded by immunity.

This section summarizes the chronology of the immunity litigation and key findings of the courts throughout. Because the immunity litigation unfolded on the public record, this discussion provides an overview; the Office's briefs and judicial decisions contain more detailed analysis.

1.    Prosecutorial Decisions During the Charging Stage

This Office conducted its investigation against the background of the Department's prior legal determinations with respect to the potential criminal liability of a former President for official acts. The longstanding view of the Department was that the Constitution's separation of powers precludes prosecution of a sitting President for official or unofficial acts. *See* Memorandum from Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000) (2000 OLC Opinion); Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973) (1973 OLC Opinion). But that same legal conclusion recognizes that former Presidents could be held criminally liable for conduct undertaken while in office. 2000 OLC Opinion at 255 & n.32, 257. The Department's constitutional analysis of the "temporary" immunity of a sitting President, *id.*, drew no distinction between official acts and unofficial conduct.

Consistent with that analysis, former Department of Justice prosecutors had historically investigated presidential conduct based on the understanding that no criminal immunity would bar prosecution if the President had used his official powers to violate federal criminal law. Significantly, no President whose conduct was investigated (other than Mr. Trump) ever claimed

absolute criminal immunity for all official acts.  During the Watergate investigation, for example, prosecutors examined whether President Nixon was liable for the obstruction-of-justice conspiracy charged against the Watergate conspirators.  Although President Nixon was not indicted, the grand jury named him as a co-conspirator, *United States v. Nixon*, 418 U.S. 683, 687 (1974), and in the Supreme Court, President Nixon acknowledged his exposure to prosecution after leaving office, *see United States v. Nixon*, Nos. 73-1766, 73-1834, 1974 WL 174855, Resp. Brief at *98 (U.S. June 21, 1974) ("While out of necessity an incumbent President must not be subject to indictment in order for our constitutional system to operate, he is not removed from the sanction of the law.  He can be indicted after he leaves office at the end of his term or after being 'convicted' by the Senate in an impeachment proceeding.").  Similarly, President Ford's pardon of President Nixon rested on both Presidents' understanding that President Nixon was exposed to criminal liability.  *See Trump v. United States*, No. 23-939, 2024 WL 1592669, Brief for the United States at 15-16 (U.S. Apr. 8, 2024) (Gov't Sup. Ct. Brief) (collecting sources).  Later, Independent Counsel Lawrence Walsh and Special Counsel Robert S. Mueller III conducted investigations into presidential conduct.  1 Lawrence E. Walsh, *Final Report Of The Independent Counsel For Iran/Contra Matters: Investigations and Prosecutions*, ch. 27 (Aug. 1993); 2 Robert S. Mueller III, Special Counsel, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (Mar. 2019) (Mueller Report).  Neither investigation reflected the view that presidents, after leaving office, were immune from prosecution for their official acts.  *See* Mueller Report at 168-181 (analyzing constitutional separation-of-powers issues and statutory clear-statement issues before concluding that the President was not categorically exempt from criminal law for his official acts); *see also* Gov't Sup. Ct. Brief at 17 (quoting Walsh Report: "a past President" can be "subject to prosecution in

appropriate cases"). And counsel for former President Trump stated at his second Senate impeachment trial that declining to convict him on the article of impeachment alleging conduct related to January 6 would not place him in "any way above the law" because a former President "is like any other citizen and can be tried in a court of law." 2 Proceedings of the U.S. Senate in the Impeachment Trial of Donald John Trump, S. Doc. No.117-2, at 144 (2021); 167 Cong. Rec. S667, S693 (daily ed. Feb. 12, 2021) ("[T]he text of the Constitution . . . makes very clear that a former President is subject to criminal sanction after his Presidency for any illegal acts he commits."). This Office made its investigative and prosecutorial decisions based on the same understanding.

The conduct at issue in the Election Case involved both unofficial and official conduct. Much of the former President's alleged conduct involved actions in his private capacity as a defeated candidate for reelection seeking to overturn the result—*e.g.*, his coordinated conduct with his personal attorneys, campaign staff, and other private advisors. Such private conduct does not implicate constitutional functions of the presidency. Other alleged conduct, however, did involve the former President's misuse of official authority—including using the power of the presidency directly by exercising his authority over agencies and personnel in the Executive Branch. In determining to bring charges in the Election Case, the Office therefore examined the former President's amenability to prosecution for that conduct through the lens of two doctrines: the separation of powers under the Constitution and clear-statement principles that limit the application of criminal statutes to presidential conduct in certain circumstances. The Office

concluded that neither the separation of powers nor clear-statement principles barred prosecution for the limited instances of official conduct at issue.[266]

That determination was consistent with similar conclusions reached by Special Counsel Mueller after detailed constitutional and statutory analysis; his report concluded that "Congress can validly regulate the President's exercise of official duties to prohibit actions motivated by a corrupt purpose" and that clear-statement principles of statutory interpretation did not apply to preclude application of criminal obstruction statutes to corrupt presidential conduct. Mueller Report at 168-181. Based on the same principles and legal frameworks, the Office's analysis determined that the potential charges—conspiracy to defraud the United States, conspiracy and substantive obstruction-of-justice offenses, and conspiracy to deprive citizens of voting rights— would not entail application of the statutes in a manner that burdened presidential prerogatives, and thus that the application of criminal law triggered neither clear-statement principles nor separation-of-powers concerns.

### 2. Immunity Litigation

On October 5, 2023, Mr. Trump filed a motion to dismiss the indictment based upon a sweeping claim of presidential immunity for all official conduct during his presidency. ECF No. 74. After briefing, on December 1, 2023, the district court rejected Mr. Trump's claim of immunity, concluding that "[t]he Constitution's text, structure, and history" do not support the contention that the President is absolutely immune from prosecution for criminal acts performed within his official responsibilities and that "[n]o court—or any other branch of government—has ever accepted" such a contention. *United States v. Trump*, 704 F. Supp. 3d 196, 206 (D.D.C.

---

[266] The Office addressed separation of powers and clear-statement principles in the district court, *see* ECF No. 109 at 32-34, and the Supreme Court, *see Trump*, No. 23-939, Brief for the United States at 26-31. Neither the district court nor the majority opinion in the Supreme Court addressed the application of clear-statement principles to the charges in the case.

2024).  The court held that a former President "may be subject to federal investigation, indictment, prosecution, conviction and punishment for any criminal acts undertaken while in office," *id.*, that "[e]xempting former Presidents from the ordinary operation of the criminal justice system" would "undermine the foundation of the rule of law," *id.* at 217, and that Mr. Trump's "four-year service as Commander in Chief did not bestow on him the divine right of kings to evade the criminal responsibility that governs his fellow citizens," *id.* at 219.

The district court reasoned that the prospect of federal criminal liability for a former President did not impair the Executive's ability to perform its constitutionally mandated functions, "either by imposing unacceptable risks of vexatious litigation or otherwise chilling the Executive's decision-making process," and that "it is likely that a President who knows that their actions may one day be held to criminal account will be motivated to take greater care that the laws are faithfully executed." *Id.* at 210.  With respect to the possible chilling effect that criminal liability might have on a President, the court concluded that "the possibility of future criminal liability might encourage the kind of sober reflection that would reinforce rather than defeat important constitutional values.  If the specter of subsequent prosecution encourages a sitting President to reconsider before deciding to act with criminal intent, that is a benefit, not a defect." *Id.* at 213.

Mr. Trump appealed the district court's ruling.  The D.C. Circuit heard oral argument on January 9, 2024.  In a telling exchange, counsel for Mr. Trump acknowledged that, under his theory of immunity, a President could not be criminally prosecuted for ordering SEAL Team Six to assassinate a political rival unless Congress had first impeached and convicted that President for the same conduct. *See* Sup. Ct. J.A. 131-132.  Less than a month after argument, the court of appeals affirmed the district court's decision, stating, "We cannot accept that the office of the

127

Presidency places its former occupants above the law for all time thereafter." *Trump*, 91 F.4th at 1200. In a unanimous opinion, the court stated that "our analysis is 'guided by the Constitution, federal statutes and history,' as well as 'concerns of public policy.'" *Id.* at 1189 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 747 (1982) (*Fitzgerald*)). "Relying on these sources," the court rejected each of Mr. Trump's "potential bases for immunity both as a categorical defense to federal criminal prosecutions of former Presidents and as applied to this case in particular." *Id.* With respect to the case before it, the court stated that "former President Trump's alleged efforts to remain in power despite losing the 2020 election were, if proven, an unprecedented assault on the structure of our government." *Id.* at 1199. As such, it "would be a striking paradox if the President, who alone is vested with the constitutional duty to 'take Care that the Laws be faithfully executed,' were the sole officer capable of defying those laws with impunity." *Id.* at 1198 (quoting U.S. CONST. art II, § 3, cl. 1).

Like the district court, the court of appeals found that "the risk of criminal liability chilling Presidential action appears to be low" and that "[i]nstead of inhibiting the President's lawful discretionary action, the prospect of federal criminal liability might serve as a structural benefit to deter possible abuses of power and criminal behavior." *Id.* at 1196 (citing with approval the district court's observation that "[e]very President will face difficult decisions; whether to intentionally commit a federal crime should not be one of them"). Based on the safeguards in place to prevent baseless indictments applicable to all citizens, the court similarly found that "the risk that former Presidents will be unduly harassed by meritless criminal prosecutions appears slight." *Id.* at 1197.

More broadly, the court of appeals' evaluation of our system of separated powers led it to conclude "that there is no functional justification for immunizing former Presidents from federal

prosecution in general or for immunizing former President Trump from the specific charges in the Indictment." *Id.* at 1200. Because it concluded that Mr. Trump did not have immunity for the crimes or conduct charged in the case, the court of appeals did not decide whether every allegation in the indictment constituted an official act. However, the court noted that "because the President has no official role in the certification of the Electoral College vote, much of the misconduct alleged in the Indictment reasonably can be viewed as that of an office-*seeker*— including allegedly organizing alternative slates of electors and attempting to pressure the Vice President and Members of the Congress to accept those electors in the certification proceeding." *Id.* at 1205 n.14 (emphasis in original). The court therefore found it "doubtful that all five types of conduct alleged in the indictment constitute official acts." *Id.*

In a divided decision, the Supreme Court vacated the court of appeals' judgment and remanded the case for further proceedings. *Trump*, 603 U.S. at 642.[267] The Supreme Court weighed the competing constitutional considerations differently than the lower courts. While the lower courts and the dissenting Justices placed greater emphasis on rule of law considerations, the majority found that the need for Presidents to act "boldly and fearlessly" in executing their duties of office was of paramount importance. *Id.* at 640.

---

[267] Justice Sotomayor, who authored a dissenting opinion joined by Justices Kagan and Jackson, described the majority opinion as follows:

> The Court effectively creates a law-free zone around the President, upsetting the status quo that has existed since the Founding. This new official-acts immunity now "lies about like a loaded weapon" for any President that wishes to place his own interests, his own political survival, or his own financial gain, above the interests of the Nation. *Korematsu v. United States*, 323 U.S. 214, 246 (1944) (Jackson, J., dissenting). The President of the United States is the most powerful person in the country, and possibly the world. When he uses his official powers in any way, under the majority's reasoning, he now will be insulated from criminal prosecution. Orders the Navy's Seal Team 6 to assassinate a political rival? Immune. Organizes a military coup to hold onto power? Immune. Takes a bribe in exchange for a pardon? Immune. Immune, immune, immune.

*Trump*, 603 U.S. at 684-685 (Sotomayor, J., dissenting).

The Court reasoned that there "'exists the greatest public interest' in providing the President with 'the maximum ability to deal fearlessly and impartially with the duties of his office,'" "free from undue pressures and distortions." *Id.* at 610, 615 (citation and quotations omitted). The Court found that "[c]riminally prosecuting a President for official conduct undoubtedly poses a far greater threat of intrusion on the authority and functions of the Executive Branch than simply seeking evidence in his possession" and that the threat of a criminal prosecution was "plainly more likely to distort Presidential decisionmaking" than a civil suit. *Id.* at 613. In responding to the dissenting Justices' concerns that the vast immunity that the Court provided opened the door to lawless behavior by Presidents in violation of their duty to faithfully execute the law, the Court assessed that a President who uses official power to violate the law was a less likely "prospect" than "an Executive Branch that cannibalizes itself, with each successive President free to prosecute his predecessors, yet unable to boldly and fearlessly carry out his duties for fear that he may be next." *Id.* at 640.

The Court rejected the lower courts' view that established safeguards such as the Department of Justice's "longstanding commitment to the impartial enforcement of law," a neutral grand jury, the requirement in criminal law that the Government must prove its case beyond a reasonable doubt, courts enforcing "existing principles of statutory construction and as-applied constitutional challenges," and certain President-specific defenses like the "public-authority defense or the advice of the Attorney General," would adequately protect a former President charged with criminal wrongdoing. *Id.* at 635-637. Instead, the Court placed greater weight on the risk to the administration of government from excessive caution by a President who might face criminal accountability for official acts, reasoning that "[w]ithout immunity, such types of prosecutions of ex-Presidents," for example over claims of insufficient

enforcement of federal law, "could quickly become routine," thus "enfeebling" the presidency through "such a cycle of factional strife." *Id.* at 640.

In conducting its balancing, the majority placed greater weight than did the dissents or the lower courts on the importance of protecting the independence and fearlessness of the President as opposed to the risk that immunity would encourage lawless behavior. *Contrast id.* at 614 ("Such an immunity is required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution.") *with* 91 F.4th at 1198 ("The risks of chilling Presidential action or permitting meritless, harassing prosecutions are unlikely, unsupported by history and 'too remote and shadowy to shape the course of justice.'" (citing *Clark v. United States*, 289 U.S. 1, 16 (1933))) *and* 704 F. Supp 3d at 213 ("Consequently, to the extent that there are any cognizable 'chilling effects' on Presidential decision-making from the prospect of criminal liability, they raise far lesser concerns than those discussed in the civil context of *Fitzgerald*. Every President will face difficult decisions; whether to intentionally commit a federal crime should not be one of them.").

Ultimately, the Supreme Court ruled that for official powers entrusted exclusively to the President, a President is entitled to absolute criminal immunity and that for other acts "within the outer perimeter of his official responsibility" he is entitled to at least presumptive immunity. *Id.* at 613-614. Specifically, the Court divided presidential acts into three categories: (1) core presidential conduct that Congress has no power to regulate and for which a former President has absolute immunity; (2) other official presidential acts for which the President has at least presumptive immunity; and (3) unofficial conduct for which the President has no immunity. *Id.* at 606, 642. Applying those principles to the original indictment, the Supreme Court concluded that Mr. Trump is "absolutely immune from prosecution for the alleged conduct involving his

discussions with Justice Department officials" and involving his "threatened removal of the Acting Attorney General." *Id.* at 620-621. The Court also concluded that several conversations between Mr. Trump and the Vice President constituted official conduct, but remanded for consideration of whether the Office could rebut the presumption of immunity. *Id.* at 624-625. As to several other allegations—involving interactions with state officials, private parties, and the public—the Court remanded for the lower courts to determine whether the conduct was undertaken in an official capacity or, alternatively, constituted a private scheme with private actors, as the Office contended. *Id.* at 625-627.

The Court also added an evidentiary rule to its immunity framework: official conduct for which the President is immune may not be used as evidence in a prosecution for non-immune conduct. *Id.* at 630-632. The Court was concerned that "jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Id.* at 631. Justice Barrett joined the dissenters in disagreeing with that rule, noting, "The Constitution does not require blinding juries to the circumstances surrounding conduct for which Presidents *can* be held liable." *Id.* at 655 (emphasis in original) (Barrett, J., concurring in part). Standard evidentiary rules, she explained, "are equipped to handle that concern [about prejudice from admitting evidence of a President's official acts] on a case-by case-basis." *Id.* at 656. "I see no need," she wrote, "to depart from that familiar and time-tested procedure here." *Id.*

### 3. Unresolved Issues Regarding Presidential Immunity

The Supreme Court's decision raises several issues about the scope of presidential immunity that the lower courts, and ultimately the Supreme Court, would likely have had to address before the prosecution could have proceeded to trial. The following discussion illustrates some of the issues that the Court's immunity decision left open and that remain unresolved given the required dismissal of the superseding indictment.

132

First, while the Court determined that certain core exercises of presidential power are absolutely immune and gave several examples, *see* 603 U.S. at 608-609 (pardon power; power to remove presidential appointees; power to recognize foreign nations), 620-621 (supervision of criminal investigations and prosecutions), it left undefined the full scope of that category. *Compare id.* at 620 (relying in part on the President's responsibility to "take Care that the Laws be faithfully executed" (U.S. CONST. art II, § 3) to find that his investigative and prosecutorial decision-making, and threats to remove the Acting Attorney General, were absolutely immune) *with id.* at 651 n.1 (Barrett, J., concurring) ("I do not understand the Court to hold that all exercises of the Take Care power fall within the core executive power"). The Office's position was that none of the allegations in the superseding indictment implicated core presidential powers.

Second, the Court's decision accorded at least presumptive immunity to all non-core official presidential conduct. 603 U.S. at 614-615. That holding left unresolved whether, at some future point, the Court will determine that absolute immunity is required for that category of official acts as well. It also left unresolved the manner of applying its test for overcoming presumptive immunity: *i.e.*, that the government must "show that applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'" *Id.* at 615 (quoting *Fitzgerald*, 457 U.S. at 754); *cf.* 603 U.S. at 667 (Sotomayor, J., dissenting) ("According to the majority, however, any incursion on Executive power is too much. When presumptive immunity is this conclusive, the majority's indecision as to 'whether [official-acts] immunity must be absolute' or whether, instead, 'presumptive immunity is sufficient,' hardly matters.") (citation omitted). In its one concrete discussion of that test, the Court described competing arguments about communications between the President and the Vice

President about the certification proceeding, noting that the Vice President presides as President of the Senate, not in any Executive Branch capacity, and that the President has "no direct constitutional or statutory role" in the certification proceeding. *See id.* at 622-625. But the Court stopped short of deciding whether any Executive Branch functions were in danger of potential intrusion in that setting and, if so, the nature of such functions. It also did not address whether de minimis intrusions would preclude rebutting the presumption, and how courts should make predictive judgments about potential intrusions (for example, by looking to history, speculating about future presidential behavior, or relying solely on legal materials).

Following the remand to the district court, the Office argued that, with respect to the presumptive immunity test, "[t]he analysis should first identify the specific alleged act at issue, and then determine whether criminal liability for the act intrudes on a relevant Executive Branch authority or function, taking care not to 'conceive[] of the inquiry at too high a level of generality.'" ECF No. 252 at 87 (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1141 (D.C. Cir. 2015) (reversing district court in civil immunity case)). The Office's brief emphasized that this approach "recognizes that Executive authority has limits—boundaries imposed by constitutional text, the separation of powers, and precedent—and that application of criminal law to the President's official conduct does not *per se* intrude impermissibly on Executive Branch authority and functions." *Id.* at 87-88. With regard to the communications between the President and the Vice President, the Office submitted that "[b]ecause the Executive Branch has no role in the certification proceeding—and indeed, the President was purposely excluded from it by design—prosecuting the defendant for his corrupt efforts regarding Pence poses no danger to the Executive Branch's authority or functioning." *Id.* at 89-90.

Third, in discussing the process of separating official from unofficial conduct, the Court wrote that the analysis is "fact specific and may prove to be challenging." 603 U.S. at 629. The Court's discussion of a President's public communications illustrates those challenges. The Court directed that the status of a President's public communications should be assessed through an "objective analysis of 'content, form, and context.'" *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). It also cautioned that "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities" while stating that there "may" be contexts in which a President "speaks in an unofficial capacity—perhaps as a candidate for office or party leader." *Id.* The Court's analysis recognized that, in principle, there is a line between a President's official and nonofficial communications, but the Court gave little detail about when an incumbent President crosses the line between his official role and his candidate role. *Cf.* 603 U.S. at 667 (Sotomayor, J., dissenting) ("In fact, the majority's dividing line between 'official' and 'unofficial' conduct narrows the conduct considered 'unofficial' almost to a nullity."). Upon remand, the Office argued that "[a]t its core, the defendant's scheme was a private one," ECF No. 252 at 88, and that in proving the case the Office would rely on "public Campaign speeches, Tweets, and other public statements and comments" that Mr. Trump made "not as President but as a candidate for office." *Id.* at 115.

Finally, as noted, the Court's decision that presidential immunity precludes the introduction of evidence of immune official acts even in a prosecution for unofficial conduct left open substantive and procedural questions. 603 U.S. at 630-632. In responding to Justice Barrett's disagreement with the Court's evidentiary holding, in which she highlighted her concern about excluding official act evidence in, for example, a bribery prosecution, *id.* at 655-656 (Barrett, J., concurring in part), the Court wrote in a footnote that in a bribery prosecution,

"of course the prosecutor may point to the public record to show the fact that the President performed the official act." *Id.* at 632 n.3 (majority opinion). "What the prosecutor may not do, however, is admit testimony or private records of the President or his advisors probing the official act itself." *Id.* Those statements create uncertainty regarding which types of evidence of official acts can be used and which cannot. A further procedural issue involved the scope of any interlocutory appeal from the district court's rulings on immunity. The Supreme Court had emphasized that immunity issues should be "addressed at the outset of a proceeding," 603 U.S. at 636, and presupposed that "a district court's denial of immunity would be appealable before trial," *id.* at 635. While the parties and the district court agreed that whether the superseding indictment states an offense based on non-immune conduct would be subject to a pretrial interlocutory appeal, the evidentiary component of the Court's immunity ruling left open the question of whether evidentiary determinations regarding potentially immune evidence could be appealed before trial. Further proceedings on remand likely would have provided guidance on this and the other issues described above.

VI.    UNDERLINE CONCLUSION

On remand from the Supreme Court's decision in *Trump*, the district court set a litigation schedule whereby the parties would submit briefs regarding whether any material in the superseding indictment was subject to presidential immunity. ECF No. 233. The parties were in the middle of that process when the results of the presidential election made clear that Mr. Trump would be inaugurated as President of the United States on January 20, 2025. As described above, it has long been the Department's interpretation that the Constitution forbids the federal indictment and prosecution of a sitting President, but the election results raised for the first time the question of the lawful course when a private citizen who has already been indicted is then elected President. The Department determined that the case must be dismissed without prejudice

before Mr. Trump takes office, and the Office therefore moved to dismiss the indictment on November 25, 2024. *See* ECF No. 281. The district court granted the motion the same day. ECF No. 283.

The Department's view that the Constitution prohibits the continued indictment and prosecution of a President is categorical and does not turn on the gravity of the crimes charged, the strength of the Government's proof, or the merits of the prosecution, which the Office stands fully behind. Indeed, but for Mr. Trump's election and imminent return to the Presidency, the Office assessed that the admissible evidence was sufficient to obtain and sustain a conviction at trial.

APPENDIX: KEY FILINGS IN SIGNIFICANT LITIGATION

*DISTRICT COURT CRIMINAL LITIGATION*

| ECF No. | Date | Document Description |
|---|---|---|
| *United States v. Donald J. Trump*, Case No. 23-cr-257 (D.D.C.) | | |
| 1 | 8/1/2023 | Indictment |
| 10 | 8/4/2023 | Government's Motion for Protective Order |
| 12 | 8/5/2023 | Government's Opposition to Defendant's Motion for Extension of Time |
| 15 | 8/7/2023 | Government's Reply in Support of Motion for Protective Order |
| 16 | 8/3/2023 | Transcript of Initial Appearance (issued 8/8/2023) |
| 23 | 8/10/2023 | Government's Response to Court's August 3, 2023 Minute Order (Proposed Trial Date) |
| 26 | 8/10/2023 | Government's Response in Opposition to Defendant's Motion for Exclusion of Time Under Speedy Trial Act |
| 28 | 8/11/2023 | Court Protective Order Governing Discovery and Authorizing Disclosure of Grand Jury Testimony |
| 29 | 8/11/2023 | Transcript of Hearing on Protective Order |
| 32 | 8/21/2023 | Government's Reply to Defendant's Response in Opposition to Government's Proposed Trial Calendar |
| 38 | 8/28/2023 | Transcript of Status Hearing |
| 39 | 8/28/2023 | Court Pretrial Order |
| 54 | 9/14/2023 | Government's Response in Opposition to Defendant's Motion for Recusal of District Judge Pursuant to 28 U.S.C. Section 455(a) |
| 57 | 9/15/2023 | Government's Opposed Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings |
| 61 | 9/27/2023 | Court Memorandum Opinion & Order (Defendant's Motion for Recusal of District Judge) |
| 64 | 9/29/2023 | Government's Reply in Support of Opposed Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings |
| 65 | 10/2/2023 | Government's Opposition to Defendant's Motion for Access to CIPA Section 4 Filing and an Adjournment of the CIPA Section 5 Deadline |
| 66 | 10/2/2023 | Government's Response in Opposition to Defendant's Motion for Extension of Time to File Pretrial Motions |
| 82 | 10/6/2023 | Court Opinion & Order (Defendant's Motion for Access to CIPA Section 4 Filing and an Adjournment of the CIPA Section 5 Deadline) |
| 97 | 10/10/2023 | Government's Opposed Motion for Fair and Protective Jury Procedures |

138

| *United States v. Donald J. Trump*, **Case No. 23-cr-257 (D.D.C.)** | | |
|---|---|---|
| ECF No. | Date | Document Description |
| 98 | 10/10/2023 | Government's Motion for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice-of-Counsel Defense |
| 103 | 10/16/2023 | Transcript of Hearing (Government's Motion on Extrajudicial Statements) |
| 105 | 10/17/2023 | Court Opinion & Order (Government's Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings) |
| 108 | 10/18/2023 | Government's Opposition to Second Defense Motion for Access to CIPA Section 4 Filing |
| 109 | 10/19/2023 | Government's Response in Opposition to Defendant's Motion to Dismiss on Presidential Immunity Grounds |
| 117 | 10/25/2023 | Government's Reply in Support of Motion for Fair and Protective Jury Procedures |
| 118 | 10/25/2023 | Government's Reply in Support of Motion for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice-of-Counsel Defense |
| 119 | 10/25/2023 | Government's Opposition to Defendant's Motion for Pre-Trial Rule 17(c) Subpoenas |
| 120 | 10/25/2023 | Government's Response in Opposition to Defendant's Motion to Stay |
| 124 | 10/29/2023 | Court Opinion & Order (Denying Defendant's Motion to Stay) |
| 126 | 11/1/2023 | Court Opinion & Order (CIPA Section 4 Motions) |
| 130 | 11/2/2023 | Court Order (Government's Motion for Fair and Protective Jury Procedures) |
| 137 | 11/3/2023 | Government's Opposition to Defendant's Motion for Extension of Time to File Pretrial Motions Related to Discovery and Subpoenas |
| 139 | 11/6/2023 | Government's Omnibus Opposition to Defendant's Motions to Dismiss the Indictment on Statutory and Constitutional Grounds |
| 140 | 11/6/2023 | Government's Opposition to Defendant's Motion to Strike Inflammatory Allegations from the Indictment |
| 141 | 11/6/2023 | Government's Opposition to Defendant's Motion to Dismiss for Selective and Vindictive Prosecution |
| 142 | 11/6/2023 | Government's Opposition to Defendant's Motion to Stay Case Pending Resolution of Motion to Dismiss Based on Presidential Immunity |
| 146 | 11/7/2023 | Court Opinion & Order (Defendant's Motion for Extension of Time to File Pretrial Motions Related to Discovery and Subpoenas) |
| 147 | 11/8/2023 | Court Opinion & Order (Government's Motion for Formal Pretrial Notice of Advice of Counsel Defense) |

| *United States v. Donald J. Trump*, Case No. 23-cr-257 (D.D.C.) | | |
|---|---|---|
| ECF No. | Date | Document Description |
| 151 | 11/13/2023 | Government's Opposition to Defendant's Motion for Extension of Time to File Reply Briefs |
| 152 | 11/13/2023 | Court Order (Defendant's Motion for Extension of Time to File Reply Briefs) |
| 158 | 11/17/2023 | Court Opinion & Order (Defendant's Motion to Strike) |
| 165 | 11/27/2023 | Court Opinion & Order (Defendant's Motion for Pretrial Rule 17(c) Subpoenas) |
| 171, 172 | 12/1/2023 | Court Memorandum Opinion & Order (Defendant's Motions to Dismiss Based on Presidential Immunity and Constitutional Grounds) |
| 176 | 12/5/2023 | Government's Notice Pursuant to Federal Rule of Evidence 404(b) |
| 181 | 12/9/2023 | Government's Opposition to Defendant's Discovery Motions |
| 182 | 12/10/2023 | Government's Opposition to Defendant's Motion to Stay Proceedings Pending Appeal |
| 183 | 12/11/2023 | Government's Summary of Anticipated Expert Testimony |
| 186 | 12/13/2023 | Court Opinion & Order (Defendant's Motion to Stay Proceedings Pending Appeal) |
| 188 | 12/18/2023 | Government's Notice of Service (Government's Draft Exhibit List) |
| 191 | 12/27/2023 | Government's Motion *in Limine* |
| 193 | 1/5/2024 | Government's Opposition to Defendant's Motion for Order to Show Cause |
| 195 | 1/18/2024 | Court Opinion & Order (Defendant's Motion to Show Cause) |
| 198, 199 | 8/3/2024 | Court Memorandum Opinion & Order (Defendant's Motion to Dismiss for Selective and Vindictive Prosecution) |
| 226 | 8/27/2024 | Superseding Indictment |
| 228 | 8/27/2024 | Government's Notice of Superseding Indictment |
| 229 | 8/30/2024 | Joint Status Report (Pretrial Schedule) |
| 232 | 9/5/2024 | Transcript of Arraignment and Status Conference |
| 233 | 9/5/2024 | Court Order (Pretrial Schedule) |
| 246 | 9/27/2024 | Government's Motion for Leave to File Unredacted Motion Under Seal, and to File Redacted Motion on Public Docket |
| 249 | 10/1/2024 | Government's Sur-Reply to Defendant's Discovery Motions |
| 251 | 10/2/2024 | Court Opinion & Order (Government's Motion for Leave to File Unredacted Motion Under Seal, and to File Redacted Motion on Public Docket) |
| 252 | 10/2/2024 | Government's Motion for Immunity Determinations |

| United States v. Donald J. Trump, Case No. 23-cr-257 (D.D.C.) | | |
|---|---|---|
| ECF No. | Date | Document Description |
| 262 | 10/16/2024 | Government's Response in Opposition to the Defendant's Supplement to His Motion to Dismiss on Statutory Grounds |
| 263 | 10/16/2024 | Court Memorandum Opinion & Order (Defendant's Motions to Compel Discovery and for an Order Regarding the Scope of Prosecution Team) |
| 265 | 10/17/2024 | Court Opinion & Order (Defendant's Motion to Continue Stay of Order) |
| 266 | 10/18/2024 | Government Appendix to Motion for Immunity Determinations |
| 277 | 10/31/2024 | Government's Response in Opposition to the Defendant's Proposed Motion to Dismiss and for Injunctive Relief Based on the Appointments and Appropriations Clauses |
| 278 | 11/8/2024 | Government's Unopposed Motion to Vacate Briefing Schedule |
| 281 | 11/25/2024 | Government's Motion to Dismiss Without Prejudice |
| 282, 283 | 11/25/2024 | Court Opinion & Order (Government's Motion to Dismiss Without Prejudice) |

*PRESIDENTIAL IMMUNITY APPELLATE LITIGATION*

| United States v. Trump, No. 23-3228 (D.C. Cir.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 2030867 | 12/11/2023 | Government's Opposed Motion for Expedited Appellate Review |
| 2031335 | 12/13/2023 | Government's Reply in Support of Motion for Expedited Appellate Review |
| 2031419 | 12/13/2023 | Court Order (Expediting Appeal and Setting Briefing Schedule) |
| 2033810 | 12/30/2023 | Government's Answering Brief (Presidential Immunity) |
| 2034942 | 1/9/2024 | Oral Argument[268] |
| 2038999, 2039001 | 2/6/2024 | Court Judgment & Opinion[269] |

---

[268] *Oral Argument Recordings Archive*, United States Court of Appeals for the District of Columbia Circuit (Jan. 9, 2024), https://media.cadc.uscourts.gov/recordings/bydate/2024/1 [https://perma.cc/9523-TRZ9].

[269] *See United States v. Trump*, 91 F.4th 1173 (D.C. Cir. 2024).

141

| \*United States v. Trump\*, No. 23-624 (U.S.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 1 | 12/11/2023 | Government's Petition for a Writ of Certiorari Before Judgment (Presidential Immunity) |
| 2 | 12/11/2023 | Government's Motion to Expedite Briefing on the Petition for a Writ of Certiorari Before Judgment and for Expedited Merits Briefing If the Court Grants the Petition |
| 3 | 12/11/2023 | Court Order (Government's Motion to Expedite) |
| 7 | 12/21/2023 | Government's Reply Brief in Support of Motion to Expedite (Presidential Immunity) |
| 8 | 12/22/2023 | Court Order (Petition for a Writ of Certiorari Before Judgment) |

| *Trump v. United States*, No. 23-939 (U.S.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 6 | 2/14/2024 | Government Response in Opposition to Application for a Stay of the Mandate of the United States Court of Appeals for the District of Columbia Circuit (Presidential Immunity) (originally filed in *Trump v. United States*, No. 23A745 (U.S.)) |
| 15, 16 | 2/28/2024 | Court Order (Application for Stay/Petition for Certiorari) (originally filed in *Trump v. United States*, No. 23A745 (U.S.)) |
| 47 | 4/8/2024 | Government's Brief (Presidential Immunity) |
| 65 | 4/25/2024 | Oral Argument[270] |
| 66, 67 | 7/1/2024 | Court Opinion & Judgment (Presidential Immunity)[271] |

## RULE 57.7(c) APPELLATE LITIGATION

| *United States v. Trump*, No. 23-3190 (D.C. Cir.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 2026922 | 11/14/2023 | Government's Answering Brief (Rule 57.7(c)) |
| 2027866 | 11/20/2023 | Oral Argument[272] |

---

[270] *Transcript of Oral Argument in Case No. 23-939*, Supreme Court of the United States (Apr. 25, 2024), http://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-939_3fb4.pdf [https://perma.cc/XQ7N-E33J].

[271] *See Trump v. United States*, 603 U.S. 593 (2024).

[272] *Oral Argument Recordings Archive*, United States Court of Appeals for the District of Columbia Circuit (Nov. 20, 2023), https://media.cadc.uscourts.gov/recordings/bydate/2023/11 [https://perma.cc/5J2E-PDT6].

| *United States v. Trump*, No. 23-3190 (D.C. Cir.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 2032665 | 12/20/2023 | Court Public Opinion (Rule 57.7(c)) (decided 12/8/2023)[273] |
| 2033815 | 12/31/2023 | Government's Response in Opposition to Rehearing |
| 2037003 | 1/23/2024 | Court Order (Petition for Rehearing) |

### SELECTED GRAND JURY LITIGATION
### (PARTIALLY UNSEALED)[274]

| Case No. | Case Name |
|---|---|
| No. 22-gj-25 (D.D.C.) | *In re Grand Jury Subpoenas* |
| No. 22-3073 (D.C. Cir.) | *In re Sealed Case* |
| No. 22-gj-33 (D.D.C.) | *In re Grand Jury Subpoenas* |
| No. 23-3002 (D.C. Cir.) | *In re Sealed Case* |
| No. 22-gj-39 (D.D.C.) | *In re Grand Jury Subpoena* |
| No. 23-3003 (D.C. Cir.) | *In re Sealed Case* |
| No. 23-gj-12 (D.D.C.) | *In re Grand Jury Subpoenas* |
| No. 23-3043 (D.C. Cir.) | *In re Sealed Case* |
| No. 23-gj-13 (D.D.C.) | *In re Grand Jury Subpoena* |
| No. 23-3049 (D.C. Cir.) | *In re Sealed Case* |

---

[273] *See United States v. Trump*, 88 F.4th 990, 1018 (D.C. Cir. 2023).

[274] As of the date of this Report, certain documents from selected grand jury litigation have been made available to the public through related litigation. *See In re Application of the New York Times*, No. 22-mc-100, ECF No. 32 (D.D.C.); *In re Press Application*, No. 23-mc-35, ECF No. 11 (D.D.C.); *see also Former Vice President Michael R. Pence's Motion to Quash Subpoena*, United States District Court for the District of Columbia (Mar. 3, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/Attachment%201.pdf [https://perma.cc/5LNK-72DG]; *Government's Opposition to Former Vice President Pence's Motion to Quash Subpoena*, United States District Court for the District of Columbia (Mar. 10, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/Attachment%202.pdf [https://perma.cc/C8VM-E2PV]; *Former Vice President Michael R. Pence's Reply in Support of His Motion to Quash Subpoena*, United States District Court for the District of Columbia (Mar. 17, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/Attachment%203.pdf [https://perma.cc/Z5DJ-7Y2K]; *Order*, United States District Court for the District of Columbia (Mar. 27, 2023); https://www.dcd.uscourts.gov/sites/dcd/files/Attachment%204.pdf [https://perma.cc/L7TS-L6AQ]; *Memorandum Opinion*, United States District Court for the District of Columbia (Mar. 27, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/Attachment%205.pdf [https://perma.cc/FR8G-S3SJ]; *Sealed Proceeding Before the Honorable James E. Boasberg*, United States District Court for the District of Columbia (Mar. 23, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/Attachment%206.pdf [https://perma.cc/J2C6-K35S].

*PERRY SEARCH WARRANT LITIGATION*

| **In re Scott Perry Cell Phone Search Warrant**, No. 22-sc-2144 (D.D.C.) (Partially Unsealed)[275] | | |
|---|---|---|
| ECF No. | Date | Document Description |
| 41[276] | 11/4/2022 | Court Memorandum Opinion & Order (Applicability of the Speech or Debate Clause) |
| 42, 43[277] | 12/28/2022 | Court Memorandum Opinion & Order (Perry's Motion for Non-Disclosure to the Government) |
| 44[278] | 1/4/2023 | Court Memorandum Opinion & Order (Perry's Emergency Motion to Stay) |
| 45[279] | 2/24/2023 | Court Memorandum & Order (Unsealing) |
| Sealed[280] | 12/19/2023 | Court Memorandum Opinion & Order (Applicability of the Speech or Debate Clause) |

| **In re Sealed Case**, No. 23-3001 (D.C. Cir.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 2031508 (Att. 2) | 1/9/2023 | Government's Opposition to Emergency Motion for Stay Pending Appeal |
| 1983102 | 1/25/2023 | Court Order (Perry's Motion for Stay Pending Appeal) |

---

[275] Additional filings in this matter have been made publicly available in *In re Sealed Case*, No. 23-3001 (D.C. Cir.), Doc. No. 2031508, Attachment 10 (Joint Appendix).

[276] *Memorandum Opinion and Order*, United States District Court for the District of Columbia (Nov. 4, 2022), http://www.dcd.uscourts.gov/sites/dcd/files/Redacted%20November%204%2C%202022%20Memorandum%20Opinion%20and%20Order.pdf [https://perma.cc/6CLJ-BETZ].

[277] *Memorandum Opinion*, United States District Court for the District of Columbia (Dec. 28, 2022), https://www.dcd.uscourts.gov/sites/dcd/files/Redacted%20December%2028%2C%202022%20Memorandum%20Opinion%2C%20ECF%20No%2043.pdf [https://perma.cc/7Z37-SRA4]; *Order*, United States District Court for the District of Columbia (Dec. 28, 2022), https://www.dcd.uscourts.gov/sites/dcd/files/Redacted%20December%2028%2C%202022%20Order%2C%20ECF%20No%2042.pdf [https://perma.cc/AYF7-ECBD].

[278] *Memorandum Opinion and Order*, United States District Court for the District of Columbia (Jan. 4, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/Redacted%20January%204%2C%202023%20Memorandum%20Opinion%20and%20Order%2C%20ECF%20No%2044.pdf [https://perma.cc/38NW-EXV3].

[279] *Memorandum and Order*, United States District Court for the District of Columbia (Feb. 4, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/Memorandum%20and%20Order%20February%2024%2C%202023.pdf [https://perma.cc/7PZQ-NZK6].

[280] *Memorandum Opinion*, United States District Court for the District of Columbia (Dec. 19, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/22-sc-2144%20-%20Opinion.pdf [https://perma.cc/5PPD-JH68]; *Order*, United States District Court for the District of Columbia (Dec. 19, 2023), https://www.dcd.uscourts.gov/sites/dcd/files/22-sc-2144%20-%20Order.pdf [https://perma.cc/C3E5-JQXK].

| *In re Sealed Case*, No. 23-3001 (D.C. Cir.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 2031508 (Att. 12) | 2/16/2023 | Government's Brief |
| --- | 2/23/2023 | Oral Argument[281] |
| 2015233 | 9/5/2023 | Court Judgment |
| 2016705 | 9/13/2023 | Court Opinion (decided 9/5/2023)[282] |

*TWITTER SEARCH WARRANT LITIGATION*

| *In re Twitter Search Warrant*, No. 23-sc-31 (D.D.C.) | | |
|---|---|---|
| ECF No. | Date | Document Description |
| 5 | 2/2/2023 | Government's Motion for an Order to Show Cause Why Twitter Inc. Should Not Be Held in Contempt for Failure to Comply with a Search Warrant |
| 11 | 2/6/2023 | Government's Reply in Further Support of Motion for an Order to Show Cause Why Twitter Inc. Should Not Be Held in Contempt for Failure to Comply with a Search Warrant |
| 50 | 2/7/2023 | Transcript of Hearing (Government's Motion for an Order to Show Cause) |
| --- | 2/7/2023 | Court Minute Order Granting Government's Motion for Order to Show Cause and Directing Twitter to Comply |
| 50 | 2/9/2023 | Transcript of Hearing (Twitter's Non-Compliance with Warrant) |
| 19 | 2/13/2023 | Government's Notice Regarding Accrued Sanction |
| 50 | 2/16/2023 | Government's Opposition to Twitter Inc.'s Motion to Vacate or Modify Non-Disclosure Order and Stay Twitter's Compliance with Search Warrant |
| 29, 32 | 3/3/2023 | Court Memorandum Opinion & Order (Twitter's Motion to Vacate or Modify and Stay) |
| 36 | 3/9/2023 | Government's Opposition to Motion for Stay Pending Appeal |
| 39 | 3/10/2023 | Court Opinion & Order (Twitter's Motion for a Stay) |
| 50 | 8/15/2023 | Court Order (Unsealing) |

---

[281] *Oral Argument Recordings Archive*, United States Court of Appeals for the District of Columbia Circuit (Feb. 23, 2023), https://media.cadc.uscourts.gov/recordings/bydate/2023/2 [https://perma.cc/YS57-HMYW].

[282] *See In re Sealed Case*, 80 F.4th 355 (D.C. Cir. 2023).

| In re Sealed Case, No. 23-5044 (D.C. Cir.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 1989703 | 3/10/2023 | Government's Response in Opposition to Twitter's Motion for Stay |
| 1991524 | 3/23/2023 | Court Order (Twitter's Motion for Stay) |
| 2017103 | 4/21/2023 | Government's Answering Brief (filed with redactions on 9/15/2023) |
| --- | 5/19/2023 | Oral Argument[283] |
| 2011549 | 8/9/2023 | Court Amended Redacted Opinion (decided 7/18/2023)[284] |
| 2018981 | 9/26/2023 | Government's Response in Opposition to Rehearing En Banc |
| 2035679 | 1/16/2024 | Court Order (Petition for Rehearing) |

| X Corp. v. United States, No. 23-1264 (U.S.) | | |
|---|---|---|
| Doc. No. | Date | Document Description |
| 5 | 7/3/2024 | Government's Opposition (Petition for Writ of Certiorari) |
| 9 | 10/7/2024 | Court Order (Petition for Writ of Certiorari)[285] |

---

[283] *Oral Argument Recordings Archive*, United States Court of Appeals for the District of Columbia Circuit (May 19, 2023), https://media.cadc.uscourts.gov/recordings/bydate/2023/5 [https://perma.cc/SR2Z-GL5B].

[284] *See In re Sealed Case*, 77 F.4th 815, 830 (D.C. Cir. 2023).

[285] *See X Corp. v. United States*, 2024 WL 4426628 (U.S. Oct. 7, 2024).

ADDENDUM



**TODD BLANCHE**
ToddBlanche@blanchelaw.com
(212) 716-1250

January 6, 2025

<u>Via Email</u>
The Honorable Merrick Garland
Attorney General of the United States
c/o Brad Weinsheimer
Associate Deputy Attorney General

  **Re: Draft "Final Report" By Jack Smith**

Dear Attorney General Garland:

  We write on behalf of President Trump to demand that Smith terminate all efforts toward the preparation and release of this report (the "Draft Report").[1]

  As you know, Courts in Florida and the District of Columbia have now dismissed both of Jack Smith's failed cases against President Trump. Rather than acknowledging, as he must, President Trump's complete exoneration, Smith now seeks to disseminate an extrajudicial "Final Report" to perpetuate his false and discredited accusations. Consistent with the bad-faith crusade that Smith executed on behalf of the Biden-Harris Administration from the moment he was appointed, we were only permitted to review the Draft Report in person in the District of Columbia, including prohibitions on the use of any outside electronic devices in the room where the Draft Report was made available. Smith's team likewise demanded, in advance of any review, that we delete prior discovery productions, preventing us from reviewing any of those underlying documents cited in the Draft Report. Nevertheless, it is clear, as has been the case with so many of the other actions of Smith and his staff, that the Draft Report merely continues Smith's politically-motivated attack, and that his continued preparation of the Report and efforts to release it would be both imprudent and unlawful.

  First, Smith lacks authority under our Constitution to issue a report because he was not validly appointed, and the plain terms of the permanent indefinite appropriation that he has pillaged for more than $20 million clearly do not apply to his politically-motivated work. The preparation and release of a report, therefore, would extend and perpetuate Smith's violations of the Appointments Clause and the Appropriations Clause.

  Second, the Draft Report violates fundamental norms regarding the presumption of innocence, including with respect to third parties unnecessarily impugned by Smith's false claims. Releasing the report to the public without significant redactions (that would render its release meaningless) would violate prohibitions on extrajudicial statements by prosecutors and Rule 6(e). This is particularly problematic with respect to ongoing proceedings relating to Waltine Nauta and Carlos De Oliveira, as well as others who Smith and his staff falsely characterize as co-conspirators in the Draft Report.

---

[1] Should these demands be improperly rejected, contrary to law, we respectfully request that this letter be appended to and addressed in any report by Smith that is issued to the public.

January 6, 2025
Page 2

Third, preparing a report and releasing it to the public would violate the Presidential Transition Act and the Presidential immunity doctrine. The Act prohibits *all* officers and those acting as such, including the Attorney General and Smith, at least in his own view of himself, from interfering with the ongoing transition process. Presidential immunity, which Smith conceded required pre-inauguration dismissal of his prosecutions, likewise prohibits criminal processes, including disclosures of any prosecutorial reports or statements, that would exacerbate stigma and public opprobrium surrounding the Chief Executive and otherwise divert from the time and attention that is necessary to complete the transition and run the County. Accordingly, releasing a report regarding Smith's failed and abandoned election-interference efforts would violate the Act and Presidential immunity.

Finally, the release of any confidential report prepared by this out-of-control private citizen unconstitutionally posing as a prosecutor would be nothing more than a lawless political stunt, designed to politically harm President Trump and justify the huge sums of taxpayer money Smith unconstitutionally spent on his failed and dismissed cases. Under such circumstances, releasing Smith's report is obviously not in the public interest—particularly in light of President Trump's commanding victory in the election and the sensitive nature of the ongoing transition process.

Accordingly, because Smith has proposed an unlawful course of action, you must countermand his plan and remove him promptly. If Smith is not removed, then the handling of his report should be deferred to President Trump's incoming attorney general, consistent with the expressed will of the People. Finally, should you disagree with the positions set forth below, we respectfully request notice of that decision prior to the unlawful release of any report so that we can pursue injunctive and other relief to protect the rights of President Trump, others unfairly implicated by Smith's work, and the people of this great Nation who elected President Trump to run the government and put an end to the weaponization of the justice system.

## I.    Background

You are no doubt familiar with the history of the unethical election-interference and lawfare by the Special Counsel's Office, as you have publicly commented on some of those efforts while they were ongoing. This letter concerns Smith's most recent improper activities.

During the week of December 9, 2024, we learned from members of the media that Smith was preparing a report, which would include a purported analysis relating to classified information at issue in the dismissed Florida prosecution. We were surprised to learn of such a plan because, among other reasons, Smith had insisted up to that point that his work was not concluded, Smith and his Office refused to disclose details regarding this alleged analysis prior to the dismissal of his Florida prosecution against President Trump, and the Biden-Harris Administration has suggested that they wish to facilitate an orderly and collegial transition process.

On December 11, 2024, we contacted a supervisor with the Special Counsel's Office to express concerns about reports we were hearing from the press. We asked whether the Office was preparing a report and, if so, whether we would be allowed to review it prior to completion. Initially, Smith's position was that: (1) we would only be permitted to access a draft of the report in Washington, D.C. between December 23 and December 29, 2024, the week of Christmas; (2) we would only be permitted to take handwritten notes during our review; and (3) any comments or objections to the draft would have to be

January 6, 2025
Page 3

submitted in writing by the close of business on December 29, 2024. Aside from all counsel living outside
D.C. and planning on spending time with family that week, as Smith and his team knew, Smith's proposal
afforded zero opportunity for President Trump to assist counsel in reviewing and preparing any response
to the report, given the irrational conditions imposed. Apparently working under a self-imposed deadline,
Smith's team informed us, implausibly, that permitting defense review of Smith's unlawful Draft Report
during the first week of January 2025 would be "too late to allow us to complete our work." Subsequently
Smith walked back those now clearly false claims and permitted defense counsel to review the two-volume
Draft Report in a conference room at Smith's office between January 3 and January 6, 2025, without
allowing counsel to access the Internet or use their own electronic devices while in the room with
supposedly sensitive documents that the press has known about for weeks by virtue of Smith's leaks.

## II. Preparation And Release Of A Report Would Violate Existing Law

Preparation and public release of a report by Smith would violate the Constitution and existing
law, including the Appropriations and Appointments Clauses, the Special Counsel Regulations, the
Presidential Transition Act, and the Presidential immunity doctrine. Collectively, these considerations
distinguish the circumstances surrounding the release of reports by prior Special Counsels. Here, release
of an unlawful report would *not* "comply with applicable legal restrictions" or "be in the public interest."
28 C.F.R. § 600.9(c); *see also id.* § 600.7(a) ("A Special Counsel shall comply with the rules, regulations,
procedures, practices and policies of the Department of Justice."). Therefore, you must countermand
Smith's proposed course of action, *id.* § 600.7(b), and he should be removed for "dereliction of duty" and
"good cause," § 600.7(d).

Smith was not validly appointed, and Congress did not provide funding for his improper mission.
No statute authorized you to deploy a private attorney against President Trump and others, and Smith
functioned as a principal officer acting without the necessary Senate confirmation. In addition, the DOJ
permanent indefinite appropriation Smith relied upon was—and still is—inapplicable. The only judge to
have examined the particulars of Smith's appointment reached these conclusions in an extremely thorough
and well-reasoned opinion. *See generally United States v. Trump*, 2024 WL 3404555, at *46 (S.D. Fla.
July 15, 2024). On appeal, Smith's prosecutors failed to identify any meritorious reason for questioning
Judge Cannon's treatment of these issues, and then abandoned the appeal as to President Trump.
Therefore, Smith lacks authority to issue a report regarding his activities while masquerading as a
prosecutor, and his Office lacks authority to expend any public funds in furtherance of preparing or issuing
such a report. Indeed, because Smith abandoned the 11th Circuit appeal as to President Trump, Judge
Cannon's decision is a final judgment with issue-preclusive effect on these issues. *See, e.g., Bravo-
Fernandez v. United States*, 580 U.S. 5, 7-8 (2016) (cleaned up) ("In criminal prosecutions, as in civil
litigation, the issue-preclusion principle means that when an issue of ultimate fact has once been
determined by a valid and final judgment, that issue cannot again be litigated between the same parties in
any future lawsuit."); *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (same).

Preparation and release of a report would also be improper under the Special Counsel Regulations.
Those Regulations only call for "Closing documentation," in the form of a "confidential report," to be
prepared "[a]t the *conclusion* of the Special Counsel's work." 28 C.F.R. § 600.8(c) (emphasis added). In
light of the violations of the Appointments Clause and the Appropriations Clause, Smith has no lawful
"work" to conclude. Moreover, by Smith's own repeated admission, Smith has not concluded his mission.

January 6, 2025
Page 4

Rather, Presidential immunity based on the national mandate arising from President Trump's overwhelming victory in the election has made it impossible for Smith to proceed, and rightly so.

Smith's representations in the District of Columbia regarding his dismissed prosecution of President Trump reinforce these points and make clear that no "Closing documentation" is warranted. 28 C.F.R. § 600.8(c). Smith wrongly relied on the claim that Presidential immunity is "temporary," which is not the case, to ask that the charges against President Trump only be dismissed "without prejudice."[2] The plain implication of Smith's position, which Judge Chutkan adopted, is that he does not believe his work targeting President Trump has reached its "conclusion." 28 C.F.R. § 600.8(c). Thus, taking a contrary position in order to justify preparation of one last long-winded, inaccurate, and unlawful smear of the President-elect and others would violate the Special Counsel Regulations.

Public release of a report by Smith would also disrupt the ongoing transition process and violate the Presidential Transition Act. "[T]he orderly transfer of the executive power is one of the most important public objectives in a democratic society. The transition period insures that the candidate will be able to perform effectively the important functions of his or her new office as expeditiously as possible." Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *Definition of "Candidate" Under 18 U.S.C. §207(j)*, 2000 WL 33716979, at *4 (Nov. 6, 2000) (cleaned up). "One of the top priorities of any presidential administration is to protect the country from foreign and domestic threats. While a challenge at all times, the country is especially vulnerable during the time of presidential transitions . . . ."[3] Thus, the transition process is "an integral part of the presidential administration," in the "national interest," and part of President Trump's "public function," as he prepares to govern. Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *Reimbursing Transition-Related Expenses Incurred Before The Administrator Of General Services Ascertained Who Were The Apparent Successful Candidates For The Office Of President And Vice President*, 2001 WL 34058234, at *3 (Jan. 17, 2001).

Congress passed the Presidential Transition Act to protect these critical functions. The purpose of the Act is "to promote the orderly transfer of the executive power in connection with the expiration of the term of office of a President and the inauguration of a new President." 3 U.S.C. § 102 note, § 2. "Any disruption" of the transition "could produce results detrimental to the safety and well-being of the United States and its people." *Id.* Consequently, under the Act, "all officers of the Government"—including the Attorney General and, according to his claims, Smith—are required to "conduct the affairs of the Government for which they exercise responsibility and authority" in a manner that "promote[s] orderly transitions in the office of President." *Id.* This includes, *inter alia*, "tak[ing] appropriate lawful steps to avoid or minimize disruptions that might be occasioned by the transfer of the executive power." *Id.*

Creating and releasing a prejudicial report to the public would violate these commands by giving rise to a media storm of false and unfair criticism that President Trump would be required to address while preparing to assume his Article II responsibilities. Equally problematic and inappropriate are the draft's

---

[2] ECF No. 281 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 25, 2024).

[3] Center for Presidential Transition, *Presidential Transitions are a Perilous Moment for National Security* (Aug. 16, 2023), https://presidentialtransition.org/reports-publications/presidential-transitions-are-a-perilous-moment-for-national-security.

January 6, 2025
Page 5

baseless attacks on other anticipated members of President Trump's incoming administration, which are an obvious effort to interfere with upcoming confirmation hearings, and Smith's pathetically transparent tirade about good-faith efforts by X to protect civil liberties, which in a myriad other contexts you have claimed are paramount.

A one-sided, improper report by Smith, particularly if publicly released, would also violate the Presidential immunity principles that Smith has conceded foreclose him from proceeding against President Trump. Indeed, footnote 1 of "Volume 1" of the Draft Report concedes that Smith has brazenly included "conduct for which the Supreme Court later held [President] Trump to be immune from prosecution," and subsequently further highlights the incredible hubris that has clouded the judgment of Smith and his staff from the outset by falsely claiming that the Supreme Court's decision is ambiguous with respect to holdings and reasoning that Smith simply does not like. Based on guidance from OLC—which Smith's staff subsequently informed us that the Office improperly failed to document in any way, in violation of, *inter alia*, DOJ policy regarding the handling of exculpatory information—Smith has acknowledged that Presidential immunity is "categorical," and that it applies while President Trump is the President-elect prior to his inauguration.[4]   A public report by Smith would unnecessarily and unjustly add to the inappropriate "peculiar public opprobrium" that has resulted from Smith's unlawful activities thus far. *Trump v. United States*, 603 U.S. 593, 613 (2024).   OLC explained previously that such "public stigma and opprobrium" could "compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs."   Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 2000 WL 33711291, at *19 (Oct. 16, 2000).   "[T]he stigma arising . . . from the need to respond to such charges through the judicial process would seriously interfere with [the President's] ability to carry out his constitutionally assigned functions." *Id.* at *22.   The release of a report would also pose an unconstitutional risk of diverting President Trump's "*personal* time and energy, and [would] inevitably entail a considerable if not overwhelming degree of mental preoccupation." *Id.* at *25 (emphasis in original).   A "single prosecutor" such as Smith should not, and must not, be afforded "the practical power to interfere with the ability of a popularly elected President to carry out his constitutional functions." *Id.* at *19.   "The Framers' design of the Presidency did not envision such counterproductive burdens on the vigor and energy of the Executive." *Trump*, 603 U.S. at 614 (cleaned up).

In sum, the same legal principles and logic that required Smith to dismiss his prosecutions of President Trump require that his activities be terminated without further action.   Preparation and release of "Closing documentation" would violate the Constitution and existing law, harm the activities of the transition, and weaken the federal government that you have sworn an oath to support.   The collective application of these circumstances make this situation entirely unlike any prior Special Counsel report. Preparation and release of a report is therefore not "in the public interest." 28 C.F.R. § 600.9(c).   To the contrary, the course of action Smith proposes would further solidify the well-founded perception of partisanship created by Smith's violation of DOJ policies in connection with decisions based on his ultimately failed attempt to influence the outcome of the 2024 Presidential election.   For all of these reasons, you must countermand Smith's proposed course of action, remove him, and stop the preparation and/or dissemination of the Draft Report.

---

[4] ECF No. 281 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 25, 2024) ("[T]he Department's position is that the Constitution requires that this case be dismissed before the defendant is inaugurated.").

### III.    Smith's Report Violates The Presumption of Innocence

The presumption of innocence is "the undoubted law, axiomatic and elementary." *Coffin v. United States*, 156 U.S. 432, 453 (1895). It is "vital and fundamental" to our Constitutional system, *id.* at 460, and "its enforcement lies at the foundation of the administration of our criminal law," *id.* at 453; *see also Cool v. United States*, 409 U.S. 100, 104 (1972) (holding violation of defendant's "constitutionally rooted presumption of innocence" required reversal).

"The presumption serves as a reminder to the jury that the prosecution has the burden of proving every element of the offense beyond a reasonable doubt," *United States v. Starks*, 34 F.4th 1142, 1158 (10th Cir. 2022), and thus, may be "extinguished only upon the *jury's* determination that guilt has been established beyond a reasonable doubt," *Mahorney v. Wallman*, 917 F.2d 469, 471 n.2 (10th Cir. 1990) (emphasis in original) (collecting cases).

Consistent with *these* bedrock principles, the Justice Manual prohibits prosecutors from publicly declaring a defendant's guilt prior to a jury verdict, or otherwise disseminating statements inconsistent with the presumption of innocence. Justice Manual §§ 1-7.500; 1-7.600; 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice."). Rather, prosecutors must limit their statements to "[t]he substance of the charge, as contained in the complaint, indictment, information, or other public documents" and any "release issued before a finding of guilt should state that the charge is merely an accusation, and the defendant is presumed innocent until proven guilty." Justice Manual § 1.7.500. Moreover, "DOJ personnel should refrain from disclosing *inter alia,* "[a]ny opinion as to [a] defendant's guilt" or any other "[o]bservations about a defendant's or party's character" "except as appropriate *in the proceeding or in an announcement after a finding of guilt*." Justice Manual § 1-7.610 (emphasis added).

These restrictions ensure that the Department's statements do not "prejudice the rights of a defendant; or unfairly damage the reputation of a person." Justice Manual § 1-7.100; *see also* 32 C.F.R. § 776.47 ("Except for statements that are necessary to inform the public of the nature and extent of the trial counsel's actions and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused."); D.C. Bar Rule 3.8 (same).

The Draft Report violates every one of these core requirements. Despite Smith's decision to dismiss his cases against President Trump, and his complete failure to obtain a "*jury's* determination that guilt has been established beyond a reasonable doubt," *Mahorney*, 917 F.2d at 471 n.2 (emphasis in original), his Draft Report repeatedly, and falsely, claims that President Trump, Carlos De Oliveria, Waltine Nauta, and others have committed crimes and otherwise engaged in purported "criminal conduct." For example, Volume I of the Draft Report falsely asserts, without any jury determination, that President Trump and others "engaged in an unprecedented criminal effort," was "the head of the criminal conspiracies," and harbored a "criminal design." Draft Report, Vol. I at 2, 68, 69. These false accusations of criminality, which Smith again utterly failed to prove in Court, repeat throughout Volume I. *See, e.g., id.* at 3, 52, 60, 64, 67, 88, 108. Likewise, Volume II asserts, without any supporting verdict, "that Mr. Trump violated multiple federal criminal laws," and that he and others engaged in "criminal conduct." Vol. II at 60, 88; *see also, e.g., id.* at 89, 121. Moreover, the Draft Report makes these allegations despite

the ongoing prosecutions of DeOliveira and Nauta, which would cause gravely unconstitutional prejudice if released.

Neither the Constitution nor applicable regulations or ethical rules allow Smith to make public, extrajudicial claims that purport to reflect conclusive determinations of guilt backed by the imprimatur of DOJ. It is the role of the jury, not the Special Counsel, to weigh the facts and determine guilt. Other Special Counsels have recognized this foundational fact. For example, Special Counsel Hur carefully cabined his observations to what some "jurors could," "might," "may well," or, at most, "would likely" conclude. *See, e.g., Hur Report* at 4, 5, 9, 10, 204, 206-211, 214, 216, 218, 220, 233, 235, 240-42, 246-47. At all points, Hur's focus was on whether "jurors assessing Mr. Biden's guilt and intent w[ould] be persuaded," *id.* at 241, and not on the Special Counsel's unilateral views or opinions regarding Biden's obvious guilt.

Likewise, Special Counsel Mueller expressly declined to "apply an approach" to his report "that could potentially result in a judgment that the President committed crimes," where, as here, "no charges c[ould] be brought." *Mueller Report*, Vol. II at 2. In Special Counsel Mueller's view, "[f]airness concerns counseled against" any kind of public accusation because:

> [t]he ordinary means for an individual to respond to an accusation is through a speedy and public trial, with all the procedural protections that surround a criminal case. An individual who believes he was wrongly accused can use that process to seek to clear his name. In contrast, a prosecutor's judgment that crimes were committed, but that no charges will be brought, affords no such adversarial opportunity for public name-clearing before an impartial adjudicator.

*Id.* Moreover, Special Counsel Mueller warned that a public disclosure of a prosecutor's unilateral judgment would only heighten these dangers. *Id.* ("[T]he possibility of the report's public disclosure and the absence of a neutral adjudicatory forum to review its findings counseled against potentially determining 'that the person's conduct constitutes a federal offense.' Justice Manual § 9-27.220."). For these reasons, Special Counsel Mueller's report "did not draw ultimate conclusions about the President's conduct," *id.* at 182, but "[i]nstead for each of the relevant actions investigated, . . . set[] out evidence on both sides of the question. . . ." Ltr. from Attorney General William Barr at 3 (Mar. 24, 2019).

To the extent Special Counsel Smith possesses any authority to draft a report (and he does not) he should have applied the same principles as Special Counsels Hur and Mueller, which the Constitution, the Justice Manual, and applicable regulations and ethical rules all require. That is—providing a dispassionate description of the relevant facts, free of any gratuitous commentary regarding President Trump's conduct, let alone direct accusations of guilt. Smith failed to do so. Instead, he chose to construct the Draft Report as a partisan weapon, designed to "unfairly damage the reputation" of President Trump, Justice Manual § 1-7.100, in a manner calculated to "heighten[] public condemnation," 32 C.F.R. § 776.47, while providing "no . . . adversarial opportunity for public name-clearing before an impartial adjudicator," *Mueller Report*, Vol. II at 2. Accordingly, the Department should not, under any circumstances, permit Smith to complete or submit the Draft Report in this form or otherwise disseminate it to the public.

January 6, 2025
Page 8

### IV.    Preparation And Release Of A Report Would Serve No Valid Purpose

There are many practical and prudential reasons to obey the law here.  Preparation and release of a report by Smith would not "be in the public interest."  28 C.F.R. § 600.9(c).

In 2023, Smith and his Office levied extremely serious, and entirely false, allegations against President Trump in two separate cases.  Smith has now been forced by the rule of law to dismiss both of those cases.  It would be highly improper and contrary to the public interest—as well as inconsistent with the reconciliation and public healing process that is necessary following divisive and unconstitutional actions by Smith—to allow him to create and disseminate yet another document recycling politically motived and inaccurate claims that the law has forced him to abandon.  Indeed, "no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights."  *In re Smith*, 656 F.2d 1101, 1106 (5th Cir. 1981).  Smith lacks the credibility that is necessary for such a report to be reliable or valuable to anyone, as his biased and unlawful approach to these cases has been widely-criticized and discredited from the outset.[5]  Quite appropriately, he is the subject of an ongoing investigation by the Office of Professional Responsibility, further diminishing any value from a report.[6]  Smith's unlawful plan would reinforce the "likely prospect of an Executive Branch that cannibalizes itself, with each successive President free to prosecute his predecessors, yet unable to boldly and fearlessly carry out his duties for fear that he may be next."  *Trump*, 603 U.S. at 640.  "The enfeebling of the Presidency and our Government that would result from such a cycle of factional strife is exactly what the Framers intended to avoid."  *Id.*

At 1999 hearings relating to the Independent Counsel Act, Ted Olson argued that "the final report . . . has turned into an excuse to file long exhaustive expositions which rationalize the investigation," as well as "offer opinions regarding and/or pronounce judgments on the individuals investigated, and generally make the Independent Counsel look good."[7]  Attorney General Janet Reno pointed out, more succinctly, that "the price of the final report is often too high."[8]  Deputy Attorney General Eric Holder

---

[5] WSJ Editorial Board, *Jack Smith Loses in the People's Court*, WSJ (Nov. 7, 2024, 5:52 PM), https://www.wsj.com/opinion/donald-trump-prosecutions-jack-smith-fani-willis-alvin-bragg-juan-merchan-1c68f640; Jonathan Turley, *Opinion: Donald Trump just won the greatest jury verdict in American history*, The Hill (Nov. 6, 2024, 10:56 AM), https://thehill.com/opinion/campaign/4976533-trump-prosecutions-lawfare-end; Elie Honig, *So What Happens With All the Cases Against Trump Now?*, N.Y. Mag. (Nov. 8, 2024), https://nymag.com/intelligencer/article/what-will-happen-with-the-charges-against-trump.html.

[6] Letter from Chairman Jim Jordan to Jeffrey Ragsdale, DOJ OPR (Dec. 4, 2024) https://www.scribd.com/document/800789357/Judiciary-to-DOJ?secret_password=vphCtDdh3lHj7mTM5Ib8.

[7] *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 231 (1999) (prepared statement of Theodore B. Olson).

[8] *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 252 (1999) (prepared statement of Attorney General Janet Reno).

January 6, 2025
Page 9

added: "the reporting requirement goes directly against most traditions and practices of law enforcement and American ideals."[9]  Based on this feedback, Congress permitted the Independent Counsel Act to expire, and DOJ promulgated a reporting regulation that was much more restrictive than its statutory predecessor.[10]

For the quarter century that DOJ has operated under these Regulations, DOJ has not released a single Special Counsel report concerning any individual who has mounted a successful defense in court, as President Trump has done with respect to Presidential immunity.  For good reason: the Special Counsel Regulations state that the purpose of a report is to "explain[] the prosecution or declination decisions."  28 C.F.R. § 600.8(c).  When filing and resolving a case in Court, that information, together with the defense's responses, becomes part of the public record.  An additional, one-sided report, would only sow confusion and undermine the judicial process.

Here, Smith has explained himself, and sought unsuccessfully to justify his actions, *ad nauseum*.  This has included routinely leaking sensitive details regarding the actions of Smith's Office to the media in violation of DOJ policy.  In October 2024, it was leaked that Smith planned to "pursue his two cases against Mr. Trump for as long as he has the legal authority to do so—including during the period between Election Day and the inauguration, when Mr. Trump, if he prevails, would be president-elect."[11]  A similar July 2024 report cited "a person familiar with Mr. Smith's thinking."[12]  As another example, we first learned from the media, rather than Smith's Office, that they were considering dismissing the prosecutions of President Trump.[13]  And we learned for the first time via private outreach from media sources, rather than Smith's Office, that Smith is working on a report.

---

[9] *Reauthorization of the Independent Counsel Statute, Part I: Hearings Before the H. Comm. on the Judiciary*, 106th Cong. 86 (1999) (prepared statement of Deputy Attorney General Eric Holder )

[10] *Compare* 28 U.S.C. § 594(h)(1)(B) (calling for a "final report . . . setting forth fully and completely a description of the work of the independent counsel, including the disposition of all cases brought"), *with* 28 C.F.R. § 600.8(c) (calling for "a confidential report explaining the prosecution or declination decisions reached by the Special Counsel").

[11] Maggie Haberman et al., *Trump Says He'll Fire Jack Smith, Special Counsel Who Indicted Him, if He Wins Again*, N.Y. Times (Oct. 24, 2024), https://www.nytimes.com/2024/10/24/us/politics/trump-jack-smith.html.

[12] Alan Feuer, *Special Counsel Is Said to Be Planning to Pursue Trump Cases Past the Election*, N.Y. Times (July 2, 2024), https://www.nytimes.com/2024/07/02/us/politics/jack-smith-trump-charges.html.

[13] Pierre Thomas et al., *Special counsel Jack Smith expected to wind down Trump prosecutions: Sources*, ABC News (Nov. 6, 2024, 3:26 PM), https://abcnews.go.com/Politics/special-counsel-jack-smith-expected-wind-trump-prosecutions/story?id=115571646; Devlin Barrett, *Jack Smith Assesses How to Wind Down Trump's Federal Cases, Official Says*, N.Y. Times (Nov. 6, 2024), https://www.nytimes.com/2024/11/06/us/politics/doj-trump-federal-cases.html.

January 6, 2025
Page 10

In addition to the leaks, Smith filed four gratuitous speaking indictments, held a lawless press conference before the national media, and filed hundreds of pages of briefing in two district courts, two Courts of Appeals, and the Supreme Court. Smith's inappropriate 165-page "Motion For Immunity Determinations," accompanied by a 1,885-page "Appendix," is an especially egregious example of Smith's proclivity to seize all available opportunities to issue lengthy diatribes attacking President Trump based on Smith's biased view of the law and evidence.[14] Smith insisted on the filing, which even Judge Chutkan characterized as "atypical,"[15] to further publicize his narrative in the lead-up to the Presidential election. Smith's tome was not responsive to a defense motion, had no basis in the Federal Rules of Criminal Procedure, and violated DOJ's election-interference policies and practices. *See, e.g.*, Justice Manual § 9-85.500.[16] Having previously insisted on highly restrictive protective orders that prevented dissemination of discovery, based in part on histrionic, unsupported claims about witness identities, Smith abandoned those arguments and released the contents of protected reports, grand jury material, and accounts from thinly-veiled witnesses whom the media immediately identified.

Under these circumstances, there is no legitimate need for an additional "report" to "explain [Smith's] prosecution or declination decisions." 28 C.F.R. § 600.8(c). His baseless rationales for prosecution are already fully public. So too is the selective description that his Office prepared of the legal basis for the motions to dismiss, which Smith's Office caused OLC not to further memorialize in violation of the *Brady* doctrine and DOJ policy. Moreover, the Draft Report goes far beyond merely explaining Smith's "prosecution or declination decisions," deviating instead into extensive and irrelevant discussions on purported "litigation issues," including post-indictment immunity litigation and Smith's violation of the Department's political non-interference policies. *See* Draft Report Vol. I at 107-37. Although Smith may wish to air his baseless and politically motivated grievances regarding the Constitutional importance of immunity, and otherwise provide feeble and transparent excuses for his plainly political motivations, that is not the purpose of a Special Counsel report under 28 C.F.R. § 600.8(c). A report must simply "explain[]" a Special Counsel's "prosecution or declination decisions" and nothing more. The Draft Report violates this core principle.

The issuance of such a report, in violation of the Constitution, the Transition Act, Presidential immunity, and DOJ's own regulations, would exacerbate the irreparable damage that Smith has already inflicted on DOJ's reputation for non-partisanship through his repeated violations of DOJ policies about election interference. As we noted one year ago in opposing Smith's failed attempt to obtain certiorari before judgment on Presidential immunity, which the Supreme Court rejected, Smith's actions "create[] the compelling appearance of a partisan motivation: To ensure that President Trump . . . will face a months-long criminal trial at the height of his presidential campaign." Br. in Opp. to Pet'n for Writ of

---

[14] ECF No. 252, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Oct. 2, 2024).

[15] ECF No. 243 at 2, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Sept. 24, 2024).

[16] *See also* A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election, U.S. Dep't of Justice Office of Inspector General (June 2018) at 18 ("[I]n general, the practice has been not to take actions that might have an impact on an election, even if it's not an election case or something like that."), *available at* https://s3.documentcloud.org/documents/4515884/DOJ-OIG-2016-Election-Final-Report.pdf.

Certiorari Before Judgment in *United States v. Trump*, No. 23-624, at 21 (filed Dec. 20, 2024). Smith's nakedly partisan, election-interference motivation was obvious to commentators across the political spectrum. *See id.* (citing many sources). "[T]he best traditions of the U.S. Department of Justice ... call for prosecutors to *avoid* the appearance of election interference in the prosecution of political candidates." *Id.* at 23 (emphasis in original). "[F]ederal prosecutors . . . may never make a decision regarding an investigation or prosecution, or select the timing of investigative steps or criminal charges, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party." *Id.* (citing Justice Manual § 9-27.260). Smith's latest illegal plan to launch yet another partisan attack against President Trump, De Oliveira, and Nauta will have the same injurious effect on DOJ's reputation if not stopped in its tracks.

Further, preparing and releasing a report would be improper for the additional reason that Smith has relied on numerous legal theories that are unprecedented and incorrect as a matter of law. Many of those issues were the subject of ongoing litigation at the time Smith dismissed the cases. To name a few, these issues include the lack of statutory authority for Smith's appointment; Smith's reliance on official-acts allegations in both cases in violation of the Presidential immunity doctrine[17]; Smith's unlawful theory under 18 U.S.C. § 1512(c)(2) in violation of *Fischer v. United States*, 603 U.S. 480 (2024); equal protection violations, based on selective and vindictive prosecution theories[18]; the unprecedented and unlawful raid at Mar-a-Lago; and violations of the Presidential Records Act and NARA's longstanding practices under that Act.[19] There were also numerous discovery disputes in both cases, including unresolved motions in the Southern District of Florida regarding *Brady* obligations, the scope of the prosecution team, and Intelligence Community holdings, which further call into question the reliability of Smith's theories.[20] Smith's Draft Report presents a selective and inaccurate response to only some of these issues, and then proceeds as if his theories are well-founded and undisputed. Nothing could be further from the truth.

Finally, given the status of Smith and his team as the inauguration approaches, using additional taxpayer resources to prepare, review, and disseminate a report is not a legitimate use of taxpayer funds—even if there were a valid appropriation here, which there is not. "The Special Counsel's office has spent tens of millions of dollars since November 2022, all drawn unconstitutionally from the Indefinite Appropriation." *United States v. Trump*, 2024 WL 3404555, at *46 (S.D. Fla. July 15, 2024). For the period preceding March 31, 2024, Smith's Office had used $20 million from a permanent indefinite appropriation and an additional $16 million from other unspecified "DOJ components."[21] The costs of Smith's activities since March 2024 have not yet been released. It is clear, however, that the total figure

---

[17] ECF No. 324, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[18] ECF No. 328, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[19] ECF No. 327, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[20] ECF No. 262, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Jan. 16, 2024).

[21] Special Counsel's Office, DOJ, Statements of Expenditures, https://www.justice.gov/sco-smith.

January 6, 2025
Page 12

will greatly exceed—by an extraordinarily wide margin—what all of this lawfare was actually worth to the public, the operations of the government, and the Country as a whole.

*     *     *

      Smith's proposed plan for releasing a report is unlawful, undertaken in bad faith, and contrary to the public interest. Smith's conduct also raises grave concerns under Article II because it unlawfully encroaches on the Executive authority of the incoming Administration of President Trump to resolve the issues surrounding Smith's Office in accordance with President Trump's commanding national mandate from the voters. The time has come to put an end to this weaponization of the justice system and move forward constructively. No report should be prepared or released, and Smith should be removed, including for even suggesting that course of action given his obvious political motivations and desire to lawlessly undermine the transition. If you elect to proceed with Smith's plan, we again respectfully request (1) notice of such decision prior to any publication of the Draft Report, allowing us to take appropriate legal action, and (2) that this letter and Smith's meritless responses to the legal arguments set forth herein be incorporated into the Report.

Respectfully Submitted,

/s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC

/s/ John Lauro / Gregory Singer
John Lauro
Gregory Singer
Lauro & Singer

*Attorneys for President Donald J. Trump*

Cc:    Jack Smith, Special Counsel
       JP Cooney, Deputy Special Counsel
       (Via Email)



**U.S. Department of Justice**

**Jack Smith**
**Special Counsel**

January 7, 2025

<u>DELIVERY BY HAND</u>
The Honorable Merrick B. Garland
Attorney General of the United States
Robert F. Kennedy Department of Justice Building
950 Pennsylvania Avenue NW
Washington, D.C. 20530

    Re:    <u>Letter from Counsel to Donald J. Trump of January 6, 2025</u>

Dear Mr. Attorney General:

    As you know, my Office provided counsel to Mr. Trump, Mr. Nauta, and Mr. De Oliveira an opportunity to review a draft of my confidential Report and to provide any response in writing by 2 p.m. on January 6, 2025, so that my Office could consider any issues that counsel identified in the final Report before officially transmitting it to you. Only Mr. Trump's counsel chose to provide a written response, in the form of a letter to you. That response fails to identify any specific factual objections to the draft. Instead, Mr. Trump principally objects to public release of the Report, and in service of that objection makes a variety of false, misleading, or otherwise unfounded claims. While the determination as to whether to publicly release the Report, consistent with applicable legal restrictions, is yours as Attorney General, *see* 28 C.F.R. § 600.9(c), I felt it necessary to address below certain inaccuracies set forth in Mr. Trump's letter.

    As an initial matter, the Office extended Mr. Trump a special accommodation by allowing his counsel to review a draft of the Report. Such an accommodation is not required under the law or regulations. Nonetheless, the Office elected to provide Mr. Trump's counsel access to the draft Report through what it understood to be a process similar to that employed by Special Counsel Robert K. Hur: by allowing counsel to review the draft in person over the course of four days, in the Office's workspace, without contemporaneous access to personal electronics but with the ability to take notes, including the use of government laptops on which to draft a response. Specifically, on December 11, 2024, Mr. Trump's counsel requested an opportunity to review the Report before it was submitted to the Attorney General. On December 15, 2024, the Office informed Mr. Trump's counsel that it would make arrangements for counsel to review the draft Report and provided a range of dates when the review could occur. After Mr. Trump's attorneys complained that the initial review dates that the Office offered conflicted with their vacation schedules, the next day the Office changed the schedule to provide the dates they requested. It was thus surprising and disappointing to see Mr. Trump's grievances about these accommodations

in his letter, *see* Trump Letter at 2-3, especially after Mr. Trump's counsel explicitly stated their "genuine" and "personal appreciation" to the Office for the new dates in a phone call on December 16, 2024.

Mr. Trump's other criticisms of the review process are similarly disingenuous. For instance, he complains that he was prevented from reviewing the underlying documents cited in the draft Report, *id.* at 1, but over the four days Mr. Trump's attorneys were given to review the Report, they never requested access to a single underlying document, despite the fact that the Office had attorneys on hand specifically assigned to respond to any questions counsel might have. Relatedly, Mr. Trump insinuates that the Office improperly "demanded" that counsel delete discovery productions prior to their review of the draft Report, when in fact that deletion was required by the protective orders that federal judges entered in both of Mr. Trump's criminal cases. *See United States v. Trump*, No. 23-cr-80101, ECF No. 27 at 3 (S.D. Fla. June 19, 2023); *United States v. Trump*, No. 23-cr-257, ECF No. 28 at 2-3 (D.D.C. Aug. 11, 2023). In sum, Mr. Trump's counsel had a full opportunity to review the draft Report, and only came to the Office to review it on the first two of the four days available. Upon completing that review, Mr. Trump has not contested a single factual representation in the Report, instead objecting only to its public release.

Other complaints by Mr. Trump are addressed and rebutted by the Report and court decisions. For instance, Mr. Trump recycles his baseless allegation that the Office's work constituted a partisan attack, a claim flatly rejected by the only court to have ruled on it. *See United States v. Trump*, No. 23-cr-257, ECF No 198 (D.D.C. Aug. 3, 2024) (denying Mr. Trump's motion to dismiss indictment based on selective and vindictive prosecution, "finding no evidence of discriminatory purpose," "no evidence demonstrating a likelihood of vindictiveness," and "no evidence that would lead the court to infer that [prosecutorial] discretion has been abused") (internal quotation omitted). The Report explains in detail the Office's steadfast adherence to neutral and evenhanded application of the law and to the Department's Election Year Sensitivities policy. Mr. Trump also persists in his challenge to the Attorney General's authority to appoint a Special Counsel, which is the subject of a pending appeal in the Eleventh Circuit. *See United States v. Nauta et al.*, No. 24-12311 (11th Cir.). As explained in my Report, the Office is confident that the Department has strong arguments to prevail on that issue.

Finally, Mr. Trump's letter claims that dismissal of his criminal cases signifies Mr. Trump's "complete exoneration." That is false. As the Office explained in its dismissal motions and in the Report, the Department's view that the Constitution prohibits Mr. Trump's indictment and prosecution while he is in office is categorical and does not turn on the gravity of the crimes charged, the strength of the Government's proof, or the merits of the prosecution—all of which the Office stands fully behind.

Sincerely yours,

JACK SMITH

# EXHIBIT 44



← **Truth Details**
1839 replies

 **Donald J. Trump** ✅
@realDonaldTrump

The Crooked Election Interference "Thugs" from the DOJ, headed by the worst Thug of them all, Deranged Jack Smith, are now admitting that the Mar-a-Lago Security Tapes were NOT DELETED. That's not what they were illegally leaking to the press. These guys should be prosecuted for MISCONDUCT. Also, whatever happened to Crooked Joe's Documents? Where are the ones he sent and stored in Chinatown? Is Deranged Jack going to Indict him for this and, at the same time, receiving BRIBES FROM CHINA?

**8.65k** ReTruths   **29.1k** Likes                                    Jul 30, 2023, 11:50 AM

# EXHIBIT 45





● LIVE NOW

*The* WHITE HOUSE

↖ **PRESIDENTIAL ACTIONS**

Suspension of Security Clearances and Evaluation of Government Contracts

The White House

February 25, 2025

MEMORANDUM FOR THE SECRETARY OF STATE

      THE SECRETARY OF DEFENSE

      THE ATTORNEY GENERAL

      THE SECRETARY OF ENERGY

      THE DIRECTOR OF THE OFFICE OF MANAGEMENT AND

        BUDGET

      THE DIRECTOR OF NATIONAL INTELLIGENCE

      THE DIRECTOR OF THE CENTRAL INTELLIGENCE AGENCY

      THE DIRECTOR OF THE OFFICE OF PERSONNEL

        MANAGEMENT

SUBJECT:     Suspension of Security Clearances and Evaluation
of Government Contracts

I hereby direct the Attorney General and all other relevant heads of executive departments and agencies (agencies) to immediately take steps consistent with applicable law to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel, pending a review and

determination of their roles and responsibilities, if any, in the weaponization of the judicial process.  I also direct the Attorney General and heads of agencies to take such actions as are necessary to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law and consistent with the memorandum that shall be issued by the Director of the Office of Management and Budget.

Additionally, if any of the covered Covington & Burling LLP members, partners, and employees referenced in this memorandum obtained a security clearance from an agency not included as an addressee of this memorandum, the Director of the Office of Personnel Management shall provide this memorandum to the appropriate clearance-granting agency to ensure compliance.

I further direct the Director of the Office of Management and Budget to issue a memorandum to all agencies to review all Government contracts with Covington & Burling LLP.  To the extent permitted by applicable law, heads of agencies shall align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

  

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 46



← **Truth Details**
1152 replies



**Donald J. Trump** ✔
@realDonaldTrump

So Crooked HILLARY Clinton's lawyer, from the biggest of all Democrat law firms, and which is headed up by Chuck Schumer's brother, is put into the Manhattan District Attorneys Office in order to dredge up bull…. to PROSECUTE "TRUMP." A TOTALLY CORRUPT WEAPONIZATION OF LAW ENFORCEMENT BY THE DEMOCRATS, RUN DIRECTLY BY THE DEPARTMENT OF INJUSTICE (D.C.), WHO HAVE IMPLANTED THEIR OWN PEOPLE INTO THAT OFFICE. In the meantime, record breaking murders and violent crime are not even being looked at!

**8.56k** ReTruths  **29.7k** Likes                           Jan 26, 2023, 6:56 PM

# EXHIBIT 47



← **Truth Details**
288 replies                                                                                           ⋯



**Donald J. Trump** ✓
@realDonaldTrump

This Crazy Pomerantz guy, Hillary Clinton's lawyer, who left his Democrat only Law Firm to join (get this!) the Manhattan D.A.'s Office in order to prosecute "Trump," while at the same time writing a book about his exploits, including everything that happened in a secret Grand Jury. This guy is deranged and should be charged approximately. Nothing like this has ever happened before. As prosecutor he actually wrote a book in the midst of an ongoing case. It's stone cold prosecutorial misconduct!

**3.55k** ReTruths    **13.8k** Likes                                              Feb 09, 2023, 5:04 PM



# EXHIBIT 48



← **Truth Details**
1218 replies

•••


**Donald J. Trump** ✅
@realDonaldTrump

Every single Legal Scholar and Expert said that Soros backed prosecutor, Alvin Bragg, has "no case." This list includes Jonathan Turley, Gregg Jarrett, Byron York, Andrew McCarthy, Mark Levin, Alan Dershowitz, Mike Davis, David Rivkin, Kristin Shapiro, Brad Smith, Andrew Cherkasky, and many more. SO WHY WON'T THEY DROP THIS CASE? Alvin Bragg never wanted to bring it - thought it was a joke. Was furious at lawyer MARK POMERANTZ (will he be prosecuted?) for what he did!

**5.48k** ReTruths  **18.8k** Likes                              Apr 23, 2024, 10:57 AM



# EXHIBIT 49

# Presidential Documents

Executive Order 14237 of March 14, 2025

## Addressing Risks From Paul Weiss

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Background.* Global law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles. Many have engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections. Additionally, they have sometimes done so on behalf of clients, pro bono, or ostensibly "for the public good"—potentially depriving those who cannot otherwise afford the benefit of top legal talent the access to justice deserved by all. My Administration will no longer support taxpayer funds sponsoring such harm.

My Administration has already taken action to address some of the significant risks and egregious conduct associated with law firms, and I have determined that similar action is necessary to end Government sponsorship of harmful activity by an additional law firm: Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss). In 2021, a Paul Weiss partner and former leading prosecutor in the office of Special Counsel Robert Mueller brought a pro bono suit against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021, on behalf of the District of Columbia Attorney General.

In 2022, Paul Weiss hired unethical attorney Mark Pomerantz, who had previously left Paul Weiss to join the Manhattan District Attorney's office solely to manufacture a prosecution against me and who, according to his co-workers, unethically led witnesses in ways designed to implicate me. After being unable to convince even Manhattan District Attorney Alvin Bragg that a fraud case was feasible, Pomerantz engaged in a media campaign to gin up support for this unwarranted prosecution.

Additionally, Paul Weiss discriminates against its own employees on the basis of race and other categories prohibited by civil rights laws. Paul Weiss, along with nearly every other large, influential, or industry leading law firm, makes decisions around "targets" based on race and sex. My Administration is committed to ending such unlawful discrimination perpetrated in the name of "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant discrimination and other activities inconsistent with the interests of the United States should not have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

**Sec. 2**. *Security Clearance Review.* (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Paul Weiss and Mark Pomerantz, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Paul Weiss. The heads

of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

**Sec. 3**. *Contracting.* (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Paul Weiss and whether that business is related to the subject of the Government contract.

(b) The heads of all agencies shall review all contracts with Paul Weiss or with entities that disclose doing business with Paul Weiss under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Paul Weiss has been hired to perform any service;

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Paul Weiss or with entities that do business with Paul Weiss effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

**Sec. 4**. *Racial Discrimination.* Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

**Sec. 5**. *Personnel.* (a) The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Paul Weiss when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Paul Weiss employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Paul Weiss, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 14, 2025.*

[FR Doc. 2025–04867
Filed 3–19–25; 8:45 am]
Billing code 3395–F4–P

# EXHIBIT 50



*The* WHITE HOUSE

**EXECUTIVE ORDER**

Addressing Remedial Action by Paul Weiss

Executive Orders

March 21, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

<u>Section 1</u>.  <u>Background</u>.  On March 14, 2025, I signed Executive Order 14237 (Addressing Risks from Paul Weiss) to address certain issues related to Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss).  I noted that "[g]lobal law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles."  Paul Weiss is one of many law firms that have participated in this harmful activity.

 Earlier this week, though, Paul Weiss indicated that it will engage in a remarkable change of course.  Specifically, Paul Weiss has acknowledged the wrongdoing of its former partner Mark Pomerantz, and it has agreed to a number of policy changes to promote equality, justice, and the principles that keep our Nation strong, including: adopting a policy of political neutrality with respect to client selection and attorney hiring; taking on a wide range of pro bono matters representing the full political spectrum; committing to merit-based hiring, promotion, and retention, instead of "diversity, equity, and inclusion" policies; dedicating the equivalent of $40 million in pro bono legal services during my term in office to support causes including assisting our Nation's veterans, fairness in the justice system, and combating anti-Semitism; and

other similar initiatives.

This development should give Americans hope.  If the legal profession dedicates a fraction of its energy to bringing justice to local communities, unleashing hard-working businesses, strengthening the American family, and unifying our Nation, all Americans will benefit.

Sec. 2.  Revocation.  I hereby revoke Executive Order 14237 of March 14, 2025 (Addressing Risks from Paul Weiss).

Sec. 3.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:
(i)  the authority granted by law to an executive department or agency, or the head thereof; or
(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.
(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.
(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
    March 21, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

    

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 51

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,
IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

<u>Exhibit 51</u>

President Trump answering questions from reporters in the oval office,
posted to KGET.com on March 21, 2025

The posted video is available here:
https://www.kget.com/video/trump-suggests-law-firms-
%e2%80%98want-to-make-deals%e2%80%99-after-rescinding-paul-
weiss-order/10560109/

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit
is being maintained by plaintiff's counsel and will be provided to the
Court and defendants' counsel.*

# EXHIBIT 52

Federal Register

Vol. 90, No. 59

Friday, March 28, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14246 of March 25, 2025

## Addressing Risks From Jenner & Block

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Background.* My Administration is committed to addressing the significant risks associated with law firms, particularly so-called ''Big Law'' firms, that engage in conduct detrimental to critical American interests. Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles. Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients. Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Jenner & Block LLP (Jenner) is yet another law firm that has abandoned the profession's highest ideals, condoned partisan ''lawfare,'' and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States. For example, Jenner engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders. Moreover, Jenner discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based ''targets.''

In addition, Jenner was ''thrilled'' to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation. Andrew Weissmann's career has been rooted in weaponized government and abuse of power, including devastating tens of thousands of American families who worked for the now defunct Arthur Andersen LLP, only to have his unlawfully aggressive prosecution overturned by the Supreme Court. The numerous reports of Weissmann's dishonesty, including pursuit of nonexistent crimes, bribery to foreign nationals, and overt demand that the Federal Government pursue a political agenda against me, is a concerning indictment of Jenner's values and priorities.

**Sec. 2.** *Security Clearance Review.* (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Jenner. The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

**Sec. 3.** *Contracting.* (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination,

Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract.

(b) The heads of agencies shall review all contracts with Jenner or with entities that disclose doing business with Jenner under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Jenner has been hired to perform any service; and

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Jenner or with entities that do business with Jenner effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

**Sec. 4**. *Racial Discrimination.* Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

**Sec. 5**. *Personnel.* (a) The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Jenner when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Jenner employees, including but not limited to Andrew Weissmann, to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Jenner, including but not limited to Andrew Weissmann, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 25, 2025.*

[FR Doc. 2025–05519
Filed 3–27–25; 8:45 am]
Billing code 3395–F4–P

# EXHIBIT 53

 **Donald J. Trump Posts From His Truth Social**  
@TrumpDailyPosts

They spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, the Fake Dossier Hoax, FISA Fraud, Election Fraud, the "No Collusion" Mueller Hoax, and so much more. I was innocent on all counts. If I am elected, they will be brought to JUSTICE, something that Republicans have always been afraid to do.

Donald Trump Truth Social Post 05:02 PM EST 9/06/23

 **Donald J. Trump** ✓
@realDonaldTrump

They spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, the Fake Dossier Hoax, FISA Fraud, Election Fraud, the "No Collusion" Mueller Hoax, and so much more. I was innocent on all counts. If I am elected, they will be brought to JUSTICE, something that Republicans have always been afraid to do.

5:02 PM · Sep 6, 2023 · **38.5K** Views

# EXHIBIT 54



*The* WHITE HOUSE

↖ PRESIDENTIAL ACTIONS

ADDRESSING RISKS FROM WILMERHALE

Executive Orders

March 27, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Background. My Administration is committed to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests. Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles. Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients. Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) is yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States. For example, WilmerHale engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including

by supporting efforts designed to enable noncitizens to vote.  Moreover, WilmerHale itself discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

WilmerHale is also bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice.  For example, WilmerHale rewarded Robert Mueller and his colleagues — Aaron Zebley, Mueller's "top aide" and "closest associate," and James Quarles — by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history.  Mueller's investigation epitomizes the weaponization of government, yet WilmerHale claimed he "embodies the highest value of our firm and profession."  Mueller's "investigation" upended the lives of public servants in my Administration who were summoned before "prosecutors" with the effect of interfering in their ability to fulfill the mandates of my first term agenda.  This weaponization of the justice system must not be rewarded, let alone condoned.

Sec. 2.  Security Clearance Review.  (a)  The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest.

(b)  The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale.  The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3.  Contracting.  (a)  To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract.

(b)  The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale under subsection (a) of this section.  To the

extent permitted by law, the heads of agencies shall:

(i)   take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which WilmerHale has been hired to perform any service; and

(ii)  otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.  Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4.  Racial Discrimination.  Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5.  Personnel.  (a)  The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States.

(b)  Agency officials shall, to the extent permitted by law, refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

 Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
   March 27, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 55

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2

3     JENNER & BLOCK LLP,
                                        Civil Action No.
4              Plaintiff,               1:25-cv-0916

5         vs.                           Washington, DC
                                        March 28, 2025
6     U.S. DEPARTMENT OF JUSTICE,
      et al.,
7                                       5:51 p.m.
               Defendants.
8     _____/

9
                    TRANSCRIPT OF MOTION HEARING
10            BEFORE THE HONORABLE JOHN D. BATES
                 UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    For the Plaintiff:      MICHAEL ATTANASIO
                              Cooley LLP
14                            4401 Eastgate Mall
                              San Diego, CA 92121
15

16    For the Defendants:     RICHARD LAWSON
                              DOJ-USAO
17                            950 Pennsylvania Avenue, NW
                              Washington, DC 20530
18

19

20

21

22

23    Court Reporter:         JEFF HOOK
                              Official Court Reporter
24                            U.S. District & Bankruptcy Courts
                              333 Constitution Avenue, NW
25                            Washington, DC 20001
```

1                        **P R O C E E D I N G S**

2              **DEPUTY CLERK:**  We are on the record in civil case

3       25-916, Jenner & Block LLP vs. U.S. Department of Justice,

4       et al.

5              Starting with plaintiff's counsel, please approach

6       the podium and state your appearance for the record.

7              **MR. ATTANASIO:**  Good evening, Your Honor.  Michael

8       Attanasio, Cooley LLP, on behalf of the plaintiff, Jenner &

9       Block.

10             **THE COURT:**  Good evening.

11             **MR. LAWSON:**  Good evening, Your Honor.  Richard

12      Lawson with the Department of Justice, a Deputy Associate

13      Attorney General in the Associate Attorney General's Office.

14      And if I could thank Court and counsel and staff for

15      accommodating the staggered schedule this evening.

16             **THE COURT:**  Well, the schedule was a little

17      rushed, but you were a little busy as well.  We're here on

18      the motion of the plaintiff, Jenner & Block, for a temporary

19      restraining order.  It has filed papers in support of that,

20      and I've reviewed those papers, including copies of the

21      various executive orders and fact sheets -- and the

22      particular ones relevant here, and the accompanying

23      declaration.

24             I don't want you to start from scratch and take an

25      hour given the late time that we're starting this, but I

1    want to give each side -- and I guess even more so the

2    government, a chance to say its piece.  I haven't heard yet

3    from the government.  But we'll start with Jenner & Block

4    and Mr. Attanasio.

5         **MR. ATTANASIO:**  Thank you, Your Honor.  And let me

6    begin by, again, thanking the Court and the court staff for

7    staying late on this very significant matter; we greatly

8    appreciate it.

9         I want to begin by mentioning to the Court that

10    with me tonight are the declarant that we submitted to Your

11    Honor, Thomas Perrelli -- he is the chair of the global firm

12    Jenner & Block, along with several partners and lawyers from

13    Jenner & Block.  And I'm glad they're here because of the

14    importance of this matter to their firm and to lawyers

15    everywhere, frankly.

16         I appreciate the Court's comment regarding not

17    starting at the beginning and marching through the whole

18    exercise, which can be found in our papers, found in the

19    declaration.  Let me attempt to address two critical issues

20    that sweep across the entire landscape of the Executive

21    Order, our complaint and the temporary restraining order we

22    would ask you to enter.  And the two sweeping issues are,

23    first, that the Executive Order on its face is retaliatory;

24    and second, that the Executive Order on its face is intended

25    to have, and is having, a chilling effect on Jenner & Block,

**4**

1    its lawyers, its employees, their clients, government

2    lawyers and officials who might engage with -- to quote the

3    Executive Order, engage with Jenner & Block are all --

4        **THE COURT:**  So what do you point to in the

5    Executive Order to specify that intent or purpose?

6        **MR. ATTANASIO:**  I believe the Executive Order --

7        **THE COURT:**  You can imply it from much of the

8    Executive Order, but what do you point to specifically that

9    expresses that intent or purpose?

10       **MR. ATTANASIO:**  Yes, Your Honor.  And I'll preface

11   it by saying I don't think we have to set aside our common

12   sense in this regard, but I will point the Court

13   respectfully --

14       **THE COURT:**  But I'm not a juror.  That's what

15   usually is said to a juror.

16       **MR. ATTANASIO:**  Fair enough, fair enough.  I will

17   go right to Section 1.  Section 1 calls out what this is

18   about, calls out what the intent is.  It might as well have

19   a heading that says:  Assault on the viewpoints of Jenner &

20   Block and its clients; assault on the free speech rights of

21   this law firm for these reasons.  And let's look at the

22   reasons, because that will tell us the intent.

23       The first reason stated is the firm's, what I

24   would suggest to this Court in particular -- and frankly all

25   courts I've been in, commendable pro bono activities on

5

1    unpopular -- sometimes unpopular causes.  It's right there

2    in Section 1.  It says:  "This is a law firm that has stood

3    for and represented clients in matters implicating LGBTQ

4    rights, and in matters impacting asylum, refugee status and

5    immigration."  It says it right here.

6         The other thing it says, Your Honor, which I found

7    frankly incredible, is:  "Jenner engages in obvious partisan

8    representations to achieve political ends."  I want to

9    center that, and I want to make sure it's quoted with the

10    court reporter.  Quote:  "Jenner engages in obvious partisan

11    representations to achieve political ends."  That says that

12    if Jenner represents in any way, pro bono or paid, a client

13    that has a partisan or political difference with the

14    Executive, then Jenner will suffer the consequences.

15         And then most startling, most surprisingly and

16    shockingly, the order then goes on in Section 1 to name and

17    malign a former -- emphasis on former, partner of Jenner &

18    Block named Andrew Weissmann.

19         **THE COURT:**  Would this case be different if

20    Mr. Weissmann was still employed at Jenner & Block?

21         **MR. ATTANASIO:**  It would not.  But his prior

22    employment, and the fact that the order later in Section 5

23    indicates that Mr. Weissmann still works for Jenner &

24    Block -- because the order says to government officials do

25    not engage with Jenner & Block attorneys; do not let them

1    into your buildings including, but not limited to, Andrew

2    Weissmann, which is both nonsensical, but more importantly,

3    more importantly, tells us what is really going on here in

4    terms of retaliation.  The President of the United States is

5    saying that if a law firm represents clients with a

6    viewpoint, if the law firm employs an attorney who once

7    worked on an investigation under the auspices of the United

8    States, fully authorized investigation, appointed Special

9    Counsel Robert Mueller by the Deputy Attorney General, then

10   that law firm will be punished.  And the law firm in this

11   case is Jenner.

12       **THE COURT:**  Now, Section 1, you and I may find

13   much in Section 1 to be reprehensible.  My question for you

14   is:  What are you asking me to enjoin there?  It doesn't

15   instruct any action.  It doesn't really -- unlike some other

16   sections, it doesn't say agencies do this or agencies do

17   that.  It's just stating some viewpoints that I understand

18   why you find to be pretty distasteful.

19       But what would I be enjoining other than enjoining

20   the President's speech on those subjects?

21       **MR. ATTANASIO:**  There are --

22       **THE COURT:**  What would I be doing, saying:  I

23   strike this; President, you can't say this?

24       **MR. ATTANASIO:**  I understood -- I understand the

25   Court's concern on that point.  Let me address it in two

1    ways.  First, the reason there is a need to enjoin Section 1

2    is that the entire structure of the Executive Order is

3    essentially circular.  There is a direction to government

4    contracting agencies in Section 3 and all officials, all

5    agencies, in Section 5 to take certain steps, to the extent

6    consistent with national security or the interests of the

7    United States otherwise.  And in doing so, it has already

8    created the standard for that, and indeed the conclusion to

9    that question, and that is found in Section 1.  There is no

10   ability to apply Section 3 and Section 5 without reference

11   to Section 1.  And I would submit that is exactly why the

12   President set it up this way, is so that Section 3 and

13   Section 5 already have the question answered:  Just look

14   above to Section 1.

15        The second reason, Your Honor, in addition to the

16   interplay between these sections, is that Section 1 by

17   itself is impermissible violation of Jenner & Block's First

18   Amendment rights to advocate, to engage with its clients, to

19   take clients with unpopular causes, and is the real engine

20   of the chilling effect behind the First Amendment violation.

21   Section 3 and Section 5 are the execution.

22        **THE COURT:**  So if the President just gave a

23   response to a reporter's question at a press conference and

24   said exactly -- or just about what's in Section 1, but

25   didn't ask for any action by anybody, do you think that

1    would be actionable in court by Jenner & Block?

2         **MR. ATTANASIO:**  Well, I don't think we'd be here

3    filing this lawsuit and seeking a TRO.

4         **THE COURT:**  I think that's right, but my question

5    is would it be actionable?

6         **MR. ATTANASIO:**  I suppose there could be

7    situations in which statements that are defamatory or

8    malicious and meet those standards -- which we're not here

9    about, could require action.  But I'm not here to say that,

10   and I'd want to give that some more thought.

11        I don't -- what I am urging the Court is that you

12   can't effectively do that.  You can't strip Section 1 out of

13   this Executive Order, Sections 1 through 5, and treat it as

14   the type of statement Your Honor just suggested.  Could

15   there be an actionable case there?  I suppose.  But I want

16   to really drill in here on the interplay between the

17   sections, beginning with Section 1, and then the impact and

18   the chilling effect.  It is retaliatory intentionally.  It

19   is retaliatory to attack the viewpoints of Jenner & Block

20   and its clients.

21        And now let me turn, if I may, to the second part

22   of the big picture items I wanted to share with the Court,

23   and that is the chilling effect.  This is not a

24   hypothetical.  This is not the future.  This is today,

25   yesterday and the day before.  Jenner has been put in a

1    position in which its attorneys are being threatened with

2    the sanction of the Executive Branch, punishment by the

3    Executive Branch because they would represent certain

4    clients.  I would like the Court to consider, as an

5    experienced lawyer and judge, the chilling effect on counsel

6    who walks on eggshells, who looks over her shoulder because

7    representation of one of these groups or some other group we

8    don't know yet would cause an executive order like this to

9    be issued against her law firm.

10         I would like the Court to consider, and not only

11   consider, but read Mr. Perrelli's declaration at paragraphs

12   63 through 71 --

13        **THE COURT:**  That chilling effect that you just

14   mentioned, does it go to Jenner attorneys or does it go to

15   other attorneys who are chilled by this Executive Order?

16        **MR. ATTANASIO:**  Both, both.  And I don't want to

17   unduly rely on what is effectively a sister court of this

18   Court, but I -- because this Court will make its own

19   decision, I understand that.  But I would, in this regard,

20   just commend Your Honor to the order in the Perkins Coie

21   case in which the court said:  "These executive orders" --

22   this is quoting, "threaten to cast a chilling harm of

23   blizzard proportions across the entire legal profession."

24        **THE COURT:**  I understand that, I was just trying

25   to --

1          **MR. ATTANASIO:**  And that's what I thought Your

2     Honor was asking.  It is both, it is our profession -- your

3     profession, my profession, all of their professions, it is.

4     But right now, tonight, it's Jenner & Block.  They have

5     clients who don't want to work with them.  We have

6     clients --

7          **THE COURT:**  So what's the specifics, just for the

8     record, in terms of the harms?  Some of the harm -- I don't

9     know whether to call it most of it or much of it or just

10     some of it, depends on something that a private third party,

11     a client might do, drop the firm.

12          What is there specifically that takes that beyond

13     just assumptions or speculation to likelihood?

14          **MR. ATTANASIO:**  Understood.  First of all, again,

15     if we just take the order on its own terms, it is intended

16     to move clients away from Jenner & Block.  The President,

17     and allies of the President, have said the goal of these

18     orders is to put firms out of business that we don't like.

19          **THE COURT:**  Has the President said that?

20          **MR. ATTANASIO:**  The President -- one of his --

21          **THE COURT:**  I know Steve Bannon said that, but has

22     the President said that?

23          **MR. ATTANASIO:**  Your Honor has certainly read the

24     papers, I appreciate that.  The President has not said it in

25     those terms.  But in dealing with this Executive Order, both

1    in announcing its signing, and prior to that when talking

2    about law firms in general, the President has said:  Law

3    firms need to behave; they're -- some of them are bad

4    actors; they need to -- and I'm paraphrasing somewhat, but

5    he said they need to behave, they need to get with it.

6            **THE COURT:**  No, I think those two things have been

7    said.  Whether that comports with put them out of business;

8    maybe.

9            **MR. ATTANASIO:**  Then -- and I want to have some

10   distinction between what is obvious about the order and what

11   we know is happening, but also I want to be very granular.

12   We have specifics in Mr. Perrelli's declaration at

13   paragraphs 63 through 71.  The day after the order issued, a

14   client was told by a government official:  We cannot meet

15   with you if Jenner & Block is there.  That meeting is not

16   two years from now after some guidance is issued, that

17   meeting is April 3rd.  And that government lawyer has said:

18   No meeting if Jenner's going to be there.

19           They were fired, fired -- paragraph 64, by a pro

20   bono client who said this is -- effectively, this is too

21   hot, we're not going to be able to do that.  We have every

22   day clients, particularly those with government contracts,

23   expressing concern about their ability to continue with

24   Jenner & Block.  And so there's nothing fanciful or

25   speculative about this.  Your Honor understands this, I'm

1    confident.

2         A paying client or a pro bono client faced with a

3    choice of selecting a law firm that is under this kind of

4    shadow and cloud, and real consequences about government

5    buildings, government lawyers, choosing that law firm -- in

6    this case Jenner, versus another law firm that somehow or

7    another has escaped that sanction, what do we think is

8    likely to happen there?  There are many good lawyers at many

9    good law firms -- there are tremendous lawyers at Jenner,

10   but there's many good lawyers at many good law firms who

11   might be a better choice in that client's mind.

12        The other thing I'd like to just address, Your

13   Honor, is I would like to frame the idea of proportionality

14   and scrutiny of this order in the following terms.  We would

15   have an Executive Order here that says to 900 people --

16   including people in the mailroom, IT professionals, young

17   attorneys who want to be an Assistant U.S. Attorney, who

18   want to be a federal prosecutor:  You cannot be hired by the

19   federal government unless you go through a different

20   procedure than everybody else.  The door for you to be a

21   prosecutor, the door for you to be a courtroom deputy, the

22   door for you to be a U.S. Marshal, that's different than

23   anybody else.  Why?  Because you worked at Perkins Coie --

24   excuse me, excuse me, because you worked at Jenner.  That

25   cannot be how things stand in terms of the First Amendment

1    and the viewpoints that this law firm has represented.

2          THE COURT:  Let me ask a couple of other questions

3    along similar lines.  So in one of the more important

4    operative sections that you seek to enjoin, Section 3,

5    agency heads are instructed to review all contracts with

6    Jenner, and it goes a little further than that.  But it

7    doesn't necessarily direct a particular outcome from that

8    review.

9          Does that mean that it leaves discretion for

10   agency heads to reach whatever conclusion they feel is

11   appropriate, and does that somehow make your irreparable

12   harm less immediate and less likely?

13         MR. ATTANASIO:  No, it does not.  First of all, it

14   does not because government contracting is a critical part

15   of Jenner's business.  And we are being told, as we've

16   proven, that we're going to lose some business in that space

17   because of this order.  But with respect to the order, if I

18   could respectfully direct the Court's attention to 3(b)(i).

19         THE COURT:  Got it.

20         MR. ATTANASIO:  Those heads of agencies, at the

21   end of that part -- of part B, are told:  "To the extent

22   permitted by law, the heads of agencies shall" -- not may,

23   "shall take appropriate steps to terminate any contract, to

24   the maximum extent permitted by applicable law, including

25   the FAR, for which Jenner has been hired to perform any

1    service."  That's -- as I read that, that's mandatory.

2    There's no savings there.  There's no savings when you have

3    a blatant First Amendment violation like this by saying as

4    long as it complies with applicable law.  That law is well

5    established, so there's no out there.

6            But what this says is shall take steps to

7    terminate the contract.  Not because it's a bad contract,

8    not because it's waste, fraud and abuse, to use the phrase

9    of the day, but because Jenner worked with the client.  The

10   client --

11           **THE COURT:**  And so what about the phrase that you

12   just referred to, which appears in several locations:  "To

13   the extent permissible by law"?  Does that mean we should be

14   comfortable, and everything that's being commanded in this

15   Executive Order will be done consistent with the law?

16           **MR. ATTANASIO:**  Absolutely not.  First of all,

17   when the order on its face is retaliatory and causes the

18   chilling effect I've described, it cannot be saved.  Second

19   of all, the law is clear that when you have an executive

20   order or an act and it first violates the Constitution the

21   way this does, it's not saved by a boilerplate recitation of

22   consistent with applicable law.  And so no, there's nothing

23   here that can take a blatantly unconstitutional executive

24   order and save it by a boilerplate reference back to other

25   law that we don't even know what it is.  That just cannot

1     operate and withstand constitutional scrutiny, certainly not

2     under the First Amendment.

3            Because what is happening then, Your Honor, would

4     be a -- it would swallow itself.  You'd be saying to Jenner:

5     You violated what we think are proper activities; you've

6     represented clients we don't like, so we are going to punish

7     you, but it's only going to be consistent with law

8     otherwise.  The Supreme Court and the Constitution does not

9     allow for that kind of approach with this kind of order.

10           **THE COURT:**  So on due process -- not on the right

11    to counsel aspect of due process, the Fifth and Sixth

12    Amendment argument in terms of representing clients, but in

13    terms of notice of what the Executive Branch is doing or

14    wants to do with respect to Jenner & Block, why isn't the

15    Executive Order sufficient notice?

16           **MR. ATTANASIO:**  Well, the Executive Order came

17    with no notice, so -- I understand the Court's question.

18    We're here now.

19           **THE COURT:**  The Executive Order itself doesn't do

20    anything, it says agencies do these things.  So why isn't

21    the Executive Order sufficient notice that this is going to

22    be happening?

23           **MR. ATTANASIO:**  Because the -- what's happening in

24    terms of the punishment and the chilling effect on Jenner &

25    Block, its people and its clients is happening the second

1    this hit.  There was no opportunity to respond to what was

2    proposed in terms of immediate irreparable injury.  The

3    immediate irreparable injury will only be added to when

4    further steps are taken.  It's already happening the second

5    this came out.

6         So the moment in time, the snapshot in time to

7    look at procedural due process was when this was issued and

8    before: Did Jenner have notice?  Did Jenner have an

9    opportunity to try to do anything about this?  And the

10   answer is no.  And then you have a sweeping, very broad --

11   overbroad set of mandates that come out of the clear blue

12   sky and, frankly, are threatening to the firm, threatening

13   to its employees, threatening to its clients without any

14   notice or process whatsoever.

15        **THE COURT:**  So why don't you take a couple of

16   minutes to sort of wrap things up so I can hear from

17   Mr. Dawson (sic) on behalf of the defendants.

18        **MR. ATTANASIO:**  Yes, Your Honor.  I'll wrap up

19   here:  I often tell the young lawyers in my firm that you

20   are blessed to work in a profession that's as unique -- is

21   unique.  It's unique in the sense that you represent

22   somebody -- an individual, a company, a public interest

23   organization, and you stand behind -- between, rather, you

24   stand between that client and whatever the threat is that

25   faces that client.  It could be government action, it could

1    be a civil lawsuit, it doesn't matter.  We are the only

2    profession where the client hires you to stand in front of

3    the client and defend the client against whatever threat is

4    on the horizon: economic, personal freedom, the right to do

5    certain things, the right to live your life.

6            Unlike being a doctor, unlike being a teacher,

7    unlike anything, this Executive Order is designed to punish

8    that.  It's designed to say:  Lawyers, if the person or the

9    company or the organization you're standing in front of is

10   something that this Executive Branch does not like, we will

11   punish you.  We will punish you.  And that is not

12   constitutional, and that is not right, and this Court should

13   enjoin it with a TRO.  Thank you.

14          **THE COURT:**  Thank you.  Mr. Dawson -- I'm sorry,

15   Lawson.

16          **MR. LAWSON:**  Thank you, Your Honor.  So I would --

17   if the Court permits, I think a way to approach this is to

18   take each section that is, I believe, currently before the

19   Court for a TRO.  I read the order -- or the proposed order

20   in the motion as only addressing Sections 1, 3 and 5, not 2

21   and 4.

22          **THE COURT:**  That's all they seek to enjoin

23   temporarily --

24          **MR. LAWSON:**  Correct.

25          **THE COURT:**  -- through this TRO motion.

1          **MR. LAWSON:**  So if we could --

2          **THE COURT:**  And I believe that's consistent with

3     at least one other case.

4          **MR. LAWSON:**  Correct, Your Honor, the Perkins Coie

5     matter.  And so as to Section 1, I think our argument tracks

6     many of the questions the Court asked.  This is -- it is

7     speech, it is background.  It informs the order.  It informs

8     the background for where the order comes from.  It would

9     inform the provisions that are to be acted upon.  I would --

10    as I understand plaintiff's argument, the purpose of

11    enjoining Section 1 is that it has material influence on how

12    Sections 3 and 5 would be implemented.

13         We would submit that an order as it relates to 3

14    and 5 -- well, we would submit that there should be no

15    order, of course, but any order that addressed 3 and 5 would

16    necessarily resolve any concerns about Section 1.  I --

17         **THE COURT:**  So why is that important to the

18    government?  Let's assume what you said a moment ago, that 3

19    and 5 were enjoined.  Why is it important to the government

20    that Section 1 not be enjoined?

21         **MR. LAWSON:**  Because --

22         **THE COURT:**  What freedom does that give you to do

23    what?

24         **MR. LAWSON:**  I think it sends a very -- I think it

25    encroaches upon the speech prerogatives of the head of the

1    Executive Branch, that certain things could be said in

2    certain circumstances where the Judiciary is saying no, you

3    can't say that.  I think it's -- I think it would be

4    improper, and I think it's unnecessary.  So it's almost a

5    discretionary point that I'm making, that there is a thicket

6    over there with Section 1.  It's immaterial to any relief

7    that could be granted as to Section 3s 3 and 5.  It's

8    background, it is commentary.  It is a more formal, refined

9    version than the -- but in essence, the same as the

10   hypothetical the Court raised of a press interview where the

11   same statements would have been made.

12         So I would just urge that there's -- it offers no

13   material relief, and it skirts into a very, very complicated

14   area as far as the speech rights of the Executive and the

15   power of the Judiciary to control that.  I don't see that

16   being necessary.  I don't think ignoring Section 1, to the

17   degree the Court is inclined to grant any relief for

18   Sections 3 and 5 --

19         THE COURT:  But you will agree that Section 1 and

20   the observations -- I'll call them observations, made in

21   Section 1 are integral to and necessary to the order in

22   Section 3 and the order in Section 5 with respect to what

23   the federal government is going to be doing?

24         MR. LAWSON:  I think it's fair to say --

25         THE COURT:  Because without the basis, to the

1    extent that it is a basis, expressed in Section 1, that

2    there's no --

3         **MR. LAWSON:**  I think any --

4         **THE COURT:**  -- nothing to support Section 3 and

5    Section 5.

6         **MR. LAWSON:**  I think any member of the Executive

7    who would be wrestling with how to implement Sections 3 or 5

8    would necessarily be resorting and looking at what was said

9    in Section 1 to guide that decision.  But again, I think for

10   the purpose -- if the Court doesn't touch one but does do

11   something for 3 and 5, I don't think there's any, any harm

12   to plaintiff that the Judiciary hasn't enjoined statements

13   from the Executive as to his feelings on this firm.  And I

14   think it probably is --

15        **THE COURT:**  So let's talk about Section 1 then for

16   a second, you know, whether it's enjoined or not.  It looks

17   to me like a lot of conclusions and very little in the way

18   of specifics or facts to support those conclusions.  Would

19   you agree with that assessment?

20        **MR. LAWSON:**  I --

21        **THE COURT:**  Other than the specifics with respect

22   to Mr. Weissmann, there's very little --

23        **MR. LAWSON:**  Well, I mean --

24        **THE COURT:**  It says, okay, in this case or with

25   respect to this client or in articulating this position.

1          **MR. LAWSON:**  The document clearly speaks for

2     itself as far as what it's saying.  Is it an almanac of

3     specific case cites?  Clearly not.  Is it a reference to

4     numerous news articles?  I don't see that in there.  So, I

5     mean, it's -- I don't -- I'm not going to be able to sit

6     here and point to a section that says no, the Court has it

7     wrong as far as what you're seeing in there.

8          That being said, I'm not sure it is insufficient

9     for the purpose of guiding the other sections and their

10    implementation.  I don't think there's anything improper

11    with the specificity or not in the order.  It is a

12    promulgation from the Executive, fully within his rights,

13    government speech, to --

14         **THE COURT:**  So I'm left to guess to some extent

15    on, for example, what's the national security threat posed

16    by Jenner employees?

17         **MR. LAWSON:**  I think that there is a concern based

18    on the former employee Mr. Weissmann's activities.

19         **THE COURT:**  But he's a former employee.  You're

20    not really going to tell me now that -- perhaps your client

21    didn't know, but now that it's clear that he hasn't been

22    employed at Jenner & Block for four years, you're not going

23    to really tell me that having someone employed four years

24    ago poses some kind of national security threat?

25         **MR. LAWSON:**  Not per se, no.  But to the --

1       **THE COURT:**  Well, if not per se, then how?

2       **MR. LAWSON:**  To the degree there were any partners

3   or any interaction with people who are still there that

4   Mr. Weissmann might have been involved with when he was

5   there previously.

6       **THE COURT:**  Interaction with Mr. Weissmann,

7   what -- of course there are going to be people who had some

8   interaction with Mr. Weissmann.  Perhaps you might try to

9   make that a little more specific, because that seems a

10  little bit broad.

11      **MR. LAWSON:**  Well, if I could, on that point, it's

12  not a subject of the TRO.  I guess we will revisit it later

13  on the more substantive portions in the pleadings.  But the

14  national security interests are not critical -- they are

15  relevant, but they're not --

16      **THE COURT:**  But it's the basis for some of what is

17  commanded in Sections 3 and 5.

18      **MR. LAWSON:**  Well, it drives Section 2.  This is

19  where I was coming from on that.  And in Section 2, there

20  are some discretionary points.  Also in Section 5, when it

21  comes to hiring, there's some discretionary points; Section

22  3 as well.  And so it's -- I think there is the opportunity

23  for an inquiry onto the national security interests of

24  any -- or jeopardization of any national security interests

25  of Jenner & Block.  So it's not unnecessarily wholesale.

1          **THE COURT:**  To play off of what Mr. Attanasio was

2     referring to in terms of the entire workforce of Jenner &

3     Block, what's the national security justification for

4     commanding that an IT person or the mail person or a

5     second-year associate who's only worked on banking issues

6     cannot be hired by the federal government?  What's the

7     national security or other justification for that?

8          **MR. LAWSON:**  Well, I would submit that even higher

9     than the national security issue is another question of the

10     prerogative of the Executive to make those hiring decisions

11     in toto.  This is -- there is no --

12          **THE COURT:**  In toto, you mean notwithstanding the

13     First Amendment?

14          **MR. LAWSON:**  No, no, no --

15          **THE COURT:**  Is that what in toto means?

16          **MR. LAWSON:**  No, Your Honor.  What I mean by that

17     is these are hiring decisions that can be made -- it's in

18     the prerogative of the Executive to determine who to hire.

19     So it doesn't have to be driven by national security

20     interests to make a decision to or not to hire an employee.

21          **THE COURT:**  But can it be driven by First

22     Amendment interests?

23          **MR. LAWSON:**  Well, then we would always be --

24          **THE COURT:**  Because that's what it's driven by

25     here, isn't it?

1      **MR. LAWSON:**  Well, I don't think there is a

2   requirement necessarily that -- you have a -- I'm just

3   trying to imagine a situation where a prominent Democrat

4   were to seek employment within the Executive Branch of a

5   Republican administration or vice versa, there's no right to

6   that, there's no prerogative to that.  And the decision to

7   hire or not will be driven in large part by First Amendment

8   activities, you know, what is one political preference over

9   another political preference.  If that -- hopefully this has

10   answered --

11      **THE COURT:**  That might be true in an individual

12   circumstance, but this is not an individual circumstance

13   because it's not tied to anything individually.  It's a

14   blanket prohibition on hiring anyone in any federal agency

15   who is associated with Jenner & Block.

16      **MR. LAWSON:**  Not toto, Your Honor.  It allows for

17   individualized review; it does allow for that.

18      **THE COURT:**  Individualized reviews that are

19   skewed.

20      **MR. LAWSON:**  Well, it's -- there are

21   individualized reviews.  I mean, and exceptions could be

22   made.  It's not the total ban on that point.  But again, I

23   would submit to examine it within what is the true

24   prerogative of the Executive to make hiring decisions on

25   this point.  And I don't think that this order is

1   inconsistent.  I don't even -- I don't think any of the

2   provisions of Section 1 necessarily have to guide that

3   decision, whether --

4        **THE COURT:**  Let's look at the scope in another

5   context.  So you get to Section 5, and it tells the agency

6   heads that they should prohibit access to federal buildings

7   when such access would threaten the national security or

8   otherwise be inconsistent with the interests of the United

9   States.

10       Given what is said in Section 1 with respect to

11  Jenner & Block and its employees, what situation would you

12  present where agency heads would not find access to be

13  inconsistent with the interests of the United States?  I

14  mean, how would agency heads, given the Executive Order,

15  possibly say okay to a Jenner & Block employee having access

16  to a federal building?  It seems to basically say never.

17       **MR. LAWSON:**  Well, I would -- on a fine point as

18  it relates to Section 5 and that, I would urge the Court's

19  direction to the fact that it is calling for guidance, that

20  the guidance has not been issued.  We have a ripeness issue.

21  And to the degree that the Court is inclined -- of course,

22  we respectfully submit you should not, but to the degree

23  that the Court is inclined to grant an order on Section 5, I

24  would urge allowance for the development of the guidance,

25  because otherwise we can't have a concrete guidance issue.

1    I readily concede that there's no --

2            **THE COURT:**  I can't remember, did Judge Howell

3    allow the development of that guidance?

4            **MR. LAWSON:**  No, it was a total -- a total ban.

5    And we would submit that there's -- the ripeness issue is

6    kind of frozen, if you will, if you don't allow the guidance

7    to be developed.  Once we have the guidance, we know what is

8    concrete.  We know we will have solid issues to join as far

9    as what problems with access to buildings; what problems to

10   access to meeting with opposing counsel in criminal cases,

11   civil cases, government regulatory agencies; what problems,

12   if any, I should stress, exist.

13           Right now, we just have a direction to promulgate

14   the guidance, we don't have the guidance.  If the Court

15   freezes the order, as I'm reading the proposed order in the

16   motion, that doesn't happen.  There are many issues at play

17   in interaction with counsel, interaction with federal

18   agencies --

19           **THE COURT:**  No one's issued guidance yet?

20           **MR. LAWSON:**  To my knowledge, no.  To my

21   knowledge, no.

22           **THE COURT:**  Well, you're the fount of all

23   knowledge as far as I'm concerned, I don't have any other

24   access.

25           **MR. LAWSON:**  Well, as the Court noted, I've been

1    busy.  But I do not know, and I would doubt it just given my

2    limited experience and the speed with which these happen.

3    But we -- I apologize, I somewhat lost my train of thought.

4    So the -- you know, if we can get the guidance, then we can

5    have a concrete issue on that point.  Obviously, we've --

6    this is the third case that's been filed.  The Court is not

7    unaware of the Perkins Coie and the WilmerHale and now the

8    Jenner & Block issues.  We've seen the issues that have been

9    brought up as far as being able to execute duties for

10   clients and so forth.  These points are available.

11          The order in its way has acted as notice.  There

12   has been, through these pleadings, ways for the parties to

13   voice their concerns.  If -- once we have the guidance, if

14   the concerns are still there, then there is something to

15   join an action in this case.  There is one -- yes.

16          **THE COURT:**  Back to the point that your adversary

17   made a few minutes ago looking beyond Jenner & Block to the

18   legal community at large.  Do you think that we should

19   expect there will be more executive orders like this?  The

20   Executive Order with respect to Perkins Coie was temporarily

21   enjoined.

22          **MR. LAWSON:**  Yes.

23          **THE COURT:**  But that didn't dissuade the President

24   from issuing executive orders with respect to Paul, Weiss,

25   Wilmer and now Jenner & Block.

1        **MR. LAWSON:**  I don't --

2        **THE COURT:**  We should expect that more is going to

3   come, shouldn't we?

4        **MR. LAWSON:**  I think it would be out of place for

5   me to represent what the White House is intending as yes or

6   no.  But I don't think I can -- there are too many double

7   negatives I was about to say.  There certainly may be more,

8   I cannot represent yes or no.  I just -- I don't know enough

9   to represent confidently on that.

10        **THE COURT:**  And so -- I know I'm jumping around,

11   but that's because --

12        **MR. LAWSON:**  It's the Court's pleasure.

13        **THE COURT:**  So part of the position of Jenner &

14   Block, as articulated in their memorandum, is that this

15   Executive Order effectively bars their lawyers from entering

16   not just agency buildings but federal courthouses.  Do you

17   agree?

18        **MR. LAWSON:**  I don't believe that -- for the

19   reasons I mentioned earlier, I do not believe this order

20   bans them from anything.  It orders guidance to agencies

21   to -- or orders --

22        **THE COURT:**  Forget --

23        **MR. LAWSON:**  -- and so we don't -- if we have --

24        **THE COURT:**  Getting past that guidance versus

25   order point, are courthouses included?

1        **MR. LAWSON:**  I don't know the formal structure.

2   It's my understanding --

3        **THE COURT:**  Well, that's a problem.  It would be

4   nice if the Executive Order, and you speaking for it, knew

5   what it applied to.

6        **MR. LAWSON:**  Well, I was going to --

7        **THE COURT:**  That's a fairly significant point for

8   a law firm, isn't it?

9        **MR. LAWSON:**  Well, yes, but I would submit my

10  understanding is that the courthouses are run by the

11  executive agency of the General Services Administration,

12  GSA.

13       **THE COURT:**  For the most part, that is true.

14       **MR. LAWSON:**  So if the GSA is --

15       **THE COURT:**  Now that I've added to the record with

16  my own knowledge.

17       **MR. LAWSON:**  Thank you.  And if -- to the degree

18  that would come into play, that the order would be bound on

19  GSA, there would be guidance on that point.  We will not

20  deny the --

21       **THE COURT:**  So the U.S. Marshals would be at the

22  door, and if a Jenner & Block attorney showed up at this

23  courthouse, the U.S. Marshals would tell them to go away?

24       **MR. LAWSON:**  Your Honor, it's --

25       **THE COURT:**  How's that look?

1          **MR. LAWSON:**  I would not expect the guidance to

2     read that way.  And this order is not saying it has to read

3     that way.  The order is not saying anything about access to

4     courthouses.  That is not in this order as drafted.  It is

5     guidance to limit access.  An issue that was that granular

6     and that specific, that U.S. Marshals are to exclude Jenner

7     & Block lawyers from courthouses, would be very specific,

8     very granular, and we would be before this Court within

9     moments.  And I don't even think the Court would adjust the

10    hearing from 4:00 p.m. to 5:45 to address that issue.

11          The larger point I'm trying to make, Your Honor --

12    and I don't mean to be cute, is we don't have the

13    granularity of the guidance to know what is enjoined.  We

14    can have many issues, many examples of things that would be

15    clearly problematic that could fall within this, if you

16    wanted to look for it that way.

17          **THE COURT:**  So if --

18          **MR. LAWSON:**  But we won't know it for certain

19    until the guidance is issued.

20          **THE COURT:**  If there's a concern that some,

21    whether they be at agencies or at courthouses or wherever,

22    wouldn't -- would take this Executive Order as requiring

23    action rather than just the development of guidance, what

24    you're asking me to do, I take it, is, okay, Judge, the

25    Executive Order we don't think says that anything has to

1    happen, so we don't care if you say nothing can happen as

2    long as you say but the guidance can continue to be

3    developed.

4         MR. LAWSON:  I think this order -- the only action

5    called for from this order, as I'm reading it, is the

6    development of guidance.  That's it.

7         THE COURT:  That's not -- I think you're being a

8    little cute when you say that, and I'm sorry for the term I

9    use.

10         MR. LAWSON:  I introduced it.

11         THE COURT:  But it doesn't just say develop

12    guidance, it says review all contracts.

13         MR. LAWSON:  That is Section 3, Your Honor.

14         THE COURT:  There are things other than developing

15    guidance in here.

16         MR. LAWSON:  Section 3 is the review contracts, an

17    important distinction.  I hope, if we have time, that I can

18    address Section 3.  But as to Section 5, as to personnel and

19    buildings, as I'm reading --

20         THE COURT:  Section 2 isn't talking about

21    guidance, it says take steps to suspend any active security

22    clearances.  Now, they may not be seeking a temporary

23    restraining order with respect to that, but to categorize

24    this Executive Order as only saying develop some guidance --

25         MR. LAWSON:  I was only referring to Section 5,

1    Your Honor, when I made that comment.  Because the Court was

2    talking about access to building, access to meeting U.S.

3    Attorneys, access to patent officers, et cetera, et cetera.

4    So I was only talking about that.  If I could, I -- we're

5    taking --

6         THE COURT:  Of course, Section 5 also says agency

7    officials shall refrain from hiring employees of Jenner.  It

8    doesn't say develop guidance, it says refrain from hiring

9    employees of Jenner.

10        MR. LAWSON:  No, I will concede the point.  On

11   Section 5(b) for the hiring, that's not the guidance, but --

12        THE COURT:  So you're only talking about guidance

13   when you're talking about Section 5(a)?

14        MR. LAWSON:  Yes, to be granular on that point.

15   That's how I read it.  If I could to Section 3, an important

16   point on this and many of the issues that have been

17   circulating on this.  And I beg the Court's indulgence, a

18   number of pleadings have been before me today and cases, but

19   I think I've got it generally correct that some arguments

20   have been made --

21        THE COURT:  The Department of Justice has a lot of

22   lawyers.  Why is this all on you, Mr. Lawson?

23        MR. LAWSON:  Some of the people working with me on

24   this were not available.  And I, frankly, was supposed to be

25   in Florida, but here I am, and I'm much happier with that.

1    But it's --

2            THE COURT:  I don't find that to be much of an

3    answer, but go ahead.

4            MR. LAWSON:  Okay.  Well, the -- so as it relates

5    to Section 3, there has been some talk in a number of the

6    pleadings about sanctions and penalties.  And I would urge

7    the Court to take a look -- or to study the points we've

8    already discussed as to Section 5, individualized hiring at

9    5(b), the guidance in 5(a).  If we look at Section 3, and

10   we're talking about reviewing of the contracts, I would

11   submit that the issues regarding sanctions and penalties are

12   not applicable here.

13           Sanctions and penalties fall within the type of

14   issues addressed in the recent Supreme Court case with Vullo

15   involving, you know, aggressive moves by a New York

16   regulatory agency against the NRA.  And then also reference

17   the older case of Bantam Books involving some censorship and

18   threatened prosecutions.  The key distinction was Section 3

19   in contracts, is that when engaged in contracting -- and

20   this is a reference to Waters v. Churchill, 511 U.S. 661.

21   The government is acting as a private party, not as a

22   sovereign.  And the significance of that is that there is a

23   very long tradition of using the procurement power to

24   advance social policy.  Yes, Your Honor?

25           THE COURT:  I'm not sure where you're going.  The

1    government is acting as a private party and therefore the

2    First Amendment doesn't apply?

3        **MR. LAWSON:**  No, where I'm coming from, Your

4    Honor, is in the order, in Section 3 and in Section 1, there

5    are references to issues such as racial discrimination and

6    diversity and that sort of thing.  And it is a

7    well-established policy -- or well-established practice

8    going back decades that the procurement power can be

9    advanced and used to advance a social policy.  One of the

10   concerns laid out in this order does relate to issues of

11   diversity.  Jenner & Block is a participant in, I believe

12   it's called, the Mansfield Certification process regarding

13   diversity issues and that sort of thing.  And so the use

14   of -- in Section 3, the reference to diversity issues,

15   racial discrimination issues, this is a plausible and

16   well-supported use of power for procurement power to advance

17   this policy.

18        To give an example, although recently rescinded,

19   back in the '60s, Lyndon Johnson issued an EO regarding

20   affirmative action in government contracting.  There were

21   challenges to this.  One case brought a challenge, and it

22   was decided -- it's Contractors Association of Eastern

23   Pennsylvania vs. The Secretary of Labor, 442 F.2d 159, Third

24   Circuit, 1971.  Older case, but fairly early, of course, in

25   reaction to the Johnson executive order.  And the court,

1    recounting the whole history going back to Roosevelt on the

2    use of executive orders to advance social policy through

3    procurement, stated this, quote:  "No less than in the case

4    of defense procurement, it is in the interests of the United

5    States in all procurement to see that its suppliers are not

6    over the long run" --

7            **THE COURT:**  Slow down for the court reporter,

8    please.

9            **MR. LAWSON:**  Sorry.  "Not over the long run

10   increasing its costs and delaying its programs by excluding

11   from the labor pool available minority workmen."  And here's

12   the essential part:  "In the area of government procurement,

13   executive authority to impose nondiscrimination contract

14   provisions falls in Justice Jackson's first category" --

15   this is a reference, of course, to the Youngstown -- the

16   Court, I'm sure, knows -- Sheet.  "Falls in Justice

17   Jackson's first category, action pursuant to the express or

18   implied authorization of Congress."

19           So I would submit that there's no general right to

20   be able to receive contractor vending.  There is great power

21   and deference given to the Executive on procurement powers

22   to advance social issues.  So I would submit -- yes, sir.

23           **THE COURT:**  But you're sort of writing out of your

24   consideration the First Amendment and whether this is being

25   done in retaliation for speech.

1              **MR. LAWSON:**  I would submit that --

2              **THE COURT:**  Does any of the law that you're

3    referring to, whether from 1971 or any other time, deal with

4    a situation where the government action in the contracting

5    field was alleged to be retaliatory for the speech of the

6    contractor or its lawyers?

7              **MR. LAWSON:**  There certainly is a body of law that

8    discusses the idea of retaliation in contracting work.  But

9    I would direct the Court's attention --

10             **THE COURT:**  Do any of those cases deal with the

11   ability of the government to actually terminate contracts

12   because of the speech of the lawyers for the contractor?

13             **MR. LAWSON:**  I do not recall any other cases --

14             **THE COURT:**  I don't recall either, but I betcha

15   there aren't any.

16             **MR. LAWSON:**  There may not be, but I know even in

17   the Umbehr case, I mean, they're quite clear in that that

18   the concerns about retaliation and contracts, that

19   doesn't -- they were quite clear that their order does

20   not -- that the order in Umbehr addressing the retaliation

21   issues for First Amendment contract retaliation doesn't

22   affect -- that order does not reach future contracts.  So

23   this could even be going on a prospective basis outside of

24   the realm of the traditional cases that undoubtedly the

25   Court is thinking of in its question.

1          But I would also direct the Court's attention to

2     the McGowan vs. Maryland case, 366 U.S. 420.  And this is a

3     case that, as I recall, involved a challenge to Maryland

4     blue laws.  There was an accusation that the closing on

5     Sundays was designed to advance a religious motive.  And the

6     court looked at it and said, you know, there is a reason to

7     make everybody rest, productivity increases and so forth.

8     So even if there was a discriminatory reason on this, if

9     there's a valid reason to support it, that covers it.  So to

10    the degree the Court is worried about First Amendment

11    retaliation as it may apply to Section 3, there is the

12    discriminatory racial aspect that I would submit covers it.

13    I would submit that the First Amendment retaliation issue

14    doesn't quite apply here, but even if the Court found that,

15    I think that these cases support that it's a procurement

16    power.

17         And the larger point I would like to leave the

18    Court with, as it debates what to do with this, is that

19    Section 3 does not involve the exercise of sovereign power,

20    sovereign power like seen in Vullo of I will launch an

21    investigation and exact fines; or on Bantam Books, I will

22    launch investigation and look for criminal --

23         **THE COURT:**  But if you're right, therefore what?

24         **MR. LAWSON:**  That at the very least, that there

25    isn't enough merit at this point to grant the extraordinary

1    remedy of a temporary restraining order.

2              THE COURT:  Because of what?

3              MR. LAWSON:  Because Section 3 deals with

4    contracting.  And when it comes to the contracting order

5    addressing social policy, that is firmly supported on the

6    firmest grounds of Youngstown Sheet.

7              THE COURT:  Even if --

8              MR. LAWSON:  Partially.

9              THE COURT:  Even if it's for First Amendment

10   retaliatory reasons?

11             MR. LAWSON:  I read the McGowan case as saying

12   that if the Court finds that it was for retaliatory reasons,

13   but finds that one portion was valid -- and this is a

14   statute --

15             THE COURT:  Is that retaliatory reasons under the

16   First Amendment or just retaliatory reasons not under the

17   First Amendment?

18             MR. LAWSON:  To be clear, the McGowan case is not

19   dealing with retaliation First Amendment.

20             THE COURT:  Why isn't the First Amendment

21   different?  You're talking about a constitutional context.

22             MR. LAWSON:  McGowan was addressing -- well, the

23   First Amendment, but religious liberty, that provision in

24   that case.  The larger point, the larger point I think

25   that -- to derive from McGowan is that the Court was

1    examining a statute talking about thou shalt be closed on

2    Sunday.  And they said even if there was a discriminatory

3    reason, there is a legitimate reason and we're going to

4    sustain it.

5           This is an EO.  As it addresses procurement --

6    Section 3 is procurement, the firmest possible grounds as

7    referenced by the Contractors Association case, firmest

8    possible grounds.  So that's what I would say as to Section

9    3.  I think we have discussed Section 5 and then also

10   Section 1.  So I think the key points I'd like to -- I'd

11   wanted to raise I have.  I don't know if the Court has --

12          **THE COURT:**  I'll thank you and I'll give --

13          **MR. LAWSON:**  Thank you, Your Honor.

14          **THE COURT:**  -- your adversary just a few minutes,

15   very few.

16          **MR. ATTANASIO:**  I appreciate that.  Let me

17   first -- I'm going to address, I think, four points.  Let me

18   first take up this point about guidance in Section 5.  And I

19   think it's important to look at the word that follows the

20   word guidance in that section.  It appears in two places:

21   guidance relating to access to federal buildings, guidance

22   relating to engagement with government officials.  The word

23   that follows in both cases is limiting: guidance limiting

24   official access from federal government buildings; guidance

25   limiting government employees acting in their official

1    capacity from engaging with Jenner employees including, but

2    not limited to, Andrew Weissmann, who doesn't work for

3    Jenner.

4         It doesn't say expanding.  It doesn't say leave

5    neutral.  It doesn't say guidance that would treat Perkins

6    Coie and Jenner & Block like every other law firm in America

7    despite their speech, it says guidance limiting.  That

8    itself is the penalty.  That itself is what clients are

9    looking at and clients are saying, gee, I can hire a lawyer

10   that is not awaiting guidance that is likely to bar or limit

11   it from federal buildings or engaging with federal officials

12   or I can hire another firm.  So that's guidance, Your Honor.

13        The second point is I don't like to engage in

14   hyperbole, but I'm astounded by some of what I heard, and

15   Your Honor was getting right at it.  Of course there is

16   discretion in the Executive on hiring decisions.  Of course

17   there is discretion in the Executive for contracting

18   decisions.  The discretion does not extend to doing things

19   to people, citizens because of their race, because of their

20   gender, because of their speech, their First Amendment

21   speech.  And for government counsel of the United States

22   Department of Justice to say that the Executive has the

23   discretion to make those decisions about hiring, about

24   access to buildings, about government contracts, and just

25   sort of casually allow it to stand that those decisions

1    could be based on retaliation because of First Amendment

2    speech, I think, answers everything Your Honor needs to know

3    in granting this order.

4         The third point is I think we can all agree the

5    transcript will be excellent, I'm sure, but what we heard

6    under Your Honor's questioning is that the Department of

7    Justice concedes there is no national security implications

8    here for the employees of Jenner & Block.  Your Honor

9    pressed on that.  The answer is clear, the transcript will

10   show it, there was no stated national security risk.  The

11   whole point of this Executive Order was supposed to be

12   national security risk.  It's as obvious a pretext as the

13   seal over Your Honor's head, but we just heard that.  That's

14   what's most interesting.

15        Fourth, and finally, I'll end effectively where

16   Your Honor and I started, and that is Section 1.  Section 1

17   is critical.  It is the engine that moves the car.  It is

18   the engine and the wheels of this car, the car being this

19   whole Executive Order.  That is what Your Honor should put

20   an end to, along with Sections 3 and 5.  But I want to -- I

21   do want to be surgical here, and I would respectfully direct

22   the Court to our proposed order.

23        The order does not say restrain anybody from

24   saying these things.  The order says restrain the Executive

25   from using Section 1 to direct agencies to implement

1    anything, to do anything, to engage or communicate with

2    Jenner & Block or its clients based on Section 1.  So it is

3    meant to enjoin a specific utilization of Section 1 in

4    Sections 3 and 5, which we clearly see.  And that is

5    appropriate.  That is not restraining speech, that is

6    restraining execution of the vision of the President in this

7    Executive Order to punish Jenner for its speech.  Section 1

8    is the engine and the wheels of the car that do that, so we

9    would ask Your Honor to enjoin that, too.  Thank you.

10            **THE COURT:**  All right, thank you.  We're going to

11   take a five-minute break, then I'm going to come back and

12   I'll issue an oral opinion.  But we're going to have a

13   five-minute break first.

14            (Recess taken at 6:54 p.m.)

15            (Proceedings resumed at 7:08 p.m.)

16            **THE COURT:**  Before I forget, my thanks to staff

17   who are here today, court reporter and deputy clerk, for

18   staying to this late hour to deal with this matter.  And

19   we're here today because of an executive order, Executive

20   Order 14246, issued a couple of days ago, March 25th, 2025.

21   Its title is Addressing Risks from Jenner & Block, very

22   specific.  And this is one of several executive orders that

23   President Trump has issued over the course of this month

24   directing the federal government to target specific

25   prominent law firms for special -- that's not necessarily a

1    good term, treatment from the Executive Branch.  And it

2    follows Executive Order 14230 dealing with Perkins Coie and

3    Executive Order 14237 dealing with Paul, Weiss.  And then

4    there also is Executive Order -- an executive order dealing

5    with WilmerHale issued yesterday, I guess.

6          So in short, this Executive Order identifies a

7    series of so called risks that the President has assessed

8    that Jenner & Block poses to the federal government and to

9    the American people, and requires the federal government to

10    take steps to either terminate, restrict or reevaluate

11    aspects of the relationship that the federal government has

12    with Jenner & Block.  And I'll use the term Jenner from here

13    on out.

14          Today, Jenner filed a complaint and a motion for a

15    temporary restraining order seeking to immediately enjoin

16    the government from enforcing Sections 1, 3 and 5 of the

17    six-part Executive Order.  The Court scheduled this hearing,

18    and I appreciate everybody being available for it.  I'm

19    going to briefly address the three sections of the Executive

20    Order that Jenner seeks to enjoin.

21          Section 1 explains the so called risks that

22    President Trump has identified from Jenner.  The risks

23    derive directly from Jenner's choice of clients and causes

24    to represent and attorneys to associate with.  First, the

25    order claims that the firm has abandoned the legal

1  profession's highest ideals, condoned partisan lawfare, and

2  abused its pro bono practice to engage in activities that

3  undermine justice and the interests of the United States.

4  Jenner also allegedly "engages in obvious partisan

5  representations to achieve political ends, supports attacks

6  against women and children based on a refusal to accept the

7  biological reality of sex, and backs the obstruction of

8  efforts to prevent illegal aliens from committing horrific

9  crimes and trafficking deadly drugs within our borders."

10  And I'm quoting provisions here.

11      The order further contends that:  "Jenner

12  discriminates against its employees based on race and other

13  categories prohibited by civil rights laws, including

14  through the use of race-based targets."  Finally, the order

15  expresses President Trump's concern about Jenner's value and

16  priorities based on the firm's hiring of Andrew Weissmann,

17  an individual who worked on the Mueller investigation back

18  in 2016 and years after that, and who has been critical of

19  President Trump.  No further specifics or factual support

20  for these conclusory assertions is provided.  While Section

21  1 does not independently direct any action, it does serve as

22  the basis for the operative sections, Sections 3 and 5 in

23  particular, and is thus critical to their enforcement.

24      Section 3 imposes obligations on government

25  agencies related to government contracts associated with

1    Jenner.  As the White House succinctly summarized in its

2    fact sheet that accompanies the Executive Order:  "The

3    federal government will terminate contracts that involve

4    Jenner."  And not only contracts directly involving Jenner,

5    but it will also assess contracts with entities that do

6    business with Jenner.

7         Section 5 requires agency heads to provide

8    guidance broadly limiting agency contact with and access for

9    Jenner employees.  Agency heads must, to the extent

10   permitted by law -- and that phrase is frequently placed in

11   the Executive Order, "provide guidance limiting official

12   access from federal government buildings to employees of

13   Jenner when such access would threaten the national security

14   of or otherwise be inconsistent with the interests of the

15   United States."  And, "provide guidance limiting government

16   employees acting in their official capacity from engaging

17   with Jenner employees, including but not limited to Andrew

18   Weissmann, to ensure consistency with the national security

19   and other interests of the United States."

20        Finally, "Agency officials shall, to the extent

21   permitted by law, refrain from hiring employees of Jenner,

22   including but not limited to Andrew Weissmann, absent a

23   waiver from the head of the agency, made in consultation

24   with the Director of the Office of Personnel Management," a

25   waiver "that such hire will not threaten the national

1    security of the United States."  Now, upon inquiry, there

2    was no satisfaction for this Court in the responses of

3    government counsel as to what the national security

4    interests were, for example, in not hiring any employee of

5    Jenner into the federal government.

6         In any event, we're here on a TRO.  To secure a

7    TRO, the movant must establish a likelihood of success on

8    the merits, show irreparable harm in the absence of

9    preliminary relief, demonstrate that the equities favor

10   issuing an injunction, and persuade the Court that an

11   injunction is in the public interest.  Citation, Trump vs.

12   Thompson, 20 F.4th 10, jump cite 31, D.C. Circuit, 2021.

13   Where, as here, the government is the defendant, factors

14   three and four often merge.

15        In my view, Jenner has satisfied each factor for a

16   temporary restraining order.  As to likelihood of success on

17   the merits, the Court determines that plaintiffs are likely

18   to succeed on the merits of at least two of their claims,

19   and perhaps as well a third.  This does not indicate that

20   its other claims lack merit.  The Court limits itself to

21   these two claims primarily in the interest of time, because

22   they are sufficient to support the relief plaintiffs seek.

23        The first claim Jenner is likely to succeed on is

24   its claim that the Executive Order retaliates against it for

25   its protected speech in violation of the First Amendment.

1    Official reprisal for protected speech offends the

2    Constitution because it threatens to inhibit exercise of the

3    protected right.  And the law is settled that, as a general

4    matter, the First Amendment prohibits government officials

5    from subjecting an individual to retaliatory actions for

6    protected speech; Hartman vs. Moore, 547 U.S. 250, jump cite

7    256, 2006.  As well, that is true for the individuals

8    associations.  See Rutan vs. Republican Party of Illinois,

9    497 U.S. 62, jump cite 75, 1990.

10          Here, the Executive Order explicitly targets

11   Jenner because of the speech the firm engages in and the

12   viewpoints it represents in litigation; namely, its actions

13   against the federal government, and its litigation in

14   support of transgender individuals and undocumented

15   immigrants.  The Executive Order also targets the firm

16   because it once employed -- in other words, it was

17   associated with, Andrew Weissmann.  As a judge in this

18   district said in regard to a similar executive order against

19   another law firm, the speech and viewpoints for which Jenner

20   is targeted fall squarely within the protections of the

21   First Amendment; a transcript of the hearing before Judge

22   Howell in the Perkins Coie matter at 76, lines 24 to 25.

23          And the Executive Order gives no reason specific

24   to Jenner for the restrictions it places on the firm besides

25   the speech or its former -- that it or its former partner

1  has engaged in.  The fact that the Executive Order facially

2  retaliates against Jenner because of its speech and

3  association is sufficient to show that the firm is likely to

4  succeed on the merits of the First Amendment retaliation

5  claim.

6       For similar reasons, the Court determines that

7  Jenner is likely to succeed on the merits of its claim that

8  the Executive Order constitutes unconstitutional viewpoint

9  discrimination.  Of all the content discrimination the First

10  Amendment covers, viewpoint discrimination is particularly

11  egregious; Vidal vs. Elster, 602 U.S. 286, jump cite 293,

12  2024.  A regulation or sanction discriminates based on

13  viewpoint if it targets not merely a subject matter but

14  particular views taken by speakers on the subject; citation

15  to id.  Such regulations are, as the D.C. Circuit has put

16  it, poison, and in cases such as this one, can only survive

17  if they survive strict scrutiny.  See Frederick Douglass

18  Foundation, Inc. vs. District of Columbia, 82 F.4th 1122,

19  jump cite 1141, D.C. Circuit 2023.

20       Little need be said to show why the Executive

21  Order places restrictions on Jenner based on the particular

22  views the firm has taken.  Indeed, all that need be said is

23  said by the Executive Order itself: Jenner supports attacks

24  against women and children based on a refusal to accept the

25  biological reality of sex, and backs the obstruction of

1    efforts to prevent illegal aliens from committing crimes.

2    All, I might add, by its litigation positions in court.  And

3    that's from Executive Order, Section 1.  These are the

4    reasons the Executive Order gives for its sanctions against

5    Jenner, and they are viewpoints.

6          There is no cogent argument that these

7    viewpoint-based sanctions are likely to pass strict

8    scrutiny.  To satisfy strict scrutiny, the government must

9    demonstrate that a speech restriction serves a compelling

10   government interest and is narrowly tailored to further that

11   interest; citation to the TikTok case v. Garland, 122 F.4th

12   930, jump cite 952, D.C. Circuit 2024.

13         The Executive Order gives lip service to the

14   interests of public safety and national security and

15   protecting constitutional rights and bedrock American

16   principles.  Even if the Court were to somehow conclude that

17   Jenner's representation of transgender individuals and

18   undocumented immigrants threatens public safety, national

19   security and the like, its sanctions imposed by Sections 3

20   and 5 sweep far too broadly.  Section 3 requires government

21   contractors to disclose any contracts with Jenner and agency

22   heads to cancel those contracts, completely divorced from

23   the subject matter of the contracts or how they impact the

24   firm's representations deemed problematic in Section 1 of

25   the Executive Order.

1          Section 5 then limits the access of every Jenner

2     employee -- not just those associated with certain

3     litigation or actions, limits their access to federal

4     government buildings and federal employees.  A limit placed

5     on everyone, from managing partners to office staff, as a

6     result of a subset of cases the firm has taken on cannot be

7     said to be narrowly tailored.  Surely there are less

8     restrictive alternatives that would accomplish the

9     government's goal, even if that goal were appropriate.  See

10    TikTok, 122 F.4th 952.

11         The Supreme Court has said time and again that the

12    public expression of ideas may not be prohibited merely

13    because the ideas are themselves offensive to some of their

14    hearers; Matal vs. Tam, 582 U.S. 218, jump cite 244, a 2017

15    case.  And those hearers include the Trump administration.

16    Thus, this Court concludes that plaintiffs are likely to

17    succeed on the merits of their claim that the Executive

18    Order unconstitutionally discriminates based on viewpoint.

19         Now, the third reason I'll refer to only briefly.

20    The First Amendment harms the Executive Order inflicts are

21    magnified by its additional Fifth and Sixth Amendment

22    deficiencies.  Together, these amendments reflect and

23    protect the essential role that lawyers play in our polity.

24    The Sixth Amendment guarantees criminal defendants the right

25    to the effective assistance of counsel, and the Fifth

1    Amendment's Due Process Clause affords certain protections

2    to civil litigants' access to lawyers.  By arguing that

3    Jenner -- by targeting Jenner for its activities in both

4    realms, the Executive Order likely offends the Fifth and

5    Sixth Amendments in addition to the First Amendment.

6         With respect to irreparable harm, of course,

7    simple likelihood of success on the merits is not enough.

8    Jenner must also show irreparable harm.  Jenner has shown

9    that absent a TRO it will likely suffer irreparable harm in

10   at least two ways.  First, Jenner will likely suffer

11   irreparable economic harm because of the Executive Order.

12   In this circuit, it is well settled that economic loss does

13   not in and of itself constitute irreparable harm.  The

14   Wisconsin Gas Company vs. FERC case, 758 F.2d 669, jump cite

15   674, D.C. Circuit 1985, stands for that proposition.  But

16   economic loss can constitute irreparable harm where the loss

17   threatens the very existence of the movant's business; id.,

18   citation to the same case at same place.  Considering the

19   firm-wide effects of the Executive Order, it threatens the

20   existence of the firm.

21        Let's start with Section 3 which requires federal

22   contractors to disclose business they do with Jenner, and

23   directs agencies to cancel any contract they have with

24   Jenner.  Jenner's firm chair, Thomas Perrelli, explains that

25   for the past five years, about 40 percent of the firm's

1    revenue came from clients who are government contractors.

2    Since the Executive Order was issued, numerous federal

3    contractor clients of the firm have expressed concerns about

4    government mandated disclosure of their relationship with

5    Jenner, and are thus nervous about their relationship with

6    the firm.  These fears make it likely that the firm could

7    lose their federal contractor business or even a portion of

8    it, which amounts to a serious threat to the firm's

9    financial health.  And that does not take account of the

10   loss from the cancellation of Jenner's own government

11   contracts, which the facts sheet confirms will occur.

12           Section 5, meanwhile, threatens a vast swath of

13   the firm's other business.  The Executive Order's directive

14   to limit official access from government buildings to

15   employees of Jenner can be read to extend to federal

16   courthouses and administrative agency buildings, and

17   certainly nothing said in this hearing or the language of

18   the Executive Order would indicate otherwise.  Jenner,

19   however, has around 540 active matters pending before

20   federal courts and numerous matters before agencies that

21   require access to federal government buildings and

22   officials; Perrelli declaration, paragraph 64.  Some of

23   those clients have already expressed concern that Jenner

24   cannot represent them; citation to the same paragraph.

25   This, combined with the imminent loss of federal contractor

1    business, could be a death knell for Jenner's financials.

2    Additionally, while it's not alone dispositive, it

3    is relevant that the defendants here are shielded by

4    sovereign immunity.  That doesn't mean that any economic

5    loss is necessarily enough to establish irreparable harm,

6    but it does weigh in favor of a showing of irreparable harm

7    because what is lost is likely lost forever.  See, for

8    example, Cardinal Health, Inc. vs. Holder, 846 F.Supp.2d

9    203, jump cite 211, D.D.C. 2012.

10    Second, and even more simply, Jenner is suffering

11    irreparable harm because the order likely impinges on the

12    firm's First Amendment rights.  Although not the case for

13    all constitutional rights, the D.C. Circuit has said that

14    the loss of First Amendment freedoms for even minimal

15    periods of time unquestionably constitutes irreparable

16    injury; Pursuing America's Greatness vs. Federal Election

17    Commission, 831 F.3d 500, jump cite 511, D.C. Circuit 2016.

18    As explained already, the Court determines that it is likely

19    that the Executive Order is depriving Jenner of its First

20    Amendment freedoms in a significant way.  The firm is,

21    therefore, suffering irreparable harm.

22    Now, the last two factors are the balance of

23    equities and the public interest.  Where the movant seeks to

24    enjoin the government, the final two factors tend to merge.

25    Here, these clearly favor issuing the TRO.  Section 1 of the

1    Executive Order targets Jenner in part based on the

2    identities of its clients, such as its pro bono

3    representation of transgender individuals and immigrants.

4    Our legal system relies on lawyers who advocate zealously

5    for all clients.  If law firms are targeted by and thus

6    chilled from representing some of the most vulnerable

7    individuals and social groups, particularly through pro bono

8    work, then it is those individuals who will suffer the

9    greatest harm.  As such, it is emphatically in the public

10   interest to temporarily enjoin the Executive Order.

11        And I will note that the reference in the

12   Executive Order, Section 1 to pro bono practice is

13   disturbing where it says:  "Law firms regularly conduct this

14   harmful activity through their powerful pro bono practices,"

15   effectively condemning pro bono practice by Jenner or other

16   large firms.  That is troubling to the Court.  The Court

17   does not take lightly the power to enjoin the Executive

18   Branch, but the government has not made any persuasive case

19   that the public interests will be harmed by a temporary halt

20   to the enforcement of this plainly speech-based Executive

21   Order.

22        By contrast, Jenner seeks refuge from serious and

23   irreparable harm, both to its constitutional rights and to

24   its pocketbook.  And the public interest extends beyond

25   Jenner.  The legal profession as a whole is watching and

1    wondering whether its courtroom activities, in the best

2    tradition of lawyering, will cause the federal government to

3    turn its unwanted attention to them next.  In these

4    circumstances, a temporary restraining order is very well

5    warranted at this time.

6         Now, the order that I'm going to issue is a

7    written order.  I'll make that available in a moment to you,

8    but I'll go ahead and read it.

9         It is ordered that the motion for a temporary

10   restraining order is granted; and it is further ordered that

11   the defendants are enjoined from implementing or enforcing

12   Sections 3 and 5 of the President's March 5, 2025 Executive

13   Order entitled Addressing Risks from Jenner & Block.

14        It is further ordered that defendants are enjoined

15   from using the statements laid out in Section 1 of the

16   Executive Order in any interactions with plaintiff or

17   plaintiff's clients or employee of plaintiff or plaintiff's

18   clients.

19        It is further ordered that defendants are directed

20   to suspend and rescind all guidance or other direction

21   provided to their officers, staff, employees or contractors

22   to communicate, effectuate, implement or enforce Sections 1,

23   3 and 5 of the Executive Order.

24        It is further ordered that defendants are directed

25   immediately to issue guidance to their officers, staff,

1    employees and contractors to disregard Sections 1, 3 and 5

2    of the Executive Order, and to carry on their ordinary

3    course of business absent these sections of the Executive

4    Order.

5         It is further ordered that defendants are directed

6    immediately to, first, communicate to every recipient of a

7    request for disclosure of any relationship with Jenner &

8    Block or any person associated with the firm, made pursuant

9    to Section 3(a) of the Executive Order, that such request is

10   rescinded until further order of the Court; and secondly,

11   cease making such requests for disclosure pursuant to

12   Section 3(a) of the Executive Order until further order of

13   the Court.

14        It is further ordered that defendants must, in

15   good faith, take such other steps as are necessary to

16   prevent the enforcement or implementation of Sections 3 and

17   5 of the Executive Order during the effective period of this

18   order.

19        It is further ordered that Defendants U.S.

20   Department of Justice, Pamela Bondi, in her official

21   capacity as U.S. Attorney General; the Office of Management

22   and Budget and Russell Vought, in his official capacity as

23   director of the Office of Management and Budget, must

24   additionally immediately issue guidance to all other

25   agencies subject to the Executive Order to suspend and

1    rescind any implementation or enforcement of Sections 3 and

2    5 of the Executive Order, as well as any use of or reliance

3    on the statements in Section 1 of the order.

4          It is further ordered that defendants must file a

5    status report by 12:00 p.m. on Monday, March 31st describing

6    the steps taken to ensure compliance with this order, and

7    certifying compliance with its requirements.

8          And it is further ordered that this order shall

9    remain in effect until further order of the Court.  It is so

10   ordered.

11         So I will get signed copies of this order out to

12   you in two minutes, but that is the ruling of the Court as

13   explained.  And with that, I believe we are done late this

14   evening.

15         Is there anything that either side wishes --

16   you're both poised to jump up.  We'll listen to the

17   plaintiffs first.

18         **MR. ATTANASIO:**  Your Honor, we would propose to

19   report back to the Court on Monday after conferring with

20   government counsel on a scheduling order for the balance of

21   the case.  In the Perkins Coie case, the parties are going

22   directly to dispositive motions, summary judgment, so on.

23         **THE COURT:**  I will welcome that proposal with

24   respect to schedule.

25         **MR. ATTANASIO:**  Thank you.

1          **THE COURT:**  Mindful of the fact that this is a

2   temporary restraining order.

3          **MR. ATTANASIO:**  Yes.

4          **THE COURT:**  But certainly if you consult and

5   propose something, that will be welcome.

6          **MR. ATTANASIO:**  Thank you, Your Honor.  We would

7   like to go quickly, and we are prepared to even go on the --

8   on Judge Howell's schedule with respect to Perkins Coie, but

9   we'll discuss with government counsel.

10          **THE COURT:**  I appreciate that.  Mr. Lawson.

11          **MR. LAWSON:**  Can I have a moment with counsel and

12   then address the Court?

13          **THE COURT:**  You may.

14      (Discussion off the record)

15          **THE COURT:**  Yes, Mr. Lawson.

16          **MR. LAWSON:**  The -- there are some logistics

17   issues for the noon Monday deadline.  I had one request.  I

18   believe there is an objection --

19          **THE COURT:**  That's because you're supposed to be

20   in Florida or something like that?

21          **MR. LAWSON:**  Well, I'm -- there's a lot going on.

22   There was one -- the second to last provision, the direct --

23   the guidance from Bondi and Vought and those agencies, that

24   involves a great deal more technical approval processes.

25          **THE COURT:**  I understand that.

1            **MR. LAWSON:**  I believe counsel has an objection.

2    I would ask the Court if it could just direct the defendants

3    to do that exact same language.  For the defendants writ

4    large, it's just logistically easier.  That's the ask.

5            **THE COURT:**  I'm not dictating what the report by

6    noon on Monday will say.  And if it's something that both

7    sides agree to, it's probably going to be all right with me.

8    But in any event, whatever the representations are, make

9    them.  And I'm a reasonable person, I understand that there

10   are limitations in what can be accomplished in a limited

11   amount of time.

12           **MR. LAWSON:**  Thank you, Your Honor.

13           **THE COURT:**  All right.  With that, I thank

14   everyone for their patience, particularly those sitting in

15   front of me.  We'll bring out signed copies of that order

16   momentarily.  Have a good evening and a good weekend.

17           (Proceedings adjourned at 7:35 p.m.)

18

19

20

21

22

23

24

25

1                        **C E R T I F I C A T E**

2

3              I, **Jeff M. Hook, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9        _____        _____

         **March 31, 2025**                    *[signature]*

10              **DATE**                      **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 56

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILMER CUTLER LLP,                    )
                                      )
          Plaintiff,                  )
                                      )   CA No. 25-917
                                      )   Washington, D.C.
      vs.                             )   March 28, 2025
                                      )   4:30 p.m.
EXECUTIVE OFFICE                      )
OF THE PRESIDENT, ET AL.,             )
                                      )
          Defendants.                 )
_____   )


TRANSCRIPT OF MOTION HEARING ON TRO PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Paul Clement
                            Erin Murphy
                            CLEMENT & MURPHY, PLLC
                            706 Duke Street
                            Alexandria, VA 20004
                            (202) 742-8900
                            Email:
                            paul.clement@clementmurphy.com


For the Defendants:         Richard Lawson
                            DOJ-USAO
                            950 Pennsylvania Avenue, NW
                            Washington, D.C. 20530-0001
                            202-445-8042
                            Email:
                            richard.lawson3@usdoj.gov

```
APPEARANCES CONTINUED:

Court Reporter:                 William P. Zaremba
                                Registered Merit Reporter
                                Certified Realtime Reporter
                                Official Court Reporter
                                E. Barrett Prettyman CH
                                333 Constitution Avenue, NW
                                Washington, D.C. 20001
                                (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription
```

1          P R O C E E D I N G S

2          COURTROOM DEPUTY:  All rise.  The United States

3   District Court for the District of Columbia is now in

4   session, the Honorable Richard J. Leon presiding.  God save

5   the United States and this Honorable Court.  Please be

6   seated and come to order.

7          We're on the record in Civil Action 25-917,

8   Wilmer Cutler, Pickering, Hall and Dorr, LLP, versus

9   Executive Office of the President, et al.

10         Starting with plaintiff's counsel, please approach

11   the podium and state your appearance for the record.

12         MR. CLEMENT:  Good afternoon, Your Honor.

13         Paul Clement from Clement & Murphy.

14         THE COURT:  Welcome.

15         MR. CLEMENT:  Thank you.

16         Would you like to me introduce my co-counsel or

17   have her --

18         THE COURT:  Sure.  She's well-known.

19         MR. CLEMENT:  Okay.

20         Well, I'll introduce my co-counsel, Erin Murphy,

21   of Clement & Murphy as well.

22         THE COURT:  Okay.  Welcome.

23         MR. LAWSON:  Good afternoon, Your Honor.

24         Richard Lawson with the Department of Justice.

25

1          THE COURT:  Whereabouts in the Department of

2    Justice?

3          MR. LAWSON:  Deputy Associate Attorney General.

4          Deputy Associate Attorney General's Office.

5          THE COURT:  Okay.

6          Well, Mr. Clement, TRO world, moving party goes

7    first.  You have 15 minutes, five minutes for rebuttal,

8    all right?

9          You have a baby in the room?

10         AUDIENCE MEMBER:  Yes, I can move her out.

11         THE COURT:  We're not going to have interference

12   from a baby.

13         Go ahead, sir.

14         MR. CLEMENT:  Thank you, Your Honor, and may it

15   please the Court.

16         As I mentioned, accompanied with my co-counsel,

17   Erin Murphy, and a number of the members of my client firm.

18         As Your Honor stated, we're here on a TRO, and

19   because of that, I want to sort of get to the various TRO

20   factors.

21         I'll just start with the idea, though, that

22   I think this case and the case that'll be argued in front of

23   Judge Bates in a few minutes and the case that was argued

24   earlier in front of Judge Howell are some of the most

25   important cases for the First Amendment and the rule of law.

1              And this is a TRO.

2              We'll eventually get to the stage of a PI or some

3     other point where I will look forward to arguing all of the

4     various issues in depth.

5              But at this stage, the questions are obviously,

6     is there a likelihood of success, is there irreparable

7     injury, and then the balance of the equities.

8              THE COURT:  Well, let's start with irreparable

9     harm.

10             MR. CLEMENT:  Sure.

11             THE COURT:  It's too speculative at this point

12     because of all the clauses that are stuck in this Executive

13     Order of, consistent with the law, consistent with national

14     interest, that shall do this, thus-and-thus, as long as it's

15     consistent with the law, consistent with the national

16     interest, all of those qualifiers, which, of course, the

17     hurdles haven't been jumped yet, this has just been issued,

18     right?

19             MR. CLEMENT:  It's just been issued, but it was

20     issued by the President with the intention that it would

21     have immediate effect.

22             Security clearances are being suspended, and

23     there'll be a process later to see if we've suspended the

24     right security clearances.  So this was decidedly by the

25     President intended to have immediate effect.

1          And, of course, in the First Amendment context,

2   the chilling effect has been immediate.

3          And the effect on my clients, the effects on them

4   in dealing with their own clients, the effects in dealing

5   with the government.

6          For example, my clients have already had two

7   meetings with agencies that were supposed to take place

8   today; were canceled at the last minute.  So there's no --

9   well, we'll cancel it if it's consistent with law, because

10  if they had done that check, they wouldn't have canceled the

11  meeting, because it's not consistent with the law.

12          THE COURT:  Right.

13          MR. CLEMENT:  I think in thinking about the

14  irreparable injury and this issue in particular, I think you

15  obviously have to approach it with an ounce of common sense.

16          And, you know, if, in fact -- because if it's

17  consistent with law clauses, this Executive Order had no

18  actual effect because it's all inconsistent with the First

19  Amendment and it's all inconsistent with the separation of

20  powers, et cetera, et cetera, there would be nobody more

21  disappointed to learn that than the President of the

22  United States.

23          When the President of the United States signed

24  that Executive Order, he thought it was having immediate

25  effect and he wanted it to have immediate effect and it has

1    had an immediate effect.

2              Then you can look at -- I mean, obviously,

3    Judge Howell considered irreparable injury and found

4    irreparable injury.

5              Since she's issued her orders, we've seen the

6    effects that it's had on our firm.

7              But, frankly, we've also seen the effects that it

8    had on Paul, Weiss.  And I think we can take notice of the

9    fact that Paul, Weiss did not, essentially, comply and make

10   a deal with the President because they wanted to or they

11   thought it was consistent with the First Amendment.  They

12   did it, as they told their own partnership, we had to do

13   this to save the business.

14             This has such a dramatic -- even with those

15   clauses, these orders have had such a dramatic effect on

16   these law firms that some of them are standing tall and some

17   of them are making deals, but it's not because it's not

18   having an immediate effect on their businesses.

19             So if I could return then just for a minute to the

20   separation of -- to the merits questions, rather, and the

21   likelihood of success on the merits.

22             As I said, there will be plenty of time to talk

23   about that in depth, but I would just like to talk about a

24   couple of the constitutional issues that I think are the

25   most straightforward.

8

1      And I'll start -- it's always a good place to

2  start:  The First Amendment.

3      And, of course, it prohibits retaliation, and it

4  prohibits government action, including Executive Branch

5  action, in retaliation for protected speech, protected

6  activity, protected petitioning activity.

7      Now, in most cases, at least that I'm aware of and

8  I've been involved in, you know, the question is, boy, we're

9  going to need discovery or something to see if there's

10  actually a retaliatory intent.

11      Here, the President has given us that in Section 1

12  of this Executive Order.  It is avowedly retaliatory.  And

13  I think that's important in the sense that this entire

14  Executive Order flows from Section 1.

15      So before I sit down, I want to talk about the

16  security clearance issues, which is probably the hardest

17  issue under Circuit law.

18      But it's not like in the way this Executive Order

19  is constructed, that you can really say, oh, well, you know,

20  we're going to look at each of these clauses completely

21  independently because they all flow from those findings in

22  that first section and they are avowedly -- all of the

23  consequences that follow are avowedly based on retaliation

24  for core protected activity.  And so I think that's a clear

25  violation of the First Amendment Free Speech Clause.

1          I think it is an equally clear violation of the

2   petition clause.  It's a little bit of the weak sibling in

3   the First Amendment; we don't think about it as much.

4   That's because you don't have Presidential action like this

5   much.

6          THE COURT:  No.

7          MR. CLEMENT:  But if there's one thing that seems

8   to me to be within the core of the constitutional right to

9   petition for the redress of grievances, it is the ability of

10  lawyers to come into court on behalf of their client and

11  plead for relief in front of the courts, and that's exactly

12  what the retaliation is targeted at.

13          And that brings me to the separation of powers,

14  because, if you think about what's happening here, it is a

15  clear violation of the separation of powers, in two

16  respects.

17          One is, there is no legislative authority for what

18  the President has done here.

19          But, second, and I think, frankly, more important,

20  the retaliation here is for representations that have taken

21  place largely in the Article III courts.  And every one of

22  those representations was overseen by an Article III Judge,

23  who's in a position to evaluate the quality of the lawyering

24  before them.  If there are any misrepresentations, if there

25  was any weaponization of the judiciary or the judicial

1    system, the judges were there to witness it firsthand.

2            Now, they didn't say, Wilmer and Cutler,

3    WilmerHale has behaved in some sort of awful way.

4            In many of these cases, the clients that

5    WilmerHale was representing won.

6            In many of the cases, the judges lauded the

7    performance of the WilmerHale attorneys, particularly when

8    they took some of these cases on on a pro bono basis, but

9    yet all of that activity that's taking place in front of the

10   Article III courts is being sanctioned by the Article I

11   branch.

12           And we simply can't go forward like that.  I mean,

13   that is as palpable a threat to the separation of powers as

14   I've seen, because you can't essentially let the Article III

15   branch to its job if lawyers appearing before you are

16   looking over their shoulder to see what is the consequence

17   of me taking on this case in the first instance; or, worse

18   yet, okay, I took it on, now how am I going to argue it?

19   Am I going to argue it on eggshells because I'm afraid that

20   I might offend somebody in the Executive Branch, or am I

21   going to give zealous representation to my client?

22           And the clients require that zealous

23   representation, but so too do the Article III courts.

24   So the threat here is absolutely palpable.

25           To paraphrase Justice Scalia, this wolf comes as a

1    wolf.  There's nothing subtle about the separation of powers

2    violation here.  There's nothing subtle about the

3    retaliatory intent here.  It's right there on full display

4    in Article I.

5              That brings me to the security clearances.

6              And we're certainly aware of *Lee against Garland*

7    and other cases in this Circuit that say, generally

8    speaking, most challenges to security clearance revocations

9    are non-justiciable.

10             THE COURT:  Yeah, the primacy of the President in

11   that arena is pretty darn clear.

12             MR. CLEMENT:  Pretty darn, but not absolute.

13             And I'm here to tell you that, unless it is

14   absolute like the pardon, then you cannot withdraw security

15   clearances or, even more precisely, because I think it's the

16   issue, you can't deny people the usual procedures for the

17   revocation of security clearances based on a purely

18   retaliatory intent.

19             And there's no other case like this on the books.

20   Certainly *Lee against Garland* was not this kind of case.

21             And I think what many courts have done in looking

22   at these issues, including the Third Circuit in the

23   *El-Ganayni* case that we cite.  But I think this is

24   consistent with footnote 7 of *Webster against Doe*.  And

25   I think it's, frankly, consistent with the *Ralls* case,

1    is you distinguish between the substantive decision to

2    withdraw or revoke the security clearance and the procedures

3    that are available for that.

4            And if your claim is not, like, look, I want to

5    second-guess, I want to -- they've denied me my security

6    clearance, I have gone through my appeals, my agency

7    appeals, I want to second-guess it.

8            THE COURT:  Have any been withdrawn yet?

9            MR. CLEMENT:  Well, on the basis of the order,

10   they are basically suspended.

11           And if you want to just give -- if I can, for a

12   second, tie this to -- because if you look at the relevant

13   provision, it basically says the security clearances are

14   gone and then subject to restoration through the agency

15   processes.

16           THE COURT:  It says, "take steps immediately" --

17   excuse me.

18           "Immediately, take steps consistent with

19   applicable law to suspend" -- to suspend -- "any active

20   security clearances held by individuals at WilmerHale

21   pending a review whether such clearances are consistent with

22   a national interest."

23           MR. CLEMENT:  Right.

24           THE COURT:  So that's future.

25

1          MR. CLEMENT:  No, no, it's the process afterwards.

2          The way I read that, in all events, is that,

3    take action to suspend those security clearances, and then

4    you have the agency review to make sure we actually got the

5    right people.

6          And just to put this in concrete terms, there are

7    WilmerHale attorneys who are reservists.  They have security

8    clearances not because of any legal work they're doing at

9    WilmerHale, they have security clearances because they are

10   serving their country in the reserves.

11         Two of those lawyers have to report for their

12   reserve duty next week.  Now, I can't tell you for sure that

13   they're going to show up and they're not going to be able to

14   do their job because their security clearance has been

15   suspended.

16         I can also tell you, though, that they have no

17   idea whether they can, you know --

18         THE COURT:  They haven't been notified?

19         MR. CLEMENT:  Nobody's been notified of anything.

20         I mean, you know, I went through what I thought

21   was the top three hits.

22         But due process, I mean, you know, whatever

23   happened to due process?

24         In every other situation -- I mean, absolutely,

25   the President has got the final say on security clearances.

1    But it's a big deal.  There's a process for it.  If you look

2    at the *Lee against Garland* case, it talks about how that

3    went through the agency's administrative appeals process.

4    None of that's been given here.

5            And I don't think for a minute the government

6    lawyer is going to come up here and tell you that they

7    actually intended to suspend the reservists' security

8    clearances.  But they're painting with such a broad brush

9    with this thing, they aren't distinguishing sheep from goats

10   at all.  If you're affiliated with WilmerHale, your security

11   clearance is gone.

12           We know from the way this has been interpreted,

13   with respect to canceling meetings and the like, this is not

14   something where this might take effect next week.  This is

15   something that's going into immediate effect.  It's having

16   an immediate effect on our clients.  It's having an

17   immediate effect on WilmerHale's ability to provide legal

18   services for its clients.

19           THE COURT:  You say there's only one way to read

20   this section.

21           MR. CLEMENT:  I think there's only -- I do.

22           And I think there's only one way to read it

23   consistent with the President's intent.

24           Again, you know -- and we have the same principle

25   in the congressional context, right.

1          Look at *Plaut v. Spendthrift Farm* or *FAIR against*

2  *Rumsfeld* [sic].  You have somebody come into court and they

3  say, oh, this is constitutional, because, actually, if you

4  read the words the right way, it does nothing.

5          And the Supreme Court gives that the back of the

6  hand; say, no, we're not going to interpret this to be a

7  blank -- you know, blank piece of paper in order to avoid a

8  constitutional question.

9          And as I say, nobody would be more disappointed to

10  learn that this Executive Order had zero effect than

11  President Trump.

12          That is not why he signed it.  He signed it

13  because he wanted to have immediate consequences on lawyers

14  and a law firm that he thought were weaponizing the judicial

15  system.  And whatever might be true in some other area of

16  the law, the chilling effect of this is immediate and

17  enormous and fully intended.

18          I mean, again, this is not some case where we're

19  going to do this for some other purpose and it might have

20  some incidental chilling effect.  This is designed to chill

21  law firms from representing certain kinds of clients, and

22  that is chilling in every meaning of the word.

23          I'll just say a minute, before I sit down, about

24  the balance of equities.

25          The balance of equities here are not close;

1   the public-interest factors are not close.

2           We've been doing it in this republic for

3   230 years, whatever exactly it's been; we've never had

4   Executive Orders like this.

5           This is not the tradition of our country.

6   Our country is based on the tradition that you can represent

7   clients, you can represent unpopular clients, you can

8   represent clients that are adverse to the interests of the

9   people in the White House right now, and, if you do a good

10  job for your client, you're applauded for doing it and

11  you're certainly not sanctioned by the government power,

12  the highest official in the land, you're not sanctioned for

13  your choices and who you represented, especially when you're

14  successfully representing them in courts that respect the

15  way you've represented them.

16          Last thing I'll just say, as I said before, we're

17  here on a TRO, and so we think the issues at this stage are

18  pretty straightforward.

19          We look forward to briefing the PI issues, but

20  I would respectfully ask that, from our standpoint, we'd

21  like this whole litigation to move promptly, because one of

22  the things we've seen with Perkins Coie is even getting a

23  TRO doesn't seem to deter the President from issuing

24  additional Executive Orders, and it doesn't fully stop the

25  bleeding in terms of the intended effects on the law firm

1   and its relationships with its clients and its ability to

2   bring in additional business.

3            THE COURT:  Well, what would you think for your PI

4   pleadings, three weeks?

5            MR. CLEMENT:  Well, what we've suggested is --

6   my understanding is that in the Perkins Coie's case,

7   briefing on the PI is supposed to be completed by

8   April 18th.

9            We are perfectly happy to brief it on that

10  schedule or on a more expeditious schedule if Your Honor

11  would prefer.  But we would really like -- because we've

12  seen that a TRO just isn't good enough in this particular

13  context.

14           THE COURT:  I certainly agree with you on the

15  expeditious part, absolutely, no question about that.

16           And we've had a little experience in this

17  courtroom with expeditious proceedings, so we know how to

18  deal with that.

19           MR. CLEMENT:  I thank you, Your Honor, and I would

20  look forward to that.

21           But as we are expeditedly briefing this, we very

22  much would want the TRO in place, we think that's absolutely

23  vital to the rule of law and absolutely vital to protecting

24  my clients from irreparable injury.

25

1          THE COURT:  You can get five minutes in rebuttal

2     when the government is done.

3          MR. CLEMENT:  Thank you, Your Honor.

4          THE COURT:  I'll hear from the government.

5          MR. LAWSON:  Good afternoon.  Richard Lawson again

6     for the Department of Justice.

7          THE COURT:  Welcome, sir.

8          MR. LAWSON:  Your Honor, perhaps the best way to

9     approach this, if we could, is to take the matter section by

10    section of the order.

11         I would submit that Section 1 has no operative

12    effect.  There's no command.  It simply is laying out --

13         THE COURT:  It's background.

14         MR. LAWSON:  Correct, yes.

15         So --

16         THE COURT:  Although it is insightful with regard

17    to the President's thinking.

18         MR. LAWSON:  Well --

19         THE COURT:  What the President was seeking to

20    accomplish.

21         MR. LAWSON:  I won't deny that it's providing

22    background as to the purpose of the order, absolutely.

23         I would say that it falls, perhaps, within the

24    realm of government speech as far as, you know, this is what

25    he is -- the President thinks on this issue and why he's

1    wishing to carry it out.

2              But I don't think it has any specific commandments

3    to any of the Executive Branches to do X or Y.  I think

4    you'll find those in the remaining 2, 3, 4, and 5 sections.

5              THE COURT:  Would you say it informs the agency

6    heads and the other people of what the objective is, what

7    the objectives are the President is seeking to achieve?

8              So, in a sense, by virtue of being first and

9    setting the stage, so to speak, for what comes later, it's

10   informing the thinking that the President is seeking to

11   accomplish?

12             MR. LAWSON:  I don't think there's any denial that

13   that is laying some groundwork for the agencies; that the

14   agencies would understand, okay, we have Section 2 on the

15   clearances, okay, what should guide decisions on there.

16             You, the Court, caught the "pending review" if

17   this is appropriate.  We would read that together, that the

18   "pending" is part of the process.  And so to determine what

19   is relevant, I think there would be some reference to

20   Section 1 for sure.

21             And so, for example, the reservist, who had

22   nothing to do with anything that was -- Section 1 was

23   addressing, might very well likely fall outside

24   Section 1's -- or Section 2's ambit, if that makes sense.

25             So if we -- but, again, going from section to

1    section, Section 1 clearly giving the background.

2         Section 2, I think the Court probably is far more

3    well-versed than I am as to the deference on national

4    security issues.

5         One point I would urge is that, to the degree

6    counsel, Mr. Clement, has brought up points regarding the

7    issues of where there may be some gray area on the

8    deference, I would submit that right now at a TRO level,

9    that that would be inappropriate at this point, given the

10   sensitivities going on in this case and other cases, where

11   there could be national security issues, caution should be

12   exerted, particularly at the TRO stage, allow at least

13   fuller briefing.  As the Court knows, we've not had a chance

14   to submit written responses.

15        THE COURT:  Not yet.

16        MR. LAWSON:  We understand it's a TRO, not

17   complaining on that.  But I would just urge --

18        THE COURT:  It's not appealable either.

19        MR. LAWSON:  Well, I would just urge that

20   Section 2 -- that no TRO be granted as to Section 2,

21   because it just -- given the particularities at this

22   temporary emergency stage, that the deference that the

23   Executive needs to have on security issues would be impaired

24   on that point.

25

1          THE COURT:  What about the chilling effect?

2          It's hard to argue that would have a chilling

3   effect.

4          You wouldn't take that position, would you?

5          Common sense.

6          MR. LAWSON:  Well, let me actually go to --

7   if you'll indulge that if I could address that as it relates

8   to Section 3, if I could move on to that.

9          THE COURT:  Okay.

10          MR. LAWSON:  So Section 3 deals with the

11   contracting issues.

12          There is -- I've read a number of pleadings from

13   various counsel today, so apologies if I'm mixing up cases.

14          THE COURT:  Of course.

15          MR. LAWSON:  But there have been some citations on

16   some of the pleadings on these issues relating to cases like

17   the recent Supreme Court *Vullo* case and the very old *Bantam*

18   *Books* case.

19          There is something very remarkably and importantly

20   and vitally different in this matter than in *Vullo* or in

21   *Bantam Books*.

22          In *Bantam Books* and in *Vullo*, the government was

23   acting as a sovereign.

24          As it relates to Section 3, the government is

25   acting as a patron.

1    And when it comes to issuing contracts, the

2    deference due to executive action is much stronger.

3    For example, although it was recently rescinded by

4    President Trump, President Johnson issued an Executive Order

5    urging affirmative action in government contracts.  There

6    was substantial litigation on this point over the decades,

7    and it was constantly affirmed that the use of soc -- of the

8    procurement power on social policy is a valid use of the

9    procurement power.

10    And I would cite *Contractors Association of*

11    *Eastern Pennsylvania*, 442 F.2d 159.  This is a Third Circuit

12    case from 1971, very early dealing with this, and there's a

13    quote in there:  "No less than in the case of defense

14    procurement, it is in the interest of the United States and

15    all procurement to see that its suppliers are not over the

16    long run increasing its costs and delaying its programs by

17    excluding from the labor pool available minority workmen."

18    And here's the key part:  In the area of

19    government procurement, executive authority to impose

20    non-discrimination contract provisions, falls within Justice

21    Jackson's, in *Youngstown Shee*t, first category:  Actions

22    pursuant to the expressed or implied authorization of

23    Congress.

24    What I would urge, the reason I wanted to flag the

25    chilling effect is to -- where it comes in in this order.

1           Section 3 is a contract provision.

2           The next operative provision in the order is

3    Section 5:  Contact with agencies.

4           There's a lot of talk in these pleadings regarding

5    penalties, a lot of talk regarding punishment.

6           This is nothing like *Vullo*.  This is nothing like

7    *Bantam*.  This is interactions within the government.

8           And so we -- as far as the chilling effect, what

9    is at stake?  What is the punishment?

10          This is a contract provision.

11          And I would urge that as it relates to the

12   foundation in Section 1 and as it relates into Section 3,

13   one of the points that's being discussed is racial

14   discrimination, which is a reference to diversity programs

15   within the law.

16          There is a program called the Mansfield

17   Certification Program.  WilmerHale is a participant in that

18   program.  We -- I think it's a valid social policy of

19   combating diversity, which, after the *Harvard* decision in

20   December of 2023, I think I have the right -- or '24 -- that

21   diversity is suspect at the very least and to use the

22   procurement power in furtherance of addressing that issue,

23   I think, is firmly supported and within the strongest realm,

24   as noted in that contractor's case, using the executive

25   power to advance social policy is very strongly supported.

1          So as to the chilling effect, who's not being able

2    to do what?  There's no penalty, there's no punishment.

3          THE COURT:  Well, Section 5 then, being prohibited

4    from having access to government buildings?

5          MR. LAWSON:  So let me address Section 5.

6          THE COURT:  I mean --

7          MR. LAWSON:  Exactly.

8          THE COURT:  -- what possible threat do they pose

9    to having access to government buildings?

10         This is a government building we're in.

11   Supreme Court's a government building.

12         MR. LAWSON:  All right.

13         So as it relates to Section 5, I think this is

14   critical as to all the sections of Section 5.  It's calling

15   for guidance to be issued addressing how government

16   buildings, government personnel will interact with the firm.

17         And one point that I would urge regarding the

18   framing of any TRO that the Court -- we would urge the Court

19   to deny -- if the Court were to grant a TRO, some care

20   should be given as to what in Section 5 is being prohibited.

21         If Section 5 is, as I'm reading the proposed

22   order, a blanket order quashing any implementation of

23   Section 5, that kills the ability to develop the guidance.

24         Now, the reason we think this is important is

25   because, without that guidance, we don't think this issue is

25

1  ripe.  We don't know exactly what limitations there will be

2  on interaction with staff.

3          The counsel has raised issues about

4  Sixth Amendment and Fifth Amendment right-to-counsel issues.

5          We will not deny that the Sixth Amendment talks

6  about right-to-counsel issues, and the Fifth and Sixth both

7  address it.  We won't deny that at all.

8          We don't see -- we don't know what the guidance is

9  and how it will interact with that.

10         And obviously we've heard these concerns, we'll be

11 mindful of those as they're being drafted.

12         But if the order bans even the creation of the

13 guidance, I don't know how this issue ever becomes ripe.

14 We need to see what the guidance says.

15         So there is an endless parade of horribles that

16 could come from implementation of Section 5, but we don't

17 know what that is.

18         So, again, I would go back to the issue of,

19 when the Court talks about the chilling effect, what is at

20 jeopardy here?

21         Contracts where there's very firm discretion for

22 the executive and to-be-determined access to staff and

23 government buildings not qualified, not defined, and

24 security clearances upon which there's extraordinary

25 deference, particularly in this type of set.

1          THE COURT:  What about litigation?

2          How are they going to -- how can a law firm of the

3    magnitude of WilmerHale, who does litigation all over the

4    nation, not be able to have access to federal buildings that

5    are courthouses?

6          MR. LAWSON:  I will submit the order as drafted

7    does not block that.  Right now, it doesn't block it.  The

8    guidance has not been issued that would address access to

9    those buildings.

10          The Court has raised a legitimate concern about a

11    law firm having access to a courtroom.  As drafted, this has

12    not defined what that access is.

13          Once drafted, and if the order prohibits the

14    drafting of it -- you see, there's an interesting Catch-22

15    here as to the ripeness of bringing this case forward.

16          If we can get the guidance, then there can be a

17    full challenge as to whether or not it is blocking access to

18    points that the Court would have concerns about, as far as

19    the regular duties of an attorney on that point.

20          But it's that ripeness issue that I think is --

21    it's just premature at this point to -- we would submit that

22    there isn't a basis to bring the claim, it's too premature

23    at this point, certainly to issue a TRO that prohibits the

24    guidance being driven, which would form the very basis of a

25    real claim, to the degree the guidance impinges on something

1    that WilmerHale finds objectionable.

2            THE COURT:  Wouldn't that uncertainty or doubt

3    have a chilling effect on a client retaining the firm to do

4    litigation for it, not knowing whether, after expending

5    resources to hire the firm and meet with the firm and make

6    available its time, it learns that the rules, so to speak,

7    or the guidelines are, indeed, prohibitive of their being

8    available to go into the courthouse and all that money is

9    lost and wasted?

10           Why would a firm that's a possible client take

11   that risk?

12           MR. LAWSON:  Well, I would -- I can't speak to the

13   prospective client's perspective.

14           THE COURT:  Are you in the practice of law?

15           MR. LAWSON:  Yes, Your Honor.

16           THE COURT:  Do you have clients?

17           MR. LAWSON:  I've had clients.

18           I understand the Court's question.

19           THE COURT:  Use your common sense.

20           You know how clients are worried about downside

21   risk, and they don't want to expend money needlessly or

22   wastefully.

23           They are going to go to a different firm.  They'll

24   go down the street to a different firm that doesn't have a

25   Presidential Executive Order hanging over -- like a Sword of

1    Damocles hanging over its head.

2            MR. LAWSON:  So to the degree the Court thinks

3    this is a concern that should be addressed on the TRO in an

4    order the Court enters, I would urge that the order be

5    allowed for the process to go forward on the drafting of the

6    guidance at least so that we can have a concrete issue here.

7            I can understand the Court's concern.  I'm not

8    going to discount --

9            THE COURT:  Well, the President could have done it

10   a different way, couldn't he?

11           I mean, the President could have given a directive

12   to his agency heads, start coming up with some guidance on

13   this, before he issued the Executive Order.

14           He did it the other way around.  He did the

15   Executive Order first before he came up with the guidance.

16           MR. LAWSON:  I think that might invite a question

17   as to the difference between mentioning it to his team in a

18   cabinet meeting versus issuing an Executive Order.  They're

19   practically, I would think, somewhat the same.

20           There is an order, there has been instruction from

21   the White House, whether it came in the form of an Executive

22   Order, whether it came in the form of a memo passed at a

23   cabinet meeting, draft some guidance about interaction and

24   access to buildings.

25           Once the guidance is issued, we have a ripe issue,

1    we have a ripe matter at that point, presuming that they

2    find it objectionable.

3              But I just urge great care in not curtailing the

4    creation of the thing that would actually bring this into

5    matter.  Hopefully, the Court understands the concern I have

6    about the breadth of the order as proposed by counsel.

7              I think that --

8              THE COURT:  You have a couple more minutes.

9              MR. LAWSON:  I think I've addressed the key

10   points.

11             As to Section 4, Section 4 is -- I believe it

12   simply engrafts the language that was in the Perkins Coie

13   order.

14             This is guidance to industry writ large to the

15   EEOC.

16             This is -- we would urge great care with that,

17   that this is typical type of instruction.

18             I think what the Court was referring to as far as,

19   I would like my Executive Branch agencies to be doing X, Y,

20   and Z.  It is moving the ball forward once they have

21   produced a result.  Then there would be something concrete

22   that is challengeable.

23             One of the last points -- and I beg the Court's

24   indulgence on this --

25             THE COURT:  Sure, go ahead.

1          MR. LAWSON:  I have not had as much chance to

2    study this as I would care for.

3          I see that one of the defendants is listed as the

4    Executive Office of the President.

5          I would urge great caution about issuing a TRO as

6    it relates to the Executive Office of the President.

7    I think they have been very comprehensive in the various

8    agencies that they would like this order to retain.

9          THE COURT:  Where is that one located?

10         MR. LAWSON:  I'm looking -- hopefully I've

11    got -- yes, I'm looking at the complaint.

12         The first defendant listed is the Executive Office

13    of the President.

14         I think there is some grave concerns about the

15    judiciary issuing things to the President itself.  The

16    concerns are less severe, of course, when it comes to the

17    executive agencies.

18         But I think the Court understands, hopefully, the

19    government's position.  I think there would be great help if

20    the Court approaches as suggested, we go section by section

21    and look at exactly what is being challenged and what,

22    if anything, is concrete in each section.

23         THE COURT:  Will you be able to handle an

24    accelerated briefing schedule for the PI?

25

1           MR. LAWSON:  Yes, I think we can probably --

2    that's probably a matter we can work out very easily with

3    counsel.  We are moving very quickly.

4           I will point out its dispositive motions on the

5    Perkins Coie case are due Wednesday.  There's some motions

6    for summary judgment, motions to dismiss dispute, but

7    they're due Wednesday, briefing should be completed by the

8    18th, with a hearing set for the 21st.

9           I think the arguments here very closely track to

10   there.  I don't think it would be hard to meet that

11   schedule, assuming I haven't missed some other very

12   complicated issue, but I think we can hit that schedule.

13          It might be good if we could have briefs due late

14   next week, rather than Wednesday, give me a few days to get

15   Perkins dealt with.  Okay.

16          THE COURT:  Well, I would suggest that by Monday,

17   we have a joint proposed accelerated briefing schedule --

18          MR. LAWSON:  That should not be a problem.

19          THE COURT:  -- that you file with the Court so

20   I can take a look at that on Monday.

21          MR. LAWSON:  Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Do you have anything that jumped out at you?

24          MR. CLEMENT:  A couple of things, Your Honor,

25   so I have a couple of quick points in rebuttal.

1        I mean, first of all, if somebody's shooting

2   randomly and you come in and say, you gotta stop that guy

3   shooting randomly, and then their best response is, well,

4   no, no, if you do that, then I won't have time to aim.

5   I mean, come on, there was plenty of opportunity for the

6   President, as you suggested, to make the guidance first.

7   He didn't do that, and he didn't do it for a reason.

8        And there's also a reason that he didn't do it in

9   a cabinet meeting.  If he'd done this in a cabinet meeting,

10  our clients wouldn't be concerned about this, Perkins Coie's

11  clients wouldn't be concerned about this, and Paul, Weiss

12  wouldn't have come in and offered to do $40 million in pro

13  bono work.

14       He needed to make this public, he needed to make a

15  point, he needed to have the chilling effect.  And it's all

16  done on the basis of a retaliatory motive that is plain as

17  day for all to see and a retaliation against litigation in

18  the Article III courts.

19       So let me also talk about the security clearance.

20       I think the TRO aspect of this cuts both ways.

21  I mean, there is immediate injury on the security

22  clearance's clause.

23       And in order to ultimately rule for the government

24  on this, given how clear paragraph 1 of the Executive Order

25  is, you are going to have to hold effectively that security

33

1    clearances are like pardons; that even if the President

2    swears on a bible that I'm giving this pardon for a purely

3    retaliatory motive for what somebody did in an Article III

4    court that the Article III court thought was great, maybe

5    you can do that with a pardon power.

6        I do not think you can do that with security

7    clearances.  That would be a grave abuse of all the residual

8    authority of the President.  All the reasons why we give

9    deference to those judgments when the procedures are

10   followed, all that goes out the window if you can say, I'm

11   going to revoke your security clearance just to get even,

12   and that's essentially what this case looks like.

13        Happy to brief it.  But in the interim, the TRO

14   should be complete, especially because, as we said in the

15   briefing, there's nothing severable about this Executive

16   Order.

17        This is not like, oh, well, the security

18   clearances stand alone.  It all fits together and it's all

19   driven by those statements in Section 1 that Your Honor

20   yourself pointed to.

21        Let me then go to this idea that somehow because

22   this is government procurement or government contracting or

23   government spending, somehow it's different.  Not when it

24   comes to retaliation, not when it comes to viewpoint

25   distribution.  That's true as a matter of constitutional

1    law, and it's also true as a matter of statutory law.

2          If you look at footnote 25 in our TRO papers,

3    we cite a congressional statute where Congress says that,

4    we don't want any contracting decisions to be done on a

5    discriminatory basis, partisan basis, and all the rest.  So

6    the Constitution itself doesn't say you have free rein when

7    it comes to spending your contracting, and Congress has made

8    the same point, which is just one of the many

9    separation-of-powers problems here.

10         Last thing I'll say is just on the chilling

11   effect, I mean, Your Honor, I think, captured this point

12   well.  But, in terms of telling your clients, hey, you know,

13   in a couple of weeks, we might know whether we can get into

14   that government building.  That is not something any client

15   wants to hear from their lawyer.  They expect their lawyers

16   to get into government buildings on a regular basis.

17         And it's not just the courts.  I mean, WilmerHale

18   has a thriving state-of-the-art intellectual property

19   practice.  They have to go in front of the PTAB, which is

20   part of the Executive Branch, looks a lot like a court in

21   some of its proceedings, but they have to go into the PTAB

22   virtually every single day.  If they can't get into the

23   PTAB, or, frankly, if there's any doubt whether they can get

24   into the PTAB on behalf of their clients, that is a complete

25   chilling effect, a complete irreparable injury.

1           And then if the reason they can't get into the

2    PTAB is because of the way that some of their lawyers, their

3    partners at the firm, have litigated cases in court,

4    succeeded for their clients in many cases, sometimes they've

5    lost as well.  But we have an adversarial system of justice.

6    We need both sides in there making the best arguments for

7    the Court.

8           They've done that in the highest tradition of the

9    law, and what do they get?  They get barred from federal

10   buildings, they lose their security clearances, some of

11   their lawyers are told that they might not be able to get a

12   job into the Executive branch, including an AUSA job that

13   has traditionally been completely nonpartisan and is a plum

14   job that somebody, whether they're at the firm now or

15   they're in law school thinking about which firm to go to,

16   if going it WilmerHale means you can't go to the U.S.

17   Attorney's Office and be an AUSA, all of that has chilling

18   effects that are happening right now.

19          And we have a declaration that supports all of

20   that.  But you also have common sense and you can look at

21   what's happened at Perkins Coie, you can look at what Paul,

22   Weiss has done.

23          I think the irreparable injury here is as clear as

24   the constitutional violations, and they are clear as day,

25   and all we have to show is a likelihood of success at this

1    stage.

2              So we'd ask you to have a TRO that applies across

3    the board to the whole Executive Order.

4              Thank you, Your Honor.

5              THE COURT:  Well, thank you, Counsel.

6              I promised my dear colleague, Judge Bates, that

7    I'd get done so that he could start his hearing for his case

8    in the next five minutes, ten minutes.

9              I'm going to digest a little bit more the

10   arguments that I've heard today, which were insightful,

11   helpful.

12             Kind of historically coincidental that it was in

13   this very courtroom that WilmerHale represented *Boumediene*

14   and represented the *Boumediene* five right in this courtroom

15   years ago.  So the Court's quite familiar with that firm's

16   litigation practice and the service that it provided to the

17   community, to the Bar, and to the nation.

18             So I will tell the government counsel that I'm

19   inclined to grant the TRO.  The only question is,

20   how broadly.

21             So I'll issue an order probably within the next

22   few hours, and, like I say, I'm inclined to grant it.

23             So that's where we stand at the moment.  We'll see

24   where this goes.  It will be an interesting ride for the

25   next few months.

1              MR. LAWSON:  Your Honor, if I could talk about one

2    point regarding a proposed grant?

3              THE COURT:  You don't have any experience in this

4    courtroom.

5              Once I've finished my remarks, I'm done.

6              Stand adjourned.

7              COURTROOM DEPUTY:  All rise.

8              This Honorable Court stands adjourned.

9              (Proceedings concluded at 5:32 p.m.)

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__March 28, 2025_____    _____

William P. Zaremba, RMR, CRR

# EXHIBIT 57

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale

The White House

March 27, 2025

**SUSPENDING SECURITY CLEARANCES TO PROTECT THE NATIONAL INTEREST:**
Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) pending a review of whether such clearances are consistent with the national interest.

- Security clearances held by WilmerHale employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
    - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to WilmerHale and restrict its employees' access to government buildings.
    - Federal Agencies will also refrain from hiring WilmerHale employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests, the Federal Government will terminate contracts that involve WilmerHale.

- The practices of WilmerHale will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

**ADDRESSING ROGUE LAW FIRMS:** President Trump believes that lawyers and law firms that engage in conduct detrimental to critical American interests should not be subsidized by American taxpayers or have access to our Nation's secrets.

- WilmerHale has abandoned the legal profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of

the United States.

- WilmerHale pursues partisan goals, supports efforts to discriminate on the basis of race, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders.

- WilmerHale has furthered the degradation of the quality of American elections by supporting efforts designed to enable noncitizens to vote.

- WilmerHale has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

- WilmerHale rewarded Robert Mueller and two of his colleagues by welcoming them to the firm after they wielded the power of the Federal government to lead a partisan "investigation" against the President and others.   Mueller's investigation epitomizes the weaponization of government.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence.

- In addition to WilmerHale, President Trump has also taken action to hold other major law firms accountable.

- This Executive Order aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States.

- It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct.

- It follows his revocation of security clearances held by intelligence officials who falsely claimed Hunter Biden's laptop was Russian disinformation during the 2020 election.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW

Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 58

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block

The White House

March 25, 2025

**SUSPENDING SECURITY CLEARANCES TO PROTECT THE NATIONAL INTEREST:**
Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Jenner & Block LLP (Jenner) pending a review of whether such clearances are consistent with the national interest.

- Security clearances held by Jenner employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
    - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to Jenner and restrict its employees' access to government buildings.
    - Federal Agencies will also refrain from hiring Jenner employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests, the Federal Government will terminate contracts that involve Jenner.

- The practices of Jenner will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

**ADDRESSING ROGUE LAW FIRMS:** President Trump believes that lawyers and law firms that engage in conduct detrimental to critical American interests should not be subsidized by American taxpayers or have access to our Nation's secrets.

- Jenner pursues partisan goals, supports attacks against women and children based on the denial of the biological reality of sex, and backs the obstruction of

efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders.

- Jenner has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

- Jenner was also "thrilled" to re-hire Andrew Weissmann, a prosecutor known for his unethical behavior, including his role in engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation.
    - Weissmann's career has been rooted in weaponized government and abuse of power, including devastating tens of thousands of American families who worked for the now defunct Arthur Andersen LLP, only to have his unlawfully aggressive prosecution overturned by the Supreme Court.
    - The numerous reports of Weissman's dishonesty, including pursuit of nonexistent crimes, bribery to foreign nationals, and overt demand that the federal government pursue a political agenda against President Trump, is a concerning indictment of Jenner's values and priorities.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence.

- This Executive Order aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States.

- It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct.

- It follows his revocation of security clearances held by intelligence officials who falsely claimed Hunter Biden's laptop was Russian disinformation during the 2020 election.

- In addition to Jenner, President Trump has also taken action to hold other major law firms accountable.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW

Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 59





← **Truth Details**
437 replies

Trending ⌄    •••



**Donald J. Trump** ✓
@realDonaldTrump

Today, President Donald J. Trump and Willkie Farr & Gallagher LLP ("Willkie") announce the following agreement regarding a series of actions to be taken by Willkie:

1. Willkie will provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support, in relation to the following areas: Assisting Veterans and other Public Servants including, among others, members of the Military, Gold Star families, Law Enforcement, and First Responders; Ensuring fairness in our Justice System; and Combatting Antisemitism. Willkie's pro bono Committee will ensure that new pro bono matters are consistent with these objectives, and that pro bono activities represent the full political spectrum, including Conservative ideals.

2. Willkie affirms its commitment to Merit-Based Hiring, Promotion, and Retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Willkie affirms that it is Willkie's policy to give Fair and Equal consideration to Job Candidates, irrespective of their political beliefs, including Candidates who have served in the Trump Administration, and any other Republican or Democrat Administration. Willkie will engage independent outside counsel to advise the Firm in confirming that employment practices are fully compliant with Law, including, but not limited to, anti-discrimination Laws.

3. Willkie affirms that it will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms, including in pro bono matters and in support of non-profits,

Statement from the White House: "Willkie Farr & Gallagher LLP proactively reached out to President Trump and his Administration, offering their decisive commitment to ending the Weaponization of the Justice System and the Legal Profession. The President is delivering on his promises of eradicating Partisan Lawfare in America, and restoring Liberty and Justice FOR ALL."

Statement from Thomas M. Cerabino, Chairman of Willkie Farr & Gallagher LLP: "We reached an agreement with President Trump and his Administration on matters of great importance to our Firm. The substance of that agreement is consistent with our Firm's views on access to Legal representation by clients, including pro bono clients, our commitment to complying with the Law as it relates to our employment practices, and our history of working with clients across a wide spectrum of political viewpoints. The Firm looks forward to having a constructive relationship with the Trump Administration, and remains committed to serving the needs of our clients, our employees, and the communities of which we are a part."

**2.14k** ReTruths   **8.4k** Likes                                    Apr 01, 2025, 4:47 PM

    

 **Robertus Trump**
@SilverKnight57 · 2h

Replying to @realDonaldTrump

# EXHIBIT 60

MAY 3 1 2022

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

AO 245A  (Rev. 12/03) Judgment of Acquittal

# UNITED STATES DISTRICT COURT

for the _____ DISTRICT OF _____ Columbia

UNITED STATES OF AMERICA

V.

MICHAEL A. SUSSMANN

**JUDGMENT OF ACQUITTAL**

CASE NUMBER: 21-CR-582 (CRC)

The Defendant was found not guilty.  IT IS ORDERED that the Defendant is acquitted, discharged, and any bond exonerated.

_____
Signature of Judge

Christopher R. Cooper                    U.S. District Judge
Name of Judge                            Title of Judge

May 31, 2022
_____
Date

# EXHIBIT 61



**TRUTH.**

← **Truth Details**
1167 replies

Trending ⌄

···



**Donald J. Trump** ✓
@realDonaldTrump

Today, President Donald J. Trump agreed to withdraw his March 14, 2025 Executive Order regarding the Paul, Weiss, Rifkind, Wharton & Garrison LLP law firm ("Paul, Weiss"), which has entered into the following agreement with the President:

1. Paul, Weiss agrees that the bedrock principle of American Justice is that it must be fair and nonpartisan for all. Our Justice System is betrayed when it is misused to achieve political ends.

Lawyers and law firms play a vital role in ensuring that we live up to that standard as a Nation. Law firms should not favor any political party when it comes to choosing their clients. Firms also should not make decisions on whom to hire based on a person's political affiliation. To do otherwise is to deny some Americans an equal opportunity for our services while favoring others.

Lawyers abandon the profession's highest ideals when they engage in partisan decision-making, and betray the ethical obligation to represent those who are unpopular or disfavored in a particular environment.

2. Paul, Weiss affirms its unwavering commitment to these core ideals and principles, and will not deny representation to clients, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers.

3. Paul, Weiss will take on a wide range of pro bono matters that represent the spectrum of political viewpoints of our society, whether "conservative" or "libe

4. Paul, Weiss affirms its commitment to merit-based hiring, promotion, and

of its commitment, it will engage experts, to be mutually agreed upon within 14 days, to conduct a comprehensive audit of all of its employment practices.

5. Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives, including: assisting our Nation's veterans, fairness in the Justice System, the President's Task Force to Combat Antisemitism, and other mutually agreed projects.

Statement from the White House: "The President is agreeing to this action in light of a meeting with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice."

In response to the President's announcement, Paul, Weiss's Chairman Brad Karp said: "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration."

**4.77k** ReTruths  **19k** Likes                                        Mar 20, 2025, 6:10 PM



🦋**WomenForTrump**💝🔥🙅‍♀️🇺🇸
@IStandWithTrump47 · Mar 20

Replying to @realDonaldTrump

# EXHIBIT 62

← Post

**Elon Musk** ✓ ☐
@elonmusk

Skadden, this needs to stop now



**Dinesh D'Souza** ✓ @DineshDSouza · Mar 23

Skadden Arps is the firm engaged in systematic lawfare against "2000 Mules."

They have a army of 17 attorneys working pro-bono against me.

…

Show more

1:19 PM · Mar 23, 2025 · **37.3M** Views

💬 1.7K          ↻ 11K          ♡ 49K          🔖 1K          ⬆

🔘 Read 1.7K replies

**New to X?**

Sign up now to get your own personalized timeline!



ⓘ Sign in as Ian
n.swnsn@gmail.com                    G

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

Retry

Terms of Service    Privacy Policy    Cookie Policy
Accessibility    Ads info    More ···    © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    **Sign up**

# EXHIBIT 63

**DECLARATION OF CHRISTOPHER N. MANNING, ESQUIRE,**
**IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

<u>Exhibit 63</u>

March 26, 2025 video of President Donald J. Trump signing an
Executive Order titled "Addressing Risks from Jenner & Block LLP."

The video is available here:
<u>https://youtu.be/7LsV-l0xWh4?si=7W5wjK2r_BxDnv7e</u>

*Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this exhibit*
*is being maintained by plaintiff's counsel and will be provided to the*
*Court and defendants' counsel.*

# EXHIBIT 64



 **TRUTH.** 

← **Truth Details**
1693 replies

Trending ⌄    •••

 **Donald J. Trump** ✅
@realDonaldTrump

Today, President Donald J. Trump and Skadden, Arps, Slate, Meagher & Flom LLP announce the following agreement regarding a series of actions to be taken by Skadden:

1. Skadden will provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support, in relation to the following areas: Assisting Veterans and other Public Servants, including members of the Military, Law Enforcement, First Responders, and Federal, State, and Local Government Officials; ensuring fairness in our Justice System; and combatting Antisemitism. Skadden will change its pro bono policy so that all pro bono moving forward will be done in the Firm name. A pro bono Committee will be constituted to ensure that pro bono matters are consistent with the objectives of the program, and that pro bono activities represent the full political spectrum.

2. The Skadden Foundation will commit to the mission of providing pro bono Legal Services to a wide variety of deserving organizations and individuals. Skadden is committed to funding no fewer than five Skadden Fellows each year dedicated to the following projects: Assisting Veterans; ensuring fairness in our Justice System; combatting Antisemitism, and other similar types of projects. Law Graduates that receive Skadden Fellowships will represent a wide range of political views, including conservative ideals.

3. Skadden affirms its commitment to merit-based hiring, promotion, and retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preference Skadden will engage independent outside counsel to advise the Firm to ensure employment practices are fully compliant with Law, including, but not limited to,

4. Skadden will not deny representation to clients, such as members of politically disenfranchised groups, who have not historically received legal representation from major National Law Firms, including in pro bono matters, and in support of non-profits, because of the personal political views of individual lawyers.

Statement From the White House: "Skadden, Arps, Slate, Meagher & Flom LLP approached President Trump and his Administration, and declared the Firm's strong commitment to ending the Weaponization of the Justice System and the Legal Profession. The President will never stop fighting to deliver on his promises of eradicating partisan Lawfare in America, and restoring Liberty & Justice for ALL."

Statement From Skadden Executive Partner, Jeremy London: "Skadden is pleased to have achieved a successful agreement with President Trump and his Administration. We engaged proactively with the President and his team in working together constructively to reach this agreement. The Firm looks forward to continuing our productive relationship with President Trump and his Admin. We firmly believe that this outcome is in the best interests of our clients, our people, and our Firm."

**7.95k** ReTruths   **33.4k** Likes                                          Mar 28, 2025, 1:57 PM