## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE, et al.,

        Defendants.

Case No. 25-cv-716

## Expert Report of Robert E. Hirshon

**Table of Contents**

I.    INTRODUCTION ...................................................................................................1
        A.    Qualifications.................................................................................................1
        B.    Compensation Disclosure ..............................................................................1
        C.    Documents Considered ..................................................................................2
II.   OPINIONS...........................................................................................................2
III.  CONCLUSION.....................................................................................................9

i

I, Robert E. Hirshon, declare and state as follows:

## I.    INTRODUCTION

### A.    Qualifications

1.    I am a former president of the American Bar Association and, until my retirement last year, I was the Frank G. Millard Professor from Practice and Special Counsel on Developments in the Legal Profession at the University of Michigan Law School.  At the University of Michigan Law School, I taught both basic and advanced courses on ethics and professional responsibility.  I also taught a seminar called "Law Firm Careers in an Evolving Profession."  My experience includes decades of law practice with private firms, as well as management of large law firms.

2.    My qualifications to provide expert opinions on questions of lawyers' professional conduct in this case are set forth more fully in Exhibit A.  I have not testified as an expert at trial or by deposition in the last four years, and I have not authored any publications in the previous ten years.

3.    When serving as an expert witness in this case and others, I render opinions in my individual capacity and do not speak on behalf of any of the entities with which I am, or have been, associated.

### B.    Compensation Disclosure

4.    Plaintiff Perkins Coie LLP is paying an hourly fee of $625.00 per hour for the time I spend working on this Report and otherwise assisting counsel on this

case. My compensation is not contingent on any outcome in this case. The views expressed herein are my own.

### C.   Documents Considered

5.   In conducting my analysis, I have considered President Trump's March 6, 2025 "Executive Order—Addressing Risks from Perkins Coie LLP," (the "Executive Order"), the accompanying Fact Sheet explaining the Executive Order (the "Fact Sheet"), and news coverage of the Executive Order.

## II.   OPINIONS

6.   As a longtime practitioner, teacher, and leader within the legal profession, I have been asked by counsel for Perkins Coie LLP for my opinions on the Executive Order. Specifically, I have been asked for my opinions on whether the Executive Order will have an effect on lawyers, clients, and the administration of justice.

7.   Counsel for Perkins Coie LLP has asked me to resubmit my declaration of March 10, 2025 in the form of a report and with all information required to be disclosed by Rule 26(a)(2).

8.   In my opinion, the Executive Order will be understood by lawyers and law firms as an extreme, dangerous, and unprecedented effort to intimidate them and prevent them from representing clients whom the President does not wish to have access to legal counsel or to the courts, or whose advocacy the President wishes to

punish.  If implemented, the Executive Order will have the effect of preventing lawyers from performing their required role in our democracy, and it will inflict grievous harm on the administration of justice in the United States.

9.     Start with first principles.  A key function of a lawyer in the United States is advocacy on behalf of the clients who retain them.  In our system, it is the client, not the lawyer, who determines what objectives the lawyer is to pursue on behalf of the client.  "A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d), and (e)…"[1]  "A lawyer's representation of a client … does not constitute an endorsement of the client's political, economic, social, or moral views or activities."[2]

10.     Moreover, a lawyer has a duty to "represent a client zealously and diligently within the bounds of the law."[3]  "A lawyer shall not intentionally … [f]ail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules."[4]

11.     D.C. R. Prof'l C. r. 1.3, Comment [1] provides:

---

[1] D.C. R. Prof'l C. r. 1.2(a).  For convenience, I will cite the version of the Rules of Professional Conduct enacted in the District of Columbia.  All 50 states have enacted substantially similar versions of those Rules, and numerous federal courts have adopted them.

[2] D.C. R. Prof'l C. r. 1.2(b).

[3] D.C. R. Prof'l C. r. 1.3(a).

[4] D.C. Rule 1.3(b)(1).

3

> The duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law, including the Rules of Professional Conduct and other enforceable professional regulations, such as agency regulations applicable to lawyers practicing before the agency. This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor.

12.    D.C. R. Prof'l C. r. 1.3, Comment [2] provides:

> This duty derives from the lawyer's membership in a profession that has the duty of assisting members of the public to secure and protect available legal rights and benefits. In our government of laws and not of individuals, each member of our society is entitled to have such member's conduct judged and regulated in accordance with the law; to seek any lawful objective through legally permissible means; and to present for adjudication any lawful claim, issue, or defense.

13.    The quality of justice in the United States depends in large measure on lawyers' diligent advocacy of their clients' respective positions. Indeed, the United States Supreme Court has written that "vigorous representation" is of "paramount importance" to "our adversarial system of justice."[5]  This adversarial system of justice distinguishes the United States legal system from that of other countries.

---

[5] *Penson v. Ohio*, 488 U.S. 75, 84 (1988).

14.     "Legal representation should not be denied to people … whose cause is controversial or the subject of popular disapproval."[6]   Indeed, lawyers have a "responsibility" to "accept[] a fair share of unpopular matters or … unpopular clients."[7]  As the late Theodore B. Olson (solicitor general of the United States from 2001 to 2004) and Georgetown Law School Professor Neal Katyal wrote (about the lawyers representing accused terrorists at Guantanamo Bay, Cuba), "[t]he ethos of the bar is built on the idea that lawyers will represent both the popular and the unpopular, so that everyone has access to justice"; "[i]f lawyers are going to be attacked … for trying to help, the best ones won't lend their talents to the cause"; "ultimately, the public will suffer because the best arguments aren't being made."[8] "Patriotism is believing that the American system, not whim and insult, will reach the right results."[9]

15.     The Executive Order, if upheld, would undermine these first principles that have long served as the foundation of the legal profession.  The Executive Order would cause lawyers to worry about their own interests—avoiding retribution from

---

[6] D.C. R. Prof'l C. r. 1.3, Comment [2].

[7] Id. at r. 6.2, Comment [1].

[8] Theodore B. Olson & Neal Katyal, *We Want Tough Arguments: When Top Advocates Stand Up For Uncle Sam and Detainees, America Gets the Best Law*, The Legal Times (Jan. 22, 2007).

[9] Id.

the executive branch—at the expense of the interests of their clients and at the expense of the zealous advocacy on which the justice system depends. It would deter lawyers and law firms from representing clients or causes that they fear the President may oppose. It would send the message that lawyers and law firms will face dire consequences, at the hands of the Executive Branch, if they perform their "responsibility" to undertake "unpopular matters … or unpopular clients."[10]

16.    The Executive Order is already chilling lawyers' advocacy on behalf of clients. As reported by *The Wall Street Journal*, law firms across the country are now "fearful of taking on a president who hasn't shied away from punishing his enemies."[11]

17.    Reasonable lawyers will understand the Executive Order to mean not only that lawyers may suffer government retribution for representing clients in matters of which the President disapproves for personal or political reasons, but also that they may be punished for representing clients who challenge the legality of government policies. The "Fact Sheet" that accompanied the Executive Order states as part of its justification that Perkins Coie "has filed lawsuits against the Trump

---

[10] Id.

[11] Erin Mulvaney & C. Ryan Barber, Fear of Trump Has Elite Law Firms in Retreat, Wall Street Journal (March 9, 2025) https://www.wsj.com/us-news/law/fear-of-trump-has-elite-law-firms-in-retreat-6f251dec.

administration."[12]   The implication for lawyers is that representing a client with interests adverse to administration policy will expose the lawyers, their colleagues, and their law firms to punishment.

18.    The Executive Order's chilling effect also extends to lawyers' advocacy within existing representations.   Lawyers' zealous advocacy will be hindered if they must fear retribution for advancing arguments with which the President disagrees.

19.    The Executive Order also will deter clients from exercising their Constitutional right to select the counsel of their choosing.   In our system, clients, not the government, decides which lawyer will represent them.   The Executive Order's threatened limitations on Perkins Coie's ability to practice law (e.g., its barring Perkins Coie lawyers from federal buildings and barring federal employees from "engaging" with Perkins Coie lawyers) will, as a practical matter, deprive clients of their right to be represented by their chosen lawyers.   Indeed, the Executive Order, if upheld, would punish clients (through cancellation of their government contracts) for seeking advice or other legal services from their chosen lawyer, or from a law firm the President dislikes.   The President has stated that "we have a lot

---

[12] Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP, the White House (March. 6, 2025) https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.

of law firms we are going to be going after," which, if that takes place, would further prevent clients from being represented by their chosen counsel.[13]

20.    The Executive Order, if enforced, also would deter law school graduates from going to work at law firms that represent clients or advocate causes of which the President disapproves.  When I was a law school professor, some of my brightest students went to work at Perkins Coie.  This Executive Order would impair Perkins Coie's hiring of lawyer and non-lawyer professionals because of the risk that joining a law firm disfavored by the President would destroy any possible future in federal government service (e.g., as a federal prosecutor or SEC lawyer).

21.    In sum, a law firm subject to an Executive Order such as this one, should it be allowed to stand for any extended period of time, would reasonably fear a tsunami of adverse consequences that would threaten its ability to continue to effectively operate—from clients leaving, to partners and/or practice groups departing, to the pipeline of new lawyers and clients coming to the firm drying up. This is particularly so for large law firms, given that such firms typically have many clients who have some form of exposure to the federal government.  It is the

---

[13] Joe DePaolo, *'We Have a Lot of Law Firms We're Going After': Trump Declares Plan to Target Law Firms He Considers 'Very, Very Dishonest'* Mediaite (Mar. 9, 2025) https://www.mediaite.com/news/we-have-a-lot-of-law-firms-were-going-after-trump-declares-plan-to-target-law-firms-he-considers-very-very-dishonest/

reasonable fear of these very consequential forms of adverse effects that creates the dangerous chilling effect on the legal profession.

22.    Lawyers must abide by the law, including the applicable Rules of Professional Conduct. With rare exceptions (e.g., for misconduct in connection with an agency proceeding), it has long been the courts, not the federal Executive, that regulates lawyers, adjudicates claims of wrongdoing, and punishes misconduct. Lawyers can be disciplined, held civilly liable, criminally prosecuted, or sanctioned—all in the context of judicial proceedings, and after notice and a hearing to ensure due process of law.

23.    The alleged ethical misconduct by Perkins Coie lawyers referenced in the Executive Order in fact was the subject of court proceedings. In view of the availability of the existing judicial processes to address lawyer misconduct, lawyers will understand the Executive Order—an unprecedented intrusion of the Executive Branch into the apparent adjudication and punishment of alleged lawyer misconduct—to be a denial of the power of the judiciary to regulate lawyer conduct and an effort at intimidation of the bar.

## III.    CONCLUSION

24.    In sum, my opinion is that the Executive Orders will have the effect of forcing lawyers to choose between performing their assigned role in our democracy

or pleasing the President, all to the detriment of clients and the fair administration of justice.

DATE: _3\|31\|25_                                    By:_____
                                                              Robert E. Hirshon

## EXHIBIT A

At the University of Michigan Law School, in addition to teaching both basic and advanced courses on ethics and professional responsibility, I was the law school's "Co-Director" of the State Bar of Michigan's Professionalism in Action Program presented at the law school during 2015-2018. The Program was a half-day seminar developed by the Michigan State Bar. First-year law students discussed hypotheticals based upon the Michigan Rules of Professional Conduct ("MRPC") with experienced practitioners and judges. As co-director, I assisted in the drafting of these hypotheticals and attended to various administrative details.

Additionally, I have volunteered my time to the Michigan Supreme Court Board of Law Examiners and provided them with comments and suggestions to the proposed ethics and professional responsibility questions and model answers for the Michigan Bar Examination.

Prior to the outbreak of the COVID virus, I was an Adjunct Professor at Peking University's School of Transnational Law in Shenzhen, China, and Visiting Professor at Haim Striks School of Law in Israel. Also, I was a consultant to a law firm located in New England until 2022; I advised the firm on law practice management issues.

My legal experience includes thirty years of practice in the Portland, Maine law firm of Drummond, Woodsum & MacMahon. My management responsibilities at the firm included advising the firm's layers on their ethical responsibilities as described in the Maine Code, and, subsequently, the Maine Rules of Professional Responsibility. The Maine rules are based upon the Model Rules adopted by the American Bar Association's House of Delegates.

Additionally, I served as the CEO of a 75-lawyer law firm and the COO of a 370-lawyer regional law firm, both headquartered in Portland, Oregon. In these firms, I confronted and assisted in the resolution of numerous ethical issues.

As a result of my various positions as a practicing lawyer, law firm manager (CEO and COO), law school professor teaching ethics and a law firm consultant, I have substantial familiarity with the administration of the rules of professional conduct.

During the period of time that I was a practicing lawyer, I was the President of the Maine State Bar Association, the Maine Bar Foundation, and the American Bar Association ("ABA"). While serving as President of the ABA, I appointed a committee to revisit Model Rule 1.6 for consideration of possible amendments. The current version of Rule 1.6 is a result of this Committee's recommendations. Prior to serving as President, I was chair of the ABA's Pro Bono Committee. I was the primary author of and floor manager for Model Rule 6.1.

As a former ABA president, I am a life-long member of the ABA's House of Delegates. I have personally participated in the debates which amended Model Rules.

Presently, I am a member of the American Law Institute, which drafts the various restatements including the Restatement of the Law Governing Lawyers. I recently served a three year term as a member of the ABA's Standing Committee on Ethics and Professional Responsibility. This committee issues ethics opinions interpreting both the Model Rules of

Professional Conduct and the Model Code of Judicial Conduct. Additionally, the Committee reviews and proposes amendments of the Model Rules to the ABA's House of Delegates. I have prepared, with others, amendments to the Model Rules 1.4 and 5.5

I have participated in numerous CLE panels and delivered many presentations focused on legal ethics and professional responsibility. I received a B.A. from the University of Michigan in 1970 as well as a J.D. in 1973, before returning to my home state of Maine to practice law.

Attached as Exhibit A-1 is a list of Honors, Service to the Community and a list of a few of my more recent presentations.

## EXHIBIT A-1

### *HONORS:*

2014 A.W. Brian Simpson Memorial Award, Student Funded Fellowships (SFF)
    University of Michigan Law School
2005 Distinguished Service Award, The National Judicial College
Muskie Access to Justice Award, The Muskie Fund for Legal Service
Special Award for Support of Military Reservists, Standing Committee of Legal
    Aid to Military
Muskie Award for Public Service, American Bar Association
Honorary Degree, Suffolk University School of Law, Boston, Massachusetts
Honorary Degree, Willamette College of Law, Salem, Oregon
Honorary Degree, University of Denver School of Law
Fellow, Maine Bar Foundation
Howard Dana Pro Bono Award, Maine Bar Foundation
Reece Smith Special Service Award, National Association of Pro Bono
    Coordinators
Fellow and State Chairperson, American Bar Foundation
Joint Legislative Resolution honoring contributions made to community and
    legal profession, Maine Senate and Maine House of Representatives
Award for support of Pro Bono Legal Services, Voluntary Legal Services of
    Northern California
Award of Honor, Armenian Assembly of America
Award for promotion of equal access to justice, American Bar Association Fund
    for Justice and Education
Listed in Who's Who in America
Listed in Who's Who in American Law

### *SERVICE TO THE COMMUNITY:*

- Member, Board of Directors of Pine Tree Legal Assistance, Inc.

- President, Maine Jewish Museum Board of Directors

- Member, Board of Visitors, Lewis and Clark Law School

- Member, Campaign Cabinet, United Way of the Columbia-Willamette

- Board of Trustees, Oregon Independent College Foundation, Inc.

- Member, Board of Directors, National Constitution Center

- Member, Dean's Advisory Council, University of Michigan Law School

- Chair, Board of Trustees, Breakwater School

- Member, Vice-Chair, Zoning Board of Appeals, Town of Cape Elizabeth, Maine

- Member, AVVO Advisory Board

### *LIST OF RECENT PRESENTATIONS*

AFL/CIO Lawyers Conference: Moderator – I Should Have Just Stayed at Home – The Unauthorized Practice of Law

Maine State Bar Association Annual Meeting: Speaker – The Disruption of the Legal Profession

College of Management Academic Studies, Israel: Speaker – The Future of the Legal Profession: A Global View

University of Michigan Law School: Speaker – The Future of the Legal Profession: Scarier than you Think

National Conference of Bar Presidents: Speaker – The Future of the Legal Profession: Why You Should Be Afraid (annual program)

The David Weiner Center for Lawyer's Ethics and Professional Responsibility: Keynote Speaker - The Future of the Legal Profession