# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

                Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
JUSTICE, et al.,

                Defendants.

Case No. 25-cv-716

**Expert Report of Prof. Roy D. Simon, Jr.**

# Table of Contents

I.    INTRODUCTION .................................................................................................1
      A.    Qualifications ........................................................................................1
      B.    Compensation Disclosure ......................................................................3
      C.    Documents Considered .........................................................................3
II.   SUMMARY OF OPINIONS .............................................................................3
            1.    *Fundamental principles of our system of justice.* ..................4
            2.    *Consequences of the Executive Order.* ....................................6
III.  FACTUAL BACKGROUND ..............................................................................7
IV.   OPINIONS AND REASONING ........................................................................8
      A.    Fundamental Principles of the United States System of Justice .............8
            1.    *Freedom of expression and the right to assemble peaceably.* ...8
            2.    *Petitioning for redress of grievances.* ......................................9
            3.    *Due process of law.* ...............................................................10
            4.    *Effective assistance of counsel.* ............................................11
            5.    *Choice of counsel.* .................................................................11
            6.    *Appointed counsel.* ...............................................................12
            7.    *Representing clients who cannot afford counsel.* ...................12
            8.    *Representing unpopular or controversial clients.* ..................13
            9.    *Zealous representation.* ..........................................................14
            10.   *Loyalty and independent professional judgment.* ..................16
      B.    Consequences of the Executive Order .................................................17
V.    CONCLUSION.................................................................................................23

I, Roy D. Simon, Jr., under penalties of perjury pursuant to 18 U.S.C. § 1746, declare and state as follows:

## I.    INTRODUCTION

### A.    <u>Qualifications</u>

1.    I received my Bachelor of Arts degree cum laude in 1973 from Williams College and received my J.D. in 1977 from New York University School of Law, where I served as Editor-in-Chief of the New York University Law Review. I then clerked for the Hon. Robert R. Merhige, Jr. in the United States District Court for the Eastern District of Virginia and practiced law for five years in Chicago before becoming a full-time law professor.

2.    I was a full-time law professor for twenty-eight years (from 1983 until 2011), first at Washington University in St. Louis (where I received tenure) and later (beginning in 1992) at Hofstra University.  In 2003 I was appointed as the Howard Lichtenstein Distinguished Professor of Legal Ethics at Hofstra University School of Law.  I remained in that position until I resigned from Hofstra in 2011.  I am now a Distinguished Professor of Legal Ethics Emeritus.

3.    I am the sole author of Roy D. Simon, Simon's New York Rules of Professional Conduct Annotated (Thomson Reuters, 24th ed. 2024), a two-thousand-page treatise that analyzes and annotates the New York Rules of Professional Conduct phrase by phrase.

1

4.     I serve or have served on multiple bar committees governing professional standards for New York lawyers.  For example: (i) since 2014 I have been the Chair or Co-Chair of the New York State Bar Association Committee on Standards of Attorney Conduct ("COSAC"), which drafts or evaluates proposed amendments to the New York Rules of Professional Conduct and other rules governing lawyers; (ii) I served as Chair of the New York State Bar Association Committee on Professional Ethics from 2008 to 2011 and have been a member of that committee since 1995; and (iii) I have served three separate three-year terms on the New York City Bar Committee on Professional Ethics.

5.     I am an active member in good standing of the New York Bar.  In my law practice, I frequently advise lawyers in New York and elsewhere regarding issues of professional conduct, including conflicts of interest, legal malpractice, fiduciary duties, and related issues.  I also sometimes serve as an expert consultant or expert witness regarding professional conduct.

6.     My qualifications to provide expert opinions on questions of lawyers' professional conduct in this case are set forth more fully in my curriculum vitae, which is attached as Exhibit A.

7.     Attached as Exhibit B is a list of the cases in which I have testified as an expert at trial or by deposition in the last four years.

8.     Attached as Exhibit C is a list of my publications over the last ten years.

2

9.      When serving as an expert witness in this case and other cases, I render opinions in my individual capacity and do not speak on behalf of any of the entities with which I am, or have been, associated.

## B.      **Compensation Disclosure**

10.     Plaintiff Perkins Coie LLP is paying my standard fee of $1,960 per hour for the time I spend working on this Report and otherwise assisting counsel on this case.  My compensation is not contingent on the content of my opinions or on the outcome of this case or any part of this case.  The views expressed in this report are my own.

## C.      **Documents Considered**

11.     In conducting my analysis, I have considered President Trump's March 6, 2025 "Executive Order—Addressing Risks from Perkins Coie LLP" (the "Executive Order") and the Fact Sheet accompanying the Executive Order (the "Fact Sheet").

## II.    SUMMARY OF OPINIONS

12.     Williams & Connolly, in its capacity as counsel for Plaintiff Perkins Coie LLP ("Perkins Coie"), has retained me to provide an objective expert opinion regarding the consequences that the Executive Order will have on lawyers, law firms, clients, potential clients,  and the public in light of fundamental principles underlying the system of justice in the United States.

13.     Counsel for Perkins Coie LLP has asked me to revise and resubmit my declaration of March 10, 2025 in the form of a report conforming to the requirements of Rule 26(a)(2) of the Federal Rules of Civil Procedure.

14.     In this section I briefly summarize my professional opinions regarding the fundamental principles underlying the system of justice and the consequences that the Executive Order will have with respect to those fundamental principles.

### 1.     *Fundamental principles of our system of justice.*

15.     In my professional opinion, the following principles are fundamental to the system of justice in the United States:

a. The people of the United States have the right to freedom of speech, which includes, among other things: (i) the right to express political views (directly or through lawyers) and (ii) the right to support or oppose political candidates, political parties, the President, members of any branch of government, and issues of public concern.

b. The people have the right to petition the government for a redress of grievances, including through communications (personally or through lawyers) with government officials and through litigation challenging government action.

c. No person may be deprived of life, liberty, or property, without due process of law.

d. In all criminal prosecutions, the accused shall have the right to effective assistance of counsel for his defense.

e. In all legal matters, civil and criminal, clients who can afford counsel have the right to choose their counsel.

f. In criminal cases, clients who cannot afford counsel generally have the right to have counsel appointed for them at government expense.

g. Lawyers and law firms have a duty to make legal counsel available to all persons who need counsel, including persons who cannot afford counsel or who can afford counsel only at discounted rates.[1]

h. Lawyers should represent clients zealously within the bounds of the law.

i. Lawyers should exercise independent professional judgment on behalf of clients, solely for the benefit of each of their clients, free of compromising or conflicting interests, influences and loyalties.

j. No person is above the law.

---

[1] In this declaration I use the terms "lawyers" and "law firms" (and their singular forms) interchangeably. My opinions regarding law firms also apply to individual lawyers, and vice versa.

## 2.    *Consequences of the Executive Order.*

16.    In my professional opinion, if the Executive Order is permitted to stand, it will have the consequences set out below, all of which will undermine and threaten the fundamental principles of our system of justice:

      a.  Law firms will be less likely to agree to represent clients that the President or his allies and supporters (or future Presidents) view with disfavor, and lawyers will be less likely to agree to represent clients who are unpopular with the President's base.

      b.  Law firms will be less likely to make legal arguments challenging a President's actions, policies, or orders (or the actions, policies, or orders of others in the Executive Branch).

      c.  Law firms will hesitate to make arguments inconsistent with the announced or anticipated positions of the President or of allies or supporters of the President outside of government.

      d.  Clients (especially clients not aligned with the President) are likely to have a narrower choice of counsel and greater difficulty finding counsel.

      e.  Clients will be less likely to bring legal challenges to actions taken by the President or by his personal or political allies, supporters, and friends inside and outside of government.

### III.    FACTUAL **BACKGROUND**

17.    The Executive Order of March 6, 2025 is on White House letterhead and is entitled "Addressing Risks from Perkins Coie LLP." It begins by asserting that "dishonest and dangerous activity of the law firm Perkins Coie … has affected this country for decades."   The Executive Order then commands the Attorney General and various other government agencies and officials to (among other things) (i) "immediately take steps … to suspend any active security clearances held by individuals at Perkins Coie" pending further review, (ii) "expeditiously cease" providing "Sensitive Compartmented Information Facilities" to Perkins Coie, (iii) "provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie," and (iv) impose various other restrictions on Perkins Coie and its lawyers and employees. (The Executive Order also contains a section headed "Racial Discrimination," but I do not express any opinions regarding that section or its consequences.)

18.    President Trump said in public when he signed the Executive Order that he was planning to issue approximately fifteen similar Executive Orders regarding other law firms, and he has said during an interview on national television that he will be "going after" other law firms.   He also has issued at least three additional Executive Orders regarding specific law firms (Paul, Weiss, Rifkind, Wharton & Garrison, Jenner & Block LLP, and WilmerHale). Whether or not President Trump

issues Executive Orders regarding any other law firms in the future, his threat and expressed intent to do so remain on the public record and have been widely publicized.

## IV.    OPINIONS AND REASONING

19.    In this section I articulate and explain in more detail the fundamental principles of our system of justice, and I explain in more depth my opinions and analysis regarding the consequences of the Executive Order.

### A.    <u>Fundamental Principles of the United States System of Justice</u>

20.    The principles set forth below are fundamental to the system of justice in the United States.  These fundamental principles are intertwined with each other, so the erosion of any one principle may lead to the erosion of other principles.

#### 1.    *Freedom of expression and the right to assemble peaceably.*

21.    The First Amendment to the United States Constitution guarantees the right of the people (including corporations and other entities) to freedom of expression (*i.e.,* free speech) and the right to peaceably assemble.  Lawyers play a vital role in helping people to exercising these rights. Lawyers are often sought out by people who desire to exercise their First Amendment right to express their views or who desire to peaceably assemble.  For example:

22.    People seeking to organize and assemble in public protests often need the guidance of lawyers to understand the legal limits of lawful protest (such as restrictions on time, place, and manner and the necessity for obtaining permits).

23.    People who desire to protest need lawyers to advise them regarding what conduct is permitted if the government prohibits a protest or arrests protesters.

24.    Individuals, groups, and entities who object to proposed or actual laws or regulations often need lawyers to help them (i) understand the language of those laws or regulations, (ii) determine the appropriate (or required) timing and recipients of any objections to the language, interpretation, or enforcement of those laws and regulations, (iii) phrase objections in a logical and legally supported manner, and (iv) determine rights of appeal if the government rejects an objection.

### 2.    *Petitioning for redress of grievances.*

25.    The First Amendment to the United States Constitution also guarantees the right of the people to petition the government for a redress of grievances. Avenues of redress include (among other things) (i) public protests, (ii) communications to the President, (iii) communications to legislative representatives, Executive Branch officers and employees, and administrative agency officials and employees, and (iv) legal actions in courts and administrative agencies.

26.    As with freedom of expression, people (*i.e.,* clients) who wish to petition the government for redress of grievances often need lawyers to help them

(i) articulate their grievances, (ii) suggest alternatives to actual or proposed laws or regulations, (iii) communicate objections and grievances to appropriate government officials in a timely fashion, (iv) follow up on these objections and grievances by advocating with the government in person or through written or oral communications, (v) respond to communications from the government, and (vi) appeal adverse decisions in a timely fashion.

### 3.    *Due process of law.*

27.    The Fifth Amendment to the United States Constitution provides that no person may be deprived of life, liberty, or property, without due process of law. Our legal system is complex, consisting not only of substantive law (including federal, state, local, and municipal laws and regulations, common law, and recognized customs and practices) but also consisting of detailed procedural options and requirements (codified in sources such as the federal Administrative Procedure Act, the Code of Federal Regulations, the Federal Rules of Civil Procedure, local court rules, rules of individual judges, administrative agency regulations, and state, local, and municipal analogs of these procedures).

28.    The term "due process" refers primarily to procedural options and requirements.  Most of these procedures are unfamiliar to nonlawyers, so most people need the guidance of lawyers to avail themselves of their procedural rights and to ensure that they are accorded due process of law under those procedures.

10

### 4.    *Effective assistance of counsel.*

29.    The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall have the right to assistance of counsel for his defense.  For more than fifty years, the United States Supreme Court has recognized that the Sixth Amendment right to assistance of counsel is the right to the "effective" assistance of counsel.  Specifically:

30.    A long line of United States Supreme Court cases, including the famous *Gideon v. Wainwright*, 372 U. S. 335 (1963), has recognized that the Sixth Amendment right to counsel exists, and is needed, to protect the fundamental right to a fair trial.

31.    The right to assistance of counsel in criminal prosecutions recognizes that in most criminal cases, the substantive laws and the procedures and techniques for mounting an effective defense are beyond the knowledge and skill of most clients.

### 5.    *Choice of counsel.*

32.    Courts at all levels, both state and federal, have long recognized that in all legal matters, whether civil or criminal, clients who can afford counsel have the right to choose their counsel.  The right to counsel of choice is a vital right because, as Sir Francis Bacon observed nearly four centuries ago: "The greatest trust, between

man and man, is the trust of giving counsel."[2] Clients hire attorneys to exercise professional judgment on their behalf, and the fiduciary duty of giving counsel is imbued with ultimate trust and confidence.  Thus, courts accord great weight to a client's choice of counsel when that right is challenged (such as via a motion to disqualify or a motion to deny *pro hac vice* admission to a client's chosen lawyer).

### 6.    *Appointed counsel.*

33.    In criminal cases, clients who cannot afford counsel generally have the right to have counsel appointed for them at government expense.  That is the holding of *Gideon v. Wainwright*, 372 U. S. 335 (1963), which recognizes the importance of the Sixth Amendment right to effective assistance of counsel, for reasons I have already stated above.

### 7.    *Representing clients who cannot afford counsel.*

34.    The legal profession has long recognized that lawyers have a duty to make legal counsel available to all persons who need counsel.  This means not only providing pro bono legal services (*i.e.,* legal services at no cost or low cost) to those who cannot afford to pay legal fees at market rates, but also the duty to represent paying clients who are unpopular or controversial, and the duty to educate the public about legal problems and possible avenues of redress.

---

[2] Sir Francis Bacon, *Of Counsel,* Essays of Francis Bacon (1627).

35.    Rule 6.1 of the District of Columbia Rules of Professional Conduct (the "Rules")[3] addresses pro bono legal services by providing as follows:

> *Rule 6.1.    Pro Bono Publico Service*
>
> *A lawyer should participate in serving those persons, or groups of persons, who are unable to pay all or a portion of reasonable attorney's fees or who are otherwise unable to obtain counsel.* A lawyer may discharge this responsibility by providing professional services at no fee, or at a substantially reduced fee, to persons and groups who are unable to afford or obtain counsel, or by active participation in the work of organizations that provide legal services to them.  [Emphasis added.]

### 8.    *Representing unpopular or controversial clients.*

36.    Rule 1.2 provides: "(b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities." The purpose Rule 1.2(b) is to avoid discouraging lawyers from representing clients who are unpopular or whose views are controversial.  The official Comment explaining Rule 1.2(b) is headed "Independence from Client's Views or Activities" and states, in pertinent part, as follows:

---

[3] Because this action is pending in the District of Columbia, I refer to the District of Columbia Rules of Professional Conduct.  But the D.C. Rules are based largely on the ABA Model Rules of Professional Conduct, and all 50 states and many federal courts have adopted Rules of Professional Conduct based on the Model Rules of Professional Conduct, so my opinions would not materially differ if based on the Rules of Professional Conduct of any other state or federal jurisdiction.

13

> [3] Legal representation should not be denied
> to people … whose cause is controversial or the
> subject of popular disapproval.  By the same token,
> representing a client does not constitute approval of
> the client's views or activities.

37.    If a lawyer's representation of an unpopular client or a client with controversial views constituted the lawyer's endorsement of the client's views or activities, then many lawyers would hesitate or refuse to represent clients who oppose the government or who are at odds with powerful corporations or powerful individuals – and such clients would consequently have greater difficulty securing counsel.

### 9.    *Zealous representation.*

38.    Lawyers should represent clients zealously within the bounds of the law.  Thus, lawyers have discretion to take any legal position in litigation as long as the legal position is not frivolous. This concept is captured in Rule 3.1, which provides as follows:

> *Rule 3.1: Meritorious Claims and Contentions*
>
> A lawyer shall not bring or defend a proceeding, or
> assert or controvert an issue therein, unless there is
> a basis in law and fact for doing so that is not
> frivolous, which includes a good-faith argument for
> an extension, modification, or reversal of existing
> law.  A lawyer for the defendant in a criminal
> proceeding, or for the respondent in a proceeding
> that could result in involuntary institutionalization,
> shall, if the client elects to go to trial or to a
> contested fact-finding hearing, nevertheless so

14

> defend the proceeding as to require that the
> government carry its burden of proof.

39.    Nothing in Rule 3.1 prohibits a lawyer from agreeing to represent an

unpopular or controversial client or a client whose views are contrary to the views

of the government, and nothing in Rule 3.1 prohibits a lawyer from asserting facts

or advancing legal arguments as long as there is "a basis in law and fact for doing so

that is not frivolous."  The official Comment to Rule 3.1 explains the lawyer's duty

of zealous advocacy by saying (in pertinent part): "[1] The advocate has *a duty to

use legal procedure for the fullest benefit of the client's cause*, but also a duty not

to abuse legal procedure. …" (Emphasis added.)   Rule 3.1 thus reinforces Rule

1.2(b) by ensuring that a lawyer has freedom not only to represent unpopular or

controversial clients but also to represent those clients zealously within the bounds

of the law, even when they are challenging government actions or officials or are

challenging allies and supporters of government officials.

40.    If lawyers violate Rule 3.1 by advancing positions or arguments for

which there is no non-frivolous basis in law and fact for doing so, courts may

penalize the offending lawyers by invoking inherent judicial authority and by

invoking authority under procedural rules (such as Rule 11 of the Federal Rules of

Civil Procedure, which governs sanctions).  In addition, courts and other lawyers

have the right or duty to refer errant lawyers to disciplinary authorities.

### 10.    *Loyalty and independent professional judgment.*

41.    Lawyers are required demonstrate loyalty to their clients and to exercise independent professional judgment on behalf of clients.  A lawyer should exercise professional judgment solely for the benefit of the client, free of compromising or conflicting interests influences and loyalties.   The twin duties of loyalty and independent professional judgment are captured most prominently in Rule 1.7, which provides, in pertinent part, as follows:

> *Rule 1.7: Conflict of Interest: General Rule*
>
> (b) Except as permitted by paragraph (c) below [which addresses informed consent], a lawyer shall not represent a client with respect to a matter if:
>
> * * * * *
>
>> (4) The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or ***the lawyer's own financial, business, property, or personal interests***.  [Emphasis added.]

42.    If a lawyer is concerned that challenging government actions or making certain arguments will cause the President to criticize the lawyer publicly or cause the President to issue an executive order inflicting financial damage on the lawyer's firm, then in my opinion the lawyer's professional judgment "reasonably may be

16

adversely affected by … the lawyer's own financial, business, property, or personal interests," creating a conflict of interest under Rule 1.7(b)(4).

### B. Consequences of the Executive Order

43.    In my professional opinion, the President's Executive Order, if permitted to stand, will have numerous adverse consequences that will threaten or undermine the fundamental principles of our system of justice. I now turn to those adverse consequences.

44.    Law firms will be less likely (and in some instances totally unwilling) to agree to represent clients who are unpopular with or critical of the President or his allies and supporters. This consequence will remove many law firms from the list of available choices for clients seeking legal advice about Executive Branch actions or clients seeking to redress grievances in courts, in government agencies, or in public forums. This is a major concern because the Plaintiff law firm here, Perkins Coie, has demonstrated a willingness, over many years, to represent clients who are challenging the legality of government actions and policies.

45.    The concern is acute because the President said at the signing ceremony for the Executive Order that approximately fifteen similar executive orders concerning law firms are in the works, and he said on a recent Fox News show: "We

17

have a lot of law firms that we're going to be going after."[4] The President's statement will be understood by the profession as a threat to remove from the marketplace various law firms that have the experience, expertise, size, and financial resources to defend clients against government overreach, and to cripple law firms willing to represent clients challenging government actions that may be illegal or challenging government actions that may have been taken without the due process of law guaranteed by the Fifth Amendment to the United States Constitution.

46.    As a corollary consequence, clients (especially clients opposing the Executive Branch) are likely to have a diminished range of options for choice of counsel and are likely to have more difficulty finding counsel.  Given that deep trust between a lawyer and a client is the bedrock of a productive attorney-client relationship, using executive orders to penalize and restrict law firms that have the courage to oppose the President will remove from the legal marketplace many law firms that clients have come to trust in the past and that clients would be likely to seek out in the future.

47.    If the President acting unilaterally has power to issue an executive order penalizing a law firm on grounds that the law firm is advancing positions that the

---

[4] Joe DePaolo, *"'We Have a Lot of Law Firms We're Going After': Trump Declares Plan to Target Law Firms He Considers 'Very, Very Dishonest'"* (Fox News, March 9, 2025) (reporting on President Trump's appearance on Fox's Sunday Morning Futures, anchored by Maria Bartiromo).

President or his allies oppose (or on grounds that the law firm has advanced such positions in the past), then the professional judgment of a lawyer in that firm "will be or reasonably may be adversely affected by … the lawyer's own financial, business, property, or personal interests."[5]  For example, a lawyer representing a client opposing the Executive Branch may justifiably fear loss of reputation, loss of government contracts, loss of access to government buildings, loss of a security clearance, or loss of access to important evidence, if the lawyer makes certain arguments or takes certain positions adverse to the Executive Branch.

48.     Clients and potential clients will be deprived of their choice of counsel if the Executive Order's restrictions on Perkins Coie (such as denying Perkins Coie lawyers access to Sensitive Compartmented Information Facilities or denying them the right to enter federal courthouses or other federal buildings) interfere with Perkins Coie's ability to represent a client competently, because in those instances the Rules of Professional Conduct will permit or require Perkins Coie to request a tribunal's permission to withdraw from a pending matter.  If a request by Perkins Coie to withdraw is granted, that will deprive Perkins Coie's clients of their chosen counsel in that matter.

---

[5] D.C. Rule 1.7(b)(4).

49.    If people with legal needs have difficulty securing counsel, that difficulty will impede their right to obtain legal advice and to petition the government for redress of grievances, and will hamper their right to effective assistance of counsel in criminal cases.  As stated in *United States v. Cronic,* 466 U.S. 648, 654 (1984): "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have."

50.    Law firms will have an incentive not to make legal arguments challenging the President's actions, policies, or orders, and law firms will have an incentive not to make arguments inconsistent with the announced or anticipated positions of the President or inconsistent with the positions or interests of the President's allies and supporters outside of government (*i.e.,* in the private sector). Law firms will be wary of incurring swift and serious penalties if the firm's lawyers challenge actions by the President, or by any arm or agent of government appointed by or aligned with the President, or by any private entity or individual that the President favors.

51.    The Executive Order will seriously undermine Rule 3.1, which permits law firms to assert any fact or legal position that is not frivolous.  If the President has power to penalize lawyers for taking positions that are *not* frivolous but that the President dislikes, then lawyers will be discouraged or prevented from fulfilling their

duty to use legal procedure for the fullest benefit of a client's cause, as Rule 3.1 and the duty of zealous representation demand.

52.     If the President has unilateral power to penalize lawyers via an executive order for representing certain clients or for asserting certain non-frivolous positions that disagree with the President's positions, then the President's unilateral power would almost inevitably negate or severely diminish a lawyer's right and duty to advance non-frivolous factual positions and to make non-frivolous legal arguments, because adversaries by definition disagree with at least some of an opposing lawyer's factual and legal positions. (Absent disagreement, there would be no case or controversy, and thus no federal court jurisdiction under Article III of the United States Constitution.)

53.     No person is above the law. Yet if the President of the United States – now or in any future administration – has power with the mere stroke of a pen on an executive order to penalize, vilify, and impede lawyers whose clients are opposing the President or the President's allies or supporters (or to penalize, vilify, and impede lawyers whose clients have opposed the President in the past, or who seem willing or likely to oppose him in the future), then upholding the Executive Order at issue here would effectively place the President above the law. Allowing the Executive Order to stand would thus confer upon the President unilateral power to hamper and even to override the carefully balanced and well-established principles and purposes

21

of the United States Constitution, the Rules of Professional Conduct, the Federal Rules of Civil Procedure, and other rules, regulations, authorities, and traditions fundamental to our system of justice.

54.    Clients will be less likely to bring meritorious legal challenges to (or to defend against) actions taken by the President or by his personal or political allies, supporters, or friends.  If clients know or believe that the President has power to prohibit lawyers at a given law firm to enter government buildings, or has power to impose other penalties on the law firm (all of which the President has attempted to do in the Executive Order at issue here), then clients and potential clients will likely fear that they themselves (the clients and potential clients) will be targeted by the President – and will thus suffer negative practical, reputational, and financial consequences – if they dare to challenge or resist actions by the President or by his allies and supporters in and out of government.

55.    In sum, in my professional opinion, the Executive Order will, if upheld, (i) chill the rights of clients to petition government for redress of grievances and to peaceably assemble, as guaranteed by the First Amendment, (ii) deprive clients of due process of law under the Fifth Amendment, and (iii) deprive clients of the right to effective assistance of counsel under the Sixth Amendment.  Moreover, if these sacrosanct rights under Bill of Rights are eroded, then other basic rights guaranteed by the First Amendment will also be in jeopardy, because the right to freedom of

22

expression and the right to counsel are an essential foundation for exercising rights under other provisions of the Constitution.

## V.    CONCLUSION

56.    In my professional opinion, the Executive Order directed at Perkins Coie and its lawyers, if allowed to stand, will undermine fundamental principles of the system of justice in the United States, and will thus undermine revered and fundamental rights under the United States Constitution.

I declare under penalty of perjury that the foregoing is true and correct.


DATE:  March 31, 2025                      By:_____
                                                   Roy D. Simon, Jr.

# Exhibit A

Updated February 19, 2025

# Roy D. Simon

**Legal Ethics Advisor to Lawyers**
**Distinguished Professor of Legal Ethics Emeritus**
**205 West End Avenue – Suite 8N**
**New York, NY 10023**

E-mail:  roy.simon@hofstra.edu                         Mobile: (607) 342-0840

## Education

1977        J.D., NEW YORK UNIVERSITY SCHOOL OF LAW, New York, N.Y.

            Editor-in-Chief, *New York University Law Review*, 1976-1977.
            Winner of John Norton Pomeroy Prize, 1975 (awarded to the top 15
            students in the first year class).

1973        B.A., WILLIAMS COLLEGE, Williamstown, Massachusetts.
            English Major.
            Graduated Cum Laude and Phi Beta Kappa.

## Publications

**A.  Books and Book Chapters**.

SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED (Thomson Reuters, 24th ed. 2024).  This 2,000-page treatise annotates and explains every phrase in the New York Rules of Professional Conduct and annotates other sources regulating New York lawyers.  In 2015, the N.Y. State Bar Association Committee on Professional Ethics presented me with the Sanford D. Levy Memorial Award for "contributions to the field of legal ethics," including this book.

REGULATION OF LAWYERS:  STATUTES AND STANDARDS (Wolters Kluwer, 30th ed. 2019) (co-authored with Professor Stephen Gillers and Dean Andrew Perlman).  This book compiles and annotates the ABA Model Rules of Professional Conduct and various statutes, court rules, and other sources governing lawyers.

LAWYERS AND THE LEGAL PROFESSION: CASES AND MATERIALS (LexisNexis, 4th ed. 2009) (co-authored by Professors Carol Needham and Burnele Powell).  This is a textbook for law students taking professional responsibility.  I am the lead co-author of the Third and Fourth Editions.  (I took over authorship after the first two editions.)

*Attorney Fees and Conflicts of Interest*, a chapter in a six-volume set entitled ENVIRONMENTAL LAW PRACTICE GUIDE (Matthew Bender 1992).

*Rule 68 in Civil Rights Litigation*, a chapter in 3 J. Lobel & B. Wolvovitz, eds., CIVIL RIGHTS LITIGATION AND ATTORNEY FEES ANNUAL HANDBOOK (Clark Boardman 1987).

### B.  Selected Articles in Law Reviews and Other Periodicals.

*Fee Sharing Between Lawyers and Public Interest Groups*, 98 Yale L. J. 1069 (1989).

*The New Meaning of Rule 68:* Marek v. Chesny *and Beyond*, 14 N.Y.U. Rev. of Law & Social Change 475 (1986) (lead article in symposium on attorneys' fees).

*The Riddle of Rule 68*, 54 Geo. Wash. L. Rev. 1 (1985) (selected by AALS Section on Civil Procedure as one of fifteen "particularly noteworthy" articles on civil procedure for 1986).

*Rule 68 at the Crossroads: The Relationship Between Offers of Judgment and Statutory Attorneys' Fees*, 53 U. Cin. L. Rev. 889   (1984) (cited by Justice Brennan, dissenting, in *Marek v. Chesny*, 473 U.S. 1, 34 n.50 (1985)).

*Developments in the Regulation of Lawyers*, a column that I wrote once or twice a year from 1991 to 2019 in the Newsletter of the AALS Section on Professional Responsibility (distributed to law professors who teach professional responsibility).

### Academic Employment

1992-2011    HOFSTRA UNIVERSITY SCHOOL OF LAW, Hempstead, New York. Professor of Law (1992-2003); Howard Lichtenstein Distinguished Professor of Legal Ethics (2003-2011); Distinguished Professor of Legal Ethics Emeritus (beginning September 1, 2011).

*Courses taught at Hofstra:* (1) Lawyers' Ethics (1992-2009); (2) Civil Procedure (1997-2006); (3) Antitrust (2001-2004); (4) Insurance Law (1999, 2000, & 2003); (5) Contracts (2006-2010); (6) Disabilities Law Clinic (1992-1997); and (7) Law & Economics (2007-2009).

1983-1992    WASHINGTON UNIVERSITY SCHOOL OF LAW, St. Louis, Missouri. Assistant Professor, 1983-1986; promoted to Associate Professor on July 1, 1986; promoted to Professor, with tenure, on July 1, 1989.

*Courses taught at Washington University:*  (1) Legal Profession (1985-1992); (2) Pretrial Litigation (1983-1991); (3) Agency and Partnership (1992); (4) Trial Practice (1990-1991); (5) Complex Litigation (1990-1991); and (6) Clinical Courses at the United States Attorney's Office (Civil and Criminal Divisions), Legal Services of Eastern Missouri, and the Special Public Defender's Office (1983-1991).

### Legal Employment

1976    Summer Associate, DAVIS POLK & WARDWELL, New York, New York. (Received but declined permanent offer.)

1977-78    Law Clerk, HON. ROBERT R. MERHIGE, JR., United States District Court for the Eastern District of Virginia, Richmond, Virginia.

1978-82    Associate, JENNER & BLOCK, Chicago, Illinois.

2

## Professional Activities

*New York State Bar Association' Committee on Standards of Attorney Conduct ("COSAC")*: Chair or Co-Chair (2014-Present), Vice-Chair (2003-2014), Chief Reporter (since 2003), and Member (since 2000). This Committee drafted proposed New York Rules of Professional Conduct from 2003 to 2008. COSAC continues to monitor and propose amendments to the New York Rules of Professional Conduct, and it comments on other existing and proposed rules, standards, and guidelines affecting lawyers.

*New York State Bar Association Committee on Professional Ethics:* Member (1995-present) and Chair (2008-2011). This Committee responds to ethics inquiries from attorneys regarding the New York Rules of Professional Conduct, and the Committee comments on proposals affecting regulation of lawyers.

*New York City Bar Committee on Professional Ethics*: Member for three separate three-year terms – 2002-2005, 2012-2015, and 2019-2022.

*Nassau County Bar Professional Ethics Committee:* Member (1993-2012) and Chair (1996-1998).

*New York City Bar Presidential Task Force on Artificial Intelligence and Digital Technologies – Subcommittee on Generative Artificial Intelligence and the Law:* Member beginning 2024.

*New York State Bar Association Task Force on Artificial Intelligence:* Inaugural Member, 2023-2024.

*Association of the Bar of the City of New York Committee on Professional Responsibility:* Member 2005-2008.

*New York City Bar Task Force on the Role of the Lawyer in Corporate Governance*: Member 2005-2006 (from inception of Task Force to completion).

*New York City Bar Ethics 2000 Committee:* Member 2000-2002. This seven-member special committee, appointed by the President of the Association, spent two years reviewing and commenting on the work of the American Bar Association's Ethics 2000 Commission, which recommended amendments to the ABA Model Rules of Professional Conduct.

*New York City Bar Committee on Professional Discipline*: Member 1995-1998 (three-year term). Chair of Subcommittee on Ethics Rules in Federal Courts.

*AALS Section of Professional Responsibility*: Chair (1993) and Executive Committee Member (1990-1994).

Admitted to practice law and in good standing in New York since 1992.

# Exhibit B

Exhibit B

**Cases in which Professor Roy D. Simon, Jr. has testified**
**<u>as an expert at a deposition or before a tribunal in the past four years</u>**

In the past four years I have testified as an expert witness at a deposition or before a tribunal in the following cases:

a. *Confidential arbitration.* On September 28, 2023, I testified at a deposition on behalf of the defendant law firm in a legal malpractice case.

b. *Confidential arbitration.* On September 12, 2023, I testified at a confidential arbitration hearing on behalf of the defendant law firm in an action to apportion a contingent legal fee between original counsel and successor counsel.

c. *Greenman v. Miller,* Index No.: 650304/2017 (N.Y. County Sup. Ct.): On November 17, 2022, I testified at trial on behalf of an individual defendant/counterclaimant in a suit arising out of a business relationship between a lawyer and the defendant, a nonlawyer who had owned and invested in various companies represented by the lawyer.

d. *Confidential arbitration.* On May 31, 2022, I testified at a deposition on behalf of the plaintiff law firm in an action to collect legal fees. On November 3-4, 2022, I testified at the arbitration hearing.

e. *Confidential arbitration.* On April 13, 2021, I testified at a confidential arbitration hearing on behalf of the plaintiff law firm in an action to collect legal fees.

# Exhibit C

Exhibit C

**Publications by Prof. Roy D. Simon, Jr. in the Past Ten Years**

In the past ten years I have published the following books and articles:

**A.  Books.**

SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED (Thomson Reuters, 23rd ed. 2023), as well as prior editions in 2015 and 2022 (without a co-author) and in 2016, 2017, 2019, and 2020-2021 (with co-author Nicole Hyland).

REGULATION OF LAWYERS:  STATUTES AND STANDARDS (Wolters Kluwer, 30th ed. 2019) (co-authored with Professor Stephen Gillers and Dean Andrew Perlman), as well as prior editions in 2015, 2016, 2017, and 2018 (sometimes with a third co-author).

**B.  Articles in Law Reviews and Other Periodicals.**

*Artificial Intelligence, Real Ethics,* New York State Bar Association Journal (March/April 2018)

*Monroe Freedman: Friend, Role Model, and Colleague*, 44 Hofstra L. Rev. 275 (2016).

*Rules Permitting Out-of-State Lawyers to Practice Temporarily in New York: Temporarily Out of Order* (March 2015)