**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PERKINS COIE LLP,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, THE UNITED STATES OF AMERICA, and, in their official capacities, PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, and TULSI GABBARD,<br><br>　　　　　Defendants. | Civil Action No. 1:25-cv-00716 |

**EXPERT REPORT OF J. WILLIAM LEONARD**

I, J. WILLIAM LEONARD, declare as follows:

1.　　　I have agreed to testify *pro bono* as an expert witness in the above matter (*Perkins Coie LLP v. U.S. Dep't of Justice, et al.*, Civ. 1:25-cv-00716 (D.D.C.)) based upon the expertise I developed during the course of a 34-year career as a Federal public servant in the national security arena and more than 50 continuous years of experience as a cleared individual.

**I.　　BACKGROUND AND CREDENTIALS**

2.　　　I was employed by the Department of Defense ("DoD") from 1973 to 2002.　My entire tenure involved the area of Personnel Security.　For the first 23 years of my career, I served in various roles of increasing responsibility at the Defense Investigative Service, which was the precursor to today's Defense Counterintelligence and Security Agency (*see*

1

https://www.dcsa.mil/).  In these roles I had operational responsibilities in the DoD's program providing oversight to private sector entities, to include defense contractors and law firms, and their employees who required access to classified national security information.  From 1992 to 1996, I served as the Assistant Deputy Director at the Defense Investigative Service, where I was responsible for a wide range of policy and operational matters pertaining to the DoD's administration of the National Industrial Security Program ("NISP," *see* https://www.dcsa.mil/Industrial-Security/National-Industrial-Security-Program-Oversight/).

NISP is the federal program that manages the access of private industry to classified information. Among other things, I was responsible in that role for the Field Services Division, the Counterintelligence Office, and all overseas operations of the Defense Investigative Service in Europe, the Middle East, Central and South America, and the Far East.  My responsibilities included reviewing submittals to the Office of the Secretary of Defense recommending the suspension of personnel security clearances of private sector individuals when appropriate.

3.      From 1996 to 1998, I served as the Director of Security Programs for DoD, and from 1999 to 2002, I served at times as the Deputy Assistant Secretary of Defense ("DASD") responsible for security and information operations, and at other times as the Principal Director in that office.  As the DASD, I was the most senior official in the DoD responsible for all security, counterintelligence, computer security, infrastructure protection and information operations programs within the DoD.  Part of my responsibility at the Pentagon was to develop and oversee policies to ensure the proper protection of classified information within the entirety of the DoD as well as within private sector entities that did business with the DoD.  These policies included the granting, revocation and suspension of personnel security clearances for military and civilian members of the DoD and for employees of DoD-affiliated private sector entities, to include law

firms, that required access to classified national security information.  As DASD, I was the final authority resolving matters relating to security clearance issues.  In 2002, I was a recipient of the Presidential Meritorious Rank, an award that recognizes a select group of career members of the Senior Executive Service (SES) for exceptional performance over an extended period of time.

4.    From 2002 to January 2008, I served as the Director of the Information Security Oversight Office ("ISOO") during the Administration of President George W. Bush.  ISOO receives its policy and program guidance from the National Security Council and is an administrative component of the National Archives and Records Administration (*see* https://www.archives.gov/isoo).    The Director of ISOO is known colloquially as the "Classification Czar" because the Director is responsible for oversight of the government-wide classification system and aspects of the security clearance process.  I was appointed to this position with the approval of President Bush, and in this role I oversaw the entire Executive Branch's classification and handling of classified national security information.

5.    The Director of ISOO has authority to access more classified information than anyone in the government other than the President and Vice-President.  As the Director of ISOO, I was the primary official charged with the responsibility to ensure that all Executive Branch agencies properly classified and declassified national security information and appropriately granted and restricted access to classified national security information in accordance with established policy.  To that end, I had a primary role in the drafting, editing and issuance by President George W. Bush of Executive Order 13292 (2003), which amended Executive Order 12958 (1995), and established the Federal government's policies with respect to classifying, safeguarding, and declassifying national security information.

6.      As the Director of ISOO, I was also the primary official charged with the responsibility to ensure that Executive Branch agencies appropriately implemented the NISP. The NISP policies that I oversaw included policies around the granting, revocation and suspension of personnel security clearances for employees of private sector firms that required access to classified national security information in support of Executive Branch agencies or in working with other cleared private sector entities.

7.      In my various capacities with the Federal government, it was my responsibility on a regular basis to recommend and/or determine whether security clearances should be granted, suspended, or revoked, and whether information which an agency sought to classify or keep classified met the appropriate classification criteria.

8.      Between 2008 and 2010, I served as the principal of my own consulting firm advising on security issues related to national defense, homeland security and counterintelligence. My area of expertise included the investigation and adjudication of personnel security clearances; assessments of the foreign ownership, control and influence of cleared U.S. defense industry; and the protection of critical infrastructures. I also served as an adjunct professor of political science at St. Mary's College of Maryland.

9.      Between 2010 and 2019, I served as the Chief Operating Officer of the National Endowment for Democracy, a nongovernmental, nonprofit foundation dedicated to the growth and strengthening of democratic institutions around the world.

10.     While I am retired from full-time employment, I currently serve as a member of the board of directors for a company cleared by the DoD under the terms of a special security agreement. In this capacity, I am required to retain a personnel security clearance, and my responsibilities include ensuring that the cleared firm and its personnel properly safeguard

4

classified information as well as ensuring that the firm's foreign-owned parent is precluded from accessing classified and other sensitive U.S. Government information.  As such, I have remained abreast of all official policy and requirements for the protection of classified national security information, as well as the standards for approving, suspending, denying or revoking security clearances.  I have been continuously cleared (i.e., have held an active security clearance) at all times between 1973 and the present.

11.    I hold a Masters of Arts degree in International Relations from Boston University and a Bachelor of Arts degree in History from Saint John's University.

## II.    RETENTION IN THIS MATTER AND RELATED DISCLOSURES

12.    In March 2025, I was approached by counsel to Perkins Coie LLP to discuss this case, which regards Executive Order 14230 entitled "Addressing Risks from Perkins Coie LLP," 90 Fed. Reg. 11781 (Mar. 6, 2025) ("Perkins Coie Executive Order").  More specifically, I was asked to address the portions of the Perkins Coie Executive Order that direct the immediate suspension and review of any security clearances held by any Perkins Coie employee, and the portions of the Perkins Coie Executive Order that address "national security."  After reviewing the Perkins Coie Executive Order, I agreed to offer the opinions in this report in the capacity of an expert witness based on my experience and credentials above.  I am doing so without compensation, as my sole motivation for involvement in this present matter is my concern for the integrity of the processes around security clearances, a key tool intended to safeguard the security of our nation and the American people.  I have devoted the great majority of my professional career to the protection of our national security through rigorous application of fair criteria determining (1) what information should be classified and (2) which individuals are entitled to access to such information, and on what terms.

13.     In the years since my retirement from public service, I have served as a *pro bono* expert in several prior court proceedings.  In all such instances, as in this case, I have made it clear to the counsel that I would become involved in their case not as an advocate for a party but rather as an advocate for the integrity of the national security classification and clearance systems.

14.     A list of publications that I have authored in the last ten years is attached as Exhibit 1.  I have not testified in any case as an expert at trial or by deposition in the last four years.  The facts or data I have considered in forming my opinions are set forth in Section III below.

**III.     SUMMARY OF RELEVANT FACTS**

   **a.  Executive Order 14230 and the Related Fact Sheet.**

15.     On March 6, 2025, President Donald Trump issued Executive Order 14230, entitled "Addressing Risks from Perkins Coie LLP." 90 Fed. Reg. 11781 (Mar. 6, 2025).   The Perkins Coie Executive Order was accompanied by a "Fact Sheet." *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.  The following points in the Perkins Coie Executive Order and Fact Sheet are relevant to this report.

16.     ***Section 1 ("Purpose").***  Section 1 sets out the "Purpose" of the Perkins Coie Executive Order.  The first paragraph of Section 1 describes and characterizes certain work undertaken by Perkins Coie in connection with election-related litigation.  It states that in 2016, Perkins Coie "hired Fusion GPS, which then manufactured a false 'dossier' designed to steal an election." It further states that Perkins Coie has "worked with activist donors such as George Soros to judicially overturn popular, necessary, and democratically enacted election laws."  There is no reference to the term "national security" in this first paragraph of Section 1 ("Purpose") of the

Perkins Coie Executive Order, which appears to pertain entirely to Perkins Coie's representation of Hillary Clinton in connection with the 2016 Presidential election and to Perkins Coie's other election-related litigation.  The reference to the Fusion GPS "dossier" notes specifically that the conduct at issue took place in 2016, i.e., prior to the *previous* Administration of the current President, which ran from January 2017 to January 2021.

17.    The second paragraph of Section 1 describes and characterizes certain practices of Perkins Coie related to its hiring and promotion practices, contending in particular that Perkins Coie "racially discriminates" against its own personnel and applicants, and applies "quotas" for hiring and promotion.  There is no reference to the term "national security" in the second paragraph of Section 1 ("Purpose") of the Perkins Coie Executive Order either, which pertains entirely to claims of racial discrimination in Perkins Coie's employment practices.

18.    The above two paragraphs are the only apparent factual "findings" in Section 1. The third paragraph of Section 1 describes the President's stated intention in issuing the Perkins Coie Executive Order, which is described as a commitment to "ending discrimination under 'diversity, equity, and inclusion' policies" and to "ensuring that Federal benefits support the laws and policies of the United States."  Here, the Perkins Coie Executive Order references "national security" and "respecting the democratic process" as two categories of "laws and policies" included within the broader term "laws and policies of the United States," but provides no other details.  The third paragraph of the Perkins Coie Executive Order then returns to the issue of "race-based and sex-based discrimination" and the "bedrock principle of equality," and makes no further reference to national security.

19.    ***Section 2 ("Security Clearance Review").***    Section 2(a) of the Perkins Coie Executive Order directs the Attorney General, the Director of National Intelligence, and "all other

7

relevant [agency] heads" to "immediately … suspend" any active security clearances held by any Perkins Coie employee, to be followed by a "review of whether such clearances are consistent with the national interest." This last phrase is notable, in that there is no reference in Section 2(a) to "national security," only to "the national interest" (a phrase that appears in Section 2(a) but nowhere else in the Perkins Coie Executive Order). Also notable in Section 2(a) is the blanket directive to suspend all active security clearances held by any person working at Perkins Coie, a firm at which I understand more than 1,200 attorneys and more than 1,200 other supporting personnel are employed. I discuss both of these noteworthy features of Section 2(a) below.

20.      Section 2(b), which also falls under the header of "Security Clearance Review," directs the Office of Management and Budget to identify "all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities" ("SCIFs") provided for Perkins Coie's benefit, and to cease such provision.

21.      ***Sections 3 and 4***. I do not address Section 3 ("Contracting") and Section 4 ("Racial Discrimination") of the Perkins Coie Executive Order in this report, as neither of those sections address security clearances nor do they contain any reference to or discussion of "national security" in any respect.

22.      ***Section 5 ("Personnel")***. Section 5 ("Personnel") contains two subsections. First, Section 5(a) directs all Federal agency heads to limit the access of Perkins Coie employees to Federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." Section 5(a) also directs Federal agency heads to limit Federal employees in their official capacity "from engaging with Perkins Coie employees," in order to "ensure consistency with the national security and other interests of the United States."

23.     Second, Section 5(b) directs Federal officials to refrain from hiring any Perkins Coie employee into Federal service unless a waiver is obtained establishing "that such hire will not threaten the national security of the United States."

24.     Section 5 ("Personnel") thus contains three references to "national security," while Section 2 ("Security Clearance Review") contains none.

25.     **_Section 6_**.  Lastly, Section 6 of the Perkins Coie Executive Order contains various general provisions common in such orders, such as directing that the order be implemented consistent with the law.

26.     **_The Fact Sheet_**.  By and large, the Fact Sheet is consistent with the Perkins Coie Executive Order.  It begins with a section entitled "Stopping Abuses That Undermine the Nation," which addresses the Perkins Coie Executive Order's security clearance directive ("Security clearances held by Perkins Coie LLP employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest"), including the notable phrase "the national interest" and the absence of a reference to national security, and also addresses aspects of the Perkins Coie Executive Order relating to government contracting.

27.     The Fact Sheet also includes reference to two additional alleged wrongdoings by Perkins Coie.  First, the Fact Sheet states that "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness."  I understand from counsel that this reference is believed to be to a pending lawsuit brought by servicemembers, represented by Perkins Coie, challenging an Executive Order that bans transgender personnel from serving in the United States Armed Forces.  Second, the Fact Sheet states that "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussman indicted for lying to the FBI about this scheme."  I understand from counsel that

this refers to the fact that a Special Counsel appointed during the first Trump Administration indicted Michael Sussman, a former partner at Perkins Coie, in connection with evidence he brought to the attention of the FBI, allegedly without disclosing his ties to the Clinton campaign. I understand further that that case went to trial in 2022, that Mr. Sussman was acquitted, and that Mr. Sussman no longer works at Perkins Coie.

**b.  Security Clearances Held by Perkins Coie Personnel.**

28.    Based on representations by counsel, I understand the following to be undisputed facts related to the security clearances currently held by Perkins Coie personnel and any SCIFs maintained by the firm:

a.    At the time the Order was issued, approximately twenty-four Perkins Coie personnel held active security clearances.  More than a dozen of those personnel are military veterans or reservists, or are former public civil servants, in either case initially entrusted with access to sensitive information by virtue of their prior public service employment, as opposed to their work at Perkins Coie.  This group of twenty-four also includes individuals who maintain active security clearances in the context of fulfilling their obligations as lawyers to represent their clients.  Four of the twenty-four security clearance holders are not attorneys.

b.    For twenty-one of the approximately twenty-four security clearance holders, the clearance was issued by the DoD.  For the other three, it was issued by the Department of Justice and/or Federal Bureau of Investigation.

c.    None of the approximately twenty-four Perkins Coie personnel holding active security clearances are primary members of Perkins Coie's Political Law practice

group, which I understand is the practice group that performed the work referenced in Section 1 of the Perkins Coie Executive Order.

d.  Nineteen of the approximately twenty-four Perkins Coie personnel holding active security clearances had no involvement in any of the matters referenced in the Perkins Coie Executive Order or the Fact Sheet.

e.  Of the five Perkins Coie personnel holding active security clearances and who worked in any respect on any matter referenced in the Perkins Coie Executive Order or the Fact Sheet, the security clearances held by those personnel were unrelated to their work on any such matter or matters, which work thus did not involve access to classified information.

f.  No Perkins Coie personnel holding an active security clearance had any involvement in the Fusion GPS engagement.  More broadly, no attorney employed by Perkins Coie at any time during the last three years (whether or not holding a security clearance) was involved in the Fusion GPS engagement.

g.  Ten Perkins Coie personnel holding active security clearances were hired at Perkins Coie after the 2016 presidential election, meaning after any relevant activity related to Fusion GPS (which the Perkins Coie Executive Order states was "designed to steal [that] election").

h.  One Perkins Coie attorney possessing an active security clearance was issued that clearance in February 2025, about three weeks before the publication of the Perkins Coie Executive Order.

i.  Perkins Coie previously maintained a secure area with a low classification level, namely a sensitive working environment, but no longer maintains this secure area. Perkins Coie has never maintained a SCIF.

## IV.  BACKGROUND PRINCIPLES ON SECURITY CLEARANCES

### a.  The Rules and Principles Governing the Security Clearance Review Process.

29.  Executive Order 12968, which established the protocols governing access to classified information to include provisions for due process, has remained in effect since it was issued nearly thirty years ago by President Bill Clinton.  Access to Classified Information, 60 Fed. Reg. 40245 (Aug. 2, 1995).  The protocols in Executive Order 12968 have been subject to minor amendments since then, the most substantive ones being the designation of the Director of National Intelligence as the "Security Executive Agent" by virtue of Executive Order 13467, *Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information*, which was issued by President George W. Bush on June 30, 2008, and the initiation of continuous vetting procedures through Executive Order 13764 that President Barack Obama signed on January 17, 2017.  None of the subsequent amendments or policy modifications have impacted the core principles of due process that were created in Executive Order 12968.

30.  The protocols established by Executive Order 12968 are aimed at ensuring that the protection of the nation's classified information is consistent with "providing fair and equitable treatment to those Americans upon whom we rely to guard our national security."  60 Fed. Reg. at 40245.  A hallmark of the process, therefore, is that it is an *individualized* one.  The touchstone of that individualized review is whether clearance is consistent with the "national security interest" of the United States.  "National security," meanwhile, is defined both in the United States Code and in Executive Order 13526, *Classified National Security Information* (Dec. 29, 2009), as "the

national defense and foreign relations of the United States." 10 U.S.C. § 801(16); 75 Fed. Reg. 707, 729 (Jan. 5, 2010) (identical definition in Executive Order 13526, except using the disjunctive "or").[1]

31.     Pursuant to Executive Order 12968, an individual may not access classified information unless (1) that individual has been "determined to be eligible" for access, (2) that individual has signed a nondisclosure agreement, and (3) that individual has a "demonstrated need-to-know" for the information at issue.  60 Fed. Reg. at 40246.  Access to classified information is generally granted (with limited and defined exceptions) only to individuals "who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information."  *Id.* at 40250. The determination of eligibility for access to such information is to be "based on judgments by appropriately trained adjudicative personnel."  *Id.*

32.     The security clearance process is a critical tool in keeping our nation and its citizens safe.  For it to be effective, it is to be implemented in a "fair and equitable" manner and through a "uniform … program."  *Id.* at 40245.

---

[1] For most of the Perkins Coie personnel holding security clearances, particularly those whose clearances are held through their military status or their former civilian public service, their due process rights are derived from Executive Order 12968.  There are other executive orders and subordinate directives and regulations that touch upon personnel vetting that are not discussed here.  While some of these may reference "national interest" instead of "national security interest", the governing executive order (12968) and the national adjudicative guidelines for security clearances, which are discussed in more detail below, explicitly rely upon the term "national security interests."

33.     To ensure that this national security tool (i.e., the individualized security clearance process) is implemented in a fair and equitable manner and through a uniform program, the Director of National Intelligence (DNI), under the authority of Executive Order 13467 referenced above and in furtherance of Executive Order 12968, issued DNI Security Executive Agent Directive 4 ("SEAD-4"), *National Security Adjudicative Guidelines*, on June 8, 2017, during the prior Administration of President Donald Trump.  This Directive establishes the criteria to be used by all Federal government agencies authorized to render a determination for initial or continued eligibility of an individual to access classified information.  Off. of the Dir. of Nat'l Intel., *Security Executive Agent Directive 4: National Security Adjudicative Guidelines* (2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf.

34.     Pursuant to SEAD-4, an individual's eligibility for a security clearance turns on whether that individual's access to classified information is "clearly consistent with the national security interests" of the United States.  *Id.* at 5.  The adjudicative process is intended to be an examination of the "whole person," meaning an examination of "a sufficient period and careful weighing of a number of variables of an individual's life," in order to make an affirmative determination that the individual is an acceptable security risk.  *Id.* at 6 ("the whole-person concept").  The adjudicative policy states unambiguously that for every individual seeking a security clearance, each such individual "case must be judged on its own merits."  *Id.*  To perform that adjudication, an individual's personal conduct in the following thirteen areas are taken into account:  allegiance to the United States (Guideline A), foreign influence (Guideline B), foreign preference (Guideline C), sexual behavior (Guideline D), personal conduct (Guideline E), financial considerations (Guideline F), alcohol consumption (Guideline G), drug involvement and substance

misuse (Guideline H), psychological conditions (Guideline I), criminal conduct (Guideline J), handling protected information (Guideline K), outside activities (Guideline L) and use of information technology (Guideline M). *Id.* The guidelines also state that in evaluating the relevance of an individual's conduct with respect to any of the above guidelines, the recency of that conduct is a key element to be taken into account. *Id.*

35.    In light of the above, the granting, suspending, and revoking of security clearances is a highly individualized process that involves a close and detailed factual analysis of the individual in question and provides any individual subject to this analysis with significant due process protections. Before any security clearance is granted, denied or revoked, the appropriate investigative agency must conduct an investigation of the individual to the required scope. This investigation addresses the factors outlined in the above adjudicative guidelines outlined in Directive 4, pursuant to Executive Order 12968.

36.    Following the appropriate investigation, should an applicant be denied a clearance or should a cleared individual's clearance be revoked, that individual is entitled to the due process considerations set forth in Executive Order 12968. The standard due process provisions that are followed within the Executive Branch whenever an individual's security clearance is denied or revoked include the following: (1) a comprehensive and detailed written explanation for the denial or revocation; (2) appropriate access to documents, records, and reports upon which the denial or revocation is based; (3) the right to be represented by counsel; (4) the opportunity to respond in writing; (5) a written notice of and the reasons for the results of the review, the identity of the deciding authority, and written notice of the appeal; and (5) the opportunity to appeal in writing and in some instances in person to a higher level of review. *See* 60 Fed. Reg. at 40252-53 (Part 5—Review of Access Determinations).

**b. Relevant History Regarding the Security Clearance Review Process.**

37.     The above-described security-clearance processes set out by Executive Order 12968 and expanded through SEAD-4, and the due process protections afforded individuals as part of the same, are an outgrowth of an earlier period of our nation's history when such rights were not present and the security clearance process was abused.  As illustrated by the well-known case of Robert Oppenheimer, it was not unusual in the immediate aftermath of World War II for groups of persons to have their security clearances denied, revoked or suspended solely based upon their membership in disfavored organizations or upon their association with other known members of such organizations.

38.     In 1947, then-Attorney General Tom Clark released the "Attorney General's List of Subversive Organizations."  As its name implies, this list was intended to compile organizations deemed to be subversive by the U.S. government.  The list included 50 organizations ranging from Communist Party USA and the Ku Klux Klan to organizations such as the National Negro Congress and the Washington Book Shop Association.  Many Americans had signed petitions or become members of such groups, often not understanding their true nature or the consequences of affiliation.  The Attorney General's List was eventually incorporated by then-President Harry Truman into Executive Order 9835, which established the first federal employee loyalty program. *See* 12 Fed. Reg. 1935 (Mar. 25, 1947).  Executive Order 9835 was in turn superseded by President Dwight Eisenhower's Executive Order 10450 in 1953, which updated the Attorney General's List and expanded the criteria for determining trustworthiness and reliability for purposes of a security clearance.  Security Requirements for Government Employment, 18 Fed. Reg. 2489 (Apr. 27, 1953).  In 1959, the Supreme Court decided the landmark case *Greene v. McElroy*, holding in relevant part that the revocation of the plaintiff's security clearance as a defense contractor on the

grounds of alleged Communist associations and sympathies was unlawful in that the plaintiff "was not afforded the safeguards of confrontation and cross-examination." 360 U.S. 474, 508 (1959).[2]

39.     It was the Supreme Court's decision in *Greene* that led to the establishment of due process provisions for the individualized granting, denial, or revocation of security clearances for contractors, which due process provisions continue to this day.  Due process provisions were first adopted for defense contractors through President Eisenhower's Executive Order 10865 in 1960, and similar due process provisions were codified in 1995 by President Clinton in Executive Order 12968 ("Access to Classified Information") to cover civil servants and military personnel.  These protections have remained unchanged through five successive administrations, including President Trump's prior administration between 2017 and 2021.  Executive Orders 10865 and 12968 as well as SEAD-4 remain the current governing policy for granting, denying and revoking personnel security clearances.[3]  There is no language within the Perkins Coie Executive Order that indicates it is superseding, revoking or modifying the protections set forth in any of the prior Executive Orders or governing due process requirements.

**c.  The Process For Suspending or Revoking a Security Clearance.**

40.     Existing policy recognizes that emergency situations may arise where an individual security clearance must be suspended before the completion of all of the due process provisions

---

[2] *Greene* stands for the proposition that due process applies to security clearances.  360 U.S. 474.  There, neither Congress nor the President authorized the constitutionally deficient procedures.  *Id.* at 508.  The Court declined to opine on the constitutionality of those procedures had they been set out in legislation or an executive order.  *Id.*

[3] Executive Order 12968 allows for narrow instances when due process may be limited because the required procedure cannot occur "without damaging the national security interests of the United States by revealing classified information."  60 Fed. Reg. at 40252.  This provision might be invoked, for example, when a government employee or contractor is charged with espionage for a foreign power.  But this limited due process section is inapplicable here, including because the required certification has not been made and because there has been no determination that full due process would itself compromise national security by revealing classified information.

outlined above.  60 Fed. Reg. at 40252-53 (Part 5—Review of Access Determinations); *see also* SEAD-4 at 7.  Specifically, an individual's security clearance can be suspended for cause when information relative to any of the adjudicative guidelines exists and raises a serious question as to the *individual's* ability or intent to protect national security information.

41.    Throughout my career I have frequently either recommended or approved the suspension of an individual's clearance.  In every case, as well as every other suspension I am aware of (whether or not personally involved in the related recommendation or approval), any such suspension was based upon the individual's conduct.  I am not aware of any instance when an individual's security clearance has been suspended for reasons *other* than the individual's own conduct.  Furthermore, in every case in which I was personally involved or am otherwise aware of, there existed a reasonable basis for concluding that the individual's continued access to classified information posed an imminent threat.  For example, if a person with a security clearance is arrested for a serious crime that calls into question the individual's honesty or trustworthiness, such that a new investigation is needed, an emergency suspension of a security clearance may be issued pending final result of the new investigation.  In the vast majority of cleared defense contractor cases where the government is seeking to revoke an individual's security clearance for conduct issues, that individual maintains their access and eligibility throughout the process, which could take years.

42.    Importantly, whenever an individual's security clearance is suspended, the government entity that granted the clearance is obligated to notify the individual in writing and to provide that individual with a statement of reasons as to why access to classified information has been suspended.

43.    The suspension process is followed, as appropriate, either with reinstatement of access to classified information or with a revocation process that affords the established processes and due process protections outlined above.

## V.    OPINIONS

### a.    Opinion 1: The Blanket Approach Of The Perkins Coie Executive Order Is Inconsistent With Governing Policy Requiring Individualized Assessments.

44.    As described above in Section IV, in order to ensure that clearance procedures "provid[e] fair and equitable treatment to those Americans upon whom we rely to guard our national security," the process is always based upon the personal conduct of the relevant individual.  That is one of the fundamental hallmarks of the security-clearance review process; Person A is never held accountable for the conduct of Person B, let alone are Persons 1 through 2,500 held accountable for the conduct of formerly-associated Person 2,501.

45.    The Perkins Coie Executive Order violates these bedrock principles of the security-clearance review process because it provides no individualized assessment of personal conduct in the suspension of clearances.  The Perkins Coie Executive Order contains no mention of, let alone any individualized assessment of, the approximately twenty-four individual Perkins Coie personnel who currently hold security clearances.  The only common feature as to those individuals is that they all currently work at Perkins Coie, yet the Perkins Coie Executive Order directs the immediate suspension of all clearances regardless of whether that clearance derived from work related to Perkins Coie, regardless of whether that clearance had anything to do with any factual finding in the Perkins Coie Executive Order, and regardless of when that individual was hired at Perkins Coie.

46.    Simply put, a blanket suspension of all security clearances at a law firm of 1,200+ lawyers and 1,200+ business professionals is unprecedented in its scope and fundamentally

inconsistent with existing authority addressing the processing, granting and revocation of security clearances. The *ad hoc* directive in this case harkens back to the repudiated and discredited programs that existed before *Greene v. McElroy*, including during the Red Scare. The arbitrary directive of immediate suspension of security clearances not for any personal conduct by any clearance holder but rather simply for that individual's association with a law firm is no different analytically than if a directive were issued to immediately suspend the security clearances of all Jews or Muslims, all members of the LGBTQ+ community, all women, or all registered Democrats or Republicans.

47.    These types of non-individualized, mass suspensions of security clearances targeted at groups of individuals threaten to harm our national security efforts. Should individuals who otherwise meet the standards be summarily denied or stripped of their security clearance through these types of sweeping, blanket decrees addressed at entire classes of thousands of persons or more at once, the resulting uncertainty that would spread throughout the system may severely impact the effectiveness of our military, intelligence and diplomatic capabilities to deter or otherwise respond to our nation's adversaries.

**b.  Opinion 2: The Perkins Coie Executive Order Is Unprecedented In Its Invocation of Facially Stale Information and Conduct Unrelated to National Security.**

48.    The Perkins Coie Executive Order is also contrary to the foundational principles surrounding the granting, suspension, denial, or revocation of security clearances, as set forth in existing and operative policy documentation that have existed for decades, in that the stated reasons for the suspension of the security clearances do not have any apparent nexus to national security concerns. As I explained in Section IV, the touchstone of the individualized security-clearance review is whether clearance is consistent with the "national security interest" of the United States, which is defined as "the national defense and foreign relations of the United States."

49.     Here, however, the Perkins Coie Executive Order—and in particular Section 2 of the Perkins Coie Executive Order related to security clearances—makes it clear it has nothing to do with national security.  For example, the Perkins Coie Executive Order faults Perkins Coie for its "work[] with activist donors such as George Soros to judicially overturn popular, necessary, and democratically enacted election laws."  By this characterization, I understand the Perkins Coie Executive Order to refer to the fact that Perkins Coie represented a number of clients opposing then-candidate Trump's challenges to the results of the 2020 Presidential Election (in almost all instances, I am told, with successful outcomes).  The Fact Sheet similarly faults Perkins Coie for bringing a lawsuit challenging an Executive Order that bans transgender personnel from serving in the United States Armed Forces.  In my more than three decades of service culminating as the most senior public servant focused professionally on the protection of United States classified information, I have never seen any security clearance determination that was based on the fact that an attorney represented clients in election-related litigation (or other litigation challenging the policies of an administration), and I can see no reasonable construction of such activity as being a matter of "national security" as that term is defined and understood.  Tellingly, Section 2 of the Perkins Coie Executive Order never uses the term "national security," and instead only mentions the "national interest," a term that is markedly broader than the "national security interest" that serves as the touchstone of a security-clearance review.  On the face of the Perkins Coie Executive Order, it therefore appears apparent and acknowledged that the directive in Section 2 to suspend security clearances is *not* based on "national security."  I am aware of no practice, examples, or guidance that permits the suspension, revocation, or denial of a security clearance on any grounds other than national security grounds.

21

50.    The closest reference in the Perkins Coie Executive Order to anything that could be considered remotely related to "national security" is one sentence relating to Perkins Coie's work with Fusion GPS (and the related allegations regarding Michael Sussman in the Fact Sheet, although nothing on that subject appears in the Perkins Coie Executive Order itself).  But the Fusion GPS issue was public knowledge in 2017 when President Trump's prior administration began.  Between 2017 and 2021, there was no effort at any time as far as I am aware to suspend, revoke, or deny any security clearance held by any Perkins Coie personnel for reasons related to Fusion GPS.  If that activity, which the Perkins Coie Executive Order expressly characterizes as taking place in 2016, was not activity that compromised "national security" during President Trump's first term in office between 2017 and 2021, it is impossible to understand how that nearly decade-old activity could now serve as a "national security" justification for the immediate suspension of security clearances.  This is especially so in that throughout my experience suspensions of access to classified information have been based upon a newly identified imminent threat that necessitated delaying the required due process, as described above.  I understand from counsel, moreover, that none of the current personnel at Perkins Coie who hold security clearances had any involvement in the Fusion GPS matter; in fact, no attorney employed by Perkins Coie at any time during the last three years was involved with the Fusion GPS engagement.  This further undermines any suggestion that the immediate suspension of all active security clearances held by any Perkins Coie personnel is necessitated in the name of national security for any reason related to Fusion GPS.

51.    More fundamentally, the behavior that the Perkins Coie Executive Order deems problematic—attorneys representing clients in court—is not of the type that has ever in my experience been deemed conduct relating to a "national security" interest.

22

52. It is further apparent that the Perkins Coie Executive Order is not grounded in a "national security" determination, in that a Perkins Coie attorney was issued a security clearance in February 2025, only a few weeks before the March 6, 2025 publication of the Perkins Coie Executive Order.  Yet Perkins Coie's engagement of Fusion GPS dates to 2016, and its involvement in election-related litigation has been well-known for many years.  There cannot reasonably have been a national security emergency grounded in these stale facts that justified the immediate suspension of a security clearance that was granted without controversy (and following a substantive determination of trustworthiness as required by law) only weeks before.

53.  The lack of any national-security concerns here is still further underscored by the fact that, as I understand from public reports, an Executive Order was issued on March 14, 2025 against a second law firm (Paul Weiss) that similarly directed the immediate suspension of all security clearances held by any firm employee, *see Addressing Risks from Paul Weiss*, The White House (Mar. 14 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/, only to be withdrawn within days following some kind of settlement agreement that provides for the provision of *pro bono* services by Paul Weiss and certain other steps by that firm. There cannot reasonably have been a national security emergency that justified the immediate suspension of security clearances but that was remedied by Paul Weiss's agreement to provide *pro bono* services.

c. **Opinion 3: The Perkins Coie Executive Order's Directive Amounts to a Preordained Revocation of Security Clearances Without Due Process.**

54.  While the Perkins Coie Executive Order purports only to suspend clearances pending review, the Perkins Coie Executive Order and Fact Sheet together amount to a preordained blanket revocation of security clearances without any of the required due process protections associated

with such revocation.  That is, the Perkins Coie Executive Order functionally plays the role of judge, jury, and executioner.

55. In Section 2, the Perkins Coie Executive Order directs all Federal agency heads to "immediately … suspend any active security clearances held by individuals at Perkins Coie" and to "review … whether such clearances are consistent with the national interest."  It might therefore seem, at first blush, that the Perkins Coie Executive Order merely calls for an emergency suspension, to be followed by appropriate due process, although there is no indication of what that might look like, when it would occur, or when it must be concluded.  In any event, Section 1 of the Perkins Coie Executive Order contains express findings that any reviewing agency necessarily must take as fact in conducting that review.  Those findings include a statement that Perkins Coie is a "dishonest and dangerous" law firm that has "undermine[d] democratic elections, the integrity of our courts, and honest law enforcement."  The findings in Section 1 functionally predetermine the outcome, meaning that no good-faith and impartial investigation could ever take place.

56. In light of the above directives in the Perkins Coie Executive Order, the outcome of any security clearance review is preordained.  For these suspensions to be reversed and the affected individuals' access to classified national security information to be reinstated would require a professional adjudicator to make findings expressly contradictory to the findings in Section 1 of the Perkins Coie Executive Order.  The approach of the Perkins Coie Executive Order is unprecedented and inconsistent with governing guidance and policy documentation.

I declare under penalty of perjury that the foregoing is true and correct.

Date: April 2. 2025

J. William Leonard

24

# EXHIBIT 1

Authored Publications in Past Ten Years

J. William Leonard, *Congress Must Stop the Weaponization of Personnel Security Clearances*, Just Sec. (Mar. 11, 2025), https://www.justsecurity.org/108657/congress-stop-weaponization-security-clearances/.

J. William Leonard, *Vice Presidents and Rules Governing Classified National Security Information*, Just Sec. (Jan. 17, 2023), https://www.justsecurity.org/84774/vice-presidents-and-rules-governing-classified-national-security-information/.

J. William Leonard, *Myths and Misunderstandings Relating to Margo-a-Lago Documents Investigation*, Just Sec. (Mar. 16, 2022), https://www.justsecurity.org/82706/myths-misunderstandings-relating-to-mar-a-lago-documents-investigation/.

J. William Leonard, *Why Joe Biden Should Pardon Reality Winner*, Wash. Post (Dec. 20, 2019), https://www.washingtonpost.com/opinions/why-joe-biden-should-pardon-reality-winner/2020/12/21/9e6f4094-4162-11eb-8db8-395dedaaa036_story.html.

J. William Leonard, *Barr's Personal Ad Hoc Declassification Authority and the Role of Congress*, Just Sec. (Dec. 9, 2019), https://www.justsecurity.org/67663/barrs-personal-ad-hoc-declassification-authority-and-the-role-of-congress/.

J. William Leonard, *Trump Repudiates a Century of U.S. Policy*, Just Sec. (Nov. 15, 2019), https://www.justsecurity.org/67255/trump-repudiates-a-century-of-u-s-policy/.