# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERKINS COIE LLP,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, THE UNITED STATES OF AMERICA, and, in their official capacities, PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, and TULSI GABBARD,<br><br>    Defendants. | Civil Action No. 25-716 |

# DEFENDANTS' MEMORANDUM IN SUPPORT OF
# MOTION TO DISMISS AND FOR EXPEDITED JUDGMENT

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ 1

**LEGAL STANDARDS AND RULE STATEMENTS** ..................................... 3

    *Shotgun Pleading* ......................................................................................... 3

    *Rule 12(b) & 56* ........................................................................................... 4

**ARGUMENT** ..................................................................................................... 7

    **I.**    **Plaintiff's claims fail as to Section 1 of the Executive Order** ................ 7

    **II.**    **Plaintiff's claims fail as to Section 2 of the Executive Order** ............. 13

    **III.**    **Plaintiff's claims fail as to Section 3 of the Executive Order** ............. 17

    **IV.**    **Plantiff's claims fail as to Section 4 of the Executive Order** .............. 25

    **V.**    **Plaintiff's claims fail as to Section 5 of the Executive Order** .............. 28

**CONCLUSION** ................................................................................................ 32

The U.S. Department of Justice, Federal Communications Commission, Office of Management and Budget, Equal Employment Opportunity Commission, Office of Personnel Management, General Services Administration, Office of the Director of National Intelligence, the United States of America, Pamela J. Bondi, Brendan Carr, Russell T. Vought, Andrea R. Lucas, Charles Ezell, Stephen Ehekian, and Tulsi Gabbard (collectively, "Defendants"), respectfully move this Court to dismiss the Complaint.

## INTRODUCTION

On March 6, President Trump issued Executive Order 14,230 (the "Executive Order"). The Executive Order lays out the President's concerns about the law firm Perkins Coie LLP ("Plaintiff") in matters related to election integrity, national security, and discriminatory employment practices. In light of those considerations, the Executive Order directs a review of Perkins Coie to ensure that the Federal Government's dealings with the firm are consistent with the national security of the United States and other public interests. And it seeks to ensure that taxpayer funds are not in any way diverted to support unlawful or unsavory practices that—if they should be permitted at all—must be financed by the private dime.

Plaintiff's 172-paragraph complaint raising nine separate legal claims only obscures what is a straightforward—and straightforwardly legal—Executive Order. Try as it might to frame the Executive Order as "punitive" or a "sanction," the preamble in Section 1 and the operative sections of the Executive Order, Sections 2, 3, 4, and 5, act within the bounds of established executive authority.

As to the Section 1 preamble, Plaintiff's lawsuit carries with it a dangerous risk of muzzling the Executive. No less than Plaintiff, the government has a right to speak which encompasses the statements in Section 1.

1

Section 2 of the Executive Order directs that agencies "review" whether "active security clearances" held by Plaintiff's employees "are consistent with the national interest."  EO 14230 § 2.  Plaintiff does not and cannot argue that it should have security clearance privileges if *contrary* to the national interest.  As detailed herein, courts have long held that on such matters the President is entitled to great deference.

Section 3 of the Executive Order seeks to cancel any contracts for which Perkins Coie is hired to perform services.  The Executive Order specifies that, among other goals, Section 3 seeks to ensure that there is no transfer of taxpayer dollars to entities that engage in racial discrimination. Executive use of the procurement power to advance social policy has long been held to be on the firmest possible grounds of authority:  The express or implied authorization of Congress.

Section 4 directs the Attorney General and the Chair of the Equal Employment Opportunity Commission ("EEOC") to review whether Perkins Coie and like employers are violating the civil rights laws—in other words, to do what it was already the EEOC's job to do.  Again, this is firmly within the prerogative of the Executive.

In Section 5 the Executive Order directs agencies to issue guidance as to what access Plaintiff's employees should have to government buildings and government officials, consistent with national security and applicable law, as well as examine the propriety of hiring employees from Plaintiff's firm.  While Plaintiff's claims are unripe as no agency has issued the guidance the order calls for.  The parameters of access to executive branch staff, offices, and employment are well within the rights of the Executive.  Try as Plaintiff might to describe potential impacts on the right to counsel, all of these assertions are pure conjecture and speculation.  The guidance—which must be consistent with the law—has yet to be issued and therefore there is no actual controversy before this Court.

The Executive Order directs agencies to do what they should already be doing, declines to contract with entities who act inconsistently with valid social policies regarding discrimination, and calls for the lawful examination of security clearances and government access of employees of Plaintiff's firm.  The law does not support Plaintiff's claims as to Sections 1, 2, 3, 4, and 5; and as to Section 5 specifically, Plaintiff's claim is at best too early and, as any guidance will be consistent with the law, will eventually fail on the merits.  Accordingly, this Court should dismiss the Complaint.

## LEGAL STANDARDS AND RULE STATEMENTS

### *Shotgun Pleading*

Each count of the Complaint begins with a paragraph stating, "Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein." *See* Compl. ¶¶ 85, 99, 106, 117, 126, 136, 144, 157, 165.  The Complaint does not limit "the preceding paragraphs" to those relevant to or illustrative of the legal and factual basis for each individual count, but incorporates every paragraph, including any preceding counts, count after count. As an example, Count IX necessarily includes every preceding paragraph, including those in Counts I–VIII.  From a practical perspective, this severely handicaps the Defendants' and the Court's ability to ascertain the particulars of Plaintiff's challenges to the various sections of the Executive Order, including which allegations and claims in the Complaint pertain to which sections of the Executive Order.

The D.C. Circuit has emphasized that FED. R. CIV. P. 8 "underscore[s] the emphasis placed on clarity and brevity by the federal pleading rules." *Ciralsky v. CIA*, 355 F.3d 661, 668–69 (D.C. Cir. 2004).  This case demonstrates why.  Plaintiff's imprecise practice here only complicates Defendants' task in moving for dismissal and the Court's ability to assess these arguments.  Indeed,

Plaintiff's Complaint in this respect is a paradigm example of a "shotgun pleading." *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). Defendants reserve the right to include in any follow-on briefing additional argument or bases for dismissal or judgment to the extent Plaintiff clarifies their claims in a manner not clearly evident on the face of its Complaint and TRO Motion. To provide some structure regarding this overbroad shotgun Complaint, Defendants have organized this motion to dismiss by addressing what appear to be Plaintiff's challenges to each section of the Executive Order.

*Rule 12(b) & 56*

On a Rule 12(b)(6) motion to dismiss, the Court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 277 (D.C. Cir. 2023). The factual allegations "must still be enough to raise a right to relief above the speculative level," and "the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint." *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023). The Court may also consider "any documents either attached to or incorporated in the complaint," "matters of which [the Court] may take judicial notice," and matters of public record. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997); *Sheppard v. United States*, 640 F. Supp. 2d 29, 32 (D.D.C. 2009). For a motion brought under Rule 12(b)(1), the Court may consider the complaint "supplemented by undisputed facts evidenced in the record or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Sheppard*, 640 F. Supp. 2d at 32. Summary judgment under Rule 56(a) may be granted only if "there is no genuine dispute as to any material fact," including based on information outside the pleadings, and "the movant is entitled to judgment as a matter of law."

4

Plaintiff raises an *ultra vires* claim (Count I), due process claims (Counts II and III), an equal protection claim (Count IV), First Amendment claims (Counts V, VI, VII), and right-to-counsel claims (Counts VIII and IX).

An *ultra vires* challenge such as that brought in Count I are "available only for the narrow purpose of obtaining injunctive relief against agency action taken in excess of its delegated powers and contrary to a specific prohibition in the law." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 765 (D.C. Cir. 2022). They are subject to a "demanding standard." *Id.* at 765. Such claims are "confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Id.* at 764 (cleaned up). "Only error that is patently a misconstruction of [a statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* (cleaned up). Further, to state an *ultra vires* claim properly, a plaintiff must show "there is no alternative procedure for review" of its claim. *Id.* at 763.

Plaintiff raises a procedural due process challenge and a void-for-vagueness due process challenge in Counts II and III. "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023); *see also English v. District of Columbia*, 717 F.3d 968, 972 (D.C. Cir. 2013) ("The procedural due process protections under the Fifth and Fourteenth Amendments are the same."). Whether the process provided is adequate depends on "(1) the importance of the private interest at stake, (2) the risk of an erroneous deprivation of the interest because of the procedures used and the probable value of additional procedural safeguards, and (3) the government's interests, including the cost of additional procedures." *English*, 717 F.3d

at 972. And "[t]he Due Process Clause prohibits the Government from taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Kincaid v. Gov't of the District of Columbia*, 854 F.3d 721, 728 (D.C. Cir. 2017) (Kavanaugh, J.) (internal quotation marks omitted).

Plaintiff also raises an equal protection claim in Count IV, based on a class-of-one theory. To bring such a claim, a plaintiff must "allege that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013). And "[e]ven at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not any reasonable conceivable state of facts that could provide a rational basis for the classification." *Lillemoe v. U.S. Dep't of Agric.*, 344 F. Supp. 3d 215, 229 (D.D.C. 2018).

Plaintiff raises three claims based upon the First Amendment in Counts V, VI, and VII. First, Plaintiff claims that Defendants engaged in unconstitutional viewpoint discrimination. Second, Plaintiff argues that the Executive Order's requirement that government contractors disclose their business with Perkins Coie and whether that business is related to a government contract compels speech. And third, Plaintiff alleges First Amendment retaliation. To succeed on a First Amendment retaliation claim, a plaintiff must allege "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v.*

*Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  In the specific context of contractor speech, "for a government employee's or contractor's speech to have First Amendment protection, the employee or contractor must have (1) spoken as a citizen and (2) addressed matters of public concern." *Ramey v. U.S. Marshals Serv.*, 755 F. Supp. 2d 88, 93 (D.D.C. 2010).  At the same time, "[t]he government needs to be free to terminate both employees and contractors for poor performance." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996).

Finally, Plaintiff raises two claims based on the right to counsel in Counts VIII and IX. The Sixth Amendment guarantees "that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel."  *Faretta v. California*, 422 U.S. 806, 807 (1975). That right is "not absolute"; it "cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice," and the "public has a strong interest in the prompt, effective, and efficient administration of justice."  *United States v. Burton*, 584 U.S. 485, 489 (D.C. Cir. 1978).

## ARGUMENT

### I.    Plaintiff's claims fail as to Section 1 of the Executive Order.

Section 1 of the Executive Order contains a brief factual explanation for the operational elements of the Executive Order that describes Perkins Coie's activities both in its capacity as a law firm offering legal representation and in its capacity as an employer.  As to its legal services, Section 1 explains that Perkins Coie was the law firm that "hired Fusion GPS," an opposition research firm that "manufactured a false 'dossier' designed to steal an election."  EO 14230 § 1. It also describes how Perkins Coie has crossed ethical lines in election litigation such that it received a court sanction.  *Id.*  These statements are not seriously contested and are matters of public record.

As to Perkins Coie's employment practices, the Executive Order noted that Perkins Coie "racially discriminates against its own attorneys and staff, and against applicants."  *Id.*  In particular, Perkins Coie "publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights laws."  *Id.*  It also "proudly excluded applicants on the basis of race for its fellowships," and "maintained these discriminatory practices until applicants harmed by them finally sued to enforce change."  *Id.*  These points, too, are not seriously contested.  The latter refers to a lawsuit instituted by the American Alliance for Equal Rights, which sued Perkins Coie because the law firm's 1L diversity fellowship required "[m]embership in a group historically underrepresented in the legal profession, including students of color, students who identify as LGBTQ+, and students with disabilities."  *See* Compl. ¶ 25, *Am. All. for Equal Rights v. Perkins Coie LLP*, No. 3:23-cv-1877 (N.D. Tex. Aug. 22, 2023), ECF No. 1.  The suit was dismissed by stipulation after Perkins Coie replaced the fellowship program with a new program that did not contain discriminatory requirements.  Stipulation of Dismissal ¶¶ 3–4, *Am. All. for Equal Rights v. Perkins Coie LLP*, No. 3:23-cv-1877 (N.D. Tex. Oct. 11, 2023), ECF No. 31.

Only Counts II and III of the Complaint actually challenge Section 1.  In Count II, Plaintiff claims that "[t]he Order harms Perkins Coie's cognizable reputation interest by stigmatizing Perkins Coie as dishonest, untrustworthy and racially discriminatory."  Compl. ¶ 101.  And in Count III, Plaintiff claims that Section 1's references to "diversity, equity, and inclusion" policies and "other categories prohibited by civil rights laws" are unconstitutionally vague.  *Id.* ¶ 109.

Neither charge carries any water.  Count II raises a procedural due process challenge that requires Plaintiff to identify a "constitutionally protected interest," *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017), and the typical plaintiff "lack[s] . . . any constitutional protection for

the interest in reputation," *Siegert v. Gilley*, 500 U.S. 226, 234 (1991).  A narrow exception to that general rule exists for "reputation-plus claim[s]," which "require[] a plaintiff to identify an act of defamation made in conjunction with an adverse employment action." *Langeman*, 88 F.4th at 296. "A defamatory statement must be false as well as defamatory," and for that reason "a statement of pure opinion cannot" be "the basis for a defamation claim."  *Campbell v. District of Columbia*, 126 F. Supp. 3d 141, 150 (D.D.C. 2015) (internal quotation marks omitted).

Count II fails because Plaintiff has not identified any defamatory act on the part of Defendants.  *See Lamb v. Millennium Challenge Corp.*, 498 F. Supp. 3d 104, 115 (D.D.C. 2020) (noting that "a reputation-plus claim requires showing that the government made defamatory statements concerning the plaintiff").  Indeed, although the Complaint asserts that Section 1 is false in conclusory fashion, such statements need not be credited under the pleading standard, and Plaintiff does precious little to contest any particular fact in Section 1.  For instance, the Complaint does not dispute that Perkins Coie hired Fusion GPS, that Fusion GPS was involved in creating the fake dossier, and that the dossier was designed to interfere with the 2016 election.  Compl. ¶ 43.  Nor does the Complaint dispute that Perkins Coie was sanctioned in the course of its election litigation.  *Id.* ¶ 44.  The Complaint *does* reflect Plaintiff's wish that Section 1 were longer, providing a laundry list of items which the Executive Order "d[id] not mention." *Id.*  ¶¶ 43, 44. But the fact that the Executive Order was not almanac-length does not begin to suggest that anything in it was false.

The only supposed falsity that the Complaint identifies is in Section 1's assertion that Perkins Coie "racially discriminates against its own attorneys and staff."  Compl. ¶ 45 (quoting EO § 1).  But even then, that charge is conclusory and unsupported.  The Complaint cites to its practices in "2019 and 2023" as a defense against the charge that they have been engaged in racial

9

discrimination.  *Id.*  But those examples only prove the point.  *See Horton v. Espindola*, 319 F. Supp. 3d 395, 400 (D.D.C. 2018) ("Under the incorporation-by-reference doctrine, a defendant can submit—and the court can consider—a document that is not attached by the plaintiff, but is referred to in the complaint and integral to the plaintiff's claim.").  Perkins Coie publicly announced in 2019 that it signed the "Mansfield Rule," which requires law firms to "certify that women, lawyers of color, LGBTQ+ lawyers and lawyers with disabilities comprise at least 30 percent of the candidate pool for significant leadership roles, senior lateral openings and promotions."  Perkins Coie, Press Release, *Perkins Coie Adopts Mansfield Rule to Boost Leadership Diversity* (Sept. 6, 2019) (available in .pdf form at https://www.bing.com/search?q=perkins+coie+2019+press+release+mansfield+rule&form=QBLH&sp=-1&lq=0&pq=&sc=0-0&qs=n&sk=&cvid=B44AA6A85C4045D88B94CC00DC9A3124&ghsh=0&ghacc=0&ghpl=).  In 2023, Perkins Coie represented to Vault that it has "set formal, measurable targets for increasing diversity in recruitment, retention, promotion, and/or leadership."  Perkins Coie 2023 Vault Law Firm Diversity Survey (available at  https://media2.vault.com/14349412/perkins-coie.pdf); *see* Perkins Coie 2024 Vault Law Firm Diversity Survey (available at https://media2.vault.com/14351750/perkins-coie.pdf).  In particular, Perkins Coie also told Vault that "[s]trategic focus and intentionality are contributing to the advancement of our historically underrepresented attorneys," and followed that up by touting the percentages of new partners who are women or attorneys of color.  Perkins Coie 2023 Vault Law Firm Diversity Survey at 7.

Moreover, Plaintiff's Complaint provides additional grounds for statements in Section 1 about Plaintiff's diversity practices as Plaintiff repeatedly asserts its commitment to diversity.  Compl. ¶¶ 45 ("It is true that Perkins Coie has a longstanding commitment to diversity and

inclusion and has made, and continues to make, public statements advancing the ideals of diversity, equity, and inclusion."), 46 ("Section 1 relies on the false premise that, by promoting diversity in the legal profession, Perkins Coie has engaged in "blatant race-based and sex-based discrimination" and therefore, violated the public trust."), and 145 ("Perkins Coie has a longstanding commitment to diversity and inclusion and has made, and continues to make, public statements advancing the ideals of diversity, equity, and inclusion").  These allegations demonstrate Plaintiff's longstanding commitment to considering irrelevant racial- and sex-based criteria in hiring decisions, and its assertions in the Complaint show that it has no apparent intention of backing away from these practices.

The Government has every right to use its procurement power to discourage such practices. Diversity initiatives have always been legally suspect, *see Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) ("Would a private employer not be guilty of unlawful discrimination if he refrained from establishing a racial hiring quota but intentionally designed his hiring practices to achieve the same end?  Surely he would."), and especially so since the Supreme Court's decision in *Students for Fair Admissions, Inc., v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*").  The practices engaged in by Plaintiff and other large law firms provide ample basis for review by the EEOC Commissioner.  By the same token, those practices also justify the lesser action of simply reviewing contracting decisions involving Plaintiff.  This Court should dismiss Count II as it relates to Section 1 of the Executive Order.

Count III fares no better.  There, Plaintiff argues that the Executive Order is void for vagueness, but identifies only Section 1 as containing the offending language.  In particular, Plaintiff singles out Section 1's references to "diversity, equity, and inclusion" and "other categories prohibited by civil rights laws" as unconstitutionally vague.  Compl. ¶ 109.

There is no merit to Plaintiff's void-for-vagueness challenge. As an initial matter, it is telling that Plaintiff cites only criminal cases to support its claim. Here, of course, the Executive Order is not a criminal statute (indeed, not a statute at all) and is not proscriptive like a criminal statute; accordingly, it is unclear that vagueness doctrine even applies. The D.C. Circuit expressed doubt that the doctrine should be applied to laws other than "those that define criminal offenses" and "those that fix the permissible sentences for criminal offenses." *Kincaid*, 854 F.3d at 729 (Kavanaugh, J.). The Executive Order does neither.

Regardless, the "degree of vagueness that the Constitution allows depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). Thus, it is a low bar for civil statutes to satisfy due process. *Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992) ("To find a civil statute void for vagueness, the statute must be so vague and indefinite as really to be no rule or standard at all."); *see also Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1174 (D.N.M. 2014) (explaining that negligence law "would . . . fail the void-for-vagueness analysis that applies to criminal statutes"). Even more so when all that is at stake are government contracts. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998) ("[W]hen the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe.").

And here, Plaintiff has no plausible argument that the Executive Order is unconstitutionally vague. The Executive Order, after all, refers to "categories prohibited by civil rights laws." EO 14230 § 1. Plaintiff alleges that this reference is "unconstitutionally vague," Compl. ¶ 109, but it is no vaguer than *the civil rights laws themselves*. *See also* DOJ Press Release, *EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination* (Mar. 19, 2025) (available at https://www.justice.gov/opa/pr/eeoc-and-justice-department-warn-against-unlawful-dei-related-discrimination) (noting that the "widespread adoption of DEI . . . does not change longstanding

legal prohibitions against the use of race, sex, and other protected characteristics in employment"). In other words, to find in Plaintiff's favor that the Executive Order is unconstitutional on vagueness grounds would also call into question the constitutionality of the civil rights laws.

The Court should decline to reach such an extraordinary conclusion. So long as it provides an "intelligible benchmark," a civil statute is not void for vagueness. *See K-S Pharms., Inc. v. Am. Home Prods. Corp.*, 962 F.2d 728, 732 (7th Cir. 1992) (Easterbrook, J.). The Executive Order easily meets that standard, to the extent the standard even applies. The Court should dismiss Count III.

At the end of the day, Plaintiff simply does not like what the current Administration thinks about Plaintiff. That is not the stuff plausible claims are made of. "A government entity has the right to speak for itself"; it is "entitled to say what it wishes," and "to select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009). That is all that Section 1 of the Executive Order does, and Plaintiff has no right to silence the Government's own opinions. Plaintiff's claims asking this Court to do just that should be dismissed.

## II.    **Plaintiff's claims fail as to Section 2 of the Executive Order.**

Section 2 of the Executive Order directs relevant agency heads to "take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest." EO 14230 § 2(a).[1] Plaintiff appears to challenge this aspect of the Executive Order on *ultra vires* grounds and as violating due process and the First Amendment. *See* Compl. ¶¶ 106–16, 126–35.

---

[1] Also, Section 2(b) of the Executive Order requires, "to the extent permitted by law," the cessation of the provision of material and services, "including Sensitive Compartmented Information Facilities, provided for the benefit of Perkins Coie." The Complaint does not appear to pursue any claim related to this provision. *See* Complaint ¶ 52.

13

Plaintiff's challenges to Section 2 of the Executive Order fail. To begin, the challenges run headlong into governing D.C. Circuit precedent reflected in *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024). Under that precedent, consistent with *Department of Navy v. Egan*, 484 U.S. 518 (1988), courts may not review a decision to deny or revoke a security clearance even when the denial or revocation is challenged on statutory or even constitutional grounds. *Lee*, 120 F.4th at 883; *id.* at 891 ("The Constitution commits the question whether to deny or revoke a security clearance to the Executive Branch."); *id.* ("[F]ederal courts generally may not second-guess the political branches' discretionary judgments about matters of national security."). Importantly, the *Lee* court considered the fact that assessment of "constitutional challenges often require courts to make nuanced judgments about the challenged government action: What was its motivation? . . . Did the government have a compelling, substantial, or legitimate interest for its decision? Was its reasoning adequately tailored to that interest?" *Id.* at 893–94. The Court concluded, however, that "[i]n the context of clearance decisions, a court could not answer such questions without doing what *Egan* said is not reasonably possible." *Id.* at 894.

Consistent with this precedent and reasoning, to the extent Plaintiff in this case challenges the suspension of security clearances pending further review, such claims, even when constitutionally based, are not judicially reviewable and must fail.

The same should be true with respect to the Executive Order's call for that further review. "[E]ntities charged with making security clearance decisions . . . need full access to even unsubstantiated and doubtful information in order to make the sensitive, predictive judgments that *Egan* protects." *Rattigan v. Holder*, 689 F.3d 764, 769 (D.C. Cir. 2012). Accordingly, even providing *false* information for purposes of making security clearance decisions is generally not

14

actionable so long as that information was not *knowingly* false.  *Id.*  And here, the review called for by the President easily surpasses that low standard.

The entire Steele dossier debacle involved multiple falsehoods related to the matter as laid out in the report by the Special Counsel John Durham.  Special Counsel, *Report On Matters Related To Intelligence Activities And Investigations Arising Out Of The 2016 Presidential Campaigns* (May 12, 2023, "Durham Report") at 233 & ff. (available at https://www.justice.gov/archives/media/1381211/dl).  The Durham Report references Perkins Coie over forty times and details its role—acting as counsel to the Clinton campaign and procuring and distributing the now-debunked "Steele Dossier."  Durham Report p. 11–12.  As that report indicates, the review contemplated by Section 2 of the Executive Order is based on undisputed fact—not falsehood, and certainly not knowing falsehood.  Evaluation of the decision to call for review lies outside of the judicial ken.

Furthermore, Plaintiff's procedural due process challenge to Section 2 must also fail.  The Executive Order provides that the suspension of any security clearances is to be done through "steps consistent with applicable law . . . pending a review whether such clearances are consistent with the national interest."  Executive Order 14230 § 2(a).  Another executive order, Executive Order 12968, 60 Fed. Reg. 40245 (1995), "establishes a uniform Federal personnel security program" for individuals "considered for initial or continued access to classified information."  Section 5.2(a) of that executive order provides extensive procedural process guarantees to individual clearance holders whose access to classified information is terminated, including notice, an opportunity to submit information, and appeal, subject to national security considerations.[2]  The

---

[2] For example, Section 5.2(e) provides:  "This section shall not be deemed to limit or affect the responsibility and power of an agency head pursuant to any law or other Executive order to deny or terminate access to classified information in the interests of national security.  The power and

executive order also directs agencies to promulgate regulations consistent with these process requirements. EO 12968 § 5.2(c). Many agencies have such regulations or directives. *See*, *e.g.*, Department of Defense Manual 5200.02 (Procedures For The DoD Personnel Security Program (PSP)) (available at https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodm/520002m.pdf); *see id.* § 9.2.d (providing that "[n]o final unfavorable national security eligibility determination may be taken" without process provided by the Manual).

Accordingly, any individual employee of Plaintiff with a security clearance will receive appropriate process, pre- or post-deprivation, with regard to maintaining or restoring their security clearance, and such process in the circumstances of security clearance related matters is permissible. *Cf. Smith v. District of Columbia*, 387 F. Supp. 3d 8, 31 (D.D.C. 2019) ("[I]n 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the' deprivation, a post-deprivation opportunity to be heard suffices.") (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378–79 (1971)). Relatedly, any claim associated with the security clearance process that, under governing precedent, may be reviewable, is, at this point, not ripe. *See In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) ("The ripeness doctrine requires that the federal courts reserve judicial power for resolution of concrete and fully crystalized disputes."). Until any clearance suspension is accomplished consistent with applicable law, and then reviewed consistent with applicable law and a further security clearance determination made, any dispute is premature for judicial consideration.

---

responsibility to deny or terminate access to classified information pursuant to any law or other Executive order may be exercised only where the agency head determines that the procedures prescribed in subsection (a) of this section cannot be invoked in a manner that is consistent with national security. This determination shall be conclusive."

Accordingly, Plaintiff's challenge to Section 2 of the Executive Order must fail.

**III.   Plaintiff's claims fail as to Section 3 of the Executive Order.**

Section 3 of the Executive Order concerns the Federal Government's contracting policies. As relevant, Section 3 issues two directives.  First, "to the extent permissible by law," "Government contractors" shall be "require[d] . . . to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract."  EO 14230 § 3(a).  Second, "the heads of agencies shall . . . take appropriate steps to terminate any contract . . . for which Perkins Coie has been hired to perform any service."  *Id.* § 3(b)(i).

As a preliminary point, it must be emphasized that when implementing Section 3 the government is acting as a private party, not as a sovereign. *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion) ("The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.").  The effort to combat racial discrimination through the procurement power has been a feature of executive orders since at least the 1940s. *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159, 168–71 (3d Cir. 1971).  Such orders enjoy the firmest possible constitutional support.  *Id*. at 170 ("In the area of Government procurement Executive authority to impose non-discrimination contract provisions falls in Justice Jackson's first category [from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), discussing varying levels of deference to Executive authority]: action pursuant to the express or implied authorization of Congress.").  Furthermore, while Section 3 relies equally on Plaintiff's racial discrimination and its malfeasance in election litigation for its authority, *either* ground is sufficient to sustain its provisions. *McGowan v. State of Maryland*, 366 U.S. 420, 426 (1961) (a

statute with discriminatory provisions "will not be set aside if any state of facts reasonably may be conceived to justify it").

In protest of Section 3, Plaintiff levies Counts I (*ultra vires*), II (procedural due process), IV (equal protection), V (viewpoint discrimination), VI (compelled speech), VII (First Amendment retaliation), VIII (right to counsel), and IX (due process right to counsel). The Court should dismiss each one.

*First*, Defendants are clearly authorized to manage their contracts. "*Ultra vires* review is an extraordinary cause of action that has repeatedly been described as extremely limited in scope." *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 193 (D.D.C. 2024). Plaintiff must show that Defendants "plainly act[ed] in excess of [their] delegated powers" in a way "so extreme that one may view [the error] as jurisdictional or nearly so." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). But Defendants are plainly authorized to enter into, manage, and terminate contracts. And Federal regulations provide that such contracts include a clause permitting the Government exceptionally wide latitude to "terminate performance of work" where "termination is in the Government's interest." 48 C.F.R. § 52.249-2(a). Plaintiff might dislike *how* Defendants would exercise that authority under the Executive Order, but that does not make Defendants' actions *ultra vires*.

*Second*, this Court should reject Plaintiff's equal protection claim. To begin, the class-of-one theory of equal protection is inapplicable in the government employment context. *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591, 609 (2008); *see also Umbehr*, 518 U.S. at 685 (treating government contractors and government employees similarly). And for good reason. "[R]atifying a class-of-one theory of equal protection in the context of public employment would impermissibly

constitutionalize the employee grievance," *Engquist*, 553 U.S. at 609—or, in this case, the contract bidding and termination process.

In all events, to "properly plead" a class-of-one claim "a plaintiff must demonstrate they have been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Neighborhood Assistance Corp. of Am. v. CFPB*, 907 F. Supp. 2d 112, 126 (D.D.C. 2012). Neither condition is met here. Plaintiff is not "similarly situated" to other potential government contractors who do not engage in unlawful DEI practices. And the distinction the Executive Order makes—between potential contractors who "engage in blatant race-based and sex-based discrimination" and those who do not—is plainly rational.

*Third*, Plaintiff's procedural due process claim is meritless. For one, Plaintiff has not demonstrated standing to challenge Section 3 insofar as it regulates its clients. "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). "[T]he law of Art[icle] III standing is built" on fundamental separation-of-powers principles, *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (citation omitted), and "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper*, 568 U.S. at 408. Accordingly, application of Article III standing requirements must be "especially rigorous when," as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by [another] branch[] of the Federal Government was unconstitutional." *Raines*, 521 U.S. at 819–20.

To establish standing, a plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is "concrete and particularized," "actual or imminent" and not

"conjectural" or "hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  There must be a "causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant; and it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court. *Id.*  As the party invoking Federal court jurisdiction, Plaintiff "bears the burden of establishing these elements." *Id.* at 555.  Further, "[P]laintiff must demonstrate standing for each claim . . . [it] seeks to press," *DaimlerChrysler Corp.*, 547 U.S. at 335.  And because Plaintiff seeks prospective equitable relief, the "threatened injury must be certainly impending" and not merely "possible." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (holding prospective relief unavailable based on mere speculation of future injury).  Such proof of an imminent and non-conjectural injury serves to ensure that legal questions "will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State*, 454 U.S. 464, 472 (1982).

Plaintiff complains that its clients are withdrawing or considering withdrawing work in light of the Executive Order, Compl. ¶¶ 70–76, but such injuries face a significant traceability issue.  *See Doe v. Apple Inc.*, 96 F.4th 403, 409 (D.C. Cir. 2024) (traceability requires a "causal connection between the assertedly unlawful conduct and the alleged injury").  Section 3 only "terminate[s] any contract . . . for which Perkins Coie has been hired to perform any service."  EO 14230 § 3(b)(i).  Plaintiff, for its part, never alleges in the complaint that it was "hired to perform any service" under any government contract, nor does it allege a direct nexus between the termination of a client relationship and the cancellation of any specific contract.  There is thus a

20

significant factual predicate missing from the Complaint that connects the Executive Order to any injury this Court can remedy. *See Apple, Inc.*, 96 F.4th at 409 (no standing when the "chain of causation" "result[s] from the independent action of some third party not before the court").

Plaintiff also argues that it was deprived of adequate process to protect its property interest on the theory that it was deprived of the "right to be considered for government contracts in common with all other persons." *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1108–09 (D.C. Cir. 1985). Here, too, Plaintiff runs into a standing problem. Plaintiff never alleges that the government is currently contracting for Plaintiff's services, or that Plaintiff ever intends to bid for any government contract. With only speculative injury, Plaintiff cannot ask relief of this Court. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("To establish Article III standing, an injury must be concrete, particularized, and actual or imminent."). But, even on the merits, this claim is just Plaintiff's equal protection argument dressed in different garb, and this Court should dismiss it. Plaintiff *does* have the "right to be considered for government contracts in common with all other persons." *Id.* And, as the Executive Order indicates, *no* person who "engage[s] in blatant race-based and sex-based discrimination" should be granted a government contract. EO 14230 § 1.

*Fourth*, Plaintiff raises a variety of First Amendment challenges. As before, Plaintiff lacks standing to press these claims, because it cannot trace any injury to the Executive Order itself. Regardless, Plaintiff has failed to state a plausible claim that the Executive Order's requirement that government contractors "disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract" is unconstitutional. EO 14230 § 3(a). For one, when business conducted with Perkins Coie is "related to the subject of the Government

contract," it is very likely that Perkins Coie is a government subcontractor, whose work Defendants are entitled to monitor.

For another, a regulation that compels disclosure satisfies the First Amendment so long as there is a "substantial relation between the disclosure requirement and a sufficiently important government interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). Here, the disclosure requirement is not of the type that compelled-speech doctrine is designed to prevent. Plaintiff's clients are not required to adopt any viewpoint; all they are asked to do is to make a *factual* disclosure, and even then only to the government and not to the public as a whole. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) (disclosure requirement subject to relaxed scrutiny when only "purely factual and uncontroversial" information had to be disclosed).

As for Plaintiff's claims of First Amendment retaliation and viewpoint discrimination, both fail. A contractor pressing these claims must "show (1) that she spoke as a citizen on a matter of public concern and (2) that the termination of her contract was motivated by her speech on a matter of public concern." *Navab-Safavi v. Broad. Bd.*, 650 F. Supp. 3d 40, 54 (D.D.C. 2009). Even then, the Government acts within its rights when its "legitimate interests as a contractor, deferentially viewed, outweigh the free speech interests at stake." *Umbehr*, 518 U.S. at 685.

The speech in this case consists of employment practices involving racial discrimination and practices that interfere with free and fair elections. EO 14230 § 3(a). The fact that these actions are punishable under civil rights laws and formed the basis of an investigation Special Counsel John Durham amply demonstrates that such speech is not "protected" in any meaningful sense. *See Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015) ("To establish a claim for retaliation under the First Amendment, an individual must prove . . . that he engaged in

*protected* conduct." (emphasis added)).  Plaintiff does not dispute that its partners were involved with the dissemination of the debunked Steele Dossier and that its lawyers were sanctioned for its conduct in litigation.  Compl. ¶¶ 8, 44.

Regardless, Defendants' "legitimate interests as a contractor . . . outweigh the free speech interests at stake" here.  *Umbehr*, 518 U.S. at 685.  "Efficiency and fiscal responsibility are powerful governmental interests."  *Messman v. Helmke*, 133 F.3d 1042, 1047 (7th Cir. 1998).  "The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption."  *Umbehr*, 518 U.S. at 674.[3]  Those are exactly the rationales the Executive Order provides in Section 3.  It is reasonable to consider a contractor's performance subpar when they retain the services of a law firm that has proudly engaged (and appears to continue to engage) in racial discrimination.  It is inefficient for Federal funds to ultimately flow into the coffers of such entities.  And it serves taxpayers to ensure that their dollars are not in any way traceable to the subsidization of "racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust."  EO 14230 § 3.

Furthermore, the fact that a funding program supports one point of view does not necessarily establish viewpoint discrimination against disfavored alternatives.  *Rust v. Sullivan*, 500 U.S. 173 (1991).  There are no constitutional concerns with programs that encourage certain activities without providing funds for alternative options on the same issue.  There are only so

---

[3] Moreover, *Umbehr*'s retaliation analysis is limited to current government employees or contractors.  The Court specifically noted that its decision did "not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on [pre-existing] relationship[s]."  *Umbehr*, 518 U.S. at 685.

many Government contracts to go around; "the Government has not discriminated on the basis of viewpoint" merely by "fund[ing] one activity to the exclusion of the other." *Id.* at 193. By the same token, a "refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." 448 U.S. 297, 317, n.19 (1980). Try as it might, Plaintiff cannot transmogrify the denial of a contract into a sanction that only the judicial branch can enter. Choosing who to contract with is not "viewpoint discrimination" or "punishment" in any meaningful sense of those words; it is merely a fact of life. If Plaintiff dislikes the Government's choices in this regard, the solution is that "a government entity is ultimately accountable to the electorate and the political process for its advocacy." *Pleasant Grove City*, 555 U.S. at 469. It is not to ask this Court for a remedy that it cannot give.

And *fifth*, this Court should reject Plaintiff's claims based on the right to counsel, because Plaintiff simply lacks standing to press them. Plaintiff suggests that the Sixth Amendment is implicated because the Executive Order requires government contractors to disclose their business with Perkins Coie. But—again—the Executive Order only directs the termination of contracts *under which Perkins Coie provides services*. Plaintiff never explains how the disclosure requirement would itself make it impossible to represent its clients in criminal or civil proceedings.

And, unsurprisingly, the Complaint provides no examples. The closest Plaintiff gets is when it alleges that one of its clients "is now considering retention of an alternative firm to represent it in connection with a DOJ investigation." Compl. ¶ 76. But that vignette proves the point. Unless that DOJ investigation somehow implicates a government contract (which the Complaint does not allege), Section 3 has nothing to say about the matter. And in any event, administrative investigations—even ones that "might one day ripen into criminal charges"—

frequently do not "implicate the right to counsel." *Collins v. CFTC*, 737 F. Supp. 1467, 1482 (N.D. Ill. 1990).  The right to counsel simply does not enter the picture as to Section 3.

## IV.    Plaintiff's claims fail as to Section 4 of the Executive Order.

Section 4 of the Executive Order directs the Chair of the Equal Employment Opportunity Commission to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e *et seq.*], including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis."  EO 14230 § 4(a).  It also directs the Attorney General, "in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate," to investigate such matters with respect to such firms that do business with Federal entities.  *Id.* § 4(b).

Plaintiff appears to challenge Section 4 on two grounds.  First, in Count III of the Complaint, Plaintiff claims Section 4 is unconstitutionally vague and violates due process because the section does not clearly define "diversity, equity, and inclusion" policies that may be subject to investigation by the EEOC.  *See* Compl. ¶¶ 109–10.  As already explained, the language Plaintiff complains of as being overly vague is no less clear than the civil rights laws themselves.  For those and other reasons described above, this Court should reject Plaintiff's attacks on Section 4 under Count III.  Second, in Count VII, Plaintiff complains that Section 4 violates the First Amendment because it constitutes "viewpoint discrimination" and retaliation against Plaintiff for its support of diversity, equity, and inclusion policies.  *See id.* ¶¶ 145–46, 151–55.

25

To repeat, Section 4 merely directs the "review" and "investigat[ion]" of "the practices of representative large, influential, or industry leading law firms" for consistency with the civil rights laws. EO 14230 § 4. That is *already* what the EEOC is supposed to be doing. The EEOC is already "empowered . . . to prevent any person from engaging in any unlawful employment practice" under the civil rights laws. 42 U.S.C. § 2000e-5(a). The EEOC is already required to make "report[s] . . . to the President . . . on the cause of and means of eliminating discrimination," including in any industry the President directs the EEOC to review. *Id.* § 2000e-4(e). And members of the EEOC are already authorized to file charges against "employer[s] . . . engaged in an unlawful employment practice." *Id.* § 2000e-5(b).

Thus, any supposed injury of Plaintiff is not traceable to the Executive Order and there is no plausible relief that the Court can give. In short, Plaintiff's supposed injury of being subject to a review for civil rights violations is unredressable. Even if the President *never* issued the Executive Order, Plaintiff would *still* be subject to review by the EEOC and subject to potential legal action from the EEOC—just like any other employer in the country. The only relief that would "redress" Plaintiff's injury is not an injunction against the Executive Order, but rather an injunction granting Plaintiff immunity from civil rights laws applicable to all "representative large, influential, or industry leading law firms."

For similar reasons, this Court should reject Plaintiff's claim of First Amendment retaliation even if it were to reach the merits. To succeed on a First Amendment retaliation claim, a plaintiff must allege "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258

(D.C. Cir. 2016). "To satisfy the causation link, a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendants' retaliatory action," *Doe v. D.C.*, 796 F.3d 96, 107 (D.C. Cir. 2015); that is, the plaintiff must allege that the retaliatory action "would not have been taken absent the retaliatory motive," *Houston Community College System v. Wilson*, 595 U.S. 468, 477 (2022).

Even assuming Plaintiff engaged in protected conduct, Plaintiff cannot demonstrate the requisite causal link. Even before the Executive Order was issued, this Administration had begun taking steps consistent with the view that certain DEI practices, misapplied, could constitute a violation of Title VII. *See* EO 14173 of Jan. 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"). EO 14173, issued more than a month *before* the challenged Executive Order, directed, among other things, Federal agencies to take appropriate action to "advance in the private sector" merit-based opportunity, EO 14173 § 4(a), and to enforce civil rights laws and combat illegal private-sector DEI policies and practices, *id.* § 2; *see also id.* § 4(b) (requiring plan for compliance investigations going after illegal discrimination in large, private entities); *supra* Part I (regarding EEOC/DOJ press release concerning DEI-related guidance). It should not be surprising, then, that an executive order concerning a large private law firm included a provision like Section 4, directing EEOC "review" of practices of "representative large, influential, or industry leading law firms," as part of the Administration's broader efforts. Thus, Plaintiff cannot show that the Section 4 review, the alleged retaliatory action, "would not have been taken absent the [alleged] retaliatory motive." Plaintiff's retaliation claim cannot succeed.

At bottom, the Administration has raised legitimate legal issues of just how far DEI policies and programs can go and whether such policies cross the line into illegal discrimination under Title

27

VII.  The Court should not use its equitable and other powers to excuse Plaintiff from the scope of a review of multiple law firms on this issue.  Plaintiff may believe its practices are not illegal, but it is not entitled to a "free pass" from a legitimate review of multiple law firms' employment practices.

## V.  **Plaintiff's claims fail as to Section 5 of the Executive Order.**

Finally, Section 5 of the Executive Order concerns Federal hiring, access to government buildings, and interaction with government employees.  As relevant, Section 5 provides three directives.  First, agency heads "shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  EO 14230 § 5(a).  Second, agency heads "shall provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States."  *Id.*  Third, "[a]gency officials shall, to the extent permitted by law, refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States."  *Id.* § 5(b).

Plaintiff raises a variety of challenges to Section 5.  This Court should reject them as unripe without even reaching the merits.  "[A] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *In re Al-Nashiri*, 47 F.4th at 826.  That describes Plaintiff's claims against Section 5 to a tee.  Section 5 directs agency heads to "provide guidance" on "limiting" access to government buildings and interactions with government employees.  It does not outright *ban* such access.  Plaintiff can only guess the

degree to which agency heads will limit government access, and indeed Section 5 directs such agency heads only to do so "to the extent permitted by law." Perhaps agency heads will limit their guidance to prohibiting Plaintiff from entering Government locations storing sensitive information, which no member of the public has a right to access. Perhaps the agency heads and the OPM director will, as a matter of course, waive the hiring freeze in all cases but the ones posing the most egregious threats to national security. Either way, Plaintiff cannot bring this challenge on nothing more than rank speculation of what agency heads *might* do in response to Section 5 and without concrete examples of harm alleged to have been caused by Section 5.

That lack of ripeness infects the entire challenge against Section 5. Plaintiff alleges that the Executive Order "impairs Perkin Coie's ability to follow its chosen profession by limiting . . . its ability to represent clients in court and before agencies." Compl. ¶ 101. It accuses the order of "barring Perkins Coie from . . . interacting with federal employees[] and accessing federal buildings." *Id.* ¶ 123. It cries alarm that the order "conditions . . . access to government facilities" on "political support or affiliation." *Id.* ¶ 132. And it lambasts the order for "significantly impair[ing] Perkins Coie's ability to advance clients' interests before the government." *Id.* ¶¶ 160–61. But at the end of the day, Plaintiff is challenging a Section of the EO that tells agency heads only to "issue guidance." It therefore cannot plausibly allege that Section 5 caused it injury on the basis of guidance which *has not been issued*. There is simply no case for this Court to hear on this subject.

Even if this Court were to proceed to the merits, it should dismiss Plaintiff's claims challenge to Section 5. Start with Plaintiff's *ultra vires* claim, which remarkably suggests that Federal agencies lack any authority to control over who can enter their buildings or interact with their employees on official business. There is no constitutional right to enter government buildings

29

at will, *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981), and "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," *Greer v. Spock*, 424 U.S. 828, 836 (1976). As before, Plaintiff might think that Defendants plan to exercise this authority in an unconstitutional manner (though, again, no guidance has yet issued), but that is reason to raise a constitutional claim, not an *ultra vires* claim. *Cf. Eagle Trust Fund v. USPS*, 811 F. App'x 669, 670 (D.C. Cir. 2020).

Those constitutional claims, however, fare no better. Once again, Plaintiff lacks standing to press its due process claims, because it cannot point to any injury traceable to Section 5 of the Executive Order. Furthermore, whether Plaintiff received adequate process depends on the "importance of the private interest at stake," *English*, 717 F.3d at 972, and the "interest at stake" depends on what guidance the agency heads will issue. Until then, Plaintiff's conclusory assertion that the Executive Order "deprives Perkins Coie of its liberty interest in its First Amendment right to petition the government" is due no weight at all. Compl. ¶ 101.

Plaintiff's equal protection claim fails as well. According to Plaintiff, there is not "even a rational justification for the Order." *Id.* ¶ 123. But that ignores the actual text of Section 5. Every part of Section 5 is tied to "the national security" of the United States. EO 14230 § 5. Agency heads are directed to "limit official access" only when "access would threaten the national security of or otherwise be inconsistent with the interests of the United States." They are directed to "limit Government employees acting in their official capacity from engaging with Perkins Coie employees" only "to ensure consistency with the national security and other interests of the United States." And the hiring freeze may be overridden so long as the agency head and the OPM Director

determines "that such hire will not threaten the national security of the United States." In other words, Section 5 clearly states a rational justification.

And Plaintiff's First Amendment claims falter for similar reasons. To state a First Amendment retaliation claim, a plaintiff must allege "a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref*, 833 F.3d at 258. Even assuming Plaintiff engaged in protected conduct Plaintiff cannot demonstrate the requisite causal link. Section 5 is not tied to speech; it is tied to the "national security" and the "interests" of the United States, "to the extent permitted by law." EO 14230 § 5.

Finally, Plaintiff appears to rest heavily on the notion that Section 5 violates its clients' right to counsel. Again, until agency heads issue guidance, Plaintiff can only speculate as to whether anyone's right to counsel will be affected at all by Section 5. Regardless, "[t]he constitutional right to choice of counsel . . . is not absolute." *United States v. Friedman*, 849 F.2d 1488, 1490 (D.C. Cir. 1988). It "must be balanced against the government's interest in the fair, orderly, and effective administration of the courts which, in a given case, may require an accused to resort to his second choice of counsel." *United States v. Koblitz*, 803 F.2d 1523, 1528 (11th Cir. 1986). And the right is "qualified by the need to avoid undermining public confidence in the integrity of the legal system." *United States v. Wheat*, 813 F.2d 1399, 1401–02 (9th Cir. 1987).

Read as a whole, the Executive Order considered Plaintiff's history in litigation—including a court sanction and involvement with Fusion GPS. EO 14230 § 1. And as to Section 5 itself, the Executive Order is preoccupied with the "national security" and "interests" of the United States. *Id.* § 5. *If* completely unfettered access to government buildings and government employees in fact "threaten[ed] the national security" of the United States, *id.*, turning a blind eye to that threat would surely "undermine public confidence in the integrity of the legal system" (*Wheat*, 813 F.2d

31

at 1401–02) and would impair "the fair, orderly, and effective administration of the courts," *Koblitz*, 803 F.2d at 1528.  And if completely unfettered access would *not* threaten the national security or interests of the United States, then Section 5 will have no impact whatsoever on Plaintiff and it would lack any injury to complain of.  Either way, the Court should dismiss this claim as well.

## CONCLUSION

The Court should dismiss the Complaint and grant judgment to Defendants.

Dated:  April 2, 2025           Respectfully submitted,
        Washington, DC


                               CHAD MIZELLE
                               Acting Associate Attorney General


                               /s/ *Richard Lawson*
                               RICHARD LAWSON
                               Deputy Associate Attorney General
                               950 Pennsylvania Avenue, NW
                               Washington, DC 20530
                               Telephone: (202) 445-8042

                               *Counsel for Defendants*