**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PERKINS COIE LLP,** ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. 1:25-cv-00716-BAH |
| ) | |
| **U.S. DEPARTMENT OF JUSTICE, et al.,** ) | |
| *Defendants*. ) | |

**BRIEF OF**
**FORMER PRESIDENTS OF THE DISTRICT OF COLUMBIA BAR**
**AS *AMICI CURIAE***
**IN SUPPORT OF PLAINTIFF**

**STATEMENT OF INTEREST**

The *amici curiae* are former Presidents of The District of Columbia Bar who were elected at various points over the past fifty years by the tens of thousands of lawyers authorized to practice law in the Nation's Capital. *See* list of *amici* (attached hereto). We tender this brief in order to put in context the enormous risk to the legal system posed by the actions that the President has directed against the Plaintiff and other lawyers and law firms.

The President's action being challenged in this litigation is not merely an attack on a single law firm (or small handful of major firms) but an assault on the vital underpinnings of the American legal process itself. Leaders of the bar elsewhere, such as the American Bar Association and dozens of state and local bar associations, have condemned these attacks on the Rule of Law.

This assault is of special concern, though, to the vitality of the Rule of Law in the seat of government, where we and others have served as elected leaders of the Bar.

It would be hard to imagine any action that poses a graver danger to the Rule of Law than allowing a President to blackball a law firm and its clients, summarily, by preventing the firm from

representing the interests of clients before government agencies and by imposing draconian sanctions on clients who exercise their right to choose their own trusted counsel in challenging government actions or in pursuing their interests in dealing with government agencies.

This conduct is patently unlawful.

## SUMMARY

The *amici* tender this brief to explain the following points.

First, the adversary system is an essential element of the legal order established by the Constitution, and the system depends on the effective functioning of an independent bar.

Second, the right to select counsel of one's own choice is an indispensable corollary of this constitutional order.

Third, under this constitutional order, no government official may punish or blackball a lawyer or law firm simply for vigorously representing a client or cause that the official dislikes.

Fourth, the President's retaliation against lawyers and law firms distorts the system of pro bono representation that is vital to the functioning of the system of justice administered by Article III courts.

## ARGUMENT

## I.     THE ADVERSARY SYSTEM IS AN ESSENTIAL ELMENT OF THE RULE OF LAW IN THE AMERICAN CONSTITUTIONAL SYSTEM

In this case, as well as in other similar instances involving, initially, the law firms Covington & Burling and Paul Weiss Rifkind Wharton & Garrison, the President of the United States has chosen to retaliate against lawyers and law firms that – as he unilaterally declares – engaged in representing clients or causes with which he disagrees, especially cases in which he himself had a personal interest.

After the present lawsuit was filed, the President upped the stakes by promulgating still another Executive Order not only targeting an additional firm, Elias Law Group, but further seeking "to cow the legal profession" by weaponizing both the Justice Department and the Department of Homeland Security, directing them to seek out retroactively and punish firms that have brought suits against the government over the past eight years, if Trump Administration officials consider those suits "vexatious."

Then, on March 25, the President imposed an interdict on another firm, Jenner & Block, simply because one of its *former* partners, Andrew Weissmann, had earned a place as a *bete noir* on the long list of the President's perceived personal enemies. See *Jenner & Block LLP* v, *United States Department of Justice* (D.D.C. 1-25-cv-916 (JDB) (TRO granted March 28, 2025 [ECF Doc. 9]).

The relentless campaign of weaponizing the Oval Office against the President's perceived personal enemies continued on March 27. The President issued an Executive Order targeting WilmerHale, because (among the President's other personal grievances) the firm had taken in as a partner former FBI Director Robert Mueller, whom the Attorney General had appointed as Independent Counsel to investigate Russian influence in connection with Mr. Trump's 2016 presidential campaign. See *Wilmer Cutler Pickering Hale and Dorr LLP* v. *Executive Office of the President* (D.D.C. 1:25-cv-917 (RJL) (TRO granted in relevant part, March 28, 2025 [ECF Doc. 10]).

There is no doubt that, in all of the limited recitals of pretexts for the President's grievances, the firms or their individual partners were acting as counsel representing clients in connection with legal proceedings. Indeed, the President's principal grievance appears to be, on the face of his stream of Executive Orders, that lawyers in these firms represented candidates for public office

who were running against Mr. Trump in his personal capacity or were involved in official investigations into his own possibly criminal conduct.

Other law firms that the President dislikes are being forced to negotiate for "protection" from his threatened retaliation.  As discussed in Point IV below, some already have succumbed to the threats.

The adversary system is a basic element of the Rule of Law on which our constitutional structure rests.  Any constraints on that system, therefore, could only be justified by the clearest constitutional authorization and only in the most extreme factual context.  Neither requirement is satisfied in the current setting.

What this Court observed in its Order of March 26 [ECF No. 36], denying the government's recusal motion, applies equally to the government's attempts to justify the unilateral decrees issued by the President such as the one at issue in this case:

> [T]he notion expressed reflects a grave misapprehension of our constitutional order. Adjudicating whether an Executive Branch exercise of power is legal, or not, is actually the job of the federal courts, and not of the President or the Department of Justice . . . .

In understanding the "constitutional order" that the President is flouting, let us begin with the Separation of Powers, a crucial part of the constitutional structure.  Article III of the Constitution creates a Supreme Court and authorizes Congress to establish lower federal courts, which it has done since the earliest days.  See 28 U.S.C. Sections §§ 43 and 132.  Under Article III, the federal courts have jurisdiction to adjudicate "cases or controversies."  As the Supreme Court has emphasized, the essence of a "case or controversy" that federal courts are to adjudicate is the presence of adverse parties genuinely contesting issues of law and fact.  See, *e.g.*, *TransUnion* v. *Ramirez*, 594 U.S ___ (2021).

As long ago as *Marbury* v *Madison*, 5 U.S. (1 Cranch) 137 (1803), the Supreme Court declared: "It is emphatically the duty of the Judicial Department to say what the law is."  Under the "case or controversy" principle, the federal courts can function and perform their constitutional function to determine what the law is only when adverse parties appear before them in a genuine dispute.

An essential corollary of the *adversary system of justice* in this country is the right of parties *to be represented by counsel* in those proceedings.  In criminal cases, the Sixth Amendment makes this right to counsel explicit.  Over time, the Supreme Court has stressed the vital importance of legal representation in order to enable the justice system to function fairly and reliably.  This principle even requires the government to pay for counsel to be appointed to represent defendants whom the government itself is prosecuting.  See, *e.g.*, *Gideon* v. *Wainwright,* 372 U.S. 335 (1963).

This constitutional principle is codified in Rule 44 of the Federal Rules of Criminal Procedure:

> **Rule 44. Right to and Appointment of Counsel**
> (a) **Right to Appointed Counsel**. A defendant who is unable to obtain counsel is entitled to have counsel appointed to represent the defendant at every stage of the proceeding from initial appearance through appeal, unless the defendant waives this right.

Implicit in this Rule, of course, is the constitutional guarantee that those defendants who are *financially able to hire counsel* of their choice are at least equally entitled to be represented throughout the proceedings by their chosen counsel.

Although the Constitution does not expressly guarantee a similar right to have counsel *appointed* to provide *free* representation in all civil proceedings, see, *e.g.*, *Turner* v. *Rogers*, 564 U.S. 431 (2011), the adversary system that is the predicate for constitutional "case or controversy"

jurisdiction under Article III presupposes a civil litigant's right to hire counsel to represent the client in the case.

For example, cases such as *Mine Workers v. Illinois State Bar Assn.*, 389 U. S. 217 (1967), and *Railroad Trainmen v. Virginia ex rel. Virginia State Bar*, 377 U. S. 1 (1964), long ago established for individuals and organizations a right to ensure "meaningful access to courts" for themselves or their members by retaining or recommending counsel. As the Court explained in *Railroad Trainmen*:

> A State could not, by invoking the power to regulate the professional conduct of attorneys, infringe in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest. Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries, cf. *Gideon* v. *Wainwright*. . . .

As the Court explained there, this right to be able to retain counsel of one's own choosing rests on the interplay of several constitutional principles, including the First Amendment rights of free speech, petition, and association, and the Due Process clause.

This right is especially important in adversary proceedings in court. Compare *Walters v. Radiation Survivors*, 473 U.S. 305, 333-334 (1985); *Caplin & Drysdale v. United States*, 491 U.S. 617, 626 (1989) (referring to "the individual's right to spend his own money to obtain the advice and assistance of . . . counsel.").

Not surprisingly, therefore, the Federal Rules of Civil Procedure assume that a party has a right to be represented in civil litigation, if the party so chooses and is able to hire counsel of the party's choosing. Thus, for example, Rule 11 establishes the core predicate for the proper functioning of federal courts in the adjudication of civil "cases or controversies":

**Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions**
(a)  SIGNATURE. Every pleading, written motion, and other paper *must be signed by at least one attorney of record* in the attorney's name—or by a party personally *if the*

party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number. Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit. The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention. [Emphasis added].

As explained, these principles apply to the adversary system for litigation in federal courts under Article III. But the Constitution also presupposes a similar process for adversary presentation in other forums, especially where the government is involved. Thus, the First Amendment enshrines the right of every person in the United States to "petition for redress of grievances," a right that extends to lobbying Congress or appearing before government agencies. *Eastern R.R. Presidents Conf. v. Noerr Motor Freight,* 365 U.S. 127, 137 (1961); *United States* v. *Harriss*, 347 U.S. 612, 617 (1954) (upholding lobbying disclosure statute, because Congress legitimately "wants only to know who is being hired, who is putting up the money, and how much) cf. "). *NAACP* v. *Button*, 371 U.S. 415, 429 (1963) (holding that NAACP-initiated litigation was protected by the First Amendment as "a form of political expression").

The right to petition assumes that the government may be reluctant to extend the protection or benefit being sought, and thus a convincing case must be made to a skeptical or sometimes hostile official. In practice, this often means that the petitioner must be able to speak through the medium of a qualified lawyer familiar with often arcane principles and procedures.

Congress recognized this real-word imperative when it included in the Administrative Procedure Act a guarantee that anyone required to appear before a federal agency "is entitled to be accompanied, represented, and advised by counsel." 5 U.S.C. § 555(b).

The role of an independent bar free from government hamstringing – or retaliation – is a constitutional imperative. The Supreme Court has been quite clear that the government may not put its official thumb on the scales of justice by, for example, prohibiting lawyers, including

federally funded lawyers providing pro-bono services, from pursuing claims or making arguments that the government disapproves.  The courts cannot perform their constitutional function, if lawyers face political restrictions on arguments and theories that the government "finds unacceptable but which by their nature are within the province of the courts to consider." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546 (2001).

In *LSC*, the Court struck down statutory restrictions on the kinds of programs that that federally funded lawyers could attack or the arguments that they could make in challenging statutes or regulations.  The Court explained that government restrictions on "advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys." (531 U.S at 544-545).  Such government constraints conflict with the principle of *Marbury* v *Madison* that it is the province of the courts to say what the law is:

> Interpretation of the law and the Constitution is the primary mission of the judiciary when it acts within the sphere of its authority to resolve a case or controversy. *Marbury* v. Madison, 1 Cranch 137, 177 (1803) ("It is emphatically the province and the duty of the judicial department to say what the law is"). An informed, independent judiciary presumes an informed, *independent* bar.
> [531 U.S. at 545 (emphasis added)]

When clients hire their own counsel, as in all the instances to which President Trump's Executive Orders react, the government has even less room under the Constitution to threaten, punish, or anathematize lawyers who represent disfavored clients, advance disfavored goals of those clients, or advance disfavored arguments in favor of those clients and goals.

Accordingly, any action by anyone, including especially the head of the Executive Branch, that undermines the proper functioning of the adversary system is fundamentally anti-constitutional.

Yet, among the blunderbuss penalties summarily imposed on Plaintiff without any evidentiary support, much less even the pretense of a hearing, the President's Executive Order

requires federal agencies to exclude lawyers from the Plaintiff law firm whenever the agency concludes that the entry into a federal building would, somehow, in somebody's imagination, be "inconsistent with the interests of the United States."

Indeed, this *diktat* is a particularly ironic misuse of alleged presidential power. One of the President's core constitutional obligations is, under Article II, Section 3, to "take Care that the Laws be faithfully executed." Any intervention by a President that demonstrably obstructs the functioning of the legal process is nothing short of a betrayal of this solemn constitutional duty.

## II.    THE RIGHT TO SELECT ONE'S OWN CHOSEN COUNSEL IS AN ESSENTIAL ELEMENT OF THE RIGHT TO REPRESENTATION

The right to representation would be hollow indeed if someone else, such as the opposing party, including the government itself, could forbid a party in court or in dealings with the government to select counsel in whom the client has confidence. A lawyer acts as a fiduciary for the client and undertakes special obligations to advance the client's interests. The legal system rests on the principle that (except in extraordinary circumstances) the client gets to select the lawyer who will be trusted to serve most faithfully and effectively in this role of trust and confidence.

Thus, for example, the Rules of Professional Conduct for members of the District of Columbia Bar make clear that the selection and retention of counsel are the prerogative of the client, and the client decides when to hire counsel, what objectives to assign the lawyer to pursue, and when to terminate the representation. See, *e.g*., Rules 1.2, 1.16, 2.1. 3.1. Thus, Rule 1.2 states:

**Rule 1.2: Scope of Representation**
(a)    A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d), and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the

lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial, and whether the client will testify.

Of course, neither this case nor the other matters in which the President has chosen to blackball law firms have anything to do with the power of the *courts* to supervise the conduct of lawyers appearing before them or with the authority of Bar authorities to assure professional competence and integrity. In the District of Columbia, as in most States, that kind of supervision over the professional conduct of lawyers comes within the ambit of the judiciary, not the Executive, especially a self-interested Chief Executive.

Federal courts have ample authority under Rule 11 of the Federal Rules of Civil Procedure to deal with "vexatious" lawsuits. Moreover, if ethical violations are properly alleged, the District of Columbia Bar has a comprehensive and well-regarded system for adjudicating and sanctioning such violations through the filing of a disciplinary complaint.

Against the backdrop, this Court will search in vain for any legitimate basis for sustaining *presidential* intervention in these affairs.

Rather, in this case and the others, the President has manifested personal pique because of the clients whom the firms represented or the causes, including "diversity, equity and inclusion" policies, that they chose to pursue on behalf of their clients or their own professional autonomy. Although the President's Executive Orders purported to invoke generic powers "as President of the United States" and unspecified "laws of the United States," he did not articulate of any specific Article II power or any particular federal statute that supposedly confers on the President any authority to determine the qualifications of lawyers otherwise licensed to practice law or to superintend the choice of counsel by otherwise competent clients.

The President's stated grounds for issuing these decrees appear to reflect his unilateral hostility toward lawyers who undertook to represent his political opponents. For more than 400

years, however, it has been a bedrock principle of the Anglo-American legal system that, as Chief Justice Sir Edward Coke put it in 1610 (*Dr. Bonham's Case*), "no man should be judge in his own cause."  See, *e.g.*, *Caperton* v. *A. T. Massey Coal Co*., 556 U.S. 868 (2009).  That principle bars the exercise of what otherwise might be some implicit presidential power in order to settle personal grudges with opposing counsel.

Moreover, the Constitution bars "bills of attainder." As the Supreme Court explained in *United States* v. *Brown*, 381 U.S. 437 (1965),  bills of attainder are *non-judicial* declarations directly imposing "pains and penalties," including deprivations of rights, that "named the parties to whom they were to apply" or "simply described them."  The prohibition of bills of attainder is "an implementation of the separation of powers," since it confines each branch within its authorized functions, and was "looked to as a bulwark against tyranny."  381 U.S. at 442-444.

*Brown* makes clear why this principle also must apply to Executive Branch actions that impinge on the judicial function, even though (for reasons the Court explained) the Framers only considered it necessary to add it to the explicit limits on *legislative* powers:

> Thus the Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited *as politically independent judges and juries* to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.
> [381 U.S.at 445 (emphasis added)].

If any of the targets of the President's summary banishment were guilty of any misconduct and were properly subject to some sanctions, the constitutional Separation of Powers would entrust such a determination to the *judicial* function under Article III (see, *e.g.*, D.D.C. Local Rules LCrR 57.27(d) [governing complaints of misconduct filed in this Court.]), not to some undiscovered, inherent power of a President under Article II simply to decree guilt.  See also *United States* v. *Lovett*, 328 U.S. 303 (1946).  As former judge J. Michael Luttig aptly opined recently, President

Trump's persistent and deliberate attacks on the institutions of the law manifest that "the president wants to assume the role of judge."

Finally, the Due Process Clause expressly prevents any officials of the government from depriving any person of liberty or property without due process of law. The long-settled standards for according procedural due process are, at a minimum, (1) notice; (2) an opportunity to be heard; and (3) an impartial tribunal. See., *e.g.*, Mullane v. Central Hanover Bank & Trust Co, 339 U.S. 306 (1950). Against this backdrop, it is not surprising the federal government has an elaborate process for determining, after due notice and an opportunity to be heard, whether a person should be "suspended" or "debarred" from eligibility to contract with the government.

Nothing in any of President Trump's spate of Executive Orders attainting a growing list of disfavored lawyers and law firms purports to have afforded any of the President's targets *any* process at all. A late-night *ukase* signed by a presidential Sharpie without notice or an opportunity to be heard cannot be treated as a valid exercise of whatever powers the President *may* have had in mind when he acted. On the face of the various Orders, moreover, the President has made clear that he has hardly been acting as an "impartial tribunal."

## III.    BLACKBALLING OR PUNISHING A LAWYER OR LAW FIRM BECAUSE OF VIGOROUS (AND LAWFUL) REPESENTATION OF A CLIENT CONFLICTS WITH BASIC PRINCIPLES OF THE RULE OF LAW

It is essential to the functioning of the legal system under our constitutional order that lawyers must be able to represent clients who may be unpopular or even contemned in the eyes of others. As this Court is well aware, that is, indeed, the proudest and most honorable characteristic of the legal profession.

This principle distinguishing the client's identity and interests from the lawyer's own personal views is enshrined in the DC Rules of Professional Conduct. Rule 1.2 declares:

(b)    A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities.

The American Bar Association Model Rules of Professional Conduct codify this same principle as reflecting the prevailing American tradition.

This vital feature of the legal profession has played a long and courageous part in American history.  For example, lawyer James Hamilton risked retaliatory disbarment for daring to represent publisher John Peter Zenger in his 1735 criminal trial for seditious libel for publishing (truthful) articles criticizing the colonial governor of New York for wrongfully sacking the colony's chief justice.  Similarly heroic and professional was the willingness of colonial patriot (and later President) John Adams to represent the British soldiers ("Redcoats") charged with murder of American protestors in the infamous 1770 Boston Massacre.

And so on down through our subsequent constitutional history.

The challenge is that someone or some group is inevitably going to be demonized by someone else or some other group –

- Catholics, Jews, evangelical Protestants, Muslims, Hare Krishna, or Scientologists, etc.
- Fundamentalists or evolutionists
- Alleged rapists, murders, pederasts, or white-collar fraudsters
- Black Panthers or KKK
- Pacificists and draft resisters or alleged terrorist detainees
- Anarchists, communists, socialists, or libertarians
- Conservatives or Liberals; Republicans or Democrats
- Impeached office holders (such as President Trump) or members of Congress evaluating impeachment

The point is that *each* has the right to effective and diligent representation by counsel, regardless of any hostility to the particular client or the client's conduct or affiliation.  As renowned Washington lawyer Edward Bennett Williams noted many years ago, of the major civil liberties

cases that reached the Supreme Court over the years, most of the defendants "have been accused of murder, rape, arson, narcotics offenses, bootlegging and membership in the Communist Party."

The Court can easily imagine where our country would be today, if lawyers who undertook to represent those unpopular clients had been browbeaten or threatened into withdrawing from the cases – or had been too fearful of recrimination and retaliation even to have undertaken the cases. Is this the kind of neutered legal system that any court would acquiesce in tolerating in response to the whim of any President wishing to deconstruct the Rule of Law some 228 years into our constitutional history?

Thus, various law firms and organizations such as the ACLU, for example, take professional pride in having represented such unpopular groups as antisemite marchers and White Supremacist organizers in asserting their constitutional rights, despite the contrary personal beliefs of the lawyers undertaking the representation.

In 1968, a Black civil rights lawyer, Eleanor Holmes Norton, appeared before the Supreme Court to argue on behalf of a white supremacist group that had been barred from holding a rally in Maryland, and in another case she went into a local New York City court to defend the right of segregationist Alabama governor George Wallace to hold a rally at Shea Stadium, after City authorities had barred this controversial figure from appearing.

During the height of the Red Scare, a fledgling law firm, Arnold, Fortas & Porter, was

"well known around the capital for representing federal employees accused of disloyalty by the Truman administration — as many as 200 a year, almost all pro bono."

They took it as a badge of honor when a friend sneered, "I understand your firm is engaged in defending communists and homosexuals."

Similarly, one of the most respected partners in the Paul Weiss firm, one of the recent targets of President Trump's petulance, was another such defender of unpopular civil-liberties

cause – Lloyd K. Garrison.  With Supreme Court Bar leader John W. Davis, he represented Dr. J. Robert Oppenheimer before a panel of the Atomic Energy Commission in 1954, when Oppenheimer was falsely accused of disloyalty in supposedly aiding the Soviet Union.  Then, along with another stalwart of the District of Columbia Bar, Joseph L. Rauh, Jr., Garrison also represented playwright Arthur Miller before the House Un-American Activities Committee in 1956 and in Miller's fight against his contempt of Congress conviction in 1957.

   History has properly lauded lawyers such as these men and women for zealously seeking to protect the rights of their clients in the face of public opprobrium.

   One more example should suffice.  During the 1950s, at the height of anti-communist fervor, it was courageous for a lawyer to represent an alleged communist.  In pursuing his "anti-communist" campaign, Senator Joseph McCarthy was aided by "no holds barred" lawyer Roy Cohn (who later served as Donald Trump's self-professed  model of his ideal lawyer).  During Senate hearings, Cohn and McCarthy were hounding defense lawyer Joseph Welch, asserting that a young lawyer in Welch's firm was a communist himself  As a Senate report later summarized:

> Welch responded with the immortal lines that ultimately ended McCarthy's career: "Until this moment, Senator, I think I never really gauged your cruelty or your recklessness." When McCarthy tried to continue his attack, Welch angrily interrupted, "Let us not assassinate this lad further, senator. You have done enough. *Have you no sense of decency?*" [Emphasis added].

   While the Plaintiff in this matter or the other firms that have pricked the President's ire may not be entirely defenseless "lads," it may not go too far to substitute "President" for "Senator," and let Welch's words summarize what this case is all about.  It is reckless and indecent to use the aegis of the Oval Office to smear the reputation of respected lawyers and law firms simply to punish them for having had the temerity to represent clients who promote policies that the President personally does not like.

**IV.    The President's Attempt to Blackball Lawyers and Law Firms Because of Personal Disagreements Threatens to Distort the Provision of Professional Legal Services, including Pro Bono Services**

Finally, we take note of the recent "capitulation" by three of the firms that the President has targeted for "retribution."  First was the Paul Weiss firm.  That firm's response illustrates the unwarranted distortion of the legal process that the President's unlawful intervention creates, especially regarding provision of pro bono services.  As the *Washington Post* summarized:

> The firm will provide $40 million in pro bono legal services *to support Trump's agenda* after the president threatened to rescind some government contracts with the firm and its clients.
> [Emphasis added].

The firm also was forced to revamp its historic commitment to minority recruitment, because of the President's personal opposition to "DEI" programs.

One of the hallmarks of the legal profession is the understanding that lawyers have an ethical obligation to undertake pro bono representation of persons and organizations who cannot afford such representation.  This principle is stated in Rule 6.1 ("Pro Bono Public Service") of the DC Bar Rules:

> A lawyer should participate in serving those persons, or groups of persons, who are unable to pay all or a portion of reasonable attorney's fees or who are otherwise unable to obtain counsel.

 As explained in the Comment to the Rule:

> The rule incorporates the legal profession's historical commitment to the principle that all persons in our society should be able to obtain necessary legal services. The rule also recognizes that the rights and responsibilities of individuals and groups in the United States are increasingly defined in legal terms and that, as a consequence, legal assistance in coping with the web of statutes, rules, and regulations is imperative for persons of modest and limited means, as well as for the relatively well-to-do.

The President has made it explicit in the various Executive Orders punishing law firms that he does not like that he is holding against them what he regards as their "harmful activity through

their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes."  [EO regarding Jenner & Block.]

The President is seeking to discourage this pro bono work both by directly imposing sanctions on the firms and by limiting their ability to be retained by paying clients.  By banning disfavored firms from representing clients in dealing with the federal government, the President's Executive Orders threaten to erode the availability of pro bono services. Law firms depend on the revenue from paying clients to enable the firms to represent pro bono clients.

A consequence of the Executive Orders, therefore, is not just to punish firms for pro bono work that the Chief Executive finds objectionable, but also to degrade firms' financial capacity to take on the routine pro bono work of representing indigent clients, a service on which our courts depend to contribute to the efficient administration of justice.

In the District of Columbia, as throughout the rest of the country, the availability of pro bono legal service has been essential to the effective participation of many non-profit organizations in the advocacy process, including advocacy before Article III courts and Congress.  This pro bono service extends to organizations that pursue programs and objectives that may be at odds with the policies and preferences of a particular national Administration.

According to the latest data from the Pro Bono Institute, law firms with at least fifty lawyers throughout the country devoted more than 5,000,000 hours of professional time to pro bono work in 2023.  One of the major categories of such professional commitment is "racial justice initiatives" in the following areas:

> Criminal Justice
> Economic Empowerment
> Education
> Healthcare
> Housing
> Police Reform

> Voting Rights

In the District of Columbia alone, major firms devoted nearly 914,000 hours to comparable pro bono services.

As is evident, many of these professional commitments involve challenging government programs and policies or pressing governments at all levels for reform.

The current President has been disturbingly candid in highlighting that a central motive for his retaliation against Plaintiff and other law firms is his disagreement with such causes pursued by the firms on behalf of their pro bono clients.

The "deal" that Paul Weiss accepted, with a loaded gun to its head, involves a massive redirection of the firm's pro-bono activities, so that at least $40 million in professional services will be redirected away from clients and organizations that the firm otherwise would be assisting and instead provided to those clients and causes that are compatible with the Chief Executive's personal "agenda."

In a March 23 memorandum to his colleagues at Paul Weiss, the chairman of the firm explained that the President's decree had presented the firm with an "existential crisis," because the President's "executive order could easily have destroyed our firm."  Accordingly, the chairman explained, "in the face of an unprecedented threat," the firm "settled" with the Administration and "agreed to commit substantial pro bono resources" to what were euphemistically described as "areas of shared interest."

In the wake of the Paul Weiss "settlement," a second firm, Skadden Arps, was forced to fork over to the President's favored causes an even greater volume of purported pro bono work in the face of the mere *threat* of being added to his law-firm hit list.  Under that euphemistically

characterized "settlement" the firm decided "to provide the equivalent of $100 million in free legal work to causes supported by the administration."

The latest firm to succumb, so far, is Willke Farr & Gallagher.  On April 1, the President announced that the firm is not only abandoning its DEI policies but also "will provide the equivalent of $100 million in pro bono legal services for causes the administration supports." Willke's crimes?  It is the firm (i) where the husband (Douglas Emhoff) of the President's 2024 electoral opponent, Vice President Kamala Harris, practices law, (ii) where an investigator who worked for a House of Representative committee probing the pro-Trump January 6 attack on the Capitol, is employed, and (iii) which represented two Georgia election workers who successfully sued presidential friend Rudy Giuliani for defamation when he falsely accused them of helping to "steal" the 2020 election from Mr. Trump.

Respect for the Rule of Law must mean that members of the legal profession must be free to exercise their own personal and professional judgment in determining which pro bono clients to represent and which causes to pursue.  No government official, especially a President, may legitimately commandeer those professional services and impress lawyers into the service of his own personal "agenda."  See, *e.g.*, 18 U.S.C. §§ 872, 1951(b)(2).

In dealing with a fictional book and film, we can simply watch passively when a powerful man confronts a citizen and "makes him an offer that he can't refuse."   But when the integrity of the American legal system is at stake, any such man, even the President, must be told that he has gone too far.

Who will deliver this message, when even major law firms are cowed, corporate clients are silenced, universities are threatened, and Congress remains complicit?  The clear answer: Only an Article III court responsible for saying "what the law is."

## CONCLUSION

Plaintiff's Motion for Summary Judgment should be granted.

Respectfully submitted.

_____
Andrea C. Ferster
Law Offices of Andrea C Ferster
DC Bar #384658
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: Andreaferster@gmail.com

*Of Counsel*
Philip Allen Lacovara
(DC Bar #194472)
4552 West Gulf Drive
Sanibel, FL 33957-5106
Phone: 239-472-2992
Email: placovara@gmail.com

**A**MICI **C**URIAE

***Past Presidents of The District of Columbia Bar***
(appearing in their individual capacities)

Charles R. Work (1976-1977)

Marna Tucker 1984-1985)

Philip Allen Lacovara (1988-1989)

Robert N. Weiner (1995-1996)

Myles V. Lynk (1996-1997)

Andrew H. Marks (1998-1999)

Joan H. Strand (1999-2000)

John W. Nields, Jr. (2000-2001)

John C. Keeney Jr. (2004-2005)

John C. Cruden (2005-2006)

James J. Sandman (2006-2007)

Melvin White (2007-2008)

Kim M. Keenan (2009-2010)

Andrea C. Ferster (2013-2014)

Annamaria Steward (2016-2017)

Patrick McGlone (2017-2018)

Susan M. Hoffman (2019-2020)

### ***Other Former Leaders of The District of Columbia Bar***

Katherine A. Mazzaferri
     (Executive Director, 1982-2010,
     Chief Executive Officer, 2010-2017)

Cynthia D. Hill
     (Assistant Executive Director for Programs, 1990-2010,
     Chief Programs Officer, 2010- 2017)

Maureen Thornton Syracuse
     (DC Bar Pro Bono Center,
     Director/Executive Director, 1992-2011)