# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PERKINS COIE LLP, | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | Civil Action |
| | ) | No. 1:25cv-00716(BAH) |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BRIEF OF LAWYERS DEFENDING AMERICAN DEMOCRACY
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF PERKINS COIE LLP'S
## MOTION FOR SUMMARY JUDGMENT

Aderson Francois (D.C. Bar No. 498544)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
Phone: (202) 661-6721
Fax: (202) 662-9634
Aderson.Francois@georgetown.edu

Counsel for Amicus

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... iii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................................................... 1

IDENTITY AND INTEREST OF AMICIUS ............................................................................. 2

SUMMARY OF ARGUMENT.................................................................................................. 2

ARGUMENT ........................................................................................................................... 3

    I.    The Executive Order is a Usurpation of Judicial Authority that Violates Basic Rule of Law Principles.................................................................................................................... 3

    II.    The Order Directly Interferes with the Professional Responsibilities of Lawyers ........ 10

CONCLUSION...................................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*In re Austin*,
  5 Rawle 191 (Pa. 1835).........................................................................5, 6

*Consumers Beverages, Inc. v Kavcon Dev. LLC*,
  227 AD3d 1381 (N.Y. App. Div. 4th Dept. 2024)..................................14

*In re Integration of Nebraska State Bar Association*,
  275 N.W. 265 (1937) ...............................................................................5

*Makesom v. Martin County*,
  491 So.2d 1109 (Fla. 1986)....................................................................10

*Strickland v. Washington*,
  466 U.S. 668 685 (1984)....................................................................11, 12

*Touche Ross Co. v. SEC*,
  609 F.2d 570 (2d. Cir. 1979)....................................................................4

**Statutes**

Florida Statutes Title XXXII, Chapter 454 .................................................4

N.Y. Judiciary Law §§ 90–499 ...................................................................4

**Regulations**

17 C.F.R. § 201.102(e)................................................................................4

37 C.F.R. Part 11 ........................................................................................4

90 Fed. Reg. 11,781 (Mar. 6, 2025).............................................................1

**Rules**

DC Court of Appeals Rule XI.......................................................................7

DC Rule of Professional Conduct 1.1 .........................................................13

DC Rule of Professional Conduct 1.16(a)(1)...............................................14

DC Rule of Professional Conduct 1.2(b) .....................................................12

DC Rule of Professional Conduct 1.3 ....................................................5, 6, 11

DC Rule of Professional Conduct 1.7(b)(4) .................................................14

DC Rule of Professional Conduct 6.1 .............................................................................15

SEC Rule 2(e) ..................................................................................................................4

**Other Authorities**

2018 American Bar Association Report on the Evaluation of Disciplinary
    Enforcement ...............................................................................................................3

Charles W. Wolfram, *Toward a History of American Legal Ethics-I. Origins*, 8
    Univ. of Chicago L. School Roundtable 469, 476 (2001) ........................................5

D.C. Court of Appeals, No. m287-24, Notice, December 10, 2024 ................................7

Elvin Mulvaney & C. Ryan Barber, "Fear of Trump Has Elite Law Firms in
    Retreat," Wall Street Journal, March 7, 2025 .........................................................17

Executive Order. No. 14230, codified at 90 Fed. Reg. 11,781 (Mar. 6,
    2025) titled "Addressing Risks from Perkins Coie LLP" ....................................1, 8, 9

George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963,
    1978-1979 (2016)......................................................................................................4

Nnamdi Egwuonwu and Ryan J. Reilly, "Trump calls for jailing his perceived
    opponents in Justice Department speech," NBC News, March 14, 2025 ................12

"Trump Tightens Grip on FBI and Justice Department," *Wall Street Journal*,
    March 7, 2025 .....................................................................................................12, 13

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Lawyers Defending American Democracy is a non-partisan tax-exempt 501(c)(3) corporation. Amicus is not owned by any parent corporation and no publicly held company has 10% or more ownership in LDAD.

## IDENTITY AND INTEREST OF AMICUS

Lawyers Defending American Democracy (LDAD) files this amicus brief in support of plaintiff's expedited motion for summary judgment.  LDAD is a non-profit, non-partisan organization devoted to encouraging the legal profession to enforce and uphold principles of democracy and law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them.  It has a significant interest in this case because the Executive Order at issue undermines basic principles of democracy and the rule of law.[1]  Perkins Coie and the United States Department of Justice have consented to our filing this brief, and a motion for leave to file it is attached.

## SUMMARY OF ARGUMENT

The Order regarding Perkins Coie is a serious intrusion by the executive branch on the authority of the judicial branch to regulate the conduct of lawyers. This intrusion represents an unprecedented effort by the executive to undermine the independence of the legal profession by subjecting it to the whims of the President.  Such independence is necessary to enable lawyers to fulfill their duty to represent clients without interference from any other party, especially the

---

[1] The brief addresses Executive Order. No. 14230, codified at 90 Fed. Reg. 11,781 (Mar. 6, 2025) titled "Addressing Risks from Perkins Coie LLP," ("Order"), and the  accompanying Fact Sheet titled "Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP" of the same date ("Fact Sheet").

1

government. By threatening law firms, the Order also attempts to limit the issues that lawyers can raise in courts. This is a fundamental challenge to the rule of law, because it seriously weakens the ability of the legal system to serve as a check on the exercise of executive power.

The Order purports to establish broad and vague standards of professional conduct that are not defined but must be inferred from various parts of the order. The unifying thread of those standards is that lawyers must not represent clients whom the President dislikes nor present arguments that he disapproves. The Order then determines that Perkins Coie has violated these standards simply by representing certain clients in various matters, regardless of the legal merits of their claims, the fact that clients were successful in many of these cases, or the conformity of lawyers to judicially-approved rules of professional conduct during the representation.

The Order imposes draconian sanctions on the firm for these ostensible violations. The Order discourages parties from becoming clients of Perkins Coie by (1) threatening them with losing or being ineligible for government contracts; (2) purporting to limit the types of claims that the firm may bring on their behalf and the arguments it may make in support of those claims; (3) undermining the ability of the firm's lawyers to represent them effectively by denying lawyers security clearances, the ability to enter federal buildings, and the ability to meet with government employees; and (4) creating the threat that those who seek to hire the firm will be guilty by association and may be the target of other adverse action by the administration. To state the obvious, a law firm's financial survival is based on its representation of clients. The intent of the order is to cripple a preeminent law firm because the President disapproves of the clients and causes that it represents.

The President has issued executive orders against additional law firms, and has stated that he intends to pursue still other firms for behavior that he deems "very dishonest." The President

has intensified his campaign with a memorandum to the Attorney General regarding "Preventing Abuses of the Legal System and the Federal Courts," which directs that official to "seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation" against the United States and in agency proceedings.  The memo also directs the Attorney General to review conduct by lawyers in such matters over the last eight years. This is, of course, the period in which various investigations of the President occurred, indicating that his ostensible concern about lawyer misconduct will be focused on representation in matters involving him or of which he disapproves.

The Order thus is part of a concerted campaign to place law firms on an "enemies list" that could put their very survival in jeopardy.  The goal is to condition law firms' ability to practice law and serve their clients on the President's approval of their conduct.  By usurping the authority of the judiciary and attempting to make the legal profession subservient to the executive, it seriously weakens the ability of the legal system to vindicate individuals' rights and to hold the President and the executive branch accountable to the rule of law.

## ARGUMENT

### I.    The Executive Order is a Usurpation of Judicial Authority that Violates Basic Rule of Law Principles

It is a well-settled principle in the United States that, with minor exceptions, primary responsibility for regulating lawyers' conduct rests with the judicial branch.  As the 2018 American Bar Association Report on the Evaluation of Disciplinary Enforcement noted, "[e]xclusive judicial regulation of lawyers has developed since colonial times." By the late 1800s, "state courts were asserting an exclusive right to regulate lawyers" based on "the constitutional doctrines of inherent power and separation of powers". *Id*. 8. "Today," the Report observed, "judicial regulation of lawyers is a principle firmly established in every state." *Id*. 8.  The highest court in each

jurisdiction has the authority to establish and enforce rules of professional conduct for lawyers who are members of the bar in that jurisdiction, as well as for lawyers from other jurisdictions who participate in proceedings in the state.

In addition to regulation by the highest court in each jurisdiction, individual courts have the authority to discipline lawyers who appear before them for misconduct. Today there is also limited legislation in some states that regulates specific lawyer conduct. *See, e.g.*, N.Y. Judiciary Law §§ 90–499 (fraudulent legal practice); Florida Statutes Title XXXII, Chapter 454 (soliciting clients at accident scenes or hospitals). When courts are confronted with these legislative efforts, they typically consider whether to uphold them as a matter of comity. *See, e.g.*, *Ark. Properties v. Cameron*, 681 S.W.3d 133, 140 (Ky. 2023)

Finally, there is very limited executive branch regulation of the conduct of lawyers. This involves rules established by several federal agencies governing the conduct of lawyers and others in agency proceedings and dealings with the agency. *See, e.g.*, 17 C.F.R. § 201.102(e) (Securities & Exchange Commission); 37 C.F.R. Part 11 (Patent & Trademark Office). Authority for such provisions is based on the need to enable agencies to perform their statutory functions. *See Touche Ross Co. v. SEC*, 609 F.2d 570, 582 (2d. Cir. 1979) (SEC Rule 2(e) "provides the Commission with the means to ensure that those professionals, on whom the Commission relies heavily in the performance of its statutory duties, perform their tasks diligently and with a reasonable degree of competence"). As one prominent scholar notes, "The vast majority of rules apply to lawyers practicing before an agency acting in its judicial capacity." George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963, 1978-1979 (2016).

The central role of the judicial branch in regulating lawyer conduct reflects lawyers' distinctive role in the U.S. legal system. As the preamble to the American Bar Association Model

Rules of Professional Conduct declares, "A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." Lawyers have a special responsibility to sustain what the commentary to Rule 1.3 of the DC Rule of Professional Conducts calls "our government of laws and not of individuals." [2] This requires that they be able to represent clients who seek to challenge the legality of executive or legislative action in order to affirm the principle that no one is above the law. In doing so, lawyers are required "honestly and ably to aid the courts in securing an efficient administration of justice." *In re Integration of Nebraska State Bar Association*, 275 N.W. 265, 268 (1937). Thus, "[t]he practice of law is so intimately connected and bound up with the exercise of judicial power and the administration of justice that the right to define and regulate its practice naturally and logically belongs in the judicial department." *Id.*

Attempts by the executive branch, particularly the Office of the President, to engage in expansive regulation of lawyers' conduct pose the especially serious danger of punishing lawyers who represent clients seeking to hold the executive accountable under the law. This country's history illustrates the gravity of this risk. The Crown's colonial representatives resorted to disbarment "more than occasionally to punish or neutralize lawyers who were perceived as politically out-of-step or otherwise uncooperative." Charles W. Wolfram, *Toward a History of American Legal Ethics-I. Origins*, 8 Univ. of Chicago L. School Roundtable 469, 476 (2001). As with the Order that is at issue in this case, such brazen political interference with lawyers' practice is fundamentally inconsistent with the rule of law.

The importance of preserving the independence of lawyers has on occasion resulted in striking down even the judicial exercise of authority over lawyers. In *In re Austin,* 5 Rawle 191

---

[2] Citations in this brief are to the DC Rules of Professional Conduct, which are generally representative of the rules in other jurisdictions.

(Pa. 1835), most of the lawyers in a county in Pennsylvania were disbarred by the Court of Common Pleas for publishing criticism of the President of that court that the court regarded as disrespectful. The Pennsylvania Supreme Court, however, struck down this sanction. "[T]o subject the members of the profession to removal at the pleasure of the court," the Chief Justice said, "would leave them too small a share of the independence necessary to the duties they are called to perform to their clients and to the public. As a class, they are supposed to be, and in fact have always been, the vindicators of individual rights, and the fearless asserters of the principles of civil liberty; existing where alone they can exist, in a government not of parties or men, but of laws!" Id. at 203.

The District of Columbia Court of Appeals, the highest court in that jurisdiction, is representative in its statement of the judiciary's regulatory authority:

> In the exercise of its inherent jurisdiction over members of the legal profession, the Court established the District of Columbia Bar and the Board on Professional Responsibility. The Court has the power to promulgate the rules regarding attorney discipline and to impose discipline upon attorneys. The Board on Professional Responsibility is the disciplinary arm of the Court, which administers the attorney discipline system and supports it in the adjudication of disciplinary cases. https://www.dccourts.gov/court-of-appeals/learn-more/attorney-discipline

This authority of the judicial branch to regulate lawyer professional conduct helps ensure that the legal system and the lawyers who practice in it are protected as much as possible from political influence, especially from the executive because of the fear of concentrating power in that branch of government.

Lawyers must be allowed to represent clients without fear of political persecution to ensure that "each member of our society is entitled to have such member's conduct judged and regulated in accordance with the law; to seek any lawful objective through legally permissible means; and to present for adjudication any lawful claim, issue, or defense." DC Rule of Professional Conduct 1.3, comment 2.

The goal of the Order to punish the firm based simply on the personal preferences of the President is reflected in the complete absence of any of the procedural protections provided in judicial regulation of professional conduct that are integral to the rule of law.

Judicially established rules governing the conduct of the profession are adopted only after extensive opportunity for comment by lawyers, deliberation by the court, and notice of a final decision and the date on which a rule will be effective. *See, e.g.*, D.C. Court of Appeals, No. m287-24, Notice, December 10, 2024. Rules also include extensive comments that explain their rationales and clarify their application.

Furthermore, lawyers are subject to sanctions for violation of judicially-established rules only after notice of an alleged violation, an opportunity to respond, and application of general rules to particular conduct that is accompanied by a statement of the reasons for a decision. DC Court of Appeals Rule XI is an example of such procedural protections. It requires that in order to initiate disciplinary proceedings, Disciplinary Counsel must file a petition under oath and provide a copy to the attorney who is the subject of the proceedings. The petition must be "sufficiently clear and specific to inform the attorney of the alleged misconduct." Rule XI, Disciplinary Proceedings, Section 8: Investigation and Hearings, 8(c).

The attorney has 20 days to file a reply to the petition. Section 8(d). After a hearing is scheduled, the attorney must be given notice of the date and place of the hearing, which must be at least 15 days after the service of the notice. The notice "shall also advise the attorney that, at the hearing, the attorney shall have the right to be represented by counsel, to cross-examine witnesses, and to present evidence in defense or mitigation of the charges." *Id.*

The Hearing Committee must submit a report to the Board on Professional Responsibility within 120 days with its findings and recommendations. Section 9. If the attorney files an

exception to the report, the matter is scheduled for submission of briefs and oral argument before the Board. If the Board recommends disbarment or suspension, the attorney has 30 days to show cause why the Court should not enter an order of suspension pending final action on the Board's recommendation. In cases in which exceptions have been filed, the DC Court of Appeals schedules the matter for consideration.

The Order's absence of any semblance of due process in establishing ostensible standards, determining that Perkins Coie lawyers have violated them, and imposing sanctions on the entire firm is of course a violation of the Constitution in itself, a point on which counsel for the firm and other amicus briefs elaborate. Beyond this, however, it is antithetical to the rule of law because it reflects the exercise of executive power based purely on the President's desires unfettered by any legal standards.

It is worth examining the Order in some detail to fully appreciate this point. First, the order purports to sanction Perkins Coie for certain actions by persons no longer at the firm whose conduct already has been adjudicated by the legal system and, with one minor exception, who have been exonerated. Complaint ¶8. Second, the order does not clearly state the standards that are the basis for sanctions, nor does it describe precisely the conduct that has allegedly violated them. Nonetheless, one can piece together portions of the order and the Fact Sheet that accompanies it to infer a new category of improper conduct by lawyers that the order purports to establish.

The Order declares that lawyers at Perkins Coie have engaged in "dishonest and dangerous activity." Order §1. This consists first of representing clients who seek to "judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification." *Id.* Attempting to "judicially overturn" legislation, however, is an unremarkable activity in which any lawyer engages when the lawyer seeks judicial review of the lawfulness of

8

legislation, especially on Constitutional grounds. The fact that such legislation may be "popular" is immaterial to its legality, as is the view of some parties that it is "necessary." Indeed, the firm's clients were successful in several election law cases relating to voting rights.

The second type of activity is representing clients with the goal of "undermining democratic elections, the integrity of our courts, and honest law enforcement." *Id.* What constitutes "undermining" these institutions is unclear. It is worth noting, for instance, that one activity in which Perkins Coie engaged was successfully defending numerous challenges to the outcome of the 2020 presidential election. Overwhelming rejection of these challenges by the courts suggests that, contrary to the contention in the Order, Perkins Coie lawyers were not engaged in attempting to undermine democratic elections but to vindicate them.

The third activity representing clients in "partisan lawsuits against the United States." EO Fact Sheet. Again, it is not clear what constitutes "partisan" lawsuits. The merits of the legal claims in these lawsuits seemingly is not the basis for this characterization. One must infer from the Order that the term "partisan" instead is based on the extent to which the President disfavors the clients whom Perkins Coie has represented and the claims that they have presented. Finally, the Order says that the firm has engaged in "unethical and discriminatory actions that threaten our elections, military strength, and national security." *Id.* There is no description whatsoever of what the firm has done that warrants this conclusion.

These broad and vague descriptions of conduct provide no meaningful guide to what behavior complies with or violates the standards that the Order purports to announce, other than it involves representation of clients of whom the President disapproves, and presentation of arguments that he dislikes. This leaves a law firm completely at the mercy of the President's discretion. Furthermore, the putative standards were adopted with no notice that the standards

were under consideration, no opportunity to comment on them, and no clear explanation of what they mean and the rationale for adopting them.

Next, in applying these standards to Perkins Coie, Order gave no notice to the firm of the accusations against it and no opportunity to respond to them, call witnesses on its behalf, or contest the accusations in a hearing before a neutral decision maker. Nor has the firm received any explanation based on reasons and supporting evidence for the decision to penalize the firm. The basis for the sanctions is simply the President's dislike of the firm's activities without regard to their legality or compliance with the judiciary's rules of professional conduct governing lawyers. By violating basic principles of due process and impartiality, the Order provides a vivid reminder of the critical importance of the rule of law in checking what otherwise would be unconstrained executive power. It is a stark illustration of why the judicial branch, not the executive, has the primary responsibility for regulating the conduct of lawyers.

## II.    The Order Directly Interferes with the Professional Responsibilities of Lawyers

The expert opinions in this case describe rules of professional conduct with which the Order is at odds. This section therefore will not discuss these rules in detail, but will simply underscore their importance to the integrity of the legal system and the rule of law. Lawyers are required to follow judicially-established rules of professional conduct and face disciplinary sanctions for violating them. By purporting to establish standards of conduct at odds with the rules of professional conduct, the Order attempts to coerce lawyers not to follow the judiciary's rules of professional conduct. This directly interferes with lawyers' ability to provide adequate representation to clients. *Cf. Makesom v. Martin County,* 491 So.2d 1109 (Fla. 1986) (finding that a court had inherent authority to invalidate a legislative limit on attorney's fees in representing

indigent criminal defendants, when limiting a fee to the statutory maximum would interfere with the Sixth Amendment right to effective assistance of counsel).

First, the Order interferes with lawyers' duties to pursue a client's lawful goals through any means permitted by the law. As DC Rule of Professional Conduct Rule 1.3 provides:

> (a) A lawyer shall represent a client zealously and diligently within the bounds of the law.

> (b) A lawyer shall not intentionally:

> 1) Fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules.

Comment 1 to the Rule says, "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."

The Order, however, effectively requires that Perkins Coie lawyers' representation of clients be guided not by the law and the rules of professional conduct, but by concern about whether the claims they pursue and the positions they take will be deemed by the President to be objectionable.

This need for lawyers to ensure that they do not displease the President is fundamentally at odds with their professional responsibility to diligently represent clients within the bounds of the law rather than to be influenced by political considerations. By interfering with this responsibility of lawyers, the Order will help concentrate the power of the executive by limiting the ability of the legal system to serve as a check on that power.

Lawyers' ability to exercise independent judgment in representing clients is especially crucial in criminal proceedings. The right to effective assistance of counsel in such proceedings "is critical to the ability of the adversarial system to produce just results. An accused is entitled to

be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland v. Washington,* 466 U.S. 668, 685 (1984). The Court in *Strickland* said that the government violates this right "when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Id.* at 686. If the Order stands, lawyers who fear executive retribution will be less likely to represent defendants in prosecutions brought by the administration, thus reducing the availability of experienced counsel in such proceedings. Those who are willing to do so will have an incentive to avoid presenting defenses with which the executive disagrees.

This is a profound threat to the rule of law because it enhances the executive's ability to use its formidable power of criminal prosecution against political opponents. This is not simply a theoretical possibility, since the President commonly characterizes many people with whom he disagrees as criminals. *See, e.g.,* Nnamdi Egwuonwu and Ryan J. Reilly, "Trump calls for jailing his perceived opponents in Justice Department speech," NBC News, March 14, 2025. As the *Wall Street Journal* has reported, "While every FBI director since J. Edgar Hoover has taken pains to keep the White House at arm's length, the new Trump administration has taken the opposite tack, working to bring the traditionally independent ethos of the FBI and Justice Department firmly within the president's grasp." "Trump Tightens Grip on FBI and Justice Department," *Wall Street Journal*, March 7, 2025.

Related to this, the Order is in direct conflict with the long-standing principle in our country that lawyers should provide representation on behalf of socially or politically unpopular people or causes. DC Rule of Professional Conduct 1.2(b), for instance, encourages this by providing, "A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities." As

comment 3 to that Rule says, "Legal representation should not be denied to people who are unable to afford legal services, or whose cause is controversial or the subject of popular disapproval." The rule of law insists that all persons are equal before the law and are entitled to present their claims regardless of popular opinion.

This principle is exemplified by John Adams' decision to represent British soldiers accused of murder in the Boston Massacre in 1775. Adams did this knowing that his decision would elicit criticism. It did: "The patriots of Boston railed against [Adams and his co-counsel]. It was said that rocks had been thrown through the windows of Adams's home. The men were jeered in the streets. Clients were lost." David Fisher & Dan Adams, John Adams under Fire: *The Founding Father's Fight for Justice in the Boston Massacre Murder Trial* 35 (2020). Adams nonetheless insisted that "every lawyer must hold himself not only to his country, but to the highest and most infallible of all tribunals for the part he should act." "Counsel ought to be the very last thing that an accused person would [lack] in a free country," Adams said. "The bar ought to be independent and impartial at all times and in every circumstance." *Id.* 32

Consistent with current rules of professional conduct, "Adams made sure to profess no sympathy for the accused officer, making it clear that he was not so much defending the man as defending the law." *Id*. 33. By discouraging representation of clients who are unpopular with the executive, the Order will reduce the availability of lawyers who are willing to follow Adams's example.

The Order also undermines the integrity of the legal system by interfering with Perkins Coie lawyers' ability to competently represent their clients. DC Rule of Professional Conduct 1.1 states:

a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

(b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters.

Suspending Perkins Coie lawyers' security clearances, denying them access to federal buildings, limiting government employees' interaction with them, and refusing to provide them with Sensitive Compartmented Information Facilities can prevent them from competently and effectively representing clients in proceedings involving the government as required by the rules. Under these circumstances, lawyers will need to determine if these disabilities will impair their ability to effectively represent their clients. If so, they will need to seek leave to withdraw from representation, thus depriving clients of their right to counsel of their choice. *See, e.g.,* DC Rule of Professional Conduct 1.16(a)(1).

This right of clients is essential because a client must have confidence and trust in their lawyer in order for the representation to be effective. The client must be willing to disclose to the lawyer information that may be sensitive or embarrassing and must believe that the lawyer at all times is pursuing their interest. Courts therefore give great weight to a client's choice of counsel . *See, e.g.*, *Consumers Beverages, Inc. v Kavcon Dev. LLC*, 227 AD3d 1381 (N.Y. App. Div. 4th Dept. 2024): "[W]e note the seriousness of a motion to disqualify a party's counsel of choice. Disqualification of a law firm during litigation implicates not only the ethics of the profession but also the substantive rights of the litigants").

The right is especially crucial in criminal proceedings. As the Supreme Court stated in the landmark case of *Powell v. Alabama* recognizing the right to counsel in capital cases, "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." 287 US 45, 53 (1932).

14

Another way in which the Order will undermine the professional responsibilities of lawyers in a democratic legal system is through the operation of attorney conflict of interest rules. DC Rule of Professional Conduct 1.7(b)(4), as do rules in other jurisdictions, provides that a lawyer shall not represent a client if "[t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by . . . the lawyer's own financial, business, property, or personal interests." Lawyers may reasonably fear that representation that displeases the President will result in public excoriation, denial of government contracts, loss of security clearance or access to federal buildings, and other potential disadvantages.

A lawyer whose representation of a client is influenced by the desire to avoid incurring these penalties would be violating their professional responsibility. In order to avoid this situation, lawyers are likely to represent clients who will not challenge the administration's actions, not bring claims against those whom the President regards as his supporters, and not advance legal arguments that the President finds threatening or with which he may disagree. The result will be to limit the number of firms that will undertake representation of clients who challenge actions by the executive. A predictable consequence as well is to reduce the number of parties who are willing to retain Perkins Coie and other firms that are the target of similar executive orders. The Order thus uses the rules of professional conduct as an instrument to interfere with clients' right to effective representation by counsel of their choice, and to prevent firms from holding the executive accountable under the law.

Finally, the Order's interference with the ability of lawyers to practice in accordance with rules of professional conduct impairs potential clients' First Amendment right to petition the government for redress of grievances. Reliance on counsel can be crucial to enable the exercise of this right. Comment 1 to DC Rule of Professional Conduct 6.1 on pro bono service, for instance,

notes, "The rule. . . recognizes that the rights and responsibilities of individuals and groups in the United States are increasingly defined in legal terms and that, as a consequence, legal assistance in coping with the web of statutes, rules, and regulations is imperative for persons of modest and limited means, as well as for the relatively well-to-do." The Order attempts to preclude Perkins Coie from assisting clients in seeking redress for certain types of grievances, thus interfering with this First Amendment right.

In sum, the Order prevents lawyers from fulfilling professional responsibilities that are integral to the functioning of an impartial legal system. The Order limits lawyers' ability to represent clients diligently within the bounds of the law by effectively requiring that they take into account whether the President is likely to disapprove of their representation. It limits their ability to represent clients competently by threatening to deprive them of access to resources that they may need to do so. It discourages lawyers from representing clients who are unpopular with the President and his supporters and threatens, in particular, to interfere with providing effective assistance of counsel in criminal proceedings. A lawyer who reasonably fears being penalized by the Order may not be able to fulfill the duty to represent a client without regard for the lawyer's own personal interest. If so, the lawyer must withdraw from or decline representation of clients. Lawyers are crucial in ensuring that the executive is constrained by the rule of law, and the Order significantly impairs their ability to do so.

Finally, it is important to emphasize that the Order is not directed simply at individual lawyers. The Order imposes penalties on all lawyers in the firm, regardless of their individual conduct. This makes clear that its concern is not with specific putative improper conduct. Rather, it is with the ability of Perkins Coie to use its reputation, experience, and resources to represent clients and advance legal arguments that could challenge the legality of the administration's

16

actions. That the goal is to hinder a significant portion of the legal profession from presenting such challenges is made clear by administration actions targeting other prominent law firms, and by the President's statement that he is planning similar measures against several other major law firms that are especially well equipped to provide such representation. As he has said, ""We have a lot of law firms that we're going to be going after because they were very dishonest people."  Elvin Mulvaney & C. Ryan Barber, "Fear of Trump Has Elite Law Firms in Retreat," Wall Street Journal, March 7, 2025. The same article says, "Advocacy groups and smaller law firms say it has been more difficult to recruit larger firms to help with cases against Trump."

The administration therefore is attempting to sideline many lawyers who are in an especially good position to hold it legally accountable.  This is fundamentally at odds with the basic principle that no person – least of all the executive – is above the law.

## CONCLUSION

The President's intrusion on judicial authority to regulate the legal profession, and the resulting impact on lawyers' independence and clients' ability to select the counsel of their choice, have grave consequences for the rule of law in this country.

The Order targeting Perkins Coie, similar retaliatory executive orders targeting other firms, and the threat of action against still other firms constitutes a campaign to dissuade law firms on pain of sanctions from: (1) representing any clients disfavored by the President; (2) presenting claims that the President dislikes against the Government or against anyone whom he supports, regardless of the legal merits of the client's claim; and (3) advancing any legal position that the President disfavors, regardless of the legal viability of that position.  As such, it represents an unmistakable attempt to limit the legal accountability of the President through intimidation of the legal profession.

17

This message is not lost on major law firms. As one law firm advisor has said, "American law firms have always represented interests adverse to the US government, without worrying if there would be retribution or sanctions until now. It's created just an incredible amount of fear." Katelyn Polantz, "The chilling effect of Trump's war against the legal establishment," CNN, March 11, 2025.

The impact of these provisions effectively is that the President is publicly placing Perkins and any other firms it chooses on an administration "enemies list."  If the Order stands, nothing will prevent the President from systematically doing the same to any firm he fears might represent clients posing any challenge to his exercise of power. The Order therefore is a fundamental assault on the rule of law and the very integrity of the Unites States legal system.


Respectfully submitted,

 /s/ Aderson B. Francois
Aderson B. Francois (D.C. Bar No. 498544)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
Phone: (202) 662-9065
aderson.francois@georgetown.edu


Counsel for Amicus

**CERTIFICATE OF COMPLIANCE**

Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements of LCvR 5.4, complies with the requirements set forth in Fed. R. App. P. 29(a)(4), and does not exceed 25 pages in length.

DATED this 3rd day of April 2025.

/s/  Aderson B. Francois
Aderson B. Francois (D.C. Bar No. 498544)

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2025, I electronically filed the original of this brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

DATED this 3rd day of April 2025.

/s/  Aderson B. Francois
Aderson B. Francois (D.C. Bar No. 498544)