# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERKINS COIE LLP,<br><br>                              Plaintiff,<br><br>        v.<br><br>U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, THE UNITED STATES OF AMERICA, and, in their official capacities, PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, and TULSI GABBARD,<br><br>                              Defendants. | Civil Action No. 1:25-cv-00716 (BAH)<br><br>Hon. Beryl A. Howell |

## BRIEF OF *AMICI CURIAE* BAR ASSOCIATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND FOR DECLARATORY AND <u>PERMANENT INJUNCTIVE RELIEF</u>

John Paredes
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
john.paredes@protectdemocracy.org
(202) 579-4582
Fax: (202) 769-3176
D.D.C. Bar No. NY0418

Hayden Johnson
Protect Democracy Project
2020 Pennsylvania Ave. NW
Suite 163
Washington, DC 20006
hayden.johnson@protectdemocracy.org
(202) 579-4582
Fax: (202) 769-3176
D.C. Bar No. 1671830

Jeannie Suk Gersen
(*pro hac vice forthcoming*)
Harvard Law School*
1563 Massachusetts Avenue
Cambridge, MA 02138
jeannie.gersen@gersen.com
(617) 496-8834

* Institutional affiliation for identification purposes only.

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), counsel for *amici curiae* certify that *amici* are bar associations. They have no parent corporations, and do not issue stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ................................................................ i

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ............................................................................................................ 1

INTEREST OF *AMICI CURIAE* ................................................................................. 2

ARGUMENT .................................................................................................................... 6

   I.  This Executive Order Threatens the Independence of the Bar................................. 6

     A. This Executive Order and related executive actions threaten to turn the bar into an instrument of the executive branch. ..................................................................... 6

     B. The executive orders encumber lawyers from performing their ethical duties to their clients and the profession. ................................................................................. 10

   II. An Independent Bar is Necessary for the Rule of Law......................................... 13

     A. An independent bar enables the proper functioning of our judicial system. ................... 13

     B. An independent judiciary is necessary for our constitutional system of checks and balances. .............................................................................................................. 16

     C. History has shown the necessity of an independent legal profession. ............................. 19

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Boumediene v. Bush*,
    128 S. Ct. 2229 (2008) ................................................................................... 17

*Climate United Fund v. Citibank, N.A.*,
    No. 1:25-cv-00698 (D.D.C. Mar. 18, 2025) ............................................... 11

*Cohen v. Hurley*,
    366 U.S. 117 (1961) ...................................................................................... 17

*Collins v. Yellen*,
    594 U.S. 220 (2021) ...................................................................................... 16

*Ex parte Garland*,
    71 U.S. 333 (1866) ........................................................................................ 18

*Greenlaw v. United States*,
    554 U.S. 237 (2008) ...................................................................................... 14

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001) ................................................................................ 13, 18

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ...................................................................... 16

*Moore v. Harper*,
    143 S. Ct. 2065 (2023) ................................................................................. 17

*NAACP v. Button*,
    371 U.S. 415 (1963) ...................................................................................... 10

*Pacito v. Trump*,
    No. 2:25-cv-00255, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ......... 11

*Penson v. Ohio*,
    488 U.S. 75 (1988) ........................................................................................ 13

*PFLAG, Inc. v. Trump*,
    No. 8:25-cv-00337, 2025 WL 685124 (D. Md. Mar. 4, 2025) .................... 11

*Sacher v. United States*,
    343 U.S. 1 (1952) .......................................................................................... 23

*Shilling v. United States*,
    No. 2:25-cv-00241, 2025 WL 926866 (W.D. Wash. Mar. 27, 2025) .......... 11

*Storch v. Hegseth*,
    No. 1:25-cv-00415 (D.D.C. Feb. 12, 2025) ........................................................... 12

*Strickland v. Washington*,
    466 U.S. 688 (1984) .............................................................................................. 12, 15

Trial of John Peter Zenger,
    17 Howell's State Trials 675 ...................................................................................... 17

*United States v. Cronic*,
    466 U.S. 648 (1984) .................................................................................................... 13

*United States v. Sineneng-Smith*,
    590 U.S. 371 (2020) .................................................................................................... 14

*Youngstown Sheet & Tube Co. v. Sawyer*,
    103 F. Supp. 569 (D.D.C. 1952) ................................................................................ 17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .................................................................................................... 17

**Court Documents**

Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute ............................ 12

**Executive Orders**

Addressing Risks from Perkins Coie LLP, Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 6,
    2025) ..................................................................................................................... *passim*

Addressing Risks from Paul Weiss, Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 14, 2025)
    .................................................................................................................................. 7, 9

Addressing Remedial Action by Paul Weiss, Exec. Order No. 14244, 90 Fed. Reg. 13685 (Mar.
    21, 2025) ......................................................................................................................... 8

Addressing Risks from Jenner & Block, Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 25,
    2025) ...................................................................................................................... 7, 9, 11

Addressing Risks from WilmerHale, Exec. Order No. 14250, 90 Fed. Reg. 14549 (Mar. 27,
    2025) ...................................................................................................................... 7, 22

**Other Authorities**

3 Diary and Autobiography of John Adams (ed. L. H. Butterfield, 1961) .................................. 18

*ACLU History: Defending Liberty in Times of National Crisis*, ACLU (Sept. 1, 2010) .............. 15

Am. Bar Ass'n Special Comm. on Evaluation of Disciplinary Enf't, *Problems and Recommendations in Disciplinary Enforcement* (1970) ........................................................... 24

Amanda O'Brien & Patrick Smith, *Paul Weiss—and Big Law—Face "An Existential Threat" Amid Intensifying Trump Administration Pressure*, Am. Law. (Mar. 18, 2025, 4:00 AM) ....... 9

Atinuke O. Adediran, *The Relational Costs of Free Legal Services*, 55 Harv. C.R-C.L. L. Rev. 357 (2020) ............................................................................................................................. 15

Baher Azmy, *Lawyers Face an Existential Choice*, Bos. Rev. (Apr. 1, 2025) ........................... 16

*Bar Organizations Support the Rule of Law*, Am. Bar Ass'n (last visited Apr. 6, 2025) ............ 19

*Burger Speaks and Kunstler "Counters,"* N.Y. Times, Sept. 18, 1971 ....................................... 24

Carroll Seron et al., *The Impact of Legal Counsel on Outcomes for Poor Tenants in New York City's Housing Court: Results of a Randomized Experiment*, 35 Law & Soc'y Rev. 419 (2001) .................................................................................................................................. 14

*Committee Reports*, N.Y. City Bar ............................................................................................. 20

Cynthia L. Fountaine, *Complicity in the Perversion of Justice: The Role of Lawyers in Eroding the Rule of Law in the Third Reich*, 10 St. Mary's J. on Legal Malpractice & Ethics 198 (2020) .................................................................................................................................. 20

*Day of the Endangered Lawyer Belarus 2025*, N.Y. City Bar (Jan. 22, 2025) ........................... 20

Debra Cassens Weiss, *Trump Order Targeting Perkins Coie is "Affront to the Constitution," Suit Says*, ABA J. (Mar. 13, 2025, 9:56 AM) .................................................................................. 8

Donald J. Trump (@realDonaldTrump), TruthSocial (Feb. 25, 2025, 8:41 PM) .......................... 7

Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 20, 2025, 6:10 PM) ......................... 8

Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 28, 2025, 1:57 PM) ......................... 9

Donald J. Trump (@realDonaldTrump), TruthSocial (Apr. 1, 2025, 4:47 PM) ............................ 9

Donald J. Trump (@realDonaldTrump), TruthSocial (Apr. 2, 2025, 2:06 PM) ............................ 9

Eugene Huskey, *Between Citizen and State: The Soviet Bar (Advokatura) Under Gorbachev*, 28 Colum. J. Transnat'l L. 95 (1990) ........................................................................................... 21

*Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025) ..................................................................................................... 6, 7

Federal Rule of Appellate Procedure 29(a)(4)(E) ......................................................................... 2

Ingo Müller, *Hitler's Justice: The Courts of the Third Reich* (Deborah Lucas Schneider trans., Harv. Univ. Press 1991) (1987) ............................................................................. 21

James E. Moliterno, *Politically Motivated Bar Discipline*, 83 Wash. Univ. L.Q. 725 (2005) ...................................................................... 22, 23

Jerold S. Auerbach, *Unequal Justice: Lawyers and Social Change in Modern America* (1976) ...................................................................................................................................... 23

*Joint Statement by the International Legal and Human Rights Community on the Actions Against the Istanbul Bar Association*, N.Y. City Bar (Jan. 28, 2025) ................................... 20

Katelyn Polantz, Law Firms are Scared to Speak out Amid Trump's Attacks on Their Livelihood, CNN (Mar. 27, 2025, 5:00 AM) .......................................................... 9

Kathryn Hendley, *Do Lawyers Matter in Russia?*, 2021 Wis. L. Rev. 301 ............................... 21

Kenneth C. H. Willig, *The Bar in the Third Reich*, 20 Am. J. Legal Hist. 1 (1976) ................... 21

Leonard S. Rubinowitz, *The Courage of Civil Rights Lawyers: Fred Gray and His Colleagues*, 67 Case W. Rsrv. L. Rev. 1227 (2017) ............................................................. 24

Letter from Andrea R. Lucas, Acting Chair, U.S. Equal Emp. Opportunity Comm'n, to Perkins Coie LLP (Mar. 17, 2025) ................................................................................ 11

Local Civil Rule 7(o)(5) ........................................................................................................... 2

Louise I. Shelley, *Soviet Defense Counsel: Past as Prologue*, 12 Am. Bar Found. Rsch. J. 835 (1987) (book review) ........................................................................................... 22

Lyle Moran, *Largest Law Firms Charge Nearly $1,000 an Hour, Report Finds*, Legal Dive (Dec. 11, 2023) ................................................................................................................ 15

Matthew Luxmoore, *Navalny Lawyers Sentenced to Years in Prison*, Wall St. J. (Jan. 17, 2025, 9:27 AM) ...................................................................................................... 22

*Memorandum on Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025) ................................................................................... 7, 8, 10

*Memorandum on Security Clearances and Suspension of Government Contracts*, The White House (Feb. 25, 2025) ........................................................................................ 7, 9

Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, Wash. Post (Mar. 25, 2025) ................................................................... 9

Model Rules of Pro. Conduct, Preamble & Scope ................................................................. 9, 10

Model Rules of Pro. Conduct, Rule 1.2 ................................................................................. 11

Model Rules of Pro. Conduct, Rule 1.3 ........................................................ 11

Model Rules of Pro. Conduct, Rule 1.6 ........................................................ 12

Model Rules of Pro. Conduct, Rule 1.7 ........................................................ 11

Model Rules of Pro. Conduct, Rule 1.8 ........................................................ 11

Model Rules of Pro. Conduct, Rule 1.9 ........................................................ 11

Model Rules of Pro. Conduct, Rule 2.1 ........................................................ 11

Model Rules of Pro. Conduct, Rule 3.3 .................................................. 12, 13

Model Rules of Pro. Conduct, Rule 6.1 .......................................................... 9

Ob Advokatskoi Deyatelnosti i Advokature v Rossi'skoi Federatsii [On Work as an Attorney and the Legal Profession in the Russian Federation], Sobranie Zakonodatel'stva Rossiikoi Federatsii [SZ RF] [Russian Federation Collection of Legislation] 2002, No. 63
........................................................................................................................ 22

Orville H. Schell, Jr., et al., Ass'n of the Bar of the City of N.Y., *Report of the Mission of Lawyers to Argentina April 1-7, 1979* (1979) ............................................. 20

Pamela A. Jordan, *Restructuring the Advokatura from Above, 2002-3 in Defending Rights in Russia: Lawyers, the State, and Legal Reform in the Post-Soviet Era* (2005) ........................ 22

Peter Finn, *Russia's Champion of Hopeless Cases Is Targeted for Disbarment*, Wash. Post. (June 2, 2007) ........................................................................... 22

Press Release, U.S. Equal Emp. Opportunity Comm'n, EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices (Mar. 17, 2025) ................................................................................... 7

Pro Bono Inst., *2024 Report on the Law Firm Pro Bono Challenge Initiative* ............................ 15

*Pro Bono*, Laws.' Comm. for C.R. Under L. (last visited Mar. 31, 2025) .................................. 16

Raymond H. Brescia et al., The Legal Needs of Nonprofits: An Empirical Study of Tax-Exempt Organizations and Their Access to Legal Services, 17 Hastings Race & Poverty L.J. 45 (2020)
........................................................................................................................ 15

Robert W. Gordon, *The Independence of Lawyers*, 68 B.U. L. Rev. 1 (1988) ..................... 20, 21

Robert A. Katzmann, *Bench, Bar, and Immigrant Representation: Meeting an Urgent Need*, 15 Leg. & Pub. Pol'y 585 (2012) ....................................................................... 14

Samuel Walker, *The Founding of the American Civil Liberties Union*, 1920, Princeton Univ. Archives (Aug. 1, 2012), ................................................................................... 15

Scott Cummings, *Lawyers in Backsliding Democracy*, 112 Cal. L. Rev. 513 (2024).................. 20

Sherrilyn Ifill, *Trump's Attack on Lawyers and Law Firms Takes a Page Out of the Southern 1950s Playbook* (Mar. 24, 2025)................................................................................... 24

Special Comm. on Courtroom Disorder, Ass'n of the Bar of the City of N.Y., *Disorder in the Court* xiii–xiv (1973) ......................................................................................... 24

*Statement Condemning Threats to Impeach Federal Judges Based on Disagreement with Rulings*, N.Y. City Bar (Mar. 31, 2025)....................................................................... 19

*Statement Expressing Concern Over Uganda's Arrest and Conviction of Human Rights Lawyer Eron Kiiza*, N.Y. City Bar (Jan. 31, 2025)............................................................... 20

Stephen Jones, *A Lawyer's Ethical Duty to Represent the Unpopular Client*, 1 Chap. L. Rev. 105 (1998) .......................................................................................................... 24

*The 2024 Pro Bono Scorecard: National Report*, Am. Law. (July 9, 2024) ............................... 16

The Declaration of Independence (U.S. 1776) ............................................................... 17

*The Federalist No. 51* (James Madison) (Jacob E. Cooke ed., 1961).......................................... 16

*The Federalist No. 78* (Alexander Hamilton) (Jacob E. Cooke ed., 1961)........................... 16, 17

Traci Yoder, Nat'l Law.'s Guild, *Breach of Privilege: Spying on Lawyers in the United States* (2014)......................................................................................................... 24

William R. Bay, *The ABA Rejects Efforts to Undermine the Courts and the Legal Profession*, Am. Bar Assoc. (Mar. 3, 2025)............................................................................... 19

William O. Douglas, *The Black Silence of Fear*, N.Y. Times Mag., Jan. 13, 1952, https://perma.cc/829P-8E4C ...................................................................... 23, 24

William C. Hubbard, *Our Justice System at an Inflection Point*, 2017 Wis. L. Rev 1................. 24

Andreas Bilinsky, *The Lawyer and Soviet Society, Probs. of Communism*, March–April 1965.................................................................................................... 20

**INTRODUCTION**

*Amici* are bar associations across the country who write to oppose the executive branch's assault on the independence of the legal profession. An attack on lawyers' independence is an attack on constitutional democracy and the rule of law. By retaliating against law firms for representing disfavored parties and advocating for disfavored positions, the executive branch's actions undermine the bar's role as an independent safeguard of the legal system.

Coercing lawyers to replace their loyalty to clients with loyalty to the President would deprive clients of effective and ethical legal representation. Without vigorous advocacy by lawyers independent of the executive, the judiciary is unable to fulfill its constitutional role of checking unlawful action in our system of separated powers. It erodes the strength of our adversarial system and thus diminishes the proper functioning of the judiciary on which the rule of law itself depends.

Undermining the bar's independence has historically been a key step on the road to authoritarianism. The retaliatory executive orders echo strategies that have weakened the rule of law at critical moments in other countries. Authoritarian governments have dismantled the independence of the legal profession, converting it into a political instrument by punishing "unreliable" lawyers and institutionalizing party loyalty. By silencing dissent, these regimes vitiated adversarial representation and deprived citizens of protection from government abuse. *Amici* urge the Court to rule as unconstitutional the retaliation that the Perkins Coie Order directs executive officials to undertake and enjoin its enforcement.

## INTEREST OF *AMICI CURIAE*[1]

*Amici* bar associations focus their efforts on, among other things, protecting the role and professional standards of the legal profession. Their members include attorneys at firms the executive branch has specifically targeted and attorneys at other firms and legal service programs who are chilled in the exercise of their constitutional rights and professional duties by a fear of being similarly targeted next.

### *Metropolitan Bar Associations:*

The **New York City Bar Association** ("City Bar")[2] is one of the nation's oldest bar associations. Founded in 1870 and with approximately 23,000 members throughout the world, its mission is to help a diverse legal profession practice with excellence, promote legal reform, and uphold the rule of law and access to justice. The City Bar submits this brief as *amicus curiae* because it believes the executive branch's actions against Perkins Coie and other law firms are not just plainly illegal; they threaten the independence of the legal profession, the integrity of our adversarial legal system, the independence of the judiciary, and the rule of law itself.

The **Boston Bar Association** ("BBA") is a volunteer organization of over 15,000 members drawn from private practice, corporations, government agencies, legal-aid organizations, the courts, and law schools. Its mission is to advance the highest standards of excellence for the legal profession, facilitate access to justice, serve the community at large, and promote diversity, equity, and inclusion in the legal profession. The BBA's interest here is in preserving the rule of law, for which the bar bears a special responsibility.

---

[1] Pursuant to Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amici curiae* certify that *amici* no counsel for a party authored this brief in whole or in part, and no person other than *amici*, their members, or their counsel made a monetary contribution to the brief's preparation or submission.

[2] The City Bar is listed first as it coordinated the preparation of this brief.

The **Chicago Bar Association** ("CBA") was founded in 1874 and is one of the oldest and most active metropolitan bar associations in the United States, with more than 15,000 members from across the legal profession. The CBA is focused on maintaining the honor and dignity of the legal profession, cultivating relationships between members, and promoting the administration of justice. The CBA submits this brief as *amicus curiae* because Executive Orders targeting law firms based on their representation of clients in matters adverse to members of the current Administration violate the fundamental tenets of our nation's legal system.

The **Denver Bar Association** is a voluntary organization dedicated to supporting legal professionals and firmly committed to advancing equity in the legal profession. It joins this brief in opposition to the executive branch's ongoing attempts to intimidate attorneys and undermine the legal profession—efforts that jeopardize equal justice and the integrity of our legal system.

The **King County Bar Association** ("KCBA") serves an area that includes Seattle and surrounding municipalities, and has over 4,500 members. The KCBA was founded in 1886, when a group of Seattle attorneys intervened in a mob effort to forcibly remove Chinese workers from Seattle. Today, the KCBA's mission is to connect and serve the diverse legal community, promote professional and judicial excellence, engage in public policy, and increase access to justice.

The **Los Angeles County Bar Association** ("LACBA"), founded in 1878, is one of the largest voluntary metropolitan bar associations in the country. LACBA's mission is to meet the professional needs of Los Angeles lawyers, advance the administration of justice, and protect our system of governance based on three co-equal and independent branches of government. LACBA condemns recent attacks on the rule of law and the independence of the judiciary and the legal profession. It joins this brief to prevent rule of law from devolving into a partisan issue.

The **Philadelphia Bar Association** is the oldest metropolitan bar in the United States, and with almost 9,000 members across all segments of the legal profession, is the largest bar association in eastern Pennsylvania. Commitment to liberty and justice for all lies at the heart of the Association's mission, which is to serve the profession and the public by promoting justice, professional excellence, and respect for the rule of law.

The **San Diego County Bar Association**, established in 1899 and consisting of over 6,000 members, works to enhance the legal system, promote justice, and uphold professional excellence and respect for the law, while serving both the public and the legal community.

*Affinity, Specialty, Regional and Local Bar Associations:*

The **Asian American Bar Association of the Greater Bay Area** ("AABA") is the largest local Asian American bar association in the country, and one of the largest minority bar associations in California. AABA joins this brief consistent with its founding values of civil rights, representation, and equality, and its longstanding advocacy of Asian Americans and Pacific Islanders in the legal profession, and to affirm the principles of the rule of law and the independence of the judiciary and of the legal profession.

The **Brehon Law Societies of New York City and Nassau County**, through their members, work to safeguard human rights and the rule of law principally—but not exclusively— on the island of Ireland. They join this brief to stand against the administration's efforts to impose its political will on the legal profession and hinder representation of clients who lack equal political might.

The **Bar Association of Erie County** ("BAEC"), founded in 1887, is made up of over 3,000 lawyers and jurists from varied practices and backgrounds. The BAEC's values are respect for the rule of law, civility, inclusion, integrity, leadership and equity. The BAEC joins this brief

to denounce the executive branch's actions against Perkins Coie and other law firms as an abuse of power and an undemocratic attack upon the legal profession, judiciary, and rule of law.

The **Garden State Bar Association** ("GSBA"), established in 1975, is New Jersey's oldest and largest professional organization for African-American judges, lawyers, and law students. The GSBA provides opportunities for attorneys to collectively tackle challenges that improve the lives of minorities. The GSBA joins this brief to uphold the rule of law and ensure equal access to justice for all individuals.

The **Metropolitan Black Bar Association** ("MBBA") is a unified, citywide organization of lawyers across New York City's five boroughs, and the largest association of Black attorneys in New York State. With members spanning all sectors of the legal profession, the MBBA is committed to upholding justice, advancing the legal profession, and safeguarding the rule of law and the integrity of our democratic institutions. In accordance with its respect for judicial independence, judges on the MBBA Board of Directors recused themselves from all discussions or decisions regarding this brief.

The **Monroe County Bar Association** ("MCBA"), originally established in 1892 as the Rochester Bar Association, is dedicated to advancing justice, promoting public understanding of the law, and supporting the professional growth, excellence, collegiality, and diversity of its members. As a strong advocate for the legal profession, the MCBA plays an active role in collaboration with bar associations across New York State and the country.

The **Muslim Bar Association of New York** ("MuBANY") is one of the nation's largest and most active professional associations for Muslim lawyers. MuBANY supports the Muslim community by promoting education, protecting civil rights, and fostering full, fair, and equal representation of Muslims in American society. MuBANY stands in solidarity with the legal

community in condemning the executive orders, which represent a clear overreach of executive power and a direct assault on the independence of the judiciary and the rule of law.

The **Women's Bar Association of the State of New York** ("WBASNY") is the largest statewide women's bar association in the country and the second largest statewide bar in New York, with more than 4,000 attorney members practicing in every area of the law. WBASNY's first Chapter was incorporated in 1918, before women achieved the right to vote. Its mission is to ensure the fair and equal administration of justice; advocate for the advancement of the status of women; support diversity, equity and inclusion in society; and act as a unified voice for its members on issues of statewide, national, and international significance.

## ARGUMENT

### I. <u>This Executive Order Threatens the Independence of the Bar</u>.

*A. This Executive Order and related executive actions threaten to turn the bar into an instrument of the executive branch.*

As retribution for providing legal representation to the President's political opponent, Executive Order No. 14320 is calculated to coerce a law firm into submission to the President. *See* Addressing Risks from Perkins Coie LLP, Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 6, 2025) (hereinafter "the Order"). The Order saddles Perkins Coie with crippling regulatory, professional, and financial consequences. It impairs the firm's ability to represent its clients, causes hefty monetary losses, and smears the firm's reputation. And it displays the public punishment as an example for all to see, to discourage other lawyers from daring to provide legal advocacy of which the President disapproves.

The Order's stated purpose is to address what it deems "egregious activity," namely, the firm's representation of the President's political opponent in the 2016 election. The related Fact Sheet alleges "unethical" actions that include "fil[ing] lawsuits against the Trump Administration."

*Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025), https://perma.cc/6SNY-476F. This retaliation against Perkins Coie for representing clients is part of a broader effort to coerce the legal profession into serving the President's agenda. To date, the President has directly targeted six firms,[3] each one selected explicitly because of that firm's association with his perceived opponents: Covington & Burling for representing former Special Counsel Jack Smith;[4] Paul Weiss for hiring an attorney who assisted the Manhattan DA's investigation of President Trump; Elias Law Group, like Perkins Coie, for representing Hillary Clinton; Jenner & Block for hiring an attorney who worked with former Special Counsel Robert Mueller; and WilmerHale for employing Mueller. The Equal Employment Opportunity Commission ("EEOC") has demanded from twenty law firms detailed personal information on the firms' lawyers as well as attorney-client communications. Press Release, U.S. Equal Emp. Opportunity Comm'n, EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices (Mar. 17, 2025). And the President has threatened law firms and attorneys more broadly with retaliatory action for any "litigation against the United States" that the Attorney General deems "frivolous, unreasonable, and vexatious." *Memorandum on Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025), https://perma.cc/4J64-TSFG.

---

[3] *See Memorandum on Security Clearances and Suspension of Government Contracts*, The White House (Feb. 25, 2025), https://perma.cc/X5YA-HCDF (Covington & Burling); Addressing Risks from Paul Weiss, Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 14, 2025); Addressing Risks from Perkins Coie LLP, Exec. Order No. 14320, 90 Fed. Reg. 11781 (Mar. 6, 2025); *Memorandum on Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025), https://perma.cc/4J64-TSFG (Elias Law Group); Addressing Risks from Jenner & Block, Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 25, 2025); Addressing Risks from WilmerHale, Exec. Order No. 14250, 90 Fed. Reg. 14549 (Mar. 27, 2025).

[4] When signing this executive order, President Trump remarked: "Who would like this pen? Why don't you send it to Jack Smith. A deranged person." *See* Donald J. Trump (@realDonaldTrump), TruthSocial (Feb. 25, 2025, 8:41 PM), https://tinyurl.com/kpu87ea5.

These measures move to co-opt law firms to become instruments of the executive branch, working on behalf of the President's interests and policies, rather than as officers of the courts. That purpose is evident from his rescission of a similar executive order targeting Paul Weiss in exchange for its agreement to, among other things, provide $40 million in pro bono services "to support the Administration's initiatives," as the President put it. Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 20, 2025, 6:10 PM), https://perma.cc/F9MT-6AKE. If Perkins Coie were similarly to "change . . . course," "acknowledge[] the wrongdoing" of its attorneys, and "agree[] to a number of policy changes," Addressing Remedial Action by Paul Weiss, Exec. Order No. 14244, 90 Fed. Reg. 13685 (Mar. 21, 2025)—that is, commit to furthering the President's agenda—it too may get out from under the executive order targeting the firm. But that would mean acquiescing to the President's demands at the expense of the firm's right to represent the clients it chooses and fiercely advocate for the clients' interests. The threats impose a vicious cycle of coercion on firms. Those who agree to certain terms to lift an executive order remain captive to the threat of a follow-on order if the President decides the firm stepped out of line.

Altogether, the executive orders inflict, in this Court's words, "a chilling harm of blizzard proportions across the legal profession." Debra Cassens Weiss, *Trump Order Targeting Perkins Coie is "Affront to the Constitution," Suit Says*, ABA J. (Mar. 13, 2025, 9:56 AM), https://perma.cc/Z42L-K4YY. Lawyers are being forced to decline representation of politically disfavored clients for fear of reprisal. Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, Wash. Post (Mar. 25, 2025), https://perma.cc/4U6D-NDY3. Attempting to forestall a targeted executive order, several firms have preemptively struck deals that each include a promise to devote $100 million of the firm's pro bono legal services to "causes"

that the President and the firm "both support."[5] The President gloated about firms submitting to

him: "They're all bending and saying, 'Sir, thank you very much. . . . Where do I sign? Where do

I sign?'" *See* Katelyn Polantz, *Law Firms are Scared to Speak out Amid Trump's Attacks on Their

Livelihood*, CNN (Mar. 27, 2025, 5:00 AM), https://perma.cc/3LD9-8M9Y. The strong incentive

for a firm to enter a preemptive agreement to save their business exemplifies the pressure bearing

on all firms to engage in anticipatory compliance to avoid angering the President.

The President has pressured law firms to cease advocating for positions and undertaking

pro bono representation that he disfavors.[6] Such pro bono representation is a pillar of our legal

system.[7] With lawyers cowed into submission and uncooperative firms putting their businesses at

risk,[8] parties seeking to check executive overreach and many pro bono clients will not have

---

[5] The President has made agreements with Skadden, *see* Donald J. Trump (@realDonaldTrump), TruthSocial (Mar. 28, 2025, 1:57 PM), https://perma.cc/XF7M-CGTL, Willkie Farr, *see* Donald J. Trump (@realDonaldTrump), TruthSocial (Apr. 1, 2025, 4:47 PM), https://perma.cc/KU2R-6LN4, and Milbank, *see* Donald J. Trump (@realDonaldTrump), TruthSocial (Apr. 2, 2025, 2:06 PM), https://perma.cc/5EBU-AHGY.

[6] *See* Addressing Risks from Perkins Coie LLP, 90 Fed. Reg. at 11781 (targeting Perkins Coie based on advocacy against certain election laws); Addressing Risks from Paul Weiss, 90 Fed. Reg. at 13039 (targeting Paul Weiss based on representation of the District Columbia in a civil suit against groups involved in the events of January 6, 2021); Addressing Risks from Jenner & Block, 90 Fed. Reg. at 13997 (targeting Jenner & Block based on advocacy for immigrants and transgender individuals); Addressing Risks from WilmerHale, 90 Fed. Reg. at 14250 (targeting WilmerHale based on advocacy for immigrants); *Memorandum on Security Clearances and Suspension of Government Contracts*, *supra* note 2 (targeting Covington & Burling for representing Jack Smith during his time as Special Counsel).

[7] The Model Rules of Professional Conduct direct "lawyer[s] [to] seek improvement of the law, access to the legal system, the administration of justice and the quality of service rendered by the legal profession." Model Rules of Pro. Conduct, Preamble & Scope (Am. Bar. Ass'n 2023). Pro bono work is a key mechanism through which law firms effectuate this duty. Model Rule 6.1 states that "[e]very lawyer has a professional responsibility to provide legal services to those unable to pay" and encourages lawyers to provide at least 50 hours of pro bono legal services annually. *Id*. r. 6.1.

[8] *See* Amanda O'Brien & Patrick Smith, *Paul Weiss—and Big Law—Face "An Existential Threat" Amid Intensifying Trump Administration Pressure*, Am. Law. (Mar. 18, 2025, 4:00 AM), https://perma.cc/94UT-Y27M (quoting Steve Bannon stating, "[W]e are trying to . . . put [major law firms] out of business and bankrupt [them]").

effective legal representation. Because of the March 22 memorandum in particular, immigrants will struggle even more than they do now to secure any legal representation.[9] *Cf. NAACP v. Button*, 371 U.S. 415, 443 (1963) (noting that civil rights plaintiffs in the South faced "an apparent dearth of lawyers . . . willing to undertake such litigation"). The retaliation and coercion campaign weakens legal advocacy for clients the President opposes, whether on immigration or otherwise, and co-opts lawyers to further the executive's policy preferences. This turns the bar into an instrument of the executive branch and undermines people's right to have their claims fairly adjudicated in court.

   *B. The executive orders encumber lawyers from performing their ethical duties to their clients and the profession.*

   The executive orders impair lawyers' ability to adhere to ethical rules that govern the practice of law. They constitute broadscale executive interference with individual attorney-client relationships, placing lawyers in the irreconcilable position of choosing between maintaining the duty of loyalty to the client and avoiding costly presidential reprisals.[10] The orders also threaten

---

   [9] As noted above, the March 22 memorandum directs the Attorney General and the Secretary of Homeland Security to take disciplinary and punitive action against attorneys their agencies oppose in judicial proceedings, with a particular focus on immigration lawyers and organizations that challenge federal immigration policies. It accuses immigration attorneys and pro bono lawyers representing asylum seekers of engaging in what the Administration deems "unscrupulous behavior," and chills their representation. *Memorandum on Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025), https://perma.cc/4J64-TSFG.

   [10] The Model Rules of Professional Conduct underscore a lawyer's duty of loyalty to the client in various provisions. *See, e.g.*, Model Rules of Pro. Conduct r. 1.7(a) (Am. Bar Ass'n 1983) ("[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest."); *id.* r. 1.8(a) (subject to limited exceptions, "[a] lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possession, security or other pecuniary interest adverse to a client"); *id.* r. 1.8(b) ("A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent."); *id.* r. 1.9 (enshrining lawyers' duties even to their former clients).

the independent professional judgment that lawyers are expected to offer their clients.[11] Fear of retaliation muzzles a lawyer's full-throated legal advocacy for a client, particularly if the client's interest challenges the government's position.[12] Moreover, the orders require firms to assess whether their work for a client conflicts with an undefined set of national "interests," pressuring lawyers to downplay strategic objectives of clients that may conflict with those of the executive branch.[13] Lawyers and clients in some circumstances are thus hamstrung in carrying out the full scope and aims of the representation.[14] The danger is concrete and immediate; the targeted firms are presently representing clients in multiple matters that are conceivably adverse to the President's policy agenda.[15] Presidential retaliation casts an ethical shadow over this work, placing direct

---

[11] *See id.* r. 2.1 ("In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation.").

[12] This also counteracts the principle established in Model Rule 1.3 by limiting the extent to which lawyers can act with commitment and dedication to their client's interests. *See id.* r. 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client.").

[13] *E.g.*, Addressing Risks from Jenner & Block, 90 Fed. Reg. at 13997 (criticizing Jenner & Block for "engag[ing] in activities" through its pro bono practice that, in the President's view, "undermine . . . the *interests of the United States*" (emphasis added)).

[14] Model Rules of Pro. Conduct r. 1.2(a) (Am. Bar Ass'n 1983) ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation."). Relatedly, Model Rule 1.2(b) stipulates that "[a] lawyer's representation of a client . . . does not constitute endorsement of the client's political, economic, social or moral views or activities." *Id.* r. 1.2(b). The executive orders undermine this norm by punishing firms like Perkins Coie for the clients it has represented (namely Democratic agents or voting rights organizations), supporting a proscribed assumption that legal representation equates to political endorsement. *See* Addressing Risks from Perkins Coie LLP, 90 Fed. Reg. at 11781 § 1.

[15] *See, e.g.*, *Shilling v. United States*, No. 2:25-cv-00241, 2025 WL 926866 (W.D. Wash. Mar. 27, 2025) (Perkins Coie representing plaintiffs challenging executive order banning transgender people from serving in the military); *Pacito v. Trump*, No. 2:25-cv-00255, 2025 WL 893530 (W.D. Wash. Mar. 24, 2025) (Perkins Coie representing plaintiffs challenging changes to refugee resettlement policy); *Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-00698 (D.D.C. Mar. 18, 2025) (Jenner & Block representing plaintiff in challenge to EPA's freezing and subsequent termination of grant funds intended for clean energy projects); *PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 685124 (D. Md. Mar. 4, 2025) (Jenner & Block representing

pressure on attorneys to alter their advocacy in violation of core ethical duties. A bar that is dependent on the President will confront a conflict between advancing clients' interests and serving the President's conception of the "national interest." This conflict undermines the right to counsel. *Cf. Strickland v. Washington*, 466 U.S. 668, 692 (1984) (a conflict of interest that inhibits a lawyer's effective representation is presumed to be prejudicial).

Additionally, the executive orders risk erosion of attorney-client confidentiality.[16] Many clients do not publicly disclose their relationship with a firm when dealing with the federal government. Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute ¶148. But the Order compels clients to disclose to the federal government confidential information about their engagement of Perkins Coie, exposing them to the risk of termination of their government contracts. The Order, 90 Fed. Reg. at 11781 ("Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Perkins Coie . . . ."). The EEOC letters also explicitly demand that firms provide protected attorney-client communications.[17]

Moreover, the executive orders subvert lawyers' duty of candor to the tribunal, which plays a critical function in our adversarial legal system.[18] The judiciary relies on lawyers to bring cases,

---

plaintiffs challenging executive orders restricting access to gender-affirming medical care for transgender youth); *Storch v. Hegseth*, No. 1:25-cv-00415 (D.D.C. Feb. 12, 2025) (WilmerHale representing inspectors general fired by the administration).

[16] *See* Model Rules of Pro. Conduct r. 1.6(a) (Am. Bar Ass'n 1983) ("A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation or the disclosure is permitted by paragraph (b).").

[17] *See, e.g.*, Letter from Andrea R. Lucas, Acting Chair, U.S. Equal Emp. Opportunity Comm'n, to Perkins Coie LLP 8–9 (Mar. 17, 2025), https://perma.cc/PTX8-5BUP (requiring information on clients' diversity-related requests).

[18] Model Rules of Pro. Conduct r. 3.3(a)(2) (Am. Bar Ass'n 1983) ("A lawyer shall not knowingly . . . fail to disclose to the tribunal legal authority in the controlling jurisdiction known

lay out pertinent facts, and make legal arguments based on those facts. Attorneys are required to speak truthfully to courts and not withhold material facts or controlling law.[19] But when the executive branch penalizes law firms for representing particular clients or causes, it creates an environment where the lawyer's duty of candor to the court must compete with the lawyer's fear of retaliation. A lawyer may hesitate to be fully candid if candor risks inviting retribution. The resulting temptation for lawyers—to mute facts, soft-pedal arguments, and engage in self-censorship—forces a perverse ethical conflict: fulfill their duty to the court and risk harm from the executive, or temper their candor to shield themselves and their clients from that harm.

## II.    <u>An Independent Bar is Necessary for the Rule of Law</u>.

*A. An independent bar enables the proper functioning of our judicial system.*

Executive actions that create a punitive atmosphere for lawyers around disfavored clients and cases undermine the integrity of the judicial process. In our adversarial system, the truth is uncovered through close scrutiny of the facts and robust cross-examination. From there, the court reaches legal conclusions by a neutral and impartial evaluation of arguments the lawyers make in zealously representing their clients' interests.

The judicial role is premised on this adversarial system of testing factual and legal arguments. As the Supreme Court has repeatedly reinforced, "[a]n informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001); *see also United States v. Cronic*, 466 U.S. 648, 655 (1984) ("The very premise of our adversary system . . . is that partisan advocacy on both sides of a case will best promote the ultimate objective." (citation omitted)); *Penson v. Ohio*, 488 U.S. 75, 84 (1988) ("The paramount

---

to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel.").

[19] *Id*. r. 3.3(a)(1), (2).

importance of vigorous representation follows from the nature of our adversarial system of justice."). Permitting the executive branch to exert control over the interests and arguments that lawyers present to courts undermines the judiciary's ability to fulfil its role. By chilling legal representation that the President disfavors, the executive orders impede the proper functioning of our judicial system.

As a concrete example, courts in our adversarial system are constrained by a principle of party presentation, meaning that they "rely on the parties to frame the issues for decision." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). Just as courts cannot go out "looking for wrongs to right," they also cannot "advance[] the facts and arguments entitling [a litigant] to relief." *See id.* at 375–76 (citations omitted). Courts are generally constrained by the facts and arguments advanced by the parties, who rely on their counsel to present full, accurate, and vigorous arguments on the parties' behalf. *Id*. Pressure on lawyers to refrain from representing certain parties, or from making certain arguments in court, distorts and limits the judicial process.

The stakes of distorting the adversarial system are high. It threatens to impede the vindication of legal rights and liberties, which are meaningfully protected only when legal advocacy enables a party to assert those rights in a legal forum. *See* Carroll Seron et al., *The Impact of Legal Counsel on Outcomes for Poor Tenants in New York City's Housing Court: Results of a Randomized Experiment*, 35 Law & Soc'y Rev. 419, 428 tbl. 4 (2001) (finding that representation more than doubles a tenant's likelihood of legal success); Robert A. Katzmann, *Bench, Bar, and Immigrant Representation: Meeting an Urgent Need*, 15 Leg. & Pub. Pol'y 585, 593–94 (2012) (finding represented immigrants to be more than five times as likely to prevail). The deprivation

of legal representation is often equivalent to a deprivation of substantive rights. *Cf. Strickland*, 466 U.S. at 692 (denial of counsel in criminal prosecution "is legally presumed to result in prejudice").

Law firms play a crucial role in preserving adversarial justice by litigating to assert legal rights and prevent abuses of government power. Historically, nonprofit legal organizations have played a leading role in representing unpopular clients. Insulated by design from the same financial pressures to which law-firm businesses are subject, legal nonprofits are especially well positioned to represent disfavored interests and parties. For example, in direct response to the "Palmer raids" under the Espionage Act of 1917 and the Sedition Act of 1918, the National Civil Liberties Bureau and American Civil Liberties Union defended parties whom other lawyers would not. *ACLU History: Defending Liberty in Times of National Crisis*, ACLU (Sept. 1, 2010), https://perma.cc/4ZAD-SVBZ; Samuel Walker, *The Founding of the American Civil Liberties Union, 1920*, Princeton Univ. Archives (Aug. 1, 2012), https://perma.cc/9YVL-52KM.

But advocacy to protect legal rights cannot rest solely on nonprofits. In 2023, large law firms provided over five million hours (equivalent to nearly $5 billion) of pro bono legal services.[20] Indeed, the work of modern legal nonprofits often involves massive contributions of pro bono work from for-profit law firms and their attorneys.[21] For instance, the Lawyers' Committee for Civil Rights Under Law states that its work "would be severely limited" without law firms' pro

---

[20] *See* Pro Bono Inst., *2024 Report on the Law Firm Pro Bono Challenge Initiative* 1, https://perma.cc/WC9C-JLSV; Lyle Moran, *Largest Law Firms Charge Nearly $1,000 an Hour, Report Finds*, Legal Dive (Dec. 11, 2023), https://perma.cc/ZJ5L-XB8R.

[21] *See* Atinuke O. Adediran, *The Relational Costs of Free Legal Services*, 55 Harv. C.R-C.L. L. Rev. 357, 359 (2020) (noting that in some years, the estimated value of pro bono work by private firms roughly doubled congressional funding for civil legal services); Raymond H. Brescia et al., *The Legal Needs of Nonprofits: An Empirical Study of Tax-Exempt Organizations and Their Access to Legal Services*, 17 Hastings Race & Poverty L.J. 451, 473 tbl. 5 (2020) (2020 survey of tax-exempt organizations reports 90% of respondents relied wholly or partly on free legal services).

15

bono attorneys, estimating that its active case docket would shrink from about eighty matters down to twenty at any given time. *Pro Bono*, Laws.' Comm. for C.R. Under L., https://perma.cc/7QC7-2EXQ (last visited Mar. 31, 2025). And the legal director of the Center for Constitutional Rights, which mobilized private law firms such as those subject to the executive orders to represent detainees at Guantanamo Bay, has implored that "civil society organizations . . . are tired, overworked, and underpaid," and that "[c]ivil society needs Big Law more than ever, just as Big Law—and the country—needs civil society more than ever." Baher Azmy, *Lawyers Face an Existential Choice*, Bos. Rev. (Apr. 1, 2025), https://perma.cc/GQ86-LEA8. Notably, the President took action against *the top three* big law firm providers of pro bono services. *See The 2024 Pro Bono Scorecard: National Report*, Am. Law. (July 9, 2024), https://perma.cc/R2LJ-B6TS (Jenner & Block, Covington & Burling, and WilmerHale). By coercing law firms, the President severely limits even legal nonprofits' ability to represent interests he disfavors.

> *B. An independent judiciary is necessary for our constitutional system of checks and balances.*

The Constitution provides for an independent judiciary to check the unlawful action of the political branches. The distribution of power among the branches "is designed to preserve the liberty of all the people." *Collins v. Yellen*, 594 U.S. 220, 245 (2021). That separation is maintained when "each department [has] a will of its own." *The Federalist No. 51*, at 348 (James Madison) (Jacob E. Cooke ed., 1961). For that reason, the Constitution entrusts each branch with the means "to resist encroachments of the others." *Id.* at 349. The judiciary's "complete independence" is "peculiarly essential" to this scheme of limited governmental power, *The Federalist No. 78*, *supra*, at 524 (Alexander Hamilton), because without an independent authority to judge the constitutionality of their acts, the political branches could trample constitutional limits on government. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). The judiciary's

constitutional means to enforce the separation of powers consists of "merely judgment." *The Federalist No.* 78, *supra*, at 523. And it cannot exercise that judgment without the assistance of litigants. Thus, it is imperative to protect litigants' ability to present the judiciary with cases, without which the judiciary is powerless to resist encroachments by Congress or the President.

Consider, for instance, law firms' representation of clients in many cases that have permitted the judiciary to enforce the separation of powers, including to:

- Prevent the President from seizing part of the legislative power, thus protecting private entities' liberty against executive seizure, *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89 (1952) (steel producers represented by, inter alia, Covington & Burling, *see Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 571 (D.D.C. 1952));

- Prevent Congress from stripping the judiciary's power to hear, and petitioners' right to assert, certain habeas petitions, *see Boumediene v. Bush*, 128 S. Ct. 2229, 2244–47 (2008) (habeas petitioners represented by, inter alia, WilmerHale and Covington & Burling, *id.* at 2239);

- Protect state courts' power to subject state legislatures' laws governing federal elections to judicial review, and thus protecting voters' interest in challenging an alleged partisan gerrymander, *see Moore v. Harper*, 143 S. Ct. 2065, 2079–81 (2023) (voter plaintiffs represented by, inter alia, Jenner & Block and Elias Law Group, *id.* at 2073).

These are just a few examples of past cases brought with the assistance of the law firms that the President is now retaliating against. Had lawyers been deterred by fear of retribution by either the executive or the legislature for legally challenging their authority, the judiciary would have been powerless to enforce the constitutional bounds at issue.

In designing constitutional checks and balances, the Framers recognized the importance of an independent bar in enabling the judiciary to repel encroachments on liberty. The colonial legal system was dependent on the King's will. The Declaration of Independence para. 11 (U.S. 1776). "Particularly fresh in [the Framers'] minds" was the case of two lawyers summarily disbarred by the royal court in apparent retaliation for representing a newspaper publisher who had printed insults to "'the dignity of his majesty's government.'" *Cohen v. Hurley*, 366 U.S. 117, 140 & n.18 (1961) (Black, J., dissenting) (quoting Trial of John Peter Zenger, 17 Howell's State Trials 675).

17

The King's will flowed through the King's courts to the bar, punishing lawyers who resisted that will. The Framers were "singularly unimpressed" by that model and thus created a constitution that protected the courts from control by the executive, and provided procedural rights to prevent abuses like those inflicted on lawyers who represented interests disfavored by the King. *See id.* at 141. John Adams, reflecting on the inability of the British soldiers accused of perpetrating the Boston Massacre to secure representation until he agreed to serve as counsel, understood his representation to demonstrate the importance of an independent bar to the preservation of liberty. 3 Diary and Autobiography of John Adams 293 (ed. L. H. Butterfield, 1961) (explaining that in a free country no accused person should lack counsel and that "the Bar ought in my opinion to be independent and impartial at all Times And in every Circumstance"). Lawyer-Framers like Adams were keenly aware that in declaring independence, they were rejecting a system of courts and lawyers dominated by the executive.

The American judiciary has long recognized that an independent bar is necessary to its own ability to check the other branches and protect liberty. Declaring unconstitutional Congress's attempt to legislate the qualifications of lawyers, the Supreme Court reasoned that the admission of an attorney to the bar "is the exercise of judicial power." *Ex parte Garland*, 71 U.S. 333, 378–79 (1866). "Attorneys and counsellors are not officers of the United States; . . . [t]hey are officers of the court." *Id.* at 378. The Court again protected an independent bar in considering whether Congress could prevent lawyers who received federal funds for indigent legal aid from challenging welfare statutes as unconstitutional. *Velazquez*, 531 U.S. at 536–37, 539. Congress sought to "prohibit[] speech and expression upon which courts must depend for the proper exercise of the judicial power." *Id.* at 545. The Court concluded that it was unconstitutional "to exclude from litigation those arguments and theories Congress finds unacceptable but which by their nature are

within the province of the courts to consider." *Id.* at 546. By protecting lawyers' freedom to bring constitutional claims, the Court protected the judiciary's ability to fulfill its own constitutional role as well as the rights of clients to assert those claims.

Just as the independent judiciary has defended the independent bar, so too has the bar defended the judiciary. In the face of recent calls for impeachment of, and even physical threats to, judges for ruling against the executive branch, the New York City Bar Association declared its support for the judiciary, noting that the current attacks on judges and threats to impeach them "ignore . . . history and the settled interpretation of Congress's impeachment power, and instead threaten judges with impeachment merely for ruling adversely to the positions taken by the current Administration." *Statement Condemning Threats to Impeach Federal Judges Based on Disagreement with Rulings*, N.Y. City Bar (Mar. 31, 2025), https://perma.cc/4JPN-AKJR. And the president of the American Bar Association declared that it would "defend our courts" and called on "every lawyer to do the same." William R. Bay, *The ABA Rejects Efforts to Undermine the Courts and the Legal Profession*, Am. Bar Ass'n (Mar. 3, 2025), https://perma.cc/5DRU-N227.[22] That mutual support between the courts and the bar, each for the other's independence, is not for the sake of independence as an end in itself; it is necessary for the system of checks and balances that preserves liberty.

*C. History has shown the necessity of an independent legal profession.*

Other countries' experiences have confirmed John Adams's theory of connecting an independent bar to liberty. In countries that have experienced the erosion of democratic governance, elected leaders seeking to consolidate power often began by threatening

---

[22] Dozens of bar organizations around the country and the world have issued similar statements defending the principles of the rule of law. *See Bar Organizations Support the Rule of Law*, Am. Bar Ass'n, https://perma.cc/2MKC-8YNL (last visited Apr. 6, 2025).

uncooperative lawyers with professional exile. *See* Scott Cummings, *Lawyers in Backsliding Democracy*, 112 Cal. L. Rev. 513, 527, 534 (2024) (explaining that professional erosion, which occurs when "critical democratic functions performed by lawyers weaken over time," is both a "product and producer of [democratic] backsliding"). Threatening lawyers' livelihood and standing in the profession intimidates and suppresses opposition while co-opting lawyers into providing a façade of legality for government actions.[23] The Order's attempt to instrumentalize the legal profession for the President's ends employs these strategies.

To vindicate legal rights, lawyers must be able to assert clients' legal interests free from government control. Such a legal system stands in contrast to a regime that coerces lawyers to act on behalf of the state's political interests. *See* Robert W. Gordon, *The Independence of Lawyers*, 68 B.U. L. Rev. 1, 11 (1988). One salient example is 1930s Germany, where the legal profession was stripped of independence and brought within the dominion of the Third Reich. By 1933, the government had institutionalized the removal of opponents and installation of sympathizers, purging from the profession attorneys whom the government deemed politically unreliable. Cynthia L. Fountaine, *Complicity in the Perversion of Justice: The Role of Lawyers in Eroding the Rule of Law in the Third Reich*, 10 St. Mary's J. on Legal Malpractice & Ethics 198, 220–24 (2020). In 1936, the German government replaced a statute establishing an independent bar with a code

---

[23] *Amicus* City Bar has had a longstanding commitment to protecting the independence of lawyers abroad. *See generally Committee Reports*, N.Y. City Bar, https://perma.cc/HLZ8-4W3N (listing dozens of reports, statements, and letters on the importance of an independent bar, *e.g.*, *Joint Statement by the International Legal and Human Rights Community on the Actions Against the Istanbul Bar Association*, N.Y. City Bar (Jan. 28, 2025), https://perma.cc/N89V-DXUW; *Day of the Endangered Lawyer Belarus 2025*, N.Y. City Bar (Jan. 22, 2025), https://perma.cc/54MR-W2A7; *Statement Expressing Concern Over Uganda's Arrest and Conviction of Human Rights Lawyer Eron Kiiza*, N.Y. City Bar (Jan. 31, 2025), https://perma.cc/MX4N-CGWJ; Orville H. Schell, Jr., et al., Ass'n of the Bar of the City of N.Y., *Report of the Mission of Lawyers to Argentina April 1-7, 1979* (1979)).

obligating lawyers to adhere to party doctrine. Kenneth C. H. Willig, *The Bar in the Third Reich*, 20 Am. J. Legal Hist. 1, 2, 6 (1976). Embracing a "unanimity of aim" would "free [lawyers] from the liberal notion of . . . a struggle to find the truth," and instead channel lawyers toward a joint effort to implement the interests of the state. Ingo Müller, *Hitler's Justice: The Courts of the Third Reich* 64 (Deborah Lucas Schneider trans., Harv. Univ. Press 1991) (1987). Courts then regularly cast defense counsel's procedural objections as subversive interference, and attorneys were coerced to pressure their clients for admissions. Gordon, *supra*, at 11–12. By transforming the legal profession into a loyal arm of the government, the regime eliminated adversarial representation for targeted individuals and silenced dissent.

Both Soviet and post-Soviet Russia also converted their legal professions into an appendage of government authority. The Bolshevik government replaced a relatively autonomous bar with state-supervised classes of lawyers closely surveilled by the Communist Party. Kathryn Hendley, *Do Lawyers Matter in Russia?*, 2021 Wis. L. Rev. 301, 305; *see also* Eugene Huskey, *Between Citizen and State: The Soviet Bar (Advokatura) Under Gorbachev*, 28 Colum. J. Transnat'l L. 95, 104–06 (1990). Lawyers were limited to advancing the regime's political goals rather than zealously advocating for clients' rights. *See* Andreas Bilinsky, *The Lawyer and Soviet Society*, Probs. of Communism, March–April 1965, at 62, 67 (explaining that lawyers in court "were expected to give evidence of their loyalty to the Bolshevik regime, often with the result that, instead of defending the accused, they joined the prosecution in heaping accusations on him"). Lawyers objecting to this design suffered ostracism, threats, disbarment, or purgings. *See* Louise I. Shelley, *Soviet Defense Counsel: Past as Prologue*, 12 Am. Bar Found. Rsch. J. 835, 837–38 (1987) (book review). The lack of an independent legal profession doomed due process reforms introduced after the Soviet Union's collapse. In the early 2000s, President Putin's government

again brought the legal profession to heel.[24] In the 2000s and 2010s, bar leadership was aligned with the Kremlin, and lawyers who represented political opposition figures or exposed official wrongdoing faced disciplinary proceedings and disbarments. *See, e.g.*, Peter Finn, *Russia's Champion of Hopeless Cases Is Targeted for Disbarment*, Wash. Post. (June 2, 2007), https://perma.cc/83A2-L3BN. The crackdown on independent lawyers intensified in the 2020s, with political prosecutions and jailings of attorneys who advocated too strongly for Kremlin opponents. *See, e.g.*, Matthew Luxmoore, *Navalny Lawyers Sentenced to Years in Prison*, Wall St. J. (Jan. 17, 2025, 9:27 AM), https://perma.cc/3WEH-KW8N. Today, with many lawyers effectively co-opted or intimidated, Russian citizens lack meaningful legal recourse against the government.

While these examples may seem stark, they cannot be dismissed as distant cautionary tales. The United States has its own history of attacking the legal profession's independence in times of political fear. In the late 1940s and 1950s, the Red Scare pervaded the government's agenda and created a culture of suspicion. Representing clients perceived as subversive or "un-American"[25] became professionally perilous. For example, then-Attorney General J. Tom Clark publicly stated that "politically wayward lawyers should be punished." James E. Moliterno, *Politically Motivated Bar Discipline*, 83 Wash. Univ. L.Q. 725, 737, 742 (2005). When the Supreme Court subjected

---

[24] For instance, the Russian government passed a 2002 law purporting to reorganize the fragmented bar but that, in practice, intensified the bar's dependence on the state. *See generally* Pamela A. Jordan, *Restructuring the Advokatura from Above, 2002-3 in Defending Rights in Russia: Lawyers, the State, and Legal Reform in the Post-Soviet Era* (2005) (citing Ob Advokatskoi Deyatelnosti i Advokature v Rossi'skoi Federatsii [On Work as an Attorney and the Legal Profession in the Russian Federation], Sobranie Zakonodatel'stva Rossiikoi Federatsii [SZ RF] [Russian Federation Collection of Legislation] 2002, No. 63) (analyzing the 2002 law's initial implementation to reveal how it deepened bar associations' dependence on the Russian state).

[25] Evoking this history, the recent executive orders targeting firms reflect aversion to causes that the President deems contrary to "American interests." *See, e.g.*, Addressing Risks from WilmerHale, 90 Fed. Reg. at 14549.

lawyers to jail terms and disbarment for their "contemptuous act[s]," *Sacher v. United States*, 343 U.S. 1, 3, 10–11 (1952), Justice Hugo Black dissented and decried the "summary blasting of legal careers," warning that it posed a threat that was "ominous for lawyers who are obscure, unpopular or defenders of unpopular persons or unorthodox causes." *Id*. at 18 (Black, J., dissenting).

Beyond formal discipline, blacklisting permeated the legal community during the Red Scare. Moliterno, *supra*, at 737–38. In a climate rife with fear of professional ostracism, attorneys who had "suspect" views or clients ill-disposed to the government's agenda risked virtually assured professional ruin, their careers derailed without any finding of actual misconduct. *See* Jerold S. Auerbach, *Unequal Justice: Lawyers and Social Change in Modern America* 107, 246–58 (1976); Moliterno, *supra*, at 737–38 (recounting experiences of prominent lawyers who were jailed and disbarred for representing alleged communists, only to be reinstated years later). Under pressure from the executive and legislative branches, large swaths of the legal profession—including bar associations[26]—paid forced obeisance to the government's agenda. As Justice Douglas described it, a "black silence of fear" descended on the bar and threatened the adversarial system as the pool of available counsel shrank. William O. Douglas, *The Black Silence of Fear*,

---

[26] Lawyers perceived as dissidents faced ostracism across the organized bar. In 1950, the American Bar Association (ABA) House of Delegates recommended that all lawyers be subjected to an anti-Communist loyalty oath as a means of purging "disloyal" members from the profession. Moliterno, *supra*, at 736. Although prominent attorneys criticized the idea and few states implemented the oath requirement, *id*. at 736–37, the proposal reflected intense pressure on lawyers to demonstrate ideological alignment. The ABA did not stop there—it compiled lists of lawyers who invoked the Fifth Amendment when interrogated about political affiliations and urged state bars to revoke those lawyers' licenses. *Id*. at 737. The Bar Associations of New York City and of New Jersey also disbarred two lawyers, Harry Sacher and Abraham Isserman, following their representation of alleged Communist Party members and contempt convictions. *Id*. Isserman was later disbarred from the United States Supreme Court Bar. *Id*. These measures sent a clear message: Attorneys were expected to aid the anti-communist crusade or face exclusion.

N.Y. Times Mag., Jan. 13, 1952, at 7, 37–38, https://perma.cc/829P-8E4C. The cumulative impact of these pressures, punishments, and purges profoundly chilled legal advocacy.

Suppression of legal advocacy during the Civil Rights Era serves as a sobering reminder of the fragility of justice when the legal profession's independence is compromised. Civil rights lawyers and their organizations were hit with ethics charges, disbarment proceedings, and government suits on pretextual grounds aiming to derail their work. *See* Stephen Jones, *A Lawyer's Ethical Duty to Represent the Unpopular Client*, 1 Chap. L. Rev. 105, 106 (1998); Sherrilyn Ifill, *Trump's Attack on Lawyers and Law Firms Takes a Page Out of the Southern 1950s Playbook* (Mar. 24, 2025), https://perma.cc/5CGB-4U7G. Leading judges and bar leaders encouraged using "rigorous powers of discipline" against subversive attorneys. *See Burger Speaks and Kunstler "Counters,"* N.Y. Times, Sept. 18, 1971, at 25, https://perma.cc/9N4E-M64M; Special Comm. on Courtroom Disorder, Ass'n of the Bar of the City of N.Y., *Disorder in the Court* xiii–xiv (1973); Am. Bar Ass'n Special Comm. on Evaluation of Disciplinary Enf't, *Problems and Recommendations in Disciplinary Enforcement* xvii (1970). In addition to professional ostracization, legal advocates—and judges—endured violent attacks, illustrating the dire risks of fighting for disfavored causes. Leonard S. Rubinowitz, *The Courage of Civil Rights Lawyers: Fred Gray and His Colleagues*, 67 Case W. Rsrv. L. Rev. 1227, 1252, 1254–58 (2017); William C. Hubbard, *Our Justice System at an Inflection Point*, 2017 Wis. L. Rev 1, 7. The executive also surveilled certain activists and their legal counsel, invading attorney-client confidentiality and engendering an atmosphere of distrust among those seeking legal help. *See generally* Traci Yoder, Nat'l Law.'s Guild, *Breach of Privilege: Spying on Lawyers in the United States* (2014).

These tactics chilled legal representation when the rule of law most needed it. And these periods stand as stark warnings: the legal profession need not be wholly disabled for liberties to

suffer. It need only be intimidated into giving up its independence so that lawyers no longer pose a meaningful check on power.

## CONCLUSION

The Order is not only blatantly illegal; it is a naked attempt to instill fear in the legal profession and intimidate lawyers into submission, thereby co-opting the bar to be subservient to the executive branch, undermining the judiciary's ability to check executive power, and striking at the heart of the rule of law. The Court should grant Plaintiff's requested relief and enjoin this Executive Order to limit the chilling effects on the legal profession.

Respectfully submitted,

*/s/ Jeannie Suk Gersen*

**PROTECT DEMOCRACY PROJECT**

Jeannie Suk Gersen
(*pro hac vice forthcoming*)
Harvard Law School*
1563 Massachusetts Avenue
Cambridge, MA 02138
jeannie.gersen@gersen.com
(617) 496-8834

John Paredes
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
john.paredes@protectdemocracy.org
(202) 579-4582
Fax: (202) 769-3176
D.D.C. Bar No. NY0418

Hayden Johnson
Protect Democracy Project
2020 Pennsylvania Ave. NW, Suite #163
Washington, DC 20006
hayden.johnson@protectdemocracy.org
(202) 579-4582
Fax: (202) 769-3176
D.C. Bar No. 1671830

* Institutional affiliation for identification
purposes only.

*Counsel for* Amici Curiae