## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

                *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

                *Defendants*.

Case No. 1:25-cv-00716 (BAH)

---

**BRIEF OF AMICUS CURIAE NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

JANAI S. NELSON
  *President and Director-Counsel*
SAMUEL SPITAL
DANIEL HARAWA*
TIFFANI BURGESS**
NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
sspital@naacpldf.org

*Counsel for Amicus Curiae*

*\*Of Counsel. Address for Mailing Purposes
Only.
\*\*Application for admission pro hac vice
forthcoming*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Civil Rule 26.1, I, the undersigned, counsel of record for *Amicus Curiae*

NAACP Legal Defense and Educational Fund, Inc. ("LDF"), certify that to the best of my

knowledge and belief, LDF has no parent companies, subsidiaries, affiliates, or companies which

own at least 10% of its stock which have any outstanding securities in the hands of the public.

Dated: April 7, 2025                          Respectfully submitted,

                                              */s/ Samuel Spital*
                                              _____
                                              Samuel Spital
                                              NAACP LEGAL DEFENSE &
                                                EDUCATIONAL FUND, INC.
                                              40 Rector Street, 5th Floor
                                              New York, NY 10006
                                              (212) 965-2200
                                              sspital@naacpldf.org

                                              *Counsel of Record for Amicus Curiae*

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................................... i

TABLE OF CONTENTS ...................................................................................... .ii

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF *AMICUS CURIAE* ...................................................................... 1

INTRODUCTION ............................................................................................ 2

ARGUMENT .................................................................................................. 5

    I.    What Is Old Is New Again: Attacking The Legal Profession ............................. 5

    II.   The Executive Order Tramples the Right to Counsel and Should Be Enjoined as an Unconstitutional Bill of Attainder. .................................................................. 12

CONCLUSION .............................................................................................. 17

CERTIFICATE OF COMPLIANCE .................................................................... 18

CERTIFICATE OF SERVICE .......................................................................... 19

## TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                    **<u>Page(s)</u>**

*Bates v. City of Little Rock*,
    361 U.S. 516 (1960) ....................................................................................................10

*In re Rail Freight Fuel Surcharge Antitrust Litigation*,
    865 F. Supp. 2d 104 (D.D.C. 2013) ...........................................................................12

*Konarski v. Donovan*,
    763 F. Supp. 2d 128 (D.D.C. 2011) ...........................................................................12

*Luis v. United States*,
    578 U.S. 5 (2016) ...............................................................................................13, 14

*Maine v. Moulton*,
    474 U.S. 159 (1985) ....................................................................................................12

*NAACP v. Ala. ex rel. Patterson*,
    357 U.S. 449 (1958) ......................................................................................................9

*NAACP v. Button*,
    371 U.S. 415 (1963) ....................................................................................................10

*Powell v. Alabama*,
    287 U.S. 45 (1932) ......................................................................................................13

*Sacher v. United States*,
    343 U.S. 1 (1952) ..........................................................................................................2

*Sai v. Dep't of Homeland Sec.*,
    99 F. Supp. 3d 50 (D.D.C. 2015) ...............................................................................12

*Trevino v. Thaler*,
    569 U.S. 413 (2013) ....................................................................................................12

*United States v. Decoster*,
    624 F.2d 196 (D.C. Cir. 1976) ...................................................................................13

*United States v. Lopez*,
    4 F.3d 1455 (9th Cir. 1993) ........................................................................................12

*United States v. Lovett*,
    328 U.S. 303 (1946) ..............................................................................................15, 16

*Weatherford v. Bursey*,
    429 U.S. 545 (1977) ....................................................................................................12

**Statutes**

U.S. Const. Art. I, § 9, cl. 3 ...................................................................................................15

Declaration of Constitutional Principles ("Southern Manifesto"), 102 Cong. Rec. 4459–61 (1956) ...............................................................................................................................8

**Executive Orders**

Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 6, 2025) .........................................................2

Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 25, 2025) ................................................4, 11

Exec. Order No. 14250, 90 Fed. Reg. 14549 (Mar. 27, 2025) .......................................................4

Presidential Mem., Preventing Abuses of the Legal System and the Federal Court (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court ...................................................................................4, 11

**Other Authorities**

Numan V. Bartley, The Rise of Massive Resistance: Race and Politics in the South During the 1950s (La. State Univ. Press 1969) ......................................................................5–10

Cynthia L. Fountaine, *Complicity in the Perversion of Justice: The Role of Lawyers in Eroding the Rule of Law in the Third Reich*, 10 St. Mary's J. on Legal Malpractice & Ethics 198 (2020) .............................................................................................................................12

Jack Greenberg, Crusaders in the Courts: How a Dedicated Band of Lawyers Fought for the Civil Rights Revolution (Univ. of Mich. 1994) ........................................................................6, 10

Sherrilyn Ifill, *Trump's Attack on Lawyers and Law Firms Takes a Page out of the Southern 1950s Playbook*, Substack (Mar. 24, 2025), https://open.substack.com/pub/sher-rilyn/p/trumps-attack-on-lawyers-and-law ...............................................................................3

Michael J. Klarman, From Jim Crow to Civil Rights: The Supreme Court and the Struggle for Racial Equality (Oxford Univ. Press 2004) ....................................................................5, 6, 9

Walter F. Murphy, *The South Counterattacks: The Anti-NAACP Laws*, 12 W. Pol. Q. 371 (1959) ...........................................................................................................................................6, 7

Leonard S. Rubinowitz, *The Courage of Civil Rights Lawyers: Fred Gray and His Colleagues*, 67 Case W. Res. L. Rev. 1227 (2017) ..............................................................................8–10

Christopher W. Schmidt, *New York Times v. Sullivan and the Legal Attack on the Civil Rights Movement*, 66 Ala. L. Rev. 293 (2014) ..............................................................................6, 7

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 18, 2025, 9:05 AM), https://truth-social.com/@realDonaldTrump/posts/114183576937425149 ................................................11

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 28, 2025, 1:57 PM), https://truth-social.com/@realDonaldTrump/posts/114241348699704594

## INTEREST OF *AMICUS CURIAE*

The NAACP Legal Defense & Educational Fund, Inc. ("LDF") is a non-profit legal organization, founded in 1940 under the leadership of Thurgood Marshall, to advance racial justice and ensure the full, fair, and free exercise of constitutional and statutory rights for Black people and other communities of color.[1]

This case arises from the current Administration's attempt to extrajudicially punish a law firm for the clients and causes it has chosen to represent. While a much different context, during the height of the Civil Rights Movement, LDF and its lawyers were regularly attacked by Southern governments for representing clients dedicated to pursuing racial equality, leading to a number of Supreme Court decisions, including the landmark decision *NAACP v. Button*, 371 U.S. 415 (1963). LDF therefore intimately understands the dangers of attacking lawyers and legal organizations based on the clients they represent or causes they choose to pursue. LDF submits this brief because it has a significant interest in ensuring that legal organizations are able to engage in legal representation without fear of reprisal from the government, and because perhaps no other legal organization in the country is as familiar with the type of retaliatory tactics that the Administration has deployed here.

LDF also has an interest in this case because its extensive advocacy for civil rights has shown that Black Americans and other minority groups are particularly vulnerable when government officials are permitted to disregard the rule of law. *See, e.g.*, *Cooper v. Aaron*, 358 U.S. 1 (1958) (involving state officials' attempted defiance of Supreme Court rulings invalidating racial segregation in public schools). Here, the President has sought to undermine the rule of law

---

[1] Pursuant to Local Civil Rule 7(o)(5), counsel for *amicus curiae* certify that no counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae*, its members, and their counsel made a monetary contribution to the brief's preparation or submission.

and interfere with access to counsel by targeting and punishing a law firm that represents clients whom the President disfavors. LDF has a strong interest in defending our constitutional democracy from this kind of executive overreach.

INTRODUCTION

President Trump's March 6, 2025 Executive Order *"Addressing Risks From Perkins Coie LLP"* ("The Order" or "EO") should send "chills down" any reader's spine. Tr. of Mar. 12, 2025 Hr'g at 46:7-8, ECF No. 22 ("Tr."); Exec. Order No. 14230 § 1, 90 Fed. Reg. 11781 (Mar. 6, 2025). The Order purports to arrogate to the President the power to punish lawyers and law firms for any reason "he sees fit." *Id.* According to the President, he can take retribution against lawyers and law firms who represent clients he dislikes or challenge the governmental actions he pursues. *See* Mem. Op. & Order at 1, ECF No. 36 (explaining that the Order "target[s] the law firm with punitive measures due to the law firm's representation of clients whom the President dislikes or who sought relief through litigation that the President opposes"). And he claims he can do so by wielding the mighty power of the federal government—formed in all our names—with the only "process" being the stroke of a pen.

The Order tramples core constitutional principles, strikes at the heart of the legal profession, and would eviscerate access to justice for litigants disfavored by the government. Lawyers are supposed to represent clients without fear or favor, *especially* the fear or favor of the government. It has long "made lawyerdom proud" when attorneys advocate for "minorities or the unpopular." *Sacher v. United States*, 343 U.S. 1, 4 (1952). If allowed to stand, this EO will irreparably diminish the independence of the private bar. Indeed, if lawyers are forced to pick clients and choose cases out of desire to stay in the Executive Branch's good graces, the rule of law and the constitutional order it undergirds will crumble.

2

While the President's actions are dangerous and unprecedented at the federal level, attacks on the legal profession are not new. In the height of the Civil Rights Movement, when LDF lawyers, cooperating attorneys, and community members fought valiantly to establish the United States as a true multiracial democracy—a fight that persists to this day—white leaders in the South engaged in a multipronged strategy of resistance. There was, of course, the unspeakable violence. There were the de jure and de facto measures carefully designed to maintain an apartheid state. But there was another strategy readily deployed, yet less well-remembered: attack the lawyers. Organizations like LDF were forced to undergo baseless investigations and were at times banned from practice in retaliation for their civil rights litigation. Civil rights lawyers at LDF and elsewhere were also forced to defend themselves in meritless bar and governmental proceedings. And with the governmental targeting came the real threat of extralegal violence, including the bombings and beatings of civil rights lawyers and organizations and the communities they served. *See* Sherrilyn Ifill, *Trump's Attack on Lawyers and Law Firms Takes a Page out of the Southern 1950s Playbook*, Substack (Mar. 24, 2025), https://open.substack.com/pub/sherrilyn/p/trumps-attack-on-lawyers-and-law. Simply put, civil rights lawyers and groups were attacked because of who they represented and the causes they sought to advance. This was an especially pernicious abuse of state power in light of the constitutional principles and core civil and human rights being vindicated on behalf of Black citizens.

In a different context but in a disturbingly similar vein, the EO targets and punishes law firms because of who they represent and the types of matters they pursue. This direct and unabashed manipulation of the legal profession generally and the lawful services of the private bar more specifically has the same aim as the haunting violence visited upon the civil rights bar and

its valiant clients: to deter the legal representation of people and causes which the government disfavors.

While the Order at issue targets Perkins Coie, it is part of a larger broadside against the legal profession.[2] LDF therefore submits this brief to make two points.[3] First, the brief draws the parallels between the Executive Branch's current attacks on the rule of law and what authoritarians did in the Jim Crow South. To be sure, the context is different: the Jim Crow attacks were part of a coordinated and violent campaign of resistance to desegregation and civil rights for Black Americans. The targeting of the legal profession today has not yet been part of a broader campaign of terror, and its goal—achieving unchecked power for the President—is different. But understanding the history of the Civil Rights Era underscores the peril to civil society and the rule of law itself.

Second, the brief explains why this Court should view should view the EO and the nearly half dozen EOs like it as an unconstitutional bill of attainder—one that risks deeply destabilizing the legal profession. Should the Court fail to stop this plainly unconstitutional targeting of specific law firms, nothing will stop the Executive's attacks from expanding to include civil rights organizations, civil society more broadly, and anyone else perceived to be an opponent of this Administration. Accordingly, this Court should permanently enjoin the Executive Order.

---

[2] *See, e.g.*, Exec. Order 14246, 90 Fed. Reg. 13997 (Mar. 25, 2025); Exec. Order 14250, 90 Fed. Reg. 14549 (Mar. 27, 2025); Presidential Mem., Preventing Abuses of the Legal System and the Federal Court (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.

[3] LDF agrees with the Plaintiff that the Order is unconstitutional for the many reasons laid out in the complaint.

## ARGUMENT

### I.    What Is Old Is New Again: Attacking The Legal Profession

In the wake of the Supreme Court's 1954 decision in *Brown v. Board of Education*, southern political leaders immediately set themselves to the task of vigorously resisting school desegregation. *See* Numan V. Bartley, *The Rise of Massive Resistance: Race and Politics in the South During the 1950s* 75 (La. State Univ. Press 1969) ("Hardly had Chief Justice Warren completed the reading of the *Brown v. Board of Education* decision when segregation strategy committees were devising methods to prevent its enforcement."). Their resistance tactics ranged from underhanded obstruction of the spirit of *Brown* to brazen frustration of its letter.

Several states passed pupil assignment laws that used criteria such as "psychological factors" and "academic background" to assign students to schools, and characterized the resultant segregation as not based on race but upon the needs of individual students. *Id*. at 78; *see also* Michael J. Klarman, *From Jim Crow to Civil Rights: The Supreme Court and the Struggle for Racial Equality* 358–59 (Oxford Univ. Press 2004) (explaining that these measures sought to circumvent desegregation obligations by committing student assignment to the discretion of local officials). Louisiana passed a nonsensical bill asserting that pursuant to the state's police power, students would be segregated "not on the basis of race but for the advancement, protection and better education of all children." Bartley, *supra*, at 74. At least four states passed laws banning desegregation and making compliance with *Brown* a criminal offense. *Id*. at 77. Rather than integrate, some states preferred to degrade their public-school systems by repealing compulsory attendance laws, selling or leasing school property, eliminating teacher tenure, and terminating state education funding. *Id*. at 75–78. Mississippi was so bold as to pass a constitutional amendment that allowed the legislature to abolish the state's public school system altogether. *Id*.

5

at 76. Southern officials also frustrated court orders to desegregate by closing schools and denying

state funds to schools that transferred or accepted students. *Id*. at 76, 274–75.

In addition to these better-known resistance strategies, nearly every southern state took

steps to prevent the NAACP, LDF, and their lawyers from engaging in advocacy, including legal

advocacy, within their states.[4] *See generally, e.g.*, Walter F. Murphy, *The South Counterattacks:

The Anti-NAACP Laws*, 12 W. Pol. Q. 371 (1959); Jack Greenberg, *Crusaders in the Courts: How

a Dedicated Band of Lawyers Fought for the Civil Rights Revolution* 217–22 (Univ. of Mich.

1994). One tactic used by many state legislatures was to use regulatory pressure to force the

NAACP to disclose the names of its members and donors. *See* Christopher W. Schmidt, *New York

Times v. Sullivan and the Legal Attack on the Civil Rights Movement*, 66 Ala. L. Rev. 293, 299–

300 (2014). Arkansas, for example, amended its occupational licensing laws to require registered

organizations to turn over membership lists upon request. *Id*. Some states required public

employees to disclose their memberships and prohibited them from becoming NAACP members.

Bartley, *supra*, at 213–14. In an act of shameful irony, Louisiana sought the NAACP's membership

lists under a 1924 law that originally took aim at the Ku Klux Klan and had until then sat dormant.

*Id*. at 215.

These efforts to obtain and publicize membership lists were plainly designed to hamper the

NAACP by exposing its supporters to threats of intimidation, violence, and economic harm. *Id*. at

213; Klarman, *supra*, at 352 (noting that in South Carolina, NAACP membership lists were

publicly posted, and that many members lost their jobs, access to credit, and suppliers). Any refusal

to disclose membership lists also gave state attorneys general grounds to seek court injunctions

preventing the NAACP from operating. Bartley, *supra*, at 213.

---

[4] Founded in 1940 by the NAACP, LDF has been a completely separate organization since 1957.

Similarly, many states weaponized corporate, tax, and legal ethics regulations to hinder the NAACP's ability to pursue litigation or to ban its operations altogether. *See id*. at 213; Murphy, *supra*, at 374–79. The Alabama legislature passed a law assessing exorbitant licensing fees against organizations that solicited members in the majority-Black Wilcox County. Bartley, *supra*, at 220. Texas Attorney General Ben Shepperd targeted the NAACP and LDF with a lawsuit alleging "a medley of charges," including for supposedly generating profit while claiming non-profit status, which disrupted—and at times entirely halted—their work within the state. *See id*. at 216; Greenberg, *supra*, at 219–20. The Georgia Revenue Commission succeeded at jailing the NAACP's Atlanta chapter president and levying a $25,000 fine during the course of an investigation for purported tax evasion. Bartley, *supra*, at 216–17; Murphy, *supra*, at 378. Several states passed legislation amending barratry, champerty, and maintenance rules in an effort to disrupt the NAACP and LDF's ability to investigate civil rights violations and bring litigation. Schmidt, *supra*, at 300; Murphy, *supra*, at 374; Greenberg, *supra*, at 219. And in Arkansas, the Governor "disbanded the [NAACP] by executive fiat" through a proclamation asserting that it had forfeited its right to operate in the state by failing to pay corporate franchise taxes, despite the NAACP's non-profit status. Bartley, *supra*, at 217.

Southern states also formed committees to investigate the NAACP for a variety of purported violations, including communist affiliations, tax evasion, legal ethics violations, and criminal offenses. Bartley, *supra*, 221–24. These committees investigated aggressively—including through the use of secret investigators, wiretapping, and paid informants—leading Georgia Lieutenant Governor Ernest Vandiver to warn against them becoming "a state gestapo where intrigue and dangerous tactics are substituted for sincerity, sound thinking and legal procedure."

*Id*. at 224. The pretextual nature of these investigation was clear: "[w]ithout exception, the NAACP was pronounced guilty of whatever wrongs the committees investigated." *Id*. at 222.

Individual civil rights lawyers also faced aggressive procedural intimidation and harassment. *Id*. Alabama civil rights attorney and LDF cooperating attorney Fred Gray, for example, faced several attacks after challenging Alabama's bus segregation laws in *Browder v. Gayle*. Leonard S. Rubinowitz, *The Courage of Civil Rights Lawyers: Fred Gray and His Colleagues*, 67 Case W. Res. L. Rev. 1227, 1263–64 (2017). While the case was pending, state officials coerced one of the plaintiffs into asserting that she had never agreed to participate in the lawsuit. *Id*. The State then charged Gray under its barratry statute, which made representing a plaintiff without their knowledge a misdemeanor. *Id*. A conviction would have subject Gray to automatic disbarment. *Id*.

Why were southern states so intent on preventing the NAACP and LDF from accessing the courts following the *Brown* decision? The question answers itself. Southern segregationists were terrified of *Brown* and the future it brought into possibility. Indeed, their reactions to the decision bordered on hysteria. *See* Bartley, *supra*, at 67–69 (observing that reactions to *Brown* ranged from declarations that the Justices had been "indoctrinated and brainwashed by Left-wing pressure groups," to proposals to have integrationists designated as "diseased" and involuntarily committed). Segregationists controlled the political branches in the South, and they desperately attempted to use their authority to delegitimize and nullify the Court's decision. *See, e.g.*, *id*. at 273 (noting that Arkansas Governor Orval Faubus declared in 1958 that "the Supreme Court['s] decision is not the law of the land," but rather "no more than the opinion of nine men"); *id*. at 212 ("In varying degrees, all southern states employed state power to hinder, harass, or crush dissent."); Declaration of Constitutional Principles ("Southern Manifesto"), 102 Cong. Rec. 4459–61 (1956).

Yet despite their open willingness to defy and circumvent court decisions, Klarman, *supra*, at 399, segregationists knew that litigation could generate pressure away from their preferred outcome of maintaining segregation and toward racial equality. *See, e.g.*, Klarman, *supra*, at 350–51 (explaining that school board members were under "intense local pressure to stall desegregation," and "faced little pressure from the opposite direction" in the absence of litigation against them); Rubinowitz, *supra*, at 1228 ("Segregationists recognized that the lawyers posed a threat to the racially discriminatory system. So, they included the lawyers in their countermovement, seeking to eliminate the lawyers, in hopes of undermining and defeating the Civil Rights Movement."). And since few Black southerners were in a position to pursue litigation on their own, segregationists understood that keeping organizations like the NAACP and LDF out of court would "be both a long step toward silencing internal dissent . . . and a significant contribution to massive resistance." Bartley, *supra*, at 212–13; Klarman, *supra*, at 352.

The segregationists' war on civil rights lawyers was not only an attack on the principle and promise of racial equality. Historian Numan V. Bartley has described southern states' assault on the NAACP and LDF as "the gravest overt threat to basic civil liberties during the 1950s," including the fundamental rights of freedom of speech, association, and due process. *See generally* Bartley, *supra*, at 212–24. Fortunately, the NAACP, LDF, and the civil rights bar refused to stop their advocacy, and courts heeded their calls to protect the basic rights at stake.

When Alabama Attorney General John Patterson sought to compel the NAACP to disclose its membership lists, the Supreme Court held that disclosure would infringe the members' First Amendment freedom to associate "for the advancement of beliefs and ideas." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460–61, 466 (1958) (noting that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group

association"). Two years later, in *Bates v. City of Little Rock*, the Court likewise rejected Arkansas's attempt to acquire NAACP membership lists under the guise of corporate regulation, and it affirmed that the freedom to associate is "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interference." 361 U.S. 516, 523 (1960).

When Virginia changed its solicitation regulations to impede civil rights litigation against it, the NAACP and LDF both sued, arguing that the regulations unconstitutionally burdened their and their members' rights to freedom of speech and association. *NAACP v. Button*, 371 U.S. 415, 418–19 (1963). The Court again agreed, holding that Virginia could not use "its power to regulate the legal profession" to prevent the NAACP and LDF from "vindicat[ing] the legal rights of members of the American Negro community" in court. *Id.* at 428, 431. As the Court noted, litigation brought by the NAACP and LDF not only protected rights for Black Americans, but also "[made] possible the distinctive contribution of a minority group to the ideas and beliefs of our society." *Id.* at 432.

Despite these important and enduring legal victories, southern segregationists' attacks on the NAACP and LDF still took a toll. The organizations were forced to divert resources to defend themselves and protect their members. Greenberg, *supra*, at 217–20 (describing the intensive planning and litigating required to defend LDF). While the organizations managed to proceed with much of their work advancing desegregation, state harassment rendered them unable to operate at all in several states for significant periods of time, including an eight year pause in Alabama. Greenberg, *supra*, at 218; Bartley, *supra*, at 215. Pervasive intimidation caused the NAACP's membership in the Deep South to drop by more than half—from over 90,000 in 1955 to around 40,000 in 1957. Greenberg, *supra*, at 220–21.

And all the while, civil rights lawyers were confronted with unspeakable violence, including bombings, death threats, and angry mobs. Rubinowitz, *supra*, at 1251–62. Fred Gray's friends and family stood guard around the clock to ward off bombings at his home. *Id*. at 1252. LDF cooperating attorney Arthur Shores endured drive-by shootings at his home in Birmingham so frequently that he kept a contractor on retainer to repair his front windows. *Id*. at 1254. These events led to lasting trauma and psychological burdens for civil rights lawyers and their families, including anxiety, fear, sadness, and grief. *See id*. at 1270–74.

In sum, during the period that followed the *Brown* decision, southern governments attempted to undercut the NAACP's and LDF's ability to pursue litigation because they disapproved of who they represented and the causes they sought to advance. The Executive Branch's current attacks on the legal profession echo important aspects of this history. The President's attempts to target, control, and demean lawyers, law firms, and judges represent a concerted effort to amass unchecked power for the Executive Branch by undermining the rule of law and those committed to upholding it. *See, e.g.*, Exec. Order No. 14246, *supra* note 1 (characterizing a law firm's work as "dishonest and dangerous" and directing punitive action against it because the President disfavors its choice of clients and cases); Presidential Mem., *supra* note 1 (directing the Attorney General to seek sanctions against attorneys and law firms for engaging in "frivolous, unreasonable, and vexatious litigation against the United States"); Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 18, 2025, 9:05 AM), https://truthsocial.com/@realDonaldTrump/posts/114183576937425149 (describing a judge who ruled against his administration as a "Radical Left Lunatic" and calling for his impeachment). These efforts to subvert basic checks on executive power are unprecedented at the federal level. Our history speaks clearly to the stakes of this kind of anti-constitutional bullying—and we ignore

them at our peril. *See generally* Cynthia L. Fountaine, *Complicity in the Perversion of Justice: The Role of Lawyers in Eroding the Rule of Law in the Third Reich*, 10 St. Mary's J. on Legal Malpractice & Ethics 198 (2020) (explaining that "lawyers and judges are uniquely responsible" for protecting the rule of law, and that failure to do so leads to "subversion of the basic lawyer-client relationship, the abrogation of the lawyer's role as an advocate, and the elimination of judicial independence").

## II.    The Executive Order Tramples the Right to Counsel and Should Be Enjoined as an Unconstitutional Bill of Attainder.

Throughout history, courts have consistently recognized the importance of the right to counsel, especially in the criminal context, and have been loath to allow any interference with it. For instance, courts in this district have explained that they will not lightly disqualify counsel over a party's objection given that it is a grave intrusion on the attorney-client relationship. *See, e.g.*, *Sai v. Dep't of Homeland Sec.,* 99 F. Supp. 3d 50, 67 (D.D.C. 2015); *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 865 F. Supp. 2d 104, 110 (D.D.C. 2013); *Konarski v. Donovan*, 763 F. Supp. 2d 128, 135 (D.D.C. 2011). There is clear reason for protecting the attorney-client relationship: "our adversary system is premised upon functional lawyer-client relationships." *United States v. Lopez*, 4 F.3d 1455, 1459 (9th Cir. 1993). As such, courts have jealously guarded the lawyer-client relationship. *See, e.g.*, *Trevino v. Thaler*, 569 U.S. 413, 422 (2013) (describing the "right to counsel [as] the foundation for our adversary system"). Justice Thurgood Marshall warned long ago that, when the government interferes with the lawyer-client relationship, such interference threatens "the integrity of the adversary system" and the "right to affective assistance of counsel." *Weatherford v. Bursey*, 429 U.S. 545, 562–63 (1977) (Marshall, J., dissenting). And the right of counsel is sacrosanct because it is preservative of all other rights necessary for a fair proceeding. *See Maine v. Moulton*, 474 U.S. 159, 168 (1985). For as the Supreme Court declared

nearly a century ago when reversing the convictions of the Scottsboro Boys: "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932).

Because the right to counsel is so fundamental to an ordered system of justice, the right to *choose* counsel cannot be intentionally interfered with by the government. As both the Supreme Court and the D.C. Circuit have recognized in the criminal context, a lawyer's representation of their client must be "'untrammeled and unimpaired' by state action." *United States v. Decoster*, 624 F.2d 196, 202 (D.C. Cir. 1976), *judgment entered*, 598 F.2d 311 (D.C. Cir. 1979) (quoting *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978)).

Less than a decade ago, the Supreme Court rebuked the federal government's attempt to interfere with a criminal defendant's right to counsel. In *Luis v. United States*, the federal government froze the assets of a criminal defendant on trial for fraud, which prevented her "from using her own funds, *i.e.*, funds not connected with the crime, to hire counsel to defend her in her criminal case." 578 U.S. 5 (2016). The Court explained that the constitutional right to counsel includes a constitutional right to counsel of one's choice: "Given the necessarily close working relationship between lawyer and client, the need for confidence, and the critical importance of the trust, neither is it surprising that the Court has held that the Sixth Amendment grants a defendant a fair opportunity to secure counsel of his own choice." *Id.* at 11 (quotation marks and brackets omitted).

Because the government violated this basic principle, the Court in *Luis* found it necessary to "emphasize" that the constitutional right at issue here is fundamental: "The Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Id.* at 12. Reiterated the Court: "The Government cannot . . . deny

13

[a defendant's] right to be represented by a qualified attorney whom she chooses and can afford." *Id.*; *see also id.* at 27 (Thomas, J., concurring) ("Unless the right to counsel also protects the prerequisite right to use one's financial resources for an attorney, I doubt that the Framers would have gone through the trouble of adopting such a flimsy parchment barrier." (quotation marks and brackets omitted)).

Here, the governmental interference with counsel is much more direct, and far less justified. Under the EO, the government punishes Perkins Coie for its choice to represent a single client. The government punishes Perkins Coie for the causes it has chosen to litigate on behalf of both paying and pro bono clients. And it punishes Perkins Coie by, *inter alia*, purporting to ban the lawyers from government buildings and ordering the Office of Management and Budget ("OMB") to "terminate" all federal contracts with the firm.

Not only that; the EO also raises the specter of punishing any entity that does business with Perkins Coie, as it requires those entities to disclose the business relationship and then orders OMB to do an "Assessment" of all of that's entity's federal contracts, goading "clients to sever their relationships with their trusted Perkins Coie lawyers" to avoid the government's ire. Mem. in Supp. of the Mot. for a TRO at 2, ECF 2-1. In other words, if the Executive has its way, the only counsel with whom one could work without fear of reprisal is one that is in the President's favor, a chilling thought on its own made even more so considering the fickleness of that favor.[5] In short, the EO interferes with the attorney-client relationship in two distinct, but equally chilling ways: it punishes the law firm for clients it represented, and then chills future attorney-client relationships by making

---

[5] The threat of these punitive executive orders is further evidenced by the terms of "settlements" required of law firms to avoid them, which entail extractive concessions such as tens of millions of dollars in pro bono services "to causes that the President" supports. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 28, 2025, 1:57 PM), https://truthsocial.com/@real-DonaldTrump/posts/114241348699704594 (discussing one of the "settlements").

clear that new clients that work with Perkins Coie will have a target on their back. Such a direct and far-reaching attempt by the federal government to interfere with the sacrosanctity of the right to counsel is breathtaking.

It is also patently unconstitutional, as it constitutes "punishment of [Perkins Coie] without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 316 (1946). In *Lovett*, the Supreme Court held that "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *Id.* at 315. There, three federal employees were accused by the House "Committee on Un-American Activities" of engaging in "subversive activity" as defined by the Committee. *Id.* at 311. In response, Congress passed a provision in an appropriation bill that prohibited paying the employees' salaries. *Id.* at 312. As the Court summarized, in passing the provision, "because of what Congress thought to be their political beliefs, [it] prohibited respondents from ever engaging in any government work, except as jurors or soldiers." *Id.* at 314. The federal employees challenged the legislation as an unconstitutional bill of attainder. *See* U.S. Const. Art. I, § 9, cl. 3.

The Supreme Court agreed. In holding that the legislation was unconstitutional, the Court explained that in ratifying the clause prohibiting bills of attainder, "[t]hose who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular named persons because the legislature thinks them guilty of conduct which deserves punishment." *Lovett*, 328 U.S. at 317. The purpose of the provision was "to safeguard the people of this country from punishment without trial by duly constituted courts." *Id.* The provision in *Lovett* fell "precisely within the category of Congressional actions which the Constitution barred" because it "accomplishes the punishment of named individuals without

judicial trial." *Id.* at 316. As the Court concluded, "No one would think that Congress could have passed a valid law, stating that after an investigation it had found [the respondents] 'guilty' of the crime of engaging in 'subversive activities,' defined that term for the first time, and sentenced them to perpetual exclusion from any government employment." *Id.* at 317.

What Congress did through legislation was unthinkable in *Lovett*. What the President did here is even more astonishing. Without any "investigation" or process, and for vague and indeterminate reasons, the President found Perkins Coie "guilty" of some unspecified offense and "sentenced [the firm] to perpetual exclusion" from doing business with the government. *Id.* Like the Congress in *Lovett*, the President targeted Perkins Coie based on its perceived and constitutionally protected "political beliefs," speech, and associations. *Id.* at 314.

What's worse is that the President did so by executive fiat, rendering his punishment with the stroke of the pen. As explained in the Plaintiff's Complaint, the President's action is patently unconstitutional because it constitutes *ultra vires* action that is well beyond the President's power to undertake. *See* Compl. at 5–6. But, even if the President had some authority to act with respect to the regulation of attorneys, he plainly does not have the authority to single out specific law firms for punishment without due process. While bill of attainder principles have historically been applied to legislative acts, that is because Congress is designed to be the only lawmaking body under the Constitution. If Congress cannot punish extrajudicially through duly enacted legislation, the President cannot punish extrajudicially through executive order. Both actions similarly "punish[ ] named individuals without a judicial trial"—the very "danger" that the Framers of the Constitution aimed to prevent. *Lovett*, 328 U.S. at 316.

While the President's Order violates the Constitution in the myriad ways that the Plaintiff urges, it is also an unconstitutional bill of attainder, frustrating the constitutional role of the courts.

There is a constitutionally required process to punish in the United States; the Executive Order does not follow it. This provides yet another reason for this Court to strike down the President's Executive Order as unconstitutional.

## CONCLUSION

By issuing the Executive Order, the President's actions harken to a dark moment in our Nation's history and impose the exact extrajudicial punishment that our Constitution forbids. LDF respectfully urges this Court to reaffirm the rule of law by permanently enjoining the Order.

Dated: April 7, 2025                          Respectfully submitted,

                                               */s/ Samuel Spital*
                                               JANAI S. NELSON
                                                  *President and Director-Counsel*
                                               SAMUEL SPITAL
                                               DANIEL HARAWA*
                                               TIFFANI BURGESS**
                                               NAACP LEGAL DEFENSE &
                                                  EDUCATIONAL FUND, INC.
                                               40 Rector Street, 5th Floor
                                               New York, NY 10006
                                               (212) 965-2200
                                               sspital@naacpldf.org

                                               *Counsel for Amicus Curiae*

                                               *\*Of Counsel. Address for Mailing Purposes
                                               Only.
                                               \*\*Application for admission pro hac vice
                                               forthcoming*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Local Civil Rule 7(o)(4), as it does not exceed twenty-five pages, as well as the typeface requirements of Local Civil Rule 5.1(d), as it has been prepared using Microsoft Word in 12-point Times New Roman font.


Dated: April 7, 2025                                  Respectfully submitted,

                                                      */s/ Samuel Spital*
                                                      Samuel Spital
                                                      NAACP LEGAL DEFENSE &
                                                        EDUCATIONAL FUND, INC.
                                                      40 Rector Street, 5th Floor
                                                      New York, NY 10006
                                                      (212) 965-2200
                                                      sspital@naacpldf.org

                                                      *Counsel of Record for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2025, I electronically filed the original of this brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

Dated: April 7, 2025                          Respectfully submitted,

                                              */s/ Samuel Spital*
                                              Samuel Spital
                                              NAACP LEGAL DEFENSE &
                                                EDUCATIONAL FUND, INC.
                                              40 Rector Street, 5th Floor
                                              New York, NY 10006
                                              (212) 965-2200
                                              sspital@naacpldf.org

                                              *Counsel of Record for Amicus Curiae*

19