# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

     *Plaintiff*,

    v.

U.S. DEPARTMENT OF JUSTICE,
FEDERAL COMMUNICATIONS
COMMISSION, OFFICE OF
MANAGEMENT AND BUDGET, EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION, OFFICE OF PERSONNEL
MANAGEMENT, GENERAL SERVICES
ADMINISTRATION, OFFICE OF THE
DIRECTOR OF NATIONAL
INTELLIGENCE, THE UNITED STATES
OF AMERICA, and, in their official
capacities, PAMELA J. BONDI, BRENDAN
CARR, RUSSELL T. VOUGHT, ANDREA
R. LUCAS, CHARLES EZELL, STEPHEN
EHEKIAN, and TULSI GABBARD,

     *Defendants*.

Civil Action No. 1:25-cv-00716 (BAH)

Judge Beryl A. Howell

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
# DEFENDANTS' MOTION TO DISMISS AND FOR EXPEDITED JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

LEGAL STANDARD AND RESPONSE TO "SHOTGUN PLEADING" ARGUMENT ...........4

ARGUMENT ......................................................................................................................5

    A.    The Complaint States First Amendment Claims ....................................................5

        1.    The Complaint States a Claim for First Amendment Retaliation .......................5

        2.    The Complaint States a Claim of Viewpoint Discrimination..........................20

        3.    The Complaint States a Claim of Compelled Disclosure.................................21

    B.    The Complaint States Due Process Claims.............................................................23

        1.    The Complaint Pleads Protected Liberty and Property Interests .....................23

        2.    The Complaint Pleads Inadequate Procedures ..................................................27

        3.    The Complaint Pleads the Executive Order Is Impermissibly Vague...................................................................................................................30

    C.    The Complaint States Fifth and Sixth Amendment Right to Counsel Claims ....................................................................................................................31

    D.    The Complaint States a Claim That the Executive Order Exceeds the President's Constitutional Authority and Violates the Separation of Powers..................................................................................................................33

        1.    No Heightened Showing of Unconstitutionality Is Required............................34

        2.    The President Has No Constitutional Authority To Punish the Firm................35

        3.    The Order Improperly Usurps Judicial Power ..................................................38

    E.    The Complaint States an Equal Protection Claim...................................................39

II.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO RECONSIDER..........41

CONCLUSION....................................................................................................................45

# TABLE OF AUTHORITIES

Page

## CASES

*Al-Hela v. Biden*, 66 F.4th 217 (D.C. Cir. 2023) (en banc) ...................................................44

*Am. Meat Inst. v. U.S. Dep't. of Agr.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc)..........................22

*\*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)....................................................23

*\*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016)........................................................................6

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ...........................................43, 44

*Arnaud v. Odom*, 870 F.2d 304 (5th Cir. 1989)........................................................................27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................................4

*Ashtari v. Pompeo*, 496 F. Supp. 3d 462 (D.D.C. 2020) ............................................................4

*\*Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996)...........................................................16

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ................................................................28

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011)...........................................................15

*Campbell v. District of Columbia*, 126 F. Supp. 3d 141 (D.D.C. 2015)......................................26

*\*Campbell v. District of Columbia*, 894 F.3d 281 (D.C. Cir. 2018)...........................................23

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)......................................................................38

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ...................................34

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................................12

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985)..........................................40

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ....................................................28

*Codd v. Velger*, 429 U.S. 624 (1977)....................................................................................26

*Contractors Association v. Secretary of Labor*, 442 F.2d 159 (3d Cir. 1971) ............................36

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001)................................................................34

*Enquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008)..........................................39

*\*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)..........................................25, 28, 31

Page

Cases—continued:

*FDIC v. Mallen*, 486 U.S. 230 (1988) ........................................................27

*Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756 (D.C. Cir. 2022) ...................34

*Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003) ................................45

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010)...................34

*Gen. Elec. Co. v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010)................................25

*Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022)........................36

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ..................................38

*Greene v. McElroy*, 360 U.S. 474 (1959) ................................................27

*Greer v. Spock*, 424 U.S. 828 (1976)...................................................38

*Gross v. Lopez*, 419 U.S. 565 (1975)...................................................26

*Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) (per curiam)............33

*\*Hartman v. Moore*, 547 U.S. 250 (2006)...............................................6, 9

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Loc. 737 v. Auto Glass Emps. Credit Union*, 72 F.3d 1243 (6th Cir. 1996)..............................27

*\*Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951) ............29, 34, 35

*\*Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994)............................24, 25

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) .......................................36

*Kincaid v. Gov't of District of Columbia*, 854 F.3d 721 (D.C. Cir. 2017) ................31

*Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024)........................................11

*\*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001)................................2, 38

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ..................................23

*Luis v. United States*, 578 U.S. 5 (2016)...............................................33

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)......................................2

*Mathews v. Eldridge*, 424 U.S. 319 (1976)..............................................27

Page

Cases—continued:

*Maynard v. Melton*, 2021 WL 6845008 (D.D.C. Apr. 7, 2021),
  *R&R adopted*, 2023 WL 1963919 (D.D.C. Feb. 10, 2023) ........................................4

*McCray v. Biden*, 574 F. Supp. 3d 1 (D.D.C. 2021)........................................................44

*McGowan v. Maryland*, 366 U.S. 420 (1961)..................................................................14

*Mead v. Indep. Ass'n*, 684 F.3d 226 (1st Cir. 2012) .......................................................24

*NAACP v. Button*, 371 U.S. 415 (1963)...........................................................................27

*\*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001)..........25, 26

*\*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .........................................6, 9, 20

*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997)......................................18

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) ..................................................................36

*News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988) .....................................39

*Perry v. Sindermann*, 408 U.S. 593 (1972).......................................................................9

*\*Powell v. Alabama*, 287 U.S. 45 (1932) ...................................................................32, 33

*Rattigan v. Holder*, 689 F.3d 764 (D.C. Cir. 2012) .......................................................11

*\*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ..............................................................21

*Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594 (D.C. Cir. 1992) .............24

*\*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995).................9, 20

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) ................17

*Rust v. Sullivan*, 500 U.S. 173 (1991) .............................................................................17

*Ryan v. Ill. Dep't of Child & Fam. Servs.*, 185 F.3d 751 (7th Cir. 1999)......................29

*Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232 (1957) ....................................................23

*SEC v. Jarkesy*, 603 U.S. 109 (2024)...............................................................................38

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000)................................4

*Stidham v. Tex. Comm'n on Priv. Sec.*, 418 F.3d 486 (5th Cir. 2005)............................24

Page

Cases—continued:

*Strickland v. Washington*, 466 U.S. 668 (1984) ..........................................................32

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).........................................12, 19

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013)........................................39, 40

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002) ...........................14

*Trentadue v. Integrity Comm.*, 501 F.3d 1215 (10th Cir. 2007)....................................27

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ...........................................................42

*Trump v. United States*, 603 U.S. 593 (2024)................................................................35

*\*UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003).....................36, 37

*United States v. Amlani*, 111 F.3d 705 (9th Cir. 1997)..................................................33

*United States v. Brown*, 381 U.S. 437 (1965).................................................................28

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)..................................................32

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977)...............................................2

*United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) ......................................................33

*\*United States v. Williams*, 553 U.S. 285 (2008) ...................................................30, 31

*Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302 (2014).....................................................37

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ...............31

*Webster v. Doe*, 486 U.S. 592 (1988) ...........................................................................11

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
    2025 WL 946979 (D.D.C. Mar. 28, 2025).................................................................8

*\*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ................................................25, 26

*Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92 (1st Cir. 2002) ...........................26

*\*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .....................34, 35, 38

*Ziglar v. Abbasi*, 582 U.S. 120 (2017)...........................................................................19

Page

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Const.
  art. I, ...........................................................................................................29
  art. II, ..........................................................................................................35
  amend. I.................................................................................................. passim
  amend. V ......................................................................................................32
  amend. VI ........................................................................................31, 32, 33

5 U.S.C.
  *§ 702 ......................................................................................................42, 44
  § 703 ............................................................................................................42

40 U.S.C.
  § 121 ............................................................................................................36
  § 318a ..........................................................................................................38

8 C.F.R. § 31.205-33 .....................................................................................22

48 C.F.R.
  § 44.101 ......................................................................................................22
  § 52.249-2 ...................................................................................................37

Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025)...........................17, 36

Exec. Order 14215, 90 Fed. Reg. 10447 (Feb. 18, 2025) .............................18

Fed. R. Civ. P.
  8.....................................................................................................................4
  12................................................................................................................4, 5
  56...................................................................................................................5

D.D.C. L.R. 7(h)(1).........................................................................................5

## OTHER AUTHORITIES

Complaint, *United States v. Coe*, 2:25-cv-02269 (W.D. Tenn. March 10, 2025) ...........................4

Complaint, *United States v. New York*, No. 1:25-cv-00205 (N.D.N.Y. Feb. 12, 2025) .................4

## INTRODUCTION

The government's motion to dismiss (ECF 43-1) attempts to obscure the unprecedented nature of the Executive Order and pretends there is nothing to see here.  The government asserts (at 1), for instance, that the Order is "within the bounds of established executive authority" but does not cite any prior instance of a President issuing a remotely similar order in the 249 years of our Republic.  The government also pretends (at 1) that "national security" necessitated the Order, even though the Order on its face shows it is intended to retaliate against the Firm for representing the President's political opponents and advocating positions he does not like.  According to the government, the Firm is "complaining about … a series of boogymen … a series of ghosts."  TRO Tr. 36:12-13.  But the government is the one whistling past the graveyard.  Unsurprisingly, four judges in this District have clearly seen the President's executive orders singling out law firms for what they are:  a personal vendetta that is antithetical to our constitutional order.

To evade review, the government suggests (at 3) the Order may amount to nothing at all because agencies still must issue "guidance" that is "consistent with law."  But the government ignores that the President's findings in Section 1 dictate the terms of any "guidance," and that Section 5, for example, makes clear that any guidance should "limit[]" the Firm's access to federal buildings and its engagement with federal employees.  Indeed, before the TRO issued, the government already began prohibiting Perkins Coie attorneys from attending meetings based on the Order alone—without awaiting any "guidance."  And since then, the President's staff secretary has made clear that the Order and those like it "ensure that [firms] *can't access* government resources [and] government buildings."  Ex. 1, at 15:40-52 (Presidential signing ceremony).[1]

---

[1] Unless otherwise indicated, exhibits are attached to the Declaration of Ryan Scarborough, filed herewith.  Also unless otherwise indicated, all emphases are added and all internal quotation marks and citations are omitted.

The government insists (at 7-8) that Section 1 of the Order—which brands Perkins Coie as "dishonest and dangerous" and declares that the Firm "racially discriminates"—contains "factual" statements that "are not seriously contested," even though the Firm vigorously contests them with evidence. Changing course, the government then asserts (at 13) that Section 1 is simply a statement of the President's "*opinions*," which the Firm "has no right to silence." But the government again ignores that these "opinions" are actually *findings* by the head of the Executive Branch, and the government's counsel recently told another judge in this District that those findings would dictate "how to implement" the rest of the Order. Manning Decl. Ex. 55 (ECF 39-4), at 20:6-9.

On top of all this, the government ignores altogether (i) the Fact Sheet, which boldly proclaims the Order's motive to retaliate against the Firm for filing "lawsuits against the Trump Administration"; (ii) the President's public statements both before and after the Order, in which he said he wanted to go after law firms like Perkins Coie; (iii) the Court's TRO ruling, which preliminarily ruled on many of the issues the government addresses, but to which the government does not bother to respond; and (iv) the similar rulings of Judges Leon and Bates, now joined by Judge AliKhan.

The reality, which becomes starker with each successive executive order against a major law firm, is this: The President has embarked on an unconstitutional mission to retaliate against Perkins Coie and, more generally, to intimidate and muzzle the independent legal profession. The Judiciary should recognize that mission for what it is and not allow it to succeed. *See United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.) ("Judges are not required to exhibit a naiveté from which ordinary citizens are free."). The Judiciary is a co-equal branch of government, but it cannot act on its own. For courts to exercise their duty to say "what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), *lawyers* must bring cases to the courts.

That is why "[a]n informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). It is plain as day that the Order and those that followed are attempts to suppress the independent bar as a check on the Executive Branch.

As the President no doubt intended, the public at large also understands the Order for what it is: "[A] naked attempt to instill fear in the legal profession and intimidate lawyers into submission." Bar Ass'ns Br. 25 (ECF 101). The outpouring of support from amici—representing diverse perspectives, types of organizations, experiences, and roles—has unequivocally condemned the Order's attempt to erode the integrity of the legal system and undermine the rule of law. Among these amici are 504 law firms, 363 law professors, 334 solo or small firm practitioners, 346 former state and federal judges, 20 States and the District of Columbia, 67 current or former corporate general counsel, 23 nongovernmental organizations, 21 litigation firms, and 16 bar associations. *See* ECF 15, 49, 77-78, 94, 99, 101, 116, 130. Each understands the stakes, from some of the Nation's largest firms to the solo practitioner who wrote: "when lawyers are apprehensive about retribution simply for filing a brief adverse to the government, there is no other choice but to do so." Pickering Legal LLC Br. 6 (ECF 93). Well said. That is why Perkins Coie brought this case.

For the reasons explained in Perkins Coie's motion for summary judgment (ECF 39) and further explained below, the Firm has pleaded—and proven—each and every claim in its Complaint. The government's ripeness and standing arguments present no obstacle to review. Before the TRO issued, the Executive Order already had caused concrete harms to the Firm. It blinks reality for the government to suggest Perkins Coie has not pleaded a connection between the Order and multiple Firm clients who terminated or considered terminating their relationship with the Firm in the Order's aftermath. The Court should deny the government's motion to dismiss, grant Perkins Coie summary judgment, declare the Order invalid, and permanently enjoin it in full.

**LEGAL STANDARD AND RESPONSE TO "SHOTGUN PLEADING" ARGUMENT**

Although this Court already has held that Perkins Coie is likely to succeed on at least three of its claims, and although the Firm has moved for summary judgment and supported its claims with evidence, the government moves to dismiss the Complaint.  A complaint survives a Rule 12(b)(6) motion if it "contain[s] sufficient factual matter, if accepted as true, to state a claim to relief that is plausible on its face."  *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (cleaned up).  When ruling on a motion to dismiss, a court must grant the plaintiff "all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up).

The government (at 3-4) accuses the Firm of engaging in "shotgun pleading" because each count incorporates prior paragraphs of the Complaint.  According to the government (at 3-4), this "severely handicaps [its] and the Court's ability to ascertain the particulars of Plaintiff's challenges to the various sections of the Executive Order."  Notably, the government does *not* seek dismissal on this basis; instead, it purports (at 4) to reserve the "right" to brief "additional argument[s]."

The government's criticism is baseless.  Incorporating prior paragraphs of a complaint is a common pleading practice that the government itself employs.[2]  That practice certainly does not "run afoul of Rule 8" where, as here, "[e]ach count includes additional allegations that make clear which of the broadly applicable facts specifically pertain to that count."  *Maynard v. Melton*, 2021 WL 6845008, at *4 (D.D.C. Apr. 7, 2021), *R. & R. adopted*, 2023 WL 1963919 (D.D.C. Feb. 10, 2023).  At the TRO stage, the Court had no difficulty understanding the Complaint and concluded the Firm was likely to succeed on "at least three" of its claims.  TRO Tr. 74:7-11.  The government

---

[2] *See, e.g.*, Compl. at 8-21, *United States v. Coe*, 2:25-cv-02269 (W.D. Tenn. March 10, 2025); Compl. Mar. 10, 2025); Compl. at 13-15, *United States v. New York*, No. 1:25-cv-00205 (N.D.N.Y. Feb. 12, 2025).

thus cannot credibly claim any confusion in ascertaining the Firm's claims.

Before delving into the discussion below, Perkins Coie makes two preliminary points. First, while the government wrongly accuses the Firm of hiding the nature of its claims, the government itself disguises the nature of its motion.  Although the government seeks dismissal under Rule 12, it also styles its motion as one for "expedited judgment," invokes Rule 56, and makes liberal use of materials outside the pleadings to draw inferences that the Firm disputes.  *See, e.g.*, MTD Cover, 4, 10, 15.  To the extent the government is moving for summary judgment, its motion should be denied for failure to comply with Local Rule 7(h)(1), which requires a statement of undisputed material facts supported by record citations.  However, insofar as the Court permits the government to move for summary judgment, the Court should consider the evidence submitted with the Firm's summary-judgment motion (ECF 39) and the additional exhibits submitted herewith in denying the government's motion.  These additional exhibits concern recent developments and provide further support for granting the Firm summary judgment.

Second, the government organizes its brief by discussing the Order section-by-section, rather than addressing the Firm's Complaint claim-by-claim.  The government's approach results in considerable repetition across sections and appears designed to obfuscate the Order's blatant unconstitutionality by discussing each section in isolation.  To more clearly present the issues and to comport with Rule 12 (which governs dismissal of *claims*), the Firm organizes this opposition on a claim-by-claim basis, addressing particular sections as they become relevant.

## ARGUMENT

### A.    The Complaint States First Amendment Claims

#### 1.    The Complaint States a Claim for First Amendment Retaliation

The Firm plainly states, and has proven with undisputed facts, a claim that the Executive Order retaliates against the Firm and its clients for protected First Amendment activities.  The

Order's retaliatory aim is obvious.  As the President's public statements confirm, the Order's purpose is to chill the Firm and the independent legal profession from representing clients he dislikes or advocating positions he disfavors.  The entire Order is a flagrant First Amendment violation and an assault on the rule of law.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out," *Hartman v. Moore*, 547 U.S. 250, 256 (2006), and from "relying on the threat of invoking legal sanctions to achieve the suppression of disfavored speech," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (cleaned up).  These principles prohibit retaliation for the Firm's own speech and for the Firm's "perceived association with another person and that person's speech."  MSJ Br. 10 (ECF 39-1) (cleaned up).

To prevail on a retaliation claim, a plaintiff must plead and ultimately prove that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link [exists] between the exercise of a constitutional right and the adverse action taken against him."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

To begin, there is no serious dispute that the Firm has pleaded the first element:  the Firm has engaged in activities protected under the First Amendment by representing clients and advocating positions on their behalf.  *See* Compl. ¶¶ 15, 19, 128; MSJ Br. 10-11 (collecting cases).[3]  As this Court previously held, the Firm's "work on behalf of a political opponent of the President and to protect voting rights in the 2020 presidential election," as well as "the viewpoint or perceived

---

[3] The Firm has standing to assert both its own First Amendment rights and those of its clients in this context.  *See* MSJ Br. 16 n.5.

viewpoint of the law firm's clients and even former or current partners," "all fall squarely within the protections of the First Amendment."  TRO Tr. 76:20-25.

As to the second and third elements, the government cannot credibly dispute that the Order takes retaliatory action because of these protected activities.  Neither the President nor the Executive Order was subtle about its retaliatory purpose.  As the Court already found, "[t]he retaliatory nature of Executive Order 14230 is *clear from its face*."  TRO Tr. 75:12-13.  Section 1, which states the Order's "Purpose," unabashedly cites as bases for the sanctions imposed in the following sections that the Firm represented the President's opponent in the 2016 presidential election, worked with so-called "activist donors," and represented clients in election-law litigation to "judicially overturn" laws that the President deems "popular" and "necessary."  EO § 1.  As the Court recognized, Section 3 further points to the Firm's work for the Clinton campaign and election litigation generally "as the explicit basis for the punitive nature of the steps" to be taken pursuant to the Order.  TRO Tr. 75:21-76:1.  The accompanying Fact Sheet "is even more explicit about the retaliatory animus for issuance of the order." *Id.* at 76:4-5.  It refers to the Firm's "partisan lawsuits against the United States" and more specifically its "[l]awsuits against the Trump Administration," and it counts the Firm among the so-called "partisan actors who exploit their influence."

The President's public statements underscore the Order's retaliatory purpose.  Since the 2016 election, he has threatened to retaliate against those who he accuses of having worked against his campaigns.  Compl. ¶¶ 54-62.  He has been clear that he includes Perkins Coie and its former partners in that group. *Id.* ¶ 61; *see also* SOF ¶¶ 100-16 (ECF 39-2).  And when signing the Order, he confirmed its retaliatory purpose, stating that the Firm had engaged in "weaponization" against "a political opponent" (himself) and asserting that "it should never be allowed to happen again."  Compl. ¶¶ 6, 61.

The President's retaliatory purpose is all the more apparent because the Order is part of a wider campaign of retribution against particular law firms he perceives to be his political opponents. The campaign began before the Order, when the White House issued a memorandum targeting several personnel at Covington & Burling for representing a special counsel who investigated the President during the preceding administration. Compl. ¶¶ 54-56. And it has continued since the Complaint was filed, with the President issuing similar executive orders against four other law firms: (1) Paul Weiss, (2) Jenner & Block, (3) WilmerHale and, most recently, (4) Susman Godfrey. SOF ¶¶ 243, 252, 256; Ex. 2 (Susman EO); Ex. 3 (Susman Fact Sheet).[4]

The common thread uniting all these orders is that they retaliate against law firms for their association (or past association) with lawyers who represented the President's opponents, participated in investigations of the President, or challenged the Administration's policies. This Court recognized the President's retaliatory purpose in this case. TRO Tr. 75:12-13 ("The retaliatory nature of Executive Order 14230 is clear from its face."). So did Judge Bates in the Jenner & Block case. Manning Decl. Ex. 55, at 48:1-5 ("[T]he Executive Order facially retaliates against Jenner…."). So did Judge Leon in the WilmerHale case. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) ("The retaliatory nature of the Executive Order at issue here is clear from its face…."). And so did Judge AliKhan in the Susman case. Ex. 8, at 44:23-25 (Susman TRO Hearing) ("the retaliatory nature of the executive order is plain from the language of the EO.").

The government has nothing to say about this historically unprecedented evidence of Presidential retaliation. Indeed, the government cannot even bring itself to acknowledge what the

---

[4] These orders go hand-in-hand with a recent Presidential Memorandum that targets a number of the President's perceived political opponents and certain lawyers, including Norman Eisen, Letitia James, Alvin Bragg, and Andrew Weissman. *See* Ex. 7.

Order says.  To read the government's brief, one would not know that the Order finds that the Firm engaged in "dishonest and dangerous activity" for its representation of clients; that it refers to this activity as "part of a pattern"; that it calls out its representation of "failed Presidential candidate Hillary Clinton"; and that it faults the Firm for "work[ing] with activist donors" to "judicially overturn popular, necessary, and democratically enacted election laws."  EO § 1.  And the government's brief *never* mentions the Fact Sheet, which explains that the Firm is being punished because of "partisan lawsuits against the United States"—including "lawsuits against the Trump Administration" itself.  Nor does the government address the President's statements, tweets, and posts that promised retaliation and then confirmed it after the fact.

The reason for the government's silence is obvious:  it cannot dispute the retaliatory motive.  The First Amendment, at its core, protects those accused of being "partisans," which is nothing other than the expression of a political viewpoint.  *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.");  *accord* ACLU Br. 9 (ECF 50) ("The Executive Order's characterization of Perkins Coie's voting rights lawsuits as 'partisan' does not remove one iota of First Amendment protection.").  And just as the First Amendment protects against censorship, it protects against "[o]fficial reprisal for protected speech," *Hartman*, 547 U.S. at 256, and even the threat of such reprisal, *Vullo*, 602 U.S. at 189.  And where the government retaliates based on First Amendment activities, that ends the inquiry, for retaliation is a reason "upon which the government may not rely."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

The reprisal here—which emanates from the President himself—casts a chilling effect of "blizzard proportions across the entire legal profession."  TRO Tr. 95:23-24.  The Order aims to

suppress the zealous advocacy that is fundamental to our adversarial system of justice and to our democracy itself.  That other firms have, in the President's words, had a "remarkable change of course" only proves the point.  *See* Manning Decl. Ex. 50.  Absent a permanent injunction, other firms will, as the President's press secretary put it, "continue[] to bend the knee."  Ex. 6.

The Order's retaliatory purpose extends to and invalidates each of its sections.  None of the government's section-specific arguments can save the Order from this retaliatory taint.

***Section 1***.  Although the government claims (at 7) that Section 1 merely "contains a brief factual explanation for the operational elements of" the Order, that characterization is doubly in-correct.  First, Section 1 is not a mere factual recitation.  As *government* counsel argued at the TRO hearing, Section 1 is a set of "finding[s]."  TRO Tr. 35:9.  And contrary to the government's contention (at 7, 15), those "findings" are hotly disputed.  *See infra* p.26.

Second, Section 1 cannot be set aside as a mere "explanation" for the so-called "opera-tional" sections of the Order.  Section 1's obvious purpose is to point agency heads, when conducting their reviews and investigations and drawing up guidance, to a preordained conclusion based on the President's "findings."  The government acknowledged this in the Jenner & Block proceedings, confirming that Section 1 of that order "inform[s] the provisions that are to be acted upon."  Manning Decl. Ex. 55, at 18:4-12.  The government added that "any member of the Exec-utive who would be wrestling with how to implement Sections 3 or 5 would necessarily be resorting and looking at what was said in Section 1 to guide that decision."  *Id.* at 20:6-9

The government also cannot save Section 1 by arguing (at 1) that an injunction would "carr[y] with it a dangerous risk of muzzling the Executive."  The Court's carefully written TRO did not muzzle the President, nor will the permanent injunction that the Firm has proposed.

Furthermore, the Executive Order is not merely a presidential statement. It is an *official act* that orders federal officials to impose sanctions on the Firm.

**Section 2(a)**. Neither of the government's defenses of Section 2(a) has merit. First, the Firm's challenge to Section 2(a) does not "run headlong" into *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024). That decision simply bars challenges to (i) the merits (ii) of individualized security-clearance decisions that are (iii) made pursuant to the prescribed regulatory process (iv) on grounds of national security. *Id.* at 883-84. The government fails to account for decisions, beginning with *Webster v. Doe*, 486 U.S. 592 (1988), making clear the courts will review the constitutionality of a *policy* concerning security clearances for an entire *category* of persons. *See* MSJ Br. 15.[5]

Here, Section 2(a) does not even invoke national security as a basis for suspending or reviewing the security clearances of Firm personnel. But perhaps more importantly, the Order dictates the suspension of clearances held by any Firm personnel, regardless of who they are or for what matter they hold a clearance, simply because they belong to the Firm. As the Firm's summary-judgment brief explains, such acts are not within *Lee*'s scope. MSJ Br. 14-16.

Section 2(a)'s categorical suspension itself indicates a retaliatory intent. But three other factors confirm that any "national security" concern is mere pretext. First, Section 2(a) does not even target the lawyers who retained Fusion GPS; they no longer work at the Firm. Compl. ¶ 20; SOF ¶¶ 71, 95. Instead, the Order punishes *current* Firm personnel who had no involvement with that episode based on nothing more than guilt by association. Second, Section 2(a) is oddly timed. If the 2016 dossier did not cause the President to revoke the clearances of Firm personnel during

---

[5] Although broadly asserting that security-clearance issues are non-justiciable, even the government recognizes that the D.C. Circuit will review security-clearance decisions when the allegation is that the decisionmaker received knowingly false information. MTD Br. 14-15 (citing *Rattigan v. Holder*, 689 F.3d 764, 769 (D.C. Cir. 2012)).

his first term, "it is impossible to understand how that nearly decade-old activity could now serve as a 'national security' justification for the immediate suspension of security clearances." Leonard Rpt. ¶ 50. Third, the Paul Weiss executive order contains a nearly identical Section 2(a). SOF ¶ 248. But the President withdrew that order after Paul Weiss agreed to provide *pro bono* services that the President supports. *Id.* ¶ 249. That settlement shows that "[t]here cannot reasonably have been a national security emergency that justified the immediate suspension of security clearances." Leonard Rpt. ¶ 53 (ECF 39-8).

Second, the government argues (at 16) that the Firm's challenges to Section 2(a) are "premature" until "any clearance suspension is accomplished" and "reviewed." Not so. Section 2 is unconstitutional, however implemented. Future proceedings cannot make it any less retaliatory. Nor can such proceedings cure the additional infirmities discussed below, including that Section 2(a) is the product of viewpoint discrimination and denies the Firm personnel equal protection by targeting them for no legitimate purpose. These legal challenges are ripe now. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (issue was ripe where it was "purely legal" and "would not be clarified by further factual development").

Nor is Section 2's harm speculative. Section 2 directs agency heads to "*immediately* take steps" to "suspend any active security clearances held by individuals at Perkins Coie, *pending a review*." EO § 2(a). The Fact Sheet similarly makes clear that clearances "*will be immediately suspended*." The government cannot forestall review by hiding behind boilerplate language requiring steps to be "consistent with applicable law." EO § 2(a). Section 2 "unambiguously commands action" and that boilerplate cannot "override [its] clear and specific language." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018).

Nor, for that matter, is the outcome of any later review in doubt. The Order directs agencies to revoke clearances "consistent with the national interest." EO § 2(a). But Section 1 dictates how agencies must view the "national interest" by declaring that the Firm is "dangerous" and should not "have access to our Nation's secrets." EO § 1. Results of any review are preordained.

***Section 2(b)***. Section 2(b) prevents the Firm from accessing not only "Sensitive Compartmentalized Information Facilities" (which the Firm has never had, SOF ¶ 99), but also "*all* Government goods, property, material, and services." EO § 2(b). On its face, that section would prohibit the Firm from, among other things, using the postal service, accessing the SEC's EDGAR filing system, or utilizing pay.gov. The government offers no defense of this section.[6] Nor can it; only retaliation can explain Section 2(b)'s sweeping prohibitions.

***Section 3***. This section has two aspects: (1) terminating the Firm's government contracts and (2) terminating contracts between the Firm's clients and the government (after first compelling clients to disclose the business they do with the Firm). Both aspects are clearly retaliatory.

Regarding government contracts with the Firm, the government (at 17) claims its purpose is to combat racial discrimination through the procurement power.[7] As discussed below, any purported concern about the Firm's employment practices is a pretext for retaliation for the Firm's First Amendment activities and viewpoints. *See infra* pp.20-21; *see also* MSJ Br. 17-18. Even setting that aside, the government concedes that Section 3 does not rely exclusively on that

---

[6] Although the government (at 13 n.1) questions whether the Firm challenges Section 2(b), the Firm's First Amendment claims apply to the entire "Order," including Section 2(b). Compl. ¶¶ 134, 155.

[7] The government seeks to have it both ways, arguing (at 20) that Section 3 fights alleged discrimination by the Firm while at the same time questioning whether the Firm even holds government contracts. That the Firm does not hold government contracts only underscores the animus behind the Order. Of course, whether or not the Firm presently has government contracts, stigmatizing the Firm and barring it from government contracting is itself a cognizable harm. *See infra* n.8.

rationale; it also relies on what the government calls (at 17) "malfeasance in election litigation," which is in reality the Firm's representation of the President's opponent in the 2016 election and of clients in election-law and election-result litigation. *See* EO § 3. Indeed, the Fact Sheet says that "the Federal Government will prohibit funding contractors that use Perkins Coie LLP" "*[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States*," and does not mention racial discrimination as a justification for Section 3.

Knowing full well that terminating contracts with Perkins Coie for its representation of clients disfavored by the President is unconstitutional retaliation, the government asserts (at 17) that it need have only one legitimate basis, citing *McGowan v. Maryland*, 366 U.S. 420 (1961). But *McGowan* does not support that proposition. The passage cited by the government involved an equal-protection claim and the proposition that "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." 366 U.S. at 426. That is irrelevant to a First Amendment retaliation claim, where even "[a]n ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) (cleaned up). If the President can retaliate against his real and perceived political opponents so long as he articulates some additional purpose—say, a so-called "national interest"—then the First Amendment provides no protection against retaliation from government officials.

The government's contention (at 22-23) that the Firm's representation of Mrs. Clinton and clients in election litigation "is not 'protected' in any meaningful sense" because Special Counsel Durham investigated the Steele dossier is baffling. The mere fact of an investigation does not rob

speech of constitutional protection—least of all the Durham investigation, which led to the *acquittal* of a former Firm partner.  Compl. ¶ 8; SOF ¶ 76.

Regarding Section 3's treatment of government contracts held by the Firm's *clients*, the government offers no defense of its obvious purpose to punish the Firm for its protected speech and association by going after its clients.  The Fact Sheet expressly makes that connection:  if government contractors employ Perkins Coie as their lawyers, then the proceeds of those government contracts "subsidize *partisan lawsuits against the United States*."  Never mind that the First Amendment protects the right to petition the government by filing a lawsuit.  *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011); TRO Tr. 85:15-19.

Instead of denying the retaliatory intent, the government argues (at 19-21) the Firm lacks standing to challenge Section 3's provisions targeting the Firm's clients because there supposedly is no causal connection between that section and clients' cutting or considering cutting their ties to the Firm.  To begin with, the government is wrong (at 20) that Section 3 "only" terminates contracts for which the Firm has been hired to perform services.  Section 3 also broadly directs agencies to assess any contracts "with entities that do business with Perkins Coie" and "align" their funding decisions with the "goals and priorities" of the Administration.  EO § 3(b)(ii).  As noted above, the Fact Sheet makes no bones about what this means:  "the Federal Government *will prohibit* funding contractors that use Perkins Coie LLP."

The Complaint pleads a direct, causal relationship between Section 3 and injury to the Firm.  It alleges that "[b]ecause of the Order," "several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie," including because of the "risk of contract termination faced by clients with government contracts."  Compl. ¶ 70; *id*. ¶¶ 71-78; SOF ¶¶ 150-60; *see also* Former & Current General Counsel Br. 8, 9-

15

11 (ECF 99).  Given the Order's close proximity to the harm, the government cannot credibly contest that the Firm has pleaded causation.  Further, the government ignores that losing business is not the only harm Section 3 inflicts; the Section also chills the Firm's and its clients' rights to free speech and association.  *See* TRO Tr. 95:22-96:5; *supra* pp.9-10.

The government fares no better in arguing (at 23) that its legitimate interests outweigh the Firm's free speech interests.  To begin, the government relies on a weighting analysis that applies when the government retaliates against government contractors for their speech.  *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 677-80 (1996).  Here, however, the government is cancelling contracts not because of contractors' speech, but because of a *non*-government-contractor law firm's speech.  Nothing in *Umbehr* permits that conduct.

In any event, the interests put forward by the government (at 22) are contrived and pre-textual.  "Efficiency" and "fiscal responsibility" will not suffice.  Section 3 relies on neither.  Nor does the Fact Sheet, which nods to fiscal responsibility only in that it seeks to ensure "taxpayer dollars" do not indirectly "subsidize partisan lawsuits."  If the government does not have a legiti-mate interest in discharging its own *employees* "for publicly or privately criticizing their employer's policies [or] for expressing hostility to prominent political figures," *Umbehr*, 518 U.S. at 674-75, it follows with even greater force that it does not have a legitimate interest in terminating *an independent contractor* by reason of the speech of its *outside lawyers*, with whom the govern-ment has no relationship.  And contrary to the government's claim (at 23), it is not reasonable "to consider a contractor's performance subpar" because of legal arguments advanced by outside counsel for other clients in unrelated litigation.  The government is unable to cite any authority that supports such an attenuated view of its legitimate interests as a contractor.  By the govern-ment's reasoning (at 23) that "it serves taxpayers to ensure that their dollars are not *in any way*

*traceable to the subsidization*" of views the President dislikes, the government could terminate any contractor whose CEO, accountant, or janitor has signed a petition in favor of what the President calls "anti-democratic election changes."  EO § 3(a).

Finally, the government's argument that "a funding program [that] supports one point of view does not necessarily establish viewpoint discrimination" is a straw man.  MTD Br. 23 (citing *Rust v. Sullivan*, 500 U.S. 173 (1991)).  The present case has nothing to do with funding one program and not another.  It concerns the *termination* of the government contracts of the Firm's clients *because* of the Firm's so-called "partisan lawsuits against the United States," "lawsuits against the Trump Administration," and alleged "partisan" influence generally.  *See* Fact Sheet. This is retaliation and viewpoint discrimination rolled into one and held up for all to see.  *See Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006) (government may not deny a person a benefit on a basis that infringes freedom of speech "even if he has no entitlement to that benefit").

***Section 4***.  The government contends (at 26-27) that Perkins Coie cannot demonstrate the requisite causal link as to Section 4—namely, that the EEOC investigation would not have been taken absent retaliatory motive.  What disproves that link, the government argues, is that "[e]ven before the Executive Order was issued, the Administration had begun taking steps" to enforce its view that certain DEI practices violate Title VII.  MTD Br. 27 (citing Exec. Order 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025)). Of course, even before that, the President repeatedly threatened the Firm with retribution.

In any event, EO 14173 proves just the opposite.  Precisely because the President already had directed federal agencies to "combat illegal private-sector DEI preferences, mandates, policies, programs, and activities" and to develop a "strategic enforcement plan" to target the "most

17

egregious and discriminatory DEI practitioners in each sector of concern," *see* EO 14173 §§ 2, 4(b)(ii), Section 4 is at most redundant, except insofar as it singles out the Firm for opprobrium and punishment by all federal agencies. And because Section 1 finds that the Firm is guilty of racial discrimination, and the Fact Sheet concludes that the Firm's conduct "violat[es] civil rights laws," the Order effectively predetermines the EEOC investigation called for by Section 4. That is particularly true because the President, through yet another executive order, has made clear "[t]he President['s] … opinions on questions of law are controlling on all employees in the conduct of their official duties." Exec. Order 14215, 90 Fed. Reg. 10447, 10448-49 (Feb. 18, 2025).

If the January 21 Executive Order actually were what prompted scrutiny of the Firm's employment practices, then one would have expected the Acting EEOC Chair (given her head start) to have followed the legal procedures for commencing investigations. Instead, on March 17, 2025 (shortly after the Perkins Coie Order), she issued a press release and published letters requesting information from Perkins Coie and other law firms, disregarding statutory limitations on the EEOC's authority to investigate conduct without first filing a charge. *See* MSJ Br. at 6. That manner of proceeding only confirms the causal link between the Order's retaliatory motive and the retaliatory action in Section 4.

**Section 5**. The government's ripeness defense to Section 5 is wishful thinking at best. It asserts (at 29) that it "cannot [be] plausibly allege[d] that Section 5 caused … injury on the basis of guidance which *has not been issued*." That argument fails. For one thing, Section 5's chilling effect alone makes the Firm's challenge ripe. *See* TRO Tr. 95:22-23; *cf. Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997) (collecting cases that were justiciable based on chilling effects within and outside the First Amendment context). For another, before the TRO, the government *already* had begun implementing Section 5, including by cancelling meetings with the

Firm.  Compl. ¶¶ 67-68.  Those government officials did so without further "guidance."  And the mere threat of the Firm's exclusion from entering federal buildings or engaging with government personnel caused some clients to withdraw work from the Firm.  *Id.* ¶¶ 70-77.  Moreover, the government's coyness about Section 5 is belied by its public statements, including the Staff Secretary's admission that the orders targeting firms are intended "*to ensure that [firms] can't access government resources [and] government buildings*."  Ex. 1, at 15:40-52.

The Firm's Section 5 claims also are ripe because they do not require "further factual development," including agency guidance.  *Susan B. Anthony List*, 573 U.S. at 167.  Section 5's constitutionality turns on whether it is motivated by retaliatory animus and on the other grounds discussed below, including that it discriminates on the basis of viewpoint and arbitrarily interferes with clients' rights to have the Firm as their counsel.  Agency guidance regarding "the degree to which agency heads will limit government access," MTD Br. 28-29, is not necessary for this Court to resolve those questions.  As this Court explained, Section 5 is "clear" in both its "purpose" and in "terms of what the guidance is supposed to look like."  TRO Tr. 99:21-23.  Finally, the government's observation (at 28-29) that the Firm "can only guess the degree to which agency heads will limit government access" only underscores the need for immediate review.  Section 5 is so vague that "the [F]irm, its employees, and its clients will have little idea what to expect in any professional encounter with any government official."  TRO Tr. 88:6-13.

The government next asserts (at 31) that "Section 5 is not tied to speech; it is tied to the 'national security' and the 'interests' of the United States, 'to the extent permitted by law.'"  But Section 5 *is* tied to speech, because the findings in Section 1 are the factual predicate for Section 5 (and the other sections).  Furthermore, "national security" is not a "talisman" that permits the President to exercise unlimited powers.  *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017).  And, here,

the incantation is half-hearted at most.  Section 5 also refers generically to "the interests of the United States" —a nebulous term that not even the government can define.  *See* TRO: 53:3-4.  But however that term might be understood, it cannot explain the application of Section 5 to *all* Perkins Coie personnel, including secretaries, IT professionals, and mailroom clerks.  Only indiscriminate retaliatory animus can explain that.

For all these reasons, the Order's retaliatory animus infects the entire Order, and the government's efforts to examine each section in isolation cannot save the Order.

### 2.    The Complaint States a Claim of Viewpoint Discrimination

The Complaint also states a claim of viewpoint discrimination.  *See* TRO Tr. 78:18-83:3.  "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).  Discrimination based on "[v]iewpoint" is an "egregious form of content discrimination," *id.* at 829, and "uniquely harmful to a free and democratic society," *Vullo*, 602 U.S. at 187.

On its face, the Order discriminates against the Firm for its perceived viewpoints regarding (i) the 2016 election, (ii) the constitutionality of certain election laws, and (iii) the values of diversity and inclusion.  EO §§ 1-5.  The Fact Sheet adds that the Order discriminates against the Firm for filing "lawsuits *against the Trump Administration*" and for its perceived views as a "*partisan actor*."  As this Court previously held, "[a]ll of this language makes perfectly clear that Perkins Coie and its employees were targeted for the firm accepting clients with perceived viewpoints that are unpopular with those in current political power."  TRO Tr. 80:10-13.

The government claims (at 22) it is discriminating against Perkins Coie only because of "employment practices involving racial discrimination and practices that interfere with free and fair elections."  That is a euphemism for viewpoint discrimination.  The government is discriminating against Perkins Coie because it does not like the Firm's speech on issues of diversity and

inclusion or the positions the Firm has advocated on behalf of its clients in election-related litiga-

tion. EO § 1. Additionally, the government ignores that the Order discriminates against the Firm

for other perceived viewpoints having nothing to do with the Firm's "employment practices" or

"free and fair elections," including that the Firm filed a lawsuit challenging the administration's

ban on transgender military personnel. Fact Sheet; Compl. ¶ 39; SOF ¶ 84.

The Administration's recent settlements with certain firms only confirm its viewpoint dis-

crimination. Those settlements not only required the firms "not to engage in … any policies,

programs, and practices previously labeled, characterized, or framed as a diversity or DEI pro-

gram"; they directly regulated speech by requiring the firms to "no longer categorize" even "*lawful*

employment or practices" as "DEI." Ex. 4 (EEOC Press Release). As one of those firms put it in

a memo to its staff, the settlement required the firms to comply "with applicable U.S. anti-discrim-

ination laws *including no longer using the term 'DEI' to describe our programs*." Ex. 5 (A&O

Shearman memo in law.com). Declaring a word that the President does not like unlawful and

barring its use by private citizens on penalty of sanctions is plainly viewpoint discrimination.

Because the Order is viewpoint discriminatory, it is unconstitutional unless the government

shows that it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed

v. Town of Gilbert*, 576 U.S. 155, 171 (2015). The government makes no attempt to satisfy that

exacting standard. Nor could it do so. The government has no compelling interest in punishing

lawyers for representing the President's opponents or advocating positions he dislikes; and even if

it did, the Order (which applies to the *entire* Firm) is far from narrowly tailored. MSJ Br. 19-20.

### 3.    The Complaint States a Claim of Compelled Disclosure

Perkins Coie also has stated a claim that the Order violates the First Amendment rights of

the Firm and its clients by compelling disclosure of attorney-client relationships. MSJ Br. 20-21.

There is no dispute that the Order would force each of the Firm's clients with any government

contracts to disclose to the government "any business they do" with the Firm and "whether that business is related to the subject of the Government contract."  EO § 3(a).

The government argues (at 22) that, when a client's business with the Firm is related to the subject of the Government contract, it may compel this disclosure because "it is very likely that Perkins Coie is a government subcontractor, whose work Defendants are entitled to monitor."  But the government provides no support for that assertion, and for obvious reason.  Federal regulations define a "subcontract" as a contract to "to furnish supplies or services for performance of a prime contract."  48 C.F.R. § 44.101.  That language applies to services that contribute *directly* to fulfill-ment of a contract, not to legal advice provided to the prime contractor by an outside law firm.  *See* 8 C.F.R. § 31.205-33 (recognizing legal advice as an allowable cost in some cases, but not classifying law firms as subcontractors).  Section 3 thus has nothing to do with monitoring "sub-contractors."  Further, the government ignores that Section 3 requires contractors to disclose "*any business* they do with Perkins Coie," regardless of "whether that business is related to the subject of the Government contract."

Nor is there any merit to the government's argument (at 22) that Section 3 does not trigger constitutional scrutiny because it merely compels disclosure of "purely factual and uncontrover-sial" information, akin to the disclosure of a meat product's country of origin.  *See Am. Meat Inst. v. U.S. Dep't. of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc).  The government ignores that Section 3 requires clients to disclose their *attorney-client relationships* with the Firm, which often are *confidential*.  Compl. ¶ 3.  To justify the compelled disclosure of such "sensitive information," the government must demonstrate a "substantial relation between the disclosure requirement and a sufficiently important governmental interest," and the requirement must be "narrowly tailored to

the interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 610-11 (2021). The government

does not, and cannot, satisfy that test. *See* MSJ Br. 21.

Finally, to the extent the government suggests (at 22) that Section 3 escapes scrutiny be-

cause it compels disclosure "only to the government and not to the public," the Supreme Court has

rejected that very argument. "[D]isclosure requirements can chill association even if there is no

disclosure to the general public." *Ams. for Prosperity Found.*, 594 U.S. at 616 (cleaned up).

### B.     The Complaint States Due Process Claims

Perkins Coie has more than adequately pleaded that the Order violates its rights to due

process. To survive a motion to dismiss, the Firm need only allege that it was (1) deprived of a

protected interest, and (2) did not receive the process that was due. TRO Tr. 83:7-10 (citing *Logan*

*v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)). The Firm has done so. In fact, this Court

already has held that the Firm is likely to succeed on its due process claims because the Order

deprives the Firm of various liberty and property interests with no process whatsoever. TRO Tr.

83:4-89:22. Indeed, the Order is so devoid of process that it functions as a "bill of attainder." *Id.*

at 89:10-13. The government's motion provides no reason to depart from that ruling.

### 1.     The Complaint Pleads Protected Liberty and Property Interests

The Court previously found that the Firm was likely to succeed in asserting four separate

liberty and property interests: (a) the rights of the Firm and its attorneys to follow their chosen

profession, (b) the Firm's right to its reputation, (c) the Firm's right to petition the government,

and (d) the Firm's property interests in its own contracts. TRO Tr. 83:11-86:19. The Complaint

sufficiently pleads those interests, each of which independently supports the Firm's claims.

***Chosen Profession***:  Perkins Coie pleads a protectable interest in its right to "follow a

chosen profession free from unreasonable governmental interference." *Campbell v. District of*

*Columbia*, 894 F.3d 281, 288 (D.C. Cir. 2018); *see Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232,

238-39 (1957).  Here, the Order directly interferes with the Firm's ability to practice law and represent its clients.  Specifically, the Order directs agencies to "limit the access of Perkins Coie attorneys and employees to federal buildings," to "limit Government employees 'from engaging with Perkins Coie employees,'" and "immediately to suspend any security clearances of Perkins Coie attorneys."  Compl. ¶¶ 66, 69 (quoting EO §§ 2(a), 5(a)).  Read literally, these provisions would prevent Firm lawyers from attending court proceedings, appearing before federal agencies, participating in any case implicating classified information, or even negotiating with prosecutors—in other words, from effectively representing Firm clients in any matters involving federal courts or the federal government.  The Order also stigmatizes the Firm by "signal[ing] to present and prospective clients alike that it is *persona non grata* with the Administration," which is particularly damaging because "[t]he firm is built around representation of clients who interact with the federal government."  *Id.* ¶¶ 79, 83; *see Kartseva v. Dep't of State*, 37 F.3d 1524, 1528-30 (D.C. Cir. 1994); *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1992).

The government does not seriously dispute that prohibiting the Firm from entering federal buildings, engaging with federal employees, or maintaining security clearances would deprive the Firm of cognizable liberty interests.  The government instead contends (at 16, 29-30) that claims relating to these interests are not yet ripe.  As discussed above, that argument is meritless.  Prior to the TRO, the government already had begun implementing the Order, and the outcome of any additional processes or guidance is predetermined.  *Supra* pp.10, 18-19.

The government also mischaracterizes the Complaint's allegations that the Order separately deprives the Firm of its liberty interest in pursuing its profession by "seeking to terminate private contractual relationships between Perkins Coie and its clients."  Compl. ¶ 101; *see, e.g.*, *Mead v. Indep. Ass'n*, 684 F.3d 226, 232 (1st Cir. 2012); *Stidham v. Tex. Comm'n on Priv. Sec.*,

418 F.3d 486, 491-92 (5th Cir. 2005). The government (at 19-21) asserts that the Firm does not have standing to challenge the Order "insofar as it regulates [the Firm's] clients." But the Firm does not allege that it has a liberty interest in its *clients'* relationships with the government; it alleges that the Order interferes with *its* relationships with its clients by pressuring those clients to abandon the Firm. Compl. ¶ 101. The government never disputes that this harm is cognizable.

**Reputation**: As this Court recognized, Perkins Coie also has a protectable interest in its reputation. TRO Tr. 85:5-9; *see Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). To show a cognizable reputational interest, the Firm must plead that "the government issue[d] a stigmatizing posting (or designation)" that "deprive[d]" the Firm of a "previously held" right. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) (cleaned up).

The government does not, and cannot, dispute that the Order stigmatizes the Firm. Among other things, the Order baselessly alleges the Firm engaged in "dishonest and dangerous activity"; "undermin[ed] democratic elections, the integrity of our courts, and honest law enforcement"; and "racially discriminates against its own attorneys and staff." EO § 1. These charges damage the Firm's "good name, reputation, honor, [and] integrity." *Constantineau*, 400 U.S. at 437.

As the government also does not dispute, these stigmatizing statements were accompanied by official directives that would make the Firm a pariah by, among other things, barring it from federal contracts, suspending security clearances, limiting its access to government buildings and services, and presumptively barring Firm personnel from federal employment. EO §§ 2, 3, 5.[8]

---

[8] The government argues (at 21) that the Firm lacks standing to raise its interest in being considered for government contracts because it does not allege that it currently holds such contracts or intends to bid for them. But the government ignores that the formal exclusion from federal contracting imposes significant reputational injury. *See Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 256 (2012); *Kartseva*, 37 F.3d at 1528. The Firm plainly has standing to vindicate its interest in avoiding such stigmatizing governmental action.

In response, the government contends (at 9) that the Firm failed to plead a reputational interest because it did not allege that the Order's statements are "false" and "defamatory." But the Complaint does dispute the Order's accusations. It pleads that the Order is "based on false premises," Compl. ¶ 104, points out that a district court dismissed a lawsuit in which the President makes many of the same allegations, *id.* ¶¶ 8, 38, and notes that the Firm prevailed in a significant number of voting rights cases about which the Order complains, *id.* ¶ 43. The Complaint further pleads that the Order falsely accuses the Firm of "racially discriminat[ing]" and utilizing "percentage quotas for hiring or promoting minorities." *Id.* ¶ 45. The Complaint explains that the purportedly discriminatory acts "did not exist [in 2019 and 2023] and do not exist now," and that the Order grossly mischaracterizes the Firm's employment practices. *See id.* ¶¶ 45, 51. These allegations, and the evidence submitted in connection with summary judgment, SOF ¶¶ 21-23, unambiguously challenge the Order's false and harmful statements.

In any event, the Firm need not prove the merits of a defamation claim to show it has been deprived of a cognizable reputational interest. "[D]ue process comes into play" whenever "the State attaches a badge of infamy to [a] citizen." *Constantineau*, 400 U.S. at 437; *see Gross v. Lopez*, 419 U.S. 565, 574-75 (1975) (reputation interest where school issued "charges [that] could seriously damage the students' standing"); *Nat'l Council of Resistance of Iran*, 251 F.3d at 204. Nor does the Firm need to prove that the Order's claims are false to be entitled to a *hearing*; that would put the cart before the horse. Instead, the Firm need only "dispute the charges made against [it]," so there is a factual dispute to be heard. *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002); *see also Codd v. Velger*, 429 U.S. 624, 627 (1977). The Firm has done so.[9]

---

[9] The government (at 9) cites a single case in which a court looked to the elements of common-law defamation while considering a due process claim. *See Campbell v. District of Columbia*, 126

*Right to Petition*:  The Firm also has a liberty interest in its "right to petition the government."  Compl. ¶ 101; *see Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236-37 (10th Cir. 2007); *see Arnaud v. Odom*, 870 F.2d 304, 311 (5th Cir. 1989); *NAACP v. Button*, 371 U.S. 415, 429-31 (1963).  The government does not dispute that barring the Firm from courthouses and other federal buildings would infringe that right, and instead relies (at 30) on its argument that any infringement is not yet ripe.  Again, that ripeness argument gets the government nowhere.  *Supra* pp.18-19.

*Private Contracts*:  Finally, the Order interferes with the Firm's property rights in its private contracts.  *See* Compl. ¶ 101; *FDIC v. Mallen*, 486 U.S. 230, 240 (1988); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Loc. 737 v. Auto Glass Emps. Credit Union*, 72 F.3d 1243, 1250 (6th Cir. 1996) (citing, *e.g.*, *Greene v. McElroy*, 360 U.S. 474, 492 (1959)).  The Order's obvious aim and effect (until being temporarily enjoined) was to force Perkins Coie's clients to terminate their relationships with the Firm.  Compl. ¶¶ 70-78.  Other than its flawed standing argument (at 19), the government does not dispute this interest at all.

## 2.    The Complaint Pleads that the Order Provides No Process and Functions as a Bill of Attainder

Perkins Coie also pleads the second element of a due process claim—that it did not receive the process it was due.  As this Court previously explained, there is no need "to determine precisely what process was due [the Firm] before issuance of [the Order] because *no process was given*."  TRO Tr. 86:20-23.  At a minimum, due process requires that "a person in jeopardy of serious loss []be given[] notice of the case against him and opportunity to meet it."  *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976) (cleaned up).  Indeed, it is a "root requirement" of due process that "an individual be given an opportunity for a hearing *before* he is deprived of any significant property

---

F. Supp. 3d 141, 150 (D.D.C. 2015).  But the court in that case looked to defamation law only because the parties agreed (wrongly) that it applied.  *See id.* at 149 n.5.

interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541-42 (1985). Due process also requires "fair notice of conduct that is forbidden," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), as well as notice of "the severity of the penalty that [the government] may impose," *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).

Here, Perkins Coie was given no process at all. The Firm "did not receive notice prior to being subjected to the Order." Compl. ¶ 102. Nor did the Firm receive "any opportunity to challenge the purported factual findings or the sanctions in the Order prior to their announcement." *Id.* ¶ 103. In addition, the Firm had no notice of what type of "conduct" would subject it to the punishments in the Order or what the "severity" of those punishments would be. *Id.* ¶ 102. The Order is based not on any legal standard, but on the President's personal views that the Firm engaged in "dishonest and dangerous activity" and should be punished without process. EO § 1.

As this Court observed, the Order is so lacking in process that it amounts to "a bill of attainder, a punishment for a singled-out entity deemed to be disloyal, without any formal investigation, trial, or even informal process." TRO Tr. 89:10-13; *see* MSJ Br. 26. The prohibition on bills of attainder is an essential component of the Constitution's "separation of powers," protects the "judicial function," and serves as "bulwark against tyranny." *United States v. Brown*, 381 U.S. 437, 442-43 (1965). That the Order functions as such a bill underscores that it violates due process.

It makes no difference that the Order was issued by the President, rather than enacted by Congress. Just as Article I forbids Congress from passing bills of attainder, the Due Process Clause prohibits the President from engaging in acts of attainder. TRO Tr. 89:20-22; *see* Caplan Br. 6-8, 14 n.2, 18-21 (ECF 120-1); Former Gov't Officials Br. 15-24 (ECF 104). As Justice Black wrote, there is no reason to "believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices

that had made the bill such an odious institution." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 144 (1951) (Black, J., concurring). This is particularly so, given that the Constitution provides that a congressional bill becomes a law only if it complies with Article I's requirement of presentment to the President. U.S. Const. art. I, § 7, cl. 2. "If the President cannot issue a bill of attainder when acting together with Congress, then he surely lacks the power to unilaterally issue the same bill of attainder by executive order." Former Gov't Officials Br. 18.

The government nowhere responds to this Court's prior holding that the Order amounts to a bill of attainder. Instead, it makes two narrower arguments. *First*, it contends (at 15) that Section 2(a) comports with due process because it contemplates a post-suspension "review" of whether security clearances "are consistent with the national interest." As discussed above, however, the outcome of any such "review" is preordained. Section 1 of the Order already declares that the Firm should not "have access to our Nation's secrets," and Section 2 directs an immediate, across-the-board suspension before that review even takes place. EO §§ 1, 2. In short, any process "would be a sham" because the "decision has already been made." *Cf. Ryan v. Ill. Dep't of Child & Fam. Servs.*, 185 F.3d 751, 762 (7th Cir. 1999); *see also* Leonard Rpt. ¶¶ 54-56 (ECF 39-8).

*Second*, the government contends (at 30) that it is too early to tell if the Firm "received adequate process" in connection with Section 5, because that question "depends on the importance of the private interest at stake," which in turn depends on "what guidance the agency heads will issue." The government cannot so easily dodge review. To begin with, there is no need for this Court to conduct any interest balancing test to determine what process was due because the Firm received "no process" at all. TRO Tr. 86:20-23. And even were there such a need, the impact on the Firm's interests already is clear. Prior to the TRO, the government already had begun implementing Section 5 by directing Firm attorneys not to attend scheduled meetings. Compl. ¶¶ 67-

68.  Section 5 thus had an immediate effect on the Firm's ability to practice its profession and represent its clients, not to mention on its reputation.  Further, any forthcoming "guidance" (assuming it ever issues) will not ameliorate these deprivations.  Section 1 dictates to agencies the type of guidance they must issue.  Indeed, as noted above, the government acknowledged as much at the Jenner TRO hearing.  Manning Decl. Ex. 55, at 20:6-9.

### 3.  The Complaint Pleads the Executive Order Is Impermissibly Vague

The Complaint also pleads that the Order is unconstitutionally vague because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008); *see* TRO Tr. 88:5-6.  In particular, the Order "does not provide Perkins Coie with a basis to understand what conduct is prohibited or how to avoid sanctions in the future," "does not provide any guidance on which interactions and buildings, and in what circumstances, its employees are restricted from," and "permits arbitrary and discriminatory enforcement." Compl. ¶ 108.  And the Order purports to punish Perkins Coie for "diversity, equity, and inclusion" policies without indicating which practices, if any, are unlawful.  *See id.* ¶¶ 109-14.

Ignoring these allegations, the government focuses exclusively on the Order's references to diversity, equity, and inclusion, and asserts (at 11) that Perkins Coie "identifies only Section 1" as impermissibly vague.  That is incorrect.  As Perkins Coie alleged and this Court found, the Order is replete with vague terms, including the instruction in Section 5 to "limit[] official access from Federal Government buildings to Perkins Coie," and "limit[] Government employees … from engaging with Perkins Coie employees."  EO § 5(a); TRO Tr. 88:5-89:9.  The government conceded it does not know what sort of "engag[ement]" will be prohibited, or what the impact of the Order will be.  TRO Tr. 88:21-89:4.  Those concessions alone doom the government's motion.

The government further suggests that the vagueness doctrine may not apply because the

Order is not a law that "define[s] criminal offenses" or "fix[es] ... permissible sentences."  MTD Br. 12 (quoting *Kincaid v. Gov't of District of Columbia*, 854 F.3d 721, 729 (D.C. Cir. 2017)). But *Kincaid* does not hold the vagueness doctrine is limited to criminal laws, and the government itself (at 12) cites multiple cases applying the vagueness doctrine to *civil* laws.  Indeed, the Supreme Court itself applies the doctrine in civil cases.  *See Fox Television*, 567 U.S. at 253-58.

The government next argues (at 12) that even if vagueness doctrine applies to civil statutes, the Order should be subject to a reduced vagueness standard.  Again, not so.  The government's own authorities explain that the "most important factor affecting the clarity that the Constitution demands ... is whether [the law] threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).  Stricter vagueness standards apply here because the Order unquestionably infringes the Firm's and its clients' First Amendment rights to petition the Government, to associate, and to pursue litigation. *See supra* pp.6-7, 27.  The government's claim (at 12) that "all that is at stake [is] Government contracts" is farcical; the Order's obvious purpose is to foreclose the Firm's ability to practice law.

The government also asserts (at 12) that the Order's attempt to punish the Firm for "diversity, equity, and inclusion" practices is not unconstitutionally vague because the Order *also* "refers to 'categories prohibited by civil rights laws.'"  But the Firm never alleged that the Order is vague because it references civil rights laws; it alleged the Order is vague because it fails to identify the conduct it proscribes or explain what features of "diversity, equity, and inclusion" programs are wrongful.  *See* Compl. ¶¶ 109-14.  The government does not explain how Perkins Coie could possibly conform its conduct to the Order.  The Order is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

### C.    The Complaint States Fifth and Sixth Amendment Right to Counsel Claims

Perkins Coie also states a claim that the Order interferes with its clients' rights to counsel

under the Fifth and Sixth Amendments.  *See* MSJ Mem. 27-31 (ECF 39-1).

The Order intentionally targets and interferes with the Firm's relationship with its clients and its ability to advocate on their behalf.  The Order forces government contractors—including the Firm's 15 largest clients, Compl. ¶ 65; SOF ¶ 147—to disclose their relationships with the Firm.  EO § 3(a).  It then requires the "heads of all agencies" to "terminate any contract … for which Perkins Coie has been hired to perform any service" and to review "all contracts" with "entities that disclose doing business with Perkins Coie" to "align" funding decisions with the "goals and priorities" of the Administration.  EO § 3(b).  The Fact Sheet makes clear what this means:  "the Federal Government will *prohibit funding contractors that use Perkins Coie*."  The government's claim (at 24) that the Order "only directs the termination of contracts under which Perkins Coie provides services" thus is belied by the government's own statements.

Making matters worse, the Order declares the Firm *persona non grata* before the federal government, requiring agencies to "limit[]" the Firm's access to government buildings and "limit[]" government employees from "engaging" with Firm personnel.  EO § 5(a).

If not enjoined, these sanctions would not only pressure the Firm's clients to fire the Firm, but also would directly restrict the Firm's ability to represent its clients in matters involving the federal government or federal courts.  This interference in the attorney-client relationship patently violates the Sixth Amendment rights to effective assistance of counsel, *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and counsel of choice, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006), as well as the Fifth Amendment right to freedom from arbitrary interference in the lawyer-client relationship, *Powell v. Alabama*, 287 U.S. 45, 69 (1932); *see* MSJ Mem. 27-31.

The government's meager responses are not credible.  First, the government argues (at 24) that the Firm "lacks standing" to challenge Section 3 because "Plaintiff never explains how the

disclosure requirement would itself make it *impossible* to represent its clients." But that is not the test; the government need not completely ban a firm to violate the right to counsel. It also is forbidden from "arbitrarily" interfering in the lawyer-client relationship. *Powell*, 287 U.S. at 69.[10] Constitutional rights "protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). The ability to engage with the government "is necessary to make meaningful" a client's right to choose the Firm. *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024) (per curiam). The Order may not leverage government access to "nullify the right to counsel of choice." *Luis*, 578 U.S. at 27 (Thomas, J., concurring).

Next, the government observes (at 31) that the right to counsel is "not absolute" and must be "balanced against the government's interest in the fair, orderly, and effective administration of the courts." But the Order does not identify any credible interest that remotely could justify the extraordinary sanction of banning the entire Firm from accessing federal buildings, receiving federal services, or engaging with federal employees. Finally, to the extent the government argues (at 32) the right-to-counsel claim is not ripe, that argument fails. *Supra* pp.18-19.

### D.    The Complaint States a Claim That the Executive Order Exceeds the President's Constitutional Authority and Violates the Separation of Powers

Perkins Coie also clearly states a claim that key provisions of the Order (Sections 1, 2(b), 3, and 5) exceed the President's constitutional authority and violate the separation of powers. There is no constitutional basis for a President to unilaterally punish a law firm, with no process

---

[10] *See also, e.g.*, *United States v. Amlani*, 111 F.3d 705, 711 (9th Cir. 1997) (Sixth Amendment does not "allow[] the government effectively to veto defendant's choice of counsel by intentionally undermining his confidence in the attorney-client relationship through disparagement."); *United States v. Stein*, 541 F.3d 130, 154-55 (2d Cir. 2008) (holding that "the right to counsel in an adversarial legal system would mean little if defense counsel could be controlled by the government or vetoed without good reason," and concluding that a Sixth Amendment violation would occur if "the government unjustifiably interfered with [a client's] relationship with counsel").

whatsoever. *See Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 142-45 (Black, J., concurring). In doing so, the President improperly usurps judicial power.

### 1.    No Heightened Showing of Unconstitutionality Is Required

There is no merit to the government's contention (at 5, 18) that Perkins Coie may not challenge the Order as *ultra vires* unless it demonstrates a clear violation. The government conflates *ultra vires* claims based on purely *statutory* violations with *ultra vires* claims based on *constitutional* violations. In particular, the government relies on cases involving claims that agencies acted beyond their statutory authority and where Congress did not authorize statutory review. *See Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763-66 (D.C. Cir. 2022). In such cases, courts understandably are reluctant to exercise non-statutory review and will do so only if certain conditions exist, including that the agency "plainly" exceeded its statutory authority. *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022).

In contrast, this action seeks to enjoin federal officers and agencies from implementing a patently *unconstitutional* executive order. It is well established that federal courts have equitable jurisdiction to enjoin federal officers and agencies from violating the Constitution, including its separation of powers. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *accord Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). Given that the basis for this Court's review is clear, there is no reason to put a thumb on the scale in favor of the government. Indeed, in the seminal case on executive orders, the Supreme Court nowhere suggested that the plaintiff had to satisfy a heightened standard to show the order was unconstitutional. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-88 (1952).

### 2. The President Has No Constitutional Authority To Punish the Firm

The Constitution does not grant the President the power to make laws or to adjudicate persons guilty of violating them. It instead vests in the President only the "executive Power" and certain enumerated powers, including the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. Thus, for an executive order to be constitutional, it "must stem either from an act of Congress" or from the President's powers in "the Constitution itself." *Youngstown*, 343 U.S. at 585. "If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so." *Trump v. United States*, 603 U.S. 593, 608 (2024) (quoting *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring)).

Here, Sections 1, 2(b), 3, and 5 of the Order have no basis in the Constitution. No constitutional provision authorizes a President to summarily declare that a law firm is "dishonest and dangerous" for representing his political opponents and then to impose various punishments on the firm. EO §§ 1, 2(b), 3, 5. Nor is there any executive practice "long pursued" and "never before questioned" of Presidents doing so. *Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring).

The government suggests (at 14, 29) the Order is justified by the President's inherent powers over "national security." As discussed in Perkins Coie's summary-judgment brief, however, any purported "national security" concern is merely a pretext for retaliation. MSJ Br. 10-16. Moreover, whatever the scope of President's national-security powers, they certainly do not include the power to unilaterally punish private parties with no process whatsoever. As Justice Black put it during the McCarthy era, our Constitution "wisely withheld authority for resort to executive investigations, condemnations and blacklists as a substitute for imposition of legal types of penalties by courts following trial and conviction in accordance with procedural safeguards of the Bill of Rights." *Joint Anti-Fascist Refugee Comm.*, 341 U.S. at 144-45 (Black, J., concurring). !

Nor does any statute authorize the President to issue the Order. In defense of Section 3, the government (at 17) invokes its "procurement power." But that power stems from the Federal Property and Administrative Service Act of 1949 ("Procurement Act"), 40 U.S.C. § 121. Under that act, the President does not have unbounded authority to order agencies to use their procurement powers for any purpose he sees fit. Instead, the President's orders must have a "sufficiently close nexus to the values of providing the government an economical and efficient system for procurement and supply." *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (cleaned up); *see* 40 U.S.C. § 121.[11]

The government asserts (at 17) that Section 3 serves to "combat racial discrimination" and analogizes to *Contractors Association v. Secretary of Labor*, 442 F.2d 159, 170 (3d Cir. 1971). The government's reliance on that case is ironic, given that it concerned a long-standing executive order on affirmative action that the President recently revoked. *See* Exec. Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (revoking Executive Order 11246). Regardless, that case only underscores how far the Order here deviates from the Procurement Act. There, the Third Circuit held that the act permitted President Johnson to require contractors on federally assisted construction projects to agree to affirmative-action provisions because such provisions advanced the government's "vital interest in assuring that the largest possible pool of qualified manpower be available" for its projects. *Contractors Ass'n*, 442 F.2d at 171.

Here, in contrast, there is zero nexus between the Order and promoting efficient procurement. Section 3 does not require government contractors to promote equal opportunity. Instead,

---

[11] Other circuits take an even narrower view of the President's authority under the Procurement Act, holding that he may issue directives only to carry out the act's "operative provisions." *Nebraska v. Su*, 121 F.4th 1, 7-8 (9th Cir. 2024); *Kentucky v. Biden*, 23 F.4th 585, 604 (6th Cir. 2022); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1298, 1300 (11th Cir. 2022). Under that test, Section 3 is plainly illegal, as the government identifies no relevant "operative provision."

Section 3 threatens government contractors with termination of their existing contracts because they "do business with Perkins Coie"—regardless of whether that business has anything to do with their government contracts.  EO § 3.  Section 3 purports to "prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize" Perkins Coie's alleged "racial discrimination." *Id.*  But that purported goal—preventing contractors from doing business with third parties who allegedly engage in unlawful employment practices—is far removed from providing an "economical and efficient" procurement system.  *UAW-Lab.*, 325 F.3d at 366 (cleaned up).  Further, the Fact Sheet makes clear that the true purpose behind Section 3 is to prevent contractors from "subsdiz[ing]" the Firm's allegedly "*partisan lawsuits*"—a goal having nothing to do with procurement.

The government (at 18) next invokes its power to "manage" contracts, citing a regulation on contract termination.  *See* 48 C.F.R. § 52.249-2(a).  But that regulation derives from the Procurement Act and thus cannot give the Executive any greater authority than the statute itself conveys.  *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 333-34 (2014) (regulation is "invalid" to the extent it purports to grants authority exceeding statute).  Because the Procurement Act does not authorize the Executive to terminate contracts to punish the Firm, neither can the regulation.

The government also argues (at 11) that, because the EEOC could investigate the Firm's employment practices, the Executive can take "the lesser action of simply reviewing contracting decisions" involving the Firm.  Setting aside that the EEOC's investigation is itself retaliatory, *supra* pp.17-18, the government's argument is flawed.  While the grant of a greater power sometimes includes a lesser one, no one would say that granting one power includes granting an *unrelated* one.  That the EEOC has some authority to investigate employment practices does not imply the President has a wholly unrelated power to terminate the contracts to punish the Firm.

Turning to Section 5, the government contends it has the "power to preserve the property under its control for the use to which it is lawfully dedicated."  MTD Br. 30 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)).  But federal law requires the government to exercise that power through general "rules and regulations," *see, e.g.*, 40 U.S.C. § 318a, like the rule prohibiting demonstrations on military bases in *Greer*.  But Section 5 does not establish any general rule governing access to federal buildings or communication with federal employees.  Instead, it singles out Perkins Coie and prohibits only its personnel from "access[ing]" federal buildings or "engaging" with federal employees.  EO § 5.  The government does not point to any federal statute authorizing the Executive to blacklist a particular firm in this manner because there is none.

In sum, the Order "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a *presidential policy* be executed in a manner prescribed by the President."  *Youngstown*, 343 U.S. at 588.  Because the Order also finds no footing in the President's Article II powers, it is unconstitutional.

### 3.    The Order Improperly Usurps Judicial Power

As explained in Perkins Coie's summary-judgment brief, the Order also usurps judicial power.  MSJ Br. 34-36.  It does so by arrogating to the President the Judiciary's exclusive authority to deprive individuals of private rights.  *See SEC v. Jarkesy*, 603 U.S. 109, 127-28 (2024); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54-55 (1989).  The Order also improperly wields the Judiciary's inherent authority to discipline lawyers for their general representation of clients.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  And the Order interferes with "the proper exercise of the judicial power" by punishing lawyers for presenting "reasonable and well-grounded arguments" in court.  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545-46 (2001).  For all these reasons, Perkins Coie has stated a claim that the Order violates the separation of powers.

### E.    The Complaint States an Equal Protection Claim

Perkins Coie also has stated an equal protection claim.  "Nowhere are the protections of the Equal Protection Clause more critical than when [the government] singles out one or a few for uniquely disfavored treatment."  *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 813 (D.C. Cir. 1988).  "The classic class-of-one claim is illustrated when a public official, with no conceivable basis for his action other than spite or some other improper motive comes down hard" on a private citizen.  *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013) (cleaned up).  As extensively described above, that is exactly what is pleaded—and what happened—here.

The government's arguments should be rejected.  First, the government wrongly argues (at 18-19) that the class-of-one theory is inapplicable to Section 3's government-contractor provisions.  The government relies on *Enquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), which held that the class-of-one theory does not apply to government employment because employment decisions require "discretionary authority based on subjective, individualized determinations."  *Id.* at 603.  But Section 3 does not involve "subjective, individualized determinations" akin to employment decisions.  Instead, the Order categorically directs agencies to "terminate any contract" for which "Perkins Coie has been hired to perform any service" and to "assess[]" any contracts "with entities that do business with Perkins Coie" to "align" funding decisions with the President's "goals and priorities."  EO § 3(b).  As noted above, the Fact Sheet makes clear that this means "the Federal Government *will prohibit funding contractors that use Perkins Coie LLP*."  This is not the kind of action that by its "nature involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments."  *Enquist*, 553 U.S. at 603.  Instead, it is a clear directive that agencies must target Perkins Coie and its government-contractor clients.

Next, the government contends (at 19) that the Firm is not "'similarly situated' to other potential government contractors who do not engage in unlawful DEI practices."  Setting aside

that the Firm does *not* engage in unlawful practices (as the Complaint pleads), the government's argument fails for two reasons. First, the government's contention that the Firm is not similarly situated to law firms that do not have similar DEI policies misses the point. There undoubtedly are numerous firms that *do* have similar policies, yet the President has targeted only Perkins Coie and a handful of other firms with executive orders. If this Court concludes that a comparator is necessary, the plethora of non-targeted firms easily would fit that bill.

Second, in any event, no comparator is necessary here. Courts have explained that because "improper motive is usually covert," the purpose of the similarly situated requirement is to "show there was no proper motivation for the disparate treatment" by pointing to two essentially identical parties who receive different treatment without any rational explanation. *Swanson*, 719 F.3d at 784. Where improper motive is "readily obvious" or "easily demonstrated" by other means, identifying similarly situated persons is unnecessary. *Id.* Here, identifying similarly situated persons is unnecessary because the Order's animus against Perkins Coie is plain on its face. *See* TRO Tr. 75:12-13; *see also* 504 Law Firms Br. 1 (ECF 78) (describing Order as "undisguised retaliation").

Finally, the government argues (at 19) that "the distinction the Executive Order makes—between potential contractors who 'engage in blatant race-based and sex-based discrimination' and those who do not—is plainly rational." That argument egregiously mischaracterizes the Order. The Order is *not* a general policy that distinguishes between firms who allegedly discriminate and firms who do not. Instead, the Order applies *only* to Perkins Coie and its clients. The government does not offer any legitimate reason for such targeting. Nor could it, as "a bare desire to harm a politically unpopular group" is "not [a] legitimate state interest." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 447 (1985) (cleaned up).

## II.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO RECONSIDER

The Court should deny the government's motion to reconsider ("MTR," ECF 44), which seeks to limit the scope of the TRO to the seven agency heads that are separately named as defendants in the Complaint.  Contrary to the government's contentions, (i) the United States *is* a proper defendant; (ii) Perkins Coie has an equitable cause of action against the United States for injunctive relief; and (iii) and an injunction against the United States may cover federal officers who are not named as defendants in the Complaint.  To the extent the government is concerned that the TRO does not specifically identify the heads of every agency, that issue easily can be resolved by adding the titles of those agency heads to the TRO itself.  There is no reason to limit the scope of injunctive relief, as the government requests.

By way of background, the Order applies to not only certain named agencies and officials (*e.g.*, OMB and the Attorney General), but also "all" other agencies and their heads.  EO §§ 2, 3, 5.  The OMB Director thus issued a memorandum instructing "all executive Departments and Agencies" to implement the Order.  Manning Decl. Ex. 31.  Accordingly, Perkins Coie sued both the specific officials and agencies identified in the Order and "the United States," which the Complaint defines as "all other agencies that are directed by the Order to take action respecting Perkins Coie."  Compl. ¶ 36.  This Court then issued a temporary restraining order against all Defendants, including the United States.  TRO (ECF 21).  In so doing, the Court specifically ordered the Attorney General and the OMB Director to issue guidance to "all other agencies subject" to the Order to suspend and rescind any implementation or enforcement of certain sections of the Order.  *Id.*

Following the Court's order, the Attorney General and OMB Director issued a memorandum on the TRO to all agencies subject to the order.  *See* Memorandum (ECF 31-1).  In addition, the government agreed to extend the TRO through final judgment, without objecting to the TRO's scope.  *See* Joint Status Rpt. ¶ 5 (ECF 25).

Now, however, the government belatedly contends the United States is "not a proper defendant" and that this Court's TRO should run against only the seven specific agency heads named as defendants in the Complaint.  MTR 4-10.  In other words, the government argues that when the President broadly orders "all" agencies to take unconstitutional action, a court is powerless to stop a particular official from implementing the order unless that official is specifically named as a defendant.  The government takes that position even though, as discussed, the Attorney General and OMB Director are more than capable of issuing directives to every agency subject to the Order.

This Court should deny the government's motion to reconsider because the United States *is* a proper defendant.  A federal statute, 5 U.S.C. § 702, expressly provides as much.  As the government recognizes (MTR 6), Section 702 is the provision that waives sovereign immunity in suits for non-monetary relief.  In language the government conspicuously omits, that statute explicitly states that "[t]he United States *may be named as a defendant* in any such action, and a judgment or decree *may be entered* against the United States."  5 U.S.C. § 702.[12]  The next statutory section adds that where, as here, no "special statutory review proceeding" is applicable, a plaintiff may bring an action against either "the United States, the agency by its official title, *or* the appropriate officer."  *Id.* § 703.  The disjunctive "or" confirms that individual agencies and officers need not be defendants.

To be sure, Section 702 further provides that, in an action against the United States, "any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title) … personally responsible for compliance."  *Id.* § 702.  But that is a requirement for the *decree*.  It

---

[12] It is immaterial that the Firm is not bringing a claim under the Administrative Procedure Act. Section 702's waiver applies to all equitable actions against the United States and its officers, including constitutional claims.  *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006).  Section 702 also makes clear that the United States may be named as a defendant in "*any*" action seeking non-monetary relief, including equitable relief.  5 U.S.C. § 702.

is not a requirement that individual officers be named as defendants in the *complaint*.  Nor would such a requirement be practicable; where, as here, an executive order is directed at "all" federal agencies, the government's position would require a plaintiff to effect formal service of the complaint on hundreds, if not thousands, of separate federal officials.

To the extent the government is concerned that the TRO does not specifically list every relevant agency head, that concern can be resolved simply by adding the titles of those officials to the TRO itself.  To that end, Perkins Coie has asked the government to identify each department, agency, or entity that received the OMB memoranda relating to the Order or that is otherwise subject to the Order, along with the name and title of the head official of each such body.  The government has indicated that it will provide such a list this week.  If the government does so, the Firm is amenable to adding those heads by title to the current TRO, as well as to the proposed permanent injunction.  That should fully moot the government's concerns.  If, however, the government ultimately fails to provide the requested list, this Court should leave the TRO in place without change.  The government cannot issue a government-wide order, fail to specify the agency heads who will implement it, and then fault the Firm for not identifying every one of them.[13]

The government's remaining objections to the TRO's scope are equally unavailing.  *First*, the government asserts that "[n]o cause of action exists" against the United States itself.  MTR 7.  The government acknowledges, however, that a cause of action in equity exists "to enjoin unconstitutional actions" by "federal officers."  MTR 6 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)).  The government offers no reason why such an equitable action

---

[13] With respect to the proposed *permanent* injunction, the Firm is working to create its own list of all federal agencies and agency heads subject to the Order in the event that the government fails to provide such a list.  If it becomes necessary, the Firm will submit that list along with a revised proposed order for the permanent injunction.

would not also lie against the United States to accomplish the same effect.  Nor is there a reason. Of course, courts should not unnecessarily recognize equitable actions that would conflict with a statute.  *See Armstrong*, 575 U.S. at 327.  But here, Section 702 expressly contemplates a suit for injunctive relief against the United States, making an equitable action particularly appropriate.

*Second*, the government argues that suing the United States would circumvent the principle that courts may not enjoin the President.  MTR 7.  Not so.  As noted, Section 702 specifically permits suits against the United States to enjoin unlawful actions by federal officers.  That comports with the longstanding rule that, while courts generally may not enjoin the President, they may enjoin federal officers from implementing an unlawful order.  *See* MTR 5-6 (acknowledging this rule).  As a case cited by the government explains, executive orders are not "immune from injunctive or declaratory relief ….  [I]n such litigation, the proper course is to seek to enjoin a member of the executive branch from carrying out the executive order at issue, not the President." *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021).  The Firm's suit against the United States seeks to do precisely that.

*Third*, the government asserts (MTR 9-10) that the Firm lacks Article III standing to seek injunctive relief against the "vast majority of Federal agencies."  The government does not dispute that the Firm has suffered injuries in fact to its business, reputation, and constitutional rights.  *See* TRO Tr. 85:5-86:13, 90:21-25, 99:15-21.  The government instead contends the Firm cannot trace these injuries to each individual agency.  But the Order itself broadly directs "all" agencies to take certain punitive actions against the Firm.  EO §§ 2, 3, 5.  Under the presumption of regularity, this Court should presume that each agency will follow those directives.  *See Al-Hela v. Biden*, 66 F.4th 217, 236 (D.C. Cir. 2023) (en banc).  The Firm's injuries are, therefore, traceable to each agency.  Indeed, because the Order acts as a bill of attainder, it inflicts sweeping reputational harm

on the Firm.  That harm is traceable to each entity instructed to carry out the Order, even those agencies with whom the Firm has not previously interacted.  *See Foretich v. United States*, 351 F.3d 1198, 1204, 1213 (D.C. Cir. 2003) (holding a plaintiff had standing to sue "the United States" over "an unconstitutional bill of attainder" because it "directly g[a]ve rise to a cognizable injury to [plaintiff's] reputation that can be redressed by a declaratory judgment").  The Firm thus has standing as to every federal agency.

## CONCLUSION

Perkins Coie respectfully requests that the Court deny the government's motion to dismiss and for expedited judgment, ECF 43-1, and deny its motion for reconsideration, ECF 44.

Dated:  April 16, 2025                                   Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

By:      */s/ Dane H. Butswinkas*
          Dane H. Butswinkas (D.C. Bar #425056)

F. Lane Heard III (D.C. Bar #291724)                Amy M. Saharia (D.C. Bar #981644)
Christopher N. Manning (D.C. Bar #464069)           Matthew B. Nicholson (D.C. Bar #1013418)
Ryan T. Scarborough (D.C. Bar #466956)              Carol J. Pruski (D.C. Bar #1006941)*
Malachi B. Jones (D.C. Bar #455555)                 Charles L. McCloud (D.C. Bar #1012047)*
Charles Davant IV (D.C. Bar #484305)                Krystal C. Durham (D.C. Bar # 987768)
David S. Kurtzer-Ellenbogen (D.C. Bar #489559)      Eden Schiffmann (D.C. Bar #1035019)
Jesse T. Smallwood (D.C. Bar #495961)

                                                    680 Maine Avenue, SW
                                                    Washington, DC  20024
                                                    (202) 434-5000
                                                    *Counsel for Plaintiff Perkins Coie LLP*

                                                    * *DDC bar application pending*

45