# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

PERKINS COIE LLP,

       Plaintiff,

     v.                                Civil Action No. 1:25-cv-00716 (BAH)

U.S. DEPARTMENT OF JUSTICE,
FEDERAL COMMUNICATIONS COMMISSION,
OFFICE OF MANAGEMENT AND BUDGET,
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
OFFICE OF PERSONNEL MANAGEMENT,
GENERAL SERVICES ADMINISTRATION,
OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE,
THE UNITED STATES OF AMERICA, and,
in their official capacities, PAMELA J. BONDI,
BRENDAN CARR, RUSSELL T. VOUGHT,
ANDREA R. LUCAS, CHARLES EZELL,
STEPHEN EHEKIAN, and TULSI GABBARD,

       Defendants.
_____

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**INTRODUCTION** ……………………………………………………………….. 3

**LEGAL STANDARD**…………………………………………………………….4

**ARGUMENT** ………………………………………………………………………5

    **I.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 1 of the Executive Order** …………………………………………………6

    **II.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 2 of the Executive Order**………………………………………… 8

    **III.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 3 of the Executive Order**…………………………………… 12

    **IV.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 4 of the Executive Order** ………………………………… 22

    **V.**    **The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 5 of the Executive Order** ………………………………………..25

**CONCLUSION**………………………………………………………………26

Plaintiff Perkins Coie ("Perkins" or "Plaintiff") has moved for summary judgment (ECF 39) and contends there is no genuine dispute that President Trump's March 6, 2025, Executive Order 14230, titled "Addressing Risks from Perkins Coie LLP," 90 Fed. Reg. 11781-82 (Mar. 6, 2025) ("Order" or "EO") violates the First, Fifth, Sixth, and Fourteenth Amendments, as well as the constitutional separation of powers. For the reasons set forth herein, the Court should deny Plaintiff's motion and grant Defendants' motion to dismiss (which is incorporated by reference into Defendants' opposition to Plaintiff's motion).

## INTRODUCTION

As noted in the Motion to Dismiss, the Plaintiff has tried and failed to cast Executive Order 14230 (the "Executive Order") as "punitive" or a "sanction." The preamble in Section 1 and the operative sections of the Executive Order, Sections 2, 3, 4, and 5, act within the bounds of established Executive authority.

To begin, Section 1 is simply the speech of the Government itself. There is no First Amendment right to silence the Government. Crediting Plaintiff's argument carries with it a dangerous risk of the Judiciary muzzling First Amendment protected Executive speech.

Section 2's "review" of "active security clearances" to determine if they "are consistent with the national interest" (EO 14230 § 2) falls well within the area of national security interests where courts have held the President is due great deference.

Similarly, Section 3 is an example of the use of the procurement power to advance social policy, a practice that stands on firm authority.

3

Section 4's direction to the Attorney General and the Chair of the Equal
Employment Opportunity Commission ("EEOC") also falls within the prerogative of the
Executive.

Lastly, as noted in the Motion to Dismiss, Plaintiff's claims against Section 5's call
for guidance on access to agency buildings and staff as well as hiring policies are simply
unripe as no agency has yet issued anything of the sort.  Regardless, issuing guidance on
access to Executive Branch staff, offices, and employment—all in the service of national
security and national interests—is firmly within the prerogatives of the Executive.

The Executive Order directs agencies to do what they should already be doing,
declines to contract with entities who act inconsistently with valid social policies
regarding discrimination, and calls for the lawful examination of security clearances and
government access of employees of Plaintiff's firm.  Plaintiff's challenge to the
Executive Order fails on the merits. This Court should deny Plaintiff's Motion for
Summary Judgment and grant Defendants' Motion to Dismiss.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary
judgment, identifying each claim or defense – or part of each claim or defense – on which
summary judgment is sought."  Fed. R. Civ. P. 56(a).  "The court shall grant summary
judgment if the movant shows that there is no genuine dispute as to any material fact and
the movement is entitled to judgment as a matter of law."  *Id*.  Once the moving party has
met this burden, to defeat the motion, the non-moving party must designate "specific
facts showing that there is a genuine issue for trial."  *Mount v. Johnson*, 36 F.Supp.3d 74,

82 (D.D.C. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  A

genuine issue of material fact exists if the evidence," viewed in a light most favorable to

the non-moving party," could support a reasonable jury's verdict for the non-moving

party.  *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012) (quoting *McCready v.

Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006)).

## ARGUMENT

Plaintiff asks the Court to hold, as a matter of law, that the EO, which directs a

review of Perkins to ensure that the Federal Government's dealings with it are consistent

with the national security of the United States and other public interests, is

unconstitutional on its face and will cause Perkins grievous harm, both financial and

otherwise, if implemented.  However, neither the law nor the facts warrant such a

conclusion.  The law makes plain that the terms of the EO are well within the scope of

Presidential prerogative.  Further, Perkins' claims of injury are largely speculative and

based on a misreading of what the EO actually calls for, as a section-by-section analysis

makes clear.  In its Memorandum in Support of its Motion (ECF 39-1), as in its

complaint, Perkins takes a blunderbuss approach to challenging the EO; for sake of

clarity, Defendants will discuss this case by considering the EO section-by-section when

weighing the legal merits and factual disputes.

Amid all the furor generated in the press and elsewhere, it is important to

recognize the EO for what it is and what it is not.  What it is *not* is the Executive Branch

of the Federal Government acting in its capacity as sovereign to punish citizens for

exercising their First Amendment Rights.  What it *is* is the Executive Branch acting as

contractor and employer, managing who it does business with and how, based on what it believes to be in the public interest.  For these reasons, the Court should deny Plaintiff's motion and instead grant Defendant's Motion to Dismiss (ECF 43), currently pending before the Court.

## I.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 1 of the Executive Order.

Section 1 of the Executive Order (EO) is precatory language describing Perkins Coie's activities as both a law firm and employer, as well as the Executive Branch's policy to end illegal racial discrimination. As to its legal services, Section 1 explains that Perkins Coie was the law firm that "hired Fusion GPS," an opposition research firm that "manufactured a false 'dossier' designed to steal an election."  EO 14230 § 1.  It also describes how Perkins Coie has crossed ethical lines in election litigation such that it received a court sanction.  *Id.*  These statements are not seriously contested and are matters of public record.

Section 1 is nothing other than a textbook example of protected government speech, and Plaintiff's attempt to enjoin it is as unlawful as it is, quite frankly, absurd. The Supreme Court has made clear that "the Government's own speech … is exempt from First Amendment scrutiny." *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 553 (2005).  Like other governmental entities, the Executive Branch has the right to "speak for itself." *Bd. of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000).  "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others." *Matal v. Tam*, 582 U.S. 218, 234 (2017).

"Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009). "It is the very business of government to favor and disfavor points of view." *Nat'l Endowment of the Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring). But "[i]f every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in private sector, and the process of government as we know it radically transformed." *Keller v. State Bar of Cal.*, 496 U.S. 1, 12-13 (1990).

Courts identify government speech by looking to history, the objective expectations of observers, and who has control over the message. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210 (2015). Presidents have long used the preambles of Executive Orders to express their own views, including on policies to end racial discrimination. *See, e.g.*, EO 8802 (June 25, 1941) (describing "policy of the United States to encourage full participation in the national defense program by all citizens … regardless of race" and referencing "evidence that available and needed workers have been barred from employment … solely because of considerations of race"). Everyone recognizes this is the President's own speech. That is because the President alone controls the content of his Executive Orders, which he publicly signs. Section 1 of the EO is a paradigmatic example of government speech promoting a policy to end racial discrimination and referencing publicly documented facts, with which Plaintiff simply disagrees.

7

When individuals disagree with government speech, there is a constitutionally prescribed remedy. "The Constitution … relies first and foremost on the ballot box … to check the government when it speaks." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022). But courts are on dangerous ground when enjoining the speech of co-equal branches of government. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"). The Government is "ultimately accountable to the electorate and the political process for its advocacy," and "[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position." *Pleasant Grove*, 555 U.S. at 468-69. This Court should reject Plaintiff's attempt to short-circuit the democratic process by lawsuit.

## II.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 2 of the Executive Order.

Plaintiff takes aim at Section 2(a) of the Executive Order, claiming that the Court should enjoin the suspension of security clearances mandated by the Order because it is not based on national security interests, it is based on "stale" information, and it is allegedly improperly categorical. *See* Pl.'s MSJ (ECF 39-1) at 13-16. Plaintiff further claims that the Court should disregard Section 2's suspension of clearances "pending a review of whether such clearances are consistent with the national interest," because the result of such review is a foregone conclusion. *Id.* at 14.

Plaintiff's claim should be rejected. As explained in Defendants' Motion to Dismiss, the process to undertake security clearance suspensions here is directly called

8

for by the President, thereby implicating the concerns reflected in *Dep't of Navy v. Egan*, 484 U.S. 518 (1988) and *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024). *See* Defs' MTD (ECF 43) at 14. Further, Plaintiff's claim of a lack of any national security nexus is plainly belied by the exposure of the entire Steele dossier and Fusion GPS debacle, involving multiple falsehoods related to the matter, in the Report of Special Counsel Durham. *See* Special Counsel, Report On Matters Related To Intelligence Activities And Investigations Arising Out Of The 2016 Presidential Campaigns (May 12, 2023, "Durham Report"), Lawson Declaration ¶ 13 & Ex. 11, at 233 & ff.; *see also* Defs' Resp. to Pl.'s Statement of Material Facts ¶¶ 75-76. Indeed, Plaintiff's own expert appears to acknowledge as much. *See* ECF 39-8 ("Leonard Report) ¶ 50. And although Plaintiff and its expert criticize the Fusion GPS matter as "stale" information, *see* Pl.'s MSJ (ECF 39-1) at 14; Leonard Report ¶ 52, they cannot dispute that official confirmation of the full scope of matter is reflected in the Special Counsel Report issued *in 2023.*

Further, Plaintiff complains that the security clearance suspension is categorical and does not take account of attorneys' work assignments or employment status. Pl.'s MSJ (ECF 39-1) at 14-15. This not only unreasonably demands that the President have had full knowledge of Plaintiff's personnel status and assignments before issuing the Executive Order, but it also disregards the fact that any clearance suspension will be reviewed individually "consistent with applicable law." EO 14230 § 2(a). As explained in Defendants' Motion to Dismiss, any individual employee of Plaintiff with a security clearance that is suspended will receive appropriate process with regard to maintaining or restoring their individual security clearance. Defs' MTD (ECF 43) at 15-16. Indeed,

Defendants' Motion outlined the requirements of "applicable law" reflected in EO 12968, 60 Fed. Reg. 40245 (1995), including the extensive process and procedural guarantees reflected therein and in agency regulations implementing those requirements. Defs' MTD (ECF 43) at 15-16.

Incredibly, Plaintiff's expert seems to discuss this follow-on review process as a reason Section 2(a) is improperly categorical. *See* Leonard Report ¶¶ 44-47. The expert relies upon a case, *Greene v. McElroy*, 360 U.S. 474 (1959), to support his conclusion, but that case was decided almost 30 years prior to *Egan* and, moreover, was explicit that its decision did not touch on issues of process that the President could follow or authorize related to the termination of security clearances or consequences following therefrom. *See id*. at 508. So *Greene* has no application with regard to Plaintiff's challenge to Section 2(a). *Cf. Burkhart v. Wash. Metro. Area Transit Auth*., 112 F.3d 1207, 1212 (D.C. Cir. 1997) (expert testimony consisting of legal conclusions cannot help trier of fact).

As explained in Defendants' Motion, any clearance suspension is subject to agency review consistent with applicable regulations. And until that happens and a further security clearance determination is made, any dispute on such matters is premature for judicial consideration.

Plaintiff also attacks Section 2(b) of the Executive Order as wildly overbroad, seeking to deprive Plaintiff of access to generally available federal services, like postal services. *See* Pl.'s MSJ (ECF-39-1) at 16, 22. This level of hysteria, however, is not warranted by Section 2(b) properly read.

10

Section 2(b) of the Executive Order requires the cessation of the provision of goods, materials, and services, "including Sensitive Compartmented Information Facilities, *provided for the benefit of Perkins Coie*." Further, such cessation is to be undertaken only "to the extent permitted by law." Several factors rebut Plaintiff's complaint that Section 2(b) is wildly overbroad. First, the location of this provision in the section of the Executive Order concerning security clearance matters, the reference to SCIF's, as well as the limiting language that "Government goods, property, material, and services" subject to cessation are those "provided for the benefit of Perkins Coie," clearly point to such goods and services as those specifically provided to Plaintiff. Indeed, the establishment of secure working areas for classified information at a private business may very well involve the provision of government goods or services to ensure the area is properly authorized to handle such information. It is those types of goods and services that clearly are the target of Section 2(b) and not services that are provided to the public more generally.

Second, and relatedly, the Section 2(b) provision was not placed and is not located in Section 5 of the Executive Order directing the promulgation of guidance regarding access to federal facilities and engagement with federal employees. That Section 2(b) is not co-located with the provisions in Section 5 further undercuts Plaintiff's argument that Section 2(b)'s intended reach is wildly overbroad.

And third, the EO is clear that any cessation of the provision of goods and services under Section 2(b) is to be undertaken "to the extent permitted by law." In other words, any service provided under applicable law to the public more generally, and not solely or

11

specially "for the benefit of Perkins Coie," presumptively would not be denied to Plaintiff and its employees as the law would provide for broad provision of the service.

For these reasons and those explained in Defendants' Motion, Plaintiff's challenge to Section 2 of the Executive Order must fail.

### III.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 3 of the Executive Order.

Section 3 of the Executive Order concerns the Federal Government's contracting policies.  As relevant, Section 3 issues two directives.  First, "to the extent permissible by law," "Government contractors" shall be "require[d] … to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract."  EO 14230 § 3(a).  Second, "the heads of agencies shall … take appropriate steps to terminate any contract … for which Perkins Coie has been hired to perform any service." *Id.* § 3(b)(i).

Perkins challenges Section 3 of the EO on the grounds that the section is overbroad to the point of being plainly retaliatory.  Plaintiff goes on to claim that any decision made regarding such an assessment is already a "foregone conclusion" and that the EO "does not address particular lawyers, clients or contractors."  Pl.'s MSJ (ECF 39-1) at 17.  The Court should not credit those statements.  The Executive Branch, in its role as procurer of goods and services, has a long history of directing funds to its contractors based on its public policy objectives, including social policy.  Further, Perkins ignores the safeguard language in the EO that calls, not for blanket action on all contracts with Perkins or its clients, but instead for individual review and consideration.  Finally,

Section 3 is forward looking, simply calling for the establishment of the process of review.  As of now, nobody has been deprived of anything.

Once again it must be emphasized that when implementing Section 3, the government is acting as a private party, not as a sovereign.  *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion) ("The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.").  Furthermore, the effort to combat racial discrimination through the procurement power has been a feature of executive orders since at least the 1940s.  *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159, 168-71 (3d Cir. 1971).  Such orders enjoy the firmest possible constitutional support.  *Id*. at 170 ("In the area of Government procurement Executive authority to impose non-discrimination contract provisions falls in Justice Jackson's first category [from *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), discussing varying levels of deference to Executive authority]: action pursuant to the express or implied authorization of Congress.").

The EO calls out Perkins for discriminatory employment activities hidden through deceptive language, an increasingly common practice.  *See Students for Fair Admissions, Inc., v. President & Fellows of Harvard College*, 600 U.S. 81, 230 (2023) ("*SFFA*") (admissions programs that lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial

stereotyping, and lack meaningful endpoints cannot be reconciled with guarantees of the Equal Protection Clause).

Furthermore, while Section 3 relies equally on Plaintiff's racial discrimination and its malfeasance in election litigation for its authority, *either* ground is sufficient to sustain its provisions. For example, in *McGowan v. State of Maryland*, 366 U.S. 420 (1961), employees convicted of violating a Sunday business closure regulation challenged the law as violating the First Amendment's prohibition against the establishment of religion. *Id.* at 430-31. The Court held that that the closure law was a valid exercise of the government's power to advance the "health, safety, recreation, and general well-being of our citizens." *Id.* at 444. The Court held that whatever may have been the purpose of a legislature in enacting a statute, a "statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *Id*. at 426. Similarly, in *United States v. O'Brien*, 391 U.S. 367 (1968), the defendant challenged his conviction for destroying a draft card on the basis that the law infringed on his First Amendment rights; rejecting the argument, the Court held that, "[i]t it is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383. Importantly, it should be noted that both *McGowan* and *O'Brien* involved challenges to improper motives in the enactment of *statutes* which carry true *punitive* sanctions—in other words, where the state is acting as *sovereign*. Not so here. In this case, the Government is merely managing its contracts, with an eye towards an undisputed federal interest. *See Contractors Ass'n of E. Pa.*, 442

14

F.2d at 168-71.  This sovereign / private party distinction is of critical importance given the Plaintiff's reliance on cases such as *National Rifle Association v. Vullo*, 602 U.S. 175 (2024).  *Vullo* addressed a potential First Amendment violation where the state used its *sovereign* regulatory powers to threaten private actors with enforcement actions in an attempt to discourage disfavored speech.  *Id*.  This Executive Order carries with it none of the force of the powers exhibited in *Vullo*.  Plaintiff cannot create a constitutional violation by reframing the Government's actions in forming contracts as punishment.

The Executive's ability to tie its procurement procedures, *i.e.*, to choose with whom it will do business, to the fulfillment of its public policy goals, including those involving national security and civil rights, is also plainly displayed in statutory and regulatory texts.  For example, Title 40 of the United States Code provides for the management of Federal properties and the organization of the General Services Administration.  Section 121(a) of title 40 specifically references the President's ability to prescribe policies necessary to carry out these powers.  This Presidential authority has been relied on in the past in the context of shaping social policy, most particularly with respect to President Johnson's Executive Order 11246, which aimed to prevent discrimination and promote equal employment opportunity by federal contractors and subcontractors.

This authority is reflected in other regulations as well, most conspicuously in the Federal Acquisitions Regulations ("FAR") system under Title 48 of the Code of Federal Regulations.  Section 1.102(a) of that system specifically states that the purpose of the FAR is to deliver on a timely basis the best value product or service to the customer

15

"while maintaining the public trust and fulfilling public policy objectives." Those regulations additionally emphasize the fulfillment of public policy objectives. *See* 48 C.F.R. § 1.102(b)(4). Again, 48 CFR § 1.102(d) calls on Executive Agency staff to review, among other things, executive orders when determining whether a purchasing policy is valid. Finally, the performance standards under 48 CFR §102-2(d) specifically state that government procurement decisions "must" support the attainment of public policy goals adopted by the Congress and the President.

Regulation of Federal contracting decisions is fully applicable downstream to a contractor's subcontractors or clients pursuant to 41 CFR § 60-1. Section 60-1.4(b) specifically binds a contractor's subcontractor or purchase to the same standard to which the contractor itself is bound. Indeed, subpart 8 of this subsection specifically cites to EO 11246, under which President Johnson forbade Federal contracts to entities debarred for failure to adhere to the equal employment opportunity policies outlined therein.

These regulations confirm that the President possesses wide discretion in managing Federal procurement and contracts based on the President's public policy objectives, including those related to national security and civil rights. This Executive Order is designed to address diversity in the Federal contracting process. Diversity initiatives have always been legally suspect. *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) ("Would a private employer not be guilty of unlawful discrimination if he refrained from establishing a racial hiring quota but intentionally designed his hiring practices to achieve the same end? Surely he would."). This is especially true after the Supreme Court's decision in *SFFA*. As the Court explained, it

16

has "time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *SFFA*, 600 U.S. at 220 (citing *Shaw v. Reno*, 509 U.S. 640, 647 (1993)).  *SFFA* could not have been clearer that applicants must be judged on their own merits, rather than as ambassadors for various identity groups: "The entire point of the Equal Protection Clause is that treating someone differently because of their skin color is *not* like treating them differently because they are from a city or from a suburb, or because they play the violin poorly or well." *Id.*  Furthermore, Courts in this Circuit routinely give great deference to Executive Orders addressing the nexus between social policy and the procurement power.  *See, e.g.*, *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360, 366-67 (D.C. Cir. 2003).

Perkins appears to have fallen short of these principles.  Plaintiff has acknowledged that it has "set formal, measurable targets for increasing diversity in recruitment, retention, promotion, and/or leadership" with a "strategic focus and intentionality" on "the advancement of our historically underrepresented attorneys." *Perkins Coie 2023 Vault Law Firm Diversity Survey*, Lawson Declaration ¶ 2 & Ex. 2, at 7.  It has done this in large part through its adoption of the "Mansfield Rule," a certification process overseen by an organization called "Diversity Labs," which seeks to "diversify the power structure of law firms and legal departments through appointments, elections, and promotions to influential leadership committees and roles." *Diversifying Leadership: How the Mansfield Rule is Driving Change*, Lawson Declaration ¶ 7 & Ex. 5.  Perkins signed the "Mansfield Rule" in 2019, and it continues to abide by the

17

requirements of the yearly certification process. This diversification is achieved "by broadening who is considered" for hire. *Id.* Diversity Lab rewards not only law firms that adhere to the "rigorous annual certification process and report their verified data" but also celebrates the firms that achieve "certification plus" which "evaluates whether they have achieved diversity in leadership, and not only considered it." *Id.* Although the certification criteria "grow increasingly challenging each year," there are a few "core principles" that firms must satisfy to achieve certification each year. Diversity Lab, *More than 360 Law Firms Achieve Mansfield Certification for 2023-24, Marking a Double-Digit Increase in the Push for Leadership Diversity*, Lawson Declaration ¶ 9 & Ex. 7 ("Diversity Lab press release"). One of those is the requirement that "at least 30% of the lawyers considered" for a role consist of "underrepresented lawyers across 75% of opportunities." *Id.* This includes "all high-level leadership committees and roles," and the requirement has expanded to include not only women and historically underrepresented racial and ethnic groups but also LGBTQ+ lawyers and lawyers with disabilities. Lawson Declaration ¶ 7 & Ex. 5.

Perkins Coie has achieved Mansfield certification for seven years in a row, and it was celebrated in 2024 for achieving "certification plus" status. *See* Diversity Lab press release, Lawson Declaration ¶ 9 & Ex. 7. Participation in the Mansfield certification process requires significant data sharing, including annual submissions signed by each firm's managing partner. *See id.* Mansfield also touts the increase in "underrepresented racial and ethnic equity partners" of 16% versus 41% between "Mansfield" and "non-Mansfield" firms, respectively, and the number of "women equity partners at Manfield

Certified firms growing at nearly three times the rate of non-Mansfield firms," meaning that implementing the criteria results in tangible differences in racial and gender demographics of these participating firms, such as Perkins Coie. *Data Shows Mansfield Firms Are Adding Diverse Leaders Much Faster*, Lawson Declaration ¶ 8 & Ex. 6. In short, firms that utilize and implement the Mansfield certification process hire and promote more non-white and female attorneys than they otherwise would by taking race, sex, and other protected characteristics into account when making hiring and promotion decisions. Diversity Labs directly cited a New York State Bar Association Task Force report on "advancing diversity" as a study of the program's efficacy. Diversity Lab press release, Lawson Declaration ¶ 9 & Ex. 7, at 2. In that very report, the authors acknowledge that Mansfield does increase diversity in law firm ranks but that "there may be some risk associated" with diversity programs, such as Mansfield, in the wake of *SFFA*. *Report and Recommendations of the New York State Bar Association Task Force on Advancing Diversity*, Lawson Declaration ¶ 10 & Ex. 8, at 74. In a "zero-sum" situation, such as hiring, "[a] benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *SFFA*, 600 U.S. at 218-19.

Rather than leveling or equalizing the playing field, Perkins Coie hires and promotes attorneys on the basis of protected characteristics in service of "diversity, equity, and inclusion." But the Supreme Court made clear in *SFFA* that decisionmakers must consider an individual on his or her own merits and that utilizing race, sex, or any other protected characteristic as a plus factor is evidence that some applicants are treated

worse than others because of that characteristic. *SFFA*, 600 U.S. at 218-19. On this basis, the United States is justified in using its procurement power to review such practices and to decline to contract with those that do. Contrary to Plaintiff's claims, a review of employment practices is not a sanction. This use of the procurement power may be a decision that Plaintiff dislikes, but the President's decision to advance *SFFA* is well within the prerogative of the Executive Branch.

Second, Plaintiff's description of contract reviews pursuant to Section 3 as leading to "preordained" or "foregone" conclusions is, once again, wildly overblown and flatly wrong. The plain language of the Section binds all government contracting agency decisions within the bounds permitted by law. Indeed, each separate subpart of the Section specifically includes such restrictive language, and Section 3(b)(ii) goes further in directing Agency Heads to align their funding decisions with the Executive's goals and priorities "as they deem appropriate."

Which brings this entire matter around to the third point: ripeness. These provisions call for government contracting agencies to begin the process of review of any contracts between the government and Perkins or entities doing business with it in accordance with the policies and findings set out in Section 1. That process has not started. Again, nobody has been deprived of or denied anything. Allegations of damage or harm at this point are purely speculative. At some future point, the contracting agencies will make their decisions regarding that status of Perkins' contracts. [11] At that

---

[11] In fact, as noted in the MTD, it is unclear if Perkins even *has* any contractual relationship with the Federal government for the provision of goods or services.

point, if Perkins believes that such decisions are not "permissible by law," it should challenge such decisions at that time.

Finally, Section 3 does not impermissibly burden the speech or association rights of the firm or its clients. Plaintiff relies on authorities addressing the constitutional rights of private individuals to donate to charitable organizations or associate as members in political organizations.  Pl.'s MSJ (ECF 39-1) at 20-21 (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021); *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958)).  But here, Section 3 of the Executive Order applies only to a limited number of government contractors, which are already subject to substantial disclosure requirements as a condition of doing business with the federal government.  They must merely identify business with Plaintiff for the limited purpose of facilitating agency review of government contracts with Plaintiff.  This is narrowly tailored to Section's stated goal.  Nor does Section 3 interfere with attorney-client privilege.  As this Court has recognized, generally "the attorney-client privilege does not protect from disclosure the 'identity of the client ... and the general purpose of the work performed.'"  *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 350 (D.D.C. 2018) (quoting *United States v. Naegele*, 468 F.Supp.2d 165, 171 (D.D.C. 2007)).  Law firms may be required to disclose the identity of a client yet still enjoy the full benefits of attorney-client privilege.  *See, e.g.*, *Att'y Gen. of U.S. v. Covington & Burling*, 411 F. Supp. 371 (D.D.C. 1976).  Indeed, firms are regularly required to disclose the identity of clients in contexts raising national security concerns.  *See, e.g.*, Foreign Agents Registration Act,

Pub. L. 75-583, 52 Stat. 631 (codified at 22 U.S.C. §§ 611 et seq.). This additional disclosure requirement limited to a subset of government contractors is far afield from the core associational rights at issue in political association and charitable donation cases.

For all these reasons, the Court should reject Plaintiff's challenge to Section 3 of the Executive Order.

## IV.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 4 of the Executive Order.

Plaintiff claims that Section 4, which initiates the EEOC's "unlawful and retaliatory 'investigation,'" retaliates against the firm for having previously exercised its First Amendment rights in support of DEI. Compl. (ECF 1) ¶¶ 126-35, 144-56; Pl.'s MSJ (ECF 39-1) at 40-41. This claim too must fail.

First, any supposed injury of Plaintiff is not traceable to the Executive Order. To repeat, Section 4 merely directs the "review" and "investigat[ion]" of "the practices of representative large, influential, or industry leading law firms" for consistency with the civil rights laws. EO 14230 § 4. That is *already* what the EEOC is supposed to be doing. The EEOC is already "empowered … to prevent any person from engaging in any unlawful employment practice" under the civil rights laws. 42 U.S.C. § 2000e-5(a). The EEOC is already required to make "report[s] … to the President … on the cause of and means of eliminating discrimination," including in any industry the President directs the EEOC to review. *Id.* § 2000e-4(e). And members of the EEOC are already authorized to file charges against "employer[s] … engaged in an unlawful employment practice." *Id.* § 2000e-5(b).

In other words, even if the President *never* issued the Executive Order, Plaintiff would *still* be subject to inquiries by the EEOC—just like any other employer in the country.

Second, Plaintiff's proposed remedy demonstrates that Perkins' supposed injury is not redressable. Plaintiff asks for an injunction against EO § 4—that is, Plaintiff wants this Court to enjoin the EEOC from "review[ing] the practices of representative large, influential, or industry leading law firms for consistency with Title VII." That is a remarkable thing to ask for, yet it is required by Plaintiff's argument. If Plaintiff is harmed merely because the EEOC is "review[ing]" its employment practices, then the only solution is for Plaintiff to be granted immunity from Title VII liability—or indeed any EEOC inquiry whatsoever. That is simply not an appropriate form of relief, and Plaintiff's claim fails for this reason as well.

Third, Perkins's First Amendment retaliation claim fails on the merits, because the firm cannot show the requisite causal link. First Amendment retaliation claims require plaintiff to show (1) plaintiff engaged in conduct protected by the First Amendment; (2) defendant took retaliatory action against plaintiff, sufficient to deter an individual in plaintiff's position from speaking again; and (3) a causal connection between the speech and the retaliation. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). First Amendment retaliation claims are analyzed under a but-for causation standard. *Houston Community College Sys. v. Wilson*, 595 U.S. 468, 477 (2022).

Just as Perkins lacks standing, so too does it fail to show a causal link. Even before the Executive Order was issued, this Administration had begun taking steps

consistent with the view that certain DEI practices, misapplied, could constitute a violation of Title VII. *See* EO 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"). EO 14173, issued more than a month *before* the challenged Executive Order, directed, among other things, Federal agencies to take appropriate action to "advance in the private sector" merit-based opportunity, EO 14173 § 4(a), and to enforce civil rights laws and combat illegal private-sector DEI policies and practices, *id.* § 2; *see also id.* § 4(b) (requiring plan for compliance investigations going after illegal discrimination in large, private entities). The inquiry is also in line with EEOC and DOJ priorities, as both agencies announced, well in advance of the issuance of the EO at issue here, that "rooting out unlawful DEI-motivated race and sex discrimination" was among their top concerns. *See* EEOC, *President Appoints Andrea R. Lucas EEOC Acting Chair* (Jan. 21, 2025), Lawson Declaration ¶ 14, Ex. 12; Memorandum from Attorney General, Re: Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025), Lawson Declaration ¶ 15, Ex. 13.

To put it simply, Section 4 directs the EEOC to do what it already should be doing. Inquiring into employment practices for consistency with Title VII is the very point of the EEOC. This Court should refuse to give Perkins a blanket exemption from the civil rights laws.

## V.    The Court Should Deny Plaintiff's Motion for Summary Judgment as to Section 5 of the Executive Order.

Finally, Perkins repeats its objection that Section 5 of the EO limits "all" Firm personnel from access to Federal building, engagement with Federal employees, or (absent a waiver), being hired as Federal employees themselves.  Additionally, it alleges that Section 5 impermissibly interferes with Perkins' attorney-client relationships.  Once again, Perkins' objection mischaracterizes the EO's language and claims harm prematurely.

To begin, the text of Section 5 simply does *not* limit any Perkins employee, much less all of them, from such access and activities.  Instead, it calls for agency heads to provide guidance as to whether or when to limit Perkins employees from entering a government building; whether or when to limit Government employees from engaging Perkins personnel in their official capacity; whether or when to bar Perkins employees from being hired into government employment.  What is more, such guidance is not arbitrary but is to be consistent with the national security and other government interests articulated throughout the language of the EO and again is limited to the extent "permissible by law."  What that guidance might consist of remains to be seen.  Surely some Federal facilities, contacts, and employment positions require tighter restrictions than others based on national security concerns.  Likewise, depending on relevant factors, the suitability of individual Perkins employees within such contexts likely would differ. That is what guidance is for.[2]  However, nightmare scenarios such as *all* Perkins attorneys

---

[2] Thus, Perkins' argument about Section 5 being impermissibly vague is also meritless.

being barred from courtroom practice, *all* staff being banned from going to the post-office, and *no* Perkins employees ever being allowed to join the Federal workforce is, currently, the stuff of imagination.

Which again goes to the point that Perkins' objections are premature. No such guidance has been issued—and the merits of Perkins' arguments necessarily depend on what that guidance says. No decisions about individual or groups of Perkins employees regarding Federal building access, Federal government contact, or Federal hiring have been reached by any agency heads. When such guidance is issued, when and if Perkins employees are impacted by it, then will be the proper time to weigh the merits of such decisions. And as to Perkins' representation of its clients, Defendant has already pointed out that the constitutional right to choice of counsel is not absolute, but is balanced against the government's interest in the fair, orderly, and effective administration of the courts, and qualified by the need to avoid undermining public confidence in the integrity of the legal system. Defs' MTD (ECF 43) at 31.

## CONCLUSION

For all the reasons stated herein, the Court should deny Plaintiff's motion for summary judgment and instead grant Defendants' motion to dismiss.

Dated: April 16, 2025
        Washington, D.C.

Respectfully submitted,


CHAD MIZELLE
Acting Associate Attorney General


/s/ *Richard Lawson*
RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 445-8042

*Counsel for Defendants*