## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

     *Plaintiff*,

   v.

U.S. DEPARTMENT OF JUSTICE,
FEDERAL COMMUNICATIONS
COMMISSION, OFFICE OF
MANAGEMENT AND BUDGET, EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION, OFFICE OF PERSONNEL
MANAGEMENT, GENERAL SERVICES
ADMINISTRATION, OFFICE OF THE
DIRECTOR OF NATIONAL
INTELLIGENCE, THE UNITED STATES
OF AMERICA, and, in their official
capacities, PAMELA J. BONDI, BRENDAN
CARR, RUSSELL T. VOUGHT, ANDREA
R. LUCAS, CHARLES EZELL, STEPHEN
EHEKIAN, and TULSI GABBARD,

     *Defendants*.

Civil Action No. 1:25-cv-00716 (BAH)

Judge Beryl A. Howell

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND FOR
## DECLARATORY AND PERMANENT INJUNCTIVE RELIEF

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................2

I.    PERKINS COIE IS ENTITLED TO SUMMARY JUDGMENT ON ITS
      CLAIMS .................................................................................................................2

      A.    The Government Fails To Raise Any Genuine Dispute of Material Fact................2

      B.    The Government's Ripeness, Standing, and Justiciability Defenses Fail...............5

      C.    Perkins Coie Is Entitled to Summary Judgment on the Claims that the
            Government Fails To Address or Barely Addresses...............................................10

      D.    Perkins Coie Is Entitled to Summary Judgment on Its First Amendment
            Claims for Retaliation and Compelled Disclosure.................................................12

            1.    The Order Retaliates for Protected First Amendment Activities...............12

            2.    The Order Burdens Protected Speech and Association by
                  Compelling Disclosure of Attorney-Client Relationships ........................22

II.   PERKINS COIE IS CONTINUING TO CONFER WITH THE GOVERNMENT
      IN AN EFFORT TO IDENTIFY ALL AGENCIES AND OFFICIALS TO BE
      INCLUDED IN A PERMANENT INJUNCTION............................................................24

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)....................................................22, 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).............................................................2, 4

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)...............................................5

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668 (1996)...............................18

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000)....................................14

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ...........................9, 10

*Crandall v. State of Nevada*, 73 U.S. 35 (1867) .......................................................................21

*Dilley v. Alexander*, 603 F.2d 914 (D.C. Cir. 1979) ....................................................................19

*Doe v. Gates*, 981 F.2d 1316 (D.C. Cir. 1993) .............................................................................6

*EEOC v. Shell Oil*, 466 U.S. 54 (1984) .........................................................................................8

*Foxworthy v. Buetow*, 492 F. Supp. 2d 974 (S.D. Ind. 2007) ......................................................15

*Gill v. DOJ*, 875 F.3d 677 (D.C. Cir. 2017) .................................................................................7

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .....................................................................11

*Internet Fin. Servs., LLC v. L. Firm of Larson-Jackson, P.C.*,
310 F. Supp. 2d 1 (D.D.C. 2004).......................................................................................3, 4

*Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005) .............................................................14

*Lozman v. Riviera Beach*, 585 U.S. 87 (2018)............................................................................18

*Matal v. Tam*, 582 U.S. 218 (2017) .............................................................................................14

*McGowan v. Maryland*, 366 U.S. 420 (1961)...............................................................................19

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
417 F.3d 1272 (D.C. Cir. 2005).............................................................................................6

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) .....................................................14

*Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286 (D.C. Cir. 1993)....................................6

Page

Cases—continued:

*Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175 (2024) ........................................................15, 18

*O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712 (1996) ...................................15, 18

*Pleasant Grove City v. Summum, 555 U.S. 460 (2009)..................................................................14

Sanchez v. Off. of the State Superintendent of Educ., 959 F.3d 1121 (D.C. Cir. 2020) ................6

Sedita v. United States, 2025 WL 387962 (D.D.C. Feb. 4, 2025) ....................................................4

Shelton v. Tucker, 364 U.S. 479 (1960)..........................................................................................23

SOME, Inc. v. Hanover Ins. Co., 2021 WL 2935893 (D.D.C. Jul. 13, 2021) ................................5

Spokeo, Inc. v. Robins, 578 U.S. 330 (2016) ...................................................................................5

*Susan B. Anthony List v. Driehaus, 573 U.S. 149 (2014)..........................................................5, 6

Toolasprashad v. Bureau of Prisons, 286 F.3d 576 (D.C. Cir. 2002) ..........................................18

*UAW-Lab. Emp. & Training Corp. v. Chao, 325 F.3d 360 (D.C. Cir. 2003)...............................11

United States v. Dynamic Visions Inc., 971 F.3d 330 (D.C. Cir. 2020) ..........................................4

United States v. Lovett, 328 U.S. 303 (1946)..................................................................................18

United States v. O'Brien, 391 U.S. 367 (1968) ...............................................................................19

United States v. Stanchich, 550 F.2d 1294 (2d Cir. 1977)...............................................................2

Waters v. Churchill, 511 U.S. 661 (1994) ......................................................................................18

Webster v. Doe, 486 U.S. 592 (1988) ...............................................................................................6

Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President,
    2025 WL 946979 (D.D.C. Mar. 28, 2025).................................................................................13

Yazzie v. Nat'l Org. for Women, 712 F. Supp. 3d 56 (D.D.C. 2024)...............................................4

**CONSTITUTION, STATUTE, AND RULE**

*U.S. Const. amend. I ..................................................................................................... passim

5 U.S.C. § 702................................................................................................................................24

Fed. R. Civ. P. 56.............................................................................................................................2

Page

**OTHER AUTHORITY**

D.C. Bar Ethics Op. 383 ...............................................................................................................22

## INTRODUCTION

In its summary-judgment opposition (ECF 143), the government goes to extraordinary lengths to disguise the Executive Order as anything but what it really is.  Perhaps the Order is simply "government speech"?  MSJ Opp. 6-7.  Maybe "the Government is merely managing its contracts"?  *Id.* at 14.  Maybe the Order is simply a "call for guidance"?  *Id.* at 4.  Maybe the Order is necessitated by "national security"?  *Id.* at 3.  Or perhaps the Order is much ado about nothing because it merely tells agencies "to do what they should already be doing"?  *Id.* at 4.

None of these disguises can mask the Order's true identity.  On its face, the Order seeks to punish and retaliate against the Firm for representing the President's perceived opponents and advocating legal positions he does not like.  Neither the President nor his staff has been coy about the retaliatory purpose of the Order and the others like it.  Quite the opposite, they have reveled in the orders' having their intended chilling effects and causing other law firms to "bend the knee." Scarborough Decl. Ex. 6 (ECF 142-1); *see* Manning Reply Decl. Exs. 1, 2 (additional examples).

The truth is plain to see.  The Order is not merely government speech; it is an operative legal act that directs the entire Executive Branch to come down hard on the Firm and its clients. The Order does not merely manage the government's contracts; it threatens the Firm and its largest, government-contractor clients with termination in retaliation for protected speech and association. The Order does not simply call for guidance; it causes *immediate* harm, and the guidance itself is preordained.  The Order is not about national security; it is blatantly retaliatory, wildly overbroad, and transparently pretextual, as the undisputed record—including Paul Weiss's settlement—amply proves.  And the Order does not merely tell agencies to do what they should already be doing; it directs agencies what to do, how to do it, why to do it, and to do it *to Perkins Coie*.

The government dissembles for a simple reason:  the Executive Order is indefensible.  As this Court immediately perceived, the President has abused the power of his office in service of a

1

"wholly personal vendetta." TRO Tr. 101:23. That already was clear when this Court confronted the Order at the TRO stage. At that time, the Order was the only one of its kind. Since then, the Order's retaliatory purpose has become even clearer, as the President targeted four more law firms for their perceived speech, associations, and petitioning. And the purpose is even clearer still because of yet other law firms' "settlements" with the Administration, which lay bare the Order's pretextual nature and severe chilling effect. "Judges are not required to exhibit a naiveté from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.). It is time, once again, to call the Order what it is: blatantly unconstitutional.

## ARGUMENT

Perkins Coie is entitled to summary judgment on all its claims. The government concedes or fails meaningfully to dispute the material facts set forth in the Firm's Statement of Facts ("SOF") (ECF 39-2). The government's ripeness and other justiciability arguments pose no obstacle to resolving the Firm's straightforward claims. On the merits, the government fails to contest, either seriously or at all, many of the Firm's claims. And the government's arguments in opposition to the Firm's First Amendment claims all depend on the government's willful blindness as to the Order's blatantly retaliatory nature. This Court should permanently enjoin the Order in its entirety.

## I.    PERKINS COIE IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS

### A.    The Government Fails To Raise Any Genuine Dispute of Material Fact

As an initial matter, the government identifies no genuine dispute of material fact that would prevent the Court from granting summary judgment to Perkins Coie. To show that a fact is genuinely disputed, the non-moving party must support its assertion by "citing to particular parts of materials in the record," including "documents," "affidavits," or "declarations." Fed. R. Civ. P. 56(c). "[M]ere allegations or denials" do not suffice. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).[1]  Nor are "[a]rguments of counsel" a "substitute for evidence that establishes a genuine issue of material fact."  *Internet Fin. Servs., LLC v. L. Firm of Larson-Jackson, P.C.*, 310 F. Supp. 2d 1, 4 (D.D.C. 2004).

The government does not come close to raising a genuine dispute of material fact.  Indeed, it admits that 120 facts offered by Perkins Coie are entirely undisputed.  *See* SOF Resp. (ECF 143-1) ¶¶ 1-14, 16-19, 25-90, 92-99, 123, 134, 146-48, 150-59, 178-83, 225-26, 239, 250, 258, 263-64.  The government also does not dispute that the President and other officials made the cited statements attacking the Firm, its clients, and other perceived political opponents.  The government responds only by saying that these statements "speak for themselves"; Perkins Coie could not agree more.  *Id.* ¶¶ 101-05, 107-18, 238, 242, 245-47, 251, 257.  Additionally, the government does not dispute that (i) the Firm had no notice of or opportunity to respond to the Order or Fact Sheet before they issued; *id.* ¶ 134; (ii) within days of the Order, government officials began to cancel meetings or initiate inquiries into the Firm's employment practices, *id.* ¶¶ 140, 162; and (iii) immediately after the Order but before the TRO, multiple clients terminated or considered terminating their engagements with the Firm, *id.* ¶ 150.  The government also does not dispute the facts demonstrating the impact the Order would have on the Firm's representations and client relationships.  *Id.* ¶¶ 25, 28-29, 32-33, 56 (facts concerning interactions with agencies and officials); *id.* ¶¶ 34, 38, 147 (facts concerning firm clients or their affiliates being government contractors or subcontractors).

As to other facts, the government asserts that they are "disputed" in whole or part, but it cites no evidence whatsoever.  *See, e.g.*, *id.* ¶¶ 24, 91, 160-72, 176-77, 191-93.  This ignores the

---

[1] Unless otherwise noted, all emphases are added and all internal quotation marks and citations are omitted.

well-settled summary judgment standard: "conclusory assertions" or denials "offered without any evidentiary support do not establish a genuine issue for trial." *Sedita v. United States*, 2025 WL 387962, at *4 (D.D.C. Feb. 4, 2025); *see also Anderson*, 477 U.S. at 248; *United States v. Dynamic Visions Inc.*, 971 F.3d 330, 336 (D.C. Cir. 2020). Similarly, the government disputes some facts as "legal conclusion[s]," *see* SOF Resp. ¶¶ 126, 144, 145, 149, 160, 173-77, 184-93, 195-14, 216-24, but most of these paragraphs include facts for which the government offers no contrary evidence, *see* SOF ¶¶ 149, 160, 167, 176-77, 184-93, 195-14, 216-24. Accordingly, the Court may accept these facts as conceded. *See Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 94 (D.D.C. 2024) (collecting cases).

Ultimately, the government provides citations to support only three of its purported factual disputes, each involving the Firm's employment practices. SOF Resp. ¶¶ 20-21, 23. But any dispute about the Firm's employment practices is not material to this motion. There is no dispute that the government did not initiate an EEOC investigation through lawful procedures. MSJ Br. 18 (ECF 39-1); *see* SOF Resp. ¶ 144 (admitting "no formal charge has been filed with the EEOC"). Rather, the Order directed the EEOC to launch an investigation in retaliation for the Firm's First Amendment activities. *See infra* pp.12-15. Nothing about that retaliation claim requires resolving the underlying merits of an uncharged EEOC claim.

"Under th[e]se circumstances, there is no genuine dispute for the court to adjudicate." *Yazzie*, 712 F. Supp. 3d at 94. The Court should deem Perkins Coie's statements of fact uncontroverted and grant summary judgment in its favor. *See Internet Fin. Servs.*, 310 F. Supp. 2d at 4 (granting summary judgment where "Defendants provide[d] only speculation" and "[a]rguments of counsel" but no "facts").

4

### B.    The Government's Ripeness, Standing, and Justiciability Defenses Fail

Rather than raise any genuine issue of material fact, the government spends much of its brief urging the Court *not* to reach the merits of Perkins Coie's claims.  In particular, the government asserts that the Firm lacks standing (at 22-23), that its claims are not ripe (at 4, 10, 20-21, 25-26), and that its claims respecting Section 2(a) are not justiciable (at 8-9).  The Court should reject each of these efforts to evade review of a plainly unconstitutional order.

To start, the Firm has standing and its claims are ripe.  Constitutional ripeness "is subsumed into the Article III requirement of standing requiring a plaintiff to allege, *inter alia*, an injury-in-fact that is imminent or certainly impending."  *SOME, Inc. v. Hanover Ins. Co.*, 2021 WL 2935893, at *3 (D.D.C. Jul. 13, 2021) (cleaned up).  That standard easily is met here.  By design, each section of the Order inflicts concrete, particularized injury on the Firm.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).  As the Court preliminarily found, the Firm experienced "anticipated and real harm" to its constitutional rights, business, and reputation.  TRO Tr. 84:13-15, 94:8-101:1.  And because the Firm has "demonstrate[d] a realistic danger of sustaining a direct injury as a result of the [Order's] operation or enforcement," claims for future injuries are ripe, too.  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  "[O]ne does not have to await the consummation of threatened injury to obtain preventive relief."  *Id.*

Causation and redressability also are satisfied.  The Firm's undisputed evidence proves what the Complaint alleged: that, as a direct result of the Order and prior to the TRO, the Firm began experiencing adverse consequences, including clients leaving or considering leaving the Firm and government employees refusing to meet with Firm personnel.  *See, e.g.*, Compl. ¶¶ 63-84; SOF ¶¶ 146-93.  A permanent injunction will redress those harms by, for example, preventing agencies from further implementing the Order and directing them to rescind or revoke any prior implementation of it.

To the extent the doctrine of prudential ripeness remains viable, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014), it is easily satisfied here. First, the issues are fit for resolution. The Firm's claims are "purely legal" and do not require "further factual development." *Id.* This Court readily can evaluate, for example, whether the Order retaliates against the Firm for protected conduct, deprives the Firm of due process, and interferes with the counsel rights of the Firm's clients. As this Court recognized, "[t]he retaliatory nature of [the Order] is clear from its face." TRO Tr. 75:12-13. Accordingly, there is "no reason here to wait for [the Order] to be applied to see what its effect will be." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005).

Second, "the hardship to the parties of withholding court consideration" calls for immediate review. *See Sanchez v. Off. of the State Superintendent of Educ.*, 959 F.3d 1121, 1124 (D.C. Cir. 2020). As noted, prior to the TRO, the Order already started inflicting irreparable harm on the Firm. TRO Tr. 95:2-101:1. Indeed, until preliminarily enjoined, the Order "threaten[ed] the [Firm's] very existence." *Id.* at 99:8-12. Prudence dictates deciding this case *now*.

The government's section-by-section arguments on standing, ripeness, and justiciability get it nowhere.

**Section 2**. Although the government challenges the justiciability of the Firm's Section 2(a) claims, the government has no response to the cases establishing that security-clearance decisions are reviewable when they rely on a categorical policy, rather than individualized, predictive judgments about particular people. *See* MSJ Br. 14-16; MTD Opp. 11-12 (ECF 142). As the D.C. Circuit has made clear, "[i]t is simply not the case that all security-clearance decisions are immune from judicial review." *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993); *see Webster v. Doe*, 486 U.S. 592, 602-03 (1988) (distinguishing between decisions based

on an individual's "homosexuality" and those based on a "policy" or "practice[]" against "*all* homosexuals"); *Doe v. Gates*, 981 F.2d 1316, 1322 (D.C. Cir. 1993) (assuming CIA "blanket policy against homosexuals" would be unconstitutional); *Gill v. DOJ*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) ("If [plaintiff] could show that the government has a policy or practice of treating Muslims or naturalized citizens differently, his equal protection claims ... would not be barred."). Indeed, review is particularly appropriate where, as here, the Executive has put the reasons for its policy in plain view, and those reasons are purely retaliatory.

As to Section 2(a), the government further argues (at 10) that the Firm's challenges are "premature" because there has not yet been "review consistent with applicable regulations." As the Firm explained, Section 2(a) is unconstitutional, however implemented. MTD Opp. 12. Further proceedings will not, for example, make Section 2(a) any less retaliatory. Moreover, Section 2(a) causes *immediate* harm by requiring the immediate suspension of security clearances and threatens *imminent* future harm because Section 1's findings dictate the outcome of any post-suspension review. MTD Opp. 12-13. Finally, to the extent the government asserts that the Firm's challenges to Sections 2(a) and 2(b) are not ripe because those sections contain boilerplate clauses referring to applicable law, those arguments fail for the reasons discussed below. *Infra* pp.9-10.

**Section 3**. The government argues (at 20-21) that the Firm's challenges to Section 3's contract-review provisions are not ripe because the review "process has not started" and any harm is "purely speculative." Again, the Firm already has refuted this argument. MTD Opp. 15-16. By threatening termination of government contracts, Section 3 (before the TRO) caused multiple Firm clients to terminate or consider terminating their relationships with the Firm. *See* SOF ¶¶ 150-60; *see also* Former & Current General Counsel Br. 8, 9-11 (ECF 99). And Section 3's *in terrorem* effect causes additional injury by chilling the Firm's and its clients' First Amendment rights to

free speech and association.  MTD Opp. 16.  That the contract-review process would inflict *additional* harm does nothing to negate the harm that Section 3 *already* has caused.

**Section 4**.  The government asserts (at 22-23) the Firm lacks standing to challenge Section 4's directive to investigate the Firm's employment practices because any injury caused by that section is "not traceable to the Executive Order."  According to the government (at 22-23), the EEOC might well have investigated the Firm's practices anyway.  As the Firm has explained, however, the Acting EEOC Chair did *not* launch her investigation until *after* the Order.  MTD Opp. 17-18.  Further, while the government cites (at 22) the statutory procedures for filing charges and commencing an investigation, it is undisputed that the Acting EEOC Chair did *not* follow those procedures.  SOF Resp. ¶ 144; *see EEOC v. Shell Oil*, 466 U.S. 54, 64 (1984).  Instead, without any charge, she proceeded to issue a press release and publish letters requesting information from Perkins Coie and other firms.  SOF ¶¶ 141-43.  That she disregarded the statutory procedures is a dead give-away that the Order triggered her "investigation."  What is more, the government fails to provide any *factual* evidence to contest the causal link.  Notably, the Acting Chair, who is a named defendant, did not submit a declaration attempting to refute that link.

There also is no merit to the government's contention (at 23) that the Firm's injury from Section 4 is "not redressable."  Contrary to the government's suggestion (at 23), the Firm is not asking "to be granted immunity from Title VII liability."  It seeks only to block "any investigation of Perkins Coie LLP *made pursuant to Section 4 of Executive Order 14230*, and to withdraw any requests for information from Perkins Coie LLP or other investigative steps *made pursuant to Section 4 of Executive Order 14230*."  Proposed Order ¶ (9) (ECF 39-9).  With respect to Section 3, the government agreed during the TRO hearing that such limiting language "would solve [its] concern" that injunctive relief might interfere with "other legitimate bases that the government

8

would have for" taking similar steps.  TRO Tr. 109:11-21, 110:7-14.  The government provides

no reason why the same would not be true for Section 4 as well.

*Section 5*.  The government argues (at 25-26) that any challenge to Section 5 must await

the issuance of agency guidance explaining exactly how agencies will limit the Firm's access to

government buildings and engagement with federal employees.  Again, the Firm's challenge is

ripe now.  MTD Opp. 18-19.  Prior to the TRO, the government already began implementing

Section 5 by cancelling meetings with the Firm—without awaiting any "guidance."  SOF ¶¶ 152,

162.  Further, the mere threat of the Firm's exclusion from entering federal buildings or engaging

with federal employees caused some clients to withdraw work from the Firm.  *Id.* ¶¶ 150-59.  And

while the Firm can only guess how far the guidance will go, *see infra* p.11, Sections 1 and 5 are

clear that the guidance must "limit" the Firm's access because the Firm is "dishonest and

dangerous."  *See* TRO Tr. 99:21-23.  In fact, the government's counsel has acknowledged that

Section 1's findings tell agencies "how to implement" the rest of the Order.  Manning Decl. Ex.

55 (ECF 39-4), at 20:6-9.  The Firm's challenges to Section 5 are ripe for decision now.

Finally, the government points (at 9-11) to language in the Order requiring agencies to act

"consistent with applicable law" or "to the extent permitted by law."  But such boilerplate caveats

do not magically insulate the Order from review for illegality.  "Savings clauses are read in their

context, and they cannot be given effect when the Court, by rescuing the constitutionality of a

measure, would override clear and specific language."  *City & County of San Francisco v. Trump*,

897 F.3d 1225, 1239 (9th Cir. 2018).  Here, the Order "unambiguously commands" certain action,

*id.* at 1240, including that agencies take immediate steps to suspend security clearances,

expeditiously cease providing the Firm with government services, review and terminate contracts

with Firm clients, initiate a retaliatory investigation, and provide guidance limiting the Firm's

access to federal buildings and federal employees.  The very point of this lawsuit is that those steps *cannot* be taken "consistent with applicable law."  The government thus may not dodge review by hiding behind these boilerplate clauses.  If a "consistent with law" clause precluded a court from examining whether an executive order is, in fact, consistent with law, then judicial review would be a "meaningless exercise."  *Id.* at 1240.

### C.    Perkins Coie Is Entitled to Summary Judgment on the Claims that the Government Fails To Address or Barely Addresses

Turning to the merits, the government's opposition is striking for how much it fails to address.  The government again chooses to organize its brief around each *section* of the Order, rather than each *claim* in Perkins Coie's complaint.  In doing so, the government fails to address at all the merits of certain claims and only briefly gestures at the merits of others.

For example, the government provides no response to the merits of Perkins Coie's claims that the Order discriminates against the Firm based on viewpoint and denies the Firm equal protection of the law.  Nor does the government ever address Perkins Coie's claim that the Order deprives the Firm of liberty and property interests without due process of law.  Perhaps most telling, the government nowhere responds to this Court's holding that the Order is so devoid of process that it functions as a "bill of attainder, a punishment for a singled-out entity deemed to be disloyal, without any formal investigation, trial, or even informal process."  TRO Tr. 89:10-13.

With respect to the Firm's void-for-vagueness claim, the most the government musters (at 25 n.2) is a footnote baldly asserting that the Firm's claim is "meritless" because agencies will issue guidance about Section 5.  But the government has conceded that it does not know what key terms in Section 5, such as "engaging" or the "interests of the United States," even mean.  TRO

Tr. 53:1-6, 57:5-19, 88:21-23.[2]  As a result, the Firm can, in the government's words, "only guess the degree to which agency heads will limit government access."  MTD Br. 28-29.  The Order thus "impermissibly delegates basic policy matters to [agency heads] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).  And these dangers are more pernicious because the Order concerns "sensitive areas of basic First Amendment freedoms."  *Id.* (cleaned up).

With respect to the Firm's right-to-counsel claim, the government asserts in passing (at 26) that the right to counsel of choice is "balanced" against various interests.  But the government does not identify any credible interest that could remotely justify the extreme sanction of banning the Firm from accessing federal buildings, receiving federal services, or engaging with federal employees.  *See* MTD Opp. 33 (ECF 142).  With respect to the Firm's separation-of-powers claim, the government points (at 15) to its powers under the Procurement Act and the implementing regulations.  As the Firm already explained, however, that argument fails because there is nowhere near a "sufficiently close nexus" between the Order and creating "an economical and efficient system for procurement and supply."  *Id.* at 36 (quoting *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (cleaned up)).

Finally, to the extent the government (at 1) "incorporates by reference" the arguments from its motion to dismiss on any of the above claims, the Firm already has rebutted those arguments in its opposition to that motion and will not restate those points here.  *See generally* MTD Opp.  The

---

[2] The government has made similar concessions in the WilmerHale, Jenner, and Susman cases. *See, e.g.*, Manning Decl. Ex. 56 (ECF 39-4) at 25:15-17 (admitting "there is an endless parade of horribles that could come from implementation of Section 5, but we don't know what that is"); Manning Decl. Ex. 55 (ECF 39-4) at 28:24-29:1 (admitting that the government "[doesn't] know" if Section 5 includes courthouses); Scarborough Decl. Ex. 8 (ECF 142-1) at 25:7-8 (admitting the government does not know "if any of that parade of horribles might be queuing up").

Court should, therefore, grant summary judgment on the above claims. The Firm spends the balance of this reply brief addressing the government's arguments concerning the Firm's remaining claims for First Amendment retaliation and compelled disclosure.

**D.    Perkins Coie Is Entitled to Summary Judgment on Its First Amendment Claims for Retaliation and Compelled Disclosure**

**1.    The Order Retaliates for Protected First Amendment Activities**

The government cannot overcome Perkins Coie's showing that it is entitled to summary judgment on its First Amendment retaliation claim. The government nowhere disputes that the Firm and its clients have engaged in protected First Amendment activities. *See* MSJ Br. 10-11. Nor does the government dispute that the Firm has standing to assert not only its own First Amendment rights, but also those of its clients in this context. *See* MSJ Br. 16 n.5.

Most importantly, the government never comes to grips with the retaliatory animus that is written all over the Executive Order's face. The government does not acknowledge what the Order itself says: that the "Purpose" for singling out Perkins Coie includes its representation of "failed Presidential candidate Hillary Clinton" and its alleged work with "activist donors" to "judicially overturn" (i.e. challenge in court) "election laws" that the President believes are "popular" and "necessary." EO § 1. The government does not acknowledge, much less defend, the President's repeated, unequivocal promises to punish the lawyers who represented his political opponents. *See* MSJ Br. 5-6. Nor does the government acknowledge the President's statements, when signing the Order and afterward, that he was "going after" the law firms who opposed him because "it should never be allowed to happen again." *Id.* at 6. And because the government (as in its motion to dismiss) *does not even mention* the Fact Sheet, it fails to address that document's naked statements of retaliatory purpose: that the Order is meant to put an end to the Firm's allegedly

"partisan" influence through purportedly "partisan lawsuits against the United States" and, more specifically, "[l]awsuits against the Trump Administration."

The government also ignores *the other four orders* the President has issued. *See* SOF ¶¶ 243, 252, 256; Scarborough Decl. Ex. 2.  Each order similarly sanctions a law firm for its perceived opposition to the President or perceived association with persons or speech the President dislikes.  Every court to consider one of these orders has agreed with this Court's conclusion that "[t]he retaliatory nature [of such an order] is clear from its face." TRO Tr. 75:12-13.[3]  Each of those orders reinforces the retaliatory purpose of the Order in this case.  And together, they confirm the President's broader campaign to chill the independent legal profession from opposing his agenda.

The government's denial of the Order's retaliatory animus leads it to ignore the very real harm the Order already has caused and is causing—to the Firm and to the legal profession at large. The government does not dispute that, following issuance of the Order and prior to the TRO, the Firm began to lose clients and business.  SOF ¶¶ 150-59.  Nor does it dispute the chilling effect that is plain for all to see, leading some firms to "settle" by agreeing to nearly $1 billion collectively in "pro bono" legal work lest they be branded as *persona non grata* with the Administration.  *See* MSJ Br. 7-8; MTD Opp. 21; *see* Manning Reply Decl. Exs. 1, 2.  The Firm's *amici* recognize this

---

[3] *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) ("The retaliatory nature of the Executive Order at issue here is clear from its face"); Manning Decl., Ex. 55, at 48:1-5 ("[T]he Executive Order facially retaliates against Jenner"); Scarborough Decl. Ex. 8, at 44:23-25 ("[T]he retaliatory nature of the executive order is plain from the language of the EO; namely, Section 1").

chilling effect and its ultimate impact:  "the rule of law cannot long endure in the climate of fear that such actions [as the Order] create."  504 Law Firms Br. 2 (ECF 78).[4]

The government's main gambit (at 6) is to reframe the Order not as retaliation but as "a textbook example of protected government speech."  If that were true, then one would expect the government to cite a textbook's worth of examples where previous Presidents have issued executive orders sanctioning individuals or particular businesses (even law firms) for their association with "activists," or their advocacy relating to election laws, or their litigation against the preferred policies of the incumbent President.  The government does not cite even one.

Whatever the Order is, neither Section 1 nor any other part of it is defensible as mere government speech.  Unlike the cases cited by the government, the Order makes *findings* about Perkins Coie and then instructs agencies to *punish* the Firm.  As this Court observed, the Order thus amounts to a retaliatory "bill of attainder."  TRO Tr. 89:10-13.  The Order is nothing like a congressionally-authorized policy of promoting beef and beef products, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 554 (2005), a city's refusal to erect a monument in a public park, *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009), or the National Endowment for the Arts' aesthetically-driven decisions to approve or deny grants, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 572-73 (1998).[5]

---

[4] *See also, e.g.*, 504 Law Firms Br. 2 ("The Executive Order at issue in this case … seek[s] to cow every other firm, large and small, into submission."); Int'l Academy of Trial Lawyers Br. 9 (ECF 103) ("The Rule of Law hangs in the balance"); Bar Ass'ns' Br. 8 (ECF 101) ("[T]he executive orders inflict, in this Court's words, 'a chilling harm of blizzard proportions across the legal profession.'"); Litigation Firms' Br. 6 (ECF 94) ("Lawyers will be less likely to exercise independent judgment or have undivided loyalty if they may face government reprisal for the clients or causes they represent.").

[5] In the other two "government-speech" cases the government cites (at 6), the Supreme Court held that no government speech was involved or did not reach the issue. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000); *Matal v. Tam*, 582 U.S. 218, 236 (2017).

Even if some aspects of the Order have an expressive function, they enjoy no protection. The Supreme Court has recognized that the government-speech doctrine "is susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). And while the doctrine sometimes can be difficult to apply, it certainly "excuses *no retaliation for*, or coercion of, private speech." *Pleasant Grove City*, 555 U.S. at 481 (Stevens, J., concurring); *id*. at 484 (doctrine cannot be used "to discriminate … say, solely on political grounds") (Breyer, J., concurring). "If the government speech doctrine immunized the government when it spoke in retaliation to a citizen's exercise of his First Amendment rights," the protections afforded by the First Amendment "would be severely undercut." *Foxworthy v. Buetow*, 492 F. Supp. 2d 974, 986 (S.D. Ind. 2007). Indeed, just last term, the Supreme Court affirmed this critical limitation on the government-speech doctrine. "While a government official can share h[is] views freely and criticize particular beliefs in the hopes of persuading others," he cannot "use the power of [the State] to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). The Order plainly and unconstitutionally does the latter.

As discussed below, the government's section-by-section arguments miss the mark for a variety of reasons. But two overarching points are important to highlight. First, the government invokes various general powers over security clearances, government contracts and property, and employment discrimination. But the government ignores a fundamental point: whatever the scope of those general powers, the government may not wield them to *retaliate* against private parties in violation of the First Amendment. *See, e.g.*, *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714-15 (1996) ("Although the government has broad discretion in formulating its contracting policies, we hold that [First Amendment protections] extend to an instance like the one before us, where government retaliates against a contractor, or a regular provider of services, for

15

the exercise of rights of political association or the expression of political allegiance."). Second, while the government touts its supposed concerns over national security and employment discrimination, it does not submit *any* admissible evidence (by way of declaration or otherwise) that those issues genuinely motivated the Order.

*Section 1*.  The government cannot pass off Section 1 as merely "precatory" (at 6), when it already has admitted that Section 1 makes *findings*.  TRO Tr. 35:9.[6]  Indeed, elsewhere in its brief (at 20), the government itself refers to "the *findings* set out in Section 1."  Those findings, moreover, are plainly intended to result in sanctions, as the Fact Sheet is frank to explain:  "the Federal Government *will* also halt all material and services … provided to Perkins Coie LLP;" "Federal Agencies *will* refrain from hiring Perkins Coie LLP employees;" "the Federal Government *will* prohibit funding contractors that use Perkins Coie LLP;" "[a]ll Federal Government contracts with Perkins Coie LLP *will* undergo rigorous scrutiny, with agency heads *directed* to terminate engagements to the maximum extent permitted by law."  The government already has given up the ghost on the argument that Section 1 is pure government speech.

*Section 2(a)*.  The government cannot justify Section 2(a) on national-security grounds. That section does not even reference national security.  The government (at 9) points to Section 1's discussion of Fusion GPS.  But even there, the Order does not criticize Perkins Coie's involvement in the Fusion GPS episode *as a national security risk*; it criticizes the Firm for "representing [the] failed Presidential candidate" who ran against Trump.  EO § 1.  Remarkably, the government has failed to make *any* showing that the Firm poses a legitimate national security

---

[6] *See also* Manning Decl., Ex. 56, 19:12-15 (Mr. Lawson: "I don't think there's any denial that [Section 1] is laying some groundwork for the agencies; that the agencies would understand, okay, … what should guide decisions on there."); *Id.*, Ex. 55, at 20:6-9 (Mr. Lawson: "I think any member of the Executive who would be wrestling with how to implement Sections 3 or 5 would necessarily be resorting and looking at what was said in Section 1 to guide that decision.").

risk. The government has not submitted any declaration from any national security official, either on the public docket or (as far as we can tell) *ex parte*, substantiating a national-security justification for Section 2(a). Nothing in the record supports the national-security argument.

That is for the obvious reason that any "national security" rationale is pretextual. As the Firm explained, Section 2(a) does not even reach the former Firm attorneys associated with the Fusion GPS dossier; it sanctions *current* personnel with no such involvement. MSJ Br. 14. Indeed, the government admits that (i) "[n]o attorney employed by Perkins Coie during the last three years was involved with the engagement of Fusion GPS," (ii) "[n]o security clearance holder had any involvement in the Fusion GPS matter," (iii) and "[n]ineteen of the security clearance holders had no involvement in any of the matters referenced in the Order or the Fact Sheet [and] [o]f the five that did, the security clearances they held were unrelated to their work on those matters." SOF Response ¶¶ 75, 94-95. The government protests (at 9) that the President cannot be expected to have "full knowledge of [the Firm's] personnel status and assignments." But it was hardly a secret that Marc Elias, Michael Sussman, and the bulk of the political law group left the Firm in 2021. SOF ¶¶ 71-76. Regardless, the government undoubtedly knows *now* that those individuals no longer work at the Firm. Yet the President has not withdrawn the Executive Order, confirming that any national security rationale is a sham.

Two other factors confirm pretext. First, the dossier episode dates back almost a decade to 2016. EO § 1. The government quibbles (at 9) that the President did not have the Durham Report until 2023. But the President believed the dossier was "false" long before then. For example, in October 2017, the President made a social media post referring to both the Firm and the "Fake Dossier." SOF ¶ 101. If the President genuinely believed that those connected to the dossier posed a national security threat, he could have revoked clearances during his first term. Leonard Rpt.

¶ 50.  Second, the President settled with Paul Weiss for *pro bono* services with no mention of national security—confirming that any such concern is pretext.  MSJ Br. 14.  The government tellingly has no response to this point.

**Section 2(b)**.  The government claims (at 11) that the denial of material and services to the Firm is limited to a SCIF and "those types of goods and services."  But Section 2(b)'s text contains no such limitation.  And the attempt to contrive a national-security rationale by referring to a SCIF is plainly pretextual, as the government concedes the Firm has never had one.  SOF ¶ 99; SOF Resp. ¶ 99.  The only rationale that can explain denying "all Government goods, property, material, and services" to the Firm is retaliation, plain and simple.

**Section 3**.  The government (at 12-13) tries to save Section 3's government-contract provisions by arguing that it is acting as a market participant, not as a sovereign.  But the government misunderstands the relevant legal principles.  What the case law actually says is that, when the government acts as contractor or employer, its interest in achieving its goals efficiently rises from a subordinate to a more significant interest.  *Waters v. Churchill*, 511 U.S. 661, 675 (1994).  But that does not mean the government may retaliate at will.  The government is still the government, and the foundational principle holds that "a government entity's threat of invoking legal sanctions and other means of coercion against a third party to achieve the suppression of disfavored speech violates the First Amendment."  *Vullo*, 602 U.S. at 180 (cleaned up); *see also Lozman v. Riviera Beach*, 585 U.S. 87, 90 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech."); *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) ("An ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right." (cleaned up)).

18

That is true even when the government retaliates against an employee or contractor. *Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996) (contractors); *O'Hare Truck Serv.*, 518 U.S. at 714-15 (contractors); *United States v. Lovett*, 328 U.S. 303, 313-14 (1946) (employees). And the principle applies with even more force, where, as here, the government is retaliating against a law firm for representing clients who oppose the President at the ballot box or in the court room.

The government next argues (at 21) that Section 3 does not "burden the [Firm's] speech or association rights" because it "applies only to a limited number of government contractors." But which contractors? The Fact Sheet explains that the government will terminate those contractors "*that use Perkins Coie LLP*." Why? "To ensure taxpayer dollars no longer go to contractors whose earnings *subsidize partisan lawsuits against the United States*." This is naked retaliation for protected speech, association, and petitioning.[7]

It is no answer for the government to say (at 12) that the Executive "has a long history of directing funds to its contractors based on its public policy objectives." That is *not* what is going on here. Perkins Coie is not a government contractor, nor is it a subcontractor.[8] There is *no history* of terminating government contractors because their outside lawyers represent the President's perceived political enemies. If Section 3 really concerned the policy objective of combatting racial

---

[7] Citing *McGowan v. Maryland*, 366 U.S. 420 (1961) and *United States v. O'Brien*, 391 U.S. 367 (1968), the government (at 14) rehashes its argument that any purportedly legitimate ground for the Order saves it. But neither of those cases involved First Amendment retaliation. In the retaliation context, if the government's retaliatory purpose was a factual cause of its action (as it clearly was here), then the government's action is unconstitutional, regardless of whether it had other purported reasons for its action. *See Dilley v. Alexander*, 603 F.2d 914, 922 (D.C. Cir. 1979). In any event, the government has no legitimate ground for the Order. Any purported concern over alleged employment discrimination is pretextual. MTD Opp. 13-14, 20-21; *infra* pp. 20-21.

[8] The government does not dispute the former, and merely assumes that the outside law firm to a government contractor is a subcontractor. Not so. MTD Opp. 22.

and sexual discrimination, it would direct the termination of government contractors that so discriminate.  But the Order is indifferent to the hiring practices of those contractors; it goes after them only insofar as they "use Perkins Coie LLP" and their earnings purportedly "subsidize partisan lawsuits against the United States" by the Firm.  *See* Fact Sheet.

**Section 4**.  As discussed above, the Firm does not seek to categorically enjoin the EEOC from reviewing its hiring practices; rather, it seeks to enjoin an illegal and unconstitutionally retaliatory and coercive investigation based on the Order.  *See supra* p.8.  Critically, the evidence in the record supports this view, and the government has done nothing to rebut it.  The government does not dispute that, just days after the Order, the Acting EEOC Chair demanded information from Perkins Coie and other firms about their employment practices "[b]ased on their public statements."  SOF ¶140.  Nor does the government dispute that the Acting Chair's demand *was unlawful* because the EEOC had not first filed a charge, as it is plainly required to do under its operating statute.  MSJ Br. 17-18.  Proceeding unlawfully is alone evidence of a retaliatory motive, but the Acting Chair did more than that.  *Id.* at 18.  Had the EEOC filed a charge, it would have been required to keep the investigation confidential—also undisputed by the government.  *Id.*  But the Acting Chair issued a *press release* insinuating that the Firm was engaged in unlawful discrimination.  SOF ¶¶ 141-43.  Having done so, the Chair and the White House then used that pseudo charge by press release to strong-arm other firms into multi-million-dollar settlements, lest they be targeted by new executive orders.  *See* MTD Opp. 21.  Those settlements ban speech, even down to prohibiting use of the acronym "DEI" to describe *lawful* practices.  Scarborough Decl. Ex. 4.  That is confirmation of retaliation, and only the government's see-no-evil, hear-no-evil Opposition can miss it.

The government argues (at 22-23) that there is no causal link between the Firm's protected conduct and the EEOC investigation. First, note that the government does not dispute that an *investigation* threatened or commenced as retaliation for protected First Amendment conduct is unconstitutional. *See* MSJ Br. 18 (citing cases). Second, the government's assertion (at 22, 24) that the Acting Chair's investigation represents what the EEOC was "*already ... supposed to be doing*" does not refute a causal link. To begin, there is no record evidence that the EEOC already was investigating the Firm's practices pursuant to the prior order that the government (at 24) cites. But even if the EEOC were doing so, that would only mean that Section 4 was intended to pile on sanctions out of retaliatory animus. Either way, the retaliatory animus and causation are clear.

**Section 5**. As to this section, the government's first response is wait and see. Wait and see what guidance emerges, if ever, from scores of federal agencies, while Perkins Coie meanwhile remains stigmatized as *persona non grata* and its clients are left to wonder whether Firm lawyers can communicate with federal employees or even enter federal buildings on the same terms as others. *Cf. Crandall v. State of Nevada*, 73 U.S. 35, 44 (1867) (a citizen "has the right to come to the seat of government to assert any claim he may have upon that government" and to access "the courts of justice in the several States."). The very uncertainty created by the Order threatens the Firm's relationships with its clients. The government's ripeness argument is wrong legally, *supra* pp.5-6, and blind to reality.

The government's next response is that we can rest assured that the guidance, when it comes, will not be arbitrary, but consistent "with the national security *and other government interests*," although the government does not say, and apparently still does not know (*see* TRO Tr. 53:1-6), what those "other government interests" might be. The retaliatory animus "clear from [the Order's] face" (TRO Tr. 75:12-13) means that those interests may well be nothing other than

furtherance of the President's personal vendetta against his perceived enemies. Given that the President already has found that the Firm acted against the national interest and that there is "good cause to conclude that [the Firm] neither [should] have access to our Nation's secrets nor be deemed [a] responsible steward[] of any Federal funds," EO § 1, the thrust of any guidance is preordained. Either way, the government's argument is wrong to the extent it sounds in ripeness. *See supra* pp.5-6. And to the extent it denies Section 5's retaliatory nature, it is as intentionally blind as the balance of the government's brief.

      **2.**      **The Order Burdens Protected Speech and Association by Compelling Disclosure of Attorney-Client Relationships**

Finally, the government fails to rebut Perkins Coie's showing (*see* MSJ Br. 20-21) that Section 3 unconstitutionally compels disclosure of the Firm's attorney-client relationships with its government-contractor clients. The government never disputes that Section 3 compels contractors to disclose "any business" with the Firm, EO § 3(a), including attorney-client-relationships. Instead, the government contends (at 21) that disclosure will not "interfere with attorney-client *privilege*" because the identity of a client generally is not protected from disclosure in litigation. That is beside the point. To fall within the scope of the First Amendment, the information being compelled need not be completely immune from discovery. What matters is that the information is "sensitive," such that its disclosure "might chill association." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615, 617 (2021). There is no dispute that the Firm's relationships with its clients, many of which are confidential, satisfy that standard. SOF ¶¶ 35, 146; D.C. Bar Ethics Op. 383 ("Absent the informed consent of the affected client …, disclosure of that person's identity or the issues on which the lawyer is representing that person would violate Rule 1.6.").

Because Section 3 compels disclosure of sensitive information, the government must show "a substantial relation between the disclosure requirement and a sufficiently important

governmental interest," and the requirement must be "narrowly tailored to the interest." *Ams. for Prosperity Found.*, 594 U.S. at 611.  The government, however, makes little effort to justify Section 3's "broad and sweeping" disclosure mandate. *Id.* at 610.  The government asserts (at 21) that Section 3 is "narrowly tailored" to its "stated goal" because contractors "must merely identify business with Plaintiff for the limited purpose of facilitating agency review of government *contracts with Plaintiff*."  But that is nonsensical.  The government already knows whether it has contracts with the Firm; it does not need to compel third-party disclosures for that purpose.

In addition to being nonsensical, the government's argument mischaracterizes Section 3. The section does not merely call for agency review of government contracts *with the Firm*; it also requires agencies to assess their contracts "*with entities that do business with Perkins Coie*," including the Firm's clients.  EO § 3(b)(ii).  The section thus puts "pressure" on clients to "avoid any ties" with the Firm. *See Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960).  And Section 3 makes clear that it does so for unconstitutional purposes.  Section 3's "stated goals" include "prevent[ing] the transfer of taxpayer dollars to Federal Contractors whose earnings subsidize" so-called "anti-democratic" challenges to election laws.  EO § 3.  The Fact Sheet is even more blunt that Section 3 "prohibit[s] funding contractors that use Perkins Coie LLP" to "ensure taxpayer dollars no longer go to contractors whose earnings *subsidize [the Firm's] partisan lawsuits against the United States*."  Section 3's purpose thus is to prevent clients from associating with the Firm so that they do not indirectly "subsidize" lawsuits the President does not like.  That is not even a legitimate interest, much less a "sufficiently important" one. *Ams. for Prosperity Found.*, 594 U.S. at 611. Nor is Section 3 narrowly tailored, as it compels disclosure of "any business" a contractor does with the Firm, regardless of whether that business has any connection to "partisan lawsuits."

The government's remaining arguments are makeweight.  The government (at 21) observes that contractors "are already subject to substantial disclosure requirements as a condition of doing business with the federal government."  But the fact that contractors are subject to *other* disclosure requirements does not somehow justify forcing them to disclose sensitive attorney-client relationships to pressure them to cut ties with the Firm.  The government further observes (at 21) that "firms are regularly required to disclose the identity of clients in contexts raising national security concerns."  But Section 3 does not even mention the pretext of national security, and the Fact Sheet makes clear it is all about preventing "subsidi[es]" to "partisan lawsuits."  The First Amendment forbids compelling disclosure for that illegitimate purpose.

## II.    PERKINS COIE IS CONTINUING TO CONFER WITH THE GOVERNMENT IN AN EFFORT TO IDENTIFY ALL AGENCIES AND OFFICIALS TO BE INCLUDED IN A PERMANENT INJUNCTION

As discussed in its opposition to the motion to dismiss, Perkins Coie repeatedly has asked the government to identify each Executive Branch department, agency, or entity ("agencies") that is subject to the Order, along with the name and title of its head official, so that they may be identified in the proposed order granting a permanent injunction.  *See* MTD Opp. 43; 5 U.S.C. § 702 (providing that, in an action against the United States, "any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title) … personally responsible for compliance").  Although the government provided a list of agencies yesterday evening, its list appears to be both over- and under-inclusive.  Manning Reply Decl. ¶¶ 5-6.  Accordingly, Perkins Coie will continue to confer with government counsel in an attempt to reach agreement on the list of agencies and officers to be included in the proposed permanent injunction.  *Id.* ¶ 7.  The Firm will submit an amended proposed order in advance of the hearing date so that the Court may issue a comprehensive permanent injunction naming all appropriate agencies and the officials personally

responsible for compliance. *Id.* The Firm also will request that the Court include the general

counsel of each agency in its injunction to ensure compliance. *Id.* ¶ 8.

## CONCLUSION

Perkins Coie respectfully requests that the Court grant summary judgment in its favor on

all of its claims and grant both declaratory and permanent injunctive relief.


Dated:  April 18, 2025                              Respectfully submitted,

                                                    **WILLIAMS & CONNOLLY LLP**

                                    By:      */s/ Dane H. Butswinkas*
                                             Dane H. Butswinkas (D.C. Bar #425056)

F. Lane Heard III (D.C. Bar #291724)            Amy M. Saharia (D.C. Bar #981644)
Christopher N. Manning (D.C. Bar #464069)       Matthew B. Nicholson (D.C. Bar #1013418)
Ryan T. Scarborough (D.C. Bar #466956)          Carol J. Pruski (D.C. Bar #1006941)*
Malachi B. Jones (D.C. Bar #455555)             Charles L. McCloud (D.C. Bar #1012047)*
Charles Davant IV (D.C. Bar #484305)            Krystal C. Durham (D.C. Bar # 987768)
David S. Kurtzer-Ellenbogen (D.C. Bar #489559)  Eden Schiffmann (D.C. Bar #1035019)
Jesse T. Smallwood (D.C. Bar #495961)

                                                680 Maine Avenue, SW
                                                Washington, DC  20024
                                                (202) 434-5000
                                                *Counsel for Plaintiff Perkins Coie LLP*

                                                *\* DDC bar application pending*