APPEAL,CLOSED,TYPE−D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25−cv−00716−BAH</u>
### *Internal Use Only*

| | |
|---|---|
| PERKINS COIE LLP v. U.S. DEPARTMENT OF JUSTICE et al | Date Filed: 03/11/2025 |
| Assigned to: Judge Beryl A. Howell | Date Terminated: 05/05/2025 |
| Cause: 28:1331 Fed. Question | Jury Demand: None |
| | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**PERKINS COIE LLP**                     represented by   **Amy Mason Saharia**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5847
Fax: 202−434−5029
Email: asaharia@wc.com
*ATTORNEY TO BE NOTICED*

**Charles Davant , IV**
WILLIAMS & CONNOLLY
680 Maine Avenue, S.W.
Washington, DC 20024
202−434−5695
Email: cdavant@wc.com
*ATTORNEY TO BE NOTICED*

**Christopher Nicholas Manning**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
202−434−5121
Fax: 202−434−5029
Email: cmanning@wc.com
*ATTORNEY TO BE NOTICED*

**David Simon Kurtzer−Ellenbogen**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5676
Fax: 202−434−5029
Email: dkurtzer@wc.com
*ATTORNEY TO BE NOTICED*

**Eden Schiffmann**
WILLIAMS & CONNOLLY

680 Maine Avenue S.W.
Washington, DC 20024
202−434−5977
Email: eschiffmann@wc.com
*ATTORNEY TO BE NOTICED*

**F. Lane Heard , III**
WILLIAMS & CONNOLLY
680 Maine Avenue, SW
Washington DC, DC 20024
202−434−5114
Fax: 202−434−5029
Email: lheard@wc.com
*ATTORNEY TO BE NOTICED*

**Jesse T. Smallwood**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5162
Email: jsmallwood@wc.com
*ATTORNEY TO BE NOTICED*

**Krystal Commons Durham**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5493
Email: kcommons@wc.com
*ATTORNEY TO BE NOTICED*

**Malachi Brown Jones , Jr.**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5445
Email: mjones@wc.com
*ATTORNEY TO BE NOTICED*

**Matthew Brian Nicholson**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5189
Email: mnicholson@wc.com
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5173

Fax: 202−434−5029
Email: rscarborough@wc.com
*ATTORNEY TO BE NOTICED*

**Dane Hal Butswinkas**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5110
Fax: 202−434−5029
Email: dbutswinkas@wc.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. DEPARTMENT OF JUSTICE**    represented by    **Douglas C. Dreier**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
601 D Street NW
Washington, DC 20053
(202) 252−2551
Email: douglas.dreier@usdoj.gov
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
DOJ−USAO
950 Pennsylvania Avenue, NW
Washington, DC 20530−0001
202−445−8042
Email: richard.lawson3@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
DOJ−CIV
1100 L Street, NW
Room 7500
Washington, DC 20530
202−514−4107
Email: terry.henry@usdoj.gov
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**FEDERAL COMMUNICATIONS
COMMISSION**    represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF MANAGEMENT AND
BUDGET**                             represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION**            represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **OFFICE OF PERSONNEL MANAGEMENT** | represented by | **Douglas C. Dreier**<br>(See above for address)<br>*TERMINATED: 03/18/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard Lawson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Terry Marcus Henry**<br>(See above for address)<br>*TERMINATED: 03/21/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **GENERAL SERVICES ADMINISTRATION** | represented by | **Douglas C. Dreier**<br>(See above for address)<br>*TERMINATED: 03/18/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard Lawson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Terry Marcus Henry**<br>(See above for address)<br>*TERMINATED: 03/21/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE** | represented by | **Douglas C. Dreier**<br>(See above for address)<br>*TERMINATED: 03/18/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard Lawson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Terry Marcus Henry**<br>(See above for address)<br>*TERMINATED: 03/21/2025*<br>*LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**          represented by    **Douglas C. Dreier**
                                                        (See above for address)
                                                        *TERMINATED: 03/18/2025*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Richard Lawson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Terry Marcus Henry**
                                                        (See above for address)
                                                        *TERMINATED: 03/21/2025*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA J. BONDI**                    represented by    **Douglas C. Dreier**
                                                        (See above for address)
                                                        *TERMINATED: 03/18/2025*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Richard Lawson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Terry Marcus Henry**
                                                        (See above for address)
                                                        *TERMINATED: 03/21/2025*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREA R. LUCAS**                    represented by    **Douglas C. Dreier**
                                                        (See above for address)
                                                        *TERMINATED: 03/18/2025*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Richard Lawson**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Terry Marcus Henry**

(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHARLES EZELL**                                  represented by   **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEPHEN EHEKIAN**                                represented by   **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TULSI GABBARD**                                  represented by   **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALL FEDERAL AGENCIES AND AGENCY HEADS**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BRENDAN CARR**

represented by **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL VOUGHT**
*in his official capacity as Acting Director*

represented by **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF WASHINGTON**                  represented by   **Emma Grunberg**
                                                          WASHINGTON OFFICE OF THE
                                                          ATTORNEY GENERAL
                                                          PO Box 40100
                                                          1125 Washington St. SE
                                                          Olympia, WA 98504−0100
                                                          206−521−3222
                                                          Email: emma.grunberg@atg.wa.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kelly A. Paradis**
                                                          WASHINGTON OFFICE OF THE
                                                          ATTORNEY GENERAL
                                                          PO Box 40100
                                                          1125 Washington St. SE
                                                          Olympia, WA 98504−0100
                                                          206−389−3105
                                                          Email: Kelly.Paradis@atg.wa.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Maureen Johnston**
                                                          WASHINGTON STATE ATTORNEY
                                                          GENERAL
                                                          800 Fifth Avenue
                                                          Suite 2000
                                                          Seattle, WA 98104
                                                          206−389−2513
                                                          Email: maureen.johnston@atg.wa.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES**             represented by   **Cecillia D. Wang**
**UNION**                                                 ACLU
                                                          425 California St
                                                          Suite 700
                                                          San Francisco, CA 94104
                                                          415−343−0775
                                                          Email: cwang@aclu.org
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES**             represented by   **Cecillia D. Wang**
**UNION OF THE DISTRICT OF**                              (See above for address)
**COLUMBIA**                                              *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**CATO INSTITUTE**                      represented by    **Cecillia D. Wang**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**ELECTRONIC FRONTIER**                 represented by    **Cecillia D. Wang**
**FOUNDATION**                                            (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**FOUNDATION FOR INDIVIDUAL**            represented by    **Cecillia D. Wang**
**RIGHTS AND EXPRESSION**                                  (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**INSTITUTE FOR JUSTICE**                represented by    **Cecillia D. Wang**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**KNIGHT FIRST AMENDMENT**               represented by    **Cecillia D. Wang**
**INSTITUTE AT COLUMBIA**                                  (See above for address)
**UNIVERSITY**                                            *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NATIONAL COALITION AGAINST**           represented by    **Cecillia D. Wang**
**CENSORSHIP**                                            (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**REPORTERS COMMITTEE FOR**              represented by    **Cecillia D. Wang**
**THE FREEDOM OF THE PRESS**                              (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**RUTHERFORD INSTITUTE**                 represented by    **Cecillia D. Wang**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**SOCIETY FOR THE RULE OF LAW INSTITUTE**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**FORMER DC BAR PRESIDENTS**

represented by **Andrea C. Ferster**
ANDREA C. FERSTER
68 Beebe Pond Rd
Canaan, NY 12029
202−669−6311
Email: andreaferster@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**363 LAW PROFESSORS**

represented by **Phillip Robert Malone**
559 Nathan Abbott Way
Stanford, CA 94305−8610
650−725−6369
Email: pmalone@law.stanford.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**LAWYERS DEFENDING AMERICAN DEMOCRACY, INC**

represented by **Aderson Bellegarde Francois**
GEORGETOWN UNIVERSITY LAW
CENTER
600 New Jersey Avenue, NW
Suite 352
Washington, DC 20001
(202) 661−6721
Fax: 202−662−9634
Email: aderson.francois@georgetown.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**

represented by **Edward G. Caspar**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202−662−8390
Email: ecaspar@lawyerscommittee.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adria Jasmine Bonillas**

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202−662−8317
Email: abonillas@lawyerscommittee.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS**                 represented by   **Kobie Flowers**
                                                            FLOWERS KELLER LLP
                                                            1601 Connecticut Avenue Northwest
                                                            20009
                                                            Washington, DC 20009
                                                            202−521−8742
                                                            Email: kflowers@flowerskeller.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**NEW YORK COUNCIL OF
DEFENSE LAWYERS**                          represented by   **Noam Biale**
                                                            SHER TREMONTE LLP
                                                            90 Broad Street
                                                            23rd Floor
                                                            New York, NY 10004
                                                            212−202−2600
                                                            Email: nbiale@shertremonte.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**346 FORMER JUDGES**                      represented by   **Donald Manwell Falk**
                                                            4416 Harbord Dr
                                                            Oakland, CA 94618
                                                            650−269−2020
                                                            Email: donald.falk@gmail.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Sara E. Kropf**
                                                            KROPF MOSELEY SCHMITT PLLC
                                                            1100 H Street NW
                                                            Suite 1220
                                                            Washington, DC 20005
                                                            202−627−6900
                                                            Email: sara@kmlawfirm.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Amicus**

**KENNETH C. PICKERING**              represented by  **KENNETH C. PICKERING**
                                                      Pickering Legal LLC
                                                      100 Grove Street
                                                      Worcester, MA 01605
                                                      *PRO SE*

**Amicus**

**504 LAW FIRMS**                     represented by  **Donald Beaton Verrilli , Jr**
                                                      MUNGER, TOLLES & OLSON LLP
                                                      1155 F Street, NW
                                                      7th Floor
                                                      Washington, DC 20004
                                                      213−683−9507
                                                      Email: donald.verrilli@mto.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Nathan P. Eimer**
                                                      EIMER STAHL LLP
                                                      224 South Michigan Avenue
                                                      Suite 1100
                                                      Chicago, IL 60604
                                                      (312) 660−7600
                                                      Fax: (312) 692−1718
                                                      Email: neimer@eimerstahl.com
                                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**LITIGATION FIRMS**                  represented by  **Kathryn A. Reilly**
                                                      WHEELER TRIGG O'DONNELL LLP
                                                      370 17th Street
                                                      Suite 4500
                                                      Denver, CO 80202−5647
                                                      303−244−1800
                                                      Email: reilly@wtotrial.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**BAR ASSOCIATIONS**                  represented by  **Eric John Galvez Paredes**
                                                      PROTECT DEMOCRACY PROJECT
                                                      82 Nassau Street
                                                      #601
                                                      New York, NY 10038
                                                      202−579−4582
                                                      Email: john.paredes@protectdemocracy.org
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Hayden Johnson**

PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW
Ste 163
Washington, DC 20006
202−870−3210
Email: hayden.johnson@protectdemocracy.org
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.** | represented by | **Samuel Spital** |

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street
5th Floor
New York, NY 10006
(212) 965−2200
Email: sspital@naacpldf.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **GENERAL COUNSEL AMICI** | represented by | **Andrew George Pappas** |

OSBORN MALEDON, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9398
Fax: 602−640−9050
Email: apappas@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Austin Tyler Marshall**
HERRERA ARELLANO LLP
1001 N Central Ave
Suite 404
Phoenix, AZ 85004
928−446−4410
Email: austin@ha−firm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B. Rosenbaum**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9345
Fax: 602−640−9050
Email: drosenbaum@omlaw.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric M. Fraser**
OSBORN MALEDON P.A.
2929 North Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9321
Fax: 602−640−9050
Email: efraser@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Roth**
OSBORN MALEDON, P.A
2929 N. Central Avenue
Suite 2100
Phoenix, AZ 85012
602−640−9320
Fax: 602−640−9050
Email: jroth@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua James Messer**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Ste 2100
Phoenix, AZ 85012
602−640−9326
Fax: 602−640−9050
Email: jmesser@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Ruth O'Grady**
OSBORN MALEDON PA
2929 N Central Ave
Suite 2000
Phoenix, AZ 85012
602−640−9000
Fax: 602−640−9050
Email: mogrady@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**INTERNATIONAL ACADEMY OF TRIAL LAWYERS**                    represented by    **Patrick Michael Regan**
REGAN ZAMBRI & LONG, PLLC
1919 M Street, NW
Suite 350
Washington, DC 20036
(202) 463−3030
Fax: (202) 463−0667
Email: pregan@reganfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**FORMER SENIOR GOVERNMENT OFFICIALS**                    represented by    **Justin A. Nelson**
SUSMAN GODFREY LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002
713−653−7895
Fax: 713−654−6666
Email: jnelson@susmangodfrey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**23 NONGOVERNMENTAL ORGANIZATIONS**                    represented by    **William E. Zapf**
KAISER PLLC
1099 14th Street, NW
Ste 8th Floor West
Washington, DC 20005
202−869−1300
Email: wzapf@kaiserlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES**                    represented by    **Mason Andrew Kortz**
HARVARD LAW SCHOOL
Cyberlaw Clinic
Lewis Hall, 4th Floor
1557 Massachusetts Avenue
Cambridge, MA 02138
617−495−2845
Email: mkortz@law.harvard.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY**                    represented by    **Jim Davy**
JIM DAVY

P.O. Box 15216
Philadelphia, PA 19125
215−792−3579
Email: jimdavy@allriselaw.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Seungchul Chang**
FRED T. KOREMATSU CENTER FOR
LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Ste 1000
Irvine, CA 92697
206−390−5676
Email: rchang@law.uci.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremiah Chin**
UNIVERSITY OF WASHINGTON
School of Law
9622 S 221st Pl
Kent, WA 98031
480−334−7703
Email: jerchin@uw.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Levin**
RONALD A. PETERSON LAW CLINIC
Civil Rights Clinic
Seattle University School of Law
901 12th Ave, Sullivan Hall
Ste Sllh 315
Seattle, WA 98115
206−398−4167
Fax: 206−398−4261
Email: levinje@seattleu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Lee**
RONALD A. PETERSON LAW CLINIC
Center for Civil Rights and Critical Justice
1112 E. Columbia St.
Seattle, WA 98122
206−398−4394
Email: leeme@seattleu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan A. McMahon**
FRED T. KOREMATSU CENTER FOR
LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Ste 1000
Irvine, CA 92697
949−824−0066
Email: smcmahon@law.uci.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**334 SOLO AND SMALL FIRM
LAWYERS**                         represented by   **Carolyn Elefant**
                                                  LAW OFFICES OF CAROLYN
                                                  ELEFANT PLLC
                                                  1440 G Street, NW
                                                  8th Floor
                                                  Washington, DC 20005
                                                  (202) 297−6100
                                                  Email: carolyn@carolynelefant.com
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

Amicus

**AMERICA'S FUTURE**              represented by   **William Jeffrey Olson**
                                                  WILLIAM J. OLSON, P.C.
                                                  370 Maple Avenue West
                                                  Suite 4
                                                  Vienna, VA 22180
                                                  (703) 356−5070
                                                  Fax: (703) 356−5085
                                                  Email: wjo@mindspring.com
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

Amicus

**GUN OWNERS OF AMERICA, INC.**   represented by   **William Jeffrey Olson**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

Amicus

**GUN OWNERS FOUNDATION**         represented by   **William Jeffrey Olson**
                                                  (See above for address)
                                                  *LEAD ATTORNEY*
                                                  *ATTORNEY TO BE NOTICED*

Amicus

**GUN OWNERS OF CALIFORNIA**      represented by

**William Jeffrey Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**JUDICIAL ACTION GROUP**          represented by   **William Jeffrey Olson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**CONSERVATIVE LEGAL DEFENSE**     represented by   **William Jeffrey Olson**
**AND EDUCATION FUND**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**AARON H. CAPLAN**                represented by   **Stephen Craig Leckar**
KALBIAN HAGERTY LLP
888 17th Street, NW
Suite 1200
Washington, DC 20006
202−223−5600
Email: sleckar@kalbianhagerty.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**LEGAL ETHICS PROFESSORS**        represented by   **Kelsi B. Corkran**
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
600 New Jersey Avenue NW
Washington, DC 20001
202−661−6728
Fax: 202−661−6730
Email: kbc74@georgetown.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Wilfred Mead**
GEORGETOWN UNIVERSITY LAW
CENTER
Institute for Constitutional Advocacy and
Protection
600 New Jersey Ave NW
Washington, DC 20001
202−662−9765
Email: jm3468@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Amicus**

**RICH MAY PC**                          represented by  **Carolyn Elefant**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Frank N. Gaeta**
                                                         RICH MAY, P.C.
                                                         Massachusetts
                                                         176 Federal Street, 6th Floor
                                                         Boston, MA 02110
                                                         617−556−3838
                                                         Email: fgaeta@richmaylaw.com
                                                         *LEAD ATTORNEY*
                                                         *PRO HAC VICE*
                                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC−11534207) filed by PERKINS COIE LLP. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons, # 3 Summons Summons, # 4 Summons Summons, # 5 Summons Summons, # 6 Summons Summons, # 7 Summons Summons, # 8 Summons Summons, # 9 Summons Summons, # 10 Summons Summons, # 11 Summons Summons, # 12 Summons Summons, # 13 Summons Summons, # 14 Summons Summons, # 15 Summons Summons, # 16 Summons Summons, # 17 Summons Summons, # 18 Summons Summons)(Butswinkas, Dane) (Entered: 03/11/2025) |
| 03/11/2025 | 2 | MOTION for Temporary Restraining Order by PERKINS COIE LLP. (Attachments: # 1 Memorandum in Support of the Motion for a Temporary Restraining Order, # 2 Declaration of David J. Burman, # 3 Declaration of Bruce Green, # 4 Declaration of Robert Hirshon, # 5 Declaration of Roy Simon, # 6 Declaration of Chris Manning, # 7 Exhibit Local Rule 65.1 Certification, # 8 Text of Proposed Order Granting TRO)(Butswinkas, Dane) (Entered: 03/11/2025) |
| 03/11/2025 |  | Case Assigned to Judge Beryl A. Howell. (zjd) (Entered: 03/11/2025) |
| 03/11/2025 | 3 | NOTICE of Appearance by Christopher Nicholas Manning on behalf of PERKINS COIE LLP (Manning, Christopher) (Entered: 03/11/2025) |
| 03/11/2025 | 4 | NOTICE of Appearance by Amy Mason Saharia on behalf of PERKINS COIE LLP (Saharia, Amy) (Entered: 03/11/2025) |
| 03/11/2025 |  | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error needs correction: Noncompliance with LCvR 5.1(c). Please file a Notice of Errata stating the error and attach the corrected initiating pleading to include the name & full residence address of each party and file using the event Errata. (zjd) (Entered: 03/11/2025) |
| 03/11/2025 | 5 | SUMMONS (17) Issued Electronically as to All Defendants, U.S. Attorney, and U.S. Attorney General. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 03/11/2025) |

| 03/11/2025 | 6 | NOTICE of Appearance by Eden Schiffmann on behalf of PERKINS COIE LLP (Schiffmann, Eden) (Entered: 03/11/2025) |
|---|---|---|
| 03/11/2025 | | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on plaintiff's 2 Motion for Temporary Restraining Order on March 12, 2025, at 2:00 PM, in Courtroom 26A− In Person before Judge Beryl A. Howell, and ORDERING plaintiff to serve defendants with a copy of this Order immediately upon receipt to ensure that counsel for defendants has sufficient notice to appear at the hearing. Signed by Judge Beryl A. Howell on March 11, 2025. (lcbah2) (Entered: 03/11/2025) |
| 03/11/2025 | | Set/Reset Hearings: Motion Hearing set for 3/12/2025 at 2:00 PM in Courtroom 26− In Person (Audio Line Available) before Judge Beryl A. Howell. (mac) (Entered: 03/12/2025) |
| 03/12/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for March 12, 2025 at 2:00PM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), available here: **Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 03/12/2025)** |
| 03/12/2025 | 7 | NOTICE of Appearance by Matthew Brian Nicholson on behalf of PERKINS COIE LLP (Nicholson, Matthew) (Entered: 03/12/2025) |
| 03/12/2025 | 8 | NOTICE of Appearance by David Simon Kurtzer−Ellenbogen on behalf of PERKINS COIE LLP (Kurtzer−Ellenbogen, David) (Entered: 03/12/2025) |
| 03/12/2025 | 9 | NOTICE of Appearance by Krystal Commons Durham on behalf of PERKINS COIE LLP (Durham, Krystal) (Entered: 03/12/2025) |
| 03/12/2025 | 10 | NOTICE of Appearance by Douglas C. Dreier on behalf of All Defendants (Dreier, Douglas) (Entered: 03/12/2025) |
| 03/12/2025 | 11 | NOTICE of Appearance by Jesse T. Smallwood on behalf of PERKINS COIE LLP (Smallwood, Jesse) (Entered: 03/12/2025) |
| 03/12/2025 | 12 | NOTICE of Appearance by Kelly A. Paradis on behalf of STATE OF WASHINGTON (Paradis, Kelly) (Entered: 03/12/2025) |
| 03/12/2025 | 13 | NOTICE of Appearance by Maureen Johnston on behalf of STATE OF WASHINGTON (Johnston, Maureen) (Entered: 03/12/2025) |
| 03/12/2025 | 14 | NOTICE of Appearance by Emma Grunberg on behalf of STATE OF WASHINGTON (Grunberg, Emma) (Entered: 03/12/2025) |
| 03/12/2025 | 15 | AMICUS BRIEF *in support of Plaintiff's Motion for Temporary Restraining Order* by STATE OF WASHINGTON. (Grunberg, Emma) (Entered: 03/12/2025) |
| 03/12/2025 | 16 | NOTICE of Appearance by Terry Marcus Henry on behalf of All Defendants (Henry, Terry) (Entered: 03/12/2025) |
| 03/12/2025 | 17 | |

| | | |
|---|---|---|
| | | NOTICE of Appearance by Charles Davant, IV on behalf of PERKINS COIE LLP (Davant, Charles) (Entered: 03/12/2025) |
| 03/12/2025 | 18 | NOTICE of Appearance by Ryan Thomas Scarborough on behalf of PERKINS COIE LLP (Scarborough, Ryan) (Entered: 03/12/2025) |
| 03/12/2025 | 19 | NOTICE of Appearance by F. Lane Heard, III on behalf of PERKINS COIE LLP (Heard, F.) (Entered: 03/12/2025) |
| 03/12/2025 | 20 | ERRATA by PERKINS COIE LLP re 1 Complaint,,. (Attachments: # 1 Exhibit 1. Complaint)(Butswinkas, Dane) (Entered: 03/12/2025) |
| 03/12/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 3/12/2025 in re 2 Motion for Temporary Restraining Order. The Court Heard Oral Arguments From The Parties. For The Reasons Stated On The Record, The Court Will Grant 2 Motion For Temporary Restraining Order. Parties Proposed Briefing Schedule Due No Later Than 4:00PM on 3/13/2025. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 03/12/2025) |
| 03/12/2025 | 21 | ORDER GRANTING plaintiff's 2 Motion for a Temporary Restraining Order. See Order for further details. Signed by Judge Beryl A. Howell on March 12, 2025. (lcbah2) (Entered: 03/12/2025) |
| 03/13/2025 | 22 | TRANSCRIPT OF HEARING, before Judge Beryl A. HowelL, held on 3−12−2025; Page Numbers: 1 − 131. Date of Issuance: 3−13−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/3/2025. Redacted Transcript Deadline set for 4/13/2025. Release of Transcript Restriction set for 6/11/2025.(Davila, Elizabeth) (Entered: 03/13/2025) |
| 03/13/2025 | | Set/Reset Deadlines: Parties Joint Status Report due by 3/14/2025. (mac) (Entered: 03/13/2025) |
| 03/13/2025 | 23 | Joint MOTION for Extension of Time to *File Joint Status Report* by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Granting Motion to Enlarge Time)(Butswinkas, Dane) (Entered: 03/13/2025) |
| 03/13/2025 | | MINUTE ORDER (paperless) GRANTING the parties' 23 Joint Motion for Enlargement of Time to File Joint Status Report and DIRECTING the parties to file jointly, by 3:00 PM on March 14, 2025, a joint status report proposing a schedule to govern further proceedings in this case. Signed by Judge Beryl A. Howell on March |

| | | |
|---|---|---|
| | | 13, 2025. (lcbah2) (Entered: 03/13/2025) |
| 03/14/2025 | 24 | NOTICE of Appearance by Richard Lawson on behalf of All Defendants (Lawson, Richard) (Entered: 03/14/2025) |
| 03/14/2025 | 25 | Joint STATUS REPORT by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Extending Injunction and Expediting Dispositive Motion Proceedings)(Butswinkas, Dane) (Entered: 03/14/2025) |
| 03/14/2025 | 26 | ORDER EXTENDING duration of 21 injunction and ISSUING schedule for expedited dispositive motions briefing. See Order for further details. Signed by Judge Beryl A. Howell on March 14, 2025. (lcbah2) (Entered: 03/14/2025) |
| 03/14/2025 | | Set/Reset Deadlines: Parties Dispositive Motions And Opening Briefs In Support due by 4/2/2025. Parties Oppositions due no later than 12:00PM on 4/16/2025. Parties Replies due no later than 4:00PM on 4/18/2025. (mac) (Entered: 03/14/2025) |
| 03/14/2025 | 27 | STATUS REPORT by PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Henry, Terry) (Entered: 03/14/2025) |
| 03/18/2025 | 28 | NOTICE OF WITHDRAWAL OF APPEARANCE as to PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. Attorney Douglas C. Dreier terminated. (Dreier, Douglas) (Entered: 03/18/2025) |
| 03/18/2025 | 29 | STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Status Report Attachment 1, # 2 Status Report Attachment 2)(Lawson, Richard) (Entered: 03/18/2025) |
| 03/18/2025 | 30 | MOTION to Clarify re 21 Order *Motion To Clarify Temporary Restraining Order* by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Proposed Order)(Manning, Christopher) (Entered: 03/18/2025) |
| 03/19/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiff's 30 Motion to Clarify Temporary Restraining Order, which appropriately raises promptly a difference of interpretation of the Court's 21 Injunction Order for clarification to ensure full compliance with the obligations imposed, ISSUING the following ORDER regarding defendants' obligations under the Court's 21 Injunction Order expressly directing (1) defendants to "communicate to *every* recipient of a request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm..." that "such request is rescinded," *id.* at 2 (emphasis supplied), regardless of which agency subject to Executive Order 14230 made the request, and (2) four of the named defendants, namely, U.S. Department of Justice; U.S. Attorney General Pamela Bondi; the Office of Management and Budget ("OMB"); and OMB Director Russell |

| | | |
|---|---|---|
| | | Vought, to "immediately issue guidance to all other agencies subject to Executive Order 14230 to suspend and rescind *any implementation or enforcement*" of the enjoined portions of the Executive Order, *id.* (emphasis supplied):<br><br>(1) DIRECTING defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget, to immediately issue guidance to all other agencies subject to Executive Order 14230 directing them immediately to (a) communicate to every recipient of a request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm, made pursuant to Section 3(a) of Executive Order 14230, that such request is rescinded until further order of this Court; and (b) cease making such requests for disclosure, pursuant to Section 3(a) of Executive Order 14230, until further order of the Court; and<br><br>(2) FURTHER DIRECTING defendants to file, by 12:00 PM on March 20, 2025, a status report describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements, in light of the fact that "some agencies have requested that contractors respond to disclosure requests as soon as Thursday, March 20, 2025." Plaintiff's <u>30</u> Motion ¶ 10.<br><br>Signed by Judge Beryl A. Howell on March 19, 2025. (lcbah2) (Entered: 03/19/2025) |
| 03/19/2025 | | Set/Reset Deadlines: Defendants Status Report due no later than 12:00PM on 3/20/2025. (mac) (Entered: 03/19/2025) |
| 03/20/2025 | 31 | STATUS REPORT by PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Henry, Terry) (Entered: 03/20/2025) |
| 03/20/2025 | 32 | Supplemental STATUS REPORT by PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Attachments: # <u>1</u> Attachment)(Henry, Terry) (Entered: 03/20/2025) |
| 03/21/2025 | 33 | NOTICE OF WITHDRAWAL OF APPEARANCE as to PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. Attorney Terry Marcus Henry |

| | | |
|---|---|---|
| | | terminated. (Henry, Terry) (Entered: 03/21/2025) |
| 03/21/2025 | 34 | MOTION to Disqualify Judge by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Text of Proposed Order Proposed Order)(Lawson, Richard) (Entered: 03/21/2025) |
| 03/26/2025 | 35 | NOTICE of Appearance by Malachi Brown Jones, Jr on behalf of PERKINS COIE LLP (Jones, Malachi) (Entered: 03/26/2025) |
| 03/26/2025 | 36 | MEMORANDUM OPINION & ORDER DENYING defendants' 34 Motion to Disqualify Judge. See Memorandum Opinion & Order for further details. Signed by Judge Beryl A. Howell on March 26, 2025. (lcbah2) (Entered: 03/26/2025) |
| 03/28/2025 | 37 | LEAVE TO FILE DENIED− Janice Wolk Grenadier's Motion to Intervene. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file denied." Signed by Judge Beryl A. Howell on 3/28/2025. (mg) (Entered: 03/31/2025) |
| 03/31/2025 | 38 | LEAVE TO FILE DENIED− Pickering Legal LLC Motion for Leave to File Amicus Brief. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file denied 3/31/25 for failure to state parties' positions on motion, as required by D.D.C. LCvR 7(o)(2)." Signed by Judge Beryl A. Howell on 3/31/2025. (mg) (Entered: 03/31/2025) |
| 04/02/2025 | 39 | MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* by PERKINS COIE LLP. (Attachments: # 1 Memorandum in Support of Plaintiff's Motion for Summary Judgment, # 2 Statement of Facts, # 3 Declaration of David J. Burman, # 4 Declaration of Chris Manning, # 5 Exhibit Expert Report of Bruce A. Green, # 6 Exhibit Expert Report of Robert E. Hirshon, # 7 Exhibit Expert Report of Roy D. Simon, Jr., # 8 Exhibit Expert Report of J. William Leonard, # 9 Text of Proposed Order Granting Plaintiff's Motion)(Butswinkas, Dane). Added MOTION for Declaratory Judgment, MOTION for Permanent Injunction on 4/3/2025 (mg). (Entered: 04/02/2025) |
| 04/02/2025 | 40 | ENTERED IN ERROR.....Unopposed MOTION for Leave to File Amicus Brief by The American Civil Liberties Union, The American Civil Liberties Union of the District of Columbia, The Cato Institute, The Electronic Frontier Foundation, The Foundation for Individual Rights and Expression, The Institute for Justice, The Knight First Amendment Institute at Columbia University, The National Coalition Against Censorship, The Reporters Committee for the Freedom of the Press, The Rutherford Institute, The Society for the Rule of Law Institute. (Attachments: # 1 Proposed Order)(Wang, Cecilia) Modified on 4/3/2025; entered in error at the request of counsel (zdp). (Entered: 04/02/2025) |
| 04/02/2025 | 41 | ENTERED IN ERROR.....AMICUS BRIEF by The American Civil Liberties Union, The American Civil Liberties Union of the District of Columbia, The Cato Institute, The Electronic Frontier Foundation, The Foundation for Individual Rights and Expression, The Institute for Justice, The Knight First Amendment Institute at Columbia University, The National Coalition Against Censorship, The Reporters Committee for the Freedom of the Press, The Rutherford Institute, The Society for the Rule of Law Institute. (Wang, Cecilia) Modified on 4/3/2025; entered in error at the request of counsel. (zdp). (Entered: 04/02/2025) |
| 04/02/2025 | 42 | Unopposed MOTION for Leave to File Amicus Brief by FORMER DC BAR PRESIDENTS. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Ferster, Andrea) (Entered: 04/02/2025) |

| 04/02/2025 | 43 | MOTION to Dismiss by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Lawson, Richard) (Entered: 04/02/2025) |
|---|---|---|
| 04/02/2025 | 44 | MOTION for Reconsideration re 21 by U.S. DEPARTMENT OF JUSTICE. (Lawson, Richard) Modified on 4/7/2025to add link (mg). (Entered: 04/02/2025) |
| 04/02/2025 | 45 | Unopposed MOTION for Leave to File Amicus Brief by Amici Curiae 363 Law Professors. (Attachments: # 1 Exhibit Amici Brief, # 2 Text of Proposed Order)(Malone, Phillip). Added MOTION for Declaratory Judgment, MOTION for Permanent Injunction on 4/3/2025 (mg). (Entered: 04/02/2025) |
| 04/03/2025 | 46 | Unopposed MOTION for Leave to File Amicus Brief by The American Civil Liberties Union, The American Civil Liberties Union of the District of Columbia, The Cato Institute, The Electronic Frontier Foundation, The Foundation for Individual Rights and Expression, The Institute for Justice, The Knight First Amendment Institute at Columbia University, The National Coalition Against Censorship, The Reporters Committee for the Freedom of the Press, The Rutherford Institute, The Society for the Rule of Law Institute. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Wang, Cecilia) (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER (paperless), in light of the filing of defendants' 44 Motion for Reconsideration after the briefing schedule proposed by the parties had been entered, which motion seeks reconsideration of "the scope of [this Court's] order granting an injunction on March 12, 2025," *id.* at 2, and is thus related to the merits of the briefing already underway, and in order to limit the separate rounds of briefing in which the parties must engage and the Court must review, DIRECTING plaintiff to include any opposition to this motion in its already−scheduled opposition to defendants' dispositive motion, due by April 16, 2025, *see* 26 Order, and FURTHER DIRECTING defendants to include any reply in support of this motion in their already−scheduled reply in support of their dispositive motion, due by April 18, 2025, *see id.*, both of which filings should comply with the normally−applicable page limits, *see* D.D.C. LCvR 7(e). Signed by Judge Beryl A. Howell on April 3, 2025. (lcbah2) (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER (paperless) GRANTING 42 Unopposed Motion for Leave to File Amicus Brief, 45 Unopposed Motion for Leave to File Amicus Brief, and 46 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 3, 2025. (lcbah2) (Entered: 04/03/2025) |
| 04/03/2025 | 47 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: Non−Party Motion for leave to File Amicus Brief, Pickering Legal LLC. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit) (zdp) (Entered: 04/03/2025) |
| 04/03/2025 | 48 | AMICUS BRIEF by FORMER DC BAR PRESIDENTS. (mg) (Entered: 04/03/2025) |
| 04/03/2025 | 49 | AMICUS BRIEF by AMICI CURIAE 363 LAW PROFESSORS. (mg) (Entered: 04/03/2025) |
| 04/03/2025 | 50 | AMICUS BRIEF by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, ELECTRONIC FRONTIER FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL |

| | | |
|---|---|---|
| | | COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR THE RULE OF LAW INSTITUTE. (mg) (Entered: 04/03/2025) |
| 04/03/2025 | 51 | Unopposed MOTION for Leave to File Amicus Brief by Lawyers Defending American Democracy. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Francois, Aderson) (Entered: 04/03/2025) |
| 04/03/2025 | 52 | NOTICE of Appearance by Aderson Bellegarde Francois on behalf of Lawyers Defending American Democracy (Francois, Aderson) (Main Document 52 replaced on 4/4/2025) (mg). (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER (paperless) GRANTING 51 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 3, 2025. (lcbah2) (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER (paperless) re 47 Request for Leave to File Review. Leave to file is granted. The Clerk is directed to file the attached document on the public docket. Signed by Judge Beryl A. Howell on April 3, 2025. (lcbah2) (Entered: 04/03/2025) |
| 04/03/2025 | 53 | MOTION for Leave to File Amicus Brief by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW. (Attachments: # 1 Proposed Order, # 2 Exhibit Amicus Brief of Lawyers' Committee for Civil Rights Under Law)(Caspar, Edward) (Entered: 04/03/2025) |
| 04/03/2025 | 54 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Adria Bonillas, Filing fee $ 100, receipt number ADCDC−11589817. Fee Status: Fee Paid. by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Proposed Order)(Caspar, Edward) (Entered: 04/03/2025) |
| 04/03/2025 | 61 | AMICUS BRIEF by LAWYERS DEFENDING AMERICAN DEMOCRACY, INC. (mg) (Entered: 04/04/2025) |
| 04/03/2025 | 62 | MOTION for Leave to file Amicus Brief by PICKERING LEGAL LLC. (mg) (Main Document 62 replaced on 4/7/2025) (mg). (Additional attachment(s) added on 4/7/2025: # 1 Amicus Brief) (mg). (Entered: 04/04/2025) |
| 04/04/2025 | 55 | NOTICE of Appearance by Kobie A. Flowers on behalf of NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS (Flowers, Kobie) (Entered: 04/04/2025) |
| 04/04/2025 | 56 | NOTICE of Appearance by Noam Biale on behalf of NEW YORK COUNCIL OF DEFENSE LAWYERS (Biale, Noam) (Entered: 04/04/2025) |
| 04/04/2025 | 57 | NOTICE of Appearance by Sara E. Kropf on behalf of Amici Curiae 346 Former Judges (Kropf, Sara) (Entered: 04/04/2025) |
| 04/04/2025 | 58 | Unopposed MOTION for Leave to File Amicus Brief by NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, NEW YORK COUNCIL OF DEFENSE LAWYERS. (Attachments: # 1 Exhibit Amici Brief for National Association of Criminal Defense Lawyers and New York Council of Defense Lawyers, # 2 Exhibit Proposed Order)(Biale, Noam) (Entered: 04/04/2025) |
| 04/04/2025 | 59 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Donald M. Falk, Filing fee $ 100, receipt number ADCDC−11591258. Fee Status: Fee Paid. by Amici |

| | | |
|---|---|---|
| | | Curiae 346 Former Judges. (Attachments: # 1 Declaration of Donald Falk, # 2 Exhibit Certificate of Good Standing)(Kropf, Sara) (Entered: 04/04/2025) |
| 04/04/2025 | 60 | Consent MOTION for Leave to File Amicus Brief by Amici Curiae 346 Former Judges. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order)(Kropf, Sara) (Entered: 04/04/2025) |
| 04/04/2025 | 63 | Unopposed MOTION for Leave to File Amicus Brief by 504 Law Firms. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order, # 3 Appendix)(Verrilli, Donald) (Entered: 04/04/2025) |
| 04/04/2025 | 64 | NOTICE of Appearance by Donald Beaton Verrilli, Jr on behalf of 504 LAW FIRMS (Verrilli, Donald) (Entered: 04/04/2025) |
| 04/04/2025 | 65 | NOTICE of Appearance by Andrea C. Ferster on behalf of FORMER DC BAR PRESIDENTS (Ferster, Andrea) (Entered: 04/04/2025) |
| 04/04/2025 | 66 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Nathan P. Eimer, Filing fee $ 100, receipt number ADCDC−11592160. Fee Status: Fee Paid. by 504 LAW FIRMS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/04/2025) |
| 04/04/2025 | 67 | ERRATA *Appendix* by 504 LAW FIRMS re 63 Motion for Leave to File Amicus Brief. (Verrilli, Donald) (Entered: 04/04/2025) |
| 04/04/2025 | 68 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Andrew G. Pappas, Filing fee $ 100, receipt number ADCDC−11591840. Fee Status: Fee Paid. by GENERAL COUNCIL AMICI. (Attachments: # 1 Declaration Declaration of Andrew G. Pappas)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 69 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David B. Rosenbaum, Filing fee $ 100, receipt number ADCDC−11592718. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of David B. Rosenbaum)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 70 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Eric M. Fraser, Filing fee $ 100, receipt number ADCDC−11592744. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Eric M. Fraser)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 71 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joseph N. Roth, Filing fee $ 100, receipt number ADCDC−11592858. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Joseph N. Roth)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 72 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joshua J. Messer, Filing fee $ 100, receipt number ADCDC−11592877. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Joshua J. Messer)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 73 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mary R. O'Grady, Filing fee $ 100, receipt number ADCDC−11592892. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Mary |

| | | |
|---|---|---|
| | | R. O'Grady)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | | MINUTE ORDER (paperless) GRANTING <u>53</u> Motion for Leave to File Amicus Brief, <u>58</u> Unopposed Motion for Leave to File Amicus Brief, <u>60</u> Consent Motion for Leave to File Amicus Brief, and <u>63</u> Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 4, 2025. (lcbah2) (Entered: 04/04/2025) |
| 04/04/2025 | | MINUTE ORDER (paperless) GRANTING <u>54</u> , <u>59</u> , <u>66</u> , <u>68</u> , <u>69</u> , <u>70</u> , <u>72</u> , and <u>73</u> motions for leave to appear pro hac vice. Each identified attorney may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** <u>Click for instructions.</u> Signed by Judge Beryl A. Howell on April 4, 2025. (lcbah2) (Entered: 04/04/2025) |
| 04/04/2025 | <u>74</u> | AMICUS BRIEF by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW. (Caspar, Edward) (Entered: 04/04/2025) |
| 04/04/2025 | <u>75</u> | ERRATA re <u>71</u> MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joseph N. Roth, Filing fee $ 100, receipt number ADCDC−11593281. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # <u>1</u> Declaration of Joseph N. Roth)(Marshall, Austin) Modified to add link on 4/7/2025 (zdp). Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | <u>76</u> | AMICUS BRIEF by NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, NEW YORK COUNCIL OF DEFENSE LAWYERS. (mg) (Entered: 04/07/2025) |
| 04/04/2025 | <u>77</u> | AMICUS BRIEF by 346 FORMER JUDGES. (mg) (Entered: 04/07/2025) |
| 04/04/2025 | <u>78</u> | AMICUS BRIEF by 504 LAW FIRMS. (mg) (Entered: 04/07/2025) |
| 04/04/2025 | <u>100</u> | ERRATA by KENNETH C. PICKERING re <u>62</u> Motion for Leave to File Amicus Brief. (mg) (Entered: 04/08/2025) |
| 04/07/2025 | | NOTICE OF ERROR regarding <u>71</u> MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joseph N. Roth, Filing fee $ 100, receipt number ADCDC−11592858. Fee Status: Fee Paid.. The following error(s) need correction: Pro Hac Vice motion must be accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata (mg) (Entered: 04/07/2025) |
| 04/07/2025 | <u>79</u> | NOTICE of Appearance by Nathan P. Eimer on behalf of 504 LAW FIRMS (Eimer, Nathan) (Entered: 04/07/2025) |
| 04/07/2025 | <u>80</u> | Unopposed MOTION for Leave to File Amicus Brief *in Support of Plaintiff's Motion for Summary Judgment* by AMICI CURIAE LITIGATION FIRMS. (Attachments: # <u>1</u> Exhibit − Brief of Amici Curiae Litigation Firms in Support of Plaintiff's Motion for Summary Judgment, # <u>2</u> Text of Proposed Order − Granting Litigation Firms' Motion for Leave to File Amici Brief)(Reilly, Kathryn) (Entered: 04/07/2025) |
| 04/07/2025 | <u>81</u> | NOTICE of Appearance by Kathryn A. Reilly on behalf of AMICI CURIAE LITIGATION FIRMS (Reilly, Kathryn) (Entered: 04/07/2025) |
| 04/07/2025 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER (paperless) GRANTING <u>71</u> Motion for Leave to Appear Pro Hac Vice, in light of <u>75</u> Errata, which provides an amended version of the <u>71</u> motion that complies with all applicable local rules. Joseph N. Roth may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** <u>Click for instructions</u>. Signed by Judge Beryl A. Howell on April 7, 2025. (lcbah2) (Entered: 04/07/2025) |
| 04/07/2025 | | MINUTE ORDER (paperless) GRANTING <u>62</u> Motion for Leave to File Amicus Brief and <u>80</u> Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 7, 2025. (lcbah2) (Entered: 04/07/2025) |
| 04/07/2025 | 82 | ERRATA by 504 LAW FIRMS re <u>78</u> Amicus Brief. (Attachments: # <u>1</u> Appendix A)(Verrilli, Donald) (Entered: 04/07/2025) |
| 04/07/2025 | 83 | Unopposed MOTION for Leave to File Amicus Brief by BAR ASSOCIATIONS. (Attachments: # <u>1</u> Exhibit − Amici Curiae Brief, # <u>2</u> Text of Proposed Order)(Paredes, Eric John) (Entered: 04/07/2025) |
| 04/07/2025 | 84 | NOTICE of Appearance by Eric John Galvez Paredes on behalf of BAR ASSOCIATIONS (Paredes, Eric John) (Entered: 04/07/2025) |
| 04/07/2025 | 85 | NOTICE of Appearance by Hayden Johnson on behalf of BAR ASSOCIATIONS (Johnson, Hayden) (Entered: 04/07/2025) |
| 04/07/2025 | 86 | Unopposed MOTION for Leave to File Amicus Brief by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (Attachments: # <u>1</u> Exhibit Brief of Amicus Curiae, # <u>2</u> Text of Proposed Order)(Spital, Samuel) (Entered: 04/07/2025) |
| 04/07/2025 | 93 | AMICUS BRIEF by KENNETH C. PICKERING. (mg) (Entered: 04/08/2025) |
| 04/07/2025 | 94 | AMICUS BRIEF by LITIGATION FIRMS. (mg) (Entered: 04/08/2025) |
| 04/08/2025 | 87 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeannie Suk Gersen, Filing fee $ 100, receipt number ADCDC−11597740. Fee Status: Fee Paid. by BAR ASSOCIATIONS. (Attachments: # <u>1</u> Declaration of Jeannie Suk Gersen, # <u>2</u> Exhibit − Certificate of Good Standing, # <u>3</u> Text of Proposed Order)(Paredes, Eric John) (Entered: 04/08/2025) |
| 04/08/2025 | 88 | NOTICE of Appearance by David B. Rosenbaum on behalf of GENERAL COUNSEL AMICI (Rosenbaum, David) (Entered: 04/08/2025) |
| 04/08/2025 | 89 | NOTICE of Appearance by Joseph N. Roth on behalf of GENERAL COUNSEL AMICI (Roth, Joseph) (Entered: 04/08/2025) |
| 04/08/2025 | 90 | NOTICE of Appearance by Joshua James Messer on behalf of GENERAL COUNSEL AMICI (Messer, Joshua) (Entered: 04/08/2025) |
| 04/08/2025 | 91 | NOTICE of Appearance by Eric M. Fraser on behalf of GENERAL COUNSEL AMICI (Fraser, Eric) (Entered: 04/08/2025) |
| 04/08/2025 | 92 | Unopposed MOTION for Leave to File Amicus Brief*in Support of Plaintiff's Motion for Summary Judgment and for Declaratory and Permanent Injunction* by INTERNATIONAL ACADEMY OF TRIAL LAWYERS. (Attachments: # <u>1</u> Exhibit Brief of Amicus Curiae, # <u>2</u> Text of Proposed Order Proposed Order)(Regan, Patrick) (Entered: 04/08/2025) |
| 04/08/2025 | | |

| | | |
|---|---|---|
| | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 86 Unopposed MOTION for Leave to File Amicus Brief by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (Attachments: # 1 Exhibit Brief of Amicus Curiae, # 2 Text of Proposed Order)(Spital, Samuel). <br><br> Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal. <br><br> Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/15/2025. (zapb) 4/10/2025 (zapb). (Entered: 04/10/2025) |
| 04/08/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 84 NOTICE of Appearance by Eric John Galvez Paredes on behalf of BAR ASSOCIATIONS (Paredes, Eric John). <br><br> Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal. <br><br> Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/15/2025. (zapb) Modified on 4/9/2025 (zhcn). (Entered: 04/08/2025) |
| 04/08/2025 | 95 | NOTICE of Appearance by Mary Ruth O'Grady on behalf of GENERAL COUNSEL AMICI (O'Grady, Mary) (Entered: 04/08/2025) |
| 04/08/2025 | 96 | MOTION for Leave to File Amicus Brief by GENERAL COUNSEL AMICI. (Attachments: # 1 Exhibit Brief of Amici Curiae, # 2 Text of Proposed Order)(Rosenbaum, David) (Entered: 04/08/2025) |
| 04/08/2025 | 97 | NOTICE of Appearance by Justin A. Nelson on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Nelson, Justin) (Entered: 04/08/2025) |
| 04/08/2025 | 98 | Unopposed MOTION for Leave to File Amicus Brief by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order, # 3 Appendix)(Nelson, Justin) (Entered: 04/08/2025) |
| 04/08/2025 | | MINUTE ORDER (paperless) GRANTING 83 Unopposed Motion for Leave to File Amicus Brief, 86 Unopposed Motion for Leave to File Amicus Brief, 92 Unopposed Motion for Leave to File Amicus Brief, 96 Motion for Leave to File Amicus Brief, and 98 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 8, 2025. (lcbah2) (Entered: 04/08/2025) |
| 04/08/2025 | 99 | AMICUS BRIEF *of Former and Current General Counsel Supporting Plaintiff Perkins Coie, LLP* by GENERAL COUNSEL AMICI. (Rosenbaum, David) (Entered: 04/08/2025) |

| 04/08/2025 | 101 | AMICUS BRIEF by BAR ASSOCIATIONS. (mg) (Entered: 04/09/2025) |
|---|---|---|
| 04/08/2025 | 102 | AMICUS BRIEF by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (mg) (Entered: 04/09/2025) |
| 04/08/2025 | 103 | AMICUS BRIEF by INTERNATIONAL ACADEMY OF TRIAL LAWYERS. (mg) (Entered: 04/09/2025) |
| 04/08/2025 | 104 | AMICUS BRIEF by FORMER SENIOR GOVERNMENT OFFICIALS. (mg) (Entered: 04/09/2025) |
| 04/09/2025 | 105 | NOTICE of Appearance by William E. Zapf on behalf of 23 NONGOVERNMENTAL ORGANIZATIONS (Zapf, William) (Entered: 04/09/2025) |
| 04/09/2025 | 106 | Unopposed MOTION for Leave to File Amicus Brief by MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES. (Attachments: # 1 Exhibit Proposed Brief, # 2 Appendix A, # 3 Text of Proposed Order)(Kortz, Mason) (Entered: 04/09/2025) |
| 04/09/2025 | 107 | Unopposed MOTION for Leave to File Amicus Brief by 23 NONGOVERNMENTAL ORGANIZATIONS. (Attachments: # 1 Exhibit Exhibit A − Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Zapf, William) (Entered: 04/09/2025) |
| 04/09/2025 | 108 | NOTICE of Appearance by Jim Davy on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Davy, Jim) (Entered: 04/09/2025) |
| 04/09/2025 | 109 | Unopposed MOTION for Leave to File Amicus Brief by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Davy, Jim) (Entered: 04/09/2025) |
| 04/09/2025 | 110 | AMICUS BRIEF by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Davy, Jim) (Entered: 04/09/2025) |
| 04/09/2025 | | MINUTE ORDER (paperless) GRANTING 87 Motion for Leave to Appear Pro Hac Vice. Jeannie Suk Gersen may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 9, 2025. (lcbah2) (Entered: 04/09/2025) |
| 04/09/2025 | | MINUTE ORDER (paperless) GRANTING 106 Unopposed Motion for Leave to File Amicus Brief, 107 Unopposed Motion for Leave to File Amicus Brief, and 109 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 9, 2025. (lcbah2) (Entered: 04/09/2025) |
| 04/09/2025 | 111 | MOTION for Leave to File Amicus Brief by 334 SOLO AND SMALL FIRM LAWYERS. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order Proposed Order)(Elefant, Carolyn) (Entered: 04/09/2025) |
| 04/09/2025 | 112 | NOTICE of Appearance by Carolyn Elefant on behalf of 334 SOLO AND SMALL FIRM LAWYERS (Elefant, Carolyn) (Entered: 04/09/2025) |
| 04/09/2025 | 113 | AMICUS BRIEF *(Corrected)* by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Davy, Jim) (Entered: 04/09/2025) |
| 04/09/2025 | 114 | Consent MOTION for Leave to File Amicus Brief by AMERICA'S FUTURE, ET AL. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Olson, William) (Entered: 04/09/2025) |

| 04/09/2025 | 115 | AMICUS BRIEF by MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES. (Attachments: # 1 Appendix A)(Kortz, Mason) (Entered: 04/09/2025) |
|---|---|---|
| 04/10/2025 | 116 | AMICUS BRIEF by 23 NONGOVERNMENTAL ORGANIZATIONS. (Attachments: # 1 Appendix)(Zapf, William) (Entered: 04/10/2025) |
| 04/10/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 111 MOTION for Leave to File Amicus Brief by 334 SOLO AND SMALL FIRM LAWYERS. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order Proposed Order)(Elefant, Carolyn).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/17/2025. (zapb) 4/10/2025 (zapb). (Entered: 04/10/2025) |
| 04/10/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 105 NOTICE of Appearance by William E. Zapf on behalf of 23 NONGOVERNMENTAL ORGANIZATIONS (Zapf, William).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/17/2025. (zapb) 4/10/2025 (zapb). (Entered: 04/10/2025) |
| 04/10/2025 | 117 | NOTICE of Appearance by Adria Jasmine Bonillas on behalf of LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Bonillas, Adria) (Entered: 04/10/2025) |
| 04/10/2025 | 118 | NOTICE of Appearance by Stephen Craig Leckar on behalf of AARON H. CAPLAN (Leckar, Stephen) (Entered: 04/10/2025) |
| 04/10/2025 | 119 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Robert Chang, Filing fee $ 100, receipt number ADCDC−11606569. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Chang Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/10/2025) |
| 04/10/2025 | 120 | MOTION for Leave to File Amicus Brief*of Professor Aaron H. Caplan Regarding Attainder* by AARON H. CAPLAN. (Attachments: # 1 Exhibit Amicus Brief of Professor Aaron H. Caplan Regarding Attainder, # 2 Text of Proposed Order)(Leckar, Stephen) (Entered: 04/10/2025) |

| 04/10/2025 |  | MINUTE ORDER (paperless) GRANTING 111 Motion for Leave to File Amicus Brief, 114 Consent Motion for Leave to File Amicus Brief, and 120 Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 10, 2025. (lcbah2) (Entered: 04/10/2025) |
|---|---|---|
| 04/10/2025 | 130 | AMICUS BRIEF by 334 SOLO AND SMALL FIRM LAWYERS. (znmw) (Entered: 04/14/2025) |
| 04/10/2025 | 131 | AMICUS BRIEF by AMERICA'S FUTURE, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, GUN OWNERS OF CALIFORNIA, JUDICIAL ACTION GROUP, CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND. (znmw) Modified to add filers on 4/14/2025 (znmw). (Entered: 04/14/2025) |
| 04/10/2025 | 132 | AMICUS BRIEF by AARON H. CAPLAN. (znmw) (Entered: 04/14/2025) |
| 04/11/2025 | 121 | NOTICE of Appearance by Samuel Spital on behalf of NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. (Spital, Samuel) (Entered: 04/11/2025) |
| 04/11/2025 |  | MINUTE ORDER (paperless) GRANTING 119 Motion for Leave to Appear Pro Hac Vice. Robert Seungchul Chang may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 11, 2025. (lcbah2) (Entered: 04/11/2025) |
| 04/11/2025 | 122 | NOTICE of Appearance by Andrew George Pappas on behalf of GENERAL COUNSEL AMICI (Pappas, Andrew) (Entered: 04/11/2025) |
| 04/11/2025 | 123 | NOTICE of Appearance by Cecilia D. Wang on behalf of AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, ELECTRONIC FRONTIER FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR THE RULE OF LAW INSTITUTE (Wang, Cecilia) (Entered: 04/11/2025) |
| 04/11/2025 | 124 | NOTICE of Appearance by Robert Seungchul Chang on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Chang, Robert) (Entered: 04/11/2025) |
| 04/11/2025 | 125 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jessica Levin, Filing fee $ 100, receipt number ADCDC−11611095. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Levin Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 04/11/2025 | 126 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeremiah Chin, Filing fee $ 100, receipt number ADCDC−11611101. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Chin Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 04/11/2025 | 127 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Melissa Lee, Filing fee $ 100, receipt number ADCDC−11611119. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Declaration Lee Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 04/11/2025 | 128 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Susan McMahon, Filing fee $ 100, receipt number ADCDC−11611136. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration McMahon Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 04/11/2025 | 129 | NOTICE *of Corrected Exhibit A* by 346 FORMER JUDGES re 77 Amicus Brief (Attachments: # 1 Exhibit A (corrected list of judges))(Kropf, Sara) (Entered: 04/11/2025) |
| 04/14/2025 | 133 | Unopposed MOTION for Leave to File Amicus Brief by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Corkran, Kelsi) (Entered: 04/14/2025) |
| 04/14/2025 | 134 | NOTICE of Appearance by Kelsi B. Corkran on behalf of LEGAL ETHICS PROFESSORS (Corkran, Kelsi) (Entered: 04/14/2025) |
| 04/14/2025 | 135 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Ruth Greenwood, Filing fee $ 100, receipt number ADCDC−11613778. Fee Status: Fee Paid. by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit I − Declaration and Certificates of Good Standing, # 2 Text of Proposed Order)(Mead, Joseph) (Entered: 04/14/2025) |
| 04/14/2025 | 136 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Samuel J. Davis, Filing fee $ 100, receipt number ADCDC−11613867. Fee Status: Fee Paid. by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit I − Declaration and Certificates of Good Standing, # 2 Text of Proposed Order)(Mead, Joseph) (Entered: 04/14/2025) |
| 04/14/2025 | | MINUTE ORDER (paperless) GRANTING 133 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 14, 2025. (lcbah2) (Entered: 04/14/2025) |
| 04/14/2025 | | MINUTE ORDER (paperless) GRANTING 125 , 126 , 127 , 128 , 135 , and 136 motions for leave to appear pro hac vice. Each identified attorney may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 14, 2025. (lcbah2) (Entered: 04/14/2025) |
| 04/14/2025 | 137 | AMICUS BRIEF by LEGAL ETHICS PROFESSORS. (mg) (Entered: 04/15/2025) |
| 04/15/2025 | 138 | NOTICE of Appearance by Jessica Levin on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Levin, Jessica) (Entered: 04/15/2025) |
| 04/15/2025 | 139 | NOTICE of Appearance by Melissa Lee on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Lee, Melissa) (Entered: 04/15/2025) |
| 04/15/2025 | 140 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Charlotte Garden, Filing fee $ 100, receipt number ADCDC−11617929. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Garden Declaration, # 2 Exhibit Certificate of good standing)(Davy, Jim) (Entered: 04/15/2025) |

| 04/15/2025 | 141 | NOTICE of Appearance by Susan A. McMahon on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (McMahon, Susan) (Entered: 04/15/2025) |
|---|---|---|
| 04/16/2025 | 142 | Memorandum in opposition to re 43 Motion to Dismiss, 44 Motion for Reconsideration filed by PERKINS COIE LLP. (Attachments: # 1 Declaration of Ryan Scarborough, Esquire, in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss and for Expedited Judgment)(Butswinkas, Dane) (Entered: 04/16/2025) |
| 04/16/2025 | 143 | Memorandum in opposition to re 39 Motion for Summary Judgment,,, Motion for Declaratory Judgment,,, Motion for Permanent Injunction,, filed by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Defendant's Response to Plaintiff's Statement, # 2 Declaration)(Lawson, Richard) (Entered: 04/16/2025) |
| 04/16/2025 | | MINUTE ORDER (paperless) GRANTING 140 Motion for Leave to Appear Pro Hac Vice. Charlotte Garden may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 16, 2025. (lcbah2) (Entered: 04/16/2025) |
| 04/17/2025 | | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on plaintiff's 39 Motion for Summary Judgment and defendants' 43 Motion to Dismiss and 44 Motion for Reconsideration on April 23, 2025, at 2:00 PM in Courtroom 26A− In Person before Judge Beryl A. Howell. <br><br> Members of the public or media who wish to listen to live audio of the hearing without physically attending the proceeding may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), available here: <https://www.dcd.uscourts.gov/sites/dcd/files/Standing%20Order%20No.%2024−31_001.pdf >. *Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court.* <br><br> Signed by Judge Beryl A. Howell on April 17, 2025. (lcbah2) (Entered: 04/17/2025) |
| 04/17/2025 | 144 | Unopposed MOTION to Continue *Reschedule Oral Hearing* by U.S. DEPARTMENT OF JUSTICE. (Lawson, Richard) Modified event on 4/18/2025 (znmw). (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER (paperless), upon consideration of defendants' 144 Unopposed Motion to Reschedule Oral Hearing, RESCHEDULING the hearing currently scheduled for April 23, 2025, at 2:00 PM. It is ORDERED that the hearing shall now take place at 11:00 AM on the same day, April 23, 2025, in Courtroom 26A− In Person before Judge Beryl A. Howell. The public access telephone line credentials previously provided, *see* Min. Order (Apr. 17, 2025) (scheduling the hearing), will remain the same. Signed by Judge Beryl A. Howell on April 17, 2025. (lcbah2) (Entered: 04/17/2025) |

| 04/17/2025 | | Set/Reset Hearings: Motion Hearing set for 4/23/2025 at 11:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 04/17/2025) |
|---|---|---|
| 04/18/2025 | 145 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Frank N. Gaeta, Filing fee $ 100, receipt number ADCDC−11626362. Fee Status: Fee Paid. by Rich May PC. (Attachments: # 1 Exhibit PHV Declaration, # 2 Exhibit Cert Good Standing, # 3 Exhibit Proposed Order)(Elefant, Carolyn) (Entered: 04/18/2025) |
| 04/18/2025 | 146 | MOTION for Leave to File Amicus Brief by Rich May PC. (Attachments: # 1 Exhibit Amicus Brief, # 2 Exhibit Proposed Order)(Elefant, Carolyn) (Entered: 04/18/2025) |
| 04/18/2025 | 147 | REPLY to opposition to motion re 43 Motion to Dismiss, 44 Motion for Reconsideration filed by PAMELA J. BONDI, BRENDAN CARR, STEPHEN EHEKIAN, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, CHARLES EZELL, FEDERAL COMMUNICATIONS COMMISSION, TULSI GABBARD, GENERAL SERVICES ADMINISTRATION, ANDREA R. LUCAS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF PERSONNEL MANAGEMENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, U.S. DEPARTMENT OF JUSTICE, UNITED STATES OF AMERICA, RUSSELL T. VOUGHT. (Lawson, Richard) (Entered: 04/18/2025) |
| 04/18/2025 | 148 | REPLY to opposition to motion re 39 Motion for Summary Judgment,,, Motion for Declaratory Judgment,,, Motion for Permanent Injunction,, filed by PERKINS COIE LLP. (Attachments: # 1 Declaration of Christopher N. Manning, Esquire, Supporting Plaintiff's Reply Memorandum in Support of Its Motion for Summary Judgment)(Butswinkas, Dane) (Entered: 04/18/2025) |
| 04/18/2025 | | MINUTE ORDER (paperless) GRANTING 145 Motion for Leave to Appear Pro Hac Vice. Frank N. Gaeta may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 18, 2025. (lcbah2) (Entered: 04/18/2025) |
| 04/18/2025 | | MINUTE ORDER (paperless) GRANTING 146 Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 18, 2025. (lcbah2) (Entered: 04/18/2025) |
| 04/22/2025 | 149 | NOTICE of Appearance by Jeremiah Chin on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Chin, Jeremiah) (Entered: 04/22/2025) |
| 04/22/2025 | 150 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/17/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/16/2025. (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 151 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TULSI GABBARD served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 152 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE served on 3/24/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 153 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PAMELA J. BONDI served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 154 | |

| | | |
|---|---|---|
| | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. DEPARTMENT OF JUSTICE served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 155 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ANDREA R. LUCAS served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 156 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 157 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. BRENDAN CARR served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 158 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FEDERAL COMMUNICATIONS COMMISSION served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 159 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. STEPHEN EHEKIAN served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 160 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. GENERAL SERVICES ADMINISTRATION served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 161 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RUSSELL T. VOUGHT served on 3/25/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 162 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF MANAGEMENT AND BUDGET served on 3/25/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 163 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CHARLES EZELL served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 164 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF PERSONNEL MANAGEMENT served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 165 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 3/17/2025. (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 166 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/21/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/20/2025. (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/23/2025 | 167 | NOTICE of Proposed Order *Granting Plaintiffs Motion − Amended* by PERKINS COIE LLP re 39 MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* MOTION for Declaratory Judgment MOTION for Permanent Injunction (Attachments: # 1 Text of Proposed Order)(Butswinkas, Dane) (Entered: 04/23/2025) |
| 04/23/2025 | 168 | AMICUS BRIEF by RICH MAY PC. (mg) (Entered: 04/23/2025) |

| 04/23/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 4/23/2025 re 43 Motion to Dismiss, 44 Motion for Reconsideration and 39 Motion for Summary Judgment. The Court Heard Arguments From The Parties. Plaintiff's Oral Motion To Amend The Complaint. The Court Will Reserve Judgment. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 04/23/2025) |
|---|---|---|
| 04/24/2025 | 169 | TRANSCRIPT OF PROCEEDINGS, before Judge Beryl A. Howell, held on 4−23−2025; Page Numbers: 1 − 124. Date of Issuance: 4−24−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 5/15/2025. Redacted Transcript Deadline set for 5/25/2025. Release of Transcript Restriction set for 7/23/2025.(Davila, Elizabeth) Modified on 4/25/2025 to correct hearing date (mg). (Entered: 04/24/2025) |
| 04/24/2025 | 170 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joe H. Tucker, Jr., Filing fee $ 100, receipt number ADCDC−11640013. Fee Status: Fee Paid. by INTERNATIONAL ACADEMY OF TRIAL LAWYERS. (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Regan, Patrick) (Entered: 04/24/2025) |
| 04/24/2025 | 171 | RESPONSE *In Opposition to Plaintiffs April 23, 2025 Oral Motion to Amend Complaint* filed by PAMELA J. BONDI, BRENDAN CARR, STEPHEN EHEKIAN, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, CHARLES EZELL, FEDERAL COMMUNICATIONS COMMISSION, TULSI GABBARD, GENERAL SERVICES ADMINISTRATION, ANDREA R. LUCAS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF PERSONNEL MANAGEMENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, U.S. DEPARTMENT OF JUSTICE, UNITED STATES OF AMERICA, RUSSELL T. VOUGHT. (Lawson, Richard) Modified event on 4/25/2025 (mg). (Entered: 04/24/2025) |
| 04/24/2025 | 172 | NOTICE of Appearance by Frank N. Gaeta on behalf of RICH MAY PC (Gaeta, Frank) (Entered: 04/24/2025) |
| 04/25/2025 | | MINUTE ORDER (paperless) GRANTING 170 Motion for Leave to Appear Pro Hac Vice. Joe H. Tucker, Jr., may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 25, 2025. (lcbah2) (Entered: 04/25/2025) |
| 04/25/2025 | 173 | |

| | | |
|---|---|---|
| | | MEMORANDUM & ORDER GRANTING plaintiff's Oral Motion for Leave to Amend Complaint, *see* Min. Entry (Apr. 23, 2025), and DENYING AS MOOT the government's 44 Motion for Reconsideration. See Memorandum & Order for further details. Signed by Judge Beryl A. Howell on April 25, 2025. (lcbah2) (Entered: 04/25/2025) |
| 04/28/2025 | | Set/Reset Deadlines: Plaintiff Amended Complaint due by 4/28/2025. (mac) (Entered: 04/28/2025) |
| 04/28/2025 | 174 | Consent MOTION to Adopt Streamlined Procedures for Amended Complaint and Pending Motions re 173 Memorandum & Opinion, by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Adopting Streamlined Procedures)(Manning, Christopher) (Entered: 04/28/2025) |
| 04/29/2025 | 175 | ORDER GRANTING plaintiff's 174 Consent Motion to Adopt Streamlined Procedures for Amended Complaint and Pending Motions. Signed by Judge Beryl A. Howell on April 29, 2025. (lcbah2) (Entered: 04/29/2025) |
| 04/29/2025 | | Set/Reset Deadlines: Plaintiff shall file a new motion for summary judgment and declaratory and permanent injunctive relief, and defendants shall file a new motion to dismiss the Amended Complaint by 4/30/2025. Plaintiff shall file a notice by 4/30/2025. (zalh) (Entered: 04/29/2025) |
| 04/29/2025 | 176 | AMENDED COMPLAINT against ALL FEDERAL AGENCIES AND AGENCY HEADS filed by PERKINS COIE LLP.(Butswinkas, Dane) Modified defendant on 4/29/2025 (znmw). (Entered: 04/29/2025) |
| 04/29/2025 | 177 | Consent MOTION for Extension of Time to Amend *Status Report and Consent Motion for Enlargement of Time To File Amended Complaint Nunc Pro Tunc* by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order)(Manning, Christopher) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER (paperless) GRANTING plaintiff's 177 Consent Motion for Enlargement of Time to File Amended Complaint and DIRECTING that the deadline for plaintiff to file its amended complaint is extended, *nunc pro tunc*, to April 29, 2025. Signed by Judge Beryl A. Howell on April 29, 2025. (lcbah2) (Entered: 04/29/2025) |
| 04/29/2025 | 178 | REQUEST FOR SUMMONS TO ISSUE *to ALL FEDERAL AGENCIES AND AGENCY HEADS listed in Attachment* filed by PERKINS COIE LLP. Related document: 176 Amended Complaint,,,,,,,,,,,,,,,,, filed by PERKINS COIE LLP.(Butswinkas, Dane) (Entered: 04/29/2025) |
| 04/29/2025 | 179 | SUMMONS (1) Issued Electronically as to ALL FEDERAL AGENCIES AND AGENCY HEADS. (mg) (Entered: 04/29/2025) |
| 04/29/2025 | 180 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ALL FEDERAL AGENCIES AND AGENCY HEADS served on 4/29/2025 (Manning, Christopher) (Entered: 04/29/2025) |
| 04/30/2025 | 181 | NOTICE of Voluntary Dismissal re Fannie Mae and William J. Pulte, in his official capacity as Chairman of Fannie Mae by PERKINS COIE LLP (Manning, Christopher) (Entered: 04/30/2025) |
| 04/30/2025 | | Set/Reset Deadlines: Plaintiff Amended Complaint due by 4/29/2025,. (mac) (Entered: 04/30/2025) |

| | | |
|---|---|---|
| 04/30/2025 | 182 | MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Granting Plaintiff's Motion)(Butswinkas, Dane). Added MOTION for Declaratory Judgment, MOTION for Permanent Injunction on 5/1/2025 (mg). (Entered: 04/30/2025) |
| 04/30/2025 | 183 | MOTION to Dismiss *(Renewed)* by ALL FEDERAL AGENCIES AND AGENCY HEADS. (Attachments: # 1 Text of Proposed Order)(Lawson, Richard). Added MOTION to Expedite on 5/1/2025 (mg). (Entered: 04/30/2025) |
| 05/02/2025 | 184 | ORDER GRANTING plaintiff's 182 Motion for Summary Judgment & Declaratory & Permanent Injunctive Relief and DENYING the government's 183 Renewed Motion to Dismiss & for Expedited Judgment. See Order for further details. The Clerk of the Court is directed to close this case. Signed by Judge Beryl A. Howell on May 2, 2025. (lcbah2) (Entered: 05/02/2025) |
| 05/02/2025 | 185 | MEMORANDUM OPINION regarding plaintiff's 182 Motion for Summary Judgment & Declaratory & Permanent Injunctive Relief and the government's 183 Renewed Motion to Dismiss & for Expedited Judgment. Signed by Judge Beryl A. Howell on May 2, 2025. (lcbah2) (Entered: 05/02/2025) |
| 05/20/2025 | 186 | MOTION to Clarify re 184 Order, by ALL FEDERAL AGENCIES AND AGENCY HEADS, PAMELA J. BONDI, BRENDAN CARR, STEPHEN EHEKIAN, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, CHARLES EZELL, FEDERAL COMMUNICATIONS COMMISSION, TULSI GABBARD, GENERAL SERVICES ADMINISTRATION, ANDREA R. LUCAS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF PERSONNEL MANAGEMENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, U.S. DEPARTMENT OF JUSTICE, UNITED STATES OF AMERICA, RUSSELL VOUGHT. (Lawson, Richard) (Entered: 05/20/2025) |
| 05/20/2025 | | MINUTE ORDER (paperless), upon consideration of the government's 186 Motion to Clarify the Court's Order, on which motion plaintiff takes no position, *see id.* at 5, GRANTING the government's 186 motion and CLARIFYING that the injunctive relief granted as to Section 4 of Executive Order 14230, *see* Court's 184 Order, runs only in favor of plaintiff Perkins Coie LLP (including its affiliates, predecessors, successors, assigns, directors, officers, partners, employees, and agents), as specifically described in ¶ 4.H. of the Order. Signed by Judge Beryl A. Howell on May 20, 2025. (lcbah2) (Entered: 05/20/2025) |
| 05/27/2025 | 187 | NOTICE of Appearance by Donald Manwell Falk on behalf of 346 FORMER JUDGES (Falk, Donald) (Main Document 187 replaced on 5/28/2025) (mg). (Entered: 05/27/2025) |
| 06/30/2025 | 188 | NOTICE OF APPEAL TO DC CIRCUIT COURT by ALL FEDERAL AGENCIES AND AGENCY HEADS, GENERAL SERVICES ADMINISTRATION, U.S. DEPARTMENT OF JUSTICE, TULSI GABBARD, CHARLES EZELL, PAMELA J. BONDI, BRENDAN CARR, ANDREA R. LUCAS, OFFICE OF PERSONNEL MANAGEMENT, RUSSELL VOUGHT, FEDERAL COMMUNICATIONS COMMISSION, UNITED STATES OF AMERICA, STEPHEN EHEKIAN, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. Fee Status: No Fee Paid. Parties have been notified. (Lawson, Richard) (Entered: 06/30/2025) |

# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

333 Constitution Avenue, NW
Washington, DC 20001-2866
Phone: 202-216-7000 | Facsimile: 202-219-8530

Plaintiff: **Perkins Coie LLP**

vs.

Civil Action No. **1:25-cv-716**

Defendant: **U.S. Department of Justice et al.**

## CIVIL NOTICE OF APPEAL

Notice is hereby given this  30  day of ____June____  20 25 , that

all Defendants

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the

judgment of this court entered on the   2  day of ____May____ , 20 25 , in

favor of Plaintiff

against said Defendants

Attorney/Pro Se Party Signature:

Name: Richard Lawson

Address: U.S. DEPARTMENT OF JUSTICE

P.O. Box 878

Washington, DC 20044

Telephone: ( 202 )  445-8042

(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil
action must be filed within 30 days after the date of entry of judgment or 60 days if the United
States or officer or agency is a party)

USCA Form 13
Rev. June 2017

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| PERKINS COIE LLP, |
| Plaintiff, |
| v. |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, |
| Defendants. |

Civil Action No. 25-716 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

No American President has ever before issued executive orders like the one at issue in this lawsuit targeting a prominent law firm with adverse actions to be executed by all Executive branch agencies but, in purpose and effect, this action draws from a playbook as old as Shakespeare, who penned the phrase: "The first thing we do, let's kill all the lawyers." WILLIAM SHAKESPEARE, HENRY VI, PART 2, act 4, sc. 2, l. 75. When Shakespeare's character, a rebel leader intent on becoming king, *see id*. l. 74, hears this suggestion, he promptly incorporates this tactic as part of his plan to assume power, leading in the same scene to the rebel leader demanding "[a]way with him," referring to an educated clerk, who "can make obligations and write court hand," *id*. l. 90, 106. Eliminating lawyers as the guardians of the rule of law removes a major impediment to the path to more power. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 371 n.24 (1985) (Stevens, J., dissenting) (explaining the import of the same Shakespearean statement to be "that disposing of lawyers is a step in the direction of a totalitarian form of government").

The importance of independent lawyers to ensuring the American judicial system's fair and impartial administration of justice has been recognized in this country since its founding era. In 1770, John Adams made the singularly unpopular decision to represent eight British soldiers charged with murder for their roles in the Boston Massacre and "claimed later to have suffered the

1

loss of more than half his practice." DAVID MCCULLOUGH, JOHN ADAMS 68 (2001). "I had no hesitation," he explained, since "Council ought to be the very last thing that an accused Person should want in a free Country," and "the Bar ought . . . to be independent and impartial at all Times And in every Circumstance." 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 293 (L.H. Butterfield et al. eds., 1961). When the Bill of Rights was ratified, these principles were codified into the Constitution: The Sixth Amendment secured the right, in "all criminal prosecutions," to "have the Assistance of Counsel for . . . defence," U.S. CONST. amend. VI, and the Fifth Amendment protected "the right to the aid of counsel when desired and provided by the party asserting the right," *Powell v. Alabama*, 287 U.S. 45, 68 (1932).[1] This value placed on the role of lawyers caught the attention of Alexis de Tocqueville, who in reflecting on his travels throughout the early United States in 1831 and 1832, insightfully remarked that "the authority . . . intrusted to members of the legal profession . . . is the most powerful existing security against the excesses of democracy." ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 301 (Henry Reeve trans., 2002) (1835).

The Supreme Court, too, has recognized the importance of lawyers to the functioning of the American judicial system, since "[a]n informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). This is so because Congress may legislate, the President may implement, and courts may adjudicate, "but only the lawyers can prepare and submit the great issues of human justice under law in such manner and

---

[1] Amici law professors highlight that the right to counsel was included in the Bill of Rights in large part to avoid "executive control of access to counsel," which "could distort the administration of justice." Br. of *Amici Curiae* 363 Law Professors in Supp. of Pl.'s Mot. for Summ. J. & for Declaratory & Permanent Injunctive Relief ("Law Professors' Br.") at 11, ECF No. 49; *see also id.* at 11-15 (reviewing the history of the inclusion of this right in the Bill of Rights and collecting authorities). The historical backdrop for these provisions, as Justice Black explained, was in direct response to the "willingness . . . of the courts of England to make 'short shrift' of unpopular and uncooperative groups," including "lawyers whose greatest crime was to dare to defend unpopular causes." *Cohen v. Hurley*, 366 U.S. 117, 139-40 (1961) (Black, J., dissenting); *see also id.* at 138-41 (reviewing the history and protections adopted in response).

form that courts, in the ultimate, may be effective." *Williams v. Beto*, 354 F.2d 698, 706 (5th Cir.

1965).  Absent their crucial independence, lawyers would "become nothing more than parrots of

the views of whatever group wields governmental power at the moment." *Cohen v. Hurley*, 366

U.S. 117, 138 (1961) (Black, J., dissenting).

The instant case presents an unprecedented attack on these foundational principles.  On

March 6, 2025, President Trump issued Executive Order 14230 ("EO 14230"), 90 Fed. Reg. 11781

(Mar. 11, 2025), entitled "Addressing Risks from Perkins Coie LLP."[2]  By its terms, this Order

stigmatizes and penalizes a particular law firm and its employees—from its partners to its associate

attorneys, secretaries, and mailroom attendants—due to the Firm's representation, both in the past

and currently, of clients pursuing claims and taking positions with which the current President

disagrees, as well as the Firm's own speech.  In a cringe-worthy twist on the theatrical phrase

"Let's kill *all* the lawyers," EO 14230 takes the approach of "Let's kill the lawyers *I don't like*,"

sending the clear message: lawyers must stick to the party line, or else.[3]

---

[2]    *See* Pl.'s Mot. for Summ. J. & Declaratory & Permanent Injunctive Relief ("Pl.'s MSJ"), Ex. 4, Declaration of Christopher N. Manning, Partner, Williams & Connolly ("Manning Decl."), Ex. 27 ("EO 14230"), ECF No. 39-4 at 127.

[3]    This message has been heard and heeded by some targeted law firms, as reflected in their choice, after reportedly direct dealings with the current White House, to agree to demand terms, perhaps viewing this choice as the best alternative for their clients and employees.  Yet, some clients may harbor reservations about the implications of such deals for the vigorous and zealous representation to which they are entitled from ethically responsible counsel, since at least the publicized deal terms appear only to forestall, rather than eliminate, the threat of being targeted in an Executive Order.  As amici former and current general counsel caution, a "fundamental premise of the rule of law" is that "when parties challenge the government, their lawyers 'oppose[] the designated representatives of the State,' and '[t]he system assumes that adversarial testing will ultimately advance the public interest in truth and fairness.'  This safeguard against government overreach fails when attorneys cannot 'advanc[e] the undivided interests of [their] client[s]' for fear of reprisal from the government."  Br. of Amici Curiae Former & Current General Counsel Supporting Pl. Perkins Coie, LLP at 9-10, ECF No. 99 (alterations in original; internal citation omitted) (quoting *Polk County v. Dodson*, 454 U.S. 312, 318-19 (1981)).
        Only when lawyers make the choice to challenge rather than back down when confronted with government action raising non-trivial constitutional issues can a case be brought to court for judicial review of the legal merits, as was done in this case by plaintiff Perkins Coie LLP, plaintiff's counsel Williams & Connolly, and the lawyers, firms, organizations, and individuals who submitted amicus briefs in this case.  As one amicus aptly put it, "[o]ur judicial system is under serious threat when determining whether to file an Amicus Curiae brief could be a career ending decision.  But, when lawyers are apprehensive about retribution simply for filing a brief adverse to the government, there is no other choice but to do so."  Amicus Curiae Br. of Pickering Legal LLC in Supp. of Pl.'s

Using the powers of the federal government to target lawyers for their representation of clients and avowed progressive employment policies in an overt attempt to suppress and punish certain viewpoints, however, is contrary to the Constitution, which requires that the government respond to dissenting or unpopular speech or ideas with "tolerance, not coercion." *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023). The Supreme Court has long made clear that "no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Simply put, government officials "cannot . . . use the power of the State to punish or suppress disfavored expression." *NRA v. Vullo*, 602 U.S. 175, 188 (2024).

That, however, is exactly what is happening here. For this reason, and those explained more fully below, Executive Order 14230 is unconstitutional, and the findings and instructions to Executive Branch agencies issued in its Sections 1 through 5 cannot be allowed to stand.

Accordingly, the government's Renewed Motion to Dismiss and for Expedited Judgment ("Gov't MTD"), ECF No. 183, which seeks dismissal of the Amended Complaint, ECF No. 176, pursuant to "Fed. R. Civ. P. 8" and "Rule 12(b) & 56," Gov't Mem. in Supp. of Mot. to Dismiss & for Expedited J. ("Gov't Mem.") at 3, 4, ECF No. 43, is denied.[4] Plaintiff's Motion for

---

Request for a Permanent Injunction at 6, ECF No. 93. If the founding history of this country is any guide, those who stood up in court to vindicate constitutional rights and, by so doing, served to promote the rule of law, will be the models lauded when this period of American history is written.

[4]     The moniker "defendants" is commonly used to refer to federal government components sued in civil cases, just as the named government components generally refer to themselves in briefing here. *See, e.g.*, Gov't Mem. at 4; Gov't's Opp'n to Pl.'s MSJ ("Gov't's Opp'n") at 5, ECF No. 143. In contrast, plaintiff refers to the named defendants in this lawsuit as "the government." *E.g.*, Pl.'s Mem. of L. in Supp. of Pl.'s MSJ ("Pl.'s Mem.") at 12, ECF No. 39-1; Pl.'s Mem. of L. in Opp'n to Gov't MTD ("Pl.'s Opp'n") at 1, ECF No. 142. Here, the challenged action is an Executive Order, issued by the President of the United States, that directs compliance by the entirety of the Executive Branch of the federal government. *See, e.g.*, EO 14230 § 3(b), 90 Fed. Reg. at 11782 (directing action by "[t]he heads of all agencies"). Using "the government" to refer to defendants thus more accurately encapsulates the circumstances of this case, where the challenge is not merely to the actions of a finite number of Executive branch components but is to the actions of the Executive branch writ large.

4

Summary Judgment and Declaratory and Permanent Injunctive Relief ("Pl.'s MSJ"), ECF No. 182, is granted.

To aid in review of this Memorandum Opinion, given its length required to address the multiple issues raised in the parties' pending dispositive motions, an overview is provided. **Part I** reviews the relevant factual and procedural background of this case. **Part II** provides the legal standards governing consideration of plaintiff's motion for summary judgment, under Federal Rule of Civil Procedure 56, and the government's motion to dismiss and cross-motion for summary judgment, under Rules 8, 12(b)(1), 12(b)(6), and 56.

**Part III** then turns to the substantive issues in dispute, which are discussed in three sections. **Section A** considers, and rejects, the following six arguments asserted by the government in support of dismissal of plaintiff's claims challenging different parts of EO 14230, namely: **(1)** that the statements set out in the Order's "*Purpose*" Section 1 are not contested; **(2)** that these same statements merely reflect government speech and not actionable findings; **(3)** that plaintiff's challenges to the Order's "*Security Clearance Review*" Section 2 are neither justiciable nor ripe; **(4)** that plaintiff lacks standing to challenge the Order's "*Contracting*" Section 3 due to the failure to allege holding or performing specific work on any government contract; **(5)** that plaintiff lacks standing to challenge the Order's "*Racial Discrimination*" Section 4 because the investigation by the Equal Employment Opportunity Commission ("EEOC") is not traceable to EO 14230; and **(6)** that plaintiff's challenges to the Order's "*Personnel*" Section 5 are not ripe because implementing guidance has not yet issued.

**Section B** addresses, in six parts, eight of plaintiff's nine claims set out in the Amended Complaint, finding that plaintiff is entitled to summary judgment on the following: **(1)** the claims of unconstitutional retaliation and viewpoint discrimination, in violation of the First Amendment,

in Counts V and VII; **(2)** the claim of unconstitutional compelled disclosure, in violation of the First Amendment, in Count VI; **(3)** the claim of unconstitutional denial of equal protection of the law, in violation of the Fifth Amendment, in Count IV; **(4)** the claims that EO 14230 violates the Fifth and Sixth Amendment right to counsel of plaintiff's clients, in Counts VIII and IX; **(5)** the claim of unconstitutional denial of due process of the law, in violation of the Fifth Amendment, in Count II; and **(6)** the claim that EO 14230 is unconstitutionally vague, in violation of the Fifth Amendment, in Count III.[5]

Finally, **Section C** addresses plaintiff's satisfaction of the requisite showings for the remedy sought of a declaratory judgment and permanent injunctive relief.

**Part IV** provides a brief conclusion summarizing the disposition of the pending motions.

## I.    BACKGROUND

The relevant factual and procedural background for resolving the two pending motions is summarized below.

### A.  Perkins Coie LLP

Plaintiff Perkins Coie LLP ("plaintiff" or "Firm") is a large international law firm, founded in 1912, that operates in the United States as a limited liability partnership.  Pl.'s MSJ, Ex. 2, Pl.'s Statement of Material Facts as to Which There is No Genuine Dispute ("Pl.'s SMF") ¶¶ 1-2, ECF No. 39-2 (citing Pl.'s MSJ, Ex. 3, Decl. of David J. Burman, Partner, Perkins Coie LLP, in Supp. of MSJ ("2nd Burman Decl.") ¶ 1, ECF No. 39-3).[6]  The Firm employs approximately 2,500

---

[5]     Plaintiff additionally claims, in Count I of the Amended Complaint, that Sections 1, 2(b), 3, and 5 of EO 14230 violate the Constitution's inherent separation of powers through the "Unconstitutional Exercise of Judicial Authority," Am. Compl. at 81 (Count I header); *see also* Pl.'s Mem. at 34 (arguing these provisions of the Order "invade[] the Judiciary's authority").  Since resolution of plaintiff's claims alleging violations of the First, Fifth, and Sixth Amendments entitles plaintiff to summary judgment and the full relief sought in this case, *see generally infra* Parts III.B., C., the separation of powers claim asserted in Count I need not be considered.

[6]     Unless otherwise noted, cited facts submitted by the parties are undisputed.  *See* Pl.'s SMF; Gov't's Opp'n, Ex. 1, Gov't's Resp. to Pl.'s SMF ("Gov't's Resp. to Pl.'s SMF"), ECF No. 143-1.

lawyers and business professionals, including roughly 1,200 lawyers, *id.* ¶¶ 3, 10 (citing 2nd Burman Decl. ¶¶ 4, 8), and represents clients of all types, including large, medium, and small businesses, individuals, and other organizations, in federal and state courts around the country and in different tribunals around the world, *id.* ¶¶ 5, 7 (citing 2nd Burman Decl. ¶¶ 5-6).  The Firm has consistently been named as one of the 50 largest law firms in the United States, and the Firm and its attorneys have received regular recognition for excellence from various legal organizations.  *Id.* ¶ 8 (citing 2nd Burman Decl. ¶ 7).  Current attorneys and alumni of the Firm come from all sides of the political spectrum and have worked in the government under administrations of both parties and reflect both major political party affiliations. *Id.* ¶¶ 12-14 (citing 2nd Burman Decl. ¶ 9).  Most Perkins Coie attorneys are not politically active.  *Id.* ¶ 12 (citing 2nd Burman Decl. ¶ 9).

At the time EO 14230 was issued, "approximately" 24 Perkins Coie employees held active security clearances, including "a dozen persons with former military or other public service backgrounds," *id.* ¶ 89 (citing 2nd Burman Decl. ¶ 36) and two who held clearances "in connection with their duties as military reservists," *id.* ¶ 97 (citing 2nd Burman Decl. ¶ 38).  Some also received clearances in connection with legal representations of clients.  *Id.* ¶ 89 (citing 2nd Burman Decl. ¶ 36).  Four of these individuals were not attorneys.  *Id.* ¶ 98 (citing 2nd Burman Decl. ¶ 38).

As part of their legal practice, Perkins Coie lawyers "necessarily interact with the federal government on behalf of their clients."  *Id.* ¶ 24 (citing 2nd Burman Decl. ¶ 19).  All nine of the Firm's practice groups "intersect with the federal government in some way and include clients with business before the federal government," *id.* ¶ 29 (citing 2nd Burman Decl. ¶ 21); *see also id.* ¶¶ 36-56 (describing business before the federal government in each practice area); *id.* ¶¶ 57-59, 62-66 (describing pro bono work involving the government), and a "significant majority of the firm's clients have matters that require Perkins Coie lawyers to interact with federal agencies," *id.*

7

¶ 33 (citing 2nd Burman Decl. ¶ 22).  All of Perkins Coie's top fifteen clients by revenue (representing collectively "almost a quarter of the firm's revenue"), and many of the Firm's other large clients currently hold contracts or subcontracts with the federal government and compete for such contracts.  *Id.* ¶ 147 (citing 2nd Burman Decl. ¶ 47).  Perkins Coie also represents many of these companies "for legal matters completely unrelated to" government contracts.  *Id.*

In addition to its legal work, Perkins Coie "has a longstanding and demonstrable commitment to fostering diversity and inclusion . . . within the firm, the legal profession and its community."  *Id.* ¶ 18 (citing 2nd Burman Decl., Ex. 1 at 1, ECF No. 39-3 at 29).  The Firm runs a "Diversity & Inclusion Fellowship program" to which all first-year law students may apply.  *Id.* ¶ 22 (citing 2nd Burman Decl., Ex. 2 at 3, ECF No. 39-3 at 38).  In 2019, the Firm also adopted the "Mansfield Rule," "which aims to diversify the leadership of large law firms by broadening the candidate pool for senior management positions."  Gov't's Opp'n to Pl.'s MSJ ("Gov't's Opp'n"), Ex. 1, Decl. of Richard Lawson, Deputy Associate Attorney General ("Lawson Decl."), Ex. 3, Press Release, Perkins Coie, *Perkins Coie Adopts Mansfield Rule to Boost Leadership Diversity* ("Pl.'s 2019 Mansfield Press Release") (Sept. 6, 2019), ECF No. 143-2 at 100 (page number refers to ECF header).  To do so, the Mansfield Rule requires that participating firms "certify that women, lawyers of color, LGBTQ+ lawyers and lawyers with disabilities comprise at least 30 percent of the candidate pool for significant leadership roles, senior lateral openings and promotions."  *Id.*

## B.  Perkins Coie's Representation of Various Clients Cited in EO 14230

In 2016, Marc Elias and other former members of a practice group within Perkins Coie, called the Political Law group, represented Hillary Clinton "in connection with her presidential campaign," against Donald J. Trump.  Pl.'s SMF ¶ 75 (citing 2nd Burman Decl. ¶ 60); *see also id.* ¶ 71 (citing 2nd Burman Decl. ¶ 21).   As part of this representation, these former Perkins Coie attorneys engaged the services of opposition research firm Fusion GPS.  Pl.'s SMF ¶ 75 (citing 2nd

Burman Decl. ¶ 60).  Elias left Perkins Coie in 2021, Pl.'s SMF ¶¶ 71, 75 (citing 2nd Burman Decl.

¶¶ 21, 60), and none of the Firm's attorneys involved in the engagement of Fusion GPS have been

employed by the law firm for at least the past three years, *id.* ¶ 75; *see also id.* ¶ 95 (stating that no

Perkins Coie employee who held a security clearance at the time EO 14230 was issued "had any

involvement in the Fusion GPS matter" (citing 2nd Burman Decl. ¶ 41)).  Another former Perkins

Coie attorney, Michael Sussmann, who was not part of the Political Law group, had been retained,

due to his cybersecurity experience, by the Clinton campaign after the campaign's emails were

hacked.  *Id.* ¶ 76.  After being indicted in 2021 by a Special Counsel, appointed during the first

Trump Administration, Sussmann was acquitted, on May 31, 2022, of the charge "of lying to the

FBI about links between the Trump Organization and Russia."  *Id.* (citation omitted).  Sussmann

also left Perkins Coie in 2021.  *Id.*

    In the 2020 presidential election, Perkins Coie "represented a number of clients opposing

then-candidate Trump's challenges" to the results of the election.  *Id.* ¶ 77 (citing 2nd Burman Decl.

¶ 33).  The firm's clients "prevailed in all but one of the challenges" brought by President Trump's

campaign.  *Id.*  During that same election cycle, Perkins Coie also represented a number of clients

in voting rights cases, including cases in which the firm's clients "were successful in defending

existing laws against various legal challenges."  *Id.* ¶ 78 (citing 2nd Burman Decl. ¶ 33).  In general,

Perkins Coie "has represented both party-affiliated and non-partisan clients in litigation over

election laws," much of which was defending state election procedures and actions taken by state

officials.  *Id.* ¶ 79; *see also* Gov't's Opp'n, Ex. 1, Gov't's Resp. to Pl.'s SMF ("Gov't's Resp. to

Pl.'s SMF") at 3, ECF No. 143-1 (noting that Pl.'s SMF ¶ 79 is undisputed).  In 2021, three former

Perkins Coie attorneys were sanctioned a total of $8,700 "in connection with a single duplicative

motion to supplement the record in a Fifth Circuit appeal in a voting-rights case."  Pl.'s SMF ¶ 83

9

(citing Court Order, *Tex. All. for Retired Ams. v. Hughs*, No. 20-40643, ECF No. 127-1 (5th Cir. June 30, 2021)).

Perkins Coie's representation of President Trump's political opponent in the 2016 presidential campaign and representation of other clients in connection with election litigation has drawn President Trump's attention and ire, as reflected in his public statements and his filing of a lawsuit against the Firm.  Specifically, on March 24, 2022, then-former President Trump filed a lawsuit against 31 individuals and entities, including Perkins Coie, "alleging that [they] 'maliciously conspired to weave a false narrative'" that the Trump campaign was colluding with Russia, including by "falsifying evidence, deceiving law enforcement, and exploiting access to highly-sensitive data sources," among other allegations, and seeking over $24 million in damages. Pl.'s SMF ¶ 80 (quoting Compl., *Trump v. Clinton et al.*, 2:22-cv-14102, ECF No. 1 (S.D. Fla.) (filed Mar. 24, 2022)).  The lawsuit was dismissed with prejudice, less than six months later, on September 8, 2022, with the court finding that the lawsuit had "no merit." *Id.* ¶ 81 (quoting *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1284 (S.D. Fla. 2022)).  As a result of this lawsuit, President Trump and one of his attorneys were sanctioned over $900,000 "for, among other things, bringing a frivolous case 'in order to dishonestly advance a political narrative.'" *Id.* ¶ 82 (quoting Order, *Trump v. Clinton et al.*, 2:22-cv-14102, ECF No. 302 (S.D. Fla. Jan. 19, 2023)).[7]

Plaintiff has provided copies of approximately twenty statements made by President Trump since the 2016 election—the authenticity of which are undisputed by the government—critically referencing the work of Perkins Coie and its former employees involved in the representation of his political opponent in the 2016 presidential campaign. *See id.* ¶¶ 100-18, 124-25, 138; *see also*

---

[7]     As of the date of this Memorandum Opinion, an appeal of this sanctions order against President Trump and his counsel remains pending in the Eleventh Circuit. *Trump et al. v. Clinton et al.*, No. 23-10387 (11th Cir.) (appeal docketed Feb. 6, 2023).

Pl.'s MSJ, Ex. 4, Declaration of Christopher N. Manning, Partner, Williams & Connolly ("Manning Decl."), Exs. 2-22, ECF No. 39-4.  For instance, on October 19, 2017, Trump tweeted, "Workers of firm involved with the discredited and Fake Dossier take the 5th.  Who paid for it, Russia, the FBI, or the Dems (or all)?"  Manning Decl., Ex. 2, ECF No. 39-4 at 14.  In two tweets posted on August 6, 2018, Trump stated:

> "Collusion with Russia was very real.  Hillary Clinton and her team 100% colluded with the Russians, and so did Adam Schiff who is on tape trying to collude with what he thought was Russians to obtain compromising material on DJT.  We also know that Hillary Clinton paid through . . . a law firm, eventually Kremlin connected sources, to gather info on Donald Trump.  Collusion is very real with Russia, but only with Hillary Clinton and the Democrats, and we should demand a full investigation."  Dan Bongino on @foxandfriends Looking forward to the new IG Report!

*Id.*, Ex. 3 ("*August 6, 2018, Trump Tweets*"), ECF No. 39-4 at 16 (ellipsis in original, denoting break between two tweets).  The demand for a "full investigation" could be read to cover plaintiff, among others.

President Trump's statements and social media posts critical of Perkins Coie and its former lawyers, including Elias and Sussmann, continued in 2018.  For instance, on November 9, 2018, Trump, speaking about an ongoing recount in a U.S. Senate election in Florida, told reporters:

> [A]ll of a sudden, they're finding votes out of nowhere.  And Rick Scott, who won by – you know, it was close, but he won by a comfortable margin – every couple of hours it goes down a little bit.  And then you see the people, and they were involved with that fraud of the fake dossier, the phony dossier.  And I guess I hear they were somehow involved or worked with the GPS Fusion people, who have committed – I mean, if you look at what they've done, you look at the dishonesty.

*Id.*, Ex. 4, Remarks by President Trump Before Marine One Departure ("*November 9, 2018, Trump Remarks*") at 5, ECF No. 39-4 at 19.[8]  The same day, he tweeted: "As soon as Democrats sent their

---

[8]    For relevant context, Elias represented Democrat Bill Nelson, Florida's then-sitting U.S. Senator, in the recount against Republican candidate Rick Scott.  *See, e.g.*, Kenneth P. Vogel & Patricia Mazzei, *In Florida*

11

best Election stealing lawyer, Marc Elias, to Broward County they miraculously started finding Democrat votes.  Don't worry, Florida – I am sending much better lawyers to expose the FRAUD!" *Id.*, Ex. 5 ("*November 9, 2018, Trump Tweet*"), ECF No. 39-4 at 34.

Four years later, on May 31, 2022, Trump posted on Truth Social about Perkins Coie's former employee, Sussmann, stating:

> Our Legal System is CORRUPT, our Judges (and Justices!) are highly partisan, compromised or just plain scared, our Borders are OPEN, our Elections are Rigged, Inflation is RAMPANT, gas prices and food costs are "through the roof," our Military "Leadership" is Woke, our Country is going to HELL, and Michael Sussmann is not guilty.  How's everything else doing?  Enjoy your day!!!

*Id.*, Ex. 10, ECF No. 39-4 at 56.  On December 11, 2022, Trump posted on Truth Social an article titled "Elon Musk Calls Out Sussmann, Perkins Coie for 'Attempt to Corrupt a Presidential Election.'"  *Id.*, Ex. 12 ("*December 11, 2022, Trump Post*"), ECF No. 39-4 at 60.  On March 31, 2024, Trump posted another article on Truth Social, this one titled "Marc Elias Is Scared…And He Should Be."  *Id.*, Ex. 16 ("*March 31, 2024, Trump Post*"), ECF No. 39-4 at 69.

Other posts have focused more generally on Perkins Coie.  On September 6, 2023, then-candidate Trump posted on Truth Social: "They spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, the Fake Dossier Hoax, FISA Fraud, Election Fraud, the 'No Collusion' Mueller Hoax, and so much more.  I was innocent on all counts.  If I am elected, they will be brought to JUSTICE, something that Republicans have always been afraid to do."  *Id.*, Ex. 53 ("*September 6, 2023, Trump Post*"), ECF No. 39-4 at 602.  The reference to the "Fake Dossier Hoax" in this litany of perceived wrong-doing alludes to plaintiff's work representing President Trump's 2016 political opponent and thus obliquely identifies plaintiff as one of the targets to be

---

*Recount Fight, Democratic Lawyer Draws Plaudits and Fire*, N.Y. Times (Nov. 14, 2018), https://www.nytimes.com/2018/11/14/us/politics/florida-governor-recount.html.

"brought to JUSTICE" upon President Trump's election to his current office.[9]  This promise of retribution was repeated publicly by President Trump.  For instance, in a March 4, 2023, speech, then-candidate Trump said, "I am your warrior, I am your justice, and for those who have been wronged and betrayed, I am your retribution.  I am your retribution."  *Id*., Ex. 14 at 29:53-30:04, ECF No. 39-4 at 64.

Plaintiff and its former employees' work representing President Trump's prior political opponent were ongoing targets throughout 2024 for criticism and his promises of retribution.  On May 5, 2024, Trump posted on Truth Social:

> Andrew McCarthy: "HILLARY CLINTON, RECIDIVIST ELECTION-THEFT CONSPIRATOR…Regarding 1992, the Clinton campaign used a law firm as the intermediary for tens of thousands of dollars in payments to a private investigator (Jack Palladino) whose task was to obtain the silence of women who claimed to have had affairs with Bill Clinton…it turns out that this 1992 tactic – booking as legal fees what might euphemistically be called 'research' – was the blueprint for the 2016 Hillary Clinton campaign, in cahoots with the Democratic National Committee.  They paid their law firm, Perkins Coie, which retained the research firm Fusion GPS and its contractor, former British spy Christopher Steele, to generate the farcical Steele dossier that was shared with the FBI, the State Department, and the media to smear Trump as a clandestine agent of the Kremlin…

*Id*., Ex. 18, ECF No. 39-4 at 73.  On September 7, 2024, and again on September 17, 2024, and October 25, 2024, in the lead-up to the 2024 presidential election, Trump posted on Truth Social his intent, if elected, to investigate and prosecute "Lawyers" and others he perceived to be helping political opponents and "involved" in what he perceived to be "unscrupulous behavior":

> CEASE & DESIST: I, together with many Attorneys and Legal Scholars, am watching the Sanctity of the 2024 Presidential Election very closely

---

[9]       President Trump's statements about plaintiff have persisted even up to April 23, 2025, the day of the motions hearing on the parties' pending cross-motions in this case, when he posted on Truth Social, among other things, that "I'm suing the law firm of Perkins Coie for their egregious and unlawful acts, in particular the conduct of a specific member of this firm."  @RealDonaldTrump, Truth Social (Apr. 23, 2025, 9:35 AM), https://truthsocial.com/@realDonaldTrump/posts/114387538306195784; *see also Trump Says He is Suing Perkins Coie Law Firm*, Reuters (Apr. 23, 2025, 9:59 AM), https://www.reuters.com/legal/trump-says-he-is-suing-perkins-coie-law-firm-2025-04-23/.  Though President Trump incorrectly describes his role in this litigation as the party bringing the lawsuit, this slip accurately reflects his intent to target plaintiff based on his negative view of the Firm.

> because I know, better than most, the rampant Cheating and Skullduggery that has taken place by the Democrats in the 2020 Presidential Election.  It was a Disgrace to our Nation!  Therefore, the 2024 Election, where Votes have just started being cast, will be under the closest professional scrutiny and, WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law, which will include long term prison sentences so that this Depravity of Justice does not happen again.  We cannot let our Country further devolve into a Third World Nation, AND WE WON'T!  Please beware that this legal exposure extends to Lawyers, Political Operatives, Donors, Illegal Voters, & Corrupt Election Officials.  Those involved in unscrupulous behavior will be sought out, caught, and prosecuted at levels, unfortunately, never seen before in our Country.

*Id.*, Exs. 20-22 ("*Trump Cease & Desist Post*"), ECF No. 39-4 at 77, 79, 81.

## C. Perkins Coie's Representation of Clients in Litigation Challenging Current Trump Administration Action

On February 6, 2025, Perkins Coie, representing a group of transgender military servicemembers *pro bono*, filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), challenging Executive Order 14183, which banned transgender people from serving in the American military.  Pl.'s SMF ¶¶ 84-85 (citation omitted).[10]  The court entered a preliminary injunction, on March 27, 2025, enjoining enforcement of this Executive Order nationwide.  *See Shilling v. United States*, --- F. Supp. 3d ---, 2025 WL 926866, at *3 (W.D. Wash. Mar. 27, 2025).[11]  No Perkins Coie employee who held an active security clearance at the time EO 14230 was issued was involved in this case.  Pl.'s SMF ¶ 96 (citing 2nd Burman Decl. ¶ 41).

---

[10]    Plaintiff's SMF identifies the challenged Executive Order as "14185," Pl.'s SMF ¶ 84, but the complaint in *Shilling* challenges Executive Order 14183, Compl. ¶ 1, *Shilling v. Trump et al.*, No. 2:25-cv-241 (W.D. Wash.) (filed Feb. 6, 2025); *see also Shilling v. United States*, --- F. Supp. 3d ---, 2025 WL 926866, at *1 (W.D. Wash. Mar. 27, 2025) (noting that the lawsuit challenged Executive Order 14183).

[11]    The same Executive Order was challenged in another lawsuit, filed in this District, in which another Judge on this Court also granted a preliminary injunction.  *See Talbott v. United States*, --- F. Supp. 3d ---, 2025 WL 842332, at *1, 3 (D.D.C. Mar. 18, 2025) (enjoining enforcement of Executive Order 14183).  Perkins Coie was not involved in that litigation.  Pl.'s SMF ¶ 87.

14

### D. Executive Order 14230

On March 6, 2025, President Trump issued EO 14230, entitled "Addressing Risks from Perkins Coie LLP." 90 Fed. Reg. at 11781. In a televised signing ceremony, President Trump made clear his reasons for the Executive Order, stating about Perkins Coie: "This is an absolute honor to sign. What they've done is, it's just terrible. It's weaponization, you could say, weaponization against a political opponent, and it should never be allowed to happen again." Manning Decl., Ex. 29, CSPAN Video of President Trump Signing Executive Orders at 5:27-40, ECF No. 39-4 at 133. On the same day, the White House released an accompanying fact sheet further explaining EO 14230 and the rationale for its issuance. *Id.*, Ex. 28, *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025), ECF No. 39-4 at 131 [hereinafter *EO 14230 Fact Sheet*], also available online at https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.

EO 14230 has six sections, five of which are challenged in this litigation. *See* Gov't's Mem. at 1 (describing the Order as consisting of Section 1 and "the operative sections . . . 2, 3, 4, and 5"); Pl.'s SMF ¶¶ 127-31 (describing Sections 1 through 5 of the EO). Section 1, titled "*Purpose*," makes a number of purported derogatory factual findings about plaintiff's conduct, using such words as, in the first sentence, "dishonest and dangerous activity"; in the third sentence, "egregious activity"; in the fourth sentence, "unethical lack of candor"; in the fifth sentence, accusing the Firm of "racially discriminat[ing] against its own attorneys and staff, and against applicants," which, in the tenth and last sentence, shows "disrespect for the bedrock principle of equality." Based on these findings, the last sentence of Section 1 states they "represent[] good cause to conclude that they neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds," as directed in the instructions to all Executive branch agencies that

15

follow in the next sections of the Order.  EO 14230 § 1, 90 Fed. Reg. at 11781.  The government confirms that these are a presidential "finding" and that "everything else in the executive order that is being challenged, Sections 3 and . . . 5, fundamentally flow from that determination."  Tr. of Mar. 12, 2025, Hr'g ("TRO Hr'g Tr.") at 35:9-12, ECF No. 22; *see also* Tr. of Apr. 23, 2025, Mots. Hearing ("Mots. Hr'g Tr.") at 38:18-19, ECF No. 169 (government counsel confirming that Section 1 "would inform any agency that's reviewing a security clearance," as directed in Section 2).

Section 2, titled "*Security Clearance Review*," consists of two parts. The first subsection orders the immediate suspension of any active security clearances held by any Perkins Coie employee "pending a review of whether such clearances are consistent with the national interest." EO 14230 § 2(a), 90 Fed. Reg. at 11781.[12]  This subsection, by its terms, covers all Perkins Coie employees, regardless of their role at the firm or the reasons for which they hold a clearance.  Mots. Hr'g Tr. at 24:13-14 (government counsel confirming "we would interpret it[] as being that broad").

The second subsection of Section 2 orders the Office of Management and Budget ("OMB") to "identify all Government goods, property, material, and services" currently provided "for the benefit of Perkins Coie," and then directs the heads of agencies to "expeditiously cease" such provision.  EO 14230 § 2(b), 90 Fed. Reg. at 11781.[13]  The government has offered scope-limiting

---

[12]    EO 14230 § 2(a) states in full: "The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest."  EO 14230 § 2(a), 90 Fed. Reg. at 11781.

[13]    EO 14230 § 2(b) states in full: "The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Perkins Coie. The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision."  EO 14230 § 2(b), 90 Fed. Reg. at 11781.

gloss on this subsection, pointing to both the instruction's placement in Section 2 of the Order and the textual phrase "for the benefit of Perkins Coie." In particular, the government suggests that, given the topic addressed in this subsection, the instructions contained therein should be construed as limited to goods, property, material, and services with "some general nexus to some national security issue," Mots. Hr'g Tr. at 52:9-12; *see also id.* at 48:9-53:1, and, given the textual reference to plaintiff's benefit, further limited to exclude the "types of goods and services . . . provided to the public more generally," Gov't's Opp'n at 11. Whatever the merits of the government's *post hoc* interpretive limitations on the scope of subsection (b), however, these limitations did not appear in OMB's implementation directions for this subsection. OMB's March 7, 2025, Memorandum, sent to the heads of all executive departments and agencies, contained no text limiting the scope of this subsection to "Government goods, property, material, and services" that were national security-related or not otherwise provided to the public generally. Mots. Hr'g Tr. at 50:25-53:1; Manning Decl., Ex. 31, M-25-17, Memorandum from OMB Director Vought to Executive Department and Agency Heads Re: Implementation of the Executive Order on "Addressing Risks from Perkins Coie LLP" ("OMB Implementation Mem."), ECF No. 39-4 at 140.

Section 3 is titled "*Contracting*," and has two subsections. EO 14230 § 3, 90 Fed. Reg. at 11781-82. The first subsection directs all "Government contracting agencies" to require government contractors to "disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract." *Id.* § 3(a), 90 Fed. Reg. at 11781.[14]

---

[14]     EO 14230 § 3(a) states in full: "To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract." EO 14230 § 3(a), 90 Fed. Reg. at 11781.

17

The next subsection provides instructions on what each agency must do with those government contractor disclosures. Specifically, all agency "heads" are directed to review all government contracts with either Perkins Coie or any entity that disclosed a business relationship with Perkins Coie. *Id.* § 3(b), 90 Fed. Reg. at 11782.[15] Pursuant to this review, agencies are directed to "terminate any contract . . . for which Perkins Coie has been hired to perform any service," *id.* § 3(b)(i); *see also EO 14230 Fact Sheet* ("[T]he Federal Government will prohibit funding contractors that use Perkins Coie LLP."), and "otherwise align" funding decisions with the administration's priorities, EO 14230 § 3(b)(ii), 90 Fed. Reg. at 11782; *see also* TRO Hr'g Tr. at 16:11-14 (plaintiff's counsel reading Section 3 as "essentially say[ing] to these contractors" that, "[i]f you want to have government contracts, you cannot use this law firm"). To monitor progress on implementation of Section 3, all agencies are instructed to submit to OMB their assessment of any contracts with Perkins Coie or contractors doing business with Perkins Coie and "any actions taken with respect to those contracts in accordance with this order." EO 14230 § 3(b)(ii), 90 Fed. Reg. at 11782.

Section 4, titled "*Racial Discrimination*," has two subsections. EO 14230 § 4, 90 Fed. Reg. at 11782. The first subsection directs the Chair of the Equal Employment Opportunity Commission ("EEOC") to "review the practices of representative large, influential, or industry

---

[15] EO 14230 § 3(b) states in pertinent part: "The heads of all agencies shall review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall: . . . (i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Perkins Coie has been hired to perform any service; [and] (ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Perkins Coie or with entities that do business with Perkins Coie effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." EO 14230 § 3(b), 90 Fed. Reg. at 11782.

leading law firms" to ensure compliance with employment laws, including specifically whether such firms "reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis." *Id.* § 4(a);[16] *see also* Mots. Hr'g Tr. at 58:6-59:19 (government counsel explaining that the Trump Administration considered appropriate subjects of investigation, law firms sending "certain racial, ethnic, and gender-based delegations to meet with clients," to the exclusion of members of other groups, and "at very large venues, training conferences, professional associations where speakers are excluded on the basis of race and sex in order to have a certain composition on the panel").

The second subsection directs the Attorney General to investigate, "in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate," any such law firms that do business with the federal government to determine their compliance with "race-based and sex-based non-discrimination laws" and take any appropriate actions based on those investigations. EO 14230 § 4(b), 90 Fed. Reg. at 11782.[17] These Attorney General-led federal investigations could evaluate both federal and state discrimination laws, though government counsel suggested that consultation with state

---

[16]    EO 14230 § 4(a) states in full: "The Chair of the Equal Employment Opportunity Commission shall review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis." EO14230 § 4(a), 90 Fed. Reg. at 11782.

[17]    EO 14230 § 4(b) states in full: "The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered." EO14230 § 4(b), 90 Fed. Reg. at 11782.

Attorneys General would most likely occur to investigate violations of state civil rights laws "pattern[ed]" closely after federal laws. Mots.' Hr'g Tr. at 60:6-10; *see also id.* at 59:20-60:17.

Section 5, titled "*Personnel*," has two subsections. EO 14230 § 5, 90 Fed. Reg. at 11782. The first subsection instructs all agency "heads" to "provide guidance" on two action items: (1) "limiting official access from Federal Government buildings to employees of Perkins Coie" when "such access would threaten the national security" or "be inconsistent with the interests of the United States," and (2) "limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States," *id.* § 5(a).[18] Government counsel resisted reading these limitations "as going, necessarily, as far as" disallowing the Firm's employees from "even talk[ing] to or speak[ing] with individuals," and implied this was not such a big deal because, during COVID, "nobody was entering federal buildings; nobody was meeting; all access and all communications were handled via letter, email, phone calls." TRO Hr'g Tr. at 55:15-22. Given the breadth of the term "engaging" used in Section 5 (a), however, he could not confirm that any one of these forms of communication with government officials would be permitted, since that is a decision left to the discretion of each agency head. *Id*. at 56:18-21, 57:15-18. To the extent that references to "national security" and "national interest" guide the exercise of agency heads' discretion, plaintiff pointed out that "these agencies are already told what the outcome of their analysis is, because they have been told in Section 1 that working with Perkins Coie is not consistent with the national interest and not consistent with the administration and policies of this administration," TRO Hr'g

---

[18]    EO 14230 § 5(a) states in full: "The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States." EO 14230 § 5(a), 90 Fed. Reg. at 11782.

Tr. at 18:16-20, a fairly obvious point to which the government offered no response, *see generally* Gov't's Mem.; Gov't's Opp'n; Gov't's Reply to Pl.'s Opp'n to the MTD ("Gov't's Reply"), ECF No. 147, other than to concede that the findings in Section 1 "would inform" these determinations "[w]here relevant," Mots. Hr'g Tr. at 38:18-19, 23.

The second subsection forbids all federal agencies from hiring any employees of Perkins Coie without a waiver obtained from the relevant agency's head, "in consultation with the Director of the Office of Personnel Management." *Id.* § 5(b);[19] *see also EO 14230 Fact Sheet* ("Federal Agencies will also refrain from hiring Perkins Coie LLP employees unless specifically authorized."). This broad text applies the federal hiring prohibition to all Perkins Coie employees, including, as plaintiff posits without dispute from the government, to "the people in the mail room, the IT director, and secretaries." TRO Hr'g Tr. at 22:25-23-1.

Finally, Section 6 provides "*General Provisions*" addressing the legal impact of the Executive Order on other applicable federal agency laws, regulations and authorities and instructs that "[t]his order shall be implemented consistent with applicable law." EO 14230 § 6(b), 90 Fed. Reg. at 11782. This instruction, by its express terms, bars implementation by any federal agency of any section of the Executive Order found to be unconstitutional and thereby not "consistent with applicable law." Government counsel confirmed that the phrase "applicable law" would "necessarily incorporate an order from this Court," Mots' Hr'g Tr. at 16:9-13, and thus, should any permanent injunction be entered against EO 14230, no "executive agency would be able to move forward with trying to implement it," *id.* at 15:11-18.

---

[19]     EO 14230 § 5(b) states in full: "Agency officials shall, to the extent permitted by law, refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." EO 14230 § 5(b), 90 Fed. Reg. at 11782.

21

### E.  Immediate Impact of EO 14230

Federal agencies began implementing EO 14230 immediately following its issuance.  Pl.'s SMF ¶ 135; Gov't's Resp. to Pl.'s SMF at 3 (conceding that "certain agencies" began immediately to implement the EO); *see also* Pl.'s SMF ¶ 137 (describing the initial steps taken by OMB to implement EO 14230); *id.* ¶ 140-43 (describing immediate steps taken by the EEOC).  On March 7, 2025, the day after issuance of EO 14230, OMB Director Russell Vought sent a "MEMORANDUM TO THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES" about the Order's implementation.  OMB Implementation Mem. (capitalization in original).  The memorandum directed that, "[i]n accordance with the direction provided by the President" in EO 14230, "[a]gencies must review all Government contracts and subcontracts with Perkins and Coie LLP, as well as provision to Perkins and Coie LLP of goods, property, material, and services, including any Sensitive Compartmented Information Facilities," which review should be completed, and results reported back to OMB, by April 5, 2025.  *Id.*

That same day, a federal official refused to allow Perkins Coie attorneys to attend a scheduled meeting to discuss a pending matter before that agency.  Pl.'s SMF ¶ 152 (citing 2nd Burman Decl. ¶ 44).  In another pending case, an attorney in the Department of Justice's Criminal Fraud Section cancelled a previously scheduled meeting with Perkins Coie attorneys, citing the Order.  *Id.* ¶ 162 (citing 2nd Burman Decl. ¶ 45).  Then, on March 17, 2025, Perkins Coie received an 11-page letter from the Acting EEOC Chair expressing "concern," based on "public statements and court filings," that the Firm's hiring practices "may entail unlawful disparate treatment . . . or unlawful limiting, segregating, and classifying based . . . on race, sex, or other protected characteristics, in violation of Title VII," and requesting extensive information, dating back in some instances for a decade, from the Firm about its hiring and promotion practices.  Manning Decl., Ex. 34, Letter from Acting EEOC Chair Lucas Re: Review of Perkins Coie LLP's

Compliance with Title VII of the Civil Rights Act of 1964 ("EEOC Letter") at 1-3, ECF No. 39-4 at 146.

Perkins Coie felt the impact of EO 14230 immediately not only from federal agencies but also from its clients. On the same day the Order was issued, one client, who had retained Perkins Coie for seven years and was represented by the Firm in seven open matters, "ended Perkins Coie's representation of that client in any litigation before the relevant federal agency." *Id.* ¶ 151 (citing 2nd Burman Decl. ¶ 48). Another client, for whom Perkins Coie had performed substantial work totaling over $1 million in fees, hired another law firm when Perkins Coie lawyers were told they could not attend a meeting to discuss the matter (discussed above). *Id.* ¶ 152 (citing 2nd Burman Decl. ¶ 44). On March 7, 2025, a major government contractor that Perkins Coie had represented for 35 years hired other counsel for two pending matters. *Id.* ¶ 153 (citing 2nd Burman Decl. ¶ 48). That same day, another client of Perkins Coie since 2018 withdrew all work from the Firm, *id.* ¶ 154 (citing 2nd Burman Decl. ¶ 48), as did a coalition of four other clients, *id.* ¶ 155 (citing 2nd Burman Decl. ¶ 48). These terminations of existing representations, each of which took place in the days immediately following the issuance of EO 14230, resulted in "significant" revenue loss for Perkins Coie.[20]

## F. Procedural History

Plaintiff filed the instant lawsuit on March 11, 2025, five days after President Trump issued EO 14230 in a televised signing ceremony. *See* Compl., ECF No. 1. The same day, plaintiff

---

[20] The government disputes this statement "as factual inference or conclusion," Gov't's Resp. to Pl.'s SMF at 5 (responding to ¶ 161), without explaining how the statements made by plaintiff's declarant, a Firm partner familiar with the "business and operations" of the firm, 2nd Burman Decl. ¶ 1, including the impact on the Firm's revenue from client terminations occurring in the days immediately following the issuance of EO 14230, may be criticized as based on "inference or conclusion," rather than direct knowledge. The government's "dispute" rings hollow, particularly given (1) the temporal closeness in time between the issuance of EO 14230 and the client reactions, (2) the long-term relationships between plaintiff and the clients who terminated business with the law firm, and (3) the Order's terms, which were designed to hamper the effectiveness of plaintiff's representation of clients before federal agencies, as discussed further *infra* in Part III.B.4.

moved for a temporary restraining order ("TRO") as to only Sections 1, 3 and 5 of EO 14230, Pl.'s

Mot. for Temporary Restraining Order ("TRO Mot."), ECF No. 2, and that motion was granted

the next day, on March 12, 2025, following a hearing, *see* Min. Entry (Mar. 12, 2025); TRO Hr'g

Tr.  Shortly after the hearing concluded, a written order granting the requested TRO as to EO

14230's Sections 1, 3 and 5, and explaining the injunction's exact parameters was posted.  Order

("TRO Order"), ECF No. 21.  The parties were additionally directed to file a joint status report

proposing a schedule to govern further proceedings in this case, and the government was directed

to file a status report "describing the steps taken to ensure compliance with this Order and

certifying compliance with its requirements."  *Id.*

On March 14, 2025, after the Court's grant of the parties' joint request for a one-day

extension of time to file a proposed schedule, *see* Joint Mot. for Extension of Time, ECF No. 23;

Min. Order (Mar. 13, 2025), the parties jointly proposed a schedule to move directly to an

expedited dispositive motions briefing, Joint Status Report ¶¶ 2-3, ECF No. 25.  The parties

additionally agreed to a stay of discovery, *id.* ¶ 4, and "to extend the Temporary Restraining Order

. . . until final judgment," *id.* ¶ 5.  In accord with the parties' proposed schedule, the Court issued

an order extending the temporary injunction "until final judgment is entered in this matter" and

setting a schedule to govern the briefing of expedited dispositive motions.  Order, ECF No. 26.

That same day, the government submitted a status report describing initial steps taken to comply

with the TRO.  Gov't's Status Report, ECF No. 27.  A second status report outlining additional

steps taken by the government was filed on March 18, 2025.  Gov't's Status Report, ECF No. 29.

The government's second status report indicated that, while guidance was issued to all

federal agencies directing them to "suspend and rescind any implementation or enforcement of

Sections 1, 3, and 5 of Executive Order 14230, including any reliance on the statements in Section

24

1 of the Executive Order," *id.* ¶ 2, agencies had not been directed to take the additional required step of immediately communicating "to every recipient of a request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm, made pursuant to Section 3(a) of Executive Order 14230, that such request is rescinded until further order of the Court," TRO Order at 2; *see also* Gov't's Status Report, ECF No. 29.  As a result, outstanding disclosure requests to government contractors made by any federal agency other than the seven named government agencies in this lawsuit, remained in place notwithstanding the broader scope of the TRO requirement beyond merely those named defendants, based on the fact that the United States was named as a defendant and defined, for purposes of the lawsuit, as constituting "all other agencies that are directed by [EO 14230] to take action respecting Perkins Coie."  Compl. ¶ 36.

This shortcoming in implementing fully the TRO prompted plaintiff to seek clarification of the scope of the TRO, *see* Pl.'s Mot. to Clarify, ECF No. 30, and alert the Court to the government's more limited view of which federal agencies were subject to the TRO, with the concomitant obligation to rescind disclosure requests to government contractors for information about any business dealings with Perkins Coie.  This motion was granted the following day, and the government was directed to provide an additional status report certifying compliance with the TRO, as clarified.  Min. Order (Mar. 19, 2025).  The government submitted two additional status reports regarding compliance with the TRO.  Gov't's Status Report, ECF No. 31; Gov't's Suppl. Status Report, ECF No. 32.[21]

---

[21]    The government's supplemental status report included as an attachment the guidance memorandum, dated March 20, 2025, sent by the Attorney General and OMB Director to all agencies, pursuant to the Court's order clarifying the scope of the TRO. This second guidance memorandum, unlike the first guidance memorandum sent on March 18, 2025, included, for the first time, the following extra text: "The Executive Branch's position is that Executive Order 14230 is permissible, and that the Court's order was erroneous. The government reserves the right to take all necessary and legal actions in response to the 'dishonest and dangerous' conduct of Perkins Coie LLP, as set forth in Executive Order 14230."  Gov't's Suppl. Status Report, Attach., Memorandum from Attorney General Bondi & OMB Director Vought Re: Court Order Regarding Executive Order 14230, ECF No. 32-1.  The inclusion of this extra text with derogatory statements about plaintiff, quoted directly from Section 1 statements when the use

On March 21, the government moved to disqualify the undersigned Judge from this case, Gov't's Mot. to Disqualify Judge Beryl Howell, ECF No. 34, which motion was denied five days later, *Perkins Coie LLP v. U.S. Dep't of Justice*, --- F. Supp. 3d ---, 2025 WL 914099 (D.D.C. Mar. 26, 2025). The parties subsequently briefed their dispositive motions in accordance with the parties' jointly proposed schedule, which was adopted by the Court. *See generally* Pl.'s MSJ; Pl.'s Mem. of L. in Supp. of Pl.'s MSJ ("Pl.'s Mem."), ECF No. 39-1; Gov't's MTD; Gov't's Mem.; Pl.'s Mem. of L. in Opp'n to Defs.' MTD ("Pl.'s Opp'n"), ECF No. 142; Gov't's Opp'n to Pl.'s MSJ ("Gov't's Opp'n"), ECF No. 143; Gov't's Reply to Pl.'s Opp'n to MTD ("Gov't's Reply"), ECF No. 147; Pl.'s Reply Mem. in Supp. of Pl.'s MSJ ("Pl.'s Reply"), ECF No. 148.[22] To support its entitlement to summary judgment, plaintiff has supplied a fulsome evidentiary record amounting to over 950 pages, consisting of four expert reports, a representative sample of President Trump's statements, dating back to 2017, critical of plaintiff and lawyers formerly associated with the Firm, contextual information about the targeting of other law firms by the Trump Administration since late February 2025, and the 148-page report submitted by Special Counsel Jack Smith to former Attorney General Merrick Garland. *See generally* Exhibits to Pl.'s

---

of Section 1 by the government was specifically enjoined, went "beyond the minimum required" to comply with the Court's order, as government counsel conceded, Mots. Hr'g Tr. at 20:24-25. As this Court has already noted, this government conduct "hardly appeared to comply with the TRO Order and raised some concern about the general presumption by courts 'that executive officials will act in good faith.'" *Perkins Coie LLP v. U.S. Dep't of Justice*, No. 25-cv-716, 2025 WL 1207079, at *3 (D.D.C. Apr. 25, 2025) (quoting *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1292-93 (D.C. Cir. 1993)).

[22]    The government additionally moved for reconsideration of the scope of the injunction, Gov't's Mot. Recons., and the parties were directed to include briefing on that motion in the parties' already-scheduled briefing on their dispositive motions, Min. Order (Apr. 3, 2025). The government's motion for reconsideration and plaintiff's motion to amend the Complaint to add all federal departments, agencies and entities subject to and responsible for implementing EO 14230, were resolved in a separate Memorandum and Order. *Perkins Coie*, 2025 WL 1207079 (granting plaintiff's oral motion to amend the complaint to include all federal departments, agencies, entities, as well as relevant officials, acting in their official capacity, identified, in consultation with the government, as subject to and responsible for implementing and enforcing EO 14230, and denying as moot the government's motion for reconsideration, which the government conceded would be rendered moot by plaintiff's proposed amendment to the complaint). Plaintiff filed an Amended Complaint on April 29, 2025, with the additional federal agency defendants named. Am. Compl., ECF No. 176.

MSJ; Pl.'s Opp'n; Pl.'s Reply.  The government, for its part, has provided approximately 550

pages of its own Exhibits, the majority of which consists of the 306-page report of Special Counsel

John Durham appointed during the first Trump Administration, but also includes information about

diversity initiatives supported and adopted by plaintiff and about DOJ and EEOC's investigations

into diversity programs.  *See generally* Exhibits to Gov't's Opp'n.[23]

A hearing was held on April 23, 2025, to consider both parties' pending dispositive

motions, which are now ripe for consideration.

## II.    LEGAL STANDARDS

### A.  Motion to Dismiss

#### 1.      Federal Rule of Civil Procedure 12(b)(1)

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized

by the Constitution and statute."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v.

Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)).  Absent subject-matter jurisdiction over a case,

the court must dismiss it.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006) (citing

*Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); Fed. R. Civ. P. 12(h)(3).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff

bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue.

---

[23]      In addition to the parties' voluminous submissions, twenty-two amicus briefs have been submitted in
support of plaintiff from a wide range of interested lawyers and law firms; legal professional organizations; law
professors; 346 former state and federal judges; former and current in-house general counsel; former senior
government officials; media and press freedom organizations; and organizations including the ACLU, Cato Institute,
Institute for Justice, Foundation for Individual Rights and Expression, and Reporters Committee for Freedom of the
Press, among others.  A single amicus brief was submitted in support of the government by three gun rights groups
and three conservative advocacy organizations.  *See* Br. *Amicus Curiae* of America's Future, Gun Owners of
America, Gun Owners Foundation, Gun Owners of California, Judicial Action Group, & Conservative Legal
Defense & Education Fund in Supp. of Recons. of the TRO & Gov't's MTD ("Br. of America's Future et al."), ECF
No. 131 (beginning with four Bible verses at the top of the Table of Authorities, *see id.* at iii, and arguing for
expansive Executive Power, while noting the total number of votes and Electoral College margin in favor of
President Trump, *id.* at 23, and listing the injunctions issued by federal courts against the current Trump
Administration's actions, *see id*. App. 1).

*Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). When reviewing such a motion, the court must "assume that the complaint states a valid legal claim," *Huron v. Cobert*, 809 F.3d 1274, 1278 (D.C. Cir. 2016), and "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," *Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021) (quoting *Arpaio*, 797 F.3d at 19). The court may also "consider materials outside the pleadings to determine [its] jurisdiction." *Id.* at 856 n.7; *see also West v. Lynch*, 845 F.3d 1228, 1231 (D.C. Cir. 2017) ("As necessary, [a court may] cull additional facts from other parts of the record." (citing *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005))).

### 2.    Federal Rules of Civil Procedure 8 and 12(b)(6)

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain a short and plain statement of the grounds upon which the court's jurisdiction depends, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks. Fed. R. Civ. P. 8(a). This rule "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). In addition, Rule 8(d) states that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). "Taken together, [those provisions] underscore the emphasis placed on clarity and brevity by the federal pleading rules," *Ciralsky v. CIA*, 355 F.3d 661, 669 (D.C. Cir. 2004) (cleaned up), and to "give the defendants fair notice of what the claim is and the grounds upon which it rests," *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016). The purposes of Rule 8(a)(2) and Rule 12(b)(6) overlap, but dismissal is proper under Rule 8 when the complaint is "so

confused, ambiguous, vague, or otherwise unintelligible" that a defendant cannot discern the plaintiff's claims. *Ciralsky*, 355 F.3d at 670 n.9.

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556-57). In deciding a motion under Rule 12(b)(6), a court must accept all factual allegations as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, and "construe the complaint 'in favor of the plaintiff,'" *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023) (quoting *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012)). Courts, however, "need not accept inferences . . . not supported by the facts set out in the complaint, nor must the court accept legal conclusions." *Id.* (quoting *Hettinga*, 677 F.4th at 476). In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint," as well as "matters of which the court may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted, citation omitted).

### B.  Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are only "'material' if a dispute over it might affect the outcome of a suit under the governing law," meaning that "factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986))).  A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (citation omitted).  Thus, "[i]n considering a motion for summary judgment, judges must ask themselves not whether they think 'the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented,' because that evidence is such that "the jury could reasonably find for the plaintiff." *Stoe v. Barr*, 960 F.3d 627, 638-39 (D.C. Cir. 2020) (quoting *Anderson*, 477 U.S. at 252).

## III.    DISCUSSION

Plaintiff advances four overarching and successful constitutional challenges to Sections 1 through 5 of EO 14230, due to the collective import and impact of its purposes, findings and instructions to all Executive branch agencies.  Specifically, the Complaint claims the Executive Order (1) violates the First Amendment rights of Perkins Coie and the Firm's clients due to unlawful retaliation, viewpoint discrimination, and compelled disclosures, Pl.'s Mem. at 10-21; *see also* Am. Compl. ¶¶ 126-56 (Counts V, VI, VII); (2) violates Perkins Coie's rights to due process of law under the Fifth Amendment, Pl.'s Mem. at 21-27; *see also* Am. Compl. ¶¶ 99-116 (Counts II and III); (3) violates the Firm's clients' right to counsel under the Fifth and Sixth Amendments, Pl.'s Mem. at 27-31; *see also* Am. Compl. ¶¶ 157-68 (Counts VIII and IX); and (4) unconstitutionally denies equal protection of the law to Perkins Coie by singling the firm out for unfair treatment, Pl.'s Mem. at 37-38; *see also* Am. Compl. ¶¶ 117-25 (Count IV).[24]  Plaintiff additionally argues that each of the factors for permanent injunctive relief has been satisfied and

---

[24]    Plaintiff also claims that EO 14230 exceeds the President's constitutional and statutory authority and therefore violates the Constitution's separation of powers, Pl.'s Mem. at 31-36; *see also* Am. Compl. ¶¶ 85-98 (Count I), but this claim, as noted *supra* n.5, is not addressed.

Sections 1 through 5 of EO 14230 should therefore be permanently enjoined.  Pl.'s Mem. at 38-45.

The government, meanwhile, seeks dismissal of all nine counts of plaintiff's complaint, on various grounds, predicated on the view that "[t]he law does not support Plaintiff's claims as to Sections 1, 2, 3, 4, and 5; and as to Section 5 specifically, Plaintiff's claim is at best too early and, as any guidance will be consistent with the law, will eventually fail on the merits."  Gov't Mem. at 3.  In so moving, the government confusingly reads the nine counts in plaintiff's complaint as each challenging separate sections of EO 14230, *see, e.g.*, *id.* at 8 (asserting that "[o]nly Counts II and III . . . actually challenge Section 1" of the Order); Gov't Opp'n at 3-4, and, on this basis, critiques the complaint as being "imprecise" and "severely handicap[ping] [its] and the Court's ability to ascertain the particulars of Plaintiff's challenges to the various sections of the Executive Order, including which allegations and claims in the Complaint pertain to which sections of the Executive Order."  Gov't Mem. at 3.[25]  This reading of the Amended Complaint, however, is erroneous.  Seven of its nine counts plainly challenge, collectively, all sections of EO 14230 as unlawful.  *See, e.g.*, Am. Compl. ¶ 101 (claiming, in Count II, that "[t]he Order interferes with . . . multiple . . . interests protected by the Due Process Clause"); *id.* ¶ 108 (claiming, in Count III, that "[t]he Order is unconstitutionally vague"); *id.* ¶ 124 (claiming, in Count IV, that "[t]he Order is . . . in violation of the Equal Protection Clause"); *id.* ¶ 128 (claiming, in Count V, that "[t]he Order . . . constitute[s] viewpoint discrimination"); *id.* ¶ 155 (claiming, in Count VII, that "[t]he Order . . . violates the First Amendment"); *id.* ¶ 160 (claiming, in Count VIII, "[t]he Order" violates "the

---

[25]    This critique of plaintiff's complaint is somewhat ironic given the government's lack of clarity in identifying the specific grounds relied upon in seeking dismissal of the claims, compounded by the government's failure to comply with applicable procedural rules in bringing a cross-motion for summary judgment.  *See infra* n.26.

firm's clients' Sixth Amendment rights to counsel"); *id.* ¶ 168 (claiming, in Count IX, "[t]he Order[] violat[e]s" the Fifth Amendment right to counsel). In the remaining two counts, plaintiff also clearly identifies the sections subjected to challenge. *See id.* ¶ 142 (claiming, in Count VI, that "Section 3 of the Order is facially unconstitutional"); Pl.'s Mem. at 31 (indicating that Count I challenges "Sections 1, 2(b), 3, and 5").

The government's motion to dismiss is addressed first before turning to plaintiff's motion for summary judgment.

### A. The Government's Motion to Dismiss

The government argues that all plaintiff's claims should be dismissed for multiple alleged deficiencies, which are discussed in the government's supporting memorandum by reviewing EO 14230 on a section-by-section basis.[26] None of these arguments are persuasive. While the government organizes its briefing in a manner designed to mount a forceful defense of each section of the Order, Federal Rule of Civil Procedure 12(b) guides the assertion of defenses to "*claim[s] for relief*," Fed. R. Civ. P. 12(b) (emphasis supplied), as plaintiff correctly points out, *see* Pl.'s Opp'n at 5. Thus, the normal form of analysis of a motion to dismiss under Rule 12(b) requires review of each claim asserted to assess its sufficiency, but this is not how the government presented its arguments. To reduce redundancy, the sufficiency of each claim is considered as part of assessing whether plaintiff is entitled to summary judgment on the claims, in Part III.B. The

---

[26] Neither the government's motion to dismiss itself or its proposed order cites to any procedural rule as the basis for the requested dismissal, *see* Gov't's MTD; *id.*, Proposed Order, ECF No. 43-2), and the government's memorandum in support likewise contains no clear statement of the procedural rules relied upon as to each claim, leaving the legal bases for the motion to the Court to discern from vague headings used in the government's memorandum or to tease out of the text of the same document, despite the critical differences in applicable standards depending on which rule is relied upon. Regardless of whether this reflects a strategy to "disguise[] the nature of its motion," Pl.'s Opp'n at 5, plaintiff requests denial of any intended government cross-motion for summary judgment "for failure to comply with [D.D.C.] Local Rule 7(h)(1), which requires a statement of undisputed material facts supported by record citations," *id.* This basis for denial urged by plaintiff need not be resolved since the pending motions are resolved on alternative grounds.

general arguments raised by the government's motion to dismiss—which arguments are only loosely tied, if at all, to specific procedural rules to test the sufficiency of the claims as pleaded—are addressed in this Part.

### 1.    Plaintiff Contests Purported Findings in EO 14230's Section 1.

The government blithely describes the statements set out in Section 1 of EO 14230 as "not seriously contested" and "matters of public record." Gov't Mem. at 7. This description is inaccurate. Plaintiff "vigorously contests" Section 1's allegations of racial discrimination throughout the complaint. Pl.'s Opp'n at 2; *see, e.g.*, Am. Compl. ¶ 45 (stating that Plaintiff "does not, and did not" racially discriminate against its employees); *id.* ¶ 46 (contesting Section 1's "false premise" that "promoting diversity in the legal profession" equates to illegal discrimination); *id.* ¶ 51 (calling Section 1's allegations "false and disparaging").

Moreover, to the extent that certain factual matters alluded to in Section 1 are not contested, *see, e.g.*, Pl.'s SMF ¶ 83 (acknowledging three former Perkins Coie lawyers were sanctioned, in 2021, a total of $8,700 resulting from a duplicative motion filed in a voting rights appeal), plaintiff *does* challenge the use of these statements as a basis for the government actions directed in EO 14230, *see, e.g.*, Am. Compl. ¶¶ 2, 8 (challenging the Order as "not executive in nature," *id.* ¶ 2, and stating that "[t]he principal claims made by the Order have already been raised in the proper forum and resolved by the branch of government with constitutional authority to do so," *id.* ¶ 8); Pl.'s Mem. at 35 (arguing the Order impermissibly invades the judicial function, "given that federal courts already have adjudicated many of the President's grievances referenced in the Order").

The thrust of the government's inaccurate characterization of Section 1's statements as "undisputed" appears to be that these statements are immune from, or would survive, any factual or legal claims asserted by plaintiff, and therefore Section 1 must withstand any challenge lodged

33

by plaintiff on any constitutional basis. This defense falls short on both procedural and legal grounds. As a factual matter, in the procedural posture of a motion to dismiss, the amended complaint's allegations firmly disputing the veracity of the Section 1 statements are assumed to be true and any factual disputes may not be resolved on a motion to dismiss for failure to state a claim. *See supra* Part II.A.2. As a legal matter, Section 1's statements setting out the "Purpose" of the Order are highly probative of the sufficiency of the claims of constitutional violations, as discussed more fully *infra* in Part III.B.1, and thus may certainly not be accepted as appropriate, let alone "straightforwardly legal," as the government urges, Gov't Mem. at 1.

### 2. EO 14230's Section 1 Operates as Actionable Findings.

Discounting EO 14230's Section 1 as merely a "preamble," rather than an "operative section[]," Gov't Mem. at 1, the government contends that Section 1's statements "lay[] out the President's concerns about the law firm Perkins Coie," *id.* As such, the government argues that, though plaintiff "does not like what the current Administration thinks about Plaintiff," *id.* at 13, the Firm may not "muzzl[e]," *id.* at 1, or "silence the Government's own opinions," *id.* at 13. On this basis, the government seeks dismissal of any of plaintiff's claims challenging Section 1. *See* Gov't Mem. at 13 ("Plaintiff has no right to silence the Government's own opinions. Plaintiff's claims asking this Court to do just that should be dismissed.").

The government's argument suggests that to the extent the Section 1 statements amount merely to President Trump's protected speech, at least that section (and potentially the full Order) may not be enjoined. *See id.*; Gov't Opp'n at 6-8; Gov't Reply at 2-3. Not so. While government officials may, under the First Amendment, "share [their] views freely and criticize particular beliefs," they may not "use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188; *see infra* Part III.B.1. (addressing plaintiff's viewpoint discrimination and retaliation claim). Courts may, therefore, properly "scrutinize" cases where

34

"the application of state power" is called into question. *Vullo*, 602 U.S. at 188 (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958)).

The government's attempt to reframe this case as about governmental speech is subterfuge. Plaintiff has not sued at any point over the last almost decade when President Trump, either when serving in an official role as President or as a private citizen and political candidate, made derogatory statements about the Firm and its current or former employees. Exactly the opposite: then-former President Trump sued plaintiff, among others, for some of the same conduct described in the Section 1 statements, and plaintiff prevailed in that suit. *See supra* n.7 and associated text. The claims that the government seeks to dismiss in this lawsuit challenge the use of governmental power, not governmental speech. More specifically, plaintiff seeks to enjoin the *use* of the Section 1 statements by executive branch actors to justify adverse actions toward plaintiff, on grounds that actions based on those statements would constitute unlawful retaliation and other violations of plaintiff's and its clients' constitutional rights. *See* TRO Hr'g Tr. at 9:17-20 (plaintiff's counsel expressly stating that plaintiff sought "instruction to departments, agenc[ies], and the administration that they are not to use Section 1's findings as a direction for any interactions with Perkins Coie"); *see also id.* at 8:6-9:1.

Indeed, the government acknowledges that Section 1's statements are more than mere governmental speech and form the basis for the Order's "*Purpose*" and amount to findings by President Trump that guide implementation of the instructions that follow. *See* TRO Hr'g Tr. at 48:7-11 (government counsel confirming Section 1's statements are "finding[s]"; *id.* at 48:12-49:21 (government counsel indicating that the President had the power to make such findings and to direct resulting actions); Mots. Hr'g Tr. at 38:14-24 (government counsel conceding that the findings in Section 1 inform the determination of the "national interest"); Gov't Mem. at 7

35

(describing Section 1 as "a brief factual explanation for the operational elements of the Executive Order"); Manning Decl., Ex. 55, Tr. of Mar. 28, 2025, Mot. Hr'g at 20:6-9, *Jenner & Block LLP v. U.S. Dep't of Justice*, 25-cv-916, ECF No. 10 (D.D.C.), ECF No. 39-4 at 610 (government counsel acknowledging, in a case involving a similar EO targeting Jenner & Block LLP, that "any member of the Executive . . . wrestling with how to implement [the EO] . . . would necessarily be resorting and looking at what was said in Section 1 to guide that decision"). The text of EO 14230 makes this explicit, stating that the Section 1 statements provide "good cause to conclude that" plaintiff should "neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds," EO 14230 § 1, 90 Fed. Reg. at 11781, which conclusions are effectuated by the subsequent instructions in the Order, *id.* §§ 2-5, 90 Fed. Reg. at 11781-82.

The TRO issued by this Court carefully skirted the President's own free speech rights and neither treaded on those rights nor enjoined the President from making statements. Instead, the TRO enjoined the government from "*using* the statements" against plaintiff, plaintiff's employees, or plaintiff's clients or their employees. TRO Order at 1 (emphasis supplied). Put another way, plaintiff does not challenge "what the current Administration thinks about Plaintiff," Gov't's Mem. at 13, but rather what the current Administration seeks to *do* to plaintiff *based on* that thinking.

Plaintiff does not seek, nor would this Court grant, an injunction to prevent President Trump from "shar[ing] [his] views" or "criticiz[ing] particular beliefs." *Vullo*, 602 U.S. at 188. At the same time, however, plaintiff may challenge "the application of state power" against plaintiff, *id.* (quoting *Patterson*, 357 U.S. at 463), based on statements qualifying as "findings" used to justify an order with which Executive branch agencies must comply.

### 3. Plaintiff's Challenges to EO 14230's Section 2 Are Justiciable.

EO 14230's Section 2(a) directs all "relevant heads of executive departments and agencies" "immediately [to] take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest." EO 14230 § 2(a), 90 Fed. Reg. at 11781. The government acknowledges that this suspension, by its terms, applies to all of plaintiff's employees, lawyers and non-lawyers, regardless of their role at the Firm, the reason for grant or use of the clearance, or any other individual characteristics, such as the employee's former or current military service. Mots. Hr'g Tr. at 23:22-24:14; *see also* 2nd Burman Decl. ¶¶ 36, 38 (explaining that two current Firm employees currently serve in the military reserves and "hold clearances in connection with their duties as military reservists" and twelve hold clearances due to "former military or other public service backgrounds"). In the government's view, this section of the Order is "not judicially reviewable," in light of "governing D.C. Circuit precedent," and thus requires dismissal of plaintiff's claims challenging Section 2. Gov't Mem. at 14 (citing *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024)). The government's argument, however, overreads *Lee* and ignores other precedents that lead to the opposite conclusion.

In *Lee*, the D.C. Circuit considered whether courts are barred "from considering constitutional challenges to adverse clearance decisions." 120 F.4th at 887. The analysis examined the nature of decisions on individual security clearance applications, which require the weighing of "intangible qualities such as 'loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment,'" *id.* at 893 (quoting Exec. Order No. 12968, 60 Fed. Reg. 40245, 40250 (Aug. 2, 1995)), and exercising "predictive judgment" about the individual's ability to safeguard sensitive information, *id.* (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988)). These determinations, the Circuit explained, are "an

37

inexact science at best," requiring a "judgment call" made by experts, and thus are "committed to the broad discretion of the agency responsible." *Id.* (quoting *Egan*, 484 U.S. at 528-29). Invoking the Supreme Court's holdings in *Egan* that "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and . . . decide whether the agency should have been able to make the necessary affirmative prediction with confidence," nor possible for nonexperts to "determine what constitutes an acceptable margin of error in assessing the potential risk," *Egan*, 484 U.S. at 529, the Circuit held that courts may not consider constitutional challenges to "Executive Branch decision[s] to deny or revoke a security clearance" of an individual, *Lee*, 120 F.4th at 891.

Importantly, the *Lee* decision did not disturb prior D.C. Circuit holdings making expressly clear that "[i]t is simply not the case that all security-clearance decisions are immune from judicial review." *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993). While "discretionary judgments regarding a particular employee's security clearance" are unreviewable, examples of reviewable decisions include "the constitutionality of the methods" used to collect information and make the required determinations. *Id.* at 290. Other Supreme Court and D.C. Circuit opinions confirm that judicial review is available for claims that a general discriminatory policy governing security clearances exists. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 602 (1988) (differentiating between a claim that a respondent was terminated "based on *his* homosexuality" and a claim "that a more pervasive discrimination policy exists . . . regarding *all* homosexuals" (emphasis in original)); *Doe v. Gates*, 981 F.2d 1316, 1322 (D.C. Cir. 1993) (assuming, on remand in the same case, that a "blanket policy against homosexuals" would be unconstitutional); *Gill v. U.S. Dep't of Justice*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) ("In my view, if [appellant] could show that the government has a policy or practice of treating Muslims or

38

naturalized citizens differently, his equal protection claims, *like the claims at issue in* Greenberg, *would not be barred by* Egan." (emphasis supplied)).

Considering the fuller context of binding precedents and where *Lee* fits comfortably within this jurisprudence, judicial review of the Order's Section 2(a) is available in the instant case for at least four reasons.  First, plaintiff seeks judicial review not of any individual security clearance decision, but of a publicly announced general policy governing security clearances for *any member of a class of people*—here, the class consists of employees of plaintiff—which policy plaintiff alleges is constitutionally suspect on multiple bases.  This is directly analogous to seeking review of an alleged "discrimination policy," *Webster*, 486 U.S. at 602, not based on any individualized assessments of any of the employees to whom the suspension applies.  *Lee* addressed only a challenge to an individual "denial or revocation of security clearances," 120 F.4th at 887, and does not foreclose review of challenges to general policies governing security clearances.  Both *Webster* and *Doe* confirm that review of the latter types of claims is proper.

Second, because plaintiff challenges a general policy rather than an individual determination, judicial review would not require a court to wade into the issues animating the decision in *Lee*.  For example, review of EO 14230 or similar general policies on the record here does not require an examination of any of the "intangible qualities" weighed in individual clearance decisions, *Lee*, 120 F.4th at 893; or second-guessing any of the "predictive judgment[s]" or "judgment call[s]," *id.* (quoting *Egan*, 484 U.S. at 529), of the security clearance experts; or making any risk assessments, *see Egan*, 484 U.S. at 529.  The D.C. Circuit made a similar observation in *Rattigan v. Holder*, 689 F.3d 764, 767-68 (D.C. Cir. 2012), where the Circuit held that judicial review is only barred when "security clearance-related decisions made by trained Security Division personnel" are at issue, since these decisions involve "sensitive, predictive

39

judgments," but is not absolutely barred as to decisions made by other employees who do not make these types of expert judgments.

Third, related to the second reason, each case relied upon by the government in which the challenged individual security clearance decision was found to be non-justiciable involved a challenge to an individualized process conducted by expert agency examiners that included consideration of articulable findings directly pertinent to the individual with the clearance. In *Lee*, for instance, the plaintiff challenged the results of three specific polygraph examinations performed by agents of the Federal Bureau of Investigation, the failure of which examinations led to the revocation of his clearance. 120 F.4th at 884-85. After failing the first two exams and having his clearance revoked on that basis, he appealed this adverse decision to an expert body at DOJ, which ordered him to sit for a third exam. *Id.* After failing the third exam, he was fired. *Id.* at 885. Similarly, in *Egan*, a laborer at a naval facility in Washington state was denied a clearance and subsequently fired due to his undisclosed prior criminal convictions and his statements acknowledging past alcohol abuse. 484 U.S. at 520-21. The respondent in that case was given a chance to respond, and favorable material he provided was weighed by the experts against the material they had deemed unfavorable. *Id.* at 521-22. After an unsuccessful appeal of this decision, the respondent was removed from the job. *Id.* at 522.

The decisions in *Lee* and *Egan* are easily reconciled with those in *Webster*, *Greenberg*, and *Rattigan*. Where individual decisions are made by experts based on information specific to the individual, such as the results of polygraph examinations, *see Lee*, 120 F.4th at 884-85, or the weighing of both specific negative and favorable information about an individual, *see Egan*, 484 U.S. at 521, courts have no basis on which to redo the analysis or second-guess the decisions, *see, e.g.*, *Lee*, 120 F.4th at 893 (explaining that review in such cases would "present . . . unmanageable

40

questions" to courts).  In circumstances like the instant case, however, no such process or apparent expertise was involved, and where the allegation is that a pervasive, class-wide discriminatory policy exists against some group of individuals, the questions involved do not create any need for courts to second-guess experts or weigh unmanageable standards.

Finally, and notably, Section 2(a) never invokes national security as the reason, or even one of multiple reasons, for the specific action directed to suspend and review security clearances held by plaintiff's employees.  *See generally* EO 14230 § 2, 90 Fed. Reg. at 11781 (citing suspension "pending a review of whether such clearances are consistent with the *national interest*" only (emphasis supplied)).  When the government does not even claim that a general policy about security clearances was motivated by national security, judicial review of that policy could not threaten unduly entangling the judicial branch in questions of national security.  Instead, the EO invokes "the national interest," *id.*, a concept seemingly far broader and more nebulous than threats to national security.  When asked, government counsel was unable to define what exactly falls within the scope of "the national interest," *see, e.g.*, TRO Hr'g Tr. at 52:21-53:4, and the scope appears to be essentially unlimited, since disagreements about the benefits of diversity programs in hiring apparently qualify, *see* EO 14230 § 1, 90 Fed. Reg. at 11781 (stating that plaintiff's alleged discrimination "represents good cause to conclude that they [should not] have access to our Nation's secrets"); Gov't's Reply at 1 (complaining about plaintiff's "aggressive DEI practices").  Finding any such government actions judicially unreviewable simply because the Executive branch invoked "the national interest" would represent a breathtaking expansion of executive power at the expense of the constitutionally mandated role of the judicial branch and the concomitant safeguards for the individual rights of Americans.

In sum, here, the issues on which plaintiff seeks judicial review are appropriate for the courts. Evaluating plaintiff's challenge requires only the application of longstanding legal principles and constitutional interpretation—"the heartland of the judicial ken." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *6 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring). For instance, to resolve the claim that the suspension of, and announcement of an investigation into, all clearances held by plaintiff's employees is unconstitutional retaliation for First Amendment activity, *see infra* Part III.B.1, the Court need only apply the test long articulated by the Supreme Court, asking first whether the "adverse action . . . [was] based on [a] forbidden motive," *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019), and second, whether any claimed "non-retaliatory grounds [were] in fact insufficient to provoke the adverse consequences," *id.* (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). The same is true for plaintiff's claim of viewpoint discrimination. *See, e.g.*, *Vullo*, 602 U.S. at 188 (stating that a government official "cannot . . . use the power of the State to punish or suppress disfavored expression"). As plaintiff persuasively argues, such questions "'sound[] in familiar principles of constitutional interpretation' and can be answered through ordinary judicial tools." Pl.'s Mem. at 16 (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012)).

Certainly, substantial discretion is given to the Executive branch in matters of national security. *See, e.g.*, *Lee*, 120 F.4th at 891. Yet, this authority, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *Dames & Moore v. Regan*, 453 U.S. 654, 661 (1981) (quoting *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-20 (1936)). While the President may have the discretion to make substantive decisions on individual security clearances, *see generally Lee*, 120 F.4th 880, he may not apply a discriminatory policy to a group of individuals during the *process* of making such

42

decisions, *see Greenberg*, 983 F.2d at 290, as plaintiff alleges occurred in the instant case. Since the questions raised in this case are proper for judicial review and determination, without requiring review of the sensitive individual determinations left to the Executive branch, the government's blanket demand for dismissal of plaintiff's challenges to EO 14230's Section 2 for lack of justiciability fails.

The government also lodges a last gasp basis to dismiss plaintiff's challenge to Section 2 as "not ripe" and "premature for judicial consideration" because the clearances have been suspended pending "a further security clearance determination." Gov't Mem. at 16. This basis for dismissal also fails. Plaintiff's Amended Complaint describes the actions already effectuated by EO 14230, including, for example, the "Order's *threatened suspension* of active security clearances held by Perkins Coie employees because the firm embraces programs and policies that espouse a belief in 'diversity, equity, and inclusion' makes it a violation of the firm's First Amendment right of free expression." Am. Compl. ¶ 149 (emphasis supplied). Such explicit threats tied to continuation of specified speech are not a speculative future harm. As the Supreme Court has held, "threat[s] of . . . coercion" intended "'to achieve the suppression' of disfavored speech" are sufficient to "violate[] the First Amendment." *Vullo*, 602 U.S. at 180 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). The question presented here, whether the actions already taken in this case amount to such threats, is a "purely legal" issue that "will not be clarified by further factual development," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)), since the ultimate outcome of any "review of whether such clearances are consistent with the national interest," EO 14230 Sec. 2(a)—whatever such "national interest" means—has no bearing on whether the *threat* of suspension and review made by the EO constitutes unlawful retaliation.

43

### 4.    Plaintiff Has Standing to Challenge EO 14230's Section 3.

The government contends that plaintiff lacks standing to assert any claim challenging EO 14230's Section 3, which directs all "Government contracting agencies" to "require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract."  EO 14230 § 3(a), 90 Fed. Reg. at 11781; *see* Gov't's Mem. at 19-21.  By its terms, the required disclosures include *all* business with Perkins Coie, whether relating to a federal government contract or not.  This section further requires the "heads of all agencies" to "take appropriate steps to terminate any contract . . . for which Perkins Coie has been hired to perform any service," *id.* § 3(b)(i), 90 Fed. Reg. at 11782, and to "otherwise align their . . . funding decisions with the interests of the citizens of the United States" and "the goals and priorities" of the Trump Administration "as expressed in executive actions," *id.* § 3(b)(ii).  In case the implications of that somewhat murky language are unclear, the accompanying fact sheet helpfully clarifies the issue: "the Federal Government will prohibit funding contractors that use Perkins Coie LLP."  *EO 14230 Fact Sheet*.

The government seeks dismissal of any claim challenging Section 3 on the ground that plaintiff failed to allege any injury traceable to this section by not specifically alleging being party to any government contract or currently performing work on any government contract.  *See* Gov't's Mem. at 19-21.  This argument simultaneously misrepresents the scope of Section 3 and misreads plaintiff's complaint, and thus may be easily dispatched.  Whether plaintiff itself is directly a signatory to a federal government contract is immaterial if plaintiff sufficiently pleads injury-in-fact traceable to Section 3 and redressable by the injunctive relief requested by performing work for clients holding or seeking to hold federal government contracts.  The Amended Complaint amply alleges facts to satisfy these standing prerequisites.

44

In response to the Order's directives, for example, the Amended Complaint alleges that "several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie" "*[b]ecause of the Order . . .* and *risk of contract termination faced by clients with government contracts*." Am. Compl. ¶ 70 (emphasis supplied). The complaint further alleges that, in the short time between the issuance of the Order and the Court's TRO, some of the firm's clients "reported [receiving] very concerning messages from government officials directing them to report business with Perkins Coie, and others are concerned about that possibility." *Id.* These allegations plainly plead injuries directly traceable to Section 3 and thus establish plaintiff's standing to challenge the constitutionality of this provision.

### 5.    Plaintiff Has Standing to Challenge EO 14230's Section 4.

The government also attacks plaintiff's standing to challenge Section 4, contending that plaintiff cannot trace any alleged injury from the EEOC's review of plaintiff to EO 14230's Section 4, since the directed "'review' and 'investigat[ion]' of 'the practices of representative large, influential, or industry leading law firms' for consistency with civil rights laws, Gov't Mem. at 26 (alteration in original) (quoting EO 14230 § 4(a), 90 Fed. Reg. at 11782), is *already* what the EEOC is supposed to be doing," *id.* (emphasis in original). To bolster this argument, the government cites Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8633 (Jan. 21, 2025) ("Anti-DEI EO"), issued on President Trump's second day in office. This Anti-DEI EO directs, among other actions, federal agencies to "enforce civil rights laws and combat illegal private-sector DEI policies and practices." Gov't Mem. at 27 (citing EO 14173 §§ 2, 4(b), 90 Fed. Reg. at 8633, 8635). According to the government, these already-existing requirements mean plaintiff cannot show that the "alleged

45

retaliatory action[] 'would not have been taken absent the alleged retaliatory motive." *Id.* (alteration accepted) (quoting *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022)).

The government's reasoning that the Anti-DEI EO breaks the traceability of any harm from challenged Section 4, thereby obviating plaintiff's standing to bring a challenge to EO 14230's Section 4, proves too much and only highlights the logical fallacy in the government's argument. As plaintiff points out, *see* Pl.'s Opp'n at 17-18, the fact that the EEOC may already have the statutory authorization and presidential mandate to conduct investigations, report to the President, and file charges, Gov't Mem. at 26-27 (citing 42 U.S.C. §§ 2000e-5(a), -4(e), -5(b), and Anti-DEI EO), makes Section 4 "at most redundant, except insofar as it singles out [plaintiff] for opprobrium and punishment by all federal agencies," Pl.'s Opp'n at 18.  Section 4 focuses the EEOC on "representative large, influential, or industry leading law firms," without expressly naming plaintiff, but the inclusion of this direction in an Order explicitly targeting plaintiff speaks volumes.  In addition, the match-up in Section 1's statements critiquing plaintiff's hiring and promotion practices and Section 4's descriptions of the "large" law firm practices the EEOC is directed to review, leaves little doubt that plaintiff is included on the EEOC's targeted law firm list.  The government concedes as much.  Gov't Mem. at 2 ("Section 4 directs the Attorney General and the Chair of the [EEOC] to review whether Perkins Coie and like employers are violating the civil rights laws.").

The government further defends Section 4 on grounds that "[t]he EEOC is already required to make 'report[s] . . . to the President . . . on the cause of and means of eliminating discrimination,' including in any industry the President directs the EEOC to review."  Gov't Mem. at 26 (citing 42 U.S.C. § 2000e-4(e), titled "Reports to Congress and the President," that provides only for the EEOC to: (1) report annually "concerning the action it has taken and the moneys it has

disbursed[,]" and (2) "make such further reports on the cause of and means of eliminating discrimination and such recommendations for further legislation as may appear desirable," without anywhere authorizing the President to direct EEOC investigations). Even assuming the President has the authority the government claims to direct the EEOC to "review" certain industries, no authority is identified by the government—and the Court is aware of none—empowering the President to direct the EEOC to target specific businesses or individuals for an investigation. *See generally id.* at 26-27.

Moreover, the government identifies no authority allowing the President to direct the initiation of investigations without regard to extant statutory prerequisites requiring, for example, before the opening of an investigation, that a charge be filed with the Commission that is "in writing under oath or affirmation," 42 U.S.C. § 2000e-5(b); *see also Commissioner Charges*, U.S. EEOC, https://www.eeoc.gov/commissioner-charges#_edn4 (last visited May 1, 2025) ("Commissioner charges must be in writing, signed, and verified." (citing 29 C.F.R. § 1601.11(a))). As the Supreme Court has explained, "the EEOC's investigative authority is tied to charges filed with the Commission; unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction, the EEOC is entitled to access only to evidence 'relevant to the charge under investigation.'" *EEOC v. Shell Oil Co.*, 466 U.S. 54, 64 (1984) (footnote omitted) (quoting 42 U.S.C. § 2000e-8(a)). Government counsel acknowledges that no such charge meeting statutory prerequisites has been filed against plaintiff. Mots. Hr'g Tr. at 74:5-8 ("I don't think that's happened here."); *see also id.* at 103:7-12 (plaintiff's counsel noting that the request received from the EEOC "seemed very similar . . . to the type of request you would get after a charge, which would trigger all the rights that you get under congressionally delegated authority"). Yet, the inclusion of Section 4(a) in EO 14230 targeting

47

only one law firm (plaintiff) implicitly claims all these powers for the President here—both presuming the President's power is so extensive that he may direct the EEOC's investigative attention and also override statutory prerequisites to initiate an EEOC investigation.  These legally questionable assumptions about the scope of presidential power underpin the government's effort to dismiss plaintiff's claims challenging EO 14230's Section 4 and only serve to confirm plaintiff's showing of traceability of harm to this Order and support plaintiff's standing to challenge Section 4.

In any event, the Amended Complaint describes actions already taken under the authority of EO 14230's Section 4, *see* Am. Compl. ¶ 153 (discussing "[t]he threatened investigations into Perkin Coie's hiring, retention, promotion, and training practices"), and alleges specific harm from those actions, *id.* ¶ 154 (detailing potential costs to plaintiff, in both money and firm resources, as well as reputational harm).  For the same reasons already discussed, *see supra* Part III.A.3., plaintiff's challenge to threats of investigation as, *inter alia*, unconstitutional retaliation and viewpoint discrimination may properly be considered.

### 6.  Plaintiff's Challenges to EO 14230's Section 5 are Ripe.

The government argues that any challenge to EO 14230's Section 5 must be dismissed as premature, since the exact contours of the restrictions that will be imposed on plaintiff and its employees to limit their "official access from Federal Government buildings" and their "engaging" with "Government employees acting in their official capacity," EO 14230 § 5(a), are as yet unknown, pending the issuance of guidance to implement those two directives, Gov't Mem. at 28-29 ("Plaintiff can only guess the degree to which agency heads will limit government access."). As an initial matter, this ripeness argument does not apply to Section 5(b), which directs agencies to "refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency,

48

made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." EO 14230 § 5(b), 90 Fed. Reg. at 11782. As the fact sheet further explains, this section means "Federal Agencies will . . . refrain from hiring Perkins Coie LLP employees unless specifically authorized," *EO 14230 Fact Sheet*—no additional guidance needed. So, not even the government contends that any ripeness issue precludes review of Section 5(b).

As to Section 5(a), the government's ripeness arguments are unavailing. The Order makes clear that, whatever the exact guidance ultimately issued, the access of employees of Perkins Coie to federal buildings and government employees will be "limit[ed]" as a result. EO 14230 § 5(a), 90 Fed. Reg. at 11782; *see also EO 14230 Fact Sheet* ("The Federal Government will . . . restrict [plaintiff's] employees' access to government buildings."). As alleged in the Amended Complaint, on at least two occasions in the days between issuance of EO 14230 and the TRO, federal employees cancelled meetings with plaintiff's employees, citing the Order. Am. Compl. ¶¶ 67-68. Partially due to both the directive that access be limited and these cancellations, plaintiff lost multiple clients and representations. *Id.* ¶¶ 70-78. The government's protestations that plaintiff's challenges to Section 5 are too speculative are contradicted by these clear, tangible allegations of harm. Consequently, the government's ripeness argument to obtain dismissal of plaintiff's claims challenging Section 5 fail on this basis alone.

In addition, plaintiff persuasively argues that the mere threat of limited access, whatever the exact details of the final guidance may be, constitutes unconstitutional retaliation to suppress viewpoints with which the current presidential administration disagrees. *See* Pl.'s Opp'n at 20 ("Only indiscriminate retaliatory animus can explain" Section 5.). As previously explained, *see supra* Part III.A.3., threats of retaliation may be sufficient to constitute unconstitutional retaliation

49

under the First Amendment, *see infra* Part III.B.1., regardless of the ultimate outcome of the threatened actions. Thus, the Court need not wait for the issuance of final guidance to review plaintiff's claims. The substance of guidance adopted by each federal agency under the authority of Section 5 has no bearing on whether issuance of the *threat* of limited access to government buildings and officials was unlawful.

***

For the reasons outline above, each of the government's general arguments for dismissal, whether construed to fall under Federal Rules of Civil Procedure 8, 12(b)(1), or 12(b)(6), fail to withstand scrutiny. Moreover, as discussed next, each of Counts II through IX in plaintiff's Amended Complaint states a claim for relief, not only fully satisfying procedural rules requiring the denial of the government's motion to dismiss but also entitling plaintiff to summary judgment in its favor.

### B. Plaintiff is Entitled to Summary Judgment

The government denies that EO 14230 is designed to be "'punitive' or a 'sanction'" and defends the Order as falling "within the bounds of established executive authority," Gov't's Opp'n at 3, claiming that, here, "the Executive Branch [is] acting as contractor and employer, managing who it does business with and how, based on what it believes to be in the public interest," *id.* at 5-6. *See also* TRO Hr'g Tr. at 44:3-6 (government counsel stating, "I don't think I would use the word 'punitive.' I would say have an impact and have caused an injury, certainly, to Perkins Coie"); Mots. Hr'g Tr. at 29:10-11 (government counsel stating, about Section 2, "we view this as not designed to punish. We view this as designed to fulfill the concerns that were laid out in Section 1"). By defending the Order as merely an exercise of procurement power, as either a contractor or employer, however, the government strains in two different directions, arguing, on one hand, that plaintiff lacks standing by not alleging "that the government is currently contracting

50

for Plaintiff's services, or that Plaintiff ever intends to bid for any government contract," Gov't's Mem. at 21; *see supra* Part III.A.4, and nevertheless, on the other hand, that EO 14230 is merely "direct[ing] a review of Perkins to ensure that the Federal Government's dealings with it are consistent with the national security of the United States and other public interests," Gov't's Opp'n at 5.  The fact is that the government has no relationship with Perkins Coie as either an employer or contractor and the Firm's "dealings" with the government are because of clients represented effectively by Perkins Coie on matters that President Trump, his prior campaign or his current Administration, have taken a contrary position, stretching back nearly a decade.

Regardless of the government's strained legal position to avoid this obvious fact, the government tries to dampen what it calls "all the furor generated in the press and elsewhere," Gov't's Opp'n at 5, and the "level of hysteria," *id.* at 10, by denying that the Order "is the Executive Branch . . . acting in its capacity as a sovereign to punish citizens for exercising their First Amendment Rights," *id*. at 5.  To believe this explanation requires ignoring the past and current factual context for, and the actual text and impact of, EO 14230, which targets plaintiff for adverse agency action when plaintiff is neither employed by nor a contractor with the government, *see, e.g.*, Gov't's Mem. at 21 (arguing that no evidence in the record shows plaintiff is either employed by or contracts with the government), and, instead, is a law firm representing some clients disliked by the President, engaging in some litigation seeking results disliked by the President, and operating its business, in part, in a manner disliked by the President.

In any event, the government is no mere "contractor and employer" and may not act without regard to decades of binding precedent holding that the government's exercise of power must conform to the limits imposed by the Constitution.  *See, e.g., Dames & Moore*, 453 U.S. at 661 (recognizing that, even when the President acts "in the field of international relations," where he

has "plenary and exclusive power," the President's authority "must be exercised in subordination to the applicable provisions of the Constitution" (citation omitted)).  Constitutional limits apply, even when, as here, the government defends its action as appropriate because of the government's role as a contractor and employer.  *See, e.g., O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714-15 (1996) (holding that the government, while acting as a contractor, may not "retaliate[] against a contractor . . . for the exercise of rights of political association or the expression of political allegiance"); *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 686 (1996) (subject to certain limitations, recognizing "the right of independent government contractors not to be terminated for exercising their First Amendment rights"); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990) (holding that the government, while acting as an employer, may not "condition[] hiring decisions on political belief and association," except in narrow compelling circumstances); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (holding, in a case involving the government acting as an employer, the government may not "deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech").

Here, the Trump Administration's blunt exercise of power in EO 14230 to target Perkins Coie for adverse actions by every Federal agency violates the Constitution in multiple ways, as detailed below by examining each of plaintiff's claims.

      **1.**      **EO 14230 Retaliates Against Plaintiff for First Amendment Protected Activities, Including Political Viewpoint and Statements Favoring Diversity and Inclusion.**

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'"  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 605-06 (2021) (quoting U.S. CONST. amend. I).  As the Supreme Court has explained, the First Amendment

protects the right of "all persons . . . to think and speak as they wish, not as the government demands." *303 Creative*, 600 U.S. at 603.

"One obvious implication" of these First Amendment protections is that government officials may not "subject[] individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Hous. Cmty. Coll. Sys.*, 595 U.S. at 474 (quoting *Nieves*, 587 U.S. at 398); *see also, e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998) ("[T]he First Amendment bars retaliation for protected speech."). Such "'[o]fficial reprisal for protected speech . . . 'threatens to inhibit exercise of the protected right.'" *Hartman*, 547 U.S. at 256 (quoting *Crawford-El*, 523 U.S. at 588 n.10). This prohibition also extends to retaliation against individuals for the specific viewpoint expressed by their First Amendment protected activities, since the government may not "use the power of the State to punish or suppress disfavored expression," *Vullo*, 602 U.S. at 188 (quoting *Rosenberger*, 515 U.S. at 830), nor use threats of "'legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech," *id.* at 189 (quoting *Bantam Books*, 372 U.S. at 67). Retaliation and threats of retaliation to effectuate viewpoint discrimination "is uniquely harmful to a free and democratic society." *Id.* at 187. As the D.C. Circuit has observed, "[r]estrictions based on viewpoint are especially invidious," since "[i]t is antithetical to a free society for the government to give 'one side of a debatable public question an advantage in expressing its views to the people.'" *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785 (1978)); *see also Ateba v. Leavitt*, 133 F.4th 114, 124 (D.C. Cir. 2025) ("Viewpoint discrimination is an 'egregious form of content discrimination,' which occurs when a government regulation 'targets not subject matter, but particular views taken by speakers on a subject." (quoting *Rosenberger*, 515 U.S. at 829)). Ultimately, punishing or denying a benefit to an individual on

the basis of "constitutionally protected speech or associations" violates the Constitution. *Perry*, 408 U.S. at 597; *see also, e.g.*, *Hous. Cmty. Coll. Sys.*, 595 U.S. at 474; *Nieves*, 587 U.S. at 398; *Crawford-El*, 523 U.S. at 592.

In this case, plaintiff claims that EO 14230 targets the Firm for unconstitutional retaliation based on two different types of viewpoints expressed by plaintiff in the exercise of First Amendment protected activities. First, in Count V, plaintiff alleges that EO 14230 "single[s] out and punish[es] Perkins Coie for its association with, and advocacy on behalf of, the President's political opponents in the 2016 and 2020 elections," Am. Compl. ¶ 128, attributing those viewpoints to plaintiff and "retaliat[ing] against the firm on that basis," *id.* ¶ 129. Second, in Count VII, plaintiff claims that EO 14230 unconstitutionally retaliates against plaintiff for "[s]tatements in [f]avor of [d]iversity and [i]nclusion." *Id.* at 37 (header of Count VII); *see also id.* ¶¶ 144-56.

To prevail on these claims, plaintiff must show that (1) the Firm "engaged in conduct protected under the First Amendment"; (2) EO 14230 "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and (3) there is "a causal link" between the protected First Amendment activity and "the adverse action taken against" the Firm. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation omitted). Here, no genuine dispute of material fact exists as to any of these three elements, and thus plaintiff is entitled to summary judgment on Counts V and VII.

> ### *(a)    First Element: Plaintiff Engaged in First Amendment Protected Activity.*

EO 14230 openly acknowledges that plaintiff engaged in speech and other activities protected by the First Amendment. Section 1 of the Order, which sets out its "Purpose," cites three reasons for the enumerated action items in Sections 2 through 5 that federal agencies are ordered to take against plaintiff: (1) the Firm's representation of "Hillary Clinton" during the 2016

54

presidential election; (2) the Firm's involvement in litigation against "election laws, including those requiring voter identification"; and (3) the Firm's alleged discrimination in "hiring and promotion" and efforts to "purposefully hide the nature of" this alleged discrimination "through deceiving language." EO 14230 § 1, 90 Fed. Reg. at 11781. The associated fact sheet adds a fourth: "Perkins Coie LLP has filed lawsuits against the Trump Administration," which are also described as "partisan lawsuits against the United States." *EO 14230 Fact Sheet.* These four reasons are the sole rationales provided for the issuance of EO 14230, *see generally* EO 14230, 90 Fed. Reg. at 11781-83; *EO 14230 Fact Sheet*, and each, on their face, implicate First Amendment protected activities.

### i.    Plaintiff's Representation of Clients

The first, second, and fourth reasons reference the Firm's representation of clients, namely: President Trump's opponent in the 2016 presidential election, parties in election litigation, and parties challenging Trump Administration actions. Well-settled law establishes that "advocacy by . . . attorney[s] to the courts" falls within the category of "private . . . speech" protected by the First Amendment, *Legal Servs. Corp.*, 531 U.S. at 542-43; *see also NAACP v. Button*, 371 U.S. 415, 429 (1963) ("[T]he First Amendment . . . protects vigorous advocacy, certainly of lawful ends, against governmental intrusion," including litigation, which "is thus a form of political expression."), meaning that plaintiff's representation of a political opponent of the current President and involvement in election litigation and lawsuits against the Trump Administration explicitly qualifies as core First Amendment speech.[27]

---

[27]    Plaintiff's involvement in litigation is also protected under the First Amendment right to petition the government and thus retaliation on this basis also runs afoul of First Amendment protections, as discussed *infra* Part III.B.5.

55

Moreover, as part of plaintiff's involvement in election litigation, EO 14230 further states that plaintiff "worked with" what is described as "activist donors," specifically naming "George Soros," in bringing these cases.  EO 14230 § 1, 90 Fed. Reg. at 11781.  This relationship explicitly invokes core First Amendment associational rights.  *See, e.g.*, *Button*, 371 U.S. at 430 (affirming "the right 'to engage in association for the advancement of beliefs and ideas'" (quoting *Patterson*, 357 at 460)).  So, too, does plaintiff's representation of and association with President Trump's former presidential opponent.  *See generally, e.g.*, *Rutan*, 497 U.S. at 64-65, 68-71 (explaining a long line of Supreme Court cases protecting political association); *id.* at 69 ("Political belief and association constitute the core of those activities protected by the First Amendment." (alteration accepted) (quoting *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (plurality opinion))).

Both EO 14230 and the accompanying fact sheet additionally make clear that President Trump and his administration disfavor the specific messages conveyed by plaintiff through involvement in these activities.  For instance, the Order expresses disapproval of the election-related lawsuits litigated by plaintiff challenging actions supported by President Trump or his campaign, EO 14230 § 1, 90 Fed. Reg. at 11781 (describing the challenged laws as "necessary"), and with other lawsuits filed by plaintiff on behalf of its clients "*against* the Trump Administration" and "*against* the United States," *EO 14230 Fact Sheet* (emphasis supplied).  The Order also takes issue with plaintiff's representation in the 2016 presidential election of President Trump's political opponent and, as part of that representation, some of plaintiff's former employees associated with an opposition research firm, Fusion GPS.  *See* EO 14230 § 1, 90 Fed. Reg. at 11781; *see also* Pl.'s SMF ¶ 125 (quoting President Trump, immediately before signing EO 14230, criticizing plaintiff's work "against a political opponent" (him) and stating that "it should never be allowed to happen again").  Finally, the fact sheet disparages plaintiff as "partisan"

three separate times, *EO 14230 Fact Sheet* (referring to "partisan lawsuits," unsubstantiated concerns about "partisan misuse" of information, and associating with "partisan actors who exploit their influence"), making explicit that those in power disagree with the political and litigation positions taken by clients of plaintiff.

### ii.     Plaintiff's Statements about Diversity

As to the third reason—that plaintiff supposedly engages in unlawful discrimination—the record also demonstrates that this claim refers to plaintiff's First Amendment protected speech in favor of diversity.

The government predicates the claim of discrimination on two items. First, the government cites a 2023 lawsuit challenging plaintiff's summer fellowship program for first-year law students. Gov't Mem. at 8 (citing *Am. All. for Equal Rights v. Perkins Coie LLP*, No. 3:23-cv-1877 (N.D. Tex.)). Plaintiff has explained that, after explicitly affirming the inclusive nature of the fellowship and confirming with the plaintiff in that lawsuit that the law student fellowships were open to all, the lawsuit was voluntarily dismissed, in October 2023. Pl.'s SMF ¶¶ 22-23. Indeed, the government concedes that plaintiff's description of its fellowship program does "not contain discriminatory requirements." Gov't Mem. at 8 (citing Lawson Decl., Ex. 12, Stip. of Dismissal ¶¶ 3-4, *Am. All. for Equal Rights*, ECF No. 31 (filed Oct. 11, 2023), ECF No. 142-2 at 230); *see also* Gov't's Resp. to Pl.'s SMF at 2 (noting, in response to ¶¶ 22-23, that the government does not dispute that plaintiff's current fellowship program is open to all first-year law students). Regardless of the merits of any claims asserted in the 2023 lawsuit or any alleged or even actual illegality in the former version of the fellowship program, this referenced lawsuit provides no support for the claim that plaintiff currently discriminates against any staff or applicants.

The government's second proffered reason for the claim that plaintiff "racially discriminates," EO 14230 § 1, 90 Fed. Reg. at 11781, is plaintiff's 2019 announcement that the firm had adopted the Mansfield Rule, Gov't's Mem. at 10. This evidence is similarly unavailing to show the government had a non-speech basis for acting against plaintiff, for at least two reasons. First, the government specifically cites only plaintiff's "public[] announce[ment]" about adopting the Mansfield Rule—not any evidence that plaintiff implemented the rule in any illegal, let alone even suspect, manner. *Id.*; *see also* Gov't's Opp'n at 17-19. To the extent the government relies only on plaintiff's press release, the government thus explicitly acknowledges reacting only to plaintiff's speech. *See also* EEOC Letter at 1 (stating the letter was prompted only by "public statements and court filings" made by plaintiff).

More generally, the Mansfield Rule expressly *does not* establish any hiring quotas or other illegally discriminatory practices, requiring only that participating law firms *consider* attorneys from diverse backgrounds for certain positions. *See* Pl.'s 2019 Mansfield Press Release. At the motions hearing, government counsel acknowledged that "[t]he way Mansfield works as far as doing the interviews maybe isn't so problematic." Mots. Hr'g Tr. at 68:17-18. While a scenario might exist where a law firm impermissibly strays from those commitments, the government has provided no evidence of any such deviation here, or any other evidence that plaintiff has engaged in any activity violative of any anti-discrimination law.[28]

---

[28]    Though conceding the use of the Mansfield Rule for interviews "isn't so problematic," Mots. Hr'g Tr. at 68:17-18, government counsel suggested the problem lies in the way the program "measur[es] their success," by "showing percentage increases" of qualified underrepresented talent in certain positions, which the government assumes means the imposition of "targets" and "evaluating people on race, sex, and ethnic-based issues unrelated to them as individuals," *id.* at 68:19-23. This assumption about the metrics reported, however, presupposes that the qualified underrepresented talent considered are given a positive preference when other explanations are just as plausible for percentage increases of such talent. The principle underlying such programs is that negative biases against qualified underrepresented lawyers, due to their race, sex, gender identity, disability or ethnicity, reduce their likelihood of being selected as frequently to interview for positions for which they are qualified, but when firms consider more underrepresented talent on their own individual merit and not *disadvantaged* for the traits "unrelated to them as individuals," *id.* at 68:23, firms tend to hire more of these individuals on their own merit. In other words,

Instead, the government's briefing reveals the true motivation lurking behind the façade of discrimination allegations: the administration's disapproval of plaintiff's speech in favor of diversity. This revelation makes clear the pretextual nature of EO 14230's cited reason regarding plaintiff's purported discrimination. For instance, the government points to the Firm's statements about efforts to "contribut[e] to the advancement of our historically underrepresented attorneys" and success in hiring "new partners who are women or attorneys of color." Gov't Mem. at 10 (quoting Lawson Decl., Ex. 2, *Perkins Coie LLP: 2023 Vault Law Firm Diversity Survey* at 7, ECF No. 143-2 at 10). Once again, however, the government provides no evidence to suggest that any of these statements show any suspect or illegal actions by plaintiff.

Even more probative of the fact that plaintiff's speech is at issue is that the government argues that statements in the Amended Complaint "repeatedly assert[ing] [plaintiff's] commitment to diversity" and showing "no apparent intention of backing away" somehow support the government actions targeting the Firm in the Order. *Id.* at 10-11 (citing Am. Compl. ¶¶ 45, 46, 146). This claim could only be true, however, if the actions taken in the Order were premised on plaintiff's statements about diversity, since public statements supporting diversity, standing alone, as they do here, provide not even a scintilla of evidence of impropriety, let alone illegality. A fair reading of the record, and taking the government at its word, requires finding that the justification for EO 14230 stemming from plaintiff's purported "racial discrimination" was motivated only by plaintiff's First Amendment protected speech in support of diversity.

---

the metrics might mean exactly the opposite of what the government assumes to be true, and exactly what the government says it wants.

In any event, both parties agree that this Court need not rule on the constitutionality of the Mansfield Rule to decide this case. Mots. Hr'g Tr. at 69:22-72:3 (government counsel acknowledging this point); *id.* at 103:25-104:15 (plaintiff's counsel acknowledging the same). The government's mere assertions—just like the government's possibly erroneous assumptions about the Mansfield Rule—provide no evidence of any illegal or discriminatory practice by plaintiff.

>    ***(b)    Second Element: EO 14230 Takes Retaliatory Actions Sufficient to Chill Speech.***

The second requirement for a retaliation claim, that plaintiff show the actions taken against the Firm were "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," *Aref*, 833 F.3d at 258, is satisfied by plaintiff's showing of irreparable harm, and further bolstered by the reactions of plaintiff's peer law firms. *See infra* Part III.C.1 (describing the significant loss of clients and revenue suffered by the Firm in the short time between the issuance of EO 14230 and the TRO in this case, as well as the potential for additional severe losses were the temporary injunction order lifted); *see also* TRO Hr'g Tr. at 44:3-6 (government counsel conceding that sections of EO 14230 "have an impact and have caused an injury, certainly, to Perkins Coie").

Providing further support for this element are the reactions of other law firms to EO 14230 and similar Executive Orders. Eight days after issuing EO 14230 against plaintiff, on March 14, 2025, President Trump issued a similar Executive Order against the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP. Manning Decl., Ex. 49, Exec. Order 14237 ("Paul, Weiss EO"), 90 Fed. Reg. 13039 (Mar. 20, 2025), ECF No. 39-4 at 588. The Paul, Weiss EO contained six sections, directing that the same actions be taken against Paul, Weiss as EO 14230 directs against plaintiff, *compare* Paul, Weiss EO, 90 Fed. Reg 13039-40, *with* EO 14230, 90 Fed. Reg. at 11781-82, with one exception that Section 4 of the Paul, Weiss EO stated only that "[n]othing in this order shall be construed to limit the action authorized by section 4 of [EO] 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)," Paul, Weiss EO § 4, 90 Fed. Reg. at 13040. Yet, the Paul, Weiss EO was revoked only seven days after its issuance when President Trump reached a "deal" with Paul, Weiss, under which agreement that law firm agreed to:

> [A]dopt[] a policy of political neutrality with respect to client selection and
> attorney hiring; tak[e] on a wide range of pro bono matters representing the
> full political spectrum; commit[] to merit-based hiring, promotion, and
> retention . . .; dedicat[e] the equivalent of $40 million in pro bono legal
> services during [President Trump's] term in office . . .; and other similar
> initiatives.

Manning Decl., Ex. 50, Exec. Order 14244 ("Paul, Weiss Revocation Order") § 1, 90 Fed. Reg. 13685, 13685 (Mar. 26, 2025), ECF No. 39-4 at 593. The fact that Paul, Weiss quickly negotiated a deal, including an agreement to provide "the equivalent of $40 million" in free legal work, rather than face the potential injuries of the similar Executive Order targeting that firm, *see* Paul, Weiss Revocation Order, 90 Fed. Reg. at 13685, demonstrates the coercive power of such targeting by the Trump Administration.

This conclusion is further confirmed by the reaction of additional peer law firms that chose to negotiate deals with the Trump White House to avoid being targeted by similar Executive Orders. *See* Manning Decl., Ex. 64, ECF 39-4 at 733 (President Trump announcing a deal with the law firm Skadden, Arps, Slate, Meagher & Flom LLP on March 28, 2025, after that law firm "engaged proactively with the President and his team" to negotiate a deal though no Executive Order had been issued against that law firm); *id.*, Ex. 59, ECF No. 39-4 at 721-22 (President Trump announcing a similar deal with the law firm Willkie Farr & Gallagher LLP on April 1, 2025, before an Executive Order had been issued against that firm).

President Trump referred to these deals being cut with law firms, in a speech on April 8, 2025, stating: "Have you noticed that lots of law firms have been signing up with Trump? $100 million, another $100 million, for damages that they've done. But they give you $100 million and then they announce, 'We have done nothing wrong.' And I agree, they've done nothing wrong. But what the hell, they've given me a lot of money considering they've done nothing wrong. And we'll use some of those people, some of those great firms, and they are great firms too—they just

had a bad moment." Pl.'s Reply, Ex. 1, Reply Decl. of Christopher N. Manning, Partner, Williams & Connolly ("2ⁿᵈ Manning Decl."), Ex. 1 at 25:57-26:30, ECF No. 148-1 at 4.

The Trump White House is keeping track of the growing value in free legal work being promised by the law firms making the deals, as indicated by what occurred immediately after President Trump signed a similar Executive Order as EO 14230 targeting the law firm Susman Godfrey LLP, on April 9, 2025. Pl.'s Opp'n, Ex. 1, Decl. of Ryan Scarborough, Partner, Williams & Connolly ("Scarborough Decl."), Ex. 2, Exec. Order 14263 ("Susman EO"), 90 Fed. Reg. 15615 (Apr. 15, 2025), ECF No. 142-1 at 5. President Trump used the occasion to recount that the administration had "signed with many law firms, the ones that we thought were inappropriate," and stated that "they went for some pretty big numbers." Scarborough Decl., Ex. 1 ("Susman EO Remarks") at 16:02-16:25, ECF No. 142-1 at 3. President Trump then asked Deputy White House Chief of Staff Steven Miller, "what's the total right now Steve?" and Miller responded, "getting to close to, probably, six, 700 million now I would think. Multiple at 100 million, some at 125 million. So, the numbers are adding up. We're going to be close to a billion soon." *Id.* at 16:25-16:40. As to the Susman EO he had just signed, President Trump then said, "this one, we're just starting the process with this one." *Id.* at 16:55-17:00.[29] Whether President Trump's focus on "the process" refers to enforcement of the Susman EO or that this Order was the opening gambit— akin to the Paul, Weiss EO followed by the Paul, Weiss Revocation Order—for deal negotiations, is unclear.

---

[29]     For context, the Deputy White House Chief of Staff's reference to getting "close to a billion soon" may include the five law firm deals announced by the White House just two days later, where each firm promised either $100 million or $125 million in free legal work. *See, e.g.*, Eric Tucker, *Trump Reaches Deals with 5 Law Firms, Allowing Them to Avoid Prospect of Punishing Executive Orders*, Associated Press (Apr. 11, 2025), https://apnews.com/article/trump-law-firms-executive-order-fe8f38a61cf77c5bb6add1315f5f96f1.

What is clear is that the Trump White House has publicly touted the negotiated deals reached with various law firms, and equally clear is that those deal-making firms have been spared, or had revoked, an Executive Order targeting them.  That is the one clear benefit of the deal to the law firms, since other than the monetary value of the promised free legal work, the precise terms of each deal are somewhat fuzzy.  The government, when asked, was unable to fill in basic details, for example, about whether the deal terms were written down or otherwise memorialized, the duration of the deals, or how recipients of the promised free legal work would be identified.  Mots. Hr'g Tr. at 8:23-9:13 (government counsel saying "I can't say anything more than . . . what I have read in the papers" about the law firm deals); *id.* at 9:19-10:3 (government counsel stating "I don't have the answers" about duration of these deals); *id.* at 10:24-11:7, 11:18-22 (government counsel saying "I don't have any insight on what, if any, mechanics are in play" to determine recipients of free legal work under the deals and repeating "I just don't have that insight").

Nevertheless, each additional deal provides further evidence to satisfy the second element of plaintiff's retaliation claim, given that each of these firms, presumably possessing "ordinary firmness," sought successfully to avoid being targeted by similar Executive branch actions, with each law firm committing the equivalent of $100 million or more as part of the price to do so.  *See also* Mots. Hr'g Tr. at 86:14-18 (plaintiff's counsel noting that these firms have "some of the most talented lawyers in the world with the most resources, and they chose silence"); Br. of *Amici Curiae* 504 Law Firms in Supp. of Pl.'s MSJ ¶¶ 1-2, ECF No. 78 (noting that EO 14230 and others like it "seek to cow every other firm . . . into submission" and explaining the "looming threat" that "any . . . representation challenging actions of the current administration (or even causes it disfavors) now brings with it the risk of devastating retaliation"); Br. of Amici Curiae Litigation

Firms in Supp. of Pl.'s MSJ at 1, ECF No. 94 ("Lawyers cannot fearlessly represent causes or clients . . . if they fear government reprisal.").

### (c)    Third Element: The Retaliation is Causally Linked to Plaintiff's First Amendment Protected Activity.

Finally, the record is clear that EO 14230 is motivated by retaliation for plaintiff's First Amendment protected activity.  Resisting this conclusion, the government protests that EO 14230 does not retaliate against plaintiff for First Amendment activity but instead takes action "based on what it believes to be in the public interest."  Gov't's Opp'n at 6.  Here, however, these arguments are merely two sides of the same coin.  The four reasons provided by the Order to justify targeting plaintiff all refer to President Trump's objections to plaintiff's protected speech and associations.  Neither the Order nor the accompanying fact sheet provide *any* basis to find that plaintiff threatens the public interest or national interest other than the stated disagreements with plaintiff's First Amendment protected activity.  *See generally* EO 14230, 90 Fed. Reg. at 11781 (providing only the reasons already discussed to justify the Order); *EO 14230 Fact Sheet* (same).  That plaintiff's protected activities are the only reasons provided by the Order itself to justify the actions directed is strong evidence that the Order retaliates against plaintiff for engaging in those protected activities.  Analysis of each section of the Order, as well as the context surrounding its issuance, only adds reasons to confirm this conclusion and further shows that the legal infirmity of retaliation permeates every section and sentence of EO 14230.

### i.    EO 14230's Section 2

The record demonstrates that retaliation is the only plausible motive for the "*Security Clearance Review*" ordered in Section 2 in two additional ways.  First, to the extent the government argues the security clearance directives were motivated by alleged national security concerns stemming from contacts with Fusion GPS in 2016, *see* Gov't's Opp'n at 9, plaintiff has no current

64

employee who was involved in that engagement, and none of the attorneys involved have been employed by plaintiff for at least three years, Pl.'s SMF ¶ 75; Gov't's Resp. to Pl.'s SMF at 3 (not disputing ¶ 75).  The government cannot credibly claim that targeting plaintiff's current employees would remedy any national security concerns related to Fusion GPS when none of those employees were involved with Fusion GPS.

This is particularly true in light of the undisputed record in this case, which establishes, in plaintiff's expert report from J. William Leonard, who worked in personnel security at the Department of Defense from 1973 to 2002, including serving as the Deputy Assistant Secretary of Defense responsible for security and information operations, and Principal Director in that same office, that "a hallmark of the [security clearance review] process . . . is that it is an *individualized one*."  Pl.'s MSJ, Ex. 8, Expert Report of J. William Leonard, former Deputy Assistant Secretary of Defense and Dep't of Defense personnel security officer ("Leonard Rep.") ¶¶ 2-3, 30, ECF No. 39-8 (emphasis supplied).  Mr. Leonard attests that "the granting, suspending, and revoking of security clearances is a *highly individualized process* that involves a close and detailed factual analysis of the individual in question," *id.* ¶ 35 (emphasis supplied), where "Person A is never held accountable for the conduct of Person B, let alone are Persons 1 through 2,500 held accountable for the conduct of formerly-associated Person 2,501," *id.* ¶ 44.  Yet, accepting the government's proffered reason—plaintiff's previous dealings with Fusion GPS—as true, holding all of plaintiff's current employees responsible for actions taken by individuals who have not been associated with the Firm for at least three years does exactly that.  *See* Pl.'s SMF ¶¶ 71, 75 (Elias left the Firm in 2021); *id.* ¶ 76 (same with Sussmann); *see also id.* ¶ 95 (stating that no Perkins Coie employee who held a security clearance at the time EO 14230 was issued "had any involvement in the Fusion GPS matter" (citing 2nd Burman Decl. ¶ 41)).

The conclusion that Section 2 engages in this type of punishment-by-association is further strengthened by President Trump's admission, in a post on Truth Social on April 23, 2025, the day the parties appeared for a motions hearing in this case, that EO 14230's actions against plaintiff were motivated by "the conduct of a specific member of this firm."  @RealDonaldTrump, Truth Social (Apr. 23, 2025, 9:35 AM), https://truthsocial.com/@realDonaldTrump/posts/114387538306195784 [hereinafter Trump April 23, 2025, Post].  Since this statement confirms that the Order targeted the entire Firm because the President disliked the purported actions of one person, and thus strongly suggests that no firm-wide national security concern exists, it points strongly to retaliation as the motivation for EO 14230, rather than any legitimate concerns about the Firm or its employees writ large.

Second, and tellingly, the Paul, Weiss EO contained a virtually identical security clearance review provision to the one at issue in this case.  *Compare* EO 14230 § 2, 90 Fed. Reg. at 11781, *with* Paul, Weiss EO § 2, 90 Fed. Reg. at 13039.  As discussed, *see supra* Part III.B.1(b), the Paul, Weiss EO was revoked only seven days after its issuance when President Trump reached a "deal" with that firm.  *See generally* Paul, Weiss Revocation Order, 90 Fed. Reg. 13685.  While the Paul, Weiss Revocation Order summarized that firm's agreement to, *inter alia*, "adopt[] a policy of political neutrality with respect to client selection and attorney hiring; tak[e] on a wide range of pro bono matters representing the full political spectrum; commit[] to merit-based hiring, promotion, and retention . . .; dedicat[e] the equivalent of $40 million in pro bono legal services during [President Trump's] term in office . . .; and other similar initiatives," none of these agreed-upon policy or practice changes appear to explain or address how any national security concerns sufficient to warrant the Paul, Weiss EO could have changed so rapidly.  *Id.* § 1, 90 Fed. Reg. at 13685.  The speed of the reversal and the rationale provided in the Paul, Weiss Revocation Order,

which focused only on agreements to advance policy initiatives of the Trump Administration, *see id.*, further support the conclusion that national security considerations are not a plausible explanation for Section 2.

### ii.    EO 14230's Section 3

As to Section 3 of the Order, the fact sheet says it all: plaintiff and its clients with government contracts are targeted because of plaintiff's "partisan lawsuits." *EO14230 Fact Sheet.* The retaliation for core First Amendment speech, *see Legal Servs. Corp.*, 531 U.S. at 542-43, and the viewpoint expressed by that advocacy, could not be stated more explicitly.

The government tries to defend Section 3 by insisting that plaintiff is acting as a "contractor [in] pressing these claims" challenging this part of the Order, and invoking *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 671 (1996).  Gov't Mem. at 22-23. This defense of Section 3 is doomed for two obvious reasons.  First, plaintiff is not a government contractor, as the government concedes.  *See* Gov't Mem. at 21 ("Plaintiff never alleges that the government is currently contracting for Plaintiff's services, or that Plaintiff ever intends to bid for any government contract.").

Second, given that plaintiff is not a government contractor, and that plaintiff advances the First Amendment retaliation claims only as to itself and not on behalf of any of plaintiff's clients, *see* Am. Compl. ¶¶ 126-35 (claiming, in Count V, retaliation only against Perkins Coie); *id.* ¶¶ 144-56 (same in Count VII), the Supreme Court case relied upon by the government is simply inapplicable here.  *Umbehr* involved a claim of unlawful retaliation brought by a contractor who alleged his contract to provide solid waste disposal services to a county had been cancelled due to his criticisms of the county and its Board of County Commissioners.  518 U.S. at 671-72.  The Supreme Court held that "independent contractors are protected" against retaliation for First

Amendment protected activities, *id.* at 673, but that the scope of this protection for government contractors is determined by balancing "the [government]'s legitimate interests as contractor, deferentially viewed," against "the free speech interests at stake," *id.* at 685; *see also id.* (describing the steps required for a contractor to prevail on a First Amendment retaliation claim under the balancing test). The government points to this balancing test and argues this test favors the government and justifies the actions directed in Section 3. Gov't Mem. at 23. Yet, because plaintiff is not a government contractor and is instead is "a *non*-government-contractor law firm," Pl.'s Opp'n at 16 (emphasis in original), the balancing step is never reached here.[30] Instead of a balancing test, the general rule governs, *see supra* Part III.B.1, namely, that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256 (citing *Crawford-El*, 523 U.S. at 592).

### iii.    EO 14230's Section 4

Section 4, by implication, directs the EEOC to investigate plaintiff, as the government has conceded. *See* Gov't Mem. at 2 (recognizing that Section 4 directs "review [of] whether Perkins Coie and like employers are violating the civil rights laws"). Under Title VII of the Civil Rights Act of 1964, however, the EEOC's "investigative authority is tied to charges filed with the Commission," *Shell Oil*, 466 U.S. at 64, meaning that, with few exceptions not relevant here, "the EEOC is entitled to access only to evidence 'relevant to the charge under investigation,'" *id.* (quoting 42 U.S.C. § 2000e-8(a)). *See also McLane Co., Inc. v. EEOC*, 581 U.S. 72, 75 (2017) ("The EEOC's responsibilities 'are triggered by the filing of a specific sworn charge of

---

[30]    It is also worth noting that the government could not succeed even under the *Umbehr* balancing test, because it has failed to show any legitimate, non-retaliatory reason for taking the actions directed in EO 14230's Section 3 (or the Order more broadly). In asserting that plaintiff engages in "racial discrimination" and that this allegation justifies the actions in Section 3, Gov't Mem. at 23, the government offers no evidence to support this claim, while plaintiff has a legitimate interest in using its First Amendment rights to discuss the importance of diversity in the legal field. When it comes to balancing, "something . . . outweighs nothing every time." *Kowal v. U.S. Dep't of Justice*, 107 F.4th 1018, 1031 (D.C. Cir. 2024).

discrimination.'" (quoting *Univ. of Pa. v. EEOC*, 493 U.S. 182, 190 (1990))); *EEOC v. Eberspaecher N. Am. Inc.*, 67 F.4th 1124, 1131 (11th Cir. 2023) ("The EEOC's enforcement procedure begins with the filing of an administrative 'charge' alleging discrimination." (citing 42 U.S.C. § 2000e-5(b))); *id.* ("'In connection with any investigation of a charge,' the EEOC 'shall at all reasonable times have access to . . . any evidence' that 'relates to unlawful employment practices . . . *relevant to the charge under investigation.*'" (emphasis and alterations in original) (quoting 42 U.S.C. § 2000e-8(a))); *EEOC v. Centura Health*, 933 F.3d 1203, 1205 (10th Cir. 2019) ("When investigating charges of discrimination, the EEOC may obtain evidence that 'relates to unlawful employment practices . . . and is relevant to the charge under investigation." (quoting 42 U.S.C. § 2000e-8(a))).[31]  Individual EEOC Commissioners are empowered to file a charge to begin an investigation, 42 U.S.C. § 2000e-6(e), but this step must be taken "in writing under oath or affirmation" and may "not be made public by the Commission," *id.* § 2000e-5(b).

EO 14230 ignores these and other statutory predicates to initiate an EEOC investigation, *see supra* Part III.A.5, and to date, so has the EEOC, *see* Mots. Hr'g Tr. at 74:5-8 (government counsel acknowledging that no charge has been filed); Pl.'s Mem. at 18 ("[N]o charge has been filed.").  Instead, on March 17, 2025, eleven days after EO 14230 was issued and six days after this lawsuit was filed, making clear that plaintiff did not intend to make a "deal" with President Trump, the Acting Chair of the EEOC sent an 11-page letter to plaintiff requesting information on plaintiff's hiring and employment practices, *see generally* EEOC Letter, and posted publicly a

---

[31]    The EEOC may conduct a "directed investigation"—an investigation without a charge—for "possible age-based discrimination under the Age Discrimination in Employment Act (ADEA) and sex-based pay discrimination under the Equal Pay Act (EPA)."  *Directed Investigations*, U.S. EEOC, https://www.eeoc.gov/directed-investigations#_ednref3 (last visited Apr. 29, 2025) (citing 29 U.S.C. §§ 211(a), 626).  Neither is relevant to this case.

press release that same day about the letter and others sent to 19 additional law firms, Manning
Decl., Ex 35, ECF No. 39-4 at 357.

A legitimate investigation by the EEOC would follow the congressionally mandated
process, with appropriate initiation procedures and compliance with statutorily mandated
protections afforded to plaintiff. *See* Mots. Hr'g Tr. at 99:19-100:4 (plaintiff's counsel noting that,
under a formal EEOC investigation, plaintiff would have a number of rights, including
"confidentiality" and "due process," the latter of which would include "[n]otice, the right to be
heard, evidentiary submissions, the right to have lawyers in the process, [and] the right to know
what the charge is that you are going up against," and further noting that "all of those things are
absent here"); *see also Eberspaecher N. Am.*, 67 F.4th at 1131-32 (reviewing the EEOC's
enforcement procedures, including relevant protections for the charged party). These hallmarks
of a legitimate investigation are missing here, and the government makes no excuse for the EEOC
simply ignoring these statutory requirements. By not following its own procedures, the EEOC has
undermined the legitimacy of its own investigation, revealing this investigation of plaintiff to be a
product of the retaliation ordered by EO 14230 rather than any legitimate investigative activity.

### iv.    EO 14230's Section 5

The retaliatory nature of Section 5 is clear from its stunning overbreadth. Under this
section, all agencies of the federal government are directed to limit the access of all of plaintiff's
employees—from attorneys to secretaries to mailroom attendants, no matter who they are
(including some current reservists in the United States military, Pl.'s SMF ¶ 11)—to federal
buildings and officials. EO 14230 § 5(a), 90 Fed. Reg. at 11782 (directing "[t]he heads of all
agencies" to "provide guidance limiting official access from Federal Government buildings to
employees of Perkins Coie when such access would threaten the national security of or otherwise

be inconsistent with the interests of the United States," as well as guidance "limiting Government employees acting in their official capacity from engaging with Perkins Coie employees"); *EO 14230 Fact Sheet*.

The government's protestations that "[w]e have no idea" what the eventual guidance will look like, Mots. Hr'g Tr. at 83:13-14, strain credulity, given the text of EO 14230, which directs agencies to "limit[]" access to buildings and government officials, EO 14230 § 5(a), 90 Fed. Reg. at 11782, and the fact sheet, which says the government will "restrict" such access, *EO 14230 Fact Sheet*. These intentions were also laid bare in statements made by the White House Staff Secretary at a televised signing ceremony for a similar Executive Order targeting the law firm Susman Godfrey LLP. *See* Susman EO. The Susman EO contains a Section 5(a) virtually identical to Section 5(a) in EO 14230. *Compare* Susman EO § 5, 90 Fed. Reg. at 15616, *with* EO 14230 § 5(a), 90 Fed. Reg. at 11782. In explaining the Susman EO to President Trump, the staff secretary stated that the Susman EO would "make sure they can't access government resources, government buildings." Scarborough Decl., Ex. 1 ("Susman EO Remarks") at 15:45-15:59, ECF No. 142-1 at 3.

The government also downplays the impact of Section 5(a) by pointing to the text that limitations on plaintiff's employees' access to government buildings will apply "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." EO 14230 § 5(a), 90 Fed. Reg. at 11782; *see* TRO Hr'g at 56:14-21, 24-25; 57:15-18. These limitations do not save this section because the outcome of any assessment of national security risks and United States' "interests" are pre-determined by the findings in Section 1 and instructions in other parts of the Order. Indeed, the fact sheet confirms this point: "The Federal Government will . . . restrict [plaintiff's] employees' access to government buildings." *EO 14230*

71

*Fact Sheet*.  Sections 1 and 3 also make clear the President's determination that interactions with plaintiff do not comport with his view of the national interest.  *See, e.g.*, EO 14230 § 1, 90 Fed. Reg. at 11781 (making purported findings about the "dishonest and dangerous" and "egregious activity" of plaintiff and thus finding "good cause to conclude that they neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds"); *id.* § 3(b)(i), 90 Fed. Reg. at 11782 (determining that "any contract . . . for which Perkins Coie has been hired to perform any service" should be terminated); TRO Hr'g Tr. at 18:15-20 (plaintiff's counsel explaining that "agencies are already told what the outcome of their analysis is, because they have been told in Section 1 that working with [plaintiff] is not consistent with the national interest and not consistent with the administration and policies of the administration.").

Section 5(b) requires agencies to "refrain from hiring Perkins Coie LLP employees unless specifically authorized," *EO 14230 Fact Sheet*, which requires receipt of "a waiver" from the head of two separate federal agencies, EO 14230 § 5(b), 90 Fed. Reg. at 11782.  This provision is vague about whether this subsection applies only to employees leaving Perkins Coie directly for government service or more broadly to any former employee of the Firm for any duration. By imposing the burden of an explicit order to "refrain" from hiring any Perkins Coie employee for an Executive branch position, compounded by the extra burden of obtaining an affirmative waiver from two agency heads to effectuate such a hire, this subsection operates as a virtual government hiring ban on current and possibly any former Perkins Coie employees. The government offers absolutely no justification, let alone any legitimate government interest for this government action imposing such a sweeping hiring ban.  *See generally* Gov't's Opp'n.

Again, particularly given that President Trump has confirmed the Order was motivated by "the conduct of a specific member of this firm," Trump April 23, 2025, Post, the targeting of all

the Firm's employees for such access and hiring restrictions simply cannot be explained by any legitimate governmental purpose, leaving only retaliation as the obvious reason for the First Amendment protected speech and other activities with which EO 14230 takes issue.

### v. President Trump's Prior Statements about Perkins Coie

In addition to the text of EO 14230, President Trump's repeated prior statements about plaintiff and lawyers formerly associated with the Firm provide probative context that informs assessment of the retaliatory purpose of the Order as a whole. Since 2017, President Trump has repeatedly attacked plaintiff and its former employees for representing clients involved in the 2016 and 2020 presidential elections, as well as the 2018 midterm election, *see supra* n.8 and associated text, accusing the Firm of involvement in "[c]ollusion" during the 2016 campaign, *August 6, 2018, Trump Tweets*; criticizing the Firm's "dishonesty," *November 9, 2018, Trump Remarks* at 5; accusing Marc Elias of "stealing" elections and engaging in election fraud, *November 9, 2018, Trump Tweet*; and sharing online articles claiming that plaintiff and Michael Sussmann tried to "[c]orrupt a Presidential Election," *December 11, 2022, Trump Post*, as just some examples. President Trump's nearly decade-long preoccupation with plaintiff's election litigation and representation of Democratic political candidates, as well as his grievances about the Firm's work in those client matters, are reflected in the purpose of the Order, which justifies the actions taken against plaintiff, in part, on the Firm's representation of his political opponent during the 2016 presidential election and election law litigation, EO 14230 § 1, 90 Fed. Reg. at 11781, as well as the fact sheet, which takes issue with plaintiff's "partisan lawsuits," *EO 14230 Fact Sheet*.

That EO 14230 was issued as retribution for plaintiff's work and President Trump's grievances is further confirmed by President Trump's statements during the 2024 presidential campaign, when he continued to attack plaintiff and its former lawyers, Marc Elias and Michael

73

Sussmann, and explicitly promised to take some form of action if he were elected. In September 2023, for instance, President Trump inveighed against those who "spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, [sic], the Fake Dossier Hoax, FISA Fraud, Election Fraud, the 'No Collusion' Mueller Hoax, and so much more," and proclaimed that, "[i]f I am elected, they will be brought to JUSTICE." *September 6, 2023, Trump Post*. In March 2024, he shared an article on Truth Social titled, "Marc Elias is Scared…And He Should Be." *March 31, 2024, Trump Post*. In the last two months of the campaign, Trump posted a message three separate times on Truth Social warning about "the rampant Cheating and Skullduggery that has taken place by the Democrats in the 2020 Presidential Election," warning that "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law," including "Lawyers, Political Operatives, Donors, Illegal Voters, and Corrupt Election Officials." *Trump Cease & Desist Post*. These retaliation threats have now come to fruition against plaintiff, through the issuance of EO 14230, which outlines in the "*Purpose*" section some of these same longstanding grievances. *See* EO 14230 § 1, 90 Fed. Reg. at 11781; *EO 14230 Fact Sheet*. President Trump's multi-year history of lodging public attacks critical of plaintiff, his promises during the 2024 campaign to act on his displeasure toward plaintiff if he won, and the subsequent issuance of EO 14230—which repeats many of the same attacks on plaintiff—further demonstrates that EO 14230 was issued to seek retribution against plaintiff for the Firm's representation of clients in political campaigns or litigation, about which President Trump expressed disapproval, dating back to 2017. This purpose amounts to no more than unconstitutional retaliation for plaintiff's First Amendment protected activity.

### vi. President Trump's Statements about Other Law Firms

As part of the evidence submitted in support of the retaliation claim, plaintiff has included evidence of actions taken by President Trump against other prominent law firms, positing that they, along with EO 14230, are part of a "campaign of retribution." Pl.'s Mem. at 6. For instance, on February 25, 2025, President Trump issued a presidential memorandum targeting the law firm Covington & Burling LLP, ordering the immediate suspension of all active security clearances held by one named partner of that firm and "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel, pending a review and determination of their roles and responsibilities, if any, in the weaponization of the judicial process." Manning Decl., Ex. 45 ("Covington Memorandum"), ECF No. 39-4 at 578.[32] President Trump had previously attacked Special Counsel Smith, who was appointed to investigate allegations that President Trump interfered with the lawful transfer of power following the 2020 presidential election and retained classified information following his presidency, as "Deranged" and the "worst" of the "Crooked Election Interference 'Thugs' from the DOJ," in a post on Truth Social on July 30, 2023. Manning Decl., Ex. 44, ECF No. 39-4 at 576; *id.*, Ex. 43, *Final Report of the Special Counsel Under 28 C.F.R. § 600.8* at 1, ECF No. 39-4 at 401 (describing the scope of Special Counsel Jack Smith's investigation); *see also id.*, Ex. 42, Tom Dreisbach, *Trump Has Made More Than 100 Threats to Prosecute or Punish Perceived Enemies* at 9, NPR (Oct. 22, 2024, 7:00 AM), ECF No. 39-4 at 382 (describing additional statements made by President Trump about Smith).

Similarly, on March 25, 2025, President Trump issued an Executive Order targeting the law firm Jenner & Block LLP ("Jenner") with provisions substantially similar to EO 14230.

---

[32] Despite the more limited scope of the suspension and review of security clearances ordered in the Covington Memorandum, government counsel was unaware of the status of the investigation or whether any clearances had been restored. Mots. Hr'g Tr. at 43:8-14.

Manning Decl., Ex. 52, Executive Order 14246 ("Jenner EO"), 90 Fed. Reg. 13997 (Mar. 28, 2025), ECF No. 39-4 at 598 (containing a "Background" section making statements and purported findings, Sections 2, 3, and 5 directing the same actions against Jenner as the corresponding sections in EO 14230, and Section 4 stating, "[n]othing in this order shall be construed to limit the action authorized by section 4 of [EO] 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)").  Section 1 of the Jenner EO invoked, as part of the justification for the Order, the work of a former Jenner partner on the investigation of Special Counsel Robert Mueller, calling it a "partisan prosecution" and an "entirely unjustified investigation." *Id.* § 1, 90 Fed. Reg. at 13997; *see also* Manning Decl., Ex. 58, *Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block*, The White House (Mar. 25, 2025), ECF No. 39-4 at 715 (attacking the Jenner partner for, among other allegations, "dishonesty" and making an "overt demand that the federal government pursue a political agenda against President Trump").  At a televised signing ceremony for the Jenner EO, President Trump noted that the same Jenner partner "is the main culprit . . . with respect to this firm," and criticized this partner as "a bad guy."  Manning Decl., Ex. 63, ECF No. 39-4 at 730.

On March 27, 2025, President Trump issued an Executive Order targeting the law firm Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), *id.*, Ex. 54, Executive Order 14250 ("WilmerHale EO"), 90 Fed. Reg. 14549 (Apr. 3, 2025), ECF No. 39-4 at 604, which, other than the background section, was virtually identical to the Jenner EO, *compare id. with* Jenner EO, 90 Fed. Reg. 13997.  Section 1 of the WilmerHale EO criticized the firm for "reward[ing] Robert Mueller and" two of his colleagues "by welcoming them to the firm after they wielded the power of the Federal government to lead one of the most partisan investigations in American history." 90 Fed. Reg. at 14549; *see also* Manning Decl., Ex. 57, *Fact Sheet: President Donald J. Trump*

*Addresses Risks from WilmerHale*, The White House (Mar. 27, 2025), ECF No. 39-4 at 710 (containing similar statements about Mueller).

Viewed in conjunction with the facts and context of the instant case, the Covington Memorandum, Jenner EO, and WilmerHale EO support the plaintiff's description of a "broader campaign," Pl.'s Reply at 13, of President Trump using the power of the presidency to target individual lawyers and law firms associated with them based on personal dislike of their legal work—in other words, for retribution.

***

EO 14230, the accompanying fact sheet, and the context surrounding the Order's issuance each express President Trump's disapproval of plaintiff's First Amendment activity and demonstrate that EO 14230 targeted plaintiff because the Firm expressed support for employment policies the President does not like, represented clients the President does not like, represented clients seeking litigation results the President does not like, and represented clients challenging some of the President's actions, which he also does not like. That is unconstitutional retaliation and viewpoint discrimination, plain and simple. Plaintiff, therefore, is entitled to summary judgment on Counts V and VII.

> **2.    EO 14230's Section 3 Violates the First Amendment Associational Rights of Plaintiff and Plaintiff's Clients by Compelled Disclosure.**

Plaintiff contends that EO 14230's Section 3, which directs all "Government contracting agencies" to "require Government contractors to disclose any business they do with Perkins Coie," either related or not to the contractor's government work, EO 14230 § 3(a), 90 Fed. Reg. at 11781, violates the First Amendment rights of plaintiff and its clients to engage in private associations. Pl.'s Mem. at 20; *see also* Pl.'s Opp'n at 21-23. The Supreme Court has long recognized that "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective

77

a restraint on freedom of association as [other] forms of governmental action," and that a "vital relationship" exists "between freedom to associate and privacy in one's associations." *Bonta*, 594 U.S. at 606-07 (quoting *Patterson*, 357 U.S. at 462).

Of course, plaintiff is a business of attorneys, at least some of whom litigate, *see, e.g.*, Pl.'s SMF ¶¶ 24-26, and in the normal course of litigation those attorneys necessarily engage in advocacy, satisfying the first requirement for constitutional protection. This advocacy is on behalf of plaintiff's clients, who also have a fundamental First Amendment right in speaking and associating with counsel. *See, e.g.*, *Jacobs v. Schiffer*, 204 F.3d 259, 264-66 (D.C. Cir. 2000) (recognizing that a government employee has "an interest in communicating with his attorney" under the First Amendment and reviewing the contours of that right); *Mothershed v. Justs. of the Sup. Ct.*, 410 F.3d 602, 611 (9th Cir. 2005) ("We recognize that—at least as a general matter—the 'right to hire and consult and attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." (quoting *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000))); *Denius*, 209 F.3d at 953 ("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult with an attorney . . . implicates . . . clearly established First Amendment rights of association and free speech."). This First Amendment right of counsel with their clients to consult and work together is akin to engaging in collective action that Supreme Court precedents firmly uphold. *See United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585-86 (1971) ("[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."); *United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 221-22 (1967) ("[T]he freedom of speech, assembly, and petition guaranteed by the First and Fourteenth

78

Amendments gives petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights."); *Bhd. of R.R. Trainmen v. Virginia*, 377 U.S. 1, 7 (1964) ("A State could not . . . infringe in any way the right of individuals and the public to be fairly represented in lawsuits."); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 376 n.32 (1977) ("Underlying [the previous three cases] was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them. This concern applies with at least as much force to aggrieved individuals as it does to groups.").

To prevail in a challenge to the government's compelled disclosure of a protected association, the government, not the plaintiff, bears the burden of meeting an exacting standard by showing "a substantial relationship between the disclosure requirement and a sufficiently important governmental interest," *Bonta*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)), and, further, that the disclosure requirement is "narrowly tailored to the government's asserted interest," *id.* at 608; *see also* Pl.'s Opp'n at 22 (pointing out that "the government must demonstrate" the standard is satisfied). Confusingly, the government identifies this standard but then ignores the fact that the burden is on the government to explain how the challenged government disclosure requirement satisfies the standard. *See* Gov't's Mem. at 22; Gov't's Opp'n at 21. Besides failing to acknowledge its burden, the government also makes zero effort to explain how EO 14230's Section 3(a)'s disclosure requirement is substantially related to and serves a sufficiently important government purpose, and is narrowly tailored to do so, *see generally* Gov't's Mem., which is a heavy lift the government cannot support.

As already found, *see supra* Part III.B.1, the express purpose of EO 14230 and its action items for all Executive branch agencies to implement, including Section 3(a), amount to unconstitutional retaliation against plaintiff for First Amendment protected activity. The

government, consequently, has *no* legitimate interests in the disclosures compelled by government contractors under Section 3(a), much less a sufficiently important one to satisfy exacting scrutiny.

Even were some government interest found to exist for such compelled disclosure by a particular government contractor due to the type or nature of the contract, Section 3(a) makes no such distinction and compels disclosure by all government contractors to any federal agency with which the contractor holds a contract—no matter whether the contract is for crucial classified military equipment costing millions of dollars per item delivered or for paper clips costing pennies, and no matter whether the disclosure of association with plaintiff had anything to do with a government contract.  Thus, Section 3 is not narrowly tailored to any identifiable government interest in particular types of contracts, based on the nature of the goods or services provided to the government or even the amount of government funds committed.  The government also cannot show that Section 3 is narrowly tailored to any legitimate goal with respect to monitoring contracts, since the Order requires disclosure of "*any* business" that contractors do with plaintiff—not merely business related to government contracts.  EO 14230 § 3(a), 90 Fed. Reg. at 11781 (emphasis supplied).  Therefore, plaintiff is entitled to summary judgment on Count VI.

### 3.    EO 14230 Violates Plaintiff's Right to Equal Protection of the Law.

The Constitution's guarantee of equal protection under the law is violated when government action treats someone "differently from others similarly situated and . . . there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  This type of so-called "class of one" claim may be brought under the Fourteenth Amendment when the alleged violation is committed by a state government actor, *see, e.g.*, *id.* at 563, and under the Fifth Amendment's due process clause, which prohibits denial of equal protection of the laws, when the alleged violation is committed by federal government actors, *see,*

*e.g.*, *Weinberger v. Weisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." (citations omitted)); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." (quoting *Buckley v. Valeo*, 424 U.S. 1, 93 (1976))). Of course, bringing a "class of one" claim does not literally require plaintiff to be the only one in the class, or only law firm, targeted. *See Vill. of Willowbrook*, 528 U.S. at 564 n.* ("[T]he number of individuals in a class is immaterial for equal protection analysis."). Instead, as plaintiff correctly observes, "[t]he key is that differential treatment is not based on 'membership in a protected class' but on arbitrary mistreatment or animus." Pl.'s Mem. at 37 n.12 (quoting *Franks v. Rubitschun*, 312 Fed. App'x 764, 765-66 (6th Cir. 2009)).

Plaintiff alleges that the government must put forward a "plausible reason" for treating the Firm differently than other law firms, by "intentionally target[ing] Perkins Coie with extraordinary sanctions not levied on other, materially similarly situated firms or lawyers," Am. Compl. ¶¶ 120-21 (Count IV) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993)), and by expressly justifying EO 14230 based on "ten-year-old allegations that courts have rejected and that involve partners whom Perkins Coie has not employed for several years," *id*. ¶ 123, and "for representing clients in lawsuits that successfully struck down unconstitutional election laws and defeated challenges brought by President Trump or his allies to the results of the 2020 election," *id*. The different treatment of plaintiff from others similarly situated is plain on the record. EO 14230 targeted plaintiff out of a crowd of similar law firms for punitive measures. Plaintiff posits that there is no need to "infer animus" in this case, Pl.'s Mem. at 37 (quoting *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013), since the text of EO 14230 and associated fact sheet

makes obvious the Trump Administration's animus toward plaintiff, which is only confirmed by other contextual evidence, including President Trump's statements over nearly the past decade. This Court agrees. *See supra* Part III.B.1(c).

The government's assertion that "[p]laintiff is not 'similarly situated' to other potential government contractors who do not engage in unlawful DEI practices," Gov't's Mem. at 19, is not persuasive. As an initial matter, putting plaintiff in a class of "potential government contractors" is, at best, a stretch since the government itself argues that plaintiff has *not* pled facts to establish it is a current or prospective government contractor, Gov't's Mem. at 18-19, and, at worst, purposefully evasive, since plaintiff is counsel to government contractors, so appropriate comparators are other law firms, not contractors. Furthermore, the government has presented no evidence that plaintiff is engaged in any practices that amount to "unlawful" discrimination. *See supra* Part III.B.1(a). Even assuming the government believes, for instance, that adoption of the Mansfield Rule is somehow unlawful, despite the inconsistencies in that position with the government's avowed goals, *see supra* n.28, plaintiff has been singled out among other signatory law firms to the Mansfield Rule for punishment. In the 2023-2024 period, more than 360 law firms achieved Mansfield Certification, including many of plaintiff's peer law firms in the AmLaw 100. *See* Lawson Decl., Ex. 7, Press Release, *More than 360 Law Firms Achieve Mansfield Certification for 2023-24, Marking a Double-Digit Increase in the Push for Leadership Diversity*, Diversity Lab (Oct. 2, 2024), ECF No. 143-2 at 112. Plaintiff, however, was one of only a small number of firms singled out for differential treatment. The same is true of the Sponsors for Educational Opportunity ("SEO") law fellowship program, which was raised in the letter from EEOC to the Firm shortly after the issuance of EO 14230 and the filing of this lawsuit, in accord with the Order's Section 4(a). According to that letter, "[d]ozens of major law firms partner" with

the SEO program, EEOC Letter at 5, but again, plaintiff was one of the few law firms plucked out and targeted for investigation.

The government has given no plausible explanation for the specific targeting of plaintiff as opposed to other signatories to the Mansfield Rule or the SEO Fellowship. *See* Mots. Hr'g Tr. at 69:16-21, 72:17-73:6. "Judges are not required to exhibit a naiveté from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.). Particularly in light of all of the other evidence of the specific targeting of plaintiff for retaliatory purposes, *see supra* Part III.B.1, the government's explanation simply is not credible.

The most obvious reasons for EO 14230 and the differential treatment meted out to plaintiff compared to other law firms are articulated clearly in Section 1—to address and suppress conduct by the Firm that constitutes First Amendment protected activity disliked by President Trump. Thus, again, this record firmly supports the finding that EO 14230 serves no legitimate government interest, but only the interest of retaliation. Our Constitution leaves no room for the exercise of "purely personal and arbitrary power." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "[S]ome objectives—such as 'a bare . . . desire to harm a politically unpopular group . . .—are not legitimate state interests." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985) (internal citation omitted; first ellipsis in original) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). Some of plaintiff's current and former clients and employment practices are unpopular with President Trump and his administration—due to the speech and associations, real or perceived, reflected in those relationships and policies—and EO 14230 was issued to harm plaintiff. *See supra* Part III.B.1. Under the Fifth Amendment's guarantee of equal protection under the law, however, settling personal vendettas by targeting a disliked business or individual

83

for punitive government action is not a legitimate use of the powers of the U.S. government or an American President.  Plaintiff is therefore entitled to summary judgment on Count IV.

   **4.    EO 14230 Violates the Fifth and Sixth Amendment Rights to Counsel of Plaintiff's Clients.**

The Sixth Amendment secures the right, "[i]n all criminal prosecutions," for "the accused . . . to have the Assistance of Counsel for his defense."  U.S. CONST. amend. VI.  Included in this Sixth Amendment guarantee is "the right to effective assistance of counsel," *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)), and a "right to choose one's own counsel," subject to some restrictions, *Wheat v. United States*, 486 U.S. 153, 159 (1988); *see also supra* n.1 (discussing briefly the historical context and purpose of the amendment).  Relatedly, in the civil litigation context, the Fifth Amendment guarantees the right for parties to "the aid of counsel when desired and provided by the party asserting the right."  *Powell*, 287 U.S. at 68.  Seeking to assert the rights of its criminal and civil clients, plaintiff contends, in Counts VIII and IX, that EO 14230 unconstitutionally interferes with both Fifth and Sixth Amendment constitutional protections by interfering with the ability of plaintiff to represent its clients.  *See* Pl.'s Mem. at 29-31.  Plaintiff is correct as to each claim.

Starting with the Sixth Amendment right to counsel in criminal matters, the instruction in EO 14230's Section 5(a) for all agencies to "limit[] Government employees acting in their official capacity from engaging with [plaintiff's] employees," EO 14230 § 5(a), 90 Fed. Reg. at 11782, threatens to undermine plaintiff's ability to provide effective assistance of counsel to clients in criminal cases, *see* 2nd Burman Decl. ¶ 20 ("Perkins Coie represents clients who have been indicted or are the targets of federal criminal investigations" and has "represented more than 80 individuals and companies who have been criminally investigated, charged, and/or prosecuted by federal authorities at the Department of Justice" in the "past five years"); TRO Hr'g Tr. at 26:23-

24 (plaintiff's counsel confirming plaintiff has "clients who are indicted and federal targets"). For instance, "defense counsel have responsibilities in the plea bargain process . . . that must be met to render the adequate assistance of counsel that the Sixth Amendment requires." *Missouri v. Frye*, 566 U.S. 134, 143-44 (2012); *accord Lafler v. Cooper*, 566 U.S. 156, 170 (2012). Obviously, the plea bargain process requires defense counsel to engage with federal prosecutors, through communicating with them in writing, speaking to them, or meeting in-person with them. The plain language of EO 14230 requiring any planned guidance to "limit[] Government employees acting in their official capacity from engaging with Perkins Coie employees" and further limiting plaintiff's employees from entering federal buildings, EO 14230 § 5(a), 90 Fed. Reg. at 11782, poses an existential threat to that critical function. The immediacy of this threat is amply demonstrated by the fact that government officials cancelled two separate meetings in separate matters with plaintiff's employees in the four business days between the issuance of EO 14230 and the Court's TRO. *See* Pl.'s SMF ¶¶ 152, 162. Cancelled meetings and restricting plaintiff's access to government officials with authority in matters affecting plaintiff's clients in criminal matters, therefore, threatens to undermine plaintiff's clients' vital right to effective assistance of counsel.

Similarly, the Order impinges on "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). As the Supreme Court has explained, this right "to counsel of choice," *id.* at 146, is "the root meaning of the constitutional guarantee" to counsel protected by the Sixth Amendment, *id.* at 147-48. In addition to impinging on the right to effective counsel by limiting access to federal government buildings and officials, as directed in Section 5(a), Section 3 undermines plaintiff's ability to perform its professional duties in these representations, by requiring any client with a

government contract, whether or not plaintiff's representation of the client is related to that contract, to terminate the relationship with plaintiff or face the loss of all government contracts. EO 14230 § 3(a), (b), 90 Fed. Reg. at 11781-82.  Though the Order does not explicitly ban government contractor clients from hiring plaintiff, the combination of limiting government building and officials access to Firm employees, directing termination of any government contract on which the Firm has provided services, and threatening termination of all government contracts held by contractors doing any business with the Firm, would effectively have that result.  *See* Pl.'s SMF ¶¶ 151-61 (describing the clients who terminated and/or began to reconsider representations in the brief time between the issuance of the EO and the Court's TRO and the resulting impacts on plaintiff); Pl.'s MSJ, Ex. 6, Expert Report of Robert E. Hirshon, former President, American Bar Association & former ethics and professional responsibility professor, Michigan Law School ("Hirshon Rep.") ¶ 19, ECF No. 39-6 ("[T]he Executive Order, if upheld, would punish clients (through cancellation of their government contracts) for seeking advice or other legal services from their chosen lawyer, or from a law firm the President dislikes.").

Even if clients choose to maintain their relationship with plaintiff in the face of EO 14230's threat of government contract termination, the Rules of Professional Conduct might force plaintiff to withdraw as counsel if government restrictions, particularly as agency guidance emerges, adversely impact plaintiff's ability to conduct legal work effectively on behalf of the Firm's clients. *See, e.g.*, Pl.'s MSJ., Ex. 7, Expert Rep. of Prof. Roy D. Simon, Jr., Distinguished Professor of Legal Ethics Emeritus, Hofstra University's Maurice A. Deane School of Law ("Simon Rep.") ¶ 48, ECF No. 39-7 ("Clients and potential clients will be deprived of their choice of counsel if the Executive Order's restrictions on Perkins Coie . . . interfere with Perkins Coie's ability to represent a client competently, because in those instances the Rules of Professional Conduct will permit or

require Perkins Coie to request a tribunal's permission to withdraw from a pending matter."). Either way, the fundamental rights of the clients would be adversely affected.

The law is well-settled that the government is not constitutionally permitted to interfere directly with the right of plaintiff's clients in criminal matters to choose plaintiff to represent them. *See Gonzalez-Lopez*, 548 U.S. at 148 ("Deprivation of the right [to counsel of choice] is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received."). Nor may the government do indirectly what a government official "is barred from doing directly." *Vullo*, 602 U.S. at 190. Yet, the record demonstrates this is exactly what has happened in this case. Since EO 14230 was issued, "[m]any clients" of plaintiff have "request[ed] frequent updates relating to the Order to assess whether Perkins Coie can continue to represent them." Pl.'s SMF ¶ 158 (citing 2nd Burman Decl. ¶ 48). Whether due to fears that the government might retaliate against clients who hire plaintiff to represent them, such as by canceling any government contracts by firms that do business with plaintiff, *see EO 14230 Fact Sheet* ("[T]he Federal Government will prohibit funding contractors that use Perkins Coie LLP."), or concern that plaintiff's lawyers may not have access to federal buildings and officials, *see* Pl.'s SMF ¶ 152 (explaining that, after plaintiff's lawyers were refused attendance at a scheduled meeting with a federal official on the day after EO 14230 was issued, the client, on which case plaintiff had already done over $1 million worth of work, "hired another law firm to represent it before the federal government and in related litigation" (citing 2nd Burman Decl. ¶ 44)), EO 14230 has already forced plaintiff's clients to choose between using their chosen lawyers and facing potential consequences from the government due to who they have hired as counsel. Forcing plaintiff's clients to make such a choice violates their Sixth Amendment rights. Plaintiff is therefore entitled to summary judgment on Count VIII.

For essentially the same reasons, EO 14230 also unconstitutionally invades the right to counsel in the civil context.  In *American Airways Charters, Inc. v. Regan*, 746 F.2d 865, 866 (D.C. Cir. 1984), the D.C. Circuit considered the rights of a corporation designated as a "Cuban national" to "choose and retain counsel without obtaining in advance a government . . . license to do so"—in this case, from the Treasury Department's Office of Foreign Assets Control ("OFAC"). In its decision, the Circuit discussed the potential danger of allowing "an executive agency that is, in significant respects, the adverse party" effectively to have veto power over the choice of an attorney.  *Id.* at 872.  In construing the statute in question to prevent OFAC from exercising power over the company's choice of counsel, *see id.* at 873-74, the Circuit recognized the "invalidity of a governmental attempt to deny counsel to a civil litigant," *id.* at 873 (citing *Powell*, 287 U.S. at 68-69, and collecting cases "elaborat[ing] on the same basic theme"); *see also Muniz v. Meese*, 115 F.R.D. 63, 66 n.11 (D.D.C. 1987) (noting "violation of civil liberties that is implied by a government intrusion into [citizens'] right to select and to be represented by counsel of their choice").

While the First Amendment's free speech and association protections safeguard a client's rights to hire and consult with an attorney, *see supra* Part III.B.2, separate constitutional problems are posed under the Fifth and Sixth Amendments when the government interferes with a client's right to choose counsel.  The government contracting compelled disclosure and termination instruction and government building and government official access bars in EO 14230's Sections 3 and 5, respectively, would adversely impact both clients' ability to choose plaintiff and plaintiff's ability to provide representation to clients in criminal cases, and would adversely impact plaintiff's

88

representations of clients in civil matters involving the government.  Plaintiff, therefore, is entitled to summary judgment on Count IX.[33]

### 5.    EO 14230 Violates Plaintiff's Procedural Right to Due Process of Law.

The Due Process Clause of the Fifth Amendment provides that no person "shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.  Plaintiff claims, in Count II, that EO 14230 violates this protection by "vitiat[ing] the Firm's right to petition the government," without affording plaintiff proper process.  Pl.'s Mem. at 21.[34]  Evaluating these procedural due process claims requires determining, first, whether a protected interest held by plaintiff in life, liberty, or property was deprived and, second, whether any process provided was adequate.  *See Reed v. Goertz*, 598 U.S. 230, 236 (2023) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).[35]

Analysis of plaintiff's claim that EO 14230 violates, without proper process, the Firm's right to petition the government, which is an interest protected under the First Amendment, is straightforward.   The Supreme Court has recognized that "[t]he very idea of government, republican in form, implies a right on the part of its citizens to . . . petition for a redress of

---

[33]     Both parties acknowledge that some security clearances held by plaintiff's employees when EO 14230 was issued were "granted in the context of their fulfilling their obligations as lawyers to represent their clients."  Pl.'s SMF ¶ 89 (citing 2nd Burman Decl. ¶ 36); Gov't's Resp. to Pl.'s SMF at 3 (noting that ¶ 89 is undisputed).  The suspension of security clearances necessary for representation in particular matters potentially implicates the rights to counsel discussed, but no evidence of such impact has been submitted in this case, and thus this issue is not addressed.

[34]     In addition to its liberty interest in petitioning the government, plaintiff claims additional protected interests were violated, in contravention of due process, including plaintiff and its employees' right to follow their chosen profession, Am. Compl. ¶ 101; the Firm's liberty interest in its reputation, *id.*; and the Firm's property interest in its private contractual relationships with clients, *id.*; *see also* Pl.'s Mem. at 23-24.  The merits of these additional claimed violations need not be addressed given resolution of summary judgment based on plaintiff's interest in petitioning the government.

[35]     Though the government disputes that plaintiff has "demonstrated standing to challenge Section 3 insofar as it regulates its clients," Gov't's Mem. at 19, plaintiff alleges a procedural due process violation based on plaintiff's *own* liberty or property interests, *see* Pl.'s Mem. at 21 (raising only claims relating to the Firm and its attorneys), and thus the government's position on this point is irrelevant.

grievances," *De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937) (quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1875)), and that this right "is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions," *id.* (citations omitted). *See also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) ("We have recognized [the] right to petition as one of 'the most precious of the liberties safeguarded by the Bill of Rights." (quoting *Mine Workers*, 389 U.S. at 222). This liberty interest in petitioning the government is so fundamental, therefore, that it is protected under the due process clauses of both the Fifth and Fourteenth Amendments. *See De Jonge*, 299 U.S. at 364 (citations omitted); *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236-37 (10th Cir. 2007) (recognizing that the Fifth Amendment's due process clause applies to the "liberty interest in [the] First Amendment right to petition the government").

The right to petition the government "extends to all departments of the Government" and, crucially, includes "[t]he right of access to the courts." *BE & K Constr. Co.*, 536 U.S. at 525 (quoting *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."). Moreover, retaliation based on the exercise of the right to petition the government via access to the courts violates that right, and the associated liberty interest, in the same way that retaliation based on protected speech violates the First Amendment. *See Guarnieri*, 564 U.S. at 387-93 (applying, in a case involving a public employee, the same test to retaliation for petition rights as is applied for retaliation based on speech). Since EO 14230's retaliatory nature has already been determined, and that retaliation relied at least in part on lawsuits filed by plaintiff, *see supra* Part III.B.1, plaintiff's liberty interest in petitioning the government

90

was clearly implicated.  In other words, the government's retaliatory actions reflected in EO 14230, based in part on plaintiff's filing of lawsuits on behalf of the Firm's clients, deprived plaintiff of its liberty interest in petitioning the government.

Here, deciding what process was due to plaintiff is unnecessary, because no process was provided.  *See* TRO Hr'g Tr. at 11:12-20 (plaintiff's counsel confirming no notice or process was given to plaintiff); *see also id.* at 17:20-18:4 (plaintiff's counsel explaining that EO 14230 "does not provide any kind of notice with respect to the factual findings in Section 1" or "the restrictions that are placed only on this law firm," since plaintiff "only learned about them contemporaneous with the release of the executive order").  Certainly, here, the text of EO 14230 does not satisfy the notice requirement because the retaliation, and thus the deprivation of the right, was completed at the time of issuance, regardless of whether guidance in some form remains pending.  *See* TRO Hr'g Tr. at 17:5-19:11 (plaintiff's counsel noting that plaintiff "only learned about" both the "factual findings in Section 1" and the "restrictions that are placed only on" plaintiff and not other law firms "contemporaneous with the release of" EO 14230, and further that, were guidance to be released in the future, "agencies are already told what the outcome of their analysis is, because they have been told in Section 1 that working with Perkins Coie is not consistent with the national interest and not consistent with the administration and policies of the administration").  Notably, even in cases involving legitimate national security interests, some level of due process is required before subjecting a person to the adverse consequences of government action.  *See, e.g.*, *Ralls Corp. v. CFIUS*, 758 F.3d 296, 318-19 (D.C. Cir. 2014) (finding a due process violation where a foreign-owned corporation was subject to an order preventing a merger without an opportunity to rebut the findings on which the order was based).[36]

---

[36]    One amicus makes a vigorous argument that the Order is an "executive branch act[] of attainder" prohibited under the Due Process Clause of the Fifth Amendment as a "deprivation[] of liberty without due process of law,"

In sum, plaintiff is entitled to summary judgment on its claim in Count II that EO 14230 violates the Firm's procedural due process rights by severely impinging on the Firm's protected liberty interest to petition the government by both retaliating against the Firm for exercising its right to petition the government and by restricting the Firm's access to government facilities and officials, without any prior notice or opportunity to be heard.

---

Amicus Br. of Prof. Aaron H. Caplan Regarding Attainder ("Caplan Br.") at 1, ECF No. 132, observing that "[a] legislative branch bill of attainder is tyranny of the majority in its purest form: on majority vote, a person is declared a wrongdoer and punished without trial. An executive branch act of attainder is an even more concentrated form of tyranny," *id.* at 10. In many ways, EO 14230 is indistinguishable from a bill of attainder: it targets plaintiff specifically, finds facts and declares plaintiff guilty of "racial discrimination," "unethical" and "egregious" conduct, and imposes multiple forms of punitive adverse actions, without notice or other judicial process protections. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977) (defining a bill of attainder as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial").

Placement of the prohibitions on bills of attainder in two sections of Article I, U.S. CONST. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."); *id.* § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder."), has led to the general view that these prohibitions apply only to the legislative branch. *See, e.g., Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 755 (7th Cir. 2002) (citing *United States v. Lovett*, 328 U.S. 303, 315 (1946)); TRO Hr'g Tr. at 45:15-18 (government counsel arguing that, "just as a pure constitutional matter, that the bill of attainder restriction is only [i]n Article I and not Article II, and so it doesn't apply to the President"). Yet, this assumption is called into question, particularly where executive orders appear to stand in for laws, by the constitutional text, which, in art. I, § 9, cl. 3, does not expressly limit the prohibition to the Congress, and then, in the following section 10 applies the prohibition to the States, as well as consideration of the history of bills of attainder, *see, e.g.*, Caplan Br. at 13 (citing "the framing-era understanding of legislative supremacy" to explain "the Framers would have felt no need to specify in Art. II that the President could not independently impose attainders" since "[t]he President may only faithfully execute laws that are allowed to exist, so he may not duplicate or unilaterally impose through executive action any type of law forbidden by Art.I, § 9, be it attainder, ex post facto punishment, suspending habeas corpus in peacetime, granting titles of nobility, or establishing preferences among ports of different states."); Br. of Former Senior Government Officials as *Amici Curiae* in Supp. of Pl.'s MSJ at 17, ECF No. 104 ("By placing the Bill of Attainder Clauses in Article I, the Framers clearly did not intend to authorize the President to do alone what Congress and the President, acting together, could not."); Matthew Steilen, *Bills of Attainder*, 53 HOUS. L. REV. 767, 890, 892 (2016) (describing the revision of a previous version of the constitutional text that limited the prohibition to "The Legislature" and explaining "although bills of attainder were largely passed by legislatures, this is not true of all"); Harold Hongju Koh, Fred Halbhuber, & Inbar Pe'er, *No, the President Cannot Issue Bills of Attainder*, Just Security (Apr. 9, 2025), https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/; *see also Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 144 (1951) (Black, J., concurring) ("I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution.").

The scope of the bills of attainder prohibition and application of this prohibition to unilateral presidential action not otherwise authorized by Congress, is worth further study and consideration. In this case, however, where plaintiff has not raised a stand-alone bill of attainder claim, *see* Compl. ¶ 96 (mentioning bill of attainder only as part of the Count I *ultra vires* claim), nor have the parties extensively briefed the question, *see* Pl.'s Mem. at 26 (suggesting as part of its *ultra vires* claim in Count I, that EO 14230 "shares the essential features of a bill of attainder"); *see generally* Gov't's Mem.; Gov't's Opp'n (not addressing the issue), and both parties took the position that the prohibition on bills of attainder only applies to Congress, *see* TRO Hr'g Tr. at 45:15-18 (government counsel making this argument); Pl.'s TRO Mot. at 18 ("To be sure, the Bill of Attainder Clause, by its terms, does not apply to the Executive Branch." (citation omitted)), consideration of this issue must be left to another day.

6. **EO 14230 is Impermissibly Vague.**

Plaintiff claims, in Count III, that EO 14230 is impermissibly vague, in violation of the Fifth Amendment Due Process clause, because the Order "fails to provide adequate notice as to what are prohibited 'diversity, equity, and inclusion' policies," Am. Compl. ¶ 109, but nevertheless directs government agencies to take multiple adverse actions against plaintiff based on this "vaguely defined" term, including "threatened investigation and enforcement action by the EEOC and [DOJ]," "threatened suspension of active security clearances," "threatened termination of contracts or funding with Perkins Coie or entities doing business with Perkins Coie," "threatened limitation of access to Federal property and engaging with government employees," and threatened prevention of hiring of Perkins Coie employees for Federal positions," *id.* ¶¶ 110-14.  When asked about what precisely was wrong with "diversity, equity and inclusion," the government provided little help, stating "diversity, in and of itself, isn't the problem.  The problem is stereotyping based off of these points." Mots. Hr'g Tr. at 64:3-5.  In defense of this due process challenge, the government avoids trying to define the terms "diversity, equity and inclusion" altogether and contends that the Order's reference "to 'categories prohibited by civil rights laws,'" Gov't's Mem. at 12 (quoting EO 14230 § 1, 90 Fed. Reg. at 11781), provides a sufficient "intelligible benchmark" to save the Order from plaintiff's vagueness challenge, *id.* at 13.  The government's defense is not persuasive.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  Courts apply this doctrine to review both civil and criminal laws. *See, e.g.*, *Boutilier v. INS*, 387 U.S. 118, 123 (1967) ("It is true that this Court has held the 'void for vagueness' doctrine applicable to civil as well as criminal actions."); *Gentile v. State Bar of*

93

*Nev.*, 501 U.S. 1030, 1048-51 (1991) (finding a state Supreme Court rule governing attorney conduct void for vagueness); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603-04 (1967) (finding a restriction on government employee speech "wholly lacking in terms susceptible of objective measurement" (internal quotation marks, citation omitted)).  In the civil context, an enactment is only void if it is "so vague and indefinite as really to be no rule or standard at all." *Boutilier*, 387 U.S. at 123; *see also Senior C.L. Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992) ("To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'" (quoting *Boutilier*, 387 U.S. at 123)).  EO 14230 fails this test, as another Judge on this Court and other courts to review the Trump Administration's use of these terms in various orders and agency rules have also concluded.  *See, e.g.*, *NAACP v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2025 WL 1196212, at *1-2, 6 (D.D.C. Apr. 24, 2025) (finding a certification requirement imposed on schools, which required compliance with a Dear Colleague Letter issued by the U.S. Department of Education ("DOE") instructing "federally funded educational institutions to cease all racially discriminatory initiatives and unlawful DEI programs," as further defined in a "follow-on 'Frequently Asked Questions' document," was void for vagueness where the DOE documents "fail[ed] to provide an actionable definition of what constitutes 'DEI' or a 'DEI' practice, or delineate between a lawful DEI practice and an unlawful one"); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2025 WL 1188160, at *1, 18 (D.N.H. Apr. 24, 2025) (finding, in another case challenging the same DOE certification requirement and underlying documents, that the plaintiff was likely to succeed on its void for vagueness challenge, since the DOE Dear Colleague Letter "does not make clear . . . what the Department believes constitutes a DEI program, or the circumstances in which the Department believes DEI programs run afoul of Title VI, or "even define what a 'DEI program' is"); *Nat'l*

94

*Ass'n of Diversity Offs. in Higher Educ. v. Trump*, --- F. Supp. 2d ---, 2025 WL 573764, at *1-2,

4, 19-20, 26  (D. Md. Feb. 21, 2025) (in considering two Executive Orders, Nos. 14151, 90 Fed.

Reg. 8339 (Jan. 29, 2025), and 14173, 90 Fed. Reg. 8633 (Jan. 31, 2025), finding term "equity-

related' grants or contracts" void for vagueness, since "[t]he meaning of the word 'equity' is

unclear to a degree that risks arbitrary and discriminatory enforcement" and "leaves current grant

recipients and contractual counterparts unsure about what activities are prohibited," and further

finding direction to Attorney General to take steps to "deter DEI programs or principles . . . that

constitute illegal discrimination or preferences" (quoting EO 14173, 90 Fed. Reg. at 8635), void

for vagueness given lack of "guidance on what the new administration considers to constitute

'illegal DEI discrimination and preferences,' . . . or what types of 'DEI programs or principles' the

new administration considers 'illegal' and is seeking to 'deter'" (internal citations omitted)), *stayed*

*pending appeal*, No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025).[37]

The Order and the accompanying fact sheet direct adverse agency actions against plaintiff

due to the finding that plaintiff "racially discriminates against its own attorneys and staff, and

against applicants" and engages in employment practices "on the basis of race and other categories

---

[37]    The Fourth Circuit's stay decision in *National Association of Diversity Officers in Higher Education* drew three separate opinions from the emergency panel, each drawing attention to ripeness concerns, without disturbing the district court's finding of vagueness.  *See, e.g.*, Order, *Nat'l Ass'n of Diversity Offs. in Higher Educ.*, No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025) at 4 and n.2 (Diaz, C.J., concurring) (observing that "neither Order ever defines DEI or its component terms," noting that "[a]s a result, it's unclear what types of programs—formal or informal—the administration seeks to eliminate," but "where the Orders only purport to direct executive policy and actors, we don't find vagueness principles outcome determinative," and cautioning "that agency action that goes beyond the narrow scope…could implicate Fifth amendment vagueness concerns"); *id.* at 9 (Rushing, J., concurring) ("[T]his case does not challenge any particular agency action implementing the Executive Orders."); *id.* at 7 (Harris, J., concurring) (noting the difference between "[w]hat the Orders say on their face and how they are enforced").  This concern does not exist in the instant case, where EO 14230's Section 1 has already found "good cause to conclude" that plaintiff "racially discriminates" with implementation of "'diversity, equity, and inclusion' policies," EO 14230 § 1, 90 Fed. Reg. at 11781, and directed enforcement actions on that basis, *id.* §§ 2-5, 90 Fed. Reg. at 11781-82.  Moreover, concerns about "enjoin[ing] *nondefendants* from taking actions", Order at 9, *Nat'l Ass'n of Diversity Offs. in Higher Educ.*, No. 25-1189, ECF No. 29 (4th Cir. Mar. 14, 2025) (Rushing, J., concurring) (emphasis in original), no longer exist here given the filing of plaintiff's Amended Complaint.

prohibited by civil rights laws."  EO 14230 § 1, 90 Fed. Reg. at 11781; *EO 14230 Fact Sheet* (mentioning plaintiff's "discriminatory actions").  While the government suggests that the Order's reference to "categories prohibited by civil rights laws" provides clarity about what is prohibited, Gov't's Mem. at 12 (quoting EO 14230 § 1, 90 Fed. Reg. at 11781), neither the Order and fact sheet nor the record submitted in this case provides any actual evidence of illegal discrimination by plaintiff that would make clear what Firm employment policies or practices, in the government's view, run afoul of the law.  *See also supra* Part III.B.1(a).[38]

The Order goes on to mention the Administration's goal of "ending discrimination under 'diversity, equity, and inclusion' policies," EO 14230 § 1, 90 Fed. Reg. at 11781, leading to a possible inference that such policies, and not any concrete evidence of discrimination, are the problematic conduct that plaintiff should avoid.  The terms diversity, equity, and inclusion, taken collectively or individually, however, could refer to a wide range of actions and programs, formal or informal, as well as basic thoughts and beliefs.  The Order provides no definition or guidance as to what form of program possibly described by these terms is considered unlawful discrimination by the Trump Administration, leaving plaintiff to guess at what is and is not permissible in the government's view, while already facing the threat of adverse actions during the guessing.

---

[38]    Though the government broadly asserts that "[d]iversity initiatives have always been legally suspect and [are] especially so since the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College ("SFFA")*, 600 U.S. 181 (2023)," Gov't's Mem. at 11—which seems to be an expansive view of the actual holding in that case, which considered challenges to the college "admissions systems used by Harvard College and the University of North Carolina," 600 U.S. at 190—the government confirmed that no determination must be made regarding the lawfulness of certain employment policies and practices adopted by plaintiff, such as the Mansfield Rule and the SEO Fellowship program, to resolve the pending summary judgment motion, Mots. Hr'g Tr. at 71:6-23, 72:4-16, even though the *Fact Sheet* alludes (with distorted descriptions) to both programs as a basis for the Order, *see EO 14230 Fact Sheet* (citing as basis for "accus[ing Firm] of racial[] discriminat[ion]" that "Perkins Coie has publicly announced racial percentage quotas for hiring and promotions . . . and excluded applicants from fellowships based on race").

The government's own briefing reflects this uncertainty. While repeatedly accusing plaintiff of engaging in racial discrimination, *see* Gov't Mem. at 2, 8-10, 17, 19, 21, 23; Gov't's Opp'n at 13, 14; Gov't's Reply at 3, 4, the government at various times also states that (1) plaintiff should be investigated by the EEOC to determine "*whether* [they] are violating the civil rights laws," Gov't Mem. at 2 (emphasis supplied); (2) the government is merely trying to advance "valid social policies regarding discrimination," rather than enforcing any legal prohibitions, Gov't Mem. at 3; *see also* Gov't's Opp'n at 3, 4; (3) "[d]iversity initiatives" are "legally suspect," and thus plaintiff's practices "provide ample basis for *review*," Gov't Mem. at 11 (emphasis supplied); *see also* Gov't's Opp'n at 16; (4) the government is merely "rais[ing] legitimate legal issues of just how far DEI policies and programs can go and *whether* such policies cross the line into illegal discrimination," Gov't Mem. at 27 (emphasis supplied); (5) plaintiff engaged in "aggressive DEI practices," Gov't's Reply at 1; and (6) plaintiff "*appears* to have" engaged in what the government characterizes as discrimination, Gov't's Opp'n at 17-19 (emphasis supplied). When even the government cannot decide what exactly the grounds for its actions were, plaintiff is truly left unable to know what conduct to avoid.

In short, EO 14230 fails to set a coherent standard for plaintiff to follow. For that reason, plaintiff is entitled to summary judgment on Count III.

### C. Permanent Injunction Factors

Plaintiff has amply demonstrated entitlement to summary judgment on its claims that EO 14230 violates the First, Fifth and Sixth Amendments. Given this determination, EO 14230 cannot be "implemented consistent with applicable law," EO 14230 § 6(b), 90 Fed. Reg. at 11782, as required by the embedded terms of the Order, which is thus is null and void. Both parties agree that, notwithstanding the effect of Section 6(b), plaintiff's request for injunctive relief must still be addressed. Mots. Hr'g Tr. at 15:3-17:20 (government counsel discussing Section 6(b) and

urging that "the application of the factors to each section that was being enjoined would still need to be undertaken"); *id.* at 91:17-92:23 (plaintiff's counsel urging same to ensure future "enforceability").

To obtain the permanent injunctive relief sought, plaintiff "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). The final two factors "merge" into one when "the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009) (applying merged factors in stay context), because "the government's interest *is* the public interest," *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original) (applying merged factors in preliminary injunction context); *see also Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (applying the merged factors in permanent injunction context). Plaintiff succeeds on each showing.

### 1.    Plaintiff Has Demonstrated Irreparable Injury Will Occur Absent an Injunction, With No Adequate Remedy at Law.

"It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*, 427 U.S. at 373); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod*, 427 U.S. at 373); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("[A] violation of Fifth Amendment

due process rights . . . support[s] injunctive relief.").  Here, plaintiff has demonstrated that EO 14230 violates the Firm's rights under the First, Fifth, and Sixth Amendments, as well as its clients' rights under the Fifth and Sixth Amendments.  *See supra* Parts III.B.1-6.  These violations were ongoing until Sections 1, 3 and 5 were temporarily enjoined and would continue were the injunction lifted, meaning they are sufficient, by themselves, to establish irreparable harm. Furthermore, these injuries are irreparable "because [they] cannot be fully compensated by later damages," *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 751 F. Supp. 218, 224 (D.D.C. 1990) (collecting cases); *see also, e.g.*, *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) ("An irreparable harm is one for which there is no adequate remedy at law." (citation and internal quotation marks omitted))—a reality reinforced in this scenario by the existence of sovereign immunity.

Plaintiff has also shown monetary harm sufficient to establish irreparable harm.  Where, as here, sovereign immunity limits plaintiff to seeking nonmonetary equitable relief and thus renders unrecoverable plaintiff's monetary damages, courts have recognized these losses "can . . . constitute irreparable harm."  *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280 (RC), 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021) (citations omitted); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (stating that economic harm caused by federal agencies protected by sovereign immunity "is irreparable . . . because the states will not be able to recover monetary damages"); *Chamber of Com. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm."); TRO Hr'g Tr. at 26:11-15 (plaintiff's counsel recognizing sovereign immunity bars monetary recovery in this

99

case). Even where unrecoverable economic harm exists, courts in this district have required the economic harm faced to be "serious in terms of its effect on the plaintiff," *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981), "significant," *Air Trans. Ass'n v. Exp.-Imp. Bank*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012); *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (quoting *Air Trans.*, 840 F. Supp. 2d at 335), or "sufficiently severe," *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 115 (D.D.C. 2015).

Under any formulation of this standard, plaintiff succeeds in showing irreparable monetary harm. The undisputed facts in this case show that plaintiff suffered significant losses in the week between the issuance of EO 14230 and entry of the TRO as a direct result of the Order. One client who had used the Firm for seven years and was represented by the Firm in seven open matters said, "within hours of the Order's release, that *due to the Order*, [plaintiff] cannot represent that client in any litigation or before the relevant federal agency." 2nd Burman Decl. ¶ 48.a (emphasis supplied); *see also* Pl.'s SMF ¶ 151 (referencing this client); Gov't's Resp. to Pl.'s SMF at 5 (noting the facts of ¶ 151 are undisputed). Another client, who had used the Firm for 35 years, reassigned two matters to other law firms the day after EO 14230 was released. Pl.'s SMF ¶ 153. Yet another client, with the Firm since 2018, "withdrew all work from [plaintiff] *as a result of* the Order," as of the day after the Order's issuance. 2nd Burman Decl. ¶ 48.c (emphasis supplied); *see also* Pl.'s SMF ¶ 154. A coalition of four clients similarly withdrew "all coalition work from [plaintiff] as of March 7, 2025 due to the need of the clients to engage with various federal agencies—including the DEA, DOJ, and HHS—by the nature of their business." 2nd Burman Decl. ¶ 48.d; *see also* Pl.'s SMF ¶ 155. "The abrupt loss of so many longstanding and significant clients across a variety of business types of practice disciplines in a one-week period is exceptional and

100

abnormal" for plaintiff, 2nd Burman Decl. ¶ 49, and the revenue loss from terminated clients alone was "significant," *id.* ¶ 50, in the short time period EO 14230 was in effect—a statement readily supported by the facts.

Moreover, without an injunction, these losses are almost certain to continue. On March 7, 2025, a major client with fifteen open matters with plaintiff "informed the firm . . . that it is reconsidering its engagements with [plaintiff] unless something changes in terms of the Order's requirements." 2nd Burman Decl. ¶ 48.e. Another long-time client "that had increased its work five-fold over the past three years and had 30 open matters started to reconsider whether to terminate every engagement with [plaintiff]." *Id.* ¶ 48.g. Finally, "[b]ecause of the uncertainty created by the Order, and even after the entry of the TRO, many clients have begun requesting frequent updates relating to the Order in order to assess whether [plaintiff] can continue to represent them," *id.* ¶ 48.h., providing strong evidence that, were the current temporary injunction lifted and implementation and enforcement of EO 14230 allowed to proceed, plaintiff would continue to suffer serious, or significant, or severe revenue losses. Therefore, plaintiff additionally succeeds in showing irreparable injury based on monetary harms. Again, because sovereign immunity bars recovery of money damages, these losses could not be adequately compensated by legal remedies.

### 2.    Balance of equities/public interest

The balance of the equities and the public interest also favor the issuance of an injunction for a simple reason: "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). Plaintiff has demonstrated that EO 14230 is unconstitutional in all its action items, from findings to instructions to federal agencies, and therefore the government should have no interest in the

Order's continued enforcement.  Plaintiff, meanwhile, has demonstrated the strong interests of the Firm, its employees, and clients, as well as the American legal system and the public more broadly, in issuance of an injunction to protect the independence of counsel to represent their clients vigorously and zealously, without fear of retribution from the government simply for doing the job of a lawyer.

Plaintiff, therefore, is entitled to a permanent injunction barring enforcement of any portion of EO 14230 by any Executive branch agency or entity subject to EO 14230.

## IV.    CONCLUSION

The U.S. Constitution affords critical protections against Executive action like that ordered in EO 14230.  Government officials, including the President, may not "subject[] individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Hous. Cmty. Coll. Sys.*, 595 U.S. at 474 (quoting *Nieves*, 587 U.S. at 398).  They may neither "use the power of the State to punish or suppress disfavored expression," *Vullo*, 602 U.S. at 188, nor engage in the use of "purely personal and arbitrary power," *Yick Wo*, 118 U.S. at 370.  In this case, these and other foundational protections were violated by EO 14230.  On that basis, this Court has found that EO 14230 violates the Constitution and is thus null and void.  For the reasons explained, plaintiff is entitled to summary judgment and declaratory and permanent injunctive relief on Counts II through IX of the Amended Complaint.  The government's motion to dismiss is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 2, 2025

**BERYL A. HOWELL**
United States District Judge

102

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PERKINS COIE LLP, | |
| Plaintiff, | Civil Action No. 25-716 (BAH) |
| v. | Judge Beryl A. Howell |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | |
| Defendants. | |

**ORDER**

Upon consideration of plaintiff Perkins Coie LLP's Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief, ECF No. 182; the government's Renewed Motion to Dismiss and for Expedited Judgment, ECF No. 183; the memoranda, declarations, and exhibits submitted in support and opposition; the arguments in support and opposition presented at the motions hearing held on April 23, 2025, and the entire record herein, it is hereby:

**(1) ORDERED** that plaintiff's Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief, ECF No. 182, is **GRANTED**; it is further

**(2) ORDERED** that the government's Renewed Motion to Dismiss and for Expedited Judgment, ECF No. 183, is **DENIED**; it is further

**(3) DECLARED** that Executive Order 14230, 90 Fed. Reg. 11781 (Mar. 11, 2025), issued by the President on March 6, 2025, entitled "Addressing Risks from Perkins Coie LLP," is unlawful because it violates the First, Fifth, and Sixth Amendments to the U.S. Constitution and is therefore null and void; it is further

**(4) ORDERED** that:

1

A.  defendants are **PERMANENTLY ENJOINED** from implementing or enforcing Executive Order 14230 in any way;

B. defendants are **PERMANENTLY ENJOINED** from using or considering in any way or for any purpose the statements in Section 1 of Executive Order 14230, including but not limited to in any interactions with plaintiff or government contractors or with employees or other personnel of plaintiff or government contractors;

C. defendants are **DIRECTED** to rescind all formal or informal guidance or other direction provided to officers, staff, employees, or independent contractors of the federal government to communicate, effectuate, implement, or enforce Executive Order 14230, including Sections 2 and 4 that were not subject to this Court's Temporary Restraining Order, ECF No. 21;

D. defendants are **DIRECTED** immediately to notify all officers, staff, employees, and independent contractors subject to Executive Order 14230 that Executive Order 14230 is unlawful, null and void in its entirety and therefore should be disregarded, including all prior formal or informal advice, opinions, or direction previously received or communicated to effectuate, implement, or enforce Executive Order 14230, and that all departments, agencies, officers, staff, employees, and independent contractors of the federal government should carry on with their ordinary course of business, absent Executive Order 14230, with Perkins Coie LLP,[1] its personnel, its clients and its clients' personnel known or believed by them to be associated with Perkins Coie LLP;

---

[1]    Perkins Coie LLP includes its affiliates, predecessors, successors, assigns, directors, officers, partners, employees, and agents.

E.  defendants are **DIRECTED** to cease any security clearance review, made pursuant to Sections 1 or 2(a) of Executive Order 14230, and to reverse any suspension or revocation of any active security clearances, made pursuant to Sections 1 or 2(a) of Executive Order 14230, although nothing in this Order shall bar defendants from suspending or revoking any security clearances for reasons independent of Executive Order 14230, an association with Perkins Coie LLP, or the reasons set out in Section 1 of Executive Order 14230;

F.  defendants the Office of Management and Budget and Russell Vought, in his official capacity as director of the Office of Management and Budget, are **DIRECTED** to identify all government goods, property, material, and services, provided for the benefit of Perkins Coie LLP, that were previously identified pursuant to Section 2(b) of Executive Order 14230, and immediately to issue direction to the relevant heads of agencies that they are to reverse and rescind any cessation of the provision of such material or services, if such cessation was done pursuant to Executive Order 14230;

G.  defendants are **DIRECTED** immediately to (a) communicate to every recipient of a formal or informal request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm, made pursuant to Sections 2(b) or 3(a) of Executive Order 14230, that such request is permanently rescinded, the recipient need not respond to such request, and there shall be no consequences for not responding to such request; (b) cease making such requests for disclosure; and (c) segregate and disregard any responses received to such requests for disclosure;

H.  defendants U.S. Department of Justice; Pamela Bondi in her official capacity as U.S. Attorney General; Equal Employment Opportunity Commission; and Andrea R.

3

Lucas, in her official capacity as Acting Chair of the Equal Employment Opportunity Commission, are **DIRECTED** immediately to cease any investigation of Perkins Coie LLP made pursuant to Section 4 of Executive Order 14230, and to withdraw any requests for information from Perkins Coie LLP or other investigative steps made pursuant to Sections 1 or 4 of Executive Order 14230, including defendant Lucas's March 17, 2025 letter titled "Review of Perkins Coie LLP's Compliance with Title VII of the Civil Rights Act of 1964";

I.  defendants are **ORDERED** that they must, in good faith, take such other steps as are necessary to prevent the implementation or enforcement of Executive Order 14230 and to reverse any implementation or enforcement of Executive Order 14230 that has occurred or is occurring;

J.  defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget, are **DIRECTED** additionally to:

   i.   provide a copy of this Order to all defendants, any other departments, agencies, and entities that received Executive Order 14230 or guidance related to Executive Order 14230, and the respective officers, staff, employees and independent contractors of any of the foregoing who were provided with Executive Order 14230 or guidance related to Executive Order 14230;

   ii.  direct the recipients to comply with the terms of this Order;

   iii. notify all recipients that they are required to comply with this Order, under penalty of contempt; and

4

iv.    provide counsel for plaintiff with a copy of such communication(s), within 7

days of issuance of such communication(s); it is further

**(5)  ORDERED** that this Court shall retain jurisdiction to enforce or modify this Order;

and it is further

**(6)  ORDERED** that the Clerk of the Court shall close this case.

**SO ORDERED.**

*This is a final and appealable order.*

Date:  May 2, 2025

_____
**BERYL A. HOWELL**
United States District Judge

5